Appellate Case: 17-7031   Document: 5-5   Date Filed: 05/26/2017   Page: 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

EDWARD LEON FIELDS,                        )
                                           )
                Petitioner/Defendant,      )
                                           )
vs.                                        )         Case No. 10-CIV-115-RAW
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                Respondent/Plaintiff.      )

**<u>OPINION AND ORDER</u>**

This matter comes before the court on Petitioner's Motion to Alter or Amend Judgment pursuant to Fed.R.Civ.P. 59(e) (Dkt. # 127).  The Government filed its response on January 30, 2017 (Dkt. # 129).  Petitioner did not file a reply.

According to Petitioner, the court committed "clear errors of fact and law" by holding "trial counsel was not ineffective for failing to present Petitioner's history of familial dysfunction because she had a strategic basis for doing so and because Petitioner was not prejudiced by her conduct."  Dkt. # 127, at p. 2.  Petitioner argues if the court had properly analyzed his claim the court would have found Petitioner had "established a reasonable probability of a different outcome if trial counsel had presented the available mitigating social history through a mitigation specialist or expert."  *Id.*  Petitioner states "[t]he Court's entire analysis of deficit performance is based on the Court's flawed assumption that because the decision about which witnesses to call is a matter of strategy, where trial counsel knew about Petitioner's mitigating social history, her decision not to present it through a mitigation

specialist or expert is 'virtually unchallengeable.'" *Id*., at p. 3.  Finally, Petitioner claims this court erred in not granting an evidentiary hearing given "the disputed factual issue supported by counsel's sworn statement that she had no strategic reason for failing to present Petitioner's mitigating social history. . . . ." *Id*., at p. 4.  In response, the government argues petitioner's claims were properly denied and the current claim of legal error is solely an attempt to "dress up arguments that previously failed."  Dkt. # 129 at p. 3, n. 1.  (quoting *Voelkel v. Gen.Motors Corp*., 846 F.Supp 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994)).

To be entitled to relief under Rule 59(e), Petitioner must establish either an intervening change in the controlling law, new evidence previously unavailable or that there is the need to correct clear error.  *See*, *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Upon careful review of the petitioner's motion and record in this matter, the court finds no basis for reconsidering the Opinion and Order denying the § 2255 motion. While the court fully understands defense counsel's desire to prevent her client from receiving the death penalty at all costs, when counsel's memory does not accurately depict what, based upon contemporaneous documents, occurred in the case, the court does not need to hold an evidentiary hearing.  Contrary to petitioner's allegations, a review of Ms. O'Connell's declaration when considered with various emails which were written contemporaneously with trial preparation convinces this court that Ms. O'Connell's memory was not as clear on March 30, 2010, as it was during trial preparation and/or the actual trial

Appellate Case: 17-7031   Document: 5-5   Date Filed: 05/26/2017   Page: 3

in 2005.  As pointed out in the Opinion and Order denying relief, Ms. O'Connell claimed she

did not have adequate assistance of counsel which was contradicted by various records in the

case.  *See*, Dkt. # 125, at pp. 10-11.  Similarly, Ms. O'Connell claimed she had no "tactical

or strategic reason for not presenting [Petitioner's social] history either through one of his

doctors or through Ms. Shettles."  Dkt. # 106-2.  Her emails, however, belie this statement.

In an email discussing trial strategy regarding a mental health expert, counsel explained:

> . . . .I recognize that experts can cancel each other out in juror's minds.  And, many of them won't care about mental health.
>
> . . . . . .I want to keep the 'crap' away from the jury if at all possible.  I think its going to be hard enough to get them to feel sympathy for client.  If they get to hear all the other junk, it may tip the scales (if we have any hope at all).

Dkt. # 110-7.  A few days later, Ms. O'Connell sent an email to another attorney who she

was consulting with regarding Petitioner's case.  After providing this consultant with her case

and client in a nutshell, including a substantial description of the social history of her client,

Ms. O'Connell stated:

> My client has absolutely no criminal record.  But the government believes he is a psychopathic retrobate.  They gathered all the garbage they could on him, by going to the community and asking what they'd heard, about a month after the murders.  The town is tiny, and there was nothing to talk about except the client.  So the FBI guys got all the dirt.
> The gov't wanted to use the dirt in aggravation.  The judge has ordered that most of it stays out.  I'll list most of it here; don't laugh:
> Client has always been considered a little strange.  He was always coming on to women, some of whom say he was 'creepy.'  He often bragged of his sexual prowess.  In fact, he dated 2 women at the same time, unbeknownst to either of the women, and spoke of marriage to both.  He had a webcam that he told people he jacked off in front of, with over 1000 visitors to his site, or so he bragged, anyway.  (And, as mentioned above, there was the fascination with

pornography during his marriage.) He chatted with women on the internet, and then went to meet them!

Client liked to fish more than anything in the world. Once he took a device to work--it was locked in his truck, in the parking lot. It was like a pipe bomb, with a kitchen timer. But it had no detonator or explosive material. In the parking lot, he showed it off to a couple guys, and explained it was for fishing. He also took a rifle to work one day, again-- locked in the car. He'd just purchased it at Wal-Mart, and didn't have time to take it home before his shift started. He showed it off to a buddy. (The bomb thing got him fired.)

He had a burmese python for a pet, and hunted rattlesnakes for extra cash (40 cents a foot).

A distant relative believes he hung a cat over a limb when he was four years old. Jump ahead 34 years--- Someone else saw him put a stray cat in a burlap bag and twirl the bag around until the cat got dizzy. He told a co-worker he shot a cat that was keeping him awake at night. Another co-worker reported that he said he fed baby kittens to his snake. And, no kidding, a (sic) witnessed him hit a cow and curse at it.

As also related above, client had some domestic violence in his life. Some people reported that his mother was afraid of him. One said he kept loaded guns by every door in the house.

questions

Judge says virtually all of this stays out, as long as I don't open the door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge (sic) and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff.

Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment. The gov't has 2 docs, the examinations were taped. I have listened, and know the outcome, because the docs had been front-loaded with the creepy-crawly stuff. Lots of questions about his womanizing, probing inquiry into why someone would make up the cat-hanging incident. So, I can anticipate all the "junk" will play a role in any determination made by the gov't docs. Most of that crap isn't true (like hanging a cat), or has been largely exaggerated (the bomb thing has turned into threatening people at work with a bomb). But I'm worried that, through my mental health evidence, all of it will somehow come in, because the govenrment's (sic) experts will say they reviewed it, it helped them reach their conclusions, whatever.

> Whatever I don't put on the table with my mental health testimony, they will want to get it in the back door, as justification for their docs' opinions.

Dkt. 129-1, at pp. 3-4.

Given Ms. O'Connell's express desire to rely on psychopharmacology evidence while avoiding all of the "crap,"[1] this court finds Ms. O'Connell had clearly developed a reasonable trial strategy to keep this evidence from the jury. Moreover, since Ms. O'Connell had investigated and discussed the petitioner's social history with a mitigating specialist prior to trial, she knew how difficult a job she had. With all of these things in mind, Ms. O'Connell did everything she could to portray the murders as an aberration caused by a "SICK"[2] individual who, upon receiving the proper medication, was no longer dangerous. Ms. O'Connell was able to elicit positive attributes of petitioner through his sister, Cherie Fields;[3] his ex-wife, Teresa Fields;[4] a co-worker, Jovanna Fields;[5] his son, Andrew Thomas Fields;[6] and his daughter, Amanda Fields,[7] while preventing the government from asking these same witnesses to explain why Petitioner's mother was scared of him.

---

[1] Dkt. # 110-7.

[2] *See*, Dkt. # 129-2.

[3] Tr. of Jury Trial, Vol. XI, at pp. 2673- 2720.

[4] *Id.*, at pp. 2720-2764.

[5] *Id.*, at pp.  2650-2620.

[6] *Id.*, Vol. XII, at pp. 2926-2930.

[7] *Id.*, at pp. 2930-2935.

Where a valid defense strategy has been well thought out and considered in light of the circumstances and existing facts of the case, simply because the strategy ultimately fails, does not automatically mean a defendant received ineffective assistance of counsel. Rather,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (citations omitted). Counsel had a duty to conduct a thorough investigation – in particular, of mental health evidence and/or social history – in preparation of the sentencing phase of trial. *Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012). The record establishes counsel fulfilled this duty. Even though a troubled childhood is the kind of evidence which "garners the most sympathy from jurors," *id.*, quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), no case dictates that counsel must always introduce the evidence especially where, as here, the evidence could potentially backfire. While trial counsel's strategy ultimately failed to convince the jury that Petitioner's life was worth sparing, this court believes it was a well thought out and sound trial strategy. Petitioner's burden to establish a claim of ineffective assistance of counsel is great and "[n]either hindsight nor success is

6

the measure" for determining the adequacy of legal representation." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994)(citing *Ellis v. Oklahoma*, 430 F.2d 1352, 1356 (10th Cir. 1970), *cert. denied*, 401 U.S. 101, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971)). Further, the constitutional right to counsel does not "mean victorious or flawless counsel." *Id.* (citing Brady *v. United States*, 433 F.2d 924 (10th Cir. 1970)). Rather, to be considered constitutionally ineffective, the representation must have been such to make the trial a mockery, sham or farce, or resulted in the deprivation of constitutional rights. *Id.* (citing *Lorraine v. United States*, 444 F.2d 1, 2 (10th Cir. 1971)). *See also*, *Maxey v. Benton*, 483 F.Supp. 1, 5 (E.D. Okl. 1977). Based upon the record herein, this court finds Petitioner has failed to establish he received ineffective assistance of counsel.

Additionally, even recognizing the importance family history can play in mitigation, this court finds, based upon the specific facts in this case, Petitioner has failed to establish prejudice. Accordingly, Petitioner's motion to alter or amend the judgment (Dkt. # 127) is hereby **denied.**

It is so ordered on this 15th day of March, 2017.

Ronald A. White
United States District Judge
Eastern District of Oklahoma