CLOSED,DEATH,M/2255,PROTO

# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: <u>6:10–cv–00115–RAW</u>

| | |
|---|---|
| Fields v. USA | Date Filed: 04/06/2010 |
| Assigned to: Judge Ronald A. White | Date Terminated: 12/15/2016 |
| Related Case: 6:03–cr–00073–RAW–1 | Jury Demand: None |
| Case in other court: 10th Circuit, 17–07031 | Nature of Suit: 535 Death Penalty – Habeas Corpus |
| Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence | Jurisdiction: U.S. Government Defendant |

**Petitioner**

| | | |
|---|---|---|
| **Edward Leon Fields, Jr.** | represented by | **Cristi Charpentier** |

Federal Community Defender – EDPA
601 Walnut St, Ste 545 W
Philadelphia, PA 19106
215–928–0520
Fax: 215–928–0826
Email: cristi_charpentier@fd.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine E. Ensler**
Federal Community Defender – EDPA
601 Walnut St, Ste 545 W
Philadelphia, PA 19106
215–928–0520
Fax: 215–928–0826
Email: katherine_ensler@fd.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David M. Osborne**
Federal Community Defender – EDPA
601 Walnut St, Ste 545 W
Philadelphia, PA 19106
215–928–0520
Fax: 215–928–0826
Email: david_osborne@fd.org
*TERMINATED: 01/15/2014*
*PRO HAC VICE*

**Hunter S. Labovitz**
Federal Public Defender – Philadelphia
Capital Habeas Corpus Unit
Ste 545 W – The Curtis Center
Philadelphia, PA 19106

1

215–928–0520
Fax: 215–928–0826
Email: hunter_labovitz@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Wiseman**
Federal Community Defender – EDPA
601 Walnut St, Ste 545 W
Philadelphia, PA 19106
215–928–0520
Fax: 215–928–0826
Email: Michael_Wiseman@fd.org
*TERMINATED: 09/08/2011*
*PRO HAC VICE*

**Renee Hurtig Edelman**
Federal Community Defender – EDPA
601 Walnut St, Ste 545 W
Philadelphia, PA 19106
215–928–0520
Fax: 215–928–0826
Email: renee_edelman@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**                                    represented by  **Cheryl R. Triplett**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5130
Email: Cheryl.Triplett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda A. Epperley**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
Email: linda.epperley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Wilson**
US Attorney (OKED)

520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
Email: Chris.Wilson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202–305–8910
Fax: 202–353–9779
Email: jeffrey.kahan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
*TERMINATED: 11/24/2010*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/06/2010 | 1 | 14 | MOTION to Vacate, Set Aside or Correct Sentence (2255) by Edward Leon Fields, Jr (With attachments)(jcb, Deputy Clerk) (Entered: 04/06/2010) |
| 04/06/2010 | 2 | 162 | APPENDIX of Authorities (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255) ) by Edward Leon Fields, Jr (With attachments)(jcb, Deputy Clerk) (Entered: 04/06/2010) |
| 04/12/2010 | 3 | | NOTICE to Respond (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255), 2 Appendix of Authorities ) (law, Deputy Clerk) (Entered: 04/12/2010) |
| 06/01/2010 | 4 | | Opposed MOTION Omnibus Non–Dispositive Relief *and Consolidated Brief* by Edward Leon Fields, Jr Responses due by 6/15/2010 (With attachments)(Wiseman, Michael) Modified on 6/2/2010 to seal all exhibits at the direction of the Court(law, Deputy Clerk). (Entered: 06/01/2010) |
| 06/10/2010 | 5 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/10/2010) |
| 06/15/2010 | 6 | 479 | RESPONSE in Opposition to Motion (Re: 4 Opposed MOTION Omnibus Non–Dispositive Relief *and Consolidated Brief* ) by USA ;(Wilson, Christopher) (Entered: 06/15/2010) |
| 06/16/2010 | 7 | | ATTORNEY APPEARANCE by Jeffrey B. Kahan on behalf of USA (Kahan, Jeffrey) (Entered: 06/16/2010) |
| 06/16/2010 | 8 | | |

| | | | |
|---|---|---|---|
| | | | First MOTION to Extend Deadline(s) *to File Answer/Response to 2255 Motion* by USA Responses due by 6/30/2010(Wilson, Christopher) (Entered: 06/16/2010) |
| 06/18/2010 | 9 | 493 | REPLY to Response to Motion (Re: 4 Opposed MOTION Omnibus Non–Dispositive Relief *and Consolidated Brief* ) by Edward Leon Fields, Jr ;(Wiseman, Michael) (Entered: 06/18/2010) |
| 06/18/2010 | 10 | | RESPONSE to Motion (Re: 8 First MOTION to Extend Deadline(s) *to File Answer/Response to 2255 Motion* ) by Edward Leon Fields, Jr ;(Wiseman, Michael) (Entered: 06/18/2010) |
| 06/29/2010 | 11 | 507 | ORDER by Judge Ronald A. White granting in part and denying in part petitioner's motion for omnibus relief ( 4 Motion for Miscellaneous Relief) and finding as moot the government's motion for extension of time ( 8 Motion to Extend Deadline(s)) (law, Deputy Clerk) (Entered: 06/29/2010) |
| 07/29/2010 | 12 | | MOTION for Leave to Exceed Page Limitation by Edward Leon Fields, Jr Responses due by 8/12/2010 (With attachments)(Wiseman, Michael) (Entered: 07/29/2010) |
| 07/30/2010 | 13 | | MINUTE ORDER by Judge Ronald A. White granting Petitioner's Unopposed Motion for Leave to File Brief in Excess of Twenty–Five Pages ( 12 Motion for Leave to Exceed Page Limitation) (law, Deputy Clerk) (Entered: 07/30/2010) |
| 07/30/2010 | 14 | 512 | TRIAL BRIEF by Edward Leon Fields, Jr (With attachments)(Wiseman, Michael) (Entered: 07/30/2010) |
| 08/02/2010 | 15 | | MINUTE ORDER by Judge Ronald A. White : Pursuant to Local Civil Rule 7.1(s), petitioner is directed to submit a courtesy copy of petitioner's brief (Re: 14 Trial Brief ) to the Court within three (3) business days.(law, Deputy Clerk) (Entered: 08/02/2010) |
| 09/28/2010 | 16 | 645 | RESPONSE (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255) ) by USA (With attachments)(Wilson, Christopher) (Entered: 09/28/2010) |
| 09/29/2010 | 17 | | MINUTE ORDER by Judge Ronald A. White : Pursuant to Local Civil Rule 7.1(s), respondent is directed to submit a courtesy copy of its response (Re: 16 Response ) to the Court within three (3) business days.(law, Deputy Clerk) (Entered: 09/29/2010) |
| 09/30/2010 | 18 | | MOTION to Extend Reply Deadline by Edward Leon Fields, Jr.; Responses due by 10/14/2010 (With attachments)(Wiseman, Michael) Modified on 10/1/2010 to edit text (dma, Deputy Clerk). (Entered: 09/30/2010) |
| 10/01/2010 | 19 | | ORDER by Judge Ronald A. White granting Petitioner's Unopposed Motion for Forty–Five Days to File a Reply ( 18 Motion for Miscellaneous Relief) (law, Deputy Clerk) (Entered: 10/01/2010) |
| 11/15/2010 | 20 | | REPLY (Re: 16 Response ) by Edward Leon Fields, Jr (With attachments)(Wiseman, Michael) (Entered: 11/15/2010) |
| 01/04/2011 | 21 | | MOTION Omnibus Relief: hearing, discovery and transport *Petitioner's Renewed Motion for Non–Dispositive Omnibus Relief* by Edward Leon Fields, Jr Responses due by 1/18/2011 (With attachments)(Wiseman, Michael) |

| | | | |
|---|---|---|---|
| | | | (Entered: 01/04/2011) |
| 01/13/2011 | 22 | | RESPONSE to Motion (Re: 21 MOTION Omnibus Relief: hearing, discovery and transport *Petitioner's Renewed Motion for Non−Dispositive Omnibus Relief* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 01/13/2011) |
| 01/21/2011 | 23 | | REPLY to Response to Motion (Re: 21 MOTION Omnibus Relief: hearing, discovery and transport *Petitioner's Renewed Motion for Non−Dispositive Omnibus Relief* ) by Edward Leon Fields, Jr ;(Wiseman, Michael) (Entered: 01/21/2011) |
| 02/09/2011 | 24 | | SUPPLEMENT (Re: 21 MOTION Omnibus Relief: hearing, discovery and transport *Petitioner's Renewed Motion for Non−Dispositive Omnibus Relief* ) by Edward Leon Fields, Jr (Wiseman, Michael) (Entered: 02/09/2011) |
| 08/15/2011 | 25 | | ORDER by Judge Ronald A. White granting in part and denying in part petitioner's renewed motion for non−dispositive omnibus relief ( 21 Motion for Miscellaneous Relief ) (law, Deputy Clerk) (Entered: 08/15/2011) |
| 08/30/2011 | 26 | | Joint MOTION to Alter Order/Judgment *granting Petitioner transport for brain imaging* (Re: 25 Ruling on Motion for Miscellaneous Relief ) by Edward Leon Fields, Jr Responses due by 9/13/2011 (With attachments)(Charpentier, Cristi) (Entered: 08/30/2011) |
| 08/30/2011 | 27 | | MOTION for Reconsideration *of Portion of Court's Order* (Re: 25 Ruling on Motion for Miscellaneous Relief ) by Edward Leon Fields, Jr Responses due by 9/13/2011(Charpentier, Cristi) (Entered: 08/30/2011) |
| 09/01/2011 | 28 | | ORDER by Judge Ronald A. White granting joint motion for amended order for transport ( 26 Motion to Alter Order/Judgment) (law, Deputy Clerk) (Entered: 09/01/2011) |
| 09/08/2011 | 29 | | WITHDRAWAL OF APPEARANCE by Michael Wiseman on behalf of Edward Leon Fields, Jr (Wiseman, Michael) Modified on 9/13/2011 to amend text and term attorney (neh, Deputy Clerk). (Entered: 09/08/2011) |
| 09/13/2011 | 30 | | RESPONSE in Opposition to Motion (Re: 27 MOTION for Reconsideration *of Portion of Court's Order* ) by USA ;(Wilson, Christopher) (Entered: 09/13/2011) |
| 09/23/2011 | 31 | | REPLY to Response to Motion (Re: 27 MOTION for Reconsideration *of Portion of Court's Order* ) by Edward Leon Fields, Jr ; (With attachments)(Charpentier, Cristi) (Entered: 09/23/2011) |
| 03/29/2012 | 32 | | ORDER by Judge Ronald A. White granting petitioner's motion for reconsideration ( 27 Motion to Reconsider) (law, Deputy Clerk) (Entered: 03/29/2012) |
| 04/05/2012 | 33 | | MOTION for Attorney Renee Hurtig Edelman to be Admitted Pro Hac Vice by Edward Leon Fields, Jr. Responses due by 4/19/2012 (pjw, Deputy Clerk) (Entered: 04/05/2012) |
| 04/05/2012 | 34 | | MOTION for Attorney David M. Osborne to be Admitted Pro Hac Vice by Edward Leon Fields, Jr. Responses due by 4/19/2012 (pjw, Deputy Clerk) (Entered: 04/05/2012) |

| 04/06/2012 | 35 | | MINUTE ORDER by Judge Ronald A. White : GRANTING (Docket No. 33 ) Motion for Admission Pro Hac Vice; adding attorney Renee Hurtig Edelman for Edward Leon Fields, Jr. (neh, Deputy Clerk) (Entered: 04/06/2012) |
| --- | --- | --- | --- |
| 04/06/2012 | 36 | | MINUTE ORDER by Judge Ronald A. White : GRANTING (Docket No. 34 ) Motion for Admission Pro Hac Vice; adding attorney David M. Osborne for Edward Leon Fields, Jr. (neh, Deputy Clerk) (Entered: 04/06/2012) |
| 04/09/2012 | 37 | | ATTORNEY APPEARANCE by Renee Hurtig Edelman on behalf of Edward Leon Fields, Jr (Edelman, Renee) (Entered: 04/09/2012) |
| 04/09/2012 | 38 | | ATTORNEY APPEARANCE by David M. Osborne on behalf of Edward Leon Fields, Jr (Osborne, David) (Entered: 04/09/2012) |
| 05/29/2012 | 39 | | MOTION for Discovery by USA. Responses due by 6/12/2012(Wilson, Christopher) (Entered: 05/29/2012) |
| 05/29/2012 | 40 | | MOTION for Discovery by Edward Leon Fields, Jr. Responses due by 6/12/2012 (With attachments)(Charpentier, Cristi) (Entered: 05/29/2012) |
| 06/08/2012 | 41 | | Joint MOTION for Extension of Time to Respond to Motion *for Discovery* (Re: 39 MOTION for Discovery, 40 MOTION for Discovery ) by Edward Leon Fields, Jr., USA Responses due by 6/22/2012 (With attachments)(Osborne, David) Modified on 6/11/2012 to add filer (cjt, Deputy Clerk). (Entered: 06/08/2012) |
| 06/11/2012 | 42 | | ORDER by Judge Ronald A. White granting 41 Motion for Extension of Time to Respond to Motions for Discovery. Responses due by 7/13/2012 (Re: 40 MOTION for Discovery, 39 MOTION for Discovery ) (neh, Deputy Clerk) (Entered: 06/11/2012) |
| 07/13/2012 | 43 | | RESPONSE to Motion (Re: 39 MOTION for Discovery ) by Edward Leon Fields, Jr ; (With attachments)(Osborne, David) (Entered: 07/13/2012) |
| 07/13/2012 | 44 | | RESPONSE in Opposition to Motion (Re: 40 MOTION for Discovery ) by USA ;(Wilson, Christopher) (Entered: 07/13/2012) |
| 07/23/2012 | 45 | | Joint MOTION to Extend Deadline(s) *to File Replies to Oppositions to Motions for Discovery* by All Parties. Responses due by 8/6/2012(Wilson, Christopher) (Entered: 07/23/2012) |
| 07/25/2012 | 46 | | ORDER by Judge Ronald A. White granting Joint Motion to Extend Time to File Replies to Oppositions to Motions for Discovery ( 45 Motion to Extend Deadline(s)) (law, Deputy Clerk) (Entered: 07/25/2012) |
| 08/13/2012 | 47 | | REPLY to Response to Motion (Re: 40 MOTION for Discovery ) by Edward Leon Fields, Jr ;(Edelman, Renee) (Entered: 08/13/2012) |
| 08/13/2012 | 48 | | REPLY to Response to Motion (Re: 39 MOTION for Discovery ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/13/2012) |
| 08/16/2012 | 49 | | NOTICE of Supplemental Authority by Edward Leon Fields, Jr (Edelman, Renee) (Entered: 08/16/2012) |
| 11/08/2012 | 50 | | ORDER by Judge Ronald A. White granting in part and denying in part 39 Respondent's Motion for Discovery and granting in part and denying in part 40 Petitioner's Motion for Discovery. Discovery due by 2/5/13 (dma, Deputy |

| | | | |
|---|---|---|---|
| | | | Clerk) (Entered: 11/08/2012) |
| 12/21/2012 | 51 | | Joint MOTION to Extend Deadline(s) *in Discovery Order* by All Parties. Responses due by 1/4/2013 (With attachments)(Osborne, David) (Entered: 12/21/2012) |
| 12/27/2012 | 52 | | MINUTE ORDER by Judge Ronald A. White granting Joint Motion to Extend Deadlines in Discovery Order filed 12/21/12 ( 51 Motion to Extend Deadline(s)). (law, Deputy Clerk) (Entered: 12/27/2012) |
| 03/06/2013 | 53 | | MOTION to Clarify (Re: 50 Ruling on Motion for Discovery,, Setting/Resetting Deadline(s) ) by USA. Responses due by 3/20/2013(Wilson, Christopher) (Entered: 03/06/2013) |
| 03/12/2013 | 54 | | MOTION to unseal firewalled documents by USA. Responses due by 3/26/2013(Wilson, Christopher) (Entered: 03/12/2013) |
| 03/19/2013 | 55 | | RESPONSE to Motion (Re: 53 MOTION to Clarify ) by Edward Leon Fields, Jr ;(Osborne, David) (Entered: 03/19/2013) |
| 03/20/2013 | 56 | | RESPONSE to Motion (Re: 54 MOTION to unseal firewalled documents ) by Edward Leon Fields, Jr ;(Osborne, David) (Entered: 03/20/2013) |
| 03/29/2013 | 57 | | REPLY to Response to Motion (Re: 53 MOTION to Clarify ) by USA ;(Wilson, Christopher) (Entered: 03/29/2013) |
| 04/03/2013 | 58 | | REPLY to Response to Motion (Re: 54 MOTION to unseal firewalled documents ) by USA ;(Wilson, Christopher) (Entered: 04/03/2013) |
| 04/15/2013 | 59 | | OPINION AND ORDER by Judge Ronald A. White granting Government's Motion for Clarification Regarding Discovery ( 53 Motion to Clarify ) (lal, Deputy Clerk) (Entered: 04/15/2013) |
| 04/15/2013 | 60 | | OPINION AND ORDER by Judge Ronald A. White granting Government's Motion to Unseal Firewalled Documents ( 54 Motion for Miscellaneous Relief) (lal, Deputy Clerk) (Entered: 04/15/2013) |
| 06/05/2013 | 61 | | Unopposed MOTION to Extend Deadline(s) *for Completion of Discovery* by USA. Responses due by 6/19/2013(Wilson, Christopher) (Entered: 06/05/2013) |
| 06/13/2013 | 62 | | ORDER by Judge Ronald A. White granting government's Unopposed Motion for Extension of Time to Complete Discovery ( 61 Motion to Extend Deadline(s)) (lal, Deputy Clerk) (Entered: 06/13/2013) |
| 06/27/2013 | 63 | | Unopposed MOTION for Release of Petitioner's Bureau of Prisons Records by USA. Responses due by 7/11/2013(Wilson, Christopher) (Entered: 06/27/2013) |
| 07/02/2013 | 64 | | ORDER by Judge Ronald A. White granting Unopposed Motion for Release of Petitioner's Bureau of Prisons Records ( 63 Motion for Miscellaneous Relief ) (lal, Deputy Clerk) (Entered: 07/02/2013) |
| 08/13/2013 | 65 | | Unopposed MOTION to Extend Deadline(s) *for Discovery* by Edward Leon Fields, Jr. Responses due by 8/27/2013 (With attachments)(Osborne, David) (Entered: 08/13/2013) |

| 08/15/2013 | 66 | | ORDER by Judge Ronald A. White granting petitioner's unopposed motion to extend discovery deadline ( 65 Motion to Extend Deadline(s)) (lal, Deputy Clerk) (Entered: 08/15/2013) |
| 09/04/2013 | 67 | | Unopposed MOTION to Extend Deadline(s) *for Discovery* by USA. Responses due by 9/18/2013(Wilson, Christopher) (Entered: 09/04/2013) |
| 09/04/2013 | 68 | | ORDER by Judge Ronald A. White granting petitioner's unopposed motion to extend discovery deadline ( 67 Motion to Extend Deadline(s)) to 11/1/2013 (lal, Deputy Clerk) (Entered: 09/04/2013) |
| 10/03/2013 | 69 | | MINUTE ORDER by Judge Ronald A. White : Pursuant to General Order 13–3, the motion to stay all civil cases filed by the U.S. Attorney is hereby granted. All deadlines are extended pending further order of the Court.(lal, Deputy Clerk) (Entered: 10/03/2013) |
| 10/18/2013 | 70 | | MINUTE ORDER by Judge Ronald A. White : Pursuant to General Order No. 13–06, the Court lifts the stay in this case ( Re: 69 Minute Order, Staying Case ) and extends any deadline or due date for thirty (30) days from the original due date. (lal, Deputy Clerk) (Entered: 10/18/2013) |
| 11/07/2013 | 71 | | MOTION to submit in camera documents for review by USA. Responses due by 11/21/2013 (With attachments)(Wilson, Christopher) (Entered: 11/07/2013) |
| 11/20/2013 | 72 | | RESPONSE to Motion (Re: 71 MOTION to submit in camera documents for review ) by Edward Leon Fields, Jr ;(Osborne, David) (Entered: 11/20/2013) |
| 11/26/2013 | 73 | | REPLY to Response to Motion (Re: 71 MOTION to submit in camera documents for review ) by USA ;(Wilson, Christopher) (Entered: 11/26/2013) |
| 12/23/2013 | 74 | | ORDER by Judge Ronald A. White granting respondent's Motion for In Camera Review of Allegedly Privileged Documents ( 71 Motion for Miscellaneous Relief ) directing the disputed documents be submitted by petitioner to the Court on or before 1/6/2014 (lal, Deputy Clerk) (Entered: 12/23/2013) |
| 01/06/2014 | 75 | | MOTION to Extend Deadline(s) *for Petitioner to Produce Documents for In Camera Review* by Edward Leon Fields, Jr. Responses due by 1/21/2014(Osborne, David) (Entered: 01/06/2014) |
| 01/07/2014 | 76 | | MINUTE ORDER by Judge Ronald A. White granting petitioner's Motion to Extend Deadline for Petitioner to Produce Documents for In Camera review filed 1/6/14 ( 75 Motion to Extend Deadline(s) ). (lal, Deputy Clerk) (Entered: 01/07/2014) |
| 01/14/2014 | 77 | | MOTION to Withdraw Attorney(s) *David Osborne* by Edward Leon Fields, Jr. Responses due by 1/28/2014(Osborne, David) (Entered: 01/14/2014) |
| 01/15/2014 | 78 | | MINUTE ORDER by Judge Ronald A. White: granting 77 Motion for Leave to Withdraw Appearance; Attorney David M. Osborne withdrawn for Petitioner Edward Leon Fields, Jr. (cjt, Deputy Clerk) (Entered: 01/15/2014) |
| 01/27/2014 | 79 | | MOTION for Attorney Hunter S. Labovitz to be Admitted Pro Hac Vice by Edward Leon Fields, Jr. Responses due by 2/10/2014 (pjw, Deputy Clerk) (Entered: 01/27/2014) |
| 01/30/2014 | 80 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by Judge Ronald A. White granting Motion for Admission of Hunter S. Labovitz Pro Hac Vice filed 1/27/14 ( 79 Motion for Admission Pro Hac Vice). This is conditioned on the filing of an entry of appearance and registration for electronic case filing by the applicant within seven (7) days from entry of this Order. See LCvR 83.4 and CM/ECF Administrative Guide of Policies and Procedures. (lal, Deputy Clerk) (Entered: 01/30/2014) |
| 02/07/2014 | 81 | | ATTORNEY APPEARANCE by Hunter S. Labovitz on behalf of Edward Leon Fields, Jr (Labovitz, Hunter) (Entered: 02/07/2014) |
| 02/20/2014 | 82 | | ORDER by Judge Ronald A. White : Granting 71 MOTION to submit in camera documents for review and ordering counsel for Petitioner to produce the documents to Government within 10 days of the date of this order.(neh, Deputy Clerk) (Entered: 02/20/2014) |
| 05/08/2014 | 83 | | Joint MOTION for Protective Order by All Parties. Responses due by 5/22/2014(Wilson, Christopher) (Entered: 05/08/2014) |
| 05/13/2014 | 84 | | ORDER by Judge Ronald A. White denying without prejudice joint motion for protective order ( 83 Motion for Protective Order ) (lal, Deputy Clerk) (Entered: 05/13/2014) |
| 05/22/2014 | 85 | | Joint MOTION for Protective Order by All Parties. Responses due by 6/5/2014(Wilson, Christopher) (Entered: 05/22/2014) |
| 05/27/2014 | 86 | | PROTECTIVE ORDER by Judge Ronald A. White (lal, Deputy Clerk) (Entered: 05/27/2014) |
| 07/29/2014 | 87 | | ORDER by Judge Ronald A. White directing the parties file a Joint Status Report no later than 9/1/2014(lal, Deputy Clerk) (Entered: 07/29/2014) |
| 08/28/2014 | 88 | | Joint STATUS REPORT by Edward Leon Fields, Jr. and USA (Edelman, Renee) Modified on 8/29/2014 to add filer (dma, Deputy Clerk). (Entered: 08/28/2014) |
| 09/05/2014 | 89 | | ORDER by Judge Ronald A. White: Supplement to Joint Status Report due by 9/25/2014 (cjt, Deputy Clerk) (Entered: 09/05/2014) |
| 09/23/2014 | 90 | | Supplemental Joint STATUS REPORT by Edward Leon Fields, Jr, USA (Edelman, Renee) Modified on 11/13/2014 (neh, Deputy Clerk). (Entered: 09/23/2014) |
| 11/13/2014 | 91 | | ORDER by Judge Ronald A. White setting deadlines for dispositive motions briefing: Govt to file dispositive motions by 2/20/15; Petitioner's response due 4/20/15; Govt to file reply brief by 5/20/15.(neh, Deputy Clerk) (Entered: 11/13/2014) |
| 01/26/2015 | 92 | | Unopposed MOTION to Extend Scheduling Order Dates by Edward Leon Fields, Jr. Responses due by 2/9/2015 (With attachments)(Labovitz, Hunter) (Entered: 01/26/2015) |
| 01/28/2015 | 93 | | ORDER by Judge Ronald A. White granting Petitioner's Unopposed Motion to Vacate the Current Motions Briefing Schedule and Extend the Discovery Deadline ( 92 Motion to Extend Scheduling Order Dates) (lal, Deputy Clerk) (Entered: 01/28/2015) |
| 02/20/2015 | 94 | | |

| | | | |
|---|---|---|---|
| | | | MOTION by Attorney Katherine E. Ensler to be Admitted Pro Hac Vice for purpose of representing Petitioner Edward Leon Fields, Jr. (neh, Deputy Clerk) (Entered: 02/20/2015) |
| 02/23/2015 | 95 | | MINUTE ORDER by Judge Ronald A. White granting Motion for Admission of Katherine E. Ensler Pro Hac Vice filed 2/20/15 ( 94 Motion for Admission Pro Hac Vice of attorney Katherine E. Ensler ) for petitioner Edward Leon Fields, Jr. This is conditioned on the filing of an entry of appearance and registration for electronic case filing by the applicant within seven (7) days from entry of this Order. See LCvR 83.4 and CM/ECF Administrative Guide of Policies and Procedures. (lal, Deputy Clerk) (Entered: 02/23/2015) |
| 02/26/2015 | 96 | | ATTORNEY APPEARANCE by Katherine E. Ensler on behalf of Edward Leon Fields, Jr (Ensler, Katherine) (Entered: 02/26/2015) |
| 03/16/2015 | 97 | | NOTICE NOTICE OF DISCOVERY COMPLIANCE by Edward Leon Fields, Jr (Labovitz, Hunter) (Entered: 03/16/2015) |
| 03/26/2015 | 98 | | Unopposed MOTION for in camera review of allegedly privileged documents by USA. Responses due by 4/9/2015 (With attachments)(Wilson, Christopher) (Entered: 03/26/2015) |
| 03/27/2015 | 99 | | ORDER by Judge Ronald A. White GRANTING (Dkt No 98 ) Unopposed Motion for In Camera Review (neh, Deputy Clerk) (Entered: 03/27/2015) |
| 05/05/2015 | 100 | | ORDER by Judge Ronald A. White directing counsel for petitioner to produce documents to counsel for respondent within 10 days of the date of this order(lal, Deputy Clerk) (Entered: 05/05/2015) |
| 08/18/2015 | 101 | | ORDER by Judge Ronald A. White setting schedule for briefing of dispositive motions(lal, Deputy Clerk) (Entered: 08/18/2015) |
| 10/02/2015 | 102 | | MOTION to Amend (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255), 2 Appendix of Authorities ) by Edward Leon Fields, Jr. Responses due by 10/16/2015 (With attachments)(Labovitz, Hunter) (Entered: 10/02/2015) |
| 10/05/2015 | 103 | | MINUTE ORDER by Judge Ronald A. White directing respondent file an EXPEDITED response to petitioner's Motion for Leave to Amend Section 2255 Motion Under Fed.R.Civ.P. 15 to Provide Additional Factual Support to Claims Already Pled filed 10/2/15 (Re: 102 MOTION to Amend ) no later than 10/9/15.(lal, Deputy Clerk) (Entered: 10/05/2015) |
| 10/07/2015 | 104 | | RESPONSE to Motion (Re: 102 MOTION to Amend ) by USA ;(Kahan, Jeffrey) (Entered: 10/07/2015) |
| 10/08/2015 | 105 | | MINUTE ORDER by Judge Ronald A. White granting petitioner's Motion for Leave to Amend Section 2255 Motion Under Fed.R.Civ.P. 15 to Provide Additional Factual Support to Claims Already Pled filed 10/2/15 ( 102 Motion to Amend). Petitioner is directed to file his amended 2255 motion no later than 10/13/15. (lal, Deputy Clerk) (Entered: 10/08/2015) |
| 10/13/2015 | 106 | | AMENDED BRIEF in Support of Motion to Vacate (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255) ) by Edward Leon Fields, Jr. Responses due by 10/27/2015 (With attachments)(Labovitz, Hunter) Modified docket entry text and termed motion on 10/14/2015 (lal, Deputy Clerk). Modified docket entry text on 3/23/2016 (lal, Deputy Clerk). (Entered: 10/13/2015) |

| 10/14/2015 | 107 | | MINUTE ORDER by Judge Ronald A. White : Counsel for Edward Leon Fields, Jr. is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed at Dkt. # 106 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 106 MOTION to Amend *Grounds in Support of Amended Motion* ) (lal, Deputy Clerk) (Entered: 10/14/2015) |
|---|---|---|---|
| 10/14/2015 | 108 | | Unopposed MOTION for Leave to Exceed Page Limitation by USA. Responses due by 10/28/2015(Kahan, Jeffrey) (Entered: 10/14/2015) |
| 10/15/2015 | 109 | | MINUTE ORDER by Judge Ronald A. White granting the government's Unopposed Motion to File a Brief in Excess of 25 Pages ( 108 Motion for Leave to Exceed Page Limitation ). (lal, Deputy Clerk) (Entered: 10/15/2015) |
| 10/15/2015 | 110 | | MOTION for Summary Judgment by USA. Responses due by 10/29/2015 (With attachments)(Wilson, Christopher) (Entered: 10/15/2015) |
| 10/16/2015 | 111 | | MINUTE ORDER by Judge Ronald A. White : Counsel for USA is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed at Dkt. # 110 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 110 MOTION for Summary Judgment ) (lal, Deputy Clerk) (Entered: 10/16/2015) |
| 11/19/2015 | 112 | | NOTICE Notice of Supplemental Discovery (Re: 110 MOTION for Summary Judgment ) by Edward Leon Fields, Jr (With attachments)(Labovitz, Hunter) (Entered: 11/19/2015) |
| 12/14/2015 | 113 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 110 MOTION for Summary Judgment) by Edward Leon Fields, Jr. Responses due by 12/28/2015 (With attachments)(Labovitz, Hunter) (Entered: 12/14/2015) |
| 12/15/2015 | 114 | | MINUTE ORDER by Judge Ronald A. White granting Petitioner's Unopposed First Motion for Brief Extension of Time to Respond to Government's Motion for Judgment in Favor of the Government filed 12/14/2015 ( 113 Motion for Extension of Time to Respond to Motion ). Accordingly, petitioner's response to the government's motion for judgment (Re: 110 MOTION for Summary Judgment ) is now due no later than 12/23/2015. (lal, Deputy Clerk) (Entered: 12/15/2015) |
| 12/22/2015 | 115 | | MOTION for Extension of Time to Respond to Motion *Petitioner's Unopposed Motion for Extension of Time to Respond to Government's Motion for Judgment in Favor of the Government* (Re: 110 MOTION for Summary Judgment ) by Edward Leon Fields, Jr. Responses due by 1/5/2016 (With attachments)(Labovitz, Hunter) (Entered: 12/22/2015) |
| 12/23/2015 | 116 | | ORDER by Judge Ronald A. White granting Petitioner's Unopposed Motion for Extension of Time to Respond to Government's Motion for Judgment in |

| | | | |
|---|---|---|---|
| | | | Favor of the Government ( 115 Motion for Extension of Time to Respond to Motion) extending the deadline to file his response to 1/6/2016 (Re: 110 MOTION for Summary Judgment ) (lal, Deputy Clerk) (Entered: 12/23/2015) |
| 01/05/2016 | 117 | | Unopposed MOTION for Leave to Exceed Page Limitation *in Excess of 25 Pages* by Edward Leon Fields, Jr (With attachments) Responses due by 1/19/2016(Labovitz, Hunter) (Entered: 01/05/2016) |
| 01/06/2016 | 118 | | ORDER by Judge Ronald A. White granting (Dkt No 117 ) Motion for Leave to Exceed Page Limitation. Petitioner's Brief shall not exceed 45 pages. (neh, Deputy Clerk) (Entered: 01/06/2016) |
| 01/06/2016 | 119 | | RESPONSE to Motion (Re: 110 MOTION for Summary Judgment ) by Edward Leon Fields, Jr ; (With attachments)(Labovitz, Hunter) (Entered: 01/06/2016) |
| 01/06/2016 | 120 | | Ex Parte MOTION to Unseal Document(s) *Trial Docs. 52 & 65 (Dkt. No. 03−CR−73)* (Re: 119 Response to Motion ) by Edward Leon Fields, Jr (With attachments) Responses due by 1/20/2016(Labovitz, Hunter) (Entered: 01/06/2016) |
| 01/07/2016 | 121 | | MINUTE ORDER by Judge Ronald A. White granting Petitioner's Ex Parte Motion to Unseal Trial Docs. 52 & 65 (Dkt. No. 03−CR−73) ( 120 Motion to Unseal Document(s)). The Clerk is hereby directed to UNSEAL Documents 52 and 65 in Case No. CR−03−73−RAW and is further directed to replace Document 52 with the complete version attached to petitioner's motion. (lal, Deputy Clerk) (Entered: 01/07/2016) |
| 02/02/2016 | 122 | | REPLY to Response to Motion (Re: 110 MOTION for Summary Judgment ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 02/02/2016) |
| 02/02/2016 | 123 | | UNOPPOSED MOTION to File Under Seal (Re: [122−5] Exhibit 5 to Reply to Response to Motion ) by USA (neh, Deputy Clerk) (Entered: 02/02/2016) |
| 02/02/2016 | 124 | | ORDER TO FILE UNDER SEAL by Judge Ronald A. White: granting (Dkt No 123 ) Motion to Seal Exhibit 5 to Respondent's Reply (Dkt No 122 ) (neh, Deputy Clerk) (Entered: 02/02/2016) |
| 12/15/2016 | 125 | | ORDER by Judge Ronald A. White denying Petitioner's Motion to Vacate, Set Aside or Correct a Sentence pursuant to 28 U.S.C. Section 2255 (Re: 1 Motion to Vacate, Set Aside or Correct Sentence (2255) ) (lal, Deputy Clerk) (Entered: 12/15/2016) |
| 12/15/2016 | 126 | | JUDGMENT by Judge Ronald A. White entering judgment in favor of respondent USA and against petitioner Edward Leon Fields, Jr. (terminates case) (lal, Deputy Clerk) (Entered: 12/15/2016) |
| 01/12/2017 | 127 | | MOTION to Alter and Amend Judgment (Re: 126 Judgment) by Edward Leon Fields, Jr; Responses due by 1/26/2017(Labovitz, Hunter) Modified on 1/19/2017 to edit text (dma, Deputy Clerk). (Entered: 01/12/2017) |
| 01/17/2017 | 128 | | MINUTE ORDER by Judge Ronald A. White extending the Response deadline Re: 127 Petitioner's MOTION to Alter and Amend Judgment pursuant to FED. R. CIV. P. 59(E). The Government is hereby directed to file a Response no later than 1/31/2017. (tls, Deputy Clerk) (Entered: 01/17/2017) |

| 01/30/2017 | 129 | | RESPONSE in Opposition to Motion (Re: 127 MOTION to Alter Order/Judgment) by USA (With attachments)(Kahan, Jeffrey) (Entered: 01/30/2017) |
| --- | --- | --- | --- |
| 03/15/2017 | 130 | | ORDER by Judge Ronald A. White denying Petitioner's Motion to Alter or Amend Judgment ( 127 Motion to Alter Order/Judgment ) (lal, Deputy Clerk) (Entered: 03/15/2017) |
| 05/12/2017 | 131 | | NOTICE of Appeal (Re: 125 Order; 126 Judgment and 130 Order) by Edward Leon Fields, Jr (Labovitz, Hunter) Modified on 5/15/2017 to add link (dma, Deputy Clerk). (Entered: 05/12/2017) |
| 05/17/2017 | 132 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 131 Notice of Appeal, 125 Order, 126 Judgment and 130 Order, along with Criminal Docket and 127 Judgment from 03−CR−073−RAW. Preliminary record transmitted to 10th Circuit Court of Appeals electronically. (Re: 131 Notice of Appeal − Final Judgment ) (jcb, Deputy Clerk) (Entered: 05/17/2017) |
| 05/18/2017 | 133 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 17−7031 (Re: 131 Notice of Appeal − Final Judgment ) (jcb, Deputy Clerk) (Entered: 05/18/2017) |
| 05/26/2017 | 134 | | DESIGNATION of Record on Appeal (Re: 131 Notice of Appeal − Final Judgment ) by Edward Leon Fields, Jr (With attachments)(Labovitz, Hunter) (Entered: 05/26/2017) |
| 05/26/2017 | 135 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 131 Notice of Appeal − Final Judgment ) by Edward Leon Fields, Jr (Labovitz, Hunter) (Entered: 05/26/2017) |
| 05/30/2017 | 136 | | ORDER from Circuit Court regarding Designation of Record (Re: 131 Notice of Appeal − Final Judgment, 134 Designation of Record on Appeal ) (jcb, Deputy Clerk) (Entered: 05/31/2017) |
| 06/11/2017 | 137 | | DESIGNATION of Record on Appeal (Re: 131 Notice of Appeal − Final Judgment ) by Edward Leon Fields, Jr (With attachments)(Labovitz, Hunter) (Entered: 06/11/2017) |

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

**CIV 10 - 115 - RA W**

| United States District Court | District | Eastern District of Oklahoma |
|---|---|---|
| Name (under which you were convicted):<br>Edward Leon Fields, Jr. | | Docket or Case No.:<br>No. 03-CR-73 -RAW |
| Place of Confinement:<br>U.S.P. Terre Haute, Indiana | | Prisoner No.:<br>04136063 |
| UNITED STATES OF AMERICA<br><br>v. | | Movant (include name under which you were convicted)<br>Edward Leon Fields, Jr. |

### MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    United States District Court, Eastern District of Oklahoma, Muskogee Division

    *FILED*
    *APR 06 2010*
    *WILLIAM B. GUTHRIE*
    *Clerk, U.S. District Court*
    *By*
    *Deputy Clerk*

    (b) Criminal docket or case number (if you know):  No. 03-CR-73

2.  (a) Date of the judgment of conviction (if you know):  11/8/2005

    (b) Date of sentencing:  11/8/2005

3.  Length of sentence: Death on counts 1, 3; 1299 months imprisonment  on all other counts.

4.  Nature of crime (all counts):

    The indictment, filed 8/1/2003, charged the defendant with two counts of first degree murder under 18 U.S.C Section 111 (Counts 1, 3); two counts of using a firearm in a crime of violence under 18 U.S.C. Section 924 (Counts 2, 4); one count of robbery with a firearm under 18 U.S.C. Section 7 (Count 5); and one count of burglary of an automobile under 18 U.S.C. Section 7 (Count 6).

5.  (a) What was your plea? (Check one)

    (1)   Not guilty ❑           (2)   Guilty ☑           (3)   Nolo contendere (no contest) ❑

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)           Jury ☑           Judge only ❑

Page 3

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ☐     No ☑

8. Did you appeal from the judgment of conviction?     Yes ☑     No ☐

9. If you did appeal, answer the following:

   (a) Name of court:   United States Court of Appeals for the Tenth Circuit

   (b) Docket or case number (if you know):   No. 05-7128

   (c) Result:   Judgment of District Court affirmed

   (d) Date of result (if you know):   3/24/2008

   (e) Citation to the case (if you know):   516 F.3d 923

   (f) Grounds raised:

   1. The federal government lacked subject-matter jurisdiction to prosecute Fields for crimes committed in the Ouachita National Forest.
   2. The district court committed Sixth Amendment reversible error in striking vernireman Fenderson, even though he assured the court he could follow the law and put aside his opposition to the death penalty.
   3. The two substantial-planning aggravators were duplicative because the murders of multiple victims occurred in a single episode, as charged in a third aggravator, and skewed the weighing process. (See following attached page for additional grounds raised)

   (g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☑   No ☐

      If "Yes," answer the following:

      (1) Docket or case number (if you know):   No. 08-6504

      (2) Result:

         Certiorari denied

      (3) Date of result (if you know):   4/6/2009

      (4) Citation to the case (if you know):   129 S.Ct. 1905

      (5) Grounds raised:

      1 In passing the Weeks Act, 16 U.S.C. § 480, did Congress intend to prohibit the federal government from acquiring and exercising either exclusive or concurrent jurisdiction in national forest lands, so that such lands are not within the "special maritime and territorial jurisdiction of the United States" for purposes of federal prosecution and adjudication of the murder charges in this case?
      2. With regard to the impact of the murders, does the Federal Death Penalty Act limit non-statutory aggravators, and evidence in support thereof, to the impact of the crimes on the victim's family alone, so as not to include the impact on close friends?

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

    Yes ☐   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court:

       (2) Docket or case number (if you know):

       (3) Date of filing (if you know):

15

9(f) (cont'd)

4.  The single verdict of death on two counts of murder deprived Fields of a unanimous verdict on each count.

5.  Despite the undisputed lag time between the murders and the robbery, the evidence was insufficient to prove the substantial planning and premeditation statutory aggravating factors, because the evidence showed Fields originally planned to rob, not murder, the Chicks.

6.  The future-danger non-statutory aggravating factor is unconstitutionally vague and overbroad, should have been limited to future danger in the prison setting, and is not supported by the evidence.

7.  Defects in the instructions and Special Findings Form permitted the jury to find the future-danger aggravating factor without constitutionally-required unanimity.

8.  Because it does not contain a scienter requirement, the mental-anguish non-statutory aggravating factor is also vague; in addition, it has been pre-empted by Congress in the "heinous-and-cruel" statutory aggravating factor.

9.  The court violated the FDPA in failing to limit the victim-impact nonstatutory aggravating factors to the victims and the victims' families, and instead allowed non-family witnesses to testify about the impact of the murders on themselves and others.

10. Based upon undisputed evidence of depression, psychosis and a series of stressors in Fields life, at least one juror should have found, by a preponderance, the severe mental or emotional disturbance statutory mitigating factor.

11. The court erred in refusing to instruct the jury that it had to find, beyond a reasonable doubt, the FDPA's standard that the aggravating factors "sufficiently outweigh" the mitigating factors before a death sentence can be imposed.

12. The court's decision to allow the "guilley suit" in the jury room during deliberations rendered the penalty phase unfair.

13. Cumulative error requires reversal.

Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 17

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ❏ No ❏

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ❏ No ❏

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes ❏ No ❏

(2) Second petition: Yes ❏ No ❏

Case 6:10-cv-00115-RAW   Document 1   Filed 04/06/10   Page 5 of 14
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 18

Page 5

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

**GROUND ONE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Fields raised ten grounds for relief. They are set forth in the pages attached to the back of this form. To aid the Court, Mr. Fields includes an Index to Grounds which is at the beginning of the attachment.

With respect to each of the ten grounds raised, none were raised on direct appeal or in any other post-conviction proceeding.

(b) **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑  No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Page 6

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:


**GROUND TWO**:


(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

Page 8

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

    Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

    Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Page 9

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

22

Case 6:10-cv-00115-RAW   Document 1   Filed 04/06/10   Page 10 of 14
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 23

Page 10

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

      Yes ❑ No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

      Yes ❑ No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

      Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

      Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

None of the grounds raised by Mr. Fields have been presented to any federal court.  Mr. Fields has not had any post-conviction proceedings.  The grounds were not raised on direct appeal for one of the following reasons:  1) grounds allege ineffective assistance of counsel which cannot be raised on direct appeal; 2) ground is based on information not available at the time of direct appeal; 3) failure to raise ground is attributable to the ineffective assistance of trial and/or appellate counsel.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?     Yes ❑   No ☑
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing:
  Julia L. O'Connell/Barry L. Derryberry, Federal Public Defender, Tulsa, OK
(b) At arraignment and plea:
  Same as (a)
(c) At trial:
  Same as (a); Isaiah S. Gant, Federal Public Defender, Nashville, TN
(d) At sentencing:
  Same as (c)

(e) On appeal:

 Vicki Mandell-King, Federal Public Defender, Denver, CO; James L. Hankins, Oklahoma City, OK

(f) In any post-conviction proceeding:

 Michael Wiseman & Crisi Charpentier, CHU, Federal Community Defender Office, [cont]

(g) On appeal from any ruling against you in a post-conviction proceeding:

 Eastern District, PA, Suite 545 West, The Curtis Center, Phila., PA 19106, 215-928-0520

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:


(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

Page 13

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

   This Motion is timely filed.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

    A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of —

        (1) the date on which the judgment of conviction became final;

        (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

        (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 14

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

Michael Wiseman

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

(month, date, year).

Executed (signed) on April 5 2010 _____ (date).

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.03-cr-73-WH |
| Respondent, | : | CAPITAL 2255 PROCEEDINGS |
| -v- | : | HON. RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| Petitioner. | : | |

**GROUNDS IN SUPPORT OF MOTION PURSUANT
TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE,
OR CORRECT A SENTENCE
BY A PERSON IN FEDERAL CUSTODY**

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields

Dated:   Philadelphia, PA
April 5, 2010

## INDEX TO GROUNDS

**GROUND ONE**

THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO
FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL
HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH
AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED
INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND
ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING
TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED
MITIGATING FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.  Trial Counsel Ineffectively Failed to Argue that Mr. Fields'
    Uncontested Mental Illness Was Mitigating. The Jury's Failure
    to Find any of this Uncontested Mitigating Evidence Violated the
    Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.  Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . 14

C.  Trial Counsel Were Ineffective for Failing to Investigate and
    Present Evidence of Mr. Fields' Organic Brain Damage . . . . . . . . . 16

    1.  The Defense's Inadequate Efforts to Develop and Present
        Neuropsychological Evidence . . . . . . . . . . . . . . . . . . . . . . 17
    2.  The Organic Brain Damage Trial Counsel Never Presented
        and the Misleading Testimony of Dr. Randall Price . . . . . . . 24
    3.  Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . 26

i

D.      Counsel Ineffectively Failed to Investigate and Present Available
        Medical and Mental Health Providers Who Could Have
        Supported the Manic Flip Defense and Who Would Have
        Testified that Mr. Fields' Mental Illness was Genuine, Not
        Malingered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.      The    Government's    Contentions    of
                Malingering and the Treating Medical
                Professionals Who Could Have Rebutted
                Those Charges  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        2.      Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 37

E.      Trial Counsel Were Ineffective for Eliciting Damaging
        Testimony During the Cross-Examination of Dr. Price . . . . . . . . . . 39

        1.      The Direct and Cross-Examination Testimony
                of Dr. Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        2.      Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 42

F.      Trial Counsel Were Ineffective for Failing to Investigate
        and Present Evidence of Compulsive Aggression in
        Effexor Patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        1.      Mr.   Fields'   Effexor   Defense   and
                Uninvestigated Evidence of Effexor-Related
                Compulsive Aggression . . . . . . . . . . . . . . . . . . . . . . . . . . 47
        2.      Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 52

G.      Counsel Ineffectively Failed to Thoroughly and Properly
        Prepare the Two Mental Health Experts Who Testified  . . . . . . . . 53

GROUND TWO

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR.
FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH.
ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION  . . . . . . . . . . . . 54

ii

## GROUND THREE

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS . . . . . . . . . . . . . 56

A.    Evidence Rebutting the Substantial Planning Aggravating
      Factor  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      1.    Evidence that Mr. Fields Did Not Shoot the
            Chicks After Substantial Planning . . . . . . . . . . . . . . . . . . . . 59
      2.    Evidence that Mr. Fields Did Not Stage a
            Robbery Many Hours After the Shootings . . . . . . . . . . . . . . 64

B.    Evidence Rebutting the Mental Anguish Aggravating
      Factor  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

C.    Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . 74

D.    The Government's Due Process Violations  . . . . . . . . . . . . . . . . 76

      1.    False and Misleading Testimony and
            Argument About a Purportedly Staged
            Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      2.    Misleading Testimony and False and
            Misleading Argument About Mr. Fields'
            Purported "Alibi" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      3.    The False and Misleading Testimony and
            Argument Could Have Affected the Judgment
            of the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

## GROUND FOUR

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    A.    Evidence of Family Dysfunction that the Jury Never Heard . . . . . . 84

    B.    Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . . . 91

## GROUND FIVE

MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

    A.    Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence . . . . . . . . . . . . 95

    B.    Improper Arguments Denying the Right to a Fair Trial . . . . . . . . . . 99

    C.    Trial Counsel's Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## GROUND SIX

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    A.    The Unified Weighing Process and General Death Verdict . . . . . 113
    B.    Trial Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . 117

**GROUND SEVEN**

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE
FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL
COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND
PRESENT EXCULPATORY EVIDENCE ............................ 119

A.      The Undisclosed Exculpatory Evidence ..................... 119

       1.      Bottle of 150 mg Effexor Capsules ................... 120
       2.      Emails and Documents from Mr. Fields'
           Computers ....................................... 122
       3.      FBI Forms 302 and Reports of the OSBI .............. 123

B.      The Undisclosed Exculpatory Evidence Was Material ......... 123

C.      Trial Counsel's Ineffective Assistance ..................... 123

**GROUND EIGHT**

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS
DUE PROCESS AND A RELIABLE SENTENCING HEARING .............. 124

**GROUND NINE**

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD
VIOLATE THE EIGHTH AMENDMENT ............................ 125

## STATEMENT REGARDING CITATIONS AND APPENDIX

The transcript of the trial proceedings are sequentially numbered and will be cited as "*TR*" followed by a page citation. Other proceedings will be cited as *TR* followed by the date of the proceeding and page number. Mr. Fields cites a number of documents that are not currently of record. Those documents are included in the accompanying *Appendix*, which will be cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix*, but will be cited. Defendant, Edward Leon Fields, the movant herein, will be referred to as Mr. Fields. The United States of America will be referred to as the Government. All other citations are either self-explanatory or will be explained.

All emphasis is supplied unless otherwise indicated.

## GROUND ONE

**THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS.**

### A.     Introduction.

1.      While there was significant debate at trial regarding whether the offenses to which Mr. Fields pled guilty could be mitigated by the occurrence of what the defense termed a "manic flip," there was no serious controversy that Edward Leon Fields has had a lifetime of mental illness. There was no dispute between the parties that he suffered from chronic depression, nor was there any serious dispute that he experienced auditory hallucinations before and after the offenses. Yet, counsel never presented these significant mitigating facts to the jury as possessing mitigating value independent of the "manic flip." Although the presence of these facts were largely conceded by the Government, the jury did not find depression or auditory hallucinations to be mitigating factors. The failure of counsel to present them as such violated the Sixth Amendment, and the jury's failure to find and give effect to these uncontested mitigating factors violated the Eighth Amendment.

2.     Counsel's closing argument was confusing, but to the extent it can be read as asking the jury to find some of the uncontested mental health-related mitigating facts, it was deficient in suggesting to the jury that they could be given mitigating effect only through one of three available statutory mitigating factors.

3.     Mr. Fields suffers from a progressive neurological disease (discussed in detail below), and at the time of trial this disease had already caused him organic brain damage localized in his frontal lobes.  However, this extant mitigating factor was not presented at all to the jury, and accordingly the jury never found his organic brain damage as a mitigating factor.  This evidence was not presented despite the fact that counsel had an expert ready to testify to the presence of this damage, and relied upon this factor in arguing to the Department of Justice not to authorize this case as a capital prosecution.

4.     These were not counsel's only failures.  They failed to call available witnesses who would have testified – contrary to the Government's position – that Mr. Fields was not malingering his illness.  These witnesses include those who treated Mr. Fields in the community before the offenses and during his pre-trial incarceration at the Muskogee and Tulsa County Jails.  Counsel also ineffectively opened the door to damaging testimony by a Government expert.  Counsel ineffectively failed to investigate, marshal and present available evidence showing

2

that one of the drugs that Mr. Fields had been prescribed in the weeks before the offenses was associated with causing aggressive and violent behavior. And, counsel ineffectively prepared the mental health experts that she did call to testify.

5.      Trial counsel rendered ineffective assistance in investigating, presenting and arguing nearly every aspect of Mr. Fields' mental health mitigation defense. These failures – and all of the failures set forth elsewhere in this *Motion* – were due to the dysfunction of the defense team.  Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer.  In this capital case, Ms. O'Connell alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument.  Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful.

6.      Ms. O'Connell initially anticipated that Mr. Gant would share the work of preparing and trying this case.  Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A* – 1, ¶¶ 2-3.  To Ms. O'Connell's dismay and Mr. Fields' significant detriment, however, Mr. Gant made no meaningful contribution to the defense effort. He punted the critical Department of Justice authorization meeting to Ms. O'Connell at the last minute, ignored pleas for assistance in drafting jury instructions, gave

3

contradictory and unfocused advice about whether Mr. Fields should plead guilty, and, other than fumbling through a portion of the voir dire,[1] played no role at the sentencing hearing. Id., ¶¶ 4, 6-10. By the time trial began, Mr. Gant had ceased to play any meaningful role in assisting the defense.

7.      Because Ms. O'Connell shouldered nearly all the burdens of preparing and trying this complex case, she became overwhelmed. The defense team repeatedly made important decisions without giving them appropriate consideration. Witness preparation was either poorly done or in some cases, non-existent – some witnesses the defense intended to call were not called at all. Ms. O'Connell acknowledges, "There is no question in my mind that the bulk of the ... errors [in this case] were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case." O'Connell Dec., ¶ 24.

8.      The defense team's dysfunction not only adversely affected the performance of Mr. Fields' lead lawyer, but also the performance of the mental health experts who were the anchors of his mitigation defense. Dr. George Woods, a

---

[1]See e.g. *TR*, 340 (The Court: "Now, we've got to work on the opening and closing argument way of questioning jurors, because I don't like it. Mr. Gant, are you listening. Okay, I really don't. And I may just cut off questioning completely by counsel if we don't restrain ourselves.); *TR*, 373 (The Court: "We've hoed this road [sic] before. We've hoed this road before. I'm going to start putting a limit on counsel of five minutes each. You're [Mr. Gant] done, okay.").

<div align="center">4</div>

psychiatrist who testified for the defense, recalls:

> Even though Ms. O'Connell was the engaged member of the team, I never believed that she gave the presentation I ultimately made the proper time and attention that it required. I had the definite sense that Ms. O'Connell was in over her head. To be clear, I do not mean that she was not capable of handling a complex set of issues, such as those presented by Mr. Fields' case. Instead, I believed that she was being required to handle too much work to be able to responsibly and competently make the required presentation. From my perspective, it was rather obvious that her inability to pay the required attention to the preparation and presentation of my testimony was traceable to Mr. Gant's failure to carry his share of the work.

Declaration of George W. Woods, M.D. ("Woods Dec."), $A-2$, ¶ 4. Another defense

psychiatrist, Dr. Bradley Grinage, states that he was contacted "rather close in time

to the trial," his preparation time was "short ... and only right before [he] testified"

and trial counsel "appeared to be overextended." Declaration of Bradley D. Grinage,

M.D. ("Grinage Dec."), $A-3$, ¶ 5.

9.   The mitigation specialist retained by the defense, Glori J. Shettles, also

recounts that Ms. O'Connell was effectively alone in her work:

> Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. . . . It was quite clear that Ms. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

> I was in close contact with Ms. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial - a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation

<center>5</center>

that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of the defense. Ms. O'Connell examined every witness in the case. This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation. During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day. Evenings seemed to him to be more in the nature of a social event than a serious endeavor. I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court. Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden. I recall her finally giving up on trying to get him to perform a meaningful role.

Declaration of Glori J. Shettles ("Shettles Dec."), *A − 4*, ¶¶ 12-13. She observed

the damage caused by the dysfunctional team:

> In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties. I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Ms. O'Connell being effectively on her own.

Id., at ¶ 15.

10.   While the defense team's dysfunction caused problems that permeated

the entire sentencing hearing, it had an especially acute impact on Mr. Fields' mental

6

health mitigation case for the reasons discussed below.[2]   Accordingly, trial counsel's

performances were ineffective in violation of the Sixth Amendment to the United

States Constitution.

> **B.     Trial Counsel Ineffectively Failed to Argue that Mr.
> Fields' Uncontested Mental Illness Was Mitigating.
> The Jury's Failure to Find any of this Uncontested
> Mitigating Evidence Violated the Eighth Amendment.**

11.     Although the defense presented mitigating facts related to Mr. Fields'

mental health – including his pre-offense history of chronic depression and auditory

hallucinations – trial counsel ineffectively failed to argue that this evidence had

---

[2]As Ms. O'Connell notes, this dysfunction did not effect just her performance with regard to the mental health evidence discussed in this Ground.  It had an impact on virtually ever significant decision and action that she took.  After recounting many of her trial shortcomings, her Declaration concludes that they are all traceable to her status as sole counsel:

> I am an experienced, dedicated and conscientious criminal defense
> attorney. I am disturbed by many of the events that I have discussed In
> this statement. As the Federal Public Defender for the Northern and
> Eastern Districts of Oklahoma, I accept full responsibility for my acts or
> omissions described above. Although Mr. Gant failed to perform his
> role, I should have either forced the issue with him, or brought it to the
> attention of the Court. **There is no question in my mind that the bulk
> of the above-described errors were a result of my being
> overburdened by essentially functioning without cocounsel in this
> complex and difficult case.**

O'Connell Dec., ¶ 24.  Accordingly, rather than repeat the allegations regarding the team dysfunction in each succeeding ground for relief, counsel will refer back to this section outlining the relevant events.

7

mitigating weight independent of the "manic flip" opinion presented by Dr. Woods and Dr. Grinage. This evidence could have been presented as free-standing mitigating evidence under 18 U.S.C. § 3592(a)(1) (significantly impaired capacity), (a)(6) (severe mental or emotional disturbance), or (a)(8) (other factors).[3] Even when counsel mentioned depression and hallucinations separately from the theory of manic flip, counsel never told the jury it could give these facts mitigating effect through anything but the (a)(1) circumstance. This, too, was ineffective.

12. The defense presented two psychiatrists, Dr. Bradley Grinage and Dr.

---

[3]These three mitigating factors state in full:

(a) Mitigating factors – In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1)   Impaired capacity – The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(6)   Disturbance – The defendant committed the offense under severe mental or emotional disturbance.

(8)   Other factors – Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

18 U.S.C. § 3592 (a).

8

George Woods, to establish that Mr. Fields suffered from bipolar disorder at the time of the offenses. *TR*, 2775 (Dr. Grinage); *TR*, 2973 (Dr. Woods). Both doctors also testified that the administration of Effexor to Mr. Fields caused him to endure a manic flip. *TR*, 2812 (Dr. Grinage: "[S]pecific to patients with bipolar disorder is you may treat the depressions with an antidepressant, but, there's a risk when treating someone with bipolar disorder that you might actually not only go past treating depression, but, put them into a manic episode or give them symptoms of mania.... the term that is described in the literature is called switching."); *TR*, 2989 ("[I]t's the medication and the blood level. In the same way that some people have unusual responses to penicillin or unusual responses to other types of medicine, there are people who have unusual responses to antidepressants as well. And one of the unusual responses for someone that is bipolar is to switch into mania."). Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of depression as early as age sixteen and, in the months before the offenses, suffered from sleeplessness, command auditory hallucinations and dramatic weight loss. *TR*, 2778, 2800 (Dr. Grinage); *TR*, 2974, 2981 (Dr. Woods). Dr. Grinage and Dr. Woods also testified that for many years prior to the offenses Mr. Fields had been treated with a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor. *TR*, 2745, 2804 (Dr. Grinage); *TR*, 2974, 2987 (Dr. Woods).

13. While contesting the core of each expert's opinion, the Government conceded much of the mental health evidence presented by the defense. Dr. Jeffrey Mitchell, a psychiatrist who testified for the Government on rebuttal, agreed that Mr. Fields suffered from severe depression. See, e.g., TR, 3263-64 (Dr. Mitchell testifies, "I think Dr. Kemp gave – diagnosed depression which I think was a correct diagnosis."). Dr. Randall Price, the Government's rebuttal psychologist, also noted that Mr. Fields suffered from depression which improved with treatment. TR, 3220. In closing argument, the Government did not dispute depression. TR, 3425 (Government telling the jury: "Was the Defendant depressed during this time period? **Absolutely.**"); TR, 3428 (Government arguing that Mr. Fields was depressed and not bipolar). In addition, Dr. Mitchell testified that Mr. Fields' history of hearing voices was "credible," TR, 3284, and that he did not "doubt that [Mr. Fields] heard voices ...."[4] TR, 3315.

14. Trial counsel requested that the Court instruct the jury on twenty-two

---

[4]Dr. Price did not endorse auditory hallucinations and believed Mr. Fields was malingering in this respect. But he was the only doctor at trial who did not believe that the hallucinations were genuine. As indicated in other portions of this *Motion*, every doctor who has ever treated Mr. Fields for a mental health-related symptom or illness, or administered mental health-related testing, has found his reports of symptoms and his testing credible. **None have found him to be a malingerer – Dr. Price stands alone in this regard.** And, in any event, Dr. Price agreed he could not rule out that the hallucinations were genuine. TR, 3221, 3228.

10

mitigating factors that they contended were present in the case. The Court charged

the jury in accordance with trial counsel's request, i.e., the Court did not refuse to

charge on any mitigating facts or factors requested by the defense.[5] In closing, trial

counsel argued these factors more or less as the Court charged them. Despite the

exquisitely detailed list of mitigating factors given by the Court and argued by

counsel (e.g. Mr. Fields was a good cook), nowhere was the jury told by the Court or

---

[5]The Court charged the jury that the defense had offered as mitigating factors the following factors: (1) the Defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge; (2) the Defendant did not have a significant prior history of other criminal conduct; (3) the Defendant committed the offenses under severe mental or emotional disturbance; (4) the Defendant served in the Navy and was honorably discharged; (5) the Defendant worked as a prison guard for the Oklahoma Department of Corrections; (6) the Defendant has special talents in cooking, art, and computers; (7) the Defendant excelled in his manufacturing job at Kenco Plastics; (8) the Defendant is a loved father; (9) the Defendant is a loved brother; (10) the Defendant is a loved son; (11) the Defendant is a valued friend; (12) the Defendant endured the death of his father months before the offenses; (13) the Defendant's mother moved away weeks before the offenses; (14) the Defendant's ex-wife and children moved away months before the offenses; (15) the mother of the Defendant's children, Teresa Fields, has recently had cancer which may or may not be in remission; (16) the Defendant's death will impact his children, family and friends; (17) the Defendant cooperated with authorities after his arrest; (18) the Defendant confessed to the crimes; (19) the Defendant pled guilty to the crimes; (20) the Defendant has expressed remorse for the crimes; (21) the Defendant sought treatment for his mental illness; (22) the Defendant will not present a future danger to society by being imprisoned for life without possibility of release. *TR*, 3400-01. The Court also instructed the jury that "any other relevant mitigating information presented in this proceeding" could be considered as a mitigating factor. *TR*, 3402.

11

by counsel that it could:

- consider whether manic flip was a mitigating factor under (a)(6)[6] or (8); the (a)(1) mitigating factor was the sole basis offered to the jury for finding and giving effect to manic flip;

- find or give mitigating effect to Mr. Fields' uncontested depression under (a)(1), (6) or (8);

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under (a)(1), (6) or (8);

- find mental health mitigation (depression and hallucinations) under (a)(1), (6) or (8), even if it did not accept the manic flip theory.

Thus, caught up in presenting and arguing Dr. Woods' and Dr. Grinage's opinions regarding manic flip, counsel made these critical errors which unconstitutionally cramped the jury's ability to find and give mitigating effect to mitigating facts, including those that were uncontested. Simply put, the jury was left without an option by which to give mitigating effect to any of the mental health evidence except under (a)(1), and was given no means of finding and giving effect to depression and hallucinations at all.

15.    The jury rejected trial counsel's presentation of manic flip under the

_____

[6]While trial counsel did offer the (a)(6) severe disturbance mitigating factor, they argued that it was proven, not by mental health evidence, but by the facts that Mr. Fields was in rocky relationships, he was apart from his family, his father had recently died, his mother was ill and he was living out of his truck. *TR*, 3440.

12

(a)(1) mitigating factor. *TR*, 3480-81. Yet, there are two other ways that the jury could have found and given effect to manic flip. If the jury believed that Mr. Fields experienced a manic flip, and that it impaired him but did not "significantly" impair him – in the words of the statute – the jury could have found it under the (a)(8) catch-all factor. Counsel never argued that, nor did they ask the Court to so instruct. Similarly, the jury may have accepted that Mr. Fields underwent a manic flip, and that this constituted a "severe mental disturbance" – to quote the statute – even if it did not "significantly impair" his capacity. Had the jury believed this, it could have found manic flip under the (a)(6) factor. Again, counsel never argued that and did not ask the Court to so instruct. And, the jury may have believed he was bipolar, but did not experience a manic flip. In that case, it may have wanted to give effect to this finding under any of the three discussed mitigating factors. But, again, counsel failed to ask for such an instruction, or provide the jury with this choice. Because of counsel's failure to provide the jury with these alternative means of finding and giving effect to the manic flip, the jury was left with no other way to give expression to the mitigating value of that evidence.

16. In similar fashion, counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations.

13

17.    The jury found no mental health related mitigation, and voted for death. *TR*, 3484-85.  Although the jury rejected the manic flip-based impaired capacity mitigating factor, this did not mean it must have rejected evidence that Mr. Fields suffered from mental illness.  One of the seventeen mitigating factors the jury did find was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482.  Concluding that seeking treatment for mental illness is mitigating assumes the existence of mental illness.  It is likely, then, that the jury was persuaded that Mr. Fields suffered from mental illness.  The jury, however, lacked a means for giving effect to these uncontested mitigating facts.  When a capital jury is not given the means by which to give effect to existing mitigating facts, the Eighth Amendment is violated.

## 1.    Trial Counsel's Ineffective Assistance.

18.    Trial counsel rendered deficient performance by failing to argue that Mr. Fields' mental health impairments were mitigating independent of the manic flip theory and the (a)(1) mitigating factor.  Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations.  Mental illnesses such as these are plainly mitigating even if they do not rise to the level of significantly impaired capacity, yet trial counsel argued the mitigating value of this evidence only through the impaired capacity mitigating factor.  Trial counsel acknowledges, "I should have told the jury that they could find these facts as mitigating and ask the

14

Court to charge them on those facts as separate mitigating factors." O'Connell Dec., ¶ 18.

19.     Trial counsel concedes that she had no tactical or strategic reason for proceeding in this way. O'Connell Dec., ¶ 18. Nor could there be any reasonable tactic or strategy for doing so. By proceeding in this manner, counsel made it far less likely that the jury would find the defense's mental health evidence to be mitigating, which is the opposite of what reasonable counsel would have intended.

20.     Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented significant evidence of his history of mental illness and current diagnoses. Some of this evidence was accepted by the Government's own rebuttal mental health experts. Both Government experts conceded that Mr. Fields suffered from depression, and one even agreed that he experienced command auditory hallucinations. See, e.g., TR, 3263-64, 3220, 3284, 3315. Given that Mr. Fields' history of depression was undisputed, and that the jurors apparently believed at least some evidence of mental illness was credible, the jury likely would have found this evidence to be mitigating had it been given a way to express such a finding. As a result, there is a reasonable likelihood that, had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the statutory impaired capacity mitigator, the verdict would have been different.

15

21.    Mr. Fields submits that, when a jury fails to find uncontested mitigation, the Eighth Amendment is violated. In addition, when counsel fails to take advantage of a prosecutor's concession that mitigating facts exist, and the jury does not find those mitigating facts, Sixth Amendment prejudice is established.

**C.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage.**

22.    At the time of the offenses, Mr. Fields suffered from organic brain damage.[7] Trial counsel failed to discover the full extent of his brain damage because they arranged for Mr. Fields to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing.

23.    Nonetheless, the testing done by the defense neuropsychologist showed that Mr. Fields' frontal lobes were impaired. These impairments affected his executive functioning in areas such as judgment and impulse control. Evidence of this damage would have been mitigating in its own right and also would have bolstered the defense that Mr. Fields experienced a manic flip at the time of the offenses. Because trial counsel did not fully investigate and discover this brain

---

[7]As discussed in more detail below, Mr. Fields' brain damage is progressive and he is now even more severely impaired than he was at the time of the offenses.

16

damage, the jury never heard this crucial mitigating mental health evidence.

### 1.   The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence.

24.   Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage, should have sought appropriate evaluation and should have presented such evidence to the jury.

25.   When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). Because this condition can cut off oxygen to the brain for periods of time, it creates a serious risk of brain damage.  Trial counsel anecdotally learned that Mr. Fields suffered from something described to them as "hollow membrane" – a non-existent medical condition – but they failed to obtain legible medical records that would have identified hyaline membrane as the actual diagnosis and documented the resulting respiratory distress. Shettles Dec., ¶ 4. Mr. Fields' current counsel obtained a legible copy of these records which clearly describe his actual condition.  They demonstrate that Baby Boy Fields was in dire condition, unable to breathe and near death. Counsel's failure to obtain a legible set of these crucial records was ineffective.

26.   The legible records recount that Baby Boy Fields had Hyaline Membrane Disease – an illness in newborns which is associated with twenty to thirty percent of

17

all neonatal deaths. The records show that the "baby sox" (which measured the level of oxygen saturation) was thirty percent when he was taken away from his mother to a specialized hospital. The records also note Baby Boy Fields had "mucous in the lung [that] was so thick" the medical staff was unable to siphon it out. The records show that Baby Boy Fields had "very labored breathing," and "appear[ed] in distress." Radiographs showed "diffuse pulmonary infiltrates, " and that "prognosis [was] guarded." At the time he was removed from his mother, he was administered emergency baptismal rites and transferred in "isolette by ambulance." Subsequent tests showed that "in comparison to earlier films [there was] persistent increase in the markings of the right lung. Persistent inadequate pneumonization of the right lung [was] indicated." See Records of Hillcrest Osteopathic Hospital, A–5, at pp. 1, 3, 4, 7, 10, 14, and 16.

27.    In addition, Mr. Fields experienced a number of head injuries and losses of consciousness before the age of twenty. When he was thirteen he had a sleigh-riding accident in which he crashed and lost consciousness for several minutes. Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), A – 6, at 2. At the age of sixteen he rolled a truck down a hill, flipping it over four times. Id. Two days later he became unconscious while riding a dirt bike and required four days of hospitalization. Id. He also experienced an

18

episode of syncope at boot camp after he enrolled in the U.S. Navy.  Id.

28.    Thus, for good reason, trial counsel arranged for Mr. Fields to receive neuropsychological testing.   On August 11, 2004, Dr. Michael Gelbort, a neuropsychologist, conducted an evaluation of Mr. Fields on behalf of the defense. Dr. Gelbort's testing battery included the Wechsler Adult Intelligence Scale-III, portions of Weschsler Memory Scale-III, Wide Range Achievement Test-III, Category Test, Trail Making Test, Lateral Dominance Test, Strength of Grip Test, a partial Sensory Perceptual Examination, Aphasia Screening, and items from the Luria Nebraska.  Gelbort Report at 3.

29.    This testing showed, among other things: "mild suppressions in working verbal and visual memory"; short-term memory for meaningful information "vacillat[ing] with the overall level of functioning in the borderline defective range of functioning"; verbally mediated tasks "mildly slowed to mildly impaired"; higher-level reasoning tasks demonstrating "mild impairment"; and "[i]mpulsivity of mild proportions."  Gelbort Report at 3-4. Dr. Gelbort noted that "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance."  Id. at 4.  In short, he found that Mr. Fields suffered from organic brain impairments.

30.    Most significantly, based on his testing, Dr. Gelbort concluded that Mr.

19

Fields likely suffered from frontal lobe damage that required further evaluation:

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. **He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted**. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

Gelbort Report at 3.

31.    Although Dr. Gelbort recommended further testing, his August 2004 evaluation was the only neuropsychological examination ever conducted for the defense. Nonetheless, there is no question that, based on Mr. Fields' birth history, the other red flags in his background and on Dr. Gelbort's testing, defense counsel knew that Mr. Fields suffered from neuropsychological impairments.

32.    That the defense knew Mr. Fields' suffered from impairments is shown by several facts. In the late summer and fall of 2004, the defense filed a number of pleadings with the Court indicating that it intended to conduct further neuropsychological testing and present neuropsychological testimony at trial. Shortly after Dr. Gelbort's testing showed the presence of neuropsychological deficits with frontal lobe involvement, on August 27, 2004, the defense notified the Court "that

defendant's neuropsychological test results indicate the presents [sic] of frontal lobe impairment in his brain functioning." Defendant's Ex Parte Supplement to Motion for Extension of Time at 1. On September 17, 2004, the defense notified the Court that they had:

> [C]onferred with the neuropsychologist, and was informed that testing indicated the presence of frontal lobe impairment. This information was then shared with the neuropsychiatrist, who determined that additional medical testing is mandated to confirm the existence, nature and extent of Fields' brain damage. The doctor arranged to return to Tulsa at the end of September to conduct a neurological examination. Thereafter, additional time is necessary for the doctors to analyze testing results, determine if any further testing is indicated, formulate opinions and confer with counsel.

Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice at 6. This filing included an affidavit from an attorney stating that "[a] neurologist is often necessary as well when any brain damage, disease, or dysfunction is suspected" and that "[n]eurologists are usually best equipped to interpret the array of data gathered from the client's history, neuropsychological tests, measures of brain structure and functioning (CT and MRI scans, EEG's, PET scans), and additional tests ...." Id., Exh. B at 7. On November 1, 2004, the defense gave notice that its experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist. Defendant's Notice of Intent to Present Expert Testimony (Rule 12.2 Notice).

21

33.     On December 1, 2004, the defense met with the Government to discuss the results of their mental health investigation in hope of settling the case for a sentence of life imprisonment without parole.   United States Attorney Sheldon Sperling memorialized this meeting in a letter sent the next day.   He wrote, among other things:

> Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. . . . no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case. You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004, $A - 7$, at pp. 1, 2, 4.

34.     Whatever doubts may have remained regarding Mr. Fields' organic impairments after Dr. Gelbort's testing were resolved in June 2005, when Dr. Jack Randall Price conducted a neuropsychological evaluation of Mr. Fields on behalf of the Government.   On July 1, 2005, Dr. Price reported impaired performance on a number of significant neuropsychological tests, including the Trail Making Test, Part A (27th percentile), Trail Making Test, Part B (7th percentile), Digit Vigilance Time (9th percentile), Selective visual attention (variable), COWA (7th percentile) and RFFT (1st percentile).   Report of Neuropsychological Evaluation dated July 1, 2005 ("Price

22

Report"), $A - 8$, at 21-25. On the Frontal Systems Behavior Scale Subscales of Apathy, Disinhibition, and Executive Dysfunction, Dr. Price found that Mr. Fields ranged from 83rd percentile to above 99th percentile. Id. at 25. He noted no evidence of malingering on the neuropsychological testing portion of the evaluation. Id. at 21.[8]

35.    Ms. O'Connell provided Dr. Price's report to Dr. Gelbort, who told her that Dr. Price's data was consistent with his, even though Dr. Price's conclusions understated the significance of the data and Mr. Fields' impairments. O'Connell Dec., ¶ 16 ("I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own – that Mr. Fields was brain damaged and neurologically impaired."). Ms. O'Connell confirmed that Dr. Gelbort would testify. Id.

36.    On July 3, 2005 – just before the start of jury selection – trial counsel sent Dr. Gelbort a contract to cover his anticipated testimony at the sentencing hearing. Trial counsel informed him that he would be needed to testify around July 18, 2003, and also would be needed to consult about the cross-examination of Dr. Price. O'Connell Dec., ¶¶ 10, 15 ("Through the months leading up to the trial, I stayed in contact with Dr. Gelbort about conducting further testing and his ability to

_____

[8]Despite these impairments, Dr. Price concluded, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27. However, as noted by Dr. Daniel Martell and discussed below, Dr. Price misrepresented the significance of his findings.

23

testify.... Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage.").

37.    Mr. Fields never received further neuropsychological testing as recommended by Dr. Gelbort, nor did Dr. Gelbort ever testify at Mr. Fields' sentencing hearing. O'Connell Dec., ¶¶ 10, 17 ("I never had him perform the additional testing.... I had no strategy or tactic for abandoning the specific factor of organic brain damage.").

> **2.    The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price.**

38.    At the request of current counsel, Mr. Fields has been evaluated by neuropsychologist Dr. Daniel A. Martell.[9]  Dr. Martell was asked to assess Mr. Fields' current neuropsychological state and functioning, and to assess the accuracy of Dr. Price's opinions and testimony.  His conclusions are stunning and compelling.

---

[9]Dr. Martell is a member of *Park Dietz and Associates*. He is routinely retained by and testifies on behalf of the Government and state prosecutors in both capital and non-capital cases. See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Coe v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

24

Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes. Dr. Martell finds that Dr. Price's testimony did not accurately reflect the significance of his data. Dr. Martell's current testing shows that Mr. Fields has experienced a "catastrophic decline in functioning over the five years since he was seen by Dr. Price" and that "some of his test performances were among the worst I have seen") Report of Daniel A. Martell, Ph.D., ("Martell Report"), *A* – 9, at p. 10.[10]

39.     On Dr. Martell's testing, Mr. Fields scored in the severely impaired range on the gold-standard of neuropsychological tests, the Halstead-Reitan battery. Martell Report at 10. Mr. Fields' executive functioning – a function controlled by the frontal lobes – was "among the most profoundly impaired area tests." Id.  Based on his review of the data provided by Dr. Gelbort and Dr. Price, Dr. Martell is easily able to opine that the progressive disease process observed on his testing had its origins prior to the time of the offenses. Id. at 16.

40.     Dr. Martell finds that Dr. Price inaccurately portrayed his neuropsychological data.  Dr. Price also gave a false impression that Mr. Fields malingered, when his own testing – and the testing of every doctor who has ever

_____

[10]Dr. Martell cannot yet be certain of the causes of this progressive decline. He believes it may be related to a tumor or another process involving stroke. He recommends further imaging to determine the cause. Martell Report at 17. Counsel will shortly move for an order to have Mr. Fields transported to an appropriate imaging facility.

25

evaluated Mr. Fields – shows that he has never malingered. Dr. Martell himself administered multiple, objective, and scientifically sound and accepted tests for malingering, which show conclusively that Mr. Fields did not malinger on his most recent testing. Martell Report at 9.

41.    Dr. Martell also finds that Dr. Price employed a "faulty basis" for concluding that Mr. Fields' reports of auditory hallucinations were false, i.e. that they were malingered. Martell Report at 13-14. Dr. Price's faulty conclusions were not challenged by the defense as they could have been.

42.    Dr. Martell finds that Dr. Price testified outside of his area of expertise when he opined on the impact of several of the psychotropic medications administered to Mr. Fields. Martell Report at 14. This testimony violated the standards articulated by the American Psychological Association's *Ethical Principles of Psychologists and Code of Conduct* and that group's *Specialty Guidelines for Forensic Psychologists*. Id. at 14-15.

### 3.    Trial Counsel's Ineffective Assistance.

43.    Trial counsel were ineffective for failing to fully develop and present evidence of Mr. Fields' organic brain damage and to present this evidence to the jury. Trial counsel also were ineffective for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological

26

impairments.

44.   Almost a year before Mr. Fields' sentencing hearing, Dr. Gelbort informed trial counsel that he suspected frontal lobe dysfunction and recommended further testing.  Gelbort Report at 3.  Trial counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG.  Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing.  O'Connell Dec., ¶ 15.

45.   Presentation of evidence that Mr. Fields' frontal lobes were damaged would have been highly mitigating.  Woods Dec., ¶ 7 ("People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. Such people act out without making the types of judgments that intact people can make.  By itself, this type of impairment is a highly mitigating factor."); Grinage Dec., ¶ 12 ("If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his 'cognition' ... I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.").

46.   Furthermore, organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offense.  As Dr.

27

Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." Woods Dec., ¶ 7. Dr. Grinage agrees that "the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers."[11] Grinage Dec., ¶ 12. Trial counsel never considered organic brain damage to be inconsistent with a manic flip defense and agreed that "[p]resentation of brain impairments would have been an important part of our mitigation presentation." O'Connell Dec., ¶¶ 15, 17.

47.    There was no reasonable basis for trial counsel's failure to fully develop and present this evidence. Trial counsel concedes she had no strategic or tactical reason for failing to arrange for additional testing to be done. O'Connell Dec., ¶ 17.

48.    Trial counsel were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments which showed frontal lobe dysfunction. Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so. O'Connell Dec., ¶ 15. As late as the start of jury selection, it was still trial counsel's intention to call Dr.

---

[11]Dr. Grinage notes that the previously undiscovered legible records of Mr. Fields' birth also strengthens this opinion. Grinage Dec., ¶ 12.

28

Gelbort as a witness. O'Connell Dec., ¶ 15. Dr. Gelbort's testimony would have been highly mitigating by itself and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12.

49.    In addition, Dr. Gelbort's testimony was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who told the jury that Mr. Fields did not suffer from brain dysfunction even though his own testing showed significant impairment. See TR, 3154; Price Report, at 21-25; see also Martell Report, pp. 12-13. (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist).

50.    Trial counsel fell below a reasonable objective professional standard when they failed to present this known and available mitigating evidence and failed to rebut Dr. Price's conclusions.  According to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem. O'Connell Dec., ¶ 17.  Trial counsel concedes she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Id. Nor could she have had a sound strategy.  One of counsel's most fundamental duties is to present her client's case. It is therefore incumbent upon trial counsel to invoke the

29

court's processes, if needed, to insure the attendance of a witness, or else to seek a continuance until the witness is available.

51.   Mr. Fields was prejudiced by trial counsel's deficient performance in failing to investigate and present evidence of organic brain damage. Evidence of frontal lobe damage would have been highly mitigating, especially when considered in combination with Mr. Fields' other diagnosed mental illnesses and his use of the antidepressant Effexor. Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Had the jury known that Mr. Fields suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different.

52.   Mr. Fields also was prejudiced by trial counsel's failure to rebut Dr. Price's testimony. That testimony was devastating, but trial counsel failed to challenge his conclusions in any meaningful way, and actually elicited more harmful testimony on cross-examination.[12] Not only did the jury never learn that Mr. Fields was brain-damaged, but it was affirmatively led to believe he was **not** brain-damaged by Dr. Price's misleading testimony. Had the jury known that Mr. Fields suffered from significant neuropsychological impairments consistent with frontal lobe dysfunction, there is a reasonable likelihood that the jury's verdict of death would

---

[12]Mr. Fields also alleges that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price. See Part E, below.

30

have been different.

**D.** **Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered.**

53.    The Government contended that Mr. Fields was malingering when he reported experiencing auditory hallucinations, and also attacked the diagnosis of manic flip presented by Dr. Woods and Dr. Grinage as the opinions of "left coast ... hired guns." *TR*, 3429. Trial counsel could have rebutted these contentions by calling the medical professionals who treated him before and immediately after the offenses. The testimony of local medical professionals, who treated Mr. Fields would have silenced the Government's "left coast ... hired guns" argument. Moreover, as treating providers, these witnesses had a unique opportunity to see and evaluate Mr. Fields' condition, and to offer persuasive testimony about it. Trial counsel neither investigated these medical professionals nor called them to testify. Their unpresented opinions would have carried great weight.

31

1.   **The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges**

54.   Dr. Randall Price, a psychologist called as a rebuttal witness for the Government, testified that Mr. Fields was malingering when he reported hearing voices:

Q:   In your report what did you say you concluded about auditory hallucinations?

A:   That the way he described them to me was consistent with exaggerated or malingered auditory hallucinations that were inconsistent with genuine auditory hallucinations experienced by psychotic individuals.

Q:   What about the description is inconsistent with the voices described by other psychotic individuals?

A:   Having identified the – a single voice and referring to that voice as a little friend that tells you what to do and that being the only kind of content to the voice, to a single voice.  Not having any strategies to be able to deal with those voices except to obey them and those voices being talked about without an associated delusional system.  Those things are inconsistent with psychotic individuals.

Q:   All right.  The fact that he said it was just a lone voice, you say that's not consistent with – that's not credible?

A:   That's correct.

*TR*, 3221-22.

32

66

55.    The Government also suggested in closing argument that Mr. Fields'
suicide attempt was not a real one, but simply a means of gaining attention and
sympathy.  *TR*, 3464 (Government arguing that suicide attempt was a "transparent
ploy" to gain sympathy and imploring the jury not to be "fooled" by it).

56.    Ostensibly to address the charge that Mr. Fields was malingering his
auditory hallucinations, trial counsel questioned Dr. Woods about whether Mr.
Fields' treating doctors believed he heard voices.  All Dr. Woods could say was that
Mr. Fields' treating doctors (i.e., those who treated him before and after the offenses)
did not make any notes in their files indicating a belief he was malingering and that
they continued to prescribe medication.  *TR*, 2979-80.  But trial counsel never
presented the available source evidence – evidence that would not have been
vulnerable to the Government's "left coast – hired guns" argument.  Nor did counsel
present any evidence showing that Mr. Fields' suicide attempt while incarcerated at
the Muskogee jail was an earnest and serious attempt to take his life.

57.    In closing argument, the Government repeated its claim that Mr. Fields
was a malingerer.  His report of auditory hallucinations was vigorously attacked:

> Not at the confession, not in that conversation [with Michelle Tipton].
> Voices, she says, are real and influential?  Not his.  The voices like the
> robbery and burglary were a convenient afterthought.  Remember the
> voice made him falsely claim that cannot be measured.  This alleged
> voice that the Defendant claims in this case at about the time he chose

33

to activate his long though out plan to become a double murderer is just not real.  When had the Defendant had any of these voices or had previously heard voices beside the issue here? ... These voices are suspiciously fabricated consistent with exaggeration or malingering, inconsistent with genuine auditory hallucinations described by psychotics.  A little friend that tells him what to do?  Heard by a person with no strategies to deal with the voice but obey?  Unaccompanied by a delusional system, the doctors say, Dr. Price, not credible.

*TR*, 3450-51.

58.    The Government also hammered its "left coast – hired guns" mantra in attacking the credibility of the defense experts:

We didn't have to go out to the left coast to find somebody who testified for the defense every time.  **We got people in our own back yard who were credible**, who would give an honest opinion who were not hired guns.

*TR*, 3429.

59.    **The Government was correct**.  There were credible local providers "in our own back yard" – to quote the Government – who could have provided extremely helpful testimony.  Such testimony would have rebutted the claim that Mr. Fields was a malingerer, supported the manic flip defense, showed that his suicide attempt was genuine, and demonstrated that, on the whole, Mr. Fields was a truly sick individual. Counsel did not call any of these medical professionals at trial, each of whom examined Mr. Fields before or immediately after the offense.  They are each local practitioners, which would have given them far greater credibility with the jury than

34

the defense's out-of-state mental health experts who were vulnerable to the Government's charge of being "left coast ... hired guns." *TR*, 3429.

60.   Dr. Louise Bumgardner is a life-time resident of Oklahoma. She is a psychiatrist who treated Mr. Fields at the Muskogee Jail after the homicides. Dr. Bumgardner states that Mr. Fields reported "that he was suffering from auditory hallucinations (hearing voices) and was feeling 'very suicidal.' He reported to me that he was depressed throughout his life." Declaration of Dr. Joyce Louise Bumgardner ("Bumgardner Dec."), *A* – 10, ¶ 3. She further states:

> Based upon my review of my records and my recollection of this patient, I believe that his suicide attempt was a genuine effort to take his life. I also believed that he was suffering from actual psychiatric symptoms and was not malingering them. I have treated many prisoners presenting with psychiatric complaints, many of whom were malingering for secondary gain. When I believed that prisoners were malingering I would not hesitate to place that conclusion in my notes. The absence of that notation, my actual notes and my recollection of Mr. Fields, show that I believed he was genuinely mentally ill.

Id., ¶ 4.

61.   In addition, Dr. Bumgardner agreed with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offense:

> Based on his history, the materials I have reviewed, and my own impressions at the time I treated him, I believe that Mr. Fields presented a classic case of the adverse impact that can occur when anti-depressive medications are given to a person with bi-polar disorder. Providing anti-depressive medications alone (that is, without appropriate additional

35

medications), to a person in Mr. Fields' condition can cause an explosion of extant smoldering manic symptoms, with devastating effects. I have seen such a reaction in other patients I have treated, and I have read about this phenomena in the literature. I also believed that he was a mentally ill individual and was not malingering.

Bumgardner Dec., ¶ 5.

62. When Mr. Fields was transferred to the Tulsa County Jail, he was treated by Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections. Like Dr. Bumgardner, Dr. Trombka believed that Mr. Fields was hearing voices:

I diagnosed schizoaffective because of Mr. Fields' complaints of auditory hallucinations which were reported concurrent with his mood symptoms. Although reasonable mental health professionals could disagree with regard to the most appropriate diagnosis for Mr. Fields' (whether depression with psychotic features or bi-polar illness with psychotic feature), it was clear to me that he was ill. There was no indication in the jail records upon which to conclude that he was faking his illness, or that his complaints were not genuine .... My notes of February 2, 2004 indicates that he told me that he was feeling better than he had in years. I also noted observations by correctional personnel, which caused me to believe that Mr. Fields was genuinely ill.

Declaration of Larry Trombka, M.D., *A* – 11, ¶ 2.

63. Other medical professionals who treated Mr. Fields in the years before the homicides confirm that he presented no signs of malingering in describing his symptoms. Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000, states that "he

36

presented with chronic depression which I treated in a standard manner. There is no indication in either my records or my memory that I believed Mr. Fields was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression." Declaration of R.L. Winters, M.D., *A* – 12, ¶ 4.

64.    In 1999, Dean Anderson, a physician's assistant at the Heavener Clinic, also treated Mr. Fields for depression. Mr. Anderson states that "I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different")." Declaration of Dean Anderson, *A* – 13, ¶ 11.

65.    Although they were each available and willing to testify at trial, none were called. Bumgardner Dec., ¶ 6; Trombka Dec., ¶ 4; Anderson Dec., ¶ 12.

### 2.    Trial Counsel's Ineffective Assistance.

66.    Trial counsel were ineffective for failing to call the medical professionals who treated Mr. Fields to testify that they did not believe he malingered his complaints of auditory hallucinations or suicide attempt, and to bolster the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip.

67.    Trial counsel admits that she had no tactic or strategy for not

37

investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. Mr. Fields' reports of auditory hallucinations were important to the defense's claim of manic flip, as well as to establishing other mental health mitigating factors. After the Government called Dr. Price to rebut this evidence, the defense needed to counter this charge of malingering. The views of local medical professionals who worked in local jails and treated Mr. Fields, would have assumed far greater weight and would have been greeted as more credible by the jury. Yet trial counsel failed to call them, relying instead on nothing more than the speculative inferences that Dr. Woods was able to draw from Mr. Fields' medical records. Trial counsel also failed to call Dr. Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even though those opinions went to the heart of Mr. Fields' mitigation defense. There was no reasonable basis for trial counsel's failure to present this evidence when it was readily available and vital to Mr. Fields' defense.

68.     Mr. Fields was prejudiced by trial counsel's failure to call the medical professionals who treated him to rebut the Government's allegations that he was malingering. In closing, the Government argued these allegations at length. This argument not only undermined the defense's claim that Mr. Fields suffered from impaired capacity at the time he shot the Chicks, but it also suggested that he was fabricating an excuse for his behavior, and thus was a powerful indication of

38

consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). There is a reasonable likelihood that, had trial counsel called these witnesses to rebut allegations of malingering, the verdict would have been different.

### E.    Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price.

69.    The defense team's dysfunction and ineffective handling of the neuropsychological evidence was reflected in trial counsel's cross-examination of Dr. Price. Although trial counsel previously sought to limit the testimony of Dr. Price to exclude discussion of organic brain damage, trial counsel elicited the very conclusions they argued were outside the scope of Dr. Price's rebuttal testimony. Furthermore, these conclusions were elicited without meaningful challenge by the defense team, even though the defense team possessed significant information to impeach the testimony of Dr. Price.

### 1.    The    Direct    and    Cross-Examination Testimony of Dr. Price.

70.    As set forth above, trial counsel ineffectively failed to present evidence of Mr. Fields' organic brain damage during the course of trial. This error was compounded by trial counsel's elicitation from rebuttal witness Dr. Price of testimony that Mr. Fields had no significant brain impairment. Counsel's combined failures left

39

Mr. Fields with the worst of both worlds.

71.    Trial counsel initially sought to limit the scope of Dr. Price's direct testimony regarding organic brain damage:

> MS. O'CONNELL:  What I was getting ready to tell the Court is that that brings to mind for me the fact that a great deal of what Dr. Price did was testing in relation to brain injury.  And during the course of our case we presented no information, no evidence, no testimony of brain injury.
>
> THE COURT: Meaning that would not be proper rebuttal?
>
> MS. O'CONNELL: Yes.

*TR,* 3080.  The Court declined to rule in a vacuum and stated that it would address the matter through any specific objections raised during the course of testimony.  *TR,* 3083-84.

72.    Despite bringing the issue to the attention of the Court, trial counsel failed to object when the Government brought out harmful, but limited, testimony from Dr. Price regarding brain damage.  See, e.g., *TR,* 3106 (observing that Mr. Fields' "cognitive processes ... were intact"); *TR,* 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16).  Notably, trial counsel did not object when Dr. Price suggested that his evaluation did not detect any organic brain damage.  *TR,* 3154 ("But I thought there was probably going to be some brain dysfunction, something there to have people

40

evaluating him for this.").

73.    Although the bulk of Dr. Price's neuropsychological opinions were not presented in his direct examination, counsel elicited them on cross-examination. She inexplicably elicited from Dr. Price the opinion that he hinted at in his direct testimony, and the opinion trial counsel initially sought to exclude:

Q:    Yesterday you said that you didn't see at least much impairment in Mr. Fields, is that right, when you testified at the jail? When you saw him at the jail you did not see much impairment?

A:    I did not see much neuropsychological impairment, not significant neuropsychological impairment, that's correct.

Q:    Not much neuropsychological impairment?

A:    Right.

Q:    The kind of impairment that comes from damage to the cells in the brain?

A:    Primarily, yes.

*TR*, 3204-5.[13]  After eliciting this testimony, trial counsel moved on to another subject and did not return to the issue of organic brain damage, leaving Dr. Price's opinion as the final – and as it is now known, inaccurate – word on the issue of organic brain

_____

[13] Trial counsel could not have been surprised by this testimony, as Dr. Price's report states, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder."  Price Report at 27; see also O'Connell Dec., ¶ 16.

41

damage.

## 2.     Trial Counsel's Ineffective Assistance.

74.     Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to use readily available information to impeach his testimony.

75.     Trial counsel could have presented Dr. Gelbort in anticipation of or in rebuttal of Dr. Price's testimony.   Trial counsel were aware of the mitigating significance of the evidence of Mr. Fields' organic brain damage.  O'Connell Dec., ¶ 17.  Trial counsel also were aware that Dr. Price's opinion regarding organic brain damage was vulnerable to impeachment:

> About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell.  I saw that Dr. Price opined that Mr. Fields did not have significant brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered.  I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own – that Mr. Fields was brain damaged and neurologically impaired.  Dr. Gelbort again confirmed that he was available to testify.

O'Connell Dec., ¶ 16.  In fact, trial counsel cross-examined Dr. Price regarding the testing areas where Mr. Fields demonstrated impairment.  See TR, 3195-96 (e.g., testimony that Mr. Fields performed at 7th percentile on Trail Making Test and Verbal Fluency, 17th percentile on Stroop Test).

42

76.     Despite this, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neurobehavioral impairments and over-reported Mr. Fields' actual level of functioning.  See Martell Report, pp. 12-13.   While trial counsel questioned Dr. Price regarding individual tests on which Mr. Fields scored poorly, they failed to demonstrate to the jury the combined significance of those results.  Trial counsel failed to pull together the isolated testing results to show that "there was a pattern of impairments suggestive of brain damage."  Martell Report at 12-13.   This could have been accomplished through cross-examination or by presenting the testimony of Dr. Gelbort, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4.

77.     Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the practice effect in neuropsychological testing.  Martell Report at 13.  The practice effect occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the practice effect).

43

Dr. Price's opinion was vulnerable to impeachment on this front, as he repeated many of the tests that Dr. Gelbort administered ten months earlier.  Id.

78.    Trial counsel failed to object to Dr. Price's testimony regarding the effects on Mr. Fields of the administration of Effexor. *TR*, 3129-30.[14] As Dr. Martell points out, Dr. Price is a psychologist and is not expert in the effects of such medications.  Indeed, Dr. Price acknowledged as much when he refused to answer a question on cross-examination about the effects of the medication, because of his lack

---

[14]On direct examination, Dr. Price gave the following testimony:

Q:    By the way, Doctor, do you know what happens if you were–let's say you were prescribed 150 milligrams of Effexor and instead of taking one, you took four. You took 600 milligrams.  What would happen?

A:    Well, I think you would– that you would feel bad.  That you would get– I mean, that you might get sick.  It might cause you to be sick to your stomach.

Q:    Would it screw up behavior?

A:    **No.**   I know on Effexor that if you stopped taking it abruptly that you could get dizzy.  But taking extra. **I don't think immediately, antidepressants don't have an effect on behavior immediately.**

*TR*, 3129.

44

of expertise in this area. *TR*, 3206.[15] Counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

79.   Trial counsel had no strategic reason for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Trial counsel originally sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence (filed March 31, 2005). Furthermore, just before Dr. Price's direct testimony was presented, trial counsel sought to **prevent** Dr. Price from testifying about organic brain damage, on the basis that it was improper rebuttal because it was outside the scope of the mitigation evidence presented by the defense team. *TR*,

---

[15]On cross-examination, he admitted he was not an expert:

Q:   How familiar are you with those medications?

A:   I'd say I have a nodding familiarity. I'm not – I don't prescribe. I'm not an M.D. It's not my – I wouldn't say by any stretch of the imagination I'm an expert in those medications.

*TR*, 3206.

45

3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude.

80.    Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not suffer from organic brain damage and failure to impeach or otherwise counter the vulnerable testimony of Dr. Price.   Instead of hearing the wealth of evidence of Mr. Fields' organic brain damage, or at a minimum, hearing nothing at all regarding Mr. Fields' brain functioning, the jury heard only that Mr. Fields tested poorly in isolated areas but on the whole did not have any significant neuropsychological impairment.   Had trial counsel not elicited Dr. Price's harmful testimony, or if trial counsel properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different.

**F.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.**

81.    Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-

46

undiagnosed bipolar disorder. The Government countered that his behavior before and after the offense indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression. This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

### 1. Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression.

82. Trial counsel called Dr. Grinage and Dr. Woods to testify that Mr. Fields committed the offense while experiencing a manic flip caused by the ill-advised administration of the antidepressant Effexor. Dr. Grinage testified that a manic flip caused by Effexor would sometimes put a person into a "really high, flighty, euphoric state, but many times I have seen with patients very irritable and unable to concentrate." *TR*, 2812. Dr. Woods, too, testified that Effexor could have caused a manic flip and that mania leads to "impaired judgment." *TR*, 2990. In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point." *TR*, 3438.

83. The Government challenged the defense's theory by arguing that the circumstances surrounding the offense demonstrated that Mr. Fields' judgment and

47

concentration were not impaired.  According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later. *TR*, 3413-22.  As the prosecutor told the jury, "The Defendant had no delusions.  It's impossible, virtually impossible, for Effexor to trigger a single manic episode.  The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness." Id. at 3451-52.

84.     The jury apparently was persuaded by the Government's argument, rejecting the impaired capacity mitigating factor. *TR*, 3480-81.  Because impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no mental health mitigation.

85.     Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression.  Compulsive aggression, unlike impaired judgment or concentration, would have been consistent with the Government's view that Mr. Fields was able to deliberate before and after the offense.  Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his

48

conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion could thus have been mitigating under the (a)(1) significant impairment factor, as a severe mental or emotional disturbance or as catch-all mitigation (18 U.S.C. § 3592 (a)(6) & (8)).

86.     Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. In a peer-reviewed article published in 2003, Dr. Peter Breggin described various case reports, epidemiological studies and clinical trials showing an increased rate in obsessive aggression and violence in patients who were being treated with selective serotonin reuptake inhibitors ("SSRIs"). Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A* − 14. Effexor, or venlafaxine, is a non-selective serotonin reuptake inhibitor that is in the category of SSRIs. Id. at 32. Obsessive aggression observed in SSRI patients includes a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Id. at 36.

49

87.    After Dr. Breggin's article was published, the United States Food and Drug Administration ("FDA") issued a related public health advisory.  On March 22, 2004 – over a year **before** Mr. Fields' sentencing hearing – the FDA asked the manufacturers of ten anti-depressant drugs, including venlafaxine (Effexor), to alter their labeling to include a warning statement recommending "close observation" of patients being treated with these drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric."  FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A* – 15.  The FDA also recommended that "therapy should be evaluated, and medications may need to be discontinued, when symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms."  Id.

88.    The PHA was widely reported in the general media.  See, e.g., Elizabeth Kaledin, *People Taking Antidepressants Need to be Monitored for Turbulent Emotions, Including Possible Risk of Suicide, CBS Evening News Transcript*, March 22, 2004, *A* – 16; Gardner Harris, *Labels on Antidepressants Sought to Warn of Suicide Risk*, N.Y. Times, March 22, 2004, *A* – 17; *Antidepressants May Have*

50

*Opposite Effect, FDA Warns*, USA Today, March 22, 2004, *A* – 18.

89.     Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to the PHA by changing the drug's Medication Guide to include the warnings requested by the FDA.  Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**."  Effexor Medication Guide (2004), *A* – 19, at 12.  The Medication Guide also advised that these changes "**may be abrupt**."  Id.

90.     Trial counsel failed to investigate and present this evidence even though it would have been highly mitigating and was consistent with the facts of his case.  Mr. Fields' behavior around the time of the offense closely matched the kinds of obsessive aggression observed in SSRI patients, including a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions."  Breggin Article at 36.  In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127.  There

51

was evidence that Mr. Fields filled this prescription the day before the homicides.[16]

This evidence is consistent with Wyeth's warning that adverse effects were more likely to occur  after an upward adjustment to the Effexor dosage.   Effexor Medication Guide (2004) at 12.

## 2.    Trial Counsel's Ineffective Assistance.

91.    Trial counsel were ineffective for failing to present evidence that patients treated with SSRI-type medications, such as Effexor, can experience increased rates of compulsive aggressiveness.

92.    The defense's theory that Mr. Fields experienced a manic flip which impaired his capacity to conform his actions to the requirements of the law or to appreciate the wrongfulness of his actions was vulnerable to the Government's argument that his actions before and after the homicides appeared to be deliberate. Evidence that Effexor caused or added to Mr. Fields' sudden compulsive aggressiveness would have been highly mitigating and entirely consistent with the facts of this case.  There was no reasonable basis for failing to investigate and present this evidence.

93.    Mr. Fields was prejudiced by trial counsel's deficient performance.

---

[16]The Government withheld exculpatory and material evidence regarding the amount of Effexor that Mr. Fields consumed.  This is discussed in Ground Seven, below.

52

Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that the verdict would have been different.

**G.  Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified.**

94.    Because trial counsel poorly prepared Dr. Grinage and Dr. Woods for their testimony, the Government was able to damage their credibility on cross-examination. Each expert believes that they were not properly and adequately prepared. Grinage Dec., ¶¶ 5-12, Woods Dec., ¶¶ 4, 8; Glori Shettles agrees (Shettles Dec., ¶ 14) and Ms. O'Connell acknowledges this as well. O'Connell Dec., ¶¶ 11-12.

95.    Aside from a general sense that the testimony was ill-prepared and presented, some specific examples demonstrate the problems each expert encountered. For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7, causing him on cross-examination to contradict some of the answers he gave on direct examination. *TR*, 2816-18; see also O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7. Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the

53

wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired." O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1). As a result, Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination. *TR*, 3048; see also O'Connell Dec., ¶ 12.

## GROUND TWO

### THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION.

96.     As set forth in connection with Ground One, above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function. Although the cause of the process is not yet clear, and the precise rate of decline has yet to be determined, Mr. Fields' mental health will not permit his execution.

97.     First, the evolving standards of decency – by which cruel and unusual punishments are adjudged under the Eighth Amendment – no longer permit the execution of profoundly mentally ill people. The evolution of these standards is seen in the prohibition of the execution of people with mental retardation, people who were under eighteen at the time of their offense, and those who are not mentally competent to be executed. Although there is no current holding of the United States

54

Supreme Court precluding the execution of those with profound mental illness, counsel submits that this date is not far off. Given the apparent pace of Mr. Fields' mental decline, it is likely that, by the time his execution, his mental health status would preclude his execution.

98. Second, the Supreme Court has ruled that the Eighth Amendment precludes the execution of people who are not competent for execution. Such people are not aware of the reason for their execution or that they are to be executed. Again, by the time of Mr. Fields' execution, it is likely that he will be incompetent for execution.

99. Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to the Court through treaty and convention.

100. Although neither of these Eighth Amendment bases for precluding Mr. Fields' execution are now ripe for adjudication, he raises them in this *Motion* to ensure that they are not waived.

## GROUND THREE

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS.**

101. The jury found, among others, the statutory aggravating factor against Mr. Fields that he shot Mr. and Mrs. Chick after substantial planning and premeditation, and it found the non-statutory aggravating factor, among others, that he inflicted mental anguish on Mrs. Chick.   See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).[17]

102. The Government presented false and at best misleading testimony and

---

[17]The statutory aggravating factor of substantial planning and premeditation is found at 18 U.S.C. § 3592(c)(9) and states:

    (c)    Aggravating factors for homicide – In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

    (9)    Substantial planning and premeditation – The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

56

argument to support the substantial planning aggravating factor. First, the Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument. Second, the Government selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides. The Government also twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings, and made it appear that he tried to concoct an alibi for his whereabouts on the night of the offense. It presented flawed expert opinions that ignored basic facts about the crime scene to support its theory that Mr. Fields returned to the scene hours later to stage a robbery.

103.   Yet at every step, trial counsel failed to attack the aggravating factors in any meaningful way. Before the sentencing hearing, trial counsel failed to consult with experts who could have helped them expose the vulnerabilities of the Government's experts on cross-examination. During cross-examination, trial counsel failed to correct distorted testimony elicited by the Government. During the defense's case-in-chief, trial counsel neglected to call their own experts to rebut the flawed testimony of the Government's experts. At closing, trial counsel never argued why

the Government had failed to prove the aggravating factors beyond a reasonable doubt.

104. Thus, through knowing presentation of false and/or misleading evidence and counsel's ineffectiveness for failing to put this aspect of the Government's case through adversarial testing, the jury was permitted to find two aggravating factors it either should not have found, or, if found, should not have weighted as heavily as it did.

105. Had trial counsel conducted a reasonable investigation – by adequately interviewing friendly Government (i.e., civilian) witnesses and consulting with a crime scene investigator or pathologist – they could have discovered and presented evidence rebutting the Government's claim that Mr. Fields shot the Chicks after substantial planning and inflicted mental anguish on Mrs. Chick. Had the defense done so, it is likely that the jury would have rejected these aggravating factors. Had these aggravating factors been rejected, in whole or part, there is a reasonable probability that the jury's weighing of the remaining aggravating and mitigating circumstances would have been different, and Mr. Fields' life would have been spared. Counsel's ineffective failure to properly challenge these circumstances allowed the jury to consider facts that they would not otherwise have had before it. Thus, counsel's failure caused Mr. Fields significant prejudice.

58

**A.   Evidence Rebutting the Substantial Planning Aggravating Factor.**

106.   To prove the substantial planning aggravating factor, the Government introduced evidence purporting to show that Mr. Fields had been laying the groundwork to shoot a human being for a year or more before the offense, and that he devised a specific plan to shoot the Chicks after setting up an alibi for his whereabouts.  The Government also introduced evidence purporting to show that, at least six hours after shooting the Chicks, Mr. Fields returned to the campsite and staged a robbery to make it appear that his objective had been to steal, not to kill.  All of this evidence could have been rebutted by proper defense investigation.

**1.   Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning.**

107.   The Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become a sniper and shoot human beings. The prosecutor argued in closing:

> Didn't start on July 10th, 2003, started long before that.  It started about a year before that when, as you heard the testimony, the Defendant was with Penney to help to create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.
>
> \* \* \*
>
> His plan down the road is to become a predator, a sniper.  This was the first step in that action.

59

TR, 3406-07.

108.   According to the Government, Mr. Fields finally decided to put his plan "to become a predator, a sniper" into action on the evening of July 10, 2003 after meeting the Chicks at the Winding Stair Campground a few days earlier. As evidence of this plan, the Government argued that Mr. Fields attempted to create an "alibi" for the evening of July 10, 2003 – when he purportedly intended to shoot the Chicks – by telling his former girlfriend that he planned to go fishing with a friend that night and would be home late. TR, 3412-13.

109.   If trial counsel had conducted a reasonable investigation by adequately interviewing a friendly Government witnesses – Daniel Presley – they would have discovered evidence refuting the Government's allegations. Mr. Presley could have explained to the jury that certain remarks and actions by Mr. Fields that the Government made seem ominous were in fact innocuous.

110.   Had he been asked by trial counsel on cross-examination, Mr. Presley could have given testimony contradicting the Government's argument that, because Mr. Fields used a ghillie suit and scoped rifle, he must have been planning a sniper attack. Under questioning by the Government, Mr. Presley told the jury that Mr. Fields went squirrel–hunting in his ghillie suit, that he attached a powerful scope to his .22 rifle, and that he was a "[g]reat shot." TR, 2378-79. He also told the jury that

60

Mr. Fields had ghillied his rifle. Id. at 2384-85. However, he has now explained that

it was common for hunters in the area to use ghillie suits and to ghillie their weapons

– questions he was never asked by trial defense counsel:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go to any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself.
>
> * * *
>
> Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't because it wasn't unusual.

Declaration of Daniel Presley ("Presley Dec."), $A - 20$, ¶¶ 4, 5.

111. Mr. Presley also would have explained, if asked, that it was not unusual

for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their

.22 rifles. He states, "You an either hunt small game with a shot gun or a .22. Using

a shot gun, its easier to hit the target, though you have to be closer to it, but it often

ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows

you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's."

Presley Dec., ¶ 5. Moreover, Mr. Presley would have testified that Mr. Fields

61

attached the scope to his rifle at least a year before the homicides. Id.

112. Mr. Presley also could have rebutted the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides, if only trial counsel had inquired into the matter. The Government first called Mr. Presley to testify that on the evening of July 10, 2003 he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." *TR*, 2382. The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2005 and told her he had plans with his Mr. Presley for that evening. Ms. Tipton testified:

> Those plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work. He was a very timed person and he got home at exactly the same time every night and he knew – at this time I was not working, so, he knew that I would worry. So, he wanted me to know that him and Danny would be out fishing and that he wouldn't be right home.

*TR*, 2558-59.

113. From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts. *TR*, 3412-13.

114. However, Mr. Presley would have testified on cross-examination that Mr. Fields came over to his house after work that day and **asked him to go snake-**

62

**hunting that night**. Presley Dec., ¶ 3. Mr. Presley declined to go hunting because he had plans to go to the casino with sister, id., but the fact that Mr. Fields suggested that the two of them go snake-hunting that evening shows that, as he indicated to Ms. Tipton, he **did** hope to do something with Mr. Presley that evening.  As Mr. Presley observes:

> When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes.  We wouldn't get back from snake hunting till ten or eleven p.m. – or even later.  Snake hunting is one of the activities we would do all the time.  Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

Id.

115.  Although trial counsel did not question Mr. Presley about this information on cross-examination, they had been alerted to its existence.  In Mr. Presley's statement to the FBI, he mentioned that, just hours before the offense,[18] Mr. Fields asked him if he "wanted to do something." FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview") *A – 21*, at 3.  Mr. Presley's statement was produced to the defense in discovery.  Yet trial counsel never followed

---

[18]Mr. Presley told the FBI that Mr. Fields came over to his house sometime after 4:00 p.m.  Presley Interview at 3.  In his testimony at the sentencing hearing he said he "thought it was around 4:00" that he last saw Mr. Fields that day, but he had "heard since that it was later than that." *TR*, 2382.  His wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven, I believe." *TR,* 2462.

63

up with Mr. Presley – either through investigation or cross-examination – to find what it was that Mr. Fields "wanted to do." Had trial counsel followed up on this remark during their investigation, they would have learned that Mr. Fields wanted to go snake hunting the night of the offense, not shoot the Chicks, and could have presented that information to the jury to contradict and challenge the substantial planning and premeditation aggravating factor.

116.   Trial counsel never asked Mr. Presley these matters. See Presley Dec., ¶ 3.

> ### 2.   Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.

117.   As further proof that Mr. Fields had a premeditated plan to shoot the Chicks, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned several hours later to stage a robbery. This claim was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal. The Government argued:

> To [Agent Dalley] this was not a true burglary or robbery. This was staged.
>
> So you have to ask yourself why would he do this. Why would he come back some hours later to commit this crime. Don't know. But one thing I throw out to you is this. The evidence suggests that he knew he may

have been caught by those people coming in.  These people may have recognized his truck and when he had completed his plan, when he had killed the Chicks, when he had finally murdered his prey, when he had graduated from squirrels to humans, he left the area.

\*   \*   \*

So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery and if anyone says anything I can say, well, I was – they were – I was there using the bathroom.  They were already dead.

*TR*, 3421, 3422; see also *TR*, 2019 (Government explains relevance of staged robbery theory to statutory aggravating factor).

118.   To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma.  Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door.  *TR*, 2099.  According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried:

65

A: In addition to the blood that is in the runners of the foot well and on top of the sandals, I also note that there are these small, shiny fragments here which are pieces of broken glass.

Q: And did you find those pieces of broken glass significant?

A: Yes, sir.

Q: And how did you find them significant?

A: In two ways. One, they were consistent with being from the driver's window, which I found had been broken, such that there was an impact to the window from the driver's side towards the passenger's side.
The other thing that I noted was there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood.

*TR*, 2098-99.

119. In addition, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot. *TR*, 2026-32, 2111-15.

120. If trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator – they would have learned that the evidence supporting the Government's "staged robbery" theory could have been soundly impeached.

66

121.  Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. Referring to a photograph marked Government's Exhibit 43, Agent Dalley testified "there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood." *TR*, 2099.  Agent Dalley did not explain on direct examination how she arrived at this conclusion, nor did trial counsel ask this question on cross-examination.

122.  In the report Agent Dalley prepared almost two weeks after the homicides, however, she recorded no observations about these glass fragments and failed to mention whether she examined the fragments at the scene or collected them for later examination.[19]  Trial counsel never cross-examined her about the fact that

---

[19]Agent Dalley reported about these objects as follows:

DALLEY opened the front passenger door.  Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep.  Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep.  *Fragments of broken glass were on top of the sandals and blood in the doorstep.*  DALLEY collected the three sandals and the tissue-like fragment.

67

her report is utterly silent as to whether the glass fragments had any blood on them.

If these fragments were such important pieces of evidence, as the Government argued,

Agent Dalley's failure to note their significance in a report written two weeks after

the crime raises serious questions about whether she did in fact examine them to

determine whether they were free of blood – particularly since she neglected to

collect and preserve the fragments as evidence. Her testimony could have been

severely impeached on this fact alone.

123.   Moreover, while Government's Exhibit 43 does not show any blood

visible on the glass fragments, another crime scene photograph taken by Agent Dalley

– a close-up of the area depicted in Government's Exhibit 43 – reveals that at least

one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe

consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), $A - 23$, ¶

8. This fact contradicts Agent Dalley's testimony that none of the glass fragments

had any blood staining and demonstrates that this particular fragment landed on Mrs.

Chick's blood while the blood was still viscous. Id., ¶ 9. If even one glass fragment

landed on Mrs. Chick's blood while it was still viscous, the driver's side window

must have been broken before the blood had time to dry. Thus, the Government's

theory is deeply flawed and was eminently impeachable.

---

OSBI Crime Scene Investigation Report dated August 1, 2003, $A - 22$, at 3.

68

124.   Even if other glass fragments had no blood on them, trial counsel could have offered a reasonable explanation for this fact during Agent Dalley's cross-examination.  Agent Dalley testified that the front passenger door was closed when she arrived on the scene and that she had to open it in order to view the interior of the van. TR, 2098.  It is likely that Agent Dalley disturbed a number of glass fragments when she opened the door, causing them to fall onto the dried blood at that time.  This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door.  Tressel Dec., ¶ 12.  Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so.  Id.

125.   Trial counsel also could have attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot.   Government's Exhibit 51 is a photograph depicting Mr. Chick's right hand.  It shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist.  Mr. Chick's right hand must have

69

been exposed to this debris while he was being moved from the picnic table to the ground. Tressel Dec., ¶ 16. If Mr. Chick had been moved many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground, and pine needles and other ground debris would not have become attached to the dried blood. Id. Thus, Mr. Chick's body likely was moved within an hour after he was shot,[20] not more than six hours later, as the Government argued. Id.

126.   In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. Tressel Dec., ¶ 17. The air temperature on the evening of July 10, 2003 was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot. Id., ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot, not more than six hours later as the Government argued.

127.   The Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body. Lividity is a

---

[20]Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. *TR*, 2099-2100. The blood on Mr. Chick's right hand appears to be considerable less thick than the blood found in the van, and thus would have dried in less time.

discoloration of the skin caused by the settling of blood in the capillaries due to gravity. Tressel Dec., ¶ 18. It does not occur in areas of the body that are in contact with the ground or another object. Id. Although lividity can become become "fixed," or unchangeable in less than four to six hours after death, although lividity can be fixed is less time in colder temperatures. Id. Dr. DiStephano and Agent Dalley testified that livor patterns on Mr. Chick's body were consistent with lividity having become fixed while Mr. Chick was seated at the picnic table. See, e.g., *TR*, 2031-32 (testimony of Dr. DiStephano), 2177 (testimony of Agent Dalley).

128.   Trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body **also** were consistent with lividity having become fixed while Mr. Chick was lying where he was found. Mr. Chick was discovered face down beside the picnic table with his left arm extended across his chest, his right foot bare, and the top of his right foot pressed against the ground. Tressel Dec., ¶¶ 19-20. Mr. Chick's body shows lividity on his left side, right abdomen, top thigh and right bottom toes, which is consistent with the position in which he was found and inconsistent with being seated at the picnic table. Id. These livor patterns could not have occurred if lividity had been fixed before Mr. Chick's body was moved. Id.

129.   Some livor patterns on Mr. Chick's body are inconsistent with the

71

position in which he was found. These patterns include areas of discoloration on the backs of Mr. Chick's thighs. Trial counsel nevertheless could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

## B.   Evidence Rebutting the Mental Anguish Aggravating Factor.

130.   In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor:

> [Mr. Chick's] wife Shirley sitting right in front of him face to face in the darkness sharing moments of the beautiful scenery and the vista. What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his [sic] face. What was the horror, the shock, the sheer oh, my God, the terror that went through her mind at that instant?

*TR*, 3415-16.

131.   As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. *TR*, 2088-91. She

72

also testified that high velocity spatter can travel up to two feet and still remain visible on an object. *TR*, 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face:

> Well, if I can explain just a bit. Since it appears to be from a gunshot wound, then I look for any other gunshot wound in the scene that would be in a position that could cause that staining on her face. And subsequent to the autopsy and getting that information, I could exclude the wounds to her head as producing these stains down on her – especially down on her cheek. I could exclude the wound to her foot. That leaves Mr. Chick having two wounds. And one of those wounds then would be consistent with the staining on her face.

*TR*, 2090. Agent Dalley never explained why she could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point, although trial counsel did establish that the blood spatter on Mrs. Chick's face was never tested to determine the source.[21] *TR*, 2213.

132. Had trial counsel consulted a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and

---

[21]Agent Dalley also did not test high velocity blood spatter that she observed on Mrs. Chick's hands. *TR*, 2213. She attributed this spatter to Mrs. Chick's head wound, claiming it could be accounted for if her hands had been in a defensive position. *TR*, 2180-81.

73

a nearby exit wound. Tressel Dec., ¶ 26.   According to Mr. Tressel, either of these

wounds could have created high velocity blood spatter[22] and this spatter could have

landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent

Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id.,

¶ 25.

### C.   Trial Counsel's Ineffective Assistance.

133.   Trial counsel were ineffective for failing to fully investigate the

Government's claims that Mr. Fields carried out this crime with substantial planning

and premeditation and inflicted mental anguish on Mrs. Chick and to adequately

challenge those claims at the sentencing hearing.

134.   Trial counsel were deficient for failing to adequately challenge the

aggravating factors.  The Government's evidence of substantial planning and mental

anguish effectively went unrebutted even though trial counsel had readily available

information that could have undermined that evidence or placed it in its proper

context.   Mr. Presley could have testified that ghillie suits and scoped rifles were

commonly used for hunting and that Mr. Fields wanted to go snake hunting with him

on the night of the offense.  Presley Dec., ¶¶ 3-5.  A crime scene investigator or other

---

[22]Indeed, Agent Dalley conceded this fact when she attributed the high velocity blood spatter on Mrs. Chick's hands to her head wound.

74

appropriate expert could have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face.  Tressel Dec., ¶¶ 8, 9, 12, 16-17, 19-20, 26.  At the very least, trial counsel could have consulted with such an expert to assist in cross-examining the Government's witnesses.  Trial counsel concedes that she did not even consider retaining a crime scene investigator or pathologist and that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses."  O'Connell Dec., ¶ 22.  Trial counsel not only failed to consult with appropriate experts and attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors, but in closing argument she failed to utter a single word about these aggravating factors.

135.  Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims.  O'Connell Dec., ¶ 22.  Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick.  These aggravating factors were factors that made Mr.

75

Fields eligible for the death penalty, and trial counsel had every reason to rebut the aggravating factors to convince the jury that mitigating factors outweighed aggravating factors.

136. Mr. Fields was prejudiced by trial counsel's deficient performance. The Government vigorously argued that its evidence supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456. That evidence went unchallenged. Trial counsel could have injected reasonable doubt into the jury's deliberations by cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. There is a reasonable likelihood that, had trial counsel vigorously attacked the Government's evidence in these ways, the verdict would have been different.

**D.    The Government's Due Process Violations.**

137. The Government presented false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

76

1. **False and Misleading Testimony and Argument About a Purportedly Staged Robbery.**

138. As discussed above, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill. *TR*, 3421, 3422. This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Field eligible for the death penalty and was weighed by the jury. See, e.g., *TR*, 2019 (explaining relevance of staged robbery theory to statutory aggravating factor).

139. The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried. Id. at 2098-99.

140. Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation

77

report, and (2) photographs she took at the crime scene.

141.   In a report she prepared approximately two weeks after the homicides, the only observation Agent Dalley made about the glass fragments was that "[f]ragments of broken glass were on top of the sandals and blood in the doorstep." OSBI Crime Scene Investigation Report dated August 1, 2003, 3.   Agent Dalley mentioned nothing more about the glass fragments, nor did she include those fragments in the list of evidence she collected at the scene.  Id. at 7-9.

142.   Although Agent Dalley testified that the glass fragments were "significant" because they were not stained by blood, TR, 2098-99, her report fails to mention any characteristic that made them significant, indicating that either she did not physically inspect the fragments at the scene or she inspected them but did not observe anything significant about them.   Because the glass fragments were not collected as evidence, she could not have examined them at a later time.   Thus, her testimony that the fragments were "significant" because they were not stained with blood could not have been based upon her physical examination of those fragments.

143.   Nor could Agent Dalley's claim that the glass fragments were "significant" have been based on her examination of photographs.   The bottom surface of these glass fragments is not visible in any photograph.   More importantly, one of the photographs taken by Agent Dalley shows that at least one glass fragment

78

resting on the dried pool of Ms. Chick's blood *does* have a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* – 24.[23] This photograph – which the Government never asked Agent Dalley about – contradicts her testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Ms. Chick's blood while the blood was still viscous. If even one glass fragment landed on Ms. Chick's blood while the blood was still viscous, the driver's side window must have been broken before the blood had time to dry.

144.   The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not solicit Agent Dalley's false and misleading testimony, they had a duty to correct it.

145.   Despite the fact that the prosecutors knew or should have known that Agent Dalley's testimony was false and misleading, they nevertheless argued in closing that her testimony supported the substantial planning aggravating

_____

[23]The photograph included in the Appendix is not a clear copy and is included for identification purposes only.

79

circumstance. *TR*, 3456 (prosecutor argues that glass fragments proved that Mr.

Fields staged a robbery).

### 2. Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi."

146. As discussed above, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offense. This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton. The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382. The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR*, 2558-59.

147. Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day. **He had already set up us [sic] alibi.** If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him. **He's**

80

**already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth**.

TR, 3412-13.

148.  The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August 2003, Mr. Presley told the FBI that, on the day of the offense, Mr. Fields came to his house sometime after 4:00 p.m.[24] and asked him if he "wanted to do something." Presley Interview at 3.  Mr. Presley replied that he had "plans to play the casino in Fort Smith." Id.  This statement was memorialized in a FBI 302 Report and provided to the prosecutors. Id.  During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening.  The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

149.  It was clear from Mr. Presley's complete statement to the FBI that Mr.

---

[24]At the sentencing hearing, Mr. Presley testified that it may have been later than 4:00. *TR*, 2382.  His wife Marilyn testified that it was between 6:30 and 6:45 p.m. *TR*, 2462.

81

Fields **did** intend – or at least wanted – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence shows that he had no plan to shoot the Chicks at the time at the time he made this statement to Ms. Tipton. It also shows that he had no intention of shooting the Chicks when he suggested to Mr. Presley that they go snake hunting, which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3. The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.

150. There is a reasonable likelihood that the judgment of the jury could have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The

82

Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigators. Moreover, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

151. The defense's presentation of Mr. Fields' social history evidence was disjointed, incomplete and unpersuasive. A handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family. Yet, as trial counsel were well aware, the defense's mitigation specialist had collected compelling evidence that, contrary to the

83

impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. This information would have been mitigating in its own right, and also would have helped a mental health expert explain his mental state at the time of the offense. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life. Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

### A.   Evidence of Family Dysfunction that the Jury Never Heard.

152.   Mr. Fields was raised in a severely dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. Ms. Shettles was retained by trial counsel in August 2003. Shettles Dec., ¶¶

84

2-3.[25] She spent the next several months interviewing persons who knew about Mr. Fields' family and background and collecting relevant documents, including his medical, mental health and school records. Id., ¶ 3. She provided trial counsel with the results of her investigation and advised them about mitigation themes. Id., ¶ 3-5.

153.   According to Ms. Shettles, Mr. Fields' family history "was marked by notable dysfunction." Shettles Dec., ¶ 5. Both of his parents came from family backgrounds where sexual abuse and violence were prevalent. Id. His father spent part of his youth in a foster home. Preliminary Assessment, dated September 11, 2003 ("Shettles Memo") A – 25, at 4. Three of his father's sisters experienced sexual abuse and rape, one was disabled from polio, and another was disfigured in an automobile accident. Id. at 4-5. In his mother's family, sexual abuse, gambling and drinking took place. Id. at 7.

154.   Mr. Fields' mother, Margaret Fields, suffered from depression her entire life and "placed her own emotional needs above those of her family ...." Shettles Dec., ¶ 5. His father was largely absent from his upbringing, and his mother "jealously

---

[25]As is typical in such cases, Glori J. Shettles is a well-credentialed (masters level educated) and vastly experienced mitigation specialist. As her declaration reveals, she has law enforcement experience, and for approximately the last 17 years she has been involved as a mitigation specialist in over 70 capital cases. Shettles Dec., ¶ 2. Counsel hired the right person, but failed to effectively use the mitigating evidence she unearthed.

85

guarded her relationship with her husband" by keeping him from their children. Id., ¶ 6. As Cherie Fields, Mr. Fields' sister, explains, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father." Declaration of Cherie Fields ("Fields Dec."), ¶ 3, $A - 26$. She recalls that her parents never hugged her or Mr. Fields or told them they were loved. Id., ¶ 5.

155. Cherie Fields also recalls that her mother "took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security." Fields Dec., ¶ 5. As a result, Mr. Fields received love from no one in the family. According to Ms. Shettles, "the relationship between the parents and Mr. Fields and his sister ... was distant, cold and unemotional." Shettles Dec., ¶ 6. Mr. Fields' apparent inability to express emotions may have its roots in the lack of appropriate parenting he received as a child. Id., ¶ 9.

156. The problem was compounded by the family's transient lifestyle. Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned the significance of the family's nomadic life: that Mr. Fields had a difficult time forming and keeping friendships, which increased his sense of

86

isolation at a time when he already felt emotionally cut off from his parents.

157. Mr. Fields and his sister were the recipients of "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." Shettles Dec., ¶ 6. Cherie Fields describes this discipline:

> I recall my father being provoked by our mother to have us whip each other with belts – our Dad would be the one to say if we were doing it hard enough. If we weren't, then he would take a lick.
>
> * * *
>
> When we got a whipping, we'd have to take our pants off and lie on the bed. Dad would whip us with a belt until we'd cry and scream. It didn't matter what time of day or night it was. If Mom ordered him to give us a whipping he'd do it. It was all very bizarre and Eddie really got the worse of it.

Fields Dec., ¶ 6.

158. For most of his life, Mr. Fields suffered from chronic depression. Shettles Dec., ¶ 8. He appeared "unhappy," "moody" and "strange," lacked motivation and moved from one activity or relationship to the next without any obvious reason. Id., ¶ 8. As a result, he was frequently and inaccurately dismissed by those who knew him as "lazy." Id., ¶ 10. To Cherie Fields, her brother's depression made him act "weird." She states that, when she was growing up with her brother, "there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird." Fields Dec., ¶ 9.

87

121

By the time the family was preparing to move to Virginia, she recalls, "my brother was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

159.    In addition, intergenerational mental health and neurological issues plagued Mr. Fields' family, particularly on his mother's side.  Shettles Dec., ¶ 8. Cherie Fields explains that Mr. Fields' mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill.  Fields Dec., ¶ 8.  Mr. Fields' mother reported having brain lesions. Shettles Memo at 2.  On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor.  Id. at 3-4.

160.    The jury never learned about Mr. Fields' severely dysfunctional family. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields.  During her direct examination, trial counsel focused on a handful of non-controversial subjects – the impact of the deaths of her father and grandfather and her mother's physical ailments, for instance[26] – which gave the

---

[26]On direct examination, Cherie Fields testified about: the places her family lived, *TR*, 2674-76; fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not

88

misleading impression that the Fields were a more or less typical family. Trial counsel never inquired into subjects that would have revealed Ms. Fields' own tortured upbringing, significant family dysfunction, including the kind of parenting she and Mr. Fields received, how they were disciplined, the struggles of Mr. Fields and his mother with depression and other mental health issues, or inter-generational mental illness.

161. One of the reasons Cherie Fields' testimony failed to reveal the degree of family dysfunction was that trial counsel never explained to her why it was important for the jury to learn about such matters. Fields Dec, ¶ 12. She states, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

162. As a result, the defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. As Ms. Shettles, who attended the entire sentencing hearing, describes it:

[W]hile some isolated social history facts were provided to the jury,

---

spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offense, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687.

89

there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

163.   Trial counsel also never asked the defense's testifying mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction.

164.   Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

165.   Not only was this social history information never presented to the jury, but much of it was not even presented to Dr. Grinage and Dr. Woods to use in evaluating Mr. Fields. Trial counsel provided Dr. Grinage only with the Shettles Memo, a "preliminary" document that Ms. Shettles had prepared in the very early stages of her investigation. Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005 at *A* − 28 at 2; Shettles Memo at 2. Similarly, the only information about family dysfunction that trial counsel provided Dr. Woods, the other defense psychiatrist, was "family historical records" which

90

included the medical records of his parents and maternal grandmother. Letter from

Dr. George Woods to Julia O'Connell dated June 25, 2005 *A – 28* at 1.

## B.     Trial Counsel's Ineffective Assistance.

166.   Trial counsel were ineffective for failing to present Mr. Fields' complete social history – including family dysfunction and other mitigating evidence – through the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert such as Dr. Woods or Dr. Grinage. Trial counsel also were ineffective for failing to argue that Mr. Fields' social history was a mitigating factor and to provide this evidence to the defense's mental health experts to help evaluate his mental state at the time of the offense.

167.   Trial counsel performed deficiently when they failed to present a complete social history and argue that social history as a mitigating factor. Ms. Shettles had collected valuable information about Mr. Fields' background that the jury never heard. Either she or a mental health expert such as Dr. Woods or Dr. Grinage could have developed this information into compelling mitigation themes of parental abandonment, emotional and physical abuse, family dysfunction, and mental illness. All three individuals were available to testify on this subject. Dr. Woods and Dr. Grinage actually did testify at the sentencing hearing (although they were not asked about Mr. Fields' social history), and Ms. Shettles, while not called as a

91

witness, attended the entire sentencing hearing and could have testified anytime. Shettles Dec., ¶ 13.

168.   Had trial counsel asked Ms. Shettles, Dr. Woods or Dr. Grinage to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields.  The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records.  All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life.  See, e.g., Shettles Dec., ¶ 11.

169.   From a mitigation and mental health standpoint, this information would have been compelling evidence for the jury to consider.  Dr. Grinage explains:

> I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel.  From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case.  However, counsel did not ask me about any of these facts and factors while I was testifying.  Nor did

92

we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented.

Grinage Dec., ¶ 10.

170. Moreover, Dr. Woods and Dr. Grinage should have been asked about how this information affected their opinions of Mr. Fields' state of mind at the time of the offense. Dr. Grinage notes, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10.

171. Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and ultimately presented a smidgen of this evidence, e.g., through the testimony of Cherie Fields. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to

93

accomplish that result.

172.   Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented and argued a number of relatively minor biographical facts as mitigators – for instance, that he served in the Navy, worked as a prison guard and performed well at his job at Kenco Plastics.  *TR*, 3400-01.  However, trial counsel never presented or argued the far more powerful mitigation that was at their fingertips:  family dysfunction and the long-term effects of that dysfunction on Mr. Fields' personality and behavior.  As Ms. Shettles observes, "counsel were not seeing the forest for the trees as a result of their [own] dysfunctional relationship."  Shettles Dec., ¶ 16.  Prejudice is well-established:

> In my view, based on over twenty years working in the criminal justice system and with significant experience in capital sentencing, **I am shocked that the jury failed to find a single mental health-related mitigating factor in this case,** when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.

Shettles Dec, ¶ 15.  Had the jury heard evidence of Mr. Fields' dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death.

94

## GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

173. The Government's closing arguments were rife with misrepresentations of law and fact, impermissible witness bolstering, *ad hominem* attacks, and speculation intended to inflame the passions of the jury. As a result, Mr. Fields was deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence. These comments violated his due process right to a fundamentally fair trial. Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal.

### A.     Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence.

174. The Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase Mr. Fields' burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns. These instances of prosecutorial misconduct had

95

a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited discretion to extend mercy based on the evidence presented.

175.   The Government twice told the jury that the mitigating factors had to outweigh aggravating factors in order to justify a sentence less than death:

> The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie.  The mitigating factors – (Interrupted)
>
> MR. DERRYBERRY:  Objection to that based on the law.
>
> THE COURT:  Overruled.
>
> MR. SPERLING:  The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

*TR*, 3463-64.  This argument incorrectly stated the law, which requires that the aggravating factors must "sufficiently outweigh" the mitigating factors in order for the jury to impose a sentence of death.   18 U.S.C.A. § 3593(e).  Trial counsel appropriately objected to this argument.  This Court erred in overruling the objection. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

176.   The improper comments were made worse when this Court overruled the objection in front of the jury, thus suggesting that the Government's incorrect statements were in fact correct.  The official imprimatur thereby placed upon the

96

prosecution's misstatements of law obviously amplified their potential prejudicial

effect on the jury.

177.   The Government also urged to the jury to reject mercy based on the

evidence as a basis for a sentence less than death:

> Ladies and gentlemen, in closing, just remember the victims in this case,
> Charles and Shirley and their family and what they went through.  The
> defense is going to talk to you and they're going to ask you to show
> mercy for this Defendant.  What I want you to do is think back on July
> 10th of 2003.  How much mercy was shown then?  The Defendant wants
> you to look at this Defendant and oh, there's a life that can be had.  This
> case is about what happened on July 10th of 2003, not what happened
> since then.

*TR*, 3430.  To the contrary, mercy is one of the most central and important factors to

guide the jury's sentencing discretion.

178.   Despite Mr. Fields' unquestioned statutory and constitutional right to

have a penalty hearing before the jury, the Government told the jurors that the entire

proceeding was unjust:

> **The Defendant wants to choose a sentence**.  He wants to live.  Now,
> how unjust is that? Just what choice did he give Charles Chick? Just
> what choice did he give Shirley Chick?

*TR*, 3457.

> Remember this, here in court the Defendant continues to victimize his
> own family by reducing them to props in an effort to escape justice.
> Remember also that Charlie didn't get an opportunity to plead for his
> life.

*TR*, 3459. The Government's comments invited the jurors to sentence Mr. Fields to death merely for exercising his Eighth Amendment right to individualized sentencing. This also violated Mr. Fields' Sixth Amendment right to a trial on these sentencing facts the jury was required to consider.

179. The Government improperly invoked societal concerns about lenient sentences and recidivism as a basis for rejecting a sentence less than death:

> You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know [sic] longer have that luxury.

*TR*, 3431. These sentiments were echoed in later comments, invoking popular opinion that prison was too easy on criminals:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates.

*TR*, 3457.[27] The Government's comments were an invitation to reject the individualized sentencing determination required by the Eighth Amendment, and a

---

[27] The Government's argument was based upon facts not in evidence. The only testimony about so-called jailhouse perks was elicited from Daniel Presley, who testified about the policies at the minimum security Oklahoma state prison where he was employed. *TR*, 2408-09. Mr. Presley had no knowledge of the conditions of confinement on the Special Confinement Unit of the Federal Death Row at the United States Penitentiary at Terre Haute, Indiana.

98

naked appeal to vengeance designed to inflame the passions of the jury.

180.   Individually and collectively, these improper arguments denied Mr. Fields his right to a jury that would consider and give effect to the mitigating evidence presented and to an individualized determination of the appropriate sentence in his case.

**B.     Improper Arguments Denying the Right to a Fair Trial.**

181.   The Government's closing argument contained numerous statements misrepresenting the record and contained comments designed to inflame the passions of the jury, thus inviting the jury to decide Mr. Fields' punishment on factors other than the evidence properly presented at trial.   The Government also improperly embellished and bolstered the testimony of its witnesses throughout its closing.

182.   Given the nature of the mitigating evidence of Effexor-induced "manic flip" presented by trial counsel, the credibility of the mental health experts presented by both Mr. Fields and the Government was a critical aspect of the trial.   The Government engaged in a series of attempts to improperly bolster and vouch for the credibility of its experts.   Referring to Dr. Price, the Government stated:

> He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns.

99

133

*TR*, 3429. The Government continued: "Dr. Mitchell – and he may be the best one of all ... Dr. Mitchell who has no axe to grind here, ladies and gentlemen." TR, 3429-30.[28]

183. The Government echoed the earlier bolstering of Drs. Price and Mitchell, personally vouching for their credibility by stating, "I respectfully submit, thought [sic], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns." *TR*, 3452. At the same time, both attorneys for the Government denigrated Mr. Fields' expert witnesses as "high dollar shrinks," id.; "hired guns," *TR*, 3429, from the "left coast," id., who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion." *TR*, 3429.

184. This improper bolstering of the Government's experts was paired with the Government's gross misrepresentation of the testimony of Drs. Grinage and Woods about a significant factual issue raised by the Government in support of the aggravating factors – whether Mr. Fields' prior use of the ghillie suit to sneak up on other people undermined Mr. Fields' contention that he killed the Chicks in an

---

[28]Contrary to the Government's "left coast – hired gun" attack, Dr. Grinage is from Topeka, Kansas. *TR*, 2768. Like the Government's expert Dr. Mitchell, Dr. Grinage had never before testified in a capital case. Grinage Dec., ¶ 2; see also *TR*, 3429-30 ("Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case."). Thus, Dr. Grinage was neither a hired gun, nor from the "left coast."

Effexor-induced manic state.  The Government argued:

> On cross examination, the doctors we asked about the Ghilley suit.
> Well, I didn't know he had the Ghilley suit and had snuck up on people
> beforehand.  I didn't know that at all.

*TR*, 3427.  The Government's statements are false.  Dr. Woods testified, "I was aware
that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit
and observed someone...." *TR*, 3024.  Dr. Grinage was **never asked** if he was aware
that Mr. Fields put on the ghillie suit and observed people.

185.   In addition to improperly bolstering its own expert witnesses and
denigrating those of Mr. Fields, the Government launched a series of *ad hominem*
attacks on Mr. Fields:

- "But it was he who chose to turn his back on his family five years ago. It was he who chose to be abusive. It was he who chose to ignore his kids and not even pay child support. ... he's already turned his back on his family..." *TR*, 3431.

- "He abandoned them though. He abandoned them." *TR*, 3458.

- "The Defendant used and discarded people." *TR*, 3449.

- "He lied.  He was trying – manipulative, a con artist." *TR*, 3450.

- "And was financially irresponsible, parasitic and promiscuous." *TR*, 3450.

- "The Defendant is unalterably and fundamentally different from most human beings." *TR*, 3455.

101

- "Selfish. Selfish. Narcissistic. It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his widowed mother move halfway across the country." *TR*, 3459.

- "He's the one who put all of us here. What a sense of power he may feel. The narcissistic kind of selfish collections of reality that he has become." *TR*, 3460.

- "He had talked often enough about committing suicide in a transparent ploy to gain sympathy and money from his marks." *TR*, 3464.

- "The fight and Terry Hanna. That was illustrative, wasn't it? That tells you who the Defendant will choose to be near. A child abuser." *TR*, 3465.

These arguments were designed to inflame the passions of the jury, inviting the jurors to sentence Mr. Fields to death, not because any of the aggravating factors that were offered or proven, but because Mr. Fields was a fundamentally bad person, the kind of man who pals around with child abusers and who did not support his family.

186.   Without factual basis in the record, the Government attempted to elicit fear of Mr. Fields – and bolster its claim that Mr. Fields posed a future danger – by arguing that he had been diagnosed as a sociopath.[29] The Government told the jury:

_____

[29] The Government repeatedly sought without success to have some witness tar Mr. Fields with the label of sociopath.  Neither of the Government's mental health experts diagnosed Mr. Fields as a sociopath. At most, Mr. Sperling was able to elicit from Dr. Price a diagnosis of personality disorder not other specified with antisocial, psychopathic and narcissistic features and traits.  *TR*, 3148.  Dr. Price did not diagnose Mr. Fields as antisocial, psychopathic, sociopathic or narcissistic. *TR*, 3215-

102

"His own doctors are saying, yeah, he has the traits of a sociopath...." *TR*, 3428;

"He's a sociopath." *TR*, 3449.  To the contrary, neither Dr. Grinage nor Dr. Woods

testified that Mr. Fields was a "sociopath" or even had sociopathic traits.  Mr.

Sperling had attempted to elicit such evidence from Dr. Grinage, whom he questioned

extensively about whether Mr. Fields exhibited any of the traits of a sociopath.  See

TR, 2841-46.  Dr. Grinage, however, denied that Mr. Fields exhibited any such traits,

as this Court itself noted.  TR, 2849 ("I think Mr. Sperling is simply asking the doctor

if he noticed these characteristics or traits in the Defendant.  I don't think he's asking

to give that.  And, of course, I know the doctor didn't and I think he said he didn't.).

Dr. Woods was never questioned regarding a diagnosis of sociopathy.[30]

---

17.   The Government then tried to adduce evidence that Mr. Fields' experts had diagnosed him as having sociopathic "tendencies" by calling a lay witness, Marilyn Presley, to testify that Mr. Fields "stated that they were – had said that he had some sociopathic tendencies, I believe, and wanted me to look it up on the computer for him."  *TR*, 3086.  Although the Government's theory was that the "they" who purportedly told Mr. Fields he had "sociopathic tendencies" referred to mental health experts retained by the defense, see *TR*, 3428, Mrs. Presley testified that Mr. Fields never told her who "they" were and in fact conceded it was a "good possibility" that the comment had been communicated to Mr. Fields by trial counsel who were merely reporting what other attorneys had said about him.  *TR*, 3086, 3090.  Thus, there was no evidence that Mr. Fields' experts had diagnosed him as having "the traits of a sociopath," contrary to Mr. Fries' assertion during closing argument.  The reports of the defense trial experts confirm that neither diagnosed Mr. Fields as a sociopath nor observed in him any psychopathic traits.

[30] Trial counsel appropriately objected to the Government's statement that Mr. Fields' "own doctors are saying, yeah, he has a traits [sic] of a sociopath." *TR*, 3428-

103

187.   In addition to arguing that Mr. Fields was a sociopath, the Government made a number of other improper arguments without factual basis in the record in order to bolster its case in support of the aggravating factor of substantial planning and deliberation.  The Government argued that Mr. Fields planned for many months to commit this crime, contending that his hobby of squirrel hunting – and his construction of the ghillie suit for that hobby – was really a prelude to murder:

> Didn't start on July 10, 2003, started long before that.  It started about a year before that when, as you heard, the Defendant was with Penny to help create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.

<p style="text-align:center">* * *</p>

> Look at the painstaking manner that must have been done in order to complete this Ghilley suit.  This is not the act of a man who's frenzied or has flights of thoughts.  It's the actions of a man who is methodically thinking out what he wants to do.  His plan down the road is to become a predator, a sniper.  This is the first step in that action.

<p style="text-align:center">* * *</p>

This is when the plan really began to take form.  Plan was not to kill

---

39. However, this Court overruled the objection. *TR*, 3429.  The Court did so despite previously sustaining an objection to the question asked to Marilyn Presley: "Did he explicitly identify the doctors who had made that finding?"  *TR*, 3086.  The Court erred in overruling the objection to the statement made in the Government's closing argument, as there was no factual basis in the record for the Government's assertion that Mr. Fields' doctors said that he had the traits of a sociopath.  Appellate counsel was ineffective for failing to raise this issue on direct appeal.

<p style="text-align:center">104</p>

Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

\* \* \*

At this time the Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper.

*TR*, 3406, 3408-9. The Government continued: "He had mastered his craft. He had practiced with squirrels and now he was moving to humans." *TR*, 3414; "in the days, weeks and months before the killing ... the killing germ began to take root in his mind ...." *TR*, 3454.

188. However, there was nothing in the record to support the inference that Mr. Fields constructed the Ghillie suit with the idea of shooting a human being, or that he hunted squirrels for reasons other than to enjoy a hobby with his friend. Indeed, the evidence adduced at trial actually contradicted such an inference. The undisputed evidence at trial established that Mr. Fields' purpose in making the Ghillie suit was to use it for hunting squirrels, and nothing more. See *TR*, 2378-79 (Mr. Presley testified that he went hunting several times with Mr. Fields, who wore the Ghillie suit to shoot squirrels); *TR*, 2458 (Mrs. Presley testified, "It's just a Ghilley suit that people go hunting in."); *TR*, 3121 (Dr. Price testified, "And [Mr. Fields] preferred to use this Ghilley suit that he had constructed and hide and let the squirrels

105

come close to him."); *TR*, 2487 (David Love testified, "He told me that he had basically made it to hunt squirrels with."). Additionally, Jovanna Fields testified Mr. Fields was prepared to abandon the ghillie suit weeks before the Chicks were killed. *TR*, 2656-57.

189. The Government further misrepresented and twisted the testimony of Daniel Presley in order to bolster its argument that Mr. Fields' hobby of squirrel hunting – and use of the ghillie suit for that hobby – was part of a greater plan to murder the Chicks. The Government told the jury that Mr. Presley – Mr. Fields' hunting partner – testified that Mr. Fields "[d]idn't need to have a ghilley suit to go squirrel hunting" and that "there's no need to have a scope like this on this kind of gun, a .22," and contended that Mr. Presley called it a "sniper's rifle." *TR*, 3407-8. Mr. Presley provided no such testimony, and disavows any suggestion that the Government's arguments correctly interpreted his testimony.[31] See *TR*, 2370-2410; Presley Dec., ¶¶ 4-5.

190. Additionally, the Government misrepresented the testimony of Daniel Love. Mr. Love testified that during the spring of 2003 Mr. Fields said he had snuck

---

[31] The Government also contended that Mr. Presley testified about an incident when Mr. Fields scared Mr. Presley while the two were hunting and Mr. Fields was wearing the Ghillie suit. *TR*, 3408-9. Mr. Presley never testified about this incident – the story was recounted in the testimony of Dr. Price. *TR*, 3122. The Government never attempted to elicit this story from Mr. Presley. See *TR*, 2370-97; 2408-10.

106

up on a couple on Talimena Drive while dressed in the Ghillie suit. *TR*, 2487. Mr. Love further testified that he told Mr. Fields to stop doing that or he would "get his ass shot off." Id. The Government contended that "the Defendant just kind of laughed at [Mr. Love]," *TR*, 3408, which was untrue. Mr. Love testified was that Mr. Fields was "[k]ind of aggravated a little bit. He took [the Ghillie suit] back out to the truck." *TR*, 2487. Mr. Love's actual testimony suggests that Mr. Fields was upset by Mr. Love's comments, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. TR, 3409.

191. The Government also contended that Mr. Fields used the campground to scout out potential victims:

> So he begins to look for victims. What is the testimony? He's hanging out at the Winding Stair Campgrounds. He's up in the Talimena Drive. He's going snake hunting. He's doing all these things, but he's also searching for a victim. Not a particular individual, but an individual or individuals who unfortunately have put themselves in a position of danger. He's at the Winding Stair Campgrounds and he's there several times a week. He's taking a shower, he's going to the bathroom. He's using it because his girlfriend won't let him live in their house anymore, but he's also using it as a place to search for a victim. He keeps track of when people are there, who's staying there, when they're staying there, what the habits are.

*TR*, 3410. Contrary to the Government's assertion, there was absolutely no testimony that Mr. Fields used to campground to identify a victim, much less any evidence that

107

he "ke[pt] track of when people are there, who's staying there, when they're staying there, what the habits are." Id. At most, the evidence indicated that Mr. Fields was aware the Chicks were staying at the campground. The Government's argument impermissibly exaggerated the trial evidence in a manner designed to mislead and inflame the jury.

192.   In support of the mental anguish aggravating factor, the Government argued that the jury could reasonably infer that Shirley Chick's death was not silent:

> He likely heard whatever cries or moans or expressions of fear from at least one of his human prey. He killed from a short distance....
>
> And by the way, may I suggest one area in which the evidence establishes really our witness's credibility? Special Agent Gary Graff didn't pump things up. He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me. But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

TR, 3462; see also TR, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life."). There was no evidence that Mrs. Chick cried out when she was shot. This argument was pure speculation and was calculated to elicit an emotional reaction from the jury. It is also another example of the Government's improper witness bolstering.

193.   The Government concluded its closing argument with an extended and

108

wholly improper recitation of scripture to support its position that Mr. Fields was

worthy of death. The Government related to the jury the well-known "writing on the

wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting

and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my Government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

*TR*, 3466-67; compare Daniel 5:1-31. The Government then argued that Mr. Fields

should be weighed in the balance and found wanting. TR, 3467. The Government's

109

invocation of biblical support for its position invited the jurors to decide the question of Mr. Fields' punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance. Bible references as a basis for a death sentence are anathema to the Eighth Amendment.

194. Individually and in combination, the improper statements by the Government had a substantially prejudicial effect on Mr. Fields' rights under the Sixth and Eighth Amendment, and rendered his trial fundamentally unfair. These comments exaggerated and improperly bolstered the evidence in support of the Government's position while denigrating the mitigating evidence presented by Mr. Fields, and invited the jury to decide the question of Mr. Fields' punishment in a manner other than set out by statute and the Constitution. It is the prosecutor's job to seek justice, not victory. Here, the Government crossed that line, using a pattern of attacks, misrepresentations and improper appeals to passion, vengeance and fear to seek victory in the form of a death sentence.

**C.    Trial Counsel's Ineffectiveness.**

195. Other than in the two instances noted above, trial counsel failed to object to any of the Government's improper statements throughout its closing arguments. Trial counsel's failure to object to these blatantly improper comments was deficient

110

performance, and trial counsel could have had no strategic reason for their failure to do so. O'Connell Dec., ¶ 23 ("Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issue for appellate review.").

196. Mr. Fields suffered prejudice from trial counsel's failure to make meritorious objections to the Government's improper closing arguments. As a result, the jury was encouraged to ignore the substantial mental health evidence presented by Mr. Fields, which it did in refusing to find that Mr. Fields committed the offenses under severe mental or emotional disturbance. *TR*, 3481. Based upon the Government's improper embellishment of its evidence, the jury also found that Mr. Fields committed the offenses after substantial planning and premeditation, and that Mr. Fields inflicted mental anguish upon Mrs. Chick. *TR*, 3479-80. If trial counsel had objected to the Government's misrepresentations of the law and the evidence, its *ad hominem* attacks on Mr. Fields, and its appeals to passion and vengeance, there is a reasonable likelihood that the verdict would have been different.

197. Appellate counsel rendered deficient performance by failing to raise these repeated instances of prosecutorial misconduct on direct appeal. Had appellate

111

counsel raised these, there is a reasonable likelihood that Mr. Fields' sentence would have been vacated and the matter remanded for resentencing. Appellate counsel can have no reason for failing to raise meritorious claims on direct appeal, particularly in a capital case.

## GROUND SIX

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.

198.   Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that applied to only one of the two counts.   This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death.   Trial counsel not only failed to object to this unconstitutional weighing process and general verdict, but they requested instructions and a jury verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form approved by the Court. United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009).   Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United

112

States Constitution.

## A.   The Unified Weighing Process and General Death Verdict.

199.   Mr. Fields pled guilty to two counts of first degree murder: Count 1 (the murder of Mrs. Chick) and Count 3 (the murder of Mr. Chick).  The Government sought the death penalty for Counts 1 and 3 based on seven aggravating factors, including three factors that exclusively applied to Count 1 (murdering Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and inflicting mental anguish on Mrs. Chick) and two factors that exclusively applied to Count 3 (murdering Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick).[32]  *TR,* 3396-99.

200.   Although Mr. Fields pled guilty to two separate murder counts, the Court never instructed the jury that it had to determine the penalty for **each** murder count individually and that it could consider only those aggravating factors applicable to a particular count in determining the sentence for that count.  See generally *TR*, 3393-3304; see also *TR*, 3478-83 (Special Findings Form).  Instead, the Court's instructions and the Special Findings Form required the jury to vote on a single verdict of life or death.  *TR*, 3404 (instructions), 3484 (Special Findings Form).  Moreover, although

---

[32]The other aggravators argued by the Government were: (1) killing more than one person in a single episode; and (2) future dangerousness. *TR*, 3396-99.

113

147

the Court instructed the jury to decide each aggravating factor separately, *TR*, 3403-04; see also *TR*, 3396, 3399 (Special Findings Form), **the jury was permitted to consider all seven aggravators in deciding whether Mr. Fields should live or die.**[33]  *TR*, 3403-04; see also *TR*, 3483-84 (Special Findings Form).

201.   Consistent with the Court's instructions, the jury "f[ou]nd by unanimous vote that *a* sentence of death shall be imposed on the Defendant."  *TR*, 3484-85 (Special Findings Form).  The jury rendered no verdict distinguishing between each murder count,[34] nor did the jury apply specific aggravating factors to particular murder counts.  See id.

202.   The jury's general verdict of death denied Mr. Fields his right under the

---

[33] The Special Findings Form instructed:

> The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death .... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer "yes" below [and] record your verdict on [the general verdict form for death] .... If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations [and] sign [the general verdict form for life imprisonment].

*TR*, 3483-84.

[34] The Court's poll of the jury after the verdict also failed to distinguish between each count. *TR*, 3485-87.

114

Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. In imposing the sentence, the jury had no mechanism for separating out the two counts. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on the other count. Such a verdict was not merely a theoretical possibility. The mental anguish aggravating factor applied only to Mrs. Chick, *TR*, 3399, arguably making her death more egregious in the eyes of the jury. The unitary weighing process used here, however, did not give the jury the option of returning a verdict of death for the murder of Mrs. Chick but life without the possibility of release for the murder of Mr. Chick. Instead, the jury faced an "all or nothing" proposition as its sole sentencing option.

203.   More importantly, the unitary weighing process approved by the Court skewed the weighing of aggravating and mitigating factors, denying Mr. Fields his right to reliable sentencing guaranteed by the Eighth Amendment. The Court instructed the jury to consider the substantial planning aggravating factor separately for each of the Chicks. *TR*, 3396; see also id. at 3478 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been

115

able to consider two plans to kill the Chicks when deliberating about the verdict for each murder count. Under a unitary weighing process, however, the substantial planning aggravating circumstance or instruction skewed the weighing of aggravating and mitigating factors because it allowed the jury to double-count the substantial planning circumstance. The instruction had the effect of allowing the jury to consider two separate plans to kill each of the Chicks even though the Government argued only that Mr. Fields had one plan to kill both of the Chicks in a single criminal episode.

204. The Court also instructed the jury to consider the victim impact aggravating factor separately with regard to each of the Chicks. *TR*, 3398-99; see also *TR*, 3479-80 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been able to consider any victim impact related to the death of Mr. Chick when deliberating about the verdict for killing Mrs. Chick, nor would it have been permitted to consider any victim impact related to the death of Mrs. Chick when deliberating about the verdict for killing Mr. Chick. Under a unitary weighing process, however, the Court's instruction on applying the victim impact aggravating factor skewed the weighing of aggravating and mitigating factors

116

because it added an aggravating factor that would not have been present had the jury separately considered each murder count. The jury was permitted to weigh victim impact related to the deaths of **both** of the Chicks in deciding whether the aggravators outweighed the mitigators.

**B.    Trial Counsel's Ineffective Assistance.**

205.   This ground was raised as court error on direct appeal. The Court of Appeals for the Tenth Circuit stated:

> Fields argues that it was error to allow the jury to consider a general death sentence in a multi-count case, based on a weighing process incorporating a set of aggravators that combined, and consequently exceeded, those it found applicable to the individual counts for which the death penalty was sought. Fields, however, did not object to the collective weighing process and general verdict below. Indeed, as the government emphasizes, the instructions and verdict form tendered by the defense were functionally the same as those ultimately used by the court. Therefore, because Fields invited any error of which he now complains, we decline to review it.

Fields, 516 F.3d at 939.

206.   While the invited-error doctrine relied upon by the Court of Appeals in denying relief may be an appropriate analysis for a direct appeal (where claims of ineffectiveness of counsel may not be raised or decided), it leaves open the question of whether trial counsel were ineffective for failing to object and in requesting the objectionable unified weighing process. The answer to that question is rather

obvious.

207. Trial counsel were ineffective for failing to object to the unified weighing process and general death verdict that denied Mr. Fields his rights under the Sixth and Eighth Amendments. For the reasons discussed above, the instructions and verdict form deprived Mr. Fields of his right to reliable sentencing and a unanimous sentencing verdict on each count to which he pled guilty. Not only did trial counsel fail to object to these unconstitutional instructions and verdict form, but, as the Court of Appeals noted, they proffered their own instructions and verdict form that were "functionally the same as those ultimately used by the court." Fields, 516 F.3d at 939; see also Defendant's Tendered Penalty Phase Instructions. Counsel could have had no reasonable tactic or strategy to fail to object to this clearly disadvantageous weighing scheme. O'Connell Dec., ¶ 23.

208. Mr. Fields was prejudiced by trial counsel's deficient performance. Because the jury was allowed to consider all of the aggravating factors in the aggregate in rendering a general verdict, its weighing of aggravating and mitigating factors was skewed in favor of death. The jury was allowed to double-count the substantial planning aggravating factor and to consider an additional victim impact aggravating factor, neither of which would have been possible if the jury had been required to render a verdict separately on each murder count. Accordingly, there is

118

a reasonable likelihood that, had the jury been required to deliberate individually on each murder count, the verdict of the jury would have been different.

## GROUND SEVEN

### THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.

209. The Government withheld exculpatory, material evidence that it had an obligation to disclose to the defense, including but not limited to evidence that would have corroborated the defense's argument that Mr. Fields had taken an increased dose of Effexor before the offense, emails and other documents on Mr. Fields' computers supporting the fact that he was mentally ill, and witness statements containing favorable information. To the extent the Government did not have an obligation to disclose this evidence, or the information was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Accordingly, Mr. Fields was denied his rights to due process and the effective assistance of counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

### A.    The Undisclosed Exculpatory Evidence.

210. The Government had a duty to disclose exculpatory evidence to the

119

defense that included but was not limited to the following.

### 1.     Bottle of 150 mg Effexor Capsules.

211.   In a report dated July 18, 2003, Agent Iris Dalley of the Oklahoma State Bureau of Investigation ("OSBI") stated that, during a search of Mr. Fields' truck, she observed two prescription pill bottles. *A – 29*. OSBI Report of Iris Dalley dated July 18, 2003 at 1. Later in her report she noted that she observed a "pharmacy sack label" dated July 9, 2003 for "30 Effexor 150 mg capsules for EDWARD FIELDS" and a bottle of pills with the same label. Id. at 3.

212.   Five days later, Special Agent James Alford of the United States Forest Service prepared an inventory of items found in Mr. Fields' truck, including an item described as "'Effexor XR 3.75mg/75mg' blister pack containing three pills" but **not** the pharmacy sack label or the bottle of Effexor 150 mg capsules observed by Agent Dalley during her search of the truck. Inventory of Items in 1989 Chevrolet Truck dated July 23, 2003, *A – 30*, at 2.

213.   The FBI subsequently turned over to Mr. Fields' mother the items found in his truck. The defense's investigator prepared an inventory of these, including "July 9, 2003 - Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg" and "14-day sample packet of Effexor XR. Three (3) capsules remain in the package." Memorandum from Glori J. Shettles dated January 1, 2004,

120

*A* – 31 at 1, 4. The bottle of 150 mg Effexor that Agent Dalley observed in July 2003 was not returned. See id.

214.   Law enforcement officials seized the bottle of 150 mg Effexor and are charged with the knowledge of what was in the bottle.   The Government elicited agreement from defense expert Dr. Woods that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage? [i.e., the 150 mg dosage of Effexor]" *TR*, 3029-30.   The Government also implied that Mr. Fields took a 37.5 mg dose of Effexor from the fourteen-day blister pack, not the 150 mg dose from the thirty day prescription bottle.   *TR*, 3030.

215.   The Government elicited this testimony from Dr. Woods while being in sole possession of the 150 mg bottle and knowing or being able to determine the contents of it. Thus, the 150 mg Effexor bottle contains exculpatory evidence relating to the quantity of Effexor capsules Mr. Fields ingested prior to the offense.   The Government failed to disclose this exculpatory evidence to the defense.   See O'Connell Dec., ¶ 20.

121

## 2.     Emails and Documents from Mr. Fields' Computers.

216.   On August 28, 2003, Patrick Kennedy of the OSBI imaged the hard drive of a computer used by Mr. Fields.  OSBI Report of Patrick Kennedy dated November 20, 2003 at 3.  This hard drive contained 7,904 documents and 544 email messages. Id. at 4.  On September 4, 2003, Mr. Kennedy imaged the hard drive of a second computer used by Mr. Fields.  Id. at 3.  This hard drive contained 8,095 documents and 6,418 email messages.  Id. at 4.  According to Mr. Kennedy's report, these drives were "searched for images, documents and web pages relevant to camouflage clothing and particularly Ghillie Suits; snipers; and homicide; in a variety of manners."  Id. at 4-5.

217.   The hard drives of these two computers contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails.  The Government failed to produce this exculpatory evidence to the defense.[35]

---

[35]In response to written requests from undersigned counsel, the Government permitted inspection of the computers seized from Mr. Fields.  Counsel appeared at the FBI office to inspect the computers and following that inspection the Government shipped three such computers to the defense for forensic analysis.  Upon such analysis, counsel were told that the computers they were permitted to inspect, and which ultimately were shipped to them, are **not** the computers or hard drives references by Agent Kennedy. Those have not been provided by the Government, and counsel will soon include a request for those in a to-be-filed discovery request.

### 3.   FBI Forms 302 and Reports of the OSBI.

218.   On information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information. The Government failed to produce this exculpatory evidence to the defense.[36]

### B.   The Undisclosed Exculpatory Evidence Was Material.

219.   The exculpatory evidence withheld by the Government was material, both considered separately and because of their cumulative impact. See, e.g., O'Connell Dec., ¶ 20 (discussing importance of Effexor pills). There is a reasonable likelihood that, had this evidence been disclosed to the defense, the result of Mr. Fields' sentencing hearing would have been different. Also, when considered along with the due process violations set forth in Ground Three, above, materiality is established.

### C.   Trial Counsel's Ineffective Assistance.

220.   To the extent the Government did not have an obligation to disclose this evidence or it was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Trial counsel rendered

------

[36]Counsel will soon file a discovery motion seeking all of these materials as well as others.

123

deficient performance by failing to discover exculpatory evidence that could have been used to prove the defense's case-in-chief and to impeach the Government's witnesses.  There was no reasonable basis for failing to investigate, discover and present this evidence.  See, e.g., O'Connell Dec., ¶ 20 (discussing lack of strategy or tactics regarding discovery of Effexor pills).  Mr. Fields was prejudiced by trial counsel's deficient performance because, had the jury learned of this exculpatory evidence, there is a reasonable likelihood that the verdict would have been different.

## GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.

221.  Each of the grounds presented in this *Motion* individually entitles Mr. Fields to relief from his death sentence.  However, even if this Court finds that Mr. Fields is not entitled to relief based on any particular ground, the cumulative effect of these errors described herein, have denied him due process and a reliable sentencing hearing as guaranteed by the Fifth and Eighth Amendments to the United States Constitution.  Moreover, counsel's cumulative errors and omissions individually and cumulatively entitle Mr. Fields to relief for violations of the Fifth, Sixth and Eighth Amendments to the United States Constitution,

124

## GROUND NINE

### THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.

222.   The manner of Mr. Fields' execution, if carried out under current Bureau of Prison lethal injection protocols, would violate the Eighth Amendment to the United States Constitution.   The protocols governing his execution, including the combination of drugs that would be used to accomplish his death, the use of untrained non-medical and unqualified personnel to carry out his execution, the physical space in which his execution would take place, and other factors which are currently not within counsel's knowledge, would result in the infliction of unnecessary pain and suffering.

223.   While the manner of Mr. Fields' execution would be unconstitutional, this claim is not ripe for review at this time.   Mr. Fields is not at imminent risk of execution, and this claim may be moot if this Court grants him the relief he seeks pursuant to other claims in the Petition.   Mr. Fields asserts this claim only to preserve it against a later challenge by the Government based on waiver or other defenses.   Mr. Fields will amend this claim if the Court deems it appropriate to address it in connection with these proceedings.

125

Respectfully Submitted,

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Dated:       Philadelphia, PA
             April 5, 2010

126

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on the 6th day of April, 2010 I caused a copy of the foregoing to be served on the following by hand delivery:

<div align="center">

Honorable Sheldon J. Sperling
United States Attorney
Eastern District of Oklahoma
1200 W. Okmulgee
Suite 201
Muskogee, Oklahoma 74401-6848

</div>

Michael Wiseman

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.03-cr-73-WH |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
| -v- | : | HON. RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| Petitioner. | : | |

CIV 10 - 115 - RAW   **FILED**

APR 06 2010

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

### *PETITIONER'S APPENDIX*
### IN SUPPORT OF MOTION PURSUANT TO
### 28 U.S.C. § 2255 TO  VACATE, SET ASIDE,
### OR CORRECT A SENTENCE
### BY A PERSON IN FEDERAL CUSTODY

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier,
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner,
Edward Leon Fields

Dated:     Philadelphia, PA
           April 5, 2010

162

# INDEX TO APPENDIX

1. Declaration of Julia O'Connell, March 30, 2010

2. Declaration of George W. Woods, M.D., March 28, 2010

3. Declaration of Bradley D. Grinage, M.D., March 29, 2010

4. Declaration of Glori J. Shettles, Mitigation Specialist, March 22, 2010

5. Hillcrest Osteopathic Hospital Birth Records

6. Neurospychological Evaluation by Michael M. Gelbort, Ph.D., August 11, 2004

7. Letter from United States Attorney Sheldon Sperling, Esq. and Assistant AUSA, Linda Epperley, Esq. to Julia O'Connell, Esq., December 2, 2004

8. Report of Neuropsychological Evaluation by  J. Randall Price, Ph.D., July 1, 2005

9. Report of Daniel A. Martell, Ph.D., April 1, 2010

10. Declaration of Joyce Louise Bumgardner, M.D., March 30, 2010

11. Declaration of Larry Trombka, M.D., March 26, 2010

12. Declaration of R.L. Winters, M.D., March 3, 2010

13. Declaration of Dean Anderson, PA, March 29, 2010

14. Peter R. Breggin - *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, International Journal of Risk & Safety in Medicine, 2003/2004

15. FDA Public Health Advisory - *Worsening Depression and Sucidality in Patients Being Treated with Antidepressant Medications*, March 22, 2004

16.   Elizabeth Kaledin - *People Taking Antidepressants Need to be Monitored for Turbulent Emotions, Including Possible Risk of Suicide*, CBS Evening News Transcript, March 22, 2004

17.   Gardiner Harris, *Labels on Antidepressants Sought to Warn of Suicide Risk*, N.Y. Times, March 22, 2004

18.   *Antidepressants May Have Opposite Effect, FDA Warns*, USA Today, March 22, 2004

19.   Wyeth Pharmaceuticals Inc., Medication Guide for Effexor, 2004

20.   Declaration of Daniel Presley, March 30, 2010

21.   Federal Bureau of Investigation 302 Report, Interview of Daniel Presley, July 30, 2003

22.   Oklahoma State Bureau of Investigation - Crime Scene Investigation Report, August 1, 2003

23.   Declaration of R. Robert Tressell, April 1, 2010

24.   Oklahoma State Bureau of Investigation Crime Scene Photograph CR03527CD40085

25.   Preliminary Assessment, Social History, September 11, 2003

26.   Declaration of Cherie Fields, March 22, 2010

27.   Forensic Mental Health Evaluation by Bradley D. Grinage, M.D., June 24, 2005

28.   Letter from George W. Woods, M.D., to Julia O'Connell, Esq., June 25, 2005

29.   Oklahoma State Bureau of Investigation Report, Search of Fields' Truck, July 18, 2003

30.     Inventory of items in Fields' Truck conducted by Special Agent James Alford, Law Enforcement Officers Gary Rose and Paul Jolivette, July 23, 2003

31.     Memorandum from Glori J. Shettles - "Items from Fields' Truck," January, 16, 2004

iii

Declaration of Julia O'Connell, Esq.
Pursuant to 28 U.S.C. § 1746

I, Julia O'Connell, Esq., hereby verify and declare and follows:

1.   I am the Federal Public Defender for the Northern and Eastern Districts of Oklahoma.   I was co-counsel in the capital case of <u>United States v. Edward Leon Fields</u>, which was tried in 2005 in the Muskogee Division of our Court.   I am making this Declaration at the request of Mr. Fields' section 2255 counsel to discuss certain aspects of my representation of Mr. Fields.

2.   At the time of Mr. Fields' arraignment, I was an Assistant Federal Defender in the Northern and Eastern Districts.   Soon after the case came into the ED, I was appointed to the case.   I had litigated two capital cases for state public defender office, but this was my first federal capital case.   I was aware of the Federal National Resource Counsel Project that made "Learned Counsel" available in capital cases.   I contacted the Project and after a short time, Isaiah "Skip" Gant was designated to seek appointment as Learned Counsel in this

1

case.

3.    I was gratified for Mr. Gant to join the team. He had a sterling reputation. I checked him out and he appeared to be a highly respected, skilled and knowledgeable federal capital trial attorney. My research corroborated my initial belief that since he was a national resource counsel, he must be highly qualified. My initial beliefs were proven incorrect.

4.    Very early on, we began to prepare for our authorization meeting with the Department of Justice. This is a critical stage of federal capital pre-trial preparation as it allows defense counsel to make a formal presentation to the Department of Justice in Washington to convince them not to seek the death penalty. I treated it as such, and prepared diligently for the DOJ presentation. It quickly became apparent to me in the preparation stage, however, that Mr. Gant was not carrying his share of the work. I was still willing to chalk this up to him having a busy national practice. All through our preparations, the plan was for Mr. Gant to make the presentation in Washington. I had never even

2

been present at a meeting like this where there would be a determination as to whether or not the government would seek the death penalty, as this was my first federal capital case — I was led to believe that this was precisely his area of learnedness. Thus, I was flabbergasted when, just two hours before the presentation, he backed out and insisted that I make the presentation. His reason was that he had made so many that the DOJ lawyers would never listen to him. If he really felt that way, he could have told me that weeks earlier, or maybe even a day earlier. Instead, at the last minute he abandoned his duty to the client and to me. I had the distinct impression that he backed out because he was not adequately prepared.

5. As our pre-trial preparations continued, and especially after our meeting with the DOJ, Mr. Gant's role grew smaller still. I carried the vast bulk of the caseload with respect to supervising the mitigation specialist's work, vetting potential expert witnesses and in overall preparation for both phases of trial.

6. The next significant incident with Mr. Gant

3

occurred when Mr. Fields reached the decision to enter a guilty plea. My immediate, strong and visceral reaction was to counsel him against pleading guilty. A guilty plea in this capital case just seemed ill-advised. Of course, I immediately contacted Mr. Gant to seek his advice. Mr. Gant said "go ahead and plead." I continued to counsel Mr. Fields against the guilty plea, and did all that I could to prevent it. If at any point he had told me that it was a disadvantage to entertain a plea and then proceed with a jury for the penalty phase trial, I would have made an extremely concerted effort to dissuade Mr. Fields from a change of plea. Nothing proved more disastrous to his  penalty phase trial.

7.   Mr. Fields remained insistent, and ultimately he pled guilty. Even though Mr. Gant knew the date of the change of plea hearing, four days after the change of plea proceeding, Mr. Gant told me that he "asked around" and he thought it would be a bad idea for Mr. Fields to plead guilty. He presented this "advice" as if the guilty plea had not already taken place. Needless to say I was very upset. Had Mr. Gant weighed in with this

4

"advice," and joined me in counseling against the plea, together we may have convinced Mr. Fields not to plead guilty. Instead, as with so many other aspects of this case, I was left to work alone, and the results were disappointing.

8. I next recall being shocked when Mr. Gant failed to perform his work on proposed jury instructions, an area for which he was nationally regarded as an "expert." Drafting of jury instructions are critical for both favorable instructions at the time of the trial and a record for any appeal – an important consideration in any case, and especially in a capital case. Despite Mr. Gant's assurances that he would take on much of the work involved with jury instructions, he did not do any of the drafting: Barry Derryberry and I worked toward completion of the instructions under strict deadline. Given his expertise, it was agreed that he would do voir dire. We requested that, because of his status as resource counsel, he at least review what we were drafting and to provide us with any model instructions that were endorsed by the Resource Counsel Project. After many attempts to

5

get his attention, he ultimately sent us a set of instructions for a Title 21 drug case. I was in disbelief and shock at his lack of effort and apparent lack of concern for our client and me.

9. At the time of jury selection, after very few jurors were questioned, Mr. Gant was having a great deal of difficulty conducting an effective voir dire and so I had to assume that responsibility as well. My planned trial preparation was severely affected by this change.

10. Because the trial was in Muskogee, we required accommodations near the Courthouse for the trial. We rented a small place for us to stay nearby. I stayed there with Mr. Gant (who brought his wife with him), and Glori Shettles, the mitigation specialist that I had retained. Mr. Derryberry commuted from Tulsa. The primary reason we had a place nearby was to prepare for witnesses and the witnesses themselves for the following day of trial. But, Mr. Gant's lack of attention to the trial was on display again. Each evening, Mr. Gant's focus was a meal, relaxation and baseball. He expected there to be a full evening meal with wine. Ms. Shettles,

6

Mr. Derryberry and I, on the other hand, wanted to grab a quick bite and get to work preparing for the next day. Mr. Gant provided no help whatsoever in the evenings. The consequences to our presentations, particularly the expert witnesses, was dramatic and harmful to our client's interest.

11. Dr. Bradley Grinage was called to the stand on July 19, 2005. Prior to his taking the witness stand, I neglected to give him three important documents: Dr. Gelbort's report, Dr. Price's report and the change of plea transcript. I recall that Dr. Grinage was effectively cross examined because he was unaware that when Mr. Fields pled guilty to the charges he admitted to acting in a premeditated manner. Because he did not have all the appropriate materials from counsel, Dr. Grinage appeared to be contradicting the opinions he gave on direct examination when he was cross examined by the United State Attorney. Dr. Grinage could have provided convincing and accurate answers to the questions of premeditation and deliberation and planning; malingering; and personality disorders had he had the appropriate

7

materials. I did not possess any tactical or strategic reason for not preparing Dr. Grinage to provide those answers or for not providing him with a copy of the change of plea transcript and the other documents.

12. It has been pointed out to me that Dr. Woods provided an opinion that Mr. Fields was "unable" to conform his behavior to the requirements of law. This is not the correct statutory standard. The statutory mitigating factor says requires only that a person's ability to appreciate the wrongfulness of his conduct or to be able to conform his conduct to the requirements of law be "significantly impaired." I have also seen where the prosecutor used this higher standard against Dr. Woods in cross-examination. I had no tactic or strategy for failing to prepare Dr. Woods on this point.

13. After I received Dr. Price's report, the question of whether Mr. Fields was malingering his mental health problems was now front and center. Current counsel have presented me with declarations of ,Dr. Winter and PA Anderson who provided physical and mental health treatment in the years prior to Mr. Fields' arrest; and

8

the declarations of psychiatrists of Drs. Trombka and Bumgardner, who provided mental health treatment in the months after Mr. Fields' arrest. Each of them indicates that they believed that Mr. Fields had serious mental health problems and did not believe that Mr. Fields was malingering. I did not have a tactic or strategy for not presenting these doctors as witnesses in my case in chief or on rebuttal.

14. In the case of Dr. Bumgardner, I also note that she has endorsed the manic-flip opinion that was presented by Dr. Woods in his testimony. I recall that Dr. Woods was cross examined on, among other topics, that he was a "hired-gun" from California. Had I a congruent opinion from a local psychiatrist, who actually treated Mr. Fields, I would have presented it as a supplement to Dr. Woods' testimony. Again, I had no tactical or strategic reason for not investigating Dr. Bumgardner and presenting her opinion.

15. Dr. George Woods was also retained to act as an expert in the field of neuropsychiatry. He studied the case and opined on the witness stand on July 20, 2005,

9

that Mr. Fields underwent a "manic-flip" at the time of the killings. We had also retained Michael Gelbort, Ph.D. to conduct neuropsychological testing. Dr. Gelbort's report of his testing showed that Mr. Fields was damaged in the frontal lobes of his brain, which, according to the doctor was a significant finding. Dr. Gelbort indicated that further testing was needed. Early on in the development of our mental health evidence we considered the presentation of both manic-flip and organic brain damage. In other words, we never considered those to be mutually exclusive. Through the months leading up to the trial, I stayed in contact with Dr. Gelbort about conducting further testing and his ability to testify. He always indicated his willingness to do both. Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage.

16. About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell. I saw that Dr. Price opined that Mr. Fields did not have significant

10

brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered. I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own- that Mr. Fields was brain damaged and neurologically impaired. Dr. Gelbort again confirmed that he was available to testify.

17. I never had him perform the additional testing that I mentioned above. I can offer no tactical or strategic reason for not having the additional testing performed. The evening before trial testimony was to begin, Dr. Gelbort notified me that he was going to be traveling and would not be available on the dates of trial that had been set. I made no motion to continue the trial to the Court. Again, I had no strategy or tactic for abandoning the specific factor of organic brain damage, but I was overwhelmed with the trial in progress. Presentation of such brain impairments would have been an important part of our mitigation presentation. However, this trial was an ordeal like none other that I have ever experienced.

18. We offered and argued to the jury the existence

11

of twenty-two mitigating factors. In the realm of mental health mitigation, we offered the two mental health statutory mitigating factors: that he suffered a severe mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired. Although we offered the theory of a drug induced manic flip, we never offered to the jury or argued to the jury, that they should find that Mr. Fields' lifetime of depression and hearing voices as distinct mitigating factors. As I recall, one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument. I should have told the jury that they could find these facts as mitigating and ask the Court to charge them on those facts as separate mitigating factors. I did not have any tactical or strategic reason for having not done so.

19. I have also been provided with a copy of the declaration of Glori Shettles. In it she indicates that she was available to testify as to Mr. Fields' social

12

history which was not well-covered by the doctors or family who testified. I do not disagree with her assessment of the social history. I had no tactical or strategic reason for not presenting that history either through one of the doctors or through Ms. Shettles.

20. Current counsel have brought to my attention that the pill bottle containing the Effexor that Mr. Fields had acquired days before the offenses, was never produced for me in discovery. I recall that the prosecution cross-examined Drs. Woods and Grinage on the fact that they could not be sure how many of the pills that had been prescribed for Mr. Fields had actually been taken. It did not occur to me at the time that I should have insisted on inspecting the bottle pre-trial and possibly putting it in evidence at trial, if the number of pills left in the bottle supported our position that Mr. Fields had taken the prescribed amount or possibly more. I had no tactical or strategic reason for not demanding production of the pill bottle for inspection.

21. I recall it was the Government's theory that Mr. Fields planned to kill the Chicks, not to rob them. The

13

Government also posited that he came back to the crime scene many hours later and staged a fake robbery to disguise his true homicidal purpose. To prove this theory, the Government called OSBI Agent Iris Dalley, who examined and photographed the crime scene. Agent Dalley testified that the driver's window of the victims' van was broken and that some glass fragments lying on a pool of dried blood in passenger compartment of the van were not stained with blood. She said this proved that the driver's window was not broken until after the blood in the van had dried, which would have taken at least an hour and possibly longer. The Government also called a pathologist, Dr. DiStefano, as well as Agent Dalley to testify that lividity patterns on Mr. Chick's body established that he was moved to the position in which he was found at least six hours after he was shot. The government argued that these facts proved its theory that Mr. Fields returned to the crime scene many hours later and staged a fake robbery.

22. This testimony was damaging because it supported the substantial planning aggravating circumstance or by

14

suggesting that Mr. Fields had a plan to kill the victims and that plan did not involve a robbery. This testimony was damaging. Although I had the government's forensic reports pre-trial, I did not retain a pathologist or criminalist of my own to test the Government's theories. I have been provided with a declaration by current counsels' expert, Robert Tressel. He presents alternative explanations for what happened. I could have presented such an expert in my case or, at a minimum, retained such an expert to advise me about how to prepare and conduct my cross-examination of the Government's witnesses. I had no strategic or tactical reason for not consulting an expert crime scene investigator or pathologist.

23. Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issues for appellate review. To the

15

contrary, my strategy was to waive no meritorious issue.

24. I am an experienced, dedicated and conscientious criminal defense attorney. I am disturbed by many of the events that I have discussed in this statement. As the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, I accept full responsibility for my acts or omissions described above. Although Mr. Gant failed to perform his role, I should have either forced the issue with him, or brought it to the attention of the Court. There is no question in my mind that the bulk of the above-described errors were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Julia F. O'Connell 3/30/2010
Julia O'Connell, Esq.
Federal Public Defender,
Eastern and Northern
Districts of Oklahoma

16

Declaration of George W. Woods, M.D.
Pursuant to 28 U.S.C. § 1746

I, George W. Woods, M.D., hereby verify and declare and follows:

1. I am a medical doctor with a specialty in neuropsychiatry. I was retained as an expert by the defense in the case of United States v. Edward L. Fields that was tried in the federal court in Muskogee, Oklahoma. I testified on Mr. Fields' behalf and was qualified as an expert in psychiatry by the Court. There has been no material changes to my qualifications since the Court found me qualified in 2005, other than my installation as Secretary General of the International Academy of Law and Mental Health in 2009.

2. Mr. Fields' present lawyers have requested that I tell them about my involvement with the trial team in this case and to comment on the mental health evidence that was presented and not presented at trial.

3. I have known Isaiah Gant for a long while. As I recall, it was at his suggestion that I became involved in this case. This case was my first chance to work with Julie O'Connell. Although both lawyers are wonderful people and skilled attorneys, it was obvious to me almost from the beginning that they did not work well together. I cannot say why that was the case. However, I was a witness to the effect that this inability to work together had on both the pre-trial and trial phases of this case. It was as if Mr. Fields had one lawyer, and not two. Mr. Gant played a very passive role and contributed little to the defense's efforts. In my interactions with counsel during pre-trial discussions and meetings, Ms. O'Connell led the way. She asked the relevant questions and made appropriate suggestions. Mr. Gant did not. During my witness preparations as the trial was approaching, this disparity was even more obvious. Ms. O'Connell did everything regarding my preparation, and handled a variety of other tasks simultaneously, while Mr. Gant did not.

4. Even though Ms. O'Connell was the engaged member of the team, I never believed that she gave the presentation I ultimately made the proper time and attention that it required. I had the definite sense that Ms. O'Connell was in over her head. To be clear, I do not mean that she was not capable of handling a complex set of issues, such as those presented by Mr. Fields' case. Instead, I believed that she was being required to handle too much work to be able to responsibly and competently make the required presentation. From my perspective, it was rather obvious that her inability to pay the required attention to the preparation and presentation of my testimony was traceable to Mr. Gant's failure to carry his share of the work.

5. The effects of the strained relationship between counsel had a toll on the presentation that I was able to make. Our preparation was rushed and incomplete and as a result I do not think that I was able to fully and clearly explain my opinions to the jury. I believed that Mr. Fields suffered from a "manic switch" resulting from the ill-advised administration of Effexor. I understand that the jury did not find this to be the case, and that it found no mental health related mitigating factors. While I obviously do not agree with the jury's findings rejecting the manic switch, I understand and accept it. What is even more troubling to me from a clinical and forensic

perspective is that the jury did not find as a mitigating factor that Mr. Fields had suffered from chronic depression and auditory hallucinations. As I recall one of the Government's experts agreed that he suffered from these conditions. It was especially perplexing that the jury failed to make a positive finding regarding Mr. Fields' depression and hallucinations – after all, they were documented in the medical records that pre-dated the offense and therefore could not reasonably be assailed as malingering.

6. I understand that Daniel Martell, Ph.D., recently administered a battery of neuropsychological tests to Mr. Fields. I also understand that he finds Mr. Fields to be severely impaired, in terms of his overall cognitive functioning, and specifically impaired in frontal lobe functioning, called executive functioning. Dr. Martell has documented not only severe frontal pathology, but a progressive neurological disorder that is diffuse, affecting multiple neurological domains in addition to the frontal lobe dysfunction. I have also reviewed the declaration of Michael Gelbort, Ph.D., who was the neuropsychologist who was retained at trial. He, too, believed that Mr. Fields was impaired in his frontal lobes at the time of his testing. After reviewing Dr. Price's findings, it is Dr.Gelbort's belief that Dr. Price's testing supports Dr. Gelbort's findings as wels.

7. Regardless of whether one accepts my opinion about a manic switch, the presence of frontal lobe impairments is highly significant. People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. They also experience impairments in social judgment. Such people act out without making the types of judgments that persons with intact frontal lobe functioning can make. By itself, this type of impairment is a highly mitigating factor. If this impairment is added to my clinical opinion that Mr. Fields underwent a manic switch, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flight into mania that I believe occurred.

8. I was provided with Dr. Gelbort's and Dr. Price's report before my testimony and I recall that there had been favorable consideration given earlier in the case to the presentation of organic brain damage or dysfunction as a supplement to my opinion regarding manic switch, or as a free-standing mitigating factor. However, the presentation of brain damage dropped out of the picture in the lawyers' last minute and rushed preparations during trial. I was not prepared by the attorneys to discuss it and was not asked any questions about it. As I now understand, there was no defense presentation of organic brain damage, and all that was presented on that score was the Government's testimony of Dr. Price.

9. In sum, this case stands out as the one where I believe that the jury never received a full, complete and accurate picture of Mr. Fields' mental health deficits and abysmal social history that supported his severe mental illness.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.

George W. Woods, M.D.

Dated:

March 28, 2010

Oakland, California

### Declaration of Bradley D. Grinage, M.D.
### Pursuant to 28 U.S.C. Section 1746

I, Bradley D. Grinage, M.D., hereby verify and declare and follows:

1.      I am a medical doctor with a specialty in  psychiatry.  I was a chemistry major at the University of Kansas and after that went to the University of Kansas Medical School. I was at that time active duty in the United States Air Force and completed a four year residency program in San Antonio, Texas, in adult psychiatry.  After that, I completed a year long fellowship in forensic psychiatry at the University of Missouri.  I was involved with the development of the forensic program at the University of Kansas and taught the complement of residents in psychiatry at the University hospital.  Following, I worked as a psychiatrist with the Veteran's Administration.  At the same time, I have developed and maintained a clinical and forensic practice in which I consult and perform evaluations for courts and for specific forensic purposes.  It was in that capacity I was retained by trial counsel for Edward Fields in 2005.

2.      I was in my early development as a testifying witness at that time, as my private clinical practice was rather new.  The Fields case was my first capital case in either the state or federal courts.  Although I felt completely competent regarding the psychiatric aspects of my participation in this, I believe that I needed extra preparation by counsel because of my relative forensic experience in this forum.

3.      I have been contacted by Mr. Fields' current counsel and asked to review my

1

report from 2005 and my trial testimony. Current counsel have also provided me with documents that were not given to me by trial counsel, including the transcript of Mr. Fields' "change of plea," Dr. Gelbort's report, Dr. Price's report, medical records for "Baby Boy Fields," Preliminary Psychosocial Assessment and a declaration by Mr. Fields' sister. They have also provided me with the Halstead-Reitan report of Mr. Fields' mother (which did not exist at the time of trial). Trial counsel only provided me Dr. Gelbort's raw neuropsychological and psychological data, the interpretation of which I am not expert.

4.     I have now reviewed all of the materials noted in the previous paragraph. I can confirm my diagnosis of Mr. Fields as a man with Bipolar I Disorder with Psychotic Features. I also confirm that a disease presentation such as Mr. Fields could be negatively affected by treatment with the wrong medication, in this instance, venlafaxine (Effexor). I also remain firm in my opinion that Mr. Fields is not a malingerer – he was not lying about his symptoms for any secondary gain before the offense or after the offense. It should be noted, however, that the additional record information as to his brain damage would be important to any further assessment of his mental status. It is highly likely that he has frontal lobe impairment that would affect his bipolar behavior and treatment.

5.     What was very problematic in my review of the records is the aura of confusion that clouded my testimony. The only lawyer with whom I had any contact from Mr. Fields' defense team was Julia O'Connell. I met also with Isaiah Gant only for an initial

2

consultation. I was contacted rather close in time to the trial, which has not been the norm even in my relatively brief forensic experience. Our preparation time for the testimony was short, as I recall, and only right before I testified. Counsel appeared to be overextended.

6.      Lamentably, I was not made aware of two important sources of information prior to my testimony. The first was the "change of plea" colloquy and the other is the report by the government's expert witness, Dr. Price.

7.      The particulars of the change of plea colloquy were not made known to me at the time I was called to the witness stand and asked to testify as to my assessment and evaluation; I have now been provided the actual transcript. With the terms and conditions of that legal proceeding not available to me, my testimony suffered. This is especially true as the question posed was not one of legal "insanity" but rather a question of Mr. Fields' impairments at the time of the killings. Without prior assessment of the medico-legal terms of art in the change of plea proceeding, particularly the concept of premeditation and deliberation, I was not prompted by counsel in a way to clearly discuss the terms and to draw the distinction between legal responsibility (insanity) and impairment that constitutes mental health mitigation for sentencing purposes. This should have been made clear for the jury. Thus, I stated to the jury " [m]y testimony is that the time he had a psychotic disorder that influenced his behavior, not his thought process. And deliberation really is a thought process issue. You know, what I can say to you is that's not part of my

3

evaluation. I did not evaluate him cognitively. What I evaluated was – what I was asked to evaluate was emotional condition that might have affected his ability to control his behavior." Not having the "change of plea" colloquy from counsel grossly affected my overall assessment and how I could have presented my opinions on Mr. Fields' diagnosis and overall mental health status to the jury. With the appropriate materials from counsel I could have been more proactive in clarifying the nature and the impact of Mr. Fields' condition as it relates to the penalty phase trial that was taking place. At a minimum, the missing plea transcript left my testimony highly vulnerable to cross examination and this did not have to occur. If I had the transcript of the change of plea, I would have been able to respond to the questions presented on cross examination.

8.      Not having the report from Dr. Price also left my testimony highly vulnerable to cross examination. Knowing what the prosecution had with regards to MH assessment would have helped me prepare. I don't believe I had any document (or idea) that anyone was thinking of a personality disorder (or malingering). The records I had were historical and in overwhelming fashion, consistent. When I evaluated him he was on Lithium and an antipsychotic medication. There had been a diagnosis of schizoaffective disorder by a doctor who had him under relatively long term observation since he had been in custody. Mr. Fields symptoms were markedly overlapping and seemingly progressive over time. Had I been aware of Dr. Price's findings and opinions I could have assisted counsel in developing

4

a presentation that effectively differentiated the personality diagnoses with the diagnoses of schizoaffective disorder and Bipolar I Disorder with Psychotic Features. Like the Anti-Social Personality Disorder or Narcissism, analogously, Mr. Fields met all the criteria for a primary sleep disorder,

eating disorder, sexual disorder, attention deficit disorder etc. However, none of these are appropriate diagnoses because they all are accounted for and are excluded based on his bipolar (schizoaffective) state.

9. Also, the Dr. Price report calls his auditory hallucinations malingering (although he did not put that on Axis I it is in his report). Malingering is ultimately a diagnosis of exclusion (where you exclude all other possible diagnoses.) Had I had notice of the Dr. Price findings and opinion, I could have been better prepared for cross examination on this important point. Based on my review of his report, Dr. Price did not exclude other diagnoses but came to his conclusion in a simple conclusory way. Likewise, a finding that Mr. Fields mood problems were "dysthymia" is problematic and unique when: 1. his primary care provider documented "voices" prior to any

potential secondary gain; 2. he had prior documentation of a major depression; 3. the jail had been treating him for a psychotic schizoaffective disorder; 4. and he was noted to markedly improve on Lithium.

10. From looking at my report, I note that as part of the request for consultation,

5

I was asked to make "detailed findings including factors in the defendant's background, record or character or other circumstance of the offense that may mitigate against imposition of the death penalty." I understand that this question encompasses my assessment of life history and social history and presentation of extant mitigation facts to the jury consistent with my expertise and experience as a psychiatrist. At the time of trial, I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history–compelling testimony about the mitigation present in Mr. Fields' social history could have been presented. It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident, and it should have been presented in Mr. Fields' case.

11.     At the time of trial, I was provided only with the raw data from Dr. Gelbort's neuropsychological testing. I have since been able to review his report and the report from

6

Dr. Price. I also have been made aware that recent additional follow-up testing has been conducted by Dr. Daniel Martell. As noted above, I am not expert in the interpretation of psychological test data, and, as most psychiatrists, I rely on reports written by psychologists to provide such interpretation. These reports then become part of my overall psychiatric opinion. From what I now understand Mr. Fields is impaired in the frontal lobes of his brain. Based on what I understand that was found by Dr. Martell, Mr. Fields was moderately impaired at the time of trial and now is severely impaired with some kind of degenerative or progressive neurological disease. If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his "cognition" – which, as the excerpt from my testimony above shows I was not asked to consider – I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.

12.     The frontal lobes of the brain are central for humans to "be human." In other words, it is with the frontal lobes – which are by far the largest parts of the human brain- that humans plan, control impulses, weigh options, deliberate and consider consequence. At the time of trial, all which was given to me was Dr. Gelbort's raw data, and that was not critical to my final opinion. However, his expert interpretive findings are very important and would have been important for my testimony. This is so for a number of reasons. The presence of such organic deficits could have explained some of his behaviors that the

prosecution portrayed as the product of his psychopathy. Additionally, there were several times when I was asked on the witness stand about the process of diagnosing a person who presents with multiple symptoms. The answer remains that one has to weigh each symptom with all the other symptoms in order to reach conclusions to a degree of psychiatric certainty. In this case, based on a number of treatment plans over his life which had failed, the manner of Mr. Fields' response to the psychopharmacology regimen he began to receive while in prison prior to the trial, his mother's history of brain damage, his own birth trauma the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Bradley D. Grinage, M.D.

Dated:        Lawrence, Kansas
              March 29, 2010

8

Declaration of Glori J. Shettles
Pursuant to 28 U.S.C. § 1746

I, Glori J. Shettles, hereby verify and declare and follows:

1.    My employer, Inquisitor, Inc., was retained by the Federal Public Defender for the Eastern District of Oklahoma to provide capital mitigation services for the defense in the criminal case of USA v. Edward Leon Fields, 03-cr-73. I was assigned to this case by my superior at Inquisitor, Inc. I am providing this declaration at the request of Mr. Fields' current counsel to explain my role in the litigation and provide information about several aspects of the case. I understand that Inquisitor, Inc., and myself in particular, was retained at the suggestion of Learned Counsel, Isaiah "Skip" Gant.

2.    I received a B.A. degree in sociology from Memphis State University in 1974. I obtained a masters degree in guidance and counseling also from Memphis State in 1978. From 1985 to 1990 I was a Regional Director for the Tennessee Board of Paroles. I served for a time as Acting State Director for the Board. I was an investigator for the District Attorney General's Office in Memphis from 1990 to 1991. I then became a Program Manager for Community Corrections until 1993. Since January 1993, I have been continuously employed by Inquisitor, Inc., as an investigator and mitigation specialist. Inquisitor provides a wide-range of forensic

1

services with respect to sentencing and parole. During my approximately seventeen years at Inquisitor, Inc., I have provided capital mitigation services in over seventy cases in state and federal courts. I am thoroughly familiar with the standard of care for the provision of capital case mitigation services and I abide by those standards in my work.

3.  I began working on the Fields case as soon as I was appointed by my superior in August, 2003. As is customary, I set out to identify, locate and interview as many individuals as possible who knew about Mr. Fields' background. I also ordered and eventually obtained as many documents as possible about Mr. Fields' life, including medical, mental health and school records. I used the records and background interviews to form impressions about Mr. Fields, to guide my on-going investigation, and to advise counsel of potential mitigation themes.

4.  The lawyers on the case were Julia O'Connell, Esq. and Isaiah "Skip" Gant. Although Mr. Gant was appointed as Learned Counsel, it was clear to me that Ms. O'Connell was assuming a grossly disproportionate amount of the pre-trial preparation. Accordingly, I took direction from her. While I was afforded some flexibility, for the most part, I interviewed only those people to whom I was directed by Ms. O'Connell. There was a third lawyer involved in the case, Barry Derryberry, who was employed in Ms. O'Connell's office. However, my sense is that he was in

2

a largely research and support role with regard to the issues in the case.

5.     During the ensuing months, I gathered a significant amount of information and prepared several memos for counsel. I learned, and told counsel, that Mr. Fields had a family history that was marked by notable dysfunction. Each parent came from highly dysfunctional backgrounds with prevalent sexual abuse and violence. Mr. Fields' mother (Margaret Fields) has been depressed for her entire life. She presents as a person who is emotionally cold, uncaring of others and highly self-centered. For instance, I learned that she insisted that her family stop celebrating Christmas after her father died because Christmas was his favorite holiday. This simple example illustrates how she placed her own emotional needs above those of her family and other loved ones.

6.     Mr. Fields' childhood was notable for several other reasons. His family moved often because of his father's jobs. His father was largely absent from Mr. Fields' day-to-day life due to the long work hours his jobs required. His mother was emotionally turbulent and self-centered. She jealously guarded her relationship with her husband to the extent that she literally kept the father from the children so as to maximize her private time with him. As a result, the relationship between the parents and Mr. Fields and his sister (Cherie), was distant, cold and unemotional. Also notable were the descriptions I heard from the children of bizarre discipline inflicted

3

by either parent, but always at the command or insistence of the mother. These factors are important in considering Mr. Fields' history of depression, discussed later in this statement.

7.     Another significant finding that I made had to do with Mr. Fields' near-death experience at the time of his birth. His mother related to me that he had a "hollow membrane disorder." We obtained his birth records (which current counsel have provided to me), however, they were largely illegible. We were unable to secure a legible copy. As I understood the story related by his mother, as a result of this condition, Mr. Fields could not breath at birth, almost died and ultimately was sent to another specialized hospital where he spent about one week. This finding is important to my mitigation investigation because it raised the possibility of organic brain damage at the time of the birth, secondary to oxygen deprivation.

8.     My investigation also revealed a documentary and anecdotal history showing that Mr. Fields suffered from life-long depression. He was predominantly described by those who knew him as "unhappy," "moody" and "strange." He did not maintain interest in any particular activities and changed jobs frequently without apparent reasons. He seemed to move from one activity or relationship to another, without any obvious motivation for doing so. Medical records document that he was variously diagnosed as "depressed," "anxious" and as having mood problems. He

4

reported sleep disturbances, weight loss and lack of energy as a result of his mood problems. At times, he reported hearing voices, which he also described to me in interview. I also discovered inter-generational mental health and apparent neurological problems, particularly on his mother's side of the family.

9.     Mr. Fields has rarely been able to express emotions or been encouraged to express emotions during his life. There are a number of possible reasons for this flat emotional presentation: he could have been modeling his mother's own cold demeanor, it could be a result of his own depression, or, as I know from my years of experience, such lability in mood is a common sign of organic brain dysfunction. Whatever the cause, Mr. Fields has been almost universally perceived as an emotionally flat or cold individual. With an emotionally flat and depressed mother, Mr. Fields' own depression was neither adequately recognized nor addressed at important times in Mr. Fields' life. Then, when he exhibited behavioral problems as a teenager, which could no longer be ignored, his mother took him to the same psychiatrist who was seeing her for "therapy." However, this was short-lived as he was soon pushed by his family into joining the Navy as a way of addressing the "problem."

10.     While he was able to complete his commitment in the service, it was far from a therapeutic environment for his problems and may have contributed to future

5

difficulties. For the remainder of his adult life, his inability to stay at one job for long, his moods, and inattention to the people around him were chalked up to his being "lazy" or "moody." The family appeared to ignore or tolerate his "moods" and erratic behavior. People around him simply did not perceive that he was chronically depressed, with, potentially, other pathology.

11. As a result of my investigation, I brought to the attention of Ms. O'Connell a variety of potential mitigating factors and themes that could be developed and presented to the jury. Such factors included that Mr. Fields was raised with a lack of parental attachment, his parents placed their own relationship ahead of their relationship with their children, he was emotionally abused, the family had a transient existence, the family was dysfunctional, his mother was chronically depressed and he suffered significant loses in his life, particularly around the time of the offenses. It is fairly standard practice in modern capital mitigation to present the defendant's "social history" to the jury through either a mental health professional or a mitigation specialist, like myself. However, I was never called to testify and much of the mitigating factors that I found were either not presented at all to the jury or were presented in isolated fashion and without providing an overall mitigating context. I was present throughout the trial. I recall that I believed that the jury was never provided with a comprehensive and contextualized presentation or explanation

6

of the relevant aspects of Mr. Fields' social history. I believe that I gathered the facts and provided the analysis needed to make this presentation.

12.     Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. At the very beginning, Mr. Gant offered some "big" suggestions. He suggested hiring Dr. George Woods as the defense mental health expert. As noted, he also suggested retaining my firm. However, it soon became clear to me that after making these "big" suggestions, he did little actual work to advance the defense's preparations. It was quite clear that Mr. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

13.     I was in close contact with Mr. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial – a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of

7

the defense.  Ms. O'Connell examined every witness in the case.  This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation.  During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day.  Evenings seemed to him to be more in the nature of a social event than a serious endeavor.  I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court.  Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden.  I recall her finally giving up on trying to get him to perform a meaningful role.

14.   Because of the lack of a coordinated team effort, and because Mr. Gant was largely not contributing to the defense, significant decisions were made without proper consideration of their impact on the defense.  The most prominent of these issues relates to the adoption of the defense of "manic-flip."  The decision to go with this explanation for Mr. Fields' action was made without any discussion or consideration of the other mental health conditions that were extant in his life. The Government was largely not contesting that Mr. Fields had a lifetime of depression and heard voices.  Nonetheless, there was no emphasis in the penalty phase to

8

demonstrate that these significant facts were mitigating in their own right. By the same token, defense counsel completely missed the obvious social history factors about which I could have testified. Thus, while some isolated social history facts were provided to the jury, there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidently provided to the jury.

15.     In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties. I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Mr. O'Connell being effectively on her own.

16.     In short, from my perspective, counsel were not seeing the forest for the trees as a result of their dysfunctional relationship. This poor relationship and Mr. Gant's unwillingness or inability to contribute to the defense, placed a significant burden on Ms. O'Connell. This burden, in turn, caused the team to fail to fully and

9

properly pursue and present to the jury obvious mitigating themes.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Glori J. Shettles

Dated:       Memphis, Tennessee
             March 22, 2010

10

/544

# CERTIFICATE OF LIVE BIRTH

State of Oklahoma - Department of Health

LOCAL REG. NO.

STATE FILE 135 —

| 1. PLACE OF BIRTH | | 2. USUAL RESIDENCE IF MOTHER (Where does mother live?) | |
|---|---|---|---|
| a. COUNTY Okla | | a. STATE Okla | b. COUNTY Okla |
| b. CITY, TOWN, OR LOCATION Okla City | | c. CITY, TOWN, OR LOCATION Moore | |
| c. NAME OF HOSPITAL Midwest Hospital | | 7. | |
| d. IS PLACE OF BIRTH INSIDE CITY LIMITS? Yes X | | IS RESIDENCE INSIDE CITY LIMITS? YES ✓ NO | IS RESIDENCE ON YES NO |

| 3. CHILD'S NAME Edward Leon Fields Jr. |
|---|
| 4. SEX M | 5a. THIS BIRTH | 5b. TWIN OR TRIPLET, WAS CHILD BORN |

| 6. FATHER'S NAME Edward Leon Fields | | 8. COLOR OR RACE W |
|---|---|---|
| 7. AGE 25 | BIRTHPLACE Calif | USUAL OCCUPATION Machinist | 11b. KIND OF BUSN. OR IND. Machinist |
| 12. MOTHER'S MAIDEN NAME Mrs. Margaret Zimmerman | | 11. COLOR OR RACE W |
| 14. AGE 26 | BIRTHPLACE Calif | | |

17. INFORMANT (Signature of either parent.) Mrs. Edward Fields

18. MOTHER'S MAILING ADDRESS

| 19a. LENGTH OF PREGNANCY COMPLETED WEEKS | 19b. WEIGHT OF CHILD AT BIRTH | 20. WAS PROPHYLACTIC DRUG USED IN BABY'S EYES? YES NO |
|---|---|---|
| 21a. WAS BLOOD OF THIS CHILD'S MOTHER TESTED FOR SYPHILIS? YES ✓ NO | | 21b. IF NO TEST, STATE REASON THEREFOR |

| 22a. SIGNATURE | 22c. ATTENDANT AT BIRTH M.D. ✓ D.C. MIDWIFE OTHER |
|---|---|
| 22b. ADDRESS | 22d. DATE SIGNED |

23a. DATE REC'D BY LOCAL REG. 23b. REGISTRAR'S SIGNATURE | 24. DATE RECEIVED BY STATE REGISTRAR

| THIS LINE FOR USE OF STATE REGISTRAR | DATE CORRECTIONS MADE | ITEMS CORRECTED | AUTHORITY | CLERK |
|---|---|---|---|---|

VS 15

REVISION

This form for live occurring on after January 1,

or print with permanent THIS IS A PERMANENT RECORD.

NOT WRITE BELOW

CODES

## SUMMARY SHEET - INFANT

| LAST NAME - FIRST - INIT. | | | CITY | DATE ADMITTED - TIME |
|---|---|---|---|---|
| FIELDS, Baby Boy | | | Moore | |
| PATIENT AGE | DATE OF BIRTH | MARITAL STATUS (X) | HOME PHONE | DOCTOR |
| 29 | | X | SW 4-6563 | Bozell |
| SEX | RELIGION | RELATIONSHIP OF RESPONSIBLE PARTY | | HOSPITAL NUMBER |
| X M F | Catholic | Mother & Father | X W LA N | 67-1544 |
| OCCUPATION | EMPLOYER NAME AND ADDRESS | | HOW LONG EMPLOYED | ADMITTING DIAGNOSIS |
| Newborn | | | | Newborn |
| SPOUSE NAME FIRST - INIT. | HOW LONG AT ABOVE ADDRESS | | PREV. ADDRESS | |
| | | | | |
| OCCUPATION | EMPLOYER NAME AND ADDRESS | | HOW LONG EMPLOYED | |
| | | | | |
| NAME OF RESPONSIBLE PARTY | ADDRESS | | HOME PHONE | RM ADM BY |
| Edward & Margaret Fields | | | SW 4-6563 | Nsy. |
| OCCUPATION | EMPLOYER NAME AND ADDRESS | | HOW LONG EMPLOYED | DATE DISCHARGED - TIME |
| Truck Driver | Mathis Bros. Furn. | | 4 years | 2-14-67 |
| MOTHER'S MAIDEN NAME | NOTIFY IN CASE OF EMERGENCY | | BASIS FOR ADMISSION [ ] BLUE CROSS [X] GROUP INS. | |
| Ginnigan | | | [ ] OTHER INSURANCE [ ] WELFARE [ ] COMPENSATN | |
| FAMILY OR RELATIVES IN WITH NAME AND YEAR | | | [ ] DEPOSIT PAID $ | |

**FINAL DIAGNOSIS**

*Probable Hyaline Membrane of the lung*
*360-9x0*

SUMMARY DIAGNOSIS OR COMPLICATIONS:

SURGERY

IS [ ] RECOVERED [ ] IMPROVED [ ] NOT IMPROVED [ ] NOT TREATED [ ] DIAGNOSIS ONLY [ ] DIE [ ] AUTOPSY [ ] SB [ ]

CONSULTATION WITH

EXAMINED AND APPROVED THIS COMPLETE MEDICAL RECORD

DATE  6-7-67

APPROVED BY MEDICAL RECORD COMMITTEE

SIGNED:

ATTENDING PHYSICIAN

# NEWBORN RECORD

Name of Infant _Fielden, Baby Boy_   Sex _M_   Birth No. _____

Mother's Name _Margaret_   Room or Ward No. _____   Hosp. No. _6715 41_

Doctor _Boyle_   Intern _Whitaker_   Nurse _L. Jackson_

Date of Birth ████████████   Hour _4 40_ A.M.   Delivery _Spont_

Position _L O A_   Birth Wt. _6_ lbs. _14_ oz.   Eye Prophylaxis _Sodium Sul'am_

Initial Respirations   Immediate ☑ Delayed ☐ Induced ☐   Oxygen administered ____

Measurements  Head _13½_  Shoulders _6_   Length _19½_   Vit. K ____

| Date | PHYSICIAN'S ORDERS | PHYSICAL EXAMINATION | At Birth | On Discharge |
|---|---|---|---|---|
| 5-15-61 | | Date: | 5-15-61 | |
| | | Weight | 6 lbs. 11 oz. | lbs.   oz. |
| | | To Breast | | |
| | | Formula | No | |
| | | Heart | | |
| | | Eyes | | |
| | | Cord | | |
| | | Skin | | |
| | | Bowels | | |
| | | Anomalies | | |
| | | General Condition | | |
| | | Remarks | | |
| | | Examined by Doctor (Signed) | | |

Instructions on Discharge

# HILLCREST OSTEOPATHIC HOSPITAL

## BABY'S RECORD

NAME _Fields Baby Boy_   MOTHER'S NAME _Morgan_

| DT | HOUR | T | R | V | STOOL | URINE | BREAST | ARTIFICIAL FORMULA | AMOUNT | WEIGHT LB. | WEIGHT OT. | REMARKS |
|----|------|---|---|---|-------|-------|--------|--------------------|--------|-----------|------------|---------|
| 5 | | NB | | | | | | | | 6 | 1 | |
| | | | | | | | | | | | | |

# HILLCREST OSTEOPATHIC HOSPITAL
## BABY'S RECORD

_____, Baby Boy _____ MOTHER'S NAME _Margaret,_____

| TIME | T | P | R | STOOLS | URINE | BREAST | ARTIFICIAL FEEDING | AMOUNT | WEIGHT | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LB | OZ | |

# HILLCREST OSTEOPATHIC HOSPITAL
## BABY'S RECORD

NAME _Fields, Baby Boy_ MOTHER'S NAME _Margaret_

| DATE | HOUR | T | P | R | STOOLS | URINE | BREAST | ARTIFICIAL FORMULA | AMOUNT | WEIGHT LB. | WEIGHT OZ. | REMARKS |
|------|------|---|---|---|--------|-------|--------|--------------------|--------|--------|--------|---------|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | 73 | 9 | | 150 | | | | | | | | |
| | | | | | | | | | | | | |

# HILLCREST OSTEOPATHIC HOSPITAL

## BABY'S RECORD

NAME F. Elde Baby Boy          MOTHER'S NAME Margaret

| DATE | HOUR | B. | H. | STOOLS | URINE | BREAST | ARTIFICIAL FORMULA | AMOUNT | WEIGHT | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LB. | OZ. | |

# HILLCREST OSTEOPATHIC HOSPITAL

## BABY'S RECORD

[illegible] Baby Boy MOTHER'S NAME Margaret

| [illegible] | T. | P | R. | STOOLS | URINE | BREAST | APPLIED FORMULA | AMOUNT | WEIGHT LB. | WEIGHT OZ | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | | | | [illegible] | | | | | | | [illegible] |

# HILLCREST OSTEOPATHIC HOSPITAL
## BABY'S RECORD

NAME *Fields Baby Boy*   MOTHER'S NAME *Margaret*

| DATE | HOUR | T | P. | R. | STOOLS | URINE | BREAST | ARTIFICIAL FORMULA | AMOUNT | WEIGHT Lb. | WEIGHT Oz. | REMARKS |
|------|------|---|----|----|--------|-------|--------|--------------------|--------|------|------|---------|
| 5- | | | | | | | | | | | | |
| | 5 30 | | | | | | | | | | | |
| | 8 40 | | | | | | | | | | | |

## PHYSICIAN'S ORDERS

| Facility Name | First Name | Attending Physician | | Roo a. | Ho. No. |
|---|---|---|---|---|---|
| *[illegible]* Baby Boy | | Bazee | | | 07-11 |

| Date Ordered | Date Discontinued | ORDERS |
|---|---|---|
| 5/18/67 | | (1) Transfer, in isolette, per ambulance, to St. Anthony Hosp. this A.M. |
| 004 | | |
| 10 A.m. | | *[illegible signature]* |

## PROGRESS NOTES

| Family Name | First Name | Attending Physician | Room No. | Hosp. No. |
|---|---|---|---|---|
| _Tassaly_ _Baby Boy_ | | _Bozell_ | | 67- _500_ |

| Date | Notes Should Be Signed by Physician |
|---|---|

_See Order Sheet_

5/9/61 _Labored breathing & expiratory grunt._
9:25 _No rales noted on auscultation._ JLE? M0

5/15/61 _No improvement noted of breathing. Dr._
4:45 _Bozell notified to come for consultation._ JLE? M0

5/16/61 8:00 _Infant having resp. diff._
_& resp. grunt and rapid breathing._
_[illegible] of extremities, with_
_[illegible] so that Dr. Bozell_ _Brunick M0_

HEMATOLOGY REQUEST

Dr. _____
Date Requested 5-15-67
Room No. _____
Division. 6B
Nurse. E. Kirckner

NAME _____ Baby Boy
Last          First        Middle

☒ CBC
☐ Hgb. _____        ☐ Blood F. _____    Comments:
☐ WBC. 14,750          ☐ Prothrombin _____    Two nucleated
☐ Diff.                ☐ Reticulocyte _____   RBC per
   Baso. _____     ☐ Platelet _____    100 WBC+
   Eosine. 2           ☐ P.T.T. _____
   Young. _____    ☐ Hematocrit 62
   Band _____      ☐ MCV _____
   Seg. 71             ☐ MCH _____
   Lymph. 27           ☐ MCHC _____
   Mono _____      ☐ Quant. Gas _____
                       ☐ Sickle Cell _____
☐ RBC. _____       ☐ Malaria _____
                       ☐ Baso. Stips _____
                                               Tech _____
                                               Date May 15, 67

## CONSULTATION RECORD

Hosp. No. _____

Date _ 5-15-67 _____

Name Baby Boy Fields   Room or Ward No. N㎎   Bed ____   Doctor Bozell

Consulting Service or Physician   Dr. Boone

Report requested regarding   Pulmonary status.

Signature of attending physician _____

### REPORT

5-15-67 4:00 PM

Findings: Infant examined at request of Dr. Bozell, chart reviewed. Term birth 4:40 AM today, spontaneous, vigored Apgar? Has had some mild resp. distress & has required O2. X-ray shows infiltrate of lung esp. RML. Chest is clear to A & P — ventilating well. No retraction. Heart tones not unusual. Slight ↑ but mild-bed cyanosis. No palpable abdominal mass/organ. Active. Cry good.

Diagnosis: Prob. aspiration. R/O RDS.

Recommendations: High humidity, O2, observation. Should improve.

Thank you.

Signature of consultant

5/16/67 9⁰⁰ Am

Reviewed with Dr. Bozell. Has had some resp. distress during night, apparently predominantly past 2 hrs. Xray now shows diffuse pulmonary infiltrate. B.S. still good, and I do not believe this youngster has bronchial obstruction. No change in heart tones. Is not retracting. I think it is definite now that

5/16/67 9²⁰ AM

Reviewed with Dr. Bozell. Has had some resp. distress during night, apparently predominantly past 2 hr. Xray now shows diffuse pulmonary infiltrate. B.S. still good, and I do not believe this youngster has bronchial obstruction. No change in heart tones is not retracting. I think it is definite now that this youngster has a hyaline membrane. He will ~~require~~ ~~possibly~~ probably require treatment to combat acidosis and I think he should be transferred to a nursery equipped for this. Arrangements made 10 AM for transfer to St. Anthony Hospital under care Dr. Larry Buchler at request of Dr. Bozell. Prognosis guarded.

N.F. Bronell,

HILLCREST OSTEOPATHIC HOSPITAL          XR No. 50103
2129 S. W. 59th
Oklahoma City, Oklahoma

# X-RAY REPORT

Name  Fields, Baby Boy                Age  NB   Rm. No.  Nursery   Hosp. No.

Address  _____   Date  5-15-67

Anatomical part or region:  CHEST:

Attending Physician  Bozell

**Findings:**

Cardiovascular structures appear within normal limits.

Pulmonary structures reveals the left lung to be normal pneumonized and
without indications of abnormality.  The right lung shows considerable
increase in the central pulmonary markings being most severe in the upper
right lung indicating inadequate cleansing through the bronchial tree in
this area.

IMPRESSION:

Changes in the bronchial pattern with  the right lung and particularly the
upper right lung thought to be inadequately cleared and showing increased
density.

2129 S. W. 59th
Oklahoma City, Oklahoma

## X-RAY REPORT

Name  Fields, Baby Boy                    NB        Nursery
Age _____ Rm. No. _____ Hosp. No. _____

Address _____ Date 5-16-67

Anatomical part or region: _____ CHEST: _____

Attending Physician _____ BOZEL _____

Findings:

Re-examination of the chest in comparison with a previous film of 24 hours earlier shows a persistant increase in the markings of the right lung which is a more generalized phenomena than that noted on the earlier examination. Persistant, inadequate pneumonization of the right lung is indicated.

Dr. _Ray E. Bishop_ __/sm__

# CONSENT TO OPERATION UPON MINOR

Place _Hillcrest Hosp_

Date _3 · 13 · 6_

1. I (we) being the parent(s), guardian, custodian of _Biddle Baby Boy_

a minor of the age of _4 h_, do hereby authorize and request Dr. _Edge_

to perform the following operation on the person of the said minor, _____

_____ _Circumcision_ _____

_____

and to do any other procedure that the judgment of above named doctor may dictate during the above operation.

2. I (we) understand that the surgeon (surgeons) will be occupied solely with the surgery, and that the administration

and maintenance of the anesthesia is an independent function, and will be in charge of Dr. _Edge_

I (we) consent to the administration of such anesthetic, or anesthetics, as Dr. _Edge_

may deem advisable in this case.

A.M.                    Signed _____ (        )

Hour _____ P.M.        _____ (        )

                        Witness _Ilene Franklin_

HOH-33—Semco

# CERTIFICATE OF LIVE BIRTH

STATE FILE NO. **135 —**

Case 6:10-cv-00115-RAW Document 2-6 Filed 04/06/10 Page 20 of 21

The document is too faded and degraded to reliably transcribe the handwritten and typed form contents.

1. PLACE OF BIRTH

2. USUAL RESIDENCE OF MOTHER

4. CHILD'S NAME

8. COLOR OR RACE

17. INFORMANT (Signature of either parent)

22a. SIGNATURE

22b. ATTENDANT AT BIRTH

THIS LINE FOR USE OF STATE REGISTRAR | ITEMS CORRECTIONS MADE | ITEMS CORRECTED | AUTHORITY | CLERK

/544

# CERTIFICATE OF LIVE BIRTH

State of Oklahoma - Department of Health

STATE FILE   135 -

| LOCAL REG NO | | |
|---|---|---|
| 1. PLACE OF BIRTH a. COUNTY  *Okla* | 2. USUAL RESIDENCE IF MOTHER a. STATE *Okla* | b. COUNTY *Okla* |
| c. CITY, TOWN, OR LOCATION *Okla City* | c. CITY, TOWN, OR LOCATION *Moore* | |

**REVISION**

his form for live occurring on fter January 1.

or print with permanent THIS IS A MANENT RD.

OT WRITE BELOW

CODES

| d. NAME OF HOSPITAL  *Memorial Hospital* | RESIDENCE INSIDE CITY LIMITS? YES ✓  NO | IS RESIDENCE ON YES  NO |
|---|---|---|

| 3. CHILD'S NAME  *Edward   Leon   Fields Jr* | | |
|---|---|---|
| 4 SEX  *M* | SINGLE, TWIN, TRIPLET | 5b. IF TWIN OR TRIPLET, WAS CHILD BORN |

| 7 FATHER'S NAME  *Edward Leon Fields* | 8 COLOR OR RACE  *W* |
|---|---|
| AGE  *25*   BIRTHPLACE  *Calif*   USUAL OCCUPATION *Truck Driver* | KIND OF BUSINESS OR IN *Machine* |
| MOTHER'S NAME  *Mrs  Margaret Zimmerman* | 13. COLOR OR RACE  *W* |
| 14 AGE  *21*  YEARS   BIRTHPLACE  *Calif* | |

17. INFORMANT   Signature of either parent.
*Mrs Edward S Fields*

18. MOTHER'S MAILING ADDRESS

| 19a LENGTH OF PREGNANCY COMPLETED WEEKS | 19b WEIGHT OF CHILD AT BIRTH  *7 lb 9 oz* | 20 WAS PROPHYLACTIC DRUG USED IN BABY'S EYES?  YES  NO |
|---|---|---|
| 21a WAS BLOOD OF THE CHILD OR MOTHER TESTED FOR SYPHILIS    YES ✓  NO | | 21c IF NO TEST, STATE REASON THEREFOR |

| 22a. SIGNATURE | 22b ATTENDANT AT BIRTH M.D.   D.C.   MIDWIFE   OTHER |
|---|---|
| 22c ADDRESS | 22d DATE SIGNED |

| 23b DATE REC'D BY LOCAL REG  23c REGISTRAR'S SIGNATURE | 124 DATE RECEIVED BY STA   REGISTRAR |
|---|---|

| THIS LINE FOR USE OF STATE REGISTRAR | DATE CORRECTION WAS MADE | ITEMS CORRECTED | AUTHORITY | CLERK |
|---|---|---|---|---|
| | | | | |

VS 15

# NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Name: | Edward Fields |
| Age: | 37 |
| Date of Birth: | ███████ |
| Date of Evaluation: | 8-11-04 |
| Referred by: | Julia O'Connell |
| Evaluated by: | Michael M. Gelbort, Ph.D. |

Edward Fields is a thirty-seven year old right-handed twice divorced (from the same woman) white male who was referred for neuropsychological evaluation by his attorney, Julia O'Connell, in the course of preparation for trial on capital murder charges. He explained during the full contact interview and evaluation that he is charged with two counts of first degree murder. Mr. Fields explained that he has been in the Tulsa County Jail for about a year after being transferred from the Muscogee County Jail. While in the first facility Mr. Fields had a "shaving accident" in which he attempted to commit suicide by slashing his right wrist once, his left wrist six times, and once to the inside of his left elbow. He was taken to the hospital where many staples and sutures were utilized to close his wounds. Asked about any accompanying alteration of consciousness with the incident the patient explained that he "got woozy." He acknowledged having thoughts of suicide on a daily basis since that event. Before the incarceration and attempt he explained that he had been having anxiety attacks "one right after the other." He had been prescribed Effexor before the incarceration and, reportedly, other neuroleptics had been considered. The dosage he was given had been doubled about three days before the event for which he has been charged. Mr. Fields has also been treated with Risperdal but complained that he had trouble breathing through his nose while on that medication. This was followed by Stelazine which resulted in involuntary muscle contractions. The patient did not believe that he was given Artane or Cogentin in conjunction with the Stelazine. Medications being given at the time of evaluation include Prozac, Lithium, Loxatane, and Artane. He has been on this regimen for approximately six months.

Health history related by the patient found that he was born "at some Catholic hospital in Oklahoma City." He did not know his birth weight but stated "when I was born I couldn't breathe" resulting in a transfer to another hospital. He did not know if there was a problem with the pregnancy or delivery. He did state that he had presented breach, that

he arrived via a vaginal delivery, but that he did not know the length of the labor or if there was distress. It was Mr. Field's understanding that developmental milestones were met at normal ages.

Asked about emergency room visits, the patient reported that he had fallen off a bicycle at age eight or nine resulting in a fracture of his left wrist, and that he had a visit as a result of "a dose of the clap" while in Ohio. Inpatient stays arose from dehydration at age fourteen with the flu resulting in a week-long stay. He was also hospitalized as a result of having "wrecked a truck" at the age of sixteen when he "rolled" a pick-up down a hill with the vehicle turning over four times. He was taken to the ER, checked over, and released. Two days later he was riding a dirt bike and "slapped it down" referring to his helmet with resulting loss of consciousness and four day hospitalization. He has also had outpatient hospitalization for vasectomy.

In addition to the motor vehicle accident induced loss/alteration of consciousness, the patient described a "sleigh-riding" incident at the age of thirteen or fourteen where he was coming off of a hill and the runner sled and he did not make a turn resulting in a crash and a presumed several minute loss of consciousness. He also had an episode of syncope reported while at boot camp "walking down the injection line, needles bother me." Otherwise he stated that, to the best of his knowledge, his heart is fine, his blood pressure is a little high, thyroid in normal, and that he has had notable febrile episodes with the flu giving rise to 104 plus degree fevers. He was also exposed to toxins while in the Navy when he performed spray painting without a respirator: as a result he said "I was pretty stoned every night." This went on for about nine months. He noted a pattern of headaches following the painting, as well as headaches once or twice a day in the evenings which improve with analgesic medications. He also had recurring headaches as a child. Mr. Fields denied any history of seizure disorder, hypoxia or anoxia, hypoglycemia or diabetes, and his kidneys are fine. He does not believe that he has ever seen a neurologist. He does acknowledge having seen a mental health professional while in Richlands at the behest of his mother when he was sixteen or seventeen. He was in treatment once per week but does not know the duration of the intervention. Medication intervention began around the time he turned thirty years old by "Mr. Anderson, a P.A. (physician's assistant) who was a fishing buddy who treated my girlfriend." At that time he believes he was given Paxil, the Prozac, then Serzone. Mr. Fields explained that he went off the medications when he lost his job and insurance as "a little bird (auditory hallucinations in the form of voices) told me to quit my job, and I did." He reported that "each medication helped me a little bit." Mr. Fields explained that he had Effexor with him at the time of his arrest, and that he also had Elavil his mother had given him. He had not attempted suicide at that time as he had a list of "things to do, including my three children in Virginia" before he was planning to end his life. He was arrested prior to executing his plan.

Asked about sleep disturbance, the patient said that he now sleeps "like the dead" with the medications on board. On the "street" he experienced poor sleep hygiene unless he took medications such as Tylenol PM. Appetite was good at the time of testing with a forty pound weight gain since incarceration. Prior to being jailed he had had a fifty pound weight loss in four months associated with problems with his girlfriend: "I just quit eating."

Educational history found that the patient completed the eleventh grade at Richlands High School with "fair" overall performance highly affected by whether or not he liked the individual class. He was never retained and may have failed an English class. He believed he was in remedial English and math in third and fourth grades. He also stated that he was never in significant trouble in school and that he had a few friends.

Work history was somewhat limited and he worked at odd jobs but "never kept a job." He was in the Navy and served about three years on active duty, including working as a recruiter for two years. He was never "busted" in rank or pay and received an Honorable Discharge. He then drove a truck for a year, was a fill-in cleaner for six months, and worked as a security guard for several years, as well as in a chicken processing plant. From July 1995 through September 1999 he worked as a Correctional Officer with the Oklahoma Department of Corrections. He also worked as a warehouseman for several years and then was unemployed for a year as "I just could not make myself go get it..." He explained "the voices would start and I would go home." He had a few other jobs and Mr. Fields noted that his mother said she "could tell when I had a job because I was happy, down when not working." Asked about the voices in this context, Mr. Fields explained that one of the voices was clear and understandable while the others mumbled." He was told to hurt himself occasionally and give homicidal instructions only "one spring night."

The patient was reared by his mother, Mary Margaret Fields, now fifty-six or fifty-seven. She is disabled with rheumatoid arthritis and Lupus. The patient's father is deceased in late 2003 of cancer and had been a coal miner. Mr. Fields has an older sister in Virginia who completed some college and who owns several Wendy's restaurants.

Mr. Fields was administered a comprehensive neuropsychological evaluation including the Wechsler Adult Intelligence Scale - III, portions of the Wechsler Memory Scale - III, Wide Range Achievement Test - III, Category Test, Trail Making Test, Lateral Dominance Exam, Strength of Grip, partial Sensory Perceptual Examination, Aphasia Screening, items from the Luria Nebraska, and diagnostic interview with mental status testing. The obtained data was judged to be an accurate reflection of the patient's functioning in the areas assessed at the time of testing.

Intellectual assessment found Verbal, Performance (non-verbal,) and Full Scale IQ scores of 92, 94, and 93, respectively. As compared with his same-aged peers, subtest scaled scores tapping vocabulary skills and fund of old, overlearned factual information were in the center of the average range. These scores are most highly correlated with premorbid levels of functioning and academic abilities. In general, they can be seen as a benchmark against which other scores can be compared to determine how the patient likely has functioned in the past and whether there has been a decline in functioning. Measures of verbal attention and concentration assessed in a structured setting were average to low average, while freedom from distractibility measures were low average. Verbal concrete reasoning abilities were average with abstract verbal reasoning capacities in the average to low average range. Non-verbal scores showed a greater range or degree of variability with a measure of pure verbal reasoning tested in an untimed paradigm reaching high average levels of performance while visual scanning to recognize what detail is missing

from familiar objects or scenes was in the lower portion of the average range. A task tapping constructional praxis was at the same level, while visual sequencing and problem solving was average to low average. Visual processing speed with an embedded visual memory task was found to be low average.

Academic achievement testing found sight-reading and spelling at the high school level with percentile scores of 30 and 34, respectively. Math tested in a written and timed format was at the seventh grade level and had a percentile score of 18. Tests of receptive and expressive language abilities were grossly within normal limits, although comprehension was mildly suppressed.

Tests of learning and memory showed mild suppressions in working verbal and visual memory with performance fluctuating and sometimes in the average range but sometimes mildly impaired. Verbal rote memorization occurred at a slower than normal rate and never reached criterion levels of performance. Short term verbal memory for meaningful, paragraph length material was also variable and sporadic with the average performance just below the center of the average range. Short term visual memory for meaningful information was also found to vacillate with the overall level of functioning in the borderline defective range of functioning. Memory was able to be utilized much of the time, but could not be counted upon, most likely due to fluctuating attention and concentration functions.

Measures of higher cognitive abilities found mildly slowed to mildly impaired processing speed for verbally mediated tasks. Impulsivity of mild proportions was also found. Higher level reasoning tasks demonstrated mild impairment (performance in the bottom three percent of the population) with better performance noted on some of the more difficult tasks and worse performance on some that were easier. Again, deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance.

Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior. Please call on me if I can clarify these results.

Michael M. Gelbort, Ph.D.
Clinical Neuropsychologist



**U.S. Depart.    f Justice**

*United States Attorney*
*Eastern District of Oklahoma*

---

*1200 West Okmulgee*                                   *(918) 684-5100*
*Muskogee, Oklahoma 74401*                    *Main Fax (918) 684-5130*
                                                          *Criminal Fax (918) 684-5150*

February 1, 2005

Julie O'Connell
Assistant Federal Public Defender
Office of the Federal Public Defender
Williams Tower I, Suite 1225
One W. Third Street
Tulsa, OK 74103-3532

      Re:    *United States v. Edward Leon Fields, Jr.*
              Case No. CR-03-73-S

Dear Ms. O'Connell:

The prosecution team has grown concerned about the absence of a written record detailing the information you disclosed to Sheldon Sperling and me during our meeting on December 2, 2004. In order to avoid any later claims that members of our trial team gained information in violation of the firewall agreement, this letter will serve to document those matters which you disclosed during the December meeting.

We met in your office in Tulsa on December 2, 2004, at the conclusion of a Federal Public Defender training session. The meeting lasted for approximately two hours. You explained that you had consulted with other members of your defense team and, believing that settlement was a possibility, had decided to withdraw your guilt phase Rule 12.2 notice and disclose the mental health aspects of your mitigation case. These disclosures addressed a medication-induced manic "flip or switch", a pre-existing frontal lobe impairment, a pharmacological explanation of Effexor and its interaction with other medications, and an in-depth discussion of bipolar disorder which included information about your client's family background, his behavior and his current medications.

You prefaced your remarks by informing us that your client is much better now and that all the people in his life have noticed a remarkable difference in him since he has been receiving treatment at the Tulsa County Jail. You commented that most people would not be able to function on the amount of medication he is currently taking, but that it has improved his life and his relations with his family members. (You also gave us an update on how his ex-wife and children are adjusting to his incarceration and showed me a videotape of his ex-wife describing the changes she has seen in him and how her children are suffering.)

**ATTACHMENT**
      **1**   228

O'Connell Letter
February 1, 2005
Page 2

*Medication-induced manic "flip" or "switch"*
You told us that, while psychiatric experts may differ on the phraseology, what likely happened to your client, serving as a trigger for this crime, was a manic "flip" or manic "switch." Your expert believes that your client suffered from bipolar disorder when he began to seek treatment in the Spring of 2004. Like other individuals with bipolar disorder, he presented to the local doctor with depression because that was the state he was in at that time. The local doctor, not being a mental health expert, diagnosed the depression that he saw and missed the manic aspect of a proper bipolar diagnosis.

Your expert said that such a misdiagnosis in not uncommon when a bipolar patient sees a general practitioner who fails to obtain a full medical, social and family history. When the patient does not respond to medication as predicted, the doctor will adjust the dosage or change the medication, still not realizing that they are treating the wrong diagnosis. When medication works properly to alleviate depression, it does so by either stimulating or suppressing electrical impulses from the synapses in the brain. If a patient is truly bipolar and not simply depressed, too much of the wrong medication will not only lift the depression, but also can increase these electrical impulses to such a degree that the brain will trigger a mania or hypomania state. This reaction is what your expert refers to as a manic "flip" or manic "switch."

*Frontal lobe impairment*
You said that the medication error was compounded by a pre-existing frontal lobe impairment. Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. Injury to the frontal lobe, which regulates impulse control and judgement, would have undoubtedly complicated any mania suffered by the defendant.

Your neuropsychiatrist asserts that it is very hard for a defendant to malinger by presenting behavior and testing which would show only a frontal lobe injury and not an injury to other parts of the brain. He told you that "there is no such thing as a minor case of brain damage" just like there is no "minor" case of cancer. You informed us that the frontal lobe is "required for the brain's operating system" and that the brain "can't just patch itself." Such an injury cannot be "cured" and cannot be overcome if the defendant were to just "suck it up and be a man."

Your experts theorize that your client's brain was injured twice. The first trauma occurred at birth due to oxygen deprivation. Your expert informed you that most babies born in the 1960's who suffered similar oxygen deprivation died or were severely impaired. The defendant's survival is something of an exception, but the injury would still have caused his frontal lobe "not to grow right". The second injury happened when he wrecked a truck during his high school years in West Virginia. He was in the hospital for three days with a head injury and probably lost consciousness. You said that the hospital basically "just kept him until they saw he was alive and then they up and let him go."

O'Connell Letter
February 1, 2005
Page 3

*Pharmacological properties of Effexor*

After emphasizing that you were not claiming that the medicine "made him do it," you explained that the defendant's acts shocked everyone who knew him. You asserted that he was "sick" when he committed the crime, beyond his own ability to control his behavior, due to a combination of diminished impulse control resulting from his frontal lobe impairment and the effects of taking the wrong medication. You stressed that, from a pharmacological standpoint, the risk of such an outcome with Effexor is greater than with other antidepressants.

You told us that Effexor was engineered to provide a controlled release of medication over a certain time period. The medication is designed to attach to protein molecules and release over time. Because your client was having trouble sleeping, he was also taking Tylenol PM - a medication that should not be taken with Effexor. You instructed us that the Tylenol attaches to the same protein molecules and effectively bars the Effexor from attaching as designed. This would increase the immediate dosage to the body, rather than allowing a gradual and controlled release of the medication. Dumping all the Effexor into the defendant's system at once would created an even more concentrated reaction to the medication.

Your experts also reported that adverse reactions are not rare and were the subject of recent FDA warnings for physicians to closely monitor any changes in antidepressant medication or dosage.

*Bipolar diagnosis*

You related that your client's family history fits with a bipolar diagnosis. His grandmother was hospitalized and subjected to electroshock therapy during the 1930's or 1940's. His mother is likely bipolar or at least mentally ill. (She has long claimed to suffer from MS - the family just learned that she does not, in fact, have MS. She suffers from cotton-mouth due to medication and was recently hospitalized after attempting to overdose on Lortabs). His sister is now being treated for bipolar disorder. His children, as of now, show no signs of mental illness, but are worried that they will also develop a mental disorder.

Since getting treatment in the Tulsa jail, the defendant reports that "my head is not racing." You indicated that this statement is characteristic of persons emerging from a manic phase. The defendant now takes Haldol, Prozac, Cogentin, and Loxipene. At the jail, doctors have combined his antidepressants with some type of antipsychotic medication. His medical professionals have actually increased the antipsychotic dosages in recent weeks.

Before the crime, the defendant often bragged that he had an I.Q. of 178. Defense tests showed that he actually has an I.Q. of 138. You reminded us that the defendant tried to commit suicide at the Muskogee jail just before his initial appearance. You told us that people suffering from bipolar disorder can experience psychotic features such as auditory and visual hallucinations. You said that there is no evidence that your client experienced visual hallucinations, but that he has reported being plagued by voices for some time. He told the doctor he saw in the Spring of 2004 that he was hearing voices. He told the doctor that he had recently heard voices telling him to "sharpen knives." When his girlfriend complained that she didn't like him repeatedly sharpening her knives, he agreed to seek medical treatment.

O'Connell Letter
February 1, 2005
Page 4

You said that indicators of his bipolar disorder can be seen in his impulsive and irrational conduct. He impulsively stopped productive behavior that he had liked or that was good for him - like quitting jobs, etc. He robbed the victims and then used their credit cards which any former prison guard should have known would get him caught.

*Defense Experts*

You stressed that you had endeavored to find experts who were not merely "hired guns" for the defense bar. You then revealed the identity of the two experts then retained by the defense team.

Dr. George Wood, M.D., is a neurologist and psychiatrist from California who volunteers one month each year with the Doctors Without Borders program. He spent approximately three days with the defendant during two trips to Oklahoma. He spent the night here during his first visit and returned for the second trip after receiving the psychological testing which showed frontal lobe impairment.

Michael Gelbort is a psychologist from Chicago. He traveled to Oklahoma and conducted several neuropsychological tests on the defendant in the Tulsa County jail. You told us that no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case. You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

You informed us that you had not yet retained a pharmacologist.

I am aware that these are only the major points covered during our meeting, but I have tried to create as comprehensive a record of what you disclosed to us as possible. If anything repeated above does not comport with your recollection of your disclosures, please respond and correct my version. If we do not hear from you, we will assume that the matters reported above were disclosed to us during the December 2004 meeting and we will also assume that we may share these matters with prospective government experts.

Thank you for you attention to this matter.

Sincerely yours,

SHELDON J. SPERLING
United States Attorney

LINDA A. EPPERLEY
Assistant United States Attorney

LAE:le

*192*

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )   Case No.   CR-03-73-WH
)
EDWARD L. FIELDS, )   FILED UNDER SEAL PURSUANT
)   TO COURT ORDER DATED 12/20/04
Defendant. )

**SEALED**

# REPORT OF NEUROPSYCHOLOGICAL EVALUATION
## OF J. RANDALL PRICE, Ph.D, DATED JULY 1, 2005

FILED

JUL 0 1 2005

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By: _____
Deputy Clerk

DAVID E. O'MEILIA
United States Attorney

DOUGLAS A. HORN, OBA No.  13508
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
(918) 382-2700

Jul 01 05 06:37a    kay Stevens    972-792-0426    p.2

# J. RANDALL PRICE, Ph.D., ABPP, ABPN

### Board Certified in Forensic Psychology, American Board of Professional Psychology
### Board Certified in Neuropsychology, American Board of Professional Neuropsychology

FORENSIC PSYCHOLOGY ASSOCIATES OF TEXAS
1221 ABRAMS RD., SUITE 109
RICHARDSON, TEXAS 75081-5579
TELEPHONE: 972-644-8686
FACSIMILE: 972-644-8688

## Report of Neuropsychological Evaluation

### Identifying Information:

| | |
|---|---|
| **Name:** | Edward Leon Fields, Jr. |
| **Date of Birth:** | ▮▮▮▮ |
| **Chronological Age:** | 38 |
| **Dates of Evaluation:** | 06/13/05 and 06/28/05 |
| **Date of Final Report:** | 07/01/05 |
| **Style of Case:** | United States of America vs. Edward L. Fields |
| **Case No.:** | CR-03-73-S |
| **Court:** | United States District Court for the Eastern District of Oklahoma |
| **Attorney for the U.S.:** | Sheldon J. Sperling |
| | United States Attorney |
| **Address:** | 1200 West Okmulgee |
| | Muskogee, Oklahoma 74401 |
| **Telephone;** | (918) 684-5100 |
| **Facsimile:** | (918) 684-5150 |
| **Attorney for the Defense:** | Julia L. O'Connell OBA#13882 |
| | Assistant Federal Public Defender |
| **Address:** | One West Third Street, Ste. 1225 |
| | Tulsa, Oklahoma 74103 |
| **Telephone:** | (918) 581-6916 |
| **Facsimile:** | (918) 581-7630 |
| **Referral:** | Sheldon J. Sperling |
| | United States Attorney |
| **Firewall Counsel:** | Scott Woodward, FAUSA/NDOK |
| **Address:** | 110 West 7th, Suite 300 |
| | Tulsa, OK 74119 |
| **Telephone:** | Office: (918) 382-2700 |
| | Cell: (918) 605-2832 |
| **Facsimile:** | (918)-560-7943 |

Neuropsychological Report: Edward L. Fields, Jr.

## EVALUATION METHODS:

- Review of Records
- Behavior Observations and Mental Status
- Clinical Interview and History
- Mini-Mental Status Examination (MMSE)
- 21 Item Test
- Rey 15 Item Test
- Digit Symbol Modality Test (DSMT)
- Wechsler Adult Intelligence Scale-III (WAIS-III)
- Wechsler Test of Adult Reading (WYAR)
- Wechsler Memory Scale-III (WMS-III)
- Trail Making Test, Parts A & B (TMT-A, TMT-B)
- Stroop Neuropsychological Screening Test
- Wisconsin Card Sorting Test (WCST)
- Booklet Category Test
- Controlled Oral Word Association Test (COWA)
- Sentence Repetition Test
- Boston Naming Test (BNT)
- Clock, Cross, Key Bicycle Drawings
- Hooper Visual Organization Test (VOT)
- Digit Vigilance Test (DVT)
- Ruff 2 & 7
- Ruff Figural Fluency
- Finger Tapping Test
- Grip Strength Test
- Grooved Pegboard Test
- Frontal Systems Behavior Scale

## RECORDS REVIEWED:

Notebook 1
Court Records and Communications from Attorneys
- A. Indictment
- B. Order Regarding Mental Health Evidence and Examination 12/20/04
- C. Government's Motion and Incorporated Memorandum Regarding Mental Health Evidence 03/24/05
    Order Responding to Government's Motion of 03/24/05
- D. Joint Motion for 30 Day Extension of Filing Deadline
- E. Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility
- F. Prosecution's Categorized Witness List
- G. Summary of Deceptive Information Provided by Edward Fields During Interview on 07/18/03
- H. Letter Dated 02/01/05 to Julie O'Connell from Sheldon J. Sperling and Linda A. Epperley Regarding Information Disclosed to Mr. Sperling and Ms. Epperley by Ms. O'Connell on 12/02/04.
- I. Time Line Designed by Prosecution

2

Neuropsychological Report: Edward L. Fields, Jr.

    J.  Communications with Attorneys (Letters and emails)

Notebook 2
    Crime and Crime Scene Investigation and Results
       A.  Supplemental Incident Report
       B.  Oklahoma SBI Crime Scene Investigation
       C.  Crime Scene Photo Log
       D.  Log of Who Entered the Crime Scene and Why
       E.  Crime Scene Measurements
       F.  Oklahoma SBI Second Search of Chick's Van
       G.  Oklahoma SBI Search of Chick's Apartment in Hurst, Texas.
       H.  FBI receipt for Property Received/Returned/Released/Seized
       I.  Report of Medical Analysis of Shirley Chick
       J.  Photographs of Mr. and Ms. Chick Before They Were Murdered
       K.  Report of Investigation By Medical Examiner for Charles Chick
       L.  Report of Investigation By Medical Examiner for Shirley Chick
       M.  Recreation Fee Permits for Camping
       N.  Automobile Records for the Chick's Car

Notebook 3
    Arrest, Confession, Suicide, Investigation Procedures and Results
       1.  Oklahoma SBI Interview with Carol Lamb When She Went to Police 07/18/03
       2.  Arrest Warrant for Edward Leon Fields & Search Warrant for Mr. Field's Truck
       3.  FBI Arrest, Interview and Confession of Edward Fields
       4.  Edward Fields' Written Confession of the Murders of Mr. and Ms. Chick
       5.  Edward Field's Phone Call to Michelle Tipton Following His Confession
       6.  FBI Transportation Record When Mr. Fields was Taken from the Poteau Police Department to the Muskogee County Detention Center
       7.  Jail, Medical Records, and Photos Related to Attempted Suicide by Mr. Fields on 07/23/03
       8.  Investigation Records Related to the Murders of Mr. and Mrs. Chick that Substantiate the Confession on Edward Fields' Confession
          j.  A series of U.S. Department of Justice FBI Homicide Reports Dated 07/26/03, 09/02/03, 01/30/04
          k.  Inventory of Items from Mr. Fields' Truck
          l.  Information Related to Carl Wise
          m.  Pre Trial Health Section:  Progress Notes from Dr. Kemp
          n.  FBI Collection of Clothes of Mr. Fields from the Muskogee County Jail
          o.  FBI Analysis and Return of Shoe Wear Impression and Field' Shoes
          p.  Oklahoma SBI Search and Recovery of Back Pack in Wister Lake
          q.  Oklahoma SBI Latent Evidence Analysis Report
          r.  Oklahoma SBI DNA Analysis Report Finding Mr. Fields DNA Matched that Found in Van
          s.  Analysis of Firearms Evidence Report Finding All Bullet Casings Found at Crime Scene Matched the Gun Found in Mr. Fields' Truck

          t.  Oklahoma SBI Report of Distance From Kenco Plastics To Winding Stairs Campground Area
          u.  FBI Analysis and Return of Ghillie Suit and Fibers

Neuropsychological Report: Edward L. Fields, Jr.

    v. FBI Items Recovered Related to Crime and Results of the Item's Analysis

    w. Information from Ray Crow, the Manager for the Firearms Information Center for Wal-Mart Stores, Inc. Verifying a Marlin .22 caliber rifle to Edwads Fields on 11/25/94.

    x. Receipts and the Chick's Credit Card Statements Records Showing Money Spent by Mr. Fields the Weekend Following the Murders

    y. Title and Registration for Mr. Fields' Truck

    z. Information Related to the Purchase of Guns by Mr. Fields in 10/00 & 09/01

    z. Discovery Log

Notebook 4

    Telephone Transcripts Between Fields and Others While in Jail

Notebook 5

    Telephone Transcripts Between Fields and Others While in Jail

Notebook 6

    Fields' Employment Files from Oklahoma Department of Corrections 04/96 – 01/99

Notebook 7:

Interviews

    A.    Deborah Bailey, Fields' Cousin, 09/09/03

    B.    Helen Walker, Fields' Aunt, 09/09/03

    C.    Mary Margaret Fields, Fields' Mother, 09/05/03

    D.    James Richard White, Fields'Cousin, 09/05/03

    E.    Teresa Fields, Fields' Ex-Wife. 09/09/03

            Rhiannon Nycole Meadows, Fields' Daughter 11/21/03

    F.    Elaeanor Elizabeth White, Fields' Aunt, 09/08/03

    G.    Angela Wade, 3rd Cousin, 09/11/03

    H.    Rufus Allan Skeens, Brother-in-Law, 10/24/03

    I.    Ethel Gist, Family Friend, 09/10/03

    J.    Paule D. Fields, Acquaintance, 09/10/03

    K.    Gayla Schlosser, Acquaintance, 09/04/03

    L.    Carlena Michele Sparks, Ex-Girlfriend, 09/09/03

    M.    Jerry Alan Carter, Friend, 10/30/03

    N.    Margaret Elliott , Mother of Shirley Chick, 10/03/03

    O.    Andrea White, Worked in Video Store Where Fields Rented 02/04/04

    P.    OK SBI Interview of Carol Sakura Lamb, Girlfriend 07/18/03

    Q.    OK SBI Interview of Roland Richard Robinson, Jr., Girlfriend 07/12/03

    R. FBI Interview with Denise Chitwood, a family friend who knew Mr. Fields 10/29/04

    S. FBI Interview with Daniel Pressley, Fields' Friend 008/07/03

    T. FBI Interview with Carol Sakura Lamb, Fields' Friend 008/07/03

    U. FBI Interview with Deborah Kay Bailey, Fields' Cousin & CO in FL. 08/07/03

    V. FBI Home Searches of Michelle Tipton 07/23/03 & 07/30/03

    W. FBI Interview of Dawn Michelle Tipton

    X. FBI Interview of Marilyn K. Pressley, Wife of Dan Pressley and Fields' Friend 08/08/03

    Y. OK State Bureau of Investigation Interview of Mr. Fields' Co-Workers

      • OK SBI Interview of Robert Ray Shankle, Employee of Kenco Plastics 07/22/03

      • OK SBI Interview of Curtis Lee Elmore, Employee of Kenco Plastics 07/22/03

4

Neuropsychological Report: Edward L. Fields, Jr.

- OK SBI Interview of Marshall Henry Lamar, Employee of Kenco Plastics 07/22/03
- OK SBI Interview of Warren Melvin Perry, Employee of Kenco Plastics 07/22/03
- OK SBI Interview of Penny Michelle Hawks, Quality Control Inspector 07/22/03

Z. Jemima Carol Hagan Meadows, Acquaintance, 11/21/03
1. Elaine Calhoun, Oklahoma Department of Corrections (OK SBI)
2. Kenneth Wayne Ritchie, Oklahoma Department of Corrections (OK SBI)
3. Gail Lynn Nichols, District Manager for Wortz (OK SBI)
4. David Love, Acquaintance through Computer Work (OK SBI)
5. Kath Fraggrell , Wortz Cracker Co. (FBI)
6. Jovonna Lee Fields, Supervisor Bremner Cracker Cp. (FBI
7. Michael Lloyd, Maintenance Manager, Oaks Nursing Home (FBI)
8. Karen Hall, cousin (FBI
9. Dean Anderson, Physician Assistant Hill Creast Clinic and Fishing Partner
10. Carol Lamb, Girlfriend, (USDA-FS)
11. Robert White, Neighbor of the Fields' Family, (USDA-FS)
12. Jason Janway, Worked with Fields at Jim Hamilton Correctional Facility '97-'98, (USDA-FS)
13. Daonal Allison, Live in Community Where Fields' Family Lived, (USDA-FS)
    Dave Meyer, Employee of Kenco, (USDA-FS)
14. Betty Vaughn, Janitor at Kenco, (USDA-FS)
15. Arlene Snyder, Employee of Kenco, (USDA-FS)
16. Judy Janway, Related to Fields by Marriage, Known Him Since Childhood, (USDA-FS)
17. Marla Dodd, Jack's Jewelers, (USDA-FS)
18. Brenda Stacy, Girlfriend, (USDA-FS)
19. Buddy Burleson, Employee of Kenco and Friend, (USDA-FS)
20. David Love, Acquaintance Through Computer Work (USDA-FS)
21. Andrea White, Met Fields in '95 and Knew Him From Her Video Store and Box Car Bar (USDA-FS)
22. Tony Lee Mayarant, Neighbor of Fields; Family (USDA-FS)
23. Sherr Sue McCullough, Friend, (USDA-FS)
24. Angela Brown, Bought Video Store from Carol Lamb, (USDA-FS)
25. Ruby Hall, Café Worker Where Fields Went Consistently, (USDA-FS)
26. Becky Steelman, Video Store Owner, (USDA-FS)
27. Elizabeth Annette Wilson, Third Cousin and Acquaintance, (USDA-FS)
28. Jerrie Lyn Mathews, Former Girlfriend
29. Janice Wright, Support Manager at Wal-Mart, (USDA-FS)
30. Charles Glascow, Wal-Mart Employee who Accessed Fields' Records, (USDA-FS)
31. Grand Jury Testimony
- Dawn Michelle Tipton 07/30/03
- Daniel Pressley 07/30/03
- Carole Lamb 07/30/03

Notebook 8
1. The Wackenhut Corporation Employment File on Mr. Fields
2. Bremner- Wortz Cracker- Poteau Employment Records
3. Kenco Plastics Employment Records
4. Navy Records

5

Jul 01 05 06:39a       Kay Stevens                    972-792-0426        p.7

Neuropsychological Report: Edward L. Fields, Jr.

Notebook 9
   A. Prison Medication Records
   B. Calendar Pictures of Each Month of 2003
   C. Photos Related to Locations Where Edward Fields Spent Time Around the Time of the Murders.
   D. Divorce and Child Support Records

Notebook 10
   A. School Records
   B. LeFlore County Medical Center Records
   C. Muskogee Jail Medical Records
   D. Tulsa Jail Medical Records
   E. Psychiatric Report: Bradley D. Grinage, M.D.
   F. Psychiatric Report: Georged W. Woods, Jr., M.D.
   G. Holy Sacrament of Baptism: Edwards Leon Fields, Jr.

## REVIEW AND ANALYSIS OF RECORDS:

### Indictment

The Indictment included the following charges:

Count 1    First Degree Murder by shooting Shirley Elliott Chick on 07/10/03 (premeditated)

Count 2    Use of a Firearm in a Federal Crime of Violence Causing the Death of a Person

Count 3    First Degree Murder by shooting Charles Glenn Chick on 07/10/03 (premeditated)

Count 4    Use of a Firearm in a Federal Crime of Violence Causing the Death of a Person

Count 5    Assimilative Crime – Robbery with a Firearm of Charles and Shirley Chick, taking cash and personal property

Count 6    Assimilative Crime – Burglary of an Automobile, breaking and entering Charles and Shirley Chick's 1996 Ford van with the intent to steal property.

### Government's Motion and Incorporated Memorandum Regarding Mental Helath Evidence

Motion requesting that (1) "the defendant should be required to submit to an examination by experts of the government's choosing at a designated Bureau of Prisons facility, (2) the examination shall be conducted under published Guidelines for Forensic Evaluations, December 2004 . . . which apply to all forensic evaluations conducted by Federal Bureau of Prisons officials, (3) the examination will focus on the defense counsel's representations concerning defense expert's findings as stated in Attachment 1 including the following:
   1. Did the defendant have a brain injury or frontal lobe deficit on July 10, 2003?
   2. Did the defendant then have a bipolar disorder?
   3. was the defendant then psychotic?
   4. Did the defendant then experience a manic flip?
   5. was the defendant then substantially affected by anti-depressants, such as Effexor or Tylenol PM?
   6. Did the defendant then experience a "manic flip" or a "manic switch" as the result of the combined impact of any or all of the foregoing conditions, circumstances, or drugs?

6

Jul 01 05 06:39a    kay Stevens                  972-792-0426          p.8

Neuropsychological Report: Edward L. Fields, Jr.

7. At the time of the commission of the acts constituting the charged offenses, was the defendant, as a result of severe mental disease or defect, unable to appreciate the nature and quality or the wrongfulness of his acts?
8. Did any such conditions or circumstances or occurrences substantially impaire the defendant's judgment at the time of the commission of the accts constituting the charged offences?

and (4) all communication between trial counsel for the government and BOP experts shall end when such experts are designated by BOP officials, which experts' communication shall then be with "firewalled" AUSA(s).

## Court Order Responding to Government's Motion Regarding Mental Health Examination and Evidence 04/05/05

"It is the Order of the Court that the government's motion regarding mental health evidence (#122) is hereby GRANTED in part and DENIED in part. The defendant shall submit to examination(s) by experts of the government's choosing, but such examinations shall take place at the defendant's place of confinement. The examination shall focus primarily on the eight questions listed at pages 13-14 of the government's motion. The results and reports of any examination shall be sealed, Rule 12.2 (c) (2), and may only be disclosed to the "firewalled" AUSA. The government shall use the mental health evidence it obtains only for rebuttal purposes at the punishment stage, if any, of the trial."

## General Description of Crime and Investigation

According to the USDA Forest Service Supplemental Incident Report (0458) & Oklahoma State Bureo of Investigation Crime Scene Report, Max Hendrix, a motorcyclist from Weatherford, Texas who was visiting the Winding Stair Campground area found Mr. and Ms. Chick's bodies and reported to law enforcement on 07/11/03 at 2:40 p.m. Law enforcement arrived and investigated the crime scene.

Ms. Chick's body was found in a prone position next to the passenger side of the van, with her head near the front passenger door and her feet down hill. Blood was around her body and running down the hill. Her shirt was pulled up partially over her head. Autopsy Reports (0010) stated that Ms. Chick suffered a gunshot wound to her left foot and two gun shot wounds to her head.

Mr. Chick's body was found in a prone position next to the picnic table with blood around his head and a pool of blood and bloodstains on the picnic table. Mr. Chick's shirt also was pulled up (0023). Autopsy Reports stated that Mr. Chick had two gun shot wounds to the head. The campsite #15 included a tent, a clothesline, a tarp over the picnic table and a grill. A van with a broken passenger side window was also at the site. A search of the campsite was conducted. Trees and bushes separated campsite 15 from campsite 14.

Investigations included the crime scene where bullets, fiber and blood samples were recovered. Mr. and Ms. Chick's apartment in Hurst, Texas was searched. A man named Carl Wise who lived in Louisiana and had been registered at the Winding Stair campsite was interviewed regarding what he had observed while visiting the area.

7

Case 6:10-cv-00115-RAW   Document 2-9   Filed 04/06/10   Page 9 of 45
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 240
Jul 01 05 06:40a     kay Stevens                  972-792-0426        p.9

Neuropsychological Report: Edward L. Fields, Jr.

## General Description of Arrest and Confession

The Oklahoma SBI interviewed (0054) Carole Lamb who was a friend of Edward Fields and who notified the police on July 18, 2003 that she had concerns regarding Mr. Edward Fields and the murders that had occurred at the campsite on June 10th. Ms. Lamb and Mr. Fields had dated on and off prior to Ms. Lamb's marriage to another man. Ms. Lamb and her husband divorced, and Mr. Fields and Ms. Lamb began dating again. He lived with her from early June 2003 to late June 2003 when the relationship began to deteriorate; however, they remained friends and talked often. Ms. Lamb had seen Mr. Fields .22 caliber rifle with its camouflage cover and his ghillie suit. Ms. Lamb was aware that Mr. Fields had been living out of his truck near the Winding Stair Campsite, because he had no place to live. He had called her on July 8th and told her he was planning to commit suicide. She visited with Mr. Fields that evening at his campsite and attempted to help him find a place to live. During their visit, Mr. Fields told Ms. Lamb that he had done something really bad the night before when he wore his ghillie suit and sneaked up on some parkers, and the parkers were unaware he was there. He giggled when he told her.

On July 10th, Ms. Lamb and Mr. Fields met for dinner at approximately 4:45, and Mr. Fields asked Ms. Lamb for money to get a motel room. She told him to be sure he could get the room and she would give him the money after her college class that she was attending at 6:00 pm. She did not hear form him again until the following day when he called to ask for money again; Ms. Lamb said she was leaving town and could not get any money to him. On July 14, she received another call from Mr. Fields when she was at the doctor, and she told him she could not talk. He left a voice message on her phone on July 15th, which had been the last time she had heard from him. However, she had seen his truck earlier that morning at Kenco where Mr. Fields worked.

Police went to Kenco and looked in the open bed of Mr. Fields' truck (0596) where they found the ghillie suit. In addition, Carl Wise, a camper who had been near the site close to the time of the murders had been contacted, and he described seeing a truck like that of Mr. Fields. Based on this evidence, a search and arrest warrant were obtained and Mr. Fields was taken in for questioning regarding the crimes.

Mr. Fields was cooperative, provided a history of his adult life, and when asked, stated he had nothing to do with the crime, he owned no guns, he was not at the campsite that week, and provided an alibi for the evening of 07/10/03. After further questioning, Mr. Fields confessed to the murders. He explained that he had gone to the campsite wearing his ghillie suit and taking his .22 caliber rifle to rob the campers at gunpoint and that he did not plan to kill them. He watched them as he hid in the trees as they were standing at a vista. He continued to creep closer to the campsite, and the campers came back. At that time the campers sat at the picnic table and Mr. Fields continued to sneek closer. At the time that the male camper said he was going to the tent, Mr. Fields opened fire on him shooting him in the head. He shot at the female camper as she ran to the van. He hit her in the foot and then moved to where she lay and shot her in the head. He then robbed the van of money, credit cards, and personal items. Mr. Fields confessions were provided verbally and in writing.

After the confession, Mr. Fields asked to call his girlfriend, Ms. Michelle Tipton. He was allowed to make the call and was heard telling Ms. Tipton where he was and what he had done. Ms. Tipton did not believe him until she called the police department back and gained verification that that Mr. Fields was telling the truth.

8

Neuropsychological Report: Edward L. Fields, Jr.

SA Gary W. Graff prepared a one-page summary opining 11 allegedly false or deceptive statements given by Mr. Fields during the interview on 07/18/03 including:

- Mr. Fields claimed he did not hunt in the traditional sense and possessed no firearms.
- Mr. Fields claimed he has not owned a .22 caliber rifle since he was a child.
- Mr. Fields claimed the cut on his left thumb occurred at work a few weeks ago; Special Agent Dalley estimated the cut to be no more than a week old and possible incurred when breaking the Chick's van window.
- Mr. Fields claimed that on July 10th, he had dinner with Carole Lamb and went directly to his campsite on Wister Lake.
- Mr. Fields claimed he last visited the Winding Stair campground during the first week of July and was not there the week of July 6yh.
- Mr. Fields denies shooting the Chicks at Winding Stair.
- Mr. Fields claimed Mr. Chick's body fell to the ground after the second shot to the head.
- Mr. Fields claimed he disposed of both of the victims backpacks, one in Wister Lake and the other near Kerr Lake.
- Mr. Fields claimed he only made one purchase with the Chick's credit cards.
- Mr. Fields claimed he had never been violent before. (The veracity of this statement would depend on how one defines violent.)

On the evening on July 18, 2003, FBI agents transported Mr. Fields from the Poteau Police Department where the confession took place to the Muskogee County Detention Center. Mr. Fields was placed on suicide watch due to his claim of being suicidal and a call from his mother stating that he was suicidal.

Records include numerous investigation reports that link Mr. Fields to the murder of Mr. and Ms. Chick including fiber samples, DNA samples, shoe prints, ballistics, witness seeing Mr. Fields truck near campsite.

Over 61 interviews with persons who knew Mr. Fields were provided to this examiner. Interviewees are listed above under Notebook 4 Table of Contents and include friends, girlfriends, family, co-workers, and neighbors. Information from many of the interviews is included in Time Table 1 and Table 2 appended to this report

## Mr. Fields' Suicide Attempt

On the morning of July 23, 2003, Mr. Fields asked if he could shave and shower to prepare for his court appearance that afternoon. He was given a razor and allowed to go to the shower where he cut his left wrist and the vein at the bend of his arm. He was found bleeding by an inmate and cared for by officer Glen Reed who tied his arm with cloth to stop the bleeding.

Juston Hutchinson, Under-sheriff-Muskogee County Sheriff's Department, stated that he rode to the hospital with Mr. Fields after his suicide attempt. After his wounds were cleaned and bandaged, the doctor left the room, and Mr. Fields began asking where he would go when he returned to jail (lock down, cage); he then said that his father had died and his mother had moved to Virginia and he had been hearing voices, and that he did not mean to kill those people, he went to rob them at gunpoint and once they were in his scope the gun went off. Mr. Fields was released from the hospital and moved to and from the wheel chair on his own.

9

Neuropsychological Report: Edward L. Fields, Jr.

## Medication Records While in the Muskogee Jail

While in the Muskogee Jail, Mr. Fields was given the following medications:
    July 19 to August 5 Effexor 150 mg every other day (which he took prior to his arrest)
    July 25 – August 2 Cefadroxil; 500 mg twice a day
    July 26 Risperidol 1 mg at bedtime
    July 27 Lexapro 20 mg. once a day
    August 8 Lithium 300 mg twice a day
All medication records stop on August 14. This was on or about the time Mr. Fields was moved from the Muskogee Jail to the Tulsa Jail.

## Prison Phone, Visitation, and Mail Records

Mr. Fields was housed in the Muskogee Jail until about 8/20/03 when he was moved to the Tulsa Jail. This examiner was given telephone transcripts on conversations held from 07/21/03 to 09/30/03. Included were 73 phone calls; seventy-one were made to Mr. Field's girlfriend, Ms. Michelle Tipton, and two were made to his friend, Mr. Danny Pressley.

Much of the talk between Mr. Fields and Ms. Tipton focused on their love for one another, their plan to marry, the possibility of Mr. Fields' mother living with Ms. Tipton, Mr. Fields wanting to receive more male from Ms. Tipton, their daily activities and feelings, and sex. Ms. Tipton says she is to blame for Mr. Fields' crime, because she did not let him move into her house. Mr. Fields says that if she had let him move in, he would not have committed the crimes, but that Ms. Tipton should not blame herself. A general theme of many conversations revolves around who is to blame for the crime.

The two calls to Danny Pressley occurred on 08/20/03 and 09/24/03. On 08/20/03, it appears the main purpose of the call to Mr. Pressley was to inform him that Ms. Tipton would be getting the truck that had been given to Mr. Pressley for safe-keeping (storage). The conversation seemed a bit uncomfortable as if perhaps Mr. Pressley thought the truck had been given to him. But, Mr. Pressley was very gracious and emphasized that what ever Mr. Fields wanted was fine. Mr. Fields and Mr. Pressley also talked about Mr. Fields' situation from the perspective of correctional officers. They teased each other a bit, but Mr. Pressley seemed concerned about Mr. Fields. Mr. Fields told Mr. Pressley that he was relieved to know that cutting veins was painless. He explained that knowing that it was pain-free was liberating.

The 09/24/03 call started out about Mr. Fields being an ex-correction officer and other prisoners remembering him as such. Teasing went on between the two men. Mr. Fields told Mr. Pressley to quit wondering if he did the crime because, they had him. Mr. Pressley asked Mr. Fields the meaning behind the song "Seven Spanish Angels" and Mr. Fields described it.

Visitors and telephone logs from the Tulsa jail spanning 09/03 to 12/21/04 showed that Pressley visited approximately once every-other month.

## Employment Files

Mr. Fields' employment records provided to this examiner include: (1) The U.S. Navy, (2) The Wackenhut Corporation, (3), Oklahoma Department of Corrections, (4) Bremer – Wortz Cracker

10

Neuropsychological Report: Edward L. Fields, Jr.

Co., and (5) Kenco Plastics. Information in other records suggests that Mr. Fields was self-employed as a computer repairperson. No files were provided for that job.

**U.S. Navy 1984 – 1999:** Mr. Fields enlisted in the U. S. Navy in 1984 after quitting high school after the 11th grade. Upon entering the Navy, he was given the Armed Services Qualifying Test (AFQT). The score table below shows the sections required and the scores Mr. Fields earned per section. To qualify for the armed forces, an overall score of 31 is required; Mr. Fields overall score was 59.

| Sections | Percentile Score |
|---|---|
| General Science | 67 |
| Arithmetic | 49 |
| Word Knowledge | 58 |
| Paragraph Comprehension | 54 |
| Numerical Operations | 57 |
| Coding Speed | 52 |
| Auto & Shop | 66 |
| Mathematics Knowledge | 48 |
| Mechanical Comprehension | 53 |
| Electronic Information | 49 |
| VE | 56 |

He served two years active duty, advancing to Boatswain mate. He voluntarily extended his active duty in 1986 for two additional years. Following those years, he served as a recruiter. His service record is without disciplinary action, and his evaluations average approximately 3.7 on a 4-point scale. He was honorably discharged in 1992.

**The Wakenhut Corporation:** The Wachenhut Corporation provided minimal records regarding Mr. Field's employment. Reviewed were payroll records and a fax stating that Mr. Fields employment was terminated in 1995. From the payroll records, it appears that he was employed on 09/29/92 and terminated on or about 02/95. Mr. Fields duties and reason for termination were not included in the records.

**The Oklahoma Department of Corrections:** The following dates indicate when Mr. Fields was employed, changed job descriptions, and received court notification regarding child support while employed with the Oklahoma Department of Corrections. Mr. Fields' file indicated no problems regarding his employment with the Department of Corrections.
07/14/95: Mr. Fields was employed at the Oklahoma State Penitentiary (OSP) (1197) as a Correctional Officer Cadet.
11/30/95: Mr. Fields requested a transfer to Ouachita Correctional Center (OCC) whenever a position became available.

11

Neuropsychological Report: Edward L. Fields, Jr.

09/15/95:    Mr. Fields signed a "Voluntary Income Assignment" to pay Jemima Carol Stubbs $136.08 per month fro child support.
12/06/95: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to be withheld was $136.08 monthly.
01/01/96 Mr. Fields requested to reallocate his position from Correctional Officer I to Correctional Food Service Supervisor at OSP(1198)
03/27/96: Mr. Fields requested a transfer to OCC as a Food Service Supervisor (1202).
04/02/96: Mr. Fields was transferred to OCC as a Food Service Supervisor
12/01/96: Mr. fields was in Food Service Supervision (1191)
01/03/97: Mr. Fields requested to be voluntary demoted from a Food Service Supervisor to a Correctional Officer I (1189). The pay decrease appeared to be approximately $100. per month.
03/14/97: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to withheld was $136.08 monthly and $129.92 per month arrearage payment, totaling $265.90 per month.
04/04/97: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to be withheld was $136.08 monthly and $50.00 per month arrearage payment, totaling $186.08 per month.
10/04/99: Mr. Fields resigned his position. At the time of resignation it appears Mr. Fields was making $1,836.36 monthly as a Correctional Security Corporal (1185

Oklahoma State Bureau of Investigation Interview of Elaine Calhoun, Oklahoma Department of Corrections (0039)
Ms. Calhoun worked with Mr. Fields for 1.5 years on the same shift at the correctional facility. He was polite and had no problems with co-workers. Mr. Fields was awkward at first with inmates, but eventually the inmates came to like him. She knew nothing of his personal life other than he and his wife divorced shortly after he began working there.

Oklahoma State Bureau of Investigation Interview of Kenneth Dwayne Ritchie, Oklahoma Department of Corrections (0039)
Mr. Ritchie and Mr. Fields worked the same shift at the correctional facility. Mr. Fields got along well with others and had no problems. Mr. Fields and Mr. Ritchie were also friends out side of work. Mr. Fields had dinner with the Ritchie's and hunted squirrel on their property. Mr. Ritchie felt that Ms. Fields was demanding of Mr. Fields time. After their divorce, Mr. Fields became irresponsible with money and very interested in computers.

**Bremner – Wortz:** Mr. Fields was hired on 10/25/99. On a Basic Physical Form completed on 11/10/99, Mr. Fields listed "Serozine" (Serzone possibly) twice daily and Tylenol PM. Serzone is an antidepressant medication and Tylenol PM is for sleep. On 02/23/00, Mr. Fields applied for a seven-day leave of absence to go to Virginia to be with his wife due to breast cancer surgery. His request appears to have been approved. On 06/27/01 an incident report was filed regarding Mr. Fields leaving the work site at a break time. On 07/02/01, Mr. Fields was given a "Final Warning" for leaving work without permission. On 07/16/01, Mr. Fields brought a bomb to work and showed it to co-workers in the parking lot near his truck. He called it a fishing device and explained that he was going to drop it in the water and kill fish. An investigation ensued resulting in workers reporting the bomb incident as well as Mr. Fields having previously brought a

12

Jul 01 05 06:42a        Kay Stevens                    971-792-0426              p.14

Neuropsychological Report: Edward L. Fields, Jr.

.22 caliber rifle with a new scope to work and showing it to co-workers.  He was
terminated on 07/17/01 for the incidents.

**Kenco Plastics**:: Apparently, Mr. Fields was employed as a temporary worker at Kenco
on 04/05/03 and was hired as a regular employee on or about 05/14/03.  On the Health
Questionnaire for Kenco completed on 05/14/03, Mr. Fields stated that he was taking no
medication and stated that he had never been treated for a mental disorder.  Kenco
records included child support information directing support to be deducted from Mr.
Fields' wages. On 07/18/03, law enforcement officers took Mr. Fields from Kenco for
questioning about the murders of Mr. and Ms. Chick, which was his final day of
employment.

<u>Oklahoma State Bureau of Investigation Interview of Robert Ray Shankle, Employee of
Kenco Plastics 07/22/03</u>
Mr. Shankle was Mr. Fields' supervisor at Kenco.  He reported that Mr. Fields was an
"excellent hand", nice person, and got along well with others; he had received no
complaints.  Mr. Shankle did not know Mr. Fields personally.

<u>Oklahoma State Bureau of Investigation Interview of Curtis Lee Elmore, Employee of
Kenco Plastics 07/22/03</u>
Mr. Elmore reported that Mr. Fields seemed "odd" and not talkative.  He remembered
only one conversation he had with Mr. Fields on 07/14/03 when Mr. Fields told him he
and his girlfriend had gone to Fayetteville, Arkansas over the weekend and spent $3,000.

<u>Oklahoma State Bureau of Investigation Interview of Marshall Henry Lamar, Employee
of Kenco Plastics 07/22/03</u>
Mr. Lamar reported that he had worked with Mr. Fields "a lot".  Mr. Lamar had observed
Mr. Fields starring at female workers.  Mr. Fields spoke most often about having sex with
his girlfriend.  Mr. Lamar said that Mr. Fields was too "weird" for him, and they were not
friends away from work.  Mr. Fields never mentioned the murders.

<u>Oklahoma State Bureau of Investigation Interview of Warren Melvin Perry, Employee of
Kenco Plastics 07/22/03</u>
Mr. Perry did not know Mr. Fields well; they worked together for one half day once.  Mr.
Perry reported that on July 14, 2003, Mr. Fields brought a live rattlesnake to work and
said he got it at the Winding Stairs Recreational Area.  Mr. Fields brought up the murders
occurring in the same area.  Mr. Perry was not aware of the murders.  Mr. Fields told Mr.
Perry the names of the victims and where they lived.  Mr. Perry stated that the person
who killed the victims should also be killed.  Mr. Fields replied, "If it gets so bad I can't
go fishing, I will move to the city".  Mr. Perry thought that was a strange reply.  Mr.
Perry did not know Mr. Fields outside of work.

<u>Oklahoma State Bureau of Investigation Interview of Penny Michelle Hawkes, Quality
Control Inspector at Kenco Plastics 07/22/03 (0039)</u>
When first meeting Mr. Fields, Ms. Hawkes found him polite and pleasant; but after a
while, he was overly polite and "creepy".  He often asked Ms. Hawkes to help him find a
girlfriend.  On July 16, 2003 Ms. Hawkes rejected some of Mr. Fields products, which
was not usual as his work was typically good.  When confronted, he became arrogant and

13

Neuropsychological Report: Edward L. Fields, Jr.

told Ms. Hawkes that he would not correct the problem, which also was uncharacteristic as he was typically receptive to Ms. Hawkes. She did not know Mr. Fields personally or anything about his personal life.

USDA Forest Service Interview of Dave Meyer, Relief Press Operator at Kenco 07/22/03 (0958)
Mr. Meyer had contact with Mr. Fields for several minutes every couple of hours. He once tried to help Mr. Fields rent an apartment. Mr. Meyer said that the women at the plant did not like Mr. Fields due to his leering and derogatory comments regarding women. He always wanted to be fixed up with a women and asked some Kenco female employees out, but they did not go. Mr. Fields seemed to think he was better than others and looked down on them. He felt that Mr. Fields had knowledge from going to the courthouse library and offered to help Mr. Meyer with a divorce. Mr. Meyer heard that Mr. Fields was having financial problems. He also noticed Mr. Fields' appearance change on 07/14/03 having shaved his moustache and omitted his glasses.

USDA Forest Service Interview of Betty Vaughn , Janitor at Kenco 07/23/03 (0959)
Ms. Vaughn first thought Mr. Fields was polite but after a short time she believed he was "a low life skank". He talked badly about women and bragged that his two girlfriends (one in Stigler and one in Wister) didn't know about each other. He said he picked up women on his way to Little Rock and met women on the Internet. He also talked about his sexual relations with women. One day he mentioned that he could kill someone and hide the person in a cave, mine, or deep hole where no one could find them. When talking with his co-workers about the murders at Winding Stair, he said it was scary, because he camped there.

USDA Forest Service Interview of Arlene Snyder at Kenco 07/22/03 (0960)
Ms. Snyder was a press operator at Kenco and a neighbor of the Fields family in Reichert. Ms. Snyder stayed away from Mr. Fields at work, because he stared at her and made her feel violated. Mr. Fields told her "he wanted her", "he liked her body", and "You have a hot body". She thought Mr. Fields scared people.

USDA Forest Service Interview of Buddy Burleson, Employee at Kenco 07/28/03 (0944)
Mr. Burleson considered Mr. Fields a friend at work; they talked most every day. Mr. Burleson knew nothing about Mr. Fields ghillie suit, guns, hearing voices, hunting, or using computers. Mr. Fields did tell Mr. Burleson that he shot a cat at his campsite because the cat was keeping him awake. Mr. Burleson thought Mr. Fields was living at the lake so he wound not have to drive to the home where he lived with his girlfriend in Stigler. Mr. Burleson said that co-workers did not like Mr. Fields due to his demeaning treatment of women.

**Child Support Documents**

Mr. Fields was responsible for child support for three children. One child, Rhiannon Nycole Meadows, was born out of wedlock; her mother is Jemima C. Hagan Stubbs. The two other children, Amanda Fields and Andrew Fields, were from the marriage of Teresa and Edward Fields. Mr. Fields was seriously behind in child support payments to both mothers of these children. He was served court papers regarding his back child support on June 5th, 2003 from

14

Neuropsychological Report: Edward L. Fields, Jr.

Jamima C. Stubbs, mother of Rhiannon. On July 8th, 2003 an Order of Support Payments was issued for Andrew and Amanda Fields. On July 30th, 2003, Mr. Fields was served with court papers regarding the back support for his children Amanda and Andrew. Court records show that during the summer of 2003, Mr. Fields was being legally pressured by the courts to meet the responsibilities of the child support owed.

**Health Section of Pretrial Service Report**

The records stated that Mr. Fields was currently taking Effexor for depression prescribed by Dr. Mike Kemp who had treated Mr. Fields since April 2003. Appointment dates and summaries with Dr. Kemp include:

| | |
|---|---|
| 04/10/03 | Initial visit. Fields complained of depression and compulsive disorder. He reported: he had seen Dr. Winters in June of 2000 who had prescribed Celexa and Prozac; had seen Dr. Schumpert (no date given) who had prescribed Paxil and Serzone; all medications had negative side effects or were not otherwise helpful; current problems began a year prior when his father became ill; father died 6 months prior; mother was also ill and he had full responsibility of her care; he hears voices that result in compulsive behavior such as telling him to sharpen his knives or drive to his girlfriend's home (which he does); no voices told him to do dangerous or harmful things; denied suicidal thoughts; had decreased appetite; had problems sleeping. Dr. noted that Mr. Fields seemed intelligent with normal judgment and a flat affect. Clinical impression was: Clinical depression and Compulsive disorder. He prescribed Lexapro 10 mg. daily (provided samples). Return in three weeks. |
| 05/01/03 | Follow-up. Fields reported: feeling better regarding depression and compulsive behavior ("medicine has been wonderful"); still raises his voice occasionally; low energy, and decreased appetite; no sharpening of knives in two weeks; minor sexual dysfunction due to medication. Dr. noted that Fields seemed calm, alert, more animated, steady hands with normal judgment and orientation. Assessment and medication remained the same (samples provided). Return in four weeks. |
| 05/27/03 | Follow-up. Mr. Fields reported: previous day he thought about taking an overdose of Elavil but did not because he thought the medication would not take full effect before his girlfriend came home, and she would take him to the hospital, which he did not want; his reason for living is gone or going--his father died and his mother is moving to Virginia; must pay child support for three children and makes $7.00/hour; he reports IQ of 168 and high scores on SAT, could have gone to Harvard; denied hearing voices telling him to hurt himself; compulsions are better. Assessment remained clinical depression and compulsive disorder with thoughts of hurting himself by taking medicine. The doctor discussed inpatient and psychiatric assistance, which Mr. Fields rejected. Lexapro was increased to 20 mg. daily (samples provided). Return in three weeks. |
| 06/16/03 | Follow-up. Mr. Fields reported: he is not doing much but going to work; doesn't want to do anything; thoughts of suicide; poor appetite with weight loss; worries; does not hear voices; compulsion is not a problem; not as anxious as previously; medicine not working as well as he wanted but would not consider inpatient treatment; going to Kentucky in a few weeks, wanted to feel better by then. Assessment remained the same. Medication was changed from Lexapro to |

15

<u>Neuropsychological Report: Edward L. Fields, Jr.</u>

Effexor XR 37.5 mg daily for one week and then 75 mg daily for two weeks (samples provided). Return in three weeks or if he feels suicidal.

07/07/03 Follow-up. Mr. Fields reported: doing a little better; catching snakes at night and selling them for 40 cents per running foot; broke-up with old girl friend but spent weekend with new girlfriend; continues to think about suicide, but not seriously; appetite increased. Dr. noted that Mr. Fields seemed happier and less negative. Assessment was that clinical depression and compulsive disorder had improved. Effexor was increased to 150 mg (prescription given). Return in one month.

## Time Tables

Time Table 1 is an addendum to this report and attempts to provide a time line of specific events, descriptions, and comments from a variety of individuals who knew Mr. Fields and were questioned about his behavior. The purpose of the Table is to provide examples of behaviors that help understand Mr. Fields over the course of his life as recorded in the records provided this examiner.

Table 2 includes comments and events taken from the records provided this examiner that are difficult to place in a time line but that shed light on the perceptions of others about Mr. Fields.

## INFORMED CONSENT:

Before the first session began, Ms. O'Connell, counsel for the defense, met with her client and me to insure a smooth beginning With his counsel present, I informed Mr. Fields about the nature of the evaluation, who had retained my services, the limits on confidential, his right to refuse to cooperate, his right to contact his attorney, and that the entire evaluation would be audio-taped. He gave consent both orally and in writing. Ms. O'Connell also met with her client and me at the beginning of the second session. The second session was also audio-taped.

## BEHAVIOR OBSERVATIONS AND MENTAL STATUS:

Ed Fields is a 38 year-old, Caucasian male in no apparent physical or emotional stress. He was attired in typical jail clothes. Personal hygiene was good with the exception of needing a shave. He wore correctional lenses. Hearing was within normal limits. His motor behavior was remarkable for a bilateral tremor secondary to medication. Gross attention and concentration was adequate for formal testing to proceed. Mr. Fields was alert, oriented, and cooperative throughout the evaluation session. Affect and mood were euthymic. Thought processes were goal-directed and logical. Thought content revealed no present or past delusions. He denied suicidal or homicidal thoughts. Sensorium was clear. Memory functions were grossly intact. Intelligence was judged to be average to above average. The results of this evaluation are judged to be a reliable and valid representation of his neuropsychological status.

## RESULTS OF CLINICAL INTERVIEW:

Mr. Fields has been incarcerated since 7/18/03 when he was charged with capital murder. He is now in a single cell designed for a disabled person so he has his own shower. Before coming to jail, he was staying with different girlfriends and in his truck in a campsite at Lake Wister. His main girlfriend continued to talk to him on the phone for approximately seven months after he was arrested but has since reconciled with her husband. Mr. Fields was working at a plastics

<div align="center">16</div>

Neuropsychological Report: Edward L. Fields, Jr.

factory before his arrest. His interests were squirrel and snake hunting, fishing, cooking, and sex with his girlfriends.

His family of origin consists of his mother with whom he reported to have a "special bond" and a sister whose financial success is a bone of contention with Mr. Fields. Mr. Fields reported that his father died in either 2001 or 2002. He described his father as a good provider, hard worker, who was "gone most of the time."

Mr. Fields has been married twice to the same woman, Teresa Fields, with whom he has two children, ages 15 and 17. He stated that his divorce from Teresa was final in March of 2003. He is the father to another offspring, who is now 18-years-of-age. Mr. Fields has been in several marital-type relationships, most of which have been on-again, off-again. These relationships include Michelle Tipton, Carole Lamb, Brenda Stacey, Carlena Sparks, and, Roberta Casin, a woman he met online that lived in Ohio. His relationships with some of these individuals overlapped. He also dated other women during his relationships with these individuals. He reported to have had close to 50 sexual partners since the age of 13 or 14 years.

When asked about current physical symptoms, Mr. Fields reported the "shaking" in his hands that began when he was started on anti-psychotic medication. Once a day, he is currently taking Loxadane (50mg), Ardane (4 gr.), Prozac (40mg.) , and Lithium(900mg). He sleeps 12 to 13 hours per day now compared to 5 to 6 hours before he was incarcerated on 7/18/03. Before he came to jail, he took Tylenol PM for sleep. He has a long history of sleep disturbance. He lost 60 pounds just before coming to jail but has been gaining it back since them. He is 6'2" and weights approximately 237-240 pounds.

When asked about current psychological symptoms, especially mood, he reported that he is "pretty good for the circumstances." He does not want to die and will fight the death penalty because his family seem to "all want me around." He also thinks he can make a life for himself in prison. Mr. Fields also reported to have had a "bad case of stupidity" in all areas of his life, such as with girlfriends. He also reported to have had auditory hallucinations since he was approximately 16 years –of-age. He referred to the voice as a "little friend." He stated: "I have a voice that talks to me and tells me things. He ran my life." He indicated that the voiced is involved in all areas of his life. He does not have a name for the voice. He reported that the voice he hears is the same one, a male voice, no other voices, inside his head, about once or twice a week, that tells him to do things like call Michele, walk off jobs, and shoot Mr. and Mrs. Chick. He first reported that he did not remember the voice ever telling him to kill himself, but he later reported that he was sure the voice told him to kill himself when he attempted suicide after he was arrested. He described the process as being like an anxiety attack, that he argues with the voice when it tells him to do something, that pressure builds up in his chest, and that the way to make the pressure go away is to follow the command of the voice. One time, the voice told him to run a comb through his hair when he looked in the mirror. No delusional system was described. He said that his mother told him when he was little that there would always be a voice in his head telling him what to do. When he discussed the voice with his mother after the offense on 7/10/03, his mother told him that she was describing his conscience. He laughed when relating this story. He thinks that the medication has helped with the voice, and he only hears it once or twice a month now.

17

<u>Neuropsychological Report: Edward L. Fields, Jr.</u>

Medical history related by Mr. Fields includes having had Hyaline Membrane Disease (Respiratory Distress Syndrome) shortly after birth. According to Mr. Fields, he was transferred to another hospital because he was unable to breath and almost died. When he was 13 years-old, he was hospitalized for 3 to 4 days because he was dehydrated from having the flu. At 26 years-

of-age, he wrecked a pick-up truck and suffered a concussion and cervical strain. He reported that he was in the hospital for about one week in Richlands, Virginia. He does not think he lost consciousness. He had headaches for a period of time but does not think he had any residual effects from the concussion.

Mental health treatment history is limited to seeing a psychiatrist for "a few times" when he was 16 years of age. He reported that this was for depressions and that it was his mother's idea. He reported life-long depressive symptoms. He reported that he first took anti-depressant medication when he worked as a Correctional Officer for the Oklahoma State Prisons. The first medication he took was Wellbutrin, first for smoking cessation and then for symptoms of depression. He has taken several different anti-depressant medication including: Paxil, Prozac, Serzone, Lexapro, and Effexor. He reported that he liked Serzone the best. He reported that he also felt good on the 75mg dose of Effexor. Also, he reports that he does not feel depressed now. Mr. Fields has now been told that he is bipolar, but he denies ever experiencing a manic episode characterized by a distinct period of abnormal, persistent elevated, expansive, or irritable mood. He denied experiencing feelings of inflated self-esteem, decreased need for sleep, and pressured speech, flight of ideas, being easily distractible, or having an increase in goal-directed activity. He admits to a long history of sexual indiscretions and to not being able to manage his money. Rather, Mr. Fields stated that he has spent more time down rather than up. He has had periods of poor appetite with weight loss, chronic insomnia, low energy, low self-esteem, feelings of hopelessness, and bad decision-making. According to his report, these symptoms have caused him distress and impaired social functioning.

As previously stated, Mr. Fields admitted to a long history of sexual indiscretions. Beginning at age 13 or 14 years-of-age, he had approximately 50 sexual partners, several of who developed into marital-type relationships and some of which were brief and casual encounters. He stated that he greatly enjoyed sex and invested considerable energy into his pursuit of women. He often dated more than one woman at the same time and had to "juggle" his girlfriends. He admits to compulsive deceitfulness, stating that he lies about "pretty much everything" and that he is good at it. He also admits to life-long financial irresponsibility, stating that he never paid bills until they threatened to turn off the service. He would meet women online, call them and "chat them up", and then take them to dinner. His opinion about women appears ambivalent—at one point in the interview, he reported that he sought out "stupid" women but at another point, he said that he "thought highly of women" and never would insult them by using "pick-up lines". He denied any deviant sexual interests including exhibitionism, voyeurism, or any type of "swinging" or "swapping".

Mr. Fields reported his interest in certain areas that he characterizes as eccentric, such as keeping his knives so sharp that they are good for surgery—not just shaving. Regarding knives, he stated that "if you are going to have one, keep it sharp." He only kept a .22 rifle for squirrel hunting which he did with the ghillie suit that he made himself in about 2001. He had a 6X18X50 Bushnell scope on it so that he could hit a squirrel at 200 yards. He seemed to enjoy the ghillie suit. He described a squirrel coming right up to his feet while hunting one time and having

18

Neuropsychological Report: Edward L. Fields, Jr.

hidden from his friend, Danny Pressley, one time so well that he reached out and grabbed Danny's leg and scared him. He hunted squirrels every year with Danny and gave his bounty to some older folks who enjoyed cooking and eating them.

Educationally, Mr. Fields reported that he completed the 11th grade in 1984 at Richlands High School in Richlands, Virginia. He attended high school at Pineville High School in Pineville, West Virginia for one month in 1984. He described having been placed in "remedial" math and reading from the 3rd to the 7th grade. He stated that he performed satisfactorily in school, even very well in science and algebra but he quit school to go live with an older woman who "came and got me". He added that he had always been bored with school. He took mechanical drafting classes from Southern Virginia Community College while he was in the 9th and 10th grade but he did not consider the vocational possibilities of this pursuit. He said, "I never in my life connected two things like that together." Mr. Fields reported that he was only in trouble one time as a student having been suspended for passing a note.

Vocationally, Mr. Fields last worked at Kenco Plastics. He worked there from 4/5/03 until 7/18/03. He reported that he was told at the time he was hired that he would not be there long because he was overqualified for the job. Prior to that, he had worked at the Wortz Cracker Co. For approximately two years. He also worked at Wackenhut for two years. His longest job was approximately four years at the Oklahoma State Prison as a Correctional Officer. He reported that he often left jobs before securing another position. Given an unconditional wish for a career, Mr. Fields stated that he would attend the College of Geology and Paleontology in the United Kingdom and become a paleontologist, "whatever it is they do."

Mr. Fields was in the United States Navy from 1984 until 1992 when he was honorably discharged. He reported he joined under pressure from his family, but "looking back, I liked it." He feels he was a good sailor. He worked as a Boatswains mate, which is a deck hand supervisor. He also worked as a recruiter, which he hated.

Past involvement with the legal and criminal justice systems is limited to one dismissed charge for reckless driving when he was 16 years of age and to issues related to the failure to pay child support.

During the Spring of 2003, Mr. Fields reported that he was under considerable stress. He named the following sources of stress: (1) a new job; (2) his father having died relatively recently; (3) his mother moving to Virginia; (4) difficulties with Michelle Tipton with whom he was supposed to live but she would not let him until her daughter left for college; (5) making four child support payments per week that only left him $100 per week to live on; (6) living in his truck because he could not afford a place to reside. He was running out of coping skills for dealing with all these stressors.

When Mr. Fields secured health insurance at Kenco Plastics, he went to Dr. Kemp for medication to assist in his stress management and depression. He was given samples of anti-depressants including Lexapro. Mr. Fields reported that he began taking Effexor in June of 2003. He first took 37.5mg then went to 75mg over a three-week period at the direction of Dr. Kemp. During this three-week period, he reported that he felt happy and outgoing. He went out to a club with a friend, Danny Pressley, and met girls. He got several phone numbers. He stated that he could never talk to strangers before. He arranged a date with a girl that worked at a

19

Jul 01 05 06:45a   kay Stevens   972-792-0426   p.21

Neuropsychological Report: Edward L. Fields, Jr.

tobacco shop. He continued to use Tylenol PM for sleep. Mr. Fields reported that he went back to Dr. Kemp on Friday, 7/4/03. However, the records indicate that he went on Monday, 7/7/03. Dr. Kemp doubled his dosage of Effexor, changing it to 75mg, quid. He stated that Carol Lamb had the prescription filled on 7/7/03 at Young's Pharmacy on Main Street in Poteau. Prior to this

time, Mr. Fields had been supplied samples of Effexor by Dr. Kemp. He reported that after taking the increased dose of Effexor, he began to feel very anxious and the voice in his head "buzzed.

On Tuesday, 7/8/03, he went to work and then reportedly stayed in his truck at a campsite. He went snake hunting that night, and he saw Mr. and Ms. Chick at their camping location that night when he visited the men's room in the area. He denies talking with them. He reportedly took the 150mg dose of Effexor. On Wednesday, 7/9/03, he went to work and then reportedly stayed with Michelle Tipton. He stated that she said that she would marry him. He reportedly took the 150mg dose of Effexor that night. On Thursday, 7/10/03, he went to work and then had dinner with Carol Lamb early in the evening. He went to the camping area to stay in his truck that night. He went snake hunting and saw Mr. and Ms. Chick again when he visited the bathroom. He related the following details concerning the events of the night of 7/10/03. He put on his ghillie suit to rob the Chicks. He parked his truck and walked down the road in his ghillie suit. It was close to dark. They were at a nearby vista. He hid close to their campsite and waited approximately 20 minutes for them to return. He observed them through his scope while they were sitting and talking. Mr. Chick said that he was going to the tent. Mr. Fields reported, "I don't remember pulling the trigger but I do remember hearing the gun go off." He had shot Mr. Chick in the head. Ms. Chick started to run, and he shot her in the foot. She ran to their van, and he followed her, then shot her twice in the head. He also shot Mr. Chick again in the head. He went through Mr. Chick's pockets and then went through their van and took all the valuables. He reported that he found $7000 in cash and a small container of marijuana. He stated that he knew that they would have cash because 'nobody in their right mind would camp out of state up there without having enough money to take care of things and get back." Mr. Fields reported that he had never thought about doing this before, but "I needed the money" as he only had $25 to his name. He was not scare but rather "preoccupied" with what he was doing. He was not distracted but rather "pretty much locked in". He was briefly distracted when a car came close to the area. He denied having a clear plan but rather he was "too wrapped up in what I was doing" and the "flood of crap in my mind". Mr. Fields said that the voice said, "You need the money, do it." He related that this was the first time the voice had told him to do something violent. After it was over, he felt "shock" and "terror". He reported that he went to his camp site and went to bed at approximately 1am and fell asleep at approximately 3am. He went to work the next morning and did not act any different. He stated, "I didn't think I was going to get caught." Later that day, he went to buy the $40 worth of marijuana that he bought every week for Michelle Tipton. While he was waiting, he bought her a $500 diamond engagement ring. He went to see her, and she accepted it. He told her that he had acquired some money from a drug run to Dallas. She reportedly said, "don't ever do that again—here, let me help you count that." He took her on a shopping spree in Arkansas on Saturday, 7/12/03 and returned on Sunday, 7/13/03. They bought pet supplies, clothes, gifts, etc. However, Mr. Fields said that it was not as much fun as it sounded. He continued to go to work at Kenco Plastics from 7/14/03 to 7/18/03 when he was arrested, charged, and confessed to robbery, burglary, and the murders of Mr. and Ms. Chick.

20

Case 6:10-cv-00115-RAW   Document 2-9   Filed 04/06/10   Page 22 of 45
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 253
Jul 01 05 06:46a          kay Stevens              97^-792-0426         p.22

Neuropsychological Report: Edward L. Fields, Jr.

A second evaluation session was conducted on 6/28/05. The major purpose of this session was to administer memory testing which was not conducted during the first session. A follow-up interview was also conducted. Mr. Fields communicated that he had experienced happy periods in his life when certain events occurred, such as graduation from boot camp in the military, his marriage, the birth of his children, etc. He also reported that he had made As in algebra in high school and As and Bs in biology, although his transcript does not support that statement. He discussed his live-in relationship with Patsy Hatfield when he was 17 years-of-age and his relationship with a woman in Ohio he met over the internet. She gave hims $1500 to pay his child support before he went to Ohio and then supported him while he lived with her. He did paint the outside of her funeral home while he was there, and she paid him $2000 for the work. He expanded his description of the "buzz" in his head on the day of 7/10/03. He first described the "buss" as a lot of information going through his head, then he added that it was an argument between the voice and himself, "back and forth, back and forth" etc. He had difficulty coming up with examples of what the voice had said to him other than quitting a job or going to see his girlfriend or during the 7/10/03 incident. He attempted to describe his depressive symptoms in more detail. He tended to externalize the feelings. He did say that his sex drive was diminished. He said that he was not irritable or violent, but maybe "cranky". He described his behavior of picking up snakes by the tail and how it was no more risky than any other way of handling a snake.

## RESULTS OF TESTING:

### Validity Indicators:

Mr. Fields put forth adequate effort to insure valid test results. Two measures directly assessing effort, one with an auditory format and the other with a visual format, both reveal good effort on cognitive tests. The one personality measure utilized suggests exaggeration but no validity scales are included on that measure. No evidence of malingering on the neuropsychological tests was found. Mr. Fields was aware of testing for malingering during this evaluation.

### Intellectual Functioning:

Formal intellectual assessment was completed using the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). On this test administration the following IQ values were revealed:

| Composite | IQ Score | Percentile | Classification |
|-----------|----------|------------|----------------|
| Verbal | 106 | 66th | *Average* |
| Performance | 111 | 77th | *High Average* |
| Full Scale | 109 | 73rd | *Average* |

• **Verbal and non-verbal intellectual abilities fall at similar levels.** The 5-point difference between the Verbal IQ and the Performance IQ is statistically and clinically insignificant.

21

Case 6:10-cv-00115-RAW Document 2-9 Filed 04/06/10 Page 23 of 45
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 254
Jul 01 05 06:46a kay stevens 97-792-0426 p.23

Neuropsychological Report: Edward L. Fields, Jr.

• **Some variability was noted among WAIS-III Subtests as indicated by the following data:**

| Verbal Subtests | Age-corrected Scale Score | Percentile |
|---|---|---|
| Vocabulary | 16 | 98th |
| Similarities | 11 | 63rd |
| Arithmetic | 6 | 9th |
| Digit Span | 9 | 37th |
| Information | 12 | 75th |
| Comprehension | 13 | 84th |
| | | |
| **Performance Subtests** | **Age-corrected Scale Score** | **Percentile** |
| Picture Completion | 14 | 91st |
| Digit Symbol-Coding | 7 | 16th |
| Block Design | 9 | 37th |
| Matrix Reasoning | 14 | 91st |
| Picture Arrangement | 15 | 95th |

• **Verbal intellectual skills ranged from low average to very superior.** Very superior performance was noted on word knowledge. High average abilities were noted for fund of

information and comprehension. Average performance was found in verbal abstraction and auditory attention. Low average was revealed in mental calculations.

• **Nonverbal intellectual skills ranged from low average to superior.** Superior performance was found on visual attention, nonverbal abstraction and logical analysis. Average performance was revealed on visual problem-solving. Low average performance was found on psychomotor speed.

• **Intellectual functioning was not found to have declined from a previous level.** Based on the Wechsler Test of Adult Reading (WTAR) that requires the reading and pronunciation of words that have irregular grapheme-to-phoneme translation without text comprehension or knowledge of word meaning, Mr. Fields' current level of intellectual functioning is stable and does not represent a decline in performance from earlier in his life. This administration of the WTAR revealed a standard score of 105, which predicts a Verbal IQ of 104, a Performance IQ of 102 and a Full Scale IQ of 104. These values do not differ significantly from actual WAIS-III IQ values obtained.

<u>Sensory Functioning:</u>

• **Basic sensory perception appears fully intact.** Mr. Fields requires corrective lenses. Audition is intact for normal conversation. He reports difficulty with taste sensations but attributes it to the bland and boring food common in a correctional setting.

22

Jul 01 03 06:47a kay Stevens 97 -792-0426 p.24

Neuropsychological Report: Edward L. Fields, Jr.

**Attention/Concentration and Information Processing:**

• **Superficial attention was fully intact.** Mr. Fields remained appropriately alert, task-focused, and attentive throughout the lengthy testing process (approximately 8 hours). Obvious evidence of distractibility or inattention was not observed.

• **Simple focused visual auditory and visual attention were found to be normal.** On a measure of attention requiring the repetition of digits both forward and in reverse order, Mr. Fields scored in the average range (Digit Span, 37th %tile). On a simple test requiring Mr. Fields to sequence numbers from 1 to 25 on a page, he performed at the average level (Trail Making Test, Part A, 27th %tile).

• **Sustained visual attention was found to be mildly impaired for speed but low average for accuracy.** On another task designed to measure vigilance during rapid visual tracking and accurate selection of target stimuli, Mr. Fields performed at the mildly impaired level for speed (Digit Vigilance Time, 9th %tile) but at the average level for accuracy (Digit Vigilance Errors, 45th %tile). Mr. Fields is not impulsive on tasks requiring visual attention. He performs slowly but accurately.

• **Selective visual attention was found to be variable.** On a task requiring him to visually scan a dense matrix of random numerical digits *and* letters with the goal of identifying a recurring target digit stimulus, Mr. Fields performed at the mildly impaired level for speed and at the mild to moderate level of impairment for accuracy. However, on a more difficult task requiring him to visually scan a dense matrix of randomly occurring numerical digits (no letters) with the goal of identifying a recurring target digit stimulus, Mr. Fields performed at the mildly impaired level

for speed but at the high average level for accuracy. Therefore, when the task became more difficult, Mr. Fields performed slower but more accurately. On another task designed to measure vigilance during rapid visual tracking and accurate selection of target stimuli, Mr. Fields performed at the mildly impaired level for speed but at the average level for accuracy. However, on a test involving speeded symbol substitution, Mr. Fields performed at the average level (SDMT, 50th %tile).

• **Attention to visual detail was found to be superior.** On a task requiring Mr. Fields to identify what important part of a picture is missing, he performed at the 93rd %tile (WAIS-III Picture Completion Subtest).

**Memory Functioning:**

• **All measured memory functions were found to fall at the average level.** Immediate memory functions, both auditory (70th %tile) and visual (27th %tile) fell within the average range. Delayed memory functions, both auditory (34th %tile) and visual (27th %tile) fell within the average range. His General Memory Quotient on the WMS-III was average (27th %tile).

23

<u>Neuropsychological Report: Edward L. Fields, Jr.</u>

<u>Visual-Spatial Functioning:</u>

• **Visuospatial constructional abilities were found to be intact.** On unstructured free-hand drawing tasks requiring planning and visual perception abilities, Mr. Fields performed within normal limits. (Clock, Cross, Key, and Bicycle Drawings).

• **Visual sequencing was demonstrated to fall at the superior level.** On a task requiring him to arrange a series of pictures so that they tell a logical story, Mr. Fields performed at the 95th %tile (WAIS-III Picture Arrangement Subtest).

• **Visual processing fell at the average level.** On a task requiring him to reproduce printed designs with colored cubes, Mr. Fields scored at the 37th %tile (WAIS-III Block Design).

• **Visual analysis and integration were found to fall at the average level.** Based on a task requiring him to identify cut-up line drawings of 30 common objects, Mr. Fields' performance was average.

<u>Language and Academic Functioning:</u>

• **Adequate use of functional speech at the conversational level was demonstrated.** Mr. Fields is fully capable of conversing at multiple levels. His auditory comprehension is intact and his verbal abilities are facile.

• **Aphasia screening results were within normal limits.** No pathognomonic signs that might identify a language processing abnormality were found. Samples of written language were unremarkable.

• **Sentence repetition was average.** On a task requiring the exact repetition of sentences of increasing length, Mr. Fields performed within the average level (MAE Sentence Repetition, 25th %tile).

• **Expressive word knowledge was found to fall within the very superior range.** On the WAIS-III Vocabulary Subtest, Mr. Fields performed equal to or above 98% of individuals of similar age in the standardization sample.

• **General fund of acquired knowledge was found to be high average.** Based on the WAIS-III Information Subtest, Mr. Fields performed equal to or above 75% of individuals of similar age in the standardization sample.

<u>Motor Functioning:</u>

• **Right-hand dominance was found.** Mr. Fields was found to be right-hand dominant for tasks normally tested. He did report that he "fishes, shoots, and deals cards left-handed."

• **Manual motor strength was low average to average bilaterally.** Mr. Fields' grip strength in his dominant hand was low average (23rd %tile) while his grip strength in his non-dominant hand was average (50th %tile).

24

Neuropsychological Report: Edward L. Fields, Jr.

• **Manual motor speed was average to high average bilaterally.** Mr. Fields' fine motor speed of the index finger of his dominant hand was high average (73rd %tile) while his fine motor speed of the index finger of his non-dominant hand was average (37th %tile).

• **Fine motor dexterity was low-average to average.** On a task requiring him to rotate small pegs to match the holes in a pegboard under timed conditions, Mr. Fields performed within the low average range with his dominant hand (23rd %tile) and within the average range with his non-dominant hand (37th %tile).

## Executive/Complex Cognitive Functioning:

• **Basic cognitive flexibility was variable.** A two-part visual motor speed of processing task was administered to assess cognitive flexibility. The second part requires the alternate sequencing of two sets of simple printed material (numbers and letters), while being timed. His performance was error-free but mildly impaired due to having performed the task slowly (Trail Making Test, Part B, 7th %tile). On another test used to measure cognitive flexibility, resistance to interference from outside stimuli, and the ability to suppress a prepotent response, Mr. Fields performed within the low average range (Stroop Color-Word Interference Test, 17th %tile).

• **Verbal fluency was found to be mildly impaired.** On a task requiring the ability to maximally produce words belonging to a particular class, Mr. Fields performed at the level of mild impairment (COWA, 7th %tile)

• **Figural fluency was found to be moderately impaired.** On a task requiring the ability to maximally produce unique figural responses under time pressure, Mr. Fields performed at the level of moderate impairment (RFFT, 1st %tile)

• **Abstract reasoning and deductive problem-solving skills fell from the average to the superior level.** Mr. Fields interpreted 100% of 11 proverbs of varying difficulty in an abstract rather than concrete fashion. On a non-verbal reasoning and problem-solving task, Mr. Fields performed at the above average level (Booklet Category Test, 70th %tile). On a test involving abstract verbal concepts involved in social awareness, Mr. Fields performed at the high average level (WAIS-III Comprehension Subtest, 84th %tile). Verbal conceptualization on a measure based on the use of abstract classificatory schemes, Mr. Fields performed at the average level (WAIS-III Similarities Subtest, 63rd %tile). Nonverbal abstract reasoning was found to fall within the superior level (WAIS-III Matrix Reasoning, 91st %tile).

## Personality and Emotional Functioning:

• **Self-perception of dysfunction in behaviors involved in frontal lobe syndromes is extremely elevated in all areas (apathy, disinhibition, and executive dysfunction) both during the time period of July, 2003 *and* currently.** Mr. Fields rates his own behavioral dysfunction on the Frontal Systems Behavior Scale Subscales of Apathy, Disinhibition, and Executive Dysfunction as falling in the range of the 83rd %tile to above the 99th %tile for the time period before he was incarcerated and for now. Scores on the Frontal Systems Behavior Scale are elevated for certain groups including ADHD, Antisocial Personality Disorder, and substance abusers.

25

Jul 01 05 06:48a       kay Stevens               97?-792-0426           P.27

Neuropsychological Report: Edward L. Fields, Jr.

**Diagnostic Formulation:**

The following diagnoses are based on the <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Fourth Edition-Text Revision</u> (DSM-IV-TR) published by the American Psychiatric Association (2000):

| AXIS I: Clinical Disorders/Other Conditions of Clinical Attention | |
|---|---|
| *Diagnostic Code* | *Disorder or Condition* |
| 300.4 | Dysthymic Disorder (Chronic Mild Depression) |
| | |
| **AXIS II: Personality Disorders/Mental Retardation** | |
| *Diagnostic Code* | *Disorder or Condition* |
| 301.9 | Personality Disorder, Not Otherwise Specified, with antisocial (and psychopathic), narcissistic, and dependent traits and features |
| | |
| **AXIS III: General Medical Conditions:** | Deferred |
| | |
| **AXIS IV: Psychosocial and Environmental Problems:** | Before incarceration: problems with primary support group, occupational problems, housing problems, and economic problems. Currently: problems related to the legal system. |
| | |
| **AXIS V: Global Assessment of Functioning Scale:** | Currently: 60-70, mild symptoms. |
| | |

Mr. Fields has received several different diagnoses in the past few years. He has been diagnosed with Clinical Depression and Compulsive Disorder by Dr. Kemp. He was diagnosed with Chronic Depression by Dr. Winters. In the Muskogee Jail, he was diagnosed with Dysthymia and Major Depression with Psychotic Features. In the Tulsa Jail, he was diagnosed with Schizoaffective Disorder. Defense-retained psychiatric expert, Dr. Ginage, diagnosed him with Bipolar I Disorder, Severe, with Psychotic Features. Defense-retained psychiatric expert, Dr. Woods, diagnosed him with Schizoaffective Disorder, Bipolar Subtype vs. Bipolar Disorder, Severe, with Psychosis, in pharmacological remission.

First of all, the results of this evaluation, including both the records review, clinical interview, and neuropsychological testing, did not reveal evidence of a brain injury or frontal lobe deficit. Second, no clear evidence was found of a bipolar disorder or a "manic flip". Third, no credible evidence was found for a psychotic disorder. No clear evidence was found for irritability or spontaneous anger. While Mr. Fields was out of resources and living out of his truck around the time of 7/10/03, he was not experiencing social deterioration or isolation. He has life-long insomnia. No evidence was found of excessive talkativeness, flight of ideas, distractibility, or increased goal-directed activity. There is evidence of a shopping spree with unrestrained buying, but it appears to be as much related to Michelle Tipton's behavior as to Ed Fields' actions. Mr. Fields describes his self-esteem as low but some

26

Neuropsychological Report: Edward L. Fields, Jr.

indications in the records suggest otherwise. Evidence was found for chronic, mild depression (Dysthymia) and for a Personality Disorder, Not Otherwise Specified. A Personality Disorder is marked by an long-standing pattern of inflexible and maladaptive personality traits that cause either distress or impairment. A personality disorder is not the same thing as a mental disorder.

## Conclusions and Opinions:

The conclusions and opinions expressed in this report are based on the results of this evaluation, my training and experience, and a reasonable degree of scientific and psychological probability.

1. From a neuropsychological point of view, Mr. Fields is of average verbal and non-verbal intelligence with some scatter in his abilities. He excels in word knowledge, fund of information, verbal comprehension, attention to visual detail, logical sequencing of non-verbal materials, as well as both verbal and non-verbal abstract reasoning. He is less adept at complex auditory attention processes and speed of processing non-meaningful non-verbal materials. The majority of neuropsychological findings identify uncompromised cognitive processes. Visual-spatial, memory, motor, and language abilities are all totally within normal limits. With regard to executive or frontal lobe functions, Mr. Fields evidences some mild deficits with regard to fluency or speed, but abstract reasoning and complex problem-solving abilities fall from the average to the superior levels. For the most part, he performed the majority of test measures within normal limits. His variable attention abilities are somewhat consistent with a longstanding attention deficit disorder. His performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder.

2. From a psychological point of view, Mr. Fields' history is consistent with a long-standing mild depressive disorder, technically referred to as Dysthymia. The evidence from records and the results of my face-to-face evaluation of Mr. Fields do not indicate a bipolar disorder or a "manic flip" or "manic switch" secondary to anti-depressant medications on or about the date of 7/10/03. Several individuals who interacted with him during the days just before and just after that date did not see any change in his behavior. During my clinical interview with Mr. Fields, he did not describe a manic episode on or about 7/10/03. Rather, the data supports long-standing depressive symptoms, exacerbated by the financial and interpersonal stress Mr. Fields was experiencing at the time.

3. Mr. Fields' descriptions of the voice he hears are inconsistent with genuine auditory hallucinations experienced by psychotic individuals. Mr. Fields reported that he hears one identifiable male voice described as a "little friend" that comes from inside his head. The voice uses stilted language in issuing commands that Mr. Fields must obey to make the pressure in his chest subside. Mr. Fields lacks strategies to diminish the voice other than obedience. He does not describe associated delusional beliefs that are typical with a psychosis. The voice was not revealed by Mr. Fields for close to 20 years. The voice does not issue non-command hallucinations. All of these factors point to malingered auditory hallucinations presented for the purpose of the evasion of personal responsibility and punishment.

27

Neuropsychological Report: Edward L. Fields, Jr.

4.      Mr. Fields was not in manic state at the time of the offense for which he is charged.  His description of the voice that told him to commit the offense is inconsistent with a genuine psychotic auditory hallucination.  At the time of the commission of the acts constituting the

charges offenses, Mr. Fields was able to appreciate the nature and quality as well as the wrongfulness of his acts.

Sincerely,

*[signature: J. Randall Price]*

J. Randall Price, Ph.D.

28

# J. RANDALL PRICE, Ph.D.

**Board Certified in Forensic Psychology, American Board of Professional Psychology**
**Board Certified in Neuropsychology, American Board of Professional Neuropsychology**

FORENSIC PSYCHOLOGY ASSOCIATES OF TEXAS
1221 ABRAMS RD., SUITE 109
RICHARDSON, TEXAS 75081-5579
TELEPHONE:  972-644-8686
FACSIMILE:   972-644-8688

## FAX

**To:**           Doug Horn

**Date:**         7/1/05

**FAX:**          (918) 560-7954

**RE:**           U.S. v. Edward L. Fields, Jr.

Mr. Horn,

My report of evaluation in this matter follows.  I am also emailing a copy to you as an attachment.  Finally, I am sending an original by Federal Express.

The faxed and emailed documents are sent in two parts: A and B.

Randy Price

*The information contained in this facsimile message is privileged, confidential, and protected from disclosure.  If you have received this fax in error, if you do not receive all pages, or if you have any problem receiving this transmission, please call 972-644-8686.  Thank you very much.*

*Part B follows.*

Jul 01 05 06:52a     Kay Stevens                9  -792-0426              p.2

## Edward Leon Fields
### Time Line Based on Records Review
### Comments form Friends, Family, and Acquaintances Based on Records Review

| Ages | Source | Reports |
|---|---|---|
| ED birth | Margaret Fields (Mom) Statement 08/31/03 1695 | Born in OK City; 3 weeks premature; Respiratory Distress Syndrome (could not get enough oxygen); doctors said he would not live.  Moved to St. Anthony's Hospital where he stayed 9 days. Infancy was normal; potty trained for day and night between 1 and 2. |
| ED ages 3 -6 | Margaret Fields (Mom) Statement 08/31/03 1695 | Price, Utah; ED socialized with children very well, was always "very busy', "into everything", and "hyper".  These characteristics extended through childhood. |
| ED age 4 | Judy Janway Related to ED by marriage Knew him as a child 1670 | • ED hung a cat with a string and killed it. |
| ED age 5 | Margaret Fields (Mom) Statement 08/31/03 1695 - 1696 | • ED talked about having another father who was an Indian and cooked over a fire.  He described details of a previous life.  His mother thought it amazing that he could describe things he had never experienced; thought possibly he was reincarnated. These discussions faded as ED aged. |
| ED ages 5 - 18 | Margaret Fields (Mom) Statement 08/31/03 1696 | • ED made noises like music to a song, sometimes like a trumpet.  Occurred especially when he was required to stay still |
| ED ages 7-13 | Margaret Fields (Mom) Statement 08/31/03 1696 | • In Beckley, WV attended Catholic School.  Had a few minor discipline problems at school |
| ED ages 6 -7 | Denise Chitwood ED 2nd Cousin Speech Pathologist Statement 11/08/04 2184 | • Remembered ED as being very sweet when he was young. •Denise feels ED was not nurtured by his father due to his father's work schedule and the attention his father gave to his moter. |

1

| ED ages 13 – 17 | Margaret Fields (Mom) ED's Mother Statement 08/31/03 1696 | In Richlands, VA: <br><br> •Ed made friends with others of lesser character. <br> •At age 16, he set up all the family guns in his bedroom; his mother believed it was to intimidate her. <br> •At age 16 while in 11th grade, ED was suspended for 2 weeks from school for making out in the hall. <br> •At age 16, he was in a car accident and had a concussion; Mom did not see any changes in behavior following accident. <br> •At age 16 ED made napalm bomb in backyard with chemicals. <br> • During teen years, ED vented anger by beating on things, breaking several doors. He beat on bedroom wall with chains to intimidate his mother <br> • Ed's teen interests:  Steven King books, hypnosis, women, Dungeons and Dragons, violent action movies, making large swords out of metal, and cooking. <br> • During teen years, ED had difficulty controlling his temper.  Lost temper when he did not get his way or when he was made to do something he didn't want to do (e.g., broke the lawn mower to avoid mowing the lawn). <br> • ED was lazy and did not like work. <br> • At age 16, he met and ran away with 37-year-old woman for 3 weeks, and contacted Mom for $100 for food. <br><br> • Based on the run-away, Mom conspired with a priest to get ED in the Navy in an attempt to help straighten him out. <br> • Prior to going to the Navy, Mom and Dad got psychiatric help for ED.  Mom remembers only result was that ED thought the psychiatrist was very pretty.  Mom remembers no treatment other than counseling. <br> • Just prior to entering the Navy, ED had a fling with Jemima Carol Hagan resulting in pregnancy and the birth of a daughter, Rhiannon. |
|---|---|---|
| 1985 | Jemima Carol Hagan, Mother of Fields' 1st child. Interview 1905 | • When Ms. Hagan told ED of the pregnancy, he said it was not his. |

| 1984 – 1992? | Military File Throughout & FBI Interview w/ ED at arrest on 07/18/03 | • Apparently, ED joined Navy at age 17 on 09/27/84; Discharged 1986? Joined again in 1988?; Discharged 1990?. Reserves 1990-1992?. <br> • Navy <br> • Worked construction the year between his military services. <br> • Navy <br> • Fast Food Places & Navy Reserves? |
|---|---|---|
| ED age 18 and adult | Teresa Fields (TF) ED's Wife Statement 09/09/03 1989 <br><br> Angela Wade Statement 09/04/03 3161 – 3162 <br><br> Teresa Fields (TF) Statement 09/09/03 1989 | In Navy: <br><br> • ED married Teresa (TF) in 1987 who he met through his sister, Cherie; Ed had known TF only for a short time. They had two children Amanda and Andy. <br><br> • Angela believed ED and TF lived with ED's parents while in VA when he was in the Navy Reserves. <br><br> • ED was verbally abusive during this marriage. <br> • ED had affair with Carlena Michelle Sparks in 91 – 92, which resulted in the divorce of ED and TF. |
| 09/25/92 | Military File 1071 | • ED was honorably discharged from the Navy Reserves |
| 1992-1995 | FBI Interview w/ ED at arrest on 07/18/03 & Employment Records | • ED worked for Wackenhut at a coal power plant in Carbo, VA. Employment was terminated; reason was not in records. |

| Early 90's | Carlena Michele Sparks Girlfriend of ED Statement 09/09/03 1993 | • Carlena had two-year affair with ED in the early '90's. Met ED at Hardees; lived with him for short period. Approximately 93-94, she purchased a gun for fields. ED was emotionally stable and never reported hearing voices; observed no sudden mood swings of anger or depression. Sexual relations with ED were normal. His spending habits were "extraordinary and he also spent her money as well as his". Never saw violence from ED. No contact since 96 or 97. |
|---|---|---|

3

| 17/14/95 - 10/04/99 | Oklahoma Dept. of Corrections Records. | • Oklahoma Dept. of Corrections<br>    OK State Penitentiary<br>    Jimmy Hamilton Corrections (Living in house bought my Grandma)<br>•At the time of resignation it appears ED was making $1,836.36 monthly as a Correctional Security Corporal. |

| 1994-1999 | Teresa Fields Statement 09/09/03<br><br>1989<br><br><br>1998-1999<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>1999 | • ED and TF remarried in 1994 and moved to Poteau, OK. where they resided for four years.<br>• During the marriage, TF saw mood swings in ED (happy one day, sad, the next).<br>• ED abused TF and the children by slapping her, kicking her and the children and choking her.<br>• ED threw things and locked himself in the computer room for hours when he was angry. He mainly viewed adult pornography but also watched animal pornography.<br>• He talked about witchcraft and ghosts and said he could cause TF to have nightmares. He said he could kill TF and no one would ever know. Amanda, their daughter, also told TF that her father had threatened to kill her.<br>• ED was irresponsible with money and did not pay bills.<br>• ED is hypoglycemic, allergic to bee stings, and has hallucinations if he takes Claritin.<br>• ED & TF's sexual life was normal.<br>• ED's depression and anger became worse with the death of his grandfather in 1996.<br>• TF could not understand the killings unless the victims angered ED.<br>• TF left in June 1999 and divorced ED; she moved with her children to VA |
| Spring 1999 | Dean Anderson Physician Assistant at Hill Crest Clinic Interview 2181 | • First saw the Fields' children<br>• TF asked Anderson if he could give her husband something that would help ED's moods. He was often disagreeable.<br>• Anderson prescribed Paxil for mood disorder, anger management and irritability.<br>• ED stated at a follow-up visit that the Paxil had increased his libido.<br>• Anderson and ED went fishing a couple of times. Anderson observed no problems with moodiness or anger. |

4

Jul 01 05 06:53a       k⊃ч Stevens                    9   -792-0426           p.6

| | | |
|---|---|---|
| | | • Anderson said he thought ED was proud of his kids.<br>• Anderson described Fields as an Internet addict.<br>• Anderson opined that web cam activity could be consistent with voyeuristic activities.<br>• Anderson was shocked about the murders not feeling ED was capable. |
| | Margaret Fields (Mom) Statement 08/31/03 1699 | • The house in which ED & TF resided rent-free from 1994 to 1996 belonged to Mom and Dad and had been purchased in anticipation of Mom and Dad moving back to Poteau in 1996. (At this time ED was working for OK Dept. of Corrections.)<br>• ED was irresponsible regarding the house and did not pay bills other than phone and electric, which he needed for his computer activities.<br>• Initially, when Mom and Dad moved back to OK, they stayed with Mom's mother, but eventually wanted their house. ED was very angry and believed it unfair for his Mom and Dad to make ED and TF move out. It "got ugly", and to resolve the conflict, Mom's mom (ED's grandmother) bought ED and TF a home. (At this time ED was still working for OK Dept. of Corrections.)<br>• ED worked at a the Oklahoma Department of Corrections from 95-99.<br>• ED & TF's marriage was horrible. They fought and TF antagonized ED. TF told Mom that ED hit her. Mom believes that ED physically and verbally abused TF and the children. ED was not a good father.<br>• ED ruined almost every family/holiday gathering by arguing or getting angry.<br>• ED never bought his parents Christmas gifts but always made it known what he wanted for Christmas and birthdays.<br>• When ED's father was very ill, ED was asked to by his sister to stay with him so she and Mom could go to dinner; ED refused.<br>• Summer 2002, following ED's father's by-pass surgery and when ED's father had been diagnosed with leukemia, ED showed no compassion. Mom needed ED, but ED decided to go to Ohio for two months to see a woman he had met on the internet.<br>• After Dad died, ED moved in with Mom (October 2002).<br>• He kept a loaded gun at each door of the house.<br>• ED and his Mom did not get along; they yelled at each other, and ED refused to do any chores. |

5

Jul 01 05 06:54a   kay Stevens   9⸱⸱⸱-792-0426   p.7

| | | |
|---|---|---|
| | | • In April 2003, he forged his deceased father's name on his mother's checks and spent $1,500.<br>• ED does not seem to understand what love is.<br>• Mom believes that ED will follow through with suicide threats. He has suffered from depression his entire adult life.<br>• ED is smart enough to kill people and not get caught; he could have gotten away with the murders had he been careful; perhaps it was a cry for help.<br>• Mom did not think ED would kill her, but some of her friends did.<br>• ED never told his Mom about the voices until after the murders.  He told her and reminded her that when he was young, she told him that voices in his head were his conscience that would tell him what was wrong and right. |
| 1999 | Denise Chitwood ED 2nd Cousin Speech Pathologist Statement 11/08/04 2184 - 2186 | • Denise remembers getting a call from TF in which TF indicated that ED had choked her during a family dispute.  Denise recommended counseling, TF agreed but did not follow-up.  This is only account of violence Denise knew. |
| 10/99 – 7/01 | Wortz Employment Files | • Worked at Wortz Cracker Co. -- fired for bringing gun and bomb to work. |
| 1999 - 2003 | From a variety of documents | • It appears ED lived with Mom from the time TF left him until Mom moved to VA in June 2003. |
| Sometime in 2000 | Brenda Stacy Girlfriend Statement 0466 | • Stacy is a schoolteacher turned home health care worker.<br>• Met ED in 2000. Had an on again – off again relationship – they would break up – then he would come back and they would date again until 04/15/03 when she ran him off for good.<br>• ED was argumentative.<br>• When ED tried to show affection, he would mess it up with a belittling comment. |
| Year Prior to Mom Moving to VA. | Mom 1703 | • During the year before she moved to VA, ED spent a lot of time in his computer room and would play "Seven Spanish Angels" over and over and louder and louder.<br>• During the year before she moved, ED had seven live copperhead snakes in an aquarium at his mom's home. |

6

| | | |
|---|---|---|
| 03/03 | David Love Computer Friend Interview | • Around March 2003, Ed told Love that he went to Ohio to see a woman he met on the Internet, and that she gave him money (Love estimated $1,500 to $1,800) |
| 03/31/03<br><br>Statement regarding 3/31/03 given 06/10/03 | Michelle Tipton (MT) Statement 06/10/03 001685 | •Ed Fields (ED) is harassing MT and wanting to live at her house. She is saying no and stopped by police dept. to report ED's harassment. He was called by police and told to stop. He left her alone for about three weeks and then it picked up again like before. |
| 04/03 | Kenco File | • ED began working at Kenco Plastics as a "temporary" and got on as a regular in May. From the time he was hired until the day he was arrested 07/18, he attended work regularly. |
| 04/10/03 | Pretrial Service Report Dr. Kemp p.4 | • ED's first visit to Dr. Kemp.<br>• ED complained of depression and compulsive disorder.<br>• ED had seen Dr. Winters in 2000 who treated him for depression. Given Prozac and Celexa.<br>• ED also saw Dr. Schumpert and dean Anderson (PA) who prescribed Paxil and Serzone<br>• ED reported dad had dies and mom was ill and he was caregiver.<br>• ED hears voices that tell him to compulsively do things like sharpen knives and drive to his girlfriend's house.<br>• Is sad much of the time.<br>• Dr.'s objective finding were within normal limits.<br>• Psychologically he has flat affect, intelligent.<br>• Lexapro 10 mg prescribed. |
| 05/01/03 | Pretrial Service Report Dr. Kemp p. 3 | • Follow up to first visit.<br>• ED reports medicine has been wonderful; depression and compulsion are improved.<br>• Has raised his voice a few times<br>• Has not sharpened knives in two weeks.<br>• Dr's. objective findings all within normal limits<br>• Dr. writes Clinical Depression and Compulsion Disorder Improved. Side effect sexual dysfunction.<br>• Continued 10 mg. Lexapro |
| On or about 05/02/03 | District Court of Leflore County Subpoena 1015 | • Mr. Fields received a subpoena to appear in court on 06/10/03 due to late child support payments to Jemima Stubbs, mother of Mr. Fields' 1st child. He was to pay $136.08 per month and was behind $637.43. |

7

Jul 01 05:06:55a Kay Stevens 9-792-0426 p.9

| 06/10/03 | District Court of Leflore County Order 1017 | • ED appeared and plead guilty to Indirect Contempt of Court for failing to make child support payments, confessed a judgment of $773.51. Punishment was withheld until 09/09/03 and until such time, ED will stay current with child support payments and provide an additional $21.49 monthly. |
|---|---|---|
| 05/26/03 | Michelle Tipton (MT) 1686 | • ED went to MT's work and begged her to allow him to live with her for only two weeks. She called him a stalker and crazy and told him to see a doctor; he needed medication. He said he was on medication and would kill himself if she didn't let him move in. She said good that she would then be rid of him. |
| 05/27/03 | Pretrial Service Report Dr. Kemp p.2 | • ED considered taking an overdose of Elavil the day before but thought his girlfriend would come home before it took effect and hospitalize him which he did not want.<br><br>• ED says his reasons for living are gone since his dad died and his mother was leaving the state. He stated that he had taken care of both his parents.<br>• ED complained about child support and no money to pay it.<br>• ED reported that his IQ was 168, he scored high on SATs, and could have gone to Harvard.<br>• No voices telling him to hurt himself and compulsions are improved.<br>• Sexual dysfunction due to medication, but doesn't matter.<br>• ED rejects impatient treatment<br>• Dr's. objective findings are within normal limits. Dr. wrote: Clinical Depression. Compulsive Disorder. Recent thoughts of killing himself although he chose not to do that.<br>• Increased Lexapro to 20 mg daily |

| 05/28/03 | MT 1686 | • ED came to MT's house unannounced, acting strange. She was afraid of him so she was polite. He said he had been to the Dr. who had adjusted his medication and also had suggested "in-house psycho treatment" She encouraged him to get treatment. |
|---|---|---|
| May 2003 | Marilyn K. Pressley Speech Pathologist; Wife of Danny Pressley and | • Marilyn introduced ED to MT (Marilyn's cousin) one year prior to murders.<br>• It was on and off relationship. ED wanted to move in with MT and MT did not want him to. She had her own family and did not need his problems.<br>• Knew ED suffered from depression and took |

8

Jul 01 05 06:55a  kay Stevens  97  792-0426  p.10

| | | |
|---|---|---|
| | Friend to ED Interview 0515 | • medicine two years prior and in May 2003.<br>• She did not know of him hearing voices.<br>• She read a description from a "Mayo Clinic" book of anti-social, excessive compulsive, and passive aggressive. After hearing the descriptions, ED said "that sounds like me". |
| June 2003 | Mom 1700 | • Mom moved to VA to live with her daughter. |
| Early June | Carole Lamb (CL) Girlfriend 0054 | • In early June, ED moved into her house.<br>• He bought burlap for gun cover and ammunition while living with her.<br>• She had seen ghilli suit previously. |
| 06/10/03 | Michelle Tipton MT GJ Testimony 07/30/03 | • MT made statement to police telling them about ED's harassment during March – May. Applied for a restraining order.<br>• Stated she had known ED 11 months and met him via Marilyn Pressley, her cousin.<br>• ED and MT had an on-again –off-again intimate relationship. |
| 06/11/03 | Morgan Hope Tipton MT's daughter 1690 | • Described to police that ED had come to the house several times between 06/06 and 06/09 while her mother was in the hospital. She and her mother had agreed not to tell ED that MT was in the hospital.<br>• He came in the house and unloaded some furniture into MT's house. He continued to ask where MT was. Morgan said she didn't know. ED got a hammer and kept asking where MT was. Morgan was frightened and felt threatened by the hammer and ED's proximity and persistence.<br>• He went outside and remained on the porch for a while staring into space |
| 06/16/03 | Pretrial service Report Dr. Kemp p. 2 | • ED reports not doing much these days – go to work, go home, go to work.<br>• Decreased desire to do things.<br>• Thoughts of suicide.<br>• He worries.<br>• Anxiety is less<br>• No voices telling him to do compulsive things<br>• Dr. suggested inpatient treatment; ED rejected idea<br>•Dr. writes that ED looks better than he sounds. All objective signs are within normal limits.<br>• Clinical depression not doing a well as pt. would like; Compulsive Disorder is stable.<br>• Discontinued Lexapro. Started Effexor 37.5 daily for one week, then 75 daily for two weeks. Return |

9

Case 6:10-cv-00115-RAW   Document 2-9   Filed 04/06/10   Page 40 of 45
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 271

Jul 01 05 06:56a   Kay Stevens   9  -792-0426   p.11

| Late June | Carole Lamb (CL) 0055 | • Dating relationship did not work out and fields moved out at the end of June. They remained friends and spoke daily on the phone. |
|---|---|---|
| Early July | Carol Lamb (CL) 0055 | • ED called CL and told her he was living out of his truck at Lake Wister and on the Talimina Drive. |
| 07/05/03 | Brenda Stacy 0467 | • Saw ED at the IGA, which led to them spending the day and night together having fun. He was perfectly sane when she was with him. |
| 07/06/03 | Brenda Stacy 0467 | • About noon, ED appeared anxious and said he was going to his grandmothers.<br>• Stacy didn't believe him so went to his grandmother's and he was not there. |
| 07/07/03 | Brenda Stacy 0467 | • Brenda left ED an angry note. |
| 07/07/03 | Danny Pressley Best Friend GJ Testimony 07/30/03 1839 | • ED drove Danny's car to Ft. Smith while Danny drove his motorcycle.<br>• ED told Danny that he used his ghilli suit to sneak up on parkers and watch them. |
| 07/07/03 | Marilyn Pressley 0517 | • ED told Marilyn that he had a problem with calling MT too often and was not going to call her until Wednesday or Thursday. His demeanor was normal. |
| 07/07/03 | Pretrial Service Report Dr. Kemp Progress Notes | • ED saw Dr. Kemp<br>• ED reported doing better, doing more, more energy, catching snakes, split with one girlfriend but spent weekend with a new girlfriend. Still thinks about suicide but not seriously.<br>• Dr. Kemp wrote that he was a little happier, less negative, affective, concentration, memory, judgment and orientation normal. Steady hands. Depression and Compulsive Disorders improved.<br>• Increased Effexor from 75 mg to 150 mg. |
| 07/08/03 | District court of Leflore Notice of Registration of Foreign Support Order Under UIFSA 0962 | • Court document states that ED owed past support to Teresa Fields in the amount of $866.86 |
| 07/08/03 | Brenda Stacy 0467 | • ED went to Brenda's house, they argued about a girl that worked at a bar, and ED left.<br>• Brenda felt ED had a problem with computers – too much.<br>• ED wanted to take nude pictures of her and put them on the Internet. |

10

Jul 01 05 06:56a    Kay Stevens    9  -792-0426    p.12

| | | |
|---|---|---|
| | | • ED wanted Brenda to pay for stuff like gas. He wanted to use her credit card.<br>• ED manipulated his parents to get money.<br>• ED and Stacy argued, but ED was not violent.<br>• ED didn't like to work; he liked to run around.<br>• ED had no stability in his life.<br>• ED's personality was up and down. When he was down, he was demeaning and hateful. When he was up, he was goofy, high, and over polite.<br>• ED's felt nothing was ever wrong with him, and everything was someone else's fault.<br>• Stacy knew that one of ED's girlfriends had given him anti-depressants, but ED did not talk about being depressed to her.<br>• ED was free spirited and lived on the edge.<br>• ED could talk to anyone; never met a stranger, but had problems approaching women. Met women on the Internet.<br>• ED loved sex and was experimental. He had been very sexually active with many girlfriends. He could be affectionate but also could be obsessed and aggressive.<br>• He had a bad relationship with grandmother because he would not pay her the rent he owed her. When Ed grocery shopped for his grandmother, he would buy things for himself with her money.<br>• He had no credit, yet ran up bills.<br>• He did not pay child support. |
| 0/08/03 | Carole Lamb (CL) 0055 | • ED called CL and told her he was going to kill himself in a couple of weeks when he got some business taken care of. CL convinced ED to meet her.<br>• They met at 7:30 at his Lake Wister campsite. CL told ED she would help him find a place to stay. She left but met him later that night at the campsite.<br>• She returned at 10:30 at which time he continued to talk about suicide and how he could make it look like an accident so his family would get insurance.<br>• ED told CL that he had done something "really bad". He snuck up on parkers in his ghilli suit and watched them. CL told him he shouldn't do that.<br>• Apparently, CL left the campsite. |
| 07/10/03 | CL 0055 | • CL met ED at LaHerta's Restaurant at 4:45 pm. ED asked CL for money to rent a room at Lester's Motel. CL said to check to see if he had a room and she would give him the money then. She did not hear from him again that day. |

11

Jul 01 05 06:56a    kay Stevens        9  -792-0426          p.13

| Date | Source | Notes |
|------|--------|-------|
| 07/10/03 | Danny Pressley 001841 | • ED went to Danny's house to see if Danny wanted to do something.<br><br>• He acted normal. |
| 07/10/03 | Marilyn Pressley 0517 | • ED was at Pressley's house from 5:30 to 6:45.<br><br>• Was upbeat and thought that things were going to work out well with MT<br><br>• ED told Marilyn about sneaking up on a couple wearing his ghilli suit and watched them have sex. |
| 07/10/03 | Edward Fields' Confession | • He stalked the Chicks as they were at the vista and as they walked back to the campsite and sat and talked. When Mr. Chick said he was going to the tent, ED shot him and then shop Ms. Chick. |
| 07/10/03 | Andrea White Employee and Al's Video and Friend and Distant Relative of ED. 0948 | • Andrea White saw ED at Jr. Food Mart in Poteau at 11:00. She was pumping gas and called to ED as he went in to the store. He seemed in a hurry and didn't stop to talk, which was unusual since he typically "talked her ear off". |

| Date | Source | Notes |
|------|--------|-------|
| 07/11/03 | CL 0058 | • ED called CL on cell phone and asked for money. She said she was leaving town and could not meet him. |
| 07/11/03 | Jack Jewelers Marla Dodd 0466 | • ED bought an engagement ring to MT. |
| 07/11/03 | Debora Kay Bailey Cousin 0367 | • On or about 07/11/03, she received several phone calls over several days from ED wanting to move to Florida and live with her and get a job.<br>• ED seemed desperate to leave OK. He owed child support; he seemed to want to run away.<br>• Debora got closer to Fields after she went into law enforcement, but she felt he got weirder and weirder over time. |
| 07/12/03 | MT Grand Jury Testimony 1865 | • ED and MT left of a weekend trip to Arkansas and spent lots of money; She asked why he had so much money, and ED told her he had done a drug run to Texas and made the money. MT asks ED if he killed the people |
| 07/12/03 | Margaret Fields Mom 1703 | • ED called Mom twice from the weekend trip with MT and was very happy both times. He told her of the engagement to MT, and he was at a bakery where he seemed ecstatic. |

12

| | | |
|---|---|---|
| 07/14/03 | | • ED worked at Kenco and lived with MT. |
| 07/15/03 | | • ED worked at Kenco and lived with MT |
| 07/16/03 | | • ED worked at Kenco and lived with MT |
| 07/17/03 | | • ED worked at Kecco and lived with MT |
| 07/18/03 | Carole Lamb Interview | • CL went to police due to her concern regarding ED and the murders that had occurred at Winding Stair campsite. |
| 07/18/03 | • Arrest of ED | • ED worked at Kenco.<br>• Law enforcement officers went to Kenco and requested that he come to the police station for questioning.<br>• ED confessed to the robbery and murders of Mr. and Ms. Chick |
| 07/30/03 | Court of Leflore County Affidavit of Service | • It appears ED was served the court papers ordering child support payments in the Muskogee Detention Center. |
| 07/30/03 | MT Grand Jury Testimony 1853 -1880 | • MT believes ED has problems and she had tried to help with the problems, but ED is very intelligent. She believes he knew exactly what he was doing when he killed the people.<br>• ED told MT that he killed the people because she would not let him live with her.<br>• ED told MT that he could kill her ex-husband for her, and spoke of people he had killed in the military. |
| 07/30/03 | Danny Presley Grand Jury Testimony 1833 - 1852 | • Did not believe ED was violent.<br>• Talked to ED the on 07/10/03 prior to the murders and ED seemed fine.<br>• "ED felt like life was too hard to live, You know, it takes effort to live it. It definitely takes effort to live a life well, you know, to get the things you want. And I believe he felt like it was just too much trouble to put the effort out for it." |

| | | |
|---|---|---|
| 07/30/03 | Carole Lamb Grand Jury Testimony 1809 - 1832 | |
| 08/11/03 | David Love Computer Friend Interview 2065 | • During week of 08/11/03, Danny Pressley asked Love to erase his hard drive so law enforcement could not retrieve it. Love refused. |

13

Jul 01 05 06:57a k-y Stevens 9 -792-0426 p.15

The following table includes comments from interviews with various individuals who knew Mr. Fields and described his behavior, characteristics of his personality and/or his relationships with them or other individuals.

Table 2

| Date | Source | Comments |
|---|---|---|
| No exact date<br><br>No exact date<br><br><br><br>For past 10 years<br><br><br>Early 2003<br><br><br>During 2003<br><br><br>Currently | Denise Chitwood 2184 - 2186 | • ED is somewhat obsessive regarding sex. She occasionally admonished ED re: his womanizing.<br>• She saw mood swings in which he would be very sweet and charismatic for a short period and then obnoxious and anti-social. Never saw him insane or irrational.<br>• Observed digression of attitude toward others, which affected social functioning. He had trouble meeting responsibilities.<br>• Denise asked ED to fix her computer. While he was fixing it, she tried to talk with him; he was distant and seemed depressed.<br>• Denise feels that ED may have felt abandon after the death of his grandfather, father, and his mother's move to VA.<br>• Denise feels ED has mental illness as well as his mother and grandmother. ED's mind has become sick over a long period of time. She remembers that ED was hurt and sad when his grandfather died.<br>• ED has a lifetime of not meeting other's expectations: failed marriage, couldn't hold a job, not a nurturing father.<br>• Denise visited ED in jail and he provided no explanation for murders. He was emotional during the visit, which was following his suicide attempt.<br>• Denise feels he did not mean to kill the people and was not in his right mind. |

| Date | Source | Comments |
|---|---|---|
| | Kathy Fagrell Friend 1747 | • Field fed baby kittens to his snakes.<br>• Kathy felt ED was polite, slow to anger, honest, stable and normal.<br>• ED talked about sex a lot |
| | Michael Lloyd Worked with ED 1998-1999 when working at the correctional facility 2044 | • ED had a very strange sex life; slept with other women than his wife. ED sought out young girls on the Internet so he could have sex with them. Described ED as a "sex freak".<br>• ED's personality could switch from nice and pleasant to rude and obnoxious depending on his mood.<br>• Once people go to know ED they did not like him as much. |

14

| | | |
|---|---|---|
| | | • Ed was quick to anger with prisoners, but never got physical.<br>• ED seemed emotionally stable except for the sex issue.<br>• ED made fake documents and identification that looked very real. |
| | Judy Janway Cousin by Marriage to ED. Knew him all his life. 1670 | • Saw bruises on TF and thought ED was violent towards TF.<br>• Mean to his mother after she sold the farm.<br>• TF said there was pornography at their house.<br>• Judy overheard someone say they had seen a picture of ED having sex with a carp fish.<br>• As a child ED did not want attention, but as an adult would do anything to get attention and to shock.<br>• In Nov. 2002 when ED was working on Judy's computer he mentioned the voices in his head and made noises as if her were talking to someone. |
| 1993-2003 | David Love Friend Computer Service Person Statement 08/22/03 2065 | • Met ED in 1993 via Ed needing computer help.<br>• ED told Love he quit prison job because he had "problems with supervisors".<br>•ED borrowed digital web cam camera from Love. Told Love he masturbated in front of the camera so everyone on website could see him masturbate.<br>• Near end of 2000 ED went to Love for a job; ED said he had no money. |
| Known of ED all his life | Donald Allison USDA Forest Service Supplemental Incident Report Interview 0462 | • ED got kicked out of the Boxcar Bar for bringing a inside.<br>• ED never had a stable job.<br>• ED was not much of a country boy -- a little on the whacky side. |

15

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Daniel A. Martell, Ph.D., ABPP**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com

**Forensic Psychiatry**
Park Dietz, MD, MPH, PhD
  President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Gregory Saathoff, MD
Esperanza Salinas, MD
Rene Sorrentino, MD
Sheila Wendler, MD

**Forensic Pathology**
Tracey S. Corey, MD
Judy Melinek, MD
George R. Nichols II, MD

**Forensic Neurology**
David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**
Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**
Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**
Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)

**Security**
Bernard Banahan
Robert Hayes, CPP, CFE
Steve Howell

**Medical Strategist**
Steven Ainbinder, MD

April 1, 2010

Cristi Charpentier, Esq.
Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA 19106

**RE:  Neuropsychological Examination:
       Edward Leon Fields, Jr.**

Dear Ms. Charpentier and Mr. Wiseman,

I am writing today to convey the findings and opinions arising from my initial examination of Mr. Fields pursuant to the above captioned matter.

## Referral Questions

You have asked that I examine Mr. Fields and administer a battery of neuropsychological tests in order to address the following referral questions:

(1)    What is Mr. Fields' current neuropsychological status, and what issues (if any) does his current status raise with regard to the mitigation case presented at the time of his trial in 2005?

(2)    Were the opinions offered by Dr. Price scientifically accurate, valid, and adequately supported by the available data?

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                              Page 2 of 21

## Basis for Opinions

### Scope of Examination and Informed Consent

I personally examined and tested Mr. Fields at the Federal Correctional Institution in Terre Haute, IN on 03/16/2010 and 03/17/2010 for a total of approximately 10 hours. The examinations were conducted in a quiet, private contact-interview room in the attorney visiting area. Mr. Fields' hands were handcuffed to a belly chain during the first day of the examination, as the Warden had not yet approved a hand-free contact visit. Therefore, the interview-only and no-hands-required portions of the examination were administered on 03/16/2010. The Warden did approve hands-free testing on 03/17/2010, and the remainder of the neuropsychological examination was accomplished that day.

Mr. Fields was informed that I had been retained by the Federal Community Defender's office; of the nature and purpose of the examination; of the limits of confidentiality in this forensic context; and of the lack of any treating relationship between us. He provided his informed consent to participate in the examination.

### Tests Administered

Structured Neuropsychological Interview
Mental Status Examination
Rey's 15 Item Memory Test
Test of Memory Malingering (TOMM)
Wide Range Achievement Test – 3 (WRAT-3)
California Verbal Learning Test - II
Halstead-Reitan Neuropsychological Test Battery
  -Booklet Category Test
  -Seashore Rhythm Test
  -Speech Sounds Perception Test
  -Portable Tactual Performance Test
  -Finger Oscillation Test
  -Reitan-Klove Sensory-Perceptual Examination
  -Tactile Form Recognition
  -Trail Making Test, Parts A & B
  -Lateral Dominance Examination
Grooved Pegboard Test

Tests of Motor Sequencing and Control
Wisconsin Card Sorting Test (WCST)
D2 Test of Attention
University of Pennsylvania Smell Identification Test (UPSIT)
Stroop Test
Controlled Oral Word Association Test (F-A-S)
Animal Naming
Boston Naming Test (BNT)
Hooper Visual Organization Test (HVOT)
Frontal Systems Assessment Battery (FrSBe)
Structured Interview of Reported Symptoms (SIRS)
Personality Assessment Inventory (PAI)

## Background Materials Reviewed

I have reviewed and considered the following background materials in forming my opinions in this case:

(1) Neuropsychological Evaluation by Michael M. Gelbort, Ph.D., 08/11/2004.
(2) Raw test data from Dr. Gelbort's examination.
(3) Mental Health Evaluation by Bradley D. Grinage, M.D., 06/24/2005.
(4) Neuropsychiatric Evaluation by George Woods, M.D., 06/25/2005.
(5) Preliminary Neuropsychological Evaluation by J. Randall Price, Ph.D., 06/20/2005.
(6) Materials Extracted from Preliminary Neuropsychological Evaluation by J. Randall Price, Ph.D., 06/20/2005.
(7) Raw data from Dr. Price's examination.
(8) Mental Health Evaluation by Jeff Mitchell, M.D., 06/30/2005.
(9) Neuropsychological Evaluation by J. Randall Price, Ph.D., 07/01/2005.
(10) Testimony of Curtis Todd Grundy, Ph.D., 07/28/2003.
(11) Raw data from the SIRS and TOMM administered to Mr. Fields by Dr. Grundy on 07/25/2003.
(12) Testimony of Bradley D. Grinage, M.D., 07/19/2003.
(13) Testimony of George W. Woods, M.D., 07-20-2005.
(14) Testimony of J. Randall Price, Ph.D., 07/21/2005.
(15) Testimony of Jeff Mitchell, M.D., 07/21/2005.
(16) Birth Certificate

Forensic Neuropsychological Examination  FIELDS, Jr., Edward
April 1, 2010  Page 4 of 21

(17) Baptism Certificate
(18) St. Francis de Sales School records.
(19) Psychological treatment records, Minaben D. Patel, M.D.
(20) Richlands High School records and yearbook photos.
(21) Humana Hospital Clinch Valley records.
(22) Southwest Virginia Community College records.
(23) General Educational Development Test records.
(24) Navy personnel records.
(25) Journal entries from service in the Navy.
(26) Oklahoma Department of Corrections employment records.
(27) Heavener Medical Clinic records.
(28) Child Support Enforcement records.
(29) Wortz Cracker employment records.
(30) Wakenhut employment records.
(31) The Employment Group records.
(32) Bremner employment records.
(33) Stigler Police Department Incident/Offense report – warrant request – arrest of Edward Leon Fields for stalking Dawn Michelle Tipton, 03/31/2003 to 06/11/2003.
(34) Leflore County Medical Center records.
(35) Kenco Plastics employment records.
(36) Muskogee County Jail records.
(37) Tulsa Jail medical records.
(38) Presentence report, 09/30/2005.
(39) Psychological treatment records of Minaben D. Patel, M.D.
(40) Neuropsychological evaluation by Dale Jeffus, Ph.D., 09/24/2001.
(41) Raw neuropsychological testing data from an examination of Mary Margaret Fields (at age 54) by Dale Jeffus, Ph.D., undated.
(42) Mercy Behavioral Outpatient Services Counseling Center records.
(43) Cooper Clinic medical records.
(44) Treatment records of Chris Hardin, M.D.
(45) Center for Psychiatry records.
(46) Dewey Medical Center records for Mildred Giniman.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                Page 5 of 21

## BACKGROUND INFORMATION

Mr. Fields was convicted in the shooting deaths of Charles and Shirley Chick on 07/10/2003, and sentenced to death.  He is currently incarcerated at USP Terre Haute, and is pursuing his Habeas Corpus appeals.

His psychosocial and neurobehavioral history has been thoroughly reported elsewhere (see reports of Drs. Gelbort, Grinage, Woods, and Price) and will not be repeated at length here.

### Notable Family Medical History

It is important in understanding Mr. Fields' mental condition to consider relevant disorders in his first degree relatives (i.e. immediate family members) that may indicate a genetic predisposition to certain brain diseases and/or psychiatric disorders.  In this regard, I find the neuropsychiatric histories of his mother and his maternal grandmother to be particularly relevant.

His mother Mary Margaret Fields was examined in 2001 at age 54 by Dr. Dale Jeffus, due to stroke-like symptoms and positive findings on an MRI scan of her brain suggestive of ischemic disease or a demyelinating process.  Dr. Jeffus' testing found her to have moderately severe brain damage consistent with cerebrovascular disease (although he could not rule out Multiple Sclerosis) with a neuropsychological test profile that is strikingly similar to that later found for her son. [Neuropsychological evaluation by Dale Jeffus, Ph.D., 09/24/2001]  MS was subsequently ruled out by Dr. Knubley at St. Edward Mercy Medical Center, and she was found to have bilateral carotid artery stenosis. [St. Edward Mercy Medical Center records]  A CT scan of her head and brain on 08/13/2009 revealed atherosclerotic vascular disease. [Eastern Oklahoma Medical Center records] Outpatient treatment notes from Dr. Hardin report a history of Transient Ischemic Attacks (TIA) and episodic delirium.  She was also seen in treatment by Dr. Patel for symptoms of depression and anxiety, including panic attacks, and fears of committing acts of violence against others [Treatment notes of Dr. Patel] and has a history of diagnosis with Bipolar II Disorder.  [St. Edward Mercy Medical Center records; Center for Psychiatry records]

Forensic Neuropsychological Examination   FIELDS, Jr., Edward
April 1, 2010            Page 6 of 21

Medical records from Mr. Fields' maternal grandmother Mildred Giniman reveal a history of transient ischemic attack (TIA), stroke, dementia/progressive memory loss, and treatment for depression and anxiety. [Dewey Medical Center records]

Considered together, it is highly likely that Mr. Fields inherited an elevated genetic risk both for cerebrovascular disease and stroke, as well as an affective psychiatric disorder based on records and test data available at the time of trial.

## Examination Findings

## Behavioral Observations and Mental Status Examination

Edward Fields is a 42 year-old Caucasian man who presented for testing on both days wearing tan prison-issues scrubs and tennis shoes.  He is overweight.  He wore a neatly trimmed graying mustache and a very short crew-cut.  He has male pattern baldness.

There was a prominent bump on his forehead over the left eye that he stated had been growing over the past five-and-a-half years.  He reported, "I stuck needles in it – nothing came out."  He also stated that the prison doctors have told him that it is, "purely cosmetic." Although rare, there are reported cases of lipomas and other tumors growing through the frontal bone, and also involving the underlying brain structures.  Given the rapid deterioration of Mr. Fields' neuropsychological test findings (discussed below) over the period of time that he reports this growth to have been enlarging, this warrants further investigation via Magnetic Resonance Imaging to rule out any underlying neuropathologic process.

He was cooperative and effortful throughout both days of examination and testing. He brought his reading glasses.

His motor behavior was remarkable for severe extra pyramidal symptoms, including a Parkinsonian tremor bilaterally in the upper extremities (i.e., in both arms and both hands) and periodic positive myoclonic jerks (spasmodic twitching) that at their worst effected his entire body and caused him to sit bolt upright.  He reported these as side effects of his neuroleptic medication, despite treatment with the anti-Parkinsonian drug Artane to control such symptoms.  The shaking

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                          Page 7 of 21

in his arms and hands was severe enough to compromise his ability to write and draw neatly.

He stated that currently and for approximately the last 4-5 years, he has been treated with Loxitane for hallucinations; Lithium as a mood stabilizer; Artane for "the shakes;" Prozac for depression; and over the past year-and-a-half, a blood pressure medication whose name he could not recall.  He could not recall the dosages for any of his medications.

On sensory-perceptual examination numerous bilateral errors were observed in finger-tip number writing perception.  On tactile finger recognition, he was unable to correctly associate his fingers with the numbers one through five; hence although he was able to correctly perceive the tactile stimulation, he was unable to correctly identify the number for the finger that was being stimulated.

Persistent motor apraxia (a deficit in motor planning) was observed on formal testing.

He was generally well oriented to person, place, and situation, but was consistently confused with regard to time, reporting the year was 2001 both verbally during mental status examination, and hours later in written form while completing test forms.

His speech was produced at a normal rate and volume, but with occasional mumbling and poor articulation.  He did produce a normal quantity of output.  The content of his speech was remarkable for intermittent odd statements and inappropriate laughter.

Verbal perseveration was noted during the testing.  For example, during the Sensory Perceptual Examination he perseverated from a previous instruction to tell me which hand I was touching (i.e. "right" or "left") to saying "right" or "left" instead of "hand" or "face" as the task and instructions changed later.  Verbal perseverations were also noted on Tests of Verbal Fluency, Animal Naming, and the CVLT-II. Severe conceptual/problem-solving perseveration was observed on the WCST, as well as set-loss errors (perseveration of old behaviors on new task demands) on the Halstead Category Test and the SIRS.

Forensic Neuropsychological Examination                FIELDS, Jr., Edward
April 1, 2010                                                          Page 8 of 21

He also complained about a recent episode of aphasic dysgraphia.  He
reported that he was attempting to write a request to use the
telephone, but instead involuntarily wrote the words: "Cheese mix
these thru and water."  This is a rare but very important
neurobehavioral finding that has been associated in the literature with
left-hemisphere stroke.[1]

His thought content was free from fixed, false beliefs (delusions).
However, he did report ongoing psychotic symptoms, including visual
and auditory hallucinations.  Behaviorally, at several discreet moments
during the examination he was observed to "zone out" and appeared
to be responding to internal stimuli.

Emotionally, his observable affect was broad and stable, being
generally appropriate and related to his mood and the content of his
thoughts.  However, at times he exhibited inappropriate laughter, and
returned on the second day and apologized, recognizing that he had
been behaving strangely and concerned that I would be offended or
not take him seriously.  Notably, his concern about this was out of
proportion to my perceptions of his behavior.  His underlying mood
was inferred to be mildly anxious, but otherwise euthymic.

He reported that his appetite is good, but that he has been losing
weight secondary to dieting because, "I'm tired of being fat."  He
reported that his sleep is good, and his social relationships are good.
He denied anhedonia, but stated that he has been, "in a funky mood
the last couple of weeks," which he attributed to increased activity

---

[1] Selnes,  O.A., Rubens, A.B., Risse, G.L., & Levy, R.S. (1982).  Transient Aphasia
With Persistent Apraxia: Uncommon Sequela of Massive Left-Hemisphere Stroke.
*Arch Neurol.,* 39(2), 122-126.

Spragg, D.D.  (2009). Resolution of Expressive Aphasia. *Circulation*; 120:645.

Gray, J.M.  (2002). 'Expressed' dysphasia.  Grand Rounds, Specialty: Neurology,
Vol 2, 35–36.

Case 6:10-cv-00115-RAW   Document 2-10   Filed 04/06/10   Page 9 of 21
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 285

regarding his legal case. He exhibited some memory impairment for old autobiographical information, and complained about forgetfulness and loosing track of his thoughts during conversation.

## Neuropsychological Test Results

### Data Validity

Mr. Fields' has no history of malingering on neuropsychological or psychodiagnostic testing, including during the examinations performed by Drs. Grundy, Gelbort, and Price. However, his level of effort during the present neuropsychological testing was evaluated nonetheless with multiple measures (Rey's 15 Items, Test of Memory Malingering), all of which indicated that he was compliant with the testing and put forth a good effort. There was no indication of exaggeration or malingering. This was also observed behaviorally, as he put forth tremendous effort in attempting all the tasks placed before him. Hence the neuropsychological test data obtained during the present examination are believed to provide an accurate indication of his current level of neurobehavioral functioning.

### Test Findings

A table is appended at the end of this report that summarizes Mr. Fields' neuropsychological test performance over time (including data from the present examination, as well as those from Drs. Gelbort and Price).

Analysis of the test data collected by other doctors in this case proceeded in the following manner. First, I inspected each available test protocol to establish that the test had been administered in a manner consistent with standard practice. Then I double-checked the scoring of test items and the mathematical calculations required in order to arrive at raw test scores and indexes. Finally, I checked to be sure that all the raw test scores had been converted to standardized scores on the basis of proper norms.[2] In order to interpret Mr. Fields' test performances properly, all the raw test scores have been

---

[2] I did note discrepancies between the WAIS-III IQ scores reported in Dr. Gelbort's test data and report, and his actual scores. The corrected scores are reflected in the Table.

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 286

converted to standardized scores on the basis of published norms.
This means comparing Mr. Fields' test performance to that of his
peers, i.e., comparing his scores wherever possible to norms for other
persons of his age, race, sex, and education.  I was guided in this
process by the American Psychological Association's Standards for
Educational and Psychological Testing and the Specialty Guidelines for
Forensic Psychologists.

A comprehensive neuropsychological test battery was administered
during the present examination, including the Halstead-Reitan and
allied procedures as listed above. Mr. Fields' test performance overall
was in the range of moderate-to-severe brain damage, and this
represents a catastrophic decline in functioning over the five years
since he was seen by Dr. Price.

Impairment was seen in almost all areas of function, with few
exceptions.  Mr. Fields' strengths included preserved or spared abilities
in visual organization (HVOT) and pure motor speed with the non-
dominant hand.  All other neurobehavioral functions tested fell in the
range of moderate to severe impairment.

**Halstead-Reitan battery**.  Mr. Fields' performance on the Halstead
Reitan battery was substantially worse than his prior testings.  This
strongly suggests the presence of a progressive, degenerative
neuropathological process.  His subtest scores fell in the range of
moderate to severe brain impairment.  Some of his test performances
were among the worst I have seen (i.e., TPT, Trails B).

**Halstead summary measures**.  Overall summary measures of brain
damage on the Halstead-Reitan battery included an Impairment Index
of 1.0 (on a scale from 0 to 1.0) which falls in the range of severe
dysfunction.  His score on the Neuropsychological Deficit Scale, which
incorporates more test scores than the Impairment Index, was in the
range of moderately severe brain damage (NDS score = 42, cutoff for
normal = 25 or less).

**Learning disability.**  Mr. Fields' academic achievement was tested
using the WRAT-3.  His scores for Reading were at the post-high
school level, and represent an area of relative strength for him.
However, he was mildly impaired in Spelling (7th grade level) and

Forensic Neuropsychological Examination      FIELDS, Jr., Edward
April 1, 2010      Page 11 of 21

moderately impaired for Arithmetic (4th grade level). These data suggest the presence of a specific learning disability for mathematics.

**Frontal lobe/executive functioning.** Mr. Fields' executive control functioning was the most profoundly impaired area tested. His scores on diverse measures of discreet frontal lobe functions were all moderately to severely impaired, including: smell identification (UPSIT), abstract problem solving and set switching (Categories Test, Trails B, and WCST), impulse control (Stroop), verbal fluency (F-A-S, Animal Naming), and apathy, disinhibition, and executive dysfunction in real-world, natural settings (FrSBe).

**Attention, concentration, and speed of information processing.** Mr. Fields' scores on tests measuring sustained attention and concentration skills were moderately to severely impaired overall. This was seen most clearly on the d2 Test of Attention, where he scored in the severe impairment range; a level of performance generally seen among inpatient schizophrenic patients. His scores on Trials A and the Speech Perception Test were moderately impaired, and his scores on the Seashore Rhythm Test were mildly impaired. Overall at the time of the present examination his speed of information processing was significantly impaired.

**Memory and verbal learning.** Mr. Fields' scores on a test of new verbal learning (the CVLT-II) reflect mild to moderate impairment in new learning, as well as short-term and long-term verbal memory. Delayed recognition was severely impaired (i.e., his ability to correctly differentiate material he had learned previously from extraneous material after a long delay interval). Notable here was a frank deficit in his ability to engage the frontal lobes in the process of organizing and clustering similar items to enhance his overall learning and memory performance.

## Psychodiagnostic Test Results

### Symptom Validity

The PAI is an objective test of psychopathology that includes built-in scales to assess response bias and malingering. Mr. Fields' PAI profile was valid, indicating that the resulting Psychodiagnostic profiles

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                    Page 12 of 21

provide a reliable picture of Mr. Fields' current level of psychological
functioning.

In addition, the SIRS was administered to address any concerns about
symptom magnification or malingering.  Mr. Fields' SIRS profile was
valid and provided no indication of "faking bad" or symptom
exaggeration.  Notably, the profile he produced during the present
examination was substantially identical to that which he produced
during Dr. Grundy's pretrial examination in August of 2003, both of
which indicate absolutely no effort to exaggerate or malinger psychotic
symptoms that he does not actually have.

## Test Findings

Mr. Fields' PAI profile is primarily consistent with DSM-IV-TR diagnoses
of Schizoaffective Disorder and Post-Traumatic Stress Disorder.  His
test responses reflect social detachment and isolation, emotional
lability, peculiar thinking and experiences, and somatic symptoms,
together with significant cognitive and physiological symptoms of
anxiety, as well as cognitive and affective symptoms of depression.
There is also evidence of maladaptive personality features that do not
rise to the level of a diagnosable condition, but involve isolated
schizotypal, antisocial and borderline symptoms.

## Regarding the Opinions and Testimony of Dr. Price

In this section, I will review what I believe to be major weaknesses in
the opinions and testimony offered by Dr. Price.

## Minimizing Deficits and Exaggerating Strengths

First, it is my opinion to a reasonable degree of neuropsychological
certainty that any reasonable neuropsychologist looking at Dr. Price's
neuropsychological data would have identified the presence of
significant impairments Mr. Fields' brain functioning, primarily
involving frontal lobe functioning.

In his reports and during his testimony Dr. Price: (a) minimized Mr.
Fields' actual neurobehavioral impairments, and (b) over-reported his
actual level of functioning.  The jury in this case was never provided
with a countervailing opinion that there was a *pattern of impairments*

288

Forensic Neuropsychological Examination                FIELDS, Jr., Edward
April 1, 2010                                                           Page 13 of 21

in his test performances suggestive of brain damage.  The jury was never told about impairments found in Dr. Gelbort's data that got worse by the time of Dr. Price's testing (e.g., WAIS-III Arithmetic, Trails B).  This could have easily been accomplished by calling any competent neuropsychologist expert to testify in rebuttal.

Regarding the issue of Dr. Price over-estimating Mr. Fields' level of functioning, it has been my experience that competent practicing neuropsychologists as well as experienced attorneys involved in capital litigation in 2003 were generally aware of the issue of "practice effects" in neuropsychological testing, whereby individuals who are tested twice in a relatively short period of time will show artificially inflated scores the second time, due to the effects of prior experience and practice with the test stimuli.  This was the case here, as Dr. Gelbort had administered many of the same tests to Mr. Fields ten months before Dr. Price tested him.  There was an existing literature documenting such performance increases in the very tests administered to Mr. Fields that could have been used to confront Dr. Price,[3] either through cross examination or rebuttal testimony by another qualified neuropsychologist.

### Faulty Basis for Opinion About Malingered Hallucinations and Failure to Present Contradictory Evidence

Dr. Price repeatedly offered the opinion that Mr. Fields was malingering auditory hallucinations, which the objective record strongly contradicts.  His testimony could have been challenged with rebuttal using Dr. Price's own prior inconsistent statements that he found Mr. Fields to be cooperative and effortful, that his test results were valid and reliable (p. 3107) and that he impressed Dr. Price as, "trying hard" (p. 3141).

---

[3] Sureyya, S., Dikmen, SS, Heaton, R.K., Grant, I., & Temkin, N.R.  (1999).  Test-retest reliability and practice effects of Expanded Halstead–Reitan Neuropsychological Test Battery.  Journal of the International Neuropsychological Society, 5:346-356

Basso, M.R., Bornstein, R.A., & Lang, J.M.  (1999).  Practice Effects on Commonly Used Measures of Executive Function Across Twelve Months  The Clinical Neuropsychologist, 13(3), 283-292.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                  Page 14 of 21

Dr. Price offered various reasons that he felt the claim of auditory
hallucinations was not genuine (primarily involving the lack of co-
occurring delusions) that could have been easily challenged by one of
the defense experts and/or with learned treatises available at the time
that contradicted Dr. Price's assertions.[4]

Dr. Price administered several malingering test, all of which indicated
honest effort and valid results, but there was no effort to square that
fact with Dr. Price's opposing opinion that Mr. Fields was indeed
malingering.  This could easily have been addressed through effective
rebuttal testimony from a qualified neuropsychologist.

An even more compelling and egregious omission on Dr. Price's part,
however, was the fact that Dr. Grundy had administered the SIRS to
Mr. Fields prior to trial, and that the SIRS had shown that there was
absolutely no evidence that he has malingering psychiatric symptoms.
Dr. Grundy could easily have been called in rebuttal to make that
point.

Dr. Price admitted that he did not administer any psychodiagnostic
testing to Mr. Fields.  This glaring omission could have been exploited
by a rebuttal expert to make the points that: (a) all the objective
psychodiagnostic tests like the MMPI-2 and the PAI have built in "lie
detector" scales that Dr. Price could have used to prove or disprove
the hypothesis that Mr. Fields' auditory hallucinations were
manufactured, and (b) that if Dr. Price was concerned about
malingering, why did he chose not to administer a test like the SIRS
himself to prove or disprove his clinical hunch?

**Testifying Outside His Expertise**

Dr. Price is a psychologist, not a physician, yet he went beyond where
Ph.D.'s generally are qualified to go in testifying about the specific
effects and side effects of various psychotropic medications.
[Testimony transcript, p. 3129; 3160].  This testimony was in conflict
with the American Psychological Association's Ethical Principles of
Psychologists and Code of Conduct, or the Specialty Guidelines for

---

[4] Resnick, P. (1997). Malingered psychosis.  In R. Rogers (ed.), Clinical Assessment
of Malingering and Deception (2 ed.).  New York:  Guilford, p. 47-67.

DSM-IV-TR, p. 411.

Forensic Psychologists that explicitly prohibit offering opinions outside of one's area of expertise.  One or more rebuttal experts could have testified about the impropriety of Dr. Price's behavior, and/or could have impeached any actual errors in the opinions he offered.  This was not done, however.

### Neglected Opportunities to Pursue Mr. Fields' Genetic Predispositions to Brain Disease and Mental Disorder

Finally, there is significant information in Mr. Fields' family history, specifically on the maternal side, to indicate that he was born at significantly elevated genetic risk for the development of brain disease and psychiatric disorder.  None of this was broached at trial, but could have made a significant impact on the jury.  The fact that Dr. Price failed to obtain or consider this information in formulating his opinions could have been used to impeach his testimony.

There were several facts and observations that Dr. Price testified about on direct that could have been used to confront him about the real possibility that Mr. Fields was suffering from a brain disease that was affecting his behavior.  This includes evidence of a disinhibiting frontal lobe syndrome reflected in Dr. Price's observations that, for example:

- Mr. Fields did not appear concerned about facing a life in prison (insouciance, p. 3111),

- That he exhibited inappropriate laughter during a conversation with mother after crime about hearing voices (p. 3115),

- That he was described as "locked-in" during crime; with no plan (p. 3136),

- That he got, "wrapped up in the process" and "wasn't thinking about the next step" (p. 3136).

These are all behaviors that are consistent with impairments reflected in the extant neuropsychological test data at that time that could have been used to challenge Dr. Price, either during cross examination or through rebuttal testimony by the available defense experts.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                     Page 16 of 21

## **Summary and Recommendations**

It is apparent from the current testing that Mr. Fields has experienced
a catastrophic loss of brain function over the past five years.  Notably,
the pattern of impairments detected at the time of trial (as well as the
rare and pathognomonic findings indicative of brain dysfunction
obtained during the present examination) are strikingly consistent with
the pattern of brain impairments detected in Mr. Fields' mother, Mary
Margaret Fields, in September of 2001.  This would raise another "red
flag" as to the possibility of an inherited vulnerablility to brain
dysfunction and the need for a more comprehensive neurodiagnostic
workup, including MRI and neurological examination.

In light of his family history and the results of the present
examination, the most likely disease process would appear to involve
the cerebral vasculature, including the possibility of atherosclerosis
and/or ischemic brain disease (transient ischemic attacks and/or
stroke) leading to a multi-infarct dementia.  It is also possible, but less
likely, that he may have neoplastic brain disease (i.e., a brain tumor).
Either way, an MRI study of his brain is strongly indicated to aid in
proper differential neurodiagnosis and treatment.

This apparent degenerative brain disease process also raises important
questions about his behavior at the time of the instant offense, as
there is evidence in the test data from the time of trial that there was
something abnormal and deteriorating about his neurocognitve
functioning.  This is also relevant in light of research literature
demonstrating linkages between transient ischemic attacks and
strokes, and violent behavior.[5]

---

[5] Stephan A. Botez, S.A., Carrera, E., Maeder, P, & Bogousslavsky, J.  (2007).
Aggressive Behavior and Posterior Cerebral Artery Stroke.  *Arch
Neurol.* 2007;64(7):1029-1033.

Aybek, S., Carota, A., Ghika-Schmid, F., Berney, A., Melle, G.V., Guex, P. &
Bogousslavsky, J.  (2005).  Emotional Behavior in Acute Stroke: The Lausanne
Emotion in Stroke Study. Cognitive and Behavioral Neurology, 18(1), 37-44.

J. S. Kim, J.S., Choi, S., Kwon, S.U., & Seo, Y.S.  (2002).  Inability to control anger
or aggression after stroke. *Neurology*, 58, 1106-1108.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 17 of 21

Although his overall level of cognitive functioning was significantly higher at that time, there is evidence in the neuropsychological test data from Drs. Gelbort and Price that indicates that whatever the underlying disease processes is, it affected his cognition and behavior at that time.  This is reflected most notably in attention, concentration, speed of information processing, and frontal lobe/ executive functioning (including measures of impulse control, cognitive flexibility, verbal fluency, design fluency; as well as apathy, disinhibition, and executive dysfunction in natural settings outside the laboratory as measured by the FrSBe).  In addition, there were distinct "lateralizing signs" suggesting left-hemisphere brain impairment (i.e., dominant hand inferiority in fine motor and grip strength).  The overall level of impairment in these areas was mild to moderate, and in the context of capital litigation during what the National Institutes of Health declared the "Decade of the Brain," would have been more than adequate to trigger a referral for brain imaging at that time.[6]

Finally, I did not anticipate finding the extreme degree of impairment and loss of function that Mr. Fields has experienced at the time I set out to evaluate him.  I did not budget time to re-administer formal intelligence testing or comprehensive memory testing during the present examination.  However, in light of the current test results I would strongly encourage you to consider having these additional assessments  administered in order to provide as complete a picture as possible of Mr. Fields' current neurobehavioral functioning.

---

Paradiso, S., Robinson, R.G., & Arndt, S.  (1996).  Self-Reported Aggressive Behavior in Patients with Stroke.  Journal of Nervous and Mental Disease,184(12), 746-753.

[6] Compare: Seiden, J.A.  (2004). The criminal brain: Frontal lobe dysfunction evidence in capital proceedings. *Capital Defense Journal*, *16*, 395;
Silva, J.A.  (2007). The relevance of neuroscience to forensic psychiatry.  *Journal of the American Academy of Psychiatry and the Law*, *35*, 6-9;

Snead, O.C.  (2007, Feb.). Neuroimaging and the "complexity" of capital punishment.  Notre Dame Law School Legal Studies Research Paper No. 07-03. Available through the SSRN: http://ssrn.com/abstract=965837.

Case 6:10-cv-00115-RAW   Document 2-10   Filed 04/06/10   Page 18 of 21
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 294

Thank you for the opportunity to consult on this complicated and challenging case.  If you have any questions regarding my findings or opinions, I will be happy to discuss them with you, and I can be reached directly at (949) 732-2211.

Sincerely,

Daniel A. Martell, Ph.D. A.B.P.P. (Forensic)
Assistant Clinical Professor of Psychiatry and Biobehavioral Sciences
Semel Neuropsychiatric Institute
David Geffen School of Medicine at U.C.L.A.

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                   Page 19 of 21

```
                Normative Neuropsychological Profile: Edward Leon Fields, Jr.
                          1 = Dr. Gelbort, 08/11/2004
                           2 = Dr. Price, 06/13/2005
                          3 = Dr. Martell, 03/16-17/2010
           (Scores Normed for Sex=Male, Education=11, and Age=at Time of Testing)


                    1    2    3
Test                   Score   -3      -2      -1    Average    +1      +2      +3
INTELLIGENCE                    .       .       |       |       |       .       .
WAIS-III                       .       .       |       |       |       .       .
Full Scale IQ   94  109        .       .       |    1  |    2  |       .       .
 Verbal IQ      92  106        .       .       |    1  |    2  |       .       .
  Information   10   12        .       .       |       1    2  |       .       .
  Digit Span     8    9        .       .       | 1  2  |       |       .       .
  Vocabulary    10   16S       .       .       |       1       |       2       .
  Arithmetic     7    6W       .       .     2 1       |       |       .       .
  Comprehension  8   13        .       .       | 1     |     2 |       .       .
  Similarities  10   11        .       .       |     1 2       |       .       .
 Performance IQ 95  111        .       .       |    1  |    2  |       .       .
  Pict. Complet  9   14        .       .       |    1  |     | 2       .       .
  Pict. Arrange  9   15        .       .       |    1  |     | 2       .       .
  Block Design   9    9W       .       .       |    12 |       |       .       .
  Object Assemb --   --        .       .       |       |       |       .       .
  Digit Symbol   7    7W       .       .      12       |       |       .       .
  MatrixReasoning13  14        .       .       |       |    1 2        .       .
Verbal Comp.   100  116        .       .       |     1       2 |       .       .
Perceptual Org.101  114        .       .       |     1      2| |       .       .
WTAR                 37        .       .       |       |       |       .       .
 Verbal IQ          104        .       .       |       | 2     |       .       .
 Performance IQ     102        .       .       |      |2       |       .       .
 Full Scale IQ      104        .       .       |       | 2     |       .       .
                               .       .       |       |       |       .       .
ACHEIVEMENT  (WRAT3)           .       .       |       |       |       .       .
Reading      30         25 .   .       |3      |       |       .       .
Spelling     34         13 .   .     3 |       |       |       .       .
Arithmetic   18          2 .   3       |       |       |       .       .
                               .       .       |       |       |       .       .
MEMORY FUNCTIONING (WMS-3)     .       .       |       |       |       .       .
General Memory       91        .       .       | 2     |       |       .       .
 Auditory Imm.      108        .       .       |       | 2     |       .       .
 Visual Imm.         91        .       .       | 2     |       |       .       .
 Immediate Memory   100        .       .       |       2       |       .       .
 Auditory Delayed    94        .       .       |    2  |       |       .       .
 Visual Delayed      91        .       .       | 2     |       |       .       .
 Aud. Recog. Delay   95        .       .       |    2  |       |       .       .
 Working Memory      --        .       .       |       |       |       .       .
Logical Memory I  38 50        .       .       |       1    2  |       .       .
Family Pictures   29 38        .       .     1 2       |       |       .       .
                               .       .       |       |       |       .       .
```

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                   Page 20 of 21

| Test | Score (1 2 3) | -3 | -2 | -1 | Average | +1 | +2 | +3 |
|---|---|---|---|---|---|---|---|---|
| **California Verbal Learning Test-II** | | | | | | | | |
| Trial 1 | 3 | | 3 | | | | | |
| Trial 5 | 11 | | | | 3 | | | |
| Total 1-5 | 32 | | 3 | | | | | |
| Tues. List | 2 | | 3 | | | | | |
| Short Delay Free | 7 | | | 3 | | | | |
| Short Delay Cued | 7 | | 3 | | | | | |
| Long Delay Free | 7 | | 3 | | | | | |
| Long Delay Cued -- | 9 | | | 3 | | | | |
| Recognition | 11 | 3 | | | | | | |
| False Positives | 5 | | | 3 | | | | |
| **ATTENTION/CONCENTRATION/SPEED OF INFORMATION PROCESSING** | | | | | | | | |
| **Ruff 2 & 7** | | | | | | | | |
| Auto Detect Speed | 117 | | | 2 | | | | |
| Auto Detect Accuracy | 89 | | 2 | | | | | |
| Control Search Speed | 102 | | | 2 | | | | |
| Total Speed | 76 | | | 2 | | | | |
| Total Accuracy | 88 | | | | 2 | | | |
| **d2 Test of Attention** | | | | | | | | |
| Total | 132 | 3 | | | | | | |
| Total-Errors | 128 | 3 | | | | | | |
| **Trails A** | 29  29  55 | 3 | | | 12 | | | |
| **Digit Vigilance** | | | | | | | | |
| Total Time | 452 | | | 2 | | | | |
| Total Errors | 7 | | | | | 2 | | |
| **Symbol Digit** | 53 | | | | 2 | | | |
| **FRONTAL LOBE/EXECUTIVE FUNCTIONING** | | | | | | | | |
| **Wisconsin Card Sort** | | | | | | | | |
| Errors | 98 | 3- | | | | | | |
| Persev. Resp. | 72 | 3- | | | | | | |
| Persev. Errors | 59 | 3- | | | | | | |
| Non-Pers. Errs | 39 | | 3. | | | | | |
| **Categories** | 53  26  82 | | | 3 | 1 | 2 | | |
| **Stroop Test** | | | | | | | | |
| Word | 45 | 3- | | | | | | |
| Color | 51 | | 3 | | | | | |
| Color-Word | 95  27 | | .3 | 2 | | | | |
| Interference | | | | | | | | |
| **Symbol-Digit Modalities Test** | | | | | | | | |
| Written | | | | | | | | |
| Oral | | | | | | | | |
| **Trails B** | 94  130  42 | 13- | 2 | 1 | | | | |
| **Verbal Fluency** | | | | | | | | |
| F-A-S | 24  15 | | 3 | 2 | | | | |
| Animals | 10 | 3 | | | | | | |
| Sentence Repetition | 11 | | | 2 | | | | |

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                     Page 21 of 21

| Test | 1 Score | 2 | 3 | -3 | -2 | -1 | Average | +1 | +2 | +3 |
|---|---|---|---|---|---|---|---|---|---|---|
| **FRONTAL LOBE/EXECUTIVE FUNCTIONING** | | | | | | | | | | |
| **Ruff Figural Fluency** | | | | | | | | | | |
| Unique Designs | 42 | | | | 2 | | | | | |
| Error Ratio | .05 | | | | | 2 | | | | |
| **USPIT** | 17 | | | | 3 | | | | | |
| | | | | | | | | | | |
| **HALSTEAD–REITAN BATTERY** | | | | | | | | | | |
| Neuro Deficit Scale | 42 | | | | 3 | | | | | |
| Impairment Index | 1.0 | | | 3 | | | | | | |
| **Categories** | 53 | 26 | 82 | | | 3 | 1 | 2 | | |
| Finger Tapping | | | | | | | | | | |
| Dominant | 57 | 41 | | | 3 | | | 2 | | |
| Non-Dominant | 46 | 44 | | | | 3 | 2 | | | |
| Grooved Pegboard | | | | | | | | | | |
| Dominant | 73 | 102 | | | 3 | 2 | | | | |
| Non-Dominant | 72 | 106 | | | 3 | | 2 | | | |
| Strength of Grip | | | | | | | | | | |
| Dominant | 47 | | | | | 2 | | | | |
| Non-Dominant | 49 | | | | | | 2 | | | |
| **Trails A** | 29 | 29 | 55 | | 3 | | 12 | | | |
| **Trails B** | 94 | 130 | 4213– | | 2 | 1 | | | | |
| Seashore Rhythm | 22 | | | | | 3 | | | | |
| Speech Perception | 15 | | | | 3 | | | | | |
| Tactual Performance Test | | | | | | | | | | |
| Dominant Hand | 5.0 | | | 3 | | | | | | |
| Non-Dominant Hand | 3.8 | | | 3 | | | | | | |
| Both Hands | 1.7 | | | | 3 | | | | | |
| Total | 2.8 | | | | 3 | | | | | |
| Memory | 3 | | | 3 | | | | | | |
| Localization | 0 | | | | 3 | | | | | |
| Boston Naming Test | -- | | | | | | | | | |
| Hooper Visual Org. | 26 | 28 | | | | | 2 | 3 | | |

Declaration of Dr. Joyce Louise Bumgardner
Pursuant to 28 U.S.C. Section 1746

I, Joyce Louise Bumgardner, M.D. hereby verify and declare and follows:

1.    My name is Joyce Louise Bumgardner.  I am a medical doctor with a specialty in psychiatry.  I graduated from the University of Oklahoma School of Medicine in 1980.  Since that time I have focused my practice in the areas of family practice, emergency care and more recently in psychiatry.  I am currently employed at CREOKS Behavioral Health System in Okmulgee, Oklahoma.  I am a life long resident of Oklahoma and my professional practice has always been based in Oklahoma.

2.    In 2003 I was employed by Green Country Behavioral Health Services, Inc.  As part of my duties, I treated and evaluated prisoners in the custody of the Muskogee Jail.  It was in that capacity that I evaluated and treated Edward Fields following his arrest for the murder of two campers at the Winding Stair Campground.  Mr. Fields' present lawyers have asked me to review my records from his stay at the Muskogee jail, other materials related to his mental health (including his treatment records from just prior to the offense) and the reports of several experts who testified at trial.  The following facts are based upon my review of the materials provided to me by counsel and my recollection of Mr. Fields.  All opinions herein are stated to a reasonable degree of psychiatric certainty.

3.    When I first encountered Mr. Fields he had been brought in following an attempted suicide.  The records indicate that he slashed both writs and his left arm in the antecubital area (that is below the elbow).  These wounds required stitches and

Page 1 of 3

the placement of staples. The records also show that I prescribed several psychiatric medications for Mr. Fields including Effexor, Lexapro, Risperdal and Lithium. The notes also indicate that he reported to me that he was suffering from auditory hallucinations (hearing voices) and was feeling "very suicidal." He reported to me that he was depressed throughout his life.

4.      Based upon my review of my records and my recollection of this patient, I believe that his suicide attempt was a genuine effort to take his life. I also believed that he was suffering from actual psychiatric symptoms and was not malingering them. I have treated many prisoners presenting with psychiatric complaints, many of whom were malingering for secondary gain. When I believed that prisoners were malingering I would not hesitate to place that conclusion in my notes. The absence of that notation, my actual notes and my recollection of Mr. Fields, show that I believed he was genuinely mentally ill.

5.      Based on his history, the materials I have reviewed, and my own impressions at the time I treated him, I believe that Mr. Fields presented a classic case of the adverse impact that can occur when anti-depressive medications are given to a person with bi-polar disorder. Providing anti-depressive medications alone (that is, without appropriate additional medications), to a person in Mr. Fields' condition can cause an explosion of extant smoldering manic symptoms, with devastating effects. I have seen such a reaction in other patients I have treated, and I have read about this phenomena in the literature. I also believed that he was a mentally ill individual and was not malingering.

**Page 2 of 3**

6.     Until Mr. Fields' current counsel recently spoke with me about this case, I was never spoken to by either lawyers or investigators for the defense or prosecution before, during or after trial.  Had I been asked by either side I would have gladly testified at trial about the facts and opinions contained in this statement.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Joyce Louise Bumgardner, M.D.

Dated:     Tulsa, Oklahoma
           March 30 , 2010

**Page 3 of 3**

Declaration of Larry Trombka, M.D.
Pursuant to 28 U.S.C. § 1746

I, Larry Trombka, M.D., hereby verify and declare and follows:

1.    I am a psychiatrist employed by the Oklahoma Department of Corrections to provide mental health services at a number of State prisons.  In 2003 I was employed by the Tulsa County Jail (known as the David L. Moss Criminal Justice Center) to provide mental health services to prisoners in that facility.  I provided clinical treatment for Edward Fields.  Mr. Fields' lawyers have asked that I review my treatment notes and his jail-chart and provide my interpretation of them and my impressions of Mr. Fields.

2.    I first saw Mr. Fields on August 15, 2003.  He had attempted suicide about two to three weeks earlier.  I diagnosed him as suffering from schizoaffective disorder.  This illness is marked by periods of depression or mania with a concurrent period of delusions or hallucinations. The Diagnostic and Statistical Manual of Mental Disorders IV-TR cautions that this illness is difficult to distinguish from Schizophrenia or from a Mood Disorder with psychotic features (such as Depression or Bi-Polar illness).  I diagnosed schizoaffective because of Mr. Fields' complaints of auditory hallucinations which were reported concurrent with his mood symptoms. Although reasonable mental health professionals could disagree with regard to the

1

most appropriate diagnosis for Mr. Fields' (whether depression with psychotic features or bi-polar illness with psychotic feature), it was clear to me that he was ill. There was no indication in the jail records upon which to conclude that he was faking his illness, or that his complaints were not genuine. This is shown by the fact that from time to time, he reported to having responded to particular medication changes. For example, my note of October 3, 2003 indicates that he reported relief from his depressive symptoms when I changed his medication from Lexapro to Prozac. In that same visit he reported that the "voices are gone" but he also requested something for his lingering "anxiety." My notes of February 2, 2004 indicates that he told me that he was feeling better than he had in years. I also noted observations by correctional personnel, which caused me to believe that Mr. Fields was genuinely ill. On December 5, 2003 I wrote that correctional counselor Morris reported that Mr. Fields sleeps a lot and when he is awake he noticeably shakes and showed poor hygiene.

3.      Mr. Fields' illness was variable while he was in my care. By that I mean that he reported the abatement of symptoms and their return. He complained from time to time that the voices had returned; he reported that at times they were non-existent and at other times they were moderately disturbing. The same was true for his mood. At times, as noted above, he felt great. Other times he felt depressed or anxious. I adjusted his medications as his symptoms ebbed and flowed, which is the

2

way in which a person with schizoaffective disorder is normally treated. Among the psychiatric medications I ordered were Prozac, Lithium, Loxitane and Artane. This was a standard regimen for patients with schizoaffective disorder.

4.      Until being contacted recently by Mr. Fields' attorneys, I was never before contacted by either the prosecution or defense in his case. Had I been contacted at the time of his trial, I would have testified consistent with the views expressed in this statement.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.


                                                    _____
                                                    Larry Trombka, M.D.

Dated:        Taft, Oklahoma
              03/26 , 2010



                                          3

Declaration of R.L. Winters, M.D.
Pursuant to 28 U.S.C. Section 1746

I, R.L. Winters, M.D. hereby verify and declare and follows:

1.    I am R.L. Winters, M.D. I am a medical doctor and retired from practice in 2002. I have been asked by legal counsel for Edward Fields to provide my recollection of my treatment of this former patient. I have been told that Mr. Fields is on death row following his conviction for killing two people on federal lands and this statement may be used in connection with litigation related to his convictions and death sentences.

2.    In 2000 I worked with Sparks Medical Foundation and in that capacity I saw Mr. Fields on three occasions: April 11, 2000; May 25, 2000 and June 27, 2000. Counsel for Mr. Fields have shown me my progress notes from each visit and a photo of Mr. Fields. I have a vague recollection of this former patient.

3.    The records that I have reviewed show that my diagnostic impression of Mr. Fields was that he suffered from Chronic Depression, Chronic Obesity and elevated blood pressure secondary to his obesity. The records also show that when he saw me on April 11, 2000 he was on Serzone for treatment of depression. I stopped that medication and started him on Prozac to treat his depression. He saw me next on May 25, 2000 and reported that the Prozac was helping his anxiety but not

**Page 1 of 2**

the depression. I increased the dosage of Prozac, told him to see me again in four weeks and that we would then consider whether to continue with Prozac, go back to Serzone or try a different medication. He saw me for a third and final time on June 27, 2000. At that time he reported that the Prozac was helping with depression and anxiety but caused him to feel "zonked" out. I stopped the Prozac and gave him samples of Celexa for four weeks, again to treat his depression, and asked that he stop in again in a month.

4.      Based upon my recollection of Mr. Fields and my review of the above records, I can state that he presented with chronic depression which I treated in a standard manner. There is no indication in either my records or my memory that I believed Mr. Fields was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. section 1746.

R.L. Winter, M.D.

Dated:      Poteau, Oklahoma
            March 3, 2010

**Page 2 of 2**

305

Declaration of Dean Anderson
Pursuant to 28 U.S.C. § 1746

I, Dean Anderson, hereby verify and declare and follows:

1.      My name is Dean Anderson. I graduated from a masters degree program at the University of Oklahoma Health Sciences Center in December, 1998 as a Physician Assistant (PA). I assumed a position as a PA at Hillcrest Hospital's Clinic in Heavener, Oklahoma. I worked there for nine months when I obtained a position with the Rubin White Clinic in Poteau, Oklahoma. I have been employed there ever since.

2.      As part of my duties at the Heavener Clinic I treated Edward Fields in 1999. I saw him on a number of occasions. As a PA, all of my patient consultations were reviewed by a licensed medical doctor. At the time I saw Mr. Fields, my work was done in consultation with Dr. Don Schumpert.

3.      I have been asked by Mr. Fields' legal counsel to review my treatment records of Mr. Fields and to explain my impressions of him at the time of my medical encounters. The following is based upon my review of records and my independent recollection. Because I was new to this part of Oklahoma when I first met Mr. Fields, we engaged in brief social interactions over a period of one to two months. I had stopped this social interaction years before the offenses.

**Page 1 of 5**

306

4.     I first saw him on February 9, 1999 for cold symptoms. I conducted a general review of his health which lead him to relate to me that he suffered from "anxiety." His family, who attended the session with him, said that they were having trouble living with him (I recall he was married with two young children). He was also somewhat anxious because he was trying to stop smoking. Because I believed that his "anxiety" was a serious concern, and possibly evidence of a mood disorder, I provided him with 30 days of Wellbutrin (150 mg) samples and recommended that Mr. Fields return to the clinic in two weeks to monitor the impact of this medication on his mood and see if it was helpful with his smoking cessation attempt.

5.     He returned to the clinic as directed on February 26, 1999. He reported that his mood and concentration improved with the Wellbutrin, per his family. He reported increased sexual libido. However, he also told me that he was more fatigued under this medication. He told me about "periods of disorientation" and "tingling" in his hands and feet and around his lips, both of which have been experienced by his mother. He said that his mother had been told that these conditions were due to "anxiety." Based on my examination, I changed my assessment from "anxiety" to "depression/anxiety." I continued him on Wellbutrin, recommended stress management techniques and ordered lab tests.

6.     My next progress note of March 5, 1999 indicates that I reviewed his lab

**Page 2 of 5**

work.   Below the typed portion, I have a handwritten entry indicating that I discontinued Wellbrutin and started him on Paxil for his mood.  I believe that I made this change after a phone call with Mr. Fields in which he indicated that his mood was not improving while on Wellbutrin.

7.      Mr. Fields next attended the clinic on June 25, 1999 ostensibly for more cold symptoms.  He also reported a new complaint of reduced libido and requested that his testosterone level be checked.  He also reported decreased energy.  My progress notes do not indicate any change in his medication related to mood.

8.      He returned to see me four days later (June 29) because of an anaphylactic reaction to a bee sting.  I tended to the bee sting and noted in my assessment "Depression by history."

9.      I saw him medically for the last time on August 11, 1999.  I noted that he was on Paxil, 20 mg per day.  He reported that his wife was divorcing him and that he was upset at not being able to see his kids.  He reported decreased sleep, increased psychomotor activity and weight loss.  Although he told me he was "doing well" on Paxil, he also told me that he "does not want to get up and go to work."  My assessment was that he was "depressed."  I continued him on Paxil and told him to return to the clinic as needed.

10.     Although I did not see Mr. Fields again professionally, I did see him

socially. We went fishing together and hung out a few times. However, I was not comfortable with Mr. Fields. I gathered that he wanted to be friends but as I told the FBI in 2003, he was "different." The FBI report of its interview with me indicates that I told them I never noticed "anything peculiar about Mr. Fields' mood." While it is true that he never acted moody in my presence, I would not want that interview to be interpreted as suggesting that Mr. Fields did not in fact suffer from depression – a mood disorder.

11.     Based upon my review of my notes and my recollection of Mr. Fields, I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different").

12.     I was aware when Mr. Fields was charged with the killing of the two campers and I was aware when his trial was on-going. As I told the FBI, I "never believed [] he would be capable of killing anyone and was shocked when" I learned of these circumstances. Until being contacted by Mr. Fields' current lawyers, I was never contacted by anyone on behalf of Mr. Fields to provide the information contained in this declaration. Had I been approached by Mr. Fields' lawyer at the

**Page 4 of 5**

time of his arrest and trial, I would have provided the information contained in this statement and would have testified if asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Dean Anderson, PA

Dated:   Poteau, Oklahoma
March 2⁊, 2010

Case 6:10-cv-00115-RAW Document 2-15 Filed 04/06/10 Page 1 of 19
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 311

International Journal of Risk & Safety in Medicine 16 (2003/2004) 31–49
IOS Press

31

# Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs): A review and analysis *

Peter R. Breggin

*101 East State Street, No. 112, Ithaca, NY 14850, USA*

**Abstract.** Evidence from many sources confirms that selective serotonin reuptake inhibitors (SSRIs) commonly cause or exacerbate a wide range of abnormal mental and behavioral conditions. These adverse drug reactions include the following overlapping clinical phenomena: a stimulant profile that ranges from mild agitation to manic psychoses, agitated depression, obsessive preoccupations that are alien or uncharacteristic of the individual, and akathisia. Each of these reactions can worsen the individual's mental condition and can result in suicidality, violence, and other forms of extreme abnormal behavior. Evidence for these reactions is found in clinical reports, controlled clinical trials, and epidemiological studies in children and adults. Recognition of these adverse drug reactions and withdrawal from the offending drugs can prevent misdiagnosis and the worsening of potentially severe iatrogenic disorders. These findings also have forensic application in criminal, malpractice, and product liability cases.

## 1. Introduction

Soon after the introduction of the first selective serotonin reuptake inhibitor (SSRI), fluoxetine (Prozac) into the United States marketplace in January 1988, reports began to appear describing fluoxetine-induced violence against self and others. In May 1990 the U.S. Food and Drug Administration required the manufacturer of Prozac, Eli Lilly and Company, to add "suicidal ideation" and "violent behaviors" to the *Postintroduction Reports* section of its label.[1] In 2003 the British Committee on the Safety of Medicines and the U.S. Food and Drug Administration issued warnings about increased rates of self-harm and suicidal behavior in children and youth under the age of 18 exposed to paroxetine (Paxil) [78]. Most recently, on August 22, 2003, the manufacturer of venlafaxine (Effexor) issued a similar "Dear Doctor" letter warning about the increased risk of "hostility and suicide-related adverse events, such as suicidal ideation and self-harm" in children age 6 to seventeen [79].

In August 11, 1990, an editorial in *The Lancet* [53] included "the promotion of suicidal thoughts and behaviour" (p. 346) among the adverse effects of fluoxetine. The following year, the *British National Formulary*, a joint publication of the British Medical Association and the Royal Pharmaceutical Society (1991), listed suicidal ideation and violent behavior as fluoxetine side effects. Subsequently, many books and reports have dealt with the subject of SSRI-induced violence and suicide (e.g., [10,12,14,35,40,72]).

This report will provide an extensive review and analyze the literature concerning SSRI-induced suicide and violence, and identify several clinical syndromes that can cause the phenomena. It will examine

---

*The present paper appears simultaneously in *Ethical Human Sciences*, Journal of the International Center for the Study of Psychiatry and Psychology, and is published with permission of Springer Publishing Company, New York, NY, USA.

[1]The section that lists violence and suicide as possible adverse drug reactions begins with a caveat that the reported reactions "may have no causal relationship with the drug."

0924-6479/03/04/$8.00 © 2003/2004 – IOS Press. All rights reserved

the clinical and forensic implications of these findings, and also examine the ethical and scientific controversy surrounding the capacity of psychoactive agents to cause "bad behavior." (The subject of abnormal behavior induced by *withdrawal* from SSRIs will be considered in a later publication. Also see [15]).

## 2. The class of SSRIs

These selective serotonin reuptake inhibitors (SSRIs) include fluoxetine (Prozac), sertraline (Zoloft), paroxetine (Paxil), fluvoxamine (Luvox), citalopram (Celexa), and, most recently, escitalopram (Lexapro). These drugs block the removal of the neurotransmitter serotonin from the synaptic cleft. A number of other antidepressants are potent non-selective serotonin reuptake inhibitors (NSRIs). These include the atypicals venlafaxine (Effexor) and nefazodone (Serzone) and the tricyclic clomipramine (Anafranil).

When observations are made in clinical practice and in the scientific literature concerning the impact of SSRIs, they are typically treated as a single category or class of pharmacological agents. It is generally recognized that an adverse mental or behavioral reaction, such as agitation or mania, that is observed in regard to one SSRI is likely to be found with all the other SSRIs.[2] While usually examined as separate classes of antidepressants, the NSRIs also share many characteristics with the SSRIs, including the capacity to induce stimulation, anxiety, agitation, and mania.

## 3. SSRI-induced mania and the continuum of stimulation

All antidepressants cause mania and mania is an acknowledged adverse effect in the FDA-approved label of all antidepressants. Preda et al. [66] carried out a retrospective study of 533 psychiatric hospital admissions over a fourteen month period and found that 43 (8.1%) could be attributed to antidepressant-induced mania and/or psychosis. The percentages for each antidepressant were as follows: the SSRIs (70%), the newer atypicals (venlafaxine, nefazodone, and buproprion) (21%), and the older tricyclic antidepressants (amitryptyline, desipramine, imipramine, nortriptyline) (21%). The total percentage exceeded 100% because of overlapping medications in five cases. Twelve of the cases represented new-onset mania or psychosis. The three illustrative cases were severe, including two with marked suicidal potential. A 52-year-old married woman with a past history of bipolar disorder developed "command auditory hallucinations with suicidal content" while taking desipramine and fluvoxamine, as well as risperidone, zolpidem, and oxazepam (p. 31). A 42-year-old woman with a one-year history of depression "began to experience derogatory and then command auditory hallucinations to kill herself" while on fluoxetine as well as lithium and thioridazine (p. 31). Finally, a 49-year-old woman taking venlafaxine for "low mood and anxiety" developed symptoms of paranoia, feelings of doom, and a delusion that television messages were being directed at her (p. 31). All three patients improved rapidly with treatment that included termination of the antidepressants.

Mania with psychosis is the extreme end of a stimulant continuum that often begins with lesser degrees of insomnia, nervousness, anxiety, hyperactivity and irritability and then progresses toward more severe agitation, aggression, and varying degrees of mania. At the lower end of the continuum, an ordinarily shy

---

[2]Marangell, Yudofsky and Silver [58] observed, "All SSRIs have a similar spectrum of efficacy and a similar side-effect profile" (p. 1035). In the same vein, Borg and Brodin [6] remarked, "There seems to be little difference between the SSRIs with respect to frequency and severity of adverse effects" (p. 66) and Grimsley and Jann [37] concluded, "Overall, the adverse-effect profiles of the different SSRIs are comparable" (p. 938).

*P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*      33

Table 1

Mental and behavioral Adverse Drug Reactions (ADRs) in adults caused by paroxetine from the 2001 FDA-approved label for Paxil

| Frequent[a] | Infrequent[b] |
| --- | --- |
| Mania/Hypomania 2.2% of bipolar patients | Paranoid reaction |
| Mania/Hypomania 1% of depressed patients | Psychosis |
| Insomnia 13% | Hostility |
| Nervousness 5% | Euphoria |
| Anxiety 5% | Delirium |
| Agitation 1% | Hallucinations |
| Drugged feeling 2% | Abnormal thinking |
| Confusion 1% | Depersonalization |
| Central nervous system stimulation | Neurosis |
| Emotional lability | Lack of emotion |
| Concentration impaired | Libido increased |
| Amnesia | |
| Depression | |
| Tremor 8% | |
| Sweating 11% | |
| Palpitation 3% | |

[a]Frequent means at a rate of 1% or greater.
[b]Infrequent means at a rate between 1% and 0.1%. All ADRs with percentages (%) are for depressed patients in placebo controlled clinical trials. ADRs without percentages are taken from the entire data pool of 7,678 patients administered Paxil, including 6,145 depressed patients. Table compiled from the label by Peter R. Breggin.

young woman acted silly and more outgoing on fluoxetine, and then developed suicidal feelings when she missed doses [8]. Evidence for this stimulant continuum or syndrome of SSRI-induced adverse reactions will be found in many of the following reports. Sometimes the psychoses lack manic qualities and appear more paranoid in nature.

SSRI labels tend to be organized in ways that avoid any implication that the medications can cause stimulation; but detailed analyses of the labels disclose that these drugs produce a continuum of stimulation (Breggin [13] for an analysis of the Luvox label; Breggin and Breggin [14] for an analysis of the Prozac label). Table 1 was compiled to illustrate the spectrum of SSRI-induced adverse drug reactions and illustrate the frequency of stimulant-like effects. All of the effects listed in the table can occur with stimulants such as amphetamine and cocaine, and many are typical of these stimulants, including hypomania/mania, insomnia, nervousness, anxiety, agitation, central nervous system stimulation, emotional lability, tremor, sweating, and palpitation, as well as paranoid reaction, psychosis, hostility, and euphoria.

Confirmation of the stimulant syndrome was provided in a previously undisclosed internal document from Eli Lilly and Company, the manufacturer of Prozac (fluoxetine) that was obtained during discovery in product liability suits against the company (Beasley [5]; discussed in Breggin [10, pp. 87–88]; Breggin [9], Fentress Trial Exhibit [28]). Charles Beasley of the company's Division of Clinical Neurosciences evaluated what he called "activation" in patients taking fluoxetine or placebo in the controlled clinical trials used for Food and Drug Administration (FDA) approval of Prozac for depression. Beasley defined activation as including any of the following: nervousness, anxiety, agitation, insomnia. Beasley found that 38% of fluoxetine-treated patients developed "activation," but only 19% of placebo patients. The

34        *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

proportion of patients "activated" by fluoxetine would have been higher if other expressions of stimulation had been included, such as akathisia, hyperactivity, euphoria, and mania. It would have been further increased if many of the patients had not been prescribed sedative tranquilizers to quiet their symptoms of stimulation [14].

Reports authored by Kapit [47,48], the FDA official in charge of evaluating adverse drug effects during the approval process of Prozac for depression, repeatedly warned that fluoxetine has a stimulant profile similar to amphetamines. He was concerned that stimulant effects such as insomnia, nervousness, anorexia, and weight loss would produce agitated depression and worsen the condition of some depressed patients (unpublished data discussed and quoted in Breggin [10, pp. 79–81]).[3]

Clinically, agitated depression is an unstable condition that can lead to violence against self or others more frequently than a non-agitated depression. A number of reports cited in the following sections will mention agitation in patients who behave abnormally as a result of antidepressant effects.

## 4. Case studies related to SSRI-induced suicidality, violence, and extreme abnormal behavior in adults

### 4.1. Case reports of mania, violence, and suicide

There are many case reports in the scientific literature documenting the capacity of SSRIs to cause mania in adults, often in association with irritability and aggression. Christensen [18], for example, reported on the case of 32-year-old man who developed his first manic episode while taking paroxetine. He became psychotic and "threatened his parents with physical harm" (p. 1400). Other reports cite fluvoxamine as the causative agent (e.g., [17,24,61]).

Dorevitch et al. [24] described three cases of fluvoxamine-induced mania. Each case was recognized quickly and the drug was reduced in dose or stopped so that potentially disastrous outcomes were avoided. Had the patients been more secretive or the monitoring less effective, the results could have been more drastic in outcome. In the first case, the patient developed a psychotic manic state with auditory hallucinations. In the second case, the patient became euphoric, displayed increased energy, inappropriate behavior with sexual advances toward other patients, irritability, and fears that people were out to kill him. In the third case, the patient developed multiple signs of mania from excessive sexual activities to excessive talking and argumentativeness. Manic patients who are "argumentative" can sometimes become very aggressive when thwarted.

Okada and Okajima [61] described three cases of aggressive and violent behavior induced by fluvoxamine. On 150 mg per day, a 32-year-old woman became both irritable and aggressive, and she expressed impulsive violence during arguments with her family. She improved after her fluvoxamine was reduced (but not stopped). Paroxetine with its high impact and short duration of action is more like fluvoxamine than like fluoxetine. A 29-year old woman on 150 mg of fluvoxamine daily became nervous and irritable and then impulsively violent and was admitted to a psychiatric hospital. She improved with discontinuation of the drug and further treatment with other medications. A 28-year-old woman receiving 150 mg of fluvoxamine daily exhibited signs of irritability and aggressive behavior and expressed violence

---

[3]In a discussion of similarities among SSRIs (in Leonard [55, pp. 9–10]), J. Mendlewicz points out that animal studies indicate that some SSRIs can cause "alertness, agitation or anxiety, or interfere with the quality of sleep" and he asks, "Are there differences between SSRIs in terms of these early 'activating' effects?" B.E. Leonard answers that there no known differences among the SSRIs in this regard to their capacity to induce "anxiety or agitation."

toward her mother. She improved when the fluvoxamine was stopped and other medications instituted. The authors warned about the existence of impulsive and aggressive behavior induced by fluvoxamine.

In another case report, a woman taking fluvoxamine became suicidal and had to be hospitalized [4]. In the hospital the fluvoxamine dose was increased from 50 mg per day to 150 mg per day whereupon her condition worsened and she began to experience auditory hallucinations. The fluvoxamine was discontinued and she recovered within twenty-four hours, confirming that the medication had caused the depression and psychosis.

### 4.2. Case reports of SSRI-induced akathisia and aggression

Akathisia is a painful inner agitation that typically manifests as the inability to sit still or to stop moving. The hyperactivity may manifest itself subtly as a feeling of jitteriness or grossly as frantic pacing or repeatedly sitting up and down. The inner agitation associated with akathisia can become extremely uncomfortable, causing the individual to feel tortured from within (see vivid descriptions in Van Putten [74,75] and Breggin [10], leading to extreme irritability and suicide or violence.

Although akathisia by definition usually involves a hyperactive movement component, clinical experience indicates that the same jittery, agitated subjective experience, accompanied by irritable, violence or suicidal feelings, can occur without the specific component of feeling driven to move about. Indeed, on earlier occasions, the individual may have experienced the associated compulsion toward hyperactivity. Healy [41] made similar observations. Furthermore the *Diagnostic and Statistical Manual of Mental Disorders* [3] specifically allows for an alternative diagnosis of "acute akathisia with only subjective or only objective complaints, but not both" (p. 801).

Lipinski et al. [57] reported on five cases of akathisia caused by fluoxetine. They also reviewed the literature and found rates of 9.7% to 25% for fluoxetine-induced akathisia. They concluded, "In summary, fluoxetine, and perhaps other antidepressant drugs as well, may produce the side effect of akathisia fairly frequently" (p. 342). The Public Citizen Health Research Group [67] estimated a rate of 15–25%. While studies of SSRI-induced akathisia vary greatly in the frequency with which this disorder is observed, they confirm that it is common.

Lane [54] observed, "SSRI-induced akathisia may represent a form of serotonergic overstimulation or serotonin toxicity" (p. 203). He also cited research linking the phenomenon to the impact of SSRIs on the dopaminergic system. He warned, "The emergence of symptoms of akathisia could be mistaken for a worsening of depression, especially the conversion of a non-agitated depression to an agitated form" (p. 206). This error in judgment could lead to the prescription of increased doses of the offending medication, resulting in a severely worsened condition. Lane cited studies indicating that "fluoxetine is not an appropriate choice of antidepressant for depressed patients with agitation and restlessness" (p. 206) because it can lead to increased rates of agitation, anxiety and manic reactions.

Rothschild and Locke [69] reported on three cases of fluoxetine-induced suicidality associated with akathisia. Each case of suicidality developed on fluoxetine (challenge) and then resolved when the drug was stopped (dechallenge). The suicidality then returned when the drug was started a second time (rechallenge) and stopped again when the drug was stopped (a second dechallenge). During rechallenge each of the patients developed akathisia and reported that this feeling had caused them to become suicidal each time.

Wirshing et al. [77] reported on five cases of a fluoxetine-induced syndrome consisting of akathisia and suicidality. In all five cases, the akathisia and the suicidality remitted when the drug was stopped or reduced in dosage. In one case, a rechallenge with an increased dose of fluoxetine again produced

36      *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

the syndrome. They concluded, "Our cases appear to confirm that certain subjects experience akathisia while taking fluoxetine and that this effect is dose-related in the individual patient. ... Furthermore, like the akathisia in the neuroleptic-treated schizophrenic population, 'fluoxetine akathisia' can apparently be associated with suicidal ideation, sometimes of a ruminative intensity" (p. 581).

Masand et al. [59] reported on two cases of suicidality in association with fluoxetine. One of the patients suffered from akathisia. In both cases, the suicidal feelings subsided shortly after stopping the medication. Neither patient had prior suicidal ideation. Both developed violent fantasies (hanging and jumping out a window).

Akathisia will also be found in combination with SSRI-induced mania and aggression (see below).

### 4.3. Case reports of SSRI-induced obsessive suicidality and aggression

A number of clinical reports have described a syndrome of obsessive SSRI-induced suicidality and aggression that seems particular to these drugs. The characteristics were first described in a report on fluoxetine-induced obsessive suicidality by Teicher et al. [71]. They summarized, "Six depressed patients free of recent serious suicidal ideation developed intense, violent suicidal preoccupation after 2–7 weeks of fluoxetine treatment" (p. 207). Additional cases and potential mechanisms of action were analyzed by Teicher et al. [72].

Dasgupta [21] described a similar case of "intense suicidal preoccupation" (p. 1570) after four weeks of fluoxetine treatment in a woman who had not been previously suicidal. She, too, rapidly recovered on stopping the fluoxetine. The syndrome was also described by Rothschild and Locke [69] in three patients taking fluoxetine, each of whom again reacted with suicidality when rechallenged by a second administration of fluoxetine. Hoover [43] described another similar case who developed intense, violent suicidality on the two occasions that she was exposed to fluoxetine.

Creaney et al. [20] described two patients who became suicidal on SSRIs. One patient developed dysphoria and manic symptoms on fluoxetine and then developed a similar syndrome, this time with suicidal feelings, on fluvoxamine. Another patient became intensely and violently suicidal sixteen days after starting fluoxetine.

Gualtieri [38] described the "case of a mentally handicapped gentleman whose rates of self-injurious behavior doubled on fluoxetine, and then fell to baseline after the drug was withdrawn" (p. 393). Gualtieri pointed out that fluoxetine can cause apathy and indifference in some patients and, conversely, mania in others.

Based on the literature and my clinical experience, the syndrome of SSRI-induced obsessive suicidality and violence includes many and sometimes all of the following:

1. A relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others.
2. A recent (typically within two months) initial exposure to the medication, or a recent change in the dose of the medication, or a recent addition or removal of another psychoactive substance to the regimen.
3. The presence of other adverse drug reactions, often involving akathisia or stimulation along a continuum from irritability and agitation to agitated depression and mania.
4. Resolution of the syndrome after termination of the causative medication, often with a marked overall improvement in the individual's mental status.
5. An extremely violent and/or bizarre quality to the thoughts and actions.
6. An obsessive, compelling, unrelenting quality to the thoughts and actions.

*P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*     37

7. An out-of-character quality for the individual as determined by the individual's history.
8. An alien or ego-dystonic quality as determined by the individual's subjective report.

## 5. Epidemiological studies and clinical trials related to SSRI-induced, depression, suicidality, violence, and extreme abnormal behavior in adults

*5.1. Epidemiological studies and clinical trials of SSRI-induced mania and aggression*

The following studies focus on SSRI-induced manic-like symptoms and mania. The clinical syndrome of mania is commonly associated with increased irritability, aggressiveness, physical violence, and a variety of antisocial and criminal behaviors ([3, pp. 357–362]). However, as the following review indicates, many patients will switch from mania to depression and suicidality.

As documented in the FDA-approved labels for SSRIs, clinical studies conducted for the FDA-approval process have shown increased rates of mania. For example, even in the relatively short four-to-six week trials used for the approval of Prozac for depression, slightly more than 1% of patients developed hypomania and mania (see, for example, the 1990 label for Prozac for depression). An unpublished FDA report obtained through the Freedom of Information Act indicated that fluoxetine caused mania at a three times greater rate than tricyclic antidepressants given in the same studies (Kapit [48]; reviewed in Breggin [10, p. 86]). Furthermore, in 23 of the 33 cases, fluoxetine caused mania in patients with no past history of mania. In no cases did the older antidepressants cause mania in patients with no prior history. This data contradicts the commonly held clinical notion that SSRI-induced mania is limited to patients with an underlying bipolar disorder.

Howland [44] found 11 cases of SSRI-induced mania among approximately 184 (6%) patients treated at a university clinic and hospital with a variety of SSRIs, including fluoxetine, paroxetine, and sertraline. The episodes were "generally quite severe" (p. 426). Eight of the 11 patients became psychotic and 4 were so agitated that they had to be put in seclusion, even though they were probably receiving additional medication to control their iatrogenic mania.

Ebert et al. [26] attempted to develop a rate for severe mental aberrations caused by fluvoxamine. They carried out a prospective study of 200 inpatients over a total of 8200 treatment days with the SSRI. Fourteen patients (17%) developed hypomania according to DSM-IV criteria. Three patients (1.5%) developed insomnia, agitation, confusion and incoherent thoughts. These patients became potentially violent and suicidal. One, a 35-year old man, developed agitation and restless legs that progressed to insomnia, confusion, paranoid ideas, and hallucinations. He recovered after fluvoxamine was stopped. Another patient, a 38-year old man, developed psychomotor agitation with insomnia that progressed to aggressiveness, incoherent thoughts, confusion, auditory hallucinations and paranoid ideas. He also recovered when fluvoxamine was stopped. A third patient, another 35-year-old man, developed insomnia and then became agitated with restless legs, and severely depressed with suicidal ideas. He was also incoherent, and confused with paranoid ideas. He too recovered within a few days after stopping the medication. Based on the clinical descriptions, all three patients probably suffered from akathisia.

Ebert and his colleagues [26] summarized the syndrome as consisting of insomnia, confusion, incoherent thoughts, agitation, hallucinations and paranoid ideas. They observed that it was especially frequent in combination with other drugs. They considered it rare but their data indicate that it was common.

38          *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

Adding up the 14 hypomanic patients and the 3 psychotic and aggressive patients, there were at least 17 severe central nervous system (psychological) reactions among 200 patients for a rate of 8.5%.[4]

Peyre et al. (1992) reviewed the histories of 189 patients treated with fluvoxamine and found a rate of 2.5% for manic switches, i.e., the development of mania during treatment for major depression.

Troisi et al. [73] used 20 mg per day of fluoxetine to treat nineteen retarded inpatients with epilepsy and a current or recent history of aggressive behavior. All of them were taking other medications as well. Using a standardized rating scale for assessing behavior before, during, and after treatment with fluoxetine, they found an increase in aggressive behavior in nine patients. Unexpectedly, the behavior decreased to *below* pre-treatment levels after the withdrawal of the fluoxetine. The authors conclude that fluoxetine can worsen aggression in retarded patients with impulsive aggressive behavior.

The FDA conducted an epidemiological study comparing fluoxetine to trazodone in regard to spontaneous reports concerning hostility and intentional injury (Food and Drug Administration [31]). When the FDA factored in the greater number of prescriptions for fluoxetine, fluoxetine still had a higher frequency of reports for aggressive and violent behavior. Furthermore, the reports began to accumulate before the controversy surrounding fluoxetine and violence (suppression of the data discussed in Breggin [10, pp. 88–89]).

### 5.2. Epidemiological studies and clinical trials of SSRI-induced depression and suicidality

An unpublished document obtained during discovery in product liability suits against the drug company disclosed that Eli Lilly and Co., the manufacturer of Prozac (fluoxetine), had evaluated the comparative rates of suicide attempts on fluoxetine, amitryptyline and placebo. The data was generated during controlled clinical trials conducted for the FDA-approval process for Prozac for depression. Based on the company's data for controlled clinical trials, patients taking fluoxetine were three-to-six times more likely to attempt suicide than a similar group of patients taking older antidepressants or placebos (see my testimony in Breggin [9]; reviewed in Breggin [10, pp. 89–91]). An evaluation by a consultant to the company, Avery Winokur, concluded that the increased rate might be due to fluoxetine-induced overstimulation of the depressed patients (unpublished documents reviewed in Breggin [10, pp. 89 ff]; also see Breggin [9]).

Healy [39] reviewed and reanalyzed data comparing the number of suicides and suicide attempts per patient in worldwide placebo controlled clinical trials used for the FDA antidepressant approval process (Khan et al. [49] and Khan et al. [50]). The drugs included four SSRIs (sertraline, paroxetine, citalopram, and fluoxetine). As a percentage of patient numbers, there was a statistically significant difference between combined suicides and suicide attempts among all SSRIs patients (1.55%) and among all SSRI trial placebo patients (0.48%). There were also a significantly greater number of completed suicides on SSRIs in the combined suicide and suicide attempt group, as well as in the paroxetine group individually, compared to placebo.

Donovan et al. [23] found a significantly increased rate of completed suicide among patients treated with SSRIs compared to those treated with tricyclic and other antidepressants. After correcting the data for the number of prescriptions for each drug, SSRIs were 3.5 times more likely to be associated with suicide. The study was conducted in three regions of England and Ireland, and involved 222 suicides.

Donovan et al. [22] also conducted a prospective study of 2776 consecutive cases of deliberate self-harm age seventeen and older who were seen at the accident and emergency department of Derbyshire

---

[4]According to the FDA, an adverse drug reaction rate of 1% is frequent or common.

Royal Infirmary as a consequence of any act of deliberate self-harm during a two year period (1995–1996). Of the 2776 cases, 307 had received an antidepressant 30 days or less prior to the incident of deliberate self-harm. With the rate of prescribing in Derbyshire taken into account, the relative incidence of deliberate self-harm was significantly higher ($P < 0.001$) in patients who were prescribed the SSRIs fluoxetine, paroxetine, and sertraline compared to patients who were prescribed the tricyclics amitryptyline, dothiepin and imipramine. The relative incidence of deliberate self-harm per 10,000 prescriptions was broken down in a table as follows: fluoxetine (19.8), sertraline (14.8), paroxetine (12.1), all SSRIs (16.6), imipramine (3.5), amitryptyline (3.0), and all tricyclics (5.6). Compared to amitryptyline, the relative risk for all SSRIs was many times higher: fluoxetine (6.6), sertraline (4.9), paroxetine (4.0), and all SSRIs (5.5). Of interest in regard to causation, the risk for the tricyclic clomipramine was very high as well with a relative incidence of 13.8 and a relative risk compared to amitryptyline of 4.6. Among the tricyclics, clomipramine has the strongest inhibitory effect on serotonin reuptake (see, for example, *Drug Facts and Comparisons* [25]).

Jick et al. [46] conducted an epidemiological study of reports from general practices (primary care) in the United Kingdom involving 172,598 patients who had at least one prescription for one of ten antidepressants. Rates of suicides were compared for patients on the various antidepressants. Patients taking fluoxetine were twice as likely to commit suicide compared to patients on other antidepressants. In comparison to three more sedating antidepressants – doxepin, imipramine, and amitryptyline – fluoxetine was four times more likely to be associated with suicide. Taking into account a past history of suicidal behavior and/or antidepressant treatment, fluoxetine remained twice as likely to be associated with suicide. Nonetheless, the authors attempted to explain away the dramatic differences.

Fisher et al. [29] conducted a phone survey of pharmacy patients taking various antidepressants and found a higher rate of suicidality on SSRIs. In a related study, Fisher et al. [30] compared fluoxetine with a more sedating antidepressant, trazodone. They concluded that fluoxetine caused "a higher incidence of psychologic/psychiatric adverse clinical events, including delusions and hallucinations, aggression, and suicidal ideation" (p. 235).

Muijen et al. [60] conducted a six-week double-blind study comparing fluoxetine, mianserin, and placebo with 26, 27, and 28 starters respectively, and 14, 14, and 16 finishers respectively. Two of the fluoxetine patients "took an overdose within two weeks of starting the study, and in both cases this was related to a deteriorating clinical state that necessitated hospitalization" (p. 386). None of the patients in the other drug group or the placebo group suffered from this decline and suicidality. Remarkably, the authors do not include these reactions among the adverse drug effects.

Gorman et al. [36] conducted an open trial of fluoxetine involving sixteen patients with panic disorder. They reported, "Two of the nonresponders became depressed and had suicidal ideation while taking fluoxetine. Only one of the two had a history of depression" (p. 331). The authors did not comment on this finding.

Healy [40] conducted a randomized double-blind crossover study comparing the effects of sertraline to a non-SSRI antidepressant (reboxetine) in a group of healthy volunteers. Many of the 20 individuals developed adverse mental and neurological effects while taking the sertraline and two became severely disturbed. Case A, a 30-year-old woman, became withdrawn and ruminated over impulsive, disinhibited actions. She was also tearful and did not feel like herself. In addition, her diary recorded impulsiveness, irritability, over-sensitivity, and marked suspicion. She became obsessed with killing herself and almost threw herself beneath a car or train. Case B, an otherwise peaceful 28-year old woman, experienced severe road rage and actually grabbed a teenage boy and threatened to knock him down. On the SSRI,

40        *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

she felt aggressive and fearless. While emotionally disturbed and out-of-control (disinhibited), the two individuals nonetheless felt and appeared emotionally blunted.

The mixture of apathy and disinhibited aggressiveness reported by Healy is probably a common finding in patient's who act uncharacteristically violent as a result of taking SSRIs. Hoehn-Saric et al. [42] reported on "Apathy and Indifference in Patients on Fluvoxamine and Fluoxetine." They described apathy, indifference, loss of initiative and disinhibition with and without hypomania in five patients.

Levine et al. [56] reported that 7% of 59 non-depressed obese patients became depressed following a rapid increase in fluoxetine to a dose of 80 mg per day.

### 5.3. Coroner studies

Frankenfield et al. [33] conducted a retrospective case review of all deaths in Maryland where either fluoxetine or tricyclic antidepressants was forensically detected. The study covered a three and one-half year period of time. They found a statistically significant increase in *violent* suicides in association with fluoxetine (65% versus 23%). Violence was defined to include "gunshot or shotgun wounds, suffocation, stabbing, strangulation, drowning, falls and jumping in front of a moving vehicle" (p. 109). The evaluation of the suicide attempts were blind to which medications were involved.

Bost and Kemp [7] reviewed a series of coroner's reports in Dallas, Texas, involving fifteen suicides associated with fluoxetine treatment. The study covered a nine month period. While they appreciated that their data was impressionistic, they warned that the proportion taking fluoxetine and committing suicide was high enough to be of concern to health care providers.

### 6. Studies related to SSRI-induced suicidality, violence, and extreme abnormal behavior in children

Many cases of SSRI-induced violent or suicidal behavior involve children or young adults. However, even in regard to cases involving older persons, the literature on children and youth is important. Adverse behavioral effects tend to show up more frequently and severely in children, providing a magnified view of the same or similar effects that the drugs are causing on adults.

### 6.1. Clinical case studies involving children

A single case study involving paroxetine described a sixteen-year-old who became manic with angry outbursts after three weeks on the drug [62]. In another single case study, a 17-year-old mildly retarded youngster was started on fluvoxamine 50 mg when he became depressed and anxious [70]. After a single dose, he developed increasing agitation and insomnia, followed in the next 24 hours by auditory and visual hallucinations, a fearful mood, and paranoid delusions about the devil. He required hospitalization and was treated with an antipsychotic drug. The authors believe that fluvoxamine caused the acute psychosis. As a third example of single case clinical reports, Wilkinson [76] described a character change with increased aggression in a fifteen-year-old boy taking fluoxetine. Uncharacteristically, he struck another youngster in the face. Fluoxetine was stopped and within a week he was no longer aggressive. The author identified blunting rather than akathisia as the motivational state.

Koizumi [52] described a thirteen and one-half year old boy who developed manic symptoms on 40 mg per day of fluoxetine. These side effects disappeared when the dose was lowered to 15 mg per day. However, after fifteen months of fluoxetine treatment he then developed "explosive, angry outbursts over

minor matters, which was totally unlike him" (p. 695). He then experienced a "weird" and ego-alien voice telling him to kill himself. He recovered from these symptoms within ten days of stopping fluoxetine.

## 6.2. Epidemiological studies and clinical trials involving children

Numerous epidemiological and clinical study reports confirm that SSRIs cause suicidal, violent and manic behavior in children and youth.

Three controlled clinical trials conducted for the FDA-approval of paroxetine for children under age eighteen demonstrated a three times increased rate of self-harm and suicidal behavior in paroxetine-treated children compared to placebo. Based on this data in 2003 the British Committee on Medicines prohibited the use of paroxetine in children and the U.S. Food and Drug Administration issued a warning [78].

The manufacturer of venlafaxine recently disclosed unpublished data from its controlled clinical trials for major depressive disorder [79]. Individuals below 18 years of age exposed to venlafaxine had more than twice the relative risk than those exposed to placebo in regard to the development of hostility (2% versus <1%) and suicidal ideation (2% versus 0%).

According to the FDA-approved label for fluvoxamine (Luvox in the *Physicians' Desk Reference* [64]), the SSRI causes a 4% rate of mania in children under age 18, compared to no cases of mania produced in a similar group of children on placebo. The rate was at least four times greater than in adults (see Breggin [13] for a more complete analysis of the Luvox label).

A controlled clinical trial found that fluoxetine caused a 6% rate of mania in depressed children and youngsters age 7–17 ([27, p. 1003]). The reactions were severe enough to cause the children to be dropped out of the trials. By contrast, none of the depressed youngsters on placebo developed mania.

Jain et al. [45] made a retrospective examination of the medical charts of children and young men age 8–19 who had taken fluoxetine in a university clinic setting. The researchers found that 23% of fluoxetine-treated young people developed mania or manic-like symptoms. Another 19% developed drug-induced hostility and aggression, including a grinding anger with short temper and increasing oppositionalism.

Constantino et al. [19] prospectively studied the course of aggressive behavior in nineteen SSRI-treated psychiatrically hospitalized adolescents who were not pre-selected for potential aggressiveness. They reported symptoms of aggression toward self or others in 12 of 19 patients on SSRIs. Of the 19 patients, 13 were assessed both on and off SSRIs. On the SSRIs there was increased verbal aggression ($P = 0.04$), increased physical aggression toward objects ($P = 0.05$), and increased physical aggression toward self ($P < 0.02$). No increase was observed in physical aggression toward others. The authors warned against using SSRIs to treat aggression in children.

Another study of children and youth age 8-16 in a university setting found that 50% developed two or more abnormal behavioral reactions to fluoxetine, including aggression, loss of impulse control, agitation, and manic-like symptoms [68]. The effects lasted until the fluvoxamine was stopped.

A second research study from the same university setting described a number of youngsters (6 of 42 or 14% in their cohort) who became aggressive and even violent while taking fluoxetine [51]. The researchers hypothesized that fluoxetine caused aggressive behavior by means of drug-induced activation (stimulation) or a specific serotonergic-mediated effect.

The report [51] provided a clinical window into the development of obsessive violence and a school-shooter mentality. A twelve-year-old boy on fluoxetine developed nightmares about becoming a school shooter and then began to lose track of reality concerning these events. This case occurred in a controlled-clinical trial and the investigators did not know that the child was getting fluoxetine until they broke the

42      *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

double-blind code. The child's reaction occurred long before any of the well-known school shootings had taken place. Therefore, his reaction was not inspired by the school shootings; it was not a "copycat":

> Thirty-eight days after beginning the protocol, F. experienced a violent nightmare about killing his classmates until he himself was shot. He awakened from it only with difficulty, and the dream continued to feel "very real." He reported having had several days of increasingly vivid "bad dreams" before this episode; these included images of killing himself and his parents dying. When he was seen later that day he was agitated and anxious, refused to go to school, and reported marked suicidal ideation that made him feel unsafe at home as well (p. 180).

The child was hospitalized first for three days and then for 17 days. He gradually improved. Then three weeks after his last hospitalization, his local physician – not one of the clinical investigators – put him back on fluoxetine. The child became acutely suicidal until the fluoxetine was stopped a second time.

This individual report is important for a variety of reasons:

(1)  It took place in a double-blind controlled clinical trial.
(2)  Entirely new symptoms related to violence developed on the drug (This stage is called challenge).
(3)  The symptoms terminated after stopping the drug (called dechallenge).
(4)  Some of the symptoms resumed on starting the drug again (called rechallenge).
(5)  The symptoms cleared for a second time after the drug was again stopped (demonstrating dechallenge for a second time).

## 7. Antidepressant-induced mania described in two standard sources

In a variety of forensic activities including criminal and civil cases, the courts sometimes rely on "authoritative" or "standard" texts in order to demonstrate that the opinions rendered are generally accepted by a significant portion of the medical or scientific community.

### 7.1. The Diagnostic and Statistical Manual of Mental Disorders (1994, 2000)

The American Psychiatric Association [2] *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (*DSM-IV*) and the Fourth Edition Text Revision (*DSM-IV-TR*, [3]) are written by committees made up of professionals considered expert by many of their colleagues in their respective fields. The conclusions therefore provide a professional consensus or body of conventional wisdom in psychiatry that can at times be useful in clinical practice and in forensics. Many aspects of the *DSM-IV* are controversial. However, when such an essentially conservative consensus document provides evidence for SSRI-induced adverse reactions related to mania, suicide and violence, it should alert clinicians to the existence of these clinical phenomena and can provide an avenue for communicating in the courtroom concerning these risks.

The *DSM-IV* was published in 1994, several years after the advent of SSRI antidepressants and makes clear that all antidepressants can cause mania. The first SSRI, fluoxetine, was approved by the FDA in December 1987 and was in widespread use when the following observations about antidepressants were published in the manual.

*DSM-IV* makes multiple references to the fact that antidepressants can cause mania or manic-like behavior. It states, for example, "Symptoms like those seen in a Manic Episode may be due to the direct effects of antidepressant medication . . ." [2, p. 329]. Similarly, it observes, "Symptoms like those seen in a Manic Episode may also be precipitated by antidepressant treatment such as medication . . ." [2, p. 331].

References to antidepressant-induced mania and mood disorder can also be found elsewhere in the manual as well (e.g., pp. 332 [note at bottom of table], 334, 336, 337, 351, 371 and 372). *DSM-IV-TR* (2000) emphasizes that a diagnosis of mania or bipolar disorder should not be made when the hypomania or mania first appears while the individual is taking a medication that can cause these symptoms and "usually disappear when the individual is no longer exposed to the substance." Of great clinical importance, it adds, "but resolution of symptoms can take weeks or months and may require treatment" (p. 191).

The association between mania and antisocial behavior, including violence, is underscored in the *DSM-IV*. Aggression is specifically mentioned as a feature of manic behavior. It is noted that "antisocial behaviors may accompany the Manic Episode," "Ethical concerns may be disregarded even by those who are typically very conscientious," "The person may become hostile and physically threatening to others" and "physically assaultive," and "The mood may shift rapidly to anger or depression" (p. 330). The very next page in the *DSM-IV*, repeats the reminder that "Symptoms like those seen in a Manic Episode may also be precipitated by antidepressant treatment such as medication..." (p. 331).

Mania is characterized by "increased involvement in goal-directed activities" (American Psychiatric Association [2, p. 328]). Therefore, the individual is able to plan and carry out inappropriate or destructive aggressive actions, or to attempt to cover them up once they have been enacted. Individuals undergoing mania often feel uncontrollably driven to carry out elaborate plans, however bizarre, destructive, or doomed they may be.

According to the *DSM-IV*, an "elevated, euphoric or irritable mood" is sufficient to qualify for a diagnosis of Substance-Induced Mood Disorder with *Manic Features* ([2, pp. 370 and 375]; *DSM-IV-TR*, 2000, [3, pp. 405–406]). This descriptor for manic features is sufficiently broad to encompass some or all symptoms associated with stimulation and aggression. Therefore, an SSRI-induced stimulant-like or aggressive reaction can often be diagnosed as an SSRI-Induced Mood Disorder with Manic Features. When drug-induced mood swings occur from mania to depression, sometimes accompanied by switches from violence to suicidality, the diagnosis can include both *depressive* and *manic* features.

Irritability as used in the *DSM-IV* has a more ominous meaning than irritability as it is used in ordinary language. During a discussion of depression, the *DSM-IV* refers to the symptom of "increased irritability (e.g., persistent anger, a tendency to respond to events with angry outbursts or blaming others, or an exaggerated sense of frustration over minor matters)" (p. 321). Many individuals who commit aggression while under the influence of SSRIs will qualify for a Substance-Induced Mood Disorder with Manic Features on the basis of their obvious increase in irritability while taking the drug.

The capacity for SSRIs to induce akathisia – and for akathisia to cause suicidality, aggression, and a worsening mental condition – are also recognized in the *DSM-IV* [2] and the *DSM-IV-TR* [3] in the section dealing with neuroleptic-induced akathisia. *DSM-IV-TR* observes, "Akathisia may be associated with dysphoria, irritability, aggression, or suicide attempts." It also mentions "worsening of psychotic symptoms or behavioral dyscontrol." It then states, "Serotonin-specific reuptake inhibitor antidepressant medications may produce akathisia that appears identical in phenomenology and treatment response to Neuroleptic-Induced Acute Akathisia" (p. 801).

### 7.2. *Practice guidelines for major depressive disorder in adults (1993)*

The American Psychiatric Association [1] practice guideline, like the *DSM-IV*, attempts to arrive at a consensus among experts. The emphasis, however, is on treatment rather than diagnosis. Like the *DSM-IV*, the practice guideline was published after the SSRIs were in use.

Using several citations from the literature, the practice guideline states:

44        *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

All antidepressant treatments, including ECT, may provoke manic or hypomanic episodes. Individuals with a history of mania or hypomania are at particular risk for this untoward effect, although it may occur even in patients with no such history; this complication is estimated to occur in 5–20% of depressed patients treated with antidepressants (p. 22).

Recognition of antidepressant-induced manic-like reactions and akathisia in the most commonly used manual of psychiatric diagnosis has important implications for clinical practice and forensics. Practitioners should be aware that these adverse drug reactions occur and that the patient should be diagnosed with a Substance-Induced Disorder or with akathisia rather than with a primary psychiatric disorder, such as Bipolar I Disorder or an anxiety disorder. It should alert practitioners to the need to stop antidepressants at the first sign of initial or recurring hypomanic and manic symptoms, or akathisia. In forensics, recognition of the existence of these adverse drug reactions can help to establish causality in malpractice, product liability, and criminal cases when SSRIs induce abnormal mental and behavioral reactions. The body of literature reviewed in this report and the confirmation found in the *DSM-IV* and *DSM-IV-TR* help to establish a standard requiring that physicians be aware of the potential for these drugs to cause mania and akathisia with the associated risks of suicidality, violence, and extreme or bizarre behavior.

### 8. My clinical and forensic experience with similar cases

I have been a medical expert in a number of suits in which children and adults have developed bizarre, irrational, and violent behavior while taking SSRI antidepressants. In one case in California, a man drowned himself and his two small children in a bathtub a few days after starting on paroxetine (see www.breggin.com for this and other legal cases). Also while taking paroxetine, a young adult in South Carolina committed a violent rape and a man in Pennsylvania drove his car into a policeman in order to obtain the officer's gun in order to kill himself. In a fourth case involving paroxetine, in Vermont a 17-year old boy who had missed one or two doses of paroxetine bludgeoned a close friend for no apparent reason. In Florida a teenage girl taking fluoxetine fired a pistol pointblank at another younger but the gun fortunately failed to function. None of these individuals had any history of violence prior to taking SSRIs.

When all of the SSRI antidepressants are included, I have direct clinical and forensic experience with dozens of cases of aggression in association with these drugs.

### 9. Discussion: "The Drug Made Me Do It"

There is a natural reluctance to attribute "bad behavior" or loss of ethical restraint (dyscontrol, loss of impulse control) to a psychoactive substance. Western philosophy, religion, and tradition tend to hold human beings responsible for their harmful behaviors and eschew "excusing" such behavior on the basis of "mental illness." Indeed, the concept of mental illness has been subject to challenge by this author and many others. Nonetheless, the weight of considered evidence indicates that psychoactive substances can play a role in causing suicide, violence, and other forms of disinhibited criminal conduct.

First, controlled clinical trials comparing any psychoactive drug to a placebo will typically produce evidence for a pattern of central nervous system adverse drug effects with mental symptoms that are specific for the drug and not for the placebo. For example, SSRI-antidepressants and amphetamine-like agents both tend to produce a continuum of central nervous system stimulation. This physical stimulation will be associated with mental manifestations that range from mild euphoria and irritability to depression and mania, and ultimately to increased rates of both aggression and suicidality.

Second, patterns of reports made to the FDA spontaneous reporting system also make apparent that certain drugs are associated with specific patterns of extreme mental and behavioral reactions (for additional examples and an analysis of methodology, see Breggin [10,11]). Even non-psychiatric medications have been implicated in causing depression and suicidality. Isotretinoin (Accutane), a medication used to treat severe acne, has been found to produce depression and suicidality as demonstrated in numerous clinical reports and in individual case studies. In some clinical cases, "depression subsided with discontinuation of the therapy and recurred with reinstitution of therapy" [65, p. 2872].

Third, many physical disorders also affect mental attitudes and behavior. Hyperthyroidism as well as overdoses of thyroid hormone can increase anxiety, irritability, and other emotions that the individual would not ordinarily experience and that can lead to behavioral abnormalities. There are, of course, many similar examples involving hormones such as testosterone and cortisone. More to the point, accidental brain injury to the frontal lobes and surgical lobotomy usually impair judgment, ethical restraint and self-reflection. The character of the individual is often viewed as "changed" and "worsened."

Fourth, as an expert in criminal and civil cases, I have studied the lives of many individuals who – under the influence of psychoactive drugs, such as SSRIs, NSRIs, and benzodiazepines – have committed acts of aggression that were wholly alien to their character and antithetical to their prior behavior. It is, of course, well-known that the illegal use of stimulant drugs, such as methamphetamine and cocaine, can be associated with paranoid reactions and violence. As Preda et al. [66] suggest, the SSRIs and hallucinogens such as lysergic acid diethylamide (LSD) may cause psychosis through similar effects on serotonin receptors.

The example of involuntary intoxication under the law helps elucidate the issue of responsibility while under the influence of psychoactive substances. Under the law, an individual is usually held responsible for behavior committed under the influence of alcohol or other non-prescription intoxicants because it is presumed that the individual knew that he was taking a psychoactive substance that can impair judgment and self-restraint. However, in most states an individual can claim *involuntary* intoxication as a mitigating or exonerating factor in a criminal case. For example, if the individual *unknowingly* drank alcohol from "spiked" punch, the involuntary nature of the intoxication might become a mitigating or exonerating factor under the law. Similarly, when an individual takes an antidepressant without knowing that it can cause mania, he or she may be exonerated from the consequences of manic-like behavior.

If an individual involuntarily intoxicates another person, the perpetrator may be guilty of a crime and the victim may be absolved of any contributory responsibility. For example, a man can be judged guilty of rape if he has impaired the consciousness and self-restraint of his victim by surreptitiously slipping a sedative into her water glass. The victim, even if physically conscious during the sexual act, may be exonerated of seeming acquiescence to the assault on the basis of the involuntary intoxication.

The debate over human responsibility will always remain at root ethical and philosophical, as well as a legal. However, empirical data must be taken into account. A mountain of experimental and clinical data, some of it reviewed in this report, supports the concept that psychoactive substances are frequently associated with an increased rate of disturbed mental and behavior reactions, causing some individuals to act as if they have lost their customary ethical restraint and self-control.

It may be argued that some individuals will not lose ethical restraint regardless of the nature or intensity of an involuntary intoxication. However, even if some individuals are immune to behaving badly under the influence of drugs, while others seem especially susceptible, this merely reflects human variation, a factor that complicates most research in medicine and behavioral science. The reality of human variation does not undermine the validity of the association between certain drugs and the relatively frequent production of certain kinds of dangerous mental states and behaviors.

46       *P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*

Drug-induced disturbances in mood or in behavior should be viewed as genuine neurological disorders rather than as vague "mental illnesses." The capacity of speculative "biochemical imbalances" or "genetic factors" to cause or contribute to mania or depression remains unproven. Nor do we know the specific biochemical or neurological mechanisms whereby psychoactive substances cause mental disturbances. But the capacity for psychoactive substances to disrupt brain function and hence mental function is beyond dispute. Furthermore, a great deal of empirical data confirms their capacity to cause disinhibition, mania, depression and other mental phenomena associated with violence toward oneself and others, and other destructive behaviors.

## 10. Conclusions

There are many reports and studies confirming that SSRI antidepressants can cause violence, suicide, mania and other forms of psychotic and bizarre behavior. Overall, the SSRIs produce violence, suicide and extremes of abnormal behavior by a variety of mechanisms. Teicher et al. [72] suggest nine possible mechanisms: (1) energizing the depressed and suicidal patient, (2) paradoxically worsening the individual's depression, (3) causing akathisia, (4) causing panic and anxiety, (5) causing manic or mixed manic-depressive states, (6) causing insomnia or disturbances in the sleep architecture, (7) causing obsessive suicidal preoccupations, (8) causing borderline states with hostility, and (9) causing alterations in EEG activity. Teicher et al. document each of these phenomena in their review of the literature and, as this paper indicates, the scientific evidence has grown considerably stronger in the intervening decade.

With the exception of the alteration in EEG activity, my clinical and forensic work has confirmed that each of above SSRI- and NSRI-induced phenomena can cause violent and suicidal behavior. However, my clinical and forensic experiences and reviews of the literature indicate that four syndromes encompass most of the phenomena and describe most of the individual cases:

(1) The production of a *stimulant continuum* that often begins with lesser degrees of insomnia, nervousness, anxiety, hyperactivity and irritability and then progresses toward more severe agitation, aggression, and varying degrees of mania. Mania or manic-like symptoms include disinhibition, grandiosity, sleep disturbances, and out-of-control aggressive behavior, including cycling into depression and suicidality.

(2) The production of a combined state of *stimulation and depression* – an *agitated depression* – with a high risk of suicide and violence. Often the overall depression is markedly worsened.

(3) The production of *obsessive preoccupations* with aggression against self or others, often accompanied by a worsening of any pre-existing depression.

(4) The production of *akathisia*, an inner agitation or jitteriness that is usually (but not always) accompanied by an inability to stop moving. It is sometimes described as psychomotor agitation or restless leg syndrome. The state causes heightened irritability and frustration with aggression against self or others, and often a generally worsening of the mental condition.

The above syndromes often appear in combination with each other. Often the syndromes will abate within days after stopping the SSRI but sometimes they persist, leading to hospitalization and additional treatment over subsequent weeks or months. Reported rates for these syndromes very widely but each of them appears to be relatively common. They frequently occur in individuals with no prior history of violence, suicidality, psychomotor agitation, or manic-like symptoms.

*P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*      47

# References

[1] American Psychiatric Association, *Practice Guidelines for Major Depressive Disorder in Adults*, American Psychiatric Association, Washington, DC, 1993. Also published in the *American Journal of Psychiatry* (April) (1993).

[2] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth edition (DSM-IV)*, American Psychiatric Association, Washington, DC, 1994.

[3] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth edition, Text Revision (DSM-IV-TR)*, American Psychiatric Association, Washington, DC, 2000.

[4] J. Bastani, M. Troester and A. Bastani, Serotonin syndrome and fluvoxamine: A case study, *Nebraska Medical Journal* **81** (1996), 107–109.

[5] C. Beasley, Activation and sedation in fluoxetine clinical studies. Unpublished in-house document generated by Eli Lilly and Company during the FDA-approval process of Prozac for depression and obtained during discovery for Fentress v. Shay Communications et al., Fentress Trial Exhibit 70, 1988.

[6] S. Borg and K. Brodin, Antidepressant drugs, in: *Meyler's Side Effects of Drugs, Thirteenth edition*, M.N.G. Dukes, ed., Elsevier, New York, 1996, pp. 31–80.

[7] R. Bost and P. Kemp, A possible association between fluoxetine use and suicide, *Journal of Analytic Toxicology* **16** (1992), 142–145.

[8] P. Breggin, A case of fluoxetine-induced stimulant side effects with suicidal ideation associated with a possible withdrawal reaction ("crashing"), *International Journal of Risk & Safety in Medicine* **3** (1992), 325–328.

[9] P. Breggin, Testimony in Joyce Fentress et al. vs. Shea Communications et al. [The Wesbecker Case]. Jefferson Circuit Court, Division, 1, Louisville, Kentucky, No. 90-CI-06033, Volume XVI, 1994.

[10] P. Breggin, *Brain-Disabling Treatments in Psychiatry: Drugs, Electroshock, and the Role of the FDA*, Springer, New York, 1997.

[11] P. Breggin, Analysis of adverse behavioral effects of benzodiazepines with a discussion of drawing scientific conclusions from the FDA's Spontaneous Reporting System, *Journal of Mind and Behavior* **19** (1998), 21–50.

[12] P. Breggin, *The Antidepressant Fact Book*, Perseus Books, Cambridge, MA, 2001.

[13] P. Breggin, Fluvoxamine as a cause of stimulation, mania, and aggression with a critical analysis of the FDA-approved label, *International Journal of Risk & Safety in Medicine* **14** (2002), 71–86.

[14] P. Breggin and G. Breggin, *Talking Back to Prozac: What Doctors Aren't Telling You About Today's Most Controversial Drug*, St. Martin's Press, New York, 1994.

[15] P. Breggin and D. Cohen, *Your Drug May be Your Problem: How and Why to Stop Taking Psychiatric Medications*, Perseus Books, Cambridge, MA, 1999.

[16] British Medical Association and Royal Pharmaceutical Society of Great Britain, *British National Formulary (BNF)*, the Pharmaceutical Press, London, England, 1991.

[17] C. Burrai, A. Bocchetta and M. Zompo, Mania and fluvoxamine, *American Journal of Psychiatry* **148** (1991), 1263–1264.

[18] R. Christen, Paroxetine-induced mania, *American Journal of Psychiatry* **152** (1995), 1439–1500.

[19] J. Constantino, M. Liberman and M. Kincaid, Effects of serotonin reuptake inhibitors on aggressive behavior in psychiatric hospitalized adolescents: Results of an open trial, *Journal of Child and Adolescent Psychopharmacology* **7** (1997), 31–44.

[20] W. Creaney, I. Murray and D. Healy, Antidepressant induced suicidal ideation, *Human Psychopharmacology* **6** (1991), 329–332.

[21] K. Dasgupta, Additional cases of suicidal ideation associated with fluoxetine, *American Journal of Psychiatry* **147** (1990), 1570.

[22] S. Donovan, A. Clayton, M. Beeharry S. Jones, C. Kirk, K. Waters, D. Gardner, J. Faulding and R. Madeley, Deliberate self-harm and antidepressant drugs: Investigation of a possible link, *British Journal of Psychiatry* **177** (2000), 551–556.

[23] S. Donovan, M. Kelleher, J. Lambourn and T. Foster, The occurrence of suicide following the prescription of antidepressant drugs, *Archives of Suicide Research* **5** (1999), 181–192.

[24] A. Dorevitch, Y. Frankel, A. Bar-Halperin, R. Aronzon and Zilberman, Fluvoxamine-associated manic behavior: A case series, *Annals of Pharmacotherapy* **27** (1993), 1455–1457.

[25] *Drug Facts and Comparisons*, Facts and Comparisons, St. Louis, 2003.

[26] D. Ebert, R. Albert, A. May, A. Merz, H. Murata, I. Stosiek and B. Zahner, The serotonin syndrome and psychosis-like side effects of fluvoxamine in clinical use – An estimation of incidence, *European Neuro-Pharmacology* **7** (1997), 71–74.

[27] G.J. Emslie, A.J. Rush, W.A. Weinberg, R.A. Kowatch, C.W. Hughes, T. Carmody and J. Rintelmann, A double-blind, randomized, placebo-controlled trial of fluoxetine in children and adolescents with depression, *Archives of General Psychiatry* **54** (1997), 1031–1037.

[28] Fentress et al. vs. Shea Communications et al. [The Wesbecker Case]. Jefferson Circuit Court, Division, 1, Louisville, Kentucky, No. 90-CI-06033, Volume XVI, 1994.

[29] S. Fisher, T. Kent and S. Bryant, Postmarketing surveillance by patient self-monitoring: Preliminary data for sertraline versus fluoxetine, *Journal of Clinical Psychiatry* **56** (1995), 288–296.

48                P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)

[30] S. Fisher, S. Bryant and T. Kent, Postmarketing surveillance by patient self-monitoring: Trazodone versus fluoxetine, *Journal of Clinical Psychopharmacology* **13** (1993), 235–242.

[31] Food and Drug Administration (FDA), Transcript of Psychopharmacologic Drugs Advisory Committee: 34th Meeting, Department of Health and Human Services, Public Health Service, Food and Drug Administration, Rockville, MD, Obtained through Freedom of Information Act, 1991.

[32] Food and Drug Administration (FDA), Adverse Event Reporting System (AERS): Freedom of Information (FOI) Report, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD, Obtained through Freedom of Information Act, 1999.

[33] D. Frankenfield, S. Baker, W. Lange, Y. Caplan and J. Smialek, Fluoxetine and violent death in Maryland, *Forensic Science International* **64** (1994), 107–117.

[34] O. Fumihiko and K. Okajima, Violent acts associated with fluvoxamine treatment, *Journal of Psychiatry and Neuroscience* **26** (2001), 339–349.

[35] J. Glenmullen, *Prozac Backlash*, Simon & Schuster, New York, 2000.

[36] J. Gorman, M. Liebowitz, A. Fyer, D. Goetz, R. Campeas, M. Fyer, S. Davies and D. Klein, An open trial of fluoxetine in the treatment of panic disorder, *Journal of Clinical Psychopharmacology* **7** (1987), 329–332.

[37] S. Grimsley and M. Jann, Paroxetine, sertraline, and fluvoxamine: New selective serotonin reuptake inhibitors, *Clinical Pharmacy* **11** (1992), 930–957.

[38] C. Gualtieri, Paradoxical effects of fluoxetine, *Journal of Clinical Psychopharmacology* **11** (1991), 393–394.

[39] D. Healy, Lines of evidence on the risks of suicide with selective serotonin reuptake inhibitors, *Psychotherapy and Psychosomatics* **72** (2003), 71–79.

[40] D. Healy, Emergency of antidepressant induced suicidality, *Primary Care Psychiatry 2000* **6** (2000), 23–28.

[41] D. Healy, The fluoxetine and suicide controversy: A review of the evidence, *CNS Drugs* **1** (1994), 223–231.

[42] R. Hoehn-Saric, J. Lipsey and D. McLeod, Apathy and indifference in patients on fluvoxamine and fluoxetine, *Journal of Clinical Psychopharmacology* **10** (1990), 343–345.

[43] C. Hoover, Additional cases of suicidal ideation associated with fluoxetine, *American Journal of Psychiatry* **147** (1990), 1569–1570.

[44] R. Howland, Induction of mania with serotonin reuptake inhibitors, *Journal of Clinical Psychopharmacology* **16** (1996), 425–427.

[45] J. Jain, B. Birmaher, M. Garcia, M. Al-Shabbout and N. Ryan, Fluoxetine in children and adolescents with mood disorders: A chart review of efficacy and adverse reactions, *Journal of Child and Adolescent Psychopharmacology* **2** (1992), 259–265.

[46] S. Jick, A. Dean and H. Jick, Antidepressants and suicide, *British Medical Journal* **310** (1995), 215–218.

[47] R. Kapit, Safety Review of NDA 18-936 [Prozac]. Internal document of the Department of Health and Human Services, Public Health Service, Food and Drug Administration, Center for Drug Evaluation and Research. Obtained through the Freedom of Information Act, 1986.

[48] R. Kapit, Response to Dr. Laughren's Q's regarding Review of Safety Update, Memo #3." NDA 18-936. Internal document of the Department of Health and Human Services, Public Health Service, Food and Drug Administration, Center for Drug Evaluation and Research. Obtained through the Freedom of Information Act, 1986.

[49] A. Khan, S. Khan, R. Leventhal and W. Brown, Symptom reduction and suicide risk in patients treated with placebo in antidepressant clinical trials: a replication analysis of the Food and Drug Administration database, *International Journal of Neuropsychopharmacology* **4** (2001), 113–118.

[50] A. Khan, H. Warner and W. Brown, Symptom reduction and suicide risk in patients treated with placebo in antidepressant clinical trials: An analysis of the Food and Drug Administration database, *Archives of General Psychiatry* **57** (2000), 311–317.

[51] R. King, M. Riddle, P. Chappell, M. Hardin, G. Anderson, P. Lombroso and L. Scahill, Emergence of self-destructive phenomena in children and adolescents during fluoxetine treatment, *Journal of the American Academy of Child and Adolescent Psychiatry* **30** (1991), 179–186.

[52] J. Koizumi, Fluoxetine and suicidal ideation, *Journal of the American Academy of Child and Adolescent Psychiatry* **30** (1991), 695.

[53] *The Lancet*, Editorials: 5-HT blockers and all that, **336** (1990), 345–346.

[54] R. Lane, SSRI-induced extrapyramidal side-effects and akathisia: Implications for treatment, *Journal of Psychopharmacology* **12** (1998), 192–214.

[55] B. Leonard, Pharmacological differences of serotonin reuptake inhibitors and possible clinical relevance, *Drugs* **43**(Supplement 2) (1992), 3–10.

[56] L. Levine, S. Rosenblatt and J. Bosomworth, Use of a serotonin re-uptake inhibitor, fluoxetine, in the treatment of obesity, *International Journal of Obesity* **11**(supplement 3) (1987), 185–190.

[57] J. Lipinski, Jr., G. Mallaya, P. Zimmerman and H. Pope, Jr., Fluoxetine-induced akathisia: clinical and theoretical implications, *Journal of Clinical Psychiatry* **50** (1989), 339–352.

*P.R. Breggin / Suicidality, violence and mania caused by selective serotonin reuptake inhibitors (SSRIs)*      49

[58] L. Marangell, S. Yudofsky and J. Silver, Psychopharmacology and electroconvulsive therapy, in: *The American Psychiatric Press Textbook of Psychiatry*, R. Hales, S. Yudofsky and J. Talbott, eds, Chapter 27, American Psychiatric Press, Washington, DC, 1999, pp. 1025–1132.

[59] P. Masand, S. Gupta and M. Dewan, Suicidal ideation related to fluoxetine treatment, *New England Journal of Medicine* **324** (1991), 420.

[60] M. Muijen, D. Roy, T. Silverstone, A. Mehmet and M. Thristie, A comparative clinical trial of fluoxetine, mianserin and placebo in depressed outpatients, *Acta Psychiatrica Scandinavica* **78** (1988), 384–390.

[61] F. Okada and K. Okajima, Violent acts associated with fluvoxamine treatment, *Journal of Psychiatry & Neuroscience* **26** (2001), 339–340.

[62] J. Oldroyd, Paroxetine-induced mania, *Journal of the American Academy of Child and Adolescent Psychiatry* **36** (1997), 721–722.

[63] R. Peyre, H. Verdous and M. Bourgeois, Fluvoxamine: Study of treatment effect on a group of 189 hospitalized patients with depression, (French), *Encephale* **18**(1) (1992), 73–74 (in French).

[64] *Physicians' Desk Reference*, Medical Economics, Montvale, NJ, 2001.

[65] *Physicians' Desk Reference*, Medical Economics, Montvale, NJ, 2003.

[66] A. Preda, R. MacLean, C. Mazure and M. Bowers, Antidepressant-associated mania and psychosis resulting in psychiatric admission, *Journal of Clinical Psychiatry* **62** (2001), 30–33.

[67] Public Citizen Health Research Group, Re: Citizens Petition for revision of fluoxetine (Prozac) labeling. Letter to David Kessler, Commissioner of the Food and Drug Administration, Public Citizen, Washington, DC, 1991.

[68] M. Riddle, R. King, M. Hardin, L. Scahill, S. Ort, P. Chappell, A. Rasmusson and J. Leckman, Behavioral side effects of fluoxetine in children and adolescents, *Journal of Child and Adolescent Psychopharmacology* **1** (1990/1991), 193–198.

[69] A. Rothschild and C. Locke, Reexposure to fluoxetine after serious suicide attempts by three patients: The role of akathisia, *Journal of Clinical Psychiatry* **52** (1991), 491–493.

[70] F. Sim, A single dose of fluvoxamine associated with an acute psychotic reaction, *Canadian Journal of Psychiatry* **45** (2000), 762.

[71] M. Teicher, C. Glod and J. Cole, Emergence of intense suicidal preoccupations during fluoxetine treatment, *American Journal of Psychiatry* **147** (1990), 207–210.

[72] M. Teicher, C. Glod and J. Cole, Antidepressant drugs and the emergence of suicidal tendencies, *Drug Safety* **8** (1993), 182–212.

[73] A. Troisi, E. Vicario, F. Nuccetelli, N. Ciani and A. Pasini, Effects of fluoxetine on aggressive behavior in adult inpatients with mental retardation and epilepsy, *Pharmacopsychiatry* **28** (1995), 73–76.

[74] T. Van Putten, Why do schizophrenic patients refuse to take their drugs? *Archives of General Psychiatry* **31** (1974), 67–72.

[75] T. Van Putten, The many faces of akathisia, *Comprehensive Psychiatry, International Journal of Neuropsychopharmacology* **2** (1975), 165–172.

[76] D. Wilkinson, Loss of anxiety and increased aggression in a 15-year-old boy taking fluoxetine, *Journal of Psychopharmacology* **13** (1999), 420.

[77] W. Wirshing, T. Van Putten, J. Rosenberg, S. Marder, D. Ames and T. Hicks-Gray, Fluoxetine, akathisia, and suicidality: Is there a connection? *Archives of General Psychiatry* **49** (1992), 580–581.

[78] Food and Drug Administration (FDA), FDA statement regarding the anti-depressant Paxil for pediatric population (June 19, 2003). www.fda.gov/eder/drug/infopage/paxil/default.htm.

[79] Wyeth Pharmaceuticals, Dear Health Care Professional, August 22, 2003.

**U.S. Food and Drug Administration**

Department of Health and Human Services

**CENTER FOR DRUG EVALUATION AND RESEARCH**

FDA Home Page | CDER Home Page | CDER Site Info | Contact CDER | http://www.fda.gov/cder/whatsnew.htm

| CDER Home | About CDER | Drug Information | Regulatory Guidance | CDER Calendar | Specific Audiences | CDER Archives |

Search [_____] GO   powered by Google™

# FDA Public Health Advisory

**FDA Public Health Advisory**

**March 22, 2004**

**Subject: WORSENING DEPRESSION AND SUICIDALITY IN PATIENTS BEING TREATED WITH ANTIDEPRESSANT MEDICATIONS**

Today the Food and Drug Administration (FDA) asked manufacturers of the following antidepressant drugs to include in their labeling a Warning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality. The drugs that are the focus of this new Warning are: Prozac (fluoxetine); Zoloft (sertraline); Paxil (paroxetine); Luvox (fluvoxamine); Celexa (citalopram); Lexapro (escitalopram); Wellbutrin (bupropion); Effexor (venlafaxine); Serzone (nefazodone); and Remeron (mirtazapine).

**Warning Information**

- Health care providers should carefully monitor patients receiving antidepressants for possible worsening of depression or suicidality, especially at the beginning of therapy or when the dose either increases or decreases. Although FDA has not concluded that these drugs cause worsening depression or suicidality, health care providers should be aware that worsening of symptoms could be due to the underlying disease or might be a result of drug therapy.

- Heath care providers should carefully evaluate patients in whom depression persistently worsens, or emergent suicidality is severe, abrupt in onset, or was not part of the presenting symptoms, to determine what intervention, including discontinuing or modifying the current drug therapy, is indicated.

- Anxiety, agitation, panic attacks, insomnia, irritability, hostility, impulsivity,

akathisia (severe restlessness), hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as for other indications, both psychiatric and nonpsychiatric. Although FDA has not concluded that these symptoms are a precursor to either worsening of depression or the emergence of suicidal impulses, there is concern that patients who experience one or more of these symptoms may be at increased risk for worsening depression or suicidality. Therefore, therapy should be evaluated, and medications may need to be discontinued, when symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

- If a decision is made to discontinue treatment, certain of these medications should be tapered rather than stopped abruptly (see labeling for individual drug products for details).

- Because antidepressants are believed to have the potential for inducing manic episodes in patients with bipolar disorder, there is a concern about using antidepressants alone in this population. Therefore, patients should be adequately screened to determine if they are at risk for bipolar disorder before initiating antidepressant treatment so that they can be appropriately monitored during treatment. Such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression.

- Health care providers should instruct patients, their families and their caregivers to be alert for the emergence of agitation, irritability, and the other symptoms described above, as well as the emergence of suicidality and worsening depression, and to report such symptoms immediately to their health care provider.

**Background**

Among antidepressants, only Prozac (fluoxetine) is approved for the treatment of pediatric major depressive disorder. Prozac (fluoxetine), Zoloft (sertraline), and Luvox (fluvoxamine) are approved for pediatric obsessive compulsive disorder. None of these drugs is approved as monotherapy for use in treating bipolar depression, either in adults or children.

The requested labeling changes are consistent with recommendations made to the Agency at a meeting of the Psychopharmacological Drugs Advisory Committee (PDAC) and the Pediatric Subcommittee of the Anti-Infective Drugs Advisory Committee (Peds AC), held on February 2, 2004. The possibility of suicidality associated with the use of antidepressant drug products in the pediatric population was also the subject of two previous FDA communications (FDA Talk Paper on June 19, 2003, and FDA Public Health Advisory on October 27, 2003).

FDA is continuing to review available clinical trial data for pediatric patients with depression and other psychiatric disorders to try to determine whether there is evidence that some or all antidepressants increase the risk of suicidality. Later this

summer, the FDA plans to update the PDAC and Peds AC about the results of this review.

FDA plans to work closely with each of the nine manufacturers of the antidepressants that are the subject of today's request to continue investigating how to optimize the safe use of these drugs and implement the proposed labeling changes and other safety communications in a timely manner.

↑Back to Top    ↖Back to Antidepressant Info

Date created: March 22, 2004

CDER Home Page | CDER Site Info | Contact CDER | http://www.fda.gov/cder/whatsnew.htm
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research

CBS News Transcripts

March 22, 2004 Monday

**SHOW:** CBS Evening News (6:30 PM ET) - CBS

People taking antidepressants need to be monitored for turbulent emotions, including possible risk of suicide

**ANCHORS:** JOHN ROBERTS

**BYLINE:** ELIZABETH KALEDIN

**LENGTH:** 460 words

JOHN ROBERTS, anchor:

There is important medical news tonight for millions of people taking the most popular types of antidepressant drugs. Federal health officials are out with a strong warning that people who begin taking antidepressants need to be monitored for turbulent emotions, including a possible risk of suicide. Medical correspondent Elizabeth Kaledin reports what prompted the warning and what it means, on the HealthWatch.

ELIZABETH KALEDIN reporting:

The FDA's decision today comes after months of careful study of the newest, most potent antidepressants on the market. Though no direct link between the drugs and suicidal behavior has been found, there is enough concern to wave a red flag.

Dr. THOMAS LAUGHREN (Food and Drug Administration): Our interest is in having patients who are getting these drugs more closely observed.

KALEDIN: Millions of prescriptions for drugs like Paxil are written every year, often by primary care physicians with little expertise in mental health. Taking that into account, the new guidelines will call for new, boldly lettered warning labels urging careful monitoring of anyone given the drugs.

Lisa van Syckel wishes she'd had warnings when her daughter Michelle took Paxil. Michelle attempted suicide twice on the drug. She's fine now, but Lisa has become a vocal opponent of the use of antidepressants in children. Last month she testified before an FDA panel but thinks today's action doesn't go far enough and the real problem starts with prescribing.

Ms. LISA VAN SYCKEL (Child Advocate): Physicians must stop haphazardly prescribing these medications. They need to do that today.

KALEDIN: Still, child psychiatrists, like Dr. Harold Koplewicz, applaud the FDA's move. The drugs are useful tools in both adults and children, he says, but they have to be prescribed wisely. Negative

side effects tend to show up within weeks.

Dr. HAROLD KOPLEWICZ (New York University Child Study Center): If they're not getting better, then you have to really think carefully whether or not this is the right medicine and the right treatment.

KALEDIN: Proving a direct link between suicidal behavior and antidepressants is likely to be extremely difficult. Today's move by the FDA seems to suggest the drugs are here to stay, so they should be used as carefully as possible. Elizabeth Kaledin, CBS News, New York.

ROBERTS: Coming up next on tonight's CBS EVENING NEWS, President Bush is watching every political move John Kerry makes. Thirty years ago, President Nixon was watching, too. You'll hear why in Nixon's own words. And later, the high price of obesity. More Americans than ever are on disability because of their weight. And guess who's paying the bill?

(Announcements)

**PERSON:** JOHN ROBERTS (75%); RICHARD NIXON (51%); JOHN KERRY (51%);

**ORGANIZATION:** FOOD & DRUG ADMINISTRATION (84%); FOOD & DRUG ADMINISTRATION (84%);

**COUNTRY:** UNITED STATES (79%);

**COMPANY:** FOOD & DRUG ADMINISTRATION (84%); FOOD & DRUG ADMINISTRATION (84%);

**SUBJECT:** SUICIDE (92%); CENTRAL NERVOUS SYSTEM DRUGS (92%); PHYSICIANS & SURGEONS (90%); PRESCRIPTION DRUGS (78%); FDA REVIEW (76%); EPIDEMIOLOGY & PUBLIC HEALTH (73%); PRODUCT LABELING (72%);

**LOAD-DATE:** March 23, 2004

**LANGUAGE:** ENGLISH

**TYPE:** Profile

Copyright 2004 CBS Worldwide Inc.
All Rights Reserved

The New York Times

# Health

e-m

# Labels on Antidepressants Sought to Warn of Suicide Risk

**By GARDINER HARRIS**
Published: March 22, 2004

Federal regulators asked drug manufacturers today to place strong and detailed warnings on the labels of all antidepressants stating that patients taking the pills can become suicidal. But the warnings do not conclude that the drugs are to blame.

Since suicide is such a rare side effect, studies on the subject have been difficult to interpret, the regulators said. But even in the absence of clear proof, a scientific advisory panel told the Food and Drug Administration last month that the agency should issue stronger warnings about the possibility that children given the drugs could become suicidal.

Instead, the F.D.A. decided to warn physicians that all patients — adults and children alike — should be watched very closely during the first weeks of therapy for signs that their depression might be worsening.

"It warns physician that patients' depression may become worse, that they may develop suicidal thinking or behavior after the initiation of treatment," said Russell Katz, director of the neuropharmacology division of the F.D.A.



Advertisement

Travel

Click here

The warning also tells physicians to be particularly careful to evaluate whether their patients have bipolar disease, which can lead them to become manic depressive. Antidepressant therapy in those who suffer bipolar disease can cause a manic episode, the label states. Manic attacks can be "very dangerous," Dr. Katz said.

http://www.nytimes.com/2004/03/22/health/22CND-DEPR.html?hp

ARTICLE TOO

E-Mail This
Printer-Frie
Most E-Mai
Reprints & I

ARTICLE TOOLS
SPONSORED BY

READERS' OP
- Forum: Join
  Mental Health

TIMES NEWS
Topics
Food and Drug
Administration
Drugs (Pharmac

Create Your Ow
Most Popular A
CLICK HERE T

HEALTH



High
R

Research
archive of mo
documents fr

- food and dr

Several drug makers said that they were studying the request and would soon decide how to react.

Dr. Catherine Clary, a Pfizer vice president, said her company would work closely with the F.D.A. to come up with appropriate label changes for its huge-selling pill, Zoloft. "I can't tell you that we'll add this warning word for word, but we're working very closely with" the F.D.A., Dr. Clary said.

A spokeswoman for GlaxoSmithKline, the maker of Paxil, said her company was also studying the request.

Dr. Jeffrey Lieberman, a professor of psychiatry and pharmacology at the University of North Carolina, said that the warnings suggested that antidepressants had become a bit too popular and that physicians had become a bit too casual about dispensing them.

"I think the effect of these warnings will be to have physicians to become a bit more conservative in using these drugs," Dr. Lieberman said. "They'll start limiting their use of them just to patients who are clearly depressed with clinically significant symptoms, as opposed to those who have very mild symptoms."

Dr. Regina Casper, a professor of psychiatry at Stanford University, agreed. Patients who are given their first prescription for an antidepressant need to see their doctor at least once a week and perhaps more frequently in the first weeks of therapy, Dr. Casper. But family physicians rarely have the time to give that kind of attention, she said.

"I think this will have a real sobering effect among family practice doctors," Dr. Casper said.

The controversy about whether popular antidepressants actually cause some patients to become suicidal has been raging for 14 years. In 1991, a scientific advisory panel concluded that there was no evidence linking use of the drugs with an increased risk of suicide, but the controversy flared again last year, when studies showed that children and teenagers given Paxil were more likely to become suicidal than those given a placebo.

While there have been instances of suicide among people taking these drugs, what has never been determined is whether the suicides were the result of the patients' underlying depression or their use of the drugs.

**Get home delivery of The Times from $2.90/week**

NEW IN REAL



House

Petaluma, CA
• Beautiful 18-
• Olympic size
• Approximatel
• 5-bedrooms

View this and
homes in Calif
realestate.nyt

OUR ADVERTI

Free IQ Test

Cancer? Call N
Kettering now

http://www.nytimes.com/2004/03/22/health/22CND-DEPR.html?hp                3/22/2004

Home
News
Money
Sports
Life
Tech
Weather

Search

powered by Google (Go)

**Markets**
Markets home
World stocks
Commodities
Currencies
Key interest rates
**Investor Tools**
Investor home
Markets Report
Your Portfolio
Stock screener
Fund screener
Snap quote
Economic calendar
Company calendar
**Managing Money**
News/columns/tips
Calculators
CD and loan rates
**Special Sections**
Small Business
**More Money**
Money briefs
Most active stocks
Talk Today

# Money

DJIA 10,064.75 ▼ -121.85 NASDAQ 1,909.91 ▼ -30.56   4:30P ET 3/22/2004 © BigCharts.com

Get a quote:  Enter Symbol(s) o

• E-MAIL THIS  • PRINT THIS  • SAVE THIS  • MOST POPULAR  • SUBSCRIBE

Posted 3/22/2004 11:27 AM

## Antidepressants may have opposite effect, FDA warns

WASHINGTON (AP) — Patients on some popular antidepressants should be closely monitored for warning signs of suicide, the government warned Monday in asking the makers of 10 drugs to add the caution to their labels.

Although the Food and Drug Administration's investigation into the possible suicide connection initially focused on children given the drugs, its warning is aimed at both adult and pediatric use.

It isn't clear the drugs actually do lead to suicide, the FDA stressed. But until that is settled, advisers to the FDA called last month for stronger warnings to doctors and parents that the antidepressants may cause agitation, anxiety and hostility in a subset of patients who may be unusually prone to rare side effects.

On Monday, the FDA followed its advisers' recommendation and issued a public health advisory putting doctors, patients, families and other caregivers on notice to be particularly vigilant for signs of worsening depression or suicidal thoughts at the beginning of antidepressant therapy or whenever the dose is changed.

The drugs of concern are all newer-generation antidepressants: Prozac, Paxil, Zoloft, Effexor, Celexa, Remeron, Lexapro, Luvox, Serzone and Wellbutrin. Most are known to affect the brain chemical serotonin.

British health authorities sounded the alarm last year, saying long-suppressed research suggests certain antidepressants might sometimes increase the risk of suicidal behavior in children and teenagers. Because only one drug, Prozac, has been proved to alleviate pediatric depression, Britain declared others — drugs called SSRIs and their close relatives — unsuitable for depressed youth.

The FDA issued a caution on pediatric use last year, but Monday's action — especially the addition of the warning to drug labels — goes significantly further.

Today's Top Money Stori

• French women's mag g hot and bothered - 1:33 F
• EU reps back fine agair 1:26 PM
• Mortgage closing costs simplified - 12:24 PM
• Antidepressants may ha effect, FDA warns - 11:2
• Tyco jurors want to hea - 2:04 PM
Add USATODAY.com he Web site

Dozens of anguished parents pleaded with the FDA in a meeting last month to add such warnings, citing preteens and teenagers who hanged themselves or slashed their wrists shortly after starting the antidepressants. Parent after parent described children who had become extremely agitated or anxious shortly after starting the antidepressants, and seemingly sudden impulses that turned deadly.

*Copyright 2004 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*



**Open online in under 5 minutes!**

**Great Rates.
No Fees.
No Minimums.**

Annual Percentage Yield

**ING DIRECT**
Save Your Money

CLICK HERE            member FDI

**RELATED ADVERTISING LINKS**                    What's this?

**Gorillas**
World Wildlife Fund Pictures, info & more.
www.worldwildlife.org/gorillas

**Just For Dads**
You don't have to feel left out!
www.marchofdimes.com

**Save Endangered Wildlife**
We take action to protect & educate worldwide. Learn how you can help!
www.WildAid.org

**America's Second Harvest**
Create a hunger-free America. Your donation will help feed millions.
www.secondharvest.org

**NBTF - Get Important Info**
Brain tumor diagnosis, treatment, support groups, news and more.
braintumor.org

http://www.usatoday.com/money/industries/health/drugs/2004-03-22-antidepressants_x.htm   3/22/2004

USATODAY.com partners: USA Weekend □ Sports Weekly □ Education □ Space.com

Home □ News □ Money □ Sports □ Life □ Tech □ Weather □ Travel □ Job Center

Resources: Mobile News □ Site Map □ FAQ □ Feedback
Email News □ Jobs with Us □ Terms of service □ Privacy Policy □ Media Kit □ Press Room

Add USATODAY.com headlines to your Web site

© Copyright 2004 USA TODAY, a division of Gannett Co. Inc.

http://www.usatoday.com/money/industries/health/drugs/2004-03-22-antidepressants_x.htm   3/22/2004

**Effexor®**
**(venlafaxine hydrochloride)**
**Tablets**

**Rx only**

---

**Suicidality in Children and Adolescents**
**Antidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders. Anyone considering the use of Effexor or any other antidepressant in a child or adolescent must balance this risk with the clinical need. Patients who are started on therapy should be observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. Effexor is not approved for use in pediatric patients. (See WARNINGS and PRECAUTIONS, Pediatric Use.)**

**Pooled analyses of short-term (4 to 16 weeks) placebo-controlled trials of 9 antidepressant drugs (SSRIs and others) in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders (a total of 24 trials involving over 4400 patients) have revealed a greater risk of adverse events representing suicidal thinking or behavior (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. No suicides occurred in these trials.**

---

**DESCRIPTION**
Effexor (venlafaxine hydrochloride) is a structurally novel antidepressant for oral administration. It is designated (R/S)-1-[2-(dimethylamino)-1-(4-methoxyphenyl)ethyl] cyclohexanol hydrochloride or (±)-1-[α-[(dimethyl-amino)methyl]-p-methoxybenzyl] cyclohexanol hydrochloride and has the empirical formula of $C_{17}H_{27}NO_2$ HCl. Its molecular weight is 313.87. The structural formula is shown below.

venlafaxine hydrochloride

Venlafaxine hydrochloride is a white to off-white crystalline solid with a solubility of 572 mg/mL in water (adjusted to ionic strength o f 0.2 M with sodium chloride). Its octanol:water (0.2 M sodium chloride) partition coefficient is 0.43.

1

Compressed tablets contain venlafaxine hydrochloride equivalent to 25 mg, 37.5 mg, 50 mg, 75 mg, or 100 mg venlafaxine. Inactive ingredients consist of cellulose, iron oxides, lactose, magnesium stearate, and sodium starch glycolate.

## CLINICAL PHARMACOLOGY

### Pharmacodynamics

The mechanism of the antidepressant action of venlafaxine in humans is believed to be associated with its potentiation of neurotransmitter activity in the CNS. Preclinical studies have shown that venlafaxine and its active metabolite, O-desmethylvenlafaxine (ODV), are potent inhibitors of neuronal serotonin and norepinephrine reuptake and weak inhibitors of dopamine reuptake. Venlafaxine and ODV have no significant affinity for muscarinic, histaminergic, or $\alpha$-1 adrenergic receptors in vitro. Pharmacologic activity at these receptors is hypothesized to be associated with the various anticholinergic, sedative, and cardiovascular effects seen with other psychotropic drugs. Venlafaxine and ODV do not possess monoamine oxidase (MAO) inhibitory activity.

### Pharmacokinetics

Venlafaxine is well absorbed and extensively metabolized in the liver. O-desmethylvenlafaxine (ODV) is the only major active metabolite. On the basis of mass balance studies, at least 92% of a single dose of venlafaxine is absorbed. Approximately 87% of a venlafaxine dose is recovered in the urine within 48 hours as either unchanged venlafaxine (5%), unconjugated ODV (29%), conjugated ODV (26%), or other minor inactive metabolites (27%). Renal elimination of venlafaxine and its metabolites is the primary route of excretion. The relative bioavailability of venlafaxine from a tablet was 100% when compared to an oral solution. Food has no significant effect on the absorption of venlafaxine or on the formation of ODV.

The degree of binding of venlafaxine to human plasma is 27% ± 2% at concentrations ranging from 2.5 to 2215 ng/mL. The degree of ODV binding to human plasma is 30% ± 12% at concentrations ranging from 100 to 500 ng/mL. Protein-binding-induced drug interactions with venlafaxine are not expected.

Steady-state concentrations of both venlafaxine and ODV in plasma were attained within 3 days of multiple-dose therapy. Venlafaxine and ODV exhibited linear kinetics over the dose range of 75 to 450 mg total dose per day (administered on a q8h schedule). Plasma clearance, elimination half-life and steady-state volume of distribution were unaltered for both venlafaxine and ODV after multiple-dosing. Mean ± SD steady-state plasma clearance of venlafaxine and ODV is 1.3 ± 0.6 and 0.4 ± 0.2 L/h/kg, respectively; elimination half-life is 5 ± 2 and 11 ± 2 hours, respectively; and steady-state volume of distribution is 7.5 ± 3.7 L/kg and 5.7 ± 1.8 L/kg, respectively. When equal daily doses of venlafaxine were administered as either b.i.d. or t.i.d. regimens, the drug exposure (AUC) and fluctuation in plasma levels of venlafaxine and ODV were comparable following both regimens.

Age and Gender

A pharmacokinetic analysis of 404 venlafaxine-treated patients from two studies involving both b.i.d. and t.i.d. regimens showed that dose-normalized trough plasma levels of either venlafaxine or ODV were unaltered due to age or gender differences. Dosage adjustment based upon the age or gender of a patient is generally not necessary (see **DOSAGE AND ADMINISTRATION**).

Liver Disease

In 9 patients with hepatic cirrhosis, the pharmacokinetic disposition of both venlafaxine and ODV was significantly altered after oral administration of venlafaxine. Venlafaxine elimination half-life was prolonged by about 30%, and clearance decreased by about 50% in cirrhotic patients compared to normal subjects. ODV elimination half-life was prolonged by about 60% and clearance decreased by about 30% in cirrhotic patients compared to normal subjects. A large degree of intersubject variability was noted. Three patients with more severe cirrhosis had a more substantial decrease in venlafaxine clearance (about 90%) compared to normal subjects.

Dosage adjustment is necessary in these patients (see **DOSAGE AND ADMINISTRATION**).

Renal Disease

In a renal impairment study, venlafaxine elimination half-life after oral administration was prolonged by about 50% and clearance was reduced by about 24% in renally impaired patients (GFR = 10-70 mL/min), compared to normal subjects. In dialysis patients, venlafaxine elimination half-life was prolonged by about 180% and clearance was reduced by about 57% compared to normal subjects. Similarly, ODV elimination half-life was prolonged by about 40% although clearance was unchanged in patients with renal impairment (GFR = 10-70 mL/min) compared to normal subjects. In dialysis patients, ODV elimination half-life was prolonged by about 142% and clearance was reduced by about 56%, compared to normal subjects. A large degree of intersubject variability was noted.

Dosage adjustment is necessary in these patients (see **DOSAGE AND ADMINISTRATION**).

**CLINICAL TRIALS**

The efficacy of Effexor (venlafaxine hydrochloride) as a treatment for major depressive disorder was established in 5 placebo-controlled, short-term trials. Four of these were 6-week trials in adult outpatients meeting DSM-III or DSM-III-R criteria for major depression: two involving dose titration with Effexor in a range of 75 to 225 mg/day (t.i.d. schedule), the third involving fixed Effexor doses of 75, 225, and 375 mg/day (t.i.d. schedule), and the fourth involving doses of 25, 75, and 200 mg/day (b.i.d. schedule). The fifth was a 4-week study of adult inpatients meeting DSM-III-R criteria for major depression with melancholia whose Effexor doses were titrated in a range of 150 to 375 mg/day (t.i.d. schedule). In these 5 studies, Effexor was shown to be significantly superior to placebo on at least 2 of the following 3 measures: Hamilton Depression Rating Scale (total score), Hamilton depressed mood item, and Clinical Global Impression-Severity of Illness rating. Doses from 75 to 225 mg/day were superior to placebo in outpatient studies and a mean dose of about 350 mg/day was effective in inpatients. Data from the 2 fixed-dose outpatient studies were suggestive of a dose-response relationship in the range of 75 to 225 mg/day. There was no suggestion of increased response with doses greater than 225 mg/day.

While there were no efficacy studies focusing specifically on an elderly population, elderly patients were included among the patients studied. Overall, approximately 2/3 of all patients in these trials were women. Exploratory analyses for age and gender effects on outcome did not suggest any differential responsiveness on the basis of age or sex.

3

In one longer-term study, adult outpatients meeting DSM-IV criteria for major depressive disorder who had responded during an 8-week open trial on Effexor XR (75, 150, or 225 mg, qAM) were randomized to continuation of their same Effexor XR dose or to placebo, for up to 26 weeks of observation for relapse. Response during the open phase was defined as a CGI Severity of Illness item score of ≤3 and a HAM-D-21 total score of ≤10 at the day 56 evaluation. Relapse during the double-blind phase was defined as follows: (1) a reappearance of major depressive disorder as defined by DSM-IV criteria and a CGI Severity of Illness item score of ≥4 (moderately ill), (2) 2 consecutive CGI Severity of Illness item scores of ≥4, or (3) a final CGI Severity of Illness item score of ≥4 for any patient who withdrew from the study for any reason. Patients receiving continued Effexor XR treatment experienced significantly lower relapse rates over the subsequent 26 weeks compared with those receiving placebo.

In a second longer-term trial, adult outpatients meeting DSM-III-R criteria for major depression, recurrent type, who had responded (HAM-D-21 total score ≤12 at the day 56 evaluation) and continued to be improved [defined as the following criteria being met for days 56 through 180: (1) no HAM-D-21 total score ≥20; (2) no more than 2 HAM-D-21 total scores >10; and (3) no single CGI Severity of Illness item score ≥4 (moderately ill)] during an initial 26 weeks of treatment on Effexor (100 to 200 mg/day, on a b.i.d. schedule) were randomized to continuation of their same Effexor dose or to placebo. The follow-up period to observe patients for relapse, defined as a CGI Severity of Illness item score ≥4, was for up to 52 weeks. Patients receiving continued Effexor treatment experienced significantly lower relapse rates over the subsequent 52 weeks compared with those receiving placebo.

## INDICATIONS AND USAGE
Effexor (venlafaxine hydrochloride) is indicated for the treatment of major depressive disorder.

The efficacy of Effexor in the treatment of major depressive disorder was established in 6-week controlled trials of adult outpatients whose diagnoses corresponded most closely to the DSM-III or DSM-III-R category of major depression and in a 4-week controlled trial of inpatients meeting diagnostic criteria for major depression with melancholia (see **CLINICAL TRIALS**).

A major depressive episode implies a prominent and relatively persistent depressed or dysphoric mood that usually interferes with daily functioning (nearly every day for at least 2 weeks); it should include at least 4 of the following 8 symptoms: change in appetite, change in sleep, psychomotor agitation or retardation, loss of interest in usual activities or decrease in sexual drive, increased fatigue, feelings of guilt or worthlessness, slowed thinking or impaired concentration, and a suicide attempt or suicidal ideation.

The efficacy of Effexor XR in maintaining an antidepressant response for up to 26 weeks following 8 weeks of acute treatment was demonstrated in a placebo-controlled trial. The efficacy of Effexor in maintaining an antidepressant response in patients with recurrent depression who had responded and continued to be improved during an initial 26 weeks of treatment and were then followed for a period of up to 52 weeks was demonstrated in a second placebo-controlled trial (see **CLINICAL TRIALS**). Nevertheless, the physician who elects to use Effexor/Effexor XR for extended periods should periodically re-evaluate the long-term usefulness of the drug for the individual patient.

**CONTRAINDICATIONS**

Hypersensitivity to venlafaxine hydrochloride or to any excipients in the formulation.

Concomitant use in patients taking monoamine oxidase inhibitors (MAOIs) is contraindicated (see **WARNINGS**).

**WARNINGS**

**Clinical Worsening and Suicide Risk**

Patients with major depressive disorder (MDD), both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal ideation and behavior (suicidality) or unusual changes in behavior, whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. There has been a long-standing concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients. Antidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders.

Pooled analyses of short-term placebo-controlled trials of 9 antidepressant drugs (SSRIs and others) in children and adolescents with MDD, OCD, or other psychiatric disorders (a total of 24 trials involving over 4400 patients) have revealed a greater risk of adverse events representing suicidal behavior or thinking (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. There was considerable variation in risk among drugs, but a tendency toward an increase for almost all drugs studied. The risk of suicidality was most consistently observed in the MDD trials, but there were signals of risk arising from some trials in other psychiatric indications (obsessive compulsive disorder and social anxiety disorder) as well. **No suicides occurred in any of these trials.** It is unknown whether the suicidality risk in pediatric patients extends to longer-term use, i.e., beyond several months. It is also unknown whether the suicidality risk extends to adults.

**All pediatric patients being treated with antidepressants for any indication should be observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases. Such observation would generally include at least weekly face-to-face contact with patients or their family members or caregivers during the first 4 weeks of treatment, then every other week visits for the next 4 weeks, then at 12 weeks, and as clinically indicated beyond 12 weeks. Additional contact by telephone may be appropriate between face-to-face visits.**

**Adults with MDD or co-morbid depression in the setting of other psychiatric illness being treated with antidepressants should be observed similarly for clinical worsening and suicidality, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases.**

The following symptoms, anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, and mania, have been reported in adult and pediatric patients being treated with antidepressants for major

5

depressive disorder as well as for other indications, both psychiatric and nonpsychiatric. Although a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, there is concern that such symptoms may represent precursors to emerging suicidality.

Consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients whose depression is persistently worse, or who are experiencing emergent suicidality or symptoms that might be precursors to worsening depression or suicidality, especially if these symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

If the decision has been made to discontinue treatment, medication should be tapered, as rapidly as is feasible, but with recognition that abrupt discontinuation can be associated with certain symptoms (see **PRECAUTIONS** and **DOSAGE AND ADMINISTRATION, Discontinuation of Treatment with Effexor**, for a description of the risks of discontinuation of Effexor).

**Families and caregivers of pediatric patients being treated with antidepressants for major depressive disorder or other indications, both psychiatric and nonpsychiatric, should be alerted about the need to monitor patients for the emergence of agitation, irritability, unusual changes in behavior, and the other symptoms described above, as well as the emergence of suicidality, and to report such symptoms immediately to health care providers. Such monitoring should include daily observation by families and caregivers.** Prescriptions for Effexor should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose. Families and caregivers of adults being treated for depression should be similarly advised.

**Screening Patients for Bipolar Disorder**
A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an antidepressant alone may increase the likelihood of precipitation of a mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients with depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression. It should be noted that Effexor is not approved for use in treating bipolar depression.

**Potential for Interaction with Monoamine Oxidase Inhibitors**
**Adverse reactions, some of which were serious, have been reported in patients who have recently been discontinued from a monoamine oxidase inhibitor (MAOI) and started on Effexor, or who have recently had Effexor therapy discontinued prior to initiation of an MAOI. These reactions have included tremor, myoclonus, diaphoresis, nausea, vomiting, flushing, dizziness, hyperthermia with features resembling neuroleptic malignant syndrome, seizures, and death. In patients receiving antidepressants with pharmacological properties similar to venlafaxine in combination with a monoamine oxidase inhibitor, there have also been reports of serious, sometimes fatal, reactions. For a selective serotonin reuptake inhibitor, these reactions have included hyperthermia, rigidity, myoclonus,**

6

**autonomic instability with possible rapid fluctuations of vital signs, and mental status changes that include extreme agitation progressing to delirium and coma. Some cases presented with features resembling neuroleptic malignant syndrome. Severe hyperthermia and seizures, sometimes fatal, have been reported in association with the combined use of tricyclic antidepressants and MAOIs. These reactions have also been reported in patients who have recently discontinued these drugs and have been started on an MAOI. Therefore, it is recommended that Effexor not be used in combination with an MAOI, or within at least 14 days of discontinuing treatment with an MAOI. Based on the half-life of Effexor, at least 7 days should be allowed after stopping Effexor before starting an MAOI.**

**Serotonin Syndrome**
The development of a potentially life-threatening serotonin syndrome may occur with Effexor treatment, particularly with concomitant use of serotonergic drugs (including SSRIs, SNRIs and triptans) and with drugs that impair metabolism of serotonin (including MAOIs). Serotonin syndrome symptoms may include mental status changes (e.g., agitation, hallucinations, coma), autonomic instability (e.g., tachycardia, labile blood pressure, hyperthermia), neuromuscular aberrations (e.g., hyperreflexia, incoordination) and/or gastrointestinal symptoms (e.g., nausea, vomiting diarrhea) (see **PRECAUTIONS, Drug Interactions**).

The concomitant use of Effexor with MAOIs intended to treat depression is contraindicated (see **CONTRAINDICATIONS** and **WARNINGS, Potential for Interaction with Monoamine Oxidase Inhibitors**).

If concomitant treatment of Effexor with an SSRI, an SNRI or a 5-hydroxytryptamine receptor agonist (triptan) is clinically warranted, careful observation of the patient is advised, particularly during treatment initiation and dose increases (see **PRECAUTIONS, Drug Interactions**).

The concomitant use of Effexor with serotonin precursors (such as tryptophan supplements) is not recommended (see **PRECAUTIONS, Drug Interactions**).

**Sustained Hypertension**
Venlafaxine treatment is associated with sustained increases in blood pressure in some patients. (1) In a premarketing study comparing three fixed doses of venlafaxine (75, 225, and 375 mg/day) and placebo, a mean increase in supine diastolic blood pressure (SDBP) of 7.2 mm Hg was seen in the 375 mg/day group at week 6 compared to essentially no changes in the 75 and 225 mg/day groups and a mean decrease in SDBP of 2.2 mm Hg in the placebo group. (2) An analysis for patients meeting criteria for sustained hypertension (defined as treatment-emergent SDBP $\geq$ 90 mm Hg $and \geq$ 10 mm Hg above baseline for 3 consecutive visits) revealed a dose-dependent increase in the incidence of sustained hypertension for venlafaxine:

| Probability of Sustained Elevation in SDBP (Pool of Premarketing Venlafaxine Studies) | |
| --- | --- |
| Treatment Group | Incidence of Sustained Elevation in SDBP |
| Venlafaxine | |
| < 100 mg/day | 3% |
| 101-200 mg/day | 5% |
| 201-300 mg/day | 7% |
| > 300 mg/day | 13% |
| Placebo | 2% |

An analysis of the patients with sustained hypertension and the 19 venlafaxine patients who were discontinued from treatment because of hypertension (<1% of total venlafaxine-treated group) revealed that most of the blood pressure increases were in a modest range (10 to 15 mm Hg, SDBP). Nevertheless, sustained increases of this magnitude could have adverse consequences. Cases of elevated blood pressure requiring immediate treatment have been reported in post marketing experience. Pre-existing hypertension should be controlled before treatment with venlafaxine. It is recommended that patients receiving venlafaxine have regular monitoring of blood pressure. For patients who experience a sustained increase in blood pressure while receiving venlafaxine, either dose reduction or discontinuation should be considered.

**Mydriasis**
Mydriasis has been reported in association with venlafaxine; therefore patients with raised intraocular pressure or at risk of acute narrow-angle glaucoma (angle-closure glaucoma) should be monitored (see **PRECAUTIONS, Information for Patients**).

**PRECAUTIONS**
**General**
Discontinuation of Treatment with Effexor
Discontinuation symptoms have been systematically evaluated in patients taking venlafaxine, to include prospective analyses of clinical trials in Generalized Anxiety Disorder and retrospective surveys of trials in major depressive disorder. Abrupt discontinuation or dose reduction of venlafaxine at various doses has been found to be associated with the appearance of new symptoms, the frequency of which increased with increased dose level and with longer duration of treatment. Reported symptoms include agitation, anorexia, anxiety, confusion, coordination impaired, diarrhea, dizziness, dry mouth, dysphoric mood, fasciculation, fatigue, headaches, hypomania, insomnia, nausea, nervousness, nightmares, sensory disturbances (including shock-like electrical sensations), somnolence, sweating, tremor, vertigo, and vomiting.

During marketing of Effexor, other SNRIs (Serotonin and Norepinephrine Reuptake Inhibitors), and SSRIs (Selective Serotonin Reuptake Inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g. paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures. While these events are generally self-limiting, there have been reports of serious discontinuation symptoms.

Patients should be monitored for these symptoms when discontinuing treatment with Effexor. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate (see **DOSAGE AND ADMINISTRATION**).

Anxiety and Insomnia
Treatment-emergent anxiety, nervousness, and insomnia were more commonly reported for venlafaxine-treated patients compared to placebo-treated patients in a pooled analysis of short-term, double-blind, placebo-controlled depression studies:

| Symptom | Venlafaxine $n = 1033$ | Placebo $n = 609$ |
|---|---|---|
| Anxiety | 6% | 3% |
| Nervousness | 13% | 6% |
| Insomnia | 18% | 10% |

Anxiety, nervousness, and insomnia led to drug discontinuation in 2%, 2%, and 3%, respectively, of the patients treated with venlafaxine in the Phase 2 and Phase 3 depression studies.

Changes in Weight
Adult Patients: A dose-dependent weight loss was noted in patients treated with venlafaxine for several weeks. A loss of 5% or more of body weight occurred in 6% of patients treated with venlafaxine compared with 1% of patients treated with placebo and 3% of patients treated with another antidepressant. However, discontinuation for weight loss associated with venlafaxine was uncommon (0.1% of venlafaxine-treated patients in the Phase 2 and Phase 3 depression trials).

The safety and efficacy of venlafaxine therapy in combination with weight loss agents, including phentermine, have not been established. Co-administration of Effexor and weight loss agents is not recommended. Effexor is not indicated for weight loss alone or in combination with other products.

Pediatric Patients: Weight loss has been observed in pediatric patients (ages 6-17) receiving Effexor XR. In a pooled analysis of four eight-week, double-blind, placebo-controlled, flexible dose outpatient trials for major depressive disorder (MDD) and generalized anxiety disorder (GAD), Effexor XR-treated patients lost an average of 0.45 kg (n = 333), while placebo-treated patients gained an average of 0.77 kg (n = 333). More patients treated with Effexor XR than with placebo experienced a weight loss of at least 3.5% in both the MDD and the GAD studies (18% of Effexor XR-treated patients vs. 3.6% of placebo-treated patients; p<0.001). Weight loss was not limited to patients with treatment-emergent anorexia (see **PRECAUTIONS, General, Changes in Appetite**).

The risks associated with longer-term Effexor XR use were assessed in an open-label study of children and adolescents who received Effexor XR for up to six months. The children and adolescents in the study had increases in weight that were less than expected based on data from age- and sex-matched peers. The difference between observed weight gain and expected weight gain was larger for children (<12 years old) than for adolescents (>12 years old).

Changes in Height
Pediatric Patients: During the eight-week placebo-controlled GAD studies, Effexor XR-treated patients (ages 6-17) grew an average of 0.3 cm (n = 122), while placebo-treated patients grew an average of 1.0 cm (n = 132); p=0.041. This difference in height increase was most notable in patients younger than twelve. During the eight-week placebo-controlled MDD studies, Effexor XR-treated patients grew an average of 0.8 cm (n = 146), while placebo-treated patients grew an average of 0.7 cm (n = 147). In the six-month open-label study, children and adolescents had height increases that were less than expected based on data from age- and sex-matched peers. The difference between observed growth rates and expected growth rates was larger for children (<12 years old) than for adolescents (>12 years old).

Changes in Appetite
Adult Patients: Treatment-emergent anorexia was more commonly reported for venlafaxine-treated (11%) than placebo-treated patients (2%) in the pool of short-term, double-blind, placebo-controlled depression studies.

Pediatric Patients: Decreased appetite has been observed in pediatric patients receiving Effexor XR. In the placebo-controlled trials for GAD and MDD, 10% of patients aged 6-17 treated with Effexor XR for up to eight weeks and 3% of patients treated with placebo reported treatment-emergent anorexia (decreased appetite). None of the patients receiving Effexor XR discontinued for anorexia or weight loss.

Activation of Mania/Hypomania
During Phase 2 and Phase 3 trials, hypomania or mania occurred in 0.5% of patients treated with venlafaxine. Activation of mania/hypomania has also been reported in a small proportion of patients with major affective disorder who were treated with other marketed antidepressants. As with all antidepressants, Effexor (venlafaxine hydrochloride) should be used cautiously in patients with a history of mania.

Hyponatremia

Hyponatremia and/or the syndrome of inappropriate antidiuretic hormone secretion (SIADH) may occur with venlafaxine. This should be taken into consideration in patients who are, for example, volume-depleted, elderly, or taking diuretics.

Seizures

During premarketing testing, seizures were reported in 0.26% (8/3082) of venlafaxine-treated patients. Most seizures (5 of 8) occurred in patients receiving doses of 150 mg/day or less. Effexor should be used cautiously in patients with a history of seizures. It should be discontinued in any patient who develops seizures.

Abnormal Bleeding

There have been reports of abnormal bleeding (most commonly ecchymosis) associated with venlafaxine treatment. While a causal relationship to venlafaxine is unclear, impaired platelet aggregation may result from platelet serotonin depletion and contribute to such occurrences.

Serum Cholesterol Elevation

Clinically relevant increases in serum cholesterol were recorded in 5.3% of venlafaxine-treated patients and 0.0% of placebo-treated patients treated for at least 3 months in placebo-controlled trials (see **ADVERSE REACTIONS–Laboratory Changes**). Measurement of serum cholesterol levels should be considered during long-term treatment.

Interstitial Lung Disease and Eosinophilic Pneumonia

Interstitial lung disease and eosinophilic pneumonia associated with venlafaxine therapy have been rarely reported. The possibility of these adverse events should be considered in venlafaxine-treated patients who present with progressive dyspnea, cough or chest discomfort. Such patients should undergo a prompt medical evaluation and discontinuation of venlafaxine therapy should be considered.

Use in Patients with Concomitant Illness

Clinical experience with Effexor in patients with concomitant systemic illness is limited. Caution is advised in administering Effexor to patients with diseases or conditions that could affect hemodynamic responses or metabolism.

Effexor has not been evaluated or used to any appreciable extent in patients with a recent history of myocardial infarction or unstable heart disease. Patients with these diagnoses were systematically excluded from many clinical studies during the product's premarketing testing. Evaluation of the electrocardiograms for 769 patients who received Effexor in 4- to 6-week double-blind placebo-controlled trials, however, showed that the incidence of trial-emergent conduction abnormalities did not differ from that with placebo. The mean heart rate in Effexor-treated patients was increased relative to baseline by about 4 beats per minute.

The electrocardiograms for 357 patients who received Effexor XR (the extended-release form of venlafaxine) and 285 patients who received placebo in 8- to 12-week double-blind, placebo-controlled trials were analyzed. The mean change from baseline in corrected QT interval (QTc) for Effexor XR-treated patients was increased relative to that for placebo-treated patients (increase of 4.7 msec for Effexor XR and decrease of 1.9 msec for placebo). In these same trials,

11

the mean change from baseline in heart rate for Effexor XR-treated patients was significantly higher than that for placebo (a mean increase of 4 beats per minute for Effexor XR and 1 beat per minute for placebo). In a flexible-dose study, with Effexor doses in the range of 200 to 375 mg/day and mean dose greater than 300 mg/day, Effexor-treated patients had a mean increase in heart rate of 8.5 beats per minute compared with 1.7 beats per minute in the placebo group.

As increases in heart rate were observed, caution should be exercised in patients whose underlying medical conditions might be compromised by increases in heart rate (eg, patients with hyperthyroidism, heart failure, or recent myocardial infarction), particularly when using doses of Effexor above 200 mg/day.

In patients with renal impairment (GFR=10 to 70 mL/min) or cirrhosis of the liver, the clearances of venlafaxine and its active metabolite were decreased, thus prolonging the elimination half-lives of these substances. A lower dose may be necessary (see **DOSAGE AND ADMINISTRATION**). Effexor (venlafaxine hydrochloride), like all antidepressants, should be used with caution in such patients.

**Information for Patients**
Prescribers or other health professionals should inform patients, their families, and their caregivers about the benefits and risks associated with treatment with Effexor and should counsel them in its appropriate use. A patient Medication Guide About Using Antidepressants in Children and Teenagers is available for Effexor. The prescriber or health professional should instruct patients, their families, and their caregivers to read the Medication Guide and should assist them in understanding its contents. Patients should be given the opportunity to discuss the contents of the Medication Guide and to obtain answers to any questions they may have. The complete text of the Medication Guide is reprinted at the end of this document.

Patients should be advised of the following issues and asked to alert their prescriber if these occur while taking Effexor.

**Clinical Worsening and Suicide Risk:** Patients, their families, and their caregivers should be encouraged to be alert to the emergence of anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, mania, other unusual changes in behavior, worsening of depression, and suicidal ideation, especially early during antidepressant treatment and when the dose is adjusted up or down. Families and caregivers of patients should be advised to observe for the emergence of such symptoms on a day-to-day basis, since changes may be abrupt. Such symptoms should be reported to the patient's prescriber or health professional, especially if they are severe, abrupt in onset, or were not part of the patient's presenting symptoms. Symptoms such as these may be associated with an increased risk for suicidal thinking and behavior and indicate a need for very close monitoring and possibly changes in the medication.

Interference with Cognitive and Motor Performance
Clinical studies were performed to examine the effects of venlafaxine on behavioral performance of healthy individuals. The results revealed no clinically significant impairment of psychomotor, cognitive, or complex behavior performance. However, since any psychoactive drug may impair

judgment, thinking, or motor skills, patients should be cautioned about operating hazardous machinery, including automobiles, until they are reasonably certain that Effexor therapy does not adversely affect their ability to engage in such activities.

Pregnancy
Patients should be advised to notify their physician if they become pregnant or intend to become pregnant during therapy.

Nursing
Patients should be advised to notify their physician if they are breast-feeding an infant.

Mydriasis
Mydriasis (prolonged dilation of the pupils of the eye) has been reported with venlafaxine. Patients should be advised to notify their physician if they have a history of glaucoma or a history of increased intraocular pressure (see **WARNINGS**).

Concomitant Medication
Patients should be advised to inform their physicians if they are taking, or plan to take, any prescription or over-the-counter drugs, including herbal preparations and nutritional supplements, since there is a potential for interactions.

Patients should be cautioned about the risk of serotonin syndrome with the concomitant use of Effexor and triptans, tramadol, tryptophan supplements or other serotonergic agents (see **WARNINGS, Serotonin Syndrome** and **PRECAUTIONS, Drug Interactions, CNS-Active Drugs**).

Alcohol
Although Effexor has not been shown to increase the impairment of mental and motor skills caused by alcohol, patients should be advised to avoid alcohol while taking Effexor.

Allergic Reactions
Patients should be advised to notify their physician if they develop a rash, hives, or a related allergic phenomenon.

**Laboratory Tests**
There are no specific laboratory tests recommended.

**Drug Interactions**
As with all drugs, the potential for interaction by a variety of mechanisms is a possibility.

Alcohol
A single dose of ethanol (0.5 g/kg) had no effect on the pharmacokinetics of venlafaxine or ODV when venlafaxine was administered at 150 mg/day in 15 healthy male subjects. Additionally, administration of venlafaxine in a stable regimen did not exaggerate the psychomotor and psychometric effects induced by ethanol in these same subjects when they were not receiving venlafaxine.

13

Cimetidine
Concomitant administration of cimetidine and venlafaxine in a steady-state study for both drugs resulted in inhibition of first-pass metabolism of venlafaxine in 18 healthy subjects. The oral clearance of venlafaxine was reduced by about 43%, and the exposure (AUC) and maximum concentration ($C_{max}$) of the drug were increased by about 60%. However, co-administration of cimetidine had no apparent effect on the pharmacokinetics of ODV, which is present in much greater quantity in the circulation than is venlafaxine. The overall pharmacological activity of venlafaxine plus ODV is expected to increase only slightly, and no dosage adjustment should be necessary for most normal adults. However, for patients with pre-existing hypertension, and for elderly patients or patients with hepatic dysfunction, the interaction associated with the concomitant use of venlafaxine and cimetidine is not known and potentially could be more pronounced. Therefore, caution is advised with such patients.

Diazepam
Under steady-state conditions for venlafaxine administered at 150 mg/day, a single 10 mg dose of diazepam did not appear to affect the pharmacokinetics of either venlafaxine or ODV in 18 healthy male subjects. Venlafaxine also did not have any effect on the pharmacokinetics of diazepam or its active metabolite, desmethyldiazepam, or affect the psychomotor and psychometric effects induced by diazepam.

Haloperidol
Venlafaxine administered under steady-state conditions at 150 mg/day in 24 healthy subjects decreased total oral-dose clearance (Cl/F) of a single 2 mg dose of haloperidol by 42%, which resulted in a 70% increase in haloperidol AUC. In addition, the haloperidol $C_{max}$ increased 88% when coadministered with venlafaxine, but the haloperidol elimination half-life ($t_{1/2}$) was unchanged. The mechanism explaining this finding is unknown.

Lithium
The steady-state pharmacokinetics of venlafaxine administered at 150 mg/day were not affected when a single 600 mg oral dose of lithium was administered to 12 healthy male subjects. O-desmethylvenlafaxine (ODV) also was unaffected. Venlafaxine had no effect on the pharmacokinetics of lithium (see also CNS-Active Drugs, below).

Drugs Highly Bound to Plasma Protein
Venlafaxine is not highly bound to plasma proteins; therefore, administration of Effexor to a patient taking another drug that is highly protein bound should not cause increased free concentrations of the other drug.

Drugs that Inhibit Cytochrome P450 Isoenzymes
CYP2D6 Inhibitors: In vitro and in vivo studies indicate that venlafaxine is metabolized to its active metabolite, ODV, by CYP2D6, the isoenzyme that is responsible for the genetic polymorphism seen in the metabolism of many antidepressants. Therefore, the potential exists for a drug interaction between drugs that inhibit CYP2D6-mediated metabolism and venlafaxine. However, although imipramine partially inhibited the CYP2D6-mediated metabolism of venlafaxine, resulting in higher plasma concentrations of venlafaxine and lower plasma concentrations of ODV, the total concentration of active compounds (venlafaxine plus ODV) was not affected. Additionally, in a clinical study involving CYP2D6-poor and -extensive

14

metabolizers, the total concentration of active compounds (venlafaxine plus ODV), was similar in the two metabolizer groups. Therefore, no dosage adjustment is required when venlafaxine is coadministered with a CYP2D6 inhibitor.

Ketoconazole: A pharmacokinetic study with ketoconazole in extensive metabolizers (EM) and poor metabolizers (PM) of CYP2D6 resulted in higher plasma concentrations of both venlafaxine and ODV in most subjects following administration of ketoconazole. Venlafaxine $C_{max}$ increased by 26% in EM subjects and 48% in PM subjects. $C_{max}$ values for ODV increased by 14% and 29% in EM and PM subjects, respectively. Venlafaxine AUC increased by 21% in EM subjects and 70% in PM subjects. AUC values for ODV increased by 23% and 141% in EM and PM subjects, respectively.

CYP3A4 Inhibitors: In vitro studies indicate that venlafaxine is likely metabolized to a minor, less active metabolite, N-desmethylvenlafaxine, by CYP3A4. Because CYP3A4 is typically a minor pathway relative to CYP2D6 in the metabolism of venlafaxine, the potential for a clinically significant drug interaction between drugs that inhibit CYP3A4-mediated metabolism and venlafaxine is small.

The concomitant use of venlafaxine with a drug treatment(s) that potently inhibits both CYP2D6 and CYP3A4, the primary metabolizing enzymes for venlafaxine, has not been studied. Therefore, caution is advised should a patient's therapy include venlafaxine and any agent(s) that produce potent simultaneous inhibition of these two enzyme systems.

Drugs Metabolized by Cytochrome P450 Isoenzymes
CYP2D6: In vitro studies indicate that venlafaxine is a relatively weak inhibitor of CYP2D6. These findings have been confirmed in a clinical drug interaction study comparing the effect of venlafaxine to that of fluoxetine on the CYP2D6-mediated metabolism of dextromethorphan to dextrorphan.

Imipramine—Venlafaxine did not affect the pharmacokinetics of imipramine and 2-OH-imipramine. However, desipramine AUC, $C_{max}$, and $C_{min}$ increased by about 35% in the presence of venlafaxine. The 2-OH-desipramine AUCs increased by at least 2.5 fold (with venlafaxine 37.5 mg q12h) and by 4.5 fold (with venlafaxine 75 mg q12h). Imipramine did not affect the pharmacokinetics of venlafaxine and ODV. The clinical significance of elevated 2-OH-desipramine levels is unknown.

Risperidone—Venlafaxine administered under steady-state conditions at 150 mg/day slightly inhibited the CYP2D6-mediated metabolism of risperidone (administered as a single 1 mg oral dose) to its active metabolite, 9-hydroxyrisperidone, resulting in an approximate 32% increase in risperidone AUC. However, venlafaxine coadministration did not significantly alter the pharmacokinetic profile of the total active moiety (risperidone plus 9-hydroxyrisperidone).

CYP3A4: Venlafaxine did not inhibit CYP3A4 in vitro. This finding was confirmed in vivo by clinical drug interaction studies in which venlafaxine did not inhibit the metabolism of several CYP3A4 substrates, including alprazolam, diazepam, and terfenadine.

Indinavir—In a study of 9 healthy volunteers, venlafaxine administered under steady-state conditions at 150 mg/day resulted in a 28% decrease in the AUC of a single 800 mg oral dose of

15

indinavir and a 36% decrease in indinavir $C_{max}$. Indinavir did not affect the pharmacokinetics of venlafaxine and ODV. The clinical significance of this finding is unknown.

CYP1A2: Venlafaxine did not inhibit CYP1A2 in vitro. This finding was confirmed in vivo by a clinical drug interaction study in which venlafaxine did not inhibit the metabolism of caffeine, a CYP1A2 substrate.

CYP2C9: Venlafaxine did not inhibit CYP2C9 in vitro. In vivo, venlafaxine 75 mg by mouth every 12 hours did not alter the pharmacokinetics of a single 500 mg dose of tolbutamide or the CYP2C9 mediated formation of 4-hydroxy-tolbutamide.

CYP2C19: Venlafaxine did not inhibit the metabolism of diazepam which is partially metabolized by CYP2C19 (see Diazepam above).

Monoamine Oxidase Inhibitors
See **CONTRAINDICATIONS** and **WARNINGS**.

CNS-Active Drugs
The risk of using venlafaxine in combination with other CNS-active drugs has not been systematically evaluated (except in the case of those CNS-active drugs noted above). Consequently, caution is advised if the concomitant administration of venlafaxine and such drugs is required.

Serotonergic Drugs: Based on the mechanism of action of Effexor and the potential for serotonin syndrome, caution is advised when Effexor is co-administered with other drugs that may affect the serotonergic neurotransmitter systems, such as triptans, SSRIs, other SNRIs, linezolid (an antibiotic which is a reversible non-selective MAOI), lithium, tramadol, or St. John's Wort (see **WARNINGS, Serotonin Syndrome**). If concomitant treatment of Effexor with these drugs is clinically warranted, careful observation of the patient is advised, particularly during treatment initiation and dose increases (see **WARNINGS, Serotonin Syndrome**). The concomitant use of Effexor with tryptophan supplements is not recommended (see **WARNINGS, Serotonin Syndrome**).

Triptans: There have been rare postmarketing reports of serotonin syndrome with use of an SSRI and a triptan. If concomitant treatment of Effexor with a triptan is clinically warranted, careful observation of the patient is advised, particularly during treatment initiation and dose increases (see **WARNINGS, Serotonin Syndrome**).

Electroconvulsive Therapy
There are no clinical data establishing the benefit of electroconvulsive therapy combined with Effexor treatment.

Postmarketing Spontaneous Drug Interaction Reports
See **ADVERSE REACTIONS, Postmarketing Reports**.

16

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
Carcinogenesis
Venlafaxine was given by oral gavage to mice for 18 months at doses up to 120 mg/kg per day, which was 16 times, on a mg/kg basis, and 1.7 times on a mg/m$^2$ basis, the maximum recommended human dose. Venlafaxine was also given to rats by oral gavage for 24 months at doses up to 120 mg/kg per day. In rats receiving the 120 mg/kg dose, plasma levels of venlafaxine were 1 times (male rats) and 6 times (female rats) the plasma levels of patients receiving the maximum recommended human dose. Plasma levels of the O-desmethyl metabolite were lower in rats than in patients receiving the maximum recommended dose. Tumors were not increased by venlafaxine treatment in mice or rats.

Mutagenicity
Venlafaxine and the major human metabolite, O-desmethylvenlafaxine (ODV), were not mutagenic in the Ames reverse mutation assay in Salmonella bacteria or the CHO/HGPRT mammalian cell forward gene mutation assay. Venlafaxine was also not mutagenic in the in vitro BALB/c-3T3 mouse cell transformation assay, the sister chromatid exchange assay in cultured CHO cells, or the in vivo chromosomal aberration assay in rat bone marrow. ODV was not mutagenic in the in vitro CHO cell chromosomal aberration assay. There was a clastogenic response in the in vivo chromosomal aberration assay in rat bone marrow in male rats receiving 200 times, on a mg/kg basis, or 50 times, on a mg/m$^2$ basis, the maximum human daily dose. The no effect dose was 67 times (mg/kg) or 17 times (mg/m$^2$) the human dose.

Impairment of Fertility
Reproduction and fertility studies in rats showed no effects on male or female fertility at oral doses of up to 8 times the maximum recommended human daily dose on a mg/kg basis, or up to 2 times on a mg/m$^2$ basis.

**Pregnancy**
Teratogenic Effects—Pregnancy Category C
Venlafaxine did not cause malformations in offspring of rats or rabbits given doses up to 11 times (rat) or 12 times (rabbit) the maximum recommended human daily dose on a mg/kg basis, or 2.5 times (rat) and 4 times (rabbit) the human daily dose on a mg/m$^2$ basis. However, in rats, there was a decrease in pup weight, an increase in stillborn pups, and an increase in pup deaths during the first 5 days of lactation, when dosing began during pregnancy and continued until weaning. The cause of these deaths is not known. These effects occurred at 10 times (mg/kg) or 2.5 times (mg/m$^2$) the maximum human daily dose. The no effect dose for rat pup mortality was 1.4 times the human dose on a mg/kg basis or 0.25 times the human dose on a mg/m$^2$ basis. There are no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

Non-teratogenic Effects
Neonates exposed to Effexor, other SNRIs (Serotonin and Norepinephrine Reuptake Inhibitors), or SSRIs (Selective Serotonin Reuptake Inhibitors), late in the third trimester have developed complications requiring prolonged hospitalization, respiratory support, and tube feeding. Such complications can arise immediately upon delivery. Reported clinical findings have included respiratory distress, cyanosis, apnea, seizures, temperature instability, feeding difficulty,

17

vomiting, hypoglycemia, hypotonia, hypertonia, hyperreflexia, tremor, jitteriness, irritability, and constant crying. These features are consistent with either a direct toxic effect of SSRIs and SNRIs or, possibly, a drug discontinuation syndrome. It should be noted that, in some cases, the clinical picture is consistent with serotonin syndrome (see **PRECAUTIONS-Drug Interactions-CNS-Active Drugs**). When treating a pregnant woman with Effexor during the third trimester, the physician should carefully consider the potential risks and benefits of treatment (see **DOSAGE AND ADMINISTRATION**).

**Labor and Delivery**
The effect of Effexor® (venlafaxine hydrochloride) on labor and delivery in humans is unknown.

**Nursing Mothers**
Venlafaxine and ODV have been reported to be excreted in human milk. Because of the potential for serious adverse reactions in nursing infants from Effexor, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**
Safety and effectiveness in the pediatric population have not been established (see **BOX WARNING** and **WARNINGS, Clinical Worsening and Suicide Risk**). Two placebo-controlled trials in 766 pediatric patients with MDD and two placebo-controlled trials in 793 pediatric patients with GAD have been conducted with Effexor XR, and the data were not sufficient to support a claim for use in pediatric patients.

Anyone considering the use of Effexor in a child or adolescent must balance the potential risks with the clinical need.

Although no studies have been designed to primarily assess Effexor XR's impact on the growth, development, and maturation of children and adolescents, the studies that have been done suggest that Effexor XR may adversely affect weight and height (see **PRECAUTIONS, General, Changes in Height** and Changes in Weight). Should the decision be made to treat a pediatric patient with Effexor, regular monitoring of weight and height is recommended during treatment, particularly if it is to be continued long term. The safety of Effexor XR treatment for pediatric patients has not been systematically assessed for chronic treatment longer than six months in duration.

In the studies conducted in pediatric patients (ages 6-17), the occurrence of blood pressure and cholesterol increases considered to be clinically relevant in pediatric patients was similar to that observed in adult patients. Consequently, the precautions for adults apply to pediatric patients (see **WARNINGS, Sustained Hypertension**, and **PRECAUTIONS, General, Serum Cholesterol Elevation**).

**Geriatric Use**
Of the 2,897 patients in Phase 2 and Phase 3 depression studies with Effexor, 12% (357) were 65 years of age or over. No overall differences in effectiveness or safety were observed between these patients and younger patients, and other reported clinical experience generally has not identified differences in response between the elderly and younger patients. However, greater

18

sensitivity of some older individuals cannot be ruled out. As with other antidepressants, several cases of hyponatremia and syndrome of inappropriate antidiuretic hormone secretion (SIADH) have been reported, usually in the elderly.

The pharmacokinetics of venlafaxine and ODV are not substantially altered in the elderly (see **CLINICAL PHARMACOLOGY**). No dose adjustment is recommended for the elderly on the basis of age alone, although other clinical circumstances, some of which may be more common in the elderly, such as renal or hepatic impairment, may warrant a dose reduction (see **DOSAGE AND ADMINISTRATION**).

## ADVERSE REACTIONS
### Associated with Discontinuation of Treatment
Nineteen percent (537/2897) of venlafaxine patients in Phase 2 and Phase 3 depression studies discontinued treatment due to an adverse event. The more common events ($\geq$ 1%) associated with discontinuation and considered to be drug-related (ie, those events associated with dropout at a rate approximately twice or greater for venlafaxine compared to placebo) included:

| CNS | Venlafaxine | Placebo |
|---|---|---|
| Somnolence | 3% | 1% |
| Insomnia | 3% | 1% |
| Dizziness | 3% | — |
| Nervousness | 2% | — |
| Dry mouth | 2% | — |
| Anxiety | 2% | 1% |
| Gastrointestinal | | |
| Nausea | 6% | 1% |
| Urogenital | | |
| Abnormal ejaculation* | 3% | — |
| Other | | |
| Headache | 3% | 1% |
| Asthenia | 2% | — |
| Sweating | 2% | — |

* Percentages based on the number of males.
— Less than 1%


### Incidence in Controlled Trials
Commonly Observed Adverse Events in Controlled Clinical Trials
The most commonly observed adverse events associated with the use of Effexor® (incidence of 5% or greater) and not seen at an equivalent incidence among placebo-treated patients (ie, incidence for Effexor at least twice that for placebo), derived from the 1% incidence table below, were asthenia, sweating, nausea, constipation, anorexia, vomiting, somnolence, dry mouth, dizziness, nervousness, anxiety, tremor, and blurred vision as well as abnormal ejaculation/orgasm and impotence in men.

19

Adverse Events Occurring at an Incidence of 1% or More Among Effexor-Treated Patients
The table that follows enumerates adverse events that occurred at an incidence of 1% or more, and were more frequent than in the placebo group, among Effexor-treated patients who participated in short-term (4- to 8-week) placebo-controlled trials in which patients were administered doses in a range of 75 to 375 mg/day. This table shows the percentage of patients in each group who had at least one episode of an event at some time during their treatment. Reported adverse events were classified using a standard COSTART-based Dictionary terminology.

The prescriber should be aware that these figures cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those which prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses and investigators. The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and nondrug factors to the side effect incidence rate in the population studied.

**TABLE 1 Treatment-Emergent Adverse Experience Incidence in 4- to 8-Week Placebo-Controlled Clinical Trials[1]**

| Body System | Preferred Term | Effexor (n=1033) | Placebo (n=609) |
|---|---|---|---|
| Body as a Whole | Headache | 25% | 24% |
| | Asthenia | 12% | 6% |
| | Infection | 6% | 5% |
| | Chills | 3% | — |
| | Chest pain | 2% | 1% |
| | Trauma | 2% | 1% |
| Cardiovascular | Vasodilatation | 4% | 3% |
| | Increased blood pressure/hypertension | 2% | — |
| | Tachycardia | 2% | — |
| | Postural hypotension | 1% | — |
| Dermatological | Sweating | 12% | 3% |
| | Rash | 3% | 2% |
| | Pruritus | 1% | — |

20

**TABLE 1 Treatment-Emergent Adverse Experience Incidence in 4- to 8-Week Placebo-Controlled Clinical Trials[1]**

| Body System | Preferred Term | Effexor (n=1033) | Placebo (n=609) |
|---|---|---|---|
| Gastrointestinal | Nausea | 37% | 11% |
| | Constipation | 15% | 7% |
| | Anorexia | 11% | 2% |
| | Diarrhea | 8% | 7% |
| | Vomiting | 6% | 2% |
| | Dyspepsia | 5% | 4% |
| | Flatulence | 3% | 2% |
| Metabolic | Weight loss | 1% | — |
| Nervous System | Somnolence | 23% | 9% |
| | Dry mouth | 22% | 11% |
| | Dizziness | 19% | 7% |
| | Insomnia | 18% | 10% |
| | Nervousness | 13% | 6% |
| | Anxiety | 6% | 3% |
| | Tremor | 5% | 1% |
| | Abnormal dreams | 4% | 3% |
| | Hypertonia | 3% | 2% |
| | Paresthesia | 3% | 2% |
| | Libido decreased | 2% | — |
| | Agitation | 2% | — |
| | Confusion | 2% | 1% |
| | Thinking abnormal | 2% | 1% |
| | Depersonalization | 1% | — |
| | Depression | 1% | — |
| | Urinary retention | 1% | — |
| | Twitching | 1% | — |
| Respiration | Yawn | 3% | — |

21

**TABLE 1 Treatment-Emergent Adverse Experience Incidence in 4- to 8-Week Placebo-Controlled Clinical Trials[1]**

| Body System | Preferred Term | Effexor (n=1033) | Placebo (n=609) |
|---|---|---|---|
| Special Senses | Blurred vision | 6% | 2% |
| | Taste perversion | 2% | — |
| | Tinnitus | 2% | — |
| | Mydriasis | 2% | — |
| Urogenital System | Abnormal ejaculation/ orgasm | 12%[2] | —[2] |
| | Impotence | 6%[2] | —[2] |
| | Urinary frequency | 3% | 2% |
| | Urination impaired | 2% | — |
| | Orgasm disturbance | 2%[3] | —[3] |

[1] Events reported by at least 1% of patients treated with Effexor (venlafaxine hydrochloride) are included, and are rounded to the nearest %. Events for which the Effexor incidence was equal to or less than placebo are not listed in the table, but included the following: abdominal pain, pain, back pain, flu syndrome, fever, palpitation, increased appetite, myalgia, arthralgia, amnesia, hypesthesia, rhinitis, pharyngitis, sinusitis, cough increased, and dysmenorrhea[3].
— Incidence less than 1%.
[2] Incidence based on number of male patients.
[3] Incidence based on number of female patients.

Dose Dependency of Adverse Events
A comparison of adverse event rates in a fixed-dose study comparing Effexor (venlafaxine hydrochloride) 75, 225, and 375 mg/day with placebo revealed a dose dependency for some of the more common adverse events associated with Effexor use, as shown in the table that follows. The rule for including events was to enumerate those that occurred at an incidence of 5% or more for at least one of the venlafaxine groups and for which the incidence was at least twice the placebo incidence for at least one Effexor group. Tests for potential dose relationships for these events (Cochran-Armitage Test, with a criterion of exact 2-sided p-value $\leq 0.05$) suggested a dose-dependency for several adverse events in this list, including chills, hypertension, anorexia, nausea, agitation, dizziness, somnolence, tremor, yawning, sweating, and abnormal ejaculation.

**TABLE 2 Treatment-Emergent Adverse Experience Incidence in a Dose Comparison Trial**

| Body System/ Preferred Term | Effexor (mg/day) | | | |
| --- | --- | --- | --- | --- |
| | Placebo (n=92) | 75 (n=89) | 225 (n=89) | 375 (n=88) |
| **Body as a Whole** | | | | |
| Abdominal pain | 3.3% | 3.4% | 2.2% | 8.0% |
| Asthenia | 3.3% | 16.9% | 14.6% | 14.8% |
| Chills | 1.1% | 2.2% | 5.6% | 6.8% |
| Infection | 2.2% | 2.2% | 5.6% | 2.3% |
| **Cardiovascular System** | | | | |
| Hypertension | 1.1% | 1.1% | 2.2% | 4.5% |
| Vasodilatation | 0.0% | 4.5% | 5.6% | 2.3% |
| **Digestive System** | | | | |
| Anorexia | 2.2% | 14.6% | 13.5% | 17.0% |
| Dyspepsia | 2.2% | 6.7% | 6.7% | 4.5% |
| Nausea | 14.1% | 32.6% | 38.2% | 58.0% |
| Vomiting | 1.1% | 7.9% | 3.4% | 6.8% |
| **Nervous System** | | | | |
| Agitation | 0.0% | 1.1% | 2.2% | 4.5% |
| Anxiety | 4.3% | 11.2% | 4.5% | 2.3% |
| Dizziness | 4.3% | 19.1% | 22.5% | 23.9% |
| Insomnia | 9.8% | 22.5% | 20.2% | 13.6% |
| Libido decreased | 1.1% | 2.2% | 1.1% | 5.7% |
| Nervousness | 4.3% | 21.3% | 13.5% | 12.5% |
| Somnolence | 4.3% | 16.9% | 18.0% | 26.1% |
| Tremor | 0.0% | 1.1% | 2.2% | 10.2% |
| **Respiratory System** | | | | |
| Yawn | 0.0% | 4.5% | 5.6% | 8.0% |
| **Skin and Appendages** | | | | |
| Sweating | 5.4% | 6.7% | 12.4% | 19.3% |

23

**TABLE 2 Treatment-Emergent Adverse Experience Incidence in a Dose Comparison Trial**

| Body System/ Preferred Term | Effexor (mg/day) | | | |
| --- | --- | --- | --- | --- |
| | Placebo (n=92) | 75 (n=89) | 225 (n=89) | 375 (n=88) |
| **Special Senses** | | | | |
| Abnormality of accommodation | 0.0% | 9.1% | 7.9% | 5.6% |
| **Urogenital System** | | | | |
| Abnormal ejaculation/orgasm | 0.0% | 4.5% | 2.2% | 12.5% |
| Impotence (Number of men) | 0.0% (n=63) | 5.8% (n=52) | 2.1% (n=48) | 3.6% (n=56) |

Adaptation to Certain Adverse Events
Over a 6-week period, there was evidence of adaptation to some adverse events with continued therapy (eg, dizziness and nausea), but less to other effects (eg, abnormal ejaculation and dry mouth).

Vital Sign Changes
Effexor (venlafaxine hydrochloride) treatment (averaged over all dose groups) in clinical trials was associated with a mean increase in pulse rate of approximately 3 beats per minute, compared to no change for placebo. In a flexible-dose study, with doses in the range of 200 to 375 mg/day and mean dose greater than 300 mg/day, the mean pulse was increased by about 2 beats per minute compared with a decrease of about 1 beat per minute for placebo.

In controlled clinical trials, Effexor was associated with mean increases in diastolic blood pressure ranging from 0.7 to 2.5 mm Hg averaged over all dose groups, compared to mean decreases ranging from 0.9 to 3.8 mm Hg for placebo. However, there is a dose dependency for blood pressure increase (see **WARNINGS**).

Laboratory Changes
Of the serum chemistry and hematology parameters monitored during clinical trials with Effexor, a statistically significant difference with placebo was seen only for serum cholesterol. In premarketing trials, treatment with Effexor tablets was associated with a mean final on-therapy increase in total cholesterol of 3 mg/dL.

Patients treated with Effexor tablets for at least 3 months in placebo-controlled 12-month extension trials had a mean final on-therapy increase in total cholesterol of 9.1 mg/dL compared with a decrease of 7.1 mg/dL among placebo-treated patients. This increase was duration dependent over the study period and tended to be greater with higher doses. Clinically relevant

24

increases in serum cholesterol, defined as 1) a final on-therapy increase in serum cholesterol ≥50 mg/dL from baseline and to a value ≥261 mg/dL or 2) an average on-therapy increase in serum cholesterol ≥50 mg/dL from baseline and to a value ≥261 mg/dL, were recorded in 5.3% of venlafaxine-treated patients and 0.0% of placebo-treated patients (see **PRECAUTIONS-General-Serum Cholesterol Elevation**).

ECG Changes
In an analysis of ECGs obtained in 769 patients treated with Effexor and 450 patients treated with placebo in controlled clinical trials, the only statistically significant difference observed was for heart rate, ie, a mean increase from baseline of 4 beats per minute for Effexor. In a flexible-dose study, with doses in the range of 200 to 375 mg/day and mean dose greater than 300 mg/day, the mean change in heart rate was 8.5 beats per minute compared with 1.7 beats per minute for placebo (see **PRECAUTIONS, General, Use in Patients with Concomitant Illness**).

**Other Events Observed During the Premarketing Evaluation of Venlafaxine**
During its premarketing assessment, multiple doses of Effexor were administered to 2897 patients in Phase 2 and Phase 3 studies. In addition, in premarketing assessment of Effexor XR (the extended release form of venlafaxine), multiple doses were administered to 705 patients in Phase 3 major depressive disorder studies and Effexor was administered to 96 patients. During its premarketing assessment, multiple doses of Effexor XR were also administered to 1381 patients in Phase 3 GAD studies and 277 patients in Phase 3 Social Anxiety Disorder studies. The conditions and duration of exposure to venlafaxine in both development programs varied greatly, and included (in overlapping categories) open and double-blind studies, uncontrolled and controlled studies, inpatient (Effexor only) and outpatient studies, fixed-dose and titration studies. Untoward events associated with this exposure were recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories.

In the tabulations that follow, reported adverse events were classified using a standard COSTART-based Dictionary terminology. The frequencies presented, therefore, represent the proportion of the 5356 patients exposed to multiple doses of either formulation of venlafaxine who experienced an event of the type cited on at least one occasion while receiving venlafaxine. All reported events are included except those already listed in Table 1 and those events for which a drug cause was remote. If the COSTART term for an event was so general as to be uninformative, it was replaced with a more informative term. It is important to emphasize that, although the events reported occurred during treatment with venlafaxine, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency using the following definitions: **frequent** adverse events are defined as those occurring on one or more occasions in at least 1/100 patients; **infrequent** adverse events are those occurring in 1/100 to 1/1000 patients; **rare** events are those occurring in fewer than 1/1000 patients.

25

Body as a whole—**Frequent:** accidental injury, chest pain substernal, neck pain; **Infrequent:** face edema, intentional injury, malaise, moniliasis, neck rigidity, pelvic pain, photosensitivity reaction, suicide attempt, withdrawal syndrome; **Rare:** appendicitis, bacteremia, carcinoma, cellulitis.

Cardiovascular system—**Frequent:** migraine; **Infrequent:** angina pectoris, arrhythmia, extrasystoles, hypotension, peripheral vascular disorder (mainly cold feet and/or cold hands), syncope, thrombophlebitis; **Rare:** aortic aneurysm, arteritis, first-degree atrioventricular block, bigeminy, bradycardia, bundle branch block, capillary fragility, cardiovascular disorder (mitral valve and circulatory disturbance), cerebral ischemia, coronary artery disease, congestive heart failure, heart arrest, mucocutaneous hemorrhage, myocardial infarct, pallor.

Digestive system—**Frequent:** eructation; **Infrequent:** bruxism, colitis, dysphagia, tongue edema, esophagitis, gastritis, gastroenteritis, gastrointestinal ulcer, gingivitis, glossitis, rectal hemorrhage, hemorrhoids, melena, oral moniliasis, stomatitis, mouth ulceration; **Rare:** cheilitis, cholecystitis, cholelithiasis, duodenitis, esophageal spasm, hematemesis, gastrointestinal hemorrhage, gum hemorrhage, hepatitis, ileitis, jaundice, intestinal obstruction, parotitis, periodontitis, proctitis, increased salivation, soft stools, tongue discoloration.

Endocrine system—**Rare:** goiter, hyperthyroidism, hypothyroidism, thyroid nodule, thyroiditis.

Hemic and lymphatic system—**Frequent:** ecchymosis; **Infrequent:** anemia, leukocytosis, leukopenia, lymphadenopathy, thrombocythemia, thrombocytopenia; **Rare:** basophilia, bleeding time increased, cyanosis, eosinophilia, lymphocytosis, multiple myeloma, purpura.

Metabolic and nutritional—**Frequent:** edema, weight gain; **Infrequent:** alkaline phosphatase increased, dehydration, hypercholesteremia, hyperglycemia, hyperlipemia, hypokalemia, SGOT (AST) increased, SGPT (ALT) increased, thirst; **Rare:** alcohol intolerance, bilirubinemia, BUN increased, creatinine increased, diabetes mellitus, glycosuria, gout, healing abnormal, hemochromatosis, hypercalcinuria, hyperkalemia, hyperphosphatemia, hyperuricemia, hypocholesteremia, hypoglycemia, hyponatremia, hypophosphatemia, hypoproteinemia, uremia.

Musculoskeletal system—**Infrequent:** arthritis, arthrosis, bone pain, bone spurs, bursitis, leg cramps, myasthenia, tenosynovitis; **Rare:** pathological fracture, myopathy, osteoporosis, osteosclerosis, plantar fasciitis, rheumatoid arthritis, tendon rupture.

Nervous system—**Frequent:** trismus, vertigo; **Infrequent:** akathisia, apathy, ataxia, circumoral paresthesia, CNS stimulation, emotional lability, euphoria, hallucinations, hostility, hyperesthesia, hyperkinesia, hypotonia, incoordination, libido increased, manic reaction, myoclonus, neuralgia, neuropathy, psychosis, seizure, abnormal speech, stupor; **Rare:** akinesia, alcohol abuse, aphasia, bradykinesia, buccoglossal syndrome, cerebrovascular accident, loss of consciousness, delusions, dementia, dystonia, facial paralysis, feeling drunk, abnormal gait, Guillain-Barre Syndrome, hyperchlorhydria, hypokinesia, impulse control difficulties, neuritis, nystagmus, paranoid reaction, paresis, psychotic depression, reflexes decreased, reflexes increased, suicidal ideation, torticollis.

Respiratory system—**Frequent:** bronchitis, dyspnea; **Infrequent:** asthma, chest congestion, epistaxis, hyperventilation, laryngismus, laryngitis, pneumonia, voice alteration; **Rare:**

26

atelectasis, hemoptysis, hypoventilation, hypoxia, larynx edema, pleurisy, pulmonary embolus, sleep apnea.

Skin and appendages—**Infrequent:** acne, alopecia, brittle nails, contact dermatitis, dry skin, eczema, skin hypertrophy, maculopapular rash, psoriasis, urticaria; **Rare:** erythema nodosum, exfoliative dermatitis, lichenoid dermatitis, hair discoloration, skin discoloration, furunculosis, hirsutism, leukoderma, petechial rash, pustular rash, vesiculobullous rash, seborrhea, skin atrophy, skin striae.

Special senses—**Frequent:** abnormality of accommodation, abnormal vision; **Infrequent:** cataract, conjunctivitis, corneal lesion, diplopia, dry eyes, eye pain, hyperacusis, otitis media, parosmia, photophobia, taste loss, visual field defect; **Rare:** blepharitis, chromatopsia, conjunctival edema, deafness, exophthalmos, glaucoma, retinal hemorrhage, subconjunctival hemorrhage, keratitis, labyrinthitis, miosis, papilledema, decreased pupillary reflex, otitis externa, scleritis, uveitis.

Urogenital system—**Frequent:** metrorrhagia*, prostatic disorder (prostatitis and enlarged prostate)*, vaginitis*; **Infrequent:** albuminuria, amenorrhea*, cystitis, dysuria, hematuria, leukorrhea*, menorrhagia*, nocturia, bladder pain, breast pain, polyuria, pyuria, urinary incontinence, urinary urgency, vaginal hemorrhage*; **Rare:** abortion*, anuria, balanitis*, breast discharge, breast engorgement, breast enlargement, endometriosis*, fibrocystic breast, calcium crystalluria, cervicitis*, ovarian cyst*, prolonged erection*, gynecomastia (male)*, hypomenorrhea*, kidney calculus, kidney pain, kidney function abnormal, female lactation*, mastitis, menopause*, oliguria, orchitis*, pyelonephritis, salpingitis*, urolithiasis, uterine hemorrhage*, uterine spasm*, vaginal dryness*.

* Based on the number of men and women as appropriate.

**Postmarketing Reports**
Voluntary reports of other adverse events temporally associated with the use of venlafaxine that have been received since market introduction and that may have no causal relationship with the use of venlafaxine include the following: agranulocytosis, anaphylaxis, aplastic anemia, catatonia, congenital anomalies, CPK increased, deep vein thrombophlebitis, delirium, EKG abnormalities such as QT prolongation; cardiac arrhythmias including atrial fibrillation, supraventricular tachycardia, ventricular extrasystole, and rare reports of ventricular fibrillation and ventricular tachycardia, including torsade de pointes; epidermal necrosis/Stevens-Johnson Syndrome, erythema multiforme, extrapyramidal symptoms (including dyskinesia and tardive dyskinesia), angle-closure glaucoma, hemorrhage (including eye and gastrointestinal bleeding), hepatic events (including GGT elevation; abnormalities of unspecified liver function tests; liver damage, necrosis, or failure; and fatty liver), interstitial lung disease, involuntary movements, LDH increased, neuroleptic malignant syndrome-like events (including a case of a 10-year-old who may have been taking methylphenidate, was treated and recovered), neutropenia, night sweats, pancreatitis, pancytopenia, panic, prolactin increased, renal failure, rhabdomyolysis, serotonin syndrome, shock-like electrical sensations or tinnitus (in some cases, subsequent to the discontinuation of venlafaxine or tapering of dose), and syndrome of inappropriate antidiuretic hormone secretion (usually in the elderly).

27

There have been reports of elevated clozapine levels that were temporally associated with adverse events, including seizures, following the addition of venlafaxine. There have been reports of increases in prothrombin time, partial thromboplastin time, or INR when venlafaxine was given to patients receiving warfarin therapy.

## DRUG ABUSE AND DEPENDENCE
### Controlled Substance Class
Effexor (venlafaxine hydrochloride) is not a controlled substance.

### Physical and Psychological Dependence
In vitro studies revealed that venlafaxine has virtually no affinity for opiate, benzodiazepine, phencyclidine (PCP), or N-methyl-D-aspartic acid (NMDA) receptors.

Venlafaxine was not found to have any significant CNS stimulant activity in rodents. In primate drug discrimination studies, venlafaxine showed no significant stimulant or depressant abuse liability.

Discontinuation effects have been reported in patients receiving venlafaxine (see **DOSAGE AND ADMINISTRATION**).

While Effexor has not been systematically studied in clinical trials for its potential for abuse, there was no indication of drug-seeking behavior in the clinical trials. However, it is not possible to predict on the basis of premarketing experience the extent to which a CNS active drug will be misused, diverted, and/or abused once marketed. Consequently, physicians should carefully evaluate patients for history of drug abuse and follow such patients closely, observing them for signs of misuse or abuse of Effexor (eg, development of tolerance, incrementation of dose, drug-seeking behavior).

## OVERDOSAGE
### Human Experience
There were 14 reports of acute overdose with Effexor (venlafaxine hydrochloride), either alone or in combination with other drugs and/or alcohol, among the patients included in the premarketing evaluation. The majority of the reports involved ingestions in which the total dose of Effexor taken was estimated to be no more than several-fold higher than the usual therapeutic dose. The 3 patients who took the highest doses were estimated to have ingested approximately 6.75 g, 2.75 g, and 2.5 g. The resultant peak plasma levels of venlafaxine for the latter 2 patients were 6.24 and 2.35 µg/mL, respectively, and the peak plasma levels of O-desmethylvenlafaxine were 3.37 and 1.30 µg/mL, respectively. Plasma venlafaxine levels were not obtained for the patient who ingested 6.75 g of venlafaxine. All 14 patients recovered without sequelae. Most patients reported no symptoms. Among the remaining patients, somnolence was the most commonly reported symptom. The patient who ingested 2.75 g of venlafaxine was observed to have 2 generalized convulsions and a prolongation of QTc to 500 msec, compared with 405 msec at baseline. Mild sinus tachycardia was reported in 2 of the other patients.

In postmarketing experience, overdose with venlafaxine has occurred predominantly in combination with alcohol and/or other drugs. The most commonly reported events in overdosage include tachycardia, changes in level of consciousness (ranging from somnolence to coma),

mydriasis, seizures, and vomiting. Electrocardiogram changes (eg, prolongation of QT interval, bundle branch block, QRS prolongation), ventricular tachycardia, bradycardia, hypotension, rhabdomyolysis, vertigo, liver necrosis, serotonin syndrome, and death have been reported.

Published retrospective studies report that venlafaxine overdosage may be associated with an increased risk of fatal outcomes compared to that observed with SSRI antidepressant products, but lower than that for tricyclic antidepressants. Epidemiological studies have shown that venlafaxine-treated patients have a higher pre-existing burden of suicide risk factors than SSRI-treated patients. The extent to which the finding of an increased risk of fatal outcomes can be attributed to the toxicity of venlafaxine in overdosage as opposed to some characteristic(s) of venlafaxine-treated patients is not clear. Prescriptions for Effexor should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

### Management of Overdosage
Treatment should consist of those general measures employed in the management of overdosage with any antidepressant.

Ensure an adequate airway, oxygenation, and ventilation. Monitor cardiac rhythm and vital signs. General supportive and symptomatic measures are also recommended. Induction of emesis is not recommended. Gastric lavage with a large-bore orogastric tube with appropriate airway protection, if needed, may be indicated if performed soon after ingestion or in symptomatic patients. Activated charcoal should be administered. Due to the large volume of distribution of this drug, forced diuresis, dialysis, hemoperfusion and exchange transfusion are unlikely to be of benefit. No specific antidotes for venlafaxine are known.

In managing overdosage, consider the possibility of multiple drug involvement. The physician should consider contacting a poison control center for additional information on the treatment of any overdose. Telephone numbers for certified poison control centers are listed in the *Physicians' Desk Reference (PDR)*.

### DOSAGE AND ADMINISTRATION
### Initial Treatment
The recommended starting dose for Effexor is 75 mg/day, administered in two or three divided doses, taken with food. Depending on tolerability and the need for further clinical effect, the dose may be increased to 150 mg/day. If needed, the dose should be further increased up to 225 mg/day. When increasing the dose, increments of up to 75 mg/day should be made at intervals of no less than 4 days. In outpatient settings there was no evidence of usefulness of doses greater than 225 mg/day for moderately depressed patients, but more severely depressed inpatients responded to a mean dose of 350 mg/day. Certain patients, including more severely depressed patients, may therefore respond more to higher doses, up to a maximum of 375 mg/day, generally in three divided doses (see **PRECAUTIONS, General, Use in Patients with Concomitant Illness**).

29

**Special Populations**
Treatment of Pregnant Women During the Third Trimester
Neonates exposed to Effexor, other SNRIs, or SSRIs, late in the third trimester have developed complications requiring prolonged hospitalization, respiratory support, and tube feeding (see **PRECAUTIONS**). When treating pregnant women with Effexor during the third trimester, the physician should carefully consider the potential risks and benefits of treatment. The physician may consider tapering Effexor in the third trimester.

Dosage for Patients with Hepatic Impairment
Given the decrease in clearance and increase in elimination half-life for both venlafaxine and ODV that is observed in patients with hepatic cirrhosis compared to normal subjects (see **CLINICAL PHARMACOLOGY**), it is recommended that the total daily dose be reduced by 50% in patients with moderate hepatic impairment. Since there was much individual variability in clearance between patients with cirrhosis, it may be necessary to reduce the dose even more than 50%, and individualization of dosing may be desirable in some patients.

Dosage for Patients with Renal Impairment
Given the decrease in clearance for venlafaxine and the increase in elimination half-life for both venlafaxine and ODV that is observed in patients with renal impairment
(GFR = 10 to 70 mL/min) compared to normals (see **CLINICAL PHARMACOLOGY**), it is recommended that the total daily dose be reduced by 25% in patients with mild to moderate renal impairment. It is recommended that the total daily dose be reduced by 50% and the dose be withheld until the dialysis treatment is completed (4 hrs) in patients undergoing hemodialysis. Since there was much individual variability in clearance between patients with renal impairment, individualization of dosing may be desirable in some patients.

Dosage for Elderly Patients
No dose adjustment is recommended for elderly patients on the basis of age. As with any antidepressant, however, caution should be exercised in treating the elderly. When individualizing the dosage, extra care should be taken when increasing the dose.

**Maintenance Treatment**
It is generally agreed that acute episodes of major depressive disorder require several months or longer of sustained pharmacological therapy beyond response to the acute episode. In one study, in which patients responding during 8 weeks of acute treatment with Effexor XR were assigned randomly to placebo or to the same dose of Effexor XR (75, 150, or 225 mg/day, qAM) during 26 weeks of maintenance treatment as they had received during the acute stabilization phase, longer-term efficacy was demonstrated. A second longer-term study has demonstrated the efficacy of Effexor in maintaining an antidepressant response in patients with recurrent depression who had responded and continued to be improved during an initial 26 weeks of treatment and were then randomly assigned to placebo or Effexor for periods of up to 52 weeks on the same dose (100 to 200 mg/day, on a b.i.d. schedule) (see **CLINICAL TRIALS**). Based on these limited data, it is not known whether or not the dose of Effexor/Effexor XR needed for maintenance treatment is identical to the dose needed to achieve an initial response. Patients should be periodically reassessed to determine the need for maintenance treatment and the appropriate dose for such treatment.

**Discontinuing Effexor (venlafaxine hydrochloride)**
Symptoms associated with discontinuation of Effexor, other SNRIs, and SSRIs, have been reported (see **PRECAUTIONS**). Patients should be monitored for these symptoms when discontinuing treatment. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate.

**SWITCHING PATIENTS TO OR FROM A MONOAMINE OXIDASE INHIBITOR**
At least 14 days should elapse between discontinuation of an MAOI and initiation of therapy with Effexor. In addition, at least 7 days should be allowed after stopping Effexor before starting an MAOI (see **CONTRAINDICATIONS** and **WARNINGS**).

**HOW SUPPLIED**
Effexor® (venlafaxine hydrochloride) Tablets are available as follows:

25 mg, peach, shield-shaped tablet with "25" and a "**W**" on one side and "701" on scored reverse side.

>    NDC 0008-0701-07, bottle of 30 tablets in unit of use package.
>    NDC 0008-0701-08, bottle of 60 tablets in unit of use package.
>    NDC 0008-0701-01, bottle of 100 tablets.
>    NDC 0008-0701-02, carton of 10 Redipak® blister strips of 10 tablets each.

37.5 mg, peach, shield-shaped tablet with "37.5" and a "**W**" on one side and "781" on scored reverse side.

>    NDC 0008-0781-07, bottle of 30 tablets in unit of use package.
>    NDC 0008-0781-08, bottle of 60 tablets in unit of use package.
>    NDC 0008-0781-01, bottle of 100 tablets.
>    NDC 0008-0781-02, carton of 10 Redipak® blister strips of 10 tablets each.

50 mg, peach, shield-shaped tablet with "50" and a "**W**" on one side and "703" on scored reverse side.

>    NDC 0008-0703-07, bottle of 30 tablets in unit of use package.
>    NDC 0008-0703-08, bottle of 60 tablets in unit of use package.
>    NDC 0008-0703-01, bottle of 100 tablets.
>    NDC 0008-0703-02, carton of 10 Redipak® blister strips of 10 tablets each.

75 mg, peach, shield-shaped tablet with "75" and a "**W**" on one side and "704" on scored reverse side.

>    NDC 0008-0704-07, bottle of 30 tablets in unit of use package.
>    NDC 0008-0704-08, bottle of 60 tablets in unit of use package.
>    NDC 0008-0704-01, bottle of 100 tablets.
>    NDC 0008-0704-02, carton of 10 Redipak® blister strips of 10 tablets each.

371

100 mg, peach, shield-shaped tablet with "100" and a "**W**" on one side and "705" on scored reverse side.

NDC 0008-0705-07, bottle of 20 tablets in unit of use package.
NDC 0008-0705-08, bottle of 60 tablets in unit of use package.
NDC 0008-0705-01, bottle of 100 tablets.
NDC 0008-0705-02, carton of 10 Redipak® blister strips of 10 tablets each.

The appearance of these tablets is a trademark of Wyeth Pharmaceuticals.

**Store at controlled room temperature 20° to 25°C (68 ° to 77°F) in a dry place.**

**Dispense in a well-closed container as defined in the USP.**

The unit of use package is intended to be dispensed as a unit.

U.S. Patent Nos. 4,535,186, 5,916,923, and 6,444,708

**Medication Guide**
**About Using Antidepressants in Children and Teenagers**

**What is the most important information I should know if my child is being prescribed an antidepressant?**
Parents or guardians need to think about 4 important things when their child is prescribed an antidepressant:

1. There is a risk of suicidal thoughts or actions.

2. How to try to prevent suicidal thoughts or actions in your child.

3. You should watch for certain signs if your child is taking an antidepressant.

4. There are benefits and risks when using antidepressants.

**1. There is a Risk of Suicidal Thoughts or Actions**
Children and teenagers sometimes think about suicide, and many report trying to kill themselves.

Antidepressants increase suicidal thoughts and actions in some children and teenagers. But suicidal thoughts and actions can also be caused by depression, a serious medical condition that is commonly treated with antidepressants. Thinking about killing yourself or trying to kill yourself is called *suicidality* or *being suicidal*.

A large study combined the results of 24 different studies of children and teenagers with depression or other illnesses. In these studies, patients took either a placebo (sugar pill) or an antidepressant for 1 to 4 months. *No one committed suicide in these studies*, but some patients became suicidal. On sugar pills, 2 out of every 100 became suicidal. On the antidepressants, 4 out of every 100 patients became suicidal.

**For some children and teenagers, the risks of suicidal actions may be especially high.** These include patients with:

- Bipolar illness (sometimes called manic-depressive illness)

- A family history of bipolar illness

- A personal or family history of attempting suicide

If any of these are present, make sure you tell your healthcare provider before your child takes an antidepressant.

**2. How to Try to Prevent Suicidal Thoughts and Actions**
To try to prevent suicidal thoughts and actions in your child, pay close attention to changes in her or his moods or actions, especially if the changes occur suddenly. Other important people in your child's life can help by paying attention as well (e.g., your child, brothers and sisters, teachers, and other important people). The changes to look out for are listed in Section 3, on what to watch for.

33

372

Whenever an antidepressant is started or its dose is changed, pay close attention to your child.

After starting an antidepressant, your child should generally see his or her healthcare provider:

- Once a week for the first 4 weeks

- Every 2 weeks for the next 4 weeks

- After taking the antidepressant for 12 weeks

- After 12 weeks, follow your healthcare provider's advice about how often to come back

- More often if problems or questions arise (see Section 3)

You should call your child's healthcare provider between visits if needed.

**3. You Should Watch for Certain Signs If Your Child is Taking an Antidepressant**
Contact your child's healthcare provider *right away* if your child exhibits any of the following signs for the first time, or if they seem worse, or worry you, your child, or your child's teacher:

- Thoughts about suicide or dying

- Attempts to commit suicide

- New or worse depression

- New or worse anxiety

- Feeling very agitated or restless

- Panic attacks

- Difficulty sleeping (insomnia)

- New or worse irritability

- Acting aggressive, being angry, or violent

- Acting on dangerous impulses

- An extreme increase in activity and talking

- Other unusual changes in behavior or mood

Never let your child stop taking an antidepressant without first talking to his or her healthcare provider. Stopping an antidepressant suddenly can cause other symptoms.

## 4. There are Benefits and Risks When Using Antidepressants

Antidepressants are used to treat depression and other illnesses. Depression and other illnesses can lead to suicide. In some children and teenagers, treatment with an antidepressant increases suicidal thinking or actions. It is important to discuss all the risks of treating depression and also the risks of not treating it. You and your child should discuss all treatment choices with your healthcare provider, not just the use of antidepressants.

Other side effects can occur with antidepressants (see section below).

Of all the antidepressants, only fluoxetine (Prozac®) has been FDA approved to treat pediatric depression.

For obsessive compulsive disorder in children and teenagers, FDA has approved only fluoxetine (Prozac®), sertraline (Zoloft®), fluvoxamine, and clomipramine (Anafranil®).*

Your healthcare provider may suggest other antidepressants based on the past experience of your child or other family members.

**Is this all I need to know if my child is being prescribed an antidepressant?**
No. This is a warning about the risk for suicidality. Other side effects can occur with antidepressants. Be sure to ask your healthcare provider to explain all the side effects of the particular drug he or she is prescribing. Also ask about drugs to avoid when taking an antidepressant. Ask your healthcare provider or pharmacist where to find more information.

* Prozac® is a registered trademark of Eli Lilly and Company
  Zoloft® is a registered trademark of Pfizer Pharmaceuticals
  Anafranil® is a registered trademark of Mallinckrodt Inc.

This Medication Guide has been approved by the U.S. Food and Drug Administration for all antidepressants.

---

 This product's label may have been updated. For current package insert and further product information, please visit www.wyeth.com or call our medical communications department toll-free at 1-800-934-5556.

---

**Wyeth®**
Wyeth Pharmaceuticals Inc.
Philadelphia, PA 19101

(Update W10402C021)
(Update ET01)
(Update Rev Date)

35

## DECLARATION AND AFFIDAVIT OF DANIEL PRESLEY
## PURSUANT TO 28 U.S.C. § 1746

I, Daniel Presley, do hereby declare and verify as follows:

1.      My name is Daniel Presley. Ed Fields and I were best friends prior to his incarceration. I have recently met with members of Ed's current defense team. They have shown me statements that I gave to the FBI in 2003 and to his investigator at the time of trial. They have also shown me my trial testimony and the prosecution's closing argument at Ed's trial. I am providing this declaration to clarify a number of serious misunderstandings and apparent attempts to twist my words. I was completely honest when I spoke with the FBI and the defense at the time of trial. These misunderstandings and twisting of my words seems to have occurred because I answered only what was asked of me. I did not know what was important to either side when they interviewed me or questioned me at trial, and I provided just the information that each side requested. I can now see because I was not asked about a number of areas, or because one side or the other decided not to ask about certain questions, that the information that I provided to them and that was given to the jury was not entirely accurate or fair.

2.      The lawyers prosecuting Ed's case called me to testify as a witness at his trial; Ed had come to my house early in the evening on the day of the homicides. I told the jury that Ed did not appear particularly stressed or depressed when I saw him that day, which was true. As I said in my testimony, I met Ed in 1998 when we were both working for the Oklahoma Department of Corrections at the Quachita Correctional Facility. We hit it off immediately and became best friends. There were

1

times Ed and I would go hunting or fishing together as many as five times a week. As a friend Ed was loyal. When my mother was sick, my wife and I spent a great deal of time tending to her needs. Ed would bring whole dinners to our house so my wife wouldn't have to cook. When Ed would come to the house he would tease and play with the kids. Neither my wife or I had any hesitation about Ed being with the kids. During the two years I worked with Ed at the prison, I never knew him to be physically violent with the inmates. Though he was stern with them, that was expected. I never knew him to be violent or use inappropriate force with inmates. Ed was never like that. Also, one of our favorite things to do was playing pool. Of course we played pool at the Electric Cowboy, a bar, where its not unusual to run into a bad apple who wants to start something. In all the hours we spent playing pool, I never once saw Ed become violent with anyone. At Ed's trial I testified that I was shocked when I heard that he had been arrested for the homicides and that I couldn't believe it. However, no one asked me why it was so shocking. Had they asked me, I could have told them how absolutely out of character it was for Ed to be a violent murderer. I mean prior to this incident I had never known him to have any criminal trouble with the law. Though I'm no doctor, I spent enough time both professionally and personally with Ed to know that something in him must have snapped when he killed those people.

3. Another reason why I think something in Ed snapped has to do with when he came to my house in the early evening on the day of the homicides. As I told the FBI in July of 2003, Ed came to the house and wanted me to do something. At the

2

time, I was not asked by the FBI about Ed's offer to "do something." When I testified at trial, neither Ed's lawyers nor the prosecutor asked me any questions about why Ed came to my house on the day of the tragedy. If asked I would have told them that when Ed came to the house that day he wanted me to go snake hunting with him. I couldn't go because I had made other plans for that evening. When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m.- or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

4. At trial I testified that Ed made a ghillie suit about a year and a half to two years before the tragedy happened. I also testified that I was with Ed when he went to Fort Smith, Arkansas, to buy materials for the suit and that, after the suit was made, I had even worn it. Lastly I testified that Ed would hunt squirrels by sitting still in the ghillie suit and waiting for squirrels to come by. That's how you hunt with a camouflage suit. Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go into any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself. It's really

3

amazing to me to read the part of the prosecution's closing argument where they said that Ed made the ghillie suit because his plan was that he intended to become a sniper, as well as the part where he implies that I said that you don't need a ghillie suit to hunt squirrels. This suggests that Ed did not make the suit for squirrel hunting, which is just a plain lie. If two years earlier Ed was making the suit to kill people, I never would have gone with him to buy the materials for it. Also, its not like Ed kept the ghillie suit hidden so no one would know about it. Most times he kept the darn thing in the back of his truck in plain sight. Like I told the FBI, Ed never once said to me that he made the ghillie suit, or that he ghillied his gun, so that he could stalk people.

5.      Like the Ghillie suit, the prosecutor also twisted my words around regarding Ed's .22 rifle and the scope he had on it. I testified that Ed hunted squirrels with a .22 rifle that had an amplified scope on it. Although I said that the scope was powerful and was something you'd usually see on a high powered hunting rifle, I did not say that there was no need for a scope like Ed's to be mounted on a .22 caliber rifle or that it was a scope for a snipers rifle. But, this is what the prosecutor told the jury I said. If someone would have asked, I could have explained to the jury that it is not at all unusual for hunters who eat the small game they catch to put a scope on a .22 rifle. You can either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's. I testified

4

that Ed could hit a squirrel off a branch from 50 to 70 yards away. Ed was a good shot and having a large scope on his gun allowed him to challenge himself by making very long shots with his gun. As I told the FBI in July of 2003, when Ed and I would go hunting, Ed would often see squirrels and shoot them before I even had a chance to see them. That was the advantage Ed had with his scope and its not like we weren't competitive when we hunted together. Although, Ed had mounted the scope on his gun more than a year before the tragedy happened, he ghillied the gun around three or four weeks before the tragedy. When I saw the gun at Carol Lambs house, like I testified, Ed didn't tell me why he ghillied the gun, but there really was no need for him to tell me why. Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't ask because it wasn't unusual. Nobody had me explain this to the jury at Ed's trial.

6.      Another thing I told the FBI in July of 2003, was that Ed's depression and his talking about suicide just got worse and worse. Ed's defense team never asked me about this. I told the FBI agent that Ed talked to me about suicide 15 to 20 times, and that he had done so especially during the year leading up to the homicides and especially during the last four months leading up to the homicides. Of course, when Ed would talk to me about his depression he would tell me about going to the doctor in the spring of 2003 and getting medication. I could never understand though why his talk about suicide got worse the more he was on the medication. As my wife told

5

the defense, it really seemed that the medication must have had something to do with this whole thing. At Ed's trial, the attorneys only asked me about the number of times Ed talked about suicide. No one asked me if it had become worse around the time of the tragedy. If they had asked, I could have told them what I told the FBI agent in July of 2003. Like I told that agent, a week or two before this tragedy happened, Ed and I were at some cliffs by Lake Eufaula. Ed jumped off the cliff and cut his back on some rocks in the water below. When I yelled at him for doing that Ed said, "The worst thing that could happen is I'd get killed."

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Daniel Presley_
Daniel Presley

Dated:      March 30, 2010
            Heavener, Oklahoma

6

D-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription ___08/07/2003___

DANIEL BERTIS DEWAYNE PRESSLEY, a white male, date of birth October 26, 1966, Social Security Account Number ███████, who resides at ██████████████, Heavener, Oklahoma, home telephone ████████████ was advised of the official identity of the interviewing Agent and the purpose of the interview. Present during the interview were U.S. Forest Service Agents PAUL JOLIVETTE and GARY ROSE. PRESSLEY provided the following information:

PRESSLEY is married to MARILYN KAY PRESSLEY. PRESSLEY has worked at the JIMMY HAMILTON CORRECTION FACILITY in Hodgen, Oklahoma, telephone 918/653-7831, extension 361 since May 18, 1998.

Prior to working at the JIMMY HAMILTON CORRECTION FACILITY, PRESSLEY worked as a Railroad Conductor for approximately six months.

Prior to working as a Railroad Conductor, PRESSLEY worked as a Concrete Company Driver for FORT SMITH ARCOLA SAND AND GRAVEL for approximately four years and also for TWIN CITIES CONCRETE in Poteau, Oklahoma.

From approximately October 3, 1985 through 1993, PRESSLEY worked at KERR McGEE in the Mojave Desert in California as a Production Value Service Maintenance and Lubrication Specialist.

PRESSLEY first met EDWARD FIELDS in 1998 as a co-worker at the JIMMY HAMILTON CORRECTION FACILITY in Hodgen. FIELDS and PRESSLEY became friends at work and began to socialize together after work. PRESSLEY recalls their first social activity where PRESSLEY and FIELDS set trot lines in the Poteau River at night in 1998. For the next few years, PRESSLEY and FIELDS would see each other numerous times at work during the day. PRESSLEY and FIELDS became close friends and fished, hunted squirrels, hunted snakes, went on canoe trips, went noodling and shot pool together over the past several years. PRESSLEY and FIELDS' social activities increased over the past two years. Sometimes, PRESSLEY and FIELDS would socialize together after work several times a week. FIELDS quit the prison in either 1999 or 2000 and went to Ohio to do some work with fiber optics. FIELDS was gone a couple of months and then returned to Oklahoma. When FIELDS moved back, PRESSLEY and FIELDS continued to socialize.

---

Investigation on ___07/25&30/2003___ at ___Poteau, Oklahoma___                      000355

File # ___70A-OC-65054___                              Date dictated ___07/30/2003___

by ___SA GARY W. GRAFF:gw___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

70A-OC-65054

Continuation of FD-302 of ___DANIEL PRESSLEY_____ , On __07/25&30/2003__ , Page __2__

     PRESSLEY described FIELDS' hobbies as canoeing, squirrel hunting, snake hunting (by hand), shooting pool, fishing, and noodling.  FIELDS also liked to date girls and work on computers. PRESSLEY described FIELDS as very smart.  FIELDS likes to play a computer game which involves flying airplanes.

     PRESSLEY is aware that FIELDS has known CAROLE LAMB for some time.  LAMB has told PRESSLEY that her relationship with FIELDS is not a sexual relationship.  FIELDS has also dated MICHELLE TIPTON, who is MARILYN PRESSLEY's cousin.  PRESSLEY described FIELDS' relationship with MICHELLE TIPTON as ROCKY. PRESSLEY was aware that FIELDS would stay at CAROLE LAMB's residence during periods he was split up with MICHELLE TIPTON. FIELDS has been seeing TIPTON off and on for the past year.

     FIELDS has mentioned to PRESSLEY that he has recently spent nights up on the Skyline Drive a few times in his truck and also spent nights at Wister Lake.  FIELDS has also told PRESSLEY that CAROLE LAMB has visited FIELDS at Wister Lake in the evenings. LAMB's visits and FIELDS' spending the night upon Skyline Drive and Wister Lake have occurred the week prior to July 10, 2003.

     On Monday, July 7, 2003, FIELDS showed up at PRESSLEY's residence.  FIELDS assisted PRESSLEY in loading a motorcycle and taking this motorcycle to a shop in Fort Smith, Arkansas.  FIELDS and PRESSLEY returned to PRESSLEY's residence late Monday evening at approximately 10:00 p.m. or 11:00 p.m.  PRESSLEY offered for FIELDS to spend the night at PRESSLEY's residence but FIELDS declined.  During the trip to Fort Smith on July 7, 2003, FIELDS informed PRESSLEY that he had seen a vehicle with a couple in it parked up on Skyline Drive.  FIELDS was not specific as to where on Skyline Drive FIELDS observed the couple, but believed it was probably a vista west of Winding Stair.  FIELDS explained to PRESSLEY that FIELDS put on his gilli suit and snuck up on them to see what they were doing.  PRESSLEY asked FIELDS why he had done this and FIELDS told PRESSLEY that the couple were "fooling around" and FIELDS wanted a closer look.  PRESSLEY was impressed that FIELDS meant that the couple were fooling around sexually.  FIELDS described the couple as a young couple, but did not say what time of day he snuck up on them.  FIELDS did not specify what day it was that FIELDS had snuck up on them, but PRESSLEY got the impression that it was within the past few days of their discussion on July 7th.

000356

FD-302a (Rev. 10-6-95)

70A-OC-65054

Continuation of FD-302 of      DANIEL PRESSLEY                                    , On  07/25&30/2003 , Page    3

On Thursday, July 10, 2003, FIELDS came by PRESSLEY's house in the late afternoon, sometime after 4:00 p.m. FIELDS asked PRESSLEY if PRESSLEY wanted to do something. PRESSLEY had plans to play the casino in Fort Smith. FIELDS and PRESSLEY's conversation was fairly short. PRESSLEY did not notice anything unusual about FIELDS' demeanor and FIELDS seemed to act fine. FIELDS did not appear to be depressed or stressed out and did not mention needing any money. FIELDS was driving his blue Chevrolet pickup truck when he stopped by. PRESSLEY did not know where FIELDS was planning on spending the night Thursday night.

PRESSLEY had two or three telephone conversations with FIELDS on approximately July 16 and 17, 2003. FIELDS and PRESSLEY were planning a fishing trip for July 18, 2003. FIELDS sounded fine during these telephone conversations and PRESSLEY could determine nothing unusual about his demeanor or personality. FIELDS mentioned that he really needed to go fishing. The topic of the killings up at Winding Stair did not come up during these conversations. FIELDS did not mention anything about money during the conversations.

PRESSLEY is aware that FIELDS owns a 22 Marlin rifle. PRESSLEY described the finish as a medium wood finish on the rifle. The rifle has a black barrel and a large good quality scope. The scope is very powerful. Approximately three or four weeks ago, FIELDS showed PRESSLEY the rifle wrapped in burlap stripping. FIELDS was staying with CAROLE LAMB in Wister at the time and FIELDS showed PRESSLEY the rifle at LAMB's residence. FIELDS did not explain to PRESSLEY why he had wrapped the rifle in burlap. PRESSLEY has seen the weapon on several occasions over the years and FIELDS had never had it wrapped before. It was PRESSLEY's impression that when FIELDS showed him the rifle at LAMB's residence, that FIELDS had wrapped the rifle recently. (On July 30, 2003, Special Agent GARY W. GRAFF showed PRESSLEY a picture of a rifle wrapped in burlap and PRESSLEY dated and initialed the back of the photograph indicating that it looked just like the rifle that FIELDS had and which FIELDS had shown PRESSLEY at CAROLE LAMB's residence).

PRESSLEY is aware that approximately one and one-half to two years ago, FIELDS made a gilli suit out of netting which included frayed ropes of different colors. PRESSLEY described the overall tint of the suit to be olive with contrasting colors. FIELDS made this suit to go squirrel hunting. FIELDS would wear the suit when PRESSLEY and FIELDS went squirrel hunting. PRESSLEY

000357

D-302a (Rev. 10-6-95)

70A-OC-65054

Continuation of FD-302 of    DANIEL PRESSLEY                        , On 07/25&30/2003 , Page   4

described FIELDS as being a good shot and has seen FIELDS shoot squirrels from 70 yards away with the powerful scope of FIELDS' 22 caliber Marlin rifle.  PRESSLEY is not certain if it's common for an individual to wear a gilli suit while squirrel hunting.  The only time that PRESSLEY has ever seen FIELDS wear the suit is when they were squirrel hunting.  FIELDS liked to stalk squirrels. PRESSLEY believes that FIELDS found stalking squirrels to be exciting.  FIELDS would often see squirrels and shoot them before PRESSLEY had a chance to even see them.  FIELDS never mentioned making the gilli suit or wrapping his gun in burlap as a reason to stalk people.

PRESSLEY believes that FIELDS maintained enough money during the week prior to July 10, 2003 to purchase a motel room if he so desired.  PRESSLEY suggested to FIELDS during the week prior to July 10, 2003 that FIELDS obtain a motel room and relax.  FIELDS informed PRESSLEY at the time that he did not want to spend that much money just for a motel room.  PRESSLEY was impressed that FIELDS had the money, but just did not want to spend it on a motel. FIELDS normally had enough money to get by especially when he was working and FIELDS was working the week prior to July 10, 2003.

FIELDS did not talk much about his ex-wife.  It was not PRESSLEY's impression that FIELDS had any anger towards his ex-wife.  FIELDS never complained to PRESSLEY about having to pay child support.

PRESSLEY described FIELDS as being somewhat "tight" with his money, especially when it came to purchasing necessities. However, FIELDS would spend money freely on food or things to influence girlfriends.

Approximately four or five weeks ago, FIELDS and PRESSLEY took a trip to Little Rock, Arkansas, together.  It was PRESSLEY's idea.  The two men went to a club and played pool.  They also stopped in the Ozark River on the way back.  FIELDS did not meet any female friends along the way.  FIELDS and PRESSLEY spent one night in a motel in Little Rock.

FIELDS' mother is named MARY MARGARET FIELDS.  MARY is very sick with Lupus in the advanced stages.  MARY will speak in a slurry tone at times.  FIELDS' father, MARY's husband, passed away last year.  PRESSLEY described MARY as a nice lady.

000358

0-302a (Rev. 10-6-95)

70A-OC-65054

Continuation of FD-302 of ___DANIEL PRESSLEY_____, On __07/25&30/2003__, Page __5__

The blue Chevrolet pickup truck which FIELDS drives belongs to FIELDS' mother, MARY.  PRESSLEY believes that the truck is still in MARY's husband's name, EDWARD L. FIELDS.

PRESSLEY described FIELDS' mental state as being sometimes up and sometimes down.  FIELDS' mental state seems to depend somewhat on his relationship with MICHELLE TIPTON.  FIELDS has mentioned to PRESSLEY that FIELDS really loves MICHELLE. During the first part of June, PRESSLEY assisted FIELDS moving his personal belongings out of MICHELLE's residence to a storage building.  MICHELLE TIPTON had kicked FIELDS out of her house.

During FIELDS' lowest times, FIELDS appears quiet and tired with a general attitude that "life is too hard."  It appears to PRESSLEY that to FIELDS, life is too hard to work at to make better at times.  FIELDS has mentioned to PRESSLEY being suicidal approximately 15 to 20 times, especially during the last year, and especially during the last four months.

PRESSLEY recalls an incident approximately three weeks ago when PRESSLEY and FIELDS visited some cliffs near Lake Eufaula. FIELDS proceeded to jump off a cliff into the water and cut his back slightly.  PRESSLEY scolded him for jumping so close to some rocks.  FIELDS responded to PRESSLEY "The worst thing that could happen is I would get killed."  It appeared to PRESSLEY that FIELDS did not hold his life in high regard.

It was not unusual for FIELDS to laugh.  FIELDS had a normal sense of humor.  Things that would make FIELDS laugh would include PRESSLEY losing at a game of pool, or PRESSLEY losing a fish off his line.  PRESSLEY described these things as "normal stuff that most men would laugh at."

PRESSLEY described FIELDS' character.  PRESSLEY has never known FIELDS to steal and PRESSLEY trusts FIELDS with his personal belongings.  PRESSLEY also trusts FIELDS to keep confidences. PRESSLEY has never known FIELDS to be violent.  FIELDS will occasionally get angry, perhaps a little loud and cuss a little, but PRESSLEY described these as normal human reactions to things that "piss us all off."  PRESSLEY has never seen FIELDS hit anyone or hurt anyone.

000359

D-302a (Rev. 10-6-95)

70A-OC-65054

continuation of FD-302 of      DANIEL PRESSLEY _____ , On  07/25&30/2003 , Page    6

          FIELDS will talk about sex at times as would a normal
male.  FIELDS sometimes likes to shock people with his comments to
get their reaction.  As an example, PRESSLEY remembers FIELDS
saying words to the affect "I won't mess with sheep, I'm allergic
to wool."

          FIELDS is an honest person.  However, FIELDS will lie to
females to get what his wants.  FIELDS has always been honest with
PRESSLEY.  If PRESSLEY needed FIELDS, FIELDS was there.  When
PRESSLEY's mother was sick, FIELDS brought dinner by the PRESSLEY's
residence.

          PRESSLEY described FIELDS' personality as someone looking
for something they could not find or could not reach.  Other than
that, there was nothing unusual.  FIELDS does not seem capable of
killing anyone.  PRESSLEY is aware that over the past three weeks,
FIELDS has taken medication for depression.

          FIELDS has never mentioned hearing voices to PRESSLEY.

          PRESSLEY described FIELDS as somewhat shy and one who did
not make friends easily.  FIELDS did not try to make friends.
PRESSLEY is aware that FIELDS was good friends with DAVID LOVE with
whom FIELDS worked on computers.  PRESSLEY is not aware of any
other associates of FIELDS outside of work.

          FIELDS occasionally helped PRESSLEY fix PRESSLEY's
computer.  FIELDS would chat on-line and play computer games.  On a
few occasions, FIELDS downloaded adult pornography off the
Internet.  FIELDS liked to chat with other countries and can speak
a little Japanese and a little Spanish.  PRESSLEY is not aware if
FIELDS maintains any sexual videos.

          PRESSLEY has no idea why FIELDS would kill anyone.
PRESSLEY does not understand the motives for FIELDS to kill anyone.
PRESSLEY had nothing to do with the killings of CHARLES and SHIRLEY
CHICK on July 10, 2003.  PRESSLEY did not know about the killings
until he found out through the news media.

          PRESSLEY and FIELDS have used e-mails to communicate in
the past, but PRESSLEY could not recall any e-mails in the past
eight or nine months.

                                              000360

D-302a (Rev. 10-6-95)

70A-OC-65054

ontinuation of FD-302 of _____ DANIEL PRESSLEY _____ , On _07/25&30/2003_ ,Page __7__

       PRESSLEY and FIELDS have had no discussions about the events of July 10, 2003.  FIELDS has not made any admissions to PRESSLEY.  PRESSLEY spoke with FIELDS on July 24, 2003 for a few minutes when FIELDS called from jail.

       On July 30, 2003, PRESSLEY was shown a picture of a gilli suit.  PRESSLEY identified the gilli suit as being that of FIELDS, specifically because of the various ropes and colors of the ropes included in it.  PRESSLEY dated and initialed the back of the photograph.

       On July 30, 2003, PRESSLEY was shown a photograph of a 22 Marlin rifle wrapped in burlap.  PRESSLEY identified the gun as looking exactly like the gun that FIELDS showed him while he visited CAROLE LAMB's house in approximately June 2003.  PRESSLEY had seen the weapon over the years, but had never seen it wrapped in burlap.  PRESSLEY did not ask FIELDS why it was wrapped in burlap.

       PRESSLEY has never noticed FIELDS having a radar detector in his truck.  PRESSLEY has not been inside FIELDS' truck since July 10, 2003.

       PRESSLEY was shown a photograph of a blue 1989 Chevrolet pickup truck.  PRESSLEY identified the truck as belonging to FIELDS and advised that FIELDS drives it everywhere.  PRESSLEY dated and initialed the back of the photograph.

000361

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 388

# OKLAHOMA STATE BUREAU OF INVESTIGATION

TITLE OF REPORT:   **CRIME SCENE INVESTIGATION**

On July 11, 2003, LeFlore County Sheriff's Department received a "911" call from MAX HENDRIX. HENDRIX told Dispatcher KIM LEONARD that two dead bodies were in a campsite in the Winding Stair Campground. LeFlore County Sheriff ROY GENTRY requested OSBI investigative assistance. OSBI Agents DONNIE LONG and IRIS DALLEY met HENDRIX, LeFlore County Deputies RICKY ROBINSON, THOMAS SCHUBERT, J. D. THORNBURG, and DALE FOUT, U. S. Forestry Officers GARY ROSE, JOE LOVETT, and JESSIE SCOTT, at the entrance to the campground.

The Winding Stair Campground was in the Winding Stair Mountain National Recreation Area. The campground had one entrance/exit. That entrance was north of HWY 1, about 2 miles west of the intersection of HWY 1 and US 259. The campsites were about .2 miles north or the campground entrance.

HENDRIX was riding a black, 1991, Honda, ST1100 motorcycle, Texas License Plate 414-L4M. HENDRIX told DALLEY and LONG that he had a 9mm pistol in the motorcycle. HENDRIX had a bandage on one finger. DALLEY asked HENDRIX for consent to search his motorcycle but HENDRIX refused.

The entrance to the campground was secured by a LeFlore County Sheriff's car and barrier tape. Campsite #15 was secured by barrier tape.

DALLEY videotaped and recorded digital images of the campsite, from the bathroom/showers building to campsite #15, and the surrounding campsites.

Campsite # 15 was at the northwest end of the campground. An asphalt drive was along the east side of the campsite. The tent pad was at the north end of the drive. A concrete picnic table was west of the drive. Fixed poles were at the north and south ends of the table. A grill was in the northwest corner of the campsite.

| | | | | | |
|---|---|---|---|---|---|
| Investigation On: 07/11/03 | At: WINDINGSTAIR CAMPGROUND | | By: IRIS DALLEY | | File: CR 03-527 |
| Offense: HOMICIDE | Victim: CHARLES CHICK & SHIRLEY CHICK | | | Case Agent: DONNIE LONG | |
| Office: ERO | Date Reported: 08/01/03 | Approved by: | | Date Approved: | IND: .031 |

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.

000110

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 2

A blue, 1996, Ford van, Texas License Plate SZK-70F, was parked in the drive of campsite #15. The van faced south. All the van doors were closed. A dark green Cabela's tent was set-up and secured on the tent pad. The tent was about 15 feet behind the van. A green dining canopy was suspended above the picnic table. The picnic table was about 10 feet west of the drive.

Campsite #14 was northeast of campsite #15. Numerous trees and brush separated those two campsites. A burlap-like fiber and small gouges were in the bark of a tree between campsite #14 and campsite #15. That tree was about 76 feet northeast of the tent in campsite #15. The gouges and the fiber were on the north side of that tree, a few inches above the ground. A partial shoe wear impression was on the ground below the gouges and fiber, on the north side of that tree. A circled "13" pattern was in that shoe wear impression. DALLEY cast that impression in dental stone and she collected the fiber from the tree bark.

The body of an adult white female was on the asphalt at the passenger side of the van. She was lying on her right side, with her head beside the front edge of the front passenger door. Her right arm was bent at the shoulder and elbow, with her right hand palm-up. Her left arm was bent at the shoulder and twisted at the elbow. Her left hand was palm-up, beside her waist. Her right leg was extended to the north. Her left leg was bent at the hip and knee, with her left foot beside her right knee.

DALLEY observed lividity in the palm of the woman's left hand.

The woman was dressed in a blue lightweight knit jacket, white shirt, blue jeans, and white athletic shoes. The left shoulder of the jacket was pulled up over her left shoulder, left upper arm, and head. Twine-like fibers were on her left shoulder. Those fibers were about 6 inches long. A burlap-like fiber was on her left wrist, and another burlap-like fiber was on her left ankle. DALLEY collected the fibers from her wrist and the ankle.

A blood pool was on the drive under the woman's body and beside the van. That stain pattern extended from below her head, under her body and left foot, then to the rear of the van.

A large, soaked bloodstain was on the front of the right leg of the female's jeans, above the drive. A soaked bloodstain was on the front of the shirt, above the drive. Those bloodstains were not consistent with occurring

000111

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 3

while the body was in the position described above. Blood spatter was on the front and back of her right hand.

A sandal was on the drive near the top of the female's head. Bloodstains were on both sides of that sandal. DALLEY collected that sandal.

Bloodstains were on the passenger doorstep, in front of the woman's head. Those stains were a flowing pattern, from the inside the van. No other bloodstains were on the passenger side of the van.

A pair of eyeglasses was under the woman's head. Keys were in the right front pocket of her jeans. DALLEY collected the eyeglasses and the keys.

Medical Examiner's Investigator SHERRY BEDFORD examined the woman's body in the campsite. Dowden Funeral Home removed the body for transport to the Office of the Chief Medical Examiner in Tulsa for autopsy.

DALLEY opened the front passenger door. Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep. Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep. Fragments of broken glass were on top of the sandals and blood in the doorstep. DALLEY collected the three sandals and the tissue-like fragment.

A spent, .22 caliber shell casing was on the drive in front of the right front tire, about 5 feet from the woman's head. A spent, .22 shell caliber casing was on the ground west of the drive, about 7 feet from the woman's head. DALLEY collected those shell casings.

The body of an adult white male was on the ground about 2 feet west of the picnic table. His body was face-down, with his head to the south and his feet to the northwest. His right arm was extended from the shoulder and bent at the elbow, with his right hand palm-down on the ground beside his head. His left arm was under his chest. His left hand was palm-up, on the ground next to his right elbow. His legs were straight, with the soles of his feet up.

000112

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 4

The male was dressed in a lightweight knit jacket, a striped shirt, and jeans. The jacket was pulled over his left shoulder and the back of his head. The left front pocket of his jeans was partially turned out. A brown, slip-on shoe was on his right foot. His left foot was bare. DALLEY observed lividity in the sole of his right foot, from the instep across the bottom of the toes. There was no lividity on the top of his right foot. The lividity pattern in that foot was opposite to its position on the ground.

The back of the man's right hand was bloodstained. That bloodstain pattern had a line of demarcation from the base of the thumb to the base of the right ring finger. The bloodstain extended from that line, over the back of his right fingers, and along both sides of his right hand. That bloodstain pattern was not on the right palm. A smeared bloodstain was across the back of his left hand. A few bloodstains were across the top of his right toes. The bloodstains on his hands and right foot were not consistent with occurring while the body was in the position described above.

A blood pool was on the ground under and around the man's head. Patterns in that blood pool indicated that one or more objects in the blood pool area had been moved.

A large bloodstain was on the front of the man's shirt. The ground below the shirt was not bloodstained.

A key chain and keys, a vial of small pills, and $7.57 in coins were in the man's pockets. DALLEY collected those items.

Medical Examiner's Investigator SHERRY BEDFORD examined the man's body at the campsite. The body was removed by Dowden Funeral Home for transport to the Office of the Chief Medical Examiner in Tulsa for autopsy.

A right, brown, slip-on shoe was on the ground between the man's left leg and the north end of the picnic table. That shoe matched the shoe on his left foot. Blood drops and a smear were on the top of the toe-end of that right shoe. No bloodstains were inside that shoe. DALLEY collected that shoe.

A vinyl tablecloth was on the picnic table. That tablecloth was secured across the north and south ends of the table with elastic cords. A large blood pool was in the middle of that tablecloth. A smaller area of

000113

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 5

bloodstain was on the tablecloth northeast of the blood pool.   Mist-like bloodstains were on the tablecloth along the east side of the tabletop. Directional spine-like bloodstains radiated from the east side of the large blood pool.   Those stains were on top of the mist-like stains.   Smears were along the north and south sides of the large blood pool.   Drip patterns were down the west side of the blood pool.   Those drips extended from the blood pool to the bottom edge of the tablecloth.

A black flashlight and a yellow portable hazard radio were on the table southeast of the large blood pool.  Smears and blood spatters were on the flashlight and the radio.   The flashlight and the radio were both functional; both were "off".

A ½ full Coors Light beer can, in an orange Little Caesar's coozie, was on the table north of the blood pool on the tablecloth.   Blood spatter was on the south side of the coozie.

An insect-repellant candle, in a glass jar, was on the south end of the table.  Melted wax was on the sides and in the bottom of the jar.   The wick was burned to the level of the melted wax.

A large, green, Coleman squeeze bottle with a white lid and straw was on the east bench of the picnic table.  That bottle was ½ full of liquid.  A small amount of blood spatter was on that bottle and on the east picnic bench.  An open bag of popcorn was on the ground at the east side of the picnic table, below the squeeze bottle.  That bag was not bloodstained.

DALLEY collected the popcorn bag, squeeze bottle, candle, radio, flashlight, beer can and coozie, and the tablecloth.

A spent .22 caliber shell casing was on the ground about 5 feet northeast of the picnic table.  DALLEY collected that casing.

A clothesline was suspended from trees limbs above the north side of the campsite.  A purple Royal Crown bag was hanging from the clothesline, north of the picnic table.   That bag contained "D" rings and clothespins. A brown hand towel and a white washcloth were hanging on the clothesline behind the tent.  Empty clothespins were on the clotheslines beside the towel.

000114

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 6

The driver's window of the van was broken. A piece of the glass safety film, with glass fragments attached, was hanging from the top back right corner of the driver's window frame. Part of that piece of the window was caught between the driver's door and the doorframe. A large piece of the broken window was on the east edge of the drive. A piece of broken concrete was on the ground about 1 foot east of that piece of window. Glass-like fragments were in that piece of concrete. A depression in the ground near the left rear of the van had the same size and shape as the piece of concrete. DALLEY collected the two pieces of the driver's window and the rock.

A cigarette butt was on the ground near the rock. DALLEY collected that cigarette butt.

A partial latent print was on the driver's doorframe, beside the driver's window frame. A scrape pattern was on the exterior side of the driver's door. DALLEY lifted the print and the scrape pattern.

A bloodstain was on the left end of the dash, near the driver's window. DALLEY collected that stain.

A Geritol bottle and a small fishing bobber were on the drive near the driver's door. DALLEY collected that bottle and bobber.

The area around the front seats appeared ransacked. The cover of the center console had been removed and it was lying between the front seats. A silver flashlight, a white roll of medical tape, and a piece of torn brown paper were on the driver's seat. The paper appeared to have been torn from a sack on the right middle seat. Miscellaneous plastic bags, notes, fishing tackle, and other small items were scattered around the driver's seat and between the front seats. Two latex gloves were on the floor near the driver's seat. Glass fragments were on and under items in the front end of the van, from the driver's door to the passenger door. DALLEY collected the medical tape and the latex gloves.

The van was packed from the middle seats to the back door. The tops of containers on the middle seats were open. Cases of beer were in the doorstep of the right side of the van, behind the front passenger seat. Camping gear and clothing was packed on and behind the back seat. Camping gear, clothing, and foodstuffs were packed behind the back seat. Items in the back seat and rear of the van appeared undisturbed.

000115

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 7

DALLEY collected miscellaneous documents, maps, and a journal from the van. Some of those documents indicated that the van was owned and maintained by CHARLES CHICK and SHIRLEY CHICK, ████ ███████████████████. One of the documents in the van was a parking space assignment letter from Lockheed (Fort Worth, Texas) to CHARLES CHICK.

The front of the tent faced southwest. The tent door flap was zipped closed. Bed mats and bedding were spread across the floor of the tent. A few plastic bags were on the floor at the west side of the tent. Two bags contained clean, folded clothing. One bag contained clean, folded pajamas.

The tent and its contents were placed inside the van. The van was removed from the campsite by Moholt Wrecker Service.

The bathroom/showers were locked by U. S. Forestry Officers after the bodies were found. The women's bathroom/shower was clean and dry. The men's bathroom/shower was clean. The shower floor was wet. DALLEY tested the shower stall and floor for the presence of blood. No blood was found.

DALLEY secured the following items in the OSBI Eastern Office Regional Property Room:

1. Cast of shoe wear impression.

2. Burlap-like fiber from tree.

3. Coors beer can in coozie.

4. Flashlight and radio from table.

5. Candle from table.

6. Green squeeze bottle from east bench of table.

7. Bag of popcorn from ground at east side of table.

000116

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 8

8. One brown shoe from ground near northwest corner of table.

9. Key chain and keys from male's jeans pocket.

10. Vial of pills from male's jeans pocket.

11. Coins ($7.57) from male's jean pockets.

12. One .22 caliber shell casing from ground east of table.

13. Burlap-like fiber from female's wrist.

14. Burlap-like fiber from female's ankle.

15. Sandal found next to female's head.

16. Keys from female's jeans pocket.

17. Eyeglasses found under female.

18. One .22 caliber shell casing from ground west of female.

19. One .22 caliber shell casing from drive near right front tire.

20. One fishing bobber from drive east of van.

21. One Geritol bottle from drive east of van.

22. One cigarette butt from ground east of van.

000117

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 9

23.   Rock from ground east of van.

24.   Latent lift from driver's doorframe.

25.   Lift of scrape pattern from driver's door.

26.   Medical tape from driver's seat.

27.   Latex glove from van floor.

28.   Driver's window glass from drive east of van.

29.   Driver's window glass from driver's door.

30.   Bloodstain from left end of dash.

31,   Three sandals from front passenger doorstep.

32.   Tissue-like fragment from front passenger doorstep.

33.   Miscellaneous documents, maps, and journal from van.

DALLEY recorded the video and digital images on compact disks. DALLEY retained those disks.

## END NOTE:

The van and tent were searched pursuant to a Search Warrant issued by Special Judge FARLEY WARD. A copy of the Affidavit and Search Warrant were attached to this report.

LeFlore County Sheriff's Deputy J. D. THORNBURG made a Crime Scene Entry Log. He gave that information to DALLEY. A copy of the Crime Scene Entry Log was attached to this report.

000118

CR 03-527.031
CRIME SCENE INVESTIGATION
PAGE 10

DALLEY prepared a log of the video and digital images of the scene.   A copy of the log was attached to this report.

DALLEY prepared a chart of the Crime Scene Measurements. A copy of that chart was attached to this report.

DALLEY prepared a map and sketch of the crime scene. Copies of the map and sketch were attached to this report.

000119

## DECLARATION OF R. ROBERT TRESSEL
## PURSUANT TO 28 U.S.C. § 1746

I, R. Robert Tressel, do hereby declare and affirm as follows:

1.      My name is R. Robert Tressel. I am a forensic investigation specialist with extensive training and experience in homicide investigation, crime scene reconstruction and death scene processing. I worked for the Medical Examiner's Office for Cobb County, Georgia for thirteen years and the Cobb County Police Department for twelve years. I have studied crime scene investigation at the Georgia Police Academy and other training programs around the country, and also have served as an instructor in many crime scene investigation training programs. I have been retained as an expert by both the defense and the prosecution. I have been qualified numerous times in federal and state courts as an expert in homicide investigation, crime scene reconstruction and death processing, and have testified on a wide range of issues, including lividity patterns, blood staining and blood spatter patterns.

2.      I have been retained on behalf of Edward Fields, Jr. by the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania. I have been asked by Mr. Fields' counsel to review and analyze certain crime scene and forensic matters relating to the homicides of Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest or about July 10, 2003. In particular, I have been asked to evaluate (1) when the driver's side window of the Chicks' van was broken relative to when Mrs. Chick was shot; (2) whether Mr. Chick's body was moved after he was shot and, if so, when his body was moved relative to when he was shot; and (3) whether Mr. Chick's wounds were the source of high velocity blood spatter observed on Mrs. Chick's face and hands.

1

3.      In performing my evaluation, I reviewed a large number of documents provided to me by Mr. Fields' counsel, including but not limited to autopsy and toxicology reports; trial testimony; law enforcement investigative and criminalistics examination reports; crime scene photographs; morgue and autopsy photographs; and stained clothing photographs.

4.      With regard to the driver's side window of the Chicks' van, after reviewing the materials provided to me, it is my conclusion that this window was broken a short time – probably an hour or less – after Mrs. Chick was shot.   My conclusion is based on the following facts.

5.      Agent Iris Dalley, who helped process the crime scene, testified that, when she arrived at the campsite, the driver's side window of the Chicks' van was broken and fragments of glass consistent with that broken window were scattered about the front compartment of the van. According to Agent Dalley, Government's Exhibit 43 depicts the area around the front passenger door of the Chicks' van.  A number of glass fragments in the well of the passenger side door are visible in Government's Exhibit 43.  Several of these fragments appear to be resting on what Agent Dalley describes as a pool of dried blood.

6.      Agent Dalley's report of her processing of the crime scene indicates that the glass fragments in question were not collected as evidence.  Her report also does not describe the condition of the glass fragments she observed in the van.  Based on my knowledge of police procedures, had Agent Dalley observed anything significant about the glass fragments, she would have recorded that information in her report.  This leads me to believe that either Agent Dalley did not conduct a physical examination of the fragments or she examined them and did not observe anything significant.

2

7.     Because Agent Dalley did not collect the glass fragments in question and preserve them as evidence, I was not able to physically examine them.

8.     Although I was not able to conduct a physical examination of the glass fragments in question, the materials I reviewed included a crime scene photograph that was not admitted into evidence depicting a close-up view of the well of the passenger side door. In this photograph, a red stripe consistent with blood is clearly visible on one of the glass fragments resting on the dried blood pool.

9.     The presence of blood on this particular glass fragment indicates that it landed on the blood pooled in the well of the passenger side door when that blood was still viscous. While it is not possible to determine precisely how long this pool of blood was viscous, given the cool mountain temperatures on the evening of the offense (indicated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot), the blood likely was dry at least an hour after Mrs. Chick was shot.

10.     I am aware that Agent Dalley testified that the glass fragments on top of the dried pool depicted in Government's Exhibit 43 were not stained with blood, although she did not explain how she determined that they were in that condition. I am also aware that Agent Dalley testified that, because these fragments lacked any blood stains, they must have landed on the blood after it had dried, which she estimates would have been at least an hour after Mrs. Chick was shot. I am further aware that, based on these facts, the government argued that the driver's window of the van was broken at least an hour after Mrs. Chick was shot.

11.     Agent Dalley's testimony and the government's argument were inconsistent with the fact that at least one of the glass fragments had a red stripe consistent with blood. The fact

3

that at least one fragment of glass had blood on it indicates that the driver's window was broken before the pooled blood dried.

12.     Even if some glass fragments resting on top of the dried blood lacked any blood staining, this does not indicate that the driver's window was broken after the blood dried. Agent Dalley testified that the front passenger door was closed when she arrived at the scene and that she opened the door to view the van's interior. It was not until after Agent Dalley opened this door that she discovered the glass fragments on the pool of dried blood. It is likely that some of these glass fragments fell onto the dried blood as a result of movement caused when Agent Dalley opened the front passenger door. This is corroborated by the fact that, in Government's Exhibit 43, a small whitish square object consistent with a glass fragment is visible lying on the pavement directly below the open passenger door. The presence of a glass fragment outside of the van confirms the fact that some glass fragments were disturbed and moved when Agent Dalley opened the front passenger door.

13.     With regard to the position of Mr. Chick's body, after reviewing the materials provided to me, it is my conclusion that Mr. Chick was moved from the picnic table to the ground after he was shot. My conclusion is based on the following facts.

14.     According to the testimony of Agent Dalley and crime scene photographs: (1) Mr. Chick's body was found lying in a prone position beside a picnic table; (2) his sweatshirt was partly pulled up over his back and his right foot was bare; (3) his bare foot had abrasions or cuts around the tops of some toes; and (4) blood was found pooled on the top surface of a picnic table. Based on these and other facts, it appears that Mr. Chick was shot while seated at the picnic table and his body was subsequently moved to the location where it was found.

4

15.     With regard to when Mr. Chick's body was moved, after reviewing the materials provided to me, it is my conclusion that his body was moved within a relatively short time – as soon as one hour or less – after he was shot. My conclusion is based on the following facts.

16.     First, when Mr. Chick's body was found, much of his right hand was covered with dried blood. Pine needles and other debris from the ground appear to be embedded in this dried blood. If Mr. Chick had been moved from the picnic table to the ground much more than an hour after he was shot, the blood on his hand would have been dry and would not have picked up this quantity of debris from the ground. Mr. Chick's body must have been moved while the blood on his hand was viscous or tacky in order to pick up this debris.

17.     Second, crime scene photographs indicate that a significant volume of blood pooled on the ground around Mr. Chick's head. Post-mortem blood flow to this extent likely would not have occurred if Mr. Chick's body had been moved many hours after he was shot, particularly since his blood would have congealed more quickly in the relatively cool evening air.

18.     Third, some lividity patterns on Mr. Chick's body are consistent with the position in which he was found.

19.     Lividity is a discoloration of the skin caused by the settling of blood in the capillaries due to gravity. It does not occur in areas of the body that are in contact with the ground or another object. Lividity becomes "fixed," or unchangeable, within four to six hours after death, although lividity can be fixed is less time in colder temperatures.

20.     Autopsy photographs of Mr. Chick's torso and thighs indicate that lividity became fixed while he was lying on the ground and not while sitting on the picnic table bench. Mr. Chick was discovered lying face down with his left arm under his chest, which had the effect of

5

slightly elevating his right side. The autopsy photographs indicate that lividity was present on

Mr. Chick's left side, right abdomen, and right top thigh. These lividity patterns are consistent

with the position in which Mr. Chick was found.

21.     Crime scene and autopsy photographs of Mr. Chick's feet also indicate that

lividity became fixed while he was lying on the ground and not while sitting on the picnic table

bench. These photographs do not indicate any significant pooling of blood in Mr. Chick's feet

and ankles, as would be expected if lividity had become fixed while he was sitting on the picnic

table bench. Moreover, crime scene photographs indicate that, when Mr. Chick's body was

found, the tops of his toes were pressed onto the ground. In these photographs, the bottom of his

toes and the ball of his foot – which were not in contact with the ground or any object – show

lividity. Autopsy photographs indicate no lividity on the tops of his toes, which were pressed

onto the ground. This lividity pattern is consistent with the position in which Mr. Chick's foot

was found.

22.     My conclusion is consistent with rigor mortis present in Mr. Chick's body. Rigor

mortis, or stiffening of the muscles, fully develops in six to twelve hours after death. Although

rigor can be broken under some circumstances, it generally does not reestablish itself. An

investigator from the medical examiner's office noted that Mr. Chick's body showed full rigor at

8:25 p.m. the day after the homicides. At that time, Mr. Chick's body was in a prone position

inconsistent with being seated at the picnic table. It is likely, then, that rigor established itself in

Mr. Chick's body while he was lying prone on the ground and not while seated at the picnic

table.

6

23.     I am aware that Dr. DiStephano and Agent Dalley testified that, based on livor patterns, Mr. Chick was moved more than six hours after he was shot. It does appear that the livor observed on the back of Mr. Chick's thighs is not consistent with lividity becoming fixed while Mr. Chick was lying on the ground. However, the livor on the back of Mr. Chick's thighs also is inconsistent with the conclusions of Dr. DiStephano and Agent Dalley because that livor appears to extend circumferentially around much of Mr. Chick's thighs, which is not the pattern that settling blood would be expected to make. At best, then, lividity patterns on Mr. Chick's body are inconclusive in establishing when Mr. Chick's body was moved.

24.     Moreover, the conclusions of Dr. DiStephano and Agent Dalley are inconsistent with the fact that (1) ground debris attached itself to the blood on Mr. Chick's right hand; (2) a significant volume of blood flowed out of Mr. Chick's head and onto the ground after he was moved; and (3) Mr. Chick's body shows fixed lividity consistent with the position in which his body was found. While it is not possible to determine precisely when Mr. Chick was moved, it had to be before the blood on his right hand dried, the blood in his body congealed, and lividity became fully fixed. The debris on Mr. Chick's hand alone indicates that he was moved less than an hour after he was shot.

25.     With regard to the high velocity blood spatter observed on Mrs. Chick's face and hands, after reviewing the materials provided to me, it is my opinion that, while it cannot be determined conclusively whether that the source of that spatter was Mr. Chick's wound, there is a likelihood that Mrs. Chick's own wounds were the source of the spatter.

26.     Dr. DiStephano testified that high velocity blood spatter was observed on Mrs. Chick's face – particularly her left cheek – and hands. High velocity blood spatter can be caused

7

by either an entrance or exit wound. The materials I reviewed indicate that this high velocity blood spatter was not tested to determine whether the blood was Mr. Chick's blood.

27.     Mrs. Chick was shot twice in the head. One shot was to the back of her head, with no associated exit wound. Another shot was to the left frontal region of her head, with an associated partial exit wound. The autopsy report indicates that this exit wound was caused by either a bone or bullet fragment. Either of the wounds caused by the shot to the left frontal region of her head could have caused high velocity blood spatter that landed on her face and, depending on their position at the time of the shot, her hands.

28.     I am aware that Dr. DiStephano and Agent Dalley testified that high velocity blood spatter can be recognized on an object after traveling up to around about two feet from its source. I also am aware that the government argued that this meant Mrs. Chick was within two feet of Mr. Chick when he was shot and that she was spattered with his blood. While this may have been the case, it is equally plausible that the source of the high velocity blood spatter observed on Mrs. Chick's face – specifically the spatter on her left cheek – and hands was the wound to the left frontal region of her own head.

29.     I was not retained by trial counsel for Mr. Fields, but the conclusions that I offer in this affidavit could have been offered by me or any competent forensic crime scene expert at the time of Mr. Field's trial. All of the opinions expressed in this affidavit are to a reasonable degree of scientific and forensic certainty.

8

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 406

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury pursuant to 28 U.S.C.A. 1746.

R. Robert Tressel

Dated: March 3/, 2010
Hiram, Georgia

9

406



# EDWARD LEON FIELDS, JR.

## PRELIMINARY ASSESSMENT

Edward Leon Fields, Jr., was born on ████████, in Oklahoma City, to Edward Leon Fields and Mary Margaret Ginniman Fields. Our client is referred to as "Eddie" by family and friends. Although the records have not yet been received, Eddie was not expected to live following his birth as a result of "hollow membrane disorder", which is now referred to as respiratory distress syndrome. He has one older sibling, Cherie Fields, who is less than two years older than Eddie. Eddie's parents remained married until his father's death on October 27, 2002, at the age of 61 years. The fact that Eddie's parents were devoted to each other throughout their marriage is undisputed, but their relationship with each other was in exclusion to their children. Because of Eddie's father's busy work schedule, there was very little interaction between Eddie's father and the children. Although Eddie's mother worked outside the home very little, there was also limited positive interaction from Eddie's mother.

Eddie's father worked the majority of his life as a supervisor with various coalmines and made a substantial salary. Limited information is known with regard to Eddie's paternal family members, but paternal aunts of Eddie were sexually abused and as a result, the siblings were placed in foster homes and in adoptive homes. Very little interaction occurred among the siblings following their separation and to date, there are siblings whose locations are unknown. Eddie's father also served a three-year sentence in Granite, Oklahoma at age 21 for Burglary, but this is unverified.

Eddie's mother had a very close relationship with her father, although Eddie's grandfather was also a person who did not talk about his feelings and did not display emotion. Eddie's grandfather, Jack Ginniman, died in 1995, unexpectedly, as a result of an aneurysm. Eddie's mother reported her own mother as being a cold, uncaring person to her two daughters but very devoted and loving toward Eddie. Eddie recognized, and was told, that he was the favorite grandchild of Pat Ginniman. Although Eddie acknowledged his grandmother's love and devotion to him, he did not speak of her in loving terms. Eddie's maternal family is very creative and talented and Eddie has a natural ability for drawing. Eddie's mother and grandmother taught themselves to make porcelain dolls, paint and make elaborate baskets.

Eddie had material items and was supported by his parents and maternal grandmother, financially throughout his life. Both sides of his family have tremendous work ethics and employment histories. Eddie has maintained work, for the most part, throughout his life; however, he did not report any goal or type of employment in which he was interested or particularly enjoyed. This aspect of Eddie's life has often been brought up to him by his immediate family members, who never understood his apathetic outlook on the

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                          2
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

importance of supporting his children and maintaining regular employment. It has been reported that while in the hospital as a result of cancer, Eddie's father told him not long prior to his death, that before he died, he had hoped he would see Eddie "make something of himself." Eddie's father implied that this would not be the case.

Eddie reported that throughout his life he has never been happy and feels that he has been depressed since childhood. During his childhood and early teenage years, he did not report his feelings or discuss his thoughts with anyone. Throughout his life, he also reported hearing a voice from within his head, which at times repeats a phrase or command incessantly, until the point Eddie felt he had to act on it. He also noted that there have been numerous occasions throughout his life that he would quit employment for no logical reason or quit an activity, which he enjoyed, such as running track and playing football while in high school. At age 17, Eddie received psychiatric counseling for the first time; however, it is believed that the basis of the referral was due to Eddie's behavioral problems at school and at his parents' home. Eddie's behavioral problems, at approximately age 16, were resolved by him being forced to join the Navy from which he was honorably discharged. Several years later Eddie admitted, and continued to receive medication for depression, but he was treated by physicians not by a psychologist or a psychiatrist. Medication prescribed for Eddie was changed approximately one month prior to the crime, as his doctor provided him with samples of Effexor.

Eddie spoke of love for one person; Michelle Tipton, a woman he began dating in July 2002. Although Eddie has a daughter who is 17, and two children from his first marriage, ages 15 and 13, he did not speak of any of his children or other adult relationships in affectionate terms. Eddie's affect is very flat and his conversation is without emotion. There has been no indication that Eddie expressed his feelings or emotions to anyone throughout his life. There are reports of impatience with his children, issues with his anger and verbal abuse to persons; however, Eddie has no criminal history, as a juvenile or an adult.

As stated earlier, Eddie's father died in October 2002, after several months of illness from a heart condition and cancer. Eddie's mother has suffered from severe medical issues for many years, including lupus and possible multiple sclerosis. She suffers from rheumatoid arthritis and has brain lesions. Prior to, and following Eddie's father's death, he was placed in a position to assist with various chores in and around his parents' home. These included caring for the cows and other chores associated with the farm on which the family lived. It would appear that no matter what Eddie did, he would never be in a position to satisfy his mother as he could not live up to the high standards his father held. For the past several years Eddie also appeared to have an obsession with regard to chat rooms on the Internet and he has met numerous women as a result of the computer interaction. Eddie's mother noted that before she moved from Oklahoma in June 2002, Eddie listened to a particular song, which was about death and suicide over and over for hours at a time, while on the computer.

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                  3
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003


Even with the estranged relationship Eddie had with his parents, his father's death seemed to have an adverse effect on him. It was difficult for him to deal with his mother's declining health and grief as a result of her husband's death; and not long prior to the crime, Eddie's mother sold the family farm and moved to Virginia to reside with her daughter. Eddie faced the loss of his immediate support system and faced financial pressure as a result of child support complaints. In the spring of 2003, Eddie was advised by his wife, Teresa, that she had met someone else and wanted a divorce, which was final in March, 2003. It should also be noted that Teresa Skeens Fields has breast cancer, which is life threatening. Eddie also struggled to maintain a relationship with Michelle Tipton, who faced serious difficulties of her own at the time involving her children. Numerous stressors were in place, including but not limited to, Eddie feeling as he had no where to live and no one to turn to, along with increasing voices and depression.


# FAMILY BACKGROUND INFORMATION

## Paternal


Edward Fields, Jr.'s grandfather was John Henry Fields, who was born in 1901. He died in 1952 in a truck fire and it is possible he was drunk at the time of the fire, although it was reported that our clients' father saw his father on more than one occasion after the time of his reported death. John Fields worked as a migrant worker in California and Oklahoma. Reportedly, Fields' father was also named John Fields, who died at age 98 after his teeth were extracted. Fields' health declined after the dental work and he predicted his death would be a result of having his teeth pulled. John Fields, Sr., had a long gray beard and mustache. He was reported to be a doctor in Larado, Texas, who was shot seven times and who told his wife to take the bullets out, although the circumstances relative to the shooting are unknown.

Edward Fields' paternal grandmother was Willie Mae Shropshire, who died in 1959 as a result of a brain tumor. It is believed that the paternal grandparents were raised in Eufala, Oklahoma. Willie Shropshire's parents were George and Bessie Mae Sisk. They were reported to be "good people" by several persons. George Sisk died after being "beat up" in a tornado in Eufala; Bessie died of old age, although their dates of demise are unknown.

For the most part John Fields and his wife, Willie Mae, resided in Vian, Oklahoma, during times they were not in California picking crops. According to a paternal aunt, Retha Fenn, her biological father sexually abused her when she was four years old. She told her mother who did not believe her, initially. For whatever reason, Retha advised that her mother finally "threw" her father out of the home approximately in 1942. Information is contradictory with regard to whether Willie Mae Fields remarried, but

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                          4
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

given the fact that she had so many children to care for and with very little income, it is doubtful that she actually remarried. After John Fields death in 1952, Willie Mae received $13.00 monthly from social security for the four oldest children. She also received welfare in the amount of $144.00 a month. In approximately 1953, Willie Mae began a relationship with a man named Jack Thomas. Willie Mae and Jack Thomas had one child, a daughter named Bobbie but whose last name and whereabouts are unknown.

Two years later, Willie Mae developed a brain tumor and became blind. It was reported that the children were placed in various foster homes because Willie Mae was unable to care for them. According to Retha Fenn, the eldest daughter, Jack Thomas had been sexually abusing her for sometime and as a result, she became pregnant. Again, Retha's mother did not initially believe or support her, but Retha was able to enlist the support of her maternal aunt. Retha gave her infant son up for adoption and remains hopeful that she will one day locate him. Retha lived with her aunt and her maternal grandparents, but all the younger children were placed in foster homes and adopted. The children of Willie Mae and John Fields are as follows along with limited information about them:

**John (Jay) Fields** 04-19-35; married in 1956 and left OK to work in various states for several years. He has been truck driver for over 50 years. He has one grandson, age 11, who is BI-polar, hears voices, and who has received in-patient treatment for significant periods of time.

**Gene Fields**, deceased, year unknown, but within the past five years, as a result of hitting his head on the bathtub

**Johnny Ray Fields**, deceased, year unknown, but within the past five years, as a result of suffocating in a parking lot from smoking. It was reported he coughed himself to death.

**Retha Fields Fenn**, 03-2038; twin of Johnny Ray. Had polio as a child, did not start school until 10 years old, only has 4th grade education. Sexually abused and raped. Has been married for 31 years; one son; four grandchildren. Husband, Preston, appears to be mentally impaired. Retha also has a severe speech impediment.

**Edward Leon Fields**, client's father. Lived with his maternal grandmother for a period of time, was in foster home at age 16. Leon spoke little of his childhood, but reported his mother beat the children everyday. She advised it made her happy to beat them. Leon believed his father was possibly guilty of murder and faked his own death, although he was unable to obtain any details. Leon asked his older brother, Jay, for specific information about his parents, but Jay would never discuss anything.

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                              5
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

**Catherine LNU**, deceased, date unknown, cause unknown.  Catherine was adopted as a child.  She also had polio as a child and remained crippled throughout her life.

**Dorothy Fields Sapp**, adopted at approximately age nine, along with her sister, Helen.  It was reported that Dorothy and Helen were also sexually abused by Jack Thomas.  Dorothy cried while speaking with me and advised that her "adoption" was too painful to discuss.  It was also reported that Dorothy related many years ago that she remembered being in court when the presiding judge asked Willie Mae Shropshire to choose between continuing her relationship with Jack Thomas or keeping her children.  Willie Mae chose Thomas.

**Helen Fields Walker,** adopted at the same time and approximate age of her sister, Dorothy.  Helen advised that she does not remember her childhood prior to her adoption and she feels this has helped her throughout the years.  She related her adoptive parents never discussed her mother with her and they did not want Dorothy or Helen to seek out their siblings.  Helen reported that she and Dorothy had very happy childhoods with their adoptive parents.

**Georgie LNU**, location unknown, by any siblings.  She was adopted as a child and her name was reportedly changed.

**Betty LNU** was adopted as a child.  She is reported to have been in an automobile accident, which left her face disfigured and as a result, she will not allow anyone to see her.

According to Jay Fields, his mother had two infants prior to his birth, who died at birth.  There was another child who died in Oregon at age one, but the birth order of this child is unknown.  Helen was responsible for the locating and contacting the siblings in the 1970's.  Because Jay and Leon lived in fairly close proximity, they had more contact than the other siblings.  Throughout the years, there has been limited contact among the siblings.

**Maternal**

Eddie Fields grandfather was Thomas Lee "Jack" Ginniman, who died unexpectedly in 1995 from an aneurysm.  Ginniman's parents were Henry and Elizabeth Ginniman.  Henry is reported to have immigrated from Germany and to have worked on the railroad in Maryland. The family was Catholic.

Children of Henry and Elizabeth:

**Jack Ginniman**

*inquisitor, inc.*

412

EDWARDS LEON FIELDS, JR.                                               6
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003


**Elizabeth "Tookie" LNU**

**Mary Alice LNU**

**Charlotte Ann LNU**, died of cancer, date unknown

(Little information is known with regard to these paternal relatives, as the information was provided by Eddie fields' maternal grandmother. Her physical and mental health is impaired).

Eddie Fields' grandmother is Mildred Pat Hines; ██████████.
Her parents were Charlie Hines, ████████████, ██████████████, and Artha Melvinia "Vina" Hensley, ██████████, ██████████████.

Artha's parents were Albert Hensely and Alice Barlow. They came from Ft. Smith on a ferry and owned general store and later a gas station.

Children of Charlie and Artha Hines

   **Inez Boggs**, nursing home Poteau

   **Albert Hines**, deceased, date unknown, cause unknown

   **Mary Alice White**, deceased, date unknown, cause unknown

   **Dorothy Browning**, deceased, date unknown, cause unknown

   **Richard Hines**, deceased, date unknown, cause unknown

   **Pat Hines Ginniman**, client's grandmother

   **Ethel Gist,** ████████; responsible for the reporting of the majority of the maternal family history

   **Welton Hines,** ████████. Reportedly has a son serving a life sentence in Maryland; no other information known

   **Betty McHugh**, deceased, date unknown, cause unknown

   **Jimmy Charles Hines**, died at six weeks old, date unknown, cause unknown.

Pat, our client's grandmother, was married to Jessie Newman in 1939 at age 15. They had one child, Sharon Jackie, born in 1940. Pat's father was "mean" to her and would not let her play basketball, although she reported that she was an excellent player. Her

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    7
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

father wrongly accused her of activities regarding boys. She had a good figure and was very pretty. Charlie did not treat other girls the way he treated Pat. It has been reported by our client's mother that Pat was sexually abused by her father and this is the reason she left home to marry at a young age. Charlie Hines, Pat's father, was reported to have been a hard worker, but also drank and gambled. Pat's husband, Jessie, could not find or keep work. Pat did not want this type of life and divorced him during the time they lived in California.

Jack Ginniman was in the Navy and met Pat in California. They married within six months of dating. There has been contradictory information about how Jack treated Jackie, his step child whom he adopted. There is also contradictory information about Pat receiving shock treatments in California, but the reason is unknown.

Children of Jack and Pat Ginniman:

**Mary Margaret Ginniman Fields,** ███████████, mother of client.

Jack worked in construction in California, then moved to Maryland, back to California, then to LeFlore Co., Oklahoma, for the purpose of finding steady employment. He worked in the McAlester Department of Correction and retired from the Hodgen Department of Correction Unit. He was described as having a "strong personality, but a good provider." Our client's mother advised that her mother was a "cold person"; her father reportedly was in an unhappy marriage, which often included arguments and verbal "fights." Jack was not a person who displayed affection or verbally expressed his feelings. After retirement, Jack and Pat moved to Florida for a period of time, then to Virginia, in close proximity to their daughter's home. Jack and our client's mother made baskets and sold them at various craft fairs. Pat worked as beautician, owned a restaurant, decorated cakes, and made porcelain dolls. The family is very creative and has a natural talent for painting.

## Parents

Leon and Margaret married on April 10, 1964. Margaret Fields advised that because of Leon's traumatic home life, he practically raised himself from the age of approximately 13 years. Although I am not certain, it is my understanding that Leon did not graduate from high school. Leon worked as a "cowboy", breaking horses. According to Margaret, Leon reported that prior to their meeting, he was disrespectful toward women and used various women for money, a place to live, and for sex. He also was incarcerated at age 21, as a result of a burglary conviction. Margaret said at the time she met Leon that he drank but at her request, he stopped and drank only on social occasions or holidays. Margaret said she thought Leon was very handsome and she knew immediately they would marry soon after meeting. Leon was very honest with Margaret about his past, although there was a great deal of information he did not know about his own family

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                              8
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

background. Margaret and Leon were very devoted to each other throughout their marriage.

Leon remodeled rooms and other aspects of the homes in which they lived at Margaret's request. Leon and Margaret shared as much time together as possible and wrote each other notes on a daily basis when their schedules conflicted. When Margaret began experiencing health problems, as early as age 27, Leon took care of her physically and did not expect her to do any tasks she did not feel like doing. Margaret said they did not enjoy attending family get together because they enjoyed each other's company more than others. The close relationship between Margaret and Leon seemed, by all accounts, to the exclude their two children, Cherie and Eddie. Leon had a very strong work ethic. He worked in coal mines for many years in various states; then at Wortz, now Bremner, which is a cracker factory in Poteau, Oklahoma, until his death.

Leon was often away from the home working. When he and Margaret returned to Oklahoma, Leon also had a farm and after Leon's regular employment, he fed the cows and took care of chores on the farm. Margaret worked little outside the home. She volunteered at the Richlands, Virginia hospital, and made willow baskets along with her father in Virginia, which they sold at various craft fairs. Leon and Margaret also made elaborate gingerbread houses during the Christmas season to give away as gifts.

Leon was described by many people as a quiet, good natured, person, who was generous and kind. Margaret was not described as a particularly loving or nurturing parent and neither Margaret or Leon spent a significant amount of time with their children. It was noted that the children were more of nurturers for Margaret than she to them. Eddie's parents had high expectations for both children. They were both lenient with their children and the children were given many material items, but love and attention was more directed to each other than to the children. Margaret has severe physical ailments, which have been a significant factor throughout her life. Margaret had a very close relationship with her father, although she could not verbalize the basis of this relationship. Christmas was a special holiday, which was enjoyed by her father. After her father's death in 1995, at her request, Christmas was no longer celebrated by her immediate family. Her father's death had an adverse effect on her and she has not recovered, emotionally, from Leon's death. Her health conditions are deteriorating and life threatening. She reported to me that she has little reason to live and she has suffered from depression throughout her life.

Eddie was allowed to live, rent free, and not forced to work, but little action was taken to change this type of behavior. Leon and Margaret had Margaret's father intervene to assist in placing Eddie in the Navy when they began having problems with him as teenager at age 16. It would appear that Margaret and Leon did not approve of Eddie's attitude and lack of responsibility, but they said and did virtually nothing, and allowed him to continue in his long standing pattern. It also appeared that early issues with depression or other related problems were not observed, understood, or possibly ignored.

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                            9
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

## EDDIE FIELDS BIRTH TO 6 YEARS

According to Margaret Fields, Eddie's "due date" was June 12, 1957. Margaret reported that on May 15th, she began experiencing labor pains. She had difficulty in locating a doctor to assist her at the hospital because the timeframe of her arrival at the hospital in Oklahoma City was during Mother's Day weekend. Margaret reported no problems during her pregnancy, but said Eddie's delivery was breech. She was aware that Eddie was not crying, when delivered and she was told immediately that there was a problem with his breathing. Eddie did not receive ample oxygen and his condition was reported as "hollow membrane disease", now referred to as respiratory distress syndrome. Eddie was immediately transferred to another hospital in Oklahoma City, where he remained for nine days. Margaret was advised that he was not expected to live and he was baptized in the nursery in the event of his death. Margaret was not allowed to hold Eddie until 7 days after his birth. His recovery was not discussed, and there were no reported medical issues throughout Eddie's life associated with his birth issues.

There were no developmental delays reported and according to Eddie's mother, Eddie was weaned from his bottle after one day, and he was also potty trained after one day. No surgeries or major illnesses were reported throughout Eddie's childhood. There were no problems or significant issues described in the first years of Eddie's life. Eddie was reported to have been loved and spoiled by his maternal grandmother, because of the fear that he would not survive at birth. Her favoritism toward Eddie did not change throughout his life.

Eddie recalled that he entered the 1st Grade in Carbon, Utah, where his father worked for the coal mines. It has been reported that this information is incorrect; that in fact, Eddie and his older sister Cherie, attended LeFlore County, Oklahoma Elementary before the family moved to Utah. Eddie's sister stated that she recalled Eddie's lack of desire to attend school. It should be noted that as of this writing, no records from 1st and 2nd Grades have been received. Eddie cried and told his mother that he wanted to stay at home and take care of her, rather than go to school. Eddie's father worked for the Howe Coal Company in Heavener, Oklahoma, but the mine was very dangerous and short lived. Within a short period of time, nine men were killed while working in the mines. Eddie's father had already advanced to management and the family moved to Utah, where Leon Fields was employed by Keiser Steel Company. Because of the close relationship shared between Eddie and his maternal grandparents, the move from Oklahoma to Utah was difficult for Eddie.

During the period of time the family lived in Utah, Eddie and his sister enjoyed playing with children within the neighborhood. This was the only timeframe reported that involved the family living around peers of the children. There were occasions, also,

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                        10
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

when the children were taken to nearby sites on family outings. The children returned to
Oklahoma to visit their maternal grandparents during the summer.


## EDDIE FIELDS - AGE 7-12

Eddie's family moved from Utah to Beckley, West Virginia, as Leon Fields was offered a
promotion to work for the Eastern Association. Eddie attended a Catholic School, St.
Francis de Sales, from his 4th Grade year through the 6th Grade. Eddie advised that he
received special education in the 4th and 5th Grades as a result of reading problems, but
the records received did not indicate the school had a special education component.
Eddie passed his courses, with unremarkable and average grades.


During the period of time the family lived in Beckley, Eddie's mother was active in the
Catholic church within the community and Margaret and Leon were a part of a bowling
league and often had persons in their home for parties. There were often priests, nuns
and others from the church visiting in the home. During these get togethers, Eddie and
Cherie were sent downstairs and were not allowed to participate in their parents'
activities. Eddie's sister noted that while the family lived in Beckley, a girl from school
slapped her and this was one of the only times in which she could recall Eddie attempting
to defend her or do something on her behalf.


## EDDIE FIELDS - AGE 13-17

Eddie attended the 7th and 8th Grades in Park Junior High School, also in Beckley, West
Virginia. It should be noted that these records have not been received as of this writing.
Eddie reported throughout his school career he was bored and there is no information that
was noted about his time in this school, or with regard to his family's life in Beckley,
with little exception. Eddie received medical treatment for a broken arm.

Eddie advised that he was interested in reading encyclopedias and cookbooks, and it was
around this time that his mother became ill as a result of a heart valve problem. She was
hospitalized on more than one occasion, and as a result, Eddie began cooking meals for
the family. Eddie continued cooking since that time and is reported to be a gourmet
cook. According to Eddie, the family left West Virginia because of problems between
the coal mine management and the union. Leon Fields received several death threats and
the family moved to Richlands, Virginia, when Eddie was approximately 15 years old.

Eddie attended Richlands High School and he reported that he enjoyed two teachers, in
particular, who allowed him to perform independent science experiments. Eddie said he
was bored throughout his school career, and this was one of the few aspects of school that
he seemed to enjoy. He also said he ran track, and played football, which he enjoyed, but

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                           11
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

he quit these activities, for reasons he could not explain, except that throughout his life, he walked away from things he seemed to enjoy. While attending this high school, Eddie also advised he was told he had a particularly high IQ. In a later medical report, he told a doctor that his IQ was 168. Eddie said that when he was in the 11th Grade a guidance counselor took it upon herself to make applications for him to Harvard, and other prominent universities, to which he was accepted, but could not afford to attend. He also advised he had no particular goals or desire to attend college, but did not express anything he was particularly interested in pursuing.

There are conflicting reports with regard to Eddie's suspension or expulsion from high school in the 11th grade. Eddie reported the reason was because he was disrespectful to the principal; his mother reported it was because he was "making out with a girl". For whatever reason, Eddie did not return to high school, but later received his GED. Eddie was sexually active, and his behavior caused concern for his parents. He was told that if he did not like the situation at home, he could leave. Eddie advised he was introduced to, and began living with a woman he described as a "biker tramp", who was considerably older than he. He also reported that during the period of time he lived with this woman, he drank and smoked marijuana for the first time. He reported no additional drug use in the future.

Although the circumstances are not clear, at this point, Eddie was also taken to a psychiatrist in Richlands, for intervention with Eddie's behavioral problems. The records have not been received, and it is unknown how long Eddie saw the doctor and the diagnosis and recommendation was, at this point. Although I am not certain of the circumstances, it would appear that Eddie's parents enlisted the help of Eddie's maternal grandfather, who arranged for Eddie to join the Navy around the same time Eddie saw the psychiatrist. I was also uncertain of how the relationship ended between Eddie and the older woman and the circumstances of his return to his parents' home. Although Eddie throughout our time together rarely expressed his feelings or emotions, it was clear that he had no desire to join the Navy. The records have not yet been received, relative to Eddie's military career, but he reported he received an honorable discharge, and this has not been disputed. He had a period of time to serve in the reserve and active duty; a total time of commitment of four years, which also included a tour of duty on a ship in the Mediterranean.

## EDDIE FIELDS - AGE 18 TO PRESENT

During the time Eddie was in the Navy reserves, he enrolled at Southwest Virginia community college, in Richlands, Virginia. His college career was very short lived, and uneventful, except for his meeting Carol Meadows, when he was approximately 18 years old. After a short time of dating, Eddie and Carol agree that they discussed marriage. According to Eddie, he was aware that Carol was pregnant, but during the time he was out to sea, he learned she had married another man. According to Carol, when she told

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    12
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

Eddie she was pregnant, he "dumped" her. Their child, Rhiannon Meadows, was born on
███████████. There are varying reports as to the reason why Eddie had such little
contact with this child, but there has been very little throughout the years, and relatively
no financial support on Eddie's part. Rhiannon would very much like to have had a
relationship with her father and she has experienced great emotional difficulty throughout
her life, especially since Eddie's arrest.

When Eddie was 19 years old, and still in the Navy, he met Teresa Skeens, who was
working for Eddie's sister, Cherie at a Wendy's restaurant, in Richlands. Teresa was 21
at the time she and Eddie met. Teresa advised that she knew immediately she would
marry Eddie, and they, did, in fact, marry on May 1, 1987, after a courtship of
approximately six weeks. Teresa gave birth to their daughter, Amanda Elise, on ███████
███ On ███████████, Teresa gave birth to a son, Andrew Thomas. In 1991, Eddie
reported he had a vasectomy, but he did not advise of Teresa's feelings about the
procedure. In 1992, Eddie was discharged from the Navy.

It was reported that jobs were very difficult to obtain and Eddie related that his
relationship with Teresa was very different when they were, in fact, living together on a
daily basis. Eddie noted that he did not feel he was a good father; he was not patient with
his children and throughout their lives did not spend time with them or listen to them.
There were ongoing disagreements about financial matters and Eddie had an affair with a
woman in Richlands. As a result of the affair and other problems in the marriage, Teresa
and Eddie divorced on November 11, 1992. Eddie worked at various jobs, but was not
employed for a significant period of time. He continued his attempt to reconcile with
Teresa, although he was still in a relationship with the woman with whom he had the
affair.

Eddie said he decided to relocate to Oklahoma and he made arrangements for a home and
employment. He convinced Teresa to reconcile and he and Teresa remarried on January
24, 1994. Teresa and the children relocated to Oklahoma. Although Eddie made a
commitment to his family, it was difficult for him to change his behavior. It was reported
that Eddie was never happy; he had a problem with his temper and was, at times,
physically abusive to the children and to Teresa. They also, noted; however, that Eddie's
moods changed several times a day and that he was like "two different people." Eddie
seemed, in particular to have difficulty with his daughter, and it was noted that Eddie was
irritated by the child's laugh. Eddie seemed relaxed during the times he fished. There
were some happy memories recalled, but the negative aspects outweighed the reported
happy times.

Eddie began work as a correctional officer for the Oklahoma State Penitentiary in
McAlester on July 14, 1995. His maternal grandfather worked as a guard for the prison
system, until his retirement, and he encouraged Eddie to work at the prison, also.
According to Eddie's former wife, he did not enjoy the work and for a period of time,
was assigned the death row. He also worked in the food service department, until a

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                              13
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

position was available as a guard.  Eddie sometimes teased the inmates and talked about
the information within their files when he arrived home.  It was reported he expressed his
disregard for sex offenders, in particular.  Eddie's parents purchased a home in Oklahoma,
but at the time they still lived in Virginia.  The home was in a rural area, with several
acres and a pond, but it had been broken into.  Because of this, Eddie and his family
moved into his parents' home.

In October, 1995, Jack Ginniman, Eddie's maternal grandfather, died suddenly from an
aneurysm.  Ginniman worked as a guard for the Oklahoma prison system until his
retirement.  Although Eddie did not verbally express his feelings for his grandfather,
others noted that Ginniman had a strong influence with Eddie and Eddie respected his
grandfather.  Eddie's mother, Margaret had a very difficult time dealing with her father's
death.  Eddie's parents no longer celebrated Christmas, following Ginniman's death,
because Christmas was Ginniman's favorite holiday; Margaret felt she could not
celebrate and felt discontinuing the holiday was in his honor.  At the request of Eddie's
maternal grandmother, Pat Ginniman, Eddie's parents moved to Oklahoma in February,
1996, because Pat felt she needed assistance following the death of Eddie's grandfather.
For a short period of time, Eddie's parents lived with his maternal grandmother, but
because of disagreements, Eddie's parents moved into the home, which had been
occupied by Eddie and Teresa; Eddie's grandmother purchased a two bedroom home for
Eddie and his family in the town of Heavener.

In April, 1996, Eddie transferred from the state prison to the Ouchita Correctional Center,
in Hodgen, which was much closer to his residence.  Eddie spent a great deal of time on
his computer and was often observed lying in bed with his keyboard.  Marital problems
increased between he and Teresa.  Eddie had problems controlling his temper and seemed
increasingly unhappy.  Eddie was seen for medical issues and he reported in August,
1996, that he lost 40 pounds over the previous year.  Teresa wanted changes made to the
small home.  Although Eddie agreed, he would never initiate the changes.  Teresa was
also unhappy and was disappointed that the problems in the marriage were increasing.

After Eddie began work at the Hodgen prison, he became friends with Danny Presley,
and they remain close friends.  Both enjoyed fishing and hunting and they often enjoyed
these activities together.  They also enjoyed their computers and Eddie seemed to have a
natural ability to repair computers and provide technical assistance.  Eddie's father found
work at the Bremner Cracker factory in Poteau,; however, Eddie's mother continued to
have debilitating medical issues and concerns.

In February, 1999, Eddie was seen for medical reasons and advised the doctor he was
attempting to quit smoking.  He was given Wellbutrin samples to help with his anxiety.
In May, 1999, Eddie met Carol "Tootie" Lamb through the Internet and they began a
relationship.  According to Eddie, the relationship with Tootie was never sexual.  He met
numerous women as a result of chat rooms and often drove to see them in towns not far
from his community.  Tootie was very serious with regard to her relationship with Eddie,

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    14
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

but she was aware of the fact that he was married. The marital problems continued to escalate between Eddie and Teresa. Teresa and the children planned a trip to visit her mother in Virginia, and they planned to leave on June 7, 1999, but Teresa and Eddie had a substantial argument, which involved the physical abuse of the children and Teresa. Although Teresa's trip had planned to be a visit, she feared Eddie's actions would continue to escalate, and she and the children remained in Virginia. It was noted that Eddie did not take medication, as prescribed. There were occasions when he would take the anti-depressant medication for a period of time, then discontinue, as he felt better. There were also times when Eddie could not afford to obtain the prescribed medication.

During the summer months, for at least two years, Eddie's oldest daughter, Rhiannon, visited with Eddie and his family in Oklahoma. Rhiannon said her father spent little actually time with her, and she said he spent a great deal of time on the computer. Rhiannon was angry and resentful about Eddie's lack of contact with her, throughout her life and she voiced her anger. Rhiannon observed Eddie's physical abuse toward Teresa and his daughter, Amanda, in particular. Eddie gave Rhiannon a spanking during one of her visits, because she called Teresa "mean." Eddie barely mentioned Rhiannon and did not advise of any visits with her during the summer months.

In August, 1999, Eddie was seen by a doctor and prescribed Paxil, as a result of depression. He told the doctor that his wife and children had moved to Virginia and his wife requested a divorce. On September 30, 1999, Eddie resigned his position at the Hodgen prison. Although I am uncertain of the timeframe, it is believed that Eddie may have begun employment, as a result of his father's assistance, at the Bremner factory. I also am unaware of the length of time he was employed, as these records have not yet been received. However, Eddie was terminated from his position because he told co-workers about a cardboard scope for a gun he made, or as a result of having a bomb in his truck. The bomb was placed in lakes to force fish out of the water. It was noted that Eddie's father was very embarrassed by his son's actions, but it is unknown if Eddie's father actually verbalized his feelings to Eddie, personally.

In January, 2000, Teresa Fields was diagnosed with breast cancer. In February, 2000, Teresa had surgery for a double mastectomy and Eddie traveled to Virginia to visit Teresa in the hospital. In April, 2000, Eddie went to the doctor and reported Teresa's cancer and noted other concerns, such as the fact that he had gained a significant amount of weight. He reported that he was employed at Bremner during this visit, but that he was considering a change of employment. His medication had been changed from Paxil to Serzone and during this visit, he was given samples of Prozac. During this time period, Eddie lived in the home purchased by his grandmother. The original arrangement was that Eddie would be responsible for the house notes, but he did not honor his obligation. Eddie and Tootie Lamb continued their relationship and they often went out to eat together.

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    15
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

In May, 2000, Eddie advised his doctor that the Prozac was helping his anxiety, but not his depression. He reported that he had been depressed since his last visit, which was a month prior. The Prozac was continued and he was encouraged to walk for 30 minutes in the sunshine each day. Eddie reported his wife, Teresa was finishing her chemotherapy and reconciliation had been discussed. In June, 2000, Eddie reported the Prozac worked well, but he was "zonked". The doctor gave Eddie samples of Celexa to try. Eddie reported Teresa and the children planned to visit in August.

At some point during the summer of 2000, Teresa and the children did, in fact, visit Eddie in Oklahoma. The home was very unkempt and although Eddie had been excited about the visit, his mood seemed to change soon after their arrival. Teresa felt Eddie had not changed, and although there had possibly been some discussion of reconciliation, Teresa and the children soon returned to Virginia. Neither Teresa, nor the children, have seen Eddie, physically, since this visit.

In August, 2000, Tootie Lamb learned she was pregnant, and moved with her husband, or soon to be husband, to Russellville, Arkansas. She and Eddie continued limited contact for the next few years through e-mail. Eddie had relationships with various women, including two women in Heavener. He did not speak of these women in flattering terms and he gave the distinct impression that he was interested in these women for sex or for other reasons advantageous to him, personally. It is believed that all medical records have been obtained from doctors who treated Eddie within his community. If this is the case, it should be noted that no doctor visits for anxiety, depression, or other medical concerns are noted from June, 2000 until April, 2003. I am also uncertain where Eddie was employed during this period of time; however, it is believed he held part time, or short lived employment at various companies.

In March, 2002, Eddie's Fields' father underwent triple by-pass surgery. Soon after the surgery, it was discovered that Leon Fields had leukemia and bone cancer. Prior to Leon's illness, he worked on a full time basis and took care of the numerous cows and other chores associated with living on a farm. Additionally, Leon assisted Eddie's mother in numerous ways, including picking up her medication, accompanying her to doctors' appointments and taking care of the household finances. It had been noted that Eddie's mother had never written a check, at that point in time.

Eddie moved into his parents' house and was expected to assist with various chores. It is my understanding that Eddie did assist, to some degree, but his way of handing things did not suit his parents, although I do not know if they actively discussed their irritation with Eddie. Eddie's father seemed to have very high expectations of Eddie, and he often expressed his lack of understand with regard to Eddie's lack of motivation and work ethic. On one occasion, Eddie's father and a friend were fishing together at the family pond. Although the pond was not a far distance from the house, Eddie rode the tractor to the pond to speak to his father, rather than walk there. Eddie's father commented his disbelief that he had such a "lazy son of a bitch son".

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                  16
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

Even though Eddie was to assist his parents, he met a woman in Toledo, Ohio through the Internet and traveled to Ohio in May, 2002, for the purpose of living with this woman. Eddie advised that the woman lied about her weight and noted that she was approximately 150 pounds heavier than described. Eddie did some work for the woman's family business, which was a funeral home, and returned to Oklahoma in July, 2002. It has been noted that Eddie was very charming and manipulative, on the Interent, and in person, and one of the reason for initiating the Internet relationships was to have women send Eddie money, for various reasons he provided. A child support order, with regard to Eddie's children with Teresa was filed and past support of over $800.00 was ordered for payment.

Also, in July, 2002, upon Eddie's return to Oklahoma and his parents' home, he was introduced to Michelle Tipton, a second cousin of Marilyn Presley, the wife of Eddie's friend, Danny. Michelle had lived in California and recently returned to Stigler, which is over an hour's drive from Heavener. Michelle worked as a veterinarian's assistant and had two children, a daughter, who was 17, and a son, 16. Michelle's former husband had custody of their son, and at the time of Michelle meeting Eddie, her daughter was in California, visiting her father. Michelle's son was scheduled to visit her for the summer, in the near future, and her daughter return from her visit.

By all accounts, Eddie seemed to respect Michelle and treat her in a manner, which was unusual for him. Eddie felt Michelle was intelligent, he enjoyed talking with her, and Michelle was assertive. Because of Michelle's former poor relationships, she immediately had strong feelings for Eddie, especially, in the way he treated her. Michelle advised that Eddie made her feel beautiful and their initial time together was very passionate. Eddie made elaborate gourmet meals for Michelle and he spent almost all of his time with Michelle.

Michelle tried to explain to Eddie that their situation would be different upon her children's return, but Eddie did not appear to grasp Michelle's concerns. Further, Michelle was concerned over the fact that Eddie was unemployed and seemed to have a poor work ethic. When Michelle's children returned, she continued to have to push Eddie away, physically and emotionally, because he would not honor her request for "space". At the time Michelle's son was to return to California, he refused, which caused Michelle a great deal of emotional and legal difficulties, as a result of her custody agreement. Eddie understood Michelle's concerns, but continued to come to her home, unannounced, and uninvited, on a very regular basis. Additionally, Michelle's son began having emotional and behavioral problems, which resulted in his placement in an adolescent psychiatric facility in Ft. Smith, Arkansas.

The son's hospitalization took place around the time of Eddie's father's death, which occurred on October 27, 2002. Teresa Fields learned, also, in October, 2002, her cancer returned. The death of Eddie's father had a significant effect on Eddie, but he did not

*inquisitor, inc.*

423

EDWARDS LEON FIELDS, JR.                                                    17
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

express his feelings to anyone; persons recognized changes in Eddie's demeanor.  It was
reported that prior to Eddie's father's death, his father expressed to Eddie that it was his
hope that he would have seen Eddie make something of himself; indicating that he would
not live to see any changes.

Because of the impact on Margaret Fields, at the time of her father's death several years
prior, she and her husband, Leon made a decision that in the event either died, no funeral
would be held and the body would be cremated.  This is what occurred following Leon
Fields' death.  There was only the immediate family who participated in any type of
memorial.  The medical issues, which had been a concern for Margaret Fields throughout
the years heightened after her husband's death.  She was, at the time, and remains,
emotionally distraught following Leon's death.

## 2003 AND EVENTS AND CIRCUMSTANCES
## LEADING UP TO THE CRIME

In January 2003, Eddie received notice of an additional order with regard to child
support, relative to Rhiannon Meadows.  Eddie was ordered to pay support, back
payments owed, and court costs within sixty (60) days.  In the early months of 2003,
Teresa Fields advised Eddie that she met someone; marriage was being considered.  Up
until this time, there had been no reason for either to obtain a divorce.  Eddie did not
relate the information regarding Teresa's request to me; in fact, he noted that Teresa had
never seen anyone but him throughout their relationship.  On March 12, 2003, Eddie and
Teresa's second divorce was final.

Sometime during  the early months of 2003, a young couple stopped by the home of
Margaret Fields and asked if she would be willing to sell her home, even though it was
not officially for sale.  Because of the home being in a rural area, and due to the fact that
Margaret felt she did not want to spend another winder in the home, she agreed for the
couple to buy the home, but felt, initially, they would be unable to finance the home.  The
decision to sell the home was discussed with Eddie.  Eddie and Michelle's relationship
also continued to be fraught with problems.  Eddie would not respect Michelle's request
to leave her alone, and his actions were such that she went to the Stigler Police
Department for assistance.  An officer contacted Eddie, by telephone and Eddie left
Michelle alone for at least three weeks.  It was also around the time that Eddie began
work at Kenco Plastics, in Poteau.

Eddie and his mother had a somewhat difficult relationship following the death of
Eddie's father.  Eddie did not perform chores, as Margaret requested or expected.  It has
been noted that Eddie was verbally disrespectful to Margaret and she described Eddie's
words as "belittling."  Margaret noted that because of her medical and emotional issues,

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    18
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

she must have been "hell" to live with and she admitted that no matter what Eddie did, it would never have pleased her, due to her feelings about her husband.

Eddie and Tootie Lamb saw each other in a store and they resumed their relationship, which by their accounts, was not sexual. In April, 2003, Eddie went to a doctor and advised that he felt he was depressed and also had a compulsive disorder. Eddie discussed the fact that he heard voices and they amounted to a compulsion to do whatever they tell him to do. The voices began at the time his father became ill. According to Eddie, in his account following his arrest, he has always been aware of a voice inside his head. Throughout his life, the voice has told him to do something he might not understand: for instance walking away from running track, which is something he enjoyed. According to Eddie, the voice became stronger and more prominent following his father's death. He said, also that he was aware of Michelle Tipton's requests and concerns of him, but it was as if a voice compelled him to drive to her house. He described the voice as saying to him, over and over, "Go to Michelle's, go to Michelle's." Eddie was aware that Michelle would be upset with him, after his arrival, but it was as if he had no control and had to do what the voice told him to do.

At the time of Eddie's visit to the doctor, he denied suicidal thoughts. Eddie was prescribed Lexapro and given samples for 21 days. Eddie was seen again in May and he noted that the Lexapro had helped his outlook, but he was experiencing sexual dysfunction. He described his depression as improved and his "compulsions" have improved, also. The Lexapro was continued. Eddie and Tootie Lamb saw each other on a regular basis and it was Tootie's hope that her relationship with Eddie would become romantic and serious. There are numerous reports that Eddie cared nothing for Tootie Lamb, but used her for money and other areas in which she could benefit him.

On May 27, 2003, Eddie was seen again, by a doctor and related suicidal thoughts. He mentioned that his mother was going to move to Virginia and he also noted that he had three children to support and made $7.00 an hour. Eddie reported that he could have had an opportunity to go to Harvard, but chose not to go, and noted that he was "along with his life." Eddie said he did not want to see a psychiatrist and had not been hearing "a lot of voices telling him to hurt himself or things like that and the convulsions are better." It is believed that the word convulsions, was in fact, intended as compulsions. The doctor offered to attempt to place Eddie in an inpatient unit, but Eddie did not feel that was necessary. The Lexapro was increased and 42 samples were given.

Eddie and Michelle had continued problems within their relationship. Eddie made a visit to Michelle's workplace, on Memorial Day, which was not appreciated. Eddie spoke of suicide to Michelle, who was so angry, at the time, she did not speak with Eddie in a kind manner. The date of Eddie's mother moving from the home drew closer, and Eddie apparently had no plans for a residence. Margaret Fields moved on June 8, 2003, and throughout the month of June, Eddie related his desire to commit suicide to his best friend, Danny Presley. Eddie had fairly regular contact, through e-mail, with a paternal

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    19
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

cousin, who lived in Florida. Eddie and his cousin had former casual conversations about job opportunities in the area and Eddie's consideration of relocating to the area. On June 11, 2003, three days after his mother moved from Oklahoma, Eddie contacted his cousin and indicated he had to get out of the area immediately. He wanted to pack his belongings in his truck and come as soon as possible to live, and indicated he would find work later. The cousin did not feel the situation was appropriate, for any number of reason, and told Eddie not to come at this time, although she would assist in finding him employment.

A few days later, in June 2003, Eddie was seen for a follow up visit for his depression and "compulsive disorder." Eddie expressed his desire to do things had decreased. He had thought of suicide, but related he was not hearing voices. He did not feel the medicine was helping as much as desired, and Eddie was once again asked if he had a desire to go into an inpatient facility. Eddie refused and he was prescribed Effexor and samples to provide him a three week supply. He was to increased his dosage following the first week.

Although no records are available at this time, Eddie continued to work, as scheduled. Tootie Lamb became increasingly angry with Eddie because he would not advise her of his whereabouts. He further did not seem to want to do things with her, and she did not feel she made him happy. Lamb asked Eddie to move his things from her home, on or about June 20, 2003. Eddie was homeless and began sleeping in his truck and bathing in a lake. He slept little for many nights.

On July 7, 2003, Eddie returned to the doctor and advised he "felt like he was doing a little better." He reported he ended his relationship with his old girlfriend, but over the weekend he spent time with a new girlfriend, referencing Michelle Tipton. Michelle's son had been arrested in California and she contacted Eddie who comforted her. Eddie's prescription for Effexor was increased. He was given a prescription for 30 days and one month refill. According to Tootie Lamb, Eddie reported to her he was suicidal on the following day. I have not been able to determine if Eddie had the prescription filled or if he continued to take his medication. The crime occurred on or about July 11, 2003, and Eddie spent the weekend with Michelle Tipton, where they enjoyed the weekend in Fayetteville, Arkansas together. Eddie was arrested at his workplace and provided a statement on July 18, 2003.

## PRELIMINARY THEMES AND RECOMMENDATIONS

Based on the interviews completed to date, along with the records received, and reviewed, it would appear that Eddie Fields has suffered from depression throughout his life. The voices he describes appear legitimate and it is believed that as a result of Eddie's emotional state as a result of issues with his immediate family relationships,

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                          20
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

collateral relationships, financial burdens, homelessness, and the feeling of desperation, he suffered a mental break, which led to his actions.

The fact that Eddie was prescribed various medications, and with various dosages, not long prior to the crime should definitely be explored, possibly with a pharmacologist, or a psychiatrist, to note the possible effects. An expert should further explore Eddie's mental state prior to and following the crime.

Follow up will be made with additional witnesses, and review of records will be added to this assessment. Although the investigation is not yet complete, the following mitigation factors for consideration are as follows, per the U. S. Code, Title 18, Part II, Chapter 228, Sec.3592.:

> Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified

> Impaired capacity. The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

> No prior criminal record

> Disturbance. The defendant committed the offense under severe mental or emotional disturbance

> Other factors. Other factors in the defendant's background, record or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

> > Lack of attachment with parents

> > Parent's unique relationship with each other; excluded children

> > Emotional abuse

> > Absence of a father

> > Transience due to father's employment

> > Family dysfunction

> > Level of intelligence

*inquisitor, inc.*

EDWARDS LEON FIELDS, JR.                                                    21
PRELIMINARY ASSESSMENT
SEPTEMBER 11, 2003

Military Service

Employment History

Special talents

Loved father

Effects on teenage children

Terminal medical condition of former spouse with regard to children

Loved grandson

Loved son

Loved brother

Loved friend

Significant Loss of grandfather

Significant Loss of father

Mother's life threatening medical issues

Significant Loss of immediate support system

Treatment Sought for Mental Illness

Effects from changes in prescribed medication

Out of character

Cooperation with Authorities

Special Circumstances Surrounding the Offense

Age at time of offense

Lack of Future Dangerousness

*inquisitor, inc.*

**Declaration of Cherie Fields**
**Pursuant to 28 U.S.C. Section 1746**

I, Cherie Fields, hereby verify and declare and follows:

1.       I am Eddie Fields' older sister and I did testify at his trial. I was interviewed by the FBI on a few occasions right after my brother was arrested. I was also interviewed by Glori Shettles who was working for Eddie's lawyer and Eddie's lawyer herself at the time of trial, Julia O'Connell. I have reviewed my interviews and trial testimony and while everything is accurate as it is written or recorded, it is far from the whole story. I never in a million years thought I would have to describe our family and describe the details of my memories of Eddie in the way I now know is relevant to his death sentence.

2.       Ed and I grew up in a family that looked pretty "normal" from the outside, so I have been told. But, it was not at all "normal" from the inside. We spent some happy times with our grandparents (our mother's parents), for sure, and we had food and clothes and a roof over our heads, but the house was stressed and tense from my earliest memories. The majority of the stress and "craziness" came from our mother. Since we were young her physical and mental illnesses affected the household. Her intense focus on herself and our father made her unavailable to us when it came to mother- daughter type stuff and mother-son stuff. With me, she was curt, hurtful and dismayed for the most part. She did not like the fact that I was "different" as a teenager (I am gay and I tried to hide it when I was living in her house because I knew my mother would make my life even harder than it already was with her), and she did what she could to keep me away from other people in the family who would show me kindness and understanding.

3.       As I said to the Court, my mother would say what she needed to in order to be the center of attention, and my Dad was more than willing to comply. He had a really rotten childhood and it was no secret that he needed that devotion and the kids didn't really matter to either of them. We often wondered why they had us in the first place. Dad did everything she wanted when she wanted it done. Dad once told me, "I love who Margaret tells me to love." Dad

1

worked constantly and when he did come home Mom kept us away from him so he could focus all his attention on her. Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to the kids to feel as though we did not matter at all to our mother or father.

4.     She kept my father from his own family too. I have one clear memory of going to my father's family for a meal and Mom just made it clear that she did not want to be there. She was miserable. She did not like it that they were different and she really didn't like it that they were interested in my father. My mom did not want my dad to have any interest but her- and she made sure that he knew that she didn't want anything to do with his family. She just didn't want anything to do with them. In fact, there was a very sad time before my Dad died when one of his sisters wanted to come around and be with him, and I wanted her to be there, but mother would not allow it. It was devastating for all of us, especially my Dad. Even when he was so sick and so sad on his death bed, he still let her control his life, and death.

5.     Neither Mom nor Dad ever showed us any physical affection. We were never hugged by our parents and they would never say that they loved us. In fact, when I was in the 9th grade, Mom had a hysterectomy and I remember Dad saying that he was thinking about putting Eddie and me on a train and getting rid of us. When we were really young Eddie and I spent lots of our time with our grandparents, Jack and Pat. After moving to Utah Eddie and I spent summers in Oklahoma with them. In Utah, Eddie used to complain bitterly about missing grandma and grandpa; he was so used to spending time with them. I have only a few clear memories of the time in Utah. I recall that our mother took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security. This went on right up until before Eddie had his break and the tragedy happened. For example, several Christmas's ago she made Eddie keep his computer connected to the internet, she had a dial up internet connection, so I couldn't contact them Christmas day. She tried to blame it on Eddie but she was the one behind it. She is just that sick.

2

6.     It was also in Utah where I have the first memories of Dad being instructed to whip us on mother's command. This could happen at any time of the day or night depending on when he worked. It was there in Utah too that I recall my father being provoked by our mother to have us whip each other with belts- our Dad would be the one to say if we were doing it hard enough. If we weren't, then he would take a lick. This happened right up until we lived in Beckley, Virginia. The belts were menacing to us all our lives. These odd four and sadistic whippings went on until I left the house. For years, Mom controlled our behavior by threatening us with a whipping from Dad. She terrorized Eddie and I with those threats. When we got a whipping, we'd have to take our pants off and lie on the bed. Dad would whip us with a belt until we'd cry and scream. It didn't matter what time of day or night it was, if Mom ordered him to give us a whipping he'd do it. It was all very bizarre and Eddie really got the worst of it.

7.     Mom was not only emotionally needy but she could fly off the handle and do mean things unexpectedly; you just never knew when craziness would happen with Mom. We walked on eggshells all the time. I remember one time she got mad at me and threw a phone at me; it hit me on the head. Another time, when I was in high school, she slapped me in the face so hard you could see her finger prints on my cheek. Another time, I was picked up and thrown down the hallway. With Eddie, it was worse. She would tolerate his strange behavior and inability to take care of himself and other people for the most part, and then she would turn on him. She even went after him with a belt just about the time she was going to move in with me after my father died. Eddie was in his thirties! When I think about people reporting that they thought Mom was scared on Eddie, they are wrong. And, it really is no wonder that by the time she was getting ready to move with me in Virginia, some people were sensing the volatility at that house and were expressing concern. By then, she was sicker and starting to act feeble and my brother was sick and as strange and depressed and unpredictable as he had ever been.

8.     For many many years, my mother was prescribed pain medication for a variety of ailments and in my opinion developed a problem with pain pills which has continued to this day.

3

She keeps a huge bottle of hydrocodone with her at all times. Several years ago Mom was diagnosed as bipolar. The doctors thought at one point she had MS, she has some brain abnormalities, lots of pain that she reports and complains about all the time. There is a history of mental health and brain type issues in the family too. My grandmother, Pat Ginnaman (Holt) had electroshock treatments.  Eddie's daughter, Amanda, has also been diagnosed as bipolar. His son, Andrew, is a lot like Eddie and is very strange in his ways as he leaves his teenage years. Also, everybody talked about Pat's sister, Aunt Inez. Everyone said she was really disturbed. There was also Aunt Polly and we were all told that she had mental problems.

9.    Someone should have had a look at Eddie's illness and brain long before he was 16. As I testified , we fought a lot as kids, up to the point I left the house. Most if it did not feel out of the ordinary, from what I was seeing in other families, but there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird.

10.    Knowing them both (our mother and Eddie) at this point in time, it seems obvious now that they are similar to each other in the worst ways: how much medication they both have been on and are on right now, how almost totally unable at times they have both been to pay attention to anyone outside of themselves. For both of them, it is more than being depressed, in my humble opinion. I am no expert, but I know what it was like to be around them and I can see how similar they are. They are both really sick people. Medication seems to help both of them only to a point. As I testified, ever since Eddie has consistently taken medication in jail, he is able to have a "normal" conversation now on the phone, he seems more able than I have ever experienced to ask about other people and be interested in what they are doing. But, he is still really odd and he shakes so badly. My mother has so many different problems that as I sit here today, I am not sure what her most major diagnosis would be. She takes drugs for pain, for bipolar, for lupus, for depression– lot of pills all the time. As I said at the trial, she went back to Oklahoma after living with me for a couple of months following the death of my father because

4

all of her craziness made it impossible for her to live with me or me to live with her.

11.    But, despite all the "nerve" problems in our family tree, and even old fashioned hospitalizations and shock treatments, including our beloved grandmother, Pat, the tension and impossible stress was just allowed to go along in our house.   My mother and father seemed to take a lot of pride in being in the middle class and interesting- a "normal" family.   That meant that they could not have a young strapping man in the family who was weird or mental, or a daughter who was gay.   Eddie and I did not come from some dreamy American family- nothing really could be further from the truth.   When I mentioned the service before it was Eddie going into the Navy when he was teenager and by now, everyone has heard the "shanghai" story-- that was when Mom and Dad wrangled Eddie into the Navy at a pretty young age so it, the Navy, could make a man out of him.   All that did was give him unlimited access to alcohol- and that certainly didn't help.   Sadly, Eddie got worse and worse as he got older.   For me, when I turned eighteen I got out.   I was fed up with my mom's madness and inappropriate behavior.

12.    The two interviews done my the FBI were right around the time that I was moving mother and everything I said was true, but I was just wrapping my mind around what had happened.   I was still in shock and not accustomed to talking about such very personal matters and stories about my family.   It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. section 1746.

Cherie Fields

3/21/10

Date

5

# From the Office of Bradley D. Grinage, M.D.
## P.O. Box 1116, Lawrence, KS 66044

Date:  June 24, 2005

### FORENSIC MENTAL HEALTH EVALUATION

RE:  United States of America vs. Edward Leon Fields, Jr.
United States District Court, Eastern District of Oklahoma Case Number: 3CR-73-WH

### IDENTIFYING INFORMATION:

The defendant, Mr. Edward Fields, Jr. is a 38-year-old, divorced, Caucasian male referred for forensic psychiatric assessment by federal public defender Julia L. O'Connell.  The defendant was charged with two counts of First Degree Murder, two counts of Use of a Firearm in a Federal Crime of Violence Causing the Death of a Person, one count of Robbery with a Firearm, and one count of Burglary of an Automobile pursuant to Title 18, United States Code, Sections 7, 13, 924, and 1111.  Charges stem from events that occurred on July 10, 2003 after the defendant allegedly shot and killed two people and took their possessions against their will and without their consent.

Prior to the interview, the defendant was informed that the usual doctor-patient relationship did not exist and information obtained in the course of the evaluation may not be confidential.  He was informed that a report might be prepared and submitted to his defense counsel.  He was also informed that the report could possibly be distributed to the Court and prosecuting attorneys, and could be used in legal proceedings.  The defendant's responses indicated that he understood the nature of the evaluation and was agreeable to participate.

### REFERRAL QUESTIONS:

Requested was made for the following:

1.  Detailed findings including factors in the defendant's background, record, or character or other circumstance of the offense that may mitigate against imposition of the death sentence;
2.  An opinion as to whether the defendant, at the time of the alleged criminal conduct suffered severe mental or emotional disturbance;
3.  An opinion as to whether there was significant impairment in the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 2

## SOURCES OF INFORMATION:

Information contained in this report was obtained from:

1.  Referral data from the Federal Public Defender's office
2.  Preliminary Psychosocial Assessment conducted September 11, 2003 by Glori J. Shettles
3.  Oklahoma State Bureau of Investigation records
4.  Muskogee County Detention Center records
5.  Muskogee County Sheriff's office records
6.  Federal Bureau of investigation records
7.  Board of Medicolegal Investigations toxicology and pathology records
8.  LeFlore County Medical Center medical records
9.  Heavener Medical Clinic medical records
10. Tulsa County Jail medical records
11. Records from a neuropsychological evaluation conducted by Michael Gelbort, Ph.D. dated August 11, 2004
12. Fifteen-minute collateral history with Mike Kemp, M.D. on June 22, 2005
13. Fifteen-minute collateral history George Woods, M.D. conducted June 20, 2005 regarding a neuropsychiatric evaluation
14. Three-hour clinical interview and mental status examination of the defendant conducted June 18, 2005

## BACKGROUND INFORMATION:

### Family History:

The defendant was born in Oklahoma City, Oklahoma on ███████████ and he was raised in Oklahoma, Utah, and West Virginia. Records note that the defendant underwent premature birth with life threatening respiratory distress resulting in prolonged hospitalization due to significant hypoxia (lack of oxygen to the brain). Although records state that there were no further developmental delays, they also indicate that the defendant may have undergone "special education classes" in the fourth and fifth grade for learning disability. The defendant denied physical or sexual abuse as a child.

Records indicate that one of the defendant's paternal cousins has a diagnosis of Bipolar Disorder and his grandmother may have had some psychiatric illness that required electro-convulsive therapy. The defendant reported that his mother was treated for depression and anxiety. He stated that his sister was seen by mental health providers for unknown reasons.

### Developmental History:

As noted above the defendant was born prematurely. He denied knowledge of difficulty with developmental milestones.

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 3

## Educational History:

Reports indicate that the defendant was suspended from school in the 11th grade and he did not complete high school. Records note that he obtained his GED. The defendant reported that he was placed in remedial math and reading classes in the fourth or fifth grade but denied attending behavioral disordered classes. The defendant stated that he left the 11th grade after being suspended to join the United States Navy at the request of his father. He indicated that he was suspended from school for "writing a letter in class." He denied expulsion from school or failing a grade but admitted to infrequent truancy. He reported being involved in one fight in High School.

## Military History:

The defendant stated that he joined the United States Navy Reserves in 1984 and was on active duty in the United States Navy from 1985 to 1988. He noted that he was honorably discharged as an E-5 and received no significant disciplinary action. Military records were not available for review.

## Employment:

The defendant reported that his longest period of employment was working for the Oklahoma Department of Corrections from 1995-2000. He stated that prior to his service in corrections, he worked two separate jobs as an armed security guard. The defendant also described various employment as a factory worker. He worked "temp" jobs for one year in 2002 and stated that during that time he was unable to afford medical care.

## Relationship History:

Records note that the defendant father a daughter in 1986 but did not marry the mother. He described financial stress after that time due to obligations of child support. The defendant indicated that he recently attempted to establish a relationship with his oldest daughter. He stated that the relationship has been difficult because she was angry that he was not available to her in her childhood.

Records note and the defendant confirmed that the defendant's longest intimate relationship was with his wife. He married in 1987 for five years. The defendant reported that he left his wife for another woman for approximately three years. He stated he then remarried his ex-wife. Records indicate that he remarried in 1994. The defendant noted that the marital relationship dissolved in 1999 after his wife and children moved to Virginia. However, they remained married until 2003. The defendant reported that he had a 17 year-old daughter and 15 year-old son by his wife and described his relationships with these two children as strong.

The defendant stated that he has always been "obsessed" with sexual intercourse. He stated that "sex" made him "feel good" whether or not he was depressed. He described approximately 45 sexual partners in his life but noted that his wife and girlfriend of three years between his

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 4

marriages were the primary intimate relationships in his life.

## Health History:

The defendant reported that he has a history of hypoglycemia (low blood sugar) and hand tremor. Medical records confirm the diagnosis of hypoglycemia and also give a history of gastroesophageal reflux, sinobronchitis, lumbosacral strain in 1996, and mild head injury in 1997 without loss of consciousness. He has no known drug allergies but experienced an anaphylactic reaction to a bee sting.

## Alcohol and Drug Use History:

The defendant reported that he first drank alcohol at age 13 and was first drunk at age 13. He described history of black outs associated with alcohol as a young adult but denied withdrawal, seizures, delirium, detoxification, DUIs, or treatment associated with alcohol. He reported that prior to his arrest he was drinking approximately three to four drinks two to three times per week. He denied illicit drug use. The defendant quit smoking one pack of cigarettes per day in 1996.

## Psychiatric History:

The defendant reported and records confirm that he was first seen "a couple of times" by a psychiatrist at age 16 for depression. He described a general depression throughout his life lasting more days than not and with episodic remissions lasting one to two weeks. He stated during periods without depression, he experienced episodes of sleeplessness for up to three days. The defendant noted associated racing thoughts described as "rushing thoughts". In addition, he reported hearing a male "voice" inside his head that appeared separate from his own internal voice. The defendant stated that the voice began when he was 14 years old and he continued to hear the voice intermittently throughout his life. During periods of severe depression the auditory perceptual disturbance became derogatory in nature. He described the voice stating, "You're a dumb ass." The defendant additionally reported auditory hallucinations that were command directed such as "It would tell me to do stupid stuff like quit my job or end a relationship." He reported that the voice was associated with anxiety that was difficult to control unless the voice went away or the command was acted upon.

The defendant reported that his primary care provider evaluated him in 1997 for smoking cessation, depression and anxiety. He described trials of buproprion, paroxetine, and nefazodone (antidepressant medications). The defendant reported that these medications helped "some". Records indicate that the defendant was seen by his primary care provider in February 1999 for "anxiety" and placed on buproprion. Records show that in June of 1999 he carried the diagnosis of depression and in September 1999 he was noted to be on paroxetine. Medical records indicate that the patient was seen in April, May, and June 2000 for "Chronic depression." Records document trials of nefazodone, fluoxetine and citalopram (antidepressant medications).

Medical records show that the defendant was evaluated on April 10, 2003. He was diagnosed

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 5

with "clinical depression" and "compulsive disorder." Records document "voices" that told him to "repetitively sharpen his knives." Collateral history from the treating physician described "odd" affect and repetitive voices that were command in nature such as "go to your girl friend's house." He was placed on escitalopram (antidepressant medication) and antipsychotic medication was considered.

The defendant reported that he had experienced increased suicidal ideation in the months prior to the alleged criminal conduct. Medical records dated May 2003 indicate that the defendant reported suicidal ideation with plan to overdose on amitriptyline (antidepressant medication). He was offered hospitalization. He was allowed to remain as an outpatient and his escitalopram was increased. In June 2003 the defendant's depression was noted to be worse and with ongoing suicidal ideation. The escitalopram was stopped and he was placed on venlafaxine (antidepressant medication). He described increased racing thoughts and increased auditory hallucinations after the initiation of venlafaxine. Collateral history from his treating physician indicated that the defendant's provider received a telephone call by a friend six days after he initiated venlafaxine. The friend was concerned about the defendant's behavior that might be associated with suicidal or homicidal ideation. Records indicate that venlafaxine was doubled in dose approximately three days prior to the alleged criminal conduct.

The defendant stated that after his arrest he experienced daily suicidal ideation. He reported that he had not experienced command auditory perceptual disturbances telling him to hurt himself until after his arrest. He described hearing a voice tell him how to obtain a razor and cut himself. Muskogee County records indicate that the defendant underwent a serious suicide attempt on July 18, 2003 with multiple lacerations to his arm by a razor. He was transported and treated at a local hospital and placed on suicide watch.

Records from Tulsa County Jail indicate that the defendant was transferred to Tulsa County Jail on escitalopram and risperidone (antipsychotic medication). Mental health records dated September and October 2003 describe a diagnosis of Schizoaffective Disorder (primary psychotic disorder) and his medications were changed to lithium carbonate (mood stabilizer) and fluoxetine. He was also maintained on risperidone. Medical records indicate that the defendant was also tried on stelazine (antipsychotic medication). The defendant was ultimately stabilized on 40 milligrams daily of fluoxetine, 900 milligrams nightly of lithium carbonate, 50 milligrams nightly of loxapine (antipsychotic medication), and 4 milligrams nightly trihexyphenidyl (anticholinergic medication for side effects of loxapine). The defendant described his thoughts as slowing down considerably after the initiation of lithium carbonate. He reported that the racing thoughts stopped completely with the initiation of loxapine.

**Legal History:**

The defendant denied legal problems or past arrests prior to his current arrest. He stated that he had "been to court" for child support issues. Records indicate that the defendant has not past prior arrests.

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 6

## MENTAL STATUS EXAMINATION:

### Appearance/Behavior:

The defendant was incarcerated at the time of the evaluation and was escorted to the interview room by detention center personnel. He presented as a well-developed Caucasian male who appeared slightly older than his stated age and he appeared to be in no acute distress. The defendant displayed normal kinetics, and his eye contact was varied, but in general appropriate. He was dressed in detention center attire, and his hygiene and grooming were fair. He had a mustache. The defendant's speech was with normal rate, rhythm, tone, and volume. He was without speech impediment. Rapport sufficient for the purpose of the evaluation was established and maintained.

### Mood/Affect:

The defendant stated that his mood was "all right." He described "good" sleep and noted obtaining up to 10 hours of sleep per night. He admitted to poor energy and concentration that was improved on medication. He denied problems with appetite. The defendant denied depressed mood since stabilization on medication but reported that he had infrequent and intermittent passive suicidal ideation that had also improved on medication. He reported that he desired the death penalty. The defendant further reported that if he were to remain incarcerated, he would most likely attempt suicide again in the undetermined future depending on "how long I could take it." At the time of the interview, the defendant denied immediate suicidal ideation or intent/plan to hurt himself. The defendant's affect was with normal intensity and range, however, at times his affect appeared incongruent with the conversation with episodic inappropriate smiling. He related well to the examiner.

### Thought Process/Thought Content:

The defendant's thought processes were linear, logical, and goal directed. There was no evidence of flight of ideas, thought blocking, or derailment. The defendant stated that he last "heard a voice" approximately one month ago. He added that there was no longer a component of intense anxiety associated with hearing a voice and that it was easily dismissed. The defendant described the voice as occurring inside his head and now with some insight that it "must be part of me." He denied hearing voices outside of his head. He denied other perceptual disturbances, ideas of paranoia, or aberrant thought formation.

### Cognitive Functioning:

The defendant was oriented to person, place, time, and situation. Based upon his vocabulary, grammar, and general fund of knowledge, the defendant's general intellectual functioning is judged to be in the average range consistent with his intelligence testing (IQ of 93). He demonstrated a sufficient complexity of concept formation. There were no indications of expressive or receptive language deficits. He was able to encode and recall new information without difficulty. The defendant was able to follow simple instructions, and he demonstrated

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 7

adequate immediate, short-term, and long-term memory.   The defendant displayed good abstraction and obtained five out of five correct answers by serial subtraction of seven from 100. He responded appropriately to hypothetical situations requiring knowledge of norms, rules, and expectations of society.

## CLINICAL SUMMARY:

Results of the evaluation indicate an individual with significant brain injury at birth and a long history of depressive symptoms and auditory perceptual disturbances that began as an adolescent.   The defendant also has a history of irritable mood swings with probable mixed manic states.   Although seen for mental health purposes sporadically throughout his life, the defendant predominantly went without appropriate mental health treatment until after his incarceration.   The defendant meets the criteria for Bipolar Disorder.   Despite a past diagnosis of Schizoaffective Disorder, there were no available data indicating active auditory hallucinations in the absence of mood symptoms that would warrant a diagnosis of Schizoaffective Disorder. For these reasons, the defendant is given the diagnosis of Bipolar I Disorder, Severe With Psychotic Features.

## DIAGNOSIS:

Axis I:  Bipolar I Disorder, Severe With Psychotic Features

Axis II:  Deferred

Axis III:  History of hypoglycemia and mild hand tremor

## MENTAL STATE AT THE TIME OF THE ALLEGED CRIMINAL OFFENSE:

The defendant's memory was intact for the time period surrounding the alleged event, and he was able to offer a detailed account of his thoughts, perceptions, and actions.   His report and the information he provided was generally consistent with the information contained in police investigation reports.

The defendant reported that he was depressed most days following the death of his father in October 2002.   He reported that he was unable to obtain medical care due to lack of health benefits.   Upon acquiring health benefits, the defendant reported that he sought help for depression due to thoughts of suicide by overdose on amitriptyline and auditory hallucinations that were derogatory in nature.   In the months leading up to the alleged criminal conduct the defendant reported experiencing marked stressors including the death of his father, mandates to pay child support, completion of his divorce in March 2003, relocation of his mother out of state in June 2003 and ultimately being homeless.   In June 2003 the defendant was started on

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 8

venlafaxine and noted improvement in his depressed state. However, he noted worsening of "rushing" thoughts and increase in auditory hallucinations.

On the day of the alleged criminal conduct, the defendant described constant racing thoughts and intermittent auditory hallucinations. He described his mood as "desperate." Consistent with investigative reports and jail records, the defendant stated that he had planned to "only rob" the victims. This plan occurred to him upon arrival at the campsite and seeing the victims. The defendant described thoughts of "tying up" the victims in order to take their money. Just prior to the alleged shooting he experienced a voice telling him to "shoot" and to "just do it, do it, do it." The defendant reported that he had no further memory prior to the shooting but felt significant anxiety of the auditory hallucination. The voice continued throughout the course of the shooting. He stated that it abruptly stopped after the shooting. The defendant reported that afterwards his racing thoughts diminished but he felt general anxiety and panic. He denied hearing voices or experiencing the specific compelling anxiety associated with auditory hallucinations during the timeframe of the alleged burglary.

The defendant reported that his racing thoughts returned the next day, however he did not experience auditory hallucinations again until after his arrest.

Information contained in the police investigation reports note a history of depression and antidepressant treatment. The defendant's behaviors, as documented by investigative reports, appeared adequately organized and executed with no indications of cognitive impairment. However, indicative of a volitional impairment, records consistently document the defendant's intention as different than his behavior during the timeframe of the shooting.

The defendant's thoughts, emotions, and behavior at the time of the shooting were consistent with a diagnosis of Bipolar I Disorder With Psychotic Features. Noticeable compelling evidence includes documentation by his treating physician of a markedly depressed and suicidal state with auditory hallucinations just prior to the shooting. His persistent racing thoughts and auditory hallucinations in the context of irritable mood suggest that, at that time, he was experiencing an irritable manic episode.

Bipolar depressive states may not respond to antidepressant therapy as well as other type of depressions. The defendant underwent multiple trials of antidepressant medication prior to the alleged criminal conduct that did not appear effective. Moreover, the risk of suffering a manic episode is increased in bipolar patients with use of antidepressant medication. There is evidence to suggest that use of venlafaxine may be particularly susceptible to switching bipolar patients from depression to mania. This risk is again elevated if the bipolar patient is not taking a mood stabilizer (such as lithium carbonate). As such, the defendant's expansion of racing thoughts and auditory hallucinations with the initiation and increase of venlafaxine is diagnostic of an irritable manic episode.

It is also of interest that the defendant had no arrests prior to this type of antidepressant treatment. Furthermore, with appropriate treatment the defendant experienced stabilization of mood, little or no auditory hallucinations, and complete resolution of racing thoughts. Such

United States of America vs. Edward Leon Fields
US District Court Case Number: 3CR-73-WH
Page 9

effective response to medications designed to treat bipolar disorder is indicative of a bipolar condition.

In the opinion of the examiner, based on a reasonable degree of medical certainty, the defendant was suffering from severe mental and emotional disturbance, specifically an active bipolar disorder with an irritable manic state and psychotic features.  Additionally, based on this psychotic state, in the opinion of the examiner, at the time of the shooting the defendant experienced significant impairment in his ability to control his behavior or conform his conduct to the requirements of the law.  This opinion is based on documentation of the defendant's multiple stressors prior to the incident, mental health treatment surrounding the alleged criminal conduct, increase in antidepressant use only days before the conduct, description of his mental state at the time of the crime, current diagnosis of a bipolar type illness, and current knowledge of response to bipolar type medications.

## SUMMARY OF REFERRAL QUESTIONS:

1.      Detailed findings as presented above;

2.      In opinion of the examiner, at the time of the alleged criminal conduct, the defendant suffered from severe mental and emotional disturbance, specifically Bipolar I Disorder With Psychotic Features;

3.      In the opinion of the examiner, at the time of the shooting the defendant suffered from mental disease such that he experienced significant impairment in his capacity to conform his conduct to the requirements of the law.

Respectfully Submitted,


Bradley D. Grinage, M.D.
Diplomat of the American Board of Psychiatry and Neurology (ABPN), 1996
ABPN Subspecialty in Forensic Psychiatry, 2003

442

FROM :MAIL BOXES ETC 2796            870-777-6231            2005,05-27   12:56   #926 P.02/11

# G

## WW  GEORGE W. WOODS, JR., M.D.

A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

June 25, 2005

Julia O'Connell, Esq.
Deputy Federal Defender
Federal Defender, Northern and Eastern Districts of Oklahoma
One West Third Street, Suite 1225
Tulsa, Oklahoma 74103

Re: Edward Leon Fields

Ms. O'Connell,

    Pursuant to your request, I have performed a neuropsychiatric examination of Mr. Edward Leon Fields, a 38 year old divorced white male, currently incarcerated in the David L. Moss Criminal Justice Center, Tulsa, Oklahoma. In order to complete this evaluation, I interviewed Mr. Fields on three occasions, August 24, 2004, August 25, 2004, and October 9, 2004.

    I have reviewed pertinent police records of the offense. I have also reviewed family historical records, including medical records of Mr. Fields' mother, father, and maternal grandmother. I've reviewed Mr. Fields's armed service records, his scholastic records, and medical records, particularly those from Drs. Kemp and the Eastern Oklahoma Healthcare Corp. I have also consulted with Bradley D. Grinage, MD.

## CONCLUSION

    It is my professional opinion, which I hold to a reasonable degree of medical certainty that Mr. Fields suffers from a severe mood disorder with significant mood swings from depressive episodes to manic episodes, manifested by irritability, explosive anger, and agitation. Mr. Fields also suffers from symptoms of psychosis, particularly auditory hallucinations, which, in the past, have become commanding in nature.

1-866-646-0509
E-mail: gwwoods@comcast.net
Oakland Seattle Atlanta San Antonio

1

FROM :MAIL BOXES ETC 2796          870-777-6231          2005.06-27   12:57   #928 P.03/11

Mr. Fields' combination of severe mood disorder and psychotic, command hallucinations fits the diagnosis of Schizoaffective Disorder, Bipolar type; as well as the diagnosis of Bipolar Disorder, severe, chronic, with psychotic features. The treatment he has received at David L. Moss Criminal Justice Center and while incarcerated in Muskogee, Oklahoma is appropriate for Schizoaffective Disorder, Bipolar Type as well as Bipolar Disorder with psychotic features. He has been given both diagnoses by treating mental health providers, and other than for the purpose of long term treatment and prognosis, the core symptom constellation of manic symptoms, depressive symptoms, and psychotic symptoms manifesting as command auditory hallucinations in each disorder is most relevant to the medicolegal findings.

It is my professional opinion Mr. Fields was in a manic state and was also experiencing auditory hallucinations at the time of the offense for which he is charged. Mr. Fields has had, in my professional opinion, manic episodes prior to the offense for which he is charged. He also reported command hallucinations to Dr. Kemp prior to the offense. Many of his manic symptoms, his depressive symptoms, and his psychosis are now under pharmacological control, due to the treatment at the Moss Criminal Justice Center.

Mr. Fields' psychotic manic episode before, during, and after the offense for which he is charged appears to have been triggered by increased doses of Effexor, a serotonergic specific reuptake inhibiting antidepressant. Serotonin, an important neurotransmitter in emotional regulation is increased with the use of Effexor. Although older classes of antidepressants, particularly the tricyclic antidepressants, have a longer history of inducing manic states, all antidepressants, when used in persons with Bipolar vulnerability, like Schizoaffective Disorder; have been documented as having the potential to induce manic states. Atshuler, et al, documented the potential impact of antidepressants on Bipolar depressive symptoms in his 1995 article;

RESULTS: Thirty-five percent of the patients had a manic episode rated as likely to have been antidepressant-induced. No variable was a predictor of vulnerability to antidepressant-induced mania. Cycle acceleration was likely to be associated with antidepressant treatment in 26% of the patients assessed. Younger age at first treatment was a predictor of vulnerability to antidepressant-induced cycle acceleration. Forty-six percent of patients with antidepressant-induced mania, but only 14% of those without, also showed antidepressant- induced cycle acceleration at some point in their illness. CONCLUSIONS: Mania is likely to be antidepressant-induced and not attributable to the expected course of illness in one-third of treatment-refractory bipolar patients, and rapid cycling is induced in one-fourth. Antidepressant-induced mania may be a marker for increased vulnerability to antidepressant-induced cycle acceleration. Antidepressant-induced cycle acceleration (but not antidepressant- induced mania) is associated with younger age at first treatment and may be more likely to occur in women and in bipolar II patients. (LL Atshuler, RM Post, GS Leverich, K Mikalauskas, A Rosoff, and L Ackerman; *Antidepressant-induced mania and cycle acceleration: a controversy revisited*, Am. J. Psychiatry, Aug 1995; 152: 1130 - 1138.)

FROM :MAIL BOXES ETC 2796          870-777-5231          2005.06-27   12:57   #928 P.04/11

Other authors have documented the prevalence of patients switching from depression to mania when treated with antidepressants. Antidepressant treatment is often first initiated because many patients with Bipolar vulnerability present, as Mr. Fields has presented much of his life, with more recognizable symptoms of depression.

In the present cohort, evidence for antidepressant-induced mania was apparent in 20% of the individuals who became manic or hypomanic, and polarity conversions were *not* more likely to occur in association with antidepressant use (whether or not in conjunction with a mood stabilizer) than spontaneously. Elsewhere, antidepressant use has been reported to induce mania in approximately one-third of patients with known bipolar illness, although less is known about the induction of mania in depressed patients without an existing history of demonstrated bipolar illness. For example, Bunney reported an approximate 9.5% risk for cycling induced by tricyclic antidepressants or monoamine oxidase inhibitors among previously "nonbipolar" depressed patients, although estimates based on the use of serotonin reuptake inhibitors or other newer-generation antidepressants have not been well established. Similarly, lithium has been reported to confer some degree of protection against mania induced by tricyclic antidepressants, but more extensive data are needed on the protective value of lithium and other mood stabilizers in depressed patients with high risk for eventual conversion to bipolarity. Few subjects in the current study had taken mood stabilizers before or with antidepressants, limiting the ability to estimate the effect of prophylactic mood stabilizers on mania otherwise preceded by antidepressant use. (Joseph F. Goldberg, Martin Harrow, and Joyce E. Whiteside, *Risk for Bipolar Illness in Patients Initially Hospitalized for Unipolar Depression*, Am. J. Psychiatry, Aug 2001; 158: 1265 – 1270)

The unique constellation of depressive symptoms associated with Bipolar Disorder and Schizoaffective Disorder has been identified in the last 20 years. It is well-understood that Bipolar Depression is a separate entity from Major Depressive Disorder. However, many clinicians, particularly those with little or no psychiatric training, do not have the expertise to differentiate the symptoms of Major Depressive Disorder and those of Bipolar Depression.

Depression in Schizoaffective and Bipolar Disorders has been shown to be more often an agitated depression, rather than the melancholic or retarded depression most often seen in Major Depressive Disorder. Depression in a person with a vulnerability to Bipolar illness has a higher incidence of psychosis, cognitive impairments, and increased social deterioration.

Even the mania of Bipolar Disorder and Schizoaffective Disorder, so often thought to be manifested by grandiosity and impulsivity, has now been shown to have symptoms of anger or irritability more often than true grandiosity. Of course, this impulsive irritability is consistent with the difficulties Mr. Fields has experienced most of his life, and for which treatment was sought as early as his mid-teens.

FROM :MAIL BOXES ETC 2796          870-777-6231          2005.06-27   12:58   #928 P.06/11

Childhood-onset depression must also be considered a major risk for ultimate bipolar transformation. This is based on the following characteristics: (1) early age of onset; (2) even sex ratio; (3) prominence of irritability, labile moods, and explosive anger, suggesting mixed episodes; (4) questionable response to antidepressants, hypomanic switches, or both; (5) high recurrence rate after depression; and (6) familial affective loading…(Kaplan and Sadock, *Comprehensive Textbook of Psychiatry, VIII edition*, 2005, Chapter 14)

Mr. Fields not only has a history consistent with early onset depression. His wife, Teresa Skeens Fields, corroborates manic symptoms of irritability, labile moods, and explosive anger. Mr. Fields reported that his wife, Teresa Skeens Fields, recommended on many occasions that he get treatment for his emotional outbursts, recognizing that something, out of his control, was overwhelming Mr. Fields. He also reported that Ms. Skeen-Fields talked with his mother about attempting to get him help for his mood swings.

Mr. Fields endorsed ongoing auditory hallucinations for much of his life. He noted that these voices had started when he was in his early adolescence. The voices were there when he was not depressed, not using drugs or alcohol, and were primarily negativistic, telling him that he was worthless or telling him what to do.

Symptoms before the offense, described by Mr. Fields and others, are consistent with a missed diagnosis of Schizoaffective Disorder, Bipolar Type or Bipolar Disorder with psychotic features. He reports auditory hallucinations, irritability, explosive anger, and depression rather than the antiquated perspective of mania as joy-filled grandiosity.

The current data support recent observations that a sizable minority of depressed patients are(sic) likely to demonstrate an eventual bipolar course, but clinicians may not regularly initiate mood stabilizer pharmacotherapy for them. The data strongly support the view that late-adolescent and young adult patients hospitalized for psychotic depression, potentially with a family history of bipolar illness, carry a high risk for developing signs of bipolar disorder within at least the first 15 years after an index episode of depression, with a remarkably high percentage of these psychotically depressed individuals demonstrating signs of mania or hypomania at one or more subsequent time periods… (Joseph F. Goldberg, Martin Harrow, and Joyce E. Whiteside, *Risk for Bipolar Illness in Patients Initially Hospitalized for Unipolar Depression*, Am. J. Psychiatry, Aug 2001; 158: 1265 – 1270)

Mr. Fields' family demonstrates a vulnerability to mood disorders. His maternal grandmother had electroshock therapy in the 1930s, consistent with treatment for a mood disorder. His mother, Margaret, has been diagnosed with multiple mood disorders, and is currently being treated with antidepressants. He describes his mother as often being in bed for months at a time when he was growing up, and having periods of excessive spending. Mr. Fields' sister, a successful businesswoman, is also being treated for mood disorders.

FROM :MAIL BOXES ETC 2795          870-777-6231          2005,06-27   12:58   #928 P.06/11

...a morbid risk of bipolar disorder in first-degree relatives of bipolar disorder probands that ranges between 3 and 8 percent. Compared with a 1 percent rate in the general population, this reflects a substantial familial increase. Similarly, studies of families of probands with depressive disorder (unipolar) reveal morbid risks for depressive disorders among first-degree relatives which are two to three times those of the general population. These data argue strongly for the familial nature of mood disorders. Furthermore, depressive disorders generally occur at a higher rate in the families of probands with bipolar disorders, and the rate of bipolar disorder is elevated in the families of probands with depressive disorders. In fact, depressive disorders are typically the most common mood disorder in families of probands with bipolar disorders. This familial overlap suggests some common genetic underpinnings between these two forms of mood disorder. (Kaplan and Sadock, Comprehensive Textbook of Psychiatry, VIII Edition, Chapter 14)

Those with family histories of bipolar illness showed a nonsignificantly higher rate of switching to mania or hypomania. Spontaneous and antidepressant-associated manias did not differ in frequency. Fewer than one-half of the patients who showed an eventual bipolar course had received prescriptions for mood stabilizers in any follow-up year.( Joseph F. Goldberg, Martin Harrow, and Joyce E. Whiteside, *Risk for Bipolar Illness in Patients Initially Hospitalized for Unipolar Depression*, Am. J. Psychiatry, Aug 2001; 158: 1265 – 1270)

When Mr. Fields was treated with Welbutrin for smoking cessation, he was treated with a medication that is also used for the treatment of depression. Welbutrin is accepted as the antidepressant with the smallest potential for inducing a manic switch. Serzone, a sedating antidepressant, was also prescribed for Mr. Fields by a doctor in Poteau, Oklahoma. Mr. Fields recalls that he had an incomplete depressive response to the Serzone, in that it didn't completely help with his depression. However, he stopped taking it when he ran out of insurance. Mr. Fields has been on varying amounts of Paxil and Celexa as well.

The rapid titration of the Effexor, without monitoring, was much different than the Paxil regimen that Mr. Fields had been on in 1999. The Effexor flipped the switch on Mr. Fields' mania. Kaplan and Sadock's description of mania is very consistent with Mr. Field's symptomatology before, during, and after the offense.

Mania typically escalates over a period of 1 to 2 weeks; more rapid sudden onsets have also been described... The irritable mood in mania can deteriorate to cantankerous behavior... Such patients are among the most aggressive seen in the emergency room... Alcohol use, observed in at least 50 percent of bipolar I patients (often during the manic phase), further disinhibits the patient and might lead to a dangerous frenzy. Such patients may attack loved ones and hurt them physically. (Kaplan and Sadock, Chapter 14)

5

FROM :MAIL BOXES ETC 2796          870-777-6231          2005.05-27   12:59   #928 P.07/11

Clinically, Mr. Fields' development of irritable mania appears to be directly related to his treatment with Effexor, provided by a well-meaning physician, Dr. Kemp, who doesn't appear well-versed in psychopharmacology and the clinical scrutiny required to differentiate Major Depressive Disorder and Bipolar Depression. Mr. Fields reported that the voices, which had been getting worse since his father died, were becoming menacing. He was actively suicidal when he was placed on the Lexapro. By the time he was placed on antidepressants, Dr. Kemp documented Mr. Fields told him he heard voices in his head that told him to do things, and, at times, he felt compelled to act.

Mr. Fields says that he hears voices and they basically amount to a compulsion that he has to do whatever they tell him. The do not tell him to do anything dangerous, homicidal, or suicidal and he denies suicidal thoughts…He notes that he does have a kind of a sad mood much of the time. He is tired a lot and can't sleep very well. He says that he has pretty well stopped eating recently having lost some 40 pounds in the past few weeks. (Medical Plaza Progress Note, April 10, 2003, Mike Kemp, MD)

Conventional treatment of psychosis mandates that the psychotic symptoms are treated first, either with antipsychotic medication or mood stabilizers to buttress against the possibility of a manic switch. Mr. Fields reports symptoms of hypomania within days of starting the increased dose of Effexor XR. He became much more animated, increasingly hypersexual (a long standing manic trait), and the "rush of thoughts" continued. Flight of ideas, the rush of thoughts Mr. Fields describes, is a symptom he reports experiencing much of his life, even when he was depressed.

The strength of the auditory hallucinations were overwhelming, according to Mr. Fields. Although he recognized that what he was doing was unlawful, he was unable to control his actions, secondary to his well-documented mood symptoms and thought disorder.

The jail mental health providers treated Mr. Fields for his psychosis, mania, and depression when he was admitted to the David L. Moss Criminal Justice Center. Mr. Fields' treatment while incarcerated at the David L. Moss Criminal Justice Center is consistent with the recognition and appropriate treatment of his manic symptoms, his depression, and his auditory hallucinations. According to mental health records, good remission of his mania has been successful, with partial control of his ongoing depression and hallucinations. The hallucinations, although continuing, are no longer command in nature.

Treating physicians within the jail setting recognized Mr. Fields was psychotic. His medication regimen history while incarcerated shows that he was initially started on Risperdal, an antipsychotic, which controlled the frequency and command quality of the voices to some degree. Due to side effects, the Risperdal was discontinued, and Mr. Fields was placed on Stelazine, another antipsychotic. He developed severe side effects to this medication, and was eventually placed on Loxitane, an antipsychotic with less propensity for the side effects Mr. Fields was experiencing.

FROM :MAIL BOXES ETC 2796                 870-777-6231                    2005,06-27    12:59    #928 P.08/11

Mr. Fields was also placed on Lithium Carbonate, one of the drugs indicated for the treatment of the mania, while he was in the Muskogee Jail. He is also currently on Prozac, an antidepressant. The clinical literature is clear that the mood symptoms of a Schizoaffective Disorder, Bipolar type are treated similarly to the Bipolar Depression. The depressive symptoms can be treated with antidepressants if a mood stabilizer such as Lithium is part of the medication picture. Mood stabilizers such as Lithium, Valproic Acid, and Tegretol can protect the patient with Schizoaffective Disorder, Bipolar type, or a Bipolar Disorder from switching into mania.

**Results:** Short-term nonresponse was more frequent in bipolar (51.3%) than unipolar (31.6%) depression. Manic switching occurred only in bipolar depression but happened less in patients taking mood stabilizers (31.6% versus 84.2%). Cycle acceleration occurred only in bipolar depression (25.6%), with new rapid cycling in 32.1%. Late response loss (tolerance) was 3.4 times as frequent, and withdrawal relapse into depression was 4.7 times less frequent, in bipolar as in unipolar depression. Mood stabilizers did not prevent cycle acceleration, rapid cycling, or response loss. Modern antidepressants, in general, did not have lower rates of negative outcomes than tricyclic antidepressants. Conclusions: The findings suggest an unfavorable cost/benefit ratio for antidepressant treatment of bipolar depression.( S. Nassir Ghaemi, M.D., Klara J. Rosenquist, B.S., James Y. Ko, A.B., Claudia F. Baldassano,M.D., Nicholas J. Kontos, M.D., Ross J. Baldessarini, M.D, *Antidepressant Treatment in Bipolar Versus Unipolar Depression,* Am J Psychiatry 2004; 161:163–165)

Fewer than one-half of the patients who showed an eventual bipolar course had received prescriptions for mood stabilizers in any follow-up year. (Joseph F. Goldberg, Martin Harrow, and Joyce E. Whiteside, *Risk for Bipolar Illness in Patients Initially Hospitalized for Unipolar Depression,* Am. J. Psychiatry, Aug 2001; 158: 1265 – 1270)

Mr. Fields incarceration has been uneventful clinically. He has done extremely well on his medications, and it is clear that he believes this tragic circumstance would have never occurred if he had been properly medicated.

RELEVANT SOCIAL HISTORY

Edward Fields was born ███████. He has one younger sister. His father, Edward Fields, Sr., was a supervisor in coal mines, and the family moved quite a bit, although they spent most of Mr. Fields, Jr.'s, childhood in West Virginia.

Mr. Fields mother, Margaret Fields, lives in Oklahoma. She has a long history of mood disorders, and has been diagnosed with depression, Bipolar Disorder, and other neurocognitive disorders. She has also been diagnosed with Lupus, an arthritic condition that is well-known to have significant psychiatric manifestations. Her mother was treated with shock therapy in the 1930s, as noted before.

FROM :MAIL BOXES ETC 2796          870-777-6231          2005,06-27     13:00     #928 P.09/11

Mr. Fields went to elementary, middle, and high school in West Virginia. He describes himself as always being a "different child." He had few friends and, although intelligent, did not do well in school. He reports that he started hearing voices when he was 13 or 14, but kept it to himself, since he was already seen as strange.

Mr. Fields acknowledges being depressed all his life. He states that his mother has always been depressed, often lying on the couch for months at a time when he was young. She would get up to fix his father's dinner, then go back to bed.

Mr. Fields was first referred for a mental health evaluation when he was 16 years of age. He describes himself as profoundly depressed then, but recalls little of the treatment he received. Around this same time, he moved out of his family's home, and, for a short period, moved in with a woman much older than himself.

Mr. Fields said that his grandparents pressured him to go into the Armed Forces. They had already signed him into the Navy, and he was in the Navy for approximately 8 years. He received his GED while in the Navy. He was honorably discharged in 1992.

Mr. Fields has 3 children. The first, Rhiannon, was with Carol Hagan, a woman he met when he first enlisted in the Navy. His other two children, Amanda and Andrew, are from his marriage to Teresa Skeens Fields. Mr. Fields notes that Amanda is currently seeing a therapist. Teresa has remained supportive of Mr. Fields, allowing him to communicate with the family on a regular basis.

Mr. Fields has a very spotty work history, except for the time when he was in the Navy. He has worked at a number of jobs, often leaving for no clear reason. He reports that the voices often told him to leave jobs, and he would. For several years, he worked as a security guard, and also worked as a correctional officer for the Oklahoma State Prison, following in the footsteps of his grandfather, who worked there for many years.

There is no ongoing history of drug use. Mr. Fields stopped drinking for 18 years during his marriage to Teresa Skeen Fields. He acknowledged smoking marijuana, but denies any other drug use at the time of the offense.

Although Mr. Fields was working at the time of the offense, he had lost almost everything else. He had no place to live. He was estranged from his family. Recent relationships, like Michelle Tipton, were disrupted. By the time Mr. Fields committed the offense for which he is charged, he was living in his truck by Lake Wisker, and going to work during the day.

He has no criminal history prior to this offense.

## MENTAL STATUS EXAMINATION

FROM :MAIL BOXES ETC 2796          870-777-6231          2005,06-27   13:00   #928 P.10/11

Edward Fields is a white male that looks slightly older than his chronological age. He was dressed in jail clothes, and was not shackled during our interview. His movements were fluid. He did not display any obvious neurological impairments of movement, gait, or extremity movement.

Mr. Fields was oriented to person, place, date, and circumstances. His intellect appeared to be grossly high normal. He has an extensive vocabulary.

Mr. Fields acknowledged current auditory hallucinations that are "extremely quiet." His voices, although still present, are no longer command in nature. He denies illusions, delusions, or other types of hallucinations.

Mood is depressed. Affective range is blunted, but there is some range. He is able to tell an occasional joke, but, ironically, his affective range is so limited, he does not laugh. Speech is soft, fluent, although there continues to be some rate problems. His speech remains tangential.

Mr. Fields thought processes reflect flight of ideas. He notes that the "rush of thoughts" he once had has decreased significantly. Insight and judgment are improved with pharmacological intervention.

Thought contents are negativistic, hopeless, and thought disordered. Mr. Fields acknowledges suicidal ideation, but denies having a current plan. He denies homicidal ideation.

DIAGNOSES
    I.     Schizoaffective Disorder, Bipolar Subtype, vs. Bipolar Disorder, severe, with psychosis, in pharmacological remission
    II.    No Personality Disorder
    III.   Diabetes, Obesity
    IV.   Legal Problems
    V.    Gaf of 30 at time of offense, currently 55

DIAGNOSTIC FORMULATION

Consistent with many, many patients today, Edward Fields was incorrectly diagnosed for much of his life. His depressive symptoms, mood swings, irritability, and spontaneous anger were read as depression, rather than Schizoaffective Disorder, Bipolar type or Bipolar Disorder with psychosis. He kept his psychotic thought disorder a secret until, before the offense for which he is charged, he told Dr. Kemp. There was a continued social deterioration, consistent with untreated psychiatric disorders, ending with Mr. Fields living in his truck, with nowhere to go and with no one. His well-meaning physician, attempting to make sense of the obsessive symptoms, depression, and psychosis Mr. Fields was describing, attempted to treat him, without a clear understanding of what this symptom constellation truly meant, and the potential danger of inaccurate diagnosis and treatment.

FROM :MAIL BOXES ETC 2796          870-777-6231          2005.06-27   13:01   #928 P.11/11

It is against this backdrop of missed opportunity that Mr. Fields was prescribed medications that increased the frequency, urgency, and command quality of the voices he had heard all his life, the voices he described to Dr. Kemp. His ability to resist the voices, always tenuous, became impossible at the time of offense.

Thank you for allowing me to interview Mr. Fields.

George Woods, MD

## OKLAHOMA STATE BUREAU OF INVESTIGATION

Page 1 of 15

TITLE OF REPORT:   SEARCH OF FIELDS' TRUCK

On July 11, 2003, the bodies of CHARLES GLENN CHICK and SHIRLEY ELLIOTT CHICK were found in campsite #15 at the Winding Stair Campground in the Quachita National Forest.  CHARLES and SHIRLEY each died of multiple gunshot wounds.

On July 18, 2003, United States Magistrate Judge STEVEN P. SHREDER issued a Search Warrant for a blue 1989 Chevrolet pickup, Oklahoma tag number LYW-924.  OSBI Agents IRIS DALLEY and STAN FLORENCE executed that warrant.

The pickup was parked in the employees parking lot of Kenco Plastics at 509 S. McKenna in Poteau.  DALLEY recorded digital images of the pickup in the Kenco parking lot then she had the pickup removed by Around-the-Clock Towing Wrecker to the Poteau Police Department Garage. DALLEY recorded digital images of the pickup inside that garage.

The pickup was dark blue with peeling paint on the top.  A Chevy emblem and "1500" were on the side chrome strips of the pickup.

Numerous items were in the pickup bed including an ice chest containing one cola can, a lawn chair, food and beverage containers, metal bed rails, a rug, a pair of men's swim trunks, and a ghille suit.  The ghille suit consisted of a cap, sweatshirt, and jeans.  Netting was attached to the outside of the cap, sweatshirt, and jeans.  Numerous lengths of twine-like strands were tied into the nettings.  DALLEY seized the ghille suit and the swim trunks.

Two prescription pill bottles, papers, miscellaneous small items, and a bloodstained gauze were in the pocket of the driver's door.  DALLEY seized that gauze.

A Cobra Radar Detector, Serial Number 006032975, was mounted on the middle of the dash.

| Investigation On: | 07/18/03 | At: | POTEAU, OKLAHOMA | By: IRIS DALLEY | | File: | CR 03-527 |
|---|---|---|---|---|---|---|---|
| Offense: HOMICIDE | | Victim: | CHARLES CHICK & SHIRLEY CHICK | | Case Agent: DONNIE LONG | | |
| Office: ERO | Date Reported: 8/1/03 | Approved by: | | Date Approved: | | IND: .022 | |

This document contains neither recommendations nor conclusions of the OSBI.  It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.

000061

CR 03-527.022
SEARCH OF FIELDS' TRUCK
PAGE 2

The interior of the cab had a bench seat. A red-&-white throw was spread across the seat. The right side of the throw was folded back toward the driver's seat covering the following items:

A Canon AE-1 camera, body # 863986, with attached Soligar 35-200mm lens, Serial Number 684157610.

One pair Ray-Ban sunglasses.

Two eyeglasses cases.

One green camouflage mini-flashlight, attached to a blue nylon headband.

One purple Royal Crown bag containing one Casio Model EV-660 handheld portable television, Serial Number: 2028881A.

One paper napkin.

One brown hairbrush.

Several containers and packaging, Effexor samples packs, two 12-gauge shotgun shells, one .22-caliber shell, and a partial box of CCI .22-caliber shells was under the seat. DALLEY seized the 12-gauge shotgun shells and the .22-caliber shells.

A box of Federal .22-caliber shells, a zippered brown cloth camouflage gun case, a pillow, firecrackers, clothing, a 2003 calendar, a pharmacy sack, 12-gauge shotgun shells, mail and other documents were behind the seat.

The gun case contained a .22-caliber Marlin Model 60W rifle, Serial Number 06198019. One live shell was in the chamber of the rifle, nine live shells were in the magazine, and eight live shells were in the gun case. A scope was mounted on top of the rifle. Strips of burlap were tied around the rifle, from the muzzle to the stock, with several inches of the strips hanging from the rifle. Only the back of the stock of the rifle was uncovered.

000062

CR 03-527.022
SEARCH OF FIELDS' TRUCK
PAGE 3

DALLEY seized the box of shells and the gun case containing the rifle, scope, and shells.

Handwritten notes were in the page blocks of the calendar pages. The notes indicated calls to and from "she", visits including "spent the night", and references to "John", "Morgan", and "Stigler". Two entries were recorded for July. Those entries were for July 2 and July 4. The July 2 entry included "said I could come back on 9th". The July 4 entry included "call Sunday about meeting".

The pharmacy sack label was dated 07/09/03. The label was for 30 Effexor 150mg capsules for EDWARD FIELDS. A bottle of pills bearing the same label was found inside the truck.

A typed note "Money that is owed Carole Lamb" was among the documents behind the seat. The note was dated June 24, 2003. Five items and amounts were listed. That list end with "$1200 total", "$100 wk ......12 weeks", and "Beginning June 26th, ending September 12th without fail".

DALLEY secured the following items in the OSBI Eastern Regional Office Property Room:

1. One Ghille suit cap, shirt, and pants.

2. One pair men's swim trunks.

3. One piece of bloodstained gauze.

4. One Cobra radar detector, SN: 006032975.

5. One Canon Ae-1 camera (863086) with Solilgar 35-200m lens (684157510).

6. One pair sunglasses and two eyeglasses cases.

7. One camouflage mini-flashlight on headband.

000063

CR 03-527.022
**SEARCH OF FIELDS' TRUCK**
**PAGE 4**

8. One Casio Model EV-660 handheld portable television, SN: 20288815.

9. Two 12-gauge shotgun shells, from under the truck seat.

10. One .22-caliber shell, from under the truck seat.

11. One partial box of CCI .22-caliber shells.

12. One box of Federal .22-caliber shells.

13. 12-gauge shotgun shells, from behind truck seat.

14. Gun case containing .22-caliber Marlin Model 60W rifle (SN:06198019) with mounted scope, and shells from rifle chamber, magazine, and gun case.

**END NOTE:**

Copies of the Affidavit and Search Warrant were attached to this report.

DALLEY prepared logs of all the digital images. Copies of those logs were attached to this report.

000064

AO 93 (Rev. 5/85) Search Warrant

## ~~ORIGINAL~~

# United States District Court

EASTERN _____ DISTRICT OF _____ OKLAHOMA _____

In the Matter of the Search of

*(Name, address or brief description of person or property to be searched)*

THE PREMISES KNOWN AS

**1989 Dark Blue Chevrolet Pickup**
**Oklahoma Tag Number LYW 924**
**located at Kenco Plastics, 509 S. McKenna,**
**Poteau, Oklahoma**

**SEARCH WARRANT**

CASE NUMBER:   **03 - 058 _ M**

SPECIAL AGENT NORMAN G. KUYLEN

TO: _FBI_____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _Special Agent Norman Kuylen_____ who has reason to
                                                                    Affiant

believe that [X] on the person of or [ ] on the premises known as *(name, description and/or location)*

A 1989 dark blue Chevrolet Pickup, Oklahoma Tag Number LYW 924, with "1500" on the exterior body, located at the
Kenco Plastics parking lot, 509 S. McKenna, Poteau, Oklahoma,

in the _____Eastern_____ District of _____Oklahoma_____ there is now concealed a
certain person or property, namely *(describe the person or property)*   See ATTACHMENT A which
property/records are fruits and instrumentalities evidencing acts in violation of Title 18, U.S.C. § 1111, as evidenced by
the Affidavit of Special Agent Norman G. Kuylen attached to the Application and Affidavit for Search Warrant,
incorporated by reference herein.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____*July 25, 2003*_____
                                                                                      Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find~~
~~reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy
of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or prop-
erty seized and promptly return this warrant to _U.S. MAGISTRATE JUDGE STEVEN P. SHREDER_
                                                                                      U.S. Judge or Magistrate
as required by law.

July 18, 2003 _____     at   Muskogee, Oklahoma _____
Date and Time Issued                                                   City and State

STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

000065

## ATTACHMENT "A"

### *Items to be Seized*

Guns; Ammunition, including shells and casings; burlap; fibers; a "gilly's suit; camera(s); film; shoes; clothing; blood; hair; documents relating to or regarding Charles Glenn Chick, Shirley Elliott Chick and/or Edward L. Fields, Winding Stair Park, Ouachita National Park, Talimina Drive; fingerprints; palm prints; shoe prints; impressions; latex gloves; broken glass, and any and all evidence relating to the homicide committed on 7-10-03 in the National Forest.

000066

AO 106 (Rev. 7/87) Affidavit for Search Warrant   ~~ORIGINAL~~

# United States District C̶o̶u̶r̶t̶ FILED

__EASTERN__   DISTRICT OF   __OKLAHOMA__   JUL 18 2003

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

William D. Guthrie
Clerk, U.S. District Court

By_____
Deputy Clerk

THE PREMISES KNOWN AS
1989 Dark Blue Chevrolet Pickup
Oklahoma Tag Number LYW 924
located at Kenco Plastics, 509 S. McKenna,
Poteau, Oklahoma

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:   03-059 M

I __NORMAN G. KUYLEN_____ being duly sworn depose and say:

I am a(n) __Special Agent, FBI__   and have reason to believe

that [ ] on the person of or   [X]   on the property or premises known as (name, description and/or location)

A 1989 dark blue Chevrolet Pickup, Oklahoma Tag Number LYW 924, with "1500" on the exterior body, located at the Kenco Plastics parking lot, 509 S. McKenna, Poteau, Oklahoma,

in the   __Eastern__   District of   __Oklahoma__   there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See ATTACHMENT "A"**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure) property/records are fruits and instrumentalities evidencing acts

concerning a violation of Title __18__ United States Code, Section(s) __1111__.
The facts to support a finding of Probable Cause are as follows:

See attached Affidavit of Special Agent Norman G. Kuylen, FBI, which is incorporated and made a part hereof by reference.

Continued on the attached sheet and made a part hereof.   [X] Yes [ ] No

_____
Signature of Affiant
NORMAN G. KUYLEN
Special Agent, FBI

Sworn to before me, and subscribed in my presence
__July 18_____, 2003____
Date
STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

at   __Muskogee, Oklahoma__
City and State

_____
Signature of Judicial Officer

000067

## ATTACHMENT "A"

### *Items to be Seized*

Guns; Ammunition, including shells and casings; burlap; fibers; a "gilly's suit; camera(s); film; shoes; clothing; blood; hair; documents relating to or regarding Charles Glenn Chick, Shirley Elliott Chick and/or Edward L. Fields, Winding Stair Park, Ouachita National Park, Talimina Drive; fingerprints; palm prints; shoe prints; impressions; latex gloves; broken glass, and any and all evidence relating to the homicide committed on 7-10-03 in the National Forest.

000068

## AFFIDAVIT

I, Norman G. Kuylen, being first duly sworn, do depose and state:

I am an Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Oklahoma City Division, Muskogee Resident Agency, and have been employed in this position for over six (6) months. Prior to my employment with the FBI, I served for thirteen and a half years in the United States Air Force, as a Fuels Operator and as an Imagery Intelligence Analyst, in several locations across the United States of America and at five military sites overseas, to include two joint assignments with North Atlantic Treaty Organization (NATO) personnel. As a Special Agent with the FBI, I am vested with the authority to investigate violations of Federal law, including violations of Title 18, United States Code, Section 1111 -- Murder in the First Degree.

This affidavit is made in support of a Complaint, Arrest Warrant against Edward L. Fields, date of birth ████, and a search warrant for a 1989 Blue Chevrolet Pickup, Oklahoma Tag Number LYW 924, dark blue in color, with "1500" on the body, located at Kenco Plastics parking lot, Poteau, Oklahoma.

Your affiant was advised by William Donnie Long, Agent with the Oklahoma State Bureau of Investigation, of the following facts:

1.      On July 11, 2003, a man identifying himself as Max Hendrix called the LeFlore County Sheriff's Department and reported that he had found a man and a woman who had been robbed and killed in the Winding Stair Campgrounds. Max Hendrix stated to law enforcement personnel that he was riding his motorcycle through the area and found the two bodies. Max Hendrix waited for officers with the LeFlore County Sheriff's Department to arrive at the location. Hendrix then directed the officers to the campsite where the bodies were discovered. This campsite is described as campsite 15 of the Winding Stair Campground in the Ouachita National Forest located in southern LeFlore County, Eastern District of Oklahoma, and is on property owned by the United States of America. Located within campsite 15 was a 1996 Ford LL van described as two tone in color with a blue color appearing over a tan color and a green Cabella's tent with a gray dome. Agent Long arrived at the above described location within the Ouachita National Forest and observed the white male and white female who were deceased with the above described tent and van located as aforesaid. Both victims had been shot. The victims were later identified as Charles Glenn Chick and Shirley Elliott Chick. The bullets recovered from the victims' body have been analyzed by Gordon Robertson of the Oklahoma State Bureau of Investigation Laboratory and were found to be .22 caliber projectiles. At the campsite, burlap-like fibers were found at six separate locations.

2.      On July 18, 2003, Agent Long interviewed Carole Sakura Lamb, a white female, DOB ████, at the LeFlore County District Attorney's Office. Lamb told Agent Long that she had been friends with Edward Fields, a white male, DOB ████, for the past four years. Fields and Lamb had lived together until June 2003. Since that time, Fields had been living in campgrounds around Wister Lake and the Talimena Drive area.

000069

461

3.     During the time they were living together, Fields showed Lamb a .22 caliber rifle with an attached scope and a camouflage suit he referred to as a "gilly suit." The suit appeared to be made up of rope like material and was brown in color. The suit consisted of pants, hat and sweat shirt. The rope-like strands were woven into the garments.

4.     Lamb further stated that sometime in early June 2003, Lamb and Fields went to Wal-Mart in Poteau, where Fields purchased a box .22 caliber ammunition. On a separate occasion around the same time, they went to Atwoods in Poteau, Oklahoma, where Fields purchased some burlap bags. Lamb asked the purpose of the burlap and Fields state "you don't want to know." Sometime after the purchase of the burlap bags, they were at Lamb's residence in Wister. At that time, Fields cut the bags into strips the length of the bags. She watched Fields tie the strips around a .22 caliber rifle. Lamb knew Fields to carry the rifle and the "gilly suit" in the bed of his pickup, or inside the cab.

5.     Last week, Fields called Lamb on her cellular telephone and told Lamb that he was going to kill himself. Lamb met Fields at the Pocahontas landing area of Lake Wister. Fields told Lamb that he had "done something real bad." Fields told Lamb that he had snuck up on some people in their car. Fields further said that he went back and got his "gilly suit", snuck back up on them and watched them.

6.     Lamb met Fields on Thursday, July 10, 2003, at approximately 4:45 PM at the LaHuerta Restaurant in Poteau. They ate dinner together. Fields asked Lamb for money so that he could get a room at a motel. Lamb left Fields approximately one hour later to go to her college class.

7.     Fields called Lamb on Friday, July 11, 2003, around noon. Fields wanted to meet Lamb to get money for a motel in Wister, Oklahoma. Lamb told him that she was leaving town and did not have time to meet him.

8.     Fields called Lamb on Monday, July 14, 2003, on Lamb's cellular telephone. Lamb was at her doctor's office. Lamb told Fields that she did not have time to talk. Lamb has not talked to Fields since that call. Fields has left several messages on Lamb's answering machine inquiring about Lamb's well being.

9.     Lamb described the vehicle that Fields drives as an eighties or nineties Chevrolet, full sized pick up truck. It is dark blue in color and in need of a paint job.

10.     Lamb stated that Fields works at Kenco Plastics in Poteau, Oklahoma. United States Forest Service Law Enforcement Special Agent James Alford has been to Kenco Plastics on this date and has found a vehicle matching the Lamb description in the parking lot at Kenco Plastics in Poteau. In plain view in the back of the pick-up truck at Kenco Plastics, Special Agent Alford saw a garment consistent with what he recognizes as a gilly suit. A records check of the truck where the gilly suit was seen shows that it is registered to Edward L. Fields.

2

000070

11.     On July 13, 2003, Agent Long traveled to Shreveport, Louisiana, to interview Carl Gabriel Wise, a white male, ███████████. Wise had been in the Winding Stair Campground on July 8 and 9, 2003. When Wise entered the campground on July 8, 2003, at approximately 9:00 PM, he saw a "dark blue, C-1500, pick up truck" parked at the campsite located in the northwest corner of the campground area. Campsite number 15 is located in the northwest corner of the campground.

Based upon the foregoing, your affiant believes probable cause exists to believe that Edward L Fields, date of birth ███████ has committed violations of Title 18, United States Code, Section 1111 -- Murder in the First Degree. Your affiant further believes there is probable cause to believe that evidence of a violation of Title 18, United States Code, Section 1111 will be found by searching the dark blue Chevrolet Pickup, Oklahoma Tag Number LYW 924.

Since this affidavit is being submitted for the limited purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a Complaint and Arrest Warrant for Edward L. Fields, date of birth ███████, and Search Warrant for a dark blue, 1989 Chevrolet pickup, Oklahoma Tag Number LYW 924, with "1500" on the body of the truck, I have not included each and every fact known concerning this investigation to me and others involved in this matter. I have set forth only the facts that I believe are essential to establish the necessary foundation for the filing of a Complaint and issuance of an Arrest Warrant for Edward L. Fields, and search warrant for the 1989 Chevrolet pickup.

Further affiant sayeth not.

NORMAN G. KUYKEN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this ___ day of July, 2003.

STEVEN P. SHREDER
United States Magistrate Judge

3

000071

Case 6:10-cv-00115-RAW   Document 2-30   Filed 04/06/10   Page 12 of 15
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 464

**PAGE#:** 12 of 15

# PHOTO LOG

Location Kenco          Date   07/18/03          Time   1630-1700hr
Camera Type  Sony          # CD   6          Photographer   Iris Dalley

| PHOTO # | DESCRIPTION | LOCATION/Direction |
|---|---|---|
| CR03527CD60001 | Search Warrant for FIELDS' pickup | |
| CR03527CD60002 | Front of pickup | Parked in Kenco parking lot |
| CR03527CD60003 | Left side of pickup | |
| CR03527CD60004 | Rear of pickup | |
| CR03527CD60005 | License plate on rear of pickup | Okla #LYW-924 |
| CR03527CD60006 | Right side of pickup | |
| CR03527CD60007 | Bed of pickup | From rear |
| CR03527CD60008 | Gilly suit in pickup bed | |
| CR03527CD60009 | Cab | Through closed driver's window |
| CR03527CD60010 | Cab (reflected pickup bed & Dalley's left leg/shoe) | Through rear window |

000072

**PAGE#:** 13 of 15

# PHOTO LOG

ation Poteau Police Department _____ Date ___07/18/03_____ Time___1700-2000hr_____

Camera Type___Sony_____ # CDs_____ Photographer___Iris Dalley___

| PHOTO # | DESCRIPTION | LOCATION/Direction |
|---|---|---|
| CR03527CD60011 | Edward Fields' face | Interview room at PPD |
| CR03527CD60012 | Edward Fields' face/upper body | |
| CR03527CD60013 | Edward Fields' body front | |
| CR03527CD60014 | Back of Edward Fields' left hand | |
| CR03527CD60015 | Back of Edward Fields' right hand | |
| CR03527CD60016 | Palm of Edward Fields' right hand | |
| CR03527CD60017 | Palm of Edward Fields' left hand | |
| CR03527CD60018 | Healing wound on Edward Fields' left thumb | |
| CR03527CD60019 | Healing wound on back of Edward Fields' right index finger | |
| CR03527CD60020 | Edward Fields' right thumb | |
| CR03527CD60021 | Back of Edward Fields' left index & left middle fingers | |
| CR03527CD60022 | Left front of Edward Fields' pickup | In PPD garage bay |
| CR03527CD60023 | Left side of Edward Fields' pickup | From rear |
| CR03527CD60024 | Rear of Edward Fields' pickup | |
| CR03527CD60025 | Right side of Edward Fields' pickup | From rear |
| CR03527CD60026 | Right front of Edward Fields' pickup | From front |
| CR03527CD60027 | Bed of Edward Fields' pickup | From rear |
| CR03527CD60028 | Inside cab | From opened driver's door |
| CR03527CD60029 | Inside cab, driver's seat | From opened driver's door |
| CR03527CD60030 | Under driver's seat | From left side |
| CR03527CD60031 | Under driver's seat | From front |
| CR03527CD60032 | Odometer | |
| CR03527CD60033 | Radar detector on dash | From left |
| CR03527CD60034 | Behind sear | From driver's side |
| CR03527CD60035 | Inside cab | From opened passenger door |
| CR03527CD60036 | Behind seat | From right |
| CR03527CD60037 | Behind seat | From right/front |
| CR03527CD60038 | Items in dash 'cubby hole' | To front |
| CR03527CD60039 | Under passenger seat | From front |

000073

Case 6:10-cv-00115-RAW   Document 2-30   Filed 04/06/10   Page 14 of 15
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 466

PAGE#: 14 of 15__

# PHOTO LOG

Location Poteau Police Department __   Date __07/18/03____   Time__1700-2000hr__
Camera Type__Sony__   # CDs_____   Photographer__Iris Dalley__

| PHOTO # | DESCRIPTION | LOCATION/Direction |
|---|---|---|
| CR03527CD60040 | Under passenger seat | From right |
| CR03527CD60041 | Under center/driver's sear | From right front |
| CR03527CD60042 | Driver's visor | Turned down |
| CR03527CD60043 | Passenger visor | Turned down |
| CR03527CD60044 | Driver's door pocket/contents | Down |
| CR03527CD60045 | Stained gauze from driver's door pocket | |
| CR03527CD60046 | Stained gauze from driver's door pocket | Close-up |
| CR03527CD60047 | Items on seat | Cover turned back to expose items |
| CR03527CD60048 | Items on seat | Cover turned back to expose items |
| CR03527CD60049 | Items (camera w/lens, eyeglass cases, Royal Crown bag/min-TV) on seat | Cover turned back to expose items. |
| CR03527CD60050 | Canon AE-1 35mm camera with attached 35-200mm lens | Found under cover on seat |
| CR03527CD60051 | Casio mini-TV from Royal Crown bag | Found under cover on seat |
| CR03527CD60052 | Camouflage cloth gun case | Found behind seat |
| CR03527CD60053 | Burlap-camouflaged rifle in gun case | Opened on paper |
| CR03527CD60054 | Shells & muzzle of burlap-camouflaged rifle | Opened on paper |
| CR03527CD60055 | Burlap-camouflaged rifle in gun case | Opened on paper |
| CR03527CD60056 | Serial number 06198019, on left side of rifle | Close-up |
| CR03527CD60057 | Make & model on left side of rifle | Marlin Model 60W, micro-groove barrel cal .22LR |
| CR03527CD60058 | Ejection port on right side of rifle | |
| CR03527CD60059 | Shell in rifle chamber | Ejection port opened by Dalley |
| CR03527CD60060 | Behind seat | After gun case removed |
| CR03527CD60061 | Calendar page – February 2003 | Calendar found behind seat |
| CR03527CD60062 | Calendar page – March 2003 | Calendar found behind seat |
| CR03527CD60063 | Calendar page – February 2003 | Calendar found behind seat |
| CR03527CD60064 | Calendar page – March 2003 | Calendar found behind seat |
| CR03527CD60065 | Calendar page – April 2003 | Calendar found behind seat |
| CR03527CD60066 | Calendar page – May 2003 | Calendar found behind seat |
| CR03527CD60067 | Calendar page – June 2003 | Calendar found behind seat |

000074

# PHOTO LOG

Location Poteau Police Department          Date  07/18/03          Time  1700-2000hr

Camera Type  Sony                          # CDs                    Photographer  Iris Dalley

| PHOTO # | DESCRIPTION | LOCATION/Direction |
|---------|-------------|--------------------|
| CR03527CD60068 | Calendar page – June 2003 | Calendar found behind seat – close-up |
| CR03527CD60069 | Calendar page – July 2003 | Calendar found behind seat |
| CR03527CD60070 | Calendar page – July 2003 | Calendar found behind seat – close-up |
| CR03527CD60071 | Pharmacy envelope label | Too much light |
| CR03527CD60072 | Pharmacy envelope label, 07/09/03 for 30 Effexor XR 150mg cap | |
| CR03527CD60073 | Typed note "Money that is owed Carole Lamb" | |
| CR03527CD60074 | Contents of glove box | Opened |
| CR03527CD60075 | Passenger door pocket & contents | Down |
| CR03527CD60076 | Ice chest in pickup bed | Down |
| CR03527CD60077 | Coke can in ice chest | Opened |
| CR03527CD60078 | Gilley suit in pickup bed | Down |
| CR03527CD60079 | Swim trunks & misc items in pickup bed | Down |
| CR03527CD60080 | Search Warrant on dash | Thru windshield – close-up |
| CR03527CD60081 | Search Warrant on dash | Thru windshield |

000075

**Inventory of items in 1989 Chevrolet Truck, Oklahoma tag "LYW 924". Inventory conducted on 07/23/03 by Special Agent James Alford, Law Enforcement Officers Gary Rose and Paul Jolivette.**

**ITEMS FROM BED OF TRUCK**
Coleman twenty-eight quart ice chest containing one can Coca-Cola
Plastic blue lawn chair
Drop hitch with ball for receiver hitch
Vehicle jack
Coleman propane torch with propane bottle attached
Sixty-four ounce bottle of "Fast Orange" hand cleaner approximately full
Metal bed rails
Pair of size eleven cross training shoes
Assorted tools
Steel smooth-jawed trap
Blue-striped towel
Solid green towel
Green bathroom rug
Maroon fleece blanket
Braun electric shaver
Cattle sorting stick with bent clothes hanger attached with tape
Trash sack containing
> One pill bottle from Choctaw Nation Health Clinic, Poteau
>> "Dawn Michell TIPTON, prescription number 3049763 "Ibuprofen 800 mg"
> One pill bottle from Wal-Mart Pharmacy, Poteau "Margaret Mary FIELDS" prescription number 4530174, "Carisoprodol 350mg"
> Three empty packages "Lexapro 10mg"
> One package containing blister pack containing seven pills "Lexapro 10mg"
> Order/Notice to Withhold Income For Child Support to FIELDS, Jr. dated 05/30/03
> "DD Form 214" Certificate of Release or Discharge From Active Duty, US Navy"
> One pill bottle from D&D Pharmacy, Poteau, "Margaret Fields" prescription number 460972, "Celexa 20mg"
> Rust colored tent rain fly
> Ten window weights

**ITEMS FROM CAB OF TRUCK**
Two reusable Wal-Mart shopping cards
One empty blister pack "Lexapro 10mg"
Key fob with one Nissan key and two other keys
One pill bottle from Green's Prescription, Heavener, "Edward Fields" prescription number 377264, "Claritin 10mg" containing twenty pills

000817

Six cc disposable syringe containing six cc of brown liquid

One twenty-gauge number eight shotgun shell

Gold colored ring with diamond type stone

Container of "EPIPEN" 0.3mg Epinephrine auto-injector

Note with "April 918-427-7099  Matt 653 2419" on back "Meds Smokes"

Note with ""Tues.&Wed. off at 5:00  653 5041 hm  653 2036 daywolf"

Note on Ramada stationary with "918-647 5705 Holland"

Chain of custody form from "Labcorp", from Kenco plastics, Poteau specimen number 0349156743

Two pay stubs for Edward Fields

Key fob with six keys

Calendar with notes on months February – July

Past due notice from AT&T long distance account number 4504231195001 dated May 6, 2003

Cord form rechargeable light

Twelve earning statements from TEC Staffing Services

Earning statement form Atwoods, Poteau

Miscellaneous receipts

Sheffield combo tool

Equate pain relieve

"Effexor XR 3.75mg/75mg" blister pack containing three pills

Five earning statements from Wortz, Poteau

Two letters from Attorney Schmuck to Fields about divorce, dated 08/21/02, 04/24/02

Court Minute from the District Court of Leflore County, Stubbs v. Fields JFRC-95-572

Black plastic bag containing travel size toiletry items

Note paper with "658-4911"

Receipt for "Money owed to Carole Lamb,  $200 Child support, $100 VA taxes,   $95 doctor visit, $725 Sebastian County, $80 4 phone cards, $1200 total,  $100 wk......12 weeks,  Beginning June 26th, ending September 12th without fail, Carole Lamb,  Edward Fields,  June 24, 2003"

Sack containing disposable syringes, oil fhirts, shirts, magazine

Red and white throw blanket

Assorted tools

James B. Hyuf   07/23/07

000818

RLL *1.21.04* OTHER _____
GJS *1-21-04* FILE _____
JAH _____ CLIENT *1-23-04*

*inquisitor, inc.*

## PRIVILEGED AND CONFIDENTIAL-ATTORNEY WORK PRODUCT

### MEMORANDUM

TO:         EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)

FROM:     GLORI J. SHETTLES

RE:         ITEMS FROM FIELDS' TRUCK

DATE:     JANUARY 16, 2004 **(Dictated 01-17-04; transcribed 01-19-04, nb)**

---

On this date, I received a package from **Jovanna Fields**. The vehicle owned by **Edward Fields** at the time of his arrest was recently released to **Jovanna's** husband, **Paul Fields**. It should be noted that **Paul** and **Jovanna Fields** are not related to **Edward Fields**, but are family friends.

The FBI provided an inventory of items removed from the vehicle, but this list was not forwarded. The following items were left in the truck; however, **Jovanna Fields** felt we should have possession of the items.

An inventory of the forwarded items is as follows:

1.    14-day sample packet of Effexor XR.
Three (3) capsules remain in the package.

2.    Empty prescription bottle of 50 BUT/APAP/CAF 325-40-5 tablets.
This prescription is for **Mary Margaret Fields**, dated 03-15-02. This medication combines a barbiturate sedative, a non-narcotic pain reliever, and a blood vessel constrictor. It was prescribed for headaches.

3.    Prescription bottle, dated 10-18-02, for **Edward Fields**, Claritin.
20 were prescribed and are contained within the bottle.

4.    Empty eight (8) pill sample packet of Lexapro.

5.    Empty eight (8) pill sample packet of *"escitalopram oxalate,"* Lexipro.

6.    Eight (8) pill sample packet of Lexapro; two (2) remaining.

7.    Empty eight (8) pill sample packet of Lexapro.

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**                    **2**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

8.   Two (2) doses of over-the-counter Maximum Strength Suphedrine Sinus caplets;
     two (2) in each dose.

9.   Empty prescription bottle of 30 Flurazepam; a benzodiazepine derivative.
     This prescription is for **Mary Margaret Fields**, for sleep.

10.  Equate[1] Pain Reliever.
     Nighttime sleep aid pain reliever.  48 of 50 caplets contained.

11.  Unmarked bottle containing 94 small blue pills, with a marking of "*2101*" on
     one side, as noted on Elavil.  This is believed to be amitriptyline, used for
     depression.  They were prescribed for **Mary Margaret Fields** as a "*pain
     reliever*," but "*didn't work*."  She gave the pills to **Eddie Fields**; date unknown,
     per **Jovanna Fields**.

12.  October 21, 2002 – Correspondence to **Edward Fields** (believed to be **Senior**)
     from Western Arkansas Heart, Lung & Vascular surgical Associates, Ft. Smith,
     AR, regarding final notice of $64.20, 120 days past due.

13.  May 6, 2003 – Notice to **Leon Fields** from AT&T re past due account of
     $104.68.

14.  October 19, 2002 – Notice to **Edward Fields, Sr.**, from the American Medical
     Collection Agency re owed amount of $93.35.

15.  March 14, 2003 – Correspondence to **Eddie Fields** which contains his March
     12, 2003 Final Decree of Divorce from **Teresa Fields**.

16.  May 2, 2003 – Pay stub for **Eddie Fields**, presumed to be from Kenco.

17.  Undated sympathy card from "*Kathy*" regarding death of **Leon Fields**.

18.  August 21, 2002 – Correspondence from **Douglas W. Schmuck**, attorney at
     law, Poteau, OK, to **Eddie** regarding September 20, 2002 Court date regarding
     child support date involving **Rhiannon Meadows**.

19.  October 11, 2002 – Check stub from TEC Staffing Services for $26.00.
     Handwritten on the back, "*Wendell Mother 783-2054 home 782-9151.*"

20.  December 20, 2002 – Money order receipt for $150.00 to "*CESU*"[2].

---

[1] Wal-Mart generic brand.
[2] Presumed to be for child support.

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**                    **3**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

21. April 22, 2002 – Copy of received check for Child Support Enforcement Unit for $1,242.00.

22. February 28, 2003 – Statement for **Edward Fields, Sr.** from Schwartz Cardiology, Ft. Smith, AR, for $23.00.

23. February 28, 2003 – Statement for **Edward Fields, Sr.** from Arkansas Heart Center, Ft. Smith, AR, for $934.91.

24. January 29, 2003 – Bill for **Mary Margaret Fields** from Green's Prescription Center, Heavener, OK for $98.74.

25. April 26, 2002 – Western Union receipt of $50.00 sent from **Roberta Jasin**[3] to **Edward Fields, Jr.**

26. Portion of an envelope with the following:
    **April** 918.427-7099
    **Matt** 653-2419
    Meds
    Smokes

27. Small piece of paper with the following:
    Tues & Wed.   off at 5:00
    653-5041      mm
    653-2036      Daywolf

28. May 31, 2003 – *"U-Lock-It"* rental agreement, Poteau, OK.  $20.00 deposit, $35.00 per month.

    **Tootie Lamb** is noted as an additional person to whom any preliminary lien notice and subsequent notices may be sent.

29. June 24, 2003 – Typewritten on paper:
    *"Money that is owed **Carole Lamb***
    | | |
    |---|---|
    | *$200* | *Child Support* |
    | *$100* | *VA taxes* |
    | *$ 95* | *Doctor visits* |
    | *$725* | *Sebastian County* |
    | *$ 80* | *4 phone cards* |

    *$1200   Total*

---

[3] This is the woman who lived in Ohio, **Fields** met on the Internet and moved in May 2002 to Ohio.

*inquisitor, inc.*

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 473

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**          4
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

*$100 wk ..... 12 weeks*

*Beginning June 26th, ending September 12th without fail.*

**Carol Lamb** *(no signature)*

**Edward Fields** *(no signature)*

*June 24, 2003*"

30.  July 9, 2003 – Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg, **Dr. Kemp**.

31.  **Handwritten notes on individual dates of 2003 Family Appointment calendar.**[4]

The entries are as follows:

| February 5, 2003 | Spent the night. |
|---|---|
| February 12, 2003 | Spent the night. |
| February 14, 2003 | Spent the night. |
| February 15, 2003 | Came to the farm. |
| February 18, 2003 | Called to say she couldn't see me Wed.  Something came up. |
| February 20, 2003 | Took back movie to Stigler.  she told me she wanted to date other people. |
| February 22, 2003 | Called from the Cowboy; told me not to ever call again. |
| February 25, 2003 | Called to ask her to lunch Friday. |
| February 27, 2003 | Called to confirm. |
| February 28, 2003 | Met for lunch. |

---

[4] It should be noted that the handwritten entries of **Eddie Fields** begin on February 5, 2003, the day after **Fields** received service of the Final Decree of Divorce from **Teresa Fields**.  It is assumed the references are made in regard to **Fields'** relationship with **Michelle Tipton**.

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**                 **5**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

| | |
|---|---|
| March 1, 2003 | She went out with **Gary**.  Let him sleep on couch. |
| March 2, 2003 | Was invited, spent the night. |
| March 3, 2003 | No contact. |
| March 5, 2003 | Spent the night. |
| March 6, 2003 | Spent the night. |
| March 7, 2003 | Spent the night. |
| March 8, 2003 | Came to the farm. |
| March 9, 2003 | Called. |
| March 10, 2003 | No contact. |
| March 11, 2003 | She called me to tell me she loved me. |
| March 12, 2003 | Was invited; spent the night. |
| March 13, 2003 | She told me I had to go home to feed.  I told her it was OK.  She let me stay.  **John**[5] called. |
| March 14, 2003 | Her & **John's** aniversery (sic).  No contact. |
| March 15, 2003 | She went to slumber party. |
| March 16, 2003 | Was involved, told me she may go back to **John**.  Kicked me out.  Call I want (illegible) my stuff back. |
| March 17, 2003 | Called, plesent (sic).  Call Wed. about meeting Thur. |
| March 18, 2003 | Dropped by.  She was pissed.  Wanted to tell her my feelings. |
| March 19, 2003 | Called; will not meet me Thursday <u>wants time</u> |
| March 20, 2003 | No contact. |

---

[5] Presumed to be ex-husband.

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**         **6**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

| | |
|---|---|
| March 21, 2003 | Called about turkey. Said that I could bring her some pot. I did. I was drunk didn't go well. Said to call her Wed. |
| March 22, 2003 | **Mar**[6] called her. She never wants to see me again & I asked **Mar**. to call her and tell her I wanted stuff back. She said Sunday after 6. |
| March 23, 2003 | I went and got my stuff back.<br><br>END OF STORY |
| March 26, 2003 | **Mar** told me that she was sick. I called. She said she wasn't doing well and didn't want to talk to me. She said I could call again but no promises. |
| March 28 2003 | Called to take her the bed back. |
| March 31, 2003 | Called her in a/m 6:38 p/m. Police called. |
| April 5, 2003 | Asked **Mar**. to call and see if she would accept a bed. She called while I was at **Danny's**[7]. She talked to me. Will accept bed. She said we both messed it up for now but in tim (sic) who knows. |
| April 6, 2003 | Took her bed, pot, roses, $2 card pop. Stayed for dinner. Told me she loved me and to give her time she may go out w/me Saturday. She said that <u>I made her happy</u> when I was w/her but she needed time. Showed me her panties (smiley face); was kissing on pourch (sic) she said go. I stopped hollered bye to **Morgan**[8]; got in truck waved and left. It was good. |
| April 8, 2003 | <u>KENCO</u> |
| April 9, 2003 | Called to tell her about my new job. Told me to call Friday to see about Saturday, told me to go ahead & get her pot & G/S. |
| April 11, 2003 | Called 3 times, no answer. |

---

[6] Presumed to be **Margaret Fields**.
[7] Presumed to be **Danny Presley**.
[8] **Michelle Tipton's** daughter

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**                                  **7**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

| | |
|---|---|
| April 12, 2003 | Called her at work.  Come between 3-5.  Picked her up.  Went out.  Sex by river.  Will talk later in the week. |
| April 16, 2003 | Called.  She may come here Sat. |
| April 18, 2003 | Called.  Meet her at 3 at Pocola Sat. |
| April 19, 2003 | Met her at Pocola.  Went out.  She came to the farm. |
| April 20, 2003 | Took her home @ 10:00.  Call Wed. |
| April 23, 2003 | Called; pick her up after work tomorrow. |
| April 24, 2003 | Tattoo shop closed; spent the night. |
| April 26, 2003 | Spent the night. |
| April 27, 2003 | Spent the night. |
| April 28, 2003 | Spent the night. |
| April 30, 2003 | Her B-Day.  Spent the night. |
| May 1, 2003 | She called me.  Pick her up on Friday. |
| May 2, 2003 | Picked her up, got tattoo, went to her house. |
| May 3, 2003 | Spent night. |
| May 4, 2003 | Mom didn't feel well; I came home, bad storms.  I called to check.  Call tomorrow. |
| May 5, 2003 | Called.  Come over tomorrow. |
| May 6, 2003 | Spent night.  Made steaks; got her pot. |
| May 7, 2003 | Spent night.  Made hot dogs. |
| May 8, 2003 | Was sick; spent night. |
| May 9, 2003 | She called me; come over tomorrow; got her pot. |
| May 15, 2003 | Said I could move in. |

*inquisitor, inc.*

**EDWARD LEON FIELDS, JR. FILE (CASE #9995-00-66747)**          **8**
**ITEMS FROM FIELDS' TRUCK**
**JANUARY 16, 2004**

| | |
|---|---|
| May 31, 2003 | Called; she said it's over. |
| June 15, 2003 | Took her couch. |
| June 20, 2003 | Called to get my stuff; told me she had a warrant (sic) out on me. Got my stuff. No wqarrent (sic). |
| June 27, 2003 | Called. Wants to meet tomorrow. |
| June 28, 2003 | Met. Asked me to move back in. |
| June 29, 2003 | **John** called. |
| July 1, 2003 | Asked me to go somewhere till **Morgan** left. Said I could come back on 9th. (In the right hand corner, a "*T*" is indicated.[9]) |
| July 2, 2003 | "*T*" |
| July 3, 2003 | "*T*" |
| July 4, 2003 | Called; hand is feeling better. Said to call Sunday about meeting. "T" |

There are no other entries. There are numerous "*X*"s on various days where handwritten notes are made and on other dates where no notes appear. The significance, if any, of the "*X*" is unknown.

These entries will be included in the timeline, along with information noted from other people interviewed as it is felt relevant.

Unless otherwise directed, the materials forwarded from the truck inventory will be retained by Inquisitor, Inc.

---

[9] It is my belief that the "*T*" indicates **Fields'** spending the night at the home of **Carole "*Tootie*" Lamb.**

*inquisitor, inc.*

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on the 6th day of April, 2010 I caused a copy of the foregoing to be served on the following by hand delivery:

Honorable Sheldon J. Sperling
United States Attorney
Eastern District of Oklahoma
1200 W. Okmulgee
Suite 201
Muskogee, Oklahoma 74401-6848

Michael Wiseman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

EDWARD LEON FIELDS, JR.,              )
                                      )
            *Petitioner*,             )
                                      )
v.                                    )        **Case No. CV-10-00115-RAW**
                                      )        **Criminal Case No. CR-03-73-RAW**
UNITED STATES OF AMERICA              )
                                      )
            *Respondent.*             )

## RESPONSE TO MOTION FOR NON-DISPOSITIVE OMNIBUS RELIEF

**COMES NOW**, Respondent, United States of America, by and through undersigned counsel, and in response to Petitioner's Motion for Non-Dispositive Relief respectfully submits the following:

## PROCEDURAL HISTORY

On August 1, 2003, a federal grand jury for the Eastern District of Oklahoma returned an indictment that charged Edward Leon Fields with four non-capital offenses and two counts of the death-eligible crime of first degree murder, stemming from the homicides of Charles Glenn Chick, Jr. and Shirley Elliot Chick.  (Trl. Doc. 16.)[1]  On March 15, 2004, the government filed a notice of intent to seek the death penalty with respect to both murder charges.  (Trl. Doc. 38.)  On June 30, 2005, Fields pleaded guilty to all six counts of the indictment.  On July 22, 2005, following a penalty phase trial, a jury returned a death penalty verdict for the two murders, for which this Court imposed judgment on November 8, 2005.  (Trl. Doc. 228.)

In a published opinion, the Tenth Circuit affirmed this Court's judgment in full.  *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008).  On April 6, 2010, Fields filed a Motion Under 28

---

[1]The government prefaces docket entries in case no. 03-cr-73-WH by with "Trl." Citations to documents filed on the instant docket, case no. 10-cv-115-RAW, have no preface.

1

U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  (Doc. 1.)

The same day, he filed a brief entitled Grounds in Support of Motion Pursuant to 28 U.S.C. § 2255

to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  (Doc. 2.)

On June 1, 2010, he filed the instant Motion for Non-Dispositive Omnibus Relief.  (Doc. 4,

hereinafter "Mot.")  This Opposition follows.

## I.  FIELDS'S REQUESTS FOR DISCOVERY ARE BASELESS, PREMATURE AND UNSUPPORTED BY A SHOWING OF GOOD CAUSE

Fields requests orders from this Court that would permit him to conduct three types of

discovery.  First, he seeks an order compelling the Bureau of Prisons to transport him to a medical

facility for a neuro-imaging examination.  Second, he requests an order compelling the government

to disclose various items and documents that he claims are supposedly within its custody.  Third,

Fields requests an order permitting him to depose a physician who treated him prior to the

commission of the murders, who has allegedly refused to provide information to defense counsel.

(Mot. 2-12.)  As shown below, Fields's requests are all fatally flawed.

A.  Legal Principals Applicable to Discovery Requests

Before trial, prosecutors must disclose all substantial material evidence favorable to the

defense.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  But after conviction, the government's duty

to disclose information favorable to the defense is not controlled by *Brady*.  *Dist. Atty's Office v.*

*Osborne*, 129 S.Ct. 2308, 2319-20 (2009).

During collateral proceedings, courts may order discovery when they conclude "that it is

necessary . . . in order that a fair and meaningful evidentiary hearing may be held so that the court

may properly 'dispose of the matter as law and justice require.'"  *Harris v. Nelson*, 394 U.S. 286,

2

300 (1969). A broad-ranging preliminary inquiry is neither necessary nor appropriate in collateral proceedings. *Harris*, 394 U.S. at 297. Rather, "[a] habeas petitioner may 'invoke the process of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.'" *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004) (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir.1997)). To demonstrate good cause for discovery, the petitioner must give the court reason to believe that, if the facts alleged are fully developed, the petitioner will be able to show that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 906-09 n.10 (1997); *see Webster*, 392 F.3d at 802.

B.  Request for Access to a Medical Examination

Fields requests that this Court order the Bureau of Prisons to transport him, albeit at his own expense, to a facility where he can undergo a neuro-imaging examination. Fields makes this request without reference to any legal authority or any standard of review. (Mot. 2-4.) Fields does not and cannot show that this Court has the authority to simply order him taken to a place of his choosing because he has elected to engage in § 2255 litigation. Moreover, he cannot justify his request as a meritorious motion for discovery.

The government recognizes that Fields does not require the imprimatur of this Court to personally acquiesce to a physical examination. However, Fields's request presumes that this Court has some plenary power to compel the Bureau of Prisons, despite its lawful incarceration of the defendant, to transport him to a place of his desire so he can undergo an exam, simply because the results could assist him in his present litigation. *Cf. Jackson  v. Vasquez*, 1 F.3d 885, 888-89 (9th Cir. 1993) (holding that statutory authority to issue writs and fund investigation does not permit a

3

district court to compel a state custodian to transport prisoner for medical exam, though discovery rules may do so). Fields cites no authority for that proposition, because there is none. *See id.* At most, Fields's desire to compel the government to transport him to a medical facility of his choosing might contemplate this Court's authority to order discovery as part of the § 2255 litigation. *See id.*; Rule 6, Rules Gov'g § 2255 Proceedings. But Fields cannot show a need to pursue discovery before the government has had an opportunity to respond to the § 2255 Motion, nor can he meet the good-cause standard for discovery.

Fields's request for discovery is necessarily premature. The government has had no opportunity to respond to Fields's § 2255 allegations. By extension, this Court has not yet had an opportunity to determine whether factual development and an evidentiary hearing will be necessary in this case. Rule 8, Rules Gov'g § 2255 Proceedings; *See, infra*, Arg. III. Accordingly, an order for discovery would be premature, as is Fields's request. *Harris v. Nelson*, 394 U.S. at 300.

In any event, Fields has failed to show good cause for any request that the government transport him for purposes of examining his brain. In the underlying § 2255 claim, Fields has argued that his trial attorneys provided ineffective assistance of counsel when they failed to properly investigate and present evidence of his supposed organic brain damage. (Doc. 2 at 16-26.) To prevail on such a claim, he must show that his attorneys' performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Fields must show, inter alia, that counsel were on notice that the subject merited investigation, that counsel had no tactical reason to forgo some or all of such an investigation, that counsel's decisions fell below reasonable professional norms, and that counsel's decisions had a reasonably likely impact on the outcome of the trial. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420

4

(2009) (regarding the burden to show performance relative to professional norms); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (holding the duty to investigate depends upon the facts known to the attorney); *Massaro v. United States*, 538 U.S. 500, 504 (2003) (observing that *Strickland* requires defendants claiming ineffective assistance of counsel to show that their attorneys' actions "were not supported by a reasonable strategy"); *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) (regarding the requisite showing of prejudice).

Despite the fact that any relevant inquiry concerning Fields's alleged brain damage focuses on the conduct of his attorneys, at or before his 2005 trial, the defendant asks this Court to facilitate an examination designed to assist the diagnosis of his condition in 2010. In fact, in recommending a neuro-imaging exam, Fields's current expert notes the possibility that the defendant may suffer from a brain tumor or ischemic brain disease, and asserts that "an MRI study of his brain is strongly indicated to aid in proper differential neurodiagnosis and treatment." (Doc. 2, Ex. 9 at 16.) Fields's expert gives no indication that any information obtained in an MRI conducted now will inform the question of Fields's condition, or trial counsel's conduct, five or more years ago. Simply put, Fields provides no indication that an MRI of his brain in 2010 can demonstrate that trial counsel acted unreasonably in light of the information available to them. Moreover, he provides no indication that the proposed examination will reveal data about his condition at the time of the crime that might be relevant to the question of prejudice.

Fields likewise fails in arguing that good cause exists for the MRI because it would inform the analysis of his claim that he is incompetent to be executed. (Mot. at 3.) Fields has conceded in his § 2255 Motion that the competence claim is not ripe. (Doc. 2 at 55.) Indeed, the great weight of legal authority suggests that this Court cannot adjudicate the competence claim at this time. *See,*

5

*e.g.*, *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n.2 (3d Cir. 2006); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000). Given that the Court cannot decide the claim, the issue cannot support good cause for ordering discovery.

Fields's request that this Court facilitate an MRI examination of his brain is untimely and bereft of a good cause showing. Accordingly, the Court should reject it.

C. Request for Specific Items Allegedly Possessed by the Government

Under the auspices of a discovery request, Fields asks this Court to order the government to disclose three items allegedly seized by investigators – a bottle of 150mg Effexor capsules and two computers that belonged to Fields at the time of the murders. According to Fields, the government had an obligation under *Brady* to disclose these items at the time of trial and should therefore do so now. Moreover, he contends that the government does not object to these requests. (Mot. 6-8.) As discussed below, Fields is wrong.

Counsel for the government has never agreed, during repeated telephonic discussions about the requested items, that formal discovery is necessary or appropriate. Counsel for the government has, however, agreed to cooperate in locating or explaining the whereabouts of the requested items. The government maintains, despite its attempts to cooperate with defense counsel, that no formal discovery should be ordered in this matter until it has had an opportunity to demonstrate that no evidentiary development is necessary. *See Harris v. Nelson*, 394 U.S. at 300. But regardless of the timing of the discovery requests, Fields has failed to show good cause for them, as the government does not have custody or control over the requested items and has offered to share the data found on Fields's computers.

1. The Pill Bottle

The FBI has advised counsel for the government that it did not collect, as evidence, a bottle of 150mg Effexor capsules observed in Fields's truck. The FBI has no record that it retained the pill bottle. Rather, the FBI has represented to the government's counsel that it delivered the bottle to the jail where Fields was held before trial, so that he could continue to take the medicine. Insofar as the government is aware, Fields ingested the contents of the bottle. Counsel for the government has informed Fields's attorneys of these facts. Defense counsel have stated that they will secure a release of medical records from their client so that the government can obtain documentary confirmation that the defendant was administered the 150mg Effexor capsules prior to trial. Fields's counsel presently estimate that they will obtain the release around June 18, 2010. Counsel for the government will, upon receipt from the jail, provide Fields with any relevant records concerning the Effexor bottle and its contents.

Even if the apparent fate of the requested Effexor bottle remained unknown, Fields still would not have shown good cause for a discovery order. His § 2255 Motion notes that Oklahoma State Bureau of Investigation ("OSBI") Agent Iris Dalley observed, but did not recover, the bottle. (Doc. 2 at 120-21; *see also* Doc. 2 Ex. 29 (Dalley's report).) The Motion goes on to assert that the FBI did not include the container when it returned the contents of Fields's truck several months after Dalley's observation of the container. (Doc. 2 at 120-21.) Based on the assertion that the bottle was not returned, Fields speculates that "[l]aw enforcement officials seized the bottle," but there exists no documentary proof of that supposition in his possession or the government's. (*Cf.* Doc. 2 at 121.) Fields's assertion is, however, based on a weak link in the chain of custody. Crediting Fields's own exhibits, it appears that his entire truck was returned to a friend, Paul Fields, whose wife, Jovanna

7

Fields, collected the contents and sent them to a defense investigator for inventory.  (Doc. 2 Ex. 31.) At a minimum, Fields has failed to show that Paul or Jovanna Fields did not keep or misplace the bottle of pills, for which the government has no records of retention.

Because the government does not have the bottle of Effexor, and had not retained it as evidence at the time of trial, there can exist no good cause for ordering its production.  Accordingly, this Court should deny this request for discovery.

2.  The Computer Hard Drives

The two computers requested by Fields were available to him from other sources.  The government does not possess or have access to the CTX computer tower (serial number 650970112-RLAK235-B0).  The government's counsel has been advised by the FBI that the computer was returned to Michelle Tipton prior to trial.   Likewise, the Government does not possess or have access to the Hewlett Packard Pavilion computer tower (serial number US90108692).  The government's counsel has been advised by the FBI that the computer was returned to the defendant's mother, Mary Margaret Fields, prior to trial.

Even if Fields could not obtain access to the computers before trial, images of the hard drives from both units were made by the OSBI.  The images were available to Fields at the time of trial, but he made no known request to examine them.  Fields's counsel have been advised that the images are available and have been provided with a point of contact at OSBI so that they can copy and inspect the data.

Given that the government has never foreclosed Fields from inspecting the hard drive images, he cannot succeed in his argument that a *Brady* violation merits the issuance of  a formal discovery order.  *Cf. United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) (noting that suppression

8

of evidence is a prerequisite to a finding that the government violated *Brady*). Indeed, because both computers were available to Fields from other sources he cannot demonstrate that the failure to allow him to inspect the hard drive images would have been a violation of *Brady*. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). As such, he falls far short of establishing good cause for discovery. *Bracy v. Gramley*, 520 U.S. at 906-09 & n.10.

D.  Requests for Unidentified, But Allegedly Undisclosed, Documents

Fields seeks a discovery order for previously undisclosed police reports and all other exculpatory documents, evidence and information. (Mot. at 9.) The government complied with its discovery obligations at the time of trial. To the best understanding and belief of counsel for the government, all known *Brady* material was timely disclosed to defense counsel, including, all FBI Form 302s and OSBI reports associated with the murders committed by the Petitioner.[2] Simply put, the government does not possess, or have access to, undisclosed exculpatory evidence. Fields fails to show good cause for discovery by arguing the contrary in an utterly conclusory fashion, before this Court has had an opportunity to decide if evidentiary development is even necessary.

E.  The Deposition of Dr. Michael Kemp

Fields requests an order to depose Dr. Michael Kemp, the physician who was treating him just prior to the murders. At trial, Fields theorized that Kemp failed to properly diagnose him and, as a result, wrongly prescribed him an anti-depressant that caused him to enter a bipolar "flip," leading to the murders. Fields now claims his attorneys were ineffective for failing to elicit Kemp's testimony to rebut government evidence that the defendant malingered auditory hallucinations that

---

[2] To the extent that Fields also requests the notes of agents, the government had no duty to disclose those documents, because their contents were accurately reflected in the police reports that were disclosed to defense counsel.

9

supposedly affected him at the time of the crime.  (*See* Doc. 2 at 37-39.)  Because Fields asserts that

Kemp refuses to cooperate with present counsel, he requests an opportunity to depose Kemp because

of the likelihood that the doctor possesses information relevant to the claim of ineffective assistance.

(Mot. at 10-12.)  Once again, Fields's request fails to establish good cause.

Beyond the fact that the government has not had an opportunity to show that evidentiary

development of the underlying claim is unnecessary, the discovery that Fields seeks is entirely

irrelevant to the resolution of the § 2255 claim, which involves the alleged ineffective assistance of

trial counsel.  To succeed on the underlying claim, Fields must show that his attorneys' failure to call

Kemp was deficient and prejudicial.  *Strickland v. Washington*, 466 U.S. at 687.  Thus, he must

show, among other things, that counsel were on notice that Kemp could offer helpful testimony, that

counsel had no tactical reason to forgo that testimony, that counsel's decisions fell below reasonable

professional norms, and that counsel's decisions had a reasonably likely impact on the outcome of

the trial.  Because trial counsel premised their strategy on arguments that Kemp misdiagnosed and

improperly medicated Fields, it appears self-evident why they would not have sought out his

testimony to prove that Fields suffered from auditory hallucinations.  Kemp's alleged professional

errors were the lynchpin of a theory that Fields was not entirely responsible for two murders.  Trial

counsel could not have credibly argued, on the one hand, that the jury should rely on the doctor's

testimonial diagnosis while arguing, on the other, that his mishandling of defendant's condition prior

to trial led to two homicides.

Accordingly, Fields gives no indication how information in Kemp's possession would inform

the question of counsel's performance at the time of trial, as their strategy was premised on

discrediting his professional opinions and conduct.  The Court should therefore deny the request to

depose Dr. Kemp.

## II.  FIELD'S REQUEST FOR LEAVE TO FILE ADDITIONAL BRIEFING IS UNTIMELY AND LEGALLY BASELESS

Fields requests leave of court to file a memorandum of law in support of his § 2255 Motion. (Mot. 12-13.)  Fields provides no legal basis for his right to make such a submission, and provides no explanation as to his failure to offer the proposed brief at the time he filed his initial pleading.

As authority for submitting the proposed brief, Fields relies on the local rules of the Eastern District of Pennsylvania, which have no application here.  (See Mot. Ex. B.)  Not only is the cited rule non-controlling, it is not persuasive.  If this Court is to give effect to the timing requirements of the Anti-Terrorism and Effective Death Penalty Act of 1996 (*see* 28 U.S.C. § 2255(f)), it makes no sense to use the one-year statute of limitations as the basis for providing *additional* time to a capital litigant to expound upon his claims.  *See Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases").  Thus, if Fields wanted to file a discretionary memorandum of points and authorities, he should have done so at the time he filed his § 2255 – the last permissible day for submitting that pleading – rather than waiting to assert an inapplicable local rule as the basis for such a document months later.

To the extent that this Court is, nonetheless, inclined to apply the Pennsylvania rule to this case, it should apply it with full force.  As such, the Court should limit the combined length of Fields's § 2255 and proposed brief to 150 pages.

## III. FIELDS'S REQUEST FOR AN EVIDENTIARY HEARING IS PREMATURE

Fields requests that this Court order an evidentiary hearing to resolve any factual disputes

presented by the § 2255 Motion.  (Mot. 13-16.)  This request should be denied because Fields's request is premature and wholly unnecessary.

The Rules following § 2255 place an affirmative duty upon this Court to "review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  Rule 8(a), Rules Governing Section 2255 Proceedings in the United States District Courts; *see* Mot. at 1.  This rule creates a duty that arises *after* the government's responsive pleading is filed.  *See Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995); *see also United States v. Lopez*, 100 F.3d 113, 119 (10th Cir.1996)(noting court's obligation to exercise discretion).

Accordingly, the Court is already obliged by the rules to consider the propriety of an evidentiary hearing, and Petitioner's Motion is an empty gesture – a request to make a determination the Court will have to make, if and when the question becomes ripe.  The Motion is not merely extraneous, it is premature, because the Court's duty to determine the need for an evidentiary hearing does not arise until the government has had an opportunity to answer the §2255 Motion.  The Court cannot now determine if the answer, which has not been filed, creates any factual conflicts that will require resolution through evidentiary development.  Indeed, the government has not had an opportunity to show that relief should not be granted even if Fields can prove his factual allegations. *See United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000).

This Court should therefore deny the request for an evidentiary hearing as premature and preempted by an existing judicial obligation.

Case 6:10-cv-00115-RAW Document 6 Filed 06/15/10 Page 13 of 14
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 491

491

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this Court to deny Fields's Omnibus Motion.

Respectfully submitted,

Dated: June 15, 2010:

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


s/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100

s/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

Case 6:10-cv-00115-RAW   Document 6   Filed 06/15/10   Page 14 of 14
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 492

492

**CERTIFICATE OF SERVICE**

I, hereby certify that on 15ᵗʰ day of June, 2010, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Michael Wiseman - Michael_Wiseman@fd.org
Cristi Charpentier - Cristi_Charpentier@fd.org

<div align="right">

s/      Christopher  J. Wilson_____
         Assistant United States Attorney

</div>

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____     :

UNITED STATES OF AMERICA,              :

                                       :        CIV-10-115-RAW

              Respondent,              :

                                       :     CAPITAL 2255 PROCEEDINGS

         -v-                           :

                                       :     HON. RONALD A. WHITE

EDWARD LEON FIELDS, JR.,               :

                                       :

              Petitioner.              :

                                       :

_____     :

**PETITIONER'S REPLY TO
GOVERNMENT'S RESPONSE TO
MOTION FOR NON-DISPOSITIVE OMNIBUS RELIEF**

In moving for non-dispositive omnibus relief at this stage of the proceedings,

Petitioner Edward Leon Fields, Jr., seeks a framework for the expeditious and orderly

resolution of his pending *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or

Correct Sentence by a Person in Federal Custody* (the "*Motion*").  He has proposed

a common-sense briefing schedule that will enable the parties to address the complex

legal and factual issues that must be decided by the Court, has requested a limited

number of narrowly tailored items needed to complete the investigation of his claims,

and has identified the factual issues that likely will be disputed by the Government

and thus

1

must be determined at an evidentiary hearing. Mr. Fields has no desire to delay these proceedings with a piecemeal, *ad hoc* litigation approach.

The Government's *Response to Motion for Non-Dispositive Relief* (the "*Response*") proposes a different approach. Rather than addressing critical issues early and in a comprehensive fashion, the Government has asked this Court to deny all of Mr. Fields' reasonable, narrowly tailored requests – even a request as simple as leave to file a memorandum of law. The Government claims that many of Mr. Fields' requests are "premature," inviting re-litigation of these issues at a later date. For the reasons discussed below, and for all of the reasons asserted in *Petitioner's Omnibus Motion for Non-Dispositive Relief and Consolidated Brief in Support* (the "*Omnibus Motion*")*, the Government's objections are unpersuasive.

## I.    Request for an Order Permitting Mr. Fields to be Transported to a Local Medical Facility for Brain Scans and Imaging.[1]

Mr. Fields has requested permission to be transported from the United States Penitentiary in Terre Haute, where he is currently incarcerated, to a local medical facility where he can undergo brain scanning that is highly relevant to a number of his

---

[1]The Government erroneously describes this as a "discovery" request. *Response* at 2. Because this request is not for information in the possession of the Respondent or a third party, it is not subject to the discovery rules. Rather, an order is necessary for counsel to complete their investigation. Mr. Fields cannot be properly evaluated at the federal penitentiary where he is currently incarcerated, and obviously he cannot get to an outside facility without a court order.

grounds for relief.

The Government baldly claims that the Court has no authority to order such transport. *Response* at 3-4. The Government is wrong. This Court unquestionably has the authority to order the Bureau of Prisons to transport Mr. Fields to an appropriate local medical facility to facilitate the investigation of his claims for post-conviction relief. District courts routinely issue transportation orders permitting prisoners litigating habeas corpus and other post-conviction claims to be evaluated outside of their place of incarceration to obtain evidence in support of their claims. See, e.g., Nields v. Bradshaw, No. 1-03-cv-019, 2010 WL 148076, at *1-*2 (S.D. Ohio Jan.11, 2010) (ordering warden to transport habeas corpus petitioner to Wallace-Kettering Neuroscience Institute for neurological imaging); Pizzuto v. Hardison, No. CV-05-516-S-BLW, 2008 WL 5115054, at *6 (D. Idaho Dec. 4, 2008) (indicating court will grant motion to transport habeas corpus petitioner to medical facility for neuropsychiatric testing upon counsel's provision of date, time and location of facility and indication of counsel's willingness to pay costs of security for transport); see also Primus v. Lee, C/A No. 4:07-911-PMD-TER, 2010 WL 1346330, at *1 (D.S.C. Jan. 22, 2010) (noting that district court ordered Department of Corrections to transport prisoner who alleged Section 1983 violations to University of South Carolina, Department of Urology, for medical examination in support of his claims).

District courts also routinely order the Bureau of Prisons to transport prisoners to designated facilities for competency examinations, such as examinations pursuant to Fed. R. Crim. P. 12.2(c)(1) and 18 U.S.C. § 4242 (insanity defense) and 18 U.S.C. § 4244 (hospitalization of convicted defendants suffering from mental disease).  See, e.g., United States v. Burgess, No. CR-08-078-JHP, 2009 WL 232999  (E.D. Okla. Jan. 30, 2009) (ordering Bureau of Prisons to transport defendant to medical facility for competency evaluation pursuant to 18 U.S.C. § 4241);  United States v. Kennedy, No.96-40066-SAC, 2005 WL 2988722, at *1 (D. Kan. Oct. 4, 2005) (ordering Bureau of Prisons to transport defendant to medical center for competency evaluation on defendant's motion pursuant to Fed. R. Crim. P. 12.2(c)(1)(A));  United States v. Chamberlin, No. 07-00377 SOM, 2009 WL 3926405, at *1 (D. Haw. Nov. 17, 2009) (ordering Bureau of Prisons to transport prisoner to appropriate facility for psychiatric or psychological examination pursuant to 18 U.S.C. § 4244).

The Government cites no authority contradicting this proposition.[2]  Instead, it

_____

[2]The Ninth Circuit case of Jackson v. Vasquez, 1 F.3d 885 (9th Cir. 1993) cited by the Government is inapposite.  There a state prisoner – prior to filing his habeas petition – sought to be transported to a medical facility under the authority of ex parte fund disbursement procedures of 21 U.S.C. § 848(q).  The Court held that this **specific** statute did not authorize the district court to force the Warden to transport the petitioner.  The Court emphasized that its holding was narrow:

> We need not decide whether, upon proper notice and motion at a proper stage in the habeas corpus proceedings, the district court is empowered to issue an order requiring a state official to transport a prisoner for

4

baldly argues that the Court has no "plenary power" to require the Bureau of Prisons

to transport him to a medical facility. *Response* at 3. Yet it is beyond dispute that the

Bureau of Prisons is subject to an order of this Court to the same extent as any other

federal agency. See, e.g., Rivera v. Santirocco, 814 F.2d 859, 863 n.7 (2d Cir. 1987)

("Of course, the Marshal and the Bureau of Prisons have a duty to comply with the

lawful orders of a federal court.").

The requested examination is crucial to the proper development of Mr. Fields'

section 2255 claims. As noted in the *Omnibus Motion*, Mr. Fields' expert

neuropsychologist, Dr. Daniel Martell, believes there is a "potential connection

between Mr. Fields' current organic impairment and his conduct at the time of the

offense" and that "brain scans and imaging may help identify the origins and course

of Mr. Fields' cognitive impairments." *Omnibus Motion*, ¶¶ 2-3. After observing that

"red flags" should have alerted trial counsel to the need for more in-depth neurological

evaluation, Dr. Martell specifically recommends brain scanning "to aid in proper

---

medical examinations that are necessary to the petitioner's case. *See* Fed. R. Civ. P. 35; Rule 6, Rules Governing § 2254 cases, 28 US.C. Foll. § 2254 (1977). We simply conclude that the ex parte fund disbursement procedures of section 848(q) do not support the district court's transportation order against the Warden.

1 F.3d at 889.

differential neurodiagnosis ...." Report of Dr. Daniel Martell ("Martell Report") at 16 (attached at *Appendix*, Exhibit 9). While brain scanning by itself may not conclusively establish prejudice, it likely will supply further evidence supporting the prejudice prong of Mr. Fields' claim. Dr. Martell's report, then, contradicts the Government's assertion that "Fields provides no indication that an MRI of his brain in 2010 can demonstrate that trial counsel acted unreasonably in light of the information available to them."[3] *Response* at 5.

Accordingly, the Court should grant Mr. Fields' request to be transported to a local medical facility for brain scanning.

## II.   Request for Discovery.

### A.   Bottle of 150 mg Effexor capsules seized from Mr. Fields' truck.

Mr. Fields has requested that the Court order the Government to produce a bottle of 150 mg Effexor capsules that was seized from his truck after his arrest. The Government's argument against this discovery request is contradictory. The Government first admits that the FBI did indeed seize the Effexor bottle, although it claims that the FBI turned the bottle over to Mr. Fields while he was incarcerated at the local jail prior to trial. *Response* at 7. In the very next paragraph, however, the

---

[3]Dr. Martell opines that the most likely causes of Mr. Fields' degenerative brain impairment are strokes and a brain tumor. Martell Report at 16. Pin pointing the cause of Mr. Fields neurological impairments is likely relevant to a determination of whether, and to what degree, they were at play during the commission of the offenses.

Government speculates that the FBI may have turned over the bottle to family friends Paul and Jovanna Fields, who "did not keep or misplace[d] the bottle of pills." *Response* at 7-8.

In any event, the Government now represents that, upon receipt of a release from Mr. Fields (which counsel are currently securing), it will produce "relevant records" concerning the bottle of Effexor capsules. This representation, of course, does not resolve Mr. Fields' claim that the Government violated its obligations under Brady v. Maryland by failing to produce the bottle of Effexor capsules to trial counsel, but it may obviate the need for an order by the Court requiring the Government to produce it to Mr. Fields' current counsel. Based on this representation, Mr. Fields has no objection if the Court defers ruling on this request. If, upon production of these records, Mr. Fields believes that further action on this specific request is needed, he will inform the Court.

**B. Contents of the hard drives of Mr. Fields' computers.**

Mr. Fields has requested that the Court order the Government to produce the contents of the hard drives of two computers seized from him after his arrest. The Government represents that images of these hard drives are available for inspection and copying. *Response* at 8. This representation, of course, does not resolve Mr. Fields' claim that the Government violated its obligations under Brady v. Maryland

by failing to produce the contents of the hard drives to trial counsel, but it may obviate the need for an order by the Court requiring the Government to produce them to Mr. Fields' current counsel.  Based on this representation, Mr. Fields has no objection if the Court defers ruling on this request.  Mr. Fields will inform the Court if further action on this specific request is needed.

## C.  Previously undisclosed FBI Form 302s and OSBI reports and other exculpatory documents, evidence and information.

Mr. Fields has requested that the Court order the Government to produce undisclosed witness statements and reports and other exculpatory documents.  The Government claims that it has no undisclosed exculpatory documents, *see Response* at 9, but fails to confirm that it has conducted a review of its files in light of Mr. Fields' section 2255 claims and the Government's obligations under Imbler v. Pachtman,  424 U.S. 409, 427 n.25 (1976).[4]  Mr. Fields requests that the Court order the Government to review all documents, evidence and information in its possession, custody or control for their exculpatory value in view of the allegations set forth in the *Motion* and to produce such documents to the extent disclosure is required under

---

[4]The Government's citation to Dist. Atty's Office v. Osborne, 129 S.Ct. 2308, 2319-20 (2009), *Response* at 2, is not persuasive.  Osborne was about access to biologic materials in a civil rights case. It's reference to post-conviction Brady obligations was dicta and is contrary to Imbler.  The Government cannot seriously contend that if it is in possession of exculpatory information it has no obligation to disclose it – at least one would hope.  Indeed, current Government counsel are to be applauded for voluntarily providing information relevant to the pill bottle and computer hard drives.

Brady.

**D. Deposition of Dr. Michael Kemp.**

Mr. Fields has requested leave to take the deposition of Dr. Michael Kemp, a physician who treated Mr. Fields in the months preceding the homicides but who has refused to speak with current counsel. The Government objects to this proposed deposition because "counsel could not have credibly argued, on the one hand, that the jury should rely on the doctor's testimonial diagnosis while arguing, on the other hand, that his mishandling of the defendant's condition prior to trial led to two homicides." *Response* at 10.

The Government misconstrues the nature of Ground 1(D) of the *Motion*. Mr. Fields contends that trial counsel should have presented the testimony of Dr. Kemp – along with other treating medical professionals – to show that Mr. Fields was **not malingering**, contrary to the Government's claims at trial. Mr. Fields does not claim that trial counsel should have presented Dr. Kemp to prove that his pre-homicide diagnoses of clinical depression and compulsive disorder were complete and accurate. While Dr. Kemp unquestionably failed to diagnose Mr. Fields' bipolar disorder, his views of whether Mr. Fields was malingering would have been valid and important for the jury to hear. Since Dr. Kemp has refused to speak with Mr. Fields' current counsel, the only way to determine what he would have testified to at trial is by

9

deposition.[5]

The Government does not assert any reason for opposing the deposition of Dr. Kemp other than its misreading of the nature of Ground 1(D).  Accordingly, the Court should grant this request.

## III.   Request for Leave to File Brief in Support of *Motion* Prior to a Response by the Government.

Mr. Fields has requested an opportunity to file a memorandum of law in support of the *Motion* prior to any response by the Government.  The Government objects based on the argument that the timing requirements of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") now bar Mr. Fields from filing a memorandum of law in support of his timely-filed factual grounds for relief.

The Government's argument barely deserves reply.  The proposed memorandum of law would not assert any new claims, but would simply assist the Court in understanding the legal basis for those claims already pled and filed, and thus would not be barred by the AEDPA statute of limitations.  Mr. Fields is aware of no authority requiring legal memoranda to be filed within the one-year limitations period

---

[5]Although counsel have not been able to speak to Dr. Kemp, it is likely he would agree that Mr. Fields was not malingering, since Dr. Kemp would not have prescribed a powerful antidepressant such as Effexor if he believed Mr. Fields was feigning his symptoms.  Thus, Dr. Kemp's deposition testimony is likely to lead to the discovery of admissible evidence.  See Fed. R. Civ. P. 26(b) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

10

set forth in section 2255, and the Government has offered none. Indeed, the limitations period contained in section 2255 by its terms applies only to a "motion" for relief. Absent compelling authority to the contrary, this Court is obliged to give this term its plain meaning.

Even if the Government were correct that a supporting memorandum is governed by the limitations period, it would still be timely if it related back to the issues addressed in the *Motion*. In Mayle v. Felix, 545 U.S. 644 (2005), the United States Supreme Court held that a timely section 2254 petition could be amended after the expiration of the limitations period as long as the amendments "relate back" to the claims in the initial timely petition. Since Mr. Fields only wishes to discuss the points and authorities supporting his already-pled claims, obviously the memorandum would relate back to those claims, and the memorandum would be timely and proper.

In requesting an opportunity to file a brief in support of the *Motion*, with the Government's response to follow, Mr. Fields has attempted to set out a practical and orderly framework for advancing this case. The Government offers no principled reason for opposing this request. The Government's opposition is all the more striking in light of the fact that, just **one day** after opposing this request, it filed a motion to extend the time for filing its answer to the *Motion* for sixty days, until September 4, 2010. See *Motion for Extension of Time to Respond to Petitioner's 28*

11

*U.S.C § 2255 Motion and Supporting Brief* (Dkt. #8).  In view of the Government's stated need for more time to prepare a response to the *Motion*, Mr. Fields' proposed briefing schedule becomes even more reasonable.  Accordingly, the Court should grant this request.

## IV.    Request for Evidentiary Hearing.

Mr. Fields has requested an evidentiary hearing at this stage of the proceedings to ensure that such a request will not be deemed waived in the future.  Although Mr. Fields believes he has submitted ample evidence warranting an evidentiary hearing on a host of issues likely to be disputed by the Government, see *Omnibus Motion* at 14-16, Mr. Fields has no objection if the Court defers ruling on this request until after the Government has answered the *Motion*.

Respectfully Submitted,

/s/Michael Wiseman
Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender for the
  Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

12

Counsel for Petitioner
Edward Leon Fields, Jr.

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 506

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 18th day of June, 2010, the foregoing document was electronically filed and is available for viewing and downloading through the ECF system.

/s/ Michael Wiseman
Michael Wiseman

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EDWARD LEON FIELDS, JR. | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-10-115-RAW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## **ORDER**

This matter comes before the Court on Petitioner's Motion for Non-Dispositive Omnibus Relief (Doc. 4) and Respondent's Motion for Extension of Time to respond to the Petitioner's Motion to Vacate (Doc. 8). Petitioner's Motion requests four (4) things: (1) an order permitting him to be transported to a local medical facility for a brain scan; (2) discovery; (3) leave to file a brief in support of his Motion to Vacate; and (4) an evidentiary hearing. The government has filed a response (Doc. 6), objecting to petitioner's motion, and petitioner has filed a reply to said response (Doc. 9). Petitioner has also filed a response to the government's motion for extension of time (Doc. 10).

Request for Leave to file Brief

This action was initiated by the filing of a Motion to Vacate on April 6, 2010 (Doc. 1). On April 12, 2010, the Court ordered the government to respond to said motion by July 6, 2010 (Doc. 3). On June 1, 2010, Petitioner requested leave to file a brief on or before September 1, 2010. Thus, Petitioner waited almost two months after filing his motion to ask

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 508

this Court to allow him to file a brief in support of his motion.  The local court rules, however, require all motions to be accompanied by a concise brief.  *See*, LCvR 7.1(c). Petitioner's motion would have been subject to dismissal if not for the fact that it did contain minimal references to the Constitution of the United States.  Instead of seeking leave to file a brief at the time of filing of the motion, Petitioner waited two months and now asks this Court to grant him almost three months additional time to submit a brief in support of his motion.  Such inaction on the part of petitioner would not typically be condoned by this Court.  Since, however, this is a death penalty case, the Court will grant Petitioner leave to file a brief in support of his motion to vacate on or before July 30, 2010.  The government will then have until September 28, 2010, to file their response.

<div align="center">Discovery Requests</div>

Rule 6(a) of the Rules Governing Section 2255 Proceedings allows a court to allow discovery for "good cause" under the Federal of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.  To demonstrate "good cause" for discovery, a party must give the court reason to believe that, if the facts are fully developed, the party will be entitled to relief.  *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).  Any party requesting discovery must provide reasons for the request.  *See*, Rule 6(b).

First, Petitioner requests this Court to issue an order permitting him to be transported, at his expense, to a local medical facility for brain scans and imaging.  Petitioner states this request is relevant to his ineffective assistance of counsel claims and to his claim that he is

<div align="center">2</div>

incompetent to be executed. While counsel state that petitioner has suffered a "cataclysmic decline" in his cognitive functioning since the trial and that his execution is precluded under the Eighth Amendment because of his mental illness, exhibits provided with his motion to vacate continue to indicate he is "generally well oriented to person, place, and situation." *See*, Appendix in Support of Motion to Vacate, Doc. 9 at p. 7. Furthermore, the motion does not provide any legal authority for this Court to allow Petitioner to be transported to a medical facility of his choosing simply because he has initiated this § 2255 proceeding.

Petitioner also requests this Court order the government to turn over a bottle of 150 mg Effexor capsules allegedly seized from petitioner's truck, contents of the hard drives of his computers, previously undisclosed FBI Form 302 and OSBI reports, and other allegedly exculpatory documents, evidence and information. The government has responded to petitioner's motion by stating they do not have custody or control over the pill bottle. Since the government does not have the pill bottle, petitioner has failed to establish good cause for ordering its production. As to the computer hard drives, the government indicates the images of the hard drives were available to petitioner at the time of trial, but no request was made to examine them. If the images were, in fact, available to trial counsel petitioner could not establish any *Brady* violation. Thus, petitioner has failed to establish "good cause" for this Court to now order production of the same.[1] As to the allegedly undisclosed reports, petitioner has failed to show "good cause" to establish that reports exist that haven't been

---

[1]The government's response indicates, however, that petitioner's "counsel have been advised that the images are available and have been provided with a point of contact at OSBI so that they can copy and inspect the data." Doc. 6, at p. 8.

previously disclosed. Rather, the motion states "[O]n information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information." *See*, Doc. 1, Motion to Vacate at p. 123, ¶ 218. This statement is nothing more than a conclusory allegation. Courts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation. *Cf., Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

As a general rule, courts must first determine, after examining the motion, answer, transcripts and records of prior proceedings, whether any of the issues raised warrant an evidentiary hearing. *See*, Rule 8 of the Rules Governing Section 2255 Proceedings. If so, the Court could then decide to allow discovery in order that the claim might be further developed. *See*, *Harris v. Nelson*, 394 U.S. 286, 300 (1969) and *Calderon v. U.S. Dist. Court for the Northern Dist. of California*, 98 F.3d 1102, 1106 (9th Cir. 1996).

For the reasons set forth herein, this Court denies Petitioner's request to have him transported to a local medical facility for brain scans and imaging and denies his request to conduct discovery and/or hold an evidentiary hearing. After all briefing has been conducted in this matter and this Court has an opportunity to determine if any of the issues raised merit an evidentiary hearing, the Court will then decide what, if any, discovery should be allowed herein.

Accordingly, it is therefore, the Order of this Court that Petitioner's Motion for Omnibus Relief (Doc. 4) is denied in part and granted in part. Petitioner shall have until July

30, 2010, to file a brief in support of his Motion to Vacate. The government will have until September 28, 2010, to file their response to Petitioner's Motion to Vacate and Brief in Support thereof. All requests for discovery are denied. Based upon this ruling, the government's motion for extension of time (Doc. 8) is moot.

It is so ordered on this 29th day of June, 2010.

**Dated this 29th Day of June 2010.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

j4h4i0

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent, | : | |
| | : | CIV-10-115-RAW |
| -v- | : | |
| | : | CAPITAL 2255 PROCEEDINGS |
| EDWARD LEON FIELDS, JR., | : | |
| | : | HONORABLE RONALD A. WHITE |
| Petitioner. | : | |
| | : | |

_____ :

**PETITIONER'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RELIEF
PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE
ALTERNATIVE PURSUANT TO 28 U.S.C. SECTION 2241**

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields

Dated:  July 30, 2010
         Philadelphia, PA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW OF CLAIMS OF
INEFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GROUND ONE

      THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY
INVESTIGATED, PRESENTED AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE.
THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY SENTENCED MR. FIELDS
TO DEATH WITHOUT HAVING FOUND AND GIVEN MITIGATING EFFECT TO
UNCONTESTED MENTAL HEALTH-RELATED MITIGATING EVIDENCE. . . . . . . . . . . . . . . . . 4

    A.    Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental
Illness Was Mitigating and Failed to Request Instructions to That Effect . . . . . . . 6

        1.    The Evidence the Defense Presented to the Jury Regarding Mr. Fields'
Mental Health Impairments and Trial Counsel's Limited Argument on the
Mitigating Effect of Only a Portion of That Evidence. . . . . . . . . . . . . . . . . 7

        2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.    The Jury's Death Verdict Violated the Eighth Amendment Because the Jury
did not Find Uncontested and Important Mitigating Evidence.. . . . . . . . . 15

    B.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of
Mr. Fields' Organic Brain Damage... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.    The Defense's Inadequate Efforts to Develop and Present
Neuropsychological Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        2.    The Organic Brain Damage Evidence That Trial Counsel Never Presented
and the Misleading Testimony of Dr. Randall Price. . . . . . . . . . . . . . . . . 18

        3.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Trial Counsel Ineffectively Failed to Investigate and Present Local Medical
Professionals Who Would Have Supported the Manic Flip Defense and
Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered. . . . . . . . 24

1.    The Government's Claims of Malingering and the Treating Medical
Professionals Who Would Have Rebutted Those Charges. . . . . . . . . . . 25

2.    Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . 26

a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.    Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-
Examination of Dr. Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1.    The Direct and Cross-Examination Testimony of Dr. Price. . . . . . . . . . 29

2.    Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . 30

a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of
Compulsive Aggression in Effexor Patients. . . . . . . . . . . . . . . . . . . . . . . . . . 34

1.    Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related
Compulsive Aggression. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.    Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . 37

a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ii

G.      Trial Counsel Ineffectively Failed to Adequately Prepare the Two Mental Health Experts Who Testified for the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        1.      Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        2.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

GROUND TWO

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW BAR MR. FIELDS' EXECUTION BECAUSE HE IS NOT COMPETENT TO BE EXECUTED AND BECAUSE THE DEATH PENALTY IS PRECLUDED BY HIS DETERIORATING MENTAL HEALTH . . . . . . . . . . . . . . . . 42

A.      Mr. Fields Will not be Competent to be Executed.. . . . . . . . . . . . . . . . . . . . . . 42

B.      Mr. Fields' Execution is Precluded by his Mental Illness. . . . . . . . . . . . . . . . . 42

C.      Ripeness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

GROUND THREE

THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE FIFTH AMENDMENT WAS VIOLATED BECAUSE THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT TO SUPPORT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.      The Substantial Planning Aggravating Factor. . . . . . . . . . . . . . . . . . . . . . . . . . 48

        1.      The Government's Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        2.      The Rebuttal Evidence That the Defense Never Presented. . . . . . . . . . . . 49

                a.      Evidence that Mr. Fields did not shoot the Chicks after substantial planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

                b.      Evidence that Mr. Fields did not stage a robbery many hours after the shootings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

iii

B.      The Mental Anguish Aggravating Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      1.      The Government's Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      2.      The Rebuttal Evidence That the Defense Never Presented. . . . . . . . . . . 53

C.      Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      1.      Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      2.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D.      The Government's Due Process Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      1.      False and Misleading Testimony and Argument About a Purportedly Staged Robbery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      2.      Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      3.      The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

GROUND FOUR

THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

A.      The Incomplete and Misleading Evidence of Mr. Fields' Family Background that the Jury Heard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B.      Mr. Fields' full – But Unpresented – Social History Shows Significant and Mitigating Family Dysfunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

C.      Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

      1.      Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

      2.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

GROUND FIVE

    MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . 71

A.    The Government's Closing Arguments Were Rife with Improper Conduct, Denying Mr. Fields' Rights Under the Fifth and Eighth Amendments. . . . . . . . . . . . . . . . 74

    1.    Improper Arguments Regarding the Weighing of Aggravating Factors and Mitigating Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    2.    Improper Arguments Regarding Mr. Fields' Mental Health. . . . . . . . . . . 78

    3.    Improper Arguments Designed to Inflame the Passions and Prejudices of the Jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

    4.    Improper Invocation of Biblical Authority in Support of a Sentence of Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

B.    Individually and Cumulatively, These Errors Rendered Mr. Fields' Trial Fundamentally Unfair and Substantially Prejudiced his Eighth Amendment Rights to Individualized Sentencing and a Death Sentence That is not Arbitrary and Capricious.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

C.    Trial Counsel Were Ineffective for Failure to Object and Preserve These Issues at Trial, and Appellate Counsel Were Ineffective for Failure to Raise These Instances of Prosecutorial Misconduct on Appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    1.    Deficient Performance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    2.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

GROUND SIX

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A.       The Unified Weighing Process and General Death Verdict. . . . . . . . . . . . . . . 91

B.       Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

GROUND SEVEN

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE. . . . . . . . . . . . . 100

A.       Effexor Pill Bottle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

B.       Emails and Documents from Mr. Fields' Computers. . . . . . . . . . . . . . . . . . . . 106

GROUND EIGHT

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS  DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

GROUND NINE

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007) .................................................... 102

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) ........................................ 4, 73

Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995) .................................... 10, 21, 41

Armstrong v. Dugger, 833 F.2d 1420 (11th Cir. 1987) ........................................ 20

Atkins v. Virginia, 536 U.S. 304 (2002) ......................................................... 44, 45

Banks v. Dretke, 540 U.S. 668 (2004) ......................................................... 103

Battenfield v. Gibson, 236 F.3d 1215 (10th Cir. 2001) ........................................ 57

Baxter v. Thomas, 45 F.3d 1501 (11th Cir. 1995) ......................................... 21

Bean v. Calderon, 163 F.3d 1073 (9th Cir. 1998) .................................... 20, 21, 73

Bell v. Cone, 129 S. Ct. 1769 (2009) ................................................ 105, 107, 108

Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053 (E.D. Ca. 2008) ......................... 10, 13

Berger v. United States, 295 U.S. 78 (1935) ................................................ 74, 85

Berryman v. Morton, 100 F.3d 1089 (1996) .......................................... 31, 110

Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991) ................................... 10, 20

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) .................................... 80, 90

Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997) ................................. 41

Bobby v. Van Hook, 130 S. Ct. 13 (2009) ......................................... 2

Boyde v. California, 494 U.S. 370 (1990) .................................... 9, 15, 102

Brady v. Maryland, 373 U.S. 83 (1963) ................................................. 103

Brewer v. Aiken, 935 F.2d 850 (7th Cir. 1991) .................................. 21

Brewer v. Quarterman, 550 U.S. 286 (2007) ................................. 10, 11

Caldwell v. Mississippi, 472 U.S. 320 (1985) ................................. 75

Callins v. Collins, 510 U.S. 1141 (1994) ............................................................ 80

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) .................................... 29, 74, passim

Chambers v. Mississippi, 410 U.S. 284 (1973) .......................................... 23, 28

City of Greenwood v. Peacock, 384 U.S. 808 (1966) ................................... 83

Claudio v. Scully, 982 F.2d 798 (2d Cir. 1992) ........................................ 92

Coble v. Quarterman, 496 F.3d 430 (5th Cir. 2007) ................................... 10

Cone v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) ................................. 19

Crane v. Kentucky, 476 U.S. 683 (1986) .............................................. 24, 28

Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991) ................................. 87

Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989) ..................................... 10

Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989) ................................. 81

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ..................................... 75

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009) ........................... 75, 82, 83

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005) .................................. 56

Eddings v. Oklahoma, 455 U.S. 104 (1982) ..................................... 4, 9, passim

Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003) ................................ 14, 22, 29

Ford v. Wainwright, 477 U.S. 399 (1986) ............................................ 43

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) ...................................... 31

Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005) ................................. 56

Giglio v. United States, 405 U.S. 150 (1972) .................................. 62, 103, 104

Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995) ..................................... 21, 24, passim

Godfrey v. Georgia, 446 U.S. 420 (1980) ........................................ 78, 81, passim

Green v. Johnson, 2006 WL 3746138, at 21 (E.D. Va. Dec. 15, 2006) ................... 34

Gregg v. Georgia, 428 U.S. 153 (1976) ......................................... 16, 43, passim

viii

Harries v. Bell, 417 F.3d 631 (6th Cir. 2005) .................................................................. 57

Harris by and Through Ramseyer v. Blodgett, 853 F. Supp. 1239
(W.D. Wash. 1994) ......................................................................................................... 10

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) .............................................................. 110

Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010) .............................................................. 83

Hitchcock v. Dugger, 481 U.S. 393 (1987) ......................................................... 4, 10, 78

Hooks v. Workman, 606 F.3d 715 (10th Cir. 2010) ........................................................ 75

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) .......................................... 31, 32, 35

Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2006) ........................................................ 108

Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995) ....................................................... 69

Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) ................................................................... 21

Jurek v. Texas, 428 U.S. 262 (1976) ............................................................................... 12

Kenley v. Armontrout, 937 F.2d 1298 (8th Cir. 1991) .................................................... 21

Kimmelman v. Morrison, 477 U.S. 365 (1986) ............................................................... 92

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) ...................................................... 23, 110

Kyles v. Whitley, 514 U.S. 419 (1995) ............................................................. 64, 103, passim

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) .................................................. 75, 80, passim

Lesko v. Lehman, 925 F.2d 1527 (3d Cir. 1991) ..................................................... 75, 110

Lewis v. Jeffers, 497 U.S. 764 (1990) ............................................................................. 15

Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) ........................................................ 20

Lockett v. Ohio, 438 U.S. 586 (1978) ..................................................................... 4, 16, passim

Lockhart v. Warden, Maine State Prison, Slip Copy, 2010 WL 610708, 7
(D. Me. Feb. 19, 2010) ................................................................................................... 38

Lowenfield v. Phelps, 484 U.S. 231 (1988)   47

Mahorney v. Wallman, 917 F.2d 469 (10th Cir. 1990) ................................... 76, 79, 90

ix

Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) ........................................................ 110, 111

Mann v. Dugger, 844 F.2d 1446 (11th Cir. 1988) ................................................... 90

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) ........................................................ 92

Matire v. Wainwright, 811 F.2d 1430 (11th Cir. 1987) ......................................... 92

Maynard v. Cartwright, 486 U.S. 356 (1988) ....................................................... 78

Mayo v. Henderson, 13 F.3d 528 (2d Cir. 1994) ................................................... 92

McCleskey v. Kemp, 481 U.S. 279 (1987) ............................................................. 78

McNeill v. Branker, 601 F. Supp. 2d 694 (E.D. N.C. 2009) ................................. 10

Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988) ........................................... 20

Middleton v. Evatt, 855 F. Supp. 837 (D. S.C. 1994) ........................................... 33

Mills v. Maryland, 486 U.S. 367 (1988) ............................................................... 96

Mooney v. Holohan, 294 U.S. 103 (1935) ............................................................. 58

Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) ................................................... 92

Napue v. Illinois, 360 U.S. 264 (1959) ................................................... 58, 60, passim

Nelson v. Nagle, 995 F.2d 1549 (11th Cir. 1993) ................................................. 81

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979) ................................................. 92

Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006) .................................................. 21

Padilla v. Kentucky, 130 S. Ct. 1473 (2010) ........................................................ 2

Parle v. Runnels, 505 F.3d 922 (9th Cir. 2007) .................................................... 112

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) ................................................. 76, 78

Peek v. Kemp, 784 F.2d 1479 (11th Cir. 1986) .................................................... 12

Penry v. Johnson, 532 U.S. 782 (2001) ................................................................ 100, 101

Penry v. Lynaugh, 492 U.S. 302 (1989) ............................................................... 7, 81

Poindexter v. Booker, 301 Fed. App'x 522, 530-31 (6th Cir. 2008) .................... 24

x

Porter v. McCollum, 130 S. Ct. 447 (2009) ............................................................ 4, 16, 20

Presnell v. Georgia, 439 U.S. 14 (1978) ........................................................................ 102

Richards v. Quarterman, 566 F.3d 553 (2009) ............................................................... 39

Richter v. Hickman, 578 F.3d 944 (9th Cir. 2009) ..................................................... 56, 58

Ring v. Arizona, 536 U.S. 584 (2002) ............................................................................. 47

Romano v. Gibson, 239 F.3d 1156 (10th Cir. 2002) ....................................................... 72

Rompilla v. Beard, 545 U.S. 374 (2005) ......................................................... 4, 16, passim

Roper v. Simmons, 543 U.S. 304 (2005) ......................................................................... 44

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) ...................................................... 40

Sandoval v. Calderon, 241 F.3d 765 (9th Cir. 2001) .............................................. 87, 88, 90

Sears v. Upton, 130 S. Ct. 3259 (2010) ........................................................................... 25

Strickland, Sears, 130 S. Ct. at 3266 .............................................................................. 72

Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008) ........................................................... 40

Simmons v. South Carolina, 114 S. Ct. 2187 (1994) ....................................................... 96

Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) .............................................................. 20

Skipper v. South Carolina, 476 U.S. 1 (1986) ................................................................. 78

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) ..................................................... 4, 15, 38

Stewart v. Martinez-Villareal, 523 U.S. 637 (1998) ....................................................... 47

Strickland v. Washington, 466 U.S. 688 (1984) .................................................... 2, 9, passim

Strickler v. Greene, 527 U.S. 263 (1999) ................................................................. 62, 103

Stromberg v. California, 283 U.S. 359 (1931) ............................................................... 102

Taylor v. Kentucky, 436 U.S. 478 (1978) ...................................................................... 110

Tosh v. Lockhart, 879 F.2d 412 (8th Cir. 1989) .............................................................. 24

Trest v. Cain, 522 U.S. 87 (1997) ..................................................................................... 3

xi

Tuilaepa v. California, 512 U.S. 967 (1994) ............................................................ 99

United States v. Agurs, 427 U.S. 97 (1976) ........................................... 58, 62, passim

United States v. Alferahin, 433 F.3d 1148 (9th Cir. 2006) ..................................... 98

United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995) .......................................... 63

United States v. Bagley, 473 U.S. 667 (1985) ................................................. 62, 103

United States v. Barham, 595 F.2d 231 (5th Cir. 1979) .......................................... 62

United States v. Biberfeld, 957 F.2d 98 (3d Cir. 1992) .......................................... 60

United States v. Bowie, 892 F.2d 1494 (10th Cir. 1990) ......................................... 82

United States v. Dunn, 564 F.2d 348 (9th Cir. 1977) ............................................. 95

United States v. Fields, 516 F.3d 923 (10th Cir. 2009) ........................... 48, 94, passim

United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) .............. 18

United States v. Garza, 608 F.2d 659 (5th Cir. 1979) ............................................ 77

United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005) ........................... 18

United States v. Hinson, 585 F.3d 1328 (10th Cir. 2009) ....................................... 74

United States v. Kelly, 35 F.3d 929 (4th Cir. 1994) ............................................. 108

United States v. Massaro, 538 U.S. 500 (2003) ...................................................... 3

United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996) ................................... 100

United States v. McGrady, 508 F.2d 13 (8th Cir. 1974) ......................................... 96

United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993) .................................... 64

United States v. Young, 470 U.S. 1 (1985) ..................................................... 82, 87

Wade v. White, 368 F. Supp. 2d 695 (E.D. Mich. 2005) ........................................ 92

Walbey v. Quarterman, 309 Fed. App'x 795, 804, 806 (5th Cir. 2009) ................... 85

Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999) ............................................... 40

White v. Thaler, - F.3d -, 2010 WL 2595272 (5th Cir. June 30, 2010) .................... 98

xii

Wicks v. Lockhart, 569 F. Supp. 549 (E.D. Ark. 1983) ..................................................... 95, 96

Wiggins v. Smith, 539 U.S. 510 (2003) ........................................................ 2, 3, passim

Williams v. Taylor, 529 U.S. 362 (2000) ..................................................... 4, 16, passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) ............................................... 20

Wilson v. Kemp, 777 F.2d 621 (11th Cir. 1985) ...................................................... 81

Woodard v. Sargent, 806 F.2d 153 (8th Cir. 1986) .................................................. 13

Woodson v. North Carolina, 428 U.S. 280 (1976) ......................................... 69, 71, 75

Worthington v. Roper, 619 F. Supp. 2d 661 (E.D. Mo. 2009) ................................. 10, 42

Zant v. Stephens, 462 U.S. 862 (1983) ......................................................... 100

## STATE CASES

Hall v. Lance, 687 S.E.2d 809 (Ga. 2010) ......................................................... 19

People v. Harris, 779 N.E.2d 705 (N.Y. 2002) ...................................................... 19

State v. Holton, 126 S.W.3d 845 (Tenn. 2004) ...................................................... 19

State v. Reid, 213 S.W.3d 792 (Tenn. 2006) ........................................................ 19

## FEDERAL STATUTES

18 U.S.C.A. § 3591 et seq., ....................................................................... 96

28 U.S.C. Section 2241 ............................................................................. 1

28 U.S.C. Section 2255 ............................................................................. 1

18 U.S.C. § 3591, et seq ........................................................................... 5

18 U.S.C. § 3592 (a)(1) ........................................................................... 37

18 U.S.C. §3592 (a)(6) ............................................................................ 37

18 U.S.C. § 3592 (a)(8) ......................................................................... 8, 37

18 U.S.C. § 3592(a)(1) ............................................................................ 41

18 U.S.C. § 3592(a)(1) ............................................................................. 8

18 U.S.C. § 3592(a)(6) ............................................................................................. 8

18 U.S.C. §3592(c)(9) ............................................................................................. 49

18  U.S.C. § 3593(c) ............................................................................................. 47, 58

18 U.S.C. § 3593(c), (d) ............................................................................................. 87

18 U.S.C. § 3593(e) ............................................................................................. 79

18 U.S.C. § 3953(a) ............................................................................................. 54

28 U.S.C. § 2255(a) ............................................................................................. 1

xiv

## PRELIMINARY STATEMENT

On April 6, 2010, Petitioner Edward Leon Fields, Jr. filed a *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* (*"Motion"*) challenging his convictions and sentences of death for two homicides in the Ouachita National Forest in 2003.

On June 29, 2010 the Court granted Mr. Fields' request for an opportunity to submit a memorandum of law in support of the *Motion* (the "*Memorandum*") and ordered him to file the *Memorandum* on or before July 30, 2010 (Dkt. # 11).

As in the *Motion*, in this *Memorandum* the transcript of the trial proceedings are cited as "*TR*" followed by a page citation. Other proceedings are cited as *TR* followed by the date of the proceeding and page number. Mr. Fields also cites a number of documents that are not currently of record. These documents are included in the *Appendix* that accompanied the *Motion*, and, as in the *Motion*, are cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix* but are cited. Mr. Fields is filing with this Memorandum a brief *Supplemental Appendix*. Entries from it are cited as "*SA*" followed by the document number.

Petitioner is referred to as Mr. Fields, and the United States of America is referred to as the Government. Parallel citations are omitted. All other citations are either self-explanatory or are explained in the *Memorandum*. All emphasis is supplied unless otherwise indicated.

## STANDARD OF REVIEW OF CLAIMS OF
## CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Under 28 U.S.C. § 2255(a), a federal conviction and sentence must be vacated if obtained in violation of the Constitution or laws of the United States.

The majority of Mr. Fields' grounds for relief allege violations of his right to the effective assistance of counsel as guaranteed by the Sixth Amendment. These claims are governed by

Strickland v. Washington, 466 U.S. 688 (1984), which provides that counsel is ineffective where: (1) his or her performance fell below objective standards of reasonableness and therefore was deficient, and (2) as a result of that deficiency, the petitioner suffered prejudice. Id. at 694.

In determining whether counsel's performance was deficient, the Supreme Court has repeatedly cited the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. Feb. 2003) ("ABA Guidelines"), as guides for determining the reasonableness of counsel's conduct.[1] "Although they are 'only guides,' ... and not 'inexorable commands,' ... these standards may be valuable measures of the prevailing professional norms of effective representation ...." Padilla v. Kentucky, 130 S.Ct. 1473, 1482 (2010) (quoting Strickland, 466 U.S. at 688; Bobby v. Van Hook, 130 S.Ct. 13, 17 (2009)).  The Guidelines relied upon herein were promulgated in 2003, before the offenses.  Accordingly, "they describe the professional norms prevailing when the representation took place." Van Hook, 130 S.Ct. at 16; see also Wiggins v. Smith, 539 U.S. 510, 523 (2003) (applying 1989 Guidelines in existence at time of trial where "[c]ounsel's conduct similarly fell short of the standards for capital defense work articulated by the [ABA Guidelines] – standards to which we long have referred as 'guides to determining what is reasonable'") (quoting Strickland at 688).

Prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. Wiggins, 539 U.S. at 534.  Such a probability can be shown by less than a preponderance of the evidence:

The result of a proceeding can be rendered unreliable, and hence the proceeding

---

[1]  The ABA Guidelines are published in 31 Hofstra L.Rev. 913 (2003) and are available online at www.ABAnet.org.

itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.   With regard to sentencing phase ineffectiveness, prejudice is established if there is a reasonable probability that even one juror would have voted for life imprisonment instead of death.  Wiggins, 539 U.S. at 537.

Claims of ineffective assistance of counsel properly are pursued in a section 2255 proceeding and are not waived even though they were not presented on direct appeal.  United States v. Massaro, 538 U.S. 500, 509 (2003) ("failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255").[2]

---

[2]  Mr. Fields does not address in this Memorandum any procedural defenses, such as procedural bar or waiver, that may be asserted by the Government.  Mr. Fields does not believe that the Government has available to it any such procedural defenses.  In any event, the Government is obliged to raise any such defenses, if they exist, and the failure to do so may constitute a waiver of such defenses.  Trest v. Cain, 522 U.S. 87, 89 (1997) (quoting Gray v. Netherland, 518 U.S. 152, 166 (1996) ("procedural default is normally a 'defense' that the [Government] is 'obliged to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'")).  Accordingly, should the Government raise procedural defenses to any of Mr. Fields' grounds for relief, he will address them in a Reply Memorandum, which is permitted by Rule 5(d) of the Rules Governing Section 2255 Proceedings for the United States District Courts.

3

## ARGUMENT

### GROUND ONE

**THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY INVESTIGATED, PRESENTED AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE. THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY SENTENCED MR. FIELDS TO DEATH WITHOUT HAVING FOUND AND GIVEN MITIGATING EFFECT TO UNCONTESTED MENTAL HEALTH-RELATED MITIGATING EVIDENCE.**

The Eighth Amendment guarantees a capital defendant the right to individualized sentencing. Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Hitchcock v. Dugger, 481 U.S. 393 (1987). This includes the constitutionally secured right to the presentation of all available mitigating evidence. Wiggins, 539 U.S. at 524-25.

Such mitigating evidence includes the defendant's mental health deficits (e.g., emotional disturbance, presence of organic brain damage), as well as evidence of a difficult upbringing. See, e.g., Porter v. McCollum, 130 S.Ct. 447 (2009); Rompilla v. Beard, 545 U.S. 374 (2005) ("It goes without saying that the undiscovered "mitigating evidence [including evidence of organic brain damage, emotional disturbance and difficult upbringing], taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability") (internal citations omitted); Williams v. Taylor, 529 U.S. 362 (2000), Eddings, 455 U.S. at 115 ("Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence. ... Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. See McGautha v. California, 402 U.S. 183, 187-188 . . . (1971)."); see also Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007); Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004).

At the time of his sentencing hearing, Mr. Fields had suffered a lifetime of mental illness and

4

emotional disturbance.   He suffered from the effects of a difficult and dysfunctional upbringing.[3]

All of this evidence was available to counsel, and it should have been presented and argued to the

jury as mitigating facts pursuant to Lockett and its progeny, as well as the Federal Death Penalty Act

(FDPA) (18 U.S.C. § 3591, et seq.).   Yet trial counsel were ineffective with regard to nearly every

aspect of Mr. Fields' mental health mitigation defense:

- Trial counsel ineffectively failed to argue to the jury that the largely uncontested evidence of Mr. Fields' pre-offense history of depression and auditory hallucinations – as well a post-offense diagnosis of bipolar disorder – possessed mitigating value independent of the "manic flip" diagnosis testified to by the defense's mental health experts.   Even with this uncontested evidence, the jury found no mental health mitigation.

- Trial counsel ineffectively failed to discover and present evidence that Mr. Fields suffered from a progressive neurological disease which at the time of his sentencing hearing had already caused him organic brain damage localized in his frontal lobes.   Trial counsel failed to do so even though they had an expert ready to testify to the existence of neurological damage and cited this neurological damage in arguing to the Department of Justice that it should not seek the death penalty against Mr. Fields.

- Trial counsel ineffectively failed to present the testimony of local medical professionals who treated Mr. Fields both before the offenses and at the Muskogee and Tulsa County Jails after his arrest.   These medical professionals would have rebutted the Government's claim that Mr. Fields was malingering his illness and supported his manic flip defense.

- Trial counsel ineffectively opened the door to a Government expert's damaging – and erroneous – testimony that Mr. Fields did not have significant neurological impairments.

- Trial counsel ineffectively failed to investigate, present and argue readily available evidence that Effexor – an antidepressant Mr. Fields had been prescribed in the weeks before the offenses –   was

---

[3] Trial counsel's failures to present Mr. Fields' dysfunctional upbringing are discussed in Ground Four, below.

associated with aggressive and violent behavior.

● Trial counsel ineffectively prepared the defense's mental health experts for their testimony, damaging their credibility with the jury even though Mr. Fields' defense largely depended on the jury believing this expert testimony.

Trial counsel's failure to effectively investigate, present and argue mitigating mental health evidence violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment,[4] while the jury's verdict, that was rendered without finding and giving mitigating effect to uncontested mental health evidence, violated his right to reliable sentencing guaranteed by the Eighth Amendment.

A.   **Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating and Failed to Request Instructions to That Effect**

Mr. Fields' lawyers presented to the jury significant mental health-related mitigating evidence, including his pre-offense history of chronic depression and auditory hallucinations and a post-offense diagnosis of bipolar disorder.  The Government agreed that much of it existed. Despite asking for jury instructions on twenty-two mitigating factors, including, for instance, that Mr. Fields was a good cook, and then arguing the existence of each of these twenty-two factors, trial

---

[4] Trial counsel's ineffectiveness with regard to this, and other claims alleging ineffective assistance of counsel, stems in large part from the overall dysfunction of the defense team.  Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer.  She assumed the lion's share of pre-trial preparation and she alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument.  Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful.  This breakdown of the defense team violated both the letter and the spirit of the ABA Guidelines, which emphasize that "the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines." ABA Guideline 10.4 (The Defense Team), cmt. at 65.  See also ABA Guideline 10.4(D) ("Counsel should demand on behalf of the client all resources necessary to provide high quality legal representation.  If such resources are denied, counsel should make an adequate record to preserve the issue for post-conviction review.").

6

counsel neither argued nor requested jury instructions on the uncontested mental health evidence

they presented. *Motion*, ¶ 14. This was ineffective:

> Eddings [v. Oklahoma] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The **sentencer must also be able to consider and give effect to that evidence in imposing sentence**. ... Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence.

Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (citation omitted).

### 1. The Evidence the Defense Presented to the Jury Regarding Mr. Fields' Mental Health Impairments and Trial Counsel's Limited Argument on the Mitigating Effect of Only a Portion of That Evidence

The defense presented two psychiatrists, Dr. Bradley Grinage and Dr. George Woods, to

establish that Mr. Fields suffered from bipolar disorder and that he was improperly treated with the

antidepressant Effexor, which caused him to experience a manic flip at the time of the offenses. *TR*,

2775, 2812, 2973, 2989. Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of

depression as early as age sixteen; that for many years prior to the offenses he had been treated with

a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor; and that in

the months before the offenses he suffered from sleeplessness, command auditory hallucinations and

dramatic weight loss. *TR*, 2778, 2800, 2974, 2981, 2745, 2804, 2974, 2987.

The Government conceded much of the defense's mental health evidence. Government

rebuttal experts Dr. Jeffrey Mitchell, a psychiatrist, and Dr. Randall Price, a psychologist, agreed

that Mr. Fields suffered from severe depression. See, e.g., *TR*, 3263-64, 3220. Dr. Mitchell also

agreed that Mr. Fields' history of hearing voices was "credible," *TR*, 3284, see also *TR*, 3315, while

Dr. Price admitted he could not rule out that Mr. Fields' hallucinations were genuine. *Tr.*, 3221,

3228. In closing argument, the Government acknowledged that Mr. Fields suffered from severe and

7

chronic depression.  *TR*, 3425, 3428.

The Court instructed the jury on each of the twenty-two separate mitigating factors that were requested by the defense.  Trial counsel argued these factors more or less as the Court charged them. Yet, of these twenty-two mitigating factors, the **only** mental health mitigation trial counsel argued was that, at the time of the offenses, Mr. Fields experienced a manic flip that "significantly impaired" his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law pursuant to 18 U.S.C. § 3592(a)(1).[5]  At no time was the jury told by either the Court or trial counsel that it could:

- find and give mitigating effect to a diagnosis of manic flip under the severe mental or emotional disturbance mitigating factor pursuant to 18 U.S.C. § 3592(a)(6)[6] or the "catch-all" mitigating factor pursuant to 18 U.S.C. § 3592(a)(8);[7]

- find and give mitigating effect to a diagnosis of bipolar disorder under the (a)(1), (a)(6) or (a)(8) mitigating factors;

- find and give mitigating effect to Mr. Fields' uncontested depression under the (a)(1), (a)(6) or (a)(8) mitigating factors; or

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under the (a)(1), (a)(6) or (a)(8) mitigating factors.

---

[5] Section 3592(a)(1) provides that it is mitigating if "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge."

[6] Section 3592(a)(6) provides that it is mitigating if "[t]he defendant committed the offense under severe mental or emotional disturbance."  While trial counsel did argue this mitigating factor, it was based, not on any mental health issues, but on the circumstances of Mr. Fields' life, including his rocky relationships, his separation from his family, his father's recent death and his homelessness.  *TR*, 3440.

[7] Section 3592(a)(8) provides that a defendant may argue "[o]ther factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence."

8

Thus, the jury was left without an option by which to give mitigating effect to any mental health evidence except the manic flip diagnosis under the (a)(1) mitigating factor.

### 2.   Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to argue or to request jury instructions that would allow the jury to give mitigating effect to Mr. Fields' mental health impairments, independent of the manic flip theory under the (a)(1) mitigating factor. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a.   Deficient performance

Trial counsel were deficit for failing to argue, and request jury instructions on, Mr. Fields' mental health impairments. These were mitigating factors independent of manic flip under the (a)(1) mitigating factor. Thus, the jury was denied an opportunity to give full mitigating effect to that evidence. Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations. Much of this evidence was uncontested. As the Supreme Court has observed, there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990) (internal quotations and emphasis omitted); Eddings, 455 U.S. at 115. Thus, mental illnesses, emotional disturbances and childhood dysfunction, such as the ones Mr. Fields suffered, are plainly mitigating, **even if they do not explain the offenses or rise to the level of significantly impaired capacity**. Hitchcock v. Dugger, 481 U.S. 393, 398 (1987) (in finding the Florida death penalty statute unconstitutional – which permitted consideration only of statutory mitigating factors such as impaired capacity, but not non-statutory factors such as those presented here – the Court stated, "We think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing

9

judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of Skipper v. South Carolina, 476 U.S. 1, (1986), Eddings [] and Lockett ...."); see also  Coble v. Quarterman, 496 F3d 430, 446-47 (5th Cir. 2007) (holding that evidence of bipolar disorder constituted "relevant mitigating information" that required special instruction); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (discussing bipolar disorder as a mitigating factor that should have been presented to jury); Worthington v. Roper, 619 F. Supp. 2d 661 (E.D. Mo. 2009) (same); Brewer v. Quarterman, 550 U.S. 286, 292-93 (2007) (holding that special issues under Texas law impermissibly prevented jury from considering mitigating evidence of defendant's depression); Blanco v. Singletary, 943 F.2d 1477, 1504 (11th Cir. 1991) (finding counsel ineffective for failing to present evidence of defendant's depression as mitigation); McNeill v. Branker, 601 F. Supp. 2d 694 (E.D. N.C. 2009) (discussing depression as a mitigating factor that should have been presented to sentencing jury); Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053 (E.D. Ca. 2008) (same); Harris by and Through Ramseyer v. Blodgett, 853 F. Supp. 1239 (W.D. Wash. 1994) (same); Delap v.  Dugger, 890 F.2d 285, 306 (11th Cir. 1989) ("there was substantial non-statutory mitigating evidence presented which could have led to a recommendation of a lesser sentence by the jury," including " expert psychological testimony as to Delap's mental and emotional problems caused in part by his organic brain syndrome").  Indeed, such illnesses are mitigating **even if they do not rise to the level of significantly impaired capacity or are otherwise related to the offenses**.  See, e.g., Brewer, 550 U.S. at 289, 292-93 (jury should have been permitted to consider as mitigation evidence that defendant suffered from bout of depression three months before murder).

Even though all of Mr. Fields' mental health impairments were broadly mitigating, trial counsel inexplicably argued **only** the mitigating value of manic flip under the (a)(1) mitigating

10

536

factor. Section 3592(a)(1) arguably is more difficult to prove than (a)(8) or even (a)(6) because it requires proof – generally presented through expert testimony – that the defendant was "significantly impaired" at the time of the offense. There were other ways that Mr. Fields' mental health impairments should have been argued to the jury.

First, trial counsel should have asked the Court to instruct the jury that, if it believed Mr. Fields experienced a manic flip but that flip did not "significantly impair" him, it could still find the manic flip diagnosis mitigating under either the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor.

Second, trial counsel should have asked the Court to instruct the jury that, if it believed Mr. Fields suffered from bipolar disorder but did not experience a manic flip, it could still find that disorder mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor.

Third, trial counsel should have asked the Court to instruct the jury that the uncontested evidence of severe depression was mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor, regardless of whether the jury believed Mr. Fields experienced a manic flip or suffered from bipolar disorder.

Finally, trial counsel should have asked the Court to instruct the jury that the largely uncontested evidence of auditory hallucinations was mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor, regardless of whether the jury believed Mr. Fields experienced a manic flip or suffered from bipolar disorder.

Trial counsel neither asked the Court for any such instructions nor argued the mitigating

<div align="center">11</div>

nature of Mr. Fields' mental health impairments independent of the defense's manic flip theory under (a)(1). Because trial counsel failed to argue these alternative means of considering Mr. Fields' mental health impairments, the jury was left with no other way to give expression to the mitigating value of that evidence.

The fact that trial counsel adduced evidence of Mr. Fields' mental health impairments did not relieve them of their duty to explain the mitigating value of that evidence to the jury. "A jury which does not understand that the evidence and argument presented to it can be considered in mitigation of punishment cannot give a capital defendant the individualized sentencing hearing which the Constitution requires." Peek v. Kemp, 784 F.2d 1479, 1488 (11th Cir. 1986). Thus, the jury must receive clear instructions which not only do not impede its consideration of mitigating factors, Lockett, but also "guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender ...." Jurek v. Texas, 428 U.S. 262, 274 (1976). That did not happen in Mr. Fields' case.

Trial counsel's failure to request alternative mental health mitigation instructions, and to argue that Mr. Fields' demonstrated mental health impairments and history of childhood dysfunction met those mitigating circumstances, violated their constitutional obligation to ensure that their client received individualized sentencing consideration. Trial counsel perform deficiently when they fail to request that a capital jury be instructed on applicable mitigating factors. See, e.g., Woodard v. Sargent, 806 F.2d 153, 157 (8th Cir. 1986) (counsel rendered deficient performance by failing to request instruction on lack of prior criminal history mitigating circumstance that was applicable to defendant); Ben-Sholom, 566 F. Supp. 2d at 1129 (counsel rendered deficient performance by failing to request instructions on statutory mitigating circumstances of extreme mental or emotional disturbance, substantial domination, and impairment due to mental disease or defect). All of the

12

instructions discussed above were applicable to Mr. Fields, but trial counsel never asked the Court to give those instructions to the jury.

Trial counsel's failure to request and argue alternative instructions to manic flip under (a)(1) also violated the standards of professional conduct for capital counsel as set out in the ABA Guidelines. As previously noted, the ABA Guidelines are "guides to determining" the adequacy of capital counsel's investigation. Wiggins, 539 U.S. at 522-25 (quoting Strickland and Williams). Guideline 10.11(K) – which were in effect at the time of Mr. Fields' sentencing hearing – provides, "Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to **all** relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions." In Mr. Fields' case, this standard of professional conduct went unmet. Trial counsel failed to request instructions and a verdict form that ensured the jury gave full mitigating effect to evidence of bipolar disorder, severe depression and auditory hallucinations.

There was no tactical or strategic reason for trial counsel's failure to request all applicable mental health mitigation instructions and to argue the mitigating nature of Mr. Fields' bipolar disorder, depression, auditory hallucinations and dysfunctional childhood. By arguing only manic flip under the (a)(1) mitigating factor, trial counsel made it far less likely that the jury would find any mitigating mental health evidence, which is the opposite of what reasonable counsel seeking to avoid a death sentence for her client would have intended. Thus, Mr. Fields' interests were not advanced by trial counsel's failure to request alternative mental health mitigation instructions and to argue those instructions to the jury. See Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003) (strategy must "advance the client's interest"). Moreover, trial counsel concede that they had no tactical or strategic reason for proceeding in this way. Ms. O'Connell acknowledges, "I should have

13

told the jury that they could find these facts as mitigating and ask the Court to charge them on those facts as separate mitigating factors." Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A – 1*, ¶ 18.

### b.   Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance. In the context of a capital sentencing proceeding, a petitioner shows a reasonable probability of a different outcome by demonstrating that, but for counsel's errors, at least one juror would have recommended a life sentence. Wiggins, 539 U.S. at 537. Trial counsel presented significant evidence of Mr. Fields' history of mental illness and current diagnoses. Some of this evidence was accepted by the Government's own rebuttal mental health experts. Both Government experts conceded that Mr. Fields suffered from depression, and one agreed that he experienced command auditory hallucinations. See, e.g., *TR*, 3263-64, 3220, 3284, 3315. It is likely that at least one juror would have found this evidence to be mitigating had he or she been given a way to express such a finding. Evidence of such mental illness "is exactly the sort of evidence that garners the most sympathy from jurors." Smith v. Mullin, 379 F.3d 919, 942 (10th Cir. 2004).[8] Had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the (a)(1) mitigating factor, then, there is a reasonable likelihood that the verdict would have been different.

This is especially true because there is evidence that, although the jury rejected the manic flip-based impaired capacity mitigating factor, it found credible at least some evidence that Mr.

---

[8] The Tenth Circuit credited the conclusions of death penalty litigation expert Dr. Craig Haney, who testified at the evidentiary hearing in district court that "[j]uries respond to and find mitigating [this type of evidence,] and [they] are more likely to vote for life rather than death sentences in cases where there is ... clear and clearly presented evidence that the defendant has suffered from some form of mental illness...." 379 F.3d at 942.

14

Fields suffered from mental illness.  One of the seventeen mitigating factors the jury found was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482.  This finding assumes that Mr. Fields in fact suffered from mental illness, since there would be nothing to treat if the illness did not exist.  Clearly, then, the jury was persuaded that Mr. Fields suffered from mental illness.  Due to trial counsel's deficient performance, however, the jury did not understand that this mental illness itself was mitigating, and it was given neither argument nor instruction as and thus could not give effect to this evidence.

### 3.    The Jury's Death Verdict Violated the Eighth Amendment Because the Jury did not Find Uncontested and Important Mitigating Evidence

The Eighth Amendment "requires that the jury be able to consider and give effect to all relevant mitigating circumstances offered by petitioner." Boyde v. California, 494 U.S. 370, 377-78 (1989) (citing Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. at 111-12; Penry v. Lynaugh, 492 U.S. 302 (1989)).  A sentence imposed in violation of this requirement results in the arbitrary and capricious imposition of the death penalty.  E.g., Lewis v. Jeffers, 497 U.S. 764, 782 (1990) (discussing "the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty"); Lockett, 438 U.S. at 601, Gregg v. Georgia, 428 U.S. 153, 188 (1976).

The sentencing jury's death verdict in this case was arbitrary and capricious.  This is because the jury did not find uncontested evidence that Mr. Fields suffered from severe depression, see, e.g., *TR*, 3263-64; *TR*, 3220, as well as largely uncontested evidence that he suffered auditory hallucinations. See *TR*, 3284, *TR*, 3315.  Having not found uncontested mitigating evidence, the jury could not have given mitigating effect to this evidence, thus rendering the verdict arbitrary and capricious.

15

**B.     Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage**

The presence of organic brain damage is mitigating in a capital case. <u>Porter</u>, 130 S.Ct. at 453; <u>Rompilla</u>, 545 U.S. at 392-93; <u>Williams</u>, 529 U.S. 362, 370 (even evidence that a defendant "might have mental impairments organic in origin" is mitigating).

At the time of the offenses, Mr. Fields suffered from organic brain damage. The jury never learned this fact because trial counsel failed to discover the extent of his impairments after ignoring a defense neuropsychologist's recommendation to conduct further testing. The jury also never learned about the brain impairments trial counsel **did** discover: that Mr. Fields' frontal lobes were damaged, affecting his executive functioning in areas such as judgment and impulse control. Although this evidence would have been highly mitigating in its own right and also would have bolstered the defense theory that Mr. Fields experienced a manic flip at the time of the offenses, trial counsel neglected to present this evidence and argue it to the jury. Trial counsel's performance was ineffective.

**1.     The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence**

Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage. When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). This condition can cut off oxygen to the brain for periods of time, creating a serious risk of brain damage. Trial counsel learned about this fact anecdotally, but failed to obtain legible medical records that would have confirmed the diagnosis as well as the seriousness of Mr. Fields' condition in the days after his birth. Declaration of Glori J. Shettles ("Shettles Dec."), *A – 4*, ¶ 4.

Because of Mr. Fields' oxygen deprivation at birth, as well as his repeated head injuries and

16

losses of consciousness before the age of twenty, see Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), *A – 6*, at 2, a full neurological evaluation was warranted to determine whether he had suffered from any brain damage.  Trial counsel took a step in this direction by having Mr. Fields evaluated by Dr. Michael Gelbort, a neuropsychologist.  Dr. Gelbort's testing found organic brain impairments in areas such as working verbal and visual memory, short-term memory, verbally mediated tasks, higher-level reasoning tasks and impulsivity control.  Gelbort Report at 3-4.

Although Dr. Gelbort conducted limited testing, he suspected that Mr. Fields suffered from frontal lobe damage and reported to trial counsel that "further evaluation [is] warranted."  Gelbort Report at 3.  Trial counsel did not follow up on this recommendation and failed to arrange for further neuropsychological examinations of Mr. Fields – even though they filed a number of court pleadings acknowledging that further neuropsychological testing was necessary.  See *Defendant's Ex Parte Supplement to Motion for Extension of Time* at 1; *Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice* at 6; see also *Defendant's Notice of Intent to Present Expert Testimony* (Rule 12.2 Notice) (indicating that experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist).  Trial counsel also argued to the Department of Justice that Mr. Fields' brain damage was a reason not to seek the death penalty in this case.  Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004,  *A – 7*, at 1, 2, 4.

On the eve of trial, the Government arranged for its own testing of Mr. Fields and produced its expert report to trial counsel.  The Government's expert, Dr. Price, discovered that Mr. Fields was impaired on a number of significant neuropsychological tests and noted no malingering.  Report of Neuropsychological Evaluation dated July 1, 2005 ("Price Report"), *A – 8*, at 21-25.  After

17

receiving this report, Ms. O'Connell turned it over to Dr. Gelbort, who told her that Dr. Price's data

was consistent with his own, but that Dr. Price's conclusions understated Mr. Fields' impairments.

O'Connell Dec., ¶ 16.

Mr. Fields never received further neuropsychological testing as recommended by Dr.

Gelbort, O'Connell Dec., ¶¶ 10, 17, nor did Dr. Gelbort testify at Mr. Fields' sentencing hearing.

### 2. The Organic Brain Damage Evidence That Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price

In the course of these post-conviction proceedings, Mr. Fields was evaluated by Dr. Daniel

A. Martell, a neuropsychologist who routinely works for the prosecution.[9] Dr. Martell has

determined that Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes

and that more current testing shows Mr. Fields has experienced a "catastrophic decline in

functioning over the five years since he was seen by Dr. Price." Report of Daniel A. Martell, Ph.D.,

("Martell Report"), *A* – 9, at 10. Dr. Martell notes that "some of his test performances were among

the worst I have seen."[10] Id. In particular, Mr. Fields scored in the severely impaired range on the

---

[9] See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Cone v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

[10] As stated in the *Motion*, Dr. Martell has not yet determined the cause of Mr. Fields' progressive decline, although he believes it may be related to a tumor or stroke and recommends brain imaging. Martell Report at 17. After filing the *Motion*, current counsel moved for an order to have Mr. Fields transported to an appropriate imaging facility for further testing. *Petitioner's Motion for Non-Dispositive Omnibus Relief* (Dkt. # 4). The Court denied this motion, stating that "[a]fter all briefing has been conducted in this matter and this Court has an opportunity to determine if any of the issues raised merit an evidentiary hearing, the Court will then decide what, if any, discovery should be allowed herein." Order dated 6/29/10 at 4 (Dkt. # 11).

gold-standard of neuropsychological tests, the Halstead-Reitan battery, and his executive functioning was "among the most profoundly impaired area tests." Id. at 10. Based on his review of the reports of Dr. Gelbort and Dr. Price, Dr. Martell concludes that Mr. Fields' disease existed prior to the offenses. Id. at 16.

### 3.   Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to fully and properly develop and present evidence of Mr. Fields' organic brain damage, as well as for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological impairments. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a.   Deficient performance

Trial counsel rendered deficient performance because evidence that Mr. Fields' frontal lobes were damaged would have been valuable mitigating information for the jury to consider. Dr. Woods states that, had he known about Mr. Fields' brain impairments, he could have explained to the jury that persons with frontal lobe impairments suffer a loss of control over impulsivity and therefore such an impairment is "highly mitigating." Declaration of George W. Woods, M.D. ("Woods Dec."), $A - 2$, ¶ 7; see also Declaration of Bradley D. Grinage, M.D. ("Grinage Dec."), $A - 3$, ¶ 12 (stating that he could have told jury that damage to frontal lobes is a mitigating factor). Counsel are routinely found to have performed deficiently for failing to discover and present evidence of neurological damage that impedes impulse control or causes other frontal lobe dysfunction. See, e.g., Porter, 130 S.Ct. at 453 (counsel rendered deficient performance by failing to uncover and present neuropsychological evidence that defendant suffered from brain damage that could manifest

19

in impulsive and violent behavior).[11]

Furthermore, evidence of organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offenses.  As Dr. Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred."  Woods Dec., ¶ 7.  Dr. Grinage agrees that  evidence of organic brain damage could have been offered as a factor that "exacerbated" Mr. Fields' bipolar disorder, an assessment that he believes is strengthened by the previously undiscovered legible records of Mr. Fields' birth.  Grinage Dec., ¶ 12.

Counsel's performance in failing to discover the extent of Mr. Fields' organic brain damage was particularly deficient because they knew that additional testing was required but failed to follow up.  Counsel perform deficiently when they ignore the need to conduct further expert evaluation.

---

[11]  See also Rompilla, 545 U.S. 374 (counsel rendered deficient performance by failing to review court records that contained reference to broad range of mitigating evidence that counsel had failed to develop through other investigative efforts, including red flags of brain damage); Williamson v. Ward, 110 F.3d 1508, 1517 (10th Cir. 1997) (counsel rendered deficient performance by failing to present history of mental illness, alcohol and drug abuse, and brain damage or neurological disorder); Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) (counsel rendered deficient performance by failing to present mental retardation and abnormal neuropsychological tests indicating brain damage); Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) (counsel rendered deficient performance by failing to present temporal lobe brain damage, head injuries, and possible schizophrenia); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) (counsel rendered deficient performance by failing to investigate, develop and present evidence of brain damage); Bean v. Calderon, 163 F.3d 1073, 1079-80 (9th Cir. 1998) (counsel rendered deficient performance by failing to present brain damage and dysfunction from drug use); Armstrong v. Dugger, 833 F.2d 1420, 1433-34 (11th Cir. 1987) (counsel rendered deficient performance by failing to investigate, develop and present evidence of brain damage); Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991) (same); Baxter v. Thomas, 45 F.3d 1501, 1512-15 (11th Cir. 1995) (counsel rendered deficient performance by failing to present low IQ, potential brain injury); Brewer v. Aiken, 935 F.2d 850, 857-60 (7th Cir. 1991) (counsel was deficient for  failing to present brain damage and "blows to the head as a young boy"); Outten v. Kearney, 464 F.3d 401, 410-12, 422-23 (3d Cir. 2006) (same); Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) (same).

See Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998) (counsel ineffective where they knew that experts needed additional information and testing but failed to obtain it).[12]  Here, almost a year before Mr. Fields' sentencing trial, Dr. Gelbort informed counsel that he suspected frontal lobe dysfunction and recommended further testing.  Gelbort Report at 3.  Counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG.  Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing.  O'Connell Dec., ¶ 15.

Counsel had no tactical or strategic reason for failing to fully develop and present this evidence, as trial counsel acknowledges.  O'Connell Dec., ¶ 17.  She never considered organic brain damage to be inconsistent with a manic flip defense and agrees that "[p]resentation of brain impairments would have been an important part of our mitigation presentation."  O'Connell Dec., ¶¶ 15, 17.  Given the highly mitigating nature of organic brain damage, Mr. Fields' interests were not advanced by denying the jury information about his frontal lobe impairments.  See Eze, 321 F.3d at 129 (strategy must "advance the client's interest").

Trial counsel also were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments indicating frontal lobe dysfunction.  Even without full testing and

---

[12]  See also Glenn v. Tate, 71 F.3d 1204, 1208-11 (6th Cir. 1995) (counsel  deficient for failing to obtain neuropsychological testing that would have confirmed that defendant suffers from organic brain damage, instead relying on incomplete evaluations that were less helpful and did not include such testing); Antwine, 54 F.3d at 1365-66 (counsel deficient for failing to obtain additional mental health evaluations after initial evaluation found no mental disease or defect but counsel was aware of numerous witness reports concerning defendant's odd behavior; psychological testing revealed that defendant suffers from bipolar disorder); Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (counsel deficient for failing to investigate further after receiving negative, but incomplete and inconclusive report from one mental health expert).

21

evaluation, Dr. Gelbort's testimony would have been highly mitigating by itself, and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12.  Counsel should present to the sentencer "all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." ABA Guideline 11.8.6 (1989).  Here, there was no reason whatsoever to forgo this important mitigating evidence.

Dr. Gelbort's testimony also was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who falsely testified that Mr. Fields did not suffer from brain dysfunction, even though his own testing showed significant impairment.  See *TR*, 3154; Price Report at 21-25. "Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence." ABA Guideline 10.11, cmt. at 115.  After reviewing Dr. Price's report, Dr. Gelbort informed trial counsel that the Government's test results were consistent with his own data and that Dr. Price understated the importance of that data in his conclusions.  O'Connell Dec., ¶ 16; see also Martell Report at 12-13 (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist). Thus, in light of the considerable contribution Dr. Gelbort could have made to the defense's mitigation presentation, trial counsel's failure to call him as a witness was deficient.  See Kubat v. Thieret, 867 F.2d 351, 368 (7th Cir. 1989) (finding counsel ineffective where counsel knew of mitigation witnesses but failed to present them).

Counsel had no strategic or tactical reason for not presenting Dr. Gelbort's testimony.  Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so.  O'Connell Dec., ¶ 15.  As late as the start of jury selection, it was still trial counsel's intention to call Dr. Gelbort as a witness.  Id., ¶ 15.  According

22

to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem.  Id., ¶ 17.  Moreover, trial counsel concedes that she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony.  Id.

Counsel's failure to take steps to ensure the attendance of their witness violated a core defense function – to present their client's case.  See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of the accused to present witnesses in his own defense."); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (discussing defendant's right to present a defense); see also Tosh v. Lockhart, 879 F.2d 412, 414 (8th Cir. 1989) (counsel rendered deficient performance by failing to call alibi witness or to ask for continuance after assuring defendant and his family that the witness would be called); cf. Poindexter v. Booker, 301 Fed. App'x 522, 530-31 (6th Cir. 2008) (counsel rendered deficient performance by failing to ask court to reopen proofs for last-minute witness).  Trial counsel made no such efforts to procure Dr. Gelbort's testimony.

### b.      Prejudice

Mr. Fields was prejudiced by trial counsel's failure to investigate and present evidence of organic brain damage.  Organic brain damage is a highly mitigating condition.  Jurors are "likely to react sympathetically when their attention is drawn to organic brain problems."  Glenn, 71 F.3d at 1211.  Had counsel presented this evidence, although some jurors may have been disinclined to employ mercy, it is equally as likely that at least one juror would have empathized with Mr. Fields, given the additional insight into his mental state.

Mr. Fields was further prejudiced by trial counsel's failure to rebut Dr. Price's testimony.  That testimony was devastating, but trial counsel failed to challenge his conclusions in any

23

meaningful way, and actually elicited more harmful testimony on cross-examination.[13] Not only did the jury never learn that Mr. Fields was brain-damaged, but Dr. Price affirmatively misled it to believe he was **not** brain-damaged. The prejudice to Mr. Fields is particularly compelling when evidence of his organic brain damage is considered in combination with his other diagnosed mental illnesses and his use of the antidepressant Effexor. When assessing prejudice a reviewing court must consider **all** of the mitigating evidence that could have been presented to the sentencing jury – including both the evidence that was presented at the trial and the evidence that was adduced in post-conviction proceedings. Sears v. Upton, 130 S.Ct. 3259, 3267 (2010) (citing Porter, 130 S.Ct. at 453-54). Both Dr. Woods and Dr. Grinage agree that Mr. Fields' frontal lobe impairment exacerbated his bipolar disorder and further inhibited his ability to control himself during his manic flip. See Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Thus, when evidence of Mr. Fields' organic brain damage is added to the mix of mitigating factors that were presented, there is an even greater likelihood that at least one juror would have voted for life.

> **C. Trial Counsel Ineffectively Failed to Investigate and Present Local Medical Professionals Who Would Have Supported the Manic Flip Defense and Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered**

The Government gave no quarter to Mr. Fields' core defense that he committed the offenses while experiencing a manic flip. Prosecutors attacked the manic flip diagnosis as the opinion of "left coast ... hired guns" and argued that Mr. Fields was malingering when he reported experiencing auditory hallucinations. Trial counsel readily could have rebutted the Government's claims by calling the local medical professionals who treated Mr. Fields before and immediately after the

---

[13] Mr. Fields' claim that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price is discussed in Part E, below.

24

offenses.  These professionals would have eviscerated the Government's malingering charge and bolstered the defense's manic flip theory.  Instead, trial counsel ineffectively failed to call them as witnesses, allowing the Government's "left coast ... hired guns" charge to stand unchallenged.  As a result, the jury rejected the only mental health mitigation argued by the defense.  Trial counsel's performance was ineffective.

### 1.   The Government's Claims of Malingering and the Treating Medical Professionals Who Would Have Rebutted Those Claims

Dr. Price, the Government's expert rebuttal psychologist, testified that Mr. Fields was malingering when he reported hearing voices.  *TR*, 3221-22.   In closing, the Government argued that Mr. Fields' was malingering with regard to his reports of auditory hallucinations, *TR*, 3450-51, and that his suicide attempt after his arrest was simply a means of gaining attention and sympathy. *TR*, 3464.   The Government told the jury, "We didn't have to go out to the left coast to find somebody who testified for the defense every time.  **We got people in our own back yard who were credible**, who would give an honest opinion who were not hired guns."  *TR*, 3429.

Trial counsel, too, did not have to "go out to the left coast" to find someone to support Mr. Fields' defense.  Trial counsel could have called credible treating medical professionals "in [their] own back yard" to rebut the Government's claim that Mr. Fields was a malingerer and to endorse the manic flip defense.

First, the defense could have called Dr. Louise Bumgardner, a psychiatrist and life-time resident of Oklahoma who treated Mr. Fields at the Muskogee County Detention Center after the offenses.  Dr. Bumgardner believes that Mr. Fields "was genuinely mentally ill," Declaration of Dr. Joyce Louise Bumgardner, *A* – 10, ¶ 4, and agrees with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offenses.  <u>Id.</u> at ¶ 5.

25

Second, the defense could have called Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections who treated Mr. Fields when he was transferred to the Tulsa County Jail.  Dr. Trombka, like Dr. Bumgardner, believes that Mr. Fields heard voices, was schizoaffective, and gave no indication "that he was faking his illness, or that his complaints were not genuine ...."  Declaration of Larry Trombka, M.D., *A* – 11, ¶ 2.

Third, the defense could have called Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000 and saw no reason to believe he "was malingering his illness.  To the contrary, I believe that Mr. Fields suffered from chronic depression."  Declaration of R.L. Winters, M.D., *A* – 12, ¶ 4.

Finally, the defense could have called Dean Anderson, a physician's assistant at the Heavener Clinic who treated Mr. Fields for depression in 1999.  Mr. Anderson is "confident" that Mr. Fields' symptoms "were genuine" and does not believe "he was in any way malingering these conditions or complaints."  Declaration of Dean Anderson, *A* – 13, ¶ 11.

Although Dr. Bumgardner, Dr. Trombka, Dr. Winters and Mr. Anderson all were ready and willing to testify, the defense failed to call any of these four local medical practitioners to support Mr. Fields' defense.

### 2.      Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present the testimony of Mr. Fields' treating medical professionals to rebut the government's allegations of malingering and to bolster the defense's manic flip theory.  Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance.  See Strickland, 466 U.S. at 687.

### a.      Deficient performance

Trial counsel's performance was deficient because Mr. Fields' reports of auditory hallucinations were important to the defense's claim of manic flip, as well as to establishing other mental health mitigating factors.  After the Government called Dr. Price to rebut this evidence, the defense needed to counter this charge of malingering.  The views of medical professionals who worked in local jails and personally treated Mr. Fields would have been viewed by the jury as highly credible.   Yet trial counsel failed to call them, relying instead on nothing more than a few speculative inferences that Dr. Woods was able to draw from Mr. Fields' medical records.  See *TR*, 2979-80.  Trial counsel also failed to call Dr. Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even though those opinions went to the heart of Mr. Fields' mitigation defense.

Trial counsel had a duty to rebut the Government's claims and to bolster Mr. Fields' core mitigation defense.  See Chambers, 410 U.S. at 302 ("Few rights are more fundamental than that of the accused to present witnesses in his own defense."); Crane, 476 U.S. at 690 (discussing defendant's right to present a defense).  The ABA Guidelines also provide that "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."  ABA Guideline 10.11.  According to the commentary to this guideline, "Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence."  ABA Guideline 10.11, cmt. at 115.  That did not happen here.  Instead, trial counsel failed to adequately respond with available witnesses to the Government's allegations of malingering and left the manic flip theory vulnerable to the Government's claim that it was nothing more than an excuse

27

cooked up by "left coast ... hired guns." See *TR*, 3429.

As trial counsel admits, she had no tactic or strategy for not investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. By not presenting local medical professionals who could rebut the Government's claims of malingering and bolster the manic flip theory, trial counsel made it less likely – not more – that the jury would accept Mr. Fields' core defense. Thus, Mr. Fields' interests were not advanced by neglecting to present the testimony of Dr. Bumgardner, Dr. Trombka, Dr. Winters and Mr. Anderson. See Eze, 321 F.3d at 129 (strategy must "advance the client's interest").

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's failure to call the medical professionals who treated him to rebut the Government's allegations that he was malingering. In closing, the Government argued these allegations at length. This argument not only undermined the defense's claim that Mr. Fields suffered from impaired capacity at the time of the offenses, but it also suggested that he was fabricating an excuse for his behavior, and thus showed consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). In short, by failing to call important witnesses "counsel effectively acquiesced in the case being tried as a neat three-act play" directed by the prosecution. Cargle v. Mullin, 317 F.3d 1196, 1214 (10th Cir. 2003) (finding that counsel's failure to call witnesses who could have contradicted prosecution's evidence made a "persuasive case for Strickland prejudice"). Moreover, prejudice is established because the jury's acceptance of the Government's argument that Mr. Fields fabricated a defense unquestionably effected its weighing of those mitigating factors that it did find.

Thus, there is a reasonable likelihood that, had trial counsel called these witnesses at least

28

one juror would have voted for life.

**D.      Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price**

Not only did trial counsel fail to present readily available evidence that Mr. Fields was brain-damaged, but they actually elicited from the Government's rebuttal expert his opinion that Mr. Fields was **not** brain-damaged.  Trial counsel exacerbated the harm by failing to either object to this expert's improper testimony on direct examination or to meaningfully challenge that testimony on cross-examination.  Trial counsel's performance was ineffective.

**1.      The Direct and Cross-Examination Testimony of Dr. Price**

Trial counsel neglected to present any evidence demonstrating that Mr. Fields suffered from organic brain damage.  For this reason, prior to Dr. Price's rebuttal testimony, trial counsel argued that, since the defense offered no evidence of brain injury, Dr. Price should not be permitted to opine on that subject.  *TR,* 3080.  Declining to rule in a vacuum, the Court stated it wanted to hear Dr. Price's testimony before ruling on the defense motion.  *TR*, 3083-84.

When the Government then elicited harmful but limited testimony regarding brain damage, the defense failed to object.  See, e.g., *TR*, 3106 (Dr. Price observed that Mr. Fields' "cognitive processes ... were intact"); *TR*, 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16); *TR*, 3154 (stating, "But I thought there was probably going to be some brain dysfunction, something there to have people evaluating him for this.").  Trial counsel also failed to object when, on direct examination, Dr. Price – a psychologist with no expertise in pharmacological matters – testified that overdosing on Effexor would not "have an effect on behavior immediately."  *TR*, 3129.

More astonishing, however, on cross-examination trial counsel directly elicited from Dr.

29

Price his opinion he "did not see much neuropsychological impairment, not significant neuropsychological impairment ...." *TR*, 3204-5. Thus, through the actions of Mr. Fields' **own counsel**, the jury heard unchallenged expert testimony that Mr. Fields did not have any real organic brain damage when in fact he suffered from significant frontal lobe impairments.

### 2.      Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to  use readily available information to impeach his testimony.  Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance.  See Strickland, 466 U.S. at 687.

### a.      Deficient performance

It was unquestionably counter to Mr. Fields' interests to disprove that he suffered from highly mitigating organic brain damage – particularly since the data proves the contrary.  When trial counsel asked Dr. Price whether he saw much impairment in Mr. Fields, she **knew** that his answer would be damaging.  Prior to the sentencing hearing, counsel received a copy of Dr. Price's report, which stated, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27; see also O'Connell Dec., ¶ 16.  Counsel's elicitation of harmful testimony is deficient.  See Freeman v. Class, 95 F.3d 639, 642-42 (8th Cir. 1996) (counsel rendered deficient performance by presenting evidence that his own client stole a police car); Berryman v. Morton, 100 F.3d 1089, 1100 (1996) (counsel deficient in rape trial when eliciting that co-defendant was a suspect in a robbery/homicide investigation).

Trial counsel's opening the door to evidence that his client was not brain-damaged was

30

similarly found deficient in Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002). There counsel showed the defense's psychologist a neuropsychological report about the defendant that had been prepared as part of pre-offense anger management counseling. Id. at 1167-68. The psychologist then wrote a one-page report opining that the data from the neuropsychological report suggested mild brain damage. Id. at 1168. At trial, counsel called the psychologist as a mitigation witness, who told the jury that, since he did not personally evaluate the defendant, the author of the original neuropsychological report was the best source of information on this subject. Id. In rebuttal, the prosecution called the author of the neuropsychological report, who testified that the defendant had no brain damage. Id. The Tenth Circuit called the testimony that the defendant was not brain-damaged "disastrous." Id. at 1171.

Mr. Fields' counsel's errors were even more egregious. Hooper noted, "[A]lthough the defense did not intend to call [the author of the neuropsychological report] as a mitigation witness, defense counsel should have foreseen that the State might use him in rebuttal after the defense specifically relied on his report as mitigating evidence." 314 F.3d at 1171. Here, trial counsel did not merely fail to foresee that Dr. Price might give damaging testimony, but affirmatively elicited that testimony from him.

Moreover, trial counsel should have presented Dr. Gelbort in anticipation of or rebuttal to Dr. Price's testimony. Trial counsel were aware that evidence of Mr. Fields' organic brain damage had mitigating significance. O'Connell Dec., ¶ 17. Trial counsel also were aware that Dr. Price's opinion regarding Mr. Fields' lack of organic brain damage was vulnerable to impeachment because Dr. Gelbort had told Ms. O'Connell before trial that Dr. Price's data was consistent with neurological impairment. O'Connell Dec., ¶ 16.

31

Nevertheless, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neuropsychological impairments and overreported Mr. Fields' actual level of functioning. See Martell Report at 12-13. While trial counsel did question Dr. Price about individual tests on which Mr. Fields scored poorly, see *TR*, 3195-96, they failed to show that these scores amounted to "a pattern of impairments suggestive of brain damage." Martell Report at 12-13. This could have been accomplished either through more probing cross-examination or by presenting the testimony of Dr. Gelbort, or another competent expert, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4. See ABA Guideline 10.11, cmt. at 115 ("Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence.").

Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the "practice effect" in neuropsychological testing. Martell Report at 13. The "practice effect" occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the "practice effect"). Dr. Price's opinion was vulnerable to impeachment on this front because he repeated many of the tests that Dr. Gelbort administered ten months earlier. Id. Cf. Middleton v. Evatt, 855 F. Supp. 837, 846-47 (D. S.C. 1994) (failure to cross-examine prosecution's expert on "practice effect" deficient – however, no prejudice because that information was elicited during cross-examination of defense's expert).

32

Trial counsel also failed to object to Dr. Price's testimony regarding the effects that Effexor had on Mr. Fields. *TR*, 3129-30. As Dr. Martell points out, Dr. Price is a psychologist and is not an expert on the effects of such medications. Indeed, Dr. Price acknowledged as much when he refused to answer a question on cross-examination about the effects of the medication because of his lack of expertise in this area. *TR*, 3206. Thus, trial counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct examination that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

Trial counsel had no reasonable basis for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Prior to the sentencing hearing, trial counsel sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally *Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence* (filed March 31, 2005). Then, just before the Government called Dr. Price as a rebuttal witness, trial counsel specifically attempted to preclude Dr. Price from testifying about organic brain damage, arguing that this subject was beyond the scope of the evidence presented by the defense. *TR*, 3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude. Cf. Green v. Johnson, 2006 WL 3746138, at *21 (E.D. Va. Dec. 15, 2006) (concluding that counsel's failure to file motion for mitigation specialist after remand was "not strategic" where counsel notified prosecution that defense intended to refile all previously filed motions and later claimed on appeal that court's denial of motion was error).

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not

33

suffer from organic brain damage and failure to impeach or otherwise counter the questionable testimony of Dr. Price. It was bad enough that the defense failed to present highly mitigating evidence that Mr. Fields suffered from significant frontal lobe damage. Trial counsel made the situation far worse by eliciting Dr. Price's opinion that he did not have any significant neuropsychological impairment. See Hooper, 314 F.3d at 1171(characterizing counsel's opening the door to testimony that client was not brain-damage "disastrous"). Had trial counsel not elicited this harmful testimony, or if trial counsel had properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different.

### E.     Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients

Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-undiagnosed bipolar disorder. The Government countered that his behavior before and after the offenses indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression. This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

34

### 1.     Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression

The antidepressant Effexor was at the center of Mr. Fields' defense.  Both Dr. Grinage and Dr. Woods testified that Mr. Fields committed the offenses while experiencing a manic flip caused by the improper administration of the antidepressant Effexor.  *TR*, 2812, 2990.  In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point."  *TR*, 3438.

The Government challenged the defense's theory by arguing that the circumstances surrounding the offenses demonstrated that Mr. Fields' judgment and concentration were not impaired.  According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later.  *TR*, 3413-22.  As the prosecutor told the jury, "The Defendant had no delusions.  It's impossible, virtually impossible, for Effexor to trigger a single manic episode.  The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness."  Id. at 3451-52.

The jury apparently was persuaded by the Government's argument because it rejected the impaired capacity mitigating factor.  *TR*, 3480-81.  Since impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no other mental health mitigation.

Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression.  Compulsive aggression, unlike impaired judgment or concentration, would have been more consistent with the Government's view that Mr.

<div align="center">35</div>

Fields was able to deliberate before and after the offenses. Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion would thus have been mitigating as significant impairment pursuant to 18 U.S.C. § 3592 (a)(1), as a severe mental or emotional disturbance pursuant to under 18 U.S.C. § 3592 (a)(6), or as catch-all mitigation under 18 U.S.C. § 3592 (a)(8).

Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. See, e.g., Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A – 14*, at 36 (discussing "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions."); FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A – 15* (recommending "close observation" of patients being treated with Effexor and other drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric.").

The PHA in particular was widely reported in the general media, and Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to it by changing the drug's

<div align="center">36</div>

Medication Guide to include the warnings requested by the FDA. Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**." Effexor Medication Guide (2004), $A - 19$, at 12.

### 2. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present evidence that patients treated with SSRI-type medications, such as Effexor, can experience increased rates of compulsive aggressiveness. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

Trial counsel's performance was deficient because the defense's theory that Mr. Fields experienced a manic flip which impaired his capacity to conform his actions to the requirements of the law or to appreciate the wrongfulness of his actions was vulnerable to the Government's argument that his actions before and after the homicides appeared to be deliberate. The Tenth Circuit has noted the importance of mitigation evidence that explains to the jury why a defendant acted as he did in committing the offense. Smith, 379 F.3d at 943. Evidence that Effexor caused or added to Mr. Fields' sudden compulsive aggressiveness would have been highly mitigating because it would have helped the jury understand how he could have committed the offenses even though he had no criminal record. Cf. Lockhart v. Warden, Maine State Prison, Slip Copy, 2010 WL 610708, *7 (D. Me. Feb. 19, 2010) (had the sentencer "credited that Lockhart was in fact experiencing aggression and hostility as a side effect of Effexor, this would have been a mitigating factor to some degree at sentencing").

It was particularly deficient for trial counsel not to pursue this investigation because Mr. Fields' behavior around the time of the offenses closely matched the kinds of obsessive aggression observed in SSRI patients. This included a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Breggin Article at 36. In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127. There was evidence that Mr. Fields filled this prescription the day before the homicides.[14] This evidence is consistent with Wyeth's warning that adverse effects were more likely to occur after an upward adjustment to the Effexor dosage. Effexor Medication Guide (2004) at 12.

Counsel could not have possessed a tactical or strategic reason for not investigating this avenue as it was entirely consistent with the defense that counsel did investigate and present. See Richards v. Quarterman, 566 F.3d 553, 564-66 (2009) (affirming district court's finding of ineffective assistance where counsel failed to present evidence of alternative theory of circumstances of the offense that was consistent with counsel's chosen strategy of self-defense).

**b.    Prejudice**

Mr. Fields was prejudiced by trial counsel's deficient performance. Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that at least one would have voted for life.

---

[14]   Mr. Fields' claim that the Government withheld exculpatory and material evidence regarding the amount of Effexor that Mr. Fields consumed is discussed in Ground Seven, below.

In a similar case involving counsel's failure to present expert evidence about the side-effects of prescription medication, the Tenth Circuit found Strickland prejudice.  In Sallahdin v. Gibson, 275 F.3d 1211, 1238 (10th Cir. 2002), the petitioner claimed that counsel ineffectively failed to present expert testimony that "a substantial and consistent scientific literature had already accumulated, showing that anabolic steroids could cause severe psychiatric effects ... in some individuals."  The Court noted that this evidence "could have explained how Sallahdin could have been transformed from an allegedly mild-mannered, law-abiding individual into a person capable of committing the brutal murder with which he was found guilty."  Thus, it "conclude[d] there is a reasonable probability that the presentation of [this expert] testimony could have altered the outcome of the sentencing phase ...."  However, the Court was unable to determine whether counsel had a strategic reason for not presenting this evidence and remanded for an evidentiary hearing.

> **G.    Trial Counsel Ineffectively Failed to Adequately Prepare the Two Mental Health Experts Who Testified for the Defense**

Capital counsel have an obligation, not merely to present necessary expert testimony, but to adequately prepare their experts to give such testimony.  Counsel may not simply hire an expert and then abandon all further responsibility.  "[A]n attorney ha[s] a responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request."  Wallace v. Stewart, 184 F.3d 1112, 1116 (9th Cir. 1999); see also Sechrest v. Ignacio, 549 F.3d 789, 816-17 (9th Cir. 2008).

Trial counsel were ineffective for inadequately preparing Dr. Grinage and Dr. Woods for their testimony, which enabled the Government to damage their credibility on cross-examination and undercut the heart of Mr. Fields' defense.  Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance.  See Strickland, 466 U.S. at 687.

39

### 1.      Deficient Performance

Both Dr. Grinage and Dr. Woods acknowledge they were not properly and adequately prepared.  Grinage Dec., ¶¶ 5-12, Woods Dec.,  ¶¶ 4, 8.  Ms. Shettles and Ms. O'Connell concur with this assessment.  Shettles Dec.,  ¶ 14; O'Connell Dec., ¶¶ 11-12.  For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing.  O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7.  Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired."  O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1).  This was deficient.  See Antwine, 54 F.3d at 1366-68 (finding counsel ineffective for failing to investigate mental issues and adequately prepare mental health expert); Glenn, 71 F.3d at 1210 n.5 ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant"); Bloom v. Calderon, 132 F.3d 1267, 1277 (9th Cir. 1997) ("counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance").

### 2.      Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance.  Because Dr. Woods and Dr. Grinage were not adequately prepared to testify, their credibility with the jury was damaged.  For instance, because trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, on cross-examination he contradicted some of the answers he gave on direct examination.  *TR*, 2816-18; see also O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7.  Because trial counsel failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that

40

Case 6:10-cv-00115-RAW   Document 14   Filed 07/30/10   Page 56 of 126
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 567

567

Mr. Fields' ability to appreciate the wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired," Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination.  *TR*, 3048; see also O'Connell Dec., ¶ 12.

In this case, the credibility of the parties' experts was paramount.  These errors singularly, or when viewed in combination with the other ways in which counsel compromised the credibility of their witnesses and theory, were highly prejudicial to the defense case.  Trial counsel placed Mr. Fields' life almost entirely in the hands of the defense's mental health experts and their diagnosis that he suffered a manic flip at the time of the offenses.  The jury plainly did not credit the testimony of Dr. Woods and Dr. Grinage, since it rejected the manic flip diagnosis that formed the core of Mr. Fields' defense.  Had Dr. Woods and Dr. Grinage been properly prepared, they likely would not have been impeached on issues that caused the jury to doubt their credibility.  There is a reasonable likelihood that the jury's verdict would have been different, undermining confidence in the result. See Worthington, 619 F. Supp. 2d at 688 ("Based on a review of the totality of the evidence that was presented at the penalty hearing, the Court finds that had the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence.").

**GROUND TWO**

**THE EIGHTH AMENDMENT AND INTERNATIONAL LAW BAR MR. FIELDS' EXECUTION BECAUSE HE IS NOT COMPETENT TO BE EXECUTED AND BECAUSE THE DEATH PENALTY IS PRECLUDED BY HIS DETERIORATING MENTAL HEALTH.**

A sentencing process that offends "the evolving standards of decency that mark the progress of a maturing society" violates the Eighth Amendment's bar against excessive and cruel and unusual punishment.  Gregg, 428 U.S. at 173 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).  Mr. Fields' execution would violate this standard and thus is prohibited by the Eighth Amendment as well as by international law.

**A.      Mr. Fields Will not be Competent to be Executed**

If Mr. Fields' execution becomes imminent, he will not be competent to be executed at that time.  As set forth in Ground One above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function.  Martell Report at 10.  Although the cause of the process is not yet clear, and the precise rate of Mr. Fields' decline has yet to be determined, it is likely that he will be incompetent at the time of his execution.  "The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane."  Ford v. Wainwright, 477 U.S. 399, 407 (1986).  Thus, Mr. Fields' execution will be barred.

**B.      Mr. Fields' Execution is Precluded by his Mental Illness**

Regardless of whether Mr. Fields is incompetent by the time of his scheduled execution, he is ineligible for the death penalty because of his mental illness.  Although the Supreme Court has not yet held that the Eighth Amendment precludes the execution of the mentally ill, two recent cases interpreting the Eighth Amendment command such a conclusion.

In Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. A person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318.

In Roper v. Simmons, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. As in Atkins, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.... [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." Id. at 571-72 (internal quotations omitted).

The Atkins and Roper bars on the death penalty for mentally retarded and underage offenders are grounded in the same concerns that ought to prevent the execution of the severely mentally ill. Such individuals, like Mr. Fields, share those characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. See ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

In addition, the execution of the mentally ill offends the "evolving standards of decency"

43

protected by the Eighth Amendment. Eighth Amendment analysis is "informed by objective factors" such as the views of professional "organizations with germane expertise." Atkins, 536 U.S. at 312, 316 n.21. The leading legal professional organization in the country, the American Bar Association, unequivocally expresses the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on Aug. 8, 2006; ABA, 30 MENTAL & PHYSICAL DISBILITY LAW RPT'R at 668.

Similarly, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing **all** mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.[15]

---

[15]  See American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness.*

In addition, just as in <u>Atkins</u> and <u>Roper</u>, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion also weigh against the execution of the mentally ill. The execution of the severely mentally ill is forbidden by Article 6, § 1 of the International Covenant on Civil and Political Rights ("ICCPR"), 999 U.N.T.S. 171 (1966). In the case of <u>Francis v. Jamaica</u>, Communication No. 606/1994 U.N.H.R.C., on August 12, 1994, the United Nations Human Rights Committee held that the execution of an individual who was mentally disturbed, but examined and found not to be "insane," amounted in that case to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR.

Finally, Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain-damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to this Court through treaty and convention. As a customary norm of international humanitarian law, the prohibition on the execution of the severely mentally ill has acquired the character of jus cogens, a peremptory norm of general international law accepted and recognized by the international community of states as a binding obligation from which no derogation is permitted, regardless of the circumstance. The United States has ratified the ICCPR, thereby recognizing the binding nature of its provisions. These international rules prohibiting cruel, inhuman or arbitrary punishments are a part of United States law, as set forth in United States treaty obligations. As such, they are directly enforceable in United States courts and are available as an alternate basis for granting the relief requested in the *Motion*. Treaties create binding obligations on the United States, and the courts must give full effect to these rules.

C.      Ripeness

By their very nature, Eighth Amendment and international law analyses are constantly evolving to reflect the evolving standards of decency on both a national and international level. Thus, portions of this claim may not be ripe for litigation at this time. See Stewart v. Martinez-Villareal, 523 U.S. 637 (1998) (recognizing that death-sentenced prisoner properly raises a Ford claim after a warrant for his execution has been issued). Nevertheless, Mr. Fields raises these issues here in order to preserve the claim for future review and avoid any assertion by the Government that the claim has been waived. He is prepared to litigate this claim and present his proofs at an evidentiary hearing should this Court conclude that it is appropriate to do so at this time.

## GROUND THREE

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE FIFTH AMENDMENT WAS VIOLATED BECAUSE THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT TO SUPPORT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR.**

"The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (citing Jurek, 428 U.S. 262). In the federal capital sentencing regime, aggravating circumstances must be proven beyond a reasonable doubt.[16] 18 U.S.C. § 3593(c).

In Mr. Fields' case, the Government sought to prove, among other aggravating

---

[16] In addition, where enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires their proof beyond a reasonable doubt. Ring v. Arizona, 536 U.S. 584, 609 (2002).

46

circumstances, the statutory aggravating factor that Mr. Fields shot Mr. and Mrs. Chick after substantial planning and premeditation, and the non-statutory aggravator that he inflicted mental anguish on Mrs. Chick. The jury found both of these aggravating circumstances. See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).

Trial counsel neglected their constitutional duty to challenge the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's evidence of substantial planning and mental anguish was deeply flawed, yet trial counsel failed to attack the Government's witnesses on cross-examination and failed to present their own rebuttal experts who could have helped them expose the vulnerabilities of this evidence. Even more remarkably, in closing argument trial counsel failed to utter a single word about why the Government had failed to prove the aggravating factors beyond a reasonable doubt.

Moreover, with regard to the substantial planning aggravating factor, the Government presented testimony and argument that was at best misleading testimony and at worst false. The Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument; selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides; and twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings.

Trial counsel's failure to challenge the substantial planning and mental anguish aggravating factors violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment, and the Government's knowing presentation of false and/or misleading evidence in

support of the substantial planning aggravating factor violated his right to due process guaranteed by the Fifth Amendment.

### A.    The Substantial Planning Aggravating Factor

### 1.    The Government's Evidence

To prove the substantial planning aggravating factor,[17] the Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become "a predator, a sniper" and shoot human beings. TR, 3406-07.  As evidence of this purported scheme, the Government elicited from Daniel Presley, a friend of Mr. Fields, that Mr. Fields went squirrel–hunting in a ghillie suit, that he attached a powerful scope to his .22 rifle (which he also ghillied), and that he was a "[g]reat shot." *TR*, 2378-79, 2384-85.

The Government further alleged that, a few days before July 10, 2003,  Mr. Fields met the Chicks and decided to put his plan into action.  As evidence of this "plan," the Government first called Mr. Presley to testify that on the evening of July 10, 2003, he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." *TR*, 2382.  The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2003, and told her he had plans to go fishing with his friend Mr. Presley

---

[17] The statutory aggravating factor of substantial planning and premeditation (18 U.S.C. § 3592(c)(9)) provides as follows:

    (c)    Aggravating factors for homicide – In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

    (9)    Substantial planning and premeditation – The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

48

that evening so "he wouldn't be right home." *TR,* 2558-59.  From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts.  *TR,* 3412-13.

The Government also presented evidence that Mr. Fields returned to the campsite hours after shooting the Chicks and "staged robbery" to make it appear that Mr. Fields' motive was to steal, not to kill.  *Tr.*, 3421, 3422; see also *Tr*, 2019.

To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma.  First, Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door.  *TR*, 2099. According to Agent Dalley, because these glass fragments had no blood on them, they must have landed on the blood in the well after it had dried.  *TR*, 2098-99.  Second, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot.  *TR*, 2026-32, 2111-15.

### 2. The Rebuttal Evidence That the Defense Never Presented

#### a. Evidence that Mr. Fields did not shoot the Chicks after Substantial Planning

Had trial counsel conducted a reasonable investigation, they would have discovered evidence refuting the Government's allegations that Mr. Fields shot the Chicks after substantial planning.  If asked, Mr. Presley – a cooperative witness who made himself available to the defense – would have told trial counsel that the evidence the Government relied on in arguing that Mr. Fields had a long-

standing plan to hunt human beings were in fact entirely innocuous. According to Mr. Presley:

● Ghillie suits and ghillied weapons were common among hunters in the area, Declaration of Daniel Presley ("Presley Dec."), *A* – 20, ¶¶ 4, 5;

● It was not unusual for hunters like Mr. Fields who ate the squirrels they shot to attach large scopes to their .22 rifles because it prevented the meat from being ruined by shot; and

● Mr. Fields attached the scope to his rifle at least a year before the homicides. Presley Dec., ¶ 5.

Mr. Presley also could have provided the defense with crucial information destroying the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides. Had he been asked by trial counsel, Mr. Presley would have told them that Mr. Fields came over to his house after work on the day of the shootings and **asked him to go snake-hunting that night**. Presley Dec., ¶ 3. Mr. Presley and Mr. Fields frequently went snake hunting at night. Id. On this particular occasion Mr. Presley declined to go because he had plans to go to the casino with his sister that evening. Id. Thus, had trial counsel been properly prepared, on cross-examination they could have elicited from Mr. Presley that Mr. Fields **did** hope to do something with Mr. Presley on the evening of the homicides, as he told Ms. Tipton, and was not trying to fabricate an "alibi." This information also would have demonstrated that, just a short time before the shootings took place, Mr. Fields still had no plan to go to the Winding Stairs Campground to kill the Chicks.[18]

>    b.    **Evidence that Mr. Fields did not stage a robbery many hours after the shootings**

Had trial counsel conducted a reasonable investigation – including consulting with an

---

[18] Although Mr. Presley initially believed Mr. Fields came to his house sometime after 4:00 p.m, see FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview"), *A* – 21, at 3, his wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven," *TR,* 2462, a fact that Mr. Presley acknowledged in his testimony. *TR*, 2382.

independent crime scene investigator – they would have discovered evidence refuting the Government's allegations that Mr. Fields returned to the crime scene many hours after the shootings and staged a robbery .

Agent Dalley's testimony that the glass fragments found resting on a dried pool of Mrs. Chick's blood were not stained with blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. In her report, Agent Dalley recorded no observations about these glass fragments, nor did she note whether she examined the fragments at the scene or collected them for later examination. OSBI Crime Scene Investigation Report dated August 1, 2003, *A* – 22, at 3. Trial counsel never cross-examined her about why, if the glass fragments were such important evidence, she failed to note in her report that they were free of blood, as she told the jury two years later.

Moreover, one of the crime scene photographs taken by Agent Dalley shows that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), *A* – 23, ¶ 8. Thus, contrary to Agent Dalley's testimony that the glass fragments landed on Mrs. Chick's blood after it had dried, at least one fragment must have landed on the blood while it was still viscous. Id., ¶ 9.

Even if other glass fragments had no blood on them, this could have been accounted for by the fact that Agent Dalley had to open the passenger door of the van to view the interior, TR, 2098, at which time she likely disturbed a number of glass fragments and caused them to fall onto the dried blood. Tressel Dec., ¶ 12. This conclusion is supported by another photograph taken by Agent Dalley which shows that at least one glass fragment appears to have fallen from the van door to the pavement below. Id.

Evidence related to Mr. Chick's body also suggests that he was not moved many hours after he was shot, as the Government alleges. As Tressel, or another competent crime scene investigator, could have told the defense:

- Government's Exhibit 51, a photograph depicting Mr. Chick's right hand, shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist. This indicates that Mr. Chick was moved from the picnic table to the ground before the blood on his hand dried. Tressel Dec., ¶ 16.

- Another crime scene photograph shows a considerable pool of blood around Mr. Chick's head. Given the cool evening temperature and the heavy volume of blood that flowed from his head, his body must have been moved relatively soon after he was shot. Tressel Dec., ¶ 17.

- Although the Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body, see, e.g., *TR*, 2031-32, 2177, trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body also were **consistent** with lividity having become fixed while Mr. Chick was lying where he was found and **inconsistent** with lividity having become fixed while Mr. Chick was slumped at the picnic table. Tressel Dec., ¶ 18. Trial counsel could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

## B.     The Mental Anguish Aggravating Factor

### 1.     The Government's Evidence

To prove the nonstatutory mental anguish aggravating factor,[19] the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over h[er] face." *TR*, 3415-16. As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check, and that high velocity spatter can

---

[19] Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

52

578

travel up to two feet and still remain visible. *TR*, 2088-91. According to Agent Dalley, Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face, *TR*, 2090, although the spatter was never tested to confirm that claim. *TR*, 2213.

### 2.      The Rebuttal Evidence That the Defense Never Presented

Had trial counsel conducted a reasonable investigation by consulting with a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and a nearby exit wound. Tressel Dec., ¶ 26. Either of these wounds could have created high velocity blood spatter, and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

### C.      Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out these crimes with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### 1.      Deficient Performance

Trial counsel were deficient because they had an obligation to rebut the aggravating factors presented by the Government. "[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guideline 10.11(A); see also ABA Guideline

10.11(I)[20] ("Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible."). Notwithstanding these duties, the Government's evidence of substantial planning and mental anguish went unrebutted.

Had trial counsel mounted a reasonable investigation, they could have discovered ample evidence with which to rebut the Government's aggravating circumstances. For instance, Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting, placing the Government's evidence on those matters in its proper context. He also could have demolished the Government's "alibi" claim by informing the jury that Mr. Fields asked him to go snake hunting on the night of the offenses. Trial counsel should have discovered this information in particular because, in Mr. Presley's statement to the FBI, he mentioned that, just hours before the offenses, Mr. Fields asked him if he "wanted to do something." Presley Interview at 3. That statement, which was produced to the defense in discovery, should have prompted trial counsel to inquire what exactly Mr. Fields wanted to do with Mr. Presley. Yet trial counsel never followed up on the matter with Mr. Presley. Presley Dec., ¶ 3.

A crime scene investigator or other appropriate expert also should have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. At the very least, trial counsel should have consulted with such an expert to assist in

---

[20]   See also ABA Guideline 10.11(I), cmt. at 111 ("Counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase. Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut.").

cross-examining the Government's witnesses.  See Richter v. Hickman, 578 F.3d 944, 955-961 (9th Cir. 2009) (counsel deficient for failing to consult with blood spatter experts before settling on trial strategy and to present expert testimony at trial).[21]  Yet trial counsel acknowledges that she did not even consider retaining a crime scene investigator or pathologist and concedes that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses."  O'Connell Dec., ¶ 22.

Not only did trial counsel fail to attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors with readily available affirmative evidence of their own, but in closing argument failed to utter a single word about these aggravating factors.  It was, in short, a nearly complete capitulation by the defense.  Under these circumstances, trial counsel's performance was deficient.  See Battenfield v. Gibson, 236 F.3d 1215, 1228 (10th Cir. 2001) (counsel's performance was "constitutionally deficient" because he was "wholly unprepared to rebut the aggravating factors argued by the prosecution"); Harries v. Bell, 417 F.3d 631, 638 (6th Cir. 2005) (counsel rendered deficient performance by failing to rebut aggravating evidence).

Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims.  O'Connell Dec., ¶ 22.  Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed these crimes with substantial planning

---

[21]  See also Draughon v. Dretke, 427 F.3d 286, 296 (5th Cir. 2005) (counsel deficient where "the failure to investigate the forensics of the fatal bullet deprived [the defendant] of a substantial argument, and set up an unchallenged factual predicate for the State's main argument .... [The defendant] became the sole source of evidence available to counter the prosecution's theory."); Gersten v. Senkowski, 426 F.3d 588, 607-08 (2d Cir. 2005) (counsel deficient when he "failed to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse").

and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr. Fields eligible for the death penalty, and trial counsel had every reason to rebut them or argue that they did not sufficiently outweigh the mitigating factors.

### 2.     Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance. The Government presented expert testimony and vigorously argued that this testimony supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456. That testimony and argument went unchallenged by the defense. Yet trial counsel could have injected reasonable doubt into the jury's deliberations by effectively cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. See Richter, 578 F.3d at 962 ("Because expert testimony that contradicted that offered by the prosecution was in fact available, and strongly persuasive, the harm caused by counsel's failure to make any effort to obtain it is readily apparent, and devastating."). Given that the Government had the burden of proof beyond a reasonable doubt, 18 U.S.C. § 3593(c), there is a reasonable likelihood that, had trial counsel attacked the Government's evidence in these ways, the verdict would have been different.

### D.     The Government's Due Process Violations

"[C]ontrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." Mooney v. Holohan, 294 U.S. 103, 112 (1935). For this reason, the Supreme Court has long recognized that a conviction obtained through the use of false evidence violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959) (citing Holohan, Pyle v. Kansas, 317 U.S. 213

<center>56</center>

(1942) and Curran v. Delaware, 259 F.2d 707 (3d Cir. 1958)).  Such a conviction violates due

process regardless of the prosecution's good faith or bad faith.  Napue, 360 U.S. at 269 (due process

violated where prosecution knew or should have known of false testimony); United States v. Agurs,

427 U.S. 97, 103 (1976) (same).

Here, the Government violated Napue and its progeny by presenting false and misleading

testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after

substantial planning and deliberation.

### 1.    False and Misleading Testimony and Argument About a Purportedly Staged Robbery

As noted, the Government argued that, after Mr. Fields shot the Chicks, he left the

campground and returned more than six hours later to stage a robbery to make it appear that his

objective had been to steal, not to kill.  *TR*, 3421, 3422.  This theory supported the Government's

claim that the shootings were the result of substantial planning and deliberation, a statutory

aggravating circumstance that made Mr. Fields eligible for the death penalty and was weighed by

the jury.  See, e.g., *TR*, 2019 (explaining relevance of "staged robbery" theory to statutory

aggravating factor).  Establishing these facts also tended to contradict Mr. Fields' mental health-

related evidence.

The Government's "staged robbery" theory relied in significant part on Agent Dalley

testimony that the driver's side window of the Chicks' van had been broken and that several glass

fragments from this window rested upon a pool of dried blood in the well of the front passenger

door.  *TR*, 2099.  According to Agent Dalley, she found these glass fragments "significant" because

they had no blood on them, and therefore must have landed on the blood in the well after it had

dried.  Id. at 2098-99.  The Government argued in closing that this testimony supported the

substantial planning aggravating circumstance. *TR*, 3456.

Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation report, and (2) photographs she took at the crime scene. She made no mention of any lack of blood staining in the report she prepared approximately two weeks after the homicides, nor did she collect the glass fragments for later examination. OSBI Crime Scene Investigation Report dated August 1, 2003, 3, 7-9. Thus, she had no basis upon which to testify two years later that the glass fragments were free of blood.

Moreover, Agent Dalley's claim that the glass fragments lacked any blood staining is refuted by the photographs she herself took at the crime scene. In one photograph, at least one glass fragment resting on the dried pool of Ms. Chick's blood shows a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* – 24. This photograph directly contradicts Agent Dalley's testimony. Significantly, during Agent Dalley's direct examination, the Government never showed her this particular photograph even though it reveals more detail than Government's Exhibit 43, the photograph prosecutors did show her.

The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not elicit Agent Dalley's false and misleading testimony, they unquestionably had a duty to correct it. Napue, 360 U.S. at 269 ("[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); US v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992) ("If a prosecutor

58

uses testimony it knows or should know is perjury, it is fundamentally unfair to an accused .... The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial.").

### 2.   Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi"

As also noted, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offenses.  This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton.  The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382.  The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR,* 2558-59.

Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day.  **He had already set up us [sic] alibi**.  If you remember, Michelle Tipton told you, yeah, he called me on that day.  He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late.  Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him.  **He's already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth**.

TR, 3412-13.

The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August 2003, Mr. Presley told the FBI that, on the day of the offenses, Mr. Fields came to his house sometime after 4:00 p.m. and asked

59

him if he "wanted to do something." Presley Interview at 3. Mr. Presley replied that he had "plans to play the casino in Fort Smith." Id. This statement was memorialized in a FBI 302 Report and provided to the prosecutors. Id. During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening. The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

It was clear from Mr. Presley's complete statement to the FBI that Mr. Fields **did** intend – or at least hoped – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence would have shown that he had no plan to shoot the Chicks at the time he made this statement to Ms. Tipton, nor did he have such a plan when he suggested to Mr. Presley that they go snake hunting – which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3.  The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury

Where false and misleading testimony and argument are used to obtain a conviction, such testimony and argument are material if "if there is any reasonable likelihood that the false testimony **could** have affected the judgment of the jury." Agurs, 427 U.S. at 103. Accord Giglio v. United States, 405 U.S. 150, 154 (1972); Napue, 360 U.S. at 271. See also Strickler Greene, 527 U.S. 263, 299 (1999); United States v. Bagley, 473 U.S. 667, 678-80 & n.9 (1985); United States v. Barham,

<div align="center">60</div>

595 F.2d 231, 242-43 (5th Cir. 1979).

There is a reasonable likelihood that the judgment of the jury **could** have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigating factors.

The impact of the false and misleading evidence used in this case was exacerbated by the fact that it not only helped prove an aggravating circumstance, but also undercut the defense's argument that Mr. Fields was not capable of planning out the crimes because he suffered a manic flip at the time of the offenses. Courts readily find that there is a reasonable likelihood that the jury's judgment could have been affected when the prosecution's misrepresentations undermine the defense position. See, e.g., United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (finding Napue/Giglio error where government witness' "testimony about the statement [defendant] made

61

while being interviewed did serious damage to the duress defense .... [The defendant's] attempt to repair that damage and salvage his only defense by explaining the statement was seriously undermined by the representations [the prosecutor] made to the court and the jury – representations which [the prosecutor] later learned were false."); United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (finding Napue/Giglio error because prosecution's argument and evidence "weakened immeasurably" the defense case).

Moreover, in determining whether suppressed exculpatory evidence or false and misleading evidence is material for purposes of Brady and Napue, the cumulative effect of that evidence must be considered. See Kyles, 514 U.S. at 436 (suppressed evidence to be considered "collectively, not item-by-item"). Thus, even if a single violation does not rise to a deprivation of the right to a fair trial, the effect of all violations considered together may undermine confidence in the outcome of the trial and deprive a defendant of a fair trial. See id. at 434. Here, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

Capital counsel has an "obligation to conduct a thorough investigation" for mitigating evidence. Williams, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). A constitutionally adequate investigation must include "efforts to discover all reasonably available mitigating evidence," including information about "family and

social history." Wiggins, 539 U.S. at 524 (quoting ABA Guidelines, §§ 11.4.1(C), 11.8.6 (1989) (emphasis omitted)); accord Rompilla, 545 U.S. 380-81.

Although the defense's mitigation specialist thoroughly investigated Mr. Fields' social history, the information she gathered was never told to the jury. What passed for a social history was a disjointed presentation of random events in Mr. Fields' life that misled the jury into believing he had been raised in a typical family. The truth was far different.

Contrary to the impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. While this information would have been mitigating in its own right, it also would have helped a mental health expert explain his mental state at the time of the offenses. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life.

Trial counsel's failure to present a comprehensive social history and to argue that social history as a mitigating factor violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment.

## A.   The Incomplete and Misleading Evidence of Mr. Fields' Family Background That the Jury Heard

Nearly all of the truncated evidence the jury heard about Mr. Fields' childhood and family background came from his sister, Cherie Fields. On direct examination, trial counsel asked her

63

about relatively benign topics. Trial counsel elicited the places her family lived, *TR*, 2674-76; her fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offenses, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687. Trial counsel never asked her any questions that would have revealed the extent of family dysfunction, abuse, and emotional neglect that characterized Mr. Fields' upbringing.

Trial counsel also never asked the defense's mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction. Indeed, very little social history information made its way to Dr. Grinage and Dr. Woods. See Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005, *A – 28*, at 2; Shettles Memo Preliminary Assessment, dated September 11, 2003 ("Shettles Memo"), *A – 25*, at 2; Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005, *A – 28*, at 1. Thus, their opinions were not informed by the wealth of family and social history uncovered by the defense's mitigation specialist, Glori Shettles.

Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

**B.      Mr. Fields' Full – But Unpresented – Social History Shows Significant and Mitigating Family Dysfunction**

In reality Mr. Fields was raised in a severely dysfunctional family – a fact that never emerged from Cherie Fields' limited testimony.  His parents were themselves raised in physically and sexually violent households.  Shettles Dec., ¶ 5; Shettles Memo at 4-5, 7.  His mother suffered from depression her entire life and failed to give her children the emotional support they needed.  Shettles Dec., ¶ 5.  The problem was compounded by the fact that, when Mr. Fields' largely absentee father was around, he and Mr. Fields' mother spent most of their time together to the exclusion of the children.  Id., ¶ 6; see also Declaration of Cherie Fields ("Fields Dec."), *A* – 26, ¶ 3.  Mr. Fields' mother played him and his sister against each other, Fields Dec., ¶ 5, creating a triangle of coldness between Mr. Fields, his sister and their parents.  Shettles Dec., ¶ 6.  At the command of their mother, Mr. Fields' father whipped Mr. Fields and his sister with belts.  Id., ¶ 6.

Mr. Fields' family had lived in four different states by the time he reached high school.  Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned that the family's nomadic lifestyle made it difficult for Mr. Fields to make and keep friends and increased his sense of isolation.  As he approached his teenage years, he began exhibiting signs of chronic depression, causing others to dismiss him as lazy.  Shettles Dec., ¶¶ 8, 10.  His sister recalls that he was "getting weirder and weirder," Fields Dec., ¶ 9, and that by the time they moved to Virginia he "was sick and as strange and depressed and unpredictable as he had ever been."  Id., ¶ 7.

It is more likely than not that Mr. Fields' mental health problems have a genetic component.  Intergenerational mental health and neurological issues have plagued Mr. Fields' family, particularly on his mother's side.  Shettles Dec., ¶ 8.  His mother and his daughter have been diagnosed as

65

suffering from bipolar disorder, his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill.  Fields Dec., ¶ 8.  Mr. Fields' mother reported having brain lesions.  Shettles Memo at 2.  On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor.  Id. at 3-4.

### C.   Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present a complete and comprehensive social history of their client – including family dysfunction and other mitigating evidence – through the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert such as Dr. Woods or Dr. Grinage.  Trial counsel also were ineffective for failing to argue that Mr. Fields' social history was a mitigating factor and to provide this evidence to the defense's mental health experts to help evaluate his mental state at the time of the offenses.  As these are among the more core duties expected of capital counsel, trial counsel's failures in this regard were ineffective.  See Strickland, 466 U.S. at 687.

### 1.   Deficient Performance

Trial counsel performed deficiently by failing to present a complete social history and to argue that social history as a mitigating factor.  It is axiomatic that the development of social history evidence is crucial to an effective mitigation defense at capital sentencing.  See, e.g., Wiggins, 539 U.S. at 524 (counsel ineffective for failing to generate and present capital defendant's "social history"); Glenn, 71 F.3d at 1208 (capital counsel must fully investigate and develop "their client's social history" and are ineffective if they fail to do so); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In cases where sentencing counsel did not conduct enough investigation to formulate

an accurate profile of a defendant," counsel's representation has consistently been held "beneath professionally competent standards."). A necessary corollary is that the evidence developed must be presented at sentencing as part of a compelling narrative that helps the jury understand the "diverse frailties of humankind" that make the defendant a unique human being. Woodson v. North Carolina, 428 U.S. 280, 304 (1976). Moreover, "it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." ABA Guidelines 10.11, cmt., p. 108. None of this happened in Mr. Fields' case.

The defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. Part of the problem stemmed from trial counsel's inadequate preparation of Cherie Fields, who now acknowledges that at the time of her testimony she did not understand why it was important for the jury to hear about family dysfunction. Fields Dec., ¶ 12. According to Cherie Fields, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

The problem was far greater than just trial counsel's poor preparation of Cherie Fields, however. As Ms. Shettles, who attended the entire sentencing hearing, describes:

> [W]hile some isolated social history facts were provided to the jury, there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

To properly contextualize Mr. Fields' life, trial counsel should have called, not just Cherie

67

Fields, but a mitigation expert such as Ms. Shettles or a mental health expert such as Dr. Woods or Dr. Grinage to relate this information to the jury.  Ms. Shettles, Dr. Woods or Dr. Grinage could have developed this information into compelling mitigation themes of parental abandonment, emotional and physical abuse, family dysfunction, and mental illness.  Had trial counsel asked any of these witnesses to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields.  The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records.  All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life.  See, e.g., Shettles Dec., ¶ 11.

Moreover, Dr. Woods and Dr. Grinage should have been given this information and asked about how it affected their opinions of Mr. Fields' state of mind at the time of the offenses.   The commentary to the ABA Guidelines discusses the importance of having the meaning of a defendant's social history explained to the jury by an appropriate expert:

> Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present.  Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations.  **For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control**. Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose"

68

expert who may have insufficient knowledge or experience to testify persuasively. ABA Guidelines 10.11, cmt., p. 108-109.

Had trial counsel asked Dr. Woods and Dr. Grinage to have provided the jury with this kind of understanding, they would have done so. According to Dr. Grinage, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10. Yet Dr. Woods and Dr. Grinage were not even supplied all of the social history evidence uncovered by Ms. Shettles, much less asked to explain the significance of that evidence to the jury. Id., ¶ 10; Forensic Mental Health Evaluation, dated June 24, 2005, *A – 28*, at 2; Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005, *A – 28*, at 1.

Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and then called Cherie Fields to testified about that background. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to accomplish that result.

## 2.   Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance, "As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense

69

counsel gives the jury something to counter both the horror of the crime and the limited information

the prosecution has introduced about the defendant." Romano v. Gibson, 239 F.3d 1156, 1180 (10th

Cir. 2002). Mr. Fields' jury learned relatively little about Mr. Fields beyond what the prosecution

wanted it to know, making it more likely to vote for death.

Although trial counsel presented a few random biographical facts, TR, 3400-01, some of the

most compelling aspects of Mr. Fields' life – his upbringing in a home filled with abuse, emotional

deprivation and dysfunction – were never coherently presented to the jury.[22] Moreover, because

Cherie Fields was not properly prepared to give testimony (i.e., by being informed about the purpose

of social history evidence), she "pulled her punches" and downplayed the dysfunction in her family.

The complete story – had it been told by an objective narrator with the ability to weave a compelling

narrative – would have powerfully mitigated the offenses. Had trial counsel presented that

information, there is a reasonable likelihood that the jury would have returned a verdict of life rather

than death. See Wiggins, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating

life history on the mitigating side of the scale, there is a reasonable probability that at least one juror

would have struck a different balance."); see also Bean v. Calderon, 163 F.3d 1073, 1080-81 (9th

Cir. 1998) (finding Strickland prejudice where counsel presented a family portrait in mitigation that

was an "unfocused snapshot" that failed to show abuse experienced by defendant as a child).

The prejudice Mr. Fields suffered from trial counsel's deficient performance was

compounded because the defense's meager social history presentation left the jury to conclude that

---

[22] The fact that trial counsel presented some mitigating evidence does not end the prejudice analysis under Strickland. Sears, 130 S.Ct. at 3266 ("We certainly have never held that counsel's effort to present **some** mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."); see also Williams, 529 U.S. at 398.

70

there was nothing particularly mitigating about his childhood and that he was, as the Government claimed, simply a "sociopath" who manipulated and mistreated his family.  For instance, the Government argued that Mr. Fields "abandoned" his family until he needed their help after being arrested, that he "envied his hard working, high achieving sister's success" and that he "wouldn't help his o[w]n widowed mother move halfway across this country."  *TR*, 3458-59.  Because there was no defense evidence putting Mr. Fields' family relationships into accurate context, the Government's argument had credibility with the jury.  See Anderson v. Sirmons, 476 F.3d 1131, 1146-47 (10th Cir. 2007) (finding prejudice resultant from counsel's inadequate mitigation presentation because "the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an 'evil' man.  The prosecution seized on Anderson's case in mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a 'good family' and was never abused as a child.").

### GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done."  Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Hinson, 585 F.3d 1328, 1338 & n.4 (10th Cir. 2009) (expressing the Court's concern that "the important message contained in Berger is being forgotten" and "remind[ing] all U.S. Attorney's Offices that ... [their] interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice

71

shall be done."). Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul

ones." Berger, 295 U.S. at 88.

As part of the duty to see that justice is done, the prosecutor has a special duty to avoid

improper argument to the jury:

> It is fair to say that the average jury, in a greater or lesser degree, has confidence that
> these obligations, which so plainly rest upon the prosecuting attorney, will be
> faithfully observed.  Consequently, improper suggestions, insinuations, and,
> especially, assertions of personal knowledge are apt to carry much weight against the
> accused when they should properly carry none.

Id.; see also Cargle, 317 F.3d at 1218 ("As the State's official representative prosecuting the case

on the public's behalf, the prosecuting attorney 'carries a special aura of legitimacy about him.'

Thus, 'the prosecutor's opinion carries with it the imprimatur of the Government and may induce

the jury to trust the Government's judgment rather than its own.' Further, the prosecutor's personal

'experience in criminal trials may induce the jury to accord unwarranted weight to [his opinions

regarding the defendant's guilt]. Finally, the jury might think that the prosecutor's opinion is based

on evidence beyond that presented at trial.") (citations omitted); Le v. Mullin, 311 F.3d 1002, 1018

(10th Cir. 2002) ("Like the Court in Berger, we are especially aware of the imprimatur of legitimacy

that a prosecutor's comments may have in the eyes of the jury.").

The United States Supreme Court has subjected closing arguments in capital cases to a

greater degree of scrutiny.  Caldwell v. Mississippi, 472 U.S. 320 (1985); see also Hooks v.

Workman, 606 F.3d 715, 746 n.29 (10th Cir. 2010); Douglas v. Workman, 560 F.3d 1156, 1194

(10th Cir. 2009) (stating that in death penalty cases court will "apply a heightened concern for

fairness ... where the state is prepared to take a man's life"); Lesko v. Lehman 925 F.2d 1527, 1541

(3d Cir. 1991) ("Because of the surpassing importance of the jury's penalty determination, a

72

prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices."). These principles are particularly important in the penalty phase of a capital case, where the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," Woodson, 428 U.S. at 305, and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury, Gregg, 428 U.S. at 189, together with the "highly subjective" nature of the sentencing decision, Caldwell, 472 U.S. at 340-41 n.7, require that special scrutiny be given to prosecutorial argument.

"When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Thus, a petitioner may receive relief by demonstrating that the prosecutor's improper argument "had a substantial prejudicial effect" on a specific constitutional right, without having to prove that the entire proceeding was unfair. Paxton v. Ward, 199 F.3d 1197, 1217-18 (10th Cir. 1999) (affirming grant of habeas relief where prosecutor's penalty phase argument "had a substantial prejudicial effect" on petitioner's right to present mitigating evidence); see also Cargle, 317 F.3d at 1207 ("claims of prosecutorial misconduct ... require a showing of fundamental unfairness in order to provide habeas relief, unless they involve violation of specific constitutional rights, in which case the principles governing such rights control"); Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990) ("While, ordinarily, claims of prosecutorial misconduct and other trial errors are reviewed on habeas [under the DeChristoforo fundamental fairness standard], when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair").

73

When "specific constitutional guarantees are [not] implicated, 'a prosecutor's misconduct will require reversal of ... a conviction only where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process.'" Cargle, 317 F.3d at 1220; see also Paxton, 199 F.3d at 1217 (holding that DeChristoforo fundamentally unfair standard applies to improper prosecutorial arguments that do not effectively deprive defendant of specific constitutional right); Mahorney, 917 F.2d at 472 (same).

Where individual remarks by themselves do not justify relief, their cumulative effect may do so. Cargle, 317 F.3d at 1206-07; see also id. at 1224-25 (granting penalty phase relief where "the death sentences imposed in this case were substantially influenced by cumulative error"). "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" Id. at 1206 (quoting United States v. Toles, 297 F.3d 959, 972 (10th Cir. 2002)); see also United States v. Garza, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not, we think it beyond question that the prosecutor's improper comments, taken as a whole, affected the substantial rights of the defendant").

## A.    The Government's Closing Arguments Were Rife with Improper Conduct, Denying Mr. Fields' Rights Under the Fifth and Eighth Amendments

During Mr. Fields' capital trial, the United States Attorney repeatedly struck "foul blows," crossing the line of acceptable trial advocacy into inflammatory argument and prosecutorial misconduct. The Government's improper arguments included: (a) misstating the law regarding the weighing of mitigating and aggravating circumstances so as to increase Mr. Fields' burden of persuasion and decrease that of its own, denigrating the jury's discretion to show mercy, and inviting

74

the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns; (b) vouching for its own expert witnesses while denigrating the expert witnesses presented by Mr. Fields; (c) launching *ad hominem* attacks on Mr. Fields that were irrelevant to any of the issues at trial; (d) misrepresenting the record and the testimony of witnesses; (e) making arguments without factual basis in the record; and (f) reciting Biblical scripture at length.  See *Motion*, Ground 5,  ¶¶ 175, 177-79, 182-93.  The cumulative effect of the Government's improper closing arguments was to render Mr. Fields' trial fundamentally unfair and to substantially prejudice his constitutional right to jury consideration of all relevant mitigating evidence and to the imposition of a death sentence only under a statutory process that "channel[s] the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death .'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (citations omitted).

### 1.     Improper Arguments Regarding the Weighing of Aggravating Factors and Mitigating Evidence

The Government's closing arguments "had a substantial prejudicial effect," Paxton, 199 F.3d at 1217, on Mr. Fields' specific constitutional right to jury consideration of all relevant mitigating information and to a sentence based only upon the objective, specific and reviewable standards set forth by the federal capital sentencing statute.  Id. at 1218 (affirming grant of penalty phase relief where improper prosecutorial closing argument deprived petitioner of right to present mitigating evidence).  One of the bedrock requirements of the Eighth Amendment is that a capital sentencing jury must be permitted to consider and give effect to all relevant mitigating evidence. E.g., Hitchcock, 481 U.S. at 394; Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Eddings, 455 U.S. at 110; Lockett, 438 U.S. at 605.  Another is that the sentence must be based upon a clear, reviewable

process set out by law that channels the discretion of the sentencer so that the imposition of death is not arbitrary and capricious.  Godfrey, 446 U.S. at 427-28; Maynard v. Cartwright, 486 U.S. 356; Gregg, 428 U.S. at 196.[23]   Here, the Government diminished and denigrated the jury's ability to weigh the significant mitigating evidence presented by Mr. Fields, and injected irrelevant and inflammatory societal concerns into the weighing process.

The Government misstated the law regarding one of the central aspects of the federal death penalty statutory scheme, the weighing of aggravating and mitigating factors, twice placing its burden of persuasion on Mr. Fields and incorrectly telling the jury that the mitigating factors must outweigh the aggravating factors in order to justify a sentence of life without parole.  Compare *TR*, 3463-64 ("The mitigating factors ... cannot outweigh the premeditated murder of Charlie. ...  The mitigating factors ... do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.') with 18 U.S.C. § 3593(e).  This misstatement of law was improper. Mahorney, 917 F.2d at 473 ("A misstatement of law that affirmatively negates a constitutional right or principle is often, in our view, a more serious infringement that the mere omission of a requested instruction.").

The Government also repeatedly and improperly contrasted Mr. Fields' life with the deaths of Mr. and Mrs. Chick, in order to denigrate the jury's discretion to show mercy and suggest that,

---

[23]   McCleskey v. Kemp, 481 U.S. 279, 305-6 (1987) ("[O]ur decisions since Furman have identified a constitutionally permissible range of discretion in imposing the death penalty.  First, there is a required threshold below which the death penalty cannot be imposed.  In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. ... Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty.  In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.").

76

by seeking a punishment of life without parole, Mr. Fields was acting injustly.  See TR, 3430 ("[J]ust remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003.  How much mercy was shown then?  The Defendant wants you to look at this Defendant and oh, there's a life that can be had."); TR, 3457 ("The Defendant wants to choose a sentence.  He wants to live.  Now, how unjust is that? Just what choice did he give Charles Chick?  Just what choice did he give Shirley Chick?"); TR, 3459 ("Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice.  Remember also that Charlie didn't get an opportunity to plead for his life.")  Such tactics are improper, and "[r]epeated attempts by the prosecution to contrast the living defendant with the dead victim might encourage the jury not to consider mitigating evidence, in violation of the Eighth Amendment." Le, 311 F.3d at 1002 (citing Tuilaepa v. California, 512 U.S. 967, 972 (1994)).

Additionally, the Government infringed Mr. Fields' Eighth Amendment right to a sentence of death imposed in a manner that is not arbitrary and capricious, by invoking improper societal concerns and making light of the punishment of life imprisonment without parole.  See TR, 3431 ("I can't believe they gave probation to a child molester"); TR, 3457 ("Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment.  If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation.  Don't let this Defendant be a hero to his incarcerated criminal inmates.").  Such comments were improper.  See Bland v. Sirmons, 459 F.3d 999, 1027 (10th Cir. 2006) ("We regret to observe that in death-penalty case after death-penalty case, Oklahoma prosecutors have made

77

speeches to the jury making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death.").

These instances of prosecutorial misconduct had a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited "discretion ... to extend mercy" based upon the evidence presented, Callins v. Collins, 510 U.S. 1141 (1994) (Scalia, J., concurring in the denial of certiorari),[24] and to a sentence of death that is not arbitrary and capricious because it is based upon clear, objective, reviewable standards, Godfrey, 446 U.S. at 427-28.

## 2.     Improper Arguments Regarding Mr. Fields' Mental Health

One of the central issues of Mr. Fields' capital trial was whether his mental state at the time of the offenses was mitigating – did Mr. Fields suffer from an Effexor-induced manic flip at the time of the offenses, thus substantially impairing his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law?  The Government's closing arguments included a barrage of comments designed to distort the evidence on this central issue and inflammatorily invoke the fear, emotions and passions of the jury, rendering his trial fundamentally unfair.

The Government's strategy at trial was to contest Mr. Fields' evidence of his mental illness

---

[24]  See also Penry v. Lynaugh, 492 U.S. 302, 326-27 (1989) (a capital sentencing jury must be able to give effect to feelings of mercy to the defendant arising out of the evidence in the case); Deutscher v. Whitley, 884 F.2d 1152, 1161 (9th Cir. 1989) ("The Constitution prohibits the imposition of the death penalty without adequate consideration of factors which might evoke mercy."), adopted in pertinent part by Deutscher v. Angelone, 16 F.3d 981 (9th Cir. 1994); Wilson v. Kemp, 777 F.2d 621, 624 (11th Cir. 1985) ("the validity of mercy as a sentencing consideration is an implicit underpinning of many United States Supreme Court decisions in capital cases") (citing Woodson v. North Carolina, 428 U.S. 280 (1976); Lockett v. Ohio, 438 U.S. 586 (1978));  cf. Nelson v. Nagle, 995 F.2d 1549 (11th Cir. 1993) ("mercy is an implicit sentencing consideration in many United States Supreme Court decisions in capital cases").

and Effexor-induced manic flip, and to portray him as a "manipulative," *TR*, 3450, "parasitic," id., "narcissistic," *TR*, 3459, 3460, "sociopath," *TR*, 3428, 3449, who was "unalterably and fundamentally different from most human beings," *TR,* 3455, and had planned all along to hunt and kill people.  While in its closing arguments the Government could have emphasized appropriate methods for presenting this strategy, such as its presentation of any counter-evidence or its cross-examination of Mr. Fields' witnesses, it instead chose to improperly vouch for its own expert witnesses while denigrating those presented by Mr. Fields, launch irrelevant *ad hominem* attacks on Mr. Fields, misrepresent testimony, and make arguments without factual basis in the record.

A large and crucial portion of the evidence regarding Mr. Fields' mental state, including the existence and likelihood of an Effexor-induced manic flip, was presented through the testimony of expert witnesses, and thus the credibility of these experts was a critical part of the jury's consideration of the evidence.  The Government engaged in a series of attempts to enhance the appearance of its own experts' credibility, improperly vouching for their credibility and expressing the prosecutor's personal belief in their honesty, which rendered Mr. Fields' trial fundamentally unfair.  See *Motion*, Ground 5, ¶¶ 182-83; see also United States v. Young, 470 U.S. 1, 7-8 (1985) (citing the ABA Standards for the proposition that a prosecutor may not "express his or her personal belief or opinion as to the truth or falsity of any testimony"); Douglas v. Workman, 560 F.3d 1156, 1179 (10th Cir. 2009) ("Under Young, vouching for the credibility of witnesses is equally as improper as other methods of 'offering unsolicited personal views on the evidence'"; finding that prosecutor's comments in closing argument expressing personal opinion of truthfulness of witness were error but AEDPA deference prevented grant of relief); Cargle, 317 F.3d at 1219.

The jury could reasonably infer from these comments that the prosecutors were expressing

79

their personal beliefs in the credibility of Dr. Price and Dr. Mitchell, from the repeated use of "we" to the suggestion that the Government easily found experts to support its position, a suggestion not based upon evidence of record. Such vouching for the witnesses is improper. <u>United States v. Bowie</u>, 892 F.2d 1494, 1498 (10th Cir. 1990) (stating that it is "impermissible vouching" if the prosecution "implicitly indicat[es] that information not presented to the jury supports the witness' testimony"); <u>Douglas</u>, 560 F.3d at 1179-80; <u>Cargle</u>, 317 F.3d at 1219.

The impropriety of the Government's witness vouching is emphasized by its corresponding denigration of Mr. Fields' expert witnesses. Dr. Woods and Dr. Grinage were disparaged as "high dollar shrinks," *TR*, 3452, and "hired guns," *TR*, 3429, from the "left coast," <u>id.</u>, who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion," *TR*, 3429. The Government's "left coast" – "hired gun" attack is especially improper given its falsity – Dr. Grinage was from Kansas, and like the Government's witness Dr. Mitchell, had never before testified in a capital case. Moreover, the Government's suggestion that the jury should trust expert witnesses from "our own back yard" over those from the "left coast" is a naked attempt to inflame the jury's passions and prejudice, and is antithetical to the traditional view of the federal courts as a safe harbor from "local prejudice." <u>Cf. Hertz Corp. v. Friend</u>, 130 S.Ct. 1181, 1188 (2010) (noting that basic rationale for diversity jurisdiction was to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties"); <u>City of Greenwood v. Peacock</u>, 384 U.S. 808, 836-40 (1966) (Douglas, J., dissenting) (discussing history of provision of federal forum to protect against "local passions and prejudices").

In addition to this improper vouching and unprofessional name-calling, the Government grossly misrepresented the testimony of Dr. Woods, Dr. Grinage and other witnesses on several

factual issues critical to the assessment of Mr. Fields' mental state. First, the Government contended that Mr. Fields had previously used the ghillie suit to sneak up on other people in practice for eventually killing the Chicks, and that this undermined Mr. Fields' contention that he killed the Chicks in an Effexor-induced manic state. Instead of relying on any evidence in the record of this contention, the Government chose to twist the testimony to falsely support its position. The Government argued that Dr. Woods and Dr. Grinage testified that they were unaware that Mr. Fields had used the ghillie suit to sneak up on other people, an argument that is false and flatly contradicted by the record.[25] Additionally, the prosecution misrepresented the testimony of lay witness Daniel Love, see *Motion*, Ground 5, ¶ 190, painting Mr. Fields in a far worse light than the evidence indicated.[26] Such misrepresentations were error, and are of special concern "given the weight with which jurors generally view a prosecutor's remarks." Le, 311 F.3d at 1020 ("Since jurors usually have no access to the testimonial record during deliberation, the risk that the prosecutor's characterization would be remembered in lieu of the correct statement ... is increased.").

Second, the Government repeatedly and falsely claimed that Mr. Fields was diagnosed as a sociopath by doctors hired by the defense, in order to elicit fear of Mr. Fields and to undermine the true diagnosis of bipolar disorder that was made by defense expert witnesses. See *Motion*,

---

[25] Dr. Woods testified that he "was aware" that Mr. Fields had admitted to doing so, *TR*, 3024, and Dr. Grinage was never questioned about the issue, by the Government or otherwise.

[26] Mr. Love's actually testimony suggests that Mr. Fields was upset by what Mr. Love said, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. *TR*, 3409. The Government also elicited from Carol Lamb that Mr. Fields said, "You don't want to know" when she asked him why he was ghillieing his rifle. *Tr.* 2340. Neither the Government nor trial counsel elicited from Ms. Lamb that, according to her statement to the OSBI, Mr. Fields often refused to tell her things. See OSBI Transcript of Interview of Carol Lamb dated 7/18/03 at 18.

81

Ground 5, ¶ 186. The prosecution's attempts to elicit any testimony to support this statement were met with failure, and the record contradicts the Government's assertions. See id. Dr. Grinage denied that Mr. Fields exhibited any such traits, *TR*, 2841-46, and Dr. Woods was never cross-examined on the subject. The Government also sought to elicit an alleged diagnosis through a lay witness, see *Motion*, Ground 5, ¶ 186 n. 29, but was unable to do so. *TR,* 3086. The allegation that Mr. Fields was a sociopath was particularly harmful by itself, see, e.g., Walbey v. Quarterman, 309 Fed. App'x 795, 804, 806 (5th Cir. 2009) (observing that antisocial personality disorder was "an aggravating diagnosis"; concluding that if trial counsel's investigation and preparation had not been deficient, "he could have offered a rebuttal to [the prosecution]'s argument that [petitioner] is a sociopath"; and granting relief on that basis), but coupled with the assertion that his own doctors believed him to be a sociopath, it was devastating. Given that the jury views a prosecutor as "'carr[ying] a special aura of legitimacy about him,'" Cargle, 317 F.3d at 1218, these misstatements of fact were "apt to carry much weight against [Mr. Fields] when they should properly carry none." Berger, 295 U.S. at 88.

### 3.    Improper Arguments Designed to Inflame the Passions and Prejudices of the Jury

The Government's closing arguments also sought to invoke the fear and inflame the passions of the jury, by concocting prejudicial theories without factual basis in the record and engaging in a series of *ad hominem* attacks on Mr. Fields.

The Government contended that the killing of the Chicks was not caused by an Effexor-induced manic flip but rather was the act of a sniper after a year's worth of practice and preparation, starting with Mr. Fields' construction of the ghillie suit and his hunting of squirrels, and culminating with his using the Winding Stair Campgrounds to scout potential victims. See *Motion*, Ground 5,

¶¶ 187, 191. The Government's story that Mr. Fields "had mastered his craft, he had practiced with squirrels, and now he was moving to humans," *TR*, 3414, was a flight of fancy worthy of a horror film and completely without factual support in the record. The undisputed testimony at trial was that Mr. Fields' purpose in making the ghillie suit was to use it for hunting squirrels, and nothing more.[27] See *Motion*, Ground 5, ¶ 188. Indeed, the testimony reflected that Mr. Fields was prepared to abandon the ghillie suit weeks before the offenses. *TR*, 2656-57. Moreover, there was absolutely no evidence to support the argument that Mr. Fields "[k]ept track of when people are [at the campground], who's staying there, when they're staying there, what the habits are." *TR*, 3410. The Government further engaged in abject speculation, coupling this theory of calculating and escalating violence with an equally unfounded description of the death of Mrs. Chick, claiming that "she was begging and pleading for her life" and that "this was not ... a silent murder," *TR*, 3417, 3462, although there was no evidence of record from which this could have even been a reasonable inference. The Government's highly speculative and misleading storytelling was calculated to scare and inflame the passions of the jury.

To complement the scary story the Government sought to tell in its closing arguments, the prosecutors launched a series of irrelevant, *ad hominem* attacks on Mr. Fields, inviting the jury to sentence Mr. Fields to death, not because any of the noticed aggravating factors were proven, but because he was a fundamentally bad person. See, e.g., *TR*, 3450 ("He lied. He was trying – manipulative, a con artist."); *TR*, 3450 ("And was financially irresponsible, parasitic and

---

[27] The Government suggested that Mr. Fields' best friend and hunting partner, Daniel Presley, said that Mr. Fields' ghillie suit and rifle were unnecessary for squirrel hunting. Mr. Presley provided no such testimony, and he disavows any suggestion that the Government's arguments correctly interpreted his testimony. See *Motion*, Ground 5, ¶ 189.

promiscuous.”); *TR*, 3455 (“The Defendant is unalterably and fundamentally different from most human beings.’); *TR*, 3459 (“Selfish. Selfish. Narcissistic.”); *TR*, 3465 (“That tells you who the Defendant will chose to be near. A child abuser.’); *Motion*, Ground 5, ¶ 185. The prosecutors’ statements were not relevant to any of the aggravating factors properly noticed,[28] nor were they proper rebuttal of any of mitigating evidence presented.[29]

Just as a prosecutor may not use closing argument to inflame the passions and prejudices of the jury, see Young, 470 U.S. at 8 n.5, here, the Government used scary stories and personal attacks to do just so.

### 4. Improper Invocation of Biblical Authority in Support of a Sentence of Death

The Government concluded its closing arguments by relating the well-known “writing on the wall” sermon from the Book of Daniel, and then argued that Mr. Fields similarly should be weighed and found wanting. *TR*, 3466-67 (“[T]he prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed.”). This appeal to religious authority was improper. Sandoval v. Calderon, 241 F.3d 765, 777 (9th Cir. 2001) (observing that “religious arguments have been condemned by virtually every federal and state court to consider their challenge” and citing cases); Cunningham v. Zant, 928 F.2d 1006, 1020 (11th Cir.

---

[28] The noticed aggravating factors were substantial planning and premeditation to cause the death of both Mr. and Mrs. Chick, multiple intentional killings in a single episode, future dangerousness, permanent loss to the family, friends and community of Mr. and Mrs. Chick, and the infliction of mental anguish upon Mrs. Chick before her death.

[29] Even if these comments were considered to be proper rebuttal – which they should not – no cautionary instruction was given to limit their consideration as rebuttal only. Without such limitation, it would swallow whole the statutory provision that a death sentence be based only upon the aggravating factors noticed and proven at trial. See 18 U.S.C. § 3593(c), (d).

1991) (finding prosecutor's appeals to religious beliefs, including comparison of defendant and

Judas Iscariot, to be improper).

Not only was the Government's extended recitation of scripture intended to inflame the

passions of the jury, it also substantially prejudiced Mr. Fields' right to a sentence of death imposed

only under the dictates of the Eighth Amendment. "In a capital case like this one, the prosecution's

invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that

the death penalty may be constitutionally imposed only when the jury makes findings under a

sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching

a verdict." Sandoval, 241 F.3d at 776 (citing Godfrey, 446 U.S. at 428).

> **B.      Individually and Cumulatively, These Errors Rendered Mr. Fields' Trial Fundamentally Unfair and Substantially Prejudiced his Eighth Amendment Rights to Individualized Sentencing and a Death Sentence That is not Arbitrary and Capricious**

Although many of the prosecutors' comments were sufficiently egregious on their own to

warrant relief, the cumulative effect of the prosecutorial misconduct throughout the Government's

closing argument was to deny Mr. Fields a fair trial in violation of his right to due process of law,

and to substantially prejudice his right to a fair and reliable sentencing proceedings in comport with

the specific dictates of the Eighth Amendment.

Unlike the instances in which courts have found prosecutors' comments to be improper but

did not render the trial fundamentally unfair, see, e.g., Le, 311 F.3d at 1020 (finding prosecutor's

misrepresentation of testimony to be error, but denying relief because of overwhelming evidence

of guilt and in support of aggravating factors), the Government's case here for death was not

overwhelming. Mr. Fields presented a significant case for life, including the hotly contested

testimony of a forensic psychiatrist and a neuropsychiatrist, as well as seven lay witnesses, and

85

elicited mitigating information from a number of witnesses presented by the Government. See, e.g., TR, 2361-65 (cross-examination of Carol Lamb); TR, 2398-2406 (cross-examination of Daniel Presley); TR, 2471-73, 2474-76 (cross-examination of Marilyn Presley); TR, 2492-94 (cross-examination of Daniel Love); TR, 2597-61 (cross-examination of Michelle Bond). The jury found seventeen mitigating factors to be present, although these factors were based largely upon uncontested fact, e.g., his cooperation with authorities, confession and guilty plea; his prior service in the Navy; his lack of criminal history.

The mitigating factors not found by the jury – indeed, the core of Mr. Fields' defense – were the factors most likely to have been affected by the Government's misconduct in its closing arguments. The rejected mitigating factors focused on Mr. Fields' mental state at the time of the offenses, and his mental health in general: (1) his capacity to appreciate the wrongfulness of his conduct and conform his conduct to the law was significantly impaired; (2) he committed the offenses under severe mental or emotional disturbance; (3) he expressed remorse for the crimes; and (4) he will not present a future danger to society by being imprisoned for life without possibility of relief. The issues raised by these factors were precisely the subject of the Government's improper conduct – its argument that Mr. Fields was a "sociopath" and did not experience an Effexor-induced manic flip; its vouching for the credibility of Government expert witnesses who minimized Mr. Fields' mental health problems and disparagement of those defense experts who supported the mitigating circumstances; its personal attacks presenting Mr. Fields as an unrepentant "con artist" who engaged in "ploys," and "selfish[ly]" and "narcissistic[ally]" "put all of us here"; its bolstering of its claim that Mr. Fields did not commit these offenses under a mental disturbance, but instead planned them for over a year, with misstatements of the record and speculation.

Moreover, the Government's closing arguments skewed the jury's sentencing determination

86

by encouraging the jury to underweigh and ignore the mitigation it did find. Its improper comments increased Mr. Fields' burden with respect to the mitigating factors, telling the jury that the evidence in mitigation must outweigh the aggravating factors. Furthermore, it employed tactics that courts have condemned as attempts to convince the jury to ignore mitigation altogether. See Le, 311 F.3d at 1002 (criticizing prosecutor's repeated contrast of living defendant and dead victim); Bland, 459 F.3d at 1027 (criticizing prosecutorial "speeches to the jury making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death."); Sandoval, 241 F.3d at 777 (noting widespread condemnation of religious arguments).

Mr. Fields' claim is not based upon a few isolated comments, but rather a pattern of argument designed to impede his rights, and to improperly influence and inflame the jury with misstatements of law and of the record, factually unsupported arguments, name-calling and personal attacks. Moreover, these instances of misconduct were committed by both attorneys who delivered closing arguments for the Government, with the improper themes repeated in both the opening and rebuttal arguments.

Trial counsel objected to two comments – the Government's misstatement of law that the mitigating factors must outweigh the aggravating factors to justify a life sentence, and the comment that Mr. Fields' "own doctors are saying, yeah, he has the traits of a sociopath" – and this Court overruled both objections, despite the impropriety of the comments.[30] "The official imprimatur thereby placed upon the prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury." Mahorney, 917 F.2d at 473; see also Mann v. Dugger, 844 F.2d

---

[30] The Court overruled the objection to the comment about Mr. Fields' doctors, despite previously sustaining an objection to the Government's question to Mrs. Presley on that very subject. *TR*, 3086.

87

1446, 1457 (11th Cir. 1988) ("When a trial court does not correct misleading [prosecutorial] comments ... the state has violated the defendant's ... rights because the court has given the state imprimatur to those comments; the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law.").  No curative instructions were given, despite the request of defense counsel to have the Court reread its initial instruction on the weighing of aggravating and mitigating factors.  *TR*, 3473.

Given that this was a close case, in which Mr. Fields presented a significant case for life and the jury found mitigation to exist, it is more likely that these errors had an effect.  See Strickland, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.")  Individually and cumulatively, the Government's improper arguments in closing rendered the trial fundamentally unfair, and denied Mr. Fields his rights to due process, to jury consideration of mitigating evidence, and to a death sentence that is not arbitrary and capricious.

> **C.      Trial Counsel Were Ineffective for Failure to Object and Preserve These Issues at Trial, and Appellate Counsel Were Ineffective for Failure to Raise These Instances of Prosecutorial Misconduct on Appeal**

Other than in the two instances noted above, trial counsel's failure to object to these unconstitutional instances of prosecutorial misconduct or to request a limiting instruction, and appellate counsel's failure to raise these issues on appeal, denied Petitioner his right to effective assistance of counsel.[31]  Strickland, 466 U.S. 668.  As discussed, the Government made a wide range of impermissible comments throughout its closing, and properly made objections would have been

---

[31]  Appellate counsel denied Mr. Fields his right to effective assistance of counsel by failing to raise on direct appeal the two issues preserved by trial counsel, and by failing to raise the other instances of improper prosecutorial argument under the plain error standard.

88

meritorious.

### 1.  Deficient Performance

Effective counsel do not fail to make meritorious objections.  See, e.g., Kimmelman v. Morrison, 477 U.S. 365 (1986) (counsel's failure to file timely motion to suppress evidence was deficient performance); Claudio v. Scully, 982 F.2d 798, 805-06 (2d Cir. 1992) (appellate counsel ineffective for failing to challenge admission of statement on potentially meritorious state constitutional grounds); Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir. 1979) (failure to raise objection and move for a mistrial on the basis of state law error constituted ineffective assistance of counsel); Wade v. White, 368 F. Supp. 2d 695 (E.D. Mich. 2005) (ineffective assistance of counsel for failure to object to inadmissible irrelevant testimony that was detrimental to the defense); see also ABA Guideline 10.11, cmt. at 1156 "counsel should . . . object to argument that improperly minimizes the significance of mitigating evidence.").

### 2.  Prejudice

When a petitioner shows that counsel ineffectively failed to object to reversible error, he has shown prejudice.  Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (petitioner prejudiced by counsel's failure to raise valid double jeopardy defense); Mason v. Hanks, 97 F.3d 887, 892 (7th Cir. 1996) (petitioner prejudiced by counsel's failure to raise meritorious appealable issue); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (same); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987) (same).

Had trial counsel objected to the Government's numerous instances of misconduct in closing and requested cautionary instructions, the jurors would not have deliberated with the Government's misstatements of law and fact, appeals to passion and prejudice, and denigration of the constitutionally-required sentencing proceeding in their minds, but rather would have assessed

punishment based upon a clear-headed consideration of the significant mitigating evidence presented, as well as the evidence in aggravation. Had the Government's improper and inflammatory arguments been corrected, Mr. Fields' trial would not have been rendered fundamentally unfair, his rights under the Eighth Amendment would not have been substantially infringed, and there is a reasonable likelihood that at least one juror would have found that the case for life presented by Mr. Fields justified a sentence less than death. Wiggins, 539 U.S. at 537.

### GROUND SIX

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that properly applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death, rendered the resulting death sentence arbitrary and capricious, and denied Mr. Fields his right to a sentencing process in which the jury was able to give effect to his evidence in mitigation. Trial counsel not only failed to object to this unconstitutional general verdict, but in fact invited it – they requested instructions and a verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form used by the Court. United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009). Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment.

<center>90</center>

**A.      Trial Counsel Were Deficient By Requesting An Unified Weighing Process**

Trial counsel were deficient by requesting – instead of objecting to – jury instructions and a verdict form that allowed the jury to engage in an unified weighing process and render a general verdict of death.

On direct appeal, the Court of Appeals explained:

Although Fields was indicted, convicted and sentenced to death on two murder counts, the verdict form and instructions did not direct the jury to weigh the aggravating and mitigating factors relevant to each count and determine whether a death sentence was warranted for either murder.  Rather, the jury was directed to weigh all of the aggravators and mitigators in the case at once and reach a single sentencing verdict.

Specifically, the verdict form and associated instructions properly directed the jury to find those aggravators applicable to the murder of Charles Chick (substantial planning and premeditation; intentional killing of more than one person; future dangerousness; and victim impact relating to Charles) and those applicable to the murder of Shirley Chick (substantial planning and premeditation; intentional killing of more than one person; future dangerousness; victim impact relating to Shirley; and mental anguish of victim).  The mitigators, which related to the defendant and thus did not vary with the victims, were properly found generally, without reference to each murder.

At that point, instead of being told to weigh the aggravators and mitigators on each count and record the resultant sentences on separate forms, the jury was given a general form with these directions regard the "Weighing Process" and "Imposition of Sentence," respectively:

> The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death ... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer _yes below [and] record your verdict on [the general verdict form for death] ... If you do not unanimously find that a death sentence is justified, answer  no_ below, stop your deliberations [and] sign [the general verdict form for life imprisonment].
>
> * * *
>
> This is the last step in your deliberations. If you have made all of the findings necessary to make the defendant eligible for a death sentence

91

and have unanimously concluded that such a sentence is justified and that a sentence of death is therefore appropriate in this case, record your decision by collectively signing the verdict [form for death] ... and notify the court that you have reached a decision. If you do not unanimously conclude that sentence of death is justified and therefore must be imposed, sign the verdict for life imprisonment ... and notify the court that you have reached a decision.

The form specifying "that a sentence of death shall be imposed on the defendant"-without reference to any particular count-was signed by all of the jurors. The court's subsequent poll of the jurors, all of whom affirmed the verdict, was likewise unitary. **Pointing up the potential problem here, however, the Judgment and Commitment Order entered by the court reflected imposition of two separate sentences: "The defendant is hereby sentenced to Death on each of the Counts One and Three of the Indictment."**

516 F.3d at 938-39 (citations omitted).  The verdict form and instructions given to the jury were "functionally the same" as those requested by trial counsel.  Id. at 939.

Trial counsel should have objected to the unified process and instead requested that the jury consider separately and render separate verdicts for each of Count One and Count Three.  See Wicks v. Lockhart, 569 F. Supp. 549 (E.D. Ark. 1983) (concluding that reasonably competent attorney would have known that separate verdict on each count "was required in order to protect the petitioner's basic constitutional rights").[32]  ABA Guideline 10.11(k) – which was in effect at the

---

[32]  In the context of a jury's determination of guilt or innocence on a multi-count indictment or information, the law is clear that the jury must consider each count separately and render separate verdicts on each count.  See, e.g., United States v. Dunn, 564 F.2d 348, 360 (9th Cir. 1977) ("the law is uniform that ... as to multiple counts against a single defendant, each count is to be considered separately"); United States v. McGrady, 508 F.2d 13, 21 (8th Cir. 1974) ("where there are separate counts in an indictment, there must be separate verdicts by the jury as to the guilt or innocence of each defendant on each count"); Wicks v. Lockhart, 569 F. Supp. 549, 561-62 (E.D. Ark. 1983) (listing cases).  This rule is no less applicable in the context of a jury's determination of whether a defendant will be sentenced to death, where the Eighth Amendment requires heightened "reliability in the determination that death is the appropriate punishment in a specific case." Simmons v. South Carolina, 114 S.Ct. 2187, 2198 (1994) (Souter, J., concurring) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality op. of Stevens, J.)); Godfrey v. Georgia, 446 U.S. 420, 427- 28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988)).

92

time of Mr. Fields' sentencing hearing – provides that "trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence.   Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions."

The federal death penalty statute, 18 U.S.C.A. § 3591 et seq., clearly anticipates that a defendant will receive a sentence of death or life without possibility of release for each death-eligible offense, that is, each murder.  The statute repeatedly uses singular references such as "the victim," "the offense," and "the charge" that indicate an intent that a defendant be sentenced for each individual charge of murder. See, e.g., § 3591(a)(2)(A) ("intentionally killed the victim"); § 3591(a)(2)(B) ("the death of the victim"); § 3591(a)(2)(C) ("the victim died");  § 3592(a)(1) ("the charge"); § 3592(a)(2) ("the charge"); § 3592(a)(3) ("the charge"); § 3592(a)(6) ("the offense"); § 3592(c) ("an offense"); § 3592(c)(1) ("the death"); § 3592(c)(6) ("the offense" and "the victim"); § 3592(c)(9) ("the offense" and "the death of a person"); § 3592(c)(11) ("the victim"); § 3592(c)(14) ("the defendant committed the offense against ... a chief of state ... a foreign official ... a Federal public servant"); § 3593(e)(1) ("an offense"); § 3593(e)(2) ("an offense"); § 3593(e)(3) ("an offense").  Additionally, the statute makes a specific provision for when a defendant kills multiple victims – the aggravating factor for "multiple killings or attempted killings" found in § 3592(c)(16). The inclusion of this specific provision indicates that Congress, in drafting the federal death penalty statute, intended that defendants receive separate sentences for each charge of murder.  Based upon these statutory provisions, as well as the constitutional principles discussed below, trial counsel should have requested an instruction requiring separate consideration of and separate verdict forms for each of Counts One and Three.

Had the jury been properly instructed and given the appropriate verdict form requiring it to

93

return separate sentences for each count, it would have weighed five aggravating factors (two

general, and three specific to Mrs. Chick) against the seventeen mitigating factors found by the jury

in determining whether to sentence Mr. Fields to death for the murder of Mrs. Chick, and four

aggravating factors (two general, and two specific to Mr. Chick) against the seventeen mitigating

factors in determining a sentence for Mr. Chick.[33]  Instead, the unified weighing process permitted

the jury to consider all seven aggravating factors (two general, two specific to Mr. Chick, and three

specific to Mrs. Chick) together in deciding whether to sentence Mr. Fields to death or life without

parole.[34]

The erroneous unified weighing process was raised as court error on direct appeal.  The

Court of Appeals declined to review the issue, finding that trial counsel invited the error.  Fields,

516 F.3d at 939; see also id. at 940 (declining to review claim that "the two instances of the

[substantial planning] aggravator were improperly aggregated" in the unitary weighing process on

basis of invited error).  While the invited error doctrine may be an appropriate appellate basis for

denying relief on a claim of court error, it leaves open the question of whether trial counsel were

---

[33]  The three factors applying exclusively to Count 1 were the murder of Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and the infliction of mental anguish on Mrs. Chick.  The two factors applying exclusively to Count 3 were the murder of Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick. The other aggravating factors were killing more than one person in a single episode and future dangerousness.

[34]  The Court instructed the jury to find the substantial planning and victim impact aggravating factors separately for each of the Chicks.  TR, 3396, 3398-99, see also id. at 3478-80 (Special Findings Form).  These instructions would have been proper if the jury was also instructed to determine, and given a mechanism to impose, separate sentences as to each count.  Because of the jurors were asked to impose one sentence in a general verdict, however, the Court's instructions permitted the jury to consider two separate plans to kill the Chicks, even though the Government argued only that Mr. Fields had one plan to kill both in a single criminal episode, and allowed the jury to consider victim impact evidence related to the death of Mr. Chick in determining the sentence for killing Mrs. Chick, and vice versa.

94

620

ineffective for requesting and failing to object to the unitary weighing process, verdict form and instructions.  See White v. Thaler, – F.3d –, 2010 WL 2595272, at *10, *14 (5th Cir. June 30, 2010) (granting habeas relief based upon counsel's "invited error"; counsel rendered ineffective assistance by opening door for impeachment of defendant with post-arrest silence); United States v. Alferahin, 433 F.3d 1148, 1162 (9th Cir. 2006) (finding counsel ineffective where court failed to instruct jury on element of crime and counsel "declined an offer by the judge to instruct the jury on the element").

> **B.      As a Result of Trial Counsel's Deficient Request of an Unified Weighing Process, Mr. Fields' Sixth and Eighth Amendment Rights Were Violated, Rendering the Death Sentence Unconstitutional**

Mr. Fields suffered prejudice from trial counsel's deficient performance.  As a result of trial counsel's error in requesting an unitary sentencing process, the jury returned a general verdict of death which could have been based upon any one of three scenarios.  Two of those three scenarios are invalid and unconstitutional, and thus his sentence cannot stand.

The jury's verdict can be interpreted in three ways.  *First*, the jury could have, as instructed, weighed all seven aggravating factors against the evidence in mitigation, and returned a sentence of death because it determined that all seven aggravating factors substantially outweighed the mitigating factors.  *Second*, it could have weighed the aggravating factors for Count One only against the mitigating factors, and separately weighed the aggravating factors for Count Three only against the mitigating factors, and returned a sentence of death based on the determination that the aggravating factors substantially outweighed the mitigating evidence for one of the two counts. *Third*, the jury could have weighed the aggravating factors for Count One only against the mitigating factors, and separately weighed the aggravating factors for Count Three only against the mitigating factors, and determined that death was appropriate because the aggravating factors substantially

outweighed the mitigating evidence for both counts.  Only the third scenario is a constitutionally valid basis for the jury's general verdict of death.

The first scenario – in which the jury returned a general verdict of death because it believed the seven aggravating factors together substantially outweighed the evidence of mitigation – is invalid because the resulting death sentence is arbitrary.  The jury was permitted to weigh aggravating factors that were unrelated to the particular count (i.e. weighing the victim impact related to Mr. Chick in determining the sentence for the death of Mrs. Chick, or the mental anguish inflicted upon Mrs. Chick prior to her death in determining the sentence for the death of Mr. Chick), and thus the process had no "inherent restraint on the arbitrary and capricious infliction of the death sentence."  Godfrey, 446 U.S. at 428-29; see also Tuilaepa, 512 U.S. at 973 ("Eligibility factors almost of necessity require an answer to a question with a *factual nexus to the crime* or to the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'") (quoting Arave v. Creech, 507 U.S. 463, 471 (1993)).  Because the jury did not distinguish between the crimes charged in Count One (the murder of Mrs. Chick) and Count Three (the murder of Mr. Chick) in considering all seven aggravating factors, the jury did not make an "individualized determination on the basis of the character of the individual and *the circumstances of the crime*." Zant v. Stephens, 462 U.S. 862, 879 (1983); see also Eddings, 455 U.S. at 110-12; Lockett, 438 U.S. at 601-5).  This scenario is the most likely of the three, as it reflects the Court's instructions, and jurors are presumed to follow those instructions.  Penry v. Johnson, 532 U.S. 782, 799 (2001) ("Penry II").

Furthermore, this scenario allowed the jury to give undue weight to the case for death, while giving short shrift to the evidence in mitigation.  The jury could have concluded that the seven aggravating factors, considered together, substantially outweighed the evidence in mitigation.  Thus,

the case for death was given greater weight by the unitary weighing process, while the mitigating factors were effectively undercounted, skewing the jury's determination in favor of death. Additionally, because all the aggravating factors for both counts were considered together, the jury was allowed to double count the substantial planning aggravating factor, even though it is not victim-specific.[35]   United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996) (holding that the identically-worded former 21 U.S.C.A. § 848 (n)(8) was not victim-specific).  Such double counting skewed the weighing process and rendered the resulting death sentence arbitrary and unconstitutional.  Id. at 1111; see also id. at 1112 ("When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot 'assume it would have made no difference if the thumb had been removed from death's side of the scale.'") (quoting Stringer v. Black, 503 U.S. 222, 232 (1992)).  In light of the significant case for life presented by Mr. Fields, it is possible that if the jury separated the two counts, and weighed only the aggravating factors applicable to each count with the mitigating evidence, at least one juror would have concluded that on neither count did the aggravating factors substantially outweigh the mitigating factors.

The second scenario – in which the jury determines that death is appropriate for only one of the two counts – is invalid because it violates Mr. Fields' Eighth Amendment right to a "vehicle for [the jury to] express[] its 'reasoned moral response' to [mitigating] evidence in rendering its sentencing decision.'"   Penry II, 532 U.S. at 797 (quoting Penry v. Lynaugh, 492 U.S. 302, 328 (1989) ("Penry I")).  The jury did not and could not make a determination of Mr. Fields' moral culpability for each murder count because the jury had no mechanism for separating the two counts. The verdict form did not allow the jury to make a finding of death as to one count and life without

---

[35] The jury separately found the substantial planning aggravating factor to be proven for both Count One and Count Three.  However, this does not save the verdict because the jury did not separately weigh the aggravating and mitigating factors for each count.

97

possibility of release as to the other.  Such a verdict was not merely a theoretical possibility – the mental anguish aggravating factor applied only to Mrs. Chick, arguably making her death more egregious in the eyes of the jury, and thus the jury could have returned a sentence of death for the murder of Mrs. Chick only, concluding that the aggravating factors applicable to the death of Mr. Chick did not substantially outweigh the evidence in mitigation.  Thus, if the jury concluded that death was an appropriate sentence for the murder of Mrs. Chick, the jury was not "able to 'consider and *give effect to* [Mr. Fields' mitigating] evidence in imposing [a] sentence'" of life without possibility of release for the death of Mr. Chick.  Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 319) (emphasis in original) (concluding that jury instructions violated Eighth Amendment because jury had no logical and ethical mechanism for giving effect to mitigation by voting for life sentence).  Because trial counsel's actions left Mr. Fields without a vehicle for the jury to give effect to mitigating evidence, we cannot "be sure that the jury 'has treated [Mr. Fields] as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence'" for either Count One or Count Three.  Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 319 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976))); Abdul-Kabir v. Quarterman, 550 U.S. 233, 252 (2007) ("Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration.") (quoting Franklin v. Lynaugh, 487 U.S. 164, 184-85 (1988) (O'Connor, J., concurring)).

These two scenarios are unconstitutional.  Although there is one possible interpretation of the jury's general verdict of death that avoids constitutional error, this is insufficient to save the sentence. As an initial matter, the most plausible interpretation of the jury's verdict is that the jury followed the instructions given by the Court and requested by trial counsel – that the jury should

weigh all seven aggravating factors against the mitigating evidence in an unitary weighing process – and this scenario is unconstitutional.  Moreover, where a verdict "may have had a proper basis," but "'it is equally likely that the verdict … rested on an unconstitutional ground,'" a court may not choose between the proper and improper bases, and the verdict cannot stand.  <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990) (quoting <u>Bachellar v. Maryland</u>, 397 U.S. 564, 571 (1970)); <u>see</u> <u>also</u> <u>Stromberg v. California</u>, 283 U.S. 359, 368 (1931) ("It follows that instead of it being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld."); <u>cf.</u> <u>Presnell v. Georgia</u>, 439 U.S. 14 (1978) (death sentence vacated where defendant was convicted of uncharged offense, noting that due process principle of <u>Cole v.</u> <u>Arkansas</u>, 333 U.S. 196 (1948), require that appellate court review verdict based upon case actually tried before and the jury "appl[ied] with no less force at the penalty phase of a trial in a capital case").

Trial counsel's request of – and failure to object to – improper jury instructions and  verdict form placed Mr. Fields in an untenable situation in which his sentence is most likely based upon an unconstitutional unitary weighing process.  On that basis alone, his sentence cannot stand.  Additionally, given the not-inconsequential case for life presented by Mr. Fields, there is a reasonable likelihood that the jury would have returned a sentence of life on both counts if it had been properly instructed to engage in an individualized sentencing determination for each count that enabled it to give effect to the evidence in mitigation.

**GROUND SEVEN**

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

Mr. Fields' right to due process was violated because the Government withheld information that was material to his punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Banks v. Dretke, 540 U.S. 668 (2004); Strickler v. Greene, 527 U.S. 263 (1999); Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 153-56 (1972).

### A.      Effexor Pill Bottle

In the *Motion*, Mr. Fields pled alternatively that the Government failed to disclose exculpatory evidence relating to the quantity of 150 mg Effexor pills Mr. Fields ingested prior to the offense, and trial counsel were ineffective for failing to investigate, discover and present this evidence. This alternative pleading was necessary because, based upon information provided to trial counsel, it was unclear what had happened to the bottle of 150 mg Effexor pills that were initially observed in Mr. Fields' truck by Oklahoma State Bureau of Investigation Agent Iris Dalley. See *A*-29.

Documents in the possession of trial counsel indicate that, during her search of Mr. Fields' truck on July 18, 2003, Agent Dalley discovered a pill bottle in Mr. Fields' truck with the label indicating it contained a prescription for thirty (30) 150 mg Effexor pills to be taken once daily, and a "pharmacy sack label" dated July 9, 2003, for the same prescription. Id. at 3. However, subsequent inventories of the contents of the truck by the United States Forest Service and a defense investigator made no mention of the pill bottle. See *A*-30, *A*-31. Documents also in the possession

100

626

of trial counsel indicated that Mr. Fields was administered 150 mg Effexor pills while in custody at the Muskogee County Detention Center.  Med Sheet July 3, *SA-1*; Med Sheet Aug 3,  *SA-2*.

In its response to Mr. Fields' *Motion for Non-Dispositive Omnibus Relief*, the Government informed Mr. Fields **for the first time** that the Effexor he was administered at the Muskogee County Detention Center **was from the bottle of Effexor pills found in his truck**. Docket #6, at 7. According to the Government's response, "the FBI has represented to the government's counsel that it delivered the bottle to the jail where Fields was held before trial, so that he could continue to take the medicine."  Id.

The Government's admission is significant in two respects.  First, it establishes that the FBI was in possession of the pill bottle.[36]  Second, this admission, combined with information on the "Med Sheet" from the Muskogee County Detention Center, demonstrates that when the FBI turned the pill bottle over to the jail, it was half empty.  The "Med Sheet" for July, 2003 indicates that Mr. Fields received his first 150 mg dosage of Effexor at the jail on July 19, 2003, the day after he was arrested. *SA-1*.  All tolled, Mr. Fields was administered fourteen 150 mg pills while at the jail before his prescription ran out.   The "Med Sheet" for August, 2003 indicates that Mr. Fields was administered his last 150 mg Effexor pill on August 5, 2003, and that the prescription was not refilled. *SA-2*.  The "Med Sheet" also indicates that the prescription was discontinued on August 12, 2003, a date on which Mr. Fields saw a doctor.  Email from Kim Shamblin of the Muskogee County Sheriff's Office to Aimee Karnes of the United States Marshal Service dated June 11, 2010,

---

[36]  To the extent this information was in the knowledge and possession of the FBI, the Government is charged with this knowledge.  A prosecutor is responsible for disclosing "any favorable evidence known to the others acting on the government's behalf, including the police." Kyles v. Whitley, 514 U.S. 419, 437, 438 (1995); see also Giglio v. United States, 405 U.S. 150, 154 (1972).

101

*SA-3*. Fourteen pills were administered at the jail out of a prescription for thirty,[37] and thus it would have been a highly reasonable inference for the jury to have drawn that he consumed sixteen pills between July 9, when the prescription was filled, and July 18, when he was arrested and the pill bottle was seen in his truck.

The Government's recent admission regarding the disposition of the bottle of 150 mg Effexor pills is material because it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435; see also Bell v. Cone, 129 S. Ct. 1769, 1783 (2009) (same). At trial, counsel pursued the theory that the increased 150 mg Effexor dosage prescribed to Mr. Fields on July 7, 2003 caused Mr. Fields to suffer a manic flip that substantially impaired his capacity to conform his conduct to the law and. The Government countered this theory by eliciting from Mr. Fields' expert witnesses that there was no evidence that Mr. Fields took the increased dosage prior to the killings of Mr. and Mrs. Chick.[38] The Government

---

[37] The fourteen pills had to have come from Mr. Fields' pill bottle, because he did not see a doctor at the prison regarding his mental health until July 24, 2003, five days after the jail began administering 150 mg Effexor pills to Mr. Fields. SA-3.

[38] Dr. Grinage was questioned as follows:

Q    How do we know if he took any of those 150 milligram pills?
A    He may not have.
Q    He may then have been operating on July 10 under the same dosage that he had been carrying and taking for a period of time prior to that, correct?
A    Well, yeah, clinically speaking. …
Q    But, he was taking the same dosage on July 10, assuming he was taking it, as he was on July 9, wasn't he?
A    If he filled it on July 9th he may have been taking it on July 10th. I can't answer that with any degree of accuracy.
                              * * *
Q    And you don't know exactly when the Defendant took Effexor on July 8, 9 or 10 or in what dosages or amounts, do you?
A    My understanding is that he was on 75 milligrams as documented by the records up until the 7th of July when he was prescribed 150 milligrams.
Q    My question to you, Doctor, is you don't know how much and when he took

102

also questioned Dr. Woods regarding the absence of any evidence that Mr. Fields took the increased

dosage of Effexor.[39]

The Government's admission demonstrates the FBI delivered a half-empty bottle of 150 mg

Effexor pills to the jail.  This undisclosed fact would have impeached the Government's suggestion

in its cross-examination of Drs. Grinage and Woods that there was no indication that Mr. Fields had

taken any of the increased dosage.  This fact leads to the highly likely inference that Mr. Fields took

the increased dosage, and in fact, took much more of the increased dosage than prescribed in the ten

---

> Effexor, do you?
>
> A    I can only testify to the records that I have read.
>
> Q    That's nowhere in the record.  Or is there any record that reflects how much Effexor he took on July 8th, 9 or 10?
>
> A    I think it is generally perceived that if you are prescribed the medication, then you take it.  In this case that may have not been.  I can only go by what I read in the records.

*TR*, 2837-38, 2868-69.

[39]  Dr. Woods was questioned as follows:

> Q    Are you aware that there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage?
>
> A    Yes.
>
> Q    Are you aware that in his truck there were still blister packs of the old dosage?
>
> A    Yes.
>
>                 * * *
>
> Q    How do you know other than what the Defendant said when he took what medication in July 2003?
>
> A    I have no indication to say that he was not taking the medication, nor do I have an indication to say that he was taking it. …
>
> Q    If there were blister packs yet in his truck that were unused, it would indicate, certainly, that he had not used the medication that had previously been dispensed, wouldn't it?
>
> A    Not used all of the medication.
>
> Q    Yes, sir. …

*TR*, 3029-30, 3060-61.

<div align="center">103</div>

days from when he filled the prescription until he was arrested.[40]   This is at a minimum circumstantial evidence that Mr. Fields took the prescribed 150 mg dosage, and possibly more, on July 9 and July 10.  Furthermore, the fact that Mr. Fields took more pills than he was prescribed (sixteen in ten days) indicates that at the time of the crimes and in the days immediately after he may have taken additional pills because his mental state was deteriorating.  Thus, the undisclosed information regarding the FBI's possession and disposition of the pill bottle "strengthens the inference that [Mr. Fields] was impaired by [his mental illness] around the time his crimes were committed."  Cone, 129 S. Ct. at 1783 (concluding that prosecution's suppression of information regarding defendant's drug addiction violated Brady because the information was material as to mitigating factor that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of law was impaired).   The best evidence to rebut the Government's claims – that the OSBI found and the FBI possessed Mr. Fields' **half-empty** bottle of 150 mg Effexor pills – was withheld by the Government.

Had the jury been aware that Mr. Fields' pill bottle was found half-empty on July 18, it could have reasonably inferred that Mr. Fields took the increased dosage of Effexor prior to killing Mr. and Mrs. Chick, and that his mental state was deteriorating at and around the time of the crimes. With these inferences in hand, there is a reasonable likelihood that at least one juror would have found the substantially impaired capacity mitigating factor to be present and concluded that the aggravating factors did not substantially outweigh this evidence in mitigation.  Thus, there is a reasonable probability that, had the Government disclosed the suppressed information regarding the half-empty pill bottle, "the result of [Mr. Fields' sentencing] proceeding would have been different."

---

[40] The prescription called for Mr. Fields to take one pill daily for thirty days.  In the ten days spanning July 9 through July 18, Mr. Fields consumed sixteen pills.

104

Cone, 129 S. Ct. at 1783 (citing United States v. Bagley, 473 U.S. 667, 682 (1985)).

Additionally, the Government's line of questioning in the cross-examinations of Drs. Grinage and Woods violated Mr. Fields' right to due process as set forth in Napue v. Illinois, U.S. 264 (1959). "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id. at 269. Reversal is required whether the prosecution **knew or should have known** that the testimony was false. United States v. Agurs, 427 U.S. 97, 103 (1976) (defendant entitled to new trial where prosecution "knew or should have known" that its witness testified falsely); Jackson v. Brown, 513 F.3d 1057, 1075 (9th Cir. 2006) ("Napue applies whenever a prosecution 'knew or should have known that the testimony was false'"); United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994) (use of false testimony violates due process 'regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected"). Here, the Government elicited testimony from Drs. Grinage and Woods that it knew or should have known was false, because it possessed information regarding the pill bottle that the defense witnesses did not.

Under Napue, Mr. Fields must demonstrate only that "there is **any reasonable likelihood** that the false testimony **could have affected** the judgment of the jury." Agurs, 427 U.S. at 103; Napue, 360 U.S. at 271. Again, for the reasons that this information was material under Brady, Mr. Fields meets this comparatively more lenient standard.

To the extent that trial counsel should have deduced that the pill bottle was half-empty from the Muskogee County Detention Center records in their possession and without the Government's admission, trial counsel was ineffective for failing to do so. See O'Connell Dec., A-1, ¶ 20. For the

<div align="center">105</div>

same reasons that this evidence is material, trial counsel's failure to present to the jury that the pill bottle was found half-empty was prejudicial.

### B.      Emails and Documents from Mr. Fields' Computers

In response to the *Motion for Non-Dispositive Omnibus Relief*, the Government provided counsel with copies of the images of the hard drives of two computers used by Mr. Fields. Counsel has submitted these imaged hard drives to a forensic computer expert for data extraction and analysis. Given the volume of the data on the two imaged hard drives, Mr. Fields' expert was not able to complete her work in time for the filing of this memorandum, and thus counsel has been unable to review any material from the imaged hard drives. Counsel will file a supplementary memorandum on this aspect of Ground Seven promptly should the analysis reveal evidence helpful to his cause.

### GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING.

Each of the claims presented herein individually entitles Mr. Fields to relief from his sentence of death. However, even if this Court finds that Mr. Fields is not entitled to relief on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair capital sentencing proceeding and the heightened procedural safeguards constitutionally required in capital cases.

Courts have long recognized that all kinds of claims of constitutional error are to be considered both individually and cumulatively, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of the individual errors warrants relief. See, e.g., Kyles, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of

exculpatory evidence undermined fairness of trial and entitled defendant to relief); Taylor v. Kentucky, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); Cargle, 317 F.3d at 1224-25 (habeas relief warranted based upon cumulative errors during guilt and penalty phases; at penalty phase prosecutor engaged in improper argument and improper victim impact evidence was presented).[41]

If the court finds cumulative error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency. See Cargle, 317 F.3d at 1223 (declining to decide issue of whether prosecutor's improper argument was so prejudicial as to render penalty-phase proceedings fundamentally unfair because "when considered with the other errors at the sentencing stage, we have no difficulty finding cumulative error"); Mak, 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [relief]"). Moreover, if the court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. Glenn, 71 F.3d at 1211 (quoting O'Neal v. McAninch, 115 S. Ct. 992, 994 (1995)).

---

[41] See also Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991) (cumulative prejudicial effect of prosecutor's penalty phase remarks entitled petitioner to new sentencing hearing, even if individually the remarks may not have been sufficiently prejudicial to warrant relief); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); Harris v. Wood, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992) (granting relief for cumulative effect of errors including counsel's failure to present mitigating evidence, court's refusal to admit exculpatory evidence and improper sentencing-stage instructions); Kubat v. Thieret, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; Strickland "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced").

The circumstances of this case demonstrate that the cumulative effect of counsel's deficient penalty phase representation, and the constitutional errors committed by the Court and the Government, so undermined the fairness of the sentencing proceedings that Mr. Fields's sentence of death should be vacated.  Mr. Fields was denied his opportunity to present significant mitigation to the jury and to rebut the Government's evidence of the aggravating factors, while at the same time the jury was allowed to consider unfettered false and misleading testimony presented in support of the aggravating factors, and the Government's improper and prejudicial comments in its closing arguments.  The verdict slip and instructions – which permitted the jury to enter a general verdict of death, rather than separately sentencing him on each count of murder – resulted in the jury double-counting the aggravating factors while depriving Mr. Fields of his right to have the jury give effect to the mitigating evidence he presented.  These errors significantly weakened Mr. Fields's case in favor of life while bolstering the Government's position in favor of death.  Where the combined effort of individual errors renders a defense "'far less persuasive that it might [otherwise] have been,' the resulting conviction violates due process."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (quoting Chambers, 410 U.S. at 294, 302-3 (granting habeas relief based upon cumulative prejudice from wrongful admission of testimony of prosecution witness and wrongful exclusion of portion of defense witness testimony because errors "left the jury with only half the picture").

Collectively and cumulatively, these errors denied Mr. Fields his rights to due process of law and his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution and require that he be afforded a new sentencing hearing.

108

Case 6:10-cv-00115-RAW   Document 14   Filed 07/30/10   Page 124 of 126
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 635

635

**GROUND NINE**

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MR. FIELDS'
EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.**

In the *Motion*, Mr. Fields alleged that the manner in which the Government would carry out his execution by lethal injection would violate the Eighth Amendment.  He also pled that the litigation of this claim was not appropriate in at this time, and that he raised the claim in the *Motion* in order to avoid a later allegation that the claim was waived.

Mr. Fields stands by those suggestions as to why the so-called lethal injection claim ought not be litigated in this context at this time.  Should the Court or the Government have a different view of this Ground, Mr. Fields will pursue it as directed.

## CONCLUSION

For all of the above reasons, those set forth in the *Motion*, and based upon the entire record of these proceedings, Mr. Fields respectfully requests that the Court grant the relief sought in the *Motion*.

Respectfully Submitted,

/s/Michael Wiseman

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Dated:  July 30, 2010
         Philadelphia, PA

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 30th day of July, 2010, the foregoing document was electronically filed and is available for viewing and downloading through the ECF system.

/s/ Michael Wiseman

Michael Wiseman

# SA-1

July 3

| MEDICATION | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Effexor 150mg ℺ PO AM QOD | 9 | | | | | | | | | | | | | | | | | | | S | R | K | S | S | R | K | S | / | R | / | m | m |
| Cefadroxil 500mg ℺ PO BID | 9 HS | | | | | | | | | | | | | | | | | | | | | | | | / R | S m | M m | K R | R K | m m | m m | |
| Lexapro 20 mg ℺ PO AM | 9 | | | | | | | | | | | | | | | | | | | | | | | | | | | m | K | R | m | m |
| Risperidol 1 mg ℺ PO HS | HS | | | | | | | | | | | | | | | | | | | | | | | | | m | m | M | K | K | m | m |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

DR:

NAME

Fields Edward

1 2 3 4 5 (DET.) S. DET. CO. (FED.) BOP WRIT ALLERGIES

6 7 8 9 10 N.DET. JUV. CITY DOC CNMS HOLD

Case 6:10-cv-00115-RAW Document 14-1 Filed 07/30/10 Page 2 of 7
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 639

640

# SA-2

Case 6:10-cv-00115-RAW Document 14-1 Filed 07/30/10 Page 4 of 7
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 641

Aug 3

MED S'

| MEDICATION | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EFFexor 150 mg 1-PO QOD | 9 | R | m | R | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lexapro 90 mg 1-PO AM | 9 | R | R | m | m | R | m | S | m | R | m | S | m | R | | | | | | | | | | | | | | | | | | |
| Risperidol 1 mg 2-PO HS | HS | R | R | m | R | m | R | m | S | R | R | m | S | R | | | | | | | | | | | | | | | | | | |
| Cefadroxil 500mg 1-PO bid NO Refill | 9 HS | R R R | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lithium 300 mg 2-PO Bid | 9 HS | | | | | | | | S | m | R | m | S | m | R | | | | | | | | | | | | | | | | | |

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

DR: B   1 2 3 4 5 DET S. DET.   CO. FED BOP   WRIT   ALLERGIES

NAME   6 7 8 9 10 N.DET. JUV.   CITY DOC CNMS HOLD

Case 6:10-cv-00115-RAW   Document 14-1   Filed 07/30/10   Page 5 of 7
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 642

642

# SA-3

06/11/2010  11:31  9186872526      US MARSHALS MKOR                PAGE 01/02

Case 6:10-cv-00115-RAW   Document 14-1   Filed 07/30/10   Page 6 of 7
Appellate Case: 17-7051   Document: 28   Date Filed: 06/16/2017   Page: 643



# UNITED STATES MARSHALS SERVICE
## Eastern District of Oklahoma
111 North 5th Street
U.S. Courthouse, Room 136
P.O. Box 738
Muskogee, Oklahoma 74402
Office: (918) 687-2335, Facsimile: (918) 687-2526

| | |
|---|---|
| To: | Scott |
| From: | Aimee Karnes – Criminal Program Specialist |
| Fax #: | 681-6525 |
| Date: | June 11, 2010 |

Number of pages ___2___ including cover sheet

Comments:

WARNING: Information attached to this cover sheet is U.S. Government property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of the information is prohibited (18 USC 641). Please notify the originator or local USMS office immediately to arrange for proper disposition.

NOTE: THIS FAX COVER PAGE SOULD NOT BE USED TO FAX CLASSIFIED INFORMATION

PRECEDENCE: ☐ IMMEDIATE  ☐ PRIORITY  ☐ ROUTINE

CLASSIFICATION: ☐ SENSITIVE  ☐ NON-SENSITIVE

Case 6:10-cv-00115-RAW   Document 14-1   Filed 07/30/10   Page 7 of 7

06/11/2010  13:31   9186872526   Appellate Case: 17-7031   Document: 28-1   US MARSHAL E70K   Date Filed: 06/16/2017   Page: 644   PAGE  02/02

Page 1 of 1

## Karnes, Aimee (USMS)

**From:** Kim Shamblin [kshamblin@muskogeeso.org]
**Sent:** Friday, June 11, 2010 12:05 PM
**To:** Karnes, Aimee (USMS)

Aimee,

Here is the info on Mr. Fields.
We ordered the following for him:

| | | |
|---|---|---|
| Duricef | 07-23-03 | |
| | | |
| Lexapro | 07-25-03 | #30 |
| Risperidone | 07-25-03 | #30 |
| | | |
| Lexapro | 08-04-03 | #30 |
| Risperidone | 08-04-03 | #30 |
| | | |
| Lithium Carb | 08-06-03 | #30 |

He saw the Dr. on these dates.

07-24-03
07-29-03
08-12-03

Let me know if you need anything else.

Thanks,
Kym

6/11/2010

Case 6:10-cv-00115-RAW Document 16 Filed 09/28/10 Page 1 of 123
Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 645

645

## fIN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

EDWARD LEON FIELDS, JR.      §

     §

     Movant,      §

     §      Case No. CV-10-00115-RAW

v.      §      Criminal Case No. CR-03-73-RAW

     §

UNITED STATES OF AMERICA      §

     §

     Respondent.      §

## GOVERNMENT'S ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

### (Answer Under 28 U.S.C. § 2255)

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100

JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 337
Washington, D.C. 20530
Tel: (202) 305-8910

# TABLE OF CONTENTS

PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FIELDS'S CONTENTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL
      JUDGMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.  Cognizable Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.  Time Barred Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.  Procedurally Defaulted Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.  Claims Previously Adjudicated on Direct Appeal. . . . . . . . . . . . . . . . . . . . . 8

      E.  New Rule of Criminal Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      F.  Harmless Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

THE GOVERNMENT'S ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      I.  COUNSEL PROVIDED COMPETENT REPRESENTATION IN PRESENTING
           AND ARGUING MENTAL HEALTH EVIDENCE. . . . . . . . . . . . . . . . . . . 9
        A.  Counsel's Mental Health Advocacy and the Jury's Verdict. . . . . . . . . . . . . 11
           1.  Trial Counsel Adequately Argued the Case in Mitigation. . . . . . . . . 12
           2.  The Jury Rejection of Mental Health Mitigators. . . . . . . . . . . . . . . 16
              a.  Procedural Default.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
              b.  Neither the Law nor the Record Required the Jury to find
                  Mental Health Mitigators. . . . . . . . . . . . . . . . . . . . . . . . . . 17
        B.  Trial Counsel Reasonably Omitted Brain Damage Evidence. . . . . . . . . . . . 23
        C.  Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating
           Mental Health Professionals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        D.  Trial Counsel Reasonably Responded to Dr. Price's Testimony . . . . . . . . . 32
        E.  Counsel's Reliance on the Opinions of Retained Experts. . . . . . . . . . . . . 36
        F.  Trial Counsel's Preparation of the Expert Witnesses. . . . . . . . . . . . . . . . 39

      II.  FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS
           INCOMPETENT TO BE EXECUTED. . . . . . . . . . . . . . . . . . . . . . . . . . 45

i

III.  TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S
VALID EVIDENCE AND ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
A.  Counsel Reasonably Responded to Evidence in Support of Aggravating
Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
1.  Substantial Planning and Premeditation. . . . . . . . . . . . . . . . . . . . . 46
a.  The Testimony of Fields's Associates.. . . . . . . . . . . . . . . . . 46
b.  Glass Fragment Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 50
c.  Blood Flow Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
2.  Mental Anguish.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
B.  The Government Properly Presented Evidence and Argued Reasonable
Inferences from the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
1.  Allegedly False Glass Fragment Evidence. . . . . . . . . . . . . . . . . . . . 58
2.  Allegedly Baseless Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV.  TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCE
WITHOUT UNDERMINING THE DEFENSE STRATEGY. . . . . . . . . . . . . . . 62

V.  COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE
PROSECUTION ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
A.  Fields Defaulted any Claim of Prosecutorial Misconduct. . . . . . . . . . . . . 67
B.  Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
1.  Appellate Counsel Reasonably Omitted an Argument that the
Prosecutor had Misstated the Law. . . . . . . . . . . . . . . . . . . . . . . . . 69
2.  Counsel Reasonably Omitted Challenges to Comments about the
Defendant's Crimes, and the Propriety of Mercy or Other
Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
3.  Counsel Reasonably Omitted Challenges to an Argument that Prison
Was Insufficient Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
4.  Counsel Reasonably Omitted Challenges to Comments on the
Credibility of Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
5.  Counsel Reasonably Omitted Challenges to Appropriate Inferences
from the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
a.  The Prosecution Fairly Characterized the Mental Health
Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
b.  The Prosecution Fairly Characterized the Evidence of Planning
and Premeditation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
c.  The Prosecution Fairly Characterized the Evidence of Shirley
Chick's Death.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
6.  Counsel Reasonably Omitted Challenges to the Prosecution's
Appropriate References to the Bible. . . . . . . . . . . . . . . . . . . . . . . . 91

VI.  TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND

VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF
AGGRAVATING AND MITIGATING FACTORS.. . . . . . . . . . . . . . . . . . . . . . 94

VII.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE
EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD FIELDS
A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
A.  Alleged Suppression of Effexor Bottle. . . . . . . . . . . . . . . . . . . . . . . 102
B.  Alleged Suppression of Computers. . . . . . . . . . . . . . . . . . . . . . . . . . 105

VIII.  THERE ARE NO ERRORS TO ACCUMULATE. . . . . . . . . . . . . . . . . . . . . . . 107

IX.  THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S
EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

iii

# TABLE OF AUTHORITIES

## A. <u>Constitution</u>

U.S. Const. art. III, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>45</u>, <u>107</u>

## B. <u>Federal Statutes</u>

1 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>96</u>

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>96</u>

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>14</u>, <u>43</u>

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>19</u>, <u>31</u>, <u>34</u>, <u>38</u>

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>20</u>

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>20</u>, <u>21</u>

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>5</u>, <u>6</u>, <u>22</u>

## C. <u>Federal Cases</u>

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003). . . . . . . . . . . . . . . . . . <u>47</u>, <u>48</u>, <u>51</u>, <u>53</u>, <u>55</u>

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . <u>10</u>

*Ballard v. United States*, 152 F.2d 941 (9th Cir. 1945). . . . . . . . . . . . . . . . . . . . . . . <u>77</u>

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . <u>7</u>

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . <u>39</u>

*Beard v. Banks*, 542 U.S. 406 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>8</u>, <u>22</u>

*Bell v. Cone*, 535 U.S. 685 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>12</u>

*Berger v. United States*, 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . <u>77</u>

*Blinder, Robinson & Co., Inc. v. S.E.C.*, 837 F.2d 1099 (D.C. Cir. 1988). . . . . . . . . . . . . <u>94</u>

*Bousley v. United States*, 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boyd v. Ward*, 179 F.3d 904 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Boyde v. California*, 494 U.S. 370 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bryan v. Mullen*, 335 F.3d 1207 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 63

*Buchanan v. Angelone*, 522 U.S. 269 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Burnett v. Kerr*, 835 F.2d 1319 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Butler v. McKellar*, 494 U.S. 407 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Caldwell v. Mississippi*, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Caldwell v. Russell*, 181 F.3d 731 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 63

*Capps v. Sullivan*, 921 F.2d 260 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 67

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*Coe v. Bell*, 209 F.3d 815 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Coleman v. Brown*, 802 F.2d 1227 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 45

*Cummings v. Sirmons*, 506 F.3d 1211 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55

*Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

v

*Dever v. Kan. State Penitentiary*, 36 F.3d 1531 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 10

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Eddings v. Oklahoma*, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Fields v. Brown*, 431 F.3d 1186 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Flast v. Cohen*, 392 U.S. 83 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 107

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 12, 29, 47, 63

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Graham v. Collins*, 506 U.S. 461 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Green v. United States*, 262 F.3d 715 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106, 108

*Hallford v. Culliver*, 459 F.3d 1193 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Harris v. Pulley*, 692 F.2d 1189 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 43

*Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 68

*Jones v. Barnes*, 463 U.S. 745 (1983) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Jones v. United States*, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kansas v. Marsh*, 548 U.S. 163 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kimmelman v. Morrison*, 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

vi

*Knighton v. Mullin*, 293 F.3d 1165 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 95

*Lankford v. Arave*, 468 F.3d 578 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 98

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 72, 74, 86

*McCoy v. North Carolina*, 494 U.S. 433 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Middleton v. McNeil*, 541 U.S. 433 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Murray v. Carrier*, 477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995). . . . . . . . . . . . 45

*Nooner v. Norris*, 499 F.3d 831 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Oregon v. Guzek*, 546 U.S. 517 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*O'Dell v. Netherland*, 521 U.S. 151 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Parker v. Scott*, 394 F.3d 1302 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Patel v. United States*, 19 F.3d 1231 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56, 57

*Patterson v. Dahm*, 769 F.Supp. 1103 (D. Neb. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Penry v. Johnson*, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Penry v. Lynaugh*, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pierce v. Blaine*, 467 F.3d 362 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Randle v. Jackson*, 544 F. Supp. 2d 619 (E.D. Mich. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Renne v. Geary*, 501 U.S. 312 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Rompilla v. Beard*, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Saffle v. Parks*, 494 U.S. 484 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 100

vii

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2001)........................................ 92, 93

*Schlup v. Armontrout*, 941 F.2d 631 (8th Cir. 1991)..................................... 39

*Schriro v. Summerlin*, 542 U.S. 348 (2004) ........................... 8, 22, 59, 62, 100

*Short v. Sirmons*, 472 F.3d 1177 (10th Cir. 2006)................................. 69, 72

*Smith v. Gibson*, 197 F.3d 454 (10th Cir. 1999). ................................... 40

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)..................................... 28

*Smith v. Murray*, 477 U.S. 527 (1986).................................... 69

*Smith v. Sec'y of New Mexico Dep't of Corrections*, 50 F.3d 801 (10th Cir. 1995). .......... 59

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008). ................................. 24

*Smith v. Zachary*, 255 F.3d 446 (7th Cir. 2001). ................................... 96

*Snow v. Sirmons*, 474 F.3d 693 (10th Cir. 2007)........................... 29, 31, 33, 37

*Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004)................................... 106

*St. Aubin v. Quarterman*, 470 F.3d 1096 (5th Cir. 2006). ............................ 63

*Steffel v. Thompson*, 415 U.S. 452 (1974) . ...................................... 45

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998). ............................... 46

*Strickland v. Washington*, 466 U.S. 668 (1984)............................ 10, 12, 16, 98

*Teague v. Lane,* 489 U.S. 288 (1989). ...................................... 6, 8, 9, 22

*Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005)........................... 77, 91

*Tuilaepa v. California*, 512 U.S. 967 (1994)..................................... 96

*United States v. Horey*, 333 F.3d 1185 (10th Cir. 2003). ........................... 68

*United States v. Agurs*, 427 U.S. 97 (1976)................................. 59, 61

*United States v. Allen*, 16 F.3d 377 (10th Cir. 1994)............................ 7, 17, 68

*United States v. Barajas-Diaz*, 313 F.3d 1242 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Basham*, 561 F.3d 302 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Bender*, 304 F.3d 161 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 101, 103, 105

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Blackwell*, 127 F.3d 947 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Blandin*, 784 F.2d 1048 (10th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . 59, 105

*United States v. Challoner*, 583 F.3d 745 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*United States v. Clingman*, 288 F.3d 1183 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cronic*, 466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Dago*, 441 F.3d 1238 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 101-103

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 7, 106

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008). . . . . . . . . . . . . . . . . . 3, 4, 21, 70, 97, 98

*United States v. Fisher*, 38 F.3d 1144 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Frady*, 456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 68

*United States v. Franklin-El*, 555 F.3d 1115 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 77, 80

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

ix

*United States v. Gabaldon*, 522 F.3d 1121 (10th Cir. 2008)............................7

*United States v. Galloway*, 56 F.3d 1239 (10th Cir. 1995)............................7

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007)............................6

*United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993)...............11, 52, 54, 58

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998)............................20, 21

*United States v. Hanley*, 974 F.2d 14 (4th Cir. 1992)............................70

*United States v. Harden*, 846 F.2d 1229 (9th Cir. 1988)............................32

*United States v. Henry*, 545 F.3d 367 (6th Cir. 1008)............................77

*United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003)............................76

*United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996)...............72, 76, 80, 85

*United States v. Jackson*, 84 F.3d 1154 (9th Cir. 1996)............................77

*United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005)............................21

*United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007)............................21, 72

*United States v. Jones*, 34 F.3d 596 (8th Cir. 1994)............................101

*United States v. Jones*, 468 F.3d 704 (10th Cir. 2006)............................77

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994)............................102

*United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000)............................10

*United States v. Khan*, 835 F.2d 749 (10th Cir. 1987)............................6

*United States v. Kluger*, 794 F.2d 1579 (10th Cir. 1986)............................106

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001)............................34

*United States v. Lopez-Medina*, 596 F.3d 716 (10th Cir. 2010)............................61, 74, 84

*United States v. Lowden*, 900 F.2d 213 (10th Cir. 1990)............................69, 72

x

*United States v. Malatesta*, 583 F.2d 748 (5th Cir. 1978)................................ 80

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990)................................ 101

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)............................. 20

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)............................. 34

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991)................................ 39

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005)................. 15, 29, 95, 98

*United States v. Nolan*, 571 F.2d 528 (10th Cir. 1978)................................. 8

*United States v. Olano*, 507 U.S. 725 (1993) .................................. 44, 98

*United States v. Ortiz Oliveras*, 717 F.2d 1 (1st  Cir. 1983)......................... 29

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000)............................... 20, 21

*United States v. Prichard*, 875 F.2d 789 (10th Cir. 1989)............................. 8

*United States v. Quezada-Enriquez*, 567 F.3d 1228 (10th Cir. 2009)............. 45, 107

*United States v. Rivera*, 347 F.3d 850 (10th Cir. 2003).............................. 9

*United States v. Rodriguez-Ramirez*, 777 F.2d 454 (9th Cir. 1985). .................. 33

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009). ......................... 107

*United States v. Salazar*, 323 F.3d 852 (10th Cir. 2003)............................ 10

*United States v. Sanders*, 372 F.3d 1183 (10th Cir. 2004). ......................... 12

*United States v. Sherrill*, 388 F.3d 535 (6th Cir. 2004)......................... 69, 75

*United States v. Shoff*, 151 F.3d 889 (8th Cir. 1998)............................... 80

*United States v. Sullivan*, 919 F.2d 1403 (10th Cir. 1991). ........................ 80

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009)....................... 101, 104

*United States v. Visinaiz*, 428 F.3d 1300 (10th Cir. 2005). ......................... 71

*United States v. Walker*, 155 F.3d 180 (3d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Warner*, 23 F.3d 287 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 106

*United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Van Poyck v. Florida Dep't of Corrections*, 290 F.3d 1318 (11th Cir. 2002). . . . . . . . . . . . . . . 37

*Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842 (10th Cir. 2010). . . . . . . . . . . . . . . . 38

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 66

*Walls v. Bowersox*, 151 F.3d 827 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Walton v. Arizona*, 497 U.S. 649 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 47

*Welch v. Workman*, 607 F.3d 674 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Williams v. Groose*, 77 F.3d 259 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Willis v. United States*, 87 F.3d 1004 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Wright v. Hopper*, 169 F.3d 695 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Yarborough v. Gentry*, 540 U.S. 1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 24, 50, 63

xii

**D.  State Cases**

*Bryant v. Bryant*, 545 S.W.2d 938 (Ky. 1977)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*People v. Crittenden*, 885 P.2d 887 (Cal. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*People v. Sandoval*, 841 P.2d 862 (Cal.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 97

*State v. Hancock*, 840 N.E.2d 1032 (Ohio 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**E.  Federal Rules**

Fed. R. Evid. 609. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Rule 2(b)(2), Rules Gov'g § 2255 Proceedings... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

**F.  Unpublished Case Material**

*Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H,1995 WL 478844 (W.D. Va. April 21, 1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664
(S.D. Miss. June 9, 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Scott v. Romero*, No. 04-2262, 2005 WL 2865173 (10th Cir. Nov. 2, 2005). . . . . . . . . . . . . . . 33

*United States v. McVeigh*, No. 96-CR-68-M, 1997 WL 330507 (D. Colo. 1997).. . . . . . . . . . . . 96

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

EDWARD LEON FIELDS, JR.          §
                                 §
          Movant,                §
                                 §     Case No. CV-10-00115-RAW
v.                               §     Criminal Case No. CR-03-73-RAW
                                 §
UNITED STATES OF AMERICA         §
                                 §
          Respondent.            §

**GOVERNMENT'S ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255**
**TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL**
**CUSTODY**

**(Answer Under 28 U.S.C. § 2255)**

**PROCEDURAL HISTORY**

On August 1, 2003, a federal grand jury for the Eastern District of Oklahoma returned an

indictment that charged Edward Leon Fields with four non-capital offenses and two death-

eligible counts of first degree murder, all stemming from the homicides of Charles Glenn Chick,

Jr. and Shirley Elliot Chick. (Trl. Doc. 16.)[1]  On March 15, 2004, the government filed a notice

of intent to seek the death penalty as to both murder charges. (Trl. Doc. 38.)

On June 30, 2005, Fields pleaded guilty to all six counts of the indictment. On July 13,

2005, a jury trial commenced regarding penalty. On July 22, 2005, at the conclusion of the trial,

the jury found that Fields was at least 18 years old at the time of the offenses and that he

intentionally killed the victims. (Trl. Doc. 228 at 33-34.)  The jury found three statutory

---

[1]Throughout its Answer, the government refers to the documents in case no. 03-cr-73-WH by docket number or date of entry and prefaces the citations with "Trl." Citations to documents filed on the instant docket, case no. 10-cv-00115-RAW, have no preface.

1

660

aggravating factors: a substantial planning and premeditation aggravator applicable to each murder and a multiple-murder aggravator applicable to both. (*Id*. at 35.) Additionally, the jury found four non-statutory aggravating factors: that Fields posed a future danger to others, that Fields inflicted mental anguish upon Shirley Chick, and – as to each victim – that Fields caused permanent injury, loss and harm to surviving family, friends and co-workers. (*Id*. at 36-37.) Seventeen mitigating factors were found true by at least one juror. (*Id*. at 38-41.) After weighing the aggravating and mitigating factors, the jury recommended a sentence of death. (*Id*. at 42-43.) On November 8, 2005, this Court imposed the recommended sentence.

Fields appealed his conviction and sentence to the United States Court of Appeals for the Tenth Circuit, raising the following claims of error:

1. The government and this Court lacked jurisdiction over these offenses.

2. This Court improperly struck a venire member whose scruples did not substantially impair his ability to serve.

3. This Court improperly allowed the jury to consider two separate substantial planning and premeditation statutory aggravators.

4. This Court improperly permitted the jury to return a single penalty verdict as to two murders.

5. Insufficient evidence supported the findings of substantial planning and premeditation.

6. The future dangerousness aggravator was vague and overbroad, and was premised on improper evidence.

7. This Court did not require the jury to unanimously agree on the factual predicates of the future dangerousness aggravator.

8. The mental anguish aggravator was vauge, overbroad and statutorily preempted.

9. This Court improperly admitted evidence concerning the impact of the murders on people unrelated to the victims.

10. The unanimous rejection of the mental disturbance mitigator was prejudicial error.

11. The jury should have weighed the aggravators and mitigators under the reasonable doubt standard.

12. This Court improperly permitted Fields's ghillie suit into the jury deliberation room.

13. Cumulative error prejudiced Fields.

In a published opinion, the Tenth Circuit affirmed the conviction and sentence in full. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008).

On April 6, 2010 (365 days after the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's judgment), Fields filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 1.) The Motion does not include any of Fields's claims, which are all contained – albeit without citation to authority – in a companion brief, entitled Grounds in Support of Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 2 (hereinafter "Pet.").) On July 30, 2010, Fields set forth his legal theories in a second companion brief, entitled Petitioner's Memorandum of Law in Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. Section 2241. (Doc. 14 (hereinafter "Mem.").) Pursuant to this Court's Orders (Docs. 3 & 11), the Government now files this Answer.

3

**STATEMENT OF FACTS**[2]

Edward Leon Fields killed Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest on July 10, 2003. He had seen the couple there days earlier and drove there the evening of July 10 with a homemade ghillie suit (a covering for head and body made to resemble underbrush that Fields referred to as his sniper suit) and a camouflaged and powerfully scoped rifle in his truck. He found the Chicks on a vista some distance from their campsite. He retrieved the rifle, put on the ghillie suit, and hid near their campsite as it grew dark. In time, the Chicks came back to the campsite and sat at a table. Fields waited and watched them for about twenty minutes. When Charles told Shirley he was going to the tent, Fields shot him in the face. As Charles slumped to the table, Shirley got up and began running toward the couple's van. Fields shot at her and a bullet tore through her foot. She reached the passenger door of the van, but was shot again, on the side of her head. Fields caught up and shot her once more, in the back of the head, in the doorway of the van. Shirley died as a result of both head wounds. Fields returned to the table and shot Charles a second time in the head. Charles also died as a result of both of his wounds.

Physical evidence indicated that Fields then left the campsite and only returned hours later, when he broke the driver's window of the van and stole some items. He rummaged through only the driver's area of the van; the rest of the van and the Chicks' tent were untouched. A tip eventually led police to Fields' truck, where they found the rifle, the ghillie suit, and some of the items stolen from the Chicks' van. In the meantime, Fields had been taken in for

---

[2]The Statement of Facts is drawn from the Tenth Circuit's opinion in this case, *Fields*, 516 F.3d at 927.

questioning.  He initially denied any connection to the crime, but confessed when confronted with the evidence taken from his truck.

### FIELDS'S CONTENTIONS

1.  The jury improperly rejected an alleged mental health mitigator, and trial counsel ineffectively investigated, presented and argued mental health evidence.

2.  Fields's mental health precludes his execution.

3.  Trial counsel ineffectively investigated and presented evidence to rebut the substantial-planning and mental-anguish aggravators, which were based on false and misleading evidence and argument.

4.  Trial counsel failed to present Fields's social history through the testimony of an appropriate expert and omitted an argument that such evidence was mitigating.

5.  Trial counsel failed to interpose appropriate objections to the prosecution's arguments.

6.  Trial counsel failed to object to the verdict form and jury charge, which allowed a unitary sentence.

7.  The government withheld exculpatory evidence, which trial counsel ineffectively failed to investigate and present.

8.  Cumulative prejudice requires relief.

9.  The means of Fields's execution would violate the Constitution.

### FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed.  The grounds for relief under § 2255 are narrower than those for relief on direct appeal.  With very limited exceptions,

relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

A.  Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed errors in conviction and sentencing.'"  *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987).  Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted. . . . Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks."  *Khan*, 835 F.2d at 753 (emphasis omitted).  Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (internal quotes omitted).

B.  Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence.  28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).  The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing.  *Willis*, 202 F.3d at 1280-81.  The period of limitations bars untimely amendments that add new claims to a defendant's initial § 2255 motion.  *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).  While § 2255 movants may file untimely

6

665

amendments that clarify, amplify or expand the facts in their timely-filed motions, they may not use such pleadings to add new claims. *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000). Section 2255 movants may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control. *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008).

C.  Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994). This doctrine applies equally in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995).

Apart from claims of ineffective assistance, courts may consider otherwise procedurally-defaulted claims in two instances. First, they may consider defaulted claims when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Allen*, 16 F.3d at 378. "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A movant can show cause by demonstrating that a claim was "so novel that its legal basis [was]

7

not reasonably available to counsel." *United States v. Barajas-Diaz*, 313 F.3d 1242, 1248 (10th Cir. 2002). A movant can also establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Wiseman*, 297 F.3d at 979. To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001) (emphasis original, internal quotations omitted).

D. Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994). Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in the law of a circuit." *United States v. Prichard*, 875 F.2d 789, 790-91 (10th Cir. 1989); *United States v. Nolan*, 571 F.2d 528, 530 (10th Cir. 1978).

E. New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. at 310. When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do. *Id.* at 351-52. A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id.* Second, it decides whether the pertinent rule of law was "new"

8

at the time of finality by deciding whether a "court considering the defendant's claim at the time

his conviction became final would have felt compelled by existing precedent to conclude that the

rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997)

(internal quotations omitted).  Third, the court considers if a new rule is of "watershed"

magnitude, and therefore applicable under an exception to *Teague*.  *United States v. Cousins*, 455

F.3d 1116, 1126 n.6 (10th Cir. 2006).

F.  Harmless Error

Even assuming a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel

and was tried by an impartial adjudicator, there is a strong presumption that any other

[constitutional] errors that may have occurred are subject to harmless-error analysis." *United*

*States v. Dago*, 441 F.3d 1238, 1245-46 (10th Cir. 2006).  Thus, absent a showing that the case

involves one of a rare group of structural errors that affect the framework of the trial and require

reversal without a showing of prejudice, a § 2255 movant cannot obtain relief without

establishing that an identified legal error "had substantial and injurious effect or influence in

determining the jury's verdict." *United States v. Rivera*, 347 F.3d 850, 852 (10th Cir. 2003)

(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see Green v. United States*, 262 F.3d

715, 717-18 (8th Cir. 2001) (applying structural error analysis in a § 2255 case); *see also Neder*

*v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

## THE GOVERNMENT'S ARGUMENT

### I.  COUNSEL PROVIDED COMPETENT REPRESENTATION IN PRESENTING AND ARGUING MENTAL HEALTH EVIDENCE

Fields raises six enumerated claims about the supposed failings of his attorneys in their

investigation, presentation and summation of mental health evidence.  Additionally, Fields makes

an abortive and procedurally-defaulted claim that the jury violated the Eighth Amendment when

it rejected his mental health mitigator.  (Pet. 1-54; Mem. 4-41.)

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so

upset the adversarial balance between defense and prosecution that the trial was rendered unfair

and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  To

demonstrate ineffective assistance of counsel, Fields must therefore show that his attorneys'

performance was deficient and that the deficient performance was prejudicial.  *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).

As to the first, prong, Fields bears the burden of demonstrating that counsel's

performance fell below prevailing professional norms.  *Knowles v. Mirzayance*, 129 S. Ct. 1411,

1420 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003).  In so doing, he must

overcome a strong presumption that counsel did provide effective assistance.  *United States v.*

*Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted).  "Counsel is strongly

presumed to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment."  *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537

(10th Cir. 1994).  Any conclusory assertions of ineffectiveness will be insufficient.  *United States*

*v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).  Indeed, counsel's own admissions of

ineffectiveness are not decisive, because the reasonableness of performance is a question for the

court.  *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *Harris v. Dugger*, 874 F.2d 756,

761 n.4 (11th Cir. 1989); *see also Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (trial

counsel's "about-face on the competency issue strongly suggests a willingness to 'fall on the

10

sword' in order to derail a death sentence.  The motive is transparent, if not misguided.").

The prejudice prong imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal.  *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993).  Under the prejudice standard, Fields must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict.  *See id.*

None of Fields's attacks on his trial attorneys have merit under the prevailing standards for constitutional competency of counsel.  And, as fully detailed below, his contention that the jury erred is procedurally defective and devoid of any legal basis.

A.  Counsel's Mental Health Advocacy and the Jury's Verdict

Fields claims that his attorneys ineffectively argued the case in mitigation.  He concedes that counsel presented substantial evidence of mental illness and argued that his various conditions established specific mitigators.  He, however, faults his lawyers for failing to argue or seek supporting instructions for a theory that his asserted mental conditions, including depression and "bipolar flip," satisfied multiple mitigating factors.  He also contends that counsel failed to argue that his history of depression and auditory hallucinations was mitigating.  Apart from his complaints about counsel's performance, Fields claims that the jury violated the Eighth Amendment when it found he had not refused to find his mental health issues were a mitigating factor.  (Pet. 7-16; Mem. 6-15.)  Fields argument is factually flawed, as it relies on claims that counsel omitted arguments that were, in fact, made on his behalf.  Indeed, counsel specifically relied in mitigation on Fields's asserted history of depression and auditory hallucinations.  To the extent counsel did not argue that Fields's alleged mental issues would satisfy multiple mitigators, he does not establish that counsel failed to provide constitutionally acceptable representation.

11

Fields's related complaint, about the jury's rejection of his defense theory, is defective and baseless.

The Constitution does not require trial counsel to present, much less argue, every nonfrivolous defense. *See Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc). Counsel are strongly presumed to have acted for tactical reasons when they focus their arguments on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Even inadvertent omission do not require automatic relief, because the Constitution guarantees "reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id.* (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. at 382; *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984)). For counsel's actions to offend the Constitution, "his strategic decisions must have been completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Given that counsel enjoys broad discretion to determine how best to employ argument as a means of sharpening and clarifying issues, trial attorneys have no obligation to advance weaker arguments that dilute their overall presentation to the jury. *See Yarborough*, 540 U.S. at 5-6; *see also Jones v. Barnes*, 463 U.S. 745, 752 (1983) (holding no duty to dilute appellate briefing with weak arguments); *United States v. Sanders*, 372 F.3d 1183, 1186 (10th Cir. 2004) (finding no duty to argue inconsistent theories).

1. Trial Counsel Adequately Argued the Case in Mitigation

Contrary to Fields's assertions, the record demonstrates that counsel presented a strong case in mitigation, premised on several theories of mental illness. None of the attorneys' supposed omissions offended the Sixth Amendment's guarantee of effective representation.

12

Fields's counsel presented the testimony of two mental health experts, George Woods and Brad Grinage. Woods, a neuropsychiatrist who specialized in examining the relationship between his patients' brains and their behavior, testified that Fields had, since childhood, suffered from a from a mood disorder. (Tr. 12: 2946.) Specifically, Woods diagnosed Fields with either schizoaffective disorder or bipolar disorder with psychotic features (Tr. 12: 2973), which the expert claimed had caused the defendant to exhibit poor judgment and erratic thinking (Tr. 12: 2976-77.) Woods asserted that the drug Effexor, which Fields was taking at the time of the murders was known to "flip" people with bipolar disorder from depression to mania, further impairing the patient's judgment. (Tr. 12: 2989-90.)

The defense's other expert, forensic psychiatrist Brad Grinage diagnosed Fields with bipolar disorder with psychotic features, including auditory hallucinations. (Tr. 11: 2768-2771, 2775-77.) Grinage explained that treating bipolar patients with antidepressant drugs, especially Effexor, carried with it the "danger" of putting them in a manic state and enhancing any existing psychosis. (Tr. 11: 2780-81, 2811-13.) Ultimately, Grinage concluded that Fields had bipolar disorder and that Effexor had caused the defendant to enter an irritable manic state that amounted to a severe emotional disturbance. (Tr. 11: 2815-16.)

During argument, counsel addressed all aspects of Barrett's alleged mental health issues. Counsel urged the jury to empathize with the defendant, in view of his supposed psychological issues, including depression and auditory hallucinations:

> Imagine being so depressed in a way that you can't control that you are in such despair that you don't want to live. That you don't want to see your beautiful children, that you don't want to be around the people who love you. That's an illness and it's serious. Imagine this thing that has been described as a rush of thoughts coming on without warning, can't control what's going through your

13

672

mind continually.  What could that be like?  And imagine if you possibly can having to live with something that you know is not real.  Hearing something that's not there.  Someone talking to you who's not there.  What does that do to you?  How do you think of yourself?  How broken do you feel you are when that is in your life?  And then imagine them all together.  [¶]  That's what this mitigation is.  Number one, the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired.

(Tr. 14: 3435-36.)  Counsel later addressed the theory of bipolar flip with specificity: "Effexor affects two of those neuroreceptors, and that over a period of time that medication built up like it's supposed to.  It built up and it was like a wave and he got to the tipping point."  (Tr. 14: 3438.)  As she finished her summation regarding the impaired capacity mitigator, counsel returned to the evidence of auditory hallucinations: "[E]veryone of those physicians endorses the idea that voices are credible.  That sounds fantastic.  You've read about it in newspapers.  But it's real, and it has to be painful for whoever is experiencing it."  (Tr. 14: 3439.)

In view of this record, Fields cannot establish a factual basis for his complaint that counsel failed to rely in mitigation on his alleged history of depression and auditory hallucinations.  Quite simply, counsel began the argument about the impaired capacity mitigator with a discussion of Fields's depression and ended it with a discussion of his hallucinations.  Fields's claim to the contrary is baseless and cannot support relief.

Fields does correctly note that counsel argued that his alleged depression, hallucinations and bipolar flip supported the impaired capacity statutory mitigator (18 U.S.C. § 3592(a)(1)), rather than the emotional disturbance allegation (§ 3592(a)(6)) or any undefined factor left to the jury's discretion ((§3592(a)(8)).  Counsel argued that traumatic events, including the death of the defendant's father and the illness of the defendant's mother, supported the emotional disturbance factor.  (Tr. 14: 3440.)  Counsel did not re-urge any of the facts alleged to have supported the

14

statutory mitigators as the basis of a jury-defined non-statutory mitigator.  Counsel recently

declared that her failure to urge every legally permissible theory of mitigation was an oversight

amounting to ineffectiveness.  (*See* Pet. Ex. 1.)  But counsel provided a cogent and intuitive

explanation of how the jury should apply the defense evidence to the alleged mitigating factors –

relying on mental illness diagnoses as the basis of alleged impaired capacity and emotional

trauma as the basis of supposed emotional disturbance.

Counsel could have quite reasonably concluded that arguing the same sets of facts under

multiple theories was potentially confusing and counterproductive.  Such an tactic would have

suggested that the alleged mitigating factors were vague and duplicative.  *Cf. Randle v. Jackson*,

544 F. Supp. 2d 619, 633-34 (E.D. Mich. 2008) (denying habeas relief where state court had

reasonably found that trial counsel had no obligation to make a confusing closing argument).

Furthermore, the jury was instructed that the weighing of factors was "not a mechanical process.

You should not simply count the number of factors, but consider the particular character of

each."  (Trl. Doc. 227 at 28.)  As such, the defense did not stand to benefit from arguing or

seeking instructions to support a theory that multiple mitigators were satisfied by the same

evidence, as Fields now claims his attorneys should have done.  Such a needlessly confusing

position could have, at best, led the jury to discount the weight it accorded to individual factors

that the defense urged it to base on a single body of evidence.  *See United States v. Nguyen*, 413

F.3d 1170, 1181-82 (10th Cir. 2005) (finding no ineffectiveness where counsel declined

instruction with potentially detrimental effect on defense); *see also Burnett v. Kerr*, 835 F.2d

1319, 1323 (10th Cir. 1988) (finding no ineffectiveness for failure to request supplement to

correct instructions).  At its worst, the forgone argument that the jury should have accorded

<div align="center">15</div>

674

alternative legal significance to a single set of facts might have caused the jury to discredit the defense generally by suggesting that its theory of the case was so plastic as to be meaningless.

Given the reasonableness of counsel's actions, Fields cannot demonstrate ineffectiveness based on the omission of arguments urging the jury to apply every legally viable defense theory, especially when such a strategy was likely to undercut the strength of the defense case as a whole. *See Yarborough*, 540 U.S. at 5-6, 8. The fact that trial counsel submitted a declaration attesting to her own supposed error does not alter the analysis, as the determination of constitutional ineffectiveness is a legal matter for the Court's determination.[3] *See Wright v. Hopper*, 169 F.3d 695, 707 (11th Cir. 1999).

Even if Fields could show that counsel's argument was ineffective, he could not demonstrate prejudice. The jury, as Fields complains, rejected both of his asserted theories of mitigation. (Trl. Doc. 228 at 38.) Fields fails to explain why his allegations of mental illness and personal trauma would have appeared any more credible and appealing to the jury had counsel argued that they were susceptible to consideration under multiple legal theories. In short, Fields has failed to establish a reasonable likelihood that the jury would have found the factors true in the first instance, much less that he would have received a more favorable verdict, had his attorneys argued that multiple mitigators could be satisfied by the same facts. *Strickland*, 466 U.S. at 691.

2. The Jury Rejection of Mental Health Mitigators

Fields summarily argues that the Eighth Amendment required the jury to find the

---

[3]Trial counsel's declaration asserts multiple instances of ineffectiveness. Rather than repeatedly address counsel's declaration, the government simply notes that the reasonableness of counsel's conduct is a legal question for the Court alone. *Wright*, 169 F.3d at 707.

16

impaired capacity and emotional disturbance aggravators because the government did not dispute

some evidence of mental illness.  (Pet. 16; Mem. 15.)  Fields defaulted this claim by failing to

raise it on appeal.  Apart from that flaw, his argument is premised on an erroneous view of the

law and a misinterpretation of the record.  Even if Fields could overcome those errors, he still

could not obtain relief on this contention because the argument requires a application of a novel

principle of constitutional law on collateral review.

> a.  Procedural Default

In his contention that the jury violated the Eighth Amendment by rejecting his mental

health mitigators, Barrett relies on facts within the four corners of the record.  On appeal, Barrett

raised a related contention that the Fifth, rather than the Eighth, Amendment guaranteed him a

right to a jury finding of mental health mitigation.  Indeed, Fields's reply brief on appeal

specifically disavowed the Eighth Amendment as a basis of the argument that the jury

erroneously rejected his proposed mitigators.  (*See* RB 53-54.)  Having failed to raise the Eighth

Amendment claim on appeal,  Fields has defaulted it for purposes of collateral review.  *See*

*United States v. Frady*, 456 U.S. at 165.  Fields makes no attempt to explain his default or to

demonstrate cause and prejudice to excuse it.  *United States v. Allen*, 16 F.3d at 378.

Furthermore, he makes no attempt to excuse his default through a showing of factual innocence.

As such, he cannot obtain collateral relief on his claim that the jury unconstitutionally rejected

his alleged mental health mitigating factors.

> b.  Neither the Law nor the Record Required the Jury to find Mental Health
> Mitigators

Assuming, arguendo, that Fields had not defaulted this claim, he still could not

676

demonstrate that it has any legal support.

Notwithstanding Fields's argument to the contrary, the Eighth Amendment does not require juries to find mitigators that are based on uncontested defense evidence. In fact, the Supreme Court has held that the government may properly place a burden upon the defendant to prove mitigating circumstances. *Kansas v. Marsh*, 548 U.S. 163, 170-71 (2006) (quoting *Walton v. Arizona*, 497 U.S. 649, 650 (1990)). "So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death." *Id.* at 171. The Supreme Court has stated that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Graham v. Collins*, 506 U.S. 461, 508 (1993) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

Drawing on this principle, the Court in *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), held that a capital sentencer must also be able to give effect to any mitigating evidence that is relevant to a defendant's background and character or the circumstances of his offense. *Accord*, *Oregon v. Guzek*, 546 U.S. 517, 526 (2006). In *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 433 (1990), the Court held that the Eighth Amendment requires that individual jurors be able to determine for themselves the existence and weight to be accorded any mitigating factor. These requirements did not, however, impede the ability of the federal government "to structure and shape consideration of mitigating evidence." *Guzek*, 546 U.S. at 526. As the Supreme Court noted at length in *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998) (some internal citations omitted):

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence . . . . However, the State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence . . . . Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California*, 494 U.S. 370 (1990), we held that the standard for determining whether jury instructions satisfied these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id*. at 380.

But we have never gone further and held that the State must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And, indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See Tuilaepa*, [512 U.S.] at 978-79 (noting that at the selection phase, the State is not confined to submitting specific propositional questions to the jury and may indeed allow unbridled discretion); [*Zant v.*] *Stephens*, [462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that acceptance of that argument would require the Court to overrule *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)]).

The Federal Death Penalty Act is consistent with these principles. In particular, the

FDPA does not require the jury to return "special findings" regarding the mitigating factors or the

number of jurors who concurred in their existence. Rather, § 3593(d) provides for different

verdicts for aggravating and mitigating factors:

> Return of Findings – The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

This dichotomy between aggravating and mitigating factors carries forward in the FDPA's

19

appellate review provisions.  The FDPA provides that a death sentence is subject to reversal if

"the admissible evidence and information adduced does not support the special finding of the

existence of the required aggravating factor."  18 U.S.C. § 3595(c)(2)(B).[4]  No comparable

provision requires appellate review of mitigating factor findings.

In light of the language of the FDPA, courts have consistently doubted their authority to

review the rejection of asserted mitigating factors.  *See United States v. Bernard*, 299 F.3d 467,

485-86 (5th Cir. 2002) (questioning authority to review jury findings regarding mitigating

evidence, as "the FDPA does not require the jury to make specific findings of the existence of, or

degree of jury unanimity upon, mitigating factors"); *United States v. Paul*, 217 F.3d 989, 999-

1000 & n.6 (8th Cir. 2000) ("We question whether we are able to review the jury's findings

regarding the number of jurors who found a particular mitigator because the FDPA does not

require the jury to return special findings showing which mitigating factors that jury found to

exist or the number of jurors who found a particular mitigator"); *United States v. Hall*, 152 F.3d

381, 413 (5th Cir. 1998) (because FDPA does not require "special findings" to be made

regarding mitigating factors, court "question[s] whether the juror's failure to find a particular

mitigating factor constitutes a proper subject for appellate review").[5]

---

[4]Vacation of a death sentence is also required if it "was imposed under the influence of passion, prejudice, or any other arbitrary factor" or because "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure."  18 U.S.C. § 3595(c)(2)(A), (C).

[5]In a case decided under the now-repealed Title 21 capital sentencing procedures (21 U.S.C. § 848(g), *et seq.*) the court in *United States v. McCullah*, 76 F.3d 1087, 1112-13 (10th Cir. 1996), reviewed a jury's non-unanimous finding regarding an asserted mitigator.  Unlike the FDPA, theTitle 21 review provision expressly required appellate courts to determine that "the information supports the special finding of the existence of every aggravating factor upon which the [death] sentence was based,  .  .  .  or the failure find[] any mitigating factors as set forth or

20

Thus, the prevailing law does not require capital juries to give mitigating weight to any particular evidence. *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007). Even when the factual predicate for a mitigator was uncontroverted, the Fifth and the Eighth Circuits held that jurors were constitutionally and statutorily free to find whether a particular set of facts has mitigating force in a particular case. *See Bernard*, 299 F.3d at 485-86 (as long as jurors were free to give mitigating effect to defendants' ages, jurors were not required to find that defendants' youthfulness was mitigating); *Paul*, 217 F.3d at 999-1000 (although defendant was 18 years old and his codefendant received a life sentence, jury not required to give mitigating effect to either factor); *Hall*, 152 F.3d at 413 ("jury was free to believe or disbelieve" testimony of family members that defendant experienced a difficult upbringing that mitigated against imposition of a death sentence).

Simply stated, the Supreme Court has clearly stated that juries cannot be directed to reject mitigation evidence as a matter of law, but it has never implied that the rejection of alleged mitigators is subject to review for correctness. *Eddings*, 455 U.S. at 114 ("neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence"). "*Eddings* simply does *not say* that the sentencer must give some weight to every mitigating factor asserted by the defendant." *United States v. Johnson*, 403 F. Supp. 2d 721, 876 (N.D. Iowa 2005); *see also Fields*, 516 F.3d at 948-49 (holding that the FDPA does not authorize appellate courts to

---

allowed in this section." 21 U.S.C. § 848(q)(3)(B). Comparable language regarding the review of mitigators was tellingly and purposely omitted from the later-enacted FDPA. The bill containing Title 21's capital procedures was drafted before the Supreme Court's *Mills* opinion. It initially required jury unanimity as to the existence of any mitigating factor and appellate review of the failure to make such a finding. After *Mills* was decided, the bill was modified to allow a single juror to find any mitigating factor, but the logical parallel change was not made in the bill's review provisions. The FDPA was not afflicted with this problem.

21

review the rejection of an alleged mitigator).  Viewed against this backdrop, the jury's refusal to find the existence of any proffered mitigating factor is not subject to judicial review.  Thus, Fields cannot show that he has any right under § 2255 to re-consideration of the jury's factual findings.

Because Fields's claim lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law.  *Schriro v. Summerlin*, 542 U.S. 348.  The Supreme Court has never held that capital defendants have an Eighth Amendment right to findings in mitigation whenever the government chooses not to contest some allegedly underlying facts.  Even if Fields could show that such a rule fell within the "logical compass" of Supreme Court authority or that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim would still rely on a new rule because the result he seeks is not dictated by existing precedent.  *See Saffle v. Parks*, 494 U.S. 484, 491 (1990); *Butler v. McKellar*, 494 U.S. 407, 415 (1990); *see also Beard v. Banks*, 542 U.S. at 416 (holding that prior precedent may support a particular result, but if it does not mandate the outcome it is not an existing rule for *Teague* purposes).  Because Fields calls upon this Court to apply a new rule of constitutional import, it should reject the matter out of hand.  *Schriro*, 542 U.S. 348.

Assuming, arguendo, that Fields had such a right, he could not show that the evidence he adduced in supported of the mental health mitigators went unchallenged by the prosecution, and was therefore necessarily deserving of some weight.  Fields argues that the defense offered uncontested evidence of depression and largely uncontested evidence of auditory hallucinations.  (Pet. 13.)  In truth, the defense presented evidence that Fields was not depressed, but that he instead suffered from bipolar or schizoaffective disorder.  (Tr. 11: 2775-76, 2815, 12: 2973.)

22

Indeed, the defense took pains to distinguish bipolarity from depression.  (Tr. 12: 2961-63.)

Responding to this evidence, the government presented a an expert who diagnosed Fields with

dysthymic disorder – a mild but chronic depression.  (Tr. 12: 3145) The expert also found that

Fields had a personality disorder with anti-social, psychopathic, narcissistic and dependent traits

and features.  (Tr. 12: 3148.)  The expert found that Fields's claims of auditory hallucinations

"sound[ed] suspiciously not genuine."  (Tr. 12: 3161.)

Crediting the prosecution witness, rather than the defense witnesses, the jury could have

easily concluded on this record that Fields had a mild depressive condition and a non-mitigating

personality disorder.  Such a plausible finding would have merited rejection of the allegations

that Fields's capacity to appreciate the wrongfulness of his conduct was significantly impaired

and that he committed the offense under a severe mental or emotional disturbance.  (*See* Trl.

Doc. 227 at 25.)  Furthermore, a finding that Fields had psychopathic traits and a mild depression

would understandably have failed to the convince the jury to find this crime was mitigated under

any theory.

Accordingly, to the extent that this Court finds that Fields has not defaulted this claim and

that it has a cognizable legal basis, it should reject the contention for lacking any factual support.

B.  Trial Counsel Reasonably Omitted Brain Damage Evidence

Fields claims his attorneys were ineffective for failing to investigate and present evidence

of his supposed organic brain damage, as it was reported to them by their retained

neuropsychologist, Dr. Gelbort.  Building on Gelbort's findings, Fields now presents the opinion

of a new expert, Dr. Martell, that indicates he is severely affected by brain damage.  (Pet. 16-31;

Mem. 16-24.)  Counsel's decision not to develop or present organic brain damage testimony was

<div align="center">23</div>

objectively reasonable, based on the information available to them at the time.  Moreover, Fields

has not demonstrated that the alleged omission caused him any prejudice.

An attorney is not required to investigate all leads or present all available mitigating

evidence as long as the decision not to pursue a particular lead or present particular evidence is

reasonable under the circumstances.  *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir.

2008).  "[R]easonably diligent counsel may draw a line when they have good reason to think

further investigation would be a waste."  *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Counsel

have, however, no obligation to advance weaker arguments that dilute their overall presentation

to the jury.  *See Yarborough*, 540 U.S. at 5-6.  Thus, a decision not to call an expert is reasonable

when the value of his testimony could be outweighed by damaging admissions elicited on cross-

examination or rebuttal.  *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008); *see also*

*Hallford v. Culliver*, 459 F.3d 1193, 1205 (11th Cir. 2006) ("It is reasonable – and not ineffective

– for trial counsel to eliminate certain lines of presentation if he has misgivings about hurtful

cross-examination and rebuttal witnesses") (internal quotations omitted).  Whatever mitigating

value a jury might ascribe to organic brain damage evidence, it remains a "double-edged sword"

that supports a future dangerousness aggravator.  *See Bryan v. Mullen*, 335 F.3d 1207, 1222-23

(10th Cir. 2003); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001).

In this case, counsel reasonably omitted to pursue Dr. Gelbort's findings as an avenue of

investigation or potential mitigation, as his report suggested the existence of only marginally

mitigating evidence.  Dr. Gelbort found only "mild impairment" of higher cognitive abilities and

processing speed for verbal tasks and "impulsivity of mild proportions."  (Pet. Ex. 6 at 4).

Gelbort noted that Fields incongruously tended to perform better on more difficult tests, a

phenomenon he explained as the result "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance." (*Id.*)  While Gelbort concluded that Fields displayed a "pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage," his report of "mild" symptoms did not suggest this was a potentially rich vein of untapped mitigation evidence.

Furthermore, trial counsel clearly hoped that by avoiding marginal evidence of brain damage evidence they might preclude the presentation of what they viewed as damaging rebuttal. After resting their case-in-chief, counsel noted an intention to interpose specific objections to Dr. Price's testimony.  (Tr. 12: 3075.)  Pressed for detail, counsel asserted that the defense case had not "open[ed] the door" to damaging rebuttal testimony about Fields's childhood.  (Tr. 12: 3078.) The Court, referring to itself as a "skeptic" about evidence of the defendant's early life, noted that experts for both parties had considered evidence of Fields's infantile hypoxia, though it did not appear to have had a significant effect on his development.  (Tr. 12: 3078-79.)  Counsel responded with a specific concern that Price's anticipated testimony concerning brain damage would constitute improper rebuttal, because the defense had "presented no information, no evidence, no testimony of brain injury."  (Tr. 12: 3080.)  While counsel's theory of exclusion relied on inapplicable legal principals (*see, infra*, Arg. I, D), the decision to forgo marginal brain damage evidence deprived the government of an opportunity to attack the reliability of an entire body of defense evidence.  Furthermore, counsel did successfully obtain evidentiary exclusion of specific, and aggravating, facts upon which Price relied.  (Tr. 12: 3081-82.)

In short, counsel made a reasonable strategic decision not to present evidence of brain

25

damage, which held little promise of mitigation but threatened to open the door to damaging rebuttal. The "mild" symptoms described by Gelbort did not suggest a need for further investigation, and counsel was aware that the prosecution had obtained an exhaustive report from Dr. Price, refuting the theory of organic brain damage. (*See*. Tr. 12: 3080; Pet. Ex. 8.) Counsel appear to have reasonably concluded that Price's report was authoritative and premised on, among other things, a litany of incidents from the defendant's life that could damage the defense case. (Pet. Ex. 8 at 2-6; Tr. 13: 3202-03 (questioning Price about records he relied on).) On this record, the decision to avoid brain damage evidence was entirely reasonable.

Even if trial counsel had erred in forgoing evidence of brain damage, Fields has not shown that he was prejudiced by the omission. Fields presents no basis for concluding that the brain damage evidence available at the time of trial was especially mitigating. In reality, it is quite the opposite. His newly-retained expert, Dr. Martell, reports that Fields has experienced a "catastrophic decline in functioning in the five years *since he was seen by Dr. Price*." (Pet. Ex. 9 at 10 (emphasis added).) Martell states that Fields's "overall level of cognitive functioning was significantly higher at the time [of trial]," and that he has experienced deterioration as a result of some unidentified organic process. (*Id*. at 16-17). Thus, Martell's report only serves to confirm Gelbort's finding that Fields showed mild indicia of brain damage at the time of trial. Because Martell ascribes the alleged brain damage to a process of deterioration, his report suggests that Fields was healthier at the time of the murders – further undermining the mitigation value of any forgone brain damage evidence. And, as noted, the contemporaneous findings were of mild impairment.

Indeed, Fields's other experts – Grinage and Woods – were aware of Gelbort's testing but

26

ascribed little value to them. Dr. Grinage testified that he considered Fields's alleged brain damage a "piece of evidence to be weighed," but nothing "cataclysmic." (Tr. 11: 2830.) Grinage also conceded that evidence of a frontal lobe impairment would "reveal itself in a number of ways concerning cognitive performance," though "you might be able to stretch to say that it would have some contribution to a bipolar type disorder." (Tr. 11: 2830-31). He also agreed that "if the defendant had suffered brain damage at birth, age thirty-six is a little late to blame an alleged hypoxia." (Tr. 11: 2868). Dr. Woods, a neuropsychiatrist who "specialize[d] in looking at the relationship between the brain and behavior (Tr. 12: 2939), read Dr. Gelbort's report (Pet. Ex. 2 at 2; Tr. 12: 3002) but made no mention of it in his findings. (*see* Pet. Ex. 28; 12: 2938-3069.)

While the brain damage evidence available at trial does not appear to have had much mitigating value, the defense presented the bipolar flip theory as a cogent explanation for Fields's commission of the murders. (Tr. 11: 2811-15 (asserting Fields committed the murders as part of an "irritable manic mania" prompted by Effexor); 12: 2989-90 (asserting that Effexor caused Fields to "flip," impairing his judgment).) Not only did that theory potentially support alleged mental health mitigators, it explained the homicides as a behavioral anomaly, potentially undermining two alleged aggravators – future dangerousness and substantial planning and premeditation. Conversely, arguing a theory of brain damage resulting in progressively-deteriorating impulse control would likely have suggested that Fields had premeditated the murders and would be apt to commit violent crimes in the future. Furthermore, the testimony obviated the defense's evident concern that presentation of brain damage evidence would permit even more damaging testimony from Dr. Price, who had prepared a chronology of the

27

defendant's behavior that counsel clearly believed would damage the case in mitigation.  (See Tr. 12: 3080-83.)

Given that the counsel presented cogent evidence of mental impairment – evidence that did not lend itself to advantageous reinterpretation by the government – Fields has not shown a reasonable likelihood that the addition of any available brain damage evidence (a double-edged sword) would have altered the outcome of this case.  *See Knighton v. Mullin*, 293 F.3d 1165, 1179 (10th Cir. 2002); *cf. Smith v. Mullin*, 379 F.3d 919, 943 n. 11 (10th Cir. 2004) (finding that mitigating evidence of mental health problems was not double-edged because the aggravating "edge" had previously been presented to the jury in the guilt phase of trial).

C.  Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating Mental Health Professionals

Fields claims that trial counsel ineffectively failed to call mental health professionals who had treated him, before and after the murders, to support the theory of bipolar flip and to rebut the testimony of a government expert that the defendant had not genuinely experienced auditory hallucinations.  Specifically, Fields argues that his attorneys should have adduced the testimony of Joyce Bumgardner and Larry Trombka – psychiatrists who treated the defendant in custody – as well as Dean Anderson and R.L.Winters – a physician and physician's assistant who treated the defendant prior to the murders.  (Pet. 31-39; Mem. 24-29.)  Trial counsel reasonably elected to forgo the putative testimony of these potential witnesses, which would have been cumulative to the evidence presented.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy."  *Boyle v. McKune*, 544 F.3d at 1139.  As such, counsel's choices are accorded a strong presumption of

<div align="center">28</div>

reasonableness. *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d at 1181 (holding that adequately informed strategic choices are "virtually unchallengeable"). To establish that a strategic decision was ineffective, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1296 (quoting *United States v. Ortiz Oliveras*, 717 F.2d 1, 4 (1st Cir. 1983)). Counsel have no obligation to present cumulative evidence. *See Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007).

In this case, trial counsel adduced substantial testimony from the retained experts regarding the diagnoses of Fields's treating mental health professionals. Much of this testimony was intended to preempt the conclusion of Dr. Price, a prosecution expert, that Fields was malingering. For instance, Dr. Grinage explained that his confidence in his diagnosis was based in part on the consistency with which Fields had described his symptoms over time:

> A I believe that he was not malingering based on pretty consistent on my interview and when I would come back with symptoms he didn't change his story. Many times people who malinger will do that. Pretty consistent story across physicians, Dr. Woods, Dr. Mitchells and Dr. Kemp. Very consistent symptoms and the way he described his symptoms. Most people with malingering don't have the criteria of bipolar in front of them to be able to say what's going on with them. So, you know, describing racing thoughts in the manner that he did was very credible and consistent with patients that I treat with bipolar disorder.

> Q The fact that he sought out a doctor's treatment for hearing voices some months prior to this happening, that's one the things you thought was important?

> . . .

> 14 A Yes.

> Q (By Ms. O'Connell) When did Ed Fields start to see Dr. Kemp for his mental condition?

<div align="center">29</div>

. . .

Q When he went to see Dr. Kemp in April of 2003 what 3 were his complaints?

A In April of 2003 he was complaining at that time of depressive symptoms and he described -- bear with me here one second. He was describing the voices at that time. And these voices that he described to Dr. Kemp in my reading of that were what we call command in nature in that they would tell him to do things. Everyone who has a command hallucination doesn't automatically act on those, but, many times there's an anxiety component associated with command hallucination that at times compels you to act on that or imposes itself upon you, I guess, to act on that. So, he was talking at that time in April about his repetitive voices.

(Tr. 11: 2798-2800.) Dr. Grinage returned to this theme on cross-examination when he stated that he believed Fields's reports of auditory hallucinations because they were previously reported: "I am assuming that based on the records that I've read and the testimony and the information I got from patient, other providers, previous providers of which he discussed voices with." (Tr. 11: 2821.) And on redirect examination, Dr. Grinage specifically cited his reliance on the observations of Dr. Kemp as a basis for his decision to credit Fields's reports of voices. (Tr. 11: 2893-94.)

Dr. Woods was even more inclusive of Fields's treating mental health professionals when he explained why he believed the defendant was not malingering: "If you look at the doctors' records from 1999, 2000, 2003, 2004, 2005, all the way through the relatively current treatment that he's getting in the jail, there is not one doctor that ever thought that Mr. Fields was malingering. Not one treating doctor that thought Mr. Fields was malingering." (Tr. 12: 2978; *see also id.* at 2980, l. 23.) Dr. Woods further explained, "In 2003 obviously Dr. Kemp believed, number one, that Mr. Fields was hearing voices, number two, that Mr. Fields was depressed."

30

(Tr. 12: 2979.)  Dr. Woods also pointed out that Fields's contemporaneous treatment records indicated that his condition had improved on anti-psychotic medications, suggesting that he had validly reported his symptoms.  (Tr. 12: 2993-95.)  Obviously cognizant of the forgone witnesses, defense counsel challenged the prosecution's expert, Dr. Price, to explain his diagnosis of malingered hallucinations in view of the findings of "Dr. Tromka " [*sic*], Dr. Kemp, and "Dr. Baumgartner" [*sic*].  (Tr. 13: 3209-10.)  Even during argument, counsel noted that Fields had reported auditory hallucinations prior to the murders.  (Tr. 14: 3442.)

Because counsel adduced substantial evidence that Fields had reported auditory hallucinations to treating professionals, they bore no obligation to present cumulative testimony from the medical personnel who recorded the defendant's complaints.  *See Snow*, 474 F.3d at 729.  Certainly, Fields cannot show that counsel bore any obligation to present percipient testimony from the treating professionals to supplement the hearsay explanations of the experts, as the relaxed evidentiary standards applicable to the penalty phase trial did not require such a tactic.  *See* 18 U.S.C. § 3593(c); *United States v. Basham*, 561 F.3d 302, 334 (8th Cir. 2009).  Given the cumulative nature of the supposedly omitted evidence, Fields cannot show that his attorneys acted ineffectively or prejudiced him.

Beyond the cumulative nature of the forgone evidence, counsel could have reasonably concluded that presenting testimony from treating mental health professionals, rather than the retained experts, was an area fraught with potential drawbacks.  Calling the treating physicians to the stand would have opened their credentials and files to scrutiny by the government.  Further, none of the treating professionals would have any obligation to prepare his or her testimony, unlike the retained experts.

<div align="center">31</div>

Moreover, Fields fails to show that his attorneys would have necessarily been aware that the treating professionals would support the bipolar flip defense theory. Indeed, Dr. Winters claims to have only a vague recollection of the defendant and does not represent that he would have testified on Fields's behalf (*see* Pet. Ex. 12). *Cf. United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (holding a defendant cannot establish ineffectiveness without showing the willingness of a forgone witness to have offered helpful testimony). Dr. Bumgardner, who now appears to endorse the defense's bipolar flip theory (*see* Pet. Ex. 10 at 2), was known at the time of trial to have made a major depression diagnosis (*see* Tr. 13: 3272), an opinion that would have undermined the defense's bipolar flip theory. Likewise, Dr. Trombka's diagnosis is freighted with ambiguity that would have detracted from the defense presentation. (*See* Pet. Exs. 11 at 1-2 ("reasonable mental health professionals could disagree with regard to the most appropriate diagnoses for Mr. Fields' [*sic*]").) Finally, physician's assistant Anderson – whose testimony could have been reasonably rejected based on the relative weakness of his credentials and his admitted social relationship with the defendant – observed anxiety and depression, not bipolarity or schizoaffective disorder like the experts. (Pet. Ex. 13.) The fact that these putative witnesses could have distracted from the defense undercuts any attempt to show that the omission of their testimony was unreasonable or prejudicial to Fields.

D.  Trial Counsel Reasonably Responded to Dr. Price's Testimony

Fields alleges that trial counsel ineffectively failed to object when Dr. Price testified that the defendant appeared to have intact and average cognitive function and when the prosecution expert later implied that he had not detected any organic brain damage. Fields also contends that counsel ineffectively cross-examined Dr. Price concerning neuropsychological evidence,

32

inadvertently adducing testimony that Fields was not brain damaged.  (Pet. 39-46; Mem. 29-34.)

Fields fails to show that counsel's actions were unreasonable, much less that they prejudiced the

outcome of this case.

As noted, trial counsel indicated before Dr. Price's testimony that the defense would

object if the government elicited evidence regarding organic brain damage.  (Tr. 12: 3080 ("[A]

great deal of what Dr. Price did was testing in relation to brain injury.  And during the course of

our case we presented no information, no evidence, no testimony of brain injury.").)  However,

the defense interposed no objection when Price touched on the subject of brain damage during

direct examination.  (Tr. 12: 3106 (stating that Fields's cognitive processes, "for just the

observer, were average.  They were intact"), 3154 (implying that he found no brain dysfunction

despite expecting to do so).)   And during cross-examination, trial counsel elected to elicit some

limited testimony regarding Price's observations of the defendant's apparently-normal cognitive

function.  (Tr. 13: 3204-05 ("I did not see much neuropsychological impairment, not significant

neuropsychological impairment").)

The omission of an objection does not constitute ineffectiveness when it is part of a valid

trial strategy.  *Snow*, 474 F.3d at 721.  By extension, attorneys have no obligation to raise futile

objections.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Hawkins v. Hannigan*, 185

F.3d 1146, 1152 (10th Cir. 1999); *see Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at **2

(10th Cir. Nov. 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument.").[6]

Likewise, cross-examination is a matter of trial strategy, subject to a presumption of

reasonableness.  *See, e.g. Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999); *United States v.*

---

[6]The government has attached to this Answer copies of all cited unpublished opinions.

33

*Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985). In hindsight, "few, if any, cross-examinations" could not be improved, but that showing does not establish constitutional ineffectiveness. *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

In this case, while counsel indicated a belief that evidence regarding Fields's cognitive function might not constitute proper rebuttal, the attorney gave no legal basis for such an objection. Any attempt to have done so would have failed. During this penalty phase hearing, the Court could have excluded evidence only "if its probative value [was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) (citing 18 U.S.C. § 3593(c) and *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)). During penalty phase trials, attorneys may elicit testimony that would normally fall outside the scope of that which preceded it, absent a showing that the evidence is unfairly prejudicial. *Lee*, 274 F.3d at 494.

Fields makes no effort to demonstrate that he was in any way unfairly prejudiced by Dr. Price's brief direct testimony regarding the apparent normalcy of his cognitive functioning. (Tr. 12: 3106, 3154.) Likewise, Fields fails to identify any basis for an objection to testimony in which Price summarily recounted the defendant's self-report that he had no permanent impact from a decades-old concussion. (*See* Tr. 12: 3116.) Fields's defense did not hinge on any claim of organic brain damage. Even if he could show he was unfairly surprised by any of the direct testimony, he was never foreclosed from introducing surrebuttal testimony from Dr. Gelbort in an attempt to contradict Dr. Price's findings. But, as discussed above, Gelbort's testimony was unlikely to be of much mitigating value. (*See, supra*, Arg. I, B.) Thus, Fields has not shown that his attorneys omitted any valid objection, and there is no reasonable probability that the failure to

interpose futile ones had a prejudicial impact on the verdict.

By the same token, Fields has not shown that his counsel acted unreasonably in eliciting Price's brief testimony regarding cognitive function. Counsel began cross-examination by eliciting Price's explanation that as a psychologist, he was involved in the "diagnosis and treatment of mental disorders, emotional dysfunction, personality problems," while as a neuropsychologist he diagnosed and sometimes treated "mental disorders that have an organic basis that are due to brain impairment." (Tr. 13: 3182.) When counsel briefly adduced his testimony that he had not observed "significant neuropsychological impairment" in Fields (Tr. 13: 3204), the defense effectively implied that half of the witness's expertise was not even implicated by Fields's condition. Counsel followed that questioning with a lengthy set of inquiries into the anti-psychotic medicines prescribed to Fields, punctuating the examination by eliciting Price's concessions that he was not a medical doctor and had no expertise about psychotropic medications. (Tr. 13: 3205-11.) In so doing, counsel implied that Price simply lacked the requisite expertise to provide a valid opinion in this case.

The decision to elicit Price's rather innocuous observation about Fields's cognitive functioning was utterly reasonable under these circumstances. As shown, the testimony assisted counsel in attempting to negate the significance of Price's opinion. Given that counsel had been informed by a defense expert that Fields had only a mild impairment (Pet. Ex. 6 at 4), the decision to elicit a slightly less sympathetic portrait from a prosecution expert was utterly reasonable in view of potential that the testimony might negate the significance of his opinion, altogether. Furthermore, given that the defense proceeded on a theory of bipolar flip and had no evidence of significant organic brain damage (*see, supra*, Arg. I, B.), Fields cannot establish any

35

694

reasonable likelihood that he would have received a more favorable verdict if counsel had not elicited Dr. Prices neuropsychological opinion.

E.   Counsel's Reliance on the Opinions of Retained Experts

Fields claims that his trial counsel provided ineffective assistance because they failed to present evidence that ingestion of the anti-depressant Effexor has been shown to correlate with higher rates of compulsive aggressive behavior.  (Pet. 46-53; Mem. 34-39.)  Fields is wrong. Counsel reasonably and effectively presented two experts who explained the defendant's violence in terms of his use of Effexor.  Fields cannot show that counsel were ineffective for relying on the experts' opinions or in omitting testimony that was different only by degree from that presented but subject to attack for admissibility.

"It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."  *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990).  Thus, an attorney need not "'shop' for a psychiatrist who will testify in a particular way." *Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir. 1987).  A retrospective assessment of an expert's methods and conclusions, even one that demonstrates the expert's inadequacy, does not establish that counsel was ineffective for relying on that expert.  *Card v. Dugger*, 911 F.2d 1494, 1513-14 (11th Cir. 1990).

As previously discussed, defense counsel presented two mental health experts who attributed Fields's commission of this crime to his use of the drug Effexor.  Dr. Grinage opined that Effexor likely caused Fields to experience "both depression and mania, but, he tended to have more of a diagnosable irritable mania."  (Tr. 11: 2814-15.)  Dr. Grinage concluded, "In my opinion he had such mental disorder that it caused significant impairment in his ability to behave

36

in a particular way that he might otherwise or what he might be thinking about doing." (Tr. 11: 2815.)  Building on those themes, Dr. Woods agreed that testified that "when you looked at the actual . . . pharmacological literature, you see that Effexor has a significant incidence of flipping people into mania, of making that switch.  When a person switches into mania, they often become – their judgment becomes increasingly impaired." (Tr. 12: 2990.)  As to mania, Woods explained that it " really shows up in irritability, in *spontaneous anger*, in kind of this *inability to control your anger*." (Tr. 12: 2953 (emphasis added)).)  He further attributed to mania behaviors that a person would not exhibit but for his condition: "They often are very responsive, not impulsive but responsive.  And you see real problems with judgment." (Tr. 12: 2954.)

The retained experts therefore provided a plausible basis upon which the jury could have found a nexus between Fields's aggressiveness and his use of Effexor, which Woods explained could result in spontaneous anger and an inability to control that anger.  Counsel's reliance on these experts, whose methods and conclusions Fields does not attack, was wholly within the ambit of professionally competent assistance, and the attorneys had no obligation to seek out different opinions. *Elledge v. Dugger*, 823 F.2d at 1447 n. 17.  Furthermore, given that counsel presented testimony that attributed the murders to the use of Effexor, any forgone evidence that statistically linked compulsively violent behavior to the use of anti-depressants would have been merely cumulative.  Such an omission does not constitute ineffective assistance. *See Snow*, 474 F.3d at 729; *see also Van Poyck v. Florida Dep't of Corrections*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative").

Fields may argue that the omitted evidence was not cumulative because it would have

37

drawn a direct link between violent behavior and the use of anti-depressants, while the testifying witnesses more cautiously testified that the drugs created the emotional prerequisites for violence – mania, irritability and poor judgment.  To the extent that the testimony adduced at trial had a shade of slightly different meaning than the information Fields now presents – in the form of an article by Peter Breggin (Pet. Ex. 14) – counsel would have still reasonably forgone the information.  Breggin's opinions, linking anti-depressants and other drugs to violent behavior have been subject to exclusion from court proceedings.  *Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842, 844 (10th Cir. 2010) (noting that Breggin did not demonstrate an accepted methodology from determining that the anti-depressant Paxil can cause suicide); *Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664 (S.D. Miss. June 9, 2005) (excluding Breggin's testimony regarding Paxil); *Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H, 1995 WL 478844 (W.D. Va. April 21, 1995) (excluding Breggin's testimony regarding Halcion: "Simply put, the court believes that Dr. Breggin's opinions do not rise to the level of an opinion based on 'good science.'").

Given that Breggin's methods have been subject to successful attack, Fields has not established the admissibility of his putative testimony, even under the liberal standards applicable in a penalty phase hearing.  In short, Fields has not demonstrated that Breggin's scientifically baseless opinions would not have been found more prejudicial than probative.  18 U.S.C. § 3593(c).  Even if Breggin had testified, his methods and specific conclusions would have been subject to obvious attack, potentially undermining Woods and Grinage's opinions about the

38

effect of Effexor on Fields.[7]   Accordingly, trial counsel did not unreasonably or prejudicially

omit to call Breggin or someone espousing his particular conclusions about anti-depressants.  *See*

*Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005) (observing that defense counsel are not

ineffective in failing to elicit presumably inadmissible evidence); *Schlup v. Armontrout*, 941 F.2d

631, 639 (8th Cir. 1991) ("Counsel was not ineffective in failing to interview and call witnesses

whose testimony would be repetitive or potentially damaging").

F.  Trial Counsel's Preparation of the Expert Witnesses

Fields claims his attorneys were ineffective for failing to adequately prepare Drs. Grinage

and Woods for their testimony.  Fields contends that the experts had a "general sense" that they

were inadequately prepared.  He further argues that counsel's failure to provide Grinage with a

transcript of his guilty plea or to inform Woods of the elements of a pertinent statutory mitigator

exposed both witnesses to damaging cross-examination.  (Pet. 53-54; Mem. 39-41.)  Fields is

wrong.  Both experts testified consistently with written opinions they rendered before Fields

pleaded guilty and defended their conclusions in the face of questioning by the prosecution.

At least one court has found a duty for trial counsel to provide adequate information to

expert witnesses before calling them to the stand.  *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th

Cir. 1998).  However, counsel do not act ineffectively when allegedly forgone preparation would

not have affected the outcome of the case.  *United States v. Molina*, 934 F.2d 1440, 1448 (9th

---

[7]Fields also notes that the FDA published Public Health Advisory that warned that anti-depressants could cause hostility.  (Pet. Ex. 15.)  The Advisory does not endorse or rely on Breggin's methods or conclusions.  In particular, it does not attribute to anti-depressants a tendency to cause violence toward others.  (*Cf*. Pet. Ex. 14 at 34-35.)  It goes no further than to warn of the potential for "hostility," virtually the same side-effect noted by Dr. Woods: "irritability, . . . spontaneous anger, [and] inability to control your anger."  (Tr. 12: 2953.)

39

Cir. 1991); *see also Smith v. Gibson*, 197 F.3d 454, 462 (10th Cir. 1999) ("Petitioner fails to allege how further preparation would have enhanced his testimony").

Given Fields's obligation to show specifically that any asserted error in witness preparation actually redounded to the detriment of the defense, his allegation of a "general sense that . . . testimony was ill-prepared and presented" should fail as a matter of law.   Simply put, a "general sense" of inadequate preparation does not demonstrate how further preparation would have enhanced the experts's testimony or led to a reasonable likelihood of a more favorable verdict.  *See Smith*, 197 F.3d at 462.

Fields's more specific allegations of error also fail to show that Drs. Grinage or Woods would have testified more effectively had they received more preparation.

Dr. Grinage testified in pertinent part that Fields committed the murders while suffering from a "severe emotional mental disturbance, mainly bipolar disorder with [auditory hallucinations]," which significantly impaired his ability to conform his behavior to the law.  (Tr. 11: 2814-15.)  Grinage's testimony was nearly identical to the conclusions he had offered in a written report, which he submitted to defense counsel on June 24, 2005, a few weeks before Fields pled guilty.  (Pet. Ex. 27 at 8-9.)

During cross-examination, the prosecution observed that Grinage's opinion predated the guilty plea, and asked whether the expert's conclusions were inconsistent with the defendant's admissions:

> Q  In your report – by the way, do I have a copy of it there, sir?
>
> A  Yes.
>
> . . .

Q And in fairness to you, this report is dated June 24, 2005.

A Correct. And I have had some other collateral history gathering since this report as well.

Q I'm not trying to be unfair with you with regard to this. This report was drafted before that plea of guilty was entered?

A Yes, sir.

. . .

Q All right, sir. You're also aware, sir – by the way have you reviewed a transcript of his plea hearing?

A No, sir, I have not.

. . .

Q All right. And are you aware that at the plea hearing the Defendant acknowledged specific – specifically to the Court that he admitted the murders with premeditation?

A Would I be surprised by that?

Q Yes, sir.

A I would find that important information.

Q In fact, that would be pretty basically inconsistent with the opinion that you just rendered to this jury, right?

A Not necessarily. It depends on what you say by premeditation. I think with regards to some of the crimes that occurred I obtain premeditative – thoughts of premeditation in my evaluation. But, with regards specifically to the shooting, I did not obtain that information. But, I think that would be information important the look at and weigh at in regards to my opinion.

(Tr. 11: 2817-19.) Rather than backing away from his earlier opinion, Grinage reiterated his

understanding of the crime – that Fields did not recall pulling the trigger of his gun but did recall

hearing a voice. (Tr. 11: 2820.)

41

In fact, Fields is mistaken in asserting that Grinage conceded on cross-examination that any aspect of the guilty plea contradicted his medical conclusions.  While Grinage stated that Fields's admission of premeditation could have significance, he eventually explained that it did not affect his conclusion: "I think I misunderstood your premeditation comment before. . . . [Fields's] intention at that particular time was not of what happened.  And all I can  say in my testimony is that he had a mental illness that was influencing.  I'm not saying it caused it.  I'm not saying it created this situation.  I'm just saying that he was influenced by mental illness at that time." (Tr. 11: 2875.)  Similarly, while Grinage allowed for the possibility that Fields's admission of deliberateness could influence his opinion (Tr. 11: 2823-24), he never conceded that it changed his conclusion: "My testimony is that the time he had a psychotic disorder that influenced his behavior, not his thought process.  And deliberation really is a thought process issue. . . . that's not part of my evaluation.  I did not evaluate him cognitively."  (Tr. 11: 2825.)

In short, Grinage stated that he had not read Fields's plea transcript, and appeared unaware of the precise elements to which the defendant had admitted, but the witness never indicated that he would have offered a different opinion had he reviewed the plea as part of his analysis.  Given that the analysis predated Fields's plea, trial counsel could not have provided him with the information in any event, precluding any finding that the attorneys acted unreasonably.  Whether or not defense counsel informed Grinage of Fields's specific admissions prior to trial, the expert explained how his opinion remained intact in the face of the defendant's plea.  As such, Fields has not shown that any alleged failure to prepare the expert for testimony had any detrimental impact on the outcome of the trial.

Likewise, Fields fails to show that counsel prejudicially omitted to prepare Dr. Woods for

42

his testimony.  Fields claims that Woods erroneously testified that the defendant was unable to conform his conduct to the dictates of the law, when the pertinent statutory mitigator required proof that the defendant was "substantially impaired" in his ability to behave lawfully.  Woods's testimony was consistent with the opinion he had rendered in writing, prior to trial.  (*See* Pet. Ex. 28 at 10 ("His ability to resist the voices, always tenuous, became impossible at the time of offense.").)  While Woods's opinion went beyond the statutory requirements for application of the application of the impaired-capacity mitigator (*cf.* 18 U.S.C. § 3592(a)(1)), it nonetheless encompassed the requisite showing of substantial impairment.

It appears, moreover, that Woods offered his diagnosis despite the fact that counsel likely asked whether Fields met the strict criteria of the statutory mitigator.  Indeed, Dr. Grinage specifically recounted trial counsel's request: "An opinion as to whether there was significant impairment in the defendant's capacity . . . to conform his conduct to the requirements of the law.  (Pet. Ex. 27 at 1.)  Fields provides no reason to believe that counsel would have asked Grinage to opine about the applicability of the elements of the statutory mitigator, while requesting that Woods determine the applicability of some inapplicable, and more rigorous, standard.  Once Woods had offered, in writing, an opinion that went beyond the applicable standard (Pet. Ex. 28), counsel had no reason to instruct him to testify inconsistently with his earlier conclusion.  Presumably, doing so would have merely opened Woods to cross-examination about a prior inconsistent statement, and it was appropriate for the attorneys to rely on the expert's conclusions.  *See Harris v. Vasquez*, 949 F.2d at 1525.

The prosecution's cross-examination in no way dislodged Woods from his conclusion:

A  Yes. I'm absolutely aware of that.  He pled guilty.

43

Q  (By Mr. Sperling) Yet you contend the Defendant was unable to conform his behavior to the law?

A  Those are two different statutory requirements.  The first one has to do – insanity has to do with whether he is guilty or not.  He pled guilty to the crime.  The second one has to do with whether there are mitigating factors to separate out the death penalty from life without the possibility of parole. They're different factors.

. . .

A  It's not irresistible impulse.  You know what I mean.  It's a mitigation factor of being able to conform your behavior to the law.

(Tr. 12: 3048-49.)  Fields fails to show how this interchange may have prejudiced the defense.

Indeed, he does not identify any argument by the prosecutors in which they attempted to exploit

Woods's possible overstatement of the requisite standard.

At most, Woods might have created the false impression that application of the mitigator

required a showing that Fields could not conform his conduct to the law rather than that he was

significantly impaired from doing so.  But the court properly instructed on the requisite standard

(Trl. Doc. 227 at 25), and the jury rejected the mitigator on a verdict form that quoted the

"significantly impaired" language (Trl. Doc. 228 at 38).  The jury presumably heeded this

Court's instructions.  *See United States v. Olano*, 507 U.S. 725, 740 (1993) ("'[It is] the almost

invariable assumption of the law that jurors follow their instructions.'"); *see also Penry v.*

*Johnson*, 532 U.S. 782, 799-800 (2001) (noting general presumption that juries follow

instructions applies in habeas proceedings).

Given that Fields has failed to show that his attorneys' alleged failure to prepare the

expert witnesses for their testimony fell below prevailing professional norms or prejudiced the

defense, his claim of ineffectiveness should fail.

44

Case 6:10-cv-00115-RAW   Document 16   Filed 09/28/10   Page 59 of 123
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 703

703

## II. FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS INCOMPETENT TO BE EXECUTED

Fields claims that his alleged mental illnesses render him incompetent to be executed. (Pet. 54-55; . Mem. 42-46.)  The argument, as Fields concedes, is not ripe for adjudication.

Fields cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies.  U.S. Const. art. III, § 1; *see United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009).  Thus, federal courts cannot give advisory opinions in hypothetical cases. *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968).  Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III.  *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).  Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship-the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution.  *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993).  The plaintiff bears the burden to allege facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Fields has made no effort to demonstrate ripeness of his complaints about his mental health, nor could he.  Courts have universally found that claims of incompetence to be executed are not ripe until the execution is imminent.  *See, e.g.*, *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n.2 (3d Cir. 2006); *Coe v. Bell*, 209 F.3d

45

815, 823 (6th Cir. 2000); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (recognizing that a defendant's claim of incompetence to be executed was "unquestionably ripe" after the state issued a warrant for the execution).

Fields's execution is not imminent, and his claim is therefore not ripe. This Court should therefore decline to consider the contention.

### III. TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S VALID EVIDENCE AND ARGUMENTS

Fields claims that trial counsel ineffectively failed to investigate and identify evidence that might have rebutted the government's showing and arguments in favor of two aggravating factors – mental anguish and substantial planning and premeditation. In related arguments, Fields complains that the government presented false and misleading evidence to support the aggravators. (Pet. 56-83; Mem. 46-62.) Fields is wrong. His attorneys reasonably responded to the government's presentation, which was, itself, entirely appropriate. The government addresses Fields's claims, in turn, below.

### A. Counsel Reasonably Responded to Evidence in Support of Aggravating Factors

Fields claims that trial counsel inadequately investigated and presented evidence to rebut evidence that he substantially planned and premeditated the crime and that he caused mental anguish. Neither of these arguments has any validity.

#### 1. Substantial Planning and Premeditation

##### a. The Testimony of Fields's Associates

Fields contends that his attorneys failed to adduce testimony from Daniel Presley that the defendant's ghillie suit was a ubiquitous item among squirrel hunters. Likewise, he argues that

counsel should have adduced Presley's testimony that Fields attached a large scope to his .22

rifle to allow him to take long range shots at squirrels.  According to Fields, Presley's putative

testimony would have rebutted government evidence and argument that the ghillie suit and rifle

scope were evidence that the defendant had long intended to murder people.  Further, Fields

claims that counsel should have presented Presley's testimony that the defendant invited him to

go snake hunting a few hours before the murders.  According to Fields, such testimony would

have rebutted evidence that the defendant manufactured an alibi by telling his girlfriend, several

hours before the murders, that he would not be home that evening because he had plans to go

fishing with Presley.  (Pet. 59-64 & 74-75; Mem. 48-49.)  Fields cannot show that the omission

of the supposedly forgone testimony was unreasonable or prejudicial.

For counsel's actions to offend the Constitution, "his strategic decisions must have been

completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible

defense strategy."  *Fox v. Ward*, 200 F.3d at 1296.  As noted, a showing that additional evidence

could have been adduced "usually proves at most the wholly unremarkable fact that with the

luxury of time and the opportunity to focus resources on specific parts of a made record,

post-conviction counsel will inevitably identify shortcomings in the performance of prior

counsel."  *Waters v. Thomas*, 46 F.3d at 1514.  But if trial counsel did not know of facts that

would alert him or her to the need to conduct a particular investigation, a failure to investigate

does not amount to deficient performance.  *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir.

2003).

In this case, Fields claims that his attorneys should have investigated Presley's knowledge

of ghillie suits and rifle scopes to show that both were items common to squirrel hunters and,

thus, not evidence of planning and premeditation on the defendant's part. But Presley's own statement to the FBI precluded any reason for defense counsel to inquire about his knowledge of ghillie suits. He told the FBI that he was "not certain if it's common for an individual to wear a gilli [sic] suit while squirrel hunting." (Pet. Ex. 21 at 4.) Presley also told the FBI that he believed Fields wrapped his rifle shortly before the crime. (Pet. Ex. 21 at 3.) Presley said that Fields had previously used the rifle to hunt without camouflage and did not explain why he had covered it. (*Id.*) As a result, counsel was aware of no fact that might have alerted the to the possibility that Presley might provide testimony,[8] as he now claims, that a ghillie suit is a "common tool" among area hunters. *See Alcala*, 334 F.3d at 893.

Had counsel adduced such testimony from Presley, the witness would have been susceptible to impeachment with his prior inconsistent statements to investigators. (*See* Pet Ex. 21.) Even if Presley had explained that other hunters commonly use camouflage like that used by Fields during the murders, such testimony would have had little impact, given that the defendant referred to his ghillie outfit as "sniper suit" or suspiciously refused to explain its purpose. (Tr. 9: 2331, 2338; 10: 2486.) Because Fields indicated, by assertion or omission, that the ghillie suit was intended for a nefarious purpose, no reasonable probability exists that any forgone testimony from Presley intended to neutralize the significance of the outfit would have altered the outcome of the trial.

Presley also told investigators that Fields's .22 caliber rifle had a "very powerful" scope.

---

[8]Presley recently declared that he did not ask Fields why he had covered the rifle because he believed he understood the motive. (Pet. Ex. 20 at 5.) Presley's understanding is, however, irrelevant, as his state of mind does not demonstrate whether trial counsel knew of facts that could form evidence helpful to the defense.

48

(Pet. Ex. 21 at 3.)  Consistent with that statement, he testified that the scope was "[v]ery powerful.  It was something you would see on a high powered hunting rifle."  (Tr. 9: 2379.) Presley now claims that he could have testified that squirrel hunters commonly use "a scope on a .22 rifle."  However, there is no indication that trial counsel knew Presley might be able to explain the reason that Fields chose to outfit his rifle with a scope meant for a longer-range weapon.  Regardless of the fact that Fields has not shown his attorneys were aware of this line of inquiry, he has not shown that it would have been fruitful.  In fact, Presley recently declared that Fields used the scope to "challenge himself," making especially long range kills.  (Pet. Ex. 20 at 4-5.)  Ironically, Presley's assertion supports, rather than defeats, the very point the prosecutor was attempting to make when he argued about the significance of squirrel hunting:

> It's the actions of a man who is methodically thinking out what he wants to do.
> His plan down the road is to become a predator, a sniper. This was the first step in
> that action.  His own friends tell you about how he tried to carry out those plans,
> how he'd go squirrel hunting, however he had the Ghilley suit, Dan Presley told
> you, they went squirrel hunting. . . . Plan was not to kill Charles and Shirley
> Chick, per se, but he had become a hunter. This was what he wanted to do. He had
> built the Ghilley suit and now he had built the gun. He had become proficient in
> his stalking activities without, as the squirrels, being able to sneak up on people.

(Tr. 14: 3407-08.)  Because Presley's explanation of the scope does not appreciably alter the fact that Fields could transfer his squirrel hunting skills to the stalking and killing of human beings, no reasonable probability exists that the defendant would have received a more favorable verdict had trial counsel adduced the witness's putative testimony.

Finally, Fields cannot show that his attorneys acted ineffectively in failing to adduce testimony from Presley that Fields invited him to go snake hunting on the evening of the murders.  Fields is simply wrong that such evidence would have forestalled the government from

49

arguing that the defendant attempted to manufacture an alibi by telling his girlfriend, Michelle

Tipton, that he was going fishing with Presley that night. (*Cf.* Tr. 10: 2558.) Indeed, such

evidence would have underscored the fact that Fields falsely told Tipton that he had a standing

social engagement with Presley. (*See id.*) At most, Fields's invitation to Presley indicated that

he was willing to defer the murder until after a snake hunt. And Fields may have hoped that, if

he committed the murders soon after such a hunt, the convergence of time lines might suggest to

investigators that he was unlikely to have killed the Chicks. However, there is no reason to

believe that Fields's last minute invitation to Presley would have detracted in any way from the

government's evidence that Fields had lied to Tipton when he told her that he had existing plans

to fish with Presley. Accordingly, counsel did not act unreasonably or prejudicially in omitting

to adduce evidence that would have largely served to advance the government's position. *See*

*Yarborough*, 540 U.S. at 5-6.

> b. Glass Fragment Evidence

Fields claims that his attorneys ineffectively failed to retain an expert witness who could

have contradicted crime scene analyst Iris Dalley or suggested fruitful cross-examination to

challenge her explanation of glass fragments found at the scene. Dalley testified that she found

unstained fragments lying inside the Chicks' van, atop a pool of dried blood. Because she

observed no blood on the fragments, Dalley concluded that they came from a window that Fields

shattered several hours after the murder – enough time to permit the blood to dry so that it was

not transferred to the glass on contact. Fields now presents the declaration of a retained expert

who asserts that one glass fragment was stained and that the fragments could have fallen from the

van door during the crime scene investigation. (Pet. 65-69 (citing Pet. Ex. 23).) Fields has not

shown that his attorneys acted unreasonably or that their asserted omission prejudiced him.

While Fields has identified an expert who disagrees with Ms. Dalley, he does not indicate why trial counsel might have sought out a criminalist.  As previously noted, if counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance.  *Alcala v. Woodford*, 334 F.3d at 893.  In this case, Fields pleaded guilty to all counts, specifically conceding that he had premeditated the Chicks' murders.  (Tr. June 30, 2005: 28-31.)  Fields had earlier confessed that he left the victims' campsite after the murders, returning with his truck to complete the robbery.  (Trl. Ex. 131 at 2.)  The confession is silent as to the period of time he was absent.  (*Id.*)  Fields provides no indication that he ever informed his attorneys that Ms. Dalley's conclusions were erroneous.  Certainly, counsel was not expected to make the observations that Fields now attributes to his current expert.  Accordingly, Fields has failed to show that counsel was alerted to circumstances that would have reasonably required them to retain a criminalist as a consultant or witness.

Regardless of the reasonableness of counsel's actions, Fields cannot show that the decision prejudiced him, because the conclusions of his present expert, Robert Tressel, are erroneous.  Tressel asserts that a photograph of the crime scene depicts a "red stripe" of blood transfer on a glass fragment, indicating that the piece of glass fell on still-viscous blood.  Tressel is wrong.  Had a glass fragment fallen into viscous blood, the stain on it would have mirrored the shape of the blood with which it came in contact, and the red stripe is a different shape than the blood beneath the fragment.  (Ex. 1 at ¶¶ 6-13.)  Furthermore, the apparent red stripe is visible from only one angle: it does not appear in other photographs of the fragment, even under magnification.  (*Id.*)  Tressel has managed only to identify the image of blood underneath the

51

fragment, refracted through the glass. (Ex. 1 at ¶ 12.) His identification of an illusory stain in a two dimensional photograph would have done nothing to undermine Dalley's eyewitness observation that the fragments were unstained.

Likewise, the defense would not have benefitted from presentation of Tressel's theory that the glass fragments may have fallen onto the dried blood when Dalley opened the van's door. Dalley could have testified that she carefully opened the door to avoid shifting any evidence. More significantly, Dalley could rely on photographs of the inside of the passenger-side door, taken prior to opening, to show that there were no glass fragments in a position to fall on the dried blood. (Ex. 1 at ¶¶ 16-20.) Indeed, the photographs show that there were no surfaces above the dried blood capable of holding glass fragments that could shift and fall when moved. While it appears that one fragment likely fell to the ground below when the door was opened, it does not demonstrate that any fragments were in line with the dried blood pool when the door opened.

Given that the government could have easily refuted Tressel's assertions regarding the glass fragments, no reasonable probability exists that the failure to retain a defense expert – to testify or merely consult – prejudiced the outcome of this case. *See Haddock*, 12 F.3d at 958.

c. Blood Flow Evidence

Fields claims that his attorneys ineffectively failed to retain an expert witness who could have reinterpreted certain crime scene photos as evidence that Charles Chick's body was moved less than six hours after the murder. Specifically, Fields relies on Tressel's declaration to argue that plant material that adhered to Chick's hand indicates that the victim was moved while blood on his hand was still wet. Fields also observes that, in Tressel's opinion, the blood found around

52

Mr. Chick's body would not have been there had the corpse been moved several hours after the murder for the simple reason that it would have congealed.  (Pet. 69-70; Mem. 52.)  Fields cannot show that trial counsel acted unreasonably because he cannot offer reliable, much less correct, evidence in support of his theory regarding the flow of blood from Charles Chick's head.

As with the glass fragment evidence, Fields fails to demonstrate that his attorneys were alerted to any fact that would have reasonably required them to obtain expert assistance in this matter.  *See Alcala*, 334 F.3d at 893.  Certainly, he has not averred that he informed counsel that the government's experts were wrong.  In any event, Fields cannot show, on the basis of Tressel's declaration, that counsel could have presented competent testimony with which to refute the government's evidence.

Fields's putative expert, Tressel, appears to have offered opinions based on facts beyond his ken.  In essence, his opinions about blood flow hinge on the rate at which blood would congeal in a dead body and therefore be available to drain several hours after death.  In no way does he indicate that he has training and knowledge about such medical matters.  This is not the first time Tressel has proffered an opinion about medical matters, despite a lack of knowledge. *See United States v. Frazier*, 387 F.3d 1244, 1252-54 (11th Cir. 2004).  Having failed to identify any reliable evidence that defense counsel could have presented, Fields has not shown that his attorneys acted unreasonably in omitting to seek expert forensic assistance.  *See Cummings v. Sirmons*, 506 F.3d 1211, 1233 (10th Cir. 2007) *cert. denied*, 128 S.Ct. 2943 (2008) (rejecting ineffective assistance claim because the petitioner never identified precisely what purported experts would have testified to).

Indeed, Tressel's conclusions are not merely unfounded, they are incorrect.  Tressel

<div align="center">53</div>

opines that Mr. Chick's blood would have congealed within six hours and therefore could not have drained when Fields was believed to have moved the body. Tressel asserts that the process of coagulation was accelerated by low temperatures on the night of the murders. (*See* Pet. Ex. 23 at 5, 7.) Tressel's assumption does not survive the barest of scrutiny. Dr. Distefano, the medical examiner who testified at Fields's trial, has explained that the coagulation of blood is slowed by lower temperatures and one could expect Mr. Chick's wounds to have drained freely for up to 24 hours after death. (Ex. 2 at ¶ 4.) As Dr. Distefano states "it is completely incorrect to conclude that blood in Mr. Chick's body would have congealed in six hours in relatively cool evening air." (*Id.*) As such, no reasonable probability exists that the omission of Tressel's involvement in this case prejudiced its outcome. *See Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994) (holding no prejudice to petitioner who failed to make specific, affirmative showing that absent witness's testimony would have affected outcome of trial).

Similarly, the defense could not have effectively refuted the evidence that Mr. Chick's body was moved several hours after death by noting that a limited amount of plant material had adhered to the blood on the back of his right hand. Any moisture such as dew could have rehydrated the blood on the back of Mr. Chick's hand sufficiently to adhere a small amount of plant material. Furthermore, the pattern of debris distribution suggests that it was transferred there by some passing animal or by Fields's hand or foot. (Ex. 1 at ¶¶ 21-24.) Once again, no reasonable probability exists that the omission of a defense forensics expert prejudiced altered the jury's findings. *See Haddock*, 12 F.3d at 958.

     d. Lividity Evidence

Fields claims that his attorneys ineffectively failed to retain an expert witness who could

713

have testified that the photos of Mr. Chick's body refuted the medical examiner's testimony that the victim sat in an upright position for several hours after death. Fields relies on Tressel's declaration to argue that the medical examiner simply misinterpreted the lividity patterns on the body. (Pet. 69-70; Mem. 52.) Fields does not show that counsel were alerted to the need for such opinions. But like Tressel's other medical opinions, his views on lividity are neither competent nor correct. As such, they fail to support any claim that trial counsel erred.

As before, Fields has not revealed that he informed counsel that the government's experts were wrong or that his attorney could have discovered competent evidence with which they could refute the government's case. *See Alcala*, 334 F.3d at 893. Furthermore, Tressel has once again offered a medical opinion without showing that he has the requisite training and experience to support it. His baseless assertions should not form the basis of a finding that counsel acted unreasonably. *See Cummings v. Sirmons*, 506 F.3d at 1233.

Tressel's conclusions are not merely beyond his expertise, but simply incorrect. Dr. Distefano has explained that lividity becomes fixed in a matter of hours – generally eight to twelve. (*See* Ex. 2; *see also* Tr. 8: 2031.) Even after lividity has set in one position, secondary patterns can develop if the body is moved to another position.[9] (Ex. 2 at ¶¶ 5-6; *see also* Ex. 1 at ¶¶ 28-29.) That fact undermines Tressels's supposition that the lividity patterns observed on Mr.

---

[9]Fields does not assert that his attorneys failed to present evidence about rigor mortis, but Tressel's Declaration asserts that rigor could have precluded the movement of Mr. Chick's body. (Pet. Ex. 23 at 7.) Tressel, however, concedes that Mr. Chick was found in full rigor 24 hours after his killing. Because the process of rigor would have therefore been previously incomplete, there is no basis for asserting that Tressel's estimation of rigor would have undermined the argument that Fields moved the body about six hours after death. In fact, Dr. Distefano testified to essentially the same estimate as Tressel, but noted the potential for variability in the process. (*See* Tr. 8: 2057-59; *see also* Ex. 2 at ¶¶ 12-13 (noting an absence of facts to suggest that rigor would have precluded movement of the body).)

Chick's body were in any way inconsistent with the trial testimony that livor initially fixed while the body was seated. (*Cf.* Tr. 8: 2029-32.) Indeed, Dr. Distefano explains that the pattern visible on the rear of Mr. Chick's lower body is consistent with lividity having fixed while he was in a seated position and the pattern visible on his anterior thighs is consistent with secondary lividity having fixing in a prone position. (Ex. 2 at ¶¶ 7-8.) Dr. Distefano also notes that the lividity patterns visible on Mr. Chick's feet are not inconsistent with either position, as the victim was thought to have had his feet pointed downward while seated, as well as prone. (Ex. 2 at ¶ 9.) Given the evident flaws in Fields's putative lividity evidence, no reasonable probability exists that its omission at trial prejudiced the defense. *See Patel v. United States*, 19 F.3d at 1237.

2. <u>Mental Anguish</u>

Fields claims that his attorneys erred when they omitted to present evidence that the high velocity blood spatter found on Shirley Chick could have come from her own wounds, though the government attributed the source of the blood to Charles Chick's wounds. According to Fields, such evidence would have blunted the government's argument that he began inflicting mental anguish upon Shirley when he shot her husband as she sat close enough to him to be misted by his blood. (Pet. 72-74; Mem. 52-53.)

Fields provides no basis for concluding the counsel might have believed such a strategy might prove fruitful. He does not indicate that counsel was aware of any information that would have indicated Mrs. Chick was an appreciable distance from her husband when the first bullet hit him. In fact, Fields told investigators, "The Chicks . . .. were sitting at the picnic table at their campsight [*sic*]. I remained concealed in the woods for about 15 minutes after their return to the campsight [*sic*]. At one point, Charles Chick said he was going to the tent. I shot Charles Chick

with one shot to the head." (Gov't Trl. Ex. 131.)  Corroborating Fields's statement, investigators

found two partially empty beverage containers at the picnic table.  (Tr. 8: 2119; Gov't Trl. Ex.

63.)  Furthermore, there could be no real controversy that Mrs. Chick was close enough to be hit

by spatter from her husband's wound, given that high-speed droplets, consistent with ejection

from a gunshot, were found on the far side of the picnic table.  (Tr. 8: 2123; Gov't Trl. Exs. 63-

66.)  In view of the defendant's confession and other evidence establishing that Ms. Chick was at

the table when Fields shot her husband, trial counsel had every reason to believe that suggesting,

or even establishing, an alternate source of blood spatter on her face could amount to nothing

more than a pyrrhic victory.  But because Fields's current expert incorrectly predicts the direction

in which back spatter from Mrs. Chick's wounds would have traveled (*see* Ex. 1 at ¶¶ 25-26), he

cannot show that the absence of such evidence would have affected the outcome of his case.  *See*

*Patel v. United States*, 19 F.3d at 1237.

Not only could counsel have validly concluded that the defense was unlikely to profit

from a rebuttal of the blood spatter evidence, but Fields has failed to show that it was central to

the government's argument in support of the mental anguish aggravator.  Fields quotes, without

appropriate context, the government's argument regarding the blood spatter evidence.  (*See* Pet.

72.)  But a more complete rendition of the prosecutor's argument makes clear that the

government premised the mental anguish factor, not on a mere misting of blood, but on Shirley's

Chick's presumed shock at seeing Charles gunned down and her own unsuccessful flight from

Fields:

> What happens at the time of the shot? She gets splattered with her husband's
> blood allover her face.  That's what happens to her.  And picture the scene, ladies
> and gentlemen. They're out in the middle of nowhere and all of a sudden a sound

57

> of a gunshot and her husband collapses and she has his blood allover his face.
> What was the horror, the shock, the sheer, oh, my God, the terror that went
> through her mind at that instant?  Because she doesn't know where it's coming
> from at this period of time, ladies and gentlemen.  She has no idea.  Her defensive
> mechanisms take over and she gets up and she begins to run.  She tries to escape.
> She tries to seek cover. But there is no escape for Shirley.  She can't run.  She's
> got a bad leg.  There is nowhere for her to hide.  This man has thought this out.
> He is executing his plan to precision.  He takes out the biggest threat and Shirley
> was going to be easy one.

(Tr. 14: 3416.)  The prosecutor continued in this vein, noting the metal rod in Ms. Chick's leg,

her attempt to seek cover, and her likely view of Fields in his ghillie suit as he approached her

and shot her at close range.  (*Id.* at 3416-17.)  While the prosecutor mentioned the spatter of

blood in arguing the mental anguish factor, he focused his argument elsewhere – on the

perceptions of Ms. Chick in the waning moments of her life.  Given the relative unimportance of

the blood-spatter evidence to support the showing of mental anguish, no reasonable probability

exists that Fields would have received a more favorable verdict had his attorneys attempted to

rebut it with the fatally flawed opinions of his current expert.  *See Haddock*, 12 F.3d at 958.

B.  The Government Properly Presented Evidence and Argued Reasonable Inferences from the
Record

As a corollary to his ineffective assistance claims, Fields also argues in the alternative

that the prosecutors improperly adduced false evidence and made improper arguments.  As

shown below, neither argument has any validity.

1.  Allegedly False Glass Fragment Evidence

Fields argues that the government erroneously presented false and misleading testimony.

Specifically, he argues that the prosecutors knew or should have known that the crime scene

reconstruction testimony of Iris Dalley was false because, as averred by his present expert, a

fragment of glass depicted in a photograph appears to have a "red stripe" on it.  (Pet. 77-80;

Mem. 57-59.)

The Supreme Court has stated that the *Brady* doctrine applies if the prosecution "knew or

should have known" that its case contained perjured testimony and "there is any reasonable

likelihood that the false testimony could have affected the judgment of the jury."  *United States v.*

*Blandin*, 784 F.2d 1048, 1051 (10th Cir. 1986) (citing *United States v. Agurs*, 427 U.S. 97, 103

(1976)).  However, the Tenth Circuit has refused to impute even the knowing falsity of a law

enforcement officer to the prosecution.  *See Smith v. Sec'y of New Mexico Dep't of Corrections*,

50 F.3d 801, 831 (10th Cir. 1995) (concluding that a *Napue* violation was avoided because the

prosecution did not have actual knowledge of false testimony).  Indeed, the notion that the

prosecution violates the Constitution when it presents evidence it "should have known" was false

is premised on dicta.  *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009).

Here, Fields's entire argument hinges on the strained notion that prosecutors should have

known Iris Dalley's testimony was false because they should have recognized what she

supposedly failed to observe.  This not only imputes Dalley's knowledge to the prosecution, but

also her expertise.  In essence, Fields's argument hinges on a finding that the prosecution has an

obligation to better practice crime scene reconstruction than a crime scene reconstruction expert.

Fields fails to identify any authority for such a proposition.  Because the claim lacks a basis in

existing law, any relief would necessarily require the legally impossible – a retroactive

application of a new rule of law.  *Schriro v. Summerlin*, 542 U.S. 348.  Fields calls upon this

Court to apply a new rule of constitutional import, and it therefore should reject the matter out of

hand.  *Id.*  Even if he could identify existing authority to support his position, his factual premise

– that Dalley erred – is without merit.  As discussed above, Ms. Dalley stands by her conclusions and has refuted the validity of Fields's theory that there is any visible blood transfer on any glass fragment that might suggest the defendant burglarized the victims' van shortly after the murder. (*See, supra*, Arg. III, A, 1, b.)

Because Fields cannot show that his present theory has any basis in fact, he cannot demonstrate that Dalley's testimony was false, much less materially so.  Indeed, the government could have relied on the medical examiner's lividity findings to demonstrate that Fields committed the burglary many hours after the murders.  (*See* Tr. 8: 2031-32.)  Thus, Fields cannot show a reasonable likelihood that he would have received a more favorable verdict, even in the absence of the supposedly false evidence regarding blood transfer to the glass fragments.

2.  Allegedly Baseless Argument

Fields also claims that the trial prosecutors falsely argued that he tried to create an alibi when he told Michelle Tipton that he had plans to spend the evening of the murders with Daniel Presley.  Fields also argues that the prosecution improperly implied that he did not attempt to spend the evening with Presley, because Presley was only asked if he had an existing engagement on the night of the murders that precluded spending time with the defendant.  According to Fields, the prosecutor should have also asked if the defendant invited Presley to go hunting just hours before he murdered the Chicks.  (Pet. 80-82; Mem. 59-60.)  Fields's argument should fail because the omitted evidence that Fields did not invite Presley out until after he claimed to have made plans would have only enhanced the government's position.

As previously discussed, Fields attempted to set up a false alibi when he told Michelle Tipton something that was not true – that he had pre-existing plans with Presley.  (*See, supra*,

Arg. III, A, 1, a.) The fact that Presley actually intended to go to a casino that night would not have assisted Fields. The prosecutor could have elicited Presley's recollection that Fields came to his house on the day of the murders – following the false statement to Tipton – and invited Presely to spend the evening with him. Such evidence would have only served to further underscore the falsity of Fields's initial statement to Tipton. In essence, prosecution only missed an opportunity to adduce evidence that would have further supported its view of the case. This may have been an oversight on the part of the prosecutor, but it certainly was not misconduct, nor was the argument that Fields attempted to set up a false alibi anything but a fair inference from the evidence. *See United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010) ("[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.").

To the extent that Fields now asserts that his statement to Tipton was a signal of his intent to spend the evening with Presley, that is merely one other interpretation of Fields's actions. (Pet. 81-82.) However, the inference is at odds with Tipton's observation that Fields was highly routinized and would note exceptions to his schedule. (Tr. 10: 2558-59.) A person like Fields, who was slavishly dedicated to his schedule, would seem unlikely to inform an intimate associate of an exception to it when had not yet confirmed plans to deviate from his usual routine. More likely, it appears that Fields would have willingly deferred the murders until after a snake hunt. And Fields may have hoped that, if he committed the murders soon after such a hunt, the convergence of time lines might suggest to investigators that he was unlikely to have killed the Chicks.

While, admittedly, *Agurs* prohibited the government from knowingly eliciting false

61

testimony, Fields has not established that the government suborned perjury, nor has he identified

any authority that required the government to adduce evidence that might have benefitted the

defense. Because the claim lacks a basis in existing law, any relief would necessarily require the

legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542

U.S. 348. This Court should therefore reject the matter out of hand. *Id.*

## IV. TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCE WITHOUT UNDERMINING THE DEFENSE STRATEGY

Fields claims that trial counsel ineffectively failed to present and rely upon social-history

evidence as a basis for mitigation. While conceding that counsel did present some such evidence

through his sister, Cherie Fields, Fields argues that his attorneys should have adduced additional

testimony to demonstrate the atmosphere of familial dysfunction in which he allegedly was

raised. Furthermore, Fields faults his lawyers for presenting social history evidence through his

sibling instead of through a paid witness – mental health experts Woods and Grinage or

mitigation investigator Glori Shettles. Fields also contends that his attorneys should have argued

that his personal history supported an independent mitigating factor. (Pet. 83-94; Mem. 62-71.)

Fields is wrong. His defense strategy centered on an explanation of his crimes as a behavioral

aberration driven by a misprescribed psychotropic drug. Any forgone evidence concerning

Fields's supposed family history would have undermined the defense by suggesting Fields was a

dangerous person whose homicidal conduct was a product of his character. In fact, evidence

intended to explain the crime in terms of Fields's upbringing would have been inconsistent with

the fact – one recognized by the jury in mitigation – that he had no record of criminal conduct

until he committed this crime at age 36.

62

As noted, the law strongly presumes that counsel acted for tactical reasons when they focus arguments on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. at 8. Even incorrect decisions do not offend the guarantee of competent counsel, so long as they are not "completely unreasonable." *Fox v. Ward*, 200 F.3d at 1296. Counsel does not err in omitting evidence that would have undermined, rather than supplemented, a viable mitigation strategy. *See Wackerly v. Workman*, 580 F.3d 1171, 1177-79 (10th Cir. 2009). In particular, testimony about a troubled upbringing and mental issues can be mitigating, but is double-edged – a fact that can support a reasonable strategic choice not to present such evidence. *See Williams v. Woodford*, 384 F.3d 567, 619-20 (9th Cir. 2004)); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006). In fact, the Tenth Circuit has frequently observed that counsel may reasonably omit "double-edged" evidence. *See Wackerly v. Workman*, 580 F.3d at 1177-78 (collecting cases); *Bryan v. Mullen*, 335 F.3d at 1222-23; *Cannon v. Gibson*, 259 F.3d at 1277-78.

In this case, defense counsel attempted to portray Fields as an essentially normal, law-abiding person who committed a horrifying and – for him – anomalous crime, while under the influence of emotional trauma and wrongly-prescribed psychotropic medicine. In argument, counsel conceded the defendant's eccentricities, but specifically attempted to dissuade the jury from accepting the government's theory that Fields acted in conformity with his bad character: "This man has never quite been able to live his life the right way, yet he has a ton of people who love him. How can that be if he is such a sociopath?" (Tr. 14: 3435.) After defining the impaired capacity statutory mitigator (Tr. 14: 3436), counsel asserted that "Effexor . . . over a period of time that medication built up like it's supposed to. . . . it was like a wave and he got to the tipping point." (Tr. 14: 3438.) Counsel observed that Fields had no history of convictions, a

63

basis for her further argument that his commission of these murders meant that, "Something was wrong" and that the death penalty was inappropriate punishment for someone who did not "need[] to be put down." (Tr. 14: 3439-40.) Further attempting to explain the crime as the product of external forces, counsel argued that Fields committed the murders under the severe emotional distress occasioned by his father's recent death and his mother's illness. (Tr. 14: 3440.) Counsel returned once again to the theme that Fields was an essentially decent person when she argued that he was a beloved relative and friend who expressed remorse and did not present a future danger. (Tr. 14: 3441-42.)

In support of the defense tactic of portraying the murders as atypical of Fields's character, the defense presented the testimony of his sister, who described her brother's upbringing. Cherie Fields said that she loved her brother. (Tr. 11: 2676, 2689.) She recounted how Fields demonstrated his love for his father by planting a garden for him and fishing with him toward the end of his life. (Tr. 11: 2685-86.) Cherie also testified, on direct and cross-examination, to troubling aspects of her family life and her brother's conduct. (*See, e.g.*, Tr. 11: 2674-76 (stating that she and her brother fought as teenagers), 2677-78 (stating that her father worked long hours and was largely absent from his children's lives), 2679-80 (discussing her mother's long-time illnesses), 2703-05 (recounting Fields's irresponsibility and laziness), 2711 (noting that Cherie believed Fields was an inadequate father).) But the thrust of her testimony was that her brother, while flawed and "sick," was not "vicious"; he was, in fact, someone she loved and supported, despite his own admonition that she not testify on his behalf. (*See* Tr. 11: 2719-20.)

Fields committed these murders as an adult, nearly 20 years after his emancipation from his parents' home. As the defense successfully observed in mitigation, he had no criminal

record. (*See* Trl. Doc. 228 at 38.) If the murders were, however, somehow a by-product of loveless parenting, Fields has not explained the psychological mechanism at work, much less the reason why two decades passed before the emotional trauma at issue manifested itself as an unprovoked double murder of two strangers unrelated to his parents in any way. Rather than rely on such a tenuous hypothesis, the defense presented concrete theory premised on the defendant's ingestion of a psychoactive substance. But the notion that these murders were, in any way, a product of some long-standing lack of socialization or empathy, caused by a bad family life, would have diluted the theory that the crime was Effexor driven, rather than a product of the defendant's sociopathic tendencies. Further, evidence that Fields was emotionally estranged from his family would have contradicted the defense arguments that the death of the defendant's father and the illness of his mother represented a severe emotional disturbance. (*Cf.* Tr. 14: 3440.) Likewise, evidence that Fields had difficulty forming relationships would have contradicted the notion that he was remorseful and that he was a loved relative and friend. (*See* Trl. Doc. 228 at 39-40.)

Thus, Fields's attorneys reasonably omitted evidence that the defendant's home life was dysfunctional – that his parents were abusive and emotionally distant, that the family's frequent moves stunted Fields's ability to form relationships, and that his upbringing created the perception that he was "moody," "lazy," and "weird." Such evidence would have severely undermined the defense's portrayal of the murders as aberrant, and would have tended to support the government's positions that Fields was a future danger to others and had substantially planned and premeditated the murders. (*See* Trl. Doc. 228 at 35-36.) In particular, presentation of evidence that Fields could not form meaningful relationships would have done nothing to

explain why he chose to commit these murders, which were certainly not shown to have been motivated by any frustration Fields might have had in befriending the victims or anyone else. In sum, the presentation of additional evidence that Fields had a dysfunctional upbringing, or was cruel and violent toward his relatives, would have weakened, rather than strengthened, the defense's attempt to mitigate this crime.

Given that any forgone evidence of the defendant's family life was a double-edged sword, counsel reasonably chose not to rely on it to the detriment of their existing strategies. In fact, the Tenth Circuit has observed that the omission of "double-edged" evidence does not constitute unreasonable or prejudicial performance. *Wackerly v. Workman*, 580 F.3d at 1178 & n.1. Because any forgone evidence would have necessarily detracted from the defense's chosen strategy, Fields cannot show a reasonably likelihood that he would have received a more favorable verdict in the absence of his attorneys' alleged error. *Id.*

Because Fields cannot demonstrate prejudicial ineffectiveness based on the omission of social history evidence, he cannot show that the decision to present evidence of the defendant's childhood through a percipient sibling, rather than through a retained expert, was error. Moreover, the notion that counsel should have elicited this information through the mental health professionals is at odds with an abortive complaint that the complete data was not shared with those witnesses. Certainly, Dr. Grinage acknowledged receipt of investigator Shettles's extensive "Preliminary Assessment" of Fields's social history. (*See* Pet. Ex. 27 at 2 (citing Pet. Ex. 25).) While Dr. Woods was less specific that Grinage in describing the documents he reviewed, he certainly provides no indication that he lacked social history information necessary for his diagnosis. (*See* Pet. Ex. 28 at 1.) Assuming, arguendo, that the experts provided opinions

in the absence of necessary information, their flawed process should not be imputed to defense

counsel. *See Card v. Dugger*, 911 F.2d at 1513-14.

In short, Fields has failed to show that trial counsel acted ineffectively in their handling

and presentation of evidence of his upbringing and social history.

## V. COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE PROSECUTION ARGUMENTS

Fields claims his trial counsel provided ineffective assistance when they failed to object

to several instances of alleged prosecutorial misconduct. He contends his attorneys should have

objected to arguments denigrating prison as insufficient punishment, vouching for Dr. Price,

attacking the defendant personally, misrepresenting the record, speculating about facts, and

reciting scripture. Additionally, Fields complains that in instances in which trial counsel

objected to supposed misconduct, appellate counsel ineffectively failed to raise the issue on

appeal. (Pet. 95-112; Mem. 71-90.) To the extent Fields now attempts to raise claims of

prosecutorial misconduct, those contentions are procedurally barred. Because, in any event,

Fields fails to identify any instance of prejudicial misconduct, he cannot show that his attorneys

unreasonably omitted any meritorious objections or appellate claims.

A. Fields Defaulted any Claim of Prosecutorial Misconduct

Under the guise of a supposed Sixth Amendment claim of ineffective assistance of

counsel, Fields attempts to smuggle a multi-part complaint that alleged prosecutorial misconduct

undermined his Fifth and Eighth Amendment rights to a fair trial and against cruel and unusual

punishment. Indeed, in his Memorandum of Law, Fields relies almost entirely on the Fifth and

Eighth amendment jurisprudence. (Mem. 71-75.)

Because any claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, Fields was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default of those arguments. *See United States v. Frady*, 456 U.S. at 167-68. To the extent Fields attempts to explain his default by claiming appellate counsel were ineffective for failing to raise these issues, the attorneys had no obligation to raise the meritless claims identified here. (*See, infra*, Arg. V, B.) Because these claims would have been futile if raised on appeal, Fields cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default. *See United States v. Allen*, 16 F.3d at 378; *cf. United States v. Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003). Apart from the fact that he has not shown cause and prejudice, Fields makes no attempt to demonstrate actual innocence to excuse his default. Accordingly, Fields cannot obtain collateral relief based on the alleged prosecutorial misconduct at trial.

B.  Ineffective Assistance of Counsel

While it remains true that Fields defaulted any claim of misconduct, he can properly address a claim of ineffective assistance to this Court's § 2255 jurisdiction. However, he cannot succeed in demonstrating his trial attorneys unreasonably omitted objections if his underlying claims of misconduct have no merit, because defense counsel had no obligation to raise futile objections arguments on his behalf. *Hawkins v. Hannigan*, 185 F.3d at 1152. As to appellate counsel, the omission of a merely "viable" appellate issue does not amount to ineffective assistance of counsel. *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009). "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate

68

advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). Only the omission of a "dead-bang

winner" by counsel is deficient performance that prejudices the defendant. *Challoner*, at 749

(citing *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995)). A "dead-bang winner" is "an

issue which was obvious from the trial record and one which would have resulted in a reversal on

appeal." *Id.*

To establish misconduct, Fields is required to have shown that the alleged malfeasance

violated due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In other words, he must

show, in view of the entire proceeding, that the prosecutor's remarks so infected the trial with

unfairness as to make the resulting judgment a denial of due process. *Donnelly v. DeChristoforo*,

416 U.S. 637, 643 (1974); *see United States v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004)

(emphasizing the need to view controverted remarks in context). To establish that a prosecutor's

remarks merit relief, a defendant must show either persistent and pronounced misconduct or that

the evidence was so insubstantial that absent the remarks, the jury would not have imposed the

death penalty. *Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006); *see United States v.

Lowden*, 900 F.2d 213, 217 (10th Cir. 1990).

Because none of the prosecutorial remarks identified by Fields in any way impinged on

his right to a fair trial, he cannot show that his attorneys ineffectively failed to challenge them.

1. Appellate Counsel Reasonably Omitted an Argument that the Prosecutor had
   Misstated the Law

Fields contends that the prosecutor misstated the law regarding the weighing of

mitigating and aggravating factors, which should have prompted a claim on appeal. (Pet. 96-97;

Mem. 76.) Specifically, Fields complains about the following passage from the prosecution's

rebuttal argument:

> Let's remember and honor the two people who are unable to be here. The aggravating factors have been proved beyond a reasonable doubt. The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie. The mitigating factors – (Interrupted)
> Mr. Derryberry: Objection to that based on the law.
> The Court: Overruled.
> Mr. Sperling: The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

(Tr. 14: 3463-64.)

While misconduct may be assigned from misstatements of law, a defendant's right to a fair trial is not violated if the jury is properly instructed. *Williams v. Groose*, 77 F.3d 259, 262 (8th Cir. 1996); *see also United States v. Hanley*, 974 F.2d 14, 19 (4th Cir. 1992) (finding no plain error in misstatement of law regarding unanimity where jury was properly instructed and returned a unanimous verdict). Indeed, instructions carry substantially more weight than the argument of counsel, when the two are in opposition to each other. *Middleton v. McNeil*, 541 U.S. 433, 438 (2004); *Boyde v. California*, 494 U.S. 370, 384-85 (1990). And even defense counsel's argument may minimize the prejudice from inappropriate prosecution argument. *See Le v. Mullin*, 311 F.3d 1002, 1017-19 (10th Cir. 2002).

In this case, the Court repeatedly instructed the jury on the appropriate standard for weighing of aggravating and mitigating factors. (Tr. 14: 3384, 3394-95, 3402-04; *see also Fields*, 516 F.3d at 950 (noting the jury instruction reflected the applicable statutorily-defined standard).) Defense counsel further explained the process as follows:

> The way mitigating factors work in the weighing process, in the decision-making process, is that as individuals you look and decide which ones you feel have been proved by a preponderance of the evidence. That's not beyond

70

> a reasonable doubt. By a preponderance of the evidence. . . . You take what
> you've decided has been proved and you weigh it. And never, ever, ever do you
> have to impose a sentence of death. The sentence of death is not foreordained.
> That's what those instructions told you.

(Tr. 14: 3443.) The prosecution did not contradict the instructions or the defense. Rather, the

prosecutor fully endorsed the application of the court-defined standard by arguing, "This

Defendant's capital crimes are way over the capital limits as defined by law that the Court has

given you." (Tr. 14: 3447.) On a similar note, the prosecutor asserted, "even if you give all of

[the mitigators] to the defense, as we emotionally were just urged. What the Defendant chose to

do is way over the balancing line under the Court's instructions." (Tr. 14: 3448; *see also* Tr. 14:

3463 ("I respectfully submit that you will find consistent with the Court's instructions that the

law allows [imposition of the death penalty]."), 3467 ("Under the Court's instructions and the law

given by the Court, the Defendant should be, as it were, weighed in the balance and found

wanting.").)

The statement to which Fields now objects did not purport to state the law. Rather, it set

forth the prosecution's unobjectionable position that the defense case was weaker than its own.

To the extent the remark make use of the verb "weigh, " thereby permitting an attenuated

inference that a death sentence was appropriate if the mitigators did not outweigh the

aggravators, that impression was amply corrected by the jury charge and the arguments of

counsel for both parties. *Cf. United States v. Visinaiz*, 428 F.3d 1300, 1312 (10th Cir. 2005)

(upholding government argument about which the court expressed doubt that the prosecutor had

"been 'stating the law' at all"). Moreover, counsel for both parties urged the jury to adhere to the

instructions. Fields has therefore fallen far short of identifying some persistent or pronounced

error that improperly led the jury to impose death.  *See Short v. Sirmons*, 472 F.3d at 1195;

*United States v. Lowden*, 900 F.2d at 217.

By extension, Fields has failed to show that his appellate attorneys unreasonably omitted

a claim regarding his strained interpretation of the prosecutor's fleeting comment.  *See United*

*States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996) (noting that courts do not ordinarily reverse for

"singular and isolated" misconduct)).  Certainly, he has not shown that such a claim would have

been a "dead bang winner," wholly undermining his effort to demonstrate ineffective assistance

of appellate counsel.

> 2.  Counsel Reasonably Omitted Challenges to Comments about the Defendant's Crimes, and the Propriety of Mercy or Other Mitigation

Fields claims that his attorneys failed to challenge an argument in which the prosecutor

improperly contrasted the living defendant with his dead victims.   (Pet. 97-98; Mem. 76-77.)  As

the legal premise for his position (*see* Mem. 77), Fields relies on a Tenth Circuit opinion that

articulated a concern that a jury might disregard mitigating factors if the prosecutor over-

emphasized the permanency of a victim's death in comparison to the defendant's continued life.

*See Le v. Mullin*, 311 F.3d at 1016; *see United States v. Johnson*, 495 F.3d at 979-80.  Fields,

however, has not identified any prosecution argument that emphasized such an inappropriate

concern.  Rather, he unsuccessfully attempts to apply the rule in *Le* to three remarks that

emphasized the defendant's lack of mercy.

In concluding the opening argument, the prosecutor reasoned that mercy was

inappropriate for a defendant who had committed two cold-blooded murders:

> [I]n closing, just remember the victims in this case, Charles and Shirley and their
> family and what they went through.  The defense is going to talk to you and

<center>72</center>

they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and what he's done for the last two and a half years and say, oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

(Tr. 14: 3430.) During rebuttal, the prosecution reiterated the theme that a merciful sentence was inappropriate for such a cold-blooded crime:

All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice, give him what he deserves. [¶] The Defendant wants to choose a sentence. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

(Tr. 14: 3457.) The prosecution highlighted this theme a third time when it encouraged the jury not to give mitigating weight to the defendant's family ties:

Sympathy. It's hard not to feel sympathy for the Defendant's family members. He abandoned them though. . . . Only resurrecting contact with them conveniently now that he's in jail. . . . What ultimately did his former wife say about him? Do you remember that one word? Selfish. Selfish. Narcissistic.. . . Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life. We can only imagine what Shirley must have said in the waning moments of her life. . . . Whatever he does for other people is far outweighed by what he has done. He has paid for membership in the club of the most hardened, the worst group of criminals. Remorseless, wanton, senseless, without any empathy or feeling, no emotion for a wonderful man and woman whose lives he extinguished that with six semi-automatic gun shots.

(Tr. 14: 3458-59.)

None of these arguments improperly compared the defendant's continued existence with his victims' perpetual state of death. Instead, they properly advanced the position that the defendant did not deserve mercy or a sentence less than death in view of his actions. An argument that a penalty phase jury should consider the mercy extended by the defendant to his

73

victims is not misconduct when based on evidence properly before the jury. *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005). This jury was specifically instructed that it could consider mercy in weighing the appropriate penalty. (Trl. Doc. 227 at 6.) The jury was also instructed that it could consider Fields's lack of remorse (*id.* at 23), the mental anguish he inflicted on Shirley Chick (*id.*), his value as a friend (*id.* at 26), his value as a family member (*id.* at 25-26), and the impact his death would have on relatives and friends (*id.* at 26). Because all of these subjects were properly before the jury, they were fairly the subject of argument by the prosecution. *Fields*, 431 F.3d at 1206; *see United States v. Lopez-Medina*, 596 F.3d at 740.

Even if Fields could successfully demonstrate that the prosecution had commented on some forbidden subject, he has not show that the statements had any impact on the outcome of this trial. Specifically, he has not established in view of the Court's instructions, that the prosecution's sporadic comments infected the trial with unfairness. *See Le v. Mullin*, 311 F.3d at 1016 ("[A] review of the record indicated that the jury was appropriately informed by the jury instructions and by closing arguments that it had to consider mitigating evidence before deciding to impose a death sentence").

Accordingly, Fields cannot show that trial counsel unreasonably omitted an objection to the arguments identified here or that appellate counsel erroneously omitted to raise any "dead-bang winner" on appeal.

3. Counsel Reasonably Omitted Challenges to an Argument that Prison Was Insufficient Punishment

Fields claims that the prosecutors improperly remarked on inappropriate societal concerns and argued that a prison sentence was insubstantial punishment for his crime. (Pet. 98; Mem. 77-

74

78.) The prosecutors, however, committed no impropriety.

At the conclusion of the opening argument, the prosecutor urged the jury to mete out justice, noting that it alone would bear the responsibility for the defendant's sentence:

> Ladies and gentlemen, when you look around this courtroom you see a lot of people. They haven't here to see me or Mr. Sperling or defense counselor not even the judge. They've come here to see justice. They've come here to see what you are going to do today. Because today you are justice. You decide what is right. You decide what is wrong. You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know longer have that luxury. We ask you to do what's right, ladies and gentlemen.

(Tr. 14: 3431.) This argument was entirely appropriate. Indeed, the converse of the prosecutor's argument – diluting or diminishing the jury's responsibility for the verdict – constitutes error. *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985); *Coleman v. Brown*, 802 F.2d 1227, 1240-41 (10th Cir. 1986). To create the appearance of error, Fields seizes on a single sentence – the reference to a hypothetically-sentenced child molester. (*See* Mem. 77.) Fields improperly quotes this language in isolation. *Cf. United States v. Sherrill*, 388 F.3d at 538. Properly read in context, Fields cannot show that the jury misunderstand the remark as a reference to him or a diminution of his potential life sentence, rather than as an analogy to its own responsibilities.

In a related vein, Fields fails to show that the prosecutor erred in commenting on the inappropriate leniency of a prison sentence. During rebuttal, the prosecutor argued that this crime merited greater punishment than lifetime incarceration:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs, like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates. All with a civilized core must recoil with revulsion of what the Defendant did to act as the

75

734

executioner of the innocent.  Don't give this Defendant what he wants.  In the
name of justice, give him what he deserves.

(Tr. 14: 3457.)  Prosecutors do not commit misconduct in arguing that incarceration is an

inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case.

*See United States v. Higgs,* 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that

the government improperly argued that imprisonment would be "soft" in view of the privileges

available to the defendant as an inmate).  As in *Higgs*, in which the defense had argued that the

defendant would face high security imprisonment, the prosecutor's argument in this case was an

especially apt rebuttal to the defense contention that Fields was already the subject of close

confinement.[10]  *See id.*; *see also* Tr. 14: 3442.

     Fields has not shown that trial counsel unreasonably omitted an objection to the

arguments or that appellate counsel erroneously failed to raise a winning issue on appeal.

     4.  Counsel Reasonably Omitted Challenges to Comments on the Credibility of
Expert Witnesses

     Fields complains that the prosecution improperly vouched for its mental health experts

and denigrated the defense's witnesses.  (Pet. 99-100; Mem. 79-80.)  Once again, Fields

identifies isolated words and phrases in an effort to create the appearance of prosecutorial error.

Properly viewed in its totality, the prosecutor's arguments were unobjectionable, supporting and

attacking credibility on the basis of the evidence rather than personal opinion.

     The hallmarks of improper vouching involve credibility arguments based on personal

---

    [10]Fields also asserts in passing that this argument was not supported by evidence because
the record did not include any testimony about conditions on federal death row.  (Pet. 98 n.27.)
Had Fields received a life sentence, he would not have been incarcerated on death row.  The
prosecutor's comments were a fair inference from Daniel Presley's testimony about prison life
(Tr. 9: 2408-09).  *See United States v. Ivy*, 83 F.3d at 1288.

76

735

belief, the prestige of the government or information outside the record. *See United States v. Franklin-El*, 555 F.3d 1115, 1124-25 (10th Cir. 2009); *United States v. Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996). But no vouching occurs when a prosecutor argues, based on an inference from the record, that a witness lacked a motive to lie. *See Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005); *United States v. Walker*, 155 F.3d 180, 188 (3d Cir. 1998); *see also United States v. Jones*, 468 F.3d 704, 707 (10th Cir. 2006) (holding that no vouching occurs when government elicits evidence of witnesses' plea agreements that include truthfulness provisions). Even comments like "I believe the evidence or testimony shows . . ." do not amount to misconduct or vouching because they are facially based on the record. *Caldwell v. Russell*, 181 F.3d 731, 737-38 (6th Cir. 1999), *superseded by statute on other grounds*, *State v. Hancock*, 840 N.E.2d 1032, 1043 (Ohio 2006) . Thus, the use of the phrase "we know," while generally inappropriate, does not constitute vouching when used as part of a summary of evidence. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005).

Prosecutors "may strike hard blows, [but] he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Ballard v. United States*, 152 F.2d 941, 943 (9th Cir. 1945) (noting that prosecutors are not limited to Chesterfieldian politeness), *reversed on other grounds*, 329 U.S. 187 (1946). They may fairly rely on the record to attack the credibility of defense witnesses. *United States v. Henry*, 545 F.3d 367, 382 (6th Cir. 1008); *see United States v. Franklin-El*, 555 F.3d at 1125-26. Accordingly, a prosecutor commits no misconduct when arguing that "[t]he defendants had to go all the way to Missouri to find some blow hard expert who talked a lot but said very little of significance in this case." *Franklin-El*, 555 F.3d at 1127. Such a comment does not constitute prosecutorial misconduct because it serves to "remind

the jury of its duty to scrutinize and weigh all witness testimony, including that of experts." *Id.*

In this case, the prosecutor properly argued that the jury should base its determination of

expert credibility on facts in the record:

> Our doctors came in, ladies and gentlemen, and told you a number of different things also and I'll just run through those quickly because obviously they had a different opinion. They thought most of the Defendant's problems were based upon his depression. Kind of look at – who do I believe? Which is the one for me? Who am I going to believe out of this? What does Dr. Price tell you? He tells you he's done hundreds of these things. And over half the time, 60 percent of the time, he testifies for the defendant. He told you he fully expected to find some type of mental illness here but didn't. He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns. Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case. He's in charge of a well-recognized psychiatric care center. He comes in and he says I've never testified before. I'm just doing the best I can. But I did this evaluation and, yeah, I did give some credence to the voices. I thought the voices may be part of his problem. Whether or not he actually heard them I can't tell you, but they may be part of it. He even tells you with that knowing with the voices, he had the ability to conform his conduct to the requirements of law. These were volitional choices on this Defendant's part. Dr. Mitchell who has no axe to grind here, ladies and gentlemen.

(Tr. 14: 3429-30.)  The prosecution returned to the subject of Fields's mental health and the

experts who testified about it, noting all were retained:

> The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness. He was just emotionally variable. . . . High dollar shrinks were hired by the defense and we paid ours as well. I respectfully submit, thought [*sic*], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns. The defense got to substantially determine the parameters, we were told, of Dr. Price's exam. They both came into this case with an open mind, open to the prospect that the defense might be right. They found them wrong. . . . The defense experts, one from far away, with a 60 to zero record, he has never testified for the Government. Every single time he testifies, sixty to zip, is for Defendant. There's no evidence of mania here. The spending spree was a rational criminal effort to impress

<div align="center">78</div>

Michelle.

(Tr. 14: 3452.)

While the prosecution struck "hard blows" in arguing about the credibility of the various expert witnesses in this case, it struck fair ones. All of its comments were based on evidence in the record, rather than the unvarnished opinion of the attorneys or their attempt to rely on the prestige of the government. The prosecutor premised supported Price's credibility with evidence: his experience as a forensic mental health expert (Tr. 12: 3097), his mixed record of retention by the defense and prosecution bars (*id.*), his expectation that he would diagnose some brain dysfunction (Tr. 12: 3154), and the fact that he was easily found in the surrounding region (Tr. 12: 3094). The prosecutor also advocated for Mitchell's credibility on the basis of evidence: his local availability (Tr. 13: 3248-49), his experience as the head of mental health center (Tr. 13: 3249-50), his lack of reliance on paid testimony (Tr. 13: 3352), and his openness to the possibility that Fields experienced auditory hallucinations (Tr. 13: 3283-84.). In contrast, defense expert George Woods, was located over 1,000 miles away (Tr. 12: 3000) and had a record of consistent testimony for the defense bar (Tr. 12: 3001-02). These facts permitted a fair inference that Woods had an "axe to grind" and that the defense had to go far afield to find him.

To the extent that the prosecutors may have occasionally used the word "we," they did so as part of a recitation of evidence and thereby did not place a personal or governmental imprimatur upon their credibility arguments. Likewise, the prosecution properly used mildly disparaging reference to – "high dollar shrinks" – was used in reference to witnesses for both parties: "we paid ours as well" (*see* Tr. 14: 3452). *See United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (permitting "colorful pejoratives" supported by the record); *see also Franklin-El*,

79

555 F.3d at 1125-26 (upholding use of "indelicate" term "whoppers" to describe aspects of defendant's testimony). As such, it was not used to unfairly characterize the defense witnesses.

Accordingly, Fields has not shown that trial counsel unreasonably omitted any valid objection or appellate claim.

5. Counsel Reasonably Omitted Challenges to Appropriate Inferences from the Record

Fields complains that the prosecution improperly denigrated him and misstated facts in the record. (Pet. 100-08; Mem. 78-82.) Here again, Fields seizes on isolated remarks in an effort to create the appearance of error. Properly viewed in its totality, the prosecutor's arguments were unobjectionable because they were properly premised on inferences from the record.

A prosecutor's summation must rely on facts adduced in the record. *See United States v. Ivy*, 83 F.3d at 1288; *United States v. Sullivan*, 919 F.2d 1403, 1425-26 (10th Cir. 1991). Prosecutors may, however, argue that the jury should draw reasonable inferences from the evidence in support the government's theory of the case. *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005). Furthermore, as previously noted, prosecutors may make use of "colorful pejoratives" when supported by the record. *United States v. Fields*, 483 F.3d at 360 (citing inter alia *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998); *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978)).

a. The Prosecution Fairly Characterized the Mental Health Evidence

Fields complains that the prosecutors referred to his many negative character traits, arguing that he was manipulative, parasitic, narcissistic, sociopathic, and unalterably and fundamentally different from most human beings. On a related note, he contends that the

80

738

prosecution baselessly argued that he was a sociopath. (Pet. 101-03; Mem. 78-79.) In truth, the

government based its arguments on evidence, highlighting Fields's many negative personality

traits in an effort to blunt the case in mitigation.

The testimony of Dr. Price provided the foundation for the arguments that Fields had the

traits of a sociopath. Price specifically diagnosed Fields as suffering from a personality disorder,

not otherwise specified, with antisocial and psychopathic narcissistic and dependent traits and

features. (Tr. 12: 3148.) When asked to expound upon traits at issue, Dr. Price provided a

lengthy explanation that wholly undergirded the prosecutor's comments during argument:

> [T]his constellation of traits is a person that can be very charming, people like
> them especially at first. They get bored easily. They like excitement. They lie a
> lot. . . . They are manipulative. They get things out of people for themselves,
> sometimes to the extent that they con people. They don't feel bad about these
> things. They don't feel guilty. If they do something bad to somebody else, they
> don't feel any significant remorse. . . . There's a lack of empathy for others, other
> living things. They don't have a wide range of feelings. . . .They have often a
> parasitic lifestyle. . . . they manage to get other people to take care of them,
> financially, et cetera. Often probably because of this excitement orientation, they
> have a lot of partners in their life. A lot of partners that are like there's some level
> of commitment. They live together. They're promising things and a lot of casual
> promiscuous sexual activity.

(Tr. 12: 3148-49.) To the extent that the prosecutor characterized these traits as immutable, Dr.

Price testified that there existed no "effective treatment" for such a disorder – explaining that the

traits were only controlled to the extent that such people were denied the ability to manipulate

others. (Tr. 12: 3150-51.)

Specific evidence of Fields's conduct supported the expert's conclusion that the

defendant was remorseless, manipulative, narcissistic and parasitic. For instance, Fields's former

girlfriend, Carol Lamb, described him as withdrawn and cold. (Tr. 9: 2362.) Immediately after

81

the murders, Fields did not evince any palpable remorse, but instead went on a spending spree with another girlfriend, whom he asked to marry him. (Tr. 10: 2544, 2554, 2556-59, 2562-74.) When subsequently describing the murders, Fields was "cool as cool could be as we went through this whole thing, and he was pretty much emotionless. He didn't express – there was no tears." (Tr. 9: 2277.) Fields's sister described the defendant's lack of work ethic (Tr. 10: 2705-07) and an incident in which he manipulated their father into paying an auto loan he had taken (Tr. 10: 2709). Likewise, she described Fields's habit of contacting her as transparent overtures to requests for money. (Tr. 10: 2711-12.) She also said she counseled him that he did not take his role as a spouse and parent seriously enough. (Tr. 10: 2710-11.) In fact, Fields's former wife noted that he was moody (Tr. 11: 2743), did not hold jobs (Tr. 11: 2729-32, 2739-41), was verbally abusive (Tr. 11: 2751), once pushed her on the bed and choked her (Tr. 11: 2752-53), did not do his fair share of domestic chores (Tr. 11: 2743 ("I just wanted a partner. And I just got miserable.")), and did not pay child support (Tr. 11: 2756). Thus, an overwhelming body of evidence fairly supported the prosecutor's description of Fields, however unpleasant it may have been.

Fields likewise fails to demonstrate any misconduct when he observes that the prosecutor argued, "One of the things that Marilyn Presley told you was after the Defendant's doctors had tested and long before the Government's doctors tested, he calls her and says, hey, they say I have the characteristics of a sociopath. . . . His own doctors are saying, yeah, he has a traits [sic] of a sociopath." (Tr. 14: 3428.) The prosecutor's argument was a fair inference from the record. Marilyn Presley testified that Fields told her sometime after Christmas 2004 that some unidentified "they" had said "he had some sociopathic tendencies," a fact that concerned him

82

enough that he asked the witness to research the condition. (Tr. 12: 3086, 3088.) Additionally, the evidence showed that Fields was under psychiatric care at the end of 2004 (*see* Tr. 12: 2991) and was evaluated by a defense expert in late 2004, but not by a prosecution expert until June 2005. (Tr. 12: 2945-46; 21: 3177, 3274.) In fact, defense expert Grinage was questioned at length about antisocial personality disorder, and agreed that Fields met many of the diagnostic criteria, but asserted the diagnosis was still inappropriate in this case. (Tr. 11: 2865-66.) On this record, the prosecutor could rationally conclude that one of Fields's treating psychiatrists or retained witnesses had noted his sociopathic tendencies, as no other known mental health expert was in a position to do so.

At one point, the prosecutor asserted that Fields was a "sociopath." (Tr. 14: 3449.) The assertion was a fair prosecutorial inference from the ample evidence of Fields's sociopathic traits, as discussed above. In no way did the prosecutor suggest, as Fields now claims, that the diagnosis emanated from the defense experts. (*Compare* Pet. 103; *with* Tr. 14: 3449.) Furthermore, the jury was well aware that sociopathy was not a diagnosable condition, though it was a widely-used term of art among mental health professionals. (Tr. 13: 3215-17.) Fields has failed to show that the prosecutor misused the term in any way.

Because the evidence amply demonstrated that Fields was sociopathic, the prosecutor's comments were not, as Fields asserts, ad hominem attacks on his character. They were rejoinders to the defense experts' mental health diagnoses. But just as significantly, they were meant to diminish the weight the jury might accord to several supposed mitigators, including the allegations that Fields was remorseful (Trl. Doc. 227 at 41), that he was a loved parent and relative (*id*. at 39), and that he was genuinely upset by his father's death and the departure of his

83

relatives in the weeks prior to the crime (*id*. at 40).  Fields made his character and emotional life

an issue in this case and cannot complain that the prosecution pointed out ample reasons why it

was not deserving of mitigating weight.  *See United States v. Lopez-Medina*, 596 F.3d at 740.

Similarly, Fields alleged that he was a valued friend (Doc. 227 at 39) and someone whose

death would impact his friends (*id*. at 40).  The weight accorded those allegations was informed

by the quality of those friends and friendships.  As such, the prosecutor did not act

inappropriately when pointing out that one of Fields's friends, Terry Hanna, was a convicted

child molester (Tr. 14: 3465), a fact wholly within the ambit of the record.  (Tr. 12: 2925-26.)  In

addition to its relevance to the weighing of the friendship mitigator, Hanna's criminal history was

probative of his credibility as a witness.  *See generally* Fed. R. Evid. 609.

Once more, Fields has not shown that his attorneys unreasonably omitted any argument,

at trial or on appeal, concerning supposed misconduct.

b.  The Prosecution Fairly Characterized the Evidence of Planning and Premeditation

Fields claims that the prosecution improperly characterized the record in arguing about

evidence that he substantially planned and premeditated the murders.  (Pet. 100-01, 104-07;

Mem. 81.)  Fields is wrong.  The government based its arguments on evidence in the record and

highlighted Fields's many negative personality traits in an effort to blunt the case in mitigation.

Fields initially argues that a prosecutor wrongly asserted that "[o]n cross examination, the

doctors were asked about the Ghilley suit.  Well, I didn't know he had the Ghilley suit and had

snuck up on people beforehand.  I didn't know that at all.  That came as news to them."  (Tr. 14:

3427.)  Consistent with the prosecutor's summation, Dr. Woods indicated that he had only

84

743

sketchy knowledge of these significant events:

> Q (By Mr. Sperling) Dr. Woods, were you aware that the Defendant reported to a number of people that he had put on his Ghilley suit and sneaked up to a couple on Talimena Drive and watched them in an intimate moment?

> A No.  I was aware that he had said to one person, perhaps two, that he had put on his Ghilley suit and observed someone, but not -- that's all I recall.

> . . .

> Q All right. If the Defendant were to have confided that factor, that he had put on his Ghilley suit, that he had sneaked up close to a vehicle in which two people were having sex, and had confided that information in four close friends, would you find that significant?

> A Yes.

> . . .

> Q If he had told another friend, some eight months, before, around the turn of the year, 2002 to 2003, that he had [contemporaneously] put on his Ghilley suit and sneaked up on some other people . . . would you find that matter to be of significance?

> A It could be, yes.

(Tr. 12: 3024-25.)  In view of this colloquy, the prosecutor accurately described Woods's ignorance of the incidents in which Fields had stalked people other than the Chicks, especially given the expert's implied concession that he did not take these facts into account in his findings.

The prosecutor's argument was, however, ambiguous as to the number of experts who expressed ignorance of the surveillance incidents – twice referring to a singular witness ("I didn't . . . I didn't.)  and twice referring to plural witnesses ("the doctors . . . . them").  While the plural references allowed an inference that Dr. Grinage had also admitted ignorance of Fields's stalking behavior, such brief and isolated misstatements should not form the basis of relief.  *See Ivy*, 83

<center>85</center>

744

F.3d at 1288.  The prosecutor's minor, isolated and ambiguous references to the two experts should be analyzed in the context of the jury's extensive instructions on its independent duty to weigh testimony and to reject the statements of counsel as evidence.  (*See* Trl. Doc. 227 at 7-8, 12-14.)  A finding of prejudicial misconduct would be particularly inappropriate here because the significance of the ghillie suit sneaking incidents went largely to the experts' knowledge of premeditation.  Grinage, however, conceded he was unaware of the defendant's judicial admission of premeditation.  (Tr. 11: 2818, 2824-25.)  Grinage was also unaware that Fields had falsely told Michelle Tipton that he had plans to go fishing with Daniel Presley on the evening of the murder in an apparent attempt to preemptively allay her concerns about his absence that evening.  (Tr. 11: 2859.)  The record, thus, showed that Grinage was unfamiliar with rudimentary evidence of Fields's premeditation, even if that evidence did not concern his stalking activities.  Viewed in light of the record as a whole, Fields cannot show that the prosecutor's two plural references infected the entire trial with unfairness.  *See Le v. Mullin*, 311 F.3d at 1016.

Fields also fails in his complaints that the prosecutors improperly argued that he constructed a ghillie suit and hunted squirrels as part of a "prelude" to murder.  In fact, the prosecutor quite reasonably inferred from the record that Fields's squirrel hunting skills assisted him in committing murder and that his ghillie suit was constructed with more than one purpose in mind.  (*See* Tr. 14: 3406-09.)  The defendant referred to his ghillie suit as a "sniper suit."  (Tr. 9: 2331, 10: 2486.)  He manifested his apparent preoccupation with killing people, rather than squirrels, in other statements: he bragged that he could shoot anyone at 100 yards (Tr. 9: 2329) and expressed interest in constructing a silencer (Tr. 10: 2488).  Likewise, when asked why he applied ghillie camouflage to his rifle, Fields ominously stated, "You don't want to know," a

86

response that hardly suggested plans to hunt small rodents. (Tr. 9: 2338.) Fields persisted in

keeping the ghillie suit despite advice that it was unnecessary camouflage for squirrel hunting.

(Tr. 10: 2487.) And while he wore it to lull squirrels into approaching him for short range kills

(Tr. 12: 3121), he incongruously used a scope more appropriate to a high-powered rifle,

permitting him to take long-range shots (Tr. 9: 2379). In any event, Fields did not restrict his use

of the suit to squirrel hunting: he also used it to surreptitiously approach friends and strangers.

(*See* Tr. 9: 2346-48, 2376-77, 2379; 12: 3122.)

Thus, Fields cannot sustain his argument that the prosecutor unfairly suggested he had

constructed his ghillie suit with murder in mind. His reference to it as "sniper suit" indicates that

he contemplated its use in killing people. Similarly, the fact that he used it to surreptitiously

surveil strangers indicates that he saw it as far more nefarious than a squirrel hunting tool. His

desire for a silencer, his use of scope inappropriate to his short-range hunting technique, and his

boastful statement about shooting people at long range all indicate a contemplation of murder.

Accordingly, the prosecutor fairly inferred that Fields's hunting activities formed an obvious

personal backdrop to the murders.

The prosecutor also appropriately characterized the record when arguing that Fields did

not shoot the Chicks during a manic episode. Specifically, the prosecutor argued as follows:

> But he waits by a tree, crouched, motionless in this Ghilley suit. . . . Is this the
> sign of somebody who's going through a manic episode and lie and wait
> motionless for long periods of time? . . . He had mastered his craft. He had
> practiced with squirrels and now he was moving to humans.

(Tr. 14: 3414.) The prosecutor did not assert, as Fields suggests, that the defendant engaged in

squirrel hunting with a specific intent to improve his ability to murder people. Rather, he

87

Case 6:10-cv-00115-RAW   Document 16   Filed 09/28/10   Page 102 of 123
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 746

746

asserted that Fields's well developed and practiced skills as a stalker were put to use on the day

of the murder and undercut the evidence that he was acting under the influence of a drug-induced

manic episode. But had the prosecutor taken such a tack, the evidence that demonstrated Fields's

preoccupation with shooting people – a desire for a silencer, references to his "sniper suit," and

boasts of human-shooting prowess – would have allowed a fair inference that squirrel hunting

served a dual purpose of recreation and murder rehearsal.

The prosecutor also properly interpreted Daniel Presley's testimony regarding the murder

weapon, when arguing, "Dan Presley told you there's no need to have a scope like this on this

kind of a gun, a .22. He said this was a scope for a high powered rifle. A sniper's rifle." (Tr. 14:

3408.) In fact, Presley described the murder weapon as follows:

> Q What did he hunt with?
>
> A A .22 rifle.
>
> Q Was the -- just a natural scope or amplified?
>
> A Oh, it was amplified.
>
> . . .
>
> Q How I mean just roughly how would you, in lay terms, explain its power?
>
> A Very powerful. It was something you would see on a high powered hunting rifle.
>
> . . .
>
> Q How far could he knock a squirrel off a branch?
>
> A I want to say in the area of -- let's see. I'll say fifty to seventy yards. I know he can make long shots with it. But with that scope, anybody could.

(Tr. 9: 2379.)

The prosecutor did not, as Fields argues, state that Presley had called the defendant's rifle a "sniper's rifle." Rather, the prosecutor properly relied on Presley's testimony to assert that the scope Fields chose to mount on his rimfire rifle was more appropriate to a weapon useable by snipers. Given that Fields viewed his ghillie suit as sniper's camouflage, expressed an interest in silencing his rifle and bragged of his ability to shoot people at long range (*see* Tr. 9: 2329, 2331; 10: 2486-88), the prosecutor certainly made a fair inferential leap in suggesting that the defendant viewed his gun as a sniper's rifle. Indeed, Fields used the gun as a sniper's rifle to kill Charles Chick, undermining any effort to show that the prosecutor's characterization was improper.

The prosecutor also properly argued that Fields had "kind of laughed' at Daniel Love when the witness warned him to desist from stalking people in his ghillie suit. (Tr. 14: 3408.) Love had testified that he admonished Fields to dispose of the ghillie suit, which he believed was unnecessary for squirrel hunting and would lead to violent retaliation if the defendant were found using it to stalk people. (Tr. 10: 2487.) Love said that Fields appeared "aggravated a little bit" by this opinion and took the suit back to his truck, rather than destroying or disposing of it. (*Id.*) If Fields did not literally laugh at Love's concern, the effect was the same: when he placed the suit in his truck, he expressed an insouciant unwillingness to heed Love's sound advice that the dangers of the ghillie suit far outweighed its benefits.

The prosecutor also fairly inferred that Fields used his regular visits to the Winding Stair Campground to keep track of potential victims. (See Tr. 14: 3410.) The record, as previously noted, showed the Fields stalked people at the campground and ultimately murdered two of them. After the killings, he confessed that he was aware of the Chicks and intended to rob them.

89

(Gov't Trl. Ex. 131; Tr. 9: 2259-70).  He specifically admitted that he had observed the Chicks two days before the murders.  (Gov't Trl. Ex. 131.)  Of course, he had also begun stalking people in his ghillie suit, as a form of recreation, sometime beforehand.  (*See* Tr. 10: 2380-81, 2486-87.) He had demonstrated his incipient homicidal intent well before the murders– inquiring about a silencer, referring to his "sniper suit," and stating he could shoot people at a long distance.  (Tr. 9: 2329, 2331.)  Given Fields's obvious preoccupation with murder, the prosecutor could properly infer that Fields used his access to the campground to consider other random victims.

As with his other claims of prosecutorial misconduct, Fields has not shown that his attorneys unreasonably omitted any argument, at trial or on appeal.

c.   The Prosecution Fairly Characterized the Evidence of Shirley Chick's Death

Fields claims that the prosecutor improperly argued that Shirley Chick did not die silently, but rather begged for her life.  (Pet. 108; Mem. 83.)  Fields is wrong.

Charles Chick was across the table from Shirley, when he was hit by the initial shot; the pair were known to have an exceptionally close relationship.  (Tr. 8: 1973, 2090-92, 2177.)  The record indicates that Shirley Chick was spattered with her husband's blood when Fields shot him in the head.  (Tr. 8: 2177.)  As Shirley ran from her mortally-wounded husband toward the van, presumably in the hope of escaping, Fields shot her in the left foot.  (Tr. 8: 2178).  The physical evidence suggested that Shirley Chick had assumed a defensive posture just before Fields, clad in a ghillie suit, shot her in the head.  (Tr. 8: 2181.)  From this evidence, the prosecutor could reasonably infer that Ms. Chick made noise before her death, and likely begged for her life: she had seen a beloved spouse gunned down, she had been wounded while seeking safety, and was then confronted by an armed and camouflaged intruder who aimed a gun at her head.  She had

ample reasons – physical pain, emotional trauma, and outright terror – to have begged for her life in the last moments Fields allowed her.   The prosecutor properly inferred as much from the evidence.[11]

Given the obvious propriety of the prosecutor's argument, Fields has not shown that his attorneys unreasonably omitted any argument, at trial or on appeal.

6.  <u>Counsel Reasonably Omitted Challenges to the Prosecution's Appropriate References to the Bible</u>

Fields claims the prosecutor improperly paraphrased the Bible during argument.  (Pet. 108-10; Mem. 84-85.)  Fields overstates the content of the prosecutor's argument as well as the applicability of his major source of legal authority.  The case law does not prohibit the instant argument because the prosecutor made no attempt to justify a death sentence in terms of biblical authority or "higher law."  Rather, he merely made a secularized, if somewhat elongated, allusion to an oft-quoted idiom.

At the conclusion of the rebuttal argument, the prosecutor argued that Fields should be found –  under the court's instructions – to be weighed in the balance and found wanting.  As a preamble to that assertion, the prosecutor recounted, by way of analogy, a story from the Old Testament, but one devoid of specific reference to the Bible or religious law:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends.  They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation.  They drank wine and they worshiped pagan idols.  All of a sudden the fingers of a hand began to write on the palace wall.  The king saw the hand and was so frightened, he was so

---

[11]Because the prosecution properly premised these arguments on the record, Fields cannot sustain his suggestion that one such comment amounted to vouching. *See Thornburg v. Mullin*, 422 F.3d at 1132; *cf.* Pet. 108.

scared, that his clothing literally came loose.  He became white.  He shook.  His knees banged together.  He cried out:  Bring the astrologers, bring the wise men of the nation.  Whoever interprets this saying on the wall will become the third most powerful member of my government.  He will have great riches.  The wise men came in.  They studied, they deliberated, they conversed, they conferred and they thought.  But they couldn't read much less interpret the writing on the wall.  The king's face turned ashen. The queen, though, remembered a forgotten man.  She called for him after talking to the king.  And the king made the man the same offer.  The man, though, he turned down all of the riches, all the honor and all of the prestige.  The man bravely interpreted the writing on the wall.  And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting.  Sure enough, that night the king was killed.  His kingdom was separated among his neighboring enemies.

The Defendant weighed his options on July 10, 2003.  Under the Court's instructions and the law given by the Court, the Defendant should be, as it were, weighed in the balance and found wanting.

(Tr. 14: 3466-67.)

Despite the distinctly non-religious content of the prosecutor's remarks, Fields unsuccessfully attempts to analogize it to an argument that gave rise to relief in *Sandoval v. Calderon*.  (*See* Mem. 84-88 (citing *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001).)

In that wholly distinguishable case, the prosecutor urged jurors, among other things, that in imposing a death sentence they would be "doing what God says."  *Sandoval*, 241 F.3d at 775 n.1.

In granting relief in *Sandoval*, the Ninth Circuit declined to find religious references automatically reversible.  *Id.* at 776.  Instead, the court found that the prosecutor had violated Sandoval's Eighth Amendment right to sentencing under a rational scheme of specific factors by advocating the jury's reliance on "higher law or extra-judicial authority."  *Id.*  The ruling was premised on a summation the court described as "eloquent, powerful, and unmistakably Biblical in style," which jurors would easily understand "as referring to Scripture."  *Id.* at 778.

The Ninth Circuit highlighted two portions of the summation that it found especially

offensive to the Eighth Amendment:

> [Defense counsel] says don't play God.  Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority?  Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.  You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right. . . . Don't be fooled by what's to come [in defense's rebuttal]. Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God.  God ordains authority.

*Sandoval*, 241 F.3d at 775, n.1.  The court characterized as the "core" of the erroneous

comments, the following remarks:

> Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God.  Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil.  Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good.  But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.

*Id.* at 778.

The summation at issue here bears no resemblance to the one that gave rise to relief in

*Sandoval*.  While eloquent, the argument was not delivered in a biblical style and made no

reference to God or any spiritually-ordained authority.  Most significantly, the prosecutor did not

argue that religious authority justified the death penalty, generally, or its imposition in this case,

93

specifically.  Instead, the prosecutor made mention of a story that appears in the Bible as the

backdrop to his assertion that the defendant, like the unnamed king in the story, should be

"weighed in the balance and found wanting."  The king was just one of several anonymous

characters who appeared in the story that featured an unidentified civilization.  Thus, the

prosecutor denuded his narrative of details and religious overtones that would have identified its

origins.  The story was merely used to drive home the point that the jury should impose a death

sentence under the law provided by the Court.

Because the prosecutor cleansed his argument of any religiosity, and used a familiar

aphorism[12] to drive home the point that the jury should apply its instructions, Fields has not

shown that his attorneys unreasonably omitted any argument, at trial or on appeal.

### VI.  TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS

Fields claims that his trial counsel acted ineffectively when they requested a single

penalty verdict for the two murders to which he had pleaded guilty.  Fields asserts that no

reasonable strategy explains the decision and contends that it prejudiced him by permitting the

jury to double count the substantial planning and premeditation aggravators.  He also complains

that the unitary verdict permitted the jury to improperly aggregate aggravating factors in its

weighing analysis.  (Pet. 112-119; Mem. 90-99.)  Fields is wrong.  His attorneys validly sought

and received a unitary verdict that supported their strategy – explaining the murders as the

product of a single behavioral and pharmacological anomaly.  Not only was the employment of a

---

[12]This turn of phrase even appears occasionally in published opinions without connoting any particular religious overtone.  *E.g.*, *Blinder, Robinson & Co., Inc. v. S.E.C.*, 837 F.2d 1099, 1112 (D.C. Cir. 1988); *Bryant v. Bryant*, 545 S.W.2d 938, 940 (Ky. 1977).

unitary verdict consistent with the defense's theory of the case, it avoided the likelihood that the outcome of the case might be influenced by multiple penalty verdicts, which would have required repeated jury consideration of the aggravated facts of these crimes.

As previously noted, Fields bears the burden of demonstrating that counsel's decision to seek a instructions on a unitary verdict was constitutionally unreasonable in light of prevailing professional norms. *See Knowles v. Mirzayance*, 129 S. Ct. at 1420. An adequately-informed strategic choice of legally-permissible instructions is virtually unchallengeable. *See United States v. Nguyen*, 413 F.3d at 1181-82; *cf. Capps v. Sullivan*, 921 F.2d 260, 262 (10th Cir. 1990) (finding ineffective assistance where counsel refused to submit legally supportable instructions and instead argued for jury nullification). A request for specific instructions is unreasonable only if they contain an affirmative misstatement of established law or reflect an abdication of counsel's role as an advocate. *See Lankford v. Arave*, 468 F.3d 578, 584-85 (9th Cir. 2006) (misstatement of law); *Patterson v. Dahm*, 769 F.Supp. 1103, 1111 (D. Neb. 1991) (abdication of role as advocate).

A request for a unitary verdict is not only permissible but, in appropriate circumstances, a sound strategic choice. *See People v. Crittenden*, 885 P.2d 887, 932-33 (Cal. 1994) (observing that no authority compels separate penalty verdicts in capital sentencing). Indeed, a unitary verdict provides two substantial benefits to defendants exposed to multiple death verdicts: it allows the jury to give individualized consideration to a defendant without over-emphasizing the individual characteristics of the victims or underscoring their number (*Crittenden*, 885 P.2d at 932-33) and it avoids the danger of compromise verdicts in which a jury imposes a death sentence for one murder and a life sentence for others (*cf. People v. Sandoval*, 841 P.2d 862,

95

Case 6:10-cv-00115-RAW   Document 16   Filed 09/28/10   Page 110 of 123
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 754

754

885-86 (Cal.1992) (rejecting an argument that multiple verdicts prejudiced the defendant)).

Indeed, at least one other court in this circuit has relied upon a unitary penalty verdict in a multi-victim case. *See* Special Findings Form A, *United States v. McVeigh*, No. 96-CR-68-M, 1997 WL 330507 (D. Colo. 1997).

Fields premises an alleged right to separate penalty verdicts on a distinguishable case that recognized a right to separate convictions for separate charges. (Mem. at 92 (citing *Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983).) Fields also erroneously relies on Congress's repeated use of singular nouns in the Federal Death Penalty Act. (Mem. 93 (quoting 18 U.S.C. § 3591, *et seq.*) Fields's statutory construction argument ignores Congress's own rule of statutory interpretation: "words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1; *see also Smith v. Zachary*, 255 F.3d 446, 449 (7th Cir. 2001) ("the distinction between plural and singular words is not scrupulously observed in legislative language"). Fields does not merely advance unpersuasive authority; he also fails to come to grips with the fact that once a jury has found a defendant death eligible, the Constitution permits it to freely "consider a myriad of factors to determine whether death is the appropriate punishment . . . . Indeed, the sentencer may be given 'unbridled discretion.'" *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). Thus, his failure to find supporting case law is unsurprising.

Lacking any specific legal bar to a unitary verdict, trial counsel reasonably elected to seek one, as it embodied the defense's view of the case and discouraged repeated consideration of damaging facts. As discussed above, the defense theorized that the murders were a single aberrant event, precipitated by Fields's reaction to a misprescribed psychotropic drug. (*See* Tr. 8: 1982-83; 13: 3438-40.) Counsel's strategy promoted a view that Fields was impaired when he

96

committed the murders, but no longer unstable or dangerous.[13]  That strategy would have been ill-served by the need for multiple penalty verdicts, which would have emphasized the number of homicides and required the jury to repeatedly weigh future dangerousness and multiple murder aggravators.  (*See* Trl. Doc. 228 at 35-36.)  Repeated weighing of future dangerousness would have underscored the jury's findings that Fields lacked remorse and committed the murders as part of a pattern of violence.  (Doc. 228 at 36.)  Counsel's successful effort to minimize these considerations, through a unitary verdict, was consistent with their prior attempts to bar presentation of future dangerousness evidence.  (*See* Trl. Docs. 54, 60,175, 221.)  The unitary verdict also avoided repeated weighing of the victim-impact testimony.  (*See* Tr. 10: 2434-51, 2495-2513, 2606-23.)  Thus, the single verdict reduced the jury's reliance on evidence that the defense had attempted to exclude.  (*See* Docs. 55, 64 & 159.)

The unitary verdict did not merely embody the defense's conception of the case, and minimize consideration of damaging facts, it also precluded the possibility of a compromise verdict.  As Fields recognizes, the jury could have rationally viewed the murder of Shirley Chick as more aggravated than the murder of Charles Chick, because she experienced the terror of seeing her husband shot to death without warning and of being stalked by an armed and camouflaged predator.  (Pet. 115,  202; Mem. 98.)  Thus, counsel could have reasonably foreseen that a jury considering the murders separately and the aggravators repeatedly and distinctly might have returned one death verdict and one life verdict despite crediting the mitigation theory– an outcome of no practical benefit to Fields.  *Cf. People v. Sandoval*, 841 P.2d at 885-86.  In these

---

[13]The Tenth Circuit resolved a challenge to the unitary verdict under the invited-error doctrine, suggesting that counsel acted consciously and strategically in requesting it.  *See Fields*, 516 F.3d at 939.

97

circumstances, counsel's strategic decision was a "reasonable response to a difficult situation." *See Nguyen*, 413 F.3d at 1181-82.

The verdict form and supporting instructions did not misapply the law, much less ease the government's burden, and counsel's request for them was wholly reasonable under the circumstances. *See Lankford*, 468 F.3d at 585. The instructions properly explained the weighing process and the government's burden of proof, informing the jury "what is called for in weighing the various factors is not arithmetic" but "careful . . . considered . . . mature judgment." (*See* Tr. 14: 3395-96; Trl. Doc. 133 at 28.) Presumably, the jury heeded those instructions and weighed the aggravators qualitatively, rather than quantitatively, avoiding any possible "double counting" of factors. *United States v. Olano*, 507 U.S. at 740 (noting presumption that jurors follow their instructions); *see also Jones v. United States*, 527 U.S. 373, 399-400 (1999) (finding instructions virtually identical to the ones used in this case cured the danger of double counting). The submission of the unitary verdict was, therefore, a presumptively informed strategic decision that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Assuming, arguendo, that Fields could show his counsel erred in seeking a unitary verdict, he cannot show that he was prejudiced by the decision. In an attempt to demonstrate prejudice, Fields explores two hypothetical scenarios under which the jury's could have returned a procedurally-defective verdict. (*See* Mem. 96-98.) Fields's argument misses the point: the fact that a unitary verdict may have created a procedural defect was waived as invited error. *Fields*, 516 F.3d at 939. At this juncture, Fields must demonstrate a reasonable probability that, absent the unitary verdict, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Welch v. Workman*, 607 F.3d 674, 702 (10th

98

Cir. 2010). Fields makes no attempt at such a showing and could not succeed in doing so. Indeed, he posits that he might well have received a death verdict for Shirley Chick's murder and a life verdict for the Charles Chick murder (*see* Mem. at 97-98), without explaining how such a state of affairs satisfies the relevant standard or would have provided him with any practical advantage over the current judgment.

Ultimately, Fields cannot carry his burden with regard to either murder. The two capital counts arose from the same set of facts, as the murders were committed in a single continuous episode. Unsurprisingly, the jury's findings of aggravation and mitigation as to both counts were identical. The jury found that the defendant killed each of the victims after substantial planning and premeditation, and that he caused harm to the family, friends and community of each victim. (Trl. Doc. 228 at 35-37.) The jury's remaining findings applied to both counts: that Fields killed and attempted to kill more than one person, that Fields inflicted mental anguish on Shirley Elliot Chick, and that Fields poses a future danger to the lives and safety of other persons. (*Id.* at 35-36.) Fields repeatedly, but baselessly, asserts that the mental-anguish factor applied only to Shirley Chick's murder. The government's Notice of Intent to Seek the Death Penalty provides no support for that position, neutrally alleging the aggravator without reference to any particular count. (Trl. Doc. 38 at 3.) Because Charles Chick's murder formed the initial basis of Shirley's mental anguish, there exists no rational argument why the aggravator would not apply to both crimes.

Fields cannot escape the fact that a jury analysis identical to the one that occurred here, but cabined by count, would have resulted in two death judgments instead of one. The circumstances of the two murders are obviously intertwined, and Fields has not identified any

reason that the jury would have weighed the factors differently had it been required to view them one crime at a time.  To analyze the question otherwise, as Fields posits may have occurred (*see, e.g.*, Mem. at 96 ("[t]he jury could have concluded that <u>seven</u> aggravating factors, considered together, substantially outweighed the mitigating evidence").), requires resort to a mechanical counting of factors, rather than the subjective evaluation employed by the jury (Trl. Doc. 227 at 28 ("You should not simply count the number of factors, but consider the particular character of each")).  *See Harris v. Pulley*, 692 F.2d 1189, 1203 (9th Cir. 1982) (refusing to presume prejudice based on the assertion that a multiple-murder unitary verdict, which included the same three narrowing special circumstances for each of three murders, led the jury to simply count up factors), *rev'd on other grounds*, 465 U.S. 37 (1984).

On this record, no reasonable probability exists that Fields would have received a more favorable verdict had his attorneys omitted to request a unitary sentencing verdict.

Indeed, Fields's claim lacks a basis in existing law, as he cannot demonstrate any requirement that counsel request, or the courts provide, separate penalty verdicts for separate counts.  As such, relief on this issue would necessitate a forbidden retroactive application of a new rule of law.  *Schriro v. Summerlin*, 542 U.S. 348.  Even if Fields could show that such a rule fell within the "logical compass" of Supreme Court authority or that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim would still rely on a new rule because the result he seeks is not dictated by existing precedent.  *See Saffle v. Parks*, 494 U.S. at 491.

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 759

## VII.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD FIELDS A FAIR TRIAL

Fields makes a two-pronged attack on the government, claiming that it suppressed exculpatory evidence concerning a bottle of Effexor and that it failed to provide evidence concerning two seized computers.  (Pet. 119-24; Mem. 100-06.)  As detailed below, Fields fails to demonstrate that any aspect of the prosecution's actions amounted to prejudicial misconduct.

Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses.  *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material."  *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009).

Prosecutors, however, bear no obligation to volunteer information they do not possess. *United States v. Erickson*, 561 F.3d at 1163.  Likewise, prosecutors need not compile or seek evidence favorable to the defense.  *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994); *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990).  Thus, a successful *Brady* claim requires a showing that any allegedly suppressed evidence actually existed.  *Erickson*, 561 F.3d at 1163.  *Brady* does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take

101

760

advantage of the exculpatory evidence. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994); *see also Erickson*, 561 F.3d at 1163 (citing with approval *Coe*, 161 F.3d at 344).

Despite his burdens in demonstrating error under *Brady*, Fields presents claims that are a conglomeration of speculation and flawed logic. Ultimately, he fails to show that the government suppressed any material evidence.

A.  Alleged Suppression of Effexor Bottle

In his initial Petition, Fields argued that the government failed to disgorge to him a bottle of Effexor that was found in his truck at the time of his arrest. The lynchpin of Fields's claim was an assertion that the government had "sole possession" of the bottle. (*See* Pet. 121.) Subsequent to filing his Petition, Fields asked counsel for the government to investigate the fate of the bottle. Counsel for the government agreed to do so and determined that the FBI had taken possession of the Effexor bottle long enough to deliver it to the jail (*see* Doc. 6), where Fields apparently ingested some or all of its contents. Relying on jailhouse medical records, Fields infers that he took more than the prescribed dosage of Effexor prior to his arrest and may therefore have done so prior to murdering the Chicks. Fields claims that the government had constructive knowledge of the bottle that it failed to disclose and further contends that the prosecutors asked improper questions of witnesses in view of that information. (Mem. 100-06.) In actuality, the Fields had access to all the information he relies upon here and has not shown that the government deprived him of any material fact.

Fields premises the exculpatory value of the bottle on the number of tablets inside of it, but he fails to show that the government was aware of that fact. The government did not

102

inventory the contents of the Effexor bottle and had no obligation to provide Fields with information it did not have.  *Erickson*, 561 F.3d at 1163.

Fields also observes that the Effexor he took in jail must have come from the seized bottle because he did not see a medical professional until July 24, 2003, five days after he began receiving the pills in custody.  This observation appears to undermine the entire premise of his claim that the government suppressed information about the container of pills.  Because Fields personally knew he was taking Effexor in jail, and the defense could have obtained records demonstrating the essential facts about the container (*see, e.g.*, Pet. Ex. 27 at 2 (noting defense expert's review of Fields's custodial medical records)), the government bore no obligation to provide him with information about the bottle.  *See Coe v. Bell*, 161 F.3d at 344.  Indeed, Fields, unlike the government, had access to his own medical records.  If, as he posits, those records demonstrate that he received Effexor that could have only come from his truck, he cannot show that the government had a burden to inform him of that fact.  Likewise, he cannot show that the government had a duty to compile his medical records in order to glean information about the container.  *See United States v. Bender*, 304 F.3d at 164.

In order to create the appearance of impropriety on the part of the government, Fields selectively assembles facts and speculation.  He presents medical records that, he claims, show that he ingested 14 Effexor tablets between his July 18 arrest and August 5.  (Mem. SA-1 & 2.)  As noted, he argues that the pills must have come from the seized bottle because he did not see a doctor in custody until July 24, 2003.  (Mem. 101-02 & n.37.)  He then speculates that he ceased taking the drug because he exhausted the remaining supply in the previously-seized bottle.  (*Id*.)  Likewise, he presumes that if he exhausted a supply of 14 pills in jail, he had taken the other 16

103

prescribed pills (from a bottle of 30 tablets) during the 10 days prior to his arrest. (*Id.*)  From

this, he guesses that at the time of the crimes . . . "he may have taken additional pills," beyond

those prescribed. (*Id.* at 104.)  But the records upon which Fields attempts to rely are hardly a

model of clarity.  They allow an inference that jailers administered 14 Effexor tablets to Fields

between July 19 and August 5, 2003, as they contain 14 initials on lines denominated "Effexor

150 mg." (Mem. SA 1 & 2.)  Interspersed among those initials are eight hash marks, which

Fields appears to have concluded reflect the denial of the tablets to him.  Fields provides no basis

for this interpretation of the record and gives no hint as to why the hash marks do not reflect the

fact that he refused to take his dosage when provided.

Ultimately, none of that matters, because even if the records indicated Fields had ingested

14 Effexor tablets in jail, it does not demonstrate that he took the other 16 pills in the bottle,

rather than losing, selling or giving away some or all of them.  Even if the jury could have

inferred that Fields ingested the 16 pills prior to his arrest, it still would have no information to

show that Fields took so much as the prescribed dosage before committing the murders.

Accordingly, the records concerning the fate of the Effexor bottle did not provide any relevant

exculpatory information about Fields's mental state at the time of the crime.  Certainly, the

simple fact that a bottle of Effexor was transmitted to the jail for Fields's personal consumption –

the only relevant evidence imputable to the government – could have created no reasonable

likelihood of a different outcome in this case. *Cf. United States v. Torres*, 569 F.3d at 1282.

In a related – but equally unavailing – claim, Fields argues that the prosecution

improperly questioned defense witnesses about the lack of evidence, apart from the defendant's

self-reports, as to the amount of Effexor he had ingested prior the murders.  Fields argues the

prosecution's presumptive knowledge of the Effexor bottle should have barred them from such examination. Fields, however, cannot show that the government had access to records that would have allowed it, or the experts, to determine the number of pills in the Effexor bottle at the time of his arrest or its disposal. Accordingly, he cannot show that the prosecutors knowingly asked a question based on a false premise. *Cf. United States v. Blandin*, 784 F.2d at 1051. Because Fields cannot show that the prosecution or its investigators knew the number of pills in the bottle at the time it was recovered, he cannot even show that the government asked a question it *should have* known was based on a false premise. *Cf. Bender*, 304 F.3d at 164 (prosecutors need not seek evidence favorable to the defense); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (holding that *Brady* requires the disclosure of only that evidence within the actual or constructive possession of the prosecution and its investigative team). In any event, the fact remains that Fields's experts, though they presumably could have requested medical records from him, apparently failed to seek any documentary evidence to substantiate the defendant's self-reported ingestion of Effexor.

Accordingly, the prosecution did not improperly ask any questions intended to adduce false testimony.

B. Alleged Suppression of Computers

Fields summarily claims that the government improperly suppressed evidence from his personal computers. (Mem. 106.) His claim is inadequately pled and, therefore, not amenable to consideration.

In a collateral attack on a criminal judgment, the defendant must allege some factual basis for relief sought. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*,

288 F.3d 1183, 1187 (10th Cir. 2002); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).  Fields makes no attempt to show that the government suppressed any material evidence, and his Court should therefore disregard his claim.

Any attempt to demonstrate error would fail.  The computers in question were returned to Fields's associates prior to trial and images of the hard drives were made available to the Petitioner upon request.  (*See* Doc. 6.)  The government had no obligation to disclose information that was available to Fields from other sources.  *United States v. Kluger*, 794 F.2d 1579, 1583 (10th Cir. 1986); *see Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004) (no *Brady* violation because evidence was available to defense from other sources), *cert. denied*, 544 U.S. 948 (2005)

Though he makes no effort at this juncture to show the suppression of any evidence, much less exculpatory evidence, Fields reserves the right to supplement his pleadings with allegations about the computers, should he develop information in the future.  (Mem. 106.) Fields does not have an unlimited right to amend his § 2255 Petition.  *See United States v. Willis*, 202 F.3d at 1280.  He may introduce an untimely amendment that "clarifies or amplifies a claim or theory in [the original motion]."  *United States v. Espinoza-Saenz*, 235 F.3d at 505.  If the proposed amendment does not seek to add a new claim or theory this Court may permit an untimely amendment.  *Id.*  However, Fields filed his present memorandum more than three months after time expired for him to file a § 2255 Motion and he has yet to articulate any reasonable basis for a *Brady* claim concerning his computers.  He should not be permitted to cede himself an unlimited right to supplement his briefing, given that he has not articulated any

106

colorable claim that an amendment might clarify or amplify.

### VIII.  THERE ARE NO ERRORS TO ACCUMULATE

Barrett argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  (Pet. 124; Mem. 106-08)  As the Government has demonstrated, none of Barrett's contentions have merit, and many are procedurally defective.  Moreover, Barrett has failed to establish prejudice as to any of the claims he raises.  Accordingly, his contention of cumulative error should be rejected.  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009).

### IX.  THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

Fields, without asserting any supporting facts, claims that his execution would constitute cruel and unusual punishment under the Eighth Amendment.  (Pet. 125; Mem. 109.)  As Fields concedes, this claim is not ripe for adjudication.  This Court should therefore disregard it.  Even if the claim were ripe, Fields's failure to plead any facts in support of it would still render it subject to dismissal.

Fields cannot challenge his prospective execution because the issue is not yet ripe.  As previously noted, the Constitution extends the judicial power of the United States only to real cases or controversies.  U.S. Const. art. III, § 1; *see United States v. Quezada-Enriquez*, 567 F.3d at 1231.  Thus, this Courts cannot give advisory opinions in hypothetical cases  *Flast v. Cohen*, 392 U.S. at 96-97.  In this case, Fields concedes a lack of ripeness.  He has not and cannot argue that the manner of execution about which he attempts to preemptively complain is not subject to change to his actual execution.  Because Fields has not and cannot demonstrate the justiciability

of the instant claim, this Court should disregard it.  Even if the claim were ripe, Fields has not

identified any fact that might give rise to relief on an Eighth Amendment theory.  Accordingly,

even if the Court finds this claim constitutionally justiciable, it should nonetheless disregard it.

*See Hall v. Bellmon*, 935 F.2d at 1110.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a

Person in Federal Custody.

Respectfully submitted,

Dated: September 28, 2010

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


s/      Christopher J. Wilson
        CHRISTOPHER J. WILSON, OBA #13801
        Assistant United States Attorney
        Eastern District of Oklahoma
        1200 West Okmulgee
        Muskogee, OK 74401-6848
        Tel: (918) 684-5100


s/      Jeffrey B. Kahan
        JEFFREY B. KAHAN, PA Bar No. 93199
        Trial Attorney
        U.S. Department of Justice
        1331 F Street, N.W.; Rm. 345
        Washington, D.C. 20530
        Tel: (202) 305-8910

108

**CERTIFICATE OF SERVICE**

I, hereby certify that on 28th day of September, 2010, I electronically transmitted the attached ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY and Attachments to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Michael Wiseman - Michael_Wiseman@fd.org
Cristi Charpentier - Cristi_Charpentier@fd.org Attorney for Petitioner


s/      Christopher  J. Wilson
        Assistant United States Attorney

DECLARATION OF IRIS DALLEY

I, IRIS DALLEY, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.   I am a forensic analyst and partner in Bevel, Gardner & Associates, a forensic consulting and education group.   I was an agent with the Oklahoma State Bureau of Investigation ("OSBI") assigned as a crime scene agent for the Eastern Regional Office.

2.   On July 11, 2003, in my capacity as an OSBI agent, I responded to a crime scene at the Winding Stair Campground, where the bodies of Charles Chick and Shirley Chick had been discovered.

3.   I was present throughout the initial crime scene investigation and took the official crime scene photographs.   I was also present during the autopsies of the Chicks and observed photographs taken of the bodies as part of that process.   The photographs attached to this Declaration as Exhibits A to L are true and accurate depictions of conditions as I observed them at the crime scene and during the autopsy, though I have modified some of the photos with circles and arrows, as noted below, to highlight certain portions of the images.

4.   I testified at the federal trial of Edward Leon Fields regarding my observations and conclusions, and I have reviewed a declaration prepared by Robert Tressel regarding my testimony.

5.   Mr. Tressel declares that an unidentified crime scene photograph depicts a "red stripe" on a fragment of glass in the front passenger door well of the Chick's van.   According to Mr. Tressel, his observation demonstrates that at least one glass fragment from the van's broken driver's window landed in viscous blood, contradicting my testimony that the glass fragments landed on dried blood.   Mr. Tressel also declares that the reliability of my testimony is

1

EXHIBIT 1

769

diminished by my decision not to preserve the glass fragments found in the door well to demonstrate that they were unstained by blood.   Mr. Tressel further hypothesizes that the unstained fragments could have fallen into the door well, onto previously dried blood, when I opened the van's front passenger door during my crime scene investigation.

6.    I personally observed the fragments of glass in the door well and they were unstained by blood.

7.    I photographed the fragments from a variety of angles to memorialize my observations.

8.    Though Mr. Tressel does not identify any particular photograph, I have reviewed the crime scene photos and have concluded that the only image containing a glass fragment that could be characterized as having a "red stripe" appears on crime scene photo CR03527CD40085.   A true and correct copy of photo CR03527CD40085 is attached to this Declaration as Exhibit A. Additionally, a true and correct copy of photo CR03527CD40085, modified with a yellow circle around the apparently striped fragment, is attached to this Declaration as Exhibit B, and a magnification of the pertinent portion of photo CR03527CD40085, with the apparently striped fragment circled in yellow, is attached to this Declaration as Exhibit C.

9.    The appearance of a seeming "red stripe" in Exhibits A, B and C does not undermine my observation that none of the glass fragments in the door well were stained by blood.   Had a glass fragment fallen into viscous blood, the stain on it would have mirrored the shape of the blood underneath it.   In other words, like any fluid, the blood would have coated the underside of the glass to the extent that the two were in contact.   The red stripe visible in Photo Exhibit A does not mirror the contact between the glass and the blood.

10.    Furthermore, if a glass fragment had contacted viscous blood, the resulting stain would have been visible from all angles.   However, crime scene photo CR03527CD40092 depicts the

2

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 770

glass fragment from above, and no red stripe is visible.   A true and correct copy of photo CR03527CD40092 is attached to this Declaration as Exhibit D.   Additionally, a magnification of the pertinent portion of photo CR03527CD40092, with the significant fragment circled in yellow, is attached to this Declaration as Exhibit E.   Again, no red stripe is visible.

11.   Likewise, the glass fragment on which Mr. Tressel identifies a stripe was captured in crime scene photo CR03527CD40095.   A true and correct copy of photo CR03527CD40095 is attached to this Declaration as Exhibit F.   Also, a magnification of the pertinent portion of photo CR03527CD40095, with the significant fragment circled in yellow, is attached to this Declaration as Exhibit G.   Once again, no red stripe is visible on the fragment.

12.   Because the "red stripe" is not visible from all angles, I conclude that it is not a stain, but an illusion created by light refracted through the glass, which is transparent to light, in a two-dimensional photograph.

13.   I have reviewed the crime scene photographs at extreme magnification, and while red pixels are occasionally visible in the images of the glass fragments, they do not mirror the shape of the blood underneath the fragments and are not consistently visible from image to image.   In short, any apparent staining on the fragments in the crime scene photographs is an illusion, created by photographing small pieces of a transparent substance above a red background.

14.   I elected not to collect the glass fragments in the door well because no further forensic testing was necessary to determine the observed condition of the fragments at the scene, and no further forensic testing was necessary to determine the origin of the glass fragments or the mechanism that produced the fragmentation.

15.   Consistent with my observation that the fragments were not blood stained, when I removed them from the door well, I did not observe any liquid blood under them.   Viscous material or

wet blood under the fragments would have indicated that the fragments had fallen into blood that had dried around them.    It is not uncommon to expose wet blood even days after the surface has dried.

16.    Mr. Tressel's theory that the glass fragments could have fallen into the door well during the crime scene investigation is inconsistent with the evidence.

17.    I opened the passenger-side door carefully to avoid shifting any evidence, before photographing the interior of the van.

18.    I photographed the inside of van, including the interior side of the front passenger door, before I opened that door.    The interior side of that door is depicted in crime scene photo CR03527CD30052.    A true and correct copy of photo CR03527CD30052 is attached to this Declaration as Exhibit H.    Likewise, the lower portion of the door is depicted in crime scene photo CR03527CD30056.    A true and correct copy of photo CR03527CD30056    is attached to this Declaration as Exhibit I.    I have studied Exhibits H and I under magnification and did not see any glass fragments that could have fallen into the dried pool of blood when the door was opened.

19.    As most clearly shown in Exhibit E, the pertinent glass fragments were found in line with, or forward of, the front edge of the passenger seat.    However, Exhibits H and I, which show the interior side of the front passenger door, do not depict any surfaces above that area capable of holding glass fragments.    The window sill and door handle, depicted in Exhibit H sloped toward the floor.    The papers visible in Exhibit I might have trapped glass fragments, but were behind the plane defined by the front edge of the seat and therefore not above the area where the fragments were found atop the dried blood.

20.    It appears that one glass fragment fell from the van to the ground below when I opened the

4

door.   That fragment may have been in a precarious position and fallen when the door was opened, but it does not explain the deposition of fragments atop the blood pool in the door well.

21.   Mr. Tressel notes that Mr. Chick's right hand was covered in blood and debris.   He declares that if Mr. Chick had been moved from the picnic table to the ground more than an hour after the shooting, the blood on his hand would have dried to the point that it would not have adhered to the debris.

22.   I took photographs of both sides of Mr. Chick's right hand.   The palm side of the hand is depicted in crime scene photo CR03527CD40044.   A true and correct copy of photo CR03527CD40044 is attached to this Declaration as Exhibit J.   Likewise, the back of his hand is depicted in crime scene photo CR03527CD30069 . A true and correct copy of photo CR03527CD30069 is attached to this Declaration as Exhibit K.

23.   Any moisture such as dew could have rehydrated blood on the hand sufficiently for the limited amount of debris on the back of Mr. Chick's hand, as depicted in Exhibit K.   The pattern of debris in that photograph is limited to the knuckles of the index to ring fingers and may have been transferred there after the body was moved to the ground (perhaps by a person or animal stepping on the hand) or may have resulted from a person grasping the back of the hand when moving the body.   Indeed, the debris appears to be a transfer pattern on top of the bloodstain.   If the debris had been picked up by wet blood, rather than superimposed upon blood, I would expect some blood to be visible on the exposed surfaces of that debris.

24.   At least two sources of wet blood were available for the palm side of the right hand, as depicted in Exhibit J.   The surface of the blood pool on the table could have sealed wet blood that was exposed when the body was moved from the table.   As noted, the removal of an object from an apparently dried blood pool commonly exposes wet blood underneath.   Additionally,

<div align="center">5</div>

Case 6:10-cv-00115-RAW   Document 16-1   Filed 09/28/10   Page 6 of 35
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 773

773

repositioning the body allowed liquids in the body to drain from the two bullet wounds in Mr.

Chick's head.    Blood draining to the ground around the right hand could have added to the

moisture, sufficient to adhere the debris found there.

25.    Mr. Tressel declares that blood spatter found on the lower portion of Mrs. Chick's face was

as likely to have come from her own head wounds as from Mr. Chick's initial bullet wound.

26.    The misted spatter on Mrs. Chick's lower face is best explained by her proximity to her

husband, when he was shot. Based on Mrs. Chick's position, as demonstrated by the surrounding

bloodstains, back spatter from either entry wound to her head can be excluded as a source of the

spatter on her face.    Back spatter travels away from the victim, toward the shooter, in a cone

shaped area.    Spatter from the wound on the left top of Mrs. Chick's head would have traveled

away from her face.    Forward spatter from the partial exit wound traveled toward Mrs. Chick's

rear.    In fact, I found a bone fragment from the exit wound on the door well frame of the van.

Backspatter from the shot to the back of Mrs. Chick's head would have been behind her.

27.    Mr. Tressel declares that some of the livor mortis or lividity patterns evident on Mr.

Chick's body were consistent with the prone position in which he was found.       He further

declares that lividity becomes fixed and unchangeable within four to six hours after death and

that cooler temperatures speed the process of fixation.

28.    Even after lividity has developed in one position, secondary patterns can develop if the

body is moved to another position before the lividity becomes fixed.

29.    The time frame in which lividity becomes fixed is variable, depending on conditions, but

generally occurs six or more hours after death.    The process of fixation is known to be slowed,

not accelerated, by lower temperatures.

30.    A true and correct copy of autopsy photo MVC005F is attached to this Declaration as

6

774

Exhibit L, and depicts fixed lividty on the rear of Mr. Chick's thighs.   The blanching (or

lightened areas of skin) evident at the tops of the thighs and across the buttocks is consistent with

Mr. Chick having been seated on the picnic table bench while lividity fixed, creating the obvious

lines of demarcation.   Blanching is caused by the pressure of the skin against an object.


Executed at Tulsa, Oklahoma this 24th day of September 2010:


Iris Dalley

# EXHIBIT A

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 776



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 777

# EXHIBIT B



# EXHIBIT C

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 780



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 781



# EXHIBIT D

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 783



# EXHIBIT E



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 786



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 787



# EXHIBIT F



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 790

# EXHIBIT G



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 792



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 793

# EXHIBIT H



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 795

# EXHIBIT I



Appellate Case: 17-7031    Document: 28-1    Date Filed: 06/16/2017    Page: 797

# EXHIBIT J

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 798



Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 799

# EXHIBIT K

Appellate Case: 17-7031 Document: 28-1 Date Filed: 06/16/2017 Page: 800



# EXHIBIT L



## DECLARATION OF RONALD F. DISTEFANO

I, RONALD F. DISTEFANO, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am a forensic pathologist formerly employed as a medical examiner at the Office of the Chief Medical Examiner, state of Oklahoma in Tulsa.   In that capacity, I testified at the federal trial of Edward Leon Fields (in Eastern District of Oklahoma case no. CR-03-73-WH) concerning autopsy findings for Charles and Shirley Chick.

2.      I have reviewed portions of a declaration prepared by Robert Tressel regarding the autopsy findings.

3.      Mr. Tressel declares that significant blood drainage was found around Mr. Chick's body, and such drainage was unlikely to have occurred had the body been moved several hours after death.   Mr. Tressel notes that his conclusion is particularly apt because blood would have congealed "more quickly" in the relatively cool air on the night of the murder.

4.      While the clotting mechanism in blood does not stop completely after death, it is markedly slowed.   The enzymatic reactions that affect blood clotting are retarded by cooling not accelerated.   Accordingly, it is completely incorrect to conclude that blood in Mr. Chick's body would have congealed in six hours in relatively cool evening air.   Indeed, based on my experience, I would expect bodily fluids to drain freely from any open defect on the body as much as twenty-four hours after death.

5.      Mr. Tressel declares that livor mortis (or "lividity") becomes fixed and unchangeable within four to six hours after death and that cooler temperatures speed the process of fixation.

EXHIBIT 2

6.      The fixation of lividity is generally accepted as occurring in eight to twelve hours. It is also a process that occurs not at once but over time.   Thus, even after lividity has partially fixed in one position, if the body is then moved to another position, additional secondary patterns can develop.

7.      The pattern visible on the upper legs and buttocks of Mr. Chick, as depicted in Exhibit A to this Declaration, is consistent with lividity having partially fixed while he was in a seated position.

8.      The pattern of lividity and blanching visible on the anterior portion of Mr. Chick's upper thighs, as depicted in Exhibit B to this Declaration, is consistent with subsequent lividity becoming fixed after he was in a prone position.

9.      Mr. Tressel declares that photographs of Mr. Chick's feet are consistent with lividity having fixed while he was in a prone position while his toes were pressed into the ground.

10.     The lividity patterns on Mr. Chick's feet are not inconsistent with the position in which he was thought to be seated at the time of his death – with his feet pointed behind him.   In essence, his feet would have been in the same position while prone or seated.

11.     Mr. Tressel declares that rigor mortis fully develops in six to twelve hours after death.

12.     Rigor mortis is generally accepted as beginning in four to six hours, becoming maximal by twelve hours, and being gone by twenty-four hours.   In other words, the process of muscle stiffening increases over time before ebbing.   However, the speed of the process is greatly affected by multiple factors including, but not limited to, temperature.   For instance, rigor mortis

805

is slowed by cooler weather, but accelerated if the decedent was physically active immediately prior to death. Though the process begins in all the muscles at the time of death, it first becomes apparent in the shorter muscles of the body, such as those in the jaw and neck, and becomes perceptible in the longer muscles later.

13. There is no basis for concluding in this case that the onset of rigor would have prevented the movement of Mr. Chick's body approximately six hours after death.

Executed at Tulsa, Oklahoma this 24th day of September 2010:

RONALD F. DISTEFANO

Page 1

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Blake SCOTT, Petitioner-Appellant,
v.
Joe ROMERO, Warden, Central New Mexico Correctional Facility; Attorney General for the State of New Mexico, Respondents-Appellees.
**No. 04-2262.**

Nov. 2, 2005.

**Background:** State prisoner sought habeas corpus relief. The United States District Court for the District of New Mexico, adopting the magistrate judge's recommendation, denied relief. Prisoner applied for certificate of appealability (COA).

**Holdings:** The Court of Appeals, Terrence L. O'Brien, Circuit Judge, held that:
(1) fair trial and *Brady* claims were procedurally defaulted, and
(2) state court's finding that counsel was not ineffective was not unreasonable application of federal law.

Application denied; appeal dismissed.

West Headnotes

**[1] Habeas Corpus 197 ⚿422**

197 Habeas Corpus
   197I In General
      197I(D) Federal Court Review of Petitions by State Prisoners

197I(D)6 State's Reliance on or Waiver of Procedural Bar or Want of Exhaustion
      197k422 k. State Court Decision on Procedural Grounds, and Adequacy of Such Independent State Grounds. Most Cited Cases
Petitioner's procedural default as to post-conviction relief in New Mexico, with petitioner deemed to have waived post-conviction claims of denial of fair trial and prosecution's *Brady* due process violation because such claims had not been raised on direct appeal, was independent and adequate state procedural ground for default, and thus, petitioner was procedurally barred from bringing federal habeas corpus claim unless he demonstrated cause and prejudice or fundamental miscarriage of justice. U.S.C.A. Const.Amends. 6, 14; 28 U.S.C.A. §§ 2253(c)(2), 2254.

**[2] Habeas Corpus 197 ⚿486(4)**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
         197k482 Counsel
            197k486 Adequacy and Effectiveness of Counsel
               197k486(4) k. Evidence; Procurement, Presentation, and Objection. Most Cited Cases
State court's finding that allegedly deficient performance of trial counsel, in failing to object to admission of recording of defendant's telephone call from police station to his mother, was not prejudicial, as element of ineffective assistance of counsel, because objection would have been futile, was not unreasonable application of federal law, and thus, defendant was not entitled to federal habeas corpus relief. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d).

**[3] Habeas Corpus 197 ⚿693**

197 Habeas Corpus

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))

**(Not Selected for publication in the Federal Reporter)**

**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

197III Jurisdiction, Proceedings, and Relief
   197III(C) Proceedings
      197III(C)1 In General
         197k691 Dismissal
            197k693 k. Proceedings. Most Cited Cases

The rules governing habeas corpus cases did not prohibit state from filing pre-answer motion to dismiss state prisoner's petition for federal habeas corpus relief. 28 U.S.C.A. § 2254.

**\*496** Patricia A. Gandert, Office of the Attorney General State of New Mexico, Santa Fe, NM, for Respondents-Appellees.

Before KELLY, O'BRIEN, and TYMKOVICH, Circuit Judges.

**ORDER DENYING CERTIFICATE OF APPEALABILITY AND DISMISSING APPEAL**

TERRENCE L. O'BRIEN, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Petitioner-Appellant Blake Scott, a state prisoner appearing *pro se,*[FN1] seeks a certificate of appealability (COA) allowing him to appeal the district court's order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He also moves to proceed *in forma pauperis* (*ifp* ) on appeal. Because we conclude Scott's claims are procedurally barred and without merit, we deny a COA and dismiss the appeal.

> FN1. We construe *pro se* pleadings liberally. *Ledbetter v. City of Topeka, Kan.,* 318 F.3d 1183, 1187 (10th Cir.2003).

The parties are familiar with the facts and we need not restate them here. On appeal, Scott reasserts three claims he presented in the district court, specifically 1) he received ineffective assistance of counsel in his state court trial when counsel failed to object to the admission of a recording of Scott's telephone call from the police station; 2) that the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding letters he had written to his mother-in-law and then only placing part of the letters into evidence; and, 3) that his Sixth Amendment rights were violated when the district court failed to allow him to present exculpatory evidence.[FN2] The magistrate judge recommended Scott's claims be dismissed because the *Brady* and Sixth Amendment claims were procedurally barred and all three claims were without merit. The district court adopted the magistrate's recommendations and dismissed Scott's habeas petition. In addition to his three claims, Scott also challenges the district court's allowance of the State's motion to dismiss prior to its filing of an answer to his habeas petition.

> FN2. In his petition before this Court, Scott argues he "was denied a fair and impartial trial." (COA Petition at 3.) Although he does not articulate the precise basis for this claim in his COA petition, this is the same language used in his Sixth Amendment claim before the district court.

*Analysis*

Unless this Court issues a COA, Scott may not appeal the dismissal of his § 2254 petition. 28 U.S.C. § 2253(c)(1)(A). "[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.' " *Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting § 2253(c)(2)). To make the requisite showing, a petitioner must demonstrate "that reasonable jurists**\*497** could debate whether ... the petition should have been resolved in a different man-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))

**(Not Selected for publication in the Federal Reporter)**

**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

ner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (quotation marks and citation omitted).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.* "[W]hen reviewing the merits of a claim already decided by the state courts, we are bound to deny relief unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' " *LaFevers v. Gibson,* 182 F.3d 705, 711 (10th Cir.1999) (quoting 28 U.S.C. § 2254(d)).

**\*\*2** [1] With these principles in mind, we have carefully reviewed the record and agree with the district court's conclusions. Scott does not dispute that he failed to raise either his *Brady* or Sixth Amendment claims in his direct appeal. Under New Mexico law, Scott is deemed to have waived these claims by failing to raise them on direct appeal. *Duncan v. Kerby,* 115 N.M. 344, 851 P.2d 466, 468 (1993). "On habeas review, this Court will not consider issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Hickman v. Spears,* 160 F.3d 1269, 1271 (10th Cir.1998). This Court has previously held that New Mexico's procedural bar at issue here is an in-

dependent and adequate state procedural ground. *Jackson v. Shanks,* 143 F.3d 1313, 1318 (10th Cir.1998) ( "Our review of New Mexico cases indicates that New Mexico courts have consistently and even handedly applied the rule waiving issues not raised on direct appeal for purposes of post-conviction relief."). Scott has failed to demonstrate cause that would avoid the procedural bar with respect to his *Brady* and Sixth Amendment claims. *See Coleman v. Thompson,* 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("the petitioner ... must bear the burden of a failure to follow state procedural rules.").

[2] In reviewing Scott's ineffective assistance of trial counsel claim, the Dona Ana County, New Mexico District Court evaluated whether trial counsel's failure to object to the admission of a recording of Scott's telephone call from the police station to his mother was ineffective. Although it questioned defense counsel's trial strategy, it noted any error was not prejudicial because any objection would have been futile. Applying *New Mexico v. Coyazo,* 123 N.M. 200, 936 P.2d 882 (1997), the district court held Scott had no reasonable expectation of privacy in a phone call made from the police station, especially where his comments indicated his awareness that the police were listening. This is not an unreasonable application of federal law. *See United States v. Turner,* 209 F.3d 1198, 1200-01 (10th Cir.2000) (no objective expectation of privacy in conversation conducted in a patrol car). Counsel is **\*498** not ineffective for failing to advance a futile argument. *See Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir.1994) ( "To be ineffective, the representation must have been such as to make the trial a mockery, sham, or farce, or resulted in the deprivation of constitutional rights.").

[3] Finally, Scott's objection to the district court's allowance of a motion to dismiss his habeas petition is based on a misreading of the Rules Governing Habeas Corpus Cases Under Section 2254. Rule 4 directs the district court judge to either dismiss the case if the petitioner "plainly is not entitled to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))

**(Not Selected for publication in the Federal Reporter)**

**(Cite as: 153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.)))**

relief" or "order the respondent to file an answer, *motion,* or other response." (emphasis added). Rule 5(a) explains that "[t]he respondent is not required to answer the petition unless a judge so orders." The Advisory Committee Notes to the 2004 Amendments state that the revised Rule 5 "does not address the practice in some districts, where the respondent files *a pre-answer motion to dismiss the petition.* But revised Rule 4 permits that practice and reflects the view that if the court does not dismiss the petition, it may require (*or permit* ) the respondent to file a *motion.*" (emphasis added). The rules do not prohibit the State from filing a motion to dismiss prior to filing an answer and the Advisory Committee Notes specifically recognize the district court's discretion to allow the filing of such motion in lieu of an answer. His claim of judicial misconduct is without merit.

**\*\*3** Because Scott's petition is wholly without merit, he has failed to show the existence of a reasoned, nonfrivolous argument on the law and facts in support of the issues he raises on appeal. Accordingly, we deny his request to proceed *ifp* on appeal.

*Conclusion*

Based on the above, we **DENY** Scott's request for a COA and **DISMISS** the appeal. We also **DENY** his motion for leave to proceed *ifp* on appeal. Scott shall remit the full amount of the filing fee within twenty (20) days of the date of this order.

C.A.10 (N.M.),2005.
Scott v. Romero
153 Fed.Appx. 495, 2005 WL 2865173 (C.A.10 (N.M.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

810

**Westlaw Delivery Summary Report for JEFFREY,KAHAN**

Date/Time of Request:                    Monday, September 27, 2010 14:46 Central
Client Identifier:                       FIELDS
Database:                                DCT
Citation Text:                           Not Reported in F.Supp.2d
Lines:                                   252
Documents:                               1
Images:                                  0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Page 1

Not Reported in F.Supp.2d, 2005 WL 1595664 (S.D.Miss.)
**(Cite as: 2005 WL 1595664 (S.D.Miss.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. Mississippi, Southern Division.
THE ESTATE OF James MOFFETT; Tammy Moffett, Individually and on Behalf of the Wrongful Death Beneficiaries of James Moffett Plaintiffs
v.
SMITHKLINE BEECHAM CORPORATION d/b/a Glaxo SmithKline Corporation and John Does 1-50 Defendants
**No. 1:03 CV 532 WJG JMR.**

June 9, 2005.

Joseph R. Colingo, Pascagoula, MS, Donald J. Farber, Law Office of Donald J. Farber, San Rafael, CA, for Plaintiffs.

Andrew T. Bayman, Amy M. Power, Chilton Davis Varner, David F. Norden, S. Samuel Griffin, King & Spalding, Atlanta, GA, Joseph Anthony Sclafani, Brunini, Grantham, Grower & Hewes, Jackson, MS, Robert E. Glanville, Tamar P. Halpern, Phillips Lytle, LLP, Buffalo, NY, for Defendants.

*MEMORANDUM OPINION*

GEX, Senior J.

**\*1** This cause is before the Court on the motion for summary judgment [74-1] and motion to stay the deadline for expert designation [74-2] filed by the Defendant, SmithKline Beecham Corporation d/b/a Glaxo SmithKline Corporation [Glaxo SmithKline]. Also before the Court is the Plaintiff's motion for declassification [92-1] of a Glaxo SmithKline document and the motion filed by the law firm of Williams, Heidelberg, Steinberger and McElhaney to intervene [77-1] in this dispute for purposes of filing an attorney's lien against any monies received by the Plaintiff or, alternatively, to refer the fee dis-

pute to chancery court for resolution [77-2]. After due consideration of the evidence of record, the briefs of the parties, and the applicable law, and being otherwise fully advised in the premises, the Court finds as follows.

*Background*

This products liability action arises from the suicide death of James Moffett on May 16, 2002, two months after he began taking Paxil, a prescription medication designed, manufactured and marketed by Glaxo SmithKline. (Ct. R., Doc. 1; Ct. R., Doc. 4, p. 3; Ct. R., Doc. 76, ¶ 1.) Paxil is a selective serotonin reuptake inhibitor [SSRI] prescribed for the treatment of major depressive disorder, social anxiety disorder, obsessive compulsive disorder, panic disorder, generalized anxiety disorder and posttraumatic stress disorder. (Ct. R., Doc. 76, ¶ 2.) Moffett's widow, individually and on behalf of Moffett's estate and wrongful death beneficiaries, filed the instant suit on May 15, 2003, seeking to recover unspecified damages under theories of products liability, negligence, strict liability, breach of express and implied warranties, breach of contract, fraud, battery, and loss of consortium. (Ct. R., Doc. 1, pp. 5-8.) She alleges that Paxil causes suicides and specifically caused or contributed to her husband's suicide in May of 2002. (Ct. R., Doc. 1, p. 3.) She further alleges that Glaxo SmithKline has known since 1989 that Paxil causes suicide but has withheld the suicidal data from the public domain, instead marketing Paxil as a safe drug. (*Id.*) Finally, she claims that Glaxo SmithKline proximately caused her husband's death by failing to place an adequate warning on Paxil's label. (*Id.,* p. 5.) An adequate warning, the Plaintiff urges, would have caused Moffett's physician to prescribe a different course of treatment or would have alerted all persons involved of the risk of suicide associated with Paxil. (*Id.*)

Glaxo SmithKline now seeks summary judgment on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1595664 (S.D.Miss.)

**(Cite as: 2005 WL 1595664 (S.D.Miss.))**

all of the Plaintiff's claims arguing that she has failed to offer expert evidence concerning the issue of specific causation and, consequently, cannot establish an essential element of her claims. (Ct. R., Doc. 74.)

*Standard of Review*

Summary judgment, where appropriate, is designed "to secure the just, speedy, and inexpensive determination of every action." FED. R. CIV. P. 1, 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation and internal quotation omitted). A district court may properly grant a motion for summary judgment when, after viewing the facts in the light most favorable to the nonmoving party, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Deas v. River West, L.P.,* 152 F.3d 471, 475 (5th Cir.1998). Summary judgment must be entered against the non-moving party "... who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir.2004) (quoting *Celotex,* 477 U.S. at 322-323). "Neither 'unsubstantiated assertions' nor 'conclus[ional] allegations' can satisfy the non-moving party's burden." *Lawrence v. University of Tex. Medical Branch at Galveston,* 163 F.3d 309, 312 (5th Cir.1999) (citing *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996)).

*Legal Analysis*

**\*2** In support of summary judgment, Glaxo SmithKline asserts that the Plaintiff has failed to adduce expert evidence to establish that Moffett's death was in any way related to his use of Paxil. (Ct. R., Doc. 75, p. 1.) The Defendant submits that,

in order to carry her burden of proof on causation, the Plaintiff must establish both general and specific causation. (Ct. R., Doc. 75, p. 5.) In other words, the she must first demonstrate that Paxil is capable of causing the type of injury alleged and then establish that Paxil did in fact cause that injury. (*Id.*) According to Glaxo SmithKline, while the Plaintiff has offered expert reports on the issue of general causation, there is no evidence of specific causation, *i.e.* that Paxil caused Moffett to suffer suicidality, akathisia, or mania or caused him to commit suicide. (*Id.,* pp. 6-7.) The Plaintiff, however, asserts that a material issue of fact exists concerning the relationship between Moffett's ingestion of Paxil and his death. (Ct. R., Doc. 78, p. 1.) Moreover, she argues, Glaxo SmithKline has offered no Mississippi authority which states that specific causation is an operative element of her claims. (*Id.,* p. 3.)

Sitting in diversity, the Court is bound to apply the substantive law of the forum state, Mississippi. *Blakely v. State Farm Mut. Auto. Ins. Co.,* 406 F.3d 747, 751 (5th Cir.2005) (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78-79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *American Nat'l Gen. Ins. Co. v. Ryan,* 274 F.3d 319, 328 (5th Cir.2001)). It is true, as noted by the Plaintiff, that no Mississippi case approaches causation in terms of general and specific causation. It is elementary law, however, that the Plaintiff must demonstrate a causal link between Moffett's use of Paxil and his death. *See* MISS.CODE ANN. § 11-1-63 (requiring the products liability plaintiff to establish that the defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought); *Bennett v. Madakasira,* 821 So.2d 794, 807 (Miss.2002) (requiring the plaintiff in a "failure to warn" prescription drug case based on negligence and strict liability to demonstrate, *inter alia,* that the injury would not have occurred had the drug not been administered); *Id.* at 808-809 (breach of implied warranty cannot be submitted to the jury absent proof of both a defect in the product and that the defect caused the in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1595664 (S.D.Miss.)

**(Cite as: 2005 WL 1595664 (S.D.Miss.))**

jury). Whether the concept is described in terms of specific causation, actual causation, medical causation, cause in fact or proximate cause, the Plaintiff, in order to prevail on any of her claims, must show by a preponderance of the evidence that Paxil caused or contributed to Moffett's death. The question for the Court, therefore, is whether the Plaintiff has come forward with sufficient evidence to enable reasonable jurors to conclude that Paxil, more likely than not, was the cause of Moffett's suicide.

**\*3** Citing the expert report of Peter Breggin, M.D., the Plaintiff asserts that a material issue of fact exists concerning the relationship between Moffett's ingestion of Paxil and his death. (Ct. R., Doc. 78, pp. 2-3.) The relevant portions of Breggin's report are set forth below:

The following opinions are rendered within a reasonable degree of medical certainty:

First, the pharmaceutical company, Glaxo SmithKline has not properly warned professionals about the complete lack of efficacy of Paxil in regard to ameliorating suicidal feelings.

Second, the manufacturer has not warned that SSRIs in general, including Paxil, can raise the rate of suicide in depressed patients.

Third, the manufacturer has not warned that Paxil has a stimulant profile of effects, including agitation, insomnia, and weight loss that can worsen depression and suicide.

Fourth, the manufacturer has not warned that Paxil can cause akathisia and thereby cause suicide.

Fifth, the manufacturer has not warned that Paxil is particularly likely to cause suicide in patients like Mr. Moffett who are already suffering from an agitated depression, in this case a state of mixed depression, mood swings, agitation, and anger.

Within a reasonable degree of medical certainty, Glaxo SmithKline was negligent in regard to withholding or misrepresenting the above information.

Had Dr. Barrett known the above facts about Paxil, he would not have prescribed it to Mr. Moffett, and Mr. Moffett would be alive today.

According to the Plaintiff, it "could not be clearer that Dr. Breggin believes-and has testified-that Paxil caused the suicide ..." (Ct. R., Doc. 78, p. 2.)

Glaxo SmithKline, however, argues that Breggin's report, more particularly the sentence wherein he states that Moffett would be alive today had Barrett not prescribed him Paxil, does not constitute a detailed and complete expert report as required by Rule 26(a)(2)(B). (Ct. R., Doc. 80, p. 2.) Having reviewed Breggin's submissions, the Court agrees that his report does not conform to the requirements of Rule 26. Expert reports filed pursuant to Rule 26 should contain:

... a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED. R. CIV. P. 26 (a0(2)(B). Breggin's report clearly fails to set forth the basis and reasons for his opinions, as well as the information he considered in forming them. This lack of information renders it impossible to determine whether his opinions constitute reliable expert testimony under the standards outlined in *Daubert v. Merrell Dow Paharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, 125 L.Ed. 469 (1993). The Court also notes that, despite Glaxo SmithKline's challenge to the sufficiency of Breggin's report, the Plaintiff has made no move to supplement.

**\*4** Even ignoring the inadequacy of his report,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2005 WL 1595664 (S.D.Miss.)

**(Cite as: 2005 WL 1595664 (S.D.Miss.))**

however, Breggin's opinions fail to create a causation issue for the jury. Breggin opines that: (1) SS-RIs can raise the rate of suicide in depressed patients; (2) that Paxil has a stimulant profile of effects including agitation, insomnia, and weight loss that can worsen depression and suicide, (3) that Paxil can cause akathisia and thereby cause suicide; (4) that Paxil is particularly likely to cause suicide in patients like Moffett who are suffering from an agitated depression; and (5) that Dr. Barrett would not have prescribed Paxil to Moffett had he known these facts. These assertions, when viewed in the light most favorable to the Plaintiff, are merely evidence that Paxil *can* cause suicide. Breggin stops short of asserting that Paxil was, in fact, the cause of Moffett's suicide, and any finding to that effect would amount to nothing more than speculation and conjecture.

Breggin's opinions permit a finding that Paxil was *possibly* the cause of Moffett's suicide. To carry her burden of proof, however, the Plaintiff must introduce evidence which affords a reasonable basis for concluding that Paxil *more likely than not* was the cause of Moffett's suicide. A "mere possibility" of causation is simply insufficient. *See Burnham v. Tabb,* 508 So.2d 1072, 1074 (Miss.1987) (citing W. Keeton, *Prosser & Keeton on Torts,* § 41 (5th ed.1984); *Tombigbee Electric Power v. Gandy,* 216 Miss. 444, 62 So.2d 567 (Miss.1953)). While the Court is mindful that some degree of speculation is necessary in cases which turn on medical causation, the Mississippi Supreme court has insisted, "that proof of causation remain within the realm of the reasonably probable," rather than "the merely speculatively possible." *Harris v. Shields* 568 So.2d 269, 273 (Miss.1990) (discussing causation in fact in the context of medical malpractice) (citing *Burnham,* 508 So.2d at 1074; *Pittman v. Hodges,* 462 So.2d 330, 334-335 (Miss.1984). For the foregoing reasons, the Court finds that the Plaintiff has failed to adduce sufficient evidence to create jury question on the issue of causation in fact.

The Plaintiff places much emphasis on the testi-

mony of Moffett's treating physician, Harris G. Barrett, M.D., that he would not have prescribed Paxil to Moffett had he received stronger warnings concerning the alleged association between Paxil and suicide.[FN1] (Ct. R., Doc. 78, p. 4.) This argument misses the mark, however. While the Plaintiff, to prevail on her failure to warn claim, must demonstrate that an adequate warning would have prevented Barrett from prescribing Paxil to Moffett, *see Bennett v. Madakasira,* 821 So.2d at 807, she must still demonstrate by a preponderance of the evidence that Paxil was the cause of Moffett's suicide. Having failed to establish such causation, the Court finds that Glaxo SmithKline is entitled to summary judgment.

> FN1. During his deposition, Barrett was read a variety of theoretical warnings concerning the alleged association between Paxil and suicide. (Ct. R., Doc. 78, Exh. B, pp. 72-78.) When asked whether he would have prescribed Paxil to Moffett if the drug had been accompanied by these warnings, Barrett indicated that he would not. (*Id.*)

*Conclusion*

The Court finds that the Plaintiff has failed to offer sufficient evidence to permit a reasonable jury to find that Paxil more likely than not caused her husband's suicide. Consequently, the Court finds that Glaxo SmithKline is entitled to judgment as a matter of law on the Plaintiff's claims. Further, having reviewed the remaining pending motions and finding that they do not alter or affect the summary judgment determination, the Court finds that these motions [74-2, 77-1, 77-2 & 92-1] should be denied as moot.

**\*5** A separate Final Judgment in accordance with this Memorandum Opinion shall issue this date.

S.D.Miss.,2005.

Estate of Moffett v. SmithKline Beecham Corp.

Not Reported in F.Supp.2d, 2005 WL 1595664

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1595664 (S.D.Miss.)

**(Cite as: 2005 WL 1595664 (S.D.Miss.))**

Page 5

815

(S.D.Miss.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

816

**Westlaw Delivery Summary Report for JEFFREY,KAHAN**

| | |
|---|---|
| Date/Time of Request: | Monday, September 27, 2010 14:49 Central |
| Client Identifier: | FIELDS |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp. |
| Lines: | 152 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Page 1

Not Reported in F.Supp., 1995 WL 478844 (W.D.Va.), Prod.Liab.Rep. (CCH) P 14,238
**(Cite as: 1995 WL 478844 (W.D.Va.))**

C

United States District Court, W.D. Virginia,
Harrisonburg Division.
The ESTATE OF Donald Ray LAM, et al.,
Plaintiffs
v.
The UPJOHN COMPANY, Defendants.
**No. Civ. A. 94-003-H.**

April 21, 1995.

Hugh David O'Donnell, Green & O'Donnell, Harrisonburg, VA, David C. Read, Paris, TX, Michael D. Mosher and Frank H. Hytken, Hytken & Mosher, Dallas, TX, for plaintiffs.

Samuel L. Tarry, Jr. and James F. Stutts, McGuire, Woods, Battle & Boothe, Richmond, VA, Stephen E. Scheve and Marie S. Woodbury, Shook, Hardy & Bacon, Kansas City, MO, for defendant.

ORDER

MICHAEL, District Judge.

**\*1** The court referred this case to the Honorable B. Waugh Crigler, United States Magistrate Judge, pursuant to a standing order for proposed findings of fact and a recommended disposition. The Magistrate Judge filed his Report on March 27, 1995, recommending, inter alia, that summary judgment be granted to the Defendants on the ground that the testimony of the Plaintiffs' expert witness is inadmissible under *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 113 S.Ct. 2786 (1993). The Plaintiffs filed Objections on April 10, 1995. After de novo review of the record in the case, and the court finding that the opinion of the Plaintiffs' expert regarding the drug Halcion is not based on sound scientific methodology, for the reasons stated by the Magistrate; and the court further finding that summary judgment should be granted due to the fact that Plaintiffs' expert is the sole causation witness for the Plaintiffs, *see generally, Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995), it is hereby

ADJUDGED AND ORDERED

that the Defendants' motion for summary judgment shall be, and it hereby is, granted, and this case shall be, and it hereby is, dismissed and stricken from the docket of this court.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record and to Magistrate Judge Crigler.

*REPORT AND RECOMMENDATION*

CRIGLER, United States Magistrate Judge.

This action is before the court on numerous motions of the defendant and upon a motion of the plaintiffs for leave to amend their designation of expert witnesses. The most significant case-dispositive motions of the defendant are those seeking to exclude the evidence of Dr. Peter Breggin, M.D., both as an expert and as a fact witness, and its motion for summary judgment based on the asserted inadmissibility of his testimony. A hearing was held before this court on March 20, 1994. Because of the time constraints between the hearing date and the trial date, this court announced its findings, conclusions and recommendations from the bench at the conclusion of the hearing. This Report and Recommendation follows both to memorialize those findings, conclusions and recommendations, and to conform to the requirements of 28 U.S.C. § 636(b)(1)(B).

*DISCUSSION, FINDINGS AND CONCLUSIONS*

On February 24, 1994 The Upjohn Company moved to exclude the testimony of Peter Breggin,

Not Reported in F.Supp., 1995 WL 478844 (W.D.Va.), Prod.Liab.Rep. (CCH) P 14,238

**(Cite as: 1995 WL 478844 (W.D.Va.))**

M.D. both as an expert under Fed.R.Evid. 702 and 703 and as a fact witness under Fed.R.Evid. 602. The motions have their genesis in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 113 S.Ct. 2786 (1993) and its progeny. Defendant's argument is that Dr. Breggin is not qualified to render any opinions in the case regarding general or specific causation, or about the adequacy of the product warnings because he does not possess the requisite knowledge, skill, experience, training or education in those relevant areas. Particularly, defendant suggests that Dr. Breggin's opinions are nothing more than theories that are personal to him and not generally accepted by the relevant scientific community; that none of his work has been subjected to peer review and publication in a scientific as opposed to a litigation forum; that none of his theories have been tested, much less proved; that his methodology is unknown, if there is one at all; and that his methodology has never been subjected to any standards other than those of his own making. In addition, defendant challenges Breggin's qualifications to express criticism concerning the adequacy of the warning on the Halcion package. Defendant argues that if Dr. Breggin's opinions are inadmissible under *Daubert,* his lay testimony is also inadmissible because does not satisfy the personal knowledge requirement of Fed.R.Evid. 602 and violates the proscriptions against the admission of hearsay under Fed.R.Evid. 801. Thus, defendant contends that not only is Dr. Breggin's testimony as an expert inadmissible, it also is not submissible on any other basis permitted by the rules of evidence.

Plaintiff opposes these particular motions on the grounds that defendants have failed to controvert a single opinion expressed by Dr. Breggin. Alternatively, they believe that the question of whether Dr. Breggin is qualified involves disputed issues of fact, and that before the court can resolve the qualification issue under *Daubert,* an evidentiary proceeding must be conducted so the court can resolve any issues of credibility.

**\*2** With all due respect to local counsel for plaintiffs who appeared on March 21, 1995, plaintiffs' first argument, which essentially addresses the parties' respective burdens in a Rule 56 context, was dispatched by the Ninth Circuit upon remand of *Daubert* from the Supreme Court. Applying what have become axiomatic Rule 56 principles, especially in light of *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the question is not whether the moving party has failed to contradict the plaintiff's evidence, but whether plaintiff has adduced enough admissible evidence to generate genuine issues of material fact. *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995). Moreover, this court does not believe that the Supreme Court in *Daubert* envisioned lower courts engaging in evidentiary proceedings to determine the validity of objections to expert testimony. After all, determinations of admissibility under Rule 702 are matters of law.

As announced from the bench on March 20, 1995, this court finds that the evidence of Peter Breggin, as a purported expert, fails nearly all particulars under the standard set forth in *Daubert* and its progeny. The record supports defendant's assertions that: 1) Breggin stands alone in his theory that Halcion causes suicidal or homicidal behavior; 2) his causation theories have not been subjected to peer review; 3) the data principally is anecdotal; and 4) his methodology essentially is an estimate incapable of producing a testable rate of error. As to his testimony regarding the warning on the Halcion package, Breggin has conducted no original research, has performed no personal re-analysis of the work of others, has prescribed Halcion only once since 1983, has no academic training or regulatory experience and has never participated in any FDA-related proceedings addressing what constitutes an adequate warning.[FN1] Simply put, the court believes that Dr. Breggin's opinions do not rise to the level of an opinion based on "good science." The motion to exclude his testimony as an expert should be granted. It is so RECOMMENDED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 478844 (W.D.Va.), Prod.Liab.Rep. (CCH) P 14,238

**(Cite as: 1995 WL 478844 (W.D.Va.))**

> FN1. There is a serious issue raised by defendant regarding whether plaintiff can prove causation because the drug at issue here was prescribed by a "learned intermediary", and because the physician prescribing the drug did not apprise Mr. Lam of the warning. *Stanback v. Park-Davis & Co.,* 637 F.2d 642 (4th Cir.1981); *Pfizer, Inc. v. Jones,* 272 S.E.2d 43 (Va.1980). The point is well taken, though moot because Dr. Breggin does not have sufficient expertise to opine about the adequacy of the warning.

It follows that defendant's motion related to his Jay testimony also is well taken. Dr. Breggin's lay testimony fails to qualify under Fed.R.Evid 602 because it is not based upon personal knowledge, but upon what technically is hearsay information reviewed for purposes of rendering a expert opinion. Accordingly, this court RECOMMENDS that the defendant's motion to exclude the testimony of Dr. Breggins as lay evidence be granted.

The Clerk is directed to immediately transmit the record in this case to the Hon. James H. Michael, Jr., United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

W.D.Va.,1995.
Estate of Lam v. Upjohn Co.
Not Reported in F.Supp., 1995 WL 478844 (W.D.Va.), Prod.Liab.Rep. (CCH) P 14,238

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Westlaw Delivery Summary Report for JEFFREY,KAHAN**

Date/Time of Request:     Monday, September 27, 2010 14:51 Central
Client Identifier:      FIELDS
Database:        OKLA-TRANS
Citation Text:       1997 WL 330507 (D.Colo.Doc.)
Lines:         205
Documents:       1
Images:         0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

1997 WL 330507 (D.Colo.Doc.)                                                            Page 1
1997 WL 330507 (D.Colo.Doc.)
**(Cite as: 1997 WL 330507 (D.Colo.Doc.))**


**\*1** TITLE:        United States of America, Plaintiff v. Timothy James McVeigh, De-
fendant.

TOPIC:           SPECIAL FINDINGS FORM A
DOCKET-NUMBER:   96-CR-68-M

VENUE:           U.S. District Court for the District of Colorado.

YEAR:            Filed:  June 13, 1997

JUDGE:           Hon. Richard P. Matsch, Chief District Judge

TEXT:

THESE FINDINGS APPLY TO ALL ELEVEN COUNTS.


I. Intent to Cause Death

   Instructions:  For each of the following, answer "Yes" or "No" as to whether
you, the jury, unanimously find that the government has established beyond a reas-
onable doubt that the defendant Timothy James McVeigh, acted with the specified
criminal intent to cause death:
   1. The defendant intentionally killed the victims.
     Yes X
     No _____
   2. The defendant intentionally inflicted serious bodily injury that resulted
in the death of the victims.
     Yes X
     No _____
   3. The defendant intentionally participated in an act, contemplating that the
life of a person would be taken or intending that lethal force would be used
against a person, and the victim(s) died as a result of that act.
     Yes X
     No _____
   4. The defendant intentionally and specifically engaged in an act of violence,
knowing that the act created a grave risk of death to a person, other than a par-
ticipant in the offense, such that participation in the act constituted a reckless
disregard for human life and the victim(s) died as a direct result of the act.
     Yes X
     No _____

   Instructions:  If you answered "No" with respect to all of the above, then con-
clude your deliberations, sign Section VI of this form, and advise the court that
you have reached a decision.


© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 6:10-cv-00115-RAW   Document 16-6   Filed 09/28/10   Page 3 of 6

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 822

**(Cite as: 1997 WL 330507 (D.Colo.Doc.))**

   If you answered "Yes" with respect to one or more of the above then continue your deliberations in accordance with the court's instructions and proceed to Section II which follows.

II. Statutory Aggravating Factors

   Instructions:  For each of the following, answer "Yes" or "No" to whether you, the jury, unanimously find that the government has established beyond a reasonable doubt the existence of that aggravating factor:

   1. The deaths or injuries resulting in death occurred during the commission of an offense under 18 U.S.C. § 844(d) (transportation of explosives in interstate commerce for certain purposes).

      Yes X

      No _____

   2. The defendant, in the commission of the offense(s), knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

      Yes X

      No _____

   3. The defendant committed the offense(s) after substantial planning and premeditation to cause the death of one or more persons and to commit an act of terrorism.

      Yes X

      No _____

   **\*2** 4. The defendant committed the offense(s) against one or more federal law enforcement officers because of such victims' status as federal law enforcement officers.

      Yes X

      No _____

   Instructions:  If you do not find any statutory aggravating factors, then conclude your deliberations, sign Section VI of this form, and advise the court that you have reached a decision.

III. Non-Statutory Aggravating Factors

   Instructions:  For each of the following, answer "Yes" or "No" as to whether you, the jury, unanimously find that the government has established the existence of that aggravating factor beyond a reasonable doubt:

   1. The offense(s) committed by the defendant resulted in the deaths of 168 persons.

      Yes X

      No _____

   2. In committing the offense(s), the defendant caused serious physical and emotional injury, including maiming, disfigurement, and permanent disability, to numerous individuals.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(Cite as: 1997 WL 330507 (D.Colo.Doc.))**

Case 6:10-cv-00115-RAW   Document 16-6   Filed 09/28/10   Page 4 of 6

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 823

```
Yes X
No ____
```

3. That, by committing the offense(s), the defendant caused severe injuries and losses suffered by the victims' families.

```
Yes X
No ____
```

Instructions:  Regardless of whether you answered "Yes" or "No" with respect to the Non-Statutory Aggravating Factors in Section III above, continue your deliberations in accordance with the court's instructions and proceed to Section IV which follows.

IV. Mitigating Factors

Instructions:  For each of the following mitigating factors, you should indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.  A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

1. Timothy McVeigh believed deeply in the ideals upon which the United States was founded.

Number of jurors who so find 0

2. Timothy McVeigh believed that the ATF and FBI were responsible for the deaths of everyone who lost their lives at Mt. Carmel, near Waco, Texas, between February 28, and April 19, 1993.

Number of jurors who so find 12

3. Timothy McVeigh believed that federal law enforcement agents murdered Sammy Weaver and Vicki Weaver near Ruby Ridge, Idaho, in August 1992.

Number of jurors who so find 12

4. Timothy McVeigh believed that the increasing use of military-style force and tactics by federal law enforcement agencies against American citizens threatened an approaching police state.

Number of jurors who so find 12

5. Timothy McVeigh's belief that federal law enforcement agencies failed to take responsibilities for their actions at Ruby Ridge and Waco, and failed to punish those persons responsible, added to his growing concerns regarding the existence of a police state and a loss of constitutional liberties.

**\*3** Number of jurors who so find 12

6. Timothy McVeigh served honorably and with great distinction in the United States Army, from May 1988, until December 1991.

Number of jurors who so find 10

7. Timothy McVeigh received the Army's Bronze Star for his heroic service in Operation Desert Storm in Kuwait and Iraq.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1997 WL 330507 (D.Colo.Doc.) Page 4
1997 WL 330507 (D.Colo.Doc.)

(Cite as: 1997 WL 330507 (D.Colo.Doc.))

Case 6:10-cv-00115-RAW   Document 16-6   Filed 09/28/10   Page 5 of 6
Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 824

Number of jurors who so find 12

8. Timothy McVeigh is a reliable and dependable person in work and in his personal affairs and relations with others.

Number of jurors who so find 2

9. Timothy McVeigh is a person who deals honestly with others in interpersonal relations.

Number of jurors who so find 1

10. Timothy McVeigh is a patient and effective teacher when he is working in a supervisory role.

Number of jurors who so find 12

11. Timothy McVeigh is a good and loyal friend.

Number of jurors who so find 0

12. Over the course of his life, Timothy McVeigh has done good deeds for and helped others, including a number of strangers, who needed assistance

Number of jurors who so find 4

13. Timothy McVeigh has no prior criminal record.

Number of jurors who so find 12

The law does not limit your consideration of mitigating circumstances to those that can be articulated in advance. Thus, you may consider during your deliberations any other factor or factors in Timothy McVeigh's background, record, character, or any other circumstances of the offense, that mitigate against imposition of the death sentence.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "None" and line out the extra spaces with a large "X." If more space is needed, write "Continued" and use the reverse side of this page.

# __. NONE
Number of jurors who so find X
# __. X
Number of jurors who so find X

Instructions: Regardless of whether or not you find Mitigating Factors in Section IV above, continue your deliberations in accordance with the court's instructions and proceed to Sections V and VI which follow.

V. Recommendation

The jury has considered whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury recommends, by unanimous vote, that the following sentence be imposed:

[Choose one of the three options immediately below, write it on the line

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 6:10-cv-00115-RAW   Document 16-6   Filed 09/28/10   Page 6 of 6

Appellate Case: 17-7031   Document: 28-1   Date Filed: 06/16/2017   Page: 825

**(Cite as: 1997 WL 330507 (D.Colo.Doc.))**

825

provided below, and then have each juror sign his or her name]
    1. Death
    2. Life Imprisonment Without Possibility of Release
    3. Some Other Lesser Sentence To Be Decided By The Court

   The defendant, Timothy James McVeigh, shall be sentenced to:
    DEATH

   Dated:  June 13, 1997

VI. Certification

   **\*4** By signing below, each juror certifies that consideration of the race, color,
religious beliefs, national origin, or sex of the defendant or the victims was not
involved in reaching his or her individual decision, and that the individual juror
would have made the same recommendation regarding a sentence for the crimes in
question no matter what the race, color, religious beliefs, national origin, or
sex of the defendant or the victims.

Foreperson

Dated:  June 13, 1997

   U.S. v. McVeigh

   D.Colo.Doc., 1997.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.