# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Appellee/Respondent, | : | Case No. 17-7031 |
| | : | |
| v. | : | DEATH PENALTY CASE |
| | : | |
| EDWARD LEON FIELDS, JR., | : | (E.D. Okla. Case No. 6:10-cv-00115-RAW) |
| | : | |
| Appellant/Petitioner. | : | |
| | : | |

# MOTION FOR CERTIFICATE
# OF APPEALABILITY

HUNTER LABOVITZ
Capital Habeas Corpus Unit
Federal Community Defender Office
 for the Eastern District of
 Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BECAUSE PETITIONER IS UNDER A FEDERAL DEATH SENTENCE
AND WAS DENIED AN EVIDENTIARY HEARING ON ALL HIS CLAIMS,
A COA IS PARTICULARLY NECESSARY ........................................................3

    A.    The General Standard for Obtaining a COA ........................................3

    B.    Special Considerations for COA in This Case. ...................................4

ISSUES FOR WHICH A COA IS REQUESTED ................................................7

I.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
TRIAL COUNSEL FAILED TO ADEQUATELY DEVELOP, PRESENT,
AND LITIGATE MITIGATING MENTAL HEALTH EVIDENCE
(GROUND 1)........................................................................................8

    A.    The Court Should Grant a COA on Trial Counsel's Failure to
Develop and Present Evidence of Petitioner's Brain Damage
(Ground 1C). ......................................................................................8

    B.    The Court Should Grant a COA on Trial Counsel's Failure to
Effectively Challenge the Testimony of the Government's Mental
Health Expert (Ground 1E). ..............................................................31

    C.    Conclusion. .......................................................................................39

II.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
TRIAL COUNSEL WAS INEFFECTIVE IN LITIGATING
AGGRAVATING FACTORS (GROUND 3).............................................41

    A.    This Court Should Grant a COA on Trial Counsel's Ineffectiveness
in Relation to the Substantial Planning Aggravator (Ground 3A). .....41

    B.    This Court Should Grant a COA on Trial Counsel's Ineffectiveness
in Relation to the Mental Anguish Aggravator (Ground 3B). ............51

    C.    Conclusion. .......................................................................................53

III.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT HIS
SOCIAL HISTORY AS A MITIGATING FACTOR (GROUND 4)...........54

    A.    Trial Counsel's Ineffectiveness. ........................................................54

i

B.      The District Court Opinion. ...................................................57

IV.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
       DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
       THE GOVERNMENT'S PENALTY PHASE CLOSING ARGUMENTS
       VIOLATED HIS CONSTITUTIONAL RIGHTS (GROUND 5). ..............62

       A.      The Government's Unconstitutional Closing Argument. ...................63

       B.      The District Court Opinion. ...................................................66

V.     REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
       DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM
       THAT TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO
       INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE
       JURY TO APPROVE A GENERAL VERDICT OF DEATH
       (GROUND 6)...............................................................................71

       A.      Trial Counsel's Ineffectiveness. ..........................................71

       B.      The District Court Opinion. ...................................................76

VI.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
       DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
       THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL
       EVIDENCE FROM THE DEFENSE AND TRIAL COUNSEL WAS
       INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT
       THE EVIDENCE (GROUND 7)........................................................78

       A.      This Court Should Grant COA on the Due Process Violations
               (Ground 7A). ...................................................................79

       B.      This Court Should Grant COA on Trial Counsel's
               Ineffectiveness (Ground 7B). .............................................85

VII.   REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S
       DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT
       THE CUMULATIVE IMPACT OF ERRORS DENIED HIM DUE
       PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND A
       RELIABLE SENTENCING HEARING (GROUND 8).............................85

CONCLUSION ....................................................................................88

## TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007)....................................................60

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ........................................ 47, 53

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004) ....................................................57

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) ............................................17

*Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs.*,
    569 F.3d 1367 (Fed. Cir. 2009) ...............................................................23

*Banks v. Dretke*, 540 U.S. 668 (2004) ....................................................................83

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) ...............................................83

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .................................................................4

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) ................................... 47, 52

*Berger v. United States*, 295 U.S. 78 (1935) .........................................................62

*Boyde v. California*, 494 U.S. 370 (1990) ...............................................................74

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................... 79, 83

*Brown v. Borg*, 951 F.2d 1011 (9th Cir. 1991)........................................................84

*Browning v. Baker*, 2017 WL 4159270 (9th Cir. Sept. 20, 2017)................... 40, 53

*Buck v. Davis*, 137 S. Ct. 759 (2017)................................................................ 3, 54

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) .......................................................62

*Carey v. Duckworth*, 738 F.2d 875 (7th Cir. 1984)................................................81

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)................................... 63, 66, 86

*Cone v. Bell*, 556 U.S. 449 (2009) .................................................................. 82, 83

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)...................................................63

*Gibson v. Klinger*, 232 F.3d 799 (10th Cir. 2000)....................................................4

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ..............................................................75

*Graham v. Koerner*, 149 F. App'x. 769 (10th Cir. 2005)............................... 39, 70

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013) .............................................16

*Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010)................................................62

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012)..............................................50

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002)................................................33

*Jefferson v. Upton*, 560 U.S. 284 (2010) ........................................................ 13, 26

*Johnson v. Mississippi*, 486 U.S. 578 (1988)........................................................48

*Jones v. Heimgartner*, 602 F. App'x 705 (10th Cir. 2015) .....................................6

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .......................................... 37, 53, 59

*Kyles v. Whitley*, 514 U.S. 419 (1995).......................................................... *passim*

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) .........................................16

*Lonchar v. Thomas*, 517 U.S. 314 (1996).................................................................5

*Machibroda v. United States*, 368 U.S. 487 (1962).................................... 19, 20, 28

*Mahorney v. Wallman*, 917 F.2d 469 (10th Cir. 1990)...........................................67

*Martinez v. Ryan*, 556 U.S. 1 (2012) ..................................................................5

*Martinez-Morales v. Victaulic Co.*, No. CIV. 11-1660 MEL, 2013 WL
    2443873 (D.P.R. June 5, 2013) ............................................................24

*Massaro v. United States*, 538 U.S. 500 (2003) ...............................................5

*McCracken v. Gibson*, 268 F.3d 970 (10th Cir. 2001) ..................................16

*Medellin v. Dretke*, 371 F.3d 270 (5th Cir. 2004) ..........................................4

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ..................................................3, 4

*Milton v. Miller*, 744 F.3d 660 (10th Cir. 2014) ....................................... 38, 53

*Moore v. United States*, 950 F.2d 656 (10th Cir. 1991) ................................19

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999) ..........................................63

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................... *passim*

*Prystash v. Davis*, 854 F.3d 830 (5th Cir. 2017) ...........................................4

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................. 47, 52

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) ....................................70

*Schriro v. Landrigan*, 550 U.S. 465 (2007) .....................................................6

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ...............................................60

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ....................................... 14, 16

*Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801 (10th Cir. 1995) .....................84

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008) .......................................57

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................. 36, 37, 50

*Strickler v. Greene*, 527 U.S. 263 (1999) .......................................................83

*Stringer v. Black*, 503 U.S. 222 (1992) ..........................................................76

*Taylor v. Kentucky*, 436 U.S. 478 (1978) .......................................................86

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................................60

*Tuilaepa v. California*, 512 U.S. 967 (1994) ..................................................75

*United States v. Bagley*, 473 U.S. 667 (1985) ...............................................84

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ............................. *passim*

*United States v. Becker*, 109 F. App'x 264 (10th Cir. 2004) ...................................19

*United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) .............................82

*United States v. Carleo*, 576 F.2d 846 (10th Cir. 1978) .................................63

*United States v. Duran-Salazar*, 307 F. App'x 209 (10th Cir. 2009) .......................19

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2009) ............................ 41, 72

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979) ....................................66

*United States v. Gonzalez*, 98 F. App'x 825 (10th Cir. 2004) ....................... 4, 6, 19

*United States v. Magallanez*, 408 F.3d 672 (10th Cir. 2005) ........................69

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) ...........................75

*United States v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993) ...................... 80, 84

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ........................................................79

*Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983) .................................74

*Wiggins v. Smith*, 539 U.S. 510 (2003) .................................................. *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................................56
*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ...............................................15
*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), *opinion reinstated
  sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009)................... 14, 15
*Wong v. Belmontes*, 558 U.S. 15 (2009) ...................................................................40

**State Cases**

*Burch v. State*, 696 A.2d 443 (Md. 1997)......................................................... 74, 77
*Jones v. State*, 134 P.3d 150 (Okla. Crim. App. 2006)...............................................74

**Statutes**

18 U.S.C. § 3591 ........................................................................................................72
18 U.S.C. § 3592........................................................................................ 12, 16, 72, 73
18 U.S.C. § 3593.........................................................................................................73
28 U.S.C. § 2253 ..........................................................................................................3
28 U.S.C. § 2255 ................................................................................................... 6, 18

**Other Authorities**

Joseph H. Baskin et al., *Is a Picture Worth a Thousand Words? Neuroimaging
  in the Courtroom*, 33 AM. J.L. & MED. 239 (2007)................................................27
Michael Franzen & Glen Getz, Screening for Brain Impairment
  (3rd ed. 2010) ................................................................................... 24, 25, 29
Benjamin Kaplan & Virginia Sadock, Comprehensive Textbook of Psychiatry
  (6th ed. 1995).......................................................................................... 24, 29
Muriel Lezak et al., Neuropsychological Assessment (5th ed. 2012) .. 24, 26, 29, 30
Teena Shetty et al., *Imaging in Chronic Traumatic Encephalopathy and
  Traumatic Brain Injury*, 8 SPORTS HEALTH 26 (2016).........................................23
 Esther Strauss et al., A Compendium of Neuropsychological Tests 432
  (3rd ed. 2006) ....................................................................................... 29, 30
Stuart Yudofsky & Robert Hales, The American Psychiatric Press Textbook
  of Neuropsychiatry (3rd ed. 1997) ....................................................... 24, 26, 29

Edward Leon Fields, Jr., through counsel and pursuant to this Court's June 7, 2017, Order, moves this Court to grant a certificate of appealability (COA) on the issues discussed below.

### INTRODUCTION

Edward Fields suffers from brain damage and mental illness. Despite pleading guilty and accepting responsibility for the murders he committed, he was sentenced to death after a federal capital sentencing trial. Lead attorney Julia O'Connell had little death penalty experience and lacked the specialized assistance and support usually seen in federal capital trials. She was overwhelmed by the workload and responsibility of trying such a complex and difficult case primarily on her own. As a result, trial counsel neglected to properly investigate and present readily available mitigation evidence and failed to meaningfully challenge the prosecution's case.[1] Although counsel centered the defense case on the theory that the murders resulted from a mental health defect, the jury did not find a single mental health mitigating factor.

Petitioner's § 2255 proceedings were his only opportunity to raise trial counsel's ineffectiveness. In those proceedings, Mr. Fields proffered the mitigation evidence that counsel should have presented to the jury – including evidence of his

---

[1] Because the district court analyzed the effectiveness of Petitioner's trial counsel based only on Ms. O'Connell's actions or decisions, references to "counsel" or "trial counsel" in this pleading are solely to Ms. O'Connell.

1

brain damage and his troubled upbringing. Mr. Fields also proffered a declaration from Ms. O'Connell in which she frankly admitted the pressures she was under and the limitations of her investigation, preparation, and presentation. The record before the district court demanded resolution by evidentiary development, yet the court refused to conduct any hearing.

Instead, without even hearing from counsel, the court conjured up reasons why trial counsel limited her investigation and presentation of mitigating evidence, failed to make necessary and appropriate objections, and failed to challenge the foundations of the Government's case (even when her declaration contradicted those reasons). The court had no justification for distrusting the post-conviction statement of Ms. O'Connell, the current Federal Defender for the Eastern and Northern Districts of Oklahoma. Even if the court had credibility concerns, it should not have resolved those concerns without a hearing. Further, without hearing from a single witness, the district court resolved all factual disputes, including disputes among experts on medical and scientific matters, against Mr. Fields. On this improper basis, the district court not only denied relief, but sought to foreclose any review of its rulings by denying a COA on all claims.

Such truncated review not only violates the statutory requirements of § 2255, but undermines the bedrock constitutional right to counsel that was at the heart of Mr. Fields' claims. Because Mr. Fields raises substantial claims of

2

constitutional error, because the district court failed to provide an evidentiary hearing and adequate process to resolve those claims, and because appellate review is particularly important in a capital case to ensure that constitutional error did not impact the jury's decision to sentence Petitioner to death, this Court should grant a COA and formally review the seven claims discussed below.

**BECAUSE PETITIONER IS UNDER A FEDERAL DEATH SENTENCE AND WAS DENIED AN EVIDENTIARY HEARING ON ALL HIS CLAIMS, A COA IS PARTICULARLY NECESSARY**

**A.     The General Standard for Obtaining a COA**

Under 28 U.S.C. § 2253(c)(2), a court of appeals must grant leave to appeal where the appellant makes a "substantial showing of the denial of a federal constitutional right." As the Supreme Court recently reiterated in *Buck v. Davis*, 137 S. Ct. 759, 773 (2017), "[a]t the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).

This is not an onerous standard. *See, e.g.*, *Buck*, 137 S. Ct. at 773 ("The COA inquiry . . . is not coextensive with a merits analysis."); *Miller-El*, 537 U.S. at 337 ("[A] COA does not require a showing that the appeal will succeed."). All Mr. Fields must do is stir a reasonable debate based on a brief "overview of [his]

3

claims." *Miller-El*, 537 U.S. at 336; *see also Gibson v. Klinger*, 232 F.3d 799, 803 (10th Cir. 2000) (explaining it would take only a "'quick' look" to determine whether petitioner had "facially allege[d] the denial of a constitutional right") (citations omitted).

**B.    Special Considerations for COA in This Case.**

The COA standard is particularly petitioner-friendly here because this is a: (1) death penalty case; (2) brought under 28 U.S.C. § 2255; (3) where the district court denied an evidentiary hearing on all claims. First, when "the petitioner faces the death penalty, 'any doubts as to whether a COA should issue must be resolved' in the petitioner's favor." *Prystash v. Davis*, 854 F.3d 830, 835 (5th Cir. 2017) (quoting *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004)); *see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983) (holding that, "[i]n a capital case, the nature of the penalty is a proper consideration" to weigh in favor granting COA); *cf. United States v. Gonzalez*, 98 F. App'x 825, 832 (10th Cir. 2004) (unpublished) (Anderson, C.J., concurring) (COA appropriate where "the stakes are so high for the petitioner (a life sentence versus an alleged promise of 15 years)" and "[t]he judicial costs of exploring this [ineffective assistance of counsel] issue further through an evidentiary hearing are low relative to what is at stake").

Second, in a § 2255 case, the danger of improperly denying review of infringements of "substantial constitutional rights" is significantly magnified.

4

Because the Petitioner's claims of ineffective assistance of counsel and other denials of his constitutional rights discussed below were appropriately first raised in § 2255 proceedings, *Massaro v. United States*, 538 U.S. 500, 505–06 (2003), he has only one opportunity for appellate review of such claims: on grant of a COA. Unlike in § 2254 cases, where state appellate courts have also reviewed the post-conviction claims, Mr. Fields will not receive any appellate review of his § 2255 claims unless a COA is granted. And if no appellate review is granted on the claims raised in this motion, then those claims will have been reviewed only by the same district court judge who decided all pre-trial motions, made all evidentiary rulings at trial, formally imposed the death sentence, denied any § 2255 hearing, denied relief on all § 2255 claims, and denied Mr. Fields any right to appeal.

If this Court denies a COA, it would, in effect, relegate to one judge exclusive oversight of the question of whether counsel performed deficiently in failing to investigate, develop, and present a compelling case that Mr. Fields deserved to be spared the death penalty. Such exclusive, unchecked authority in a federal capital case is inconsistent with the Supreme Court's recognition of the writ of habeas corpus as the "highest safeguard of liberty," *Lonchar v. Thomas*, 517 U.S. 314, 322 (1996) (internal citation omitted); undermines the "right to the effective assistance of counsel at trial [that] is a bedrock principle in our justice system," *Martinez v. Ryan*, 556 U.S. 1, 12 (2012); and flouts the command that a

5

court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case," *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

Third, the district court's failure to hold an evidentiary hearing also favors grant of COA. Under 28 U.S.C. § 2255, the district court "shall" hold an evidentiary hearing on the prisoner's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In making that determination, the district court has to accept Petitioner's factual allegations as true. *United States v. Barrett*, 797 F.3d 1207, 1224 (10th Cir. 2015) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)) (capital case on § 2255 appeal following denial of hearing and denial of COA on all issues in district court). Thus COA is warranted if *any* reasonable jurist would find that, taking everything Petitioner has alleged as true, the record does *not conclusively* show that Petitioner is not entitled to relief. *See, e.g.*, *Jones v. Heimgartner*, 602 F. App'x 705, 706 (10th Cir. 2015) (unpublished) ("Because the district court resolved factual disputes against Mr. Jones as a matter of law, we will grant a COA, reverse, and remand for further proceedings."); *Gonzalez*, 98 F. App'x. at 826 (COA appropriate where "record does not conclusively demonstrate that [petitioner's] claim is without basis").

Considering the general COA standard as well as the special considerations of this case, Mr. Fields' claims merit a COA grant for the reasons set forth below.

6

## ISSUES FOR WHICH A COA IS REQUESTED

Mr. Fields asks this Court to grant a COA on the following issues he

presented in § 2255 proceedings:

1.      Was trial counsel ineffective in failing to adequately develop, present and litigate mitigating mental health evidence, including by failing to present evidence of Mr. Fields' brain damage?

2.      Was trial counsel ineffective in failing to investigate, present, and argue evidence to rebut the substantial planning and mental anguish aggravating factors, and did the Government present false and misleading testimony and argument in support of the substantial planning aggravator?

3.      Was trial counsel ineffective for failing to present Mr. Fields' social history and argue that social history as a mitigating factor?

4.      Did the Government's myriad improper closing argument remarks violate Mr. Fields' right to due process, and was trial counsel ineffective for failing to object to the improprieties?

5.      Was trial counsel ineffective in failing to object to instructions and a verdict form that allowed the jury to approve a general verdict of death based on the weighing of aggravating factors applicable to two separate murder counts?

6.      Did the Government withhold exculpatory, material evidence from the defense in violation of due process, and was trial counsel ineffective for failing to discover and present that evidence?

7.      Did the cumulative impact of these errors deny Mr. Fields due process, effective assistance of counsel, and a reliable sentencing hearing?

## ARGUMENT

**I.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT TRIAL COUNSEL FAILED TO ADEQUATELY DEVELOP, PRESENT, AND LITIGATE MITIGATING MENTAL HEALTH EVIDENCE (GROUND 1).**

Reasonable jurists could disagree with the district court's dismissal, without an evidentiary hearing, of this claim as discussed below.

**A.    The Court Should Grant a COA on Trial Counsel's Failure to Develop and Present Evidence of Petitioner's Brain Damage (Ground 1C).**

At the time of the offense, Edward Fields suffered from brain damage. His frontal lobes were damaged, affecting his judgment and impulse control. Although this evidence is mitigating, trial counsel did not present or argue it to the jury. It is at least debatable that counsel was ineffective in this failure.

**1.    Trial counsel's ineffectiveness.**

Almost one year before trial, defense expert Dr. Michael Gelbort told trial counsel that his comprehensive neuropsychological testing and evaluation showed that Mr. Fields suffered from long-standing brain damage in his frontal lobes, and that such damage "is well-known to adversely impact executive function." Doc. 106–35, ¶ 10.[2] Dr. Gelbort further communicated to trial counsel his opinion that

---

[2] References to the record in these § 2255 proceedings will be to the docket number, followed by the exhibit number (where applicable) and relevant page or paragraph number. References to the record in the underlying criminal trial case will be cited as "CR Doc." followed by the exhibit number (where applicable) and

Mr. Fields' "neurocognitive impairments affect his ability to adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions," and also explained that "[s]tressful situations exacerbate Mr. Fields's inability to control his actions and solve problems in a reasonable manner." *Id.* ¶ 7.

In two pre-trial pleadings, counsel then told the court that Mr. Fields had brain damage and this was important mitigation evidence that she wanted the sentencing jury to hear if the case reached a penalty phase. *See* CR Doc. 52, ¶¶ 1–2, 4 (explaining that "the existence of physical brain impairment may be a mitigating factor that would cause a jury to render a life verdict rather than a death verdict"); CR Doc. 65, ¶ 13 and n.7 (describing Dr. Gelbort's findings and stating that the evidence of frontal lobe impairment had "overwhelming importance . . . for [Mr. Fields'] mitigation case"). Trial counsel also shared this evidence with the Government during a December 2004 meeting that addressed settling the case for a sentence of life imprisonment. *See* CR Doc. 122–2 at 2 (letter from then-United States Attorney Sheldon Sperling memorializing this meeting and confirming trial counsel's understanding that psychological testing had established Mr. Fields suffered from brain damage affecting his impulse control and judgment).

In addition to these court filings and settlement discussions, counsel's pre-

---

relevant page or paragraph number. References to transcripts of the trial will be cited as "Tr." followed by the page number.

trial emails show that she affirmatively chose to present evidence of Mr. Fields'

"frontal lobe impairment" as part of the "mitigation case." Doc. 110–8 at 4; *see*

*also* Doc. 110–10.

Further, the record establishes that trial counsel intended to present this

evidence primarily through the testimony of Dr. Gelbort. *See* Doc. 119–7 (July 3,

2005 email from trial counsel to Dr. Gelbort stating that "I'll probably need you [to

testify] around the 18th of July, but that won't get firmed up for a couple days.");

Doc. 119–9 (July 6, 2005 contract from trial counsel to Dr. Gelbort for his

testimony). *Accord* Doc. 119–8 (July 1, 2005 email from trial counsel to Drs.

Woods and Gelbort informing them of trial dates and confirming she would be

needing them both to testify).

All of this contemporaneous evidence proves that trial counsel knew that

Mr. Fields' brain damage: affected his judgment and impulse control; was of

"overwhelming importance" to the mitigation case; and should be explained to the

jury by defense experts because such mitigation could be a basis for a life

sentence.[3] For no good reason, however, trial counsel failed to present *any*

*evidence* of Mr. Fields' brain damage to the fact finder, by presenting Dr. Gelbort's

---

[3] Ms. O'Connell's § 2255 declaration corroborates that she considered Dr. Gelbort's neuropsychological findings important information that the defense wanted to present as part of the mitigation case. *See* Doc. 106–2, ¶¶ 15, 17. To the extent this central fact is disputed, it is debatable among reasonable jurists that Mr. Fields is entitled to an evidentiary hearing. *See infra* Point I.A.2.a.

testimony and/or through the opinions of the mental health experts the defense

called, much to Mr. Fields' detriment.

### a.    Deficient performance.

Supreme Court case law confirms the importance of counsel presenting

evidence of a defendant's brain dysfunction to a capital sentencing jury. *See, e.g.*,

*Porter v. McCollum*, 558 U.S. 30, 36, 41 (2009) (per curiam) (defendant's "brain

abnormality," revealed in "psychological assessments" and which "could manifest

in impulsive, violent behavior," is the "kind of troubled history [the Supreme

Court] has declared relevant to assessing a defendant's moral culpability").

Here, Dr. Gelbort was available and willing to testify about Petitioner's

brain damage. *See* Doc. 112–1 at 2; Doc. 119–7; Doc. 106–35 at 4–5, ¶¶ 11–12. He

did not need to do any additional testing to provide his opinion. Doc. 106–35, ¶ 10.

Even though trial counsel's "plan was to call Dr. Gelbort at the penalty phase trial

to testify" about Petitioner's brain damage, Doc. 106–2, ¶ 15, she failed to follow

through once the trial was underway. Ms. O'Connell admitted in her declaration

that she "had no strategy or tactic for abandoning" a presentation about Petitioner's

brain damage, but simply failed to do because she was "overwhelmed with the trial

in progress." Doc. 106–2, ¶ 17.[4] However, being overwhelmed and overburdened,

---

[4] Other evidence Petitioner submitted in the § 2255 proceedings corroborates
Ms. O'Connell's explanation that her failures were a result of her being
"overwhelmed" from trying a federal capital case essentially by herself. *See, e.g.*,

Doc. 106–2, ¶ 24, is not a reasonable basis for failing to present pertinent expert testimony.

Had the defense presented Dr. Gelbort's testimony at trial, he "would have told the jury that [his] neuropsychological evaluation showed that Mr. Fields has brain dysfunction focused in the frontal lobe" and "could have explained that concept and the resulting impairments to the sentencing jury." *Id.* ¶ 12.

Further, a defense expert called at trial – psychiatrist Dr. Bradley Grinage – would have testified about Petitioner's brain damage had trial counsel properly prepared him and then asked. Doc. 106–4, ¶ 11. Trial counsel, however, failed to provide Dr. Grinage with Dr. Gelbort's report, on which he would have relied as a psychiatrist, *id.*, and prepared him to testify for only a "short" period of time "right before" he testified. *Id.* ¶ 5. Although trial counsel asked Dr. Grinage for his opinion regarding mitigating factors under 18 U.S.C. § 3592(a)(1) (impaired

---

Doc. 106–5, ¶ 13 (defense mitigation specialist observing that "Ms. O'Connell was left to shoulder almost the entire burden of the case" and that this had "an adverse impact on the defense preparations and presentation"); Doc. 106–3, ¶ 4 (defense expert Dr. George Woods stating that Ms. O'Connell "was being required to handle too much work to be able to responsibly and competently make the required presentation" of Mr. Fields' mental health defense); *see also* Doc. 106-33, ¶¶ 4-5 (court-appointed co-counsel Isaiah Gant admitting that he adopted a "hands-off approach" to his representation of Mr. Fields, limiting his work primarily to assisting in settlement negotiations, retaining (but not engaging with) a mitigation specialist, and conducting a "day or two" of voir dire); Doc. 106–34 (former Federal Public Defender for Eastern District of Ohio detailing similar experience involving Mr. Gant's neglect in Ohio federal capital trial).

12

capacity), (a)(6) (disturbance), and (a)(8) (other factors), *see* Tr. at 2772, trial counsel never asked Dr. Grinage to address how Mr. Fields' brain dysfunction was directly relevant to the jury's evaluation of these three factors. *See, e.g.*, *Jefferson v. Upton*, 560 U.S. 284, 285–86 (2010) (per curiam) (capital defendant's "permanent brain damage" "causes abnormal behavior" over which he "has no or substantially limited control"; causes "emotional dullness," "restless or aggressive characteristics," "impulsiveness," "temper outbursts," "markedly diminished impulse control," "impaired social judgment," and "transient outbursts of rage which are totally inconsistent with his normal behavioral pattern"; and "profoundly alter[s] [defendant's] ability to plan and coordinate his actions, to be aware of the consequences of his behavior, and to engage in premeditated or intentional acts").

Additionally, the defense's other testifying expert, neuropsychiatrist Dr. George Woods, was aware of the brain damage findings and considered that to be "highly significant" "[b]y itself," as well as supportive of his trial opinion. Doc. 106–3, ¶ 7. Had counsel asked him, Dr. Woods could have explained to the sentencing jury that, "[i]f this [brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." *Id.* Yet much like with the failure with Dr. Grinage, trial counsel did not ask Dr. Woods to testify about brain damage, as "the presentation

13

of brain damage dropped out of the picture in the lawyers' last minute and rushed

preparations during trial." Doc. 106–3, ¶ 8. In district court, even the Government

agreed that Dr. Woods, like Dr. Grinage, "could have relied on information he

received from [Dr.] Gelbort" during trial testimony if counsel had asked questions

about Petitioner's brain dysfunction. Doc. 122 at 12 (citing, inter alia, Fed. R. Ev.

703). Hence, counsel's failure to prepare these two defense experts to testify about

Petitioner's brain damage based on Dr. Gelbort's findings was deficient even apart

from her failure to call Dr. Gelbort. *See, e.g.*, *Wilson v. Sirmons*, 536 F.3d 1064,

1074 (10th Cir. 2008), *opinion reinstated sub nom. Wilson v. Workman*, 577 F.3d

1284 (10th Cir. 2009) ("Petitioner's most persuasive claim is that he was deprived

of effective assistance of counsel because of his trial attorney's failure 'to

adequately prepare his mental health expert . . . to testify in second stage or even

make use of all of the mitigating information about Petitioner's mental state that

[the expert] could have provided to the jury.'").

Trial counsel's failure to present the available mitigating evidence of Mr.

Fields' frontal lobe brain dysfunction through the testimony of Dr. Gelbort, Dr.

Woods, and/or Dr. Grinage was "patently unreasonable." *Smith v. Mullin*, 379 F.3d

919, 942 (10th Cir. 2004); *see also Porter*, 558 U.S. at 36, 40 (counsel rendered

deficient performance by failing to uncover and present neuropsychological

evidence that defendant suffered from brain damage that could manifest in

14

impulsive and violent behavior); *Wilson,* 536 F.3d at 1074 (it is a "guiding

principle" that, "because of the crucial mitigating role that evidence of . . . mental

health problems can have in the sentencing phase, defense counsel must pursue this

avenue of investigation with due diligence"); *Williamson v. Ward*, 110 F.3d 1508,

1517 (10th Cir. 1997) (counsel rendered deficient performance by failing to

present history of mental illness, alcohol and drug abuse, and brain damage or

neurological disorder); *cf. Wiggins v. Smith*, 539 U.S. 510, 535 (2003) ("[W]e find

there to be a reasonable probability that a competent attorney, aware of this

[evidence,] would have introduced it at sentencing in an admissible form.").

Counsel's failure was even more unreasonable because Mr. Fields' brain

damage evidence would have strengthened the defense presented: that Mr. Fields

committed the offense while in the throes of a medication-induced manic state.[5]

For instance, testimony about Mr. Fields' brain damage would have bolstered Dr.

Grinage's trial presentation. *See* Doc. 106–4, ¶ 12 ("[T]he evidence of organic

brain damage could have been offered as a factor that exacerbated the bipolar

disease from which Mr. Fields suffers."). At the pre-trial settlement meeting with

the Government, trial counsel confirmed that, far from being inconsistent with the

---

[5] Ms. O'Connell's declaration corroborates that the defense did not view these theories as inconsistent. *See* Doc. 106–2, ¶ 15 ("Early on in the development of our mental health evidence we considered the presentation of both manic-flip and organic brain damage. In other words, we never considered those to be mutually exclusive.").

trial defense, Mr. Fields' "[i]njury to the frontal lobe, which regulates impulse control and judgement, *would have undoubtedly complicated any mania suffered by the defendant.*" CR Doc. 122–2 at 2 (emphasis added).

Despite having been alerted to evidence that "is exactly the sort of evidence that garners the most sympathy from jurors," *Mullin*, 379 F.3d at 942, and that "ranks among the most powerful types of mitigation evidence available," *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013), and despite understanding its "overwhelming importance," counsel failed to present it. Instead, trial counsel presented bipolar disorder evidence, *see* Tr. at 2775–2816, and personality disorder evidence, *see* Tr. at 2946–94, both of which this Court has ruled "unhelpful in mitigation." *Barrett*, 797 F.3d at 1231; *accord Grant v. Trammell*, 727 F.3d 1006, 1021 (10th Cir. 2013) (holding that evidence suggesting the defendant suffered from "generalized personality disorders" was "not reasonably likely" to have helped him avoid death sentence); *McCracken v. Gibson*, 268 F.3d 970, 979–80 (10th Cir. 2001) (same as to bipolar disorder). Trial counsel's inaction was unreasonable, or, at a minimum, debatable among reasonable jurists.

### b.    Prejudice.

Mr. Fields' jury unanimously rejected the mental health mitigating factors, 18 U.S.C. § 3592 (a)(1) and (a)(6), and trial counsel did not offer brain dysfunction in support of the catch-all mitigator, 18 U.S.C. § 3592 (a)(8). CR Doc. 228 at 38.

16

Given the "compelling" nature of mitigating evidence of brain impairment,

*Barrett*, 797 F.3d at 1231, there is a reasonable probability that at least one juror

would have voted for a life sentence had trial counsel presented testimony from Dr.

Gelbort, Dr. Woods, and/or Dr. Grinage about Mr. Fields' brain damage. *See, e.g.*,

*Anderson v. Sirmons*, 476 F.3d 1131, 1147–48 (10th Cir. 2007) (holding that the

importance of presenting evidence of frontal lobe brain dysfunction "cannot [be]

overstate[d]" because such evidence "serves to humanize a defendant and explain

why an otherwise kind and loving family man can come to participate in a violent,

murderous event").

Indeed, in *Barrett*, this Court held that evidence of brain damage that affects

a defendant's judgment is "most important" to assessing prejudice, explaining:

> [Neuropsychologist] Dr. Young said [in her § 2255 declaration] . . .
> that tests she administered . . . indicated that Defendant's executive
> functioning – which involves the ability to reason, anticipate
> consequences to actions, and respond to new information and act
> accordingly – was significantly impaired. She stated that Defendant's
> "brain dysfunction . . . would particularly impair his abilities to
> organize, think, reason, plan, anticipate consequences of actions, and
> change actions as needed based on information he receives from the
> environment. His disabilities would be further exacerbated under
> conditions of complexity and/or highly stressful situations."

*Barrett*, 797 F.3d at 1230. That is precisely the evidence that Dr. Gelbort could

have provided at Mr. Fields' trial but for counsel's deficient performance. *See* Doc.

106–35, ¶ 7.

Further, in assessing prejudice, a court must "consider the totality of the

17

available mitigation evidence – both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding – and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41. When evidence of Mr. Fields' brain damage is added to the mix of mitigating factors that were presented at trial, there is an even greater likelihood that at least one juror would have voted for life.

In short, "[t]aking Defendant's proffered mitigation evidence as true," it is at least debatable that "the omitted evidence" of Mr. Fields' brain damage "undermine[s] confidence in the outcome." *Barrett*, 797 F.3d at 1229.

### 2.    The district court opinion.

The district court's reasons for denying Mr. Fields a hearing and relief on this claim are debatable among reasonable jurists.

### a.    Improper denial of an evidentiary hearing.

Under 28 U.S.C. § 2255, the district court "shall" hold an evidentiary hearing on the prisoner's claims "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief." § 2255(b) (emphasis added). Applying this petitioner-friendly standard, this Court has consistently reversed district court rulings denying § 2255 hearings. Most recently, in *Barrett*, the Court remanded a § 2255 capital case to the Eastern District of Oklahoma for an evidentiary hearing after finding that the evidence on record was not "unambiguous," but rather contained "factual disputes." *Barrett*, 797 F.3d at

18

1227; *see also United States v. Duran-Salazar*, 307 F. App'x 209, 212 (10th Cir. 2009) (unpublished) (reversing district court's refusal to hold § 2255 evidentiary hearing on petitioner's ineffective assistance of counsel claim because "our precedents state a preference for an evidentiary hearing in such circumstances"); *United States v. Becker*, 109 F. App'x 264, 270 (10th Cir. 2004) (unpublished) (remanding for § 2255 evidentiary hearing because, where petitioner presented expert report in support of ineffectiveness claim and "showed that his counsel did not present such evidence at sentencing," "our case law requires the district court to grant an evidentiary hearing").[6]

Here, Petitioner supported his claim that trial counsel acted unreasonably in failing to present available evidence of Petitioner's brain damage with reference to the trial record, documents in counsel's trial file, and post-conviction declarations, including declarations from *four experts* stating that neuropsychological testing showed that Mr. Fields suffered from brain damage. *See* Doc. 106–35, ¶¶ 5–12 (declaration of Dr. Gelbort); Doc. 106–4, ¶ 11 (declaration of Dr. Grinage); Doc. 106–3, ¶ 7 (declaration of Dr. Woods); Doc. 106–10 at 12 (report of defense post-

---

[6] *See also Gonzalez*, 98 F. App'x at 831 (remanding for § 2255 evidentiary hearing and observing that when "a habeas petitioner alleges detailed and specific charges," supported by affidavits, "[f]ull consideration of [petitioner's] claims of ineffective assistance of counsel must be done with the benefit of a complete record") (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)); *Moore v. United States*, 950 F.2d 656, 660 (10th Cir. 1991) (remanding for a § 2255 evidentiary hearing because "factual disputes and inconsistencies beyond the record exist").

conviction expert Dr. Daniel Martell).

Although the Government presented some contrary evidence, that evidence did not "*conclusively* show that [Petitioner] is entitled to no relief." Rather, the Government's response created ambiguities and factual disputes that mandated an evidentiary hearing to explore trial counsel's *actual* reasons for not presenting evidence of Petitioner's brain damage. *See Barrett*, 797 F.3d at 1224 (holding that where a petitioner has "presented considerable evidence supporting his claims" – even if "other evidence may counter it" – "an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether [he] has a valid claim"); *see also Machibroda*, 368 U.S. at 495 (holding that even "[t]he Government's contention that [a Petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence."). The district court should not have denied an evidentiary hearing on this claim because the existing records did not conclusively demonstrate that Mr. Fields was not entitled to relief. At a minimum, reasonable jurists could debate whether the district court was correct in dismissing, without an evidentiary hearing, Petitioner's claim that trial counsel was ineffective in failing to develop and present evidence of his brain damage.

### b.    Deficient performance.

The district court conducted a highly selective review of the relevant records

to conclude that counsel acted reasonably in not presenting brain damage testimony from neuropsychologist Dr. Gelbort. The court cited to an email in which Ms. O'Connell was advised to consider forgoing the testimony of Dr. Gelbort, concluding the email showed counsel was "aware she faced a difficult task to convince the jury to rely on her mental health evidence." Doc. 125 at 14 (citing Doc. 110–7). However, the court ignored an email Ms. O'Connell *sent to Dr. Gelbort the following day* formalizing his agreement to testify at Mr. Fields' sentencing trial. Doc. 119–9. The later-in-time email demonstrates that, notwithstanding any contrary suggestion, trial counsel decided to present Dr. Gelbort's testimony about Petitioner's brain dysfunction. Ms. O'Connell's failure to follow through was neither reasoned nor reasonable.

Additionally, the district court's ruling on deficient performance ignored that even if Dr. Gelbort was unavailable, which he was not, reasonable counsel still would have elicited information about Petitioner's brain damage through testifying experts Dr. Grinage and/or Dr. Woods. At a minimum, any factual dispute as to why counsel failed to present expert testimony about Petitioner's brain dysfunction required an evidentiary hearing. *See, e.g.*, *Barrett*, 797 F.3d at 1227.

### c.  Prejudice.

The lower court opined that Mr. Fields failed to establish prejudice based entirely on its determination, without any evidentiary development, that Mr. Fields

had a "normal" MRI scan in 2011 and thus trial counsel could not have established brain damage. Doc. 125 at 9, 17. This finding was not only factually and scientifically incorrect, it also inappropriately assumed, as a legal matter, that all jurors presented with substantial evidence of Petitioner's neuropsychological testing establishing brain dysfunction would have rejected that evidence based on the single MRI scan.

### i.   Erroneous factual determination.

In response to Petitioner's declarations from *four experts* stating that neuropsychological testing showed that Mr. Fields suffered from brain damage, *see* Docs. 106-3-4, -10, -35, the Government submitted a *single report*, from Dr. James Seward, who devoted a small section of his ninety-nine-page report to the issue of Mr. Fields' brain damage. *See* Doc. 110–23 at 73–80. Within this section are a few sentences relating Dr. Seward's summary of a 2011 MRI scan of Petitioner. Dr. Seward based his impression solely on the hearsay report of a Dr. Susan Koslow, who did not seem familiar with Mr. Fields' history of head trauma, and who has never been questioned or submitted a formal statement in these proceedings. Contrary to the district court's assertion, Doc. 125 at 17, the Government never even submitted the MRI report itself as an exhibit. Dr. Seward simply declared that the MRI was "normal" and "did not reveal any intracranial abnormality." Doc. 110–23 at 78, 79.

Notwithstanding the fundamental factual dispute between the parties' experts as to whether Mr. Fields has brain damage, the court's "no prejudice" finding depends on its speculation that Mr. Fields could not prove brain damage because his 2011 MRI scan was "normal." But that holding rests on the false premise that a purportedly "normal" MRI *conclusively excludes* the possibility of brain damage, a proposition that is not supported anywhere in the record and that is scientifically wrong. Simply, the district court was wrong to rely on the MRI to refute the results of Petitioner's neuropsychological testing.

It is a well-established scientific and medical fact that brain imaging such as MRI is *not* determinative of brain damage, particularly where, as here, neuropsychological testing shows otherwise. For instance, chronic traumatic encephalopathy (CTE), the degenerative brain disease affecting professional football players and others who have suffered repeated head trauma, can be definitively diagnosed only in post-mortem examination, not through brain imaging during life. *See, e.g.*, Teena Shetty et al., *Imaging in Chronic Traumatic Encephalopathy and Traumatic Brain Injury*, 8 SPORTS HEALTH 26, 27 (2016); *cf. Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs.*, 569 F.3d 1367, 1382 n.10 (Fed. Cir. 2009) ("'You can have a normal MRI for the rest of your life and have brain damage.' . . . [An] MRI many times doesn't show us things, yet at autopsy, we will see areas [of the brain] that are very abnormal.'").

23

By comparison, neuropsychological testing can "frequently reveal deficits in the head injured patient when all other neurodiagnostic tests are negative." Michael Franzen & Glen Getz, Screening for Brain Impairment 22 (3rd ed. 2010); *accord* Muriel Lezak et al., Neuropsychological Assessment 5 (5th ed. 2012) ("[E]ven the most highly sensitive laboratory analyses may not be diagnostically enlightening" for all conditions, in which case "the neuropsychological findings can be diagnostically crucial"); *see also Martinez-Morales v. Victaulic Co.*, No. CIV. 11-1660 MEL, 2013 WL 2443873, at \*1 (D.P.R. June 5, 2013) (unpublished) (noting that where plaintiff's scores on neuropsychological testing "have been associated to the frontal lobe traumatic brain injury," one "do[es] not necessarily have to have visual MRI signs of brain damage to have brain damage" because "[t]here's substantial literature that indicates that you can have brain damage and some of these instruments may not be sensitive to that type of a finding").

This is because an MRI is designed "to determine structural anomalies or intracerebral bleeds," Franzen & Getz, *supra* at 52, whereas neuropsychological testing and evaluation "provides information about the patient's cognition, personality characteristics, social behavior, emotional status, and adjustment to limitations," Stuart Yudofsky & Robert Hales, The American Psychiatric Press Textbook of Neuropsychiatry 181–82 (3rd ed. 1997); *see also* Benjamin Kaplan & Virginia Sadock, Comprehensive Textbook of Psychiatry 562–63 (6th ed. 1995)

24

(neuropsychological testing allows analysis of "cognitive and behavioral disturbances" and "provide[s] an accurate and unbiased estimate of various aspects of a patient's behavioral capacity").

Because brain scans and neuropsychological assessments test for different aspects of brain damage, these two tests – one measuring structural issues and the other measuring functional issues – are independent of one another. Therefore, an individual can have a "normal" MRI and still have brain damage based on neuropsychological testing and evaluation. *Cf.* Franzen & Getz, *supra* at 168 ("[I]f the patient being assessed does not happen to have a dysfunction in the area being tapped by the test, but does indeed have some form of cognitive impairment, that particular patient may be inappropriately identified as non-braindamaged.").

This explains why Dr. Gelbort's neuropsychological assessment was sufficient for him to reach an opinion to a reasonable degree of psychological certainty that Mr. Fields had brain impairments affecting his judgment without conducting any additional testing, including those that would assess physical aspects of the brain. Doc. 106–35, ¶ 10. Likewise, one of Mr. Fields' post-conviction experts, Dr. Martell, stated unequivocally that Dr. Gelbort's neuropsychological testing "identified the presence of significant impairments in Mr. Fields' brain functioning, primarily involving frontal lobe functioning," Doc. 106–10 at 12, and then recommended an MRI only to "aid in proper differential

25

neurodiagnosis and treatment, *id.* at 16. Thus, even if the district court was correct in determining – without a hearing – that Mr. Fields had a "normal" MRI, that does not negate Mr. Fields' assertion of brain dysfunction based on the neuropsychological assessment.

In fact, in a capital case such as this, even an MRI that accurately detects brain damage is much less useful than neuropsychological assessment of cognitive, emotional, and executive functions. As the Supreme Court and this Court have repeatedly held and as discussed above, the important questions for mitigation usually involve assessment of not only whether brain damage is present, but also whether and how the brain damage affected the defendant's mental state, emotional state, and behavior. *See, e.g., Jefferson*, 560 U.S. at 285–86 (describing how such impairments are relevant to mitigation case); *Barrett*, 797 F.3d at 1231 (same). Neuropsychological testing is much more useful than an MRI for that purpose because neuropsychological testing provides "a better understanding of specific brain-behavior relationships and the psychosocial consequences of brain damage." Yudofsky & Hales, *supra* at 181; Lezak et al., *supra* at 19.

Further, Dr. Seward's interpretation of the MRI scan could be wrong and refutable by Petitioner's experts. It is not known whether Petitioner's or other experts would have agreed – upon examination of all the data – that the MRI showed no brain injury. And, because "[b]rain imaging is the product of a complex

set of techniques, subjective decisions, technical choices, and informed interpretations," Joseph H. Baskin et al., *Is a Picture Worth a Thousand Words? Neuroimaging in the Courtroom*, 33 AM. J.L. & MED. 239, 249 (2007), it is very possible that the 2011 MRI examination actually confirms the neuropsychological testing showing brain dysfunction. There was an inadequate basis in the undeveloped record for the district court's assertion that Mr. Fields' 2011 MRI scan was "normal."

Finally, even if the MRI was indisputably "normal," the district court still had no basis to treat it as conclusive evidence that Mr. Fields does not have brain damage because nothing in the record supported that conclusion. Even the Government expert, Dr. Seward, never contended that a "normal" MRI precludes Mr. Fields from having brain damage. Presumably, if the MRI was dispositive on that issue, Dr. Seward would have eschewed any neurological testing as unnecessary and rested his opinion on the MRI alone. He did not do so; rather, he "administered a variety of psychological and neuropsychological tests to Mr. Fields" over the course of three days in 2013. Doc. 110–23 at 58.

The district court's improper conclusion regarding both the interpretation and the significance of the MRI scan is a direct result of its erroneous approach to ruling on the Government's motion for summary judgment. The court should not have relied exclusively on the single MRI scan to refute the results of Petitioner's

27

neuropsychological testing. Instead, it first should have accepted as correct Mr.

Fields' proffer that neuropsychological testing and evaluation shows brain damage

impairing his judgment and functioning. *Barrett*, 797 F.3d at 1224. And, because

Petitioner presented "considerable evidence supporting" his entitlement to relief,

the court should have held an evidentiary hearing, even if the MRI evidence

"counter[ed]" his proffer. *Id.*; *accord Machibroda,* 368 U.S. at 493–94 (post-

conviction court cannot make "findings on controverted issues of fact . . . without a

hearing."). By doing neither, the lower court reached an unsupportable result.

This Court must allow at least the opportunity to review a district court

finding that is inconsistent with, and contrary to, accepted scientific principles. At

a minimum, the district court needed to hold an evidentiary hearing to resolve any

questions about the scan and its nexus to Petitioner's brain damage.

### ii.    Erroneous legal determination.

In addition to wrongly interpreting the results of the MRI scan and its

scientific significance, the lower court erred as a legal matter by simply assuming

that the jury could not have found that Mr. Fields suffers from brain damage

despite the substantial neuropsychological testing evidence to the contrary. In

making that ruling, the district court had to ignore the opinions of Drs. Gelbort,

Woods, Grinage, and Martell that neuropsychological testing showed Mr. Fields

had brain dysfunction, independent of any MRI findings. Yet, the results of

neuropsychological testing from qualified practitioners – such as those obtained by

Dr. Gelbort in Petitioner's case – are routinely relied upon by forensic mental

health and medical experts as well as courts to establish the existence of brain

damage. *See e.g.*, Franzen & Getz, *supra* at 167 ("Comprehensive

neuropsychological assessments . . . have been shown for several years to be

effective in differentiating brain-damaged from psychiatric and normal patients.");

Kaplan & Sadock, *supra* at 546–51, 562–81; Lezak et al., *supra* at 5, 19; Yudofsky

& Hales, *supra* at 181–204;; *see also Sears v. Upton*, 561 U.S. 945, 949–50 (2010)

("Based on [neuropsychological testing] results, the [neuropsychological] expert's

first-hand observations, and an extensive review of Sears' personal history,"

"[t]here [wa]s 'clear and compelling evidence' that Sears has 'pronounced frontal

lobe pathology,'" and that "Sears suffers from substantial cognitive impairment"

"[r]egardless of the cause of his brain damage").

For example, Petitioner had impaired performance on Dr. Gelbort's

administration of the Halstead Category Test (HCT), which "is sensitive to a

variety of brain disturbances and is almost as sensitive as the full Halstead-Reitan

battery in determining the presence or absence of neurological damage." Esther

Strauss et al., A Compendium of Neuropsychological Tests 432 (3rd ed. 2006);

*accord* Lezak et al., *supra* at 625 ("Of the tests in Halstead's battery, HCT is

generally recognized as the most sensitive to the presence of brain damage per se,

regardless of its nature or location."). Petitioner also had poor performance on the

Trail Making Test-Part B, which is a "particularly . . . useful indicator of

neurological integrity in both adults and children," Strauss et al., *supra* at 669, and

"is highly vulnerable to the effects of brain injury." Lezak et al., *supra* at 424.

Again, the district court was required to take the brain damage evidence Mr.

Fields proffered in the § 2255 pleadings – including the declarations and reports

from Drs. Gelbort, Woods, Grinage, and Martell – as true. *Barrett*, 797 F.3d at

1229. Yet it did the exact opposite, without a hearing and without any analysis or

explanation. The court provided only one reason for its legal finding that Mr.

Fields could not establish prejudice: "petitioner submits nothing to contradict or

rebut the evidence submitted by the government which shows an MRI conducted

in 2011 was normal." Doc. 125 at 17. The court's reasoning was flawed. Even if

the MRI scan was "normal," it was not inconsistent with a finding of brain

damage. Since the neuropsychological diagnosis of brain damage can co-exist with

the MRI results, Petitioner was not required to attack or impeach the MRI report to

receive an evidentiary hearing.

Furthermore, in basing its prejudice determination on the MRI results alone,

the lower court acted in direct contravention of Supreme Court precedent holding

that a post-conviction court cannot "discount entirely" the impact that defense

expert testimony would have had on the sentencing jury:

> [N]either the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to [defense expert] Dr. Dee's testimony regarding the existence of a brain abnormality and cognitive defects. While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.

*Porter*, 558 U.S. at 42–43. Likewise, the district court here should not have presumed that the sentencing jury would have found the Government experts more persuasive than Dr. Gelbort, Dr. Martell, and/or Drs. Woods and Grinage had trial counsel properly prepared them to testify about Mr. Fields' brain dysfunction. At the very least, the district court's no prejudice presumption – a presumption made without hearing from the witnesses and developing a full record for review – was debatable among jurists of reason.

**B.  The Court Should Grant a COA on Trial Counsel's Failure to Effectively Challenge the Testimony of the Government's Mental Health Expert (Ground 1E).**

Trial counsel compounded her error in failing to present readily available evidence that Mr. Fields was brain damaged, *see supra*, by then eliciting from Government expert Dr. J. Randall Price erroneous testimony that Mr. Fields was *not* brain damaged. Trial counsel exacerbated that harm by failing: to object to Dr. Price's improper testimony on direct examination; to meaningfully challenge him on cross-examination; and/or to present available rebuttal testimony. Trial counsel's performance was ineffective. Reasonable jurists could debate the district

court's resolution of this claim.

### 1. Trial counsel's ineffectiveness.

### a. Deficient performance.

Trial counsel made multiple errors in her approach to Dr. Price's testimony. First, trial counsel failed to object to Dr. Price's testimony on direct examination suggesting that Mr. Fields did not have brain damage, even though such testimony was beyond the scope of the defense's mitigation presentation. Before Dr. Price testified, trial counsel argued that any testimony about "brain injury . . . would not be proper rebuttal." Tr. at 3080. The court deferred ruling until counsel raised any specific objections during Dr. Price's testimony. *Id.* at 3083–84. However, trial counsel then failed to object when Dr. Price opined on direct that Mr. Fields did not have brain dysfunction. *Id.* at 3106, 3154.

Second, on cross-examination of Dr. Price, trial counsel elicited *additional* harmful evidence about Petitioner's purported lack of brain dysfunction, which was the very opinion she had sought to exclude. *Id.* at 3204–05. Prior to the sentencing hearing, counsel received a copy of Dr. Price's report, which stated: "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Doc. 106–29 at 27. Knowing that opinion, reasonable counsel would not have asked Dr. Price the open-ended questions trial counsel asked about whether

32

he saw neurological impairment in Mr. Fields. Tr. at 3204–05. It was

unquestionably contrary to Mr. Fields' interests, and thus deficient performance,

for counsel to elicit testimony that Mr. Fields did not have brain damage,

particularly when the objective view of the neuropsychological assessment proved

otherwise. *See, e.g.*, *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002).

Third, trial counsel failed to impeach or otherwise rebut Dr. Price's

misleading testimony, even though Dr. Gelbort had told counsel prior to trial that

Dr. Price's neuropsychological test results *supported Dr. Gelbort's assessment* that

Mr. Fields did not have "a fully functioning or normally functioning brain." Doc.

119–12. Notably, trial counsel understood that meant that *both* the Government

and defense experts' neuropsychological testing revealed "that Mr. Fields was

brain damaged and neurologically impaired." Doc. 106–2, ¶ 16. This

understanding is supported by post-conviction expert Dr. Clark Clipson, who

determined that "a major problem with Dr. Price's conclusions involves his failure

to recognize the presence of executive functioning deficits that are evident in the

test results." Doc. 106–37, ¶ 35. According to Dr. Clipson, Mr. Fields'

performance on Dr. Price's tests actually show "consistent deficits in fluency . . . [,

which] are well-documented evidence of frontal lobe disorders and deficits in

executive functioning." *Id.* However, while trial counsel did ask Dr. Price limited

questions about the results of some of his neuropsychological findings, Tr. at

3195–98, she failed to elicit evidence that Mr. Fields' poor performance on Dr. Price's tests.

Nor did trial counsel impeach Dr. Price, or rebut his testimony, regarding his failure to "follow[] accepted practice" in his assessment, despite stating pre-trial that she wanted to do just that. Doc. 110–2 at 35. Had she followed up on her stated intention, trial counsel could have retained an expert such as Dr. Clipson or Dr. Alan Kaufman, both of whom found substantial errors in Dr. Price's test administration and interpretation during review of his data, including audio tapes of his testing.[7] *See generally* Doc. 106–36; Doc. 106–37.

Trial counsel also could have relied on Dr. Gelbort to presented evidence challenging Dr. Price's assessment, but she never provided Dr. Gelbort with any of Dr. Price's underlying data. Doc. 106–35, ¶ 15. This failure was particularly unreasonable because, once trial counsel learned that Dr. Gelbort could assist with impeaching Dr. Price, Doc. 119–12, she told him that she planned to "consult [with

---

[7] Instead of speaking to a qualified mental health expert, trial counsel spoke to trial consultant David Freedman, who the district court said provided trial counsel with "ideas on how to best defend [the case]." Doc. 125 at 11. In reality, Mr. Freedman responded to trial counsel's request for help challenging Dr. Price by saying: "I'm not sure I would be able to make anything of the tapes of neuropsych[ological] testing – maybe of the history [Dr. Price] took but I'm not knowledgeable enough to just listen and make sense of it." Doc. 119–13. Ms. O'Connell listened to the tape recordings, as evidenced by some of her questions to Dr. Price, *see, e.g.*, Tr. at 3233–36, 3310, 3329, but she was not qualified to recognize the flawed methodologies that experts like Drs. Kaufman and Clipson could recognize, as evidenced by her request for Mr. Freedman's help.

him] re: cross-exam of Randy Price," Doc. 119-7.

Now that Dr. Gelbort has reviewed Dr. Price's raw testing data in the § 2255 proceedings, Doc. 106–35, ¶ 16, he concludes, like Drs. Kaufman and Clipson, that Dr. Price made substantial errors in the administration and interpretation of his tests. *Id.* ¶¶ 15–16. Dr. Gelbort would have been able to assist with impeachment of Dr. Price if only counsel had provided him the underlying data and then followed up as planned. Doc. 106–35, ¶ 15. Thus, through cross-examination and/or rebuttal expert testimony, counsel could have shown that Dr. Price administered and interpreted his testing of Petitioner in a flawed manner skewed toward a finding of no brain damage. Trial counsel was deficient for failing to do so. *See Porter*, 558 U.S. at 32 (failure to present evidence in support of chosen defense theory is deficient performance); *Wiggins*, 539 U.S. at 526 (same).

### b.    Prejudice.

Trial counsel's deficient performance regarding Dr. Price's testimony allowed the prosecution to create a false narrative of Petitioner's brain dysfunction. Mr. Fields was prejudiced not only by trial counsel's elicitation of harmful testimony that he did not suffer from brain damage but also by trial counsel's failure to impeach or otherwise rebut the vulnerable testimony of Dr. Price. Instead of hearing the wealth of evidence of Mr. Fields' brain damage, *supra*, or at a minimum, hearing nothing at all regarding Mr. Fields' brain functioning, the jury

heard only Dr. Price's inaccurate testimony that Mr. Fields did not have brain damage. Had trial counsel not elicited this harmful testimony, or if trial counsel properly attacked Dr. Price's opinion with readily available evidence of its flaws, there is a reasonable likelihood that at least one juror would have voted for life.

### 2.    The district court opinion.

Reasonable jurists could debate the district court's conclusion on both the deficient performance and the prejudice prongs of the test for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

### a.    Improper denial of an evidentiary hearing.

This claim presented the district court with multiple factual disputes, including: why counsel did not object to testimony from Dr. Price that went beyond the scope of the mitigation case; why counsel elicited harmful testimony from Dr. Price on cross-examination; why counsel did not cross-examine Dr. Price about how his testing data actually supported Dr. Gelbort's brain damage finding; and why counsel did not call rebuttal witnesses who could have shown the flaws in Dr. Price's testing administration and interpretation.

Without holding an evidentiary hearing, the lower court improperly resolved each of these disputes in favor of the Government. At minimum, the court should have held a hearing on this claim. *See supra* Point I.A.2.a.

### b.    Deficient performance.

The district court focused only on counsel's failure to object to Dr. Price's

claim that Petitioner did not have brain damage and counsel's limited cross-examination of Dr. Price. *See* Doc. 125 at 17. This approach ignored that trial counsel unreasonably elicited damaging testimony from Dr. Price and also failed to call available rebuttal experts to challenge Dr. Price's failure to follow accepted practices in the administration and interpretation of his tests.

The district court characterized trial counsel's failure to object as "reasonable trial strategy" because objecting "would have drawn the jury's attention to the testimony" when "counsel[] desired to limit the jury's exposure to such testimony." *Id*. This rationale is at least debatable for multiple reasons. First, this reason appears nowhere in the § 2255 record. Instead, the district court impermissibly created its own reasons for trial counsel's failure to object. This post-hoc rationalization was improper. Under *Strickland*, a court may not speculate as to reasons for counsel's actions where no such reason actually existed at the time of trial. *See Wiggins*, 539 U.S. at 526–27 (rather than accept a "post hoc rationalization of counsel's conduct," court must rely on "an accurate description of [counsel's] deliberations prior to sentencing") (citing *Strickland*, 466 U.S. at 691); *see also Kimmelman v. Morrison*, 477 U.S. 365, 386–87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy for counsel).

Second, the court's ruling is inconsistent with trial counsel's post-conviction declaration that she knew Dr. Price's testing also showed Mr. Fields was brain

37

damaged, *see* Doc. 106–2, ¶ 16, as well as her pre-trial writings discussed above that she wanted to expose problems with Dr. Price's testing on cross-examination and wanted the jury to hear that Petitioner had brain damage. The district court should have accepted the of-record, pre-trial evidence and counsel's post-conviction declaration. declaration – or at least subjected the proffer to adversarial testing. *See Wiggins*, 539 U.S. at 527.

Third, the court ignored the reality of counsel's actions at trial: if counsel "wanted to limit the jury's exposure" to Dr. Price's harmful testimony that Petitioner was not brain damaged, then she should not have elicited those opinions herself on cross-examination. Tr. at 3204–05. At a minimum, any questions about counsel's credibility and her reasons for not objecting to Dr. Price's testimony should have been resolved at an evidentiary hearing, not by post-hoc speculation. *Cf. Milton v. Miller*, 744 F.3d 660, 672 (10th Cir. 2014) (remanding for evidentiary hearing where district court "simply assume[d] the credibility of" one affiant and accepted his version of the facts, when the affidavit actually "create[d] a dispute of fact which has never been explicitly resolved by any court and which the record [was] inadequate to resolve").

Regarding trial counsel's limited cross-examination of Dr. Price, the district court deemed it reasonable because Petitioner "does not have organic brain damage." Doc. 125 at 17. This contention is equally debatable, as discussed in

detail above. Reasonable jurists would also debate the district court's finding

because trial counsel's limited cross-examination neglected two of her of-record

trial goals: to give the jury powerful mitigation about Petitioner's brain dysfunction

and to impeach Dr. Price on his failure to follow accepted practices.

### c.    Prejudice.

The district court's prejudice ruling is debatable among reasonable jurists

because the court ignored Petitioner's post-conviction averments from Drs.

Clipson, Kaufman, and Gelbort that impeached Dr. Price and corroborated

Petitioner's brain dysfunction. Reasonable jurists could debate whether the district

court should have "discount[ed] entirely" the opinions of these three experts. *See*

*Porter*, 558 U.S. at 43; *see also Graham v. Koerner*, 149 F. App'x. 769, 772 (10th

Cir. 2005) (unpublished) (granting COA on claim that "trial counsel was

ineffective for failing to impeach the [prosecution] witnesses with evidence

contrary to their testimony.").

### C.    Conclusion.

Trial counsel's presentation at Mr. Fields' penalty phase hearing was almost

entirely focused on a narrow mental health defense that the killings were the result

of a medication-induced psychiatric crisis. Counsel relied on this "unhelpful"

defense, *Barrett*, 797 F.3d at 1231, instead of far more "compelling" mitigation

evidence of brain damage, *id.*, of which she was aware but then failed to present.

Trial counsel magnified this failure by then allowing the Government's expert to testify that Mr. Fields did *not* have brain damage, even though trial counsel knew that opinion was incorrect, readily subject to challenge, and damaging to the case for life.

As demonstrated above, each of these instances of ineffectiveness alone is worthy of debate among reasonable jurists, thereby supporting the grant of a COA. Additionally, in determining whether a COA should issue on this claim, this Court must consider counsel's "wholesale" failure to develop and present a compelling mental health defense, as opposed to simply "separating [Petitioner's] IAC argument into individual 'claims' of IAC corresponding to particular instances of [counsel's] conduct." *Browning v. Baker*, 2017 WL 4159270, at *19 (9th Cir. Sept. 20, 2017) (reversing district court's denial of COA after determining that the "IAC portion of the COA should have been crafted at a higher level of generality") (citing *Wong v. Belmontes*, 558 U.S. 15, 17 (2009)).

The district court's summary disposition of this capital § 2255 claim denigrates the importance of at least one complete round of judicial review of claims that a Petitioner was denied his Sixth Amendment right to counsel, and was at odds with the standards and rules set forth for the proper disposition of such claims. Particularly in capital cases, arguably meritorious ineffective assistance of counsel claims should be resolved upon a fully developed record. Examining this

40

claim in its entirety, and considering the district court's dismissal of all aspects thereof without conducting an evidentiary hearing and without taking testimony from the relevant witnesses, a COA should issue.

## II.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE IN LITIGATING AGGRAVATING FACTORS (GROUND 3).

Mr. Fields' jury found the statutory aggravating factor that Mr. Fields shot Mr. and Mrs. Chick after substantial planning and premeditation, and the non-statutory aggravator that he inflicted mental anguish on Mrs. Chick. *See United States v. Fields*, 516 F.3d 923, 927 (10th Cir. 2009). It is at least debatable that trial counsel was ineffective for failing to investigate, present, and argue evidence that would have rebutted each of these aggravating factors.

### A.    This Court Should Grant a COA on Trial Counsel's Ineffectiveness in Relation to the Substantial Planning Aggravator (Ground 3A).

#### 1.    Trial counsel's ineffectiveness.

The Government's argument in support of the substantial planning aggravator consisted of three themes: (1) Mr. Fields did not rob the Chicks until six hours after the killings, meaning his true motive all along had been to kill, not to rob; (2) Mr. Fields had been preparing for the killings for over one year, as evidenced by the fact that he sewed his own ghillie suit long before the killings, he wore the suit to hunt squirrels, and he attached a powerful scope to his rifle; and

41

(3) Mr. Fields sought to establish a false alibi by telling Michelle Tipton that he would be fishing with his friend Daniel Presley the night of July 10, 2003, when in fact Mr. Presley planned to go to a casino.

The Government buttressed each theme by false or, at best, misleading evidence and argument that could have been refuted by effective counsel, either through cross-examination or rebuttal testimony. To support its theory that Mr. Fields "staged" a robbery six hours after the killings, the Government presented testimony from Iris Dalley, an Oklahoma State Bureau of Investigation crime scene agent, and pathologist Dr. Ronald DiStephano. Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. Tr. at 2099. According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried. Tr. at 2098–99. In addition, Agent Dalley and Dr. DiStephano testified that lividity patterns on Mr. Chick's body (indicating where the blood settled after death) showed that his body was moved from the picnic table to the ground at least six hours after he was shot. Tr. at 2026–32, 2111–15.

But, if trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator such as Robert Tressel, Mr. Fields' post-

42

conviction forensic investigator – she would have learned that the evidence

supporting the Government's "staged robbery" theory could have been soundly

impeached. *See* Doc. 106–24, ¶¶ 8–9, 12, 16–17, 19–20. Particularly:

- Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by Agent Dalley's own investigative report, which includes no observations about the glass fragments and fails to explain whether Agent Dalley examined them at the scene or collected them for later examination.

- A close-up of Government's trial Exhibit 43—a photograph of the glass fragments used to support Agent Dalley's testimony— reveals that at least one fragment has a red stripe consistent with blood, demonstrating that it landed on Mrs. Chick's blood while the blood was still viscous. *See id.* ¶¶ 8–9.

- Even if other glass fragments had no blood on them, this could be explained by the fact that Agent Dalley likely disturbed a number of glass fragments when she opened the van's front passenger door to view the interior, Tr. at 2098, causing them to fall onto the dried blood at that time. This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door. *Id.* ¶ 12. Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so. *Id.*

- In response to the claim that Mr. Chick's body was moved six hours after he was shot, trial counsel could have pointed to Government's Exhibit 51, a photograph depicting Mr. Chick's right hand with pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top of his hand, but showing no debris on the blood-free portion of his hand and wrist. Mr. Chick's right hand must have been exposed to this debris while he was being moved from the picnic table to the ground. *Id.* ¶ 16. If Mr. Chick had been moved

many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground,[8] and pine needles and other ground debris would not have become attached to the dried blood. *Id.*

- In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. *Id.* ¶ 17. The air temperature on the evening of July 10, 2003, was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants. *Id.* ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot.

- Finally, trial counsel could have challenged the Government's reliance on livor patterns on the body in support of its theory that Mr. Chick's body was moved more than six hours after he was shot through the testimony of an expert such as Mr. Tressel, who detected livor patterns *inconsistent* with the theory that lividity became fixed while Mr. Chick was seated at the picnic table and *consistent* with lividity having become fixed while Mr. Chick was lying where he was found. *See id.* ¶¶ 19–20.

Likewise, counsel could have presented testimony from an available witness, Mr. Presley, explaining that: a ghillie suit can cost upwards of a hundred dollars if purchased in a store rather than made by hand; it was not unusual to use a ghillie suit for squirrel hunting; and hunters often attach large scopes to their rifles because it allows them to shoot small game from a distance and reduce the amount of shot left in the meat. *See* Doc. 106–21, ¶¶ 4–5. Mr. Presley also could have testified that Mr. Fields came to his house after work on July 10 and asked him to

---

[8] Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. Tr. at 2099–2100. The blood on Mr. Chick's right hand appears to be considerably less thick than the blood found in the van, and thus would have dried in less time.

44

go snake hunting that night, *id.* ¶ 3, which shows that Mr. Fields had hoped to do something with Mr. Presley that evening and had not been lying to Ms. Tipton.

Trial counsel admits she had no reason for failing to challenge the Government's case in support of the substantial planning aggravator. *See* Doc. 106–2, ¶ 22. Her failure to do so through cross-examination, expert rebuttal and/or closing argument prejudiced Mr. Fields: not only did the jury find an unwarranted statutory aggravator that qualified Mr. Fields for death, but also the Government's substantial planning claim effectively decimated counsel's psychiatric defense.

### 2.　The district court opinion.

#### a.　Improper denial of hearing.

Mr. Fields submitted substantial evidence in support of this claim, including: a declaration from trial counsel explaining specifically that she had "no strategic or tactical reason for not consulting an expert crime scene investigator or pathologist" and more generally that she made errors "as a result of [her] being overburdened by essentially functioning without co-counsel in this complex and difficult case," Doc. 106–2, ¶¶ 22, 24; a declaration from Daniel Presley containing many facts helpful to Mr. Fields that were never presented to the jury, Doc. 106–21, ¶¶ 3–5; and a declaration from crime scene expert Robert Tressel challenging the testimony of Agent Dalley and Dr. DiStephano. *See* Doc. 106–24, ¶¶ 8–9, 12, 16–17, 19–20. Yet, the lower court discounted all this evidence without a hearing,

45

choosing instead to create post-hoc rationalizations for counsel's actions and improperly resolve factual disputes between experts based on its lay interpretation of the evidence. The district court acted improperly. *See supra* Point I.A.2.a.

### b. Deficient performance.

The district court largely accepted that trial counsel failed to use available evidence to rebut testimony and argument that was false or misleading. The district court did dispute that an independent crime scene investigator could have undermined one aspect of the evidence used to support the "staged robbery" theory, namely, that lividity patterns showed Mr. Chick's body was moved from the picnic table to the ground six hours after he was shot. Doc. 125 at 29. But this was only one of several ways in which the "staged robbery" theory could have been impeached, and the court did not meaningfully address the other misleading evidence presented in support of substantial planning. In any event, the district court's finding on the lividity pattern evidence is itself debatable because that finding is based on the time at which full rigor mortis occurred, rather than the point at which lividity became fixed. Doc. 125 at 29; *see also* Doc. 106–24, ¶¶ 19, 22 (explaining that lividity generally becomes fixed within four to six hours of death, and can occur within an even shorter time in cold temperatures, whereas rigor mortis, "or stiffening of the muscles, fully develops in six to twelve hours after death").

46

The district court also suggested that, because there was no evidence that Mr. Fields affirmatively told counsel he did not move Mr. Chick's body six hours after the killings, counsel was not on notice of the need to investigate and thus did not perform deficiently. Yet, Mr. Fields' confession contains no information suggesting he returned to the campsite hours after the killings, but rather implies he killed the Chicks, went to fetch his nearby truck, and immediately returned to the site to complete the robbery. *See* Tr. at 2280–83. Regardless, Supreme Court and Tenth Circuit law hold that counsel must conduct a thorough investigation for "all reasonably available . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (citations omitted); *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (same); *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (finding counsel performed deficiently where failure to investigate left him "wholly unprepared to rebut the aggravating factors argued by the prosecution"). Indeed, even the decision cited by the district court to support its finding holds that it "cannot have been reasonable for [defense counsel] not to investigate the crime scene *at all*." *Alcala v. Woodford*, 334 F.3d 862, 891 (9th Cir. 2003) (emphasis added).

### c.     Prejudice.

The district court also dismissed Mr. Fields' ineffectiveness claim by asserting that the "staged robbery" evidence was irrelevant to substantial planning.

Doc. 125 at 22–29. The court erred.

First, the district court's holding that the "staged robbery" evidence was irrelevant to the substantial planning aggravator is belied by the very arguments made by the Government regarding that evidence. *See, e.g.*, Tr. at 3420 ("There was no robbery. Not at least contemporaneously. It took place probably six hours or so later."); Tr. at 3422 ("So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery."); Tr. at 3456 ("He said the robbery was a motive for the murders. The evidence shows the victims were not robbed or their van burglarized until hours after the murders.").

The district court attempted to simply dismiss all of this, saying: "Regardless of the government's closing argument, what occurred after the victims were killed was relevant only to establish the defendant's mental state and/or state of mind after the murders." Doc. 125 at 29. This reasoning is flawed. Petitioner's actions immediately after the crime were relevant precisely because of the inferences that could be drawn about his state of mind at the time of the killings. Indeed, the Government used that evidence for that very purpose, although without objection by counsel or limitation by the court. The Government's closing argument is unquestionably relevant to the determination of prejudice. *See Johnson v. Mississippi*, 486 U.S. 578, 590 & n.8 (1988) (improper reliance on aggravating evidence of prior conviction was not harmless where prosecutor argued this

48

particular aggravating circumstance as a reason to impose the death penalty); *cf.*

*Kyles*, 514 U.S. at 444–45 (in assessing *Brady* materiality, which is the same as

*Strickland* prejudice, "[t]he likely damage is best understood by taking the word of

the prosecutor [in closing argument]"). The district court's refusal to consider the

argument actually made was error or, at least, debatable.

Second, the district court found that there was no reasonable probability of a

different finding on the substantial planning aggravator even if the jury had not

heard the Government's misleading evidence regarding Mr. Fields' use of the

ghillie suit to hunt squirrels with a scoped rifle and his purported attempt to feign

an alibi. But, as with the "staged robbery" evidence, the district court's finding as

to the other misleading evidence discounts the emphasis placed by the Government

on Mr. Fields' creation of the ghillie suit, the scoping of his rifle, and the supposed

creation of an alibi as central to his "plan" to "become a predator." Tr. at 3406.

This evidence was central to the Government's substantial planning case, as

demonstrated in Mr. Fries' closing argument:

> Didn't start on July 10th, 2003, started long before that. It started
> about a year before that when, as you heard the testimony, the
> Defendant was with Penny to help to create a Ghilley [sic] suit. . . His
> plan down the road is to become a predator, a sniper. This was the
> first step in that action. . . . Didn't need to have a Ghilley [sic] suit to
> go squirrel hunting. . . .
>
> [Dan Presley] told you [Mr. Fields] had a high-powered scope on this
> rifle. . . . Dan Presley told you there's no need to have a scope like this
> on this kind of a gun, a .22. He said this was a scope for a high

powered rifle. A sniper's rifle. . . .

[T]he Defendant knows what the Ghilley [sic] suit is for. He doesn't want to tell anybody. He knows at that point in time that this Ghilley [sic] suit is part of a plan. It's part of a plan for him to become the predator he's always wanted to be, the sniper that he's always wanted to be. Just another step in this long process, ladies and gentlemen. . . .

He knew this was the day. He had already set up [his] alibi. If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true. . . . He's already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth.

Tr. at 3406–13.

Finally, the district court's holding ignores that counsel has a duty to rebut aggravating factors presented by the government, even if the rebuttal evidence "would not have entirely negated" the aggravator. *Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012) (counsel ineffective for failing to present evidence that would have "softened [the] edge" of the violent-felony aggravator). Ultimately, the test is whether, had counsel challenged the Government's case on the substantial planning aggravator in the various ways Petitioner identified in his district court pleadings, there is a reasonable probability that the result of the penalty hearing would have been different. *See Strickland*, 466 U.S. at 688.

Instead, the district court considered whether a challenge to any given piece of evidence or argument *alone* would have altered the jury's decision as to the substantial planning aggravator. *See, e.g.*, Doc. 125 at 29 ("[T]he opinions now

proffered by Robert Tressel regarding blood flow and lividity do not convince this court that any reasonable probably exists that his conclusions would have altered the jury's decision . . . regarding the substantial planning and premeditation aggravator."). Thus, the district court not only based its dismissal of this claim on an erroneous reading of the record, it also applied the wrong legal standard. Reasonable jurists could disagree with its disposition. A COA should be granted.

**B.      This Court Should Grant a COA on Trial Counsel's Ineffectiveness in Relation to the Mental Anguish Aggravator (Ground 3B).**

**1.       Trial counsel's ineffectiveness.**

In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor. Tr. at 3415–16. To support this argument, the Government presented Agent Dalley, who testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. Tr. at 2088–91. She also testified that high velocity spatter can travel up to two feet and still remain visible on an object. Tr. at 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face because she "could exclude" that blood as being from the wounds to Mrs. Chick's head and foot, which left only the wounds to Mr. Chick. Tr. at 2090. Yet Agent Dalley never explained why she

51

could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point.

Had trial counsel consulted a blood spatter expert, she could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. *See* Doc. 106–24, ¶¶ 25-26. Trial counsel concedes she had no strategic or tactical reason for not consulting or presenting an appropriate expert to rebut the Government's claims. Doc. 106–2, ¶ 22. Nor could there could be any reasonable basis for failing to do so, given capital counsel's duty to rebut aggravating factors argued by the prosecution. *See Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387 n.7; *Battenfield*, 236 F.3d at 1229. Further, Mr. Fields was prejudiced as a result of counsel's performance, as the Government vigorously argued the mental anguish aggravating factor, Tr. 3415–16, and trial counsel made no argument in response, thereby allowing the jury to find an additional aggravator based on unreliable evidence.

## 2.    The district court opinion.

The district court dismissed this claim, finding in light of the "totality of the evidence heard by the jury" that counsel acted strategically in not challenging the Government's evidence regarding the source of the blood spatter. Doc. 125 at 30–32. Yet, aside from the blood spatter evidence, the only additional *evidence* cited by the court was that the campground where the murders occurred "was fairly rural

and isolated" and that investigators "found two partially empty beverage containers at the picnic table" where the Chicks had been sitting. *Id.* Beyond that, the court observed that Mrs. Chick "likely" would have "heard the shot and seen her husband fall" and that she "probably caught a glimpse of the ghillied up creature shortly before her death." *Id.* But this is pure speculation, not part of the "totality of the evidence heard by the jury."

In any event, trial counsel conceded that she had no reasonable strategy for failing to rebut the blood spatter evidence. Doc. 106–2, ¶ 22. The district court dismissed this concession as counsel "falling on her sword," Doc. 125 at 31, but it is inappropriate for a court to "manufacture a reasonable strategic decision" for trial counsel when the only evidence on the record is a statement from counsel denying any such strategy. *Alcala*, 334 F.3d at 871; *see also Kimmelman*, 477 U.S. at 386–87. At the very least, the evidence and argument submitted warranted an evidentiary hearing. *See Milton*, 744 F.3d at 672.

## C.    Conclusion.

As with counsel's failure to develop and present a compelling mental health defense at sentencing, *see supra*, counsel's failures to adequately challenge the Government's evidence in support of aggravation must be considered both individually and "wholesale" for the purposes of a COA determination. *Browning*, 2017 WL 4159270, at *19. Under both approaches, the "issues presented are

53

adequate to deserve encouragement to proceed further," and a COA should issue.

*Buck*, 137 S. Ct. at 773.

## III. REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT HIS SOCIAL HISTORY AS A MITIGATING FACTOR (GROUND 4).

In Ground 4, Mr. Fields argued that his right to effective assistance of trial counsel was violated when trial counsel failed to present Mr. Fields' compelling social history through the testimony of a mitigation specialist or mental health expert. Because trial counsel did not present this evidence, not a single mitigating factor raised by the defense addressed Mr. Fields' childhood, family background, or family dysfunction. Tr. at 3400–01.

The district court deemed that trial counsel had a strategic basis for failing to present such evidence and that Mr. Fields was not prejudiced. Doc. 125 at 32–34. Reasonable jurists could disagree with the district court's resolution of both prongs of the *Strickland* test.

### A. Trial Counsel's Ineffectiveness.

Mr. Fields was raised in a dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. *See generally* Doc 106–5; Doc. 106–26. This history included emotionally and physically abusive parents; a nomadic lifestyle that made it difficult for Mr. Fields

54

to make friends, thereby increasing his sense of isolation; intergenerational mental health and neurological issues; and Mr. Fields' lifelong battle with long-undiagnosed chronic depression that led others to unjustly perceive him as "moody," "strange," and "lazy." *See* Doc. 14 at 63–66; Doc. 106, ¶¶ 152–65.

Mr. Fields received little emotional support during his childhood and adolescence. His father contemplated "getting rid of" his children at least once. Worse yet, Petitioner and his sister were always being pitted against one another, often quite literally. For example, they had to whip each other with belts, and if they did not do it hard enough, their father took over. The threat of a whipping from his father caused Petitioner constant fear and anxiety. Doc. 106-27, ¶¶ 3–6.

Mr. Fields' family tree is dotted with mental health and neurological issues on both his paternal and maternal sides. Doc. 106-5, ¶ 8. His mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother received electroshock treatments (her two sisters were also known to have been mentally ill). *Id.* Moreover, Petitioner's mother reported having brain lesions and his paternal grandmother dies of a brain tumor.

Yet Mr. Fields' jury never learned about his deeply troubled history and intergenerational psychological and neurological issues. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields, who addressed only non-controversial subjects, giving the misleading

55

impression that the Fieldses were a more or less typical family. Nor did trial counsel ask the defense's mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' family history. Indeed, very little social history information made its way to Dr. Grinage and Dr. Woods. *See* Doc. 106–4, ¶ 10; *see also* Doc. 106–28 at 2; Doc. 106–26 at 2; Doc. 106–29 at 1. Thus, their opinions were not informed by the wealth of available family and social history.

The development and presentation of social history evidence is crucial to an effective mitigation defense at capital sentencing. *See, e.g.*, *Wiggins*, 539 U.S. at 523 (counsel ineffective for failing to generate and present capital defendant's "social history"); *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (counsel ineffective where jury never learned of capital defendant's childhood, which was "filled with abuse and privation"). Indeed, this Court has recognized that "evidence of childhood abuse, neglect, and instability can play a significant role in mitigation." *Barrett*, 797 F.3d at 1229–30. Counsel admitted that she had no reasonable strategic basis for failing to present evidence of Mr. Fields' background. Doc. 106–2, ¶ 19 ("I had no tactical or strategic reason for not presenting [Mr. Fields' social] history either through one of the doctors or through Ms. Shettles."). Given the importance of presenting social history evidence in capital sentencing trials, counsel's deficient performance prejudiced Mr. Fields.

## B.    The District Court Opinion.

This Court has recognized that, "[w]hen reviewing the performance of counsel at the sentencing stage of a capital case, there is a need to apply close scrutiny . . . because mitigating evidence plays an overwhelmingly important role in the just imposition of the death penalty . . . and the sentencing stage is the most critical phase of a death penalty case." *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) (internal citations and quotations omitted). The district court failed to apply any such scrutiny here.

### 1.    Deficient performance.

In analyzing the first prong of *Strickland*, the district court began by completely discounting trial counsel's sworn statement that she "had no tactical or strategic reason for not presenting th[e] history either through one of the doctors or through Ms. Shettles," Doc. 106–2, ¶ 19, again opining that counsel was "fall[ing] on [her] sword," Doc. 125 at 31, 33. But, unlike in *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004), in which this Court held that trial counsel's post-conviction declaration could be disregarded where it constituted an "about face" from statements made at the time of trial, counsel here made no contradictory statements at trial or any other time. The district court's suggestion to the contrary in its opinion denying Mr. Fields' Rule 59(e) motion on this issue is unconvincing. *See* Doc. 130 at 3–5. Specifically, the district court pointed to an email written by trial

57

counsel regarding her fear that, "through her *mental health evidence*," she would

open the door to certain "bad acts" evidence that the trial court had provisionally

excluded. *Id.* (citing Doc. 129–1 at 3–4) (emphasis added). But:

- The email says nothing about *social history evidence* and thus explains nothing about counsel's supposed strategy in relation to this claim. *See* Doc. 129–1 at 3–4. Nor would the type of social history evidence described above have opened the door to the rebuttal about which counsel was concerned.

- In any event, the advice counsel received in response to another email expressing the same concern was that she was "entitled to know . . . whether what you propose to put on will or will not open the door." Doc. 119–11 at 1. Yet there is no evidence that counsel ever pursued with the trial court whether presenting social history evidence would in fact have opened the door to the bad acts evidence.

- As discussed below, the Government ultimately introduced significant evidence at trial depicting Mr. Fields as a vile and dangerous person, meaning counsel had no reasonable basis for failing to provide a complete picture of his social history.

In its Rule 59(e) opinion, the district court also noted that trial counsel

"claimed she did not have adequate assistance of counsel which was contradicted

by various records in the case." Doc. 130 at 3. However, the limited advice Ms.

O'Connell received from experienced capital counsel does not change that, in

practice, Ms. O'Connell handled all aspects of this complex federal capital case on

her own. This reality caused her to make critical decisions – including forgoing

presentation of Mr. Fields' social history – without any rational basis.

Having improperly dismissed trial counsel's affidavit disclaiming any

strategy, the district court then assumed that, because Ms. Shettles had investigated

Mr. Fields' social history, any decision by trial counsel not to present that history

was "an adequately informed strategic choice." Doc. 125 at 33. But under

*Strickland*, a court is not at liberty to defer to strategic bases for counsel's actions

where no such reason actually existed at the time of trial. *See Wiggins*, 539 U.S. at

526–27; *Kimmelman*, 477 U.S. at 386–87.

Given the disputed factual issue supported by counsel's declaration, the

district court erred in reaching its conclusion without an evidentiary hearing. At the

very least, reasonable jurists could debate the lower court's disposition.

### 2. Prejudice.

The district court's finding that Mr. Fields was not prejudiced was based on

the court's misapprehension of the law and its unjustified assumptions. First, the

court erroneously viewed the value of mitigating evidence as being dependent on

its causal nexus to the crime, concluding:

> The decision . . . to submit evidence that these murders were, in some
> way, the product of a long-standing lack of socialization or empathy,
> caused by a less than idyllic family life approximately twenty years
> earlier, would have diluted the defense theory that the crime was
> Effexor driven as opposed to the product of the defendant's
> sociopathic tendencies.

Doc. 125 at 33. This contention rests on the premise that evidence is mitigating

only if it explains the crime or has some nexus with the crime, which the Supreme

Court has repeatedly rejected. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233,

246 (2007); *Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Mitigating evidence is *any* evidence that "might serve as a basis for a sentence less than death." *Skipper*, 476 U.S. at 4.

Moreover, neither a dysfunctional upbringing nor evidence of intergenerational mental health issues "undermine[s] the defense theory that Effexor caused an anomaly, a one-time switch to flip in Petitioner's brain thereby leading an otherwise law-abiding citizen to commit these horrific murders." Doc. 125 at 33. These mitigation themes are not mutually exclusive. The district court's speculation otherwise was unconvincing:

> [E]vidence Fields was emotionally estranged from his family would have directly contradicted the defense arguments that the death of his father and his mother's illness caused the defendant to experience severe emotional disturbances. . ., [and] evidence the defendant had difficulty forming relationships would have undermined the notions that the defendant was remorseful and that he was a loved relative and friend.

*Id*. But there is no support for the contention that someone cannot be both emotionally estranged from his family and also deeply affected by the death or illness of a parent. Likewise, nothing supports the claim that someone who has difficulty forming relationships cannot also be remorseful or loved by friends and family.

In the absence of a hearing, the district court was simply creating a rationale to justify a summary denial of relief. There was no evidence to support the district

60

court's theory that counsel deliberately chose not to present the evidence of Mr.

Fields' troubled social history to avoid purported inconsistencies. To the contrary,

Ms. O'Connell elicited evidence from the defense mental health experts that Mr.

Fields had judgment problems, Tr. at 2948, 2953-54, and that he "was suffering

from a severe emotional mental disturbance" and had a mental disorder that

"caused significant impairment in his ability to behave in a particular way that he

might otherwise or what he might be thinking about doing," Tr. at 2815. This

evidence opened the door for the Government to introduce extensive evidence and

argument regarding Mr. Fields' purported antisocial personality and future

dangerousness. *See, e.g.*, Tr. at 2700, 2705–06, 2717–18, 2751–54, 2761, 2763.[9]

Because such evidence was already coming in, counsel had no reasonable basis for

failing to provide a complete picture of Mr. Fields' background and family history

of mental illness. Doing so would have neutralized the evidence of his violent

tendencies that the Government brought out on cross-examination, and served as a

stand-alone reason for a juror to vote for life. Again, the district court's holding is

at the very least debatable among reasonable jurists, and a COA is warranted.

---

[9] The defense also opened the door to evidence regarding Petitioner's hypersexuality – which the court had excluded, *see* CR Doc. 157 – through Drs. Grinage and Woods, both of whom testified that it was relevant to their diagnoses. Tr. at 2791-92, 2970, 2973; *cf.* Tr. at 3082 (district court noting, "I thought I was not going to let sexual stuff be evidence of anything, but somehow that's winnowed it's [sic] way in. Not improperly, just . . ..").

IV.    **REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT THE GOVERNMENT'S PENALTY PHASE CLOSING ARGUMENTS VIOLATED HIS CONSTITUTIONAL RIGHTS (GROUND 5).**

The Government's penalty phase closing arguments were rife with legal and factual misrepresentations, impermissible witness bolstering, ad hominem attacks, and speculation intended to inflame the passions of the jury. Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel was ineffective for failing to raise these issues on direct appeal. As a result, Petitioner was deprived of his Eighth Amendment right to individualized sentencing, his due process right to a fundamentally fair trial, and his right to the effective assistance of counsel.

It is well established that the prosecutor has a special duty to avoid improper argument to the jury, *Berger v. United States*, 295 U.S. 78, 88 (1935), and courts have recognized that particular scrutiny must be applied to a prosecutor's actions in a capital case, *see, e.g.*, *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Hooks v. Workman*, 606 F.3d 715, 746 n.29 (10th Cir. 2010). Nevertheless, the district court here selectively examined the record and repeatedly made unconvincing excuses for the prosecutors' improper remarks. Reasonable jurists could disagree with the district court's holdings. A COA should be granted.

62

## A.    The Government's Unconstitutional Closing Argument.

Generally, "a prosecutor's misconduct will require reversal . . . where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process.'" *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003). However, "[w]hen specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Thus, relief is warranted if the prosecutor's improper argument "had a substantial prejudicial effect" on a particular constitutional right, without proof that the entire proceeding was unfair. *Paxton v. Ward*, 199 F.3d 1197, 1217–18 (10th Cir. 1999) (affirming grant of habeas relief where prosecutor's penalty phase argument "had a substantial prejudicial effect" on petitioner's right to present mitigating evidence); *see also United States v. Carleo*, 576 F.2d 846, 851–52 (10th Cir. 1978) ("[I]t cannot be gainsaid that the prosecution would commit" error that "irreparably prejudiced the defendant" if the prosecution "personally attacks or vouches for the credibility of any witness.").

Here, the Government's closing argument was rife with improprieties that not only violated Mr. Fields' right to a fundamentally fair trial, but also infringed upon the jury's ability to consider and weigh all relevant mitigating evidence, invited the jury to base its sentence on evidence not contained in the record, and

63

otherwise violated Mr. Fields' Eighth Amendment right to a sentence of death

imposed in a manner that is not arbitrary and capricious. Specifically, the

Government's improper arguments included:

- misstating the law regarding the weighing of mitigating and
  aggravating circumstances so as to increase Mr. Fields' burden of
  persuasion and decrease its own,[10] disparaging the jury's discretion to
  show mercy,[11] and inviting the jury to sentence Mr. Fields to death
  based upon irrelevant and inflammatory societal concerns[12];

- expressing his personal opinion and repeatedly vouching for the
  credibility of its own expert witnesses,[13] while inaccurately and

[10] *See, e.g.*, Tr. at 3463–64 ("The mitigating factors . . . cannot *outweigh* the premeditated murder of Charlie. . .. The mitigating factors . . . do not begin *to outweigh* just one of the steps that Shirley took in a terrorized flight from the Defendant."),

[11] *See, e.g.*, Tr. at 3430 ("[J]ust remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had."); Tr. at 3457 ("The Defendant wants to choose a sentence. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?"); Tr. at 3459 ("Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.").

[12] *See, e.g.*, Tr. at 3431 ("I can't believe they gave probation to a child molester."); Tr. at 3457 ("Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates.").

[13] *See, e.g.*, Tr. at 3429 ("[Dr. Price] has a lot of credibility."); *id.* ("We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own backyard who were credible, who would give an honest opinion who were not hired guns."); Tr. at 3429–30 ("Dr.

- unprofessionally denigrating the expert witnesses presented by Mr. Fields as "high dollar shrinks" and "hired guns" from the "left coast," who had an "axe to grind," and did not give "an honest opinion"[14];

- launching ad hominem attacks on Mr. Fields that were irrelevant to any of the issues at trial[15];

- misrepresenting the record and the testimony of witnesses,[16] including the defense's own medical experts[17];

- making multiple arguments with absolutely zero factual basis in the record, including arguing that Mr. Fields' own doctors had diagnosed him as a sociopath,[18] that Mr. Fields had visited the Winding Stair

---

Mitchell – and he may be the best one of all. . . Dr. Mitchell who has no axe to grind here, ladies and gentlemen."); Tr. at 3452 ("I respectfully submit . . . that Randy Price and Jeff Mitchell were straight shooters. Not hired guns."). The Government also bolstered the credibility of FBI agent Gary Graff, bizarrely suggesting Agent Graff performed in an exemplary fashion when he refrained from embellishing Mr. Fields' confession. Tr. at 3462.

[14] Tr. at 3429–30, 3459.

[15] *See, e.g.*, Tr. at 3450 ("He lied. He was trying – manipulative, a con artist."); Tr. at 3450 ("And was financially irresponsible, parasitic and promiscuous."); Tr.at 3455 ("The Defendant is unalterably and fundamentally different from most human beings.'); Tr. at 3459 ("Selfish. Selfish. Narcissistic."); Tr. at 3465 ("That tells you who the Defendant will choose to be near. A child abuser.").

[16] For multiple examples, *see* Doc. 106 (Petitioner's *Grounds in Support of Amended Motion*) at 105–07.

[17] For instance, the Government stated that, on cross-examination both Dr. Woods and Dr. Grinage testified they were not aware that Mr. Fields "had the Ghilley [sic]suit and had snuck up on people beforehand." Tr. at 3427. In reality, Dr. Woods testified, "I was aware that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit and observed someone. . .." Tr. at 3024. Dr. Grinage, meanwhile, was never even asked if he was aware that Mr. Fields put on the ghillie suit and observed people.

[18] *See* Tr. at 3428 ("His own doctors are saying, yeah, he has the traits of a sociopath."); Tr. at 3449 ("He's a sociopath."). In fact, neither Dr. Grinage nor Dr. Woods testified that Mr. Fields was a "sociopath" or had sociopathic traits.

Campground to "search[] for a victim,"[19] and that Mrs. Chick was "begging and pleading for her life" before Mr. Fields shot her[20]; and

- relating the well-known "writing on the wall" sermon from the Book of Daniel, a book of the Old Testament in which God finds King Belshazzar wanting and condemns him to death,[21] and then arguing that Mr. Fields similarly should be weighed and found wanting.[22]

Individually and collectively, these errors rendered Mr. Fields' trial fundamentally unfair and substantially prejudiced his Eighth Amendment right to individualized sentencing and a death sentence that is not arbitrary and capricious. *See Cargle*, 317 F.3d at 1224–25 (granting penalty phase relief where "the death sentences imposed in this case were substantially influenced by cumulative error"); *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction. . ., we think it beyond question that the prosecutor's improper comments, taken as a whole, affected the substantial rights of the defendant.").

## B.    The District Court Opinion.

The district court disposed of this claim based on a selective examination of the record and unpersuasive excuses for the Government's improper remarks.

In certain instances, the court simply re-characterized the improper remark and deemed it innocuous. For example, regarding the Government's erroneous

---

[19] Tr. at 3410.
[20] Tr. at 3417.
[21] Daniel 5:1–31.
[22] Tr. at 3466–67; *compare* Daniel 5:1–31.

66

statement that mitigating factors must "outweigh" aggravating factors, which improperly shifted the burden of persuasion to Mr. Fields, the court observed: "when taken in context this *does not appear* to be what the prosecutor was saying." Doc. 125 at 37. This finding disregards the plain statements of the prosecutor, as well as this Court's holding that a prosecutor's "misstatement of law that affirmatively negates a constitutional right or principle" is a particularly "serious infringement" on that right. *Mahorney v. Wallman*, 917 F.2d 469, 473 (10th Cir. 1990). The district court's finding is also contrary to *Mahorney* in that it ignored: (1) the weight that the trial court afforded the prosecutor's misstatement of law when it overruled trial counsel's objection in front of the jury, and (2) the fact that the court's correct statement of the law on the weighing of aggravating and mitigating factors was given to the jury *before* the prosecutor delivered his closing argument. *See id.* at 473–74 & n.5 (explaining that the trial court's overruling of defense counsel's objection placed an "official imprimatur" on the prosecutor's misstatements of law, thus "amplify[ing] their potential prejudicial effect on the jury," and refusing to find that the court's instructions cured the prosecutor's error in part because the instruction was delivered prior to closing arguments).

Other examples of the court's attempt to recharacterize the prosecutors' improper remarks include the following findings:

- There was nothing wrong with the Government's description of its experts as "people in our own backyard who were credible, who

would give an honest opinion who were not hired guns" because, according to the court, "the comments, as a whole were designed to remind the jury of its duty to scrutinize and weigh all of the witnesses' testimony." Doc. 125 at 43.

- The prosecution's comment that Dr. Mitchell had "no axe to grind" was "simply one way for the prosecutor to direct the jury's attention to evidence from which the jury could determine the expert witness's credibility." *Id.* at 45.

- The Government's statement asking the jury to consider the defense's plea for mercy against "how much mercy" was shown to the victims was not an attempt to urge the jury to reject mercy, but rather "simply focused the jury's attention on the aggravating nature of these crimes." *Id.* at 39.

With each of these findings, the district court disregarded extensive jurisprudence holding such remarks improper by insisting that the prosecutors did not intend the plain meaning of their own words.

In other instances, the court excused the improper remarks with "explanations" that do not absolve the wrongdoing. For example, the court found no error in the Government's statement that its own expert "has a lot of credibility" because it was "immediately followed by a statement derived from evidence in the record which established that Dr. Price did not always testify for the defense." Doc. 125 at 43. But improper bolstering occurs *either* when the prosecutor "implicitly indicat[es] that information not presented to the jury supports the witnesses' testimony" *or* when the prosecutor gives "explicit personal assurance of the witness' veracity." *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir.

68

2005). It is hard to imagine a more explicit personal assurance of veracity than the prosecutor stating flatly that Dr. Price "has a lot of credibility." Likewise, the court attempted to excuse the Government's comments "suggesting incarceration would be an inadequate sentence" as an "appropriate response" to testimony delivered by Daniel Presley. Doc. 125 at 40. In fact, Mr. Presley testified about the policies at the minimum-security Oklahoma state prison where he was employed, Tr. 2408–09, and had no knowledge of the conditions of confinement for a prisoner federally sentenced to life without parole for committing two first degree murders.

The court also overlooked the factual record. For instance, the court excused the Government's reference to the defense's doctors as "hired guns" from the "left coast" who had an "axe to grind" and did not give "an honest opinion," Tr. 3457, by citing to the fact that Dr. Woods has his primary office in Oakland, California, and had never been called to testify by the prosecution. Doc. 125 at 44–45. Not only do these facts fail to justify the Government's unprofessional name-calling and expressions of personal opinion, but the court made *no mention* of the fact that the defense's other expert, Dr. Grinage, was from nearby Kansas and had never before testified in a capital case. *See* Doc. 106–4, ¶ 2. Regarding the Government's multiple misrepresentations of testimony, the district court simply concluded that all of the comments "were supported by the record or appropriate inferences to be made therefrom," without analyzing a single concrete example.

Finally, the court excused the Government's unconstitutional use of the Bible by holding that, unlike in *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000), the prosecutor's "argument was not delivered in biblical style," did not expressly reference God, and "used a story devoid of any religious connotation," Doc. 125 at 47. This ignores that, as with the improper remarks in *Sandoval*, the "lay juror would readily understand the words" used "as referring to Scripture." *Sandoval*, 241 F.3d at 778. And, as in *Sandoval*, "[t]hose learned in the New Testament would recognize the argument as closely following" the biblical passage from which it was drawn. *Id.* Just as in *Sandoval*, "[w]e do not know what actually happened in the jury room, [and] we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death." *Id.*

In sum, the district court's rulings upholding the Government's conduct do not withstand scrutiny. Furthermore, had the court properly considered the cumulative effect of the multiple improper remarks on Mr. Fields' constitutional rights, it could not have dismissed this claim. At the very least, these issues are debatable among jurists of reason. *See, e.g.*, *Graham*, 149 F. App'x. at 772 (granting COA on petitioner's claim that prosecutor's statements to jury during closing arguments deprived petitioner of a fair trial). A COA is warranted.

**V.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH (GROUND 6).**

Although Mr. Fields pled guilty to two counts of first degree murder, pursuant to the trial court's instructions, the jury sentenced him to a single, general verdict of death. In doing so, the jury was allowed to cumulatively consider all seven of the aggravating factors argued by the Government, even though five factors properly applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death, rendered the resulting death sentence arbitrary and capricious, and denied Mr. Fields' right to a sentencing process in which the jury gave full effect to his mitigation. Trial counsel was ineffective in failing to object to the unified process and request that the jury render separate verdicts. The district court's findings supporting a holding to the contrary are at least debatable by reasonable jurists.

### A.    Trial Counsel's Ineffectiveness.

As this Court explained on direct appeal:

> Although Fields was indicted, convicted and sentenced to death on two murder counts, the verdict form and instructions did not direct the jury to weigh the aggravating and mitigating factors relevant to each count and determine whether a death sentence was warranted for either murder. Rather, the jury was directed to weigh all of the aggravators and mitigators in the case at once and reach a single sentencing verdict.

*Fields*, 516 F.3d at 938; *see also* Tr. at 3404 (instructions); Tr. at 3484 (Special Findings Form). Trial counsel not only failed to object to this unconstitutional general verdict, but in fact invited it, requesting instructions and a verdict form that were, in the words of this Court, "functionally the same" as the improper instructions and verdict form used by the district court. *Fields*, 516 F.3d at 939.[23]

Under 18 U.S.C. §§ 3591–93, the federal death sentencing procedure is offense-specific, requiring a jury to "determin[e] whether a sentence of death is justified for *an offense*." 18 U.S.C. § 3592(c) & (d) (emphasis added).[24] Nothing in the federal scheme contemplates or permits aggravating factors for multiple offenses to be weighed against the mitigating evidence and the federal scheme expressly requires that all mitigating evidence must be considered and reweighed against the aggravators for each offense. *See, e.g.*, 18 U.S.C. § 3592(a)(1) (defining impaired capacity as a mitigating factor whether or not it was a defense "to the charge"); 18 U.S.C. § 3592(a)(2) (same as to duress); 18 U.S.C. § 3592(a)(3) (same as to minor participation); 18 U.S.C. § 3592(a)(4) (listing as mitigating factor the fact that co-defendants to "the crime" not sentenced to death); 18 U.S.C.

---

[23] On direct appeal, Mr. Fields raised a challenge to the single verdict as trial court error, but this Court declined to review the claim on the grounds that "Fields invited any error of which he now complains" through trial counsel's actions. *Fields*, 516 F.3d at 939.

[24] *See also* 18 U.S.C. § 3591(a)(1) (authorizing capital sentencing procedure where defendant has been found guilty of "an offense"); 18 U.S.C. § 3591(a)(2) (same as to any singular "offense").

§ 3592(a)(6) (mitigating whether defendant was "under severe mental or emotional disturbance" at time of "the offense"); 18 U.S.C. § 3592(a)(7) (mitigating where "victim consented to the criminal conduct"); 18 U.S.C. § 3592(a)(8) (mitigation includes "any other circumstance of the offense that mitigate[s] against imposition of the death sentence").[25]

Moreover, because different aggravators were charged as to each of Mr. Fields' two victims,[26] because the substantial planning aggravator charged as to both victims would be impermissibly double-counted under a unitary process,[27]

_____

[25] *See also* 18 U.S.C. § 3592(c)(1) (establishing aggravating factor for "an offense"); 18 U.S.C. § 3592(c)(5) (same as to "the offense"); 18 U.S.C. § 3592(c)(6) (same); 18 U.S.C. § 3592(c)(7) (same); 18 U.S.C. § 3592(c)(8) (same); 18 U.S.C. § 3592(c)(9) (same); 18 U.S.C. § 3592(c)(11) (same as to "the victim"); 18 U.S.C. § 3592(c)(13) (same as to "the offense"); 18 U.S.C. § 3592(c)(14) (same); 18 U.S.C. § 3592(d)(4) (same); 18 U.S.C. § 3592(d)(5) (same); 18 U.S.C. § 3592(d)(6) (same); 18 U.S.C. § 3592(d)(7) (same); 18 U.S.C. § 3592(d)(8) (same); 18 U.S.C. § 3593(a) (requiring notice of capital prosecution where "the attorney for the government believes that the circumstances *of the offense* are such that a sentence of death is justified") (emphasis added); *id.* (repeatedly referring to "the offense" and "the victim"); 18 U.S.C. § 3593(b) (authorizing capital sentencing hearing for "an offense"); 18 U.S.C. § 3593(c) (same); 18 U.S.C. § 3593(e)(1)–(3) (same).

[26] The three factors applying exclusively to Count 1 were the murder of Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and the infliction of mental anguish on Mrs. Chick; the two factors applying exclusively to Count 3 were the murder of Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick. Tr. at 3396–99. The other aggravating factors were killing more than one person in a single episode and future dangerousness. *Id.*

[27] The Court instructed the jury to find the substantial planning aggravating factor separately for each of the Chicks. Tr. at 3396–99. This instruction would have been proper if the jury was also instructed to determine, and given a

73

and because the unified process permitted the jury to consider all seven aggravating factors together in deciding whether to sentence Mr. Fields to death, there could have been no strategic reason for counsel's failures. *See, e.g.*, *Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983) (reasonably competent attorney would have known that separate verdict on each count "was required in order to protect the petitioner's basic constitutional rights"); *Burch v. State*, 696 A.2d 443, 462 (Md. 1997) (use of single sentencing verdict form in double-murder case constituted error); *Jones v. State*, 134 P.3d 150, 156 (Okla. Crim. App. 2006) (reversing and remanding for resentencing with separate aggravating circumstance verdict forms where a single verdict form containing aggravating circumstances, which did not apply to both murder counts, was used).

Where a verdict "may have had a proper basis," but "it is equally likely that the verdict . . . rested on an unconstitutional ground," a court may not choose between the proper and improper bases, and the verdict cannot stand. *Boyde v. California*, 494 U.S. 370, 380 (1990) (internal citations and quotations omitted). Here, given the wording of the trial court's instruction, and the presumption that juries follow instructions, *Penry v. Johnson*, 532 U.S. 782, 799 (2001), it must be

---

mechanism to impose, separate sentences as to each count. Because the jurors were asked to impose one sentence in a general verdict, however, the Court's instructions permitted the jury to consider two separate plans to kill the Chicks, even though the Government argued only that Mr. Fields had one plan to kill both in a single criminal episode.

assumed that the jury returned a general verdict of death based on a finding that the seven aggravating factors together outweighed the evidence in mitigation. Such an outcome is invalid for several reasons.

First, the jury was permitted to weigh aggravating factors that were unrelated to the particular count (i.e., weighing the victim impact related to Mr. Chick in determining the sentence for the death of Mrs. Chick, or the mental anguish inflicted upon Mrs. Chick prior to her death in determining the sentence for the death of Mr. Chick), and thus the process had no "inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980); *see also Tuilaepa v. California*, 512 U.S. 967, 973 (1994) ("Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or to the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'").

Furthermore, the jury was allowed to double count the substantial planning aggravating factor, even though it is not victim-specific. *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) (holding that the identically worded former 21 U.S.C.A. § 848 (n)(8) was not victim-specific). Such double counting skewed the weighing process and rendered the resulting death sentence arbitrary and unconstitutional. *Id.* at 1111.

Finally, a scenario under which all seven aggravators were simultaneously

75

weighed together against the mitigating evidence gave undue weight to the case for death, while weighing the evidence in mitigation only once instead of twice. In so doing, the process skewed the proceedings in favor of the death sentence by improperly placing a "thumb . . . [on] death's side of the scale," *Stringer v. Black*, 503 U.S. 222, 232 (1992), in violation of the Eighth and Fourteenth Amendments. By contrast, had the jury considered the verdicts separately, it would have considered *the mitigating* evidence twice.

## B.   The District Court Opinion.

The district court determined that counsel acted strategically because separate verdict forms would have: (1) "emphasized the separate protracted nature of the two murders"; and (2) "required the jury to focus more on the aggravating facts of the case since they would have been required to consider them twice." Doc. 125 at 48. Yet each of these rationales is illusory.

First, the Government argued throughout the proceedings that Mr. Fields murdered Mr. Chick first and then murdered Mrs. Chick, and put forward a detailed theory of the way these murders were carried out. Separate verdict forms would have done nothing to "emphasize" this already-prominent aspect of the Government's case, at least not to an extent sufficient to justify trial counsel's waiver of her client's constitutional rights.

Second, there is no reason to believe that permitting the jury to twice

76

consider the two general aggravating factors separately as to each victim (while forfeiting the right to have the jury weigh the mitigating evidence twice) would be more detrimental to Mr. Fields than permitting the jury to consider irrelevant factors for each of the victims, double count the substantial planning aggravator, and aggregate all of the aggravating factors in one weighing process as it necessarily did under the unitary form.

The district court also determined that Mr. Fields failed to establish prejudice, explaining:

> There can be no question that all twelve jurors, after weighing the aggravating factors that they have found to exist, concluded Fields should be put to death for at least one, if not both, of the murders. The suggestion by counsel that the jury might have returned two life sentences had it used separate verdict forms has no basis in fact and is nothing more than unsupported conjecture and speculation.

Doc. 125 at 49. Notably, this passage is taken practically verbatim (though without attribution) from the Maryland Supreme Court's decision in *Burch*. *See Burch*, 696 A.2d at 462.[28] But in that case, unlike here, the "two aggravating factors that [the jury] found *necessarily applied to both victims*; there was no basis for it to have found that either factor applied to one victim (or murder) but not the other." *Id.*

---

[28] The *Burch* decision reads: "[T]here can be no question but that all 12 jurors, after weighing the aggravating and mitigating factors that they found to exist, concluded that appellant should be put to death for at least one, if not both, of the murders. The notions asserted in appellant's brief that the jury may have returned two life sentences had it used separate forms to record its decisions have utterly no basis in fact and are no more than unsupported conjecture and speculation." *Burch*, 696 A.2d at 462.

(emphasis added). Moreover, the *Burch* court held that, "had there been any prospect of either an aggravating or a mitigating factor peculiar to one victim but not the other or anything that could reasonably have caused the jury to reach a different balance in the weighing process, from one victim to another, *it would have required that we vacate both death sentences and remand for resentencing*." *Id.* (emphasis added). That is precisely the case here, and the district court therefore erred in adopting the *Burch* court's finding on prejudice and applying it to facts the *Burch* court itself found distinguishable. In light of *Burch*, this issue is debatable. A COA should issue.

**VI.    REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT THE EVIDENCE (GROUND 7).**

A key trial issue was whether Petitioner had ingested any of the increased-dose, 150 milligram Effexor pills that he had been prescribed just prior to the murders. Trial counsel argued that the increased dose caused Mr. Fields to suffer a "manic flip" that substantially impaired his capacity to conform his conduct to the law, but the Government insisted there was no evidence that Mr. Fields took any of the increased dose. In these § 2255 proceedings, Mr. Fields learned for the first time that the FBI recovered a half-empty bottle of 150 milligram Effexor pills from Mr. Fields' truck on the day of his arrest, as well as a prescription label indicating

78

the pills had been obtained the day before the murders.

Based on the foregoing, Mr. Fields alleged that the Government violated his rights to due process under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Alternatively, he claimed that trial counsel was ineffective for failing to investigate and present the evidence. To the extent the district court addressed these allegations, it did so in a summary and unpersuasive manner. A COA is warranted.

### A.  This Court Should Grant COA on the Due Process Violations (Ground 7A).

### 1.  The due process violations.

To establish a *Brady* violation, a defendant must show that favorable evidence was suppressed by the government, either intentionally or inadvertently, and that the suppressed evidence was material. *Brady*, 373 U.S. at 87. The duty to disclose material exculpatory evidence extends to evidence in the possession of the police, regardless of whether prosecutors are aware of it. *Kyles*, 514 U.S. at 437. Regarding materiality, a court must assess whether the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435; *see also Wearry v. Cain*, 136 S. Ct. 1002, 1006 & n.6 (2016) (petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict," meaning he "can prevail even if . . . the undisclosed information may not have affected the jury's verdict").

Here, the FBI recovered a pill bottle in Mr. Fields' truck with the label

79

indicating it contained a prescription for thirty 150 mg Effexor pills to be taken once daily, and a "pharmacy sack label" for the same prescription. *See* Doc. 106–30 at 3. The day after Mr. Fields' arrest, the FBI turned the bottle over to the Muskogee County Detention Center, at which point fourteen pills remained in the bottle. *See* Doc. 14 at 101–02. However, this fact was never disclosed to the defense. Instead, the prosecutor asked the defense's experts, Drs. Grinage and Woods, if they knew how many pills Mr. Fields had taken from the prescription and to confirm that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage." Tr. at 2837–38, 2868–69, 3029–30, 3060–61.

Thus, Mr. Fields established that there was "a kind of double-acting prosecutorial error: a failure to communicate salient information, which, under [*Brady*,] should be disclosed to the defense, and a deliberate insinuation that the truth is to the contrary." *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993). Furthermore, Mr. Fields established materiality because, had the jury been aware that Mr. Fields' pill bottle was found half-empty, it could have reasonably inferred that he took the increased dosage of Effexor prior to the crime, and that his mental state was deteriorating at and around that time. There is a reasonable likelihood that, with these inferences in hand, at least one juror would have found the substantially impaired capacity mitigating factor to be present and concluded

that the aggravating factors did not substantially outweigh this evidence in mitigation.

### 2. The district court opinion.

The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422. Nevertheless, the district court precipitously dismissed Mr. Fields' *Brady* claim, relying on two specious findings.

First, it concluded that, because there is no evidence that the Government "took an inventory of the number of pills contained within the pill bottle prior to delivering the same to the jail," there could be no *Brady* violation, as the Government "had no obligation to provide information . . . that was never collected." Doc. 125 at 51. But "[a] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984); *see also Kyles*, 514 U.S. at 437 (holding an "individual prosecutor has a duty to learn of any favorable evidence").

Here, Mr. Fields told the FBI in his confession that "during the week prior to July 10th, [he] had been very depressed," even "suicidal." Tr. 2282. That statement, combined with the FBI's recovery of the Effexor prescription and pill bottle, alerted the Government that Mr. Fields had mental health issues that were likely to be at issue in his case. Having been so alerted, the Government had a duty

to inventory the contents of the bottle and disclose the results to the defense. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 475 (2009) (vacating lower court's denial of *Brady* claim where government suppressed evidence that supported defense of drug-induced psychosis).

In *Cone*, the prosecution told the jury that the defendant's mental health defense was "baloney," despite having in its possession evidence that "may have persuaded the jury that Cone had a far more serious drug problem than the prosecution was prepared to acknowledge." *Id.* Likewise, in this case, the Government told the jury there was "no evidence" to support the theory that Mr. Fields' actions resulted from his having ingested an increased dose of Effexor, despite possessing evidence indicating that Mr. Fields had in fact begun taking such an increased dose just prior to the crimes.

Nor would it have been difficult for the Government to properly inventory the contents of the bottle. *Cf. United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) ("As the burden of the proposed examination [for *Brady* material] rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort."). Hence, excusing the Government for failing to disclose the contents of the pill bottle because it may have failed to conduct an inventory is tantamount to excusing the Government for failing to disclose an exculpatory report in its possession because it never read the contents of that report.

82

Second, the lower court dismissed the *Brady* claim on the ground that "Fields is the only one who can say exactly how many pills . . . he actually took," meaning the information was already known the defendant. Doc. 125 at 51. However, in *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court explicitly rejected a due diligence requirement as anathema to *Brady*. *See Banks*, 540 U.S. at 696 ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."); *see also Cone*, 556 U.S. at 459, 475 (2009) (prosecution unconstitutionally failed to disclose mitigating information about Cone's drug use at the time of the crime even though Cone himself knew he was high on drugs).[29]

Furthermore, the court failed to consider that disclosure of the half-empty pill bottle would have been powerful corroboration for the defense claim that Mr. Fields had in fact ingested the increased dose, a claim that the Government

---

[29] *See also Strickler v. Greene*, 527 U.S. 263, 284 n. 26 (1999) (rejecting as "insubstantial" the prosecution's contention that examination of a letter witness published in a local newspaper should have alerted defendant to the existence of undisclosed police interviews of witness and holding that prosecution still had *Brady* obligation to disclose information); *Brady*, 373 U.S. at 84 (finding that government violated due process by failing to disclose evidence that Brady's co-defendant was the actual killer, a fact that was known to Brady); *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995) ("[T]he prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge. Simply stated, '[i]f the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it to defense counsel whether a general request is made or whether no request is made.'").

expressly disputed. *See Kyles*, 514 U.S. at 449 n.19 (withheld evidence "would have made the defense's case more plausible and reduced its vulnerability to credibility attack"); *United States v. Bagley*, 473 U.S. 667, 683 (1985) (*Brady* materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled"). *Accord Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 834–35 (10th Cir. 1995) (considering in finding *Brady* materiality that "[t]he nondisclosure of this [suppressed] evidence altered and affected [defendant's] preparation and presentation of his defense at trial").

Finally, the court made no mention of the Government's false assertion that there was no evidence that Mr. Fields ever consumed any of the increased Effexor dose, despite the clearly improper nature of the Government's conduct. *See, e.g.*, *Udechukwu*, 11 F.3d at 1105 ("the prosecutor's persistent theme in closing argument suggesting the nonexistence of" information supporting the defense, when the government knew the opposite to be true, "fatally taint[ed] the trial"); *Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991) (ordering new trial where prosecutor not only failed to disclose facts contrary to her theory of the case, but "then presented testimony in such a way as to suggest the opposite of what she alone knew to be true"). Given the lower court's complete failure to address this

aspect of the claim, there is certainly room to debate whether the claim should have been granted.

### B.    This Court Should Grant COA on Trial Counsel's Ineffectiveness (Ground 7B).

Having dismissed the *Brady* aspect of this claim on the ground that the Government had no disclosure obligation with respect to the Effexor bottle, the district court was obligated to consider Mr. Fields' alternative argument: that trial counsel was ineffective for failing to discover and present this evidence. Yet the district court's entire response to this assertion was that, "assuming counsel was ineffective," Mr. Fields "has failed to establish prejudice." Doc. 125 at 51. The court engaged in no analysis and provided no reasons to support its finding.

Because Mr. Fields demonstrated a reasonable probability that at least one juror would have voted for life had the jury been presented evidence that he took the increased dosage of Effexor prior to the killings, the district court's summary finding to the contrary is at least debatable among jurists. A COA is warranted.

### VII.  REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S DENIAL, WITHOUT A HEARING, OF PETITIONER'S CLAIM THAT THE CUMULATIVE IMPACT OF ERRORS DENIED HIM DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND A RELIABLE SENTENCING HEARING (GROUND 8).

Courts have long recognized that claims of constitutional error are to be considered both individually and cumulatively, and that cumulative error or prejudice may provide a basis for relief whether or not any individual error

warrants relief. *See, e.g.*, *Kyles*, 514 U.S. at 437–38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Cargle*, 317 F.3d at 1224–25 (habeas relief warranted based upon cumulative errors during guilt and penalty phases).

Here, counsel's errors had the cumulative effect of preventing the jury from hearing a powerful mitigation case while simultaneously allowing the jury to consider misleading evidence and improper argument in support of aggravation. In particular, absent counsel's deficient performance, the jury could have heard a mitigation case built not just on a single-episode manic flip, but also on evidence of brain damage that affected Mr. Fields' executive functioning as well as a childhood history of family troubles. At the same time, counsel could have greatly diminished the Government's case by challenging the testimony of its mental health expert and the evidence it presented in support of aggravating circumstances, as well as by objecting to the Government's grossly improper arguments to the jury. Counsel's errors resulted in the jury being presented with a misleading case in support of the aggravating circumstances and a relatively weak case in support of mitigation. Counsel compounded that imbalance by failing to

insist on separate jury verdicts for each murder. Considered cumulatively, there is more than a reasonable probability that at least one juror would have voted to spare Mr. Fields' life absent counsel's many errors.

Because a reasonable jurist could find that each claim of constitutional error discussed above is individually meritorious, it follows that a reasonable jurist could find their cumulative impact invalidates Mr. Fields' death sentence. Indeed, a finding that two or more of Mr. Fields' claims are debatable requires this Court to grant a COA on this cumulative error claim.

## CONCLUSION

Edward Fields is entitled to a COA on his claims, which are supported by extensive pleadings, legal authority, and evidentiary support. Reasonable jurists could certainly debate the district court's dismissal of these claims, particularly where the court resolved material factual disputes without an evidentiary hearing, if not find the district court to have plainly erred. Failure to grant Mr. Fields a COA will result in a violation of due process and his right to appeal. Mr. Fields' request for a COA on the claims set out above should be granted.

Respectfully Submitted,

 /S/ Hunter Labovitz
Hunter Labovitz (PA 204760)
Federal Community Defender Office
 for the Eastern District of Pennsylvania
601 Walnut St., Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Dated: October 2, 2017          Hunter_Labovitz@fd.org

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I, Hunter Labovitz, hereby certify that on this 2nd day of October, 2017, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christopher J. Wilson, Attorney for Respondent

Jeffrey B. Kahan, Attorney for Respondent


/S/ Hunter Labovitz
Hunter Labovitz

**CERTIFICATION THAT MOTION IS FREE FROM VIRUSES**

I, Hunter Labovitz, hereby certify on this 2nd day of October, 2017, that the foregoing Motion for Certificate of Appealability has been scanned for viruses using Symantec Endpoint Protection and is free from viruses; all required privacy redactions have been made per 10th Cir. R. 25.5; and the text of the electronic submission is an exact copy of the paper copy.

/S/ Hunter Labovitz

Hunter Labovitz