**CASE NO. 17-7031**

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Appellee/Respondent, | : | DEATH PENALTY CASE |
| | : | |
| v. | : | D.C. Nos. 6:10-CV-00115-RAW; |
| | : | 6:03-CR-00073-RAW-1 |
| EDWARD LEON FIELDS, JR., | : | |
| | : | |
| Appellant/Petitioner. | : | |
| | : | |

Appeal from the United States District Court for the Eastern District of Oklahoma
Honorable Ronald A. White

**APPELLANT'S OPENING BRIEF**

Oral Argument Requested

> HUNTER LABOVITZ
> Assistant Federal Defender
> Pa. Bar. No. 204760
> KATHERINE ENSLER
> Assistant Federal Defender
> Pa. Bar No. 319029
> Capital Habeas Unit
> Federal Community Defender Office
> for the Eastern District of Pennsylvania
> 601 Walnut St., Ste. 545W
> Philadelphia, PA 19106
> Telephone: (215) 928-0520
>
> Attorneys for Appellant/Petitioner

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iv

I.  THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT AVAILABLE EVIDENCE OF MR. FIELDS'S BRAIN DAMAGE.............7

    A.  Standard of Review ..........................................................................8

    B.  Record References..............................................................................8

    C.  Taking his proffer as true, Mr. Fields has proven that trial counsel ineffectively failed to present evidence of his brain damage...............8

        1.  Deficient Performance.........................................................10

        2.  Prejudice .............................................................................18

            a.  Brain dysfunction evidence in and of itself provides powerful support for a life sentence, as the Supreme Court and this Court have repeatedly found. ............................................................18

            b.  The defense could have used the evidence of Mr. Fields's brain damage to enhance its bipolar-based mitigation presentation in support of the two state-of-mind mitigating circumstances, as well as the "other factors" mitigator. ......................................22

            c.  Presenting Mr. Fields's brain dysfunction to the jury would have strengthened another mitigating factor that the jury unanimously rejected: Mr. Fields "w[ould] not present a future danger to society by being imprisoned for life without possibility of release." ............................................................23

            d.  Presenting evidence supporting that Mr. Fields would make a positive adjustment to prison life also would have refuted the prosecution's argument that Mr. Fields would be dangerous in prison.....................................................................................25

        3.  In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim.  At a minimum, this Court should remand for a hearing..................................................................30

a.    The district court erred in denying Mr. Fields an evidentiary hearing.................................................................................................31

b.    The district court improperly invented hypothetical explanations for trial counsel's inactions that contradicted both her documented intentions at the time of trial and her post-conviction declaration. ...........................................................37

c.    The district court erred both factually and legally in its prejudice analysis.......................................................................43

i.    Erroneous factual determination ......................................44

ii.    Erroneous legal determination ........................................49

II.    THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS'S SOCIAL HISTORY AS A MITIGATING FACTOR. ...............50

A.    Standard of Review ......................................................................51

B.    Record References........................................................................51

C.    Taking his proffer as true, Mr. Fields has proven that trial counsel ineffectively failed to present Mr. Fields's history of family dysfunction and mental illness. ......................................................51

1.    Family Dysfunction Evidence the Jury Did Not Hear ........................52

2.    Deficient Performance.....................................................55

3.    Prejudice ..........................................................................56

4.    In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim.  At a minimum, this Court should remand for a hearing. ...........................................................58

a.    The district court erred in denying Mr. Fields an evidentiary hearing.........................................................................59

b.    Deficient Performance .........................................................59

c.    Prejudice.............................................................................63

III.    THE GOVERNMENT'S INVOCATION OF RELIGIOUS AUTHORITY DURING CLOSING ARGUMENT WAS UNCONSTITUTIONALLY IMPROPER AND PREJUDICIAL; THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING

TO DETERMINE WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT. ..................................................................67

    A.      Standard of Review ..................................................................67

    B.      Record References..................................................................68

    C.      The Government's Unconstitutional Closing Argument ....................68

    D.      Trial Counsel's Ineffectiveness...........................................72

    E.      In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim.  At a minimum, this Court should remand for a hearing..................................................................73

IV.    THE CUMULATIVE IMPACT OF THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND A RELIABLE SENTENCING HEARING. ........................................75

**TABLE OF AUTHORITIES**

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ................................................ 64

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) ......................... 9, 19, 21, 27

*Bennett v. Angelone*, 92 F.3d 1336 (4th Cir. 1996) ........................................ 70-71

*Bennett v. Stirling*, 842 F.3d 319 (4th Cir. 2016) ................................................ 73

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................ 67

*Bussard v. Lockhart*, 32 F.3d 322 (8th Cir. 1994) ................................................ 74

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ..................................... 70, 72, 75

*Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013) ......................................... 70, 72

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998) ............................................................ 70

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991) .......................................... 71

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)............................................ 69, 73

*Fields v. United States*, 129 S. Ct. 1905 (2009) ..................................................... 3

*Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001) .......................................... 58

*Gregg v. Georgia*, 428 U.S. 153, 189 (1976).........................................................67

*Harrington v. Richter*, 562 U.S. 86 (2011) ........................................................... 42

*Hinton v. Alabama*, 571 U.S. 263 (2014) ............................................................. 23

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) ................................................... 72

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ............................. 9, 20, 21, 47

*Jefferson v. Upton*, 560 U.S. 284 (2010) .............................................................. 47

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................. 75

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ................................. *passim*

*Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017) ....................................... *passim*

*Machibroda v. United States*, 368 U.S. 487 (1962) ........................... 31, 32, 35, 44

*Mahorney v. Wallman*, 917 F.2d 469 (10th Cir. 1990) ......................................... 69

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000) ............................................... 64

*McNeill v. Branker*, 601 F. Supp. 2d 694 (E.D.N.C. 2009) ................................... 66

*Milton v. Miller*, 744 F.3d 660 (10th Cir. 2014) ......................................... 31, 34, 45

*Osborn v. Shillinger*, 861 F.2d 612 (10th Cir. 1988) ................................... 36

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999) .................................... 70

*Porter v. McCollum*, 558 U.S. 30, 41 (2009)......................... 10, 18, 49, 64

*Rompilla v. Beard*, 545 U.S. 374 (2005) ........................................... 18

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2001) ................................ 70, 71, 74

*Sears v. Upton*, 561 U.S. 945 (2010) ............................................... *passim*

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................... 23, 64

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ............................... *passim*

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008) ............................... 36

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................... 9, 58, 64

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ........................................... 75

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................... 64

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ............................. *passim*

*United States v. Becker*, 109 F. App'x 264 (10th Cir. 2004) ......................... 31, 32

*United States v. Duran-Salazar*, 307 F. App'x 209 (10th Cir. 2009) ................... 32

*United States v. Estrada*, 849 F.2d 1304 (10th Cir. 1988) ............................. 33, 38

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008) ................................. *passim*

*United States v. Giry*, 818 F.2d 120 (1st Cir. 1987) ............................... 71

*United States v. Gonzalez*, 98 F. App'x 825 (10th Cir. 2004) ............. 32, 38, 44-45

*United States v. Hinson*, 585 F.3d 1328 (10th Cir. 2009) ................................. 67

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................... *passim*

*Williams v. Taylor*, 562 U.S. 362 (2000)......................................... 18, 51

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ................................. 36

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) ......................... 27, 38, 56, 65

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................. 67

*Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015) .......................................... 72-73

**State Cases**

*Malone v. State*, 168 P.3d 185, 209 (Okla. Ct. Crim. App. 2007)..........................71

**Federal Statutes**

18 U.S.C. § 3592 .........................................................................................14, 22

28 U.S.C. § 1291 ............................................................................................... 1

28 U.S.C. § 2253..................................................................................................1

28 U.S.C. § 2254 .......................................................................................... 33, 34

28 U.S.C. § 2255 ....................................................................................... *passim*

**State Statutes**

**Other**

Fed. R. App. P. 4......................................................................................... 1

Muriel Deutsch Lezak et al., *Neuropsychological Assessment* (5th ed. 2012)11, 46, 48

David F. Long, *Issues in Behavioral Neurology and Brain Injury*, in *Neuropsychological Treatment After Brain Injury* (David Ellis & Anne-Lise Christensen eds., 1989) ...............................................................................24

Michael Franzen & Glen Getz, *Screening for Brain Impairment* 22 (3rd ed. 2010)46

Esther Strauss et al., *A Compendium of Neuropsychological Tests* (3rd ed. 2006) 11

Stuart C. Yudofsky & Robert E. Hales, *The American Psychiatric Press Textbook of Neuropsychiatry* 181-82 (3rd ed. 1997)...............................................................48

## PRIOR OR RELATED APPEALS

This Court affirmed Appellant Edward Fields's convictions and sentence on direct appeal. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008).

## JURISDICTION

After the Supreme Court denied certiorari on Mr. Fields's direct appeal on April 6, 2009, he timely filed a motion for post-conviction relief under 28 U.S.C. § 2255, which conferred jurisdiction on the district court.  The district court denied relief on December 15, 2016, ROA 12:566-619,[1] and denied Mr. Fields's Motion to Amend Judgment on March 15, 2017, ROA 12:643-49.  Mr. Fields timely filed his notice of appeal, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B) on May 12, 2018.  This Court granted Mr. Fields a certificate of appealability on the grounds addressed below. Accordingly, this Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

## STATEMENT OF ISSUES

I.      Whether Mr. Fields's trial counsel ineffectively failed to present evidence of his organic brain damage;

---

[1] The record of Mr. Fields's district court trial and post-conviction proceedings was transmitted electronically to this Court in 13 numbered volumes. Volumes 1 through 8 contain the pleadings, orders, and transcripts from trial, and Volumes 9 through 13 contain the pleadings, orders, and transcripts of the § 2255 proceedings below.  Citations to the record will be to "ROA," followed by the appropriate volume number, followed by the appropriate page numbers that appear in the bottom right hand corner of the PDF volume. Thus, a citation to page 75 of the PDF document transmitted to this Court as Volume 7 would be cited as "ROA 7:75."

II.     Whether Mr. Fields's trial counsel ineffectively failed to present his social

history as a mitigating factor;

III.    Whether the Government's penalty phase closing argument violated Mr.

Fields's constitutional rights; and

IV.     Whether the cumulative effect of these errors denied Mr. Fields due process,

effective assistance of counsel, and a reliable sentencing hearing.

## STATEMENT OF THE CASE[2]

Edward Fields shot and killed Charles and Shirley Chick at a campground in

Ouachita National Forest in 2003.  Mr. Fields accepted responsibility for killing

the Chicks and pled guilty to capital murder in the United States District Court for

the Eastern District of Oklahoma in 2005.  His lead attorney Julia O'Connell had

limited death penalty experience and lacked the legal assistance usually seen in

federal capital trials.  She was overwhelmed by the workload and responsibility of

handling such a complex sentencing hearing primarily on her own, and as a result,

neglected to properly present readily available mitigation evidence about Mr.

Fields's brain damage and family dysfunction, or meaningfully challenge the

prosecution's case.[3]   Following the sentencing hearing, the jury imposed a death

---

[2] The specific facts relevant to each claim are set forth in the claim's respective argument section.

[3] Because the district court analyzed the effectiveness of Mr. Fields's trial counsel based only on Ms. O'Connell's actions or decisions, references to "counsel" or "trial counsel" in this pleading are solely to Ms. O'Connell.

Appellate Case: 17-7031    Document: 010110050306    Date Filed: 09/10/2018    Page: 10

sentence.   Although counsel attempted to explain the murders as an aberration resulting from a manic episode, not a single juror found any mental health mitigating factor, but every juror found that Mr. Fields would be a future danger in prison.

On February 25, 2008, this Court affirmed Mr. Fields's convictions and sentences on direct appeal.  *Fields*, 516 F.3d at 928.  The Supreme Court denied a petition for a writ of certiorari on April 6, 2009.  *Fields v. United States*, 129 S. Ct. 1905 (2009).

Mr. Fields then timely filed a motion to vacate sentence under 28 U.S.C. § 2255.  ROA 9:28.  He supported the motion with numerous exhibits, including a declaration from trial counsel detailing the pressures she was under and the limitations of her investigation, preparation, and presentation, as well as declarations from multiple mental health experts detailing Mr. Fields's brain damage and troubled upbringing that counsel did not present.  *See* ROA 9:166-202. The court then granted limited document discovery for both parties, but denied both sides' requests for depositions, among other things.  ROA 10:670-80.  With the court's permission, Mr. Fields then filed an amended motion that included declarations from co-counsel and additional mental health experts.  *See* ROA 11:495-97, 504-611.  Following briefing on the Government's motion for summary judgment, ROA 12:14, the district court denied Mr. Fields's request for a hearing,

denied all his claims, and did not grant a certificate of appealability on any claim. ROA 12:566-618.  The district court also denied Mr. Fields's Motion to Amend Judgment pursuant to Rule 59(e) related to counsel's ineffectiveness for failing to present Mr. Fields's social history.  *See* ROA 12:643-49.

On March 9, 2018, this Court granted COA on Grounds 1(C) and 1(E), Ground 4, Ground 5, and Ground 8 of Mr. Fields's Motion, and noted that the COA "granted on these issues includes whether an evidentiary hearing should have been provided, to the extent such a hearing would be necessary to resolve the issue."  Case Management Order at 2 (Mar. 9, 2018).

In denying Mr. Fields any relief, the district court made the following rulings, which Mr. Fields presents for review:

- counsel was not ineffective for her failure to present evidence of Mr. Fields's brain damage, ROA 12:574-585;

- counsel was not ineffective for her failure to present evidence of his social history, ROA 12:597-99; *see also* ROA 12:643-49 (opinion and order denying Rule 59(e) motion); and

- appellate counsel was not ineffective for failing to appeal the prosecutor's closing argument drawn from the Book of Daniel, ROA 12:599-613.

## SUMMARY OF THE ARGUMENT

Edward Fields was denied his Sixth Amendment right to the effective assistance of counsel.  Trial counsel performed deficiently in failing to present evidence of Mr. Fields's brain damage, failing to present his dysfunctional social

4

history as a mitigating factor, and failing to object to the Government's penalty phase closing argument in which it exhorted the jury to sentence Mr. Fields to death based on religious law and biblical scripture. Whether viewed individually or collectively, had these failures not taken place, there is a reasonable probability that at least one juror would have voted for a life sentence.

Because this is a federal criminal case, Mr. Fields's § 2255 proceedings were his only opportunity to raise trial counsel's ineffectiveness. In those proceedings, he proffered the mitigation evidence that counsel should have presented, but failed to present, including evidence of his brain damage and his troubled upbringing. Mr. Fields also proffered a declaration from trial counsel in which she frankly admitted the pressures she was under and the limitations of her preparation and presentation. This record demanded resolution through a hearing, but the district court refused to conduct such a hearing. The court's truncated review not only violates the statutory requirements of § 2255, but undermines the bedrock constitutional right to counsel that is at the heart of Mr. Fields's claims.

Under § 2255, the district court "shall" hold an evidentiary hearing on the prisoner's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In making that determination, the district court must accept a petitioner's factual allegations as true. *United States v. Barrett*, 797 F.3d 1207, 1224 (10th Cir. 2015)

(citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)) (§ 2255 capital case on appeal following denial of hearing and denial of COA on all issues in district court).  Here, the district court did neither: it did not accept Mr. Fields's factual allegations as true nor did it conduct an evidentiary hearing even though it could not conclusively determine that Mr. Fields was entitled to no relief, assuming his allegations were true.

Instead, without hearing from counsel, the court conjured up unsupported reasons why trial counsel limited her presentation of mitigating evidence and failed to challenge the foundations of the Government's case (even when counsel's contemporaneous trial writings and her own declaration contradicted those reasons).  The court had no justification for rejecting the post-conviction statement of Ms. O'Connell, the Federal Defender for the Eastern and Northern Districts of Oklahoma, particularly where the trial record and documents in trial counsel's file as well as other post-conviction declarations corroborated her declaration.

Even if the court had credibility concerns, it should not have resolved those concerns absent a hearing.  Further, without hearing from a single witness, the district court resolved all factual disputes, including disputes among experts on medical and scientific matters, against Mr. Fields.  A remand for a hearing would be consistent with § 2255's requirements and case law from the Supreme Court

and this Court, as well as precedent stressing the need for heightened court scrutiny

of trial counsel's actions in capital cases.

**ARGUMENT**

**I.    THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT AVAILABLE EVIDENCE OF MR. FIELDS'S BRAIN DAMAGE.**

Trial counsel knew that, at the time of the offense, Edward Fields suffered

from frontal lobe brain dysfunction that impaired his judgment, reasoning, and

decision-making.  Counsel thought it was important that the sentencing jury also

know this fact.  But counsel still did not tell the sentencing jury about Mr. Fields's

dysfunction, which would have supported multiple mitigating circumstances,

including that Mr. Fields would not be a future danger in prison.  Rather, counsel

elicited from the prosecution's expert that Mr. Fields did *not* have any brain

damage.

In post-conviction proceedings, Mr. Fields presented a detailed proffer

showing counsel's deficient performance and prejudice.  That proffer, which the

district court had to take as true in deciding the Government's motion for summary

judgment, entitled Mr. Fields, at a minimum, to an evidentiary hearing on this

claim.  Instead, the district court summarily – and erroneously – denied this claim

on the merits.

### A.    Standard of Review

Where "the district court d[id] not hold an evidentiary hearing, but rather denie[d] the motion as a matter of law upon an uncontested trial record," the claim is reviewed de novo. *Barrett*, 797 F.3d at 1213 (quoting *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011)).

### B.    Record References

Mr. Fields raised this claim in his original and amended § 2255 motions, as well as his supporting and reply pleadings. ROA 9:50-65, 73-80, 542-50, 555-60; ROA 10:33-39, 41-43; ROA 11:36-51; 59-66; ROA 12:508-31, 533-38. The district court denied relief. ROA 12:574-585.

### C.    Taking his proffer as true, Mr. Fields has proven that trial counsel ineffectively failed to present evidence of his brain damage.

Because Mr. Fields is a federal prisoner proceeding under 28 U.S.C. § 2255, the district court was required to hold an evidentiary hearing on this claim "[u]nless the motion and the files and records of the case conclusively show[ed] that [he was] entitled to no relief." 28 U.S.C. § 2255(b). In making this determination, the district court had to accept Mr. Fields's allegations as true. *Barrett*, 797 F.3d at 1224. If those allegations would merit relief if proven, then the court could deny a hearing on this claim only if the record conclusively refuted Mr. Fields's allegations. *See, e.g.*, *id.* at 1228 (record must "necessarily establish"

8

that movant not entitled to relief in order to bar an evidentiary hearing).  The district court ignored this standard and followed none of its requirements.

To merit relief on an ineffective assistance of trial counsel claim, a defendant must show: (1) deficient performance, "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984); and (2) prejudice, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   Mr. Fields's proffer satisfied this standard.

This Court has found that evidence of a defendant's brain damage is powerful mitigation in a capital sentencing proceeding because it can help explain a defendant's behavior, lessen a defendant's moral culpability, and humanize a defendant.  *Littlejohn v. Trammell*, 704 F.3d 817, 865 (10th Cir. 2013) (*Littlejohn I*); *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012); *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).  Trial counsel's failure to present Mr. Fields's brain dysfunction to his jury prejudiced Mr. Fields because trial counsel could have "sketched a more sympathetic figure of Mr. [Fields], one less deserving of death."  *Hooks*, 689 F.3d at 1205.

9

### 1.    Deficient Performance

It is well-settled that trial counsel representing a brain-damaged capital defendant should ensure that the sentencing jury learns that fact. *See, e.g.*, *Sears v. Upton*, 561 U.S. 945, 949 (2010) (finding deficient performance for not presenting psychological testing results indicating "that [defendant] had substantial deficits in mental cognition and reasoning"); *Porter v. McCollum*, 558 U.S. 30, 36, 41 (2009) (per curiam) (finding deficient performance for failing to present evidence that "psychological assessments" revealed that defendant had a "brain abnormality," which is the "kind of troubled history . . . relevant to assessing a defendant's moral culpability").

Here, the trial record, counsel's trial files, and Mr. Fields's post-conviction proffer show that trial counsel intended to present Mr. Fields's brain damage as mitigation but unreasonably failed to do so.  This failure constitutes deficient performance under *Strickland*.

Almost a year before trial, defense expert neuropsychologist Dr. Michael Gelbort told trial counsel that his comprehensive neuropsychological testing and evaluation showed that Mr. Fields suffered from brain damage in his frontal lobes. ROA 11:507.[4]  For example, Mr. Fields had impaired performance on the Halstead

---

[4] Trial counsel first retained psychiatrist Dr. George Woods to assist with mental health issues.  Based on his review of Mr. Fields's history, Dr. Woods recommended that neuropsychological testing be done to determine whether Mr.

Category Test, which, "[o]f the tests in Halstead's battery, . . . is generally recognized as the most sensitive to the presence of brain damage *per se*, regardless of its nature or location."  Muriel Deutsch Lezak et al., *Neuropsychological Assessment* 625 (5th ed. 2012).  Mr. Fields also had poor performance on the Trail Making Test-Part B, which is a "particularly . . . useful indicator of neurological integrity in both adults and children," Esther Strauss et al., *A Compendium of Neuropsychological Tests* 669 (3rd ed. 2006), and "is highly vulnerable to the effects of brain injury."  Lezak et al., *supra*, at 424.

Dr. Gelbort informed trial counsel that Mr. Fields's "neurocognitive impairments affect his ability to adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions," and also explained that "[s]tressful situations exacerbate Mr. Fields's inability to control his actions and solve problems in a reasonable manner."  ROA 11:507.

Based on the neuropsychological testing, counsel then advised the court in two ex parte pre-trial pleadings that Mr. Fields had "frontal lobe impairment in his brain functioning," ROA 6:45, that this impairment had "overwhelming importance . . . for [Mr. Fields's] mitigation case," ROA 6:55 & n.7, and that Mr.

---

Fields might suffer from brain dysfunction.  ROA 6:54.  *Cf.* ROA 9:12 (district court granting Mr. Fields's motion to unseal this ex parte trial document). Counsel then retained Dr. Gelbort to conduct that testing, which Dr. Woods, as a psychiatrist, could not conduct.

Fields's brain damage "[wa]s of such a compelling nature" that a trial presentation regarding "the existence of physical brain impairment may be a mitigating factor that would cause a jury to render a life verdict rather than a death verdict."  ROA 6:46-47.[5]  Trial counsel also shared the neuropsychological findings with the Government in a pre-trial attempt to settle the case with a life sentence.  *See* ROA 1:436.  In addition to these court filings and settlement discussions, counsel's pre-trial emails show that she decided to present "frontal lobe impairment" evidence as part of the mitigation case.  *See, e.g.*, ROA 12:122,124.

Ms. O'Connell's post-conviction declaration corroborates that the "[p]resentation of [Mr. Fields's] brain impairments would have been an important part of [the] mitigation presentation."  ROA 11:164.   In *Barrett*, this Court relied on trial counsel's post-conviction affidavit to find that the defense made "an informed strategic choice" about how to counter a government expert.  797 F.3d at 1215-16.  Similarly, this Court should credit Ms. O'Connell's declaration that the defense had planned to present evidence of Mr. Fields's brain impairment to the sentencing jury.  In deciding whether Mr. Fields should have been granted an evidentiary hearing, this Court – like the district court – is required to accept trial counsel's averments as true.  *See id.* at 1224.

Trial counsel could have presented Mr. Fields's brain impairment through

---

[5] On January 7, 2016, the district court granted Mr. Fields's motion to unseal these two documents. *See supra* n.4.

multiple available experts.  For instance, the records reveal that trial counsel knew that Dr. Gelbort was available and willing to testify about Mr. Fields's brain dysfunction.  ROA 12:556 (email from trial counsel to Dr. Gelbort three days before voir dire began confirming date for his trial testimony); ROA 12:497 (email from Dr. Gelbort to trial counsel during voir dire confirming his availability on proposed date as well as additional date); *cf.* ROA 11:508 (Dr. Gelbort's declaration confirming conversations with trial counsel).   Indeed, trial counsel sent Dr. Gelbort an expert services contract that confirmed that the defense needed him to testify.  *See* ROA 12:558-60.  And yet, when the trial actually took place, counsel never called Dr. Gelbort – or any other expert – to discuss Mr. Fields's brain damage.

Had the defense presented Dr. Gelbort at trial, he "would have told the jury that [his] neuropsychological evaluation showed that Mr. Fields has brain dysfunction focused in the frontal lobe" and "could have explained that concept and the resulting impairments to the sentencing jury."  ROA 11:508.

Even though trial counsel confirmed in her declaration that she "plan[ned] . . . to call Dr. Gelbort," ROA 11:163, she failed to do so.  She admitted that she "had no strategy or tactic for abandoning" a presentation about Mr. Fields's brain damage, but was "overwhelmed with the trial in progress."  ROA 11:164.  Being overwhelmed and overburdened is not a reasonable basis for failing

to present crucial mitigation evidence.

Further, a defense expert called at trial – psychiatrist Dr. Bradley Grinage – would have testified about the connection between Mr. Fields's brain damage and his criminal behavior had trial counsel properly prepared him and had he been asked. ROA 11:181. Because trial counsel only provided Dr. Grinage with an "excerpt of [Dr. Gelbort's] preliminary report," ROA 12:444, Dr. Grinage did not have adequate information about Mr. Fields's brain impairment. ROA 11:180-81.

While trial counsel asked Dr. Grinage to testify about the two state-of-mind mitigating factors,[6] she did not ask Dr. Grinage to consider the impact Mr. Fields's cognitive impairments had on either his behavior or their role in establishing these two mitigators. *See* ROA 3:441. Had Dr. Grinage been properly consulted and then questioned at trial, he could have explained to the sentencing jury that Mr. Fields has "organic brain damage, focused in his frontal lobes, . . . which control impulses, weigh options, deliberate and consider consequence, . . . [and which] could have explained some of his behaviors that the prosecution portrayed as the product of his psychopathy." ROA 11:180-81.

Trial counsel did provide the defense's other testifying expert, neuropsychiatrist Dr. George Woods, with the full neuropsychological report

---

[6] *See* 18 U.S.C. § 3592(a)(1) (defendant's "capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired"), and § 3592(a)(6) (defendant "committed the offenses under severe mental or emotional disturbance").

14

describing Mr. Fields's brain damage.  As Dr. Woods made clear in his post-conviction declaration, he considered Mr. Fields's frontal lobe impairment to be "highly significant" "[b]y itself" because "[p]eople with frontal lobe impairments . . . experience impairments in social judgment. Such people act out without making the types of judgments that persons with intact frontal lobe functioning can make."  ROA 11:172.

And yet, trial counsel did not ask Dr. Woods to testify about these impairments.[7]  In his post-conviction declaration, Dr. Woods explained that "the presentation of brain damage dropped out of the picture in the lawyers' last minute and rushed preparations during trial."  ROA 11:172.   Similar to counsel's unreasonable lapse with Dr. Gelbort, "rushed preparations" is not a strategic basis for omitting mitigation.

Counsel's failure was all the more unreasonable because she knew that evidence of brain damage would have strengthened the defense she presented: that Mr. Fields had undergone a medicine-induced manic flip prior to committing the offense. *See*, *e.g.*, ROA 5:105-06.  At the pre-trial settlement meeting with the Government, trial counsel confirmed that, far from being inconsistent with the manic flip-based trial defense, Mr. Fields's "[i]njury to the frontal lobe, which

---

[7] In the district court proceedings, the Government agreed that Dr. Woods, like Dr. Grinage, "could have relied on information he received from [Dr.] Gelbort" during his testimony if counsel had asked questions about Mr. Fields's brain dysfunction.  ROA 13:69 (citing, *inter alia*, Fed. R. Evid. 703).

15

regulates impulse control and judgement [sic], would have undoubtedly complicated any mania suffered by the defendant." ROA 1:436. Ms. O'Connell's post-conviction declaration confirms that the defense did not view "the presentation of both manic-flip and organic brain damage . . . [as] mutually exclusive." ROA 11:163. Had counsel properly prepared Dr. Grinage, he could have testified that Mr. Fields's brain damage "exacerbated the bipolar disease from which Mr. Fields suffers." ROA 11:182. Dr. Woods could have offered similar testimony but for counsel's neglect. ROA 11:172. Trial counsel's failure to even prepare Dr. Grinage or Dr. Woods to testify about Mr. Fields's brain dysfunction based on the neuropsychological findings was deficient even apart from her failure to call Dr. Gelbort.

In short, trial counsel knew Mr. Fields suffers from brain damage, recognized the importance of presenting this evidence to the jury, and had multiple defense experts available to testify about Mr. Fields's brain impairment if asked. Under these circumstances, her inaction was unreasonable.

Instead of presenting evidence that "garners the most sympathy from the jurors," *Barrett*, 797 F.3d at 1231, trial counsel presented bipolar disorder evidence, *see* ROA 3:394-431; Tr. at 2775-2777,[8] and personality disorder

---

[8] Undersigned counsel confirmed with the Clerk of Courts that six pages from the trial transcript are missing from Volume 3 of the Record on Appeal.

evidence, *see* ROA 4:91-139, both of which this Court has recognized as

"unhelpful in mitigation." *Barrett*, 797 F.3d at 1231 (citing *Grant v. Trammell*,

727 F.3d 1006, 1021 (10th Cir. 2013)).

Counsel faced a similar set of options as counsel in *Littlejohn I*. There, the

Court discussed capital counsel's obligation regarding presentation of "powerful"

brain damage evidence in the penalty phase:

> [W]here there are credible, reasonably discernable clues that a capital
> defendant's circumstances will support a mitigation theory based on
> organic brain damage, it is at the core of a defense counsel's
> constitutional responsibilities . . . , ordinarily, to present such evidence
> to the jury. . . . Given the powerful mitigative effect of such evidence,
> reasonably competent counsel would not have settled for some
> mitigation case based on mental-health evidence . . . , regarding
> largely behavioral abnormalities, if the organic-brain-damage option
> was available; not only is this behavioral-abnormality evidence
> different in kind from evidence concerning organic brain damage, but,
> critically, in most instances it also will be of significantly lesser
> mitigative value.

704 F.3d at 860 n.23. The Court further noted that, "[b]ecause of [brain damage's]

central significance . . . , ordinarily it would be 'patently unreasonable for

[counsel] to omit this evidence from [the] case for mitigation.'" *Id.* at 860 (quoting

*Smith*, 379 F.3d at 942).

The trial record and counsel's trial files combined with Mr. Fields's post-

conviction proffer show that trial counsel had no strategic reason for not presenting

---

Because Mr. Fields relies on three of those pages in this argument, he has filed a
contemporaneous motion to supplement the record.

evidence of brain damage, and in fact, intended to do so.  Counsel had a core

constitutional responsibility to inform Mr. Fields's sentencing jury about his brain

damage.  Her "patently unreasonable" omission constituted deficient performance.

### 2.    Prejudice

In assessing *Strickland* prejudice, a court must "consider the totality of the

available mitigation evidence – both that adduced at trial, and the evidence

adduced in the [§ 2255] proceeding – and reweigh it against the evidence in

aggravation."  *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 562 U.S. 362,

397-98 (2000)).  Here, trial counsel's omission of brain damage evidence

prejudiced Mr. Fields in several ways, as detailed below.

### a.    Brain dysfunction evidence in and of itself provides powerful support for a life sentence, as the Supreme Court and this Court have repeatedly found.

In *Porter v. McCollum*, the Supreme Court relied on post-conviction

neuropsychological test results showing the defendant's "brain abnormality" to

find prejudice because the evidence "would [have] humanize[d] Porter [and]

allow[ed] the [jury] to accurately gauge his moral culpability."  558 U.S. at 41.

The Supreme Court likewise relied on post-conviction neuropsychological testing

showing "organic brain damage" and "significantly impair[ed] …. cognitive

functions" as part of a *Strickland* prejudice finding in *Rompilla v. Beard*, 545 U.S.

374, 392 (2005).  Most recently, in *Sears v. Upton*, the Supreme Court remanded

the case where trial counsel failed to present brain damage evidence, holding that

"[a] proper" prejudice analysis must "take[] into account" the defendant's

"significant frontal lobe abnormalities" as revealed on psychological tests.  561

U.S. at 956.

This Court has found similarly.  In *Smith v. Mullin*, this Court relied on post-

conviction neuropsychological testing showing brain damage in finding prejudice

because that "is exactly the sort of evidence that garners the most sympathy from

jurors."  379 F.3d at 942.  The *Smith* Court supported its conclusion with reference

to empirical studies indicating that capital juries are persuaded by evidence such as

"organic brain problems."  *Id.*  In *Anderson v. Sirmons*, this Court found prejudice

based on Dr. Gelbort's[9] post-conviction neuropsychological testing showing brain

damage to the frontal lobe, the area of the brain that "affect[s] . . . reasoning,

problem solving and judgment."  476 F.3d at 1147.  The Court "c[ould] not

overstate the importance" of presenting frontal lobe brain dysfunction because

such evidence "serves to humanize a defendant and explain why an otherwise kind

and loving family man can come to participate in a violent, murderous event."  *Id.*

Again relying on Dr. Gelbort's neuropsychological finding of frontal lobe brain

damage, this Court in *Hooks v. Workman* found prejudice where the evidence

would have diminished the defendant's moral culpability, "humaniz[ed], . . .

---

[9] Brief for Appellant at 37, *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) (No. 04-6397) (identifying Dr. Gelbort as the neuropsychologist).

explain[ed] [and] individualize[d]" the defendant.  689 F.3d at 1205; *see also*

*Littlejohn I*, 704 F.3d at 864 (remanding for an evidentiary hearing on trial

counsel's failure to present brain damage as evidenced by neuropsychological

testing because  "[e]vidence of organic mental deficits ranks among the most

powerful types of mitigation evidence available").[10]

In *United States v. Barrett* – a case identical to Mr. Fields's case

procedurally – this Court, relying on *Smith*, *Littlejohn I*, and *Hooks*, remanded a

capital § 2255 case for an evidentiary hearing on trial counsel's failure to present

brain damage because neuropsychological test findings of brain damage impairing

judgment were "most important" to the prejudice analysis.  797 F.3d at 1230-31.

Here, as in *Barrett*, counsel omitted evidence that is among the most

persuasive types of mitigation evidence, particularly in comparison to the case the

jury heard.  *See, e.g.*, *id.* at 1231.  The qualitative difference between what counsel

presented and what counsel could have presented is a strong basis for a remand to

determine if Mr. Fields can demonstrate prejudice.  Specifically, available experts

could have testified about Mr. Fields's brain damage and how it interfered with his

judgment, reasoning, and behavior.  *Compare id.* at 1230 ("[T]ests [the

neuropsychologist] administered . . . indicated that Defendant's executive

---

[10] *Cf. Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017) (*Littlejohn II*) (finding no prejudice where the specific evidence of brain damage developed at the post-remand evidentiary hearing was less compelling compared to the pre-remand proffer).

functioning – which involves the ability to reason, anticipate consequences to actions, and respond to new information and act accordingly – was significantly impaired. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.'"), *with* ROA 11:506-07 (Dr. Gelbort declaring that Mr. Fields's "neurocognitive impairments affect his ability to adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions. Stressful situations exacerbate Mr. Fields's inability to control his actions and solve problems in a reasonable manner.").

Even the government's trial neuropsychologist Dr. J. Randall Price testified that frontal lobe dysfunction reflects "[d]amage [to] the cells of the brain in that part of the brain that has a resulting consequence in their behavior, thinking, [and] emotion." ROA 4:344-45. All of this expert testimony would have humanized Mr. Fields and explained why he "c[a]me to participate in a violent, murderous event." *Anderson*, 476 F.3d at 1147; *accord Hooks*, 689 F.3d at 1207; *Smith*, 379 F.3d at 943. Such explanation would have been particularly important here because the prosecution characterized Mr. Fields as someone who "chose to do evil." ROA 5:116.

        **b.**        **The defense could have used the evidence of Mr. Fields's brain damage to enhance its bipolar-based mitigation presentation in support of the two state-of-mind mitigating circumstances, as well as the "other factors" mitigator.**[11]

Both Dr. Woods and Dr. Grinage testified in support of the impaired capacity and disturbance mitigating factors. ROA 3:431 (Dr. Grinage); ROA 4:144 (Dr. Woods). In closing, trial counsel urged the jury to find and consider those two factors as a basis for a life sentence. ROA 5:101, 107. But the jury unanimously rejected both factors. ROA 1:959; ROA 5:147-48.

Had counsel asked Dr. Woods, he would have explained to the sentencing jury that, "[i]f this [frontal lobe brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields's already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." ROA 11:172. Dr. Woods has declared that "there had been favorable consideration given earlier in the case to the presentation of organic brain damage or dysfunction as a supplement to my opinion regarding manic switch." *Id.* The *Barrett* Court relied on Dr. Woods's similar comorbidity finding that frontal lobe impairments are known to be a foundation for disinhibition, impaired judgment, and grandiosity found in bipolar disorder. 797 F.3d at 1230-31. Likewise, had counsel asked Dr. Grinage, he could have testified that Mr.

---

[11] *See* 18 U.S.C. § 3592 (a)(1) (impaired capacity), (a)(6) (disturbance), & (a)(8) (other factors).

Fields's brain damage "exacerbated the bipolar disease from which Mr. Fields suffers." ROA 11:182.

Because Mr. Fields's brain dysfunction impacted his behavior at the time of the crime, presentation of that evidence would have increased the chances that at least one juror would have accepted the defense experts' trial opinions on the impaired capacity and/or disturbance statutory mitigating factors and voted for a life sentence. Prejudice is established in such circumstances. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275-76 (2014) (per curiam) (finding prejudice where jury did not believe defense expert's trial testimony and additional expert testimony from post-conviction proceedings would have impacted jury's decision making).

> **c.  Presenting Mr. Fields's brain dysfunction to the jury would have strengthened another mitigating factor that the jury unanimously rejected: Mr. Fields "w[ould] not present a future danger to society by being imprisoned for life without possibility of release."[12]**

The Supreme Court has long held that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986). Yet the only evidence counsel presented in support of this mitigator was a single lay witness who testified that Mr. Fields did not fight back when he was attacked during pre-trial detention. ROA 4:47-71 (Mr.

---

[12] ROA 1:962; ROA 5:149-50.

Fields's pre-trial cellmate describing incident). Accordingly, counsel's only argument for the positive prison adjustment mitigator was that Mr. Fields's response during the pre-trial fight "gives you insight into how Ed Fields will not be a danger to society if he's in prison for the rest of his life." ROA 5:109. The jury unanimously rejected the mitigator. ROA 1:962; ROA 5:149-50.

Evidence explaining Mr. Fields's frontal lobe dysfunction would have provided strong support for the "positive prison adjustment" mitigator. "The importance of a structured environment for patients with frontal-system dysfunction is well known,"[13] and prison is "[t]he ultimate in structured environment," as the Government conceded at trial. ROA 5:93. Furthermore, but for counsel's omission, Dr. Woods could have provided critical testimony on this subject. For instance, in response to an unrelated question, Dr. Woods observed that Mr. Fields has "been able to function very successfully in very structured situations. There's no question about that. The greater the structure, the better he does." ROA 4:154-55. Dr. Woods also explained that impairments in thinking and problem solving can be controlled when "a person's environment is extremely structured." ROA 4:122-23. Dr. Woods supported his opinion by referring to the "two times in Mr. Fields' life that we see him functioning on the job pretty well.

---

[13] David F. Long, *Issues in Behavioral Neurology and Brain Injury*, in *Neuropsychological Treatment After Brain Injury* 62 (David Ellis & Anne-Lise Christensen eds., 1989).

When he's in the service, in the Navy on a ship, with that armed services structure and when he's working as a correctional officer. Again, these very structured jobs." ROA 4:123.

That Mr. Fields "function[ed] very successfully" in structured workplaces that regulated his impairments both corroborates the nature of his brain damage and indicates that he would likewise function well in prison, the ultimate structured environment. But trial counsel made no effort to develop and present expert testimony demonstrating that Mr. Fields's brain damage would have supported the "positive prison adjustment" mitigator.

Had trial counsel explained to the jury through expert testimony how prison's structure regulates the behavioral issues stemming from Mr. Fields's brain impairment, there is a reasonable probability that at least one juror would have voted for a life sentence.

> **d.     Presenting evidence supporting that Mr. Fields would make a positive adjustment to prison life also would have refuted the prosecution's argument that Mr. Fields would be dangerous in prison.**

As this Court recognized on direct appeal, the government "addressed future dangerousness specifically in terms of the prison setting." *Fields*, 516 F.3d at 943. This Court has "characterized a petitioner's potential for continued dangerousness, even if incarcerated, as 'perhaps [the] most important aggravating circumstance' that juries consider in weighing the death penalty." *Littlejohn II*, 875 F.3d at 564

25

(quoting *Grant*, 727 F.3d at 1017).

At trial, the prosecution introduced extensive evidence to attempt to prove this aggravator. *See, e.g.*, ROA 3:322 (Mr. Fields's mother was scared of him); ROA 3:327-28 (Mr. Fields physically and verbally threatened his sister); ROA 3:373-76, 383 (Mr. Fields physically and verbally abused his ex-wife);[14] ROA 3:460-62 (prosecution cross-examining Dr. Grinage about Mr. Fields's purported antisocial personality disorder); ROA 4:231 (Government rebuttal witness testifying that Mr. Fields told her "that he had some sociopathic tendencies"); ROA 4:391-92 (Government expert Dr. Price contending that Mr. Fields has antisocial personality traits).

The prosecution then argued that Mr. Fields would be a future danger in prison: "Future dangerous[ness]? Which one of us would want to be in a cell next to someone who is capable of coldly attacking two innocent people who had done nothing to him?" ROA 5:132. On direct appeal, this Court noted the "effective[ness]" of this argument. *Fields*, 516 F.3d at 942. The jury unanimously found this aggravating factor. ROA 1:957; ROA 5:146.

Trial counsel could have used the same brain damage-based evidence supporting Mr. Fields's amenability to prison's structure to counter the

---

[14] The prosecution argued that a future dangerousness instruction was warranted in part because of "the acts of domestic violence against [Mr. Fields's] family which were revealed to the jury during cross-examination of defense witnesses." ROA 1:911.

26

prosecution's future dangerousness evidence and argument, including the "devastating . . . [and] highly pejorative characterization"[15] of Mr. Fields as "a sociopath . . . [who] used and discarded people."[16] *See, e.g.*, *Littlejohn I*, 704 F.3d at 867 ("the continuing-threat aggravator . . . could have been diminished significantly by evidence of a treatable organic brain disorder"); *Anderson*, 476 F.3d at 1144 ("Anderson's [frontal lobe] brain deficits affect his reasoning, problem solving, and judgment. These deficits can be perceived by lay persons as 'meanness' or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system."); ROA 11:181-82 (Dr. Grinage declaring that "[t]he presence of such organic deficits [in the frontal lobes] could have explained some of [Mr. Fields's] behaviors that the prosecution portrayed as the product of his psychopathy").

Additionally, brain damage evidence would have addressed a concern that this Court raised on direct appeal that "the circumstances of the murders themselves" would lead Mr. Fields to "act [] out the dangerous personal characteristics" in prison. *Fields*, 516 F.3d at 943. This Court found that those circumstances do not "suggest[] an inherently one-time occurrence" or an "abrupt isolated course of conduct" that "would not likely recur." *Id.* But trial counsel

---

[15] *Wilson v. Sirmons*, 536 F.3d 1064, 1091 (10th Cir. 2008), *opinion reinstated sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009).

[16] ROA 5:116.

could have shown that the brain impairment-based violence and judgment problems Mr. Fields exhibited in the community "would not likely recur" in prison had she developed expert testimony discussing the regulating effect of a structured setting on Mr. Fields's frontal lobe impairment.  As explained above, Dr. Woods offered such testimony in a different context,[17] but counsel made no attempt to connect that testimony to refuting the future-dangerousness aggravator.

As this Court already noted, "[o]ther than the circumstances of the murders themselves, the government's case on future dangerousness was not particularly strong."  *Fields*, 516 F.3d at 943.  Had counsel explained why Mr. Fields's brain damage made him unlikely to "act [] out the dangerous personal characteristics" in prison, the Government's case for future dangerousness would have been all the weaker.  If trial counsel undermined the future dangerousness aggravating factor with evidence that prison structure could regulate Mr. Fields's brain-based behavioral issue, there is a reasonable likelihood at least one juror would have voted for life.

This Court has recognized that a proper prejudice analysis accounts for the "prosecution's response" to the omitted mitigation.  *Littlejohn II*, 875 F.3d at 553 (quoting *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013)); *Barrett*, 797

---

[17] *See, e.g.*, ROA 4:122-23 (Dr. Woods's testimony that impairments in thinking and problem solving can be controlled when "a person's environment is extremely structured"); ROA 4:154-55 (Dr. Woods testifying that Mr. Fields responded well to a structured environment).

28

F.3d at 1231 (same). But that is just one more reason why this case should be remanded for an evidentiary hearing where the Government can present evidence in response and Mr. Fields can have the opportunity to challenge that evidence.

On the current record, accepting Mr. Fields's proffer as true and drawing the inferences favorable to him, the presentation of Mr. Fields's brain damage evidence would not be the "two-edged sword" that this Court has found in cases like *Littlejohn II*. 875 F.3d at 560. Unlike in *Littlejohn II*, the prosecution in this case already had placed any aggravating "edge" squarely before the jury by emphasizing Mr. Fields's purported antisocial traits. Because the jury had already heard this extensive damaging testimony, presenting the mitigating brain damage "edge" would have "presented little downside risk." *Barrett*, 797 F.3d at 1232. Rather, like in *Smith*, the omitted brain damage mitigating evidence would have provided an explanation for Mr. Fields's behavior and placed his conduct in an empathetic light. 379 F.3d at 943 & n.11.

Additionally, to the extent that the prosecution's response would have been that Mr. Fields is not brain damaged, *see, e.g.*, ROA 4:250, 299, 350-51 (Dr. Price's trial testimony), reasonable counsel would have undercut that opinion as well. *See*, *e.g,* ROA 11:603 (declaration from Dr. Clark Clipson stating that "a major problem with Dr. Price's conclusions involves his failure to recognize the presence of executive functioning deficits that are evident in the test results"); *see*

*also* ROA 11:510 (Dr. Gelbort declaring that Dr. Price's scoring errors "make Mr. Fields seem less impaired than he actually is [and] . . . call into question the validity of Dr. Price's testing results and the competency of his trial testimony . . ..."); ROA 11:525-38 (declaration from Dr. Alan Kaufman discussing unreliability of Dr. Price's test administration and interpretation).

In sum, a proper *Strickland* prejudice assessment must take into account Mr. Fields's post-conviction brain damage evidence, along with the mitigation evidence introduced during his penalty phase trial, to assess whether there is a reasonable probability that at least one juror would have voted for a life sentence. *Sears*, 561 U.S. at 956. Accepting Mr. Fields's evidence as true, he has demonstrated prejudice because a brain damage presentation would have explained his behavior and humanized him, would have supported three mitigating factors the jury unanimously rejected, would have undermined the most powerful aggravating factor the jury found, and would not have harmed his mitigation case. At a minimum, Mr. Fields's proffer is "sufficient to require an evidentiary hearing." *Barrett*, 797 F.3d at 1229.

> **3.      In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim.  At a minimum, this Court should remand for a hearing.**

In contravention of § 2255 and controlling case law, the district court ignored trial counsel's post-conviction declaration, denied Mr. Fields an

30

evidentiary hearing, resolved material factual disputes among the experts based only on affidavits and selective excerpts from the trial record, and applied an erroneous legal standard for assessing prejudice.

### a. The district court erred in denying Mr. Fields an evidentiary hearing.

In *Machibroda v. United States*, 368 U.S. 487 (1962), the seminal Supreme Court case on the right to an evidentiary hearing in a § 2255 case, the Court remanded for an evidentiary hearing following summary denial. The Supreme Court held that when a movant makes a "detailed and specific" proffer, even if the Government's counter–proffer denies those allegations, the district court must grant an evidentiary hearing to decide the case "'[n]ot by the pleadings and the affidavits, but by the whole of the testimony.'" *Id*. at 495 (quoting *Walker v. Johnston*, 312 U.S. 275, 287 (1941)).

Under this petitioner-friendly hearing standard: (1) a district court should be "reticen[t] to reach definitive determinations on [an] undeveloped record," *Littlejohn II*, 875 F.3d at 555; (2) the parties' allegations should be subjected "to the crucible of adversarial testing," *id.* at 559 n.4; (3) a district court should not make credibility findings without an evidentiary hearing, *Milton v. Miller*, 744 F.3d 660, 672 (10th Cir. 2014); (4) a record containing controverted facts by definition does not conclusively resolve a claim and such factual disputes merit a hearing, *Machibroda*, 368 U.S. at 495; *Barrett*, 797 F.3d at 1224; *United States v.*

31

*Becker*, 109 F. App'x 264, 265 (10th Cir. 2004) (unpublished); and (5) a detailed,

specific, and corroborated proffer merits a hearing even if the government presents

some counter evidence, *Machibroda*, 368 U.S. at 495; *Barrett*, 797 F.3d at 1224.

Abiding by these principles, this Court has consistently reversed district

court rulings denying evidentiary hearings in § 2255 cases:

- In *Barrett*, the Court remanded a federal capital case for an evidentiary hearing – including on counsel's failure to present results of neuropsychological testing showing frontal lobe brain impairments, 797 F.3d at 1230-31 – after finding that the record was not "unambiguous" but rather contained "factual disputes." *Id.* at 1227.   The Court further held that where a § 2255 petitioner has "presented considerable evidence supporting his claims" – even if "other evidence may counter it" – "an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether [he] has a valid claim." *Id.* at 1224;

- In *United States v. Duran-Salazar*, 307 F. App'x 209 (10th Cir. 2009) (unpublished), the Court remanded for a hearing on trial counsel ineffectiveness because "the allegations in [petitioner's] motion coupled with [the trial record] are sufficient to entitle him to a hearing," even though "[i]t may be that Duran-Salazar cannot ultimately prevail," *id.* at 211;

- In *Becker*, the Court remanded for a hearing on trial counsel ineffectiveness because "our case law requires the district court to grant an evidentiary hearing" where petitioner presented an expert report in support of the ineffectiveness claim and "showed that his counsel did not present such evidence at sentencing," 109 F. App'x at 270;

- In *United States v. Gonzalez*, 98 F. App'x 825 (10th Cir. 2004) (unpublished), the Court remanded for an evidentiary hearing on trial counsel ineffectiveness, holding that  when "a habeas petitioner alleges detailed and specific charges," supported by affidavits, and there are "controverted questions of fact," "[f]ull consideration of [petitioner's] claims of ineffective assistance of counsel must be done with the benefit

of a complete record," *id.* at 831-32  (citing *Machibroda*, 368 U.S. at 495);

- In *United States v. Estrada*, 849 F.2d 1304 (10th Cir. 1988), the Court remanded a drug distribution case for an evidentiary hearing on whether a guilty plea was involuntary due to threats despite Mr. Estrada's having "told the judge he had not been threatened" at the plea hearing.  *Id.* at 1306.  Despite noting that such "[s]olemn declarations in open court carry a strong presumption of verity" that constitutes a formidable barrier in any subsequent collateral proceedings,[18] the Court still remanded for an evidentiary hearing because Mr. Estrada's "contentions regarding the involuntariness of his plea [were] neither 'unsupported by specifics' nor 'wholly incredible' in the face of the record."  *Id.* at 1307.  Specifically, the Court cited to an ambiguity in one of Mr. Estrada's answers at the plea hearing and a statement from a witness to the purported threatening conversation and determined that the record did not conclusively show that Mr. Estrada's claim lacked merit.  *Id.*

Additionally, in *Littlejohn I*, a § 2254 capital case where federal review was de novo, the Court remanded for an evidentiary hearing on trial counsel's failure to present neuropsychological-based brain damage evidence in the penalty phase. The petitioner warranted a hearing because he "alleged a mitigation theory and supporting facts which, *if true*, would entitle him to relief under *Strickland*."  704 F.3d at 867 (emphasis in original).  Notably, the Court ordered a remand even though: (1) Mr. Littlejohn's post-conviction neuropsychological examination "did not result in a clear diagnosis of significant brain damage, but only tentative conclusions of *possible* brain injury," 704 F.3d at 875 (Tymkovich, J., dissenting) (emphasis in original); *see also id.* at 865 (post-conviction proffer "suggested"

---

[18] *Estrada*, 849 F.2d at 1306 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

neurological deficits); and (2) the substance of the post-conviction expert's proffer "added little to the evidence before the jury," *id.* at 873.

This Court even remanded for an evidentiary hearing in *Milton*, a non-capital § 2254 case incorporating AEDPA deference, which does not restrict the Court's review here. In *Milton*, the Court ordered a hearing on whether trial counsel was ineffective in allegedly failing to inform the defendant of a plea offer, stressing that the district court "simply assume[d] the credibility of" trial counsel's post-conviction proffer and accepted that version of the facts over those of Mr. Milton. 744 F.3d at 672. Because trial counsel's affidavit "create[d] a dispute of fact which has never been explicitly resolved by any court and which the record [was] inadequate to resolve," a hearing was required. *Id.*

Here, Mr. Fields supported his claim that trial counsel ineffectively failed to present available evidence of his brain damage with the trial record, documents in counsel's trial file, and post-conviction declarations, including declarations from four experts stating that neuropsychological testing showed that Mr. Fields has brain damage. *See* ROA 11:505-07 (Dr. Gelbort's declaration); ROA 11:181 (Dr. Grinage's declaration); ROA 11:172 (Dr. Woods's declaration); ROA 11:282 (report of defense post-conviction expert Dr. Daniel Martell). The trial record and trial counsel's file combined with Mr. Fields's post-conviction proffers, all of which must be taken as true, would, if proven, entitle Mr. Fields to relief and are

therefore "sufficient evidence of deficient performance and prejudice to entitle [Mr. Fields] to an evidentiary hearing." *Barrett*, 797 F.3d at 1232.

Although the Government presented some evidence to counter Mr. Fields's specific, detailed, and corroborated proffer, that evidence did not "conclusively show that [Mr. Fields] is entitled to no relief." Rather, the Government's response created ambiguities and factual disputes that, if credited on their face, mandate an evidentiary hearing to consider the reasons for trial counsel's omission of evidence of brain damage, and whether that omission prejudiced Mr. Fields. Nonetheless, the district court improperly resolved all factual disputes in favor of the Government, and even adopted factual findings not advocated by the Government in denying a hearing. Because Mr. Fields "presented considerable evidence supporting his claims," the prosecution's counter-evidence did not vitiate his right to an evidentiary hearing on this claim. *Barrett*, 797 F.3d at 1224; *see also Machibroda*, 368 U.S. at 495.

Given the fact-intensive nature of this claim and Mr. Fields's detailed averments and proffer of evidence, which, if true, would require relief, the district court erred in refusing to hold a hearing on this claim. The district court should have resolved any disputed facts through adversarial testing rather than summary dismissal.

That this is a capital case makes the district court's denial of a hearing all the more improper. This Court has recognized that, "[w]hen reviewing the performance of counsel at the sentencing stage of a capital case, there is a need to apply close scrutiny because mitigating evidence plays an overwhelmingly important role in the just imposition of the death penalty and the sentencing stage is the most critical phase of a death penalty case." *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) (internal citations and quotations omitted); *see also Littlejohn I*, 704 F.3d at 856 ("We recognize the heightened care that must be employed in the death-penalty context to ensure that the qualitatively different penalty of death rests on a solid legal footing."); *Smith*, 379 F.3d at 938 (need for "particular[] vigilan[ce]" in guarding right to effective assistance of counsel in capital penalty phase); *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("In assessing counsel's conduct, we are mindful of the Supreme Court's observation that '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'") (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)); *Osborn v. Shillinger*, 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase.") (citing *Strickland*, 466 U.S. at 704-06 (Brennan, J., concurring)).

**b.    The district court improperly invented hypothetical explanations for trial counsel's inactions that contradicted both her documented intentions at the time of trial and her post-conviction declaration.**

In addition to improperly resolving Mr. Fields's claim without holding a hearing, the district court erred in reaching the merits conclusion that trial counsel acted reasonably in not telling Mr. Fields's jury that he suffers from brain damage affecting his judgment and reasoning. The court based that conclusion on a highly selective review of the record that ignored trial counsel's post-conviction declaration and that improperly supplied reasons for counsel's actions that she did not offer and that contradict contemporaneous trial records. In this respect, too, the district court's decision requires reversal and either warrants relief or a remand for an evidentiary hearing.

For instance, citing to a pre-trial email in which a consulting investigator advised Ms. O'Connell to consider forgoing the testimony of Dr. Gelbort, the district court concluded that counsel "was aware she faced a difficult task to convince the jury to rely on her mental health evidence." ROA 12:579 (citing ROA 12:118). But the court improperly ignored that Ms. O'Connell *sent Dr. Gelbort a contract the following day* formalizing his agreement to testify at Mr. Fields's penalty phase. ROA 12:558-60; *see Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (postconviction court erred in failing to consider counsel's contemporaneous trial files that painted "an accurate description of [counsel's]

37

Appellate Case: 17-7031    Document: 010110050306    Date Filed: 09/10/2018    Page: 45

deliberations prior to sentencing"). The later-in-time document demonstrates that, notwithstanding any contrary suggestions she received, trial counsel ultimately decided to present Dr. Gelbort's mitigating testimony. The failure to do so – which trial counsel herself attributed to inattention and being overwhelmed – was unreasonable. Even if the record on counsel's decision regarding Dr. Gelbort was ambiguous, that required a hearing, not summary dismissal. *See, e.g.*, *Barrett*, 797 F.3d at 1224; *Gonzalez*, 98 F. App'x at 831-32; *Estrada*, 849 F.2d at 1306.

Additionally, the district court's ruling on deficient performance ignored that, even without Dr. Gelbort, reasonable counsel still could and would have elicited information about his brain damage through the experts she did call to testify, Dr. Grinage and Dr. Woods. As detailed above, counsel lacked any reason for not presenting the mitigating brain damage evidence through these experts. Any factual dispute as to why counsel failed to ask these testifying experts about Mr. Fields's brain dysfunction required an evidentiary hearing. *See, e.g.*, *Barrett*, 797 F.3d at 1224; *see also Wilson v. Sirmons*, 536 F.3d 1064, 1074 (10th Cir. 2008), *opinion reinstated sub nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (remanding capital § 2254 case for evidentiary hearing on trial counsel ineffectiveness for "fail[ing] to adequately prepare his mental health expert . . . to testify in second stage or even make use of all of the mitigating information about Petitioner's mental state that [the expert] could have provided to the jury")

38

(internal quotation and citation omitted).

The district court also failed to credit trial counsel's post-conviction averment that she wanted to present Mr. Fields's brain damage evidence but neglected to do so because she was overwhelmed from trying a federal capital case essentially by herself.  ROA 11:156, 164, 169.  The court disavowed Ms. O'Connell's declaration, substituting its own observation that she had "help" from the three other attorneys who made an appearance at trial.  ROA 12:575 n.6.  The record does not support the district court's assumption.  One of those three attorneys was Ms. O'Connell's colleague Michael Abel, who does not appear on the record at trial.  A second attorney was Ms. O'Connell's colleague Barry Derryberry, a Research & Writing Specialist, who did not question a single witness or veniremember.  Mr. Derryberry only argued a motion on a voir dire issue and a motion to strike an aggravating factor, and also assisted Ms. O'Connell during a jury instruction discussion.  *See* ROA 3:253; ROA 4:440-41.  The third lawyer was Isaiah Gant, who admitted that he adopted a "hands-off approach" to his representation of Mr. Fields, limiting his work primarily to assisting in settlement negotiations, retaining (but not engaging with) a mitigation specialist, and conducting a "day or two" of voir dire.  ROA 11:496-97.[19]  The district court was

---

[19] *Cf.* ROA 11:499-502 (former Federal Public Defender for Eastern District of Ohio detailing similar experience involving Mr. Gant's neglect in Ohio federal capital trial).

required to accept Mr. Gant's proffer as true, and its conclusion that Ms. O'Connell could not have been overwhelmed at trial in light of these attorneys' assistance was unreasonable.

Other evidence Mr. Fields submitted in the § 2255 proceedings corroborated Ms. O'Connell's assertion that her failure to present brain damage evidence resulted from her being overwhelmed. *See, e.g.*, ROA 11:190-91 (defense trial mitigation specialist observing, based on "close contact with M[s.] O'Connell during the pre-trial [and trial] period," that "Ms. O'Connell was left to shoulder almost the entire burden of the case" and that this had "an adverse impact on the defense preparations and presentation"); ROA 11:171 (defense trial expert Dr. George Woods stating that, based on his observations, Ms. O'Connell "was being required to handle too much work to be able to responsibly and competently make the required [mitigation] presentation"). In *Barrett*, this Court relied on similar corroborating declarations – including from Ms. O'Connell – in determining that Mr. Barrett's proffer regarding trial counsel's penalty phase failures was sufficient to entitle to him to an evidentiary hearing. 797 F.3d at 1225.

The district court ignored this corroboration, which strengthens the credibility of trial counsel's specific averment, and instead asserted that the record "impl[ied] more counsel were available to assist on this case than those who actually made a formal appearance in the case." ROA 12:576. The only evidence

40

the district court relied on for this claim is that, almost two years before trial, Ms. O'Connell's then-boss, former Federal Defender for the Eastern and Northern Districts of Oklahoma Paul Brunton, forwarded an email about resources generally available to assist the office to another lawyer in Ms. O'Connell's office who did not make an appearance in the case. ROA 12:65. Nothing in the pleadings, emails, or declarations before the district court indicates this lawyer did anything on the case, much less assisted Ms. O'Connell in developing and presenting mitigating evidence. Without an evidentiary hearing, the district court's speculation cannot conclusively disprove trial counsel's presumptively true declaration that she was essentially trying a federal capital case by herself.

The district court also relied on email consultation Ms. O'Connell had with members of the Federal Death Penalty Resource Counsel Project.[20] ROA 12:576. Other than Mr. Gant, who had a "hands-off approach," no one from that Project appeared at trial. And one of the Project consultants conceded his lack of relevant expertise.[21]

---

[20] The Federal Death Penalty Resource Counsel Project is a program of the Administrative Office of the United States Courts, Office of Defender Services.

[21] In trying to evaluate the reliability of Dr. Price's audiotaped evaluation of Mr. Fields, trial counsel consulted with a Project investigator with no mental health degree, who the district court said provided trial counsel with "ideas on how to best defend [the case]." ROA 12:576. In reality, the investigator responded to trial counsel's request for help by saying "I'm not sure I would be able to make anything of the tapes of neuropsych testing – maybe of the history [Dr. Price] took

41

In the absence of an evidentiary hearing, the district court had no justification for substituting its own, unsupported findings for the specific and corroborated declaration submitted by Ms. O'Connell.  Indeed, this Court relied upon her declaration in another federal capital case to determine whether trial counsel acted unreasonably.  *See Barrett*, 797 F.3d at 1225 ("Additional evidence [from the "declaration of Julia O'Connell"] further supports Defendant's assertion of a lack of effort to retain mitigation expertise.").  Even if the district court had credibility concerns, it should not have resolved those concerns without a hearing.  Instead, the court simply conjured up reasons why Ms. O'Connell omitted presentation of Mr. Fields's brain damage.  Under *Strickland*, a court cannot create reasons for counsel's actions where no such reason actually existed at trial. *Wiggins*, 539 U.S. at 526-27 (court cannot substitute its own "post hoc rationalization of counsel's conduct" for what actually happened) (citing *Strickland*, 466 U.S. at 691); *see also Harrington v. Richter*, 562 U.S. 86, 109 (2011) (courts "may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions") (quoting *Wiggins*, 539 U.S. at 526-27).

At the very least, because the trial record, documents created at the time of trial, and trial counsel's post-conviction declaration do not "necessarily establish"

---

but I'm not knowledgeable enough to just listen and make sense of it."  ROA 12:565.

that trial counsel was not deficient, the district court should have resolved any questions about counsel's reasons for not presenting brain damage evidence at an evidentiary hearing, not by post hoc speculation. *Barrett*, 797 F.3d at 1228.

> ### c.  The district court erred both factually and legally in its prejudice analysis.

The district court based its "no prejudice" finding entirely on its determination that Mr. Fields had a purportedly normal MRI brain scan post-trial and thus "does not have organic brain damage." *See* ROA 12:574, 580, 582. Because such a finding was not only in conflict with the evidence Mr. Fields proffered but also not supported by anything the Government proffered or even argued, the district court should not have made this finding without an evidentiary hearing where its speculation could have been challenged. Nothing in the record or scientific literature supports the district court's assumption that a purportedly normal brain scan contradicts, let alone conclusively negates, the neuropsychological testing showing Mr. Fields's brain impairment.

The district court also inappropriately assumed, as a matter of law, that the MRI scan would have caused all jurors to reject Mr. Fields's expert neuropsychological evidence. However, a proper *Strickland* prejudice determination cannot ignore how the jury would have received the neuropsychological findings.

#### i.      Erroneous factual determination

Without hearing testimony from a single expert or citing to a single authoritative source, the district court resolved all factual disputes, including disputes among the parties' experts, against Mr. Fields.

Mr. Fields submitted declarations from four experts stating that he suffered from brain damage at the time of trial.  In response, the Government submitted a report from neuropsychologist James Seward that addressed, *inter alia*, whether Mr. Fields suffered from "brain damage-related disinhibition at the time of the crime."  ROA 12:254.  Dr. Seward considered neuropsychological testing data from Dr. Gelbort and Dr. Price as well as "pertinent collateral history," including information Mr. Fields related during Dr. Seward's clinical interview and reports from Mr. Fields's associates.  ROA 12:254-59.  Dr. Seward concluded that Mr. Fields did not have "frontal lobe or other meaningful brain damage," ROA 12:259, thus creating a factual dispute necessitating resolution by hearing.  *See, e.g.*, *Machibroda*, 368 U.S. at 494 ("[T]he District Court did not proceed in conformity with the provisions of 28 U.S.C. § 2255, when it made findings on controverted issues of fact . . . without a hearing."); *Barrett*, 797 F.3d at 1232 ("disputed facts" requires resolution by evidentiary hearing); *Gonzalez*, 98 F. App'x at 827, 832 (remanding for hearing even though trial counsel provided affidavit countering defendant's proffer because "controverted questions of fact" in the record do not

44

conclusively demonstrate claim has no merit). *Cf. Milton*, 744 F.3d at 668

(remanding for evidentiary hearing because district court "simply assume[d] the

credibility of" one affiant and accepted his version of the facts, when the affidavit

actually "create[d] a dispute of fact which has never been explicitly resolved by

any court and which the record [was] inadequate to resolve").

The district court's "no prejudice" finding depends entirely on its assertion

that Mr. Fields could not prove brain damage because his post-trial MRI scan was

"normal." But that holding rests on the premise that a purportedly normal MRI

*conclusively excludes* the possibility of brain damage, a proposition that is not

supported anywhere in the record and that is scientifically wrong.

Nothing in the record supports the district court's assumption. Even

Government expert Dr. Seward – the only prosecution expert who mentioned the

MRI – did not contend that a "normal" MRI precludes Mr. Fields from having

brain damage. Presumably, if the MRI in 2011 was dispositive on the impairment

issue, Dr. Seward would not have needed to "administer[] a variety of

psychological and neuropsychological tests to Mr. Fields" over the course of three

days in 2013, ROA 12:239. Nor would he have spent six pages in his report

discussing how that psychological testing as well as collateral records and

anecdotes – all apart from the MRI – led him to his opinion. ROA 12:254-59.

Instead, Dr. Seward briefly mentioned the purportedly normal MRI result once,

45

only to state it was "not surprising[]" given his opinion. *See* ROA 12:259.

Basic scientific and medical principles also refute the district court's exclusive reliance on the MRI. Brain imaging such as an MRI is *not* determinative of brain damage, particularly where, as here, neuropsychological testing shows otherwise. *See, e.g.*, Lezak et al., *supra*, at 5 ("[E]ven the most highly sensitive laboratory analyses may not be diagnostically enlightening" for all conditions, in which case "the neuropsychological findings can be diagnostically crucial"); Michael Franzen & Glen Getz, *Screening for Brain Impairment* 22 (3rd ed. 2010) (neuropsychological testing can "frequently reveal deficits in the head injured patient when all other neurodiagnostic tests are negative"); *id.* at 168 ("[I]f the patient being assessed does not happen to have a dysfunction in the area being tapped by the test, but does indeed have some form of cognitive impairment, that particular patient may be inappropriately identified as non-brain damaged."). An individual can have a normal MRI and still have brain damage based on neuropsychological testing and evaluation.

This Court has repeatedly confirmed this principle. *See, e.g.*, *Barrett*, 797 F.3d at 1231 (remanding for hearing on counsel's ineffectiveness for failing to present brain damage evidence based on post-conviction proffer that neuropsychological testing showed brain damage even though "[a] medical history sheet completed [during pre-trial hospitalization] stated that [Barrett] had no

46

symptoms of neurological problems"); *Hooks*, 689 F.3d at 1212-13 (Gorsuch, J., dissenting) (remanding for hearing on counsel's ineffectiveness for failing to present brain damage evidence based on post-conviction proffer that neuropsychological testing showed brain damage even though "doctors found no evidence of organic brain injury" during hospitalization).

The Supreme Court has also recognized that neuropsychological testing results determine the existence of brain damage. *See, e.g.*, *Sears*, 561 U.S. at 949-50 ("Based on [neuropsychological testing] results, the [neuropsychological] expert's first-hand observations, and an extensive review of Sears' personal history," "[t]here [wa]s 'clear and compelling evidence' that Sears has 'pronounced frontal lobe pathology,'" and that "Sears suffers from substantial cognitive impairment" "[r]egardless of the cause of his brain damage").

Particularly for capital mitigation purposes, neuropsychological testing is distinct from, and more probative than, neuroimaging. As the Supreme Court and this Court have repeatedly held, the important questions for mitigation usually involve assessment of not only whether brain damage is present, but also whether and how the brain damage affected the defendant's mental state, emotional state, and behavior – impacts that neuropsychological testing, unlike imaging, can assess. *See, e.g.*, *Jefferson v. Upton*, 560 U.S. 284, 285-86 (2010) (describing how such impairments are relevant to mitigation case); *Barrett*, 797 F.3d at 1231 (the "most

47

important" question for mitigation is how judgment is affected, as shown by neuropsychological testing).

Neuropsychological testing is much more useful than a brain MRI for these mitigation-related inquiries because it provides "a better understanding of specific brain-behavior relationships and the psychosocial consequences of brain damage." Stuart C. Yudofsky & Robert E. Hales, *The American Psychiatric Press Textbook of Neuropsychiatry* 181-82 (3rd ed. 1997).  Neuropsychological assessment is the most reliable method for acquiring this information about a person's cognitive, emotional, and executive functions.  Lezak, et al., *supra*, at 15 ("[n]europsychological assessment . . . measur[es] on a quantitative, standardized fashion the most complex aspect of human behavior [including] . . . reasoning, problem solving, [and] judgment. . ..."); *id.* at 19 ("[T]he concept of brain damage only becomes meaningful in terms of specific behavioral dysfunctions and their implication regarding underlying brain pathology and real-world functioning.  The neuropsychological assessment helps to determine what are the . . . ramifications of the known brain injury or evident brain disorder.").

Thus, even if Mr. Fields had a normal MRI, that is not dispositive of whether Mr. Fields suffers from brain dysfunction affecting his reasoning.  While the district court faulted Mr. Fields for "submit[ting] nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011

was normal," ROA 12:582, that is not the relevant inquiry for determining whether Mr. Fields merited a hearing on this issue.  Noticeably absent from any of the Government's district court pleadings was any argument that Mr. Fields's MRI report precludes a finding of brain damage.

The district court's improper reliance on the MRI scan was a direct consequence of its erroneous approach to ruling on the Government's motion for summary judgment.   The district court should have accepted Mr. Fields's proffer, which contained "considerable evidence supporting" his entitlement to relief,  as correct and then held an evidentiary hearing, even if the MRI evidence "counter[ed]" some aspect of his proffer.  *Barrett*, 797 F.3d at 1224.  By failing to do so, the lower court reached an unsupportable result.

<strong>ii.   Erroneous legal determination</strong>

Not only did the district court err in treating as dispositive the post-trial MRI result, it also ruled contrary to Supreme Court precedent by "discount[ing] entirely" the impact defense expert testimony about brain impairment would have had on the sentencing jury.  *Porter*, 558 U.S. at 42-43.  At the very least, the district court should have held a hearing, as it could not resolve the prejudice issue without receiving testimony from the parties' respective witnesses and developing a full record for review.

## II. THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS'S SOCIAL HISTORY AS A MITIGATING FACTOR.

Trial counsel also was ineffective for failing to present Mr. Fields's compelling social history through the testimony of a mitigation specialist or mental health expert. Counsel stated that she had no strategic reason for failing to present Mr. Fields's social history. Because trial counsel did not present this evidence, not a single mitigating factor offered by the defense addressed Mr. Fields's family dysfunction. ROA 5:67-68. There is a reasonable probability that such evidence of a troubled childhood and family history of mental health problems, taken together with the mitigating evidence presented at trial, would have led at least one juror to vote for a life sentence.

The district court denied this claim without a hearing and resolved all the factual disputes against Mr. Fields by adopting speculative and unsupported theories about counsel's decision-making. ROA 12: 597-98, 644-49. The district court then found no prejudice, erroneously discounting the mitigating value of social history evidence that does not explain the crime. ROA 12:597-98. The district court's failure to conduct a hearing and its holdings under both prongs of *Strickland* were erroneous. At the very least, this Court should remand for an evidentiary hearing on this claim.

50

## A. Standard of Review

As with the previous claim, this claim is reviewed de novo, where "the district court d[id] not hold an evidentiary hearing, but rather denie[d] the motion as a matter of law upon an uncontested trial record." *Barrett*, 797 F.3d at 1213 (quoting *Rushin*, 642 F.3d at 1302).

## B. Record References

Mr. Fields raised this claim in his original and amended § 2255 motions, as well as his supporting and reply pleadings. ROA 9:117-28; ROA 10:64-66; ROA 11:103-14; ROA 12:541-44, 621-26. The district court denied relief. ROA 12:597-99; *see also* ROA 12:643-49 (opinion and order denying Rule 59(e) motion).

## C. Taking his proffer as true, Mr. Fields has proven that trial counsel ineffectively failed to present Mr. Fields's history of family dysfunction and mental illness.

The development and presentation of social history evidence is crucial to an effective mitigation defense at capital sentencing. *See, e.g.*, *Wiggins*, 539 U.S. at 523 (counsel ineffective for failing to develop and present capital defendant's "social history"); *Williams*, 529 U.S. at 398 (counsel ineffective where jury never learned of capital defendant's childhood, which was "filled with abuse and privation"). Indeed, this Court has recognized that "evidence of childhood abuse, neglect, and instability can play a significant role in mitigation." *Barrett*, 797 F.3d

51

at 1229-30.  Trial counsel failed to present evidence of Mr. Fields's family history and dysfunction.

### 1.    Family Dysfunction Evidence the Jury Did Not Hear

Mr. Fields's social history "was marked by notable dysfunction" and intergenerational dysfunction and mental illness.  ROA 11:186-88, 420-24. Following his paternal grandfather's premature death in a truck fire, his paternal grandmother developed a brain tumor that left her blind and would later kill her. ROA 11:420-21.  As a result of both her debilitating condition and her then-husband's sexual abuse of her daughters,[22] Mr. Fields's father, Leon, and his siblings were separated from another, and put in foster care or put up for adoption during their formative years.  ROA 11:420-21.

Mr. Fields's mother, Margaret, also grew up under challenging circumstances.  Her parents had an "unhappy marriage, which often included arguments and verbal 'fights.'"  ROA 11:424.  Mr. Fields's maternal grandmother received electroshock treatment for her mental health problems, and one of her sisters was "disturbed" while another had unspecified mental problems.  ROA 11:443.  Margaret was her parents' only child, though she had a step-sister from her mother's previous marriage.  ROA 11: 424.  Margaret suffered from depression

---

[22] One of Mr. Fields's aunts recalled "being in court when the presiding judge asked [Mr. Fields's grandmother] to choose between continuing her relationship with Jack Thomas or keeping her children. [She] chose Thomas." ROA 11:422.

her entire life, was diagnosed with bipolar disorder, and, as an adult, placed her own emotional needs above those of her children.  ROA 11:186, 425, 442.

Given their own traumatic childhoods, it is not surprising that Mr. Fields's parents prioritized their relationship at the expense of their children.  Leon was largely absent from Mr. Fields's upbringing due to the long hours his jobs required, but when he was home, Margaret "jealously guarded her relationship with her husband to the extent that she literally kept [him] from the children so as to maximize her private time with him."  ROA 11:186-87.  As Mr. Fields's sister, Cherie, explained in a post-conviction declaration, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father."  ROA 11:440-41.  Mr. Fields "had a really rotten childhood and it was no secret that [his father] needed that devotion and the kids didn't really matter to either of them."  ROA 11:440-41.  Mr. Fields's father once told Cherie that he was "thinking about putting Eddie and [her] on a train and getting rid of [them]."  ROA 11:441.

Mr. Fields was never shown affection or love.  ROA 11:441.  In fact, quite the opposite, Margaret Fields "took pleasure in making sure Eddie and [Cherie] stayed at each other's throats. She was very good at dividing [them] and separating [them] from emotional comfort and security."  ROA 11:441.  In a similar vein, Mr.

53

Fields and his sister often were forced to physically discipline each other at the

command of their mother.  As Cherie describes in her post-conviction declaration:

> I recall my father being provoked by our mother to have us whip each
> other with belts – our Dad would be the one to say if we were doing it
> hard enough. If we weren't, then he would take a lick. . . . When we
> got a whipping, we'd have to take our pants off and lie on the bed.
> Dad would whip us with a belt until we'd cry and scream. It didn't
> matter what time of day or night it was, if Mom ordered him to give
> us a whipping he'd do it. It was all very bizarre and Eddie really got
> the worst of it.

ROA 11:442.  "[T]he relationship between the parents and Mr. Fields and his sister

(Cherie), was distant, cold and unemotional."  ROA 11:186.  Not surprisingly,

given his family history of mental illness and the circumstances in which he was

raised, Mr. Fields himself had a lifelong battle with long-undiagnosed chronic

depression that led others to unjustly perceive him as "moody," "strange," and

"lazy."  *See* ROA 11:187-89.  Indeed, Mr. Fields's childhood is one possible

explanation for his "flat emotional presentation: he could have been modeling his

mother's own cold demeanor."  ROA 11:188.  Mr. Fields has been "almost

universally perceived as an emotionally flat or cold individual."[23]  This inability to

express emotions likely had its roots in the lack of appropriate parenting he

received as a child.  ROA 11:188.

Compounding the lack of parental support, the Fields family's nomadic life

---

[23] Indeed, at trial, the prosecution relied on this fact in arguing that Mr.
Fields lacked remorse.  *See* ROA 5:117 (prosecutor's closing argument).

54

– Mr. Fields moved between four different states before reaching high school – made it difficult for Mr. Fields to form or maintain friendships with any peers and increased his sense of isolation.  ROA 11:426-28.

Yet Mr. Fields's jury heard almost none of this information about Mr. Fields and his family.  What it did hear were cursory mentions of a handful of Mr. Fields's significant life events. *See, e.g.*, ROA 3:296 (Cherie noting the different places she lived).

## 2.   Deficient Performance

Before Mr. Fields's trial, the defense investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel that Mr. Fields grew up in a dysfunctional family.  *See generally* ROA 11:184-93, 418-38.

But the jury never learned the full story about his troubled history. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields, who addressed only non-controversial subjects, giving the misleading impression that the Fields were a more or less typical family.  Dr. Woods briefly discussed "familial mood disorders" on Mr. Fields's maternal side of the family, but counsel did not ask him about any other aspect of the intergenerational dysfunction pervasive in his social history.  *See* ROA 11:112-13. Nor did trial counsel ask Dr. Grinage to talk about Mr. Fields's family history.  *See* ROA 11:180 (Dr. Grinage noting, "[T]here were many aspects of Mr. Fields'

family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did we prepare my testimony to cover these facts in any sort of comprehensive manner.").

Counsel admitted that she had no reasonable strategic basis for failing to present Mr. Fields's complete social history.  ROA 11:166.

### 3.    Prejudice

The defense presented almost no evidence regarding Mr. Fields's social history, and not one mitigating factor offered by the defense addressed his family dysfunction.  ROA 5:67-68.  As discussed above, the defense did argue for the two state-of-mind mitigators, but the jury rejected both of them.  *See* ROA 1:959; ROA 5:147-48.  The jury also found that Mr. Fields lacked remorse – a component of the future dangerousness aggravator – among other aggravating factors.  ROA 5:146.

Given the importance of social history evidence in capital sentencing trials, counsel's deficient performance prejudiced Mr. Fields.  *See Wilson v. Sirmons*, 536 F.3d at 1094 (finding evidence of mental health issues to be most powerful when combined with narratives from lay witnesses supporting such issues).  While a few, isolated biographical facts were told to the jury, some of the most mitigating aspects of Mr. Fields's life – his upbringing in a home filled with abuse, emotional deprivation and dysfunction – were never coherently presented to the jury through

any of the defense witnesses. That trial counsel presented some mitigating evidence does not end the prejudice analysis under *Strickland*. *Sears*, 561 U.S. at 954 (Supreme Court has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented").

Mr. Fields's social history could have been utilized by Dr. Grinage to bolster his testimony related to the defense's theory because a "collateral history is critical in assessing and presenting a complete picture of the patient/defendant . . . to explain his mental state at the time of the incident." ROA 11:180. Moreover, presentation of Mr. Fields's complete social history could have provided the jury an explanation for his seeming lack of emotion or remorse, which the jury relied upon in sentencing Mr. Fields to death. ROA 11:188 (noting that Mr. Fields's flat emotional presentation was likely the result of "modeling his mother's own cold demeanor" and originated from the lack of adequate parenting he received as a child).

Trial counsel's presentation at Mr. Fields's penalty phase hearing focused almost entirely on a narrow defense that the killings resulted from a medicine-induced manic flip. Yet trial counsel ignored additional (and available) mitigating evidence that would have bolstered this chosen defense theory and rebutted the prosecution's case in aggravation. Had this evidence been presented, there is a reasonable probability that at least one juror would have voted for a life sentence.

57

This is particularly true when the prejudice resulting from each instance of trial counsel's deficient performance is examined cumulatively. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); *Gonzales v. McKune*, 247 F.3d 1066, 1078 n.4 (10th Cir. 2001), *vacated in part on reh'g en banc*, 279 F.3d 922 (10th Cir. 2002) (*Strickland* "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong."). Mr. Fields was prejudiced by both trial counsel's omission of brain damage and her omission of his history of family dysfunction.

### 4. In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim. At a minimum, this Court should remand for a hearing.

As with the prior claim regarding counsel's ineffective failure to present evidence of brain damage, the district court denied Mr. Fields an evidentiary hearing on this claim, resolved material factual disputes based only on affidavits and selective excerpts from the trial record, and applied an erroneous legal standard for assessing the mitigating value of Mr. Fields's undisputed dysfunctional upbringing.

### a. The district court erred in denying Mr. Fields an evidentiary hearing.

The district court erred in refusing to hold a hearing where Mr. Fields's detailed averments and proffer of evidence, if true, would require relief. The district court should have resolved any disputed facts through adversarial testing rather than summary dismissal. Given that this is a capital case challenging the constitutionality of trial counsel's representation, the district court's denial of a hearing is all the more improper. *See supra* pp. 31-36.

### b. Deficient Performance

In analyzing the first prong of *Strickland*, the district court began by completely discounting trial counsel's sworn statement that she "had no tactical or strategic reason for not presenting th[e] history either through one of the doctors or through Ms. Shettles." ROA 11:166.

Rather than conduct a hearing, the district court suggested that documents at the time of the trial demonstrate she had "clearly developed a reasonable trial strategy to keep this [bad acts] evidence from the jury." *See* ROA 12:645-47. Specifically, the district court pointed to an email written by trial counsel regarding her fear that, "through her *mental health evidence*," she would open the door to certain "bad acts" evidence that the trial court had provisionally excluded. ROA 12:645-47 (quoting ROA 12:639-40) (emphasis added).

This bad acts evidence included:

- evidence of Mr. Fields's hyper sexuality and womanizing, including his dating multiple women at the same time, his interest in pornography, his bragging about masturbating in front of a webcam, and his meeting women through internet chat rooms;

- two instances of Mr. Fields bringing different hunting weapons to work;

- evidence of Mr. Fields's interest in hunting snakes, and keeping them as pets;

- evidence of alleged animal abuse[24]; and

- evidence of domestic violence, including that his mother was afraid of him.

ROA 12:639-40.  But the email says nothing about *social history evidence* and thus explains nothing about counsel's supposed strategy in relation to this claim.  ROA 12:639-40.

In any event, the district court's concern for opening the door is illusory because the door was already opened at trial and almost all of the bad acts evidence made its way to the jury:

- evidence regarding Mr. Fields's hypersexuality came in through Drs. Grinage and Woods, both of whom testified that it was relevant to their diagnoses, ROA 3:407-08 (discussing his preoccupation with sex"), ROA 3:461 (discussing his hyper sexuality and internet relationships), ROA 4: 115, 118; *cf.* ROA 4:227 (district court noting, "I thought I was not going to let sexual stuff be evidence of anything, but somehow that's winnowed it's way in. Not improperly, just . . . .");

---

[24] This evidence was consistently excluded by the Court.  *See, e.g.*, ROA 4:227 ("[W]e can't be trying him for hanging the cat, you know, when he was four. We can't do that. And so, and that can't be evidence of an aggravating factor. I just can't let that be. . . . We've hashed that out. The horse is laying on its side and not getting up.").

- evidence describing Mr. Fields as being involved with multiple women at the same time was elicited by the Government, ROA 2:466;

- evidence regarding Mr. Fields meeting women over the internet in chat rooms came in through Dr. Price, ROA 4:265;

- evidence that Mr. Fields enjoyed hunting snakes, *see, e.g.*, ROA 2:464-65; ROA 3:77, and had snakes as pets, ROA 3:290, was elicited by the Government; and

- evidence regarding Mr. Fields's domestic abuse came in through multiple witnesses, ROA 3:322 (Mr. Field's mother was scared of him); ROA 3:327-28 (Mr. Fields physically and verbally threatened his sister); ROA 3:339-40, 373-76 (Mr. Fields physically and verbally abused his ex-wife); ROA 3:383, 385 (same); *see also supra* p. 26.

The Government (and the defense to a certain extent) ultimately introduced significant evidence at trial depicting Mr. Fields as a womanizing, "creepy," and dangerous person,[25] including references to almost all of the bad acts counsel had concerns about, particularly that Mr. Fields's own mother was scared of him. ROA 3:304 (counsel eliciting fact of mother's fear on her direct of Cherie Fields); ROA 3:322, 328. In evaluating counsel's decision-making, the district court applauded her ability to "elicit positive attributes of petitioner" from Mr. Fields's family members, "while preventing the government from asking these same witnesses to explain why [his] mother was scared of him," ROA 12:647; however, the very fact that Mr. Fields's mother was afraid of him was the prejudicial

---

[25] This was evidence the district court had previously deemed "incredibly prejudicial character evidence." ROA 1:1127.

information that counsel was concerned about presenting.  Counsel had no

reasonable basis for failing to provide a complete picture of Mr. Fields's social

history when it would not have opened any doors that were not already open.  This

is particularly so because that door *was* opened, and the omitted social history

evidence could have helped counsel explain and contextualize some of the

behavior and personality traits the Government was otherwise able to wield as

aggravating evidence.

In the absence of a hearing, the district court simply contrived a rationale to

justify a summary denial of relief.  There is no evidence to support the district

court's theory that counsel decided not to present evidence of Mr. Fields's troubled

social history to avoid purported inconsistencies.  To the contrary, Ms. O'Connell

elicited evidence from the defense mental health experts that Mr. Fields had

judgment problems, ROA 4:93, 98-99, that he "was suffering from a severe

emotional mental disturbance," and had a mental disorder that "caused significant

impairment in his ability to behave in a particular way that he might otherwise or

what he might be thinking about doing," ROA 3:431.  This evidence opened the

door for the Government to introduce extensive evidence and argument regarding

Mr. Fields's purported antisocial personality and future dangerousness.  *See supra*

pp. 26-27, 29.  Because such evidence was already coming in, counsel had no

reasonable basis for failing to provide a complete picture of Mr. Fields's

background and family history of mental illness.  Doing so would have bolstered his mental health defense, humanized Mr. Fields, explained why he acted as he did, neutralized the evidence of his violent tendencies that the Government brought out on cross-examination, and served as a reason for a juror to vote for a life sentence.

Having improperly dismissed trial counsel's affidavit disclaiming any strategy, the district court then assumed that, because Ms. Shettles had investigated Mr. Fields's social history, any decision by trial counsel not to present that history was "an adequately informed strategic choice."  ROA 12:598.  But the court, by denying a hearing, never even asked counsel if she, in fact, made such an informed choice.  And under *Strickland*, a court is not at liberty to defer to strategic bases for counsel's actions where no such reason actually existed at the time of trial.  *See Wiggins*, 539 U.S. at 526-27.  This is particularly true where counsel herself has explicitly disavowed the existence of any strategic reason for the decision.

Given the clear factual disputes, the district court should have ordered an evidentiary hearing.

### c.    Prejudice

The district court's finding that Mr. Fields was not prejudiced was based on the court's misapprehension of the law and unjustified assumptions.  First, the court erroneously viewed the value of mitigating evidence as being dependent on its causal nexus to the crime, concluding:

> The decision . . . to submit evidence that these murders were, in some way, the product of a long-standing lack of socialization or empathy, caused by a less than idyllic family life approximately twenty years earlier, would have diluted the defense theory that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies.

ROA 12:598. The Supreme Court has repeatedly rejected this view. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Skipper*, 476 U.S. at 4. Mitigating evidence is *any* evidence that "might serve as a basis for a sentence less than death." *Skipper*, 476 U.S. at 4. It need not have a direct causal relationship with the crime, but could instead serve to "humanize [the defendant]." *Porter*, 558 U.S. at 41. "The presentation of mitigation evidence affords an opportunity to humanize and explain – to individualize a defendant outside the constraints of the normal rules of evidence." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000); *see also Strickland*, 466 U.S. at 717-18 (Marshall, J., dissenting) ("Experienced members of the death-penalty bar have long recognized the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections." (internal citations omitted)). As this Court explained in *Mayes*, it is "compelled to insure the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics.'" 210 F.3d at 1288.

Moreover, neither a dysfunctional upbringing nor evidence of

64

intergenerational dysfunction and mental health issues "undermine the defense

theory that Effexor caused an anomaly, a one-time switch to flip in Petitioner's

brain thereby leading an otherwise law abiding citizen to commit these horrific

murders." ROA 12:598. These mitigation themes are not mutually exclusive. In

fact, Dr. Grinage could have used Mr. Fields's social history to bolster the

defense's trial theory. ROA 11:180. A complete picture of Mr. Fields would not

have "diluted the defense theory that the crime was Effexor driven"; instead, it

would have provided a greater foundation for the defense's mental health experts

to base their assessments. *Wilson v. Sirmons*, 536 F.3d at 1094 (noting that

"[t]here is evidence that expert testimony on mental illness is most powerful when

combined with narratives from lay witnesses such as family and friends," including

"personal narratives of [a defendant's] problems and experiences from his

childhood through adulthood, which both led to and revealed his mental health

problems") (citing Scott E. Sundby, *The Jury as Critic: An Empirical Look at How*

*Capital Juries Perceive Expert and Lay Testimony,* 83 Va. L.Rev. 1109, 1135

(1997)).

> The district court's speculation otherwise was unconvincing:

> [E]vidence Fields was emotionally estranged from his family would
> have directly contradicted the defense arguments that the death of his
> father and his mother's illness caused the defendant to experience
> severe emotional disturbances. . . . , [and] evidence the defendant had
> difficulty forming relationships would have undermined the notions
> that the defendant was remorseful and that he was a loved relative and

friend.

ROA 12:598.  There is no support in human experience, much less in the record, for the contention that someone cannot be both emotionally estranged from his family and also deeply affected by the death or illness of a parent.  Likewise, nothing supports the claim that someone who has difficulty forming relationships cannot also be remorseful, or loved by friends and family.  Rather, Mr. Fields's "positive character traits would have been more admirable in light of his personal struggle with mental health issues." *McNeill v. Branker*, 601 F. Supp. 2d 694, 720 (E.D.N.C. 2009) (finding evidence showing that "petitioner was raised in an environment void of normal parental affection, dominated by a controlling and abusive father and mother who coped by withdrawing emotionally," and that numerous family members suffered from depression and other mental illnesses, would not have undermined – but would have strengthened – the case presented in mitigation).

Lastly, at trial, counsel did make a presentation – albeit very limited – relating to Mr. Fields's dysfunctional family, ROA 3:296-97, 299, 301-04, in addition to her mental health presentation.  Thus she had already embraced any alleged inconsistency between the two types of evidence, and would have had no reasonable basis for not presenting a more complete presentation of Mr. Fields's upbringing.  There is a reasonable probability that a thorough social history

presentation would have caused at least one juror to vote for a life sentence.

## III. THE GOVERNMENT'S INVOCATION OF RELIGIOUS AUTHORITY DURING CLOSING ARGUMENT WAS UNCONSTITUTIONALLY IMPROPER AND PREJUDICIAL; THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Hinson*, 585 F.3d 1328, 1338 & n.4 (10th Cir. 2009). This duty precludes a prosecutor from making improper argument to the jury, particularly in the penalty phase of a capital case, where the Eighth Amendment demands heightened reliability and guarantees a sentence free from prejudice or passion. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).

Here, the Government violated its duty to seek justice when it concluded its closing argument in support of the death penalty with a lengthy reference to the well-known "writing on the wall" sermon from the Book of Daniel. ROA 5:133–34. Trial counsel was ineffective for failing to object to the Government's improper argument.

### A. Standard of Review

As stated above, the claim that counsel was ineffective is reviewed de novo,

because "the district court d[id] not hold an evidentiary hearing, but rather denie[d] the motion as a matter of law upon an uncontested trial record." *Barrett*, 797 F.3d at 1213 (quoting *Rushin*, 642 F.3d at 1302).

## B.    Record References

Mr. Fields raised this claim in his original and amended § 2255 motions, as well as his supporting and reply pleadings. ROA 9:133-46; ROA 10:66-75; ROA 11:115-32; ROA 12:544-46. The district court denied relief. ROA 12:599-613.

## C.    The Government's Unconstitutional Closing Argument

The Government argued forcefully in favor of the death penalty in closing arguments, concluding with an extended and wholly improper recitation of biblical scripture. Specifically, the Government related to the jury the well-known "writing on the wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's

68

> face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

ROA 5:133-34; *see also Daniel* 5:1-31. The Government went on to argue that Mr. Fields should similarly be "weighed in the balance" and "found wanting." ROA 5:134.

Ordinarily, "[i]mproper prosecutorial argument will not warrant federal habeas relief unless the conduct complained of 'made [petitioner's] trial so fundamentally unfair as to deny him due process.'" *Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)). However, where "the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." *Id.*; *see also Donnelly*, 416 U.S. at 643 (noting that where "specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them"). Instead, a petitioner who claims that the prosecutor's improper argument

infringed a specific constitutional right need only establish that the argument "had

a substantial prejudicial effect" on that constitutional right. *Paxton v. Ward*, 199

F.3d 1197, 1217-18 (10th Cir. 1999) (affirming grant of habeas relief where

prosecutor's penalty phase argument "had a substantial prejudicial effect" on

petitioner's right to present mitigating evidence); *see also Cargle v. Mullin*, 317

F.3d 1196, 1207 (10th Cir. 2003) ("[C]laims of prosecutorial misconduct . . .

require a showing of fundamental unfairness in order to provide habeas relief,

unless they involve violation of specific constitutional rights, in which case the

principles governing such rights control").

Here, the prosecutor's Bible references had a substantial prejudicial effect on

Mr. Fields's Eighth Amendment right to a fair and reliable sentencing. *See, e.g.*,

*Cauthern v. Colson*, 736 F.3d 465, 476-77 (6th Cir. 2013) ("[B]iblical references

. . . are particularly inappropriate in a sentencing proceeding, because they can

create the inference that the death penalty is mandatory through their appeal to a

higher authority, and because they allow a jury to delegate its own responsibility

for the imposition of the sentence."); *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th

Cir. 2001) (observing that "religious arguments have been condemned by virtually

every federal and state court to consider their challenge" and citing cases); *Coe v.*

*Bell*, 161 F.3d 320, 351 (6th Cir. 1998) (inappropriate for prosecutor to tell jurors

that capital punishment is sanctioned by the Bible); *Bennett v. Angelone*, 92 F.3d

1336, 1346 (4th Cir. 1996) ("Federal and state courts have universally condemned such religiously charged arguments as confusing, unnecessary, and inflammatory."); *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991) (finding prosecutor's appeals to religious beliefs, including comparison of defendant and Judas Iscariot, to be "outrageous"); *United States v. Giry*, 818 F.2d 120, 133 (1st Cir. 1987) (reference to Bible is improper appeal to jurors' private religious beliefs).[26]

As the *Sandoval* court explained:

> In a capital case like this one, the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict.

*Sandoval*, 241 F.3d at 776 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)).

The court continued:

> Argument involving religious authority also undercuts the jury's own sense of responsibility for imposing the death penalty. The Supreme Court has disapproved of an argument tending to transfer the jury's sense of sentencing responsibility to a higher court. A fortiori, delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process.

*Id.* at 777 (internal citation and quotation omitted).

---

[26] *See also Malone v. State*, 168 P.3d 185, 209 (Okla. Ct. Crim. App. 2007) (witness's and prosecutors' "invocation of religious belief and obligation in the context of a capital sentencing recommendation [was] totally inappropriate").

By invoking religious authority and appealing to the passions of the jury, the Government impermissibly infringed on Mr. Fields's rights under the Eighth and Fourteenth Amendments. It is reasonably probable that the Government's appeal to religion had the intended prejudicial effect. *See Cauthern*, 736 F.3d at 478 (granting habeas relief based on prosecutor's improper argument where it was "plausible that given the high burden for imposing a death sentence, the remarks were what tipped the scale in favor of imposing such a sentence").

### D.     Trial Counsel's Ineffectiveness

Despite the glaring impropriety in the Government's closing argument, trial counsel failed to object. Counsel had no strategic basis for not objecting. *See* ROA 11:168-69; *see also Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) ("[T]rial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable.").

Mr. Fields suffered prejudice from trial counsel's failure to object. *Cargle*, 317 F.3d at 1217 ("[A]ny effort by the State to deflect responsibility for prosecutorial misconduct [including during closing argument] or to discount the resultant prejudice by blaming defense counsel for not objecting to/curing the errors would support petitioner's case for relief in connection with his associated allegations of ineffective assistance."); *see also Zapata v. Vasquez*, 788 F.3d 1106, 1108 (9th Cir. 2015) ("[T]rial counsel's failure to object to egregious prosecutorial

misconduct during closing argument constituted ineffective assistance of counsel substantially affecting the outcome of his trial.").

Additionally, had counsel objected, counsel could have also requested a curative instruction directing the jury to disregard the Government's improper appeal to passion and vengeance. *See, e.g.*, *Bennett v. Stirling*, 842 F.3d 319, 327 (4th Cir. 2016) (habeas relief warranted in part because, "[u]nlike the trial judge in *Donnelly*, who directed the jury to ignore the challenged remark, the state trial court here never instructed the jury on [the offending] comments") (internal citation omitted). Having been so admonished, there is a reasonable likelihood that the jury would have returned a different verdict.

### E.     In light of Mr. Fields's proffer, the district court erred in denying a hearing and rejecting the claim. At a minimum, this Court should remand for a hearing.

As the district court did with Mr. Fields's other claims of ineffective assistance of counsel, the court improperly speculated as to the reasons for counsel's inaction. ROA 12:599-600 (asserting that counsel refrained from objecting so as not to call attention to the argument). The court ignored counsel's declaration, which must be taken as true, stating that she had no reason for not making this meritorious objection. *See* ROA 11:168. In these circumstances, remand is appropriate. *See supra* pp. 31-36.

The court's ruling on prejudice was also in error. The court excused the

Government's unconstitutional use of the Bible by holding that, unlike in *Sandoval*, the prosecutor's "argument was not delivered in biblical style," did not expressly reference God, and "used a story devoid of any religious connotation." ROA 12:612. And, because the court found that the Government's argument was not improper, it also found that appellate counsel was not ineffective.[27] ROA 12:613.

The court's finding ignored that, as with the improper remarks in *Sandoval*, the "lay juror would readily understand the words" used "as referring to Scripture." *Sandoval*, 241 F.3d at 778. And, as in *Sandoval*, "[t]hose learned in the New Testament would recognize the argument as closely following" the biblical passage from which it was drawn. *Id.* Nor was this a case in which the biblical reference was merely "poetic"; the purpose was to "use the Bible to invoke the wrath of God against" Mr. Fields. *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994).

Just as in *Sandoval*, "[w]e do not know what actually happened in the jury room, [and] we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death." *Id.* The district court's attempts to distinguish the cases are therefore unconvincing.

---

[27] Trial counsel failed to object to this religious aspect of the prosecutor's argument, therefore, this is first and foremost a claim of *trial* counsel ineffectiveness. To the extent that the district court's standard of whether the claim "would have warranted reversal on appeal," ROA 12:613, is a higher threshold than *Strickland*'s prejudice standard, the district court erred in not also examining trial counsel's ineffectiveness in its prejudice analysis.

## IV.    THE CUMULATIVE IMPACT OF THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND A RELIABLE SENTENCING HEARING.

Courts have long recognized that claims of constitutional error are to be considered both individually and cumulatively, and that cumulative error or prejudice may provide a basis for relief whether or not any individual error warrants relief.  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Cargle*, 317 F.3d at 1224-25 (habeas relief warranted based upon cumulative errors during guilt and penalty phases).

Here, counsel's errors had the cumulative effect of preventing the jury from hearing a powerful mitigation case while simultaneously allowing the jury to consider misleading evidence and improper argument in support of aggravation.  In particular, absent counsel's deficient performance, the jury could have heard a mitigation case built not just on a single-episode manic flip, but also on evidence of brain damage that affected Mr. Fields's executive functioning as well as a history of family problems. At the same time, counsel could have greatly diminished the Government's case by challenging the testimony of its mental

75

health expert and the evidence it presented in support of aggravating

circumstances, as well as by objecting to the Government's grossly improper

argument to the jury.  Counsel's errors resulted in the jury being presented with a

misleading case in support of the aggravating circumstances and a relatively weak

case in support of mitigation.  Considered cumulatively, there is more than a

reasonable probability that at least one juror would have voted to spare Mr.

Fields's life absent counsel's multiple errors.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's

Opinion and Order and remand this matter for a new sentencing trial or, at a

minimum, an evidentiary hearing.

## ORAL ARGUMENT

Oral argument is requested as this capital case involves complicated fact-

based issues.

Respectfully Submitted,

 /s/ Hunter Labovitz
HUNTER LABOVITZ
Assistant Federal Defender
Pa. Bar. No. 204760
KATHERINE ENSLER
Assistant Federal Defender
Pa. Bar. No. 319029
Federal Community Defender Office
Capital Habeas Unit
601 Walnut St., Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Facsimile: (215) 928-0826
Dated: September 10, 2018          Hunter_Labovitz@fd.org

# CERTIFICATE OF COMPLIANCE

I, Hunter Labovitz, hereby certify on this 10th day of September, 2018, that the foregoing brief is in compliance with this Court's March 9, 2018 order that it consist of no more than 24,000 words. The foregoing brief contains 19,576 words.

/s/ Hunter Labovitz
HUNTER LABOVITZ

**CERTIFICATION THAT HARD COPIES ARE EXACT COPIES OF ELECTRONIC VERSION**

I, Hunter Labovitz, hereby certify on this 10th day of September, 2018, that the hard copies of Appellant's brief submitted to the Court are exact copies of the version submitted electronically.

/s/ Hunter Labovitz
HUNTER LABOVITZ

Appellate Case: 17-7031     Document: 010110050306     Date Filed: 09/10/2018     Page: 87

# CERTIFICATION THAT MOTION IS FREE FROM VIRUSES

I, Hunter Labovitz, hereby certify on this 10th day of September, 2018, that

the foregoing brief has been scanned for viruses using Symantec Endpoint

Protection and is free from viruses.


/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATION REGARDING REDACTIONS

I, Hunter Labovitz, hereby certify on this 10th day of September, 2018, that all the required privacy redactions have been made to the foregoing brief per 10th Cir. R. 25.5.

/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I, Hunter Labovitz, hereby certify that on this 10th day of September, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christopher J. Wilson, Attorney for Respondent

Jeffrey B. Kahan, Attorney for Respondent

/s/ Hunter Labovitz
HUNTER LABOVITZ

## **ATTACHMENTS**

A.    Opinion and Order on Motion, December 15, 2016

B.    Opinion and Order on Rule 59 Motion, March 15, 2017

Appellate Case: 17-7031   Document: 010110050306   Date Filed: 03/10/2018   Page: 91

# ATTACHMENT A:

# Opinion & Order on Motion
# December 15, 2016

Appellate Case: 17-7031   Document: 010190260506   Date Filed: 09/06/2017   Page: 92

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

EDWARD LEON FIELDS,                      )
                                         )
          Petitioner/Defendant,      )
                                         )
vs.                                      )          Case No. 10-CIV-115-RAW
                                         )
UNITED STATES OF AMERICA,                )
                                         )
          Respondent/Plaintiff.      )

### OPINION AND ORDER

This is a proceeding initiated, on April 6, 2010, by the above-named petitioner's filing of a Motion to Vacate, Set Aside, or Correct Sentence.[1]  The motion to vacate conviction and sentence is brought pursuant to 28 U.S.C. § 2255.  The government has filed a response by and through the United States Department of Justice and the United States Attorney for the Eastern District of Oklahoma.  On November 15, 2010, Petitioner filed his reply.

### PROCEDURAL HISTORY

On August 1, 2003, Petitioner was named in a six-count indictment.  The indictment charged Petitioner with Counts 1 and 3: First Degree Murder, in violation of 18 U.S.C. §§ 1111(a) and (b), 7(3) and 13; Counts 2 and 4, Use of a Firearm in a Federal Crime of

---

[1]The motion itself does not contain any of the grounds for relief.  Rather, Petitioner states:

      Mr. Fields raised ten grounds for relief.  They are set forth in the pages attached to the back of this form.  To aid the Court, Mr. Fields includes an Index to Grounds which is at the beginning of the attachment.
      With respect to each of the ten grounds raised, none were raised on direct appeal or in any other post-conviction proceeding." Dkt. # 1, at p. 5.

      Only nine grounds, however, are raised in the pages attached to the original motion to vacate. Dkt. #s 1-2 and 1-3.

Violence Causing the Death of a Person, in violation of 18 U.S.C. §§ 924(c)(1)(A), (d), (j), 7(3) and 13; Count 5, Assimilative Crime – Robbery with a Firearm, in violation of 18 U.S.C. § 7(3) and 13; and Count 6, Assimilative Crime – Burglary of an Automobile, also in violation of 18 U.S.C. § 7(3) and 13.  On March 15, 2004, the government gave notice of its intention to seek the death penalty in the event of a conviction on Counts 1 and/or 3.

On June 30, 2005, Petitioner appeared before this court and waived jury trial as to stage one only and entered pleas of guilty to all of the six counts contained in the indictment. Thereafter, on July 5, 2005, this court began death penalty qualification of potential jurors. On July 13, 2005, the second stage jury trial was commenced.  On July 22, 2005, the jury unanimously returned a verdict of death.  Cr. Dkt. # 228.

On November 8, 2005, the court sentenced Petitioner to death on Counts 1 and 3; 405 months on Counts 2 and 4, to be served consecutively to one another and consecutively to any other term of imprisonment imposed; 405 months on Count 5; and 84 months on Count 6.  Additionally, in the event of subsequent release, Petitioner was ordered to serve 36 months of supervised release.  Petitioner was further ordered to pay restitution in the sum of $15,323.84 and a $100 special assessment on each count, for a total special assessment of $600.  The judgment and commitment was filed of record on November 15, 2005.

Following his conviction, Petitioner filed a direct appeal.  The following issues were raised on appeal:

> 1.  The federal government lacked subject-matter jurisdiction to prosecute Fields for crimes committed in the Quachita National Forest.
>
> 2.  The district court erred in sustaining the government's challenge to a potential juror for cause.
>
> 3.   Double-counting of the aggravator for substantial planning and premeditation unconstitutionally skewed the weighing process because the victims were killed in a single episode.

2

4.  The single verdict of death on two counts of murder deprived Fields of a unanimous verdict on each count.

5.   The evidence was insufficient to prove substantial planning and premeditation.

6.   The non-statutory aggravating factor for future dangerousness is unconstitutionally vague and overbroad, should have been limited to future danger in the prison setting, and was not supported by the evidence.

7.  Since the jury was not required to unanimously agree on the which factual predicates applied to the future dangerousness aggravator, petitioner's right to a unanimous verdict was violated.

8.  The non-statutory aggravator relating to the infliction of anguish or other special suffering on the part of a victim is unconstitutionally vague and overbroad and statutorily preempted.

9.  The trial court improperly admitted evidence regarding the impact of the murders on people unrelated to the victims.

10.   The unanimous rejection of the severe disturbance mitigator was prejudicial error.

11.   The jury should have been required to find that the aggravating factor(s) sufficiently outweigh the mitigating factors beyond a reasonable doubt.

12.   The trial court's decision to allow the "guilley suit" in the jury room during deliberations was improper.

13.  Cumulative error requires reversal.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed Petitioner's conviction. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1905, 173 L.Ed.2d 1060 (2009).[2]

On April 6, 2010, Petitioner filed his Motion to Vacate pursuant to 28 U.S.C. § 2255 (Dkt. # 1).  As previously indicated, Petitioner raised nine (9) grounds for relief.  Seven of those grounds contain Sixth Amendment claims that he received ineffective assistance of counsel.  In addition, he claims the Eighth Amendment was violated because the jury did not

---

[2]Certiorari was denied on April 6, 2009.

568

find as mitigating factors any of the uncontested mental health-related mitigating factors presented; the Eighth Amendment and international law bar his execution because he is not competent to be executed and the death penalty is precluded due to his deteriorating mental health; prosecutorial misconduct deprived him of due process and a fair trial; his Due Process rights were violated because the government withheld exculpatory evidence; cumulative errors deprived him of Due Process and a reliable sentencing hearing; and the manner of Petitioner's death, if carried out, would violate the Eighth Amendment.

Following extensive discovery of the issues herein, the record was expanded on October 13, 2015, with the filing by Petitioner of a document styled: "Grounds in Support of Amended Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a person in federal custody" (Dkt. # 106)[3] and an Amended Appendix in support thereof consisting of thirty-six (36) exhibits (Dkt. #s 106-1 & 106-2). Thereafter, the record was further expanded on October 15, 2015, when the government filed a motion for summary judgment (Dkt. # 110) containing thirty-nine (39) new exhibits. On January 6, 2016, Petitioner filed his response adding thirteen (13) additional exhibits. Finally, on February 2, 2016, the government filed a reply (Dkt. # 122) containing eight (8) more exhibits. This Court has reviewed the relevant trial court records associated with Case No. CR-03-73-RAW, including pleadings, pretrial and trial transcripts as well as all of the pleadings and exhibits filed herein.

---

[3]This amended pleading contains the same nine grounds contained in the attachment to the original motion.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act") delineates the circumstances under which a federal court may grant collateral relief. Title 28, section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). A prisoner seeking post-conviction relief under this statute must allege as a basis for relief: (1) lack of jurisdiction by the court entering judgment; (2) an error of constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error of law or fact where the claimed error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

Section 2255 is not a substitute for an appeal and is not available to test the legality of matters which should have been challenged on appeal. *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987), *cert. denied*, 487 U.S. 1222 (1988). Failure to raise an issue on direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier, and that the court's failure to consider the claim would result in actual prejudice to his defense, . . ." *Id*. "An error of law [or fact] does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (citations omitted).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings. A petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue. Where the omitted issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel. *Hooks v. Ward*, 184 F.2d 1206, 1221 (10th Cir. 1999). *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

## STATEMENT OF THE FACTS

On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case. *Fields*, 516 F.3d, at pp. 927-928. Therefore, this court will not recite them here. The court will, however, discuss various facts as they become relevant to a particular issue. The court would also note that during the sentencing stage of the proceedings, the government presented twenty (20) witnesses and the defendant called nine (9) witnesses. Thereafter, the government put on three (3) rebuttal witnesses. *See*, Tr. of Jury Trial, Vol. VIII-XIII.

6

## PETITIONER'S CLAIMS FOR RELIEF

### I.  Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of counsel in Grounds One, Three, Four, Five, Six and Seven.  *See*, Dkt. #s 14 and 106.  Claims of ineffective assistance of counsel are governed by the now familiar two-part test announced by the Supreme Court in *Strickland v. Washington*,  466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The performance prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness."   *Id*., 466 U.S., at 688.  While the prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*., at 694.  Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims.  *Id*., at 696.

"There is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption."  *United States v. Kennedy*, 225 F.3d 1187, 1196 (10th Cir. 2000) (quoting *United States v. Williams*, 948 F.Supp. 956, 960 (D.Kan. 1996), *cert. denied*, 522 U.S. 1033, 118 S.Ct. 636, 139 L.Ed.2d 615 (1997)).  *See also*, *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). "Effective assistance does not mean victorious or flawless counsel.  To be ineffective, the representation must have been such as to make the trial a mockery, sham or farce, or resulted in the deprivation of constitutional rights."  *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994) (citations omitted).  "The sixth amendment right to reasonably effective counsel does not mean 'errorless counsel' or counsel judged ineffective by hindsight."  *Clark v. Blackburn*, 619 F.2d 431, 433 (5th Cir. 1980).

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id*., at 689. In order to establish prejudice at the penalty stage of a capital trial, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.* Establishing prejudice imposes a heavier burden on a petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Moreover, "admissions of inadequate performance by trial lawyers are not decisive in ineffective claims." *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998). Ineffectiveness is a question the court must decide. *Id*.

*A. Failure to investigate, present and effectively argue mitigating mental health evidence*

In his first ground for relief, Petitioner claims counsel were ineffective "with regard to nearly every aspect of [his] mental health mitigation defense," Dkt. 14, at p. 5, enumerating six specific claims dealing with counsel's alleged failures regarding investigation, presentation and summation of mental health evidence. In essence, Petitioner asserts his counsel ineffectively argued his mental health history and failed to request jury instructions to the effect that his asserted mental conditions satisfied multiple mitigating factors. Although conceding that counsel presented "significant mental health-related mitigating evidence, including his pre-offense history of chronic depression and auditory hallucinations and a post-offense diagnosis of bi-polar disorder" (Dkt. # 14, at  p. 21); substantial evidence of mental illness[4] and argued his various conditions established specific mitigating factors, petitioner complains because his lawyers did not argue that his mental health issues satisfied multiple mitigating factors. Petitioner also argues counsel were ineffective for failing to assert that his uncontested mental health history was mitigating and the Eighth Amendment was violated because the jury did not find any of this uncontested evidence was a mitigating factor in his case.

Petitioner further contends, despite the fact that in 2011 an MRI of his brain showed it was "normal",[5] counsel were ineffective for failing to investigate and present evidence of his organic brain damage. Petitioner also complains because counsel failed to call local

---

[4]Declaration of trial counsel states, in pertinent part, "[w]e offered and argued to the jury the existence of twenty-two mitigating factors. In the realm of mental health statutory mitigating factors: that he suffered a severe mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired. . . . .one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument." Dkt. # 2-2 at pp. 11-12.

[5]*See*, Dkt. # 110-23, at p. 78.

9

medical professionals to support his manic flip defense and to testify that his mental illness was genuine. Additionally, petitioner states counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price and for failing to investigate and present evidence of compulsive aggression in effexor patients. Finally, petitioner complains trial counsel ineffectively failed to thoroughly and properly prepare two mental health experts who testified.

To support his claims, petitioner relies primarily upon an affidavit by Julia O'Connell, Federal Public Defender for the Northern and Eastern Districts of Oklahoma and lead defense counsel in the criminal proceedings from which this § 2255 action arose. Ms. O'Connell indicates she was an Assistant Federal Defender at the time of appointment but had never tried a federal death penalty case. Ms. O'Connell had, however, tried two state capital cases while employed by the state public defender's office. Dkt. # 2-2, at ¶ 2. While counsel bemoans the fact she was overworked and didn't have a clue what she was doing, the record reveals there were actually four (4) attorneys who made appearances in this matter, three of whom were from the local federal defender's office and each of those attorneys had substantial federal and/or state criminal trial experience.[6] *See also*, Dkt. # 110-1 (email in which Paul Brunton, Federal Public Defender advises Judy Clark, National Capital Resource Counsel that his office has "very able lawyers both with lots of trial, motions and appeal experience in state [death penalty] cases." Brunton forwarded his email and the response

---

[6]The docket sheet in this matter reflects Michael A. Able, Assistant Federal Public Defender appeared at Fields initial appearance on July 21, 2003. Mr. Abel was admitted to practice in the United States District Court for the Eastern District of Oklahoma on November 8, 1995 and he was not terminated as counsel in this case until November 15, 2005, following Fields' formal sentencing. Additionally, on July 25, 2003, both Julia O'Connell and Barry L. Derryberry entered their appearances on behalf of Fields. *See*, Dkt. #s 9 and 10, respectively. Finally, on August 12, 2003, Mr. Isaiah S. Gant filed a Motion to appear *pro hac vice* on behalf of Fields. Dkt. # 19. On September 9, 2003, the motion was granted. Dkt. # 29.

thereto to Michael Abel, Barry Derryberry and Rob Ridenour, three assistant federal public defenders in his office.  This would imply more counsel were available to assist on this case than those who actually made a formal appearance in the case.)   Additionally, Ms. O'Connell's emails establish that she consulted numerous times with attorneys from the National Capital Resource Counsel regarding the facts of this particular case and ideas on how best to defend it.  *See*, Dkt. #s 110-1-110-10.

Ms. O'Connell claims, despite the fact her client "remained insistent, and ultimately pled guilty," if Isaiah "Skip" Gant, counsel deemed "Learned Counsel by the Federal National Resource Counsel Project" had joined her in counseling against the plea, together they might have convinced Fields not to plead guilty.  *Id*., at ¶¶ 6 and 7.  To the extent she admits Fields was insistent on pleading guilty, it is nothing more than wishful thinking to speculate that one more attorney would have been able to convince Fields to follow counsel's advice.  Ms. O'Connell continues her affidavit by claiming she had no tactical or strategic reasons for everything which is challenged in the case.  *Id*., at p.8 (¶¶s 11 and 12); p. 9 (¶¶s 13 and 14); p. 11 (¶ 17); p. 12 (¶ 18); p 13 (¶¶s 19 and 20); and p. 15 (¶¶s 22 and 23).

Statements by trial counsel in affidavits filed years after trial, where counsel in effect "fall on their swords," do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary. *Jackson v. United States*, 638 F.Supp. 2d 514, 528 (W.D.N.C. 2009).  *See also*, *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (court relied on contemporaneous court record to discount trial counsel's testimony in competency trial).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064.

In this court's opinion, the arguments made by petitioner are the kind of arguments which the Supreme Court in *Strickland* cautioned against, those made with the advantage of 20/20 hindsight. *Id.*, 466 U.S., at 689, 104 S.Ct., at 2065. A review of the record reflects, despite the circumstances surrounding the murders of two individuals who were stalked like animals before being killed in cold blood, defense counsel presented a strong case in mitigation premised on several theories of mental illness, including the testimony of two mental health experts, Brad Grinage and George Woods. Grinage, a forensic psychiatrist testified Fields suffered from bipolar disorder and he described symptoms which led him to his diagnosis as depression, rushing thoughts which were episodic in nature and distractibility. *See*, Tr. of Jury Trial, Vol. XI at pp. 2778, 2790-2791, and 2794-2795. Additionally, Grinage indicated Fields had the classic symptoms of mania with regard to pleasure seeking behaviors and hypersexuality. *Id.*, at pp. 2791-2792 and 2795. Moreover, Grinage explained the most compelling evidence in his diagnosis was the fact Field's primary care doctor had documented that Fields suffered from auditory hallucinations prior to the murders. Grinage also explained to the jury that treating bipolar patients with antidepressants, especially Effexor, carried an increased risk of causing mania or symptoms of hypomania and/or enhancing any existing psychosis. *Id.*, at p. 2780. Finally, Grinage indicated, in his professional opinion, Fields was suffering from a "severe emotional mental disturbance, mainly bipolar disorder with psychotic features" with the psychotic features being auditory hallucinations. *Id.*, at p. 2815.

The other defense expert, Dr. Woods, a neuropsychiatrist who specialized in examining the relationship between a person's brains and their behavior, testified that Fields had suffered from a mood disorder for many years beginning in childhood. *See*, Tr. of Jury Trial, Vol. XII at p. 2946. Woods also discussed Fields history of depression beginning at

age sixteen and the many different medications which had been tried. Woods further indicated Fields had a history of mania which he described as being at "the other end of the bipolar." *Id*., at p. 2973. Woods continued by explaining the symptoms experienced by Fields such as irritability, impaired judgment, hypersexuality, "anger and rage that's come out of nowhere," impaired functioning, problems sleeping, problems with his appetite and hearing voices both before and after the offenses. *Id*. Based upon his examination, Woods diagnosed Fields with either a schizoaffective disorder or a bipolar disorder with psychotic features which led Fields to display poor judgment and have erratic thinking. *Id*., at p. 2976-2977. Woods explained to the jury that the Effexor, which Fields was taking at the time of the murders, could "flip" people with bipolar disorder from depression to mania, further impairing his judgment.

Moreover, during closing argument, counsel addressed all aspects of Fields mental health discussing his depression and how it affected everything in his life, his inability to control what was going through his mind continually because of "rushing thoughts," and counsel implored the jury to show empathy for Fields since he had already accepted responsibility for his actions. Tr. of Jury Trial, Vol. XIV, at pp. 3434-3436. Counsel indicated his mental disease impaired his abilities. *Id*., at p. 3436. Counsel also emphasized the bipolar flip theory, pointing out to the jury that the Effexor built up like it was supposed to and then it hit a tipping point so bad that a girl friend of Fields called the prescribing doctor worried about either suicidal or homicidal behavior. Thus, counsel argued when Fields committed these offenses he was "under severe mental or emotional disturbances." *Id*., at p. 3440. Counsel also reminded the jury that all of the physicians who had treated Fields endorsed the idea that the voices were credible. *Id*., at 3439.

13

While the right to effective assistance of counsel extends to closing arguments, counsel still has wide latitude in deciding how best to represent their client, and deference to counsel's tactical decisions in their closing arguments is extremely important because of the broad range of legitimate defense strategy at this stage of the case. *Yarborough v. Gentry*, 540 U.S. 1, 4, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003). The purpose of closing arguments is to "sharpen and clarify the issues for resolution by the trier of fact . . . . " *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

> Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed it might sometimes make sense to forgo closing argument altogether.

*Yarborough*, *supra*. Therefore, as in all challenges to effectiveness of defense counsel's actions, this court's review of a defense attorney's summation is highly deferential.

Furthermore, in spite of petitioner's claim counsel should have argued these alleged mental issues satisfied multiple mitigators, the jury outright rejected this evidence, finding petitioner did not commit the offenses under severe mental or emotional disturbance. Cr. Dkt. # 229, at p. 6. To the extent the jury did not believe the mental health testimony was mitigating, it is pure speculation to suggest the jury would have viewed the evidence differently if counsel had argued it fit under several different mitigating factors. Ms. O'Connell's correspondence reveals she was aware she faced a difficult task to convince the jury to rely on her mental health evidence. Dkt. # 110-7. Counsel's criminal trial experience clearly gave her the ability to make a strategic decision as to the best way to argue the mental health evidence to the jury.

14

Fields argues failure to find the uncontested mental health evidence[7] was mitigating violates the Eighth Amendment. The government makes a compelling argument that this claim has been procedurally defaulted. Whether or not the claim has been defaulted, this court finds no authority to suggest that a jury is automatically required to find uncontested mental health evidence automatically qualifies as a "mitigating factor." Rather, the Supreme Court has suggested complete jury discretion is constitutionally permissible so long as the jury is not precluded from considering any relevant mitigating evidence offered by the defendant to support a sentence less than death. *See, Graham v. Collins*, 506 U.S. 461, 508, 113 S.Ct. 892, 919, 122 L.Ed.2d 260 (1993) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). The Eighth Amendment simply requires jurors be allowed to consider and determine for themselves the existence and weight to be accorded alleged mitigating factors. *See, Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

Additionally, regardless of the reasons counsel did not followup with an MRI,[8] in light of the results of a 2011 MRI, this court finds petitioner has failed to establish prejudice based upon counsel's failure to investigate and/or present evidence of his alleged organic brain damage. While Petitioner urges this court to disregard the post-trial information of Dr. James Seward regarding a peer-reviewed psychological and neuropsychological evaluation of

---

[7]Fields argues "counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations." Dkt. # 106, at ¶ 16. There is nothing within the record to indicate the jury was prevented from considering **any** of the evidence which they heard at trial.

[8]In February, 2005, counsel advised the United States Attorney's office that the cost of a PET scan was $35,000 and suggested the prosecution team should absorb this cost. Thus, the cost of a brain imaging scan clearly played a role in counsel's decision to rely on their expert testimony and forego conducting a brain scan. *See*, Dkt. # 106-8.

Fields, Dkt. # 110-23, because it did not exist at the time of trial,[9] it is petitioner's burden to establish prejudice.  The government's burden is to rebut the arguments presented by petitioner.

To support his argument that counsel was ineffective for failing to investigate and present evidence of his organic brain damage, petitioner submitted a neuropsychological examination report dated April 1, 2010, by Daniel A. Martell, Ph.D, Dkt. # 106-10.  Dr. Martell claims the report of Dr. Price unequivocally demonstrates organic impairment in the frontal lobes.  In that report, Dr. Martell indicates "any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments (sic) Mr. Fields' brain functioning, primarily involving frontal lobe functioning", *id*., at p. 13, and "Mr. Fields has experienced a catastrophic loss of brain function over the past five years." *Id*., at p. 17.  Dr. Martell goes on to state that "[t]his apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve (sic) functioning." *Id*.  In addition, petitioner submits an affidavit from Dr. Grinage, which state "[i]t is highly likely that [Fields] has frontal lobe impairment that would affect his bipolar behavior and treatment."  Dkt. # 106-4.  To rebut Field's argument that he has significant brain impairments which trial counsel failed to follow up on, the government had the right to rely on current psychological testing, including an MRI of his brain.  To hold otherwise, would allow post-conviction counsel to make arguments which could never have been proven at trial even if trial counsel had taken the very steps which post-conviction counsel argue they should have taken.  While petitioner cites to, *United States v. Gonzalez*, 98

---

[9]*See*, Dkt. # 119, at pp. 31-32.

Fed.Appx. 825, 832 (10th Cir. 2004),  an unpublished Tenth Circuit opinion, for the proposition that this court cannot resolve differences among the parties mental health experts without an evidentiary hearing, petitioner submits nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011 was normal.

Fields further argues the trial counsel failed to object when the Government "brought out harmful, but limited, testimony from Dr. Price regarding brain damage." Dkt. # 106, at p. 47. A review of the testimony, however, reveals interposing an objection to the limited testimony elicited by the government which briefly indicated Fields "cognitive processes . . . . were intact"[10] and Price's statement he "thought there was probably going to be some brain dysfunction"[11] would have drawn the jury's attention to the testimony. Giving counsel's desire to limit the jury's exposure to such testimony, this court finds counsel's decision to not object was a reasonable trial strategy. Again, to the extent Fields does not have organic brain damage, counsel's limited cross-examination of Dr. Price was not ineffective. Nor did this brief testimony likely impact the outcome of the trial. Therefore, this court finds petitioner has failed to establish prejudice.

Petitioner also is dissatisfied with counsel's decision to not call his local medical professionals, *i.e.*, two psychiatrists who treated him while he was in custody - Joyce Bumgardner and Larry Trombka - and a physician and physician's assistant who treated petitioner prior to the murders - Dean Anderson and R.L. Winters, respectively. This testimony, however, was cumulative to the evidence, discussed above, which was presented

---

[10]Tr. of Jury Trial, Vol. XII, at p. 3106.

[11]Tr. of Jury Trial, Vol. XII, at p. 3154.

at trial through defense experts, Dr. Grinage[12] and Dr. Woods.[13]  Moreover, trial counsel used

this evidence in closing arguments to remind the jury that Fields had reported auditory

hallucinations prior to the murders.[14]  Counsel's failure to call witnesses whose testimony is

cumulative of evidence already presented at trial is not considered constitutionally deficient

performance.  *Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007).  Since evidence which

is essentially cumulative would not have led the jury to reach a different result in the

sentencing phase of a capital case, failure to present such evidence could not have prejudiced

the defendant.  *Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th Cir. 2001).  Petitioner has

failed to establish his attorneys actions regarding this omitted testimony rendered their

assistance ineffective or that he was prejudiced thereby.

Petitioner further attacks counsel's failure to investigate and present evidence

regarding how the use of Effexor correlates with compulsive aggression.  Petitioner then cites

to an FDA public health advisory asking manufacturers of ten anti-depressant drugs,

including Effexor, to alter their labeling to include a "warning statement recommending

'close observation' of patients being treated with these drugs for increased depression or

suicidality and noting that '[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**,

impulsivity, akathisia, hypomania, and mania . . . .'"  Dkt. # 106, at p. 57 (bold in original).

Yet, the two experts presented by counsel attributed Fields behavior to the effects of Effexor.

First, Dr. Grinage opined Fields

> . . . . . had gone for some time with a depression that alternated with bipolar-
> like symptoms and could probably have been diagnosed with bipolar had it
> been recognized.  And when given multiple fail trials of antidepressants which

---

[12]Tr. of Jury Trial, Vol. XI, at pp. 2795-2810, 2821, 2893-2894.

[13]Tr. of Jury Trial, Vol. XII, at pp. 2978 - 2995 and Vol. XIII, at pp. 3209-3210.

[14]Tr. of Jury Trial, Vol. XIV, at p. 3442.

you might expect with a bipolar patient given an antidepressant with some norepinephrine activity that he developed an irritable manic mania.  He went from depression or mixed depression manic state into a more irritable state.  He continued to have depressive symptoms, so, he was - - in essence, he may have been completely in a mix, both depression and mania, but, he tended to have more of a diagnosable irritable mania as he described classically an increase in his rushing thoughts, hearing the voices more frequently and having anxiety associated with the voice.

Tr. of Jury Trial, Vol. XI, at pp. 2814-2815.  Thereafter, Dr. Woods discussed "mania" and indicated that newer studies showed "often mania does not show up as – just pure grandiosity but that it really shows up in irritability, in spontaneous anger, in kind of this inability to control your anger."   *Id*., Vol. XII, at p. 2953.   Dr. Woods further discussed the pharmacological literature surrounding Effexor, testifying:

[w]hen you look at the literature - - not the PDR, not the Physicians Desk Reference, because the Physicians Desk Reference is not a learned treatise by any stretch of the imagination.  But when you look at the actual literature, pharmacological literature, you see that Effexor has a significant incidence of flipping people into mania, of making that switch.  When a person switches into mania, they often become - - their judgment becomes increasingly impaired.

*Id*., at p. 2990.  Fields' argument that counsel would have learned that patients treated with Effexor "experience increased rates of compulsive aggression" is just another way of saying what defense experts actually said, *i.e.* Effexor increases the incidence of causing spontaneous anger, irritability or inability to control your anger.  Therefore, this court finds counsel were not ineffective for failing to hire more experts who would have said the same things about the potential side effects of Effexor.

Finally, Petitioner states trial counsel failed to thoroughly and properly prepare their mental health experts.  While trial counsel failed to provide Dr. Grinage with the transcript of Fields' change of plea hearing or to inform Woods of a pertinent statutory mitigator, this court finds petitioner has not established any prejudice occurred as a result of these oversights.  Rather, as noted by the government, both experts testified consistent with the

19

written opinions they rendered before Fields entered his guilty pleas and defended their

conclusions on cross-examination.  Fields has failed to establish counsel was ineffective in

investigating, presenting and/or arguing his mitigating mental health evidence.

20

*B. Failure to investigate, present and argue evidence rebutting aggravating factors*

In his third ground for relief, Petitioner claims trial counsel's failure to challenge the statutory aggravating factor of substantial planning and premeditation and the non-statutory mental anguish aggravator violated his right to effective assistance of counsel. Moreover, Petitioner contends the government presented false and misleading testimony and argument in support of the substantial planning and premeditation factor thereby violating his right to due process guaranteed by the Fifth Amendment.

1. Substantial planning and premeditation

In regard to this aggravating factor, the jury was instructed as follows:

> The government seeks to prove that the defendant committed the offense of murder after substantial planning and premeditation to cause the death of Charles Glenn Chick, Jr. and/or Shirley Elliot Chick. "Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand. "Substantial planning" means planning that is ample or considerable for the commission of the crime at issue.

Cr. Dkt. # 227, at p. 22.

Petitioner argues counsel was ineffective for failing to conduct a reasonable investigation by asking his friend and government witness, Daniel Presley, about his knowledge of ghillie suits and rifles with scopes. First, he claims Presley would have testified that "ghillie suits and ghillied weapons were common among hunters in the area."[15] He also claims Presley "would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles;"[16] and "Fields attached the scope to his rifle at least a year before the homicides."[17] Additionally, Fields

---

[15]Dkt. # 14, at p. 50; Dkt. # 106, at p. 61; and Dkt. # 106-21, at p. 4.

[16]Dkt. # 14, at p. 50; Dkt. # 106, at p. 68; and Dkt. # 106-21, at p. 5.

[17]Dkt. # 14, at p. 50; Dkt. # 106, at pp. 68-69; and Dkt. # 106-21, at p. 6.

asserts Presley could have rebutted the government's claim that he had tried to set up an alibi for the night of the homicides by testifying that Fields had asked him to go snake hunting on the night of the murders. Finally, Fields argues a reasonable investigation, including consulting with an independent crime scene investigator, would have found evidence to refute the government's allegations that Fields returned to the crime scene many hours after the shooting to "stage" a robbery. Dkt. # 14, at p. 66; Dkt. # 106, at pp. 71-79; and Dkt. # 106-24. According to Fields this additional testimony would have rebutted the substantial planning and premeditation aggravating factor.

If this testimony had been elicited, however, it would not have changed the defendant's own statements regarding the what he had done on the evening of July 10, 2003, which were introduced through Special FBI Agent Graff. In particular, Agent Graff begin by telling the jury that the defendant originally denied having any firearms and stated that he did not hunt. Tr. of Jury Trial, Vol. IX, at pp. 2249-2250. Additionally, Fields originally denied having been to the Winding Stair campground and told the FBI agent he had made a ghillie suit approximately four years before, but he had thrown it away about two or three years ago. *Id.*, at pp. 2255-2256. Finally, Fields initially denied shooting the Chicks. *Id.*, at pp. 2256-2257.

Once confronted with the facts known by Agent Graff,[18] Fields changed his story and admitted that he had killed the Chicks. *Id.* In his confession to the FBI, Fields stated he went to the Winding Stair Campground on the evening of the 10th to use the bathroom. When he arrived at the campground, "he observed the Chicks over at the vista, which was an overlook

_____

[18]These facts included: 1) defendant's truck had been seen at Winding Stair on the evening of the 9th; 2) agents were in the process of searching his truck; 3) a .22 rifle had been found behind the seat in his truck and it appeared to be consistent with the firearm that was used in the killings of the Chicks; 4) a ghillie suit had been found in the back of his truck which contained fibers that appeared to be consistent with fibers found at the crime scene and 5) items secluded under a blanket in his truck appeared to be personal items which belonged to the Chicks, including a camera and a portable Casio T.V. *Id.*, at pp. 2257-2259.

which overlooks the valley to the north.  And he described the vista as being approximately seventy-five yards from their campsite." *Id*, at p. 2261.  Upon seeing the Chicks, Fields "put on his ghillie suit and took his [.22 caliber] rifle and went over in the woods and secreted himself in the woods near their campsite." *Id*.  Fields could not say how long he watched and waited for them to come back from the vista; but he observed them for approximately fifteen minutes after they had returned to the picnic table at their campsite before he crept up, on his belly, closer to their campsite (taking another five minutes) and when he heard Mr. Chick say he was going to the tent, he fired a shot into Mr. Chick's head.  *Id*., at pp. 2263-2267.  After shooting Mr. Chick, Fields told Agent Graff he moved closer to the campsite; Shirley Chick had gotten up from the picnic table and was running towards the van, so he fired two to three shots at her as she ran.  *Id*., at pp. 2267-2268.  Fields approached the van and shot Ms. Chick in the head at least two times.  *Id*.  Thereafter, Fields told the FBI that he went back to the picnic table and because he thought Mr. Chick might still be alive, he shot him in the head a second time.  *Id*., at p. 2268.  Further, Fields stated he then removed forty dollars from Mr. Chick's pants pocket, which he kept.  *Id*., at p. 2270.  Fields continued his confession to the FBI, indicating he went back to his truck, took off his ghillie suit and drove back to the Chicks' campsite, picked up a rock, broke the window of the van and took personal items of the Chicks from the van.  *Id*.  Following his interview with the defendant, the FBI agent wrote a synopsis of what Fields had said.  It was introduced as Government's Exhibit 131 and read to the jury.  The written confession stated the following:

> I, Edward L. Fields, have been advised of my Miranda warnings pursuant to my arrest for shooting Charles and Shirley Chick resulting in their deaths.  I waive my Miranda rights and voluntarily provide the following written statement.
> On approximately Tuesday, July 8[th], 2003, I observed a man and woman, whom I later determined to be Charles and Shirley Chick, camping at the Winding Stair Campground.  My purpose for being there was to use the bathroom.  The Chicks appeared to be using a tent and a blue van.

During the evening hours of July 10th, a Thursday, I returned to Winding Stair Campground to use the bathroom. Just before dark, I observed the Chicks at the vista approximately seventy-five yards from their campsite. I dressed myself in a guillie (sic) suit, and with a .22 caliber rifle crept up close to their campsite and waited for them to return.

I had been short of money all week and intended to rob the Chicks. The main reason I was short of money was because of child support payments I have to pay. My intent was to rob the Chicks at gunpoint, tie them up, and leave.

The Chicks returned from the vista and were sitting at the picnic table at their campsite. I remained concealed in the woods for about fifteen minutes after their returning to the campsite.

At one point Charles Chick said he was going to the tent. I shot Charles Chick with one shot to the head. I then shot at Shirley Chick a couple of times. I followed Shirley Chick to the van and shot her twice in the head. I then returned to Charles Chick and shot him once in the head. I removed forty dollars cash from Charles' pants pocket.

I returned to my truck, a blue Chevrolet, parked about seventy-five yards away, and brought my truck over to the Chicks' campsite. I broke the driver's side window out of the Chicks' van using a rock. I removed the Chick's van -- I removed from the Chicks' van two backpacks, a camera with a long lens, a mini television, Charles Chicks' wallet, a battery charger, two mini flashlights and a radar detector. One mini flashlight, the camera, the mini television, and the radar detector remain in my truck at the present time. I disposed of one of the backpacks, which included the battery charger at Kerr Lake. I disposed of the other backpack which contained Charles Chick's wallet, Shirley chick's purse and a rock in Lake Wister. I recovered $300 from Shirley Chick's purse before I disposed of it.

Both Charles and Shirley Chick were dead when I left their campsite the evening of July 10th. After leaving the Chicks' campsite, I returned to my campsite located near Lake Wister. Between the hours of 7:00 and 8:00 a.m. on Friday, July 11th, I purchased gasoline at the Wal-Mart in Poteau using Charles Chick's credit card.

During the week prior to July 10th, I had been very depressed. I had felt suicidal. I had no money, and I felt desperate. Since shooting the Chicks, I have felt very sick and very remorseful. I would like to tell the Chicks' family and relatives that I am sorry for this incident.

I make the above voluntarily. The above statement, Pages 1 through 3, are true and accurate.

Signed by Edward Fields, 7-18-03, witnessed by myself, Agent Jones and Donnie Long.

*Id*., at pp. 2280-2283.

In addition to the defendant explicitly admitting he had seen the Chicks two nights prior to the murders, that he stalked them for at least fifteen minutes before shooting them like animals, evidence supporting the substantial planning and premeditation aggravator was

24

introduced thru several other witnesses.  First, Ms. Hairrell testified she helped make a "sniper suit"[19] for the defendant a few years before the murders.  She asked the defendant several times what the suit was for and the defendant never would answer.  *Id*., at pp. 2326-2331.  On one occasion when Ms. Hairrell saw the defendant's rifle, the defendant said "[h]e could shoot anybody a hundred yards off."  *Id.*, at pp. 2329.

Carol Lamb testified, on June 15, 2003, she accompanied the defendant to Atwoods where he purchased gunny sacks.  Later that day, Ms. Lamb helped the defendant cut the gunny sacks into strips.  When Ms. Lamb observed the defendant tying the strips to his rifle, she asked him what he was doing and "[h]e  just kind of laughed it off and said, 'You don't want to know.'" *Id.*, at pp. 2238 and 2340.  Additionally, the defendant admitted to Ms. Lamb that he had previously snuck up on a couple while wearing his ghillie suit.  *Id*., at p. 2348.

On July 7, 2003, the defendant told his friend, Daniel Presley, he had seen a couple parked in a car and he had snuck up on them in his ghillie suit.  *Id*., at p. 2377.  Another witness, Brenda Stacy, also heard the defendant say "You don't really want to know" when asked what the ghillie suit in the bed of his truck was for.  *Id*., p. 2421.  Further, Marilyn Presley testified on July 7, 2003, the defendant also told her, he had donned his ghillie suit and watched a couple in a car for  a few minutes.  *Id.*, Vol. X, at p. 2463.

Charles Love testified about the defendant telling him he had worn his sniper suit "on Talimena Drive and had slipped upon on a couple of people on Talimena Drive."  *Id*., at p. 2487.  This incident occurred sometime in the spring of 2003.  *Id*., ap p. 2486.  Mr. Love indicated the defendant had told him that he got within 20 yards of this couple and they did

---

[19]This was the term the defendant used to refer to the ghillie suit.  *Id*., at p. 2331.  *See also*, Tr. of Jury Trial, Vol. X,  at p. 2486.

not know he was there.  *Id.*  A couple of weeks after this incident, the defendant asked Mr. Love about making a silencer.  *Id.*, at pp. 2487-2488.

Finally, Dawn Michelle Bond testified the defendant called her from the Poteau Police Department to tell her "that he was in jail for murdering the people that I had joked with him about murdering."  *Id.*, at p. 2584.  During the course of her testimony, Ms. Bond said the defendant had told her he had watched the victims have sex in their car on some day prior to the shootings.  *Id.*, at p. 2583.

All of this evidence establishes the defendant planned these murders for at least two days, if not substantially longer, prior to actually committing them.  Even if Presley had testified about lawful uses of ghillie suits and rifles with scopes, that Fields had attached the scope to his rifle at least a year before the murders or that "lots of guys who use ghillie suits also ghillie their guns,"[20] it would not have lessened the impact of the evidence the jury heard regarding Fields ghillying his rifle less a month before the murders; his statements to so many people that they didn't want to know what his ghillie suit was for; the fact that the defendant became proficient in sneaking up on people while wearing his "sniper suit;" or finally, his statements that he drove to a secluded area, laid in wait for over fifteen minutes (even crawling closer on his belly) before killing two unsuspecting campers in cold blood.  Each of these actions established the substantial and methodical planning and premeditation that went into the murders of these two innocent campers which the defendant ultimately carried out on July 10, 2003.  Moreover, whether or not the defendant knew he was definitely going in for the kill when he told Ms. Tipton he would not be over because he would be going "fishing" with Presley, does nothing to lessen the substantial amount of planning which defendant engaged in to finally fulfill this human hunting expedition.

---

[20]Dkt. # 106, at p. 68 and Dkt. # 106-21 at p. 6.

Fields continues his attack on counsel's investigation by arguing counsel was ineffective for failing to consult an independent crime scene investigator. According to Fields, if counsel had consulted with such an expert, counsel could have introduced evidence contradicting an Oklahoma State Bureau of Investigation (O.S.B.I.) agent's testimony that Fields staged the robbery many hours after the shootings and/or suggested cross-examination questions to challenge the accuracy of the testimony regarding glass fragments and/or blood flow evidence at the scene. During the trial, Agent Dalley testified as a crime scene investigator, having expertise in blood stain pattern analysis and crime scene reconstruction. Tr. of Jury Trial, Vol. VIII, at p. 2080. Agent Dally indicated she was called to the scene on July 11, 2003, at which time she took numerous photographs of both of the victims and different areas of the victim's van. Many of the photographs taken at the scene were introduced in the trial. Agent Dalley explained each of the photographs to the jury and discussed gravity blood flow patterns depicted within those photographs, including pooling on the pavement , around the victims and in the victims' clothing. The agent also described blood spatter on Ms. Chick's face and while the photograph depicting this blood was not admitted into evidence, Dalley testified, after reviewing the photograph, she believed the only source for the blood on Ms. Chick's left cheek was from one of Mr. Chick's wounds. According to Dalley, Ms. Chick would have been approximately two feet from Mr. Chick when he sustained a gunshot wound thereby spraying high velocity spatter onto Ms. Chick. *Id.*, at pp. 2082-2091. Dalley further testified she observed glass fragments at the scene of the murders which were consistent with the broken driver's window of the van. Dalley surmised, because there was no blood stains on these fragments, that the glass had to have been shattered, at least an hour, after the murder in order to allow the blood to dry enough that it was not transferred to the glass on contact. *Id.*, at p. 2099.

27

Petitioner now claims

> Agent Dalley's testimony that the glass fragments found resting on a dried pool of Mrs. Chick's blood were not stained with blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. In her report, Agent Dalley recorded no observations about these glass fragments, nor did she note whether she examined the fragments at the scene or collected them for later examination.

Dkt. # 14, at p. 66. *See also*, Petitioner's Exh. # 22, Dkt. # 106-23. Defense counsel, however, got Dalley to admit on cross-examination that she did not collect any of these glass fragments. Tr. of Jury Trial, Vol. IX, at p. 2216-2217.

Petitioner further claims the government argued he left the campground after shooting the Chicks and returned several hours later to stage a robbery and that this argument "was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal." Dkt. # 106, at p. 71. Based upon the evidence in this trial, the court does not believe the length of time after the murders the robbery occurred was relevant to the jury's finding beyond a reasonable doubt that the "substantial planning and premeditation" aggravator applied to these murders. The defendant admitted in his confession that he took $40 from Mr. Chick's pocket right after the murders, then he left the victim's campsite, returning with his truck to complete the robbery. Nowhere does his confession indicate the length of time he was in his truck before he returned to the victim's campsite and completed the robbery, Tr. of Jury Trial, Vol. IX, at pp. 2281-2282; but, again, this was not relevant. As a result, the court finds it was not unreasonable for defense counsel to not consider hiring experts to contest evidence related to the robbery.

Next, petitioner argues trial counsel should have "attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot." Dkt. # 106, at p. 76. Nowhere does Fields state that he advised

counsel that this evidence was not accurate; yet, Fields would have been the one person who would have known how long after the murders he moved the bodies. If counsel did not know of facts which would alert her to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 892 (9th Cir. 2003). Moreover, the opinions now proffered by Robert Tressel regarding blood flow and lividity do not convince this court that any reasonable probability exists that his conclusions would have altered the jury's decision in this particular case regarding the substantial planning and premeditation aggravator. Since Tressel concedes Mr. Chick was found in full rigor 24 hours after his killing, there is no basis for this court to find Tressel's estimations regarding rigor would have undermined the testimony that the body was moved about six hours after death. In fact, the testimony at trial noted various factors which could have altered the timeline before full rigor mortis occurred and defense counsel adequately cross-examined the witnesses. *See*, Tr. of Jury Trial, at Vol. VIII, at pp. 2047- 2054; Vol. IX, at pp. 2196-2224; and Vol. XI, at pp. 2639-2650. Based on the record before the court, this court finds failure to hire an expert, like Robert Tressel, did not so undermine the proper functioning of the adversarial process such "that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064. Once again, how long it took the victim to "bleed out" and whether or not the victim was moved from the picnic table within an hour or after six hours is irrelevant to whether or not the defendant engaged in "substantial planning and premeditation" in relation to the actual murders. Regardless of the government's closing argument, what occurred after the victims were killed was relevant only to establish the defendant's mental state and/or state of mind after the murders.

2. <u>Mental anguish</u>

Petitioner also argues his attorneys were ineffective for not contesting the source of the blood spatter on Ms. Chick's face since it could have come from her own head wounds as opposed to being from Mr. Chick's head wounds. Petitioner claims this testimony would have rebutted the mental anguish aggravating factor because it was the only evidence used by the government, in conjunction with what he claims was "sheer speculation designed to inflame the passions of the jury,"[21] to provide a basis for the jury to find the mental anguish aggravating factor. Fields fails, however, to consider many of the facts known both by defense counsel, as she considered how to best defend this case, and the totality of the evidence heard by the jury. The evidence indicated the campground where these murders occurred was fairly rural and isolated. Tr. of Jury Trial, Vol. IX, at p. 2210. Defendant admitted that the victims were sitting at a picnic table when he silently approached and shot Mr. Chick in the head. Corroborating this confession, investigators found two partially empty beverage containers at the picnic table. *Id*., at pp. 2118-2119. The jury could use their common sense in determining that Ms. Chick would likely have heard the shot and seen her husband fall seconds before she began to run for her life, only to be shot in the foot as she attempted to escape to her van. She probably caught a glimpse of the ghillied up creature shortly before her death. While the prosecutor mentioned the blood spatter evidence in regard to this aggravator, his focus was on Ms. Chick's perceptions in the final moments of her life trying in vain to escape death. *See*, *id*., at Vol. XIV, pp. 3415-3418. These facts clearly allowed the jury to find beyond a reasonable doubt that Ms. Chick suffered mental anguish in the last moments of her life. Putting on an expert to opine as to the source of blood spatter

---

[21]Dkt. # 20, at p. 41.

30

on Ms. Chick's face would not have altered the jury's finding regarding the mental anguish aggravating factor.

Just as mitigating evidence can be important in a capital sentencing trial, defense counsel can not overlook the real risk of offending the jury by contesting points that, based upon a totality of the facts, are insignificant. This is never more important than in a case like this where the defendant is trying to convince the jury that his actions were the result of a manic flip from taking legally prescribed drugs, he has accepted full responsibility, and he wants the jury to believe that his apology to the victims' family was sincere.

There is no question that defense counsel could have hired more experts to contest the government's case. In the last twenty years, defense of criminal cases, especially capital cases, has become much more complex. Experts have sprung up for virtually every aspect of every case. Still all the high dollar experts money could buy would not have overcome the insurmountable task of convincing the jury in this particular case that the defendant deserved anything less than death for these two murders. The emails from defense counsel recognize she knew she was fighting an uphill battle to convince jurors to believe her mental health experts as jurors tend to distrust/discount expert testimony. Dkt. # 110-7. To have contested either the length of time which elapsed between the killings and the robbery or the source of the blood spatter on Ms. Chick's face with expert witnesses, would have been counter-productive in convincing the jury that the defendant deserved a sentence less than death if the murders were solely the result of a manic flip from taking a prescription drug. Accordingly, this court finds counsel was not ineffective in failing to investigate or present evidence to rebut these aggravating factors. Moreover, despite counsel "falling on her sword" and swearing she had absolutely no trial strategy, counsel's decision regarding her closing remarks fall within the broad range of reasonable trial conduct under *Strickland*. Counsel emphasized

31

the evidence she wanted the jury to remember in the jury room. Accordingly, no prejudice has been shown.

*C. Failure to present defendant's social history through mitigation specialist or mental heath expert*

Fields further argues counsel's presentation of his social history "was disjointed, incomplete and unpersuasive." Dkt. # 106, at p. 90. Fields admits trial counsel was aware that the defense mitigation specialist "had collected compelling evidence" that he "was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning." *Id.*, at pp. 90-91. While it is relatively easy in hindsight to look at an unsuccessful trial strategy and recreate various scenarios of all the things which could have been done differently, this is the exact type of post-trial exercise the Supreme Court in *Strickland* cautioned courts from becoming entangled in. The defendant has a "heavy burden"[22] to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S., at 689, 104 S.Ct., at 2065 (citation omitted). This court recognizes that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*, 466 U.S., at 690, 104 S.Ct., at 2066. "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citations omitted).

Counsel's duty in regard to mitigation was to conduct a reasonable investigation since professional decisions and informed legal choices can only be made after an investigation of

---

[22]*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002).

the options.  In this case, there is no question that counsel had fully investigated petitioner's

social history.  Thus, despite Ms. O'Connell's affidavit that she had no strategic reason for

not submitting Fields history through one of his doctors or through her mitigation specialist,[23]

it is clear counsel fulfilled her duty to conduct a reasonable investigation into petitioner's

social history.  Decisions regarding which witnesses to call at trial are "quintessentially a

matter of strategy for the trial attorney."  *Boyle v. McKune,* 544 F.3d 1132, 1139 (10th Cir.

2008).  Where it is shown that a particular decision was, in fact, an adequately informed

strategic choice, the presumption that the attorney's decision was objectively reasonable

becomes "virtually unchallengeable."  *Strickland*, 466 U.S., at 690, 104 S.Ct., at 2066.

Moreover, submission of the evidence which Fields now suggests should have been

introduced into evidence would not have changed the jury's verdict.  Rather, it would have

actually undermined the defense theory that the Effexor caused an anomaly, a one-time switch

to flip in Petitioner's brain thereby leading an otherwise law abiding citizen to commit these

horrific murders.  The decision not to submit evidence that these murders were, in some way,

the product of a long-standing lack of socialization or empathy, caused by a less than idyllic

family life  approximately twenty years earlier, would have diluted the defense theory that the

crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies.

Furthermore, evidence Fields was emotionally estranged from his family would have directly

contradicted the defense arguments that the death of defendant's father and his mother's

illness caused the defendant to experience severe emotional disturbances.  Similarly, evidence

the defendant had difficulty forming relationships would have undermined the notions that

the defendant was remorseful and that he was a loved relative and friend.  Simply put,

presentation of additional evidence that petitioner had a dysfunctional upbringing, or was

---

[23]Dkt. # 106-2, at pp. 13-14.

cruel and violent toward his relatives, would have substantially weakened, as opposed to strengthening, the defense's mitigation case. Fields has not met his burden to establish counsel's decision to not call the mitigation specialist or put more social history evidence before the jury through a mental health expert was an unreasonable trial strategy.

*D. Failure to object to the government's closing argument deprived the petitioner of his right to individualized sentencing, due process and a fair trial*

Petitioner claims the Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase the defense's burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Fields to death based upon irrelevant and inflammatory societal concerns. Dkt. # 14, at pp. 89-90; and Dkt. # 106, at p. 102. Additionally, petitioner claims the prosecutor improperly vouched for its own expert witnesses while denigrating defense witnesses; launched *ad hominem* attacks against petitioner that were irrelevant to any issues in the trial; misrepresented the record and the testimony of witnesses; made arguments not supported by the evidence; and recited Biblical scripture at length. Thus, petitioner claims because this was a "close case,"[24] these alleged errors, individually and cumulatively, resulted in a fundamentally unfair trial thus rendering his death sentence "arbitrary and capricious." Most of the alleged prosecutorial conduct which Petitioner now challenges was not objected to at trial. Of course, "many lawyers refrain from objecting during opening and closing argument, absent egregious misstatements." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir 1993). One reason to refrain from objecting is counsel may simply be calling the jury's attention to something which counsel, observing live jury reaction to, is not overly

---

[24]Petitioner defines "close case" as one in which he "presented a significant case for life and the jury found mitigation to exist." Dkt. # 14, at p. 103.

concerning. *Phyle v. Leapley*, 66 F.3d 154 (8th Cir. 1995). As a result, the failure to object during closing argument is considered within the "wide range" of permissible professional legal conduct. *Necoechea*, 986 F.2d, at 1281. In an effort to overlook this arguably permissible conduct, petitioner asserts appellate counsel were ineffective for failing to raise these issues on direct appeal. Petitioner further argues, because of counsel's ineffective assistance, he was "deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence." *Id*. Petitioner also argues his Fifth Amendment rights were violated because the government presented false and misleading testimony to support the substantial planning aggravating factor. The government argues Fields' claims of prosecutorial misconduct are procedurally barred.

In an effort to bolster his ineffective assistance of counsel claims, Petitioner complains of prosecutorial misconduct. Inappropriate prosecutorial comments, standing alone, will not justify reversal since the statements must be reviewed in context. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). In a § 2255 action, relief for prosecutorial misconduct is only appropriate "when the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[F]or due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987).

> To establish that a prosecutor's remarks were so inflammatory that they prejudiced substantial rights, a petitioner must overcome a high threshold: he or she must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty.

*Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006).

As previously indicated, however, § 2255 "is not available to test the legality of matters which should have been raised on appeal."   *United States v. Khan*, 835 F.3d 749, 753 (10ᵗʰ Cir. 1987), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988).  As can be seen, to overcome this procedural bar, petitioner argues he received ineffective assistance of appellate counsel.  The Sixth Amendment does not require an attorney to raise every nonfrivolous argument on appeal.  Rather, the relevant questions in this proceeding are whether appellate counsel was "objectively unreasonable" in failing to raise these issues on direct appeal and, if so, whether there is a reasonable probability that, but for his counsel's unreasonable failure to raise these claims, he would have prevailed in his direct appeal.  *Neill v. Gibson*, 278 F.3d 1044, 1057 (10ᵗʰ Cir. 2001).  When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue on appeal, the court considers the merits of the omitted issue.  *Id.*  (citations omitted).  Therefore to resolve this claim, this court will focus on the merits of the alleged prosecutorial-misconduct claims.

Initially, Fields argues the prosecutor misstated the law regarding the weighing of mitigating and aggravators, this court erred in overruling the objection of trial counsel and appellate counsel was ineffective for failing to raise this issue on appeal.  The specific rebuttal portion of the closing arguments challenged by Fields contained the following statements:

> MR. SPERLING:  . . . . . . . . . . .Let's remember and honor the two people who are unable to be here.  The aggravating factors have been proved beyond a reasonable doubt.  The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie.  The mitigating factors - - (Interrupted)
>
> MR. DERRYBERRY:       Objection to that based on the law.
>
> THE COURT:       Overruled.
>
> MR. SPERLING:       The mitigating factors - - and I submit all of this to you based on the evidence that has been admitted - - do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.  She sought to

36

601

escape the monstrous form the Defendant had chosen to
assume in the final moments of her life.

Tr. of Jury Trial, Vol. XIV, at pp. 3462-3463.

While petitioner argues the prosecutor's comments seemed to imply the mitigating

factors had to outweigh the aggravating factors, taken in context this does not appear to be

what the prosecutor was saying. Rather, the prosecutor was attempting to emphasize how,

despite the mitigating evidence, the crime was so calculatingly heinous that the jury should

easily find the aggravating factors outweighed all mitigating factors. Moreover, the court

properly instructed the jury on how to weigh the aggravating and mitigating evidence, stating:

> The second step involves a weighing process. You must decide whether
> the proved aggravating factors outweigh the proved mitigating factors
> sufficiently to justify the death sentence. (If you do not find any mitigating
> factors, you still must decide whether the aggravating factors are sufficient to
> justify imposition of a death sentence). If you determine as a result of this
> weighing process that the factors do not justify a death sentence, such a
> sentence may not be imposed, and your deliberations are over.

Cr. Dkt. # 227, at p. 6; Tr. of Jury Trial, Vol. XIV, at p. 3384. The court also instructed the

jury: "You must determine whether the proven aggravating factor[s] sufficiently outweigh any

proven mitigating factor[s] to justify a sentence of death." *Id*., at p. 28; and p. 3403.

Therefore, this court finds counsel's failure to raise this issue on direct appeal was not

objectively unreasonable.

Next, Fields argues his counsel was ineffective for failing to object to prosecutorial

comments during closing arguments regarding defendant's plea for mercy. In particular,

Fields focuses on the following comments of the prosecutor:

> Ladies and gentlemen, in closing, just remember the victims in this case,
> Charles and Shirley and their family and what they went through. The defense
> is going to talk to you and they're going to ask you to show mercy for this
> Defendant. What I want you to do is think back on July 10th of 2003. How
> much mercy was shown then? The Defendant wants you to look at this
> Defendant and what he's done for the last two and a half years and say, oh,

37

602

there's a life that can be had.  This case is about what happened on July 10th of 2003, not what happened since then.

Tr. of Jury Trial, Vol. XIV, at p. 3430.  Thereafter, during rebuttal, the prosecutor said:

> Well, can justice be served by life in prison?  The Defendant wants to be sent to his room as punishment.  If he's allowed to live, he will have their percs, (sic) like workouts and visitors and phone calls and mail and tv and recreation.  Don't let this Defendant be a hero to his incarcerated criminal inmates.  All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent.  Don't give this Defendant what he wants.  In the name of justice, give him what he deserves.
>
> **The Defendant wants to choose a sentence.**  He wants to live.  Now, how unjust is that?  Just what choice did he give Charles Chick?  Just what choice did he give Shirley Chick?  You know, the Defendant made Shirley do something she would never have done, never have done, unless she knew there was absolutely nothing she could do for her dying husband, her best friend.  This Defendant made her do something she would never have done unless she knew her life was in absolute, absolute jeopardy.  And if we have to go much farther down the aggravating factor road that (sic) Shirley's fightingly horrible murder, there is something really wrong with us.  This disturbing criminal conduct is far beyond the capital line.  The Defendant didn't need to commit this murder.  Even if we concede that the robbery was the motive, he said he had $500 in Michelle's panty drawer.  Danny said he had seen the Defendant more broke.  Michelle told him that he could move in within a day or so.  He wanted the thrill of the kill.  And even if we concede that robbery was a motive, the most we could argue is that he thought with premeditation and deliberation if I'm going to rob them and kill them, I may as well kill them and rob them.  That's no excuse.
>
> Sympathy.  It's hard not to feel sympathy for the Defendant's family members. He abandoned them though. He abandoned them. Only resurrecting contact with them conveniently now that he's in jail.  . . . .  What did his former wife say about him?  Do you remember that one word?  Selfish.  Selfish.  Narcicisstic. (sic) It's all about him.  That's an understatement. He would have left them all perhaps by the easy way out.  Typical for him.  The Defendant wouldn't help his on (sic) widowed mother move halfway across this country.  Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice.  Remember also that Charlie didn't get an opportunity to plead for his life.  We can only imagine what Shirley must have said in the waning moments of her life.  She came face to face with a killer who wore this suit.  The Defendant's best friend now is down to a monthly phone call.  Whatever he does for other people is far outweighed by what he has done.  He has paid for membership in the club of the most hardened, the worst group of criminals.  Remorseless, wanton, senseless, without any empathy or feeling, no emotion for a wonderful man and woman whose lives he extinguished that with six semi-automatic gun shots.

*Id.*, at p. 3457-3459 (emphasis added by petitioner).

Petitioner argues these comments urged the jury to reject mercy based on the evidence and invited the jurors to sentence him to death simply for exercising his Eighth Amendment right to individualized sentencing. This court disagrees. These comments simply focused the jury's attention on the aggravating nature of these crimes and was based upon the evidence before the jury. Moreover, the jury was instructed they could consider mercy (and petitioner's own trial counsel advised the jury - "Mercy is not precluded."),[25] the defendant's lack of remorse, the mental anguish the defendant inflicted on Shirley Chick, his value as a friend, his value as a family member and the impact his death would have on his relatives and friends. *See*, Cr. Dkt. # 227, at pp. 6, 23, and 25-26. Attorneys are given wide latitude during closing arguments and challenged remarks must be evaluated in the context of the trial as a whole. *United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013). Since each of these subjects were before the jury, the court finds they were proper topics for the prosecutor to touch upon during closing arguments and such comments did not result in a fundamentally unfair trial.

Fields continues his challenge to the prosecutor's closing arguments by alleging the prosecutors improperly "invoked societal concerns about lenient sentences and recidivism." Dkt. # 106, at p. 105. Fields focuses this argument on the following comments of the prosecutors:

> Ladies and gentlemen, when you look around this courtroom you see a lot of people. They haven't come here to see me or Mr. Sperling or defense counsel or not even the judge. They've come here to see justice. They've come here to see what you are going to do today. Because today you are justice. You decide what is right. You decide what is wrong. You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know (sic) longer have that luxury. We ask you to do what's right, ladies and gentlemen.

___

[25]Tr. of Jury Trial, Vol. XIV, at p. 3443.

Tr. of Jury Trial, Vol. XIV, at p. 3431. These comments were made right as the prosecutor's first closing arguments concluded. Although the court does not really understand the reference to giving "probation to a child molester," it is clear all the prosecutor was telling the jury was that the decision as to an appropriate sentence in the case was solely their decision. Fields continues, however, that "these sentiments were echoed in later comments, invoking popular opinion that prison was to easy on criminals." Dkt. # 106, at p. 105. The rebuttal comments to which Fields objects seem designed to convince the jury that petitioner's crimes warranted greater punishment than lifetime incarceration and have already been discussed by this court. Furthermore, this court finds the prosecutor's comments suggesting incarceration would be an inadequate sentence, was an appropriate response not only to the defense counsel's suggestion that life imprisonment would be spent in a space smaller than the jury box[26] but also to the testimony during trial of Daniel Presley[27] which described various things inmates could do in prison such as working, receiving visitors, receiving and sending mail, reading and watching television.

Claiming the mental health experts' credibility was a "critical aspect of the trial," Petitioner continues his attacks on the prosecutor's closing arguments by arguing the prosecutor improperly embellished and bolstered the testimony of its mental health experts and improperly vouched for their credibility, while denigrating the defense experts. Dkt. # 106, at p. 106. To support his argument, petitioner highlights terms contained in the prosecutors' arguments, such as "high dollar shrinks," "hired guns," "from the left coast," "an axe to grind" and "an honest opinion." Dkt. 14, at p. 80.

---

[26]Tr. of Jury Trial, Vol. XIV, at p. 3442.

[27]Tr. of Jury Trial, Vol. IX, at pp. 2405-2406 and 2408-2409.

To the extent that there is no bright red line separating acceptable advocacy from improper advocacy, prosecutors have sometimes breached their duty to refrain from overzealous conduct by commenting on a defendant's guilt or offering unsolicited personal views on the evidence. *United States v. Young*, 470 U.S. 1, 7-8, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985). As a result, the federal courts have been required to police prosecutorial misconduct. In order to assist the courts, the legal profession has developed Codes of Professional Responsibility. *Id.* The American Bar Association's Standing Committee on Standards for Criminal Justice has complemented these efforts by developing Criminal Justice Standards, one of which states:

> The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

ABA Standards for Criminal Justice 3-5.8 (b)(3rd ed. 1993). The Unites States Attorney acts as a representative of a sovereignty whose obligation is to govern impartially. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935). In this role, a federal prosecutor becomes a

> servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not a liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id*.

Use by a prosecutor of "we know" statements in closing arguments should generally be avoided because such statements can blur the line between improper vouching and legitimate summary. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). An argument will be considered improper vouching "only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit

41

personal assurance of the witness' veracity or by implicitly indicating that information not

presented to the jury supports the witnesses' testimony." *United States v. Magallanez*, 408

F.3d 672, 680 (10th Cir. 2005)(quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir.

1990)). "[I]t is not improper for a prosecutor to direct the jury's attention to evidence that

tends to enhance or diminish a witness's credibility." *Thornburg v. Mullin*, 422 F.3d 1113,

1132 (10th Cir. 2005).

The prosecutor in this case said the following, during the first closing remarks, in

regard to the expert witnesses:

> Our doctors came in, ladies and gentlemen, and told you a number of different things also and I'll just run through those quickly because obviously they had a different opinion. They thought most of the Defendant's problems were based upon his depression. Kind of look at - - who do I believe? Which is the one for me? Who am I going to believe out of this? What does Dr. Price tell you? He tells you he's done hundreds of these things. And over half the time, 60 percent of the time, he testifies for the defendant. He told you he fully expected to find some type of mental illness here but didn't. He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left (sic) coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns. Dr. Mitchell - - and he may be the best one of all, one because he's never been a witness before in a criminal case. He's in charge of a well-recognized psychiatric care center. He comes in and he says I've never testified before. I'm just doing the best I can. But I did this evaluation and, yeah, I did give some credence to the voices. I thought the voices may be part of his problem. Whether or not he actually heard them I can't tell you, but they may be part of it. He even tells you with that knowing with the voices, he had the ability to conform his conduct to the requirements of the law. These were volitional choices on this Defendant's part. Dr. Mitchell who has no axe to grind here, ladies and gentlemen.

Tr. of Jury Trial, Vol. XIV, at pp. 3429-3430. During rebuttal arguments, the prosecutor

returned to topic of experts stating:

> . . . . The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness. He was just emotionally variable. Even united bipolarities, Dr. Price, I'm mostly on the low side, he says. High dollar shrinks were hired by the defense and we paid ours as well. I respectfully submit, thought (sic), that

42

Randy Price and Jeff Mitchell were straight shooters. Not hired guns. The defense got to substantially determine the parameters, we were told, of Dr. Price's exam. They both came into this case with an open mind, open to the prospect that the defense might be right. They found them wrong. Sure, the Defendant was depressed, but no evidence exists of bipolarity or mania. He now wants us to bail him out after he wrecked his life. People who experience traumatic, even depressing circumstances in their life are obligated at a minimum not to lash out at innocent people. The defense experts, one from far away, with a 60 to zero record, he has never testified for the Government. Every single time he testifies, sixty to zip, is for the Defendant. There's no evidence of mania here. The spending spree was a rational criminal effort to impress Michelle.

*Id*., at p. 3452.

While this court might have sustained an objection, if it had been made as soon as the prosecutor stated, in regards to Dr. Price: "He has a lot of credibility";[28] the comment was immediately followed by a statement derived from evidence in the record which established that Dr. Price did not always testify for the defense. In context, this statement was not error. The prosecutor went farther, however, by stating: "We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns." *Id*. This statement shows how quickly an argument can enter into the "gray zone"[29] between acceptable and improper advocacy. When considered, however, in context with the evidence introduced in this particular case this court finds the prosecutor's comments did not render petitioner's trial fundamentally unfair. Rather, this court concludes the comments, as a whole, were designed to remind the jury of its duty to scrutinize and weigh all of the witnesses' testimony, including that of the experts. *See, United States v. Franklin-El*, 555 F.3d 1115, 1127 (10th Cir. 2009) (finding no prosecutorial misconduct where the prosecutor stated in rebuttal, "The defendants had to go all the way to Missouri to find some blow hard expert who talked a lot

---

[28]Tr. of Jury Trial, Vol. XIV, at p. 3429.

[29]*United States v. Young*, 470 U.S., at 7, 105 S.Ct., at 1042.

43

but said very little of significance in this case.") As can be seen, the government began by urging the jury to decide who was the most believable. To focus the jury's thoughts, the prosecutor discussed the experts' experience based upon testimony presented in the trial.[30] In particular, the evidence established that Dr. Price was licensed to practice in the field of psychology in Texas and Oklahoma. Tr. of Jury Trial, Vol. XII, at p. 3094. Dr. Price had extensive experience in murder cases, having consulted on close to 200 cases. *Id*, at p. 3097. Dr. Price indicated he was retained by the defense in about 60% of those cases. *Id*. Dr. Price testified he began his evaluation of Fields anticipating that there was

> probably going to be some brain dysfunction, something there to have people evaluating him for this. And I thought there was going to be a mental illness there, probably more than the depression. I thought there was going -- you know, I didn't know what effect it was going to - - it would have had on the crime, but I thought there was going to be evidence of those things.

*Id*., at 3154. And, he was open to considering that the defense experts might be right. *Id.* The evidence further established Dr. Mitchell was a clinical assistant professor at the University of Oklahoma College of Medicine, practicing at Laureate, a large psychiatric hospital in Tulsa, Oklahoma, and vice president of St. Francis Health Care System. *Id*., Vol. XIII, at pp. 3248-3250. Dr. Mitchell testified he had never previously testified in a criminal case for either side. *Id*., at p. 3352. Dr. Mitchell indicated he gave Fields the benefit of the doubt regarding whether or not he was hearing voices. *Id*., at p. 3284. It was proper for the prosecutor to contrast this evidence with the testimony of the defense expert, Dr. Woods, who testified his primary office was in Oakland, California. *Id*., at Vol. XII, at p. 3000. Additionally, Dr. Woods testified approximately 40% of his practice was devoted to forensics and he had been qualified as an expert approximately 60 times. *Id*., at p. 3001. Dr. Woods indicated he had never been retained by the United States or by a state government in a

---

[30]Tr. of Jury Trial, Vol. XII, at pp. 2938-3068; 3091-3162; Vol. XIII, at pp. 3171-3356.

criminal prosecution. *Id.*, at p. 3002. After commenting on the differences in the doctors'

qualifications, it was not inappropriate for the prosecutor to say that Dr. Mitchell had no "axe

to grind" and this court finds the comment was not "improper vouching." Rather, it was

simply one way for the prosecutor to direct the jury's attention to evidence from which the

jury could determine the expert witnesses' credibility. Similarly, while stating the defense

hired "high dollar shrinks," the government immediately admitted they too had paid their

shrinks. Thus, it could not have unfairly characterized only the defense experts. While it is

true, not all defense experts were from the west coast, this court finds, based upon the

evidence at trial, that it was not improper for the government to emphasize that the expert

from the west coast had always testified on behalf of the defense.

Fields also argues the government "grossly misrepresented the testimony of Dr.

Woods, Dr. Grinage and other witnesses on several factual issues critical to the assessment

of Mr. Fields' mental state." Dkt. # 14, at p. 81. After reviewing the closing arguments in

light of the evidence presented at trial, this court finds the comments of the government

attacked by Fields were supported by the record or appropriate inferences to be made

therefrom.

Finally, petitioner argues the government improperly invoked Biblical Authority in

support of a sentence of death. Dkt. # 14, at p. 84. The comments, which petitioner

complains of were contained in the following passage of the rebuttal argument of the

government:

> Thousands of years ago the kind of the world's greatest then existent
> civilization and most powerful empire held a great feast for thousands of his
> ruling friends. They ate, they drank from golden and silver goblets that they
> had stolen from the temple of a subdued and now enslaved nation. They drank
> wine and they worshiped pagan idols. All of a sudden the fingers of a hand
> began to write on the palace wall. The king saw the hand and was so
> frightened, he was so scared, that his clothing literally came loose. He became
> white. He shook. His knees banged together. He cried out: Bring the

astrologers, bring the wise men of the nation.  Whoever interprets this saying on the wall will become the third most powerful member of my government. He will have great riches.  The wise men came in.  They studied, they deliberated, they conversed, they conferred and they thought.  But they couldn't read much less interpret the writing on the wall.  The king's face turned ashen. The queen, though, remembered a forgotten man.  She called for him after talking to the king.  And the king made the man the same offer.  The man, though he turned down all of the riches, all the honor and all of the prestige. The man bravely interpreted the writing on the wall.  And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting.  Sure enough, that night the king was killed.  His kingdom was separated among his neighboring enemies.

The Defendant weighed his options on July 10, 2003.  Under the Court's instructions and the law given by the court, the Defendant should be, as it were, weighed in the balance and found wanting.

Tr. of Jury Trial, Vol. XIV, at pp. 3466-3467.

Fields argues these remarks were similar to an arguments held improper and highly prejudicial in *Sandoval v. Calderon*, 241 F.3d 765, 775 (9th Cir. 2000).[31]   In *Sandoval*, the prosecutor's language was "eloquent, powerful, and unmistakably Biblical in style." *id*., at 778; "[t]he lay juror would readily understand the words as referring to Scripture", *id*.; and the message was clear: those who have opposed the ordinance of God should fear the sword-bearing state, whose task, as an avenging minister of God, is to bring wrath upon those who, like Sandoval, practice evil." *Id*.  The *Sandoval* court recognized that "[t]hose learned in the New Testament would recognize the argument as closely following the thirteenth chapter of the Book of Romans." *Id*.  Additional comments made by the prosecutor following this

_____

[31]Petitioner also cites to *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991) to support his argument that the prosecutor's analogy was improper.  While the *Cunningham* court condemned the prosecutor's closing arguments, the case was reversed for other reasons.  Further, the closing arguments in *Cunningham* were significantly worse than any comments in this case where statements found offensive included comments that the prosecutor was "'offended' that Cunningham had exercised his Sixth Amendment right to a trial by jury in the guilt-innocence phase of the trial;" "improperly implied that Cunningham had abused our legal system in some way by exercising his Sixth Amendment right to a jury trial;" "questioned whether Cunningham was even entitled to his Sixth amendment rights;" and "made numerous appeals to religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot." *Id*. (footnote omitted).

portion of his summation told the jury they were "not playing God" but were "doing what God says." *Id.*, at 779.

Despite religious arguments being condemned by both state and federal courts, relief is not warranted unless the remarks prejudiced Fields chances of receiving life without the possibility of parole instead of the death penalty. *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998)(recognized argument that Bible condones capital punishment was inappropriate, but did not constitute reversible error). The remarks in this case are clearly distinguishable from those discussed by the court in *Sandoval*. While the analogy given by the prosecutor may have been paraphrased from the "writing on the wall" sermon in the Book of Daniel, the argument was not delivered in biblical style. The prosecutor did not argue that God or any other religious authority justified the death penalty in this case. Rather, the prosecutor used a story devoid of any religious connotation, to emphasize the defendant knew what could happen to him when he decided his course of action on July 10, 2003 and it was now up to the jury to impose the appropriate sentence based upon the court's instructions, which included a balancing (*i.e.*, weighing) of the aggravating and mitigating factors. Moreover, unlike *Sandoval*, where the jury deliberated over three days before advising "it was hopelessly deadlocked," *id.*, only to later return to court with a unanimous verdict; this was a case where the defendant pled guilty to murdering two people by randomly stalking them while wearing a ghillie suit; shooting them while hidden in the woods; and then stealing from them. The jury rendered their sentencing verdict in less than four hours. *See*, Criminal Docket sheet minutes for July 22, 2005, indicating the bailiff was sworn at 11:40 a.m. and the jury returned its verdict in open court at 3:38 p.m.

47

612

Accordingly, this court finds none of the prosecutorial arguments, either individually or collectively, would have warranted reversal of the sentence on appeal. Therefore, appellate counsel was not ineffective for failing to raise these issues on appeal.

*E. Failure to object to instructions and verdict form*

Fields claims in his sixth ground for relief that trial counsel were ineffective for failing to object to the jury instructions and the use of a single verdict form which allowed the jury to approve a general verdict of death based on the combined weighing of aggravating factors applicable to two separate murder counts. According to Fields, the jury was allowed to consider all seven of the aggravating factors argued by the Government, including five factors which applied to only one of the two counts of murder thereby allow the jury to improperly aggregate factors in their weighing analysis.

As the Government points out in its motion for summary judgment, however, the thrust of the defense was to characterize the murders as a single behavioral irregularity caused by the manic-flip nature of the psychotropic drug - Effexor. *See*, Dkt. # 110-20, at p. 1; and Dkt. # 110-2, at p. 37. Separating the verdict form would have emphasized the separate protracted nature of the two murders. Moreover, separate verdict forms would have required the jury to focus more on the aggravating facts of the case since they would have been required to consider them twice. Thus, this court finds it was a sound strategic choice by defense counsel to request a unitary verdict form.

Furthermore, since Fields pled guilty to both murders, this is not a case where one count could have been reversed on appeal and the sentence on that count had to be vacated. The jury was given a single basis for imposing a death sentence and they unanimously found that the aggravators outweighed the mitigators. If the jury had been required to make separate findings, it is possible the jury could have returned a sentence of life without possibility of

release on one of the murders and a death sentence on the other.  But, as pointed out by the

Tenth Circuit,

> [t]he jury was not presented with alternative routes to the death penalty; it was given a single basis for imposing a death sentence – the jury had to unanimously find that the aggravators (themselves unanimously found) collectively outweighed the mitigators.  Thus, we know what the basis for the jury's verdict was and that it was unanimous.

*United States v. Fields*, 516 F.3d at 939-40.  There can be no question that all twelve jurors,

after weighing the aggravating factors that they found to exist, concluded Fields should be put

to death for at least one, if not both, of the murders.  The suggestion by counsel that the jury

might have returned two life sentences had it used separate verdict forms has no basis in fact

and is nothing more than unsupported conjecture and speculation.  Even assuming counsel

was ineffective for failing to request two separate verdict forms, this court finds petitioner has

failed to establish prejudice.  Accordingly, this claim is denied.

## II.  Alleged Brady violations

The seventh ground for relief alleges the government withheld exculpatory, material

evidence from the defense in violation of due process and trial counsel was ineffective for

failing to investigate and present exculpatory evidence.  Specifically, petitioner argues certain

evidence would have corroborated the defense's argument that Fields had taken an increased

dose of Effexor before the offense and emails and other items on his computer would have

tended to help establish he was mentally ill.  Finally, petitioner argues the government

withheld certain witness statements or interviews which would have been helpful to his

defense.  To the extent the government had no duty to disclose this evidence, petitioner claims

his counsel were ineffective for failing to investigate, discover and present this evidence.

The Supreme Court has held "that the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). In *Strickler v. Green*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court identified three components or essential elements of a *Brady* prosecutorial misconduct claim as follows: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Id.*, 527 U.S., at 281-282, 119 S.Ct., at 1948. To show evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 91995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S., at 434, 115 S.Ct., at 1566.

If a defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence, *Brady* does not compel disclosure because no suppression occurred. *United States v. Erickson*, 561 3d 1150, 1163 (10th Cir. 2009). *See also*, *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)(*Brady* violation does not occur when defendant "knew or should have known the essential facts permitting him to take advantage of exculpatory information" or where the evidence was available to him from another source).

50

615

*A. Bottle of effexor pills*

In his reply (Dkt. # 20) and in his answer to government's motion for summary judgment, petitioner concedes "[t]he bottle containing the remaining prescription pills was provided to Muskogee County Detention Center by the FBI after it was found in Petitioner's truck." Dkt. # 119, at p. 49. Petitioner goes so far in his reply to state that the "fourteen Effexor pills he consumed while at the Muskogee County Detention Center came from the bottle in his truck." Dkt. # 20, at p. 70. Petitioner has not established that the government took an inventory of the number of pills contained within the pill bottle prior to delivering the same to the jail and then failed to release that information to them. The government had no obligation to provide information to the petitioner that was never collected. Moreover, Fields is the only one who can say exactly how many pills from that the bottle he actually took. As a result, the information regarding the Effexor pills was information the defendant knew or should have known. Accordingly, this court finds no *Brady* violation occurred in relation to this bottle of Effexor pills.

Furthermore, assuming counsel was ineffective for failing to inspect the bottle of pills pre-trial and/or submit the bottle as evidence in trial to establish that Fields had taken the prescribed amount of pills or possibly more, this court finds Petitioner has failed to establish prejudice.

*B. Seized computers*

Fields summarily claimed in his motion to vacate that the "hard drives . . . . contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails." Dkt. # 1-3, at p. 62. Additionally, he stated the "exculpatory evidence withheld by the Government was material." *Id*., at p. 63. During the course of these proceedings, Fields has made no effort to supplement these conclusory statements with any facts which would establish what information contained on these computers, if any, was relevant to his criminal case. Therefore, this court finds petitioner has failed to establish any *Brady* violation in regard to the two seized computers.

**III. Execution issues**

In ground two of his amended motion, Petitioner argues he is not competent to be executed and, therefore, his execution would violate the Eighth Amendment to the United States Constitution and international law. In his ninth ground for relief, Petitioner argues his execution would violate the Eighth Amendment to the United States Constitution. Petitioner submits no facts to support these claims. Moreover, Petitioner admits these issues are not ripe for review.

Article III of the United States Constitution only extends the judicial power of this court to real cases or controversies. U.S. Const. art. III, § 1. "Under Article III of the Constitution, [this court] may hear only cases involving a live case or controversy, and this requirement adheres at all stages of judicial proceedings." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009) (citations omitted). Courts have routinely held that claims of incompetency are not ripe for review until the execution is imminent. *See*,

*Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). Further, even if the claims were justiciable, Petitioner has failed to identify any facts which might give rise to relief under the Eighth Amendment. Accordingly, these claims are denied.

## IV. Cumulative Errors

Cumulative-error analysis evaluates only the effect of matters determined to be error, not the cumulative effect of non-errors. *U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990). In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors – were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial." *United States v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000). Since this court has found Petitioner has failed to prevail on any of the claims he raises, cumulative-error analysis is not appropriate. Accordingly, this claim is denied.

### CONCLUSION

For the reasons stated herein, the Petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied. Furthermore, this Court finds the Petitioner has failed to establish that he has been deprived of any constitutional rights. 28 U.S. § 2253(c)(2). Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this Court hereby declines to issue a certificate of appealability.

Dated this 15th day of December, 2016.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **EDWARD LEON FIELDS,** | ) | |
| | ) | |
| **Petitioner/Defendant,** | ) | |
| | ) | |
| **vs.** | ) | **No. 10-CIV-115-RAW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent/Plaintiff.** | ) | |

### JUDGMENT

This matter came before the Court for consideration of Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255.  The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United State of America, and against petitioner, Edward Leon Fields, on his challenge to the legality of his sentence.

IT IS SO ORDERED this 15th day of December, 2016.

**Dated this 15th day of December, 2016.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

Appellate Case: 17-7031     Document: 010110050300     Date Filed: 09/10/2018     Page: 146

# ATTACHMENT B:

# Opinion & Order on Rule 59 Motion
# March 15, 2017

Appellate Case: 17-7031     Document: 010110050300     Date Filed: 09/10/2018     Page: 146

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EDWARD LEON FIELDS, ) | |
| ) | |
| Petitioner/Defendant, ) | |
| ) | |
| vs. ) | Case No. 10-CIV-115-RAW |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent/Plaintiff. ) | |

## OPINION AND ORDER

This matter comes before the court on Petitioner's Motion to Alter or Amend Judgment pursuant to Fed.R.Civ.P. 59(e) (Dkt. # 127). The Government filed its response on January 30, 2017 (Dkt. # 129). Petitioner did not file a reply.

According to Petitioner, the court committed "clear errors of fact and law" by holding "trial counsel was not ineffective for failing to present Petitioner's history of familial dysfunction because she had a strategic basis for doing so and because Petitioner was not prejudiced by her conduct." Dkt. # 127, at p. 2. Petitioner argues if the court had properly analyzed his claim the court would have found Petitioner had "established a reasonable probability of a different outcome if trial counsel had presented the available mitigating social history through a mitigation specialist or expert." *Id.* Petitioner states "[t]he Court's entire analysis of deficit performance is based on the Court's flawed assumption that because the decision about which witnesses to call is a matter of strategy, where trial counsel knew about Petitioner's mitigating social history, her decision not to present it through a mitigation

specialist or expert is 'virtually unchallengeable.'" *Id*., at p. 3.  Finally, Petitioner claims this court erred in not granting an evidentiary hearing given "the disputed factual issue supported by counsel's sworn statement that she had no strategic reason for failing to present Petitioner's mitigating social history. . . . ." *Id*., at p. 4.  In response, the government argues petitioner's claims were properly denied and the current claim of legal error is solely an attempt to "dress up arguments that previously failed."  Dkt. # 129 at p. 3, n. 1.  (quoting *Voelkel v. Gen.Motors Corp*., 846 F.Supp 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994)).

To be entitled to relief under Rule 59(e), Petitioner must establish either an intervening change in the controlling law, new evidence previously unavailable or that there is the need to correct clear error*. See*, *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Upon careful review of the petitioner's motion and record in this matter, the court finds no basis for reconsidering the Opinion and Order denying the § 2255 motion. While the court fully understands defense counsel's desire to prevent her client from receiving the death penalty at all costs, when counsel's memory does not accurately depict what, based upon contemporaneous documents, occurred in the case, the court does not need to hold an evidentiary hearing.  Contrary to petitioner's allegations, a review of Ms. O'Connell's declaration when considered with various emails which were written contemporaneously with trial preparation convinces this court that Ms. O'Connell's memory was not as clear on March 30, 2010, as it was during trial preparation and/or the actual trial

in 2005.  As pointed out in the Opinion and Order denying relief, Ms. O'Connell claimed she

did not have adequate assistance of counsel which was contradicted by various records in the

case.  *See*, Dkt. # 125, at pp. 10-11.  Similarly, Ms. O'Connell claimed she had no "tactical

or strategic reason for not presenting [Petitioner's social] history either through one of his

doctors or through Ms. Shettles."  Dkt. # 106-2.  Her emails, however, belie this statement.

In an email discussing trial strategy regarding a mental health expert, counsel explained:

> . . . .I recognize that experts can cancel each other out in juror's minds.  And,
> many of them won't care about mental health.
>
>  . . . . . .I want to keep the 'crap' away from the jury if at all possible.  I think
> its going to be hard enough to get them to feel sympathy for client.  If they get
> to hear all the other junk, it may tip the scales (if we have any hope at all).

Dkt. # 110-7.  A few days later, Ms. O'Connell sent an email to another attorney who she

was consulting with regarding Petitioner's case.  After providing this consultant with her case

and client in a nutshell, including a substantial description of the social history of her client,

Ms. O'Connell stated:

> My client has absolutely no criminal record.  But the government believes he
> is a psychopathic retrobate.  They gathered all the garbage they could on him,
> by going to the community and asking what they'd heard, about a month after
> the murders.  The town is tiny, and there was nothing to talk about except the
> client.  So the FBI guys got all the dirt.
> The gov't wanted to use the dirt in aggravation.  The judge has ordered that
> most of it stays out.  I'll list most of it here; don't laugh:
> Client has always been considered a little strange.  He was always coming on
> to women, some of whom say he was 'creepy.'  He often bragged of his sexual
> prowess.  In fact, he dated 2 women at the same time, unbeknownst to either
> of the women, and spoke of marriage to both.  He had a webcam that he told
> people he jacked off in front of, with over 1000 visitors to his site, or so he
> bragged, anyway.  (And, as mentioned above, there was the fascination with

3

pornography during his marriage.) He chatted with women on the internet, and then went to meet them!

Client liked to fish more than anything in the world. Once he took a device to work--it was locked in his truck, in the parking lot. It was like a pipe bomb, with a kitchen timer. But it had no detonator or explosive material. In the parking lot, he showed it off to a couple guys, and explained it was for fishing. He also took a rifle to work one day, again-- locked in the car. He'd just purchased it at Wal-Mart, and didn't have time to take it home before his shift started. He showed it off to a buddy. (The bomb thing got him fired.)

He had a burmese python for a pet, and hunted rattlesnakes for extra cash (40 cents a foot).

A distant relative believes he hung a cat over a limb when he was four years old. Jump ahead 34 years--- Someone else saw him put a stray cat in a burlap bag and twirl the bag around until the cat got dizzy. He told a co-worker he shot a cat that was keeping him awake at night. Another co-worker reported that he said he fed baby kittens to his snake. And, no kidding, a (sic) witnessed him hit a cow and curse at it.

As also related above, client had some domestic violence in his life. Some people reported that his mother was afraid of him. One said he kept loaded guns by every door in the house.

questions

Judge says virtually all of this stays out, as long as I don't open the door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge (sic) and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff.

Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment. The gov't has 2 docs, the examinations were taped. I have listened, and know the outcome, because the docs had been front-loaded with the creepy-crawly stuff. Lots of questions about his womanizing, probing inquiry into why someone would make up the cat-hanging incident. So, I can anticipate all the "junk" will play a role in any determination made by the gov't docs. Most of that crap isn't true (like hanging a cat), or has been largely exaggerated (the bomb thing has turned into threatening people at work with a bomb). But I'm worried that, through my mental health evidence, all of it will somehow come in, because the govenrment's (sic) experts will say they reviewed it, it helped them reach their conclusions, whatever.

4

> Whatever I don't put on the table with my mental health testimony, they will want to get it in the back door, as justification for their docs' opinions.

Dkt. 129-1, at pp. 3-4.

Given Ms. O'Connell's express desire to rely on psychopharmacology evidence while avoiding all of the "crap,"[1] this court finds Ms. O'Connell had clearly developed a reasonable trial strategy to keep this evidence from the jury. Moreover, since Ms. O'Connell had investigated and discussed the petitioner's social history with a mitigating specialist prior to trial, she knew how difficult a job she had. With all of these things in mind, Ms. O'Connell did everything she could to portray the murders as an aberration caused by a "SICK"[2] individual who, upon receiving the proper medication, was no longer dangerous. Ms. O'Connell was able to elicit positive attributes of petitioner through his sister, Cherie Fields;[3] his ex-wife, Teresa Fields;[4] a co-worker, Jovanna Fields;[5] his son, Andrew Thomas Fields;[6] and his daughter, Amanda Fields,[7] while preventing the government from asking these same witnesses to explain why Petitioner's mother was scared of him.

---

[1] Dkt. # 110-7.

[2] *See*, Dkt. # 129-2.

[3] Tr. of Jury Trial, Vol. XI, at pp. 2673- 2720.

[4] *Id*., at pp. 2720-2764.

[5] *Id*., at pp. 2650-2620.

[6] *Id*., Vol. XII, at pp. 2926-2930.

[7] *Id*., at pp. 2930-2935.

5

Where a valid defense strategy has been well thought out and considered in light of the circumstances and existing facts of the case, simply because the strategy ultimately fails, does not automatically mean a defendant received ineffective assistance of counsel. Rather,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (citations omitted). Counsel had a duty to conduct a thorough investigation – in particular, of mental health evidence and/or social history – in preparation of the sentencing phase of trial. *Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012). The record establishes counsel fulfilled this duty. Even though a troubled childhood is the kind of evidence which "garners the most sympathy from jurors," *id.*, quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), no case dictates that counsel must always introduce the evidence especially where, as here, the evidence could potentially backfire. While trial counsel's strategy ultimately failed to convince the jury that Petitioner's life was worth sparing, this court believes it was a well thought out and sound trial strategy. Petitioner's burden to establish a claim of ineffective assistance of counsel is great and "[n]either hindsight nor success is

649

the measure" for determining the adequacy of legal representation." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994)(citing *Ellis v. Oklahoma*, 430 F.2d 1352, 1356 (10th Cir. 1970), *cert. denied*, 401 U.S. 101, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971)). Further, the constitutional right to counsel does not "mean victorious or flawless counsel." *Id.* (citing Brady *v. United States*, 433 F.2d 924 (10th Cir. 1970)). Rather, to be considered constitutionally ineffective, the representation must have been such to make the trial a mockery, sham or farce, or resulted in the deprivation of constitutional rights. *Id.* (citing *Lorraine v. United States*, 444 F.2d 1, 2 (10th Cir. 1971)). *See also*, *Maxey v. Benton*, 483 F.Supp. 1, 5 (E.D. Okl. 1977). Based upon the record herein, this court finds Petitioner has failed to establish he received ineffective assistance of counsel.

Additionally, even recognizing the importance family history can play in mitigation, this court finds, based upon the specific facts in this case, Petitioner has failed to establish prejudice. Accordingly, Petitioner's motion to alter or amend the judgment (Dkt. # 127) is hereby **denied.**

It is so ordered on this 15th day of March, 2017.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

649