# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

No. 17-7031

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee*,

**v.**

**EDWARD LEON FIELDS, JR.,**
*Defendant/Appellant.*

APPEAL FROM U.S. DISTRICT COURT, EASTERN DISTRICT OF OKLAHOMA
THE HONORABLE RONALD A. WHITE, CHIEF UNITED STATES DISTRICT JUDGE
CASE NO. CIV-10-115-RAW

## RESPONDENT/APPELLEE'S BRIEF

## ORAL ARGUMENT IS REQUESTED

Respectfully submitted,

BRIAN A. BENCZKOWSKI
Assistant Attorney General
United States Department of Justice

Jeffrey B. Kahan
Deputy Chief, Capital Case Section
U.S. Department of Justice
1331 F Street, N.W.; 6th Fl.
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

Christopher J. Wilson
Linda Epperley
Assistant United States Attorneys
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov
Linda.Epperley@usdoj.gov

## TABLE OF CONTENTS

ISSUES PRESENTED FOR REVIEW ..................................................................1

STATEMENT OF THE CASE.............................................................................1

    A.    Procedural History and Rulings Presented for Review............................1

    B.    Statement of Facts ..................................................................................3

        1.    Aggravation Case ............................................................................3

        2.    Mitigation Case ................................................................................7

        3.    Rebuttal Case ................................................................................11

SUMMARY OF ARGUMENT ...........................................................................12

STANDARD OF REVIEW ................................................................................16

ARGUMENT .....................................................................................................17

    I.    TRIAL COUNSEL SELECTED APPROPRIATE MENTAL HEALTH
    EVIDENCE FOR PRESENTATION TO THE JURY ......................................17

    A.    Standards for Evaluating Counsel.........................................................18

        1.    Counsel Made a Valid Tactical Choice ..........................................20

        2.    Counsel Made a Non-Prejudicial Choice.........................................28

    B.    The District Court Appropriately Denied an Evidentiary Hearing..........40

    II.    TRIAL COUNSEL APPROPRIATELY SELECTED MITIGATING
    EVIDENCE FOR PRESENTATION AT TRIAL .............................................46

    A.    Counsel Made a Valid Tactical Choice.................................................47

    B.    Counsel Made a Non-Prejudicial Choice..............................................54

    C.    The District Court Appropriately Denied an Evidentiary Hearing..........61

    III.    FIELDS PROCEDURALLY DEFAULTED HIS CLAIM OF
    PROSECUTORIAL MISCONDUCT ..............................................................63

    A.    Fields Fails to Identify Any Cause for His Procedural Default Beyond a
    Claim of Ineffective Assistance of Trial Counsel That is Barred by the
    Certificate of Appealability..................................................................64

    B.    Had Fields Attempted to Excuse His Default, he Could Not Show Cause
    and Prejudice ......................................................................................67

    IV.    THERE ARE NO ERRORS TO ACCUMULATE ..................................79

STATEMENT REGARDING ORAL ARGUMENT ...........................................81

CONCLUSION..................................................................................................81

## TABLE OF AUTHORITIES

**Federal Cases**

*Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) ................................62

*Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007)................ 37, 38

*Bell v. Thompson*, 545 U.S. 794, 809-10 (2005) ..........................................19

*Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996)..................... 72, 75

*Bousley v. United States*, 523 U.S. 614, 623-24 (1998) ...............................64

*Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ...........................19

*Brinkley v. Houk*, 831 F.3d 356, 365 (6th Cir. 2016)...................................48

*Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011)..................... 47, 54

*Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) ............................69

*Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002)............................39

*Caspari v. Bohlen*, 510 U.S. 383, 390-396 (1994)......................................70

*Castro v. Ward*, 138 F.3d 810, 832 (10th Cir. 1998)...................................41

*Cauthern v. Colson*, 736 F.3d 465, 476-77 (6th Cir. 2013) ............. 72, 73, 74

*Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir.2000) ........43

*Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001).........................41

*Citizens Ass'n of Georgetown v. Washington*, 370 F. Supp. 1101, 1109
   (D.D.C. 1974).......................................................................................32

*Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998) ..................................... 72, 74

*Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991) ........... 72, 75, 76

*DeRosa v. Workman*, 679 F.3d 1196, 1218-21 (10th Cir. 2012) .................55

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ................... 68, 69, 71

*Fields v. Gibson*, 277 F.3d 1203, 1216 n.8 (10th Cir. 2002).......................67

*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000)...................................47

*Graham v. Collins*, 506 U.S. 461, 467 (1993).............................................70

*Gregg v. Georgia*, 428 U.S. 153, 189 (1976)......................................... 68, 69

*Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015)................................79

*Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) ..66

*Harrington v. Richter*, 562 U.S. 86, 104 (2011) ...........................................18

*Harris v. Dugger*, 874 F.2d 756, 761 n.4 (11th Cir. 1989) ...........................62

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) ......................78

*Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012) ............. 37, 39, 54

*Jackson v. United States*, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009) ........62

*Jefferson v. Upton*, 560 U.S. 284, 285-86 (2010).........................................32

*Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) .................................78

*Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009).......................................18

*Lackey v. Scott*, 28 F.3d 486, 490 (5th Cir. 1994)........................................70

*Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013)...... 37, 38, 45, 80

*Machibroda v. United States*, 368 U.S. 487 (1962) .............................. 41, 61

*Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir. 1995) ...........................19

*Marrero v. Horn*, 505 Fed. App'x 174, 181 (3d Cir.2012) ...........................43

*Massaro v. United States*, 538 U.S. 500, 504 (2003)....................................64

*Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009).............80

*McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990)............................54

*Miles v. Ryan*, 691 F.3d 1127, 1137-39 (9th Cir. 2012)................................54

*Milton v. Miller*, 744 F.3d 660, 673 (10th Cir. 2014) ..................................45

*Miniel v. Cockrell*, 339 F.3d 331, 345 (5th Cir. 2003)..................................56

*Miranda v. Arizona*, 384 U.S. 436 (1966).......................................................5

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) ..............................................65

*Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001).......................... 65, 68

*Paxton v. Ward*, 199 F.3d 1197, 1217-18 (10th Cir. 1999)..........................69

*Petrovich v. Leonardo*, 229 F.3d 384, 387 (2d Cir. 2000) ...........................70

*Phillips v. Bradshaw*, 607 F.3d 199, 216-19 (6th Cir. 2010).......................57

*Porter v. McCollum*, 558 U.S. 30, 41 (2009) ...............................................29

*Postelle v. Carpenter*, 901 F.3d 1202, 1214-15 (10th Cir. 2018) ................19

*Raines v. United States*, 423 F.2d 526, 529 & n.2 (4th Cir. 1970)...............41

*Ramsey v. Bowersox*, 149 F.3d 749, 759 (8th Cir. 1998).............................67

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011)...66

*Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ..............................................18

*Saffle v. Parks*, 494 U.S. 484, 487 (1990) ....................................................70

*Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001) .................... 72, 74

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)...........................................40

*Schriro v. Summerlin*, 542 U.S. 348 (2004) ..................................................70

*Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at **2 (10th Cir. Nov. 2, 2005)..............................................................................................................78

*Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006) ...................... 68, 77

*Silverstein v. Gwinnett Hosp. Authority*, 861 F.3d 1560, 1567 (11th Cir. 1988)..............................................................................................................32

*Smith v. Jones* 143 F.3d 1086, 1113 (10th Cir. 1998).................................80

*Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) ...................... 37, 38, 54

*Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) ..........................19

*Strickland v. Washington*, 466 U.S. 668, 687 (1984)....................... 18, 28, 47

*Teague v. Lane*, 489 U.S. 288, 310 (1989)............................................ 69, 70

*Tippins v. Walker*, 77 F.3d 682, 686-87 (2d Cir. 1996) ...............................54

*Turrentine v. Mullin*, 390 F.3d 1181, 1204 (10th Cir. 2004) ................. 47, 48

*United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015) ........... passim

*United States v. Becker*, 109 Fed. App'x. 264 (10th Cir. 2004) ...................44

*United States v. Bernard*, 762 F.3d 467, 476, 480 (5th Cir. 2014) ..............64

*United States v. Caro*, 597 F.3d 608, 624-25 (4th Cir. 2010)......................79

*United States v. Cousins*, 455 F.3d 1116, 1126 n.6 (10th Cir. 2006)...........70

iv

*United States v. Cruz*, 774 F.3d 1278, 1284-85 (10th Cir. 2014) .................18

*United States v. De Vaughn*, 694 F.3d 1141, 1159 (10th Cir. 2012) ...........66

*United States v. Driscoll*, 892 F.3d 1127 (10th Cir. 2018)..........................17

*United States v. Duran-Salazar*, 307 Fed. App'x. 209, 210 (10th Cir. 2009) ....................................................................................................44

*United States v. Estrada*, 849 F.2d, 1304, 1305-06 (10th Cir. 1988)............44

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008)........................ passim

*United States v. Flood*, 713 F.3d 1281, 1290 (10th Cir. 2013) ....................17

*United States v. Frady*, 456 U.S. 152, 165 (1982) ................................. 64, 65

*United States v. Giry*, 818 F.2d 120, 133 (1st Cir. 1987)...................... 72, 76

*United States v. Gonzalez*, 98 Fed. App'x 825 (10th Cir. 2004)...................44

*United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000).......... 31, 32

*United States v. McGaughy*, 670 F.3d 1149, 1159 (10th Cir. 2012).............64

*United States v. Porter*, 405 F.3d 1136, 1143-44 (10th Cir. 2005)...............66

*United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)....................79

*United States v. Rodriguez-Vega*, 797 F.3d 781, 792 (9th Cir. 2015).... 41, 61

*United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011) ............ 17, 18

*United States v. Snyder*, 793 F.3d 1241, 1243 (10th Cir. 2015) ..................17

*United States v. Snyder*, 871 F.3d 1122, 1126 (10th Cir. 2017........ 64, 65, 68

*United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997)..........79

*United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002)............. 64, 65

*Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1195 n.7 (10th Cir. 2008) ...31

*Wackerly v. Workman*, 580 F.3d 1171, 1177-79 (10th Cir. 2009)......... 48, 49

*Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998) ................................62

*Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002)..................... 19, 48

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)......................... 68, 69

*Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003).........................80

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ...................................................47

**Statutes**

18 U.S.C. § 1111.................................................................................................1

18 U.S.C. § 3593(e) ........................................................................................77

28 U.S.C. § 2254..............................................................................................45

28 U.S.C. § 2255............................................................................... passim

**Rules**

Fed. R. Crim. P. 52(b) .................................................................................79

**Treatises**

David F. Long, "Issues in Behavioral Neurology and Brain Injury," in

*Neuropsychological Treatment After Brain Injury* 62 (David Ellis &

Anne-Lise Christensen eds., 1989) ............................................................36

Michael Franzen & Glen Getz, *Screening for Brain Impairment* 22 (3rd ed.

2010).................................................................................................................31

Muriel Deutsch Lezak et al., *Neuropsychological Assessment* (5th ed. 2012)

.......................................................................................................................31

*Sears v. Upton*, 561 U.S. 945, 949 (2010)...................................... 32, 37, 38

## ISSUES PRESENTED FOR REVIEW

On March 9, 2018, this Court granted a certificate of appealability ("COA") for the following issues:

1.  Whether Fields's trial counsel ineffectively developed, presented, and litigated mitigating mental health evidence by failing to investigate and present evidence of organic brain damage and by failing to properly cross-examine the government's expert witness, Dr. Price.

2.  Whether Mr. Fields's trial counsel ineffectively failed to present his social history as a mitigating factor.

3.  Whether the Government's penalty phase closing arguments violated Mr. Fields's constitutional rights (limited to the prosecutor's story drawn from the Book of Daniel).

4.  Whether the cumulative effect of these errors denied Mr. Fields due process, effective assistance of counsel, and a reliable sentencing hearing.

## STATEMENT OF THE CASE

A. Procedural History and Rulings Presented for Review

A federal grand jury for the Eastern District of Oklahoma returned an indictment charging Edward Fields with two capital counts of first degree murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111, and four other crimes, all stemming from the

1

homicides of the Charles and Shirley Chick. ROA 1:64-69.[1] The government filed a notice of intent to seek the death penalty as to both murder charges. ROA 1:79-82. Fields pleaded guilty to all counts. ROA 1:1179-1214. Following a penalty trial, the jury recommended a sentence of death, which the district court imposed. ROA 1:954-67, 978-82. This Court affirmed, and the Supreme Court denied review. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008), *cert. denied*, 556 U.S. 1167 (2009).

Fields subsequently moved for collateral relief under 28 U.S.C. § 2255. ROA 9:14-161,162-478, 512-637; 11:14-611. After the government answered the motion, the parties engaged in discovery at the district court's direction. *See* ROA 10:432-34, 670-80. The district court then entertained dispositive briefing and permitted the parties to expand the record with supporting exhibits. ROA 12:14-492, 498-564; 13:57-194. After reviewing the briefs and exhibits, the district court denied relief and a COA. ROA 12:566-618. The court subsequently denied a motion to alter and amend the judgment, and Fields filed a notice of appeal. ROA 12:643-49. This Court granted a COA limited to four issues.

---

[1] The government adopts Fields's citation convention, referring to the appellate record by volume and page number, separated by a colon. "Doc." refers to entries on the docket of this case.

B. Statement of Facts

1. Aggravation Case

In the late 1990s, Fields and Dan Presley worked together as prison guards. After work, they hunted and fished together and became best friends. ROA 2:461-64. Fields hunted with a .22 rifle and was a "great shot." *Id*. at 467. In 2002, with the assistance of a girlfriend, Fields made a ghillie suit, which he referred to as a "sniper suit."[2] *Id*. at 413-22.

Beginning in May 2003, Fields resided briefly with Carol Lamb. ROA 2:424-25, 430. Lamb helped Fields financially, and they discussed marriage. *Id*. at 438, 441-42. On June 15, 2003, Lamb observed Fields purchasing gunny sacks, which he cut into pieces that he wrapped around one of his rifles. When she asked him what he was doing, Fields responded, "You don't want to know." *Id*. at 429. Around July of 2003, following an argument, Lamb asked Fields to move out, and he began living in his truck. *Id*. at 439. Later that month, Fields told Lamb he intended to kill himself, prompting her to provide him with money, as she felt responsible for his homelessness. During the conversation, Fields admitted he had recently donned his ghillie suit and snuck up on a couple having sex. *Id*. at 437-39.

---

[2] A ghillie suit is "a covering for head and body made to resemble underbrush." *Fields* 516, F.3d at 927.

3

While residing with Lamb, Fields began dating Michelle Bond, and talked to her about possibly committing suicide if she did not let him move in with her. ROA 3:165, 175-76.  On July 6, 2003, following Fields's eviction from Lamb's home, Bond permitted him to stay overnight, but refused to do so again on July 9th or 10th.  *Id.* at 176-77.  On the afternoon of July10, Fields met Lamb for dinner. ROA 2:433.  They held hands at the restaurant and talked about running away together.  *Id.*  Lamb left around 6:00 p.m. for a college class (*id.* at 446), and Fields drove to a nearby town to visit Presley and his wife, Marilyn.  *Id.* at 472; ROA 3:72, 81-82.  While at the Presley's home, Fields did not appear depressed, distressed, or in financial need.  ROA 2:474.

Shortly before dark, Fields drove to the Winding Stair Campground in the Ouachita National Forest, where he killed Charles and Shirley Chick without provocation:

> He found the Chicks on a vista some distance from their campsite.  He retrieved the rifle, put on the ghillie suit, and hid near their campsite as it grew dark.  In time, the Chicks came back to the campsite and sat at a table.  Fields waited and watched them for about twenty minutes. When Charles told Shirley he was going to the tent, Fields shot him in the face.  As Charles slumped to the table, Shirley got up and began running toward the couple's van.  Fields shot at her and a bullet tore through her foot. She reached the passenger door of the van, but was shot again, on the side of her head.  Fields caught up and shot her once more, in the back of the head, in the doorway of the van. . . . Fields returned to the table and shot Charles a second time in the head. . . . [¶]  Physical evidence indicated that Fields then left the campsite and only returned hours later, when he broke the driver's window of the van and stole some items.

4

*Fields*, 516 F.3d at 927.

The day after the murders, Fields went to work and later visited Bond. ROA 3:165, 175, 177. He arrived at Bond's home with a bag of marijuana, a wallet full of money, and two backpacks containing property stolen from the Chicks. *Id*. at 178-80. Fields proposed marriage and gave Bond an engagement ring. *Id*. at 179. For the next two days, he and Bond drove to Arkansas and back, a trip financed with the Chicks' stolen money and credit cards. *Id*. at 184-95. When Bond asked Fields where he had gotten the money, Fields told her an elaborate story about trafficking drugs. *Id*. at 195.

After reading about the murders, Lamb, contacted a friend who worked in law enforcement and identified Fields as a suspect. ROA 2:450. On July 18, 2003, Fields left his workplace and voluntarily accompanied an FBI agent to a police station. *Id*. at 316-20. During the ensuing interview, officials obtained a search warrant for Fields's truck, from which they recovered the ghillie suit, stolen property, and the camouflaged .22 caliber rifle. *Id*. at 235-36, 244-50. Fields denied involvement in the murders until investigators confronted him with the incriminating physical evidence (*id*. at 347-50), after which he provided a *Mirandized* confession[3] (*id*. at 316-30).

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

5

Fields admitted camouflaging himself, lying in wait, and then sniping Charles Chick when the victim announced his intent to go to his tent. Fields further admitted, "I then shot at Shirley Chick a couple of times. I followed Shirley Chick to the van and shot her twice in the head. I then returned to Charles Chick and shot him once in the head." After stealing cash from Charles Chick's pocket, Fields said he retrieved his own vehicle and then burgled the Chicks' van. He told the investigators, "Both Charles and Shirley were dead when I left their campsite the evening of July 10th." ROA 2:371-73.

The government also presented victim-impact evidence through Shirley Chick's sister, Carolyn Curry, and two family friends, Mark Bruski and Charles Thomas Miliara. Curry recalled her sister's life and referred to the Chicks as "soul mates." ROA 3:116-18. The pair traveled frequently, made friends widely, and enjoyed the "immense beauty of nature." *Id*. at 118-19. Bruski met Charles Chick when he was 10 years old. They grew up together, were inseparable, and became like brothers. *Id* at. 54. Charles Chick was Bruski's "best man [in his wedding], he was my best friend, he was my brother." *Id*. at 69. Miliara and Charles worked together for 15 years. *Id*. at 227-29. The Chicks became part of Miliara's family. *Id*. at 231-32. On weekends for the better part of a year, the Chicks helped Miliara build a house. *Id*. at 230. The Chicks and Miliaras frequently celebrated holidays together. *Id*. at 232.

6

2.    Mitigation Case

Jovanna Fields, no relation to the defendant, worked with and befriended Edward Fields, Sr. shortly before he became terminally ill. At the time, Fields lived with his parents, but after his father's death, his mother sold the house, forcing him to move.  He showed little interest in packing his belongings, including his ghillie suit.  ROA 3:271-281.  Ms. Fields conceded that she helped Fields's parents more than he did.  *Id*. at 285-87.

Fields's sister, Cherie Fields, described her and her brother's upbringing in Oklahoma, Utah, West Virginia, and Virginia.  She and her brother fought, but she considered it "normal teenage type stuff," though she admitted he had violent outbursts that frightened her and their mother.  Fields displayed little work ethic and rejected authority.  At age 16, he moved in with an older woman, but was convinced to come home, earn a GED, and join the Navy.  While in the Navy, he fathered a child with his girlfriend.  Subsequently, he married another woman and had two other children.  ROA 3:294-98, 309, 327-30.

Fields's father worked long hours and was not often home to spend time with his children, but he still expressed his love for them.  ROA 3:299, 315, 322-23.  He was a "wonderful" provider, who sent his children to private school, and had a stable relationship with Fields's mother.  *Id*. at 316-18.  When Fields's father became ill, Fields planted a garden for him, and he and his sister took him fishing.

7

*Id*. at 306-07.  After the death of Fields's father, his mother asked Cherie Fields to move her to Virginia, claiming she feared the defendant – accusations she repeated to her neighbors.  Cherie interpreted her mother's assertions as a manipulation for attention, rather than a sincere expression of fear.  *Id*. at 304, 322, 339-40.

Cherie Fields believed her brother did not provide emotional support for others.  ROA 3:338.  She described him as manipulative to the FBI, and she recalled that he had asked her for money on approximately five occasions.  She said "he was always bumming money from" their parents.  *Id*. at 334, 337.  Before his arrest, Fields had little contact with his children, and his sister counseled him to take fatherhood more seriously.  In her opinion, his arrest and subsequent medication in jail "totally changed" him.  The medication made him more caring and allowed Fields and his sister to forge a much closer relationship.  *Id*. at 310, 319, 332-33, 341.  After her brother's arrest, Cherie Fields arranged regular phone contact between him and his two younger children, who lived near her.  *Id*. at 309.

Teresa Fields married and divorced Fields twice, and they had two children. The couple first married when Fields was enlisted in the Navy.  He discharged briefly, but returned to the service.  ROA 3:343-50.  He was depressive, sometimes angry, and had difficulty maintaining employment outside the military.  *Id*. at 350-52.  After leaving the Navy a second time, Fields worked as a security guard and had an affair, leading to the first breakup of his marriage.  *Id*. at 355.  But Fields

was very compassionate when his children became ill and rekindled his relationship with his wife. *Id*. at 356-60. The couple moved to Oklahoma, where Fields worked as a prison guard for several years. ROA 3:360-63. But the marriage failed a second time because Fields was moody, depressed, and would stay in his room for days at a time. *Id*. at 364-66, 376-77, 383-84. He was physically abusive to his wife, on one occasion choking her. *Id*. at 374-76. He never took financial responsibility during their marriage and only occasionally paid partial child support afterward. *Id*. at 378.

After leaving Fields, Teresa Fields was twice treated for cancer. During treatment, she and Fields tried unsuccessfully to reconcile. Though they did not repair their relationship, they remained emotionally connected. ROA 3:368-71. After Fields's incarceration, he began to have "normal conversations" with his ex-wife and expressed concern about their children. *Id*. at 384-85. While jailed, Fields was excited to speak and visit with relatives, especially his sister and children, of whom he spoke with great pride. ROA 4:56-57.

Fields's son, Andrew, corresponded with his father and spoke to him by phone. Andrew Fields wanted to have a relationship with his father. ROA 4:71-75. Fields's daughter, Amanda Fields, also spoke and corresponded with her father. She found him more stable in jail, describing him as "two different people"

9

before his arrest.  Amanda Fields wanted to share her life with her father.  *Id*. at 75-80.

Dr. Brad Grinage, a psychiatrist, diagnosed Fields with bipolar disorder with psychotic features.  ROA 3:389-94.  Grinage found that Fields displayed classic symptoms of mania: "pleasure seeking behavior . . . either spending money . . . . [and] hyper[-]sexuality."  Grinage reported that Fields had been treated repeatedly with antidepressant medications, rather than the mood stabilizers used for bipolar disorder.  *Id*. at 394-95, 407-08.  Antidepressants can cause manic episodes and irritable agitation in people who suffer from bipolar disorder.  They can also enhance existing psychosis.  *Id*. at 396-97, 427-29.

In April 2003, Fields visited a physician, Dr. Kemp, complaining of depression, command hallucinations, and suicidal ideation.  ROA 3:416.  Kemp, prescribed the antidepressant Lexapro.  On June 16, 2003, when Lexapro proved ineffective, Kemp prescribed the antidepressant Effexor, doubling the initial dosage on July 7, 2003.  *Id*. at 420-22, 425.  According to Grinage, Fields developed an irritable manic mania from the antidepressants.  As a result, he suffered a severe mental or emotional disturbance—bipolar disorder with psychotic features (auditory hallucinations)—at the time of the murders that significantly impaired his ability to behave in a particular way.  *Id*. at 431.

Dr. George Woods, a neuropsychiatrist, evaluated Fields.  Woods found that Fields had a history of mania, including grandiosity, impaired judgment, and hyper-sexuality.  In view of Fields's reported auditory hallucinations, Woods believed the defendant had schizoaffective disorder or bipolar disorder with psychotic features, which affected his judgment.  ROA 4:83-121.  Woods explained the Effexor, atypical of antidepressants, affected two neurotransmitters and has a significant incidence of flipping patients in manic states.  Mania impairs judgment and increases symptoms of psychosis.  ROA 4:134-35, 140-41.  He further stated that a person experiencing a manic switch may feel compelled to act on any command hallucinations.  *Id*. at 142.  In Woods's opinion, Fields was not insane at the time of the crime but—because of his bipolar disorder—he could not conform his behavior to the law.  *Id*. at 144.

3.  <u>Rebuttal Case</u>

Dr. Jack Randall Price, a neuropsychologist, evaluated Fields.  He doubted Fields's claims of delusions and hallucinations, noting the defendant described the symptoms in an atypical fashion.  ROA 4:236-37, 256-59, 306-07.  Price concluded that Fields did not experience a manic episode at the time of the crime.  *Id*. at 262-63, 276-77, 298-300.  Fields told Price that he felt no fear during the commission of the crime—he felt focused and had concentrated on the tasks at hand.  *Id*. at 281.  Price concluded that Fields had acted in a very controlled, selfish

manner, without empathy or remorse, knowing his behavior was wrong. *Id*. at 301, 303. Price diagnosed Fields with mild chronic depression and a personality disorder with anti-social and psychopathic, narcissistic and dependent traits and features. *Id*. at 290-95.

Dr. Jeffrey Mitchell, a psychiatrist, evaluated Fields and concluded that his physician, Dr. Kemp, had correctly diagnosed Fields with depression and had treated him appropriately with antidepressants. ROA 4:393-403, 406-10, 431. When diagnosed by Kemp, Fields had not described symptoms of mania, much less did he exhibit paranoid or delusional thinking. *Id*. at 410-13. Kemp prescribed a low dose of Effexor until three days before the crime, when Fields began receiving "the low end of effective therapeutic dose[s]." Antidepressants take two-to-three weeks to become effective, peaking after six-to-eight weeks. *Id*. at 423.

Mitchell found the fact that Fields laid in wait for the Chicks inconsistent with mania. ROA 4:416. Fields's description of auditory hallucinations during the crime was atypical, as he claimed the voice provided rational explanations for its commands. *Id*. at 423-24. Mitchell described Fields's commission of the murder and his conduct afterward as volitional—"methodical, purposeful [and] planned." *Id*. at 425-27. Mitchell saw no evidence Fields suffered from mania. *Id*. at 429-30.

## SUMMARY OF ARGUMENT

I. Trial counsel properly declined to present evidence that Fields suffered from organic brain damage. Before trial, counsel consulted three mental health experts, Drs. Woods, Grinage, and Gelbort, who all evaluated Fields. Counsel chose to call Woods and Grinage, who testified that Fields suffered from bipolar or schizoaffective disorder with psychotic features, but had been misdiagnosed and treated for depression before the crimes. According to the defense experts, the prescribed antidepressants exacerbated Fields's preexisting auditory hallucinations and caused him to experience irritable mania and impaired judgment when he murdered the Chicks.

Counsel elected to forgo the testimony of Dr. Gelbort, who had reported symptoms of possible brain damage that he believed warranted further evaluation. Gelbort detected "mild impairment" of higher cognitive abilities and verbal processing speed, as well as "impulsivity of mild proportions." Mild impairments and impulsivity would not explain why Fields chose to murder two strangers without provocation. As such, counsel reasonably focused on the theory presented through Woods and Grinage, both of whom reviewed Gelbort's tentative findings but made little if any mention of them in their testimony, which purported to explain the commission of the crime.

Putting aside the tentative, uninspiring nature of Gelbort's findings, counsel's decision to forgo them did not prejudice the verdict. Subsequent

investigation revealed that Fields has a healthy brain, and any effort to prove

otherwise would have motivated damaging rebuttal.  At the outset of this collateral

proceeding, a new defense expert, Dr. Daniel Martell, asserted Fields had suffered

"a catastrophic loss of brain function over the past five years," as an almost certain

result of stroke or tumor.  At Martell's behest, Fields had an MRI that revealed he

had a healthy brain, upending the reliability of the defense-expert's findings and

corroborating the conclusions of a government-retained neuropsychologist, Dr.

James Seward, who rejected "insinuations that everyone is overlooking Mr.

Fields's rotting brain."  Seward also cast doubt on theories advanced at trial,

questioning the relationship between the crime and Fields's claims of auditory

hallucinations.  Given the evident weakness of the brain damage evidence, no

reasonable likelihood exists that its omission prejudiced the verdict.

The district court appropriately exercised its discretion to deny an

evidentiary hearing concerning the brain damage evidence.  The MRI requested by

Martell disproved the existence of any physically verifiable brain damage,

impeaching the defense diagnosis without testimony.  Common sense dictated that

an evidentiary proceeding would not enhance Fields's ability to show that his

counsel, in omitting such information, provided prejudicially ineffective assistance.

II.  Trial counsel properly declined to present evidence of Fields's social

history, to the extent it reflected a dysfunctional family life and upbringing.  As

14

noted, the defense sought to explain Fields's crimes as a behavioral aberration driven by a wrongly-prescribed psychotropic drug. It characterized Fields as loved and lovable, alleging in mitigation that he had suffered the loss of his father, the relocation of his mother, and the departure of his ex-wife and children. In view of this strategy, the forgone evidence had marginal, if any, mitigating value. It would have detracted from the defense effort to attribute the murders to antidepressants, suggesting the existence of deeper character flaws that motivated Fields's conduct. Moreover, such evidence would have implied Fields actually had strained relationships with his relatives, diminishing the weight of mitigators based on the sincerity of his attachments. Counsel had no obligation to present evidence that could backfire. Moreover, when counsel decided to forgo the evidence, she believed it might invite damaging rebuttal.

Because the social history evidence would have detracted from the weight of mitigators premised on Fields's interpersonal relationships and exposure to antidepressants, no reasonable likelihood exists that counsel's decision to omit it prejudiced the verdict, even if it might have drawn a fuller portrait of his life.

The district court appropriately denied an evidentiary hearing on this claim, though trial counsel had declared she had no tactical reason for omitting the social history evidence. As revealed in correspondence received in discovery, counsel articulated her reasoning for omitting the evidence and vetted it with other

15

experienced members of the capital-defense bar. Common sense dictates that a formal evidentiary hearing would not have disclosed evidence to rebut counsel's contemporaneous thinking.

III. Fields defaulted his challenge to a prosecution argument that alluded to a story from the Bible's Book of Daniel, as he failed to raise the matter on appeal. He makes no effort to excuse that default by demonstrating cause and prejudice for the omission. Instead, he attacks trial counsel for failing to object to the argument, though he lacks permission to raise that issue. In any event, the prosecutor's remarks were neither erroneous nor prejudicial, as they made no direct reference to religion or religious law. The argument underscored the government's contention that Fields's conduct demanded capital punishment under secular law. Assuming, arguendo, Fields had excused his default of this claim, he has still failed to show—in view of the brutal double murder of the Chicks—that absent the remarks in issue, the jury would not have imposed the death penalty.

IV. The cumulative error doctrine applies only where multiple errors occurred, those errors were deemed harmless individually but their cumulative impact affected the trial's fundamental fairness. Fields has failed to identify any cognizable and meritorious claim of error that might begin to satisfy this standard.

## STANDARD OF REVIEW

16

On appeal from the denial of § 2255 relief, this Court ordinarily reviews "the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Driscoll*, 892 F.3d 1127, 1130 (10th Cir. 2018) (internal quotes omitted) (quoting *United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015) and *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011)).  The Court "can, of course, affirm a lower court's ruling on any grounds adequately supported by the record, even grounds not relied upon by the district court." *United States v. Snyder*, 793 F.3d 1241, 1243 (10th Cir. 2015) (internal quotation marks omitted). It reviews the denial of an evidentiary hearing for abuse of discretion. *United States v. Flood*, 713 F.3d 1281, 1290 (10th Cir. 2013).

## ARGUMENT

### I.   TRIAL COUNSEL SELECTED APPROPRIATE MENTAL HEALTH EVIDENCE FOR PRESENTATION TO THE JURY

Fields claims he is entitled to collateral relief because trial counsel provided ineffective assistance by failing to present evidence of his alleged brain damage. He further argues that the district court improperly denied his claim without granting him an evidentiary hearing.  Br. 7-49.  Trial counsel made an appropriate tactical decision to forgo brain damage evidence based on the relative strength of mitigation evidence presented, which centered on a neurochemical explanation for Fields's behavior.  Counsel's tactics, moreover, proved prophetic—investigations undertaken during the collateral proceedings revealed that Fields did not suffer

from brain damage. Any effort to have established otherwise would have exposed the defense to withering rebuttal. The record submitted to the district court in regard to the claim of brain damage permitted it to rule without conducting formal evidentiary proceedings.

### A.     Standards for Evaluating Counsel

To demonstrate ineffective assistance, a defendant must show that trial counsel performed deficiently and that the deficiencies were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, the defendant first must show that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011). In so doing, the defendant must overcome a strong presumption that counsel provided adequate assistance. *Rushin*, 642 F.3d at 1306 (citing *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). Additionally, the defendant must demonstrate that, absent an alleged error, a reasonable probability exists that he would have received a more favorable verdict. *United States v. Cruz*, 774 F.3d 1278, 1284-85 (10th Cir. 2014).

Informed strategic decisions are presumptively reasonable. *Strickland*, 466 U.S. at 690 (characterizing the presumption as "virtually unchallengeable"). Thus, "counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *see*

18

*Postelle v. Carpenter*, 901 F.3d 1202, 1214-15 (10th Cir. 2018) (noting "we make every effort . . . to evaluate the conduct from counsel's perspective at the time" (quotation omitted)).  Further, counsel may generally rely on the opinions of properly informed experts.  *Postelle*, 901 F.3d at 1215-16 (observing "[t]his is precisely the reason lawyers seek out expert assistance"); *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002); *see also Bell v. Thompson*, 545 U.S. 794, 809-10 (2005) (suggesting defendant "would have faced an uphill battle" to show counsel should have continued a mental health investigation despite an expert opinion that he was not mentally ill).

Decisions regarding witness choice are "quintessentially" strategic matters for an attorney.  *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).  Accordingly, an attorney need not investigate or present all available mitigating evidence, if the decision to forgo such information is reasonable under the circumstances.  *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008).  Specifically, the law does not require counsel to present "all mental illness mitigating circumstance evidence . . . to render effective assistance."  *Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir. 1995); *see also Postelle*, 901 F.3d at 1217 (holding "the difference of a few IQ points was not some magical key to success. . . . [T]he possible marginal benefit of raising the issue . . . could have detracted from the relatively strong evidence" presented).

19

### 1. Counsel Made a Valid Tactical Choice

In this case, trial counsel had no professional obligation to present brain damage evidence that they reasonably believed would not advance the case.[4] Indeed, any existing evidence of brain damage was tentative and insignificant. Any confirmation of the possible findings carried litigation risk counsel hoped to avoid.

Before trial, counsel consulted with three mental health experts: George Woods, a neuropsychiatrist, Brad Grinage, a psychiatrist, and Michael Gelbort, a neuropsychologist. Gelbort never claimed to have a theory that explained Fields's commission of the murders. *See* ROA 9:224-27. Gelbort noted only "mild impairment" of higher cognitive abilities and processing speed for verbal tasks and "impulsivity of mild proportions." *Id*. at 227. He reported that Fields tended to perform better on more difficult tests, a phenomenon he explained as the likely result of "deficits or impairments in functional attention and concentration abilities." *Id*. Gelbort never diagnosed Fields with brain damage, venturing only

---

[4] The government here refers to counsel in the plural because three attorneys entered appearances for Fields (ROA 12:23-25) in his seven-day trial (*see* ROA 1:33-36), which was limited to the issue of punishment (*see* ROA 2:52). Fields's lead counsel, Julia O'Connell, enjoyed "ongoing support from[] the capital defense bar's brightest stars – Judy Clarke, David Bruck, Kevin McNally, Dick Burr, Michael Burt and investigator David Freedman" with whom she communicated regularly "in addition to other expert attorneys like Lisa Greenman and Alex Bunin." ROA 12:25. Still, when appropriately reflected in the record, the government refers to counsel in the singular.

that he displayed "a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted."[5]  *Id*.

At trial, counsel chose to present mitigation evidence through her other two mental health experts, Drs. Woods and Grinage.  *See generally* ROA 12:577-78 (summarizing the defense's mental health evidence).  Woods testified that Fields suffered from a mood disorder—schizoaffective disorder or bipolar disorder with psychotic features—to which he attributed the defendant's poor judgment and erratic thinking.  ROA 4:91, 118, 121-22.  Woods asserted that Effexor, an antidepressant prescribed to Fields prior to the murders, could "flip" people with bipolar disorder from depression to mania, further impairing judgment.  *Id*. at 134-35.  In a similar vein, Grinage, diagnosed Fields with bipolar disorder with psychotic features, including auditory hallucinations.  ROA 3:390-93, 481-83.  He explained that bipolar patients treated with antidepressants, especially Effexor, could enter a manic state, aggravating existing psychoses.  *Id*. at 396-97, 427-29.  Grinage concluded that, at the time of the murders, Effexor had caused Fields to

---

[5] As discussed below, Gelbort wanted to administer a personality test to Fields, apparently to rule out a non-organic explanation for his performance on neuropsychological testing.  Fields's counsel refused to permit administration of the test, a fact that underscores the incomplete basis of Gelbort's limited remarks.

enter an irritable manic state that amounted to a severe emotional disturbance.  *Id*. at 430-31.

As presented through Woods and Grinage, counsel reasonably focused the defense on a theory that explained the crimes in terms of the interaction between psychotropic medications and an undiagnosed mood disorder.  Woods, a neuropsychiatrist and board certified neurologist, had lectured on brain function and on the relationship between neuroimaging, neuropsychology and behavior. ROA 12:126-55 (Woods's curriculum vitae), 156 (defense team correspondence). Given Woods's credentials, counsel anticipated he would identify any pertinent brain damage evidence.  *See* ROA 12:157-58; *see also id*. at 159 (indicating an expectation that Woods would evaluate brain damage).  Fields's counsel did nothing to prevent Woods from reaching appropriate conclusions regarding brain damage, prior to trial or during his testimony.  *See* ROA 4:88 (explaining that counsel retained Woods to determine "if Mr. Fields suffered from any mental disorder or mental defect; and . . . what possible impact it may have had").  Woods conferred with Gelbort before trial.  *Id.* at 147.  And at trial, counsel asked Woods to opine, without limitation, on what conclusions he had drawn.  *Id.* at 91.  Indeed, Fields concedes Woods could have testified about brain damage.  Br. 16.

Woods's omission of any reference to brain damage appears to reflect his sincere belief and confidence in his own theory concerning Fields's use of Effexor,

22

an attitude adopted by counsel. Woods, alluding to his knowledge of psychopharmacology, privately assured counsel before trial that he could counter Dr. Price, a government-retained neuropsychologist who testified in rebuttal that Fields suffered from mild depression and a personality disorder with anti-social, psychopathic, narcissistic and dependent traits and features. ROA 4:237, 290-95. Woods believed Price, by dint of his specialty, presented little danger: "He's a psychologist. He doesn't know shit about medications, and [Fields] is being treated now, so he's probably not very symptomatic. We'll have to look to see if he did any tests of effort/malingering, to see how [Fields] performed." ROA 12:162. These assurances reflected a belief that Fields suffered from a chemical imbalance amenable to medication, not organic brain damage. Counsel appeared convinced, commenting in an e-mail, "I smell blood. [Price] can be 'had' in cross-examination. He's just a PhD, not a REAL doctor." *Id.* at 164.

Fields's other testifying mental health expert, Dr. Grinage, also possessed professional credentials that permitted him to testify about neurological health. Indeed, he did so, agreeing on cross-examination that "if [Fields] had suffered brain damage from birth, age 36 is a little late to blame an alleged hypoxia as a rule." ROA 3:491. But before trial, Grinage told counsel he had reviewed Gelbort's neuropsychological testing (*id.* at 445) and did not object when counsel asked him to avoid the subject:

23

> I'm writing to see how you feel about the neuropsychologist stuff we have. I'm thinking that – if it is not vital to your conclusion – you not mention it in your report. The reason for this is: if I have to go to trial, and their neuropsychologist reaches some conclusion contrary to Dr. Gelbort's, I can jettison the neuropsychologist testimony. Then the govt's neuropsychologist probably wouldn't be allowed to testify.

ROA 13:85. Grinage saw no issue with the strategy: "I don't have a problem leaving out Dr. Gelbort's information with the understanding that if on the stand, if I am asked why I did not include his information in my report I would need to answer that it was at your request." *Id*. at 86.

Putting aside the pre-trial correspondence, the testifying experts' testimony suggests they put little stock in any brain damage theory. Grinage testified the possibility of frontal lobe damage caused by hypoxia amounted to a "piece of evidence to be weighed," but nothing "cataclysmic." ROA 3:196. Grinage conceded that evidence of a frontal lobe impairment would "reveal itself in a number of ways concerning cognitive performance," though "you might be able to stretch to say that it would have some contribution to a bipolar type disorder." *Id*. at 196-97. For his part, Woods read Gelbort's report before writing his own (ROA 4:147), and met with Gelbort before testifying (*id*. at 148), but did not mention Gelbort's concerns in his testimony. *See* ROA 4:83-214. Given that neither testifying expert appeared concerned with Gelbort's findings, counsel understandably and appropriately adopted the same views. *See Postelle*, 901 F.3d at 1215-16.

24

Although counsel initially expressed a high opinion of Gelbort's work (*see* ROA 1:438), his tepid conclusions ultimately failed to make an impression as significant as those of Woods and Grinage.  Counsel informed a consulting attorney, "Most of my mitigation case is mental health evidence.  Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment."  ROA 12:122.  She specifically explained that Woods's opinion formed the core of the defense:

> I have George Woods, who is my real mental health expert.  His report will be far more comprehensive (and valuable).  Quite frankly, I'd rather rely on [Woods] than [Gelbort].  The potential brain damage has some value, but it's not a huge part of my mitigation. It just enters the equation, complicating the client's ability to make it through his hyper-manic state.

ROA 12:124; *see also id*. at 125 (calling Gelbort's opinion "icing on the cake").

Beyond the relative insignificance of Gelbort's tentative opinion, counsel had a strategic reason to forgo it—to avoid administration of personality testing. Gelbort believed personality testing was so important to his diagnosis that he left a copy of the Minnesota Multiphasic Personality Inventory for counsel to administer. ROA 12:160.  Apparently concerned the test would reveal damaging evidence about Fields's personality, counsel refused to administer it.  *Id*.  With Dr. Woods's concurrence, she also resisted a request by the government's expert to do so.  *Id*. Counsel evidently concluded that any diagnosis Gelbort might offer did not merit the potential damage threatened by personality testing.

After Price diagnosed Fields with a personality disorder with antisocial traits, counsel became determined to rely on her experts' lack of personality testing to narrow the scope of the evidence. In response to Price's diagnosis— "[p]ersonality disorder, nos [*sic*: NOS or Not Otherwise Specified], with antisocial (and psychopathic), narcissistic, and dependent traits and features"—counsel wrote, "This is killing me!!!! [¶] [Price] had to arrive at that shit by studying the prosecutor's 'can you help me kill this guy' pre-retainer packet. He didn't give any personality testing." ROA 12:165. In response to her concerns, counsel received advice from a consulting attorney to argue that the defense had not opened the door to personality disorder evidence, advice she apparently took to heart. *Id*. at 167; *see* ROA 4:223 (arguing the defense had not opened the door to personality disorder testimony). Counsel had a further tactical reason for forgoing brain damage evidence—concerns about showing such material to prosecutors:

> I don't know how far I want the report to go, for several reasons. One being that I may show it to the gov't for settlement purposes; the other being that my claim to fame isn't brain damage, it's the manic flip due to Effexor (the flip complicated by Tylenol PM for sleep problems, and then add on top maybe even some brain damage).

ROA 12:169.

Additionally, the record demonstrates that Fields's attorney had reservations about Gelbort's report, which she referred to as "THE crappiest one I have ever seen." *Id*. at 178. Gelbort's report raised alarms among other members of the

26

extended defense team, including an investigator who observed that facts available to the expert should have upended some of his own findings:

> [H]e says that Fields only did badly in classes he did not like which does not strike me as a very informed opinion for Gelbort to express; also, he never kept a job (Fields own self-report) is followed by he was in the military for 3 years and worked for DOC [Oklahoma Department of Corrections] for 4 years - that strikes me as keeping a job - why is Gelbort uncritically reporting that sort of thing when it appears contradicted by collateral evidence?

*Id*. at 174-75.

The investigator observed that Gelbort's findings provided little substantive mitigation: "The best potential evidence here is in the 'higher functions' paragraph in which he says he is mildly impaired on impulsivity and processing speed and higher level reasoning - but he takes that away by saying it results from concentration and attention deficits." *Id*. The investigator recommended that counsel simply adduce, through Woods, any helpful neuropsychological evidence as part of the diagnosis of bipolar disorder. *See id*. at 179-80. Woods concurred, *id*. at 181, as did a consulting attorney: "It doesn't sound, at least initially, like you will be needing/wanting Gelbort to have to carry much of the story line." *Id*. at 176.

In the end, counsel made an informed tactical decision—based on advice from legal and medical experts—to jettison a witness who had provided tentative findings of mild deficits based on an inaccurate analysis of facts. Gelbort had

27

created fertile ground for cross-examination and potentially exposed Fields to personality testing that counsel wanted to avoid.  The testifying experts, who presented a fully-formed theory to explain the crime, chose not to relate or rely upon Gelbort's findings, though they both had access to them.  Guided by her team of expert witnesses and others in the capital-defense bar, counsel properly exercised her professional judgment to omit Gelbort's putative opinion testimony, which she never believed would play a central role in the case.  *See Postelle*, 901 F.3d at 1214-16.  Such an informed tactical choice enjoys a presumption of reasonableness under *Strickland*, and this Court should therefore affirm the judgment below, denying relief.

2.   Counsel Made a Non-Prejudicial Choice

Even if counsel's decision to omit the brain damage evidence had fallen below prevailing professional norms, it would not have prejudiced the outcome of Fields's trial.  Indeed, Gelbort's tentative, inchoate suggestion of mild brain damage would not have constituted weighty mitigation in the face of Fields's double murder, especially given that the mental health theory that purported to explain the offense failed to sway the jury.  Furthermore, a complete exploration of any claim of brain damage appears likely to have resulted in an affirmative showing that it lacked any substance.

To demonstrate prejudice, Fields must establish "'a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Barrett*, 797 F.3d at 1229 (quoting *United States v. Rushin*, 642 F.3d at 1302 (internal quotation marks omitted). "To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding—and reweigh it against the evidence in aggravation." *Id.* at 1229 (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (brackets and internal quotation marks omitted).

Fields cannot demonstrate a reasonable probability that he would have received a more favorable verdict had counsel fully investigated Gelbort's suggestion of mild brain damage. Based on the record developed below, counsel could not have presented credible evidence that Fields actually suffered from any brain damage.

Nearly a half-decade after trial, in support of his § 2255 claim that counsel had overlooked proof of more significant neurological damage, Fields was evaluated by Dr. Daniel Martell, who diagnosed him with "a catastrophic loss of brain function over the past five years." ROA 9:292. Martell attributed Fields's neurological decline to one of two physiological phenomena: "atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia . . . .[or] less likely, . . . neoplastic brain disease (i.e., a brain

29

tumor)." *Id.* In either event, Martell "strongly" recommended an MRI study of Fields's brain. *Id.*

Martell's dire findings, and his attribution of them to physical deterioration of the brain, were undone by the very neuroimaging he recommended. The testing, undertaken by a radiologist with no connection to the case, disclosed no evidence of damage to Fields's brain. As explained in the report of the government's mental health expert on collateral review, neuropsychologist Dr. James Seward, "Mr. Fields had an MRI of the brain on November 3, 2011 . . . . According to Susan Koslow, M.D., this study did not reveal any intracranial abnormality." ROA 12:232. Though Koslow's findings were unavailable at trial, Fields cannot show that his brain healed itself from the stroke or tumor postulated by Martell.

Fields makes much of the fact that the district court relied upon the results of the MRI exam he requested, arguing on the basis of non-legal literature that such imaging "is not determinative of brain damage." Br. 45-49. Putting aside his resort to evidence outside the record, Fields fundamentally misreads the significance of the MRI, which he asked the district court to facilitate, based on Martell's assertions about its value:

> Dr. Daniel Martell, has opined that Mr. Fields has suffered a
> cataclysmic decline in his cognitive functioning due to either a tumor,
> stroke or other disease process . . . . According to Dr. Martell, brain
> scans and imaging may help identify the origins and course of Mr.
> Fields's cognitive impairments, and that "red flags" should have
> alerted trial counsel to the need for such in-depth testing prior to trial.

30

> [Cite.] The requested examination is *crucial* to the proper development of Mr. Fields's Section 2255 Claims.

ROA 10:318-19 (emphasis added). Elsewhere, Fields assured the district court, "the information brain scanning will provide is *central* to the resolution of the factual issues underlying Mr. Fields's claim that trial counsel rendered ineffective assistance." *Id*. at 322 (emphasis added). Having assured the district court of the importance of the brain imaging, Fields now complains that the judge relied on his representations to assess his likelihood of success. As discussed below, the evident disparity between reality and Fields's assertions undermined any factual dispute that might have otherwise existed. *See, infra*, Arg. I, B.

In an effort to buttress his position, Fields cites to scientific texts, outside the record, for the proposition that the district court should have relied on neuropsychological testing, rather than the MRI (the results of which suggested the speciousness of Martell's theory). *See* Br. 46 (citing Muriel Deutsch Lezak et al., *Neuropsychological Assessment* (5th ed. 2012) and Michael Franzen & Glen Getz, *Screening for Brain Impairment* 22 (3rd ed. 2010)). Fields did not present that matter in the court below, did not make it a part of the record, and cannot properly introduce it at this juncture. *See United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000); *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1195 n.7 (10th Cir. 2008) ("[N]ew evidence not submitted to the district court is not properly part of the record on appeal."). As such, it should not inform this Court's decision.

*Kennedy*, at 1191; *see Citizens Ass'n of Georgetown v. Washington*, 370 F. Supp. 1101, (D.D.C. 1974) (declining to decide a question for which the court lacked an evidentiary record or requisite scientific expertise); *see also Silverstein v. Gwinnett Hosp. Authority*, 861 F.3d 1560, 1567 (11th Cir. 1988) (acknowledging the court's lack of medical expertise).

Fields fares no better in citing *Sears v. Upton*, 561 U.S. 945, 949 (2010), an opinion that recounts experts relying on neuropsychological testing to assess brain function, but creates no legal, medical, or scientific preference for such evidence. Ultimately, Fields takes a self-defeating tack, citing two cases for the proposition that neuropsychological testing surpasses the importance of neuroimaging because it assesses the extent of an individual's impairments.  Br. 47-48 (citing *Jefferson v. Upton*, 560 U.S. 284, 285-86 (2010); *Barrett*, 797 F.3d at 1231).  That argument does not assist Fields since the testing administered at the time of trial revealed, at most, a mild deficit that plainly did not impress either of his testifying experts or anyone else in the defense camp.  *See* ROA 9:224-27; *supra*, Arg. I, A, 1.  If the extent of Fields's contemporaneous testing performance constitutes the measure of counsel's omission, counsel omitted very little indeed.

In any event, the government's expert on collateral review conducted a complete neuropsychological evaluation and found that Fields did not suffer from any major mental illness that would have mitigated his crimes.  *See,* ROA 12:265-

32

71, 275-79.  In reaching his findings, Seward reviewed and considered the reports of Martell and Gelbort, as well the reports and testimony of the experts who took the stand at trial—Woods, Grinage, Price and Mitchell.  ROA 12:184-85.  But Seward also administered his own tests, the results of which demonstrated the health of Fields's brain.  Specifically, Seward found Fields's intellectual functioning in the low average to average range, but stable over time.  ROA 12:242.  Fields's attention and concentration tested below normal, but he was not markedly impaired.  *Id*. at 244.  His performance on "measures of executive functioning ranged from borderline abnormal to average, with no markedly impaired scores."  *Id*. at 245.

The testing produced these unremarkable results even though Fields attempted to manufacture or exaggerate symptoms.  *Id*. at 255.  One test affirmatively revealed evidence that Fields "feigned psychosis, neurologic impairment, memory disorders, low intelligence, and affective disturbance."  *Id*. at 248.  Other tests revealed similar efforts to mislead.  *Id*. at 249, 251.  Indeed, Fields received low-average to average scores on memory tests and claimed an inability to remember some things, but still reported that he had taught himself American Sign Language.  *Id*. at 247.

In view of the foregoing evidence, "no particular pattern emerged of pronounced difficulties with executive functioning or any other particular cognitive

domain." ROA 12:254, 259. The evidence did not reflect any "frontal lobe or other meaningful brain damage." *Id*. at 259. Fields's lack of distress was consistent with observations of the mental health experts who evaluated him in prison and consistently found him asymptomatic, notwithstanding Dr. Martell's claim of patent decline. *See id*. at 284, 290, 293, 306, 313, 316, 318, 322, 327-28, 332, 334-35-55, 337-38, 351, 358, 361, 364, 372, 377, 380-81, 387-88, 391-98, 400-10.

Putting aside the fact that Fields is not brain damaged, Seward's testing exposed evidence that undermined the mental health theories presented by the defense at trial. Specifically, Seward rejected claims that Fields had experienced manic episodes, allegations central to the defense. ROA 12:269-70. Seward concluded, "When considered collectively, these data cast serious doubt on the veracity of Mr. Fields's self-report of psychological symptoms, and strong evidence for malingering." *Id*. at 275. Seward's evaluation also cast doubt on another mental health claim made at trial—that Fields committed the murders in response to an auditory hallucination. *See* ROA 3:390-93, 481-83. Although Seward reached no conclusion as to the validity of any supposed hallucinations, he determined that they did not impact the murders:

> His description of the offense is one in which he was planning, scheming, and acting in an organized plan according to rational motive. . . . [¶] There are no indications that he was horrified by or remorseful of his actions, or that they were the product of an alien will

34

> or any type of delusional system. . . . [H]e clearly derived pleasure and emotional satisfaction from having looted the Chicks, and concocted a rational explanation to enable him to shower bounty on his love interest.

ROA 12:265. Seward therefore found the jury "received embellished, and at times specious, analysis from qualified mental health professionals . . . . A more informed jury would have been better equipped to identify disingenuous defense testimony and think cautiously about mental health claims." *Id*. at 279.

Seward's findings are consistent with those of BOP experts. *See* ROA 3:291 (observing that Fields has reported symptoms that "are often inconsistent with symptoms which are typically reported by individuals experiencing psychotic symptoms."), 339 (noting "his description of hallucinations, particularly visual hallucinations, are atypical of individuals with active psychosis"); *see also id*. at 365 (referring to Fields's reports of auditory hallucinations as "suspect"). In fact, one BOP psychologist hypothesized that Fields was malingering in an effort to acquire additional psychotropic medications. *Id*. at 389.

Had Fields's attorneys pursued evidence of brain damage at trial, they would have invited precisely this manner of rebuttal. Seward's findings—corroborated by the observations of an independent radiologist—indicate that Fields never suffered from brain damage, and any attempt to prove otherwise would have been futile or misleading. As Seward reported, "[I]insinuations that everyone is overlooking Mr. Fields's rotting brain, are not at all borne out by evidence. Failure

35

to expose these to a trial jury . . . reflects only . . . [the omission of] an entirely fictional argument." ROA 12:279.

Largely ignoring the drawbacks of relying on a theory of brain damage at trial, Fields asserts the evidence would have tended to show he did not constitute a threat in custody. In support of this assertion, Fields cites another scholarly article, outside the record, for the proposition that "[t]he importance of a structured environment for patients with frontal-system dysfunction is well known." Br. at 24 (quoting David F. Long, "Issues in Behavioral Neurology and Brain Injury," in *Neuropsychological Treatment After Brain Injury* 62 (David Ellis & Anne-Lise Christensen eds., 1989)). The statement upon which Fields relies does not indicate that brain-damaged individuals are not dangerous when confined; it indicates only that such patients are best served by environmental structure. Whether the day-to-day atmosphere of a maximum security federal penitentiary would provide the necessary support, Fields leaves entirely to speculation. Although federal prisons undoubtedly provide a measure of behavioral structure, Fields provides no evidence that the environment is intended to, or effective at, controlling the impulsivity of brain-damaged inmates. Putting aside the absence of any specific evidence to support Fields's claim, common sense demands the conclusion that the defense would have had difficulty simultaneously attributing a double murder and a lack of dangerousness to the same allegation of brain damage.

Fields also cites several cases in an effort to imply that counsel's omission of brain damage evidence was prejudicial as a matter of law, or nearly so. Br. 18-21 (citing *Sears*, 561 U.S. at 956; *Barrett*, 797 F.3d at 1231; *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012); *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004)). Fields reads too much into his own authority. The plainly distinguishable opinions concern glaring omissions by trial counsel in favor of, at best, marginal mitigation evidence.

In *Sears*, trial counsel failed to present any mental health evidence, much less testing that demonstrated the defendant "perform[ed] at or below the bottom first percentile in several measures of cognitive functioning and reasoning. . . . [due to] significant frontal lobe brain damage Sears suffered as a child, as well as drug and alcohol abuse in his teens." 561 U.S. at 945. Given this glaring omission, the *Sears* opinion did not alter the *Strickland* prejudice doctrine expressly or otherwise. Rather, it reiterated the rule that "there is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented" to the decisionmaker.'" *Id*. at 954. In contrast to the evidence at issue in *Sears*, the omitted evidence in this case would barely have altered Fields's profile before the jury. His trial counsel identified and presented significant mental health evidence that Fields acted under the influence of a psychoactive substance.

37

If that theory did not carry the day, no reasonable likelihood exists that an unverified, mild organic impairment might have done so.

Omissions as stark as those in *Sears* figure prominently in the other case cited by Fields. In *Barrett*, counsel presented essentially no mental health evidence, having done little or nothing to assess that aspect of the defendant's life. 797 F.3d at 1223-25. In *Littlejohn*, counsel focused "solely on . . . socioeconomic conditions of [defendant's] upbringing and psychological development" despite indicators of possible neurological damage. 704 F.3d at 863. As a result, counsel failed to develop evidence that the defendant suffered global brain damage caused by his mother's neglect and prenatal ingestion of drugs, a theory that could have "go[ne] far in offering a scientifically supported and physical link to Mr. Littlejohn's crime." *Id*. In *Anderson*, "trial counsel mounted an extraordinarily limited case in mitigation," omitting such evidence as proof that "Anderson suffers from brain damage; is "borderline mentally defective"; and functions below the bottom two percent of the general population." 476 F.3d at 1146, 1147. In *Smith*, trial counsel "failed to understand that Mr. Smith's "borderline mental retardation, mental illness, and organic brain impairment" constituted mitigating evidence to be presented at the penalty stage." 379 F.3d at 939. These wholesale oversights do not inform a case, like this one, in which counsel investigated different brain-behavior theories to explain the offense and presented the stronger of the two.

One other inapposite case cited by Fields merits further exploration. In *Hooks*, counsel presented perfunctory family history evidence and mental health evidence that failed to tie the defendant's condition to his crime while repeatedly characterizing him as "violent." 689 F.3d 1204. Counsel failed to discover that "by the time of trial [the defendant] had been clinically diagnosed with mild or borderline mental retardation." *Id*. at 1205. During collateral proceedings, Dr. Gelbort, the same expert who offered counsel a tentative theory of mild impairment in this case, diagnosed Hooks with diffuse organic brain damage and damage to the frontal lobes. The *Hooks* opinion emphasized the importance of a mitigation case that exploits available evidence that the defendant's "behavior was physically compelled." *Id*. at 1205 (quoting *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002)). Although the *Hooks* court spoke specifically to brain damage evidence, it did not do so to the exclusion of other possible neurological explanations for criminal behavior, like the one offered by counsel for Fields. Given that counsel in this case elected a theory based on uncontroverted fact—the defendant's ingestion of a psychoactive substance—in favor of the nebulous, tentative and uninspiring results of Gelbort's neuropsychological testing, *Hooks* does not compel relief here.

On this record, Fields cannot demonstrate any reasonable likelihood that he would have received a more favorable verdict had trial counsel elected to further

investigate or present his illusory evidence of brain damage. Accordingly, this Court should affirm the judgment below.

B.      The District Court Appropriately Denied an Evidentiary Hearing

Fields asserts the district court improperly denied him an evidentiary hearing to prove his allegations of brain damage, and his trial counsel's related assertion that she lacked any tactical basis for omitting such material. But the record, as expanded during the course of the collateral litigation, refuted the factual underpinnings of the claim, demonstrating Fields did not suffer from brain damage, the court should not rely on the expert who opined otherwise, and trial counsel had valid reasons for omitting any such theory from evidence.

A district court considering a § 2255 motion must review the record to determine whether an evidentiary hearing "could enable [the movant] to prove the [motion's] factual allegations, which, if true, would entitle the [movant] to . . . relief." *Barrett*, 797 F.3d at 1224 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)); *see also* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto"). Courts may dispose of a § 2255 motion without an evidentiary hearing if the case records, as expanded during the collateral proceedings, render a testimonial hearing unnecessary. *See*

40

*United States v. Rodriguez-Vega*, 797 F.3d 781, 792 (9th Cir. 2015); *Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001); *Raines v. United States*, 423 F.2d 526, 529 & n.2 (4th Cir. 1970) (citing, inter alia, *Machibroda v. United States*, 368 U.S. 487 (1962)).  In short, district courts retain "discretion to exercise their common sense" in determining whether a "full hearing" is needed.  *Machibroda*, 368 U.S. at 495-96.  Of course, courts may deny a claim of ineffectiveness based solely on a defendant's failure to demonstrate prejudice, irrespective of the reasonableness of counsel's actions.  *Castro v. Ward*, 138 F.3d 810, 832 (10th Cir. 1998).

In this case, Fields's § 2255 motion alleged that he "suffer[ed] from a progressive neurological disease . . ., and at the time of trial this disease had already caused him organic brain damage localized in his frontal lobes."  ROA 9:36.  He premised his claim on Martell's evaluation (conducted well after trial) in which he concluded, as noted, that Fields had suffered "a catastrophic decline in functioning in the five years since" his pre-trial testing.  ROA 9:59.  As noted, Martell attributed Fields's "catastrophic decline," with near certainty, to atherosclerosis or a tumor:

> [T]he most likely disease process would appear to involve the cerebral vasculature, including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia.  It is also possible, but less likely, that he may have neoplastic brain disease (i.e., a brain tumor).  Either

41

way, an MRI study of his brain is strongly indicated to aid in proper differential neurodiagnosis and treatment.

ROA 9:292. Based on Martell's expert opinion about the progression of Fields's supposedly degenerative brain condition, the defense twice asked permission to conduct an MRI. ROA 13:14-56; 10:313-30. In so doing, Fields described the MRI "as crucial to the proper development of" his claims and "central to the resolution of the factual issues," presumably in reliance on Martell who had requested the test. ROA 10:318-19, 322. The district court ultimately entered an order permitting the MRI. ROA 10:404-05.

Fields's MRI, however, showed no evidence of ischemia or tumor. ROA 12:232. Not only did the result refute Fields's claim that he has brain damage, it undermined the credibility of Martell, who had incorrectly prognosticated the corroborative and diagnostic value of the MRI (*see* ROA 9:292), and did so before he could set foot in a courtroom. At best, the MRI invited the conclusion that Martell did not understand the nexus between Fields's neuropsychological test results and the likelihood of detectable brain injury. At worst, it invited the conclusion that he had misdiagnosed Fields by misinterpreting the data, using the wrong testing methods, or failing to detect successful efforts to malinger in a forensic setting. In either event, Martell's wildly inaccurate prediction destroyed the reliability of his supposed findings.

42

The expanded record similarly undermined trial counsel's declaration that she had no "tactical or strategic reason for not having [Gelbort perform] additional testing," or that she possessed "no strategy or tactic for abandoning the specific factor of organic brain damage." ROA 9:176. As an initial matter, the mere fact that trial counsel submitted a declaration attesting to her supposed errors did not require a finding of ineffectiveness. *See Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir.2000) (because the ineffective assistance inquiry is objective, counsel's post-conviction admission "matters little"); *Marrero v. Horn*, 505 Fed. App'x 174, 181 (3d Cir.2012) (upholding denial of ineffectiveness where counsel's post-conviction affidavit had "the earmarks of one attempting to fall on his sword"). Moreover, as explored above, counsel had several reasons that she articulated and vetted with colleagues for abandoning Gelbort and his inchoate theory of brain damage. *See, supra*, Arg. I, A, 1. The record developed in collateral proceedings further confirms what the two testifying experts, Grinage and Woods, apparently concluded—that Gelbort's suggestion that Fields was brain-damaged did not merit meaningful comment or reliance.

Given the self-inflicted damage to Fields's post-conviction expert, the expanded record and common sense permitted the district court to conclude it did not require an evidentiary hearing to determine whether the trial attorneys ineffectively omitted evidence of brain damage. Given the MRI results and

43

counsel's correspondence, the court could assess the reliability of the evidence supporting the claim without considering live testimony.

This case does not resemble the authority Fields purports to rely upon as the bases for granting a hearing. *See* Br. 32-33, 44. In *Barrett*, this Court noted a bevy of unpresented evidence and remanded for a hearing after finding the record inadequate to determine whether counsel provided prejudicially ineffective assistance. Br. 32 (citing 797 F.3d at 1224-25). *Barrett* makes clear that the decision to grant a hearing hinges on the adequacy of the record, and the opinion does not address an instance in which the petitioner's central factual claim proved false. Other opinions cited by Fields, *Estrada*, *Duran-Salazar*, *Becker*, and *Gonzalez* (cited at Br. 32-33) are much the same—granting hearings to address unrebutted evidence. *United States v. Estrada*, 849 F.2d, 1304, 1305-06 (10th Cir. 1988); *United States v. Duran-Salazar*, 307 Fed. App'x. 209, 210 (10th Cir. 2009); *United States v. Becker*, 109 Fed. App'x. 264 (10th Cir. 2004); *United States v. Gonzalez*, 98 Fed. App'x 825 (10th Cir. 2004). None of those cases concern a court's discretion to deny a hearing when the available record obviates the need for further fact finding, specifically when documents known to the judge refute the basic underpinnings of a claim, as happened here. Moreover, none of those cases confronts a situation, like the one here, in which the district court could have

44

disposed of the issue for want of prejudice based on a consideration of evidence available at the time of trial.

Fields also cites two cases arising under 28 U.S.C. § 2254, neither of which assist him. The first decision, *Littlejohn*, remanded for an evidentiary hearing following a finding that the defendant made "allegations, if true and not contravened by the existing factual record, [that] would entitle him to habeas relief." *Littlejohn v. Trammell*, 704 F.3d at 858. *Littlejohn* did not concern an instance in which the existing record undermined the factual premise of the petitioner's claim. By the same token, it does not speak to circumstances in which the defendant could not establish prejudice, regardless of his factual showing, given the relative weight of the case in aggravation and the allegedly omitted evidence in mitigation. The second § 2254 opinion speaks to application of the evidentiary hearing provisions of the Antiterrorism and Effective Death Penalty Act of 1996 in light *Cullen v. Pinholster*, 563 U.S. 170 (2011). Br. 34 (citing *Milton v. Miller*, 744 F.3d 660, 673 (10th Cir. 2014)). *Miller* interprets statutory provisions that do not apply here and says nothing about a district court's discretion to determine the need for an evidentiary hearing under § 2255 when the existing record negates the need for one.

The law did not compel the district court to conduct a live evidentiary hearing to determine what the record laid bare—Fields is not brain damaged. The

45

sole expert to state conclusively otherwise (Martell) was demonstrably incorrect when he predicted that an MRI would reveal evidence of brain damage.  Moreover, Fields's trial counsel had many, articulated reasons not to call Gelbort: his unconfirmed brain-damage theory appeared in a poorly-written report, his incomplete findings of mild damage fell outside the thrust of the mitigation case, his theory did not appear to interest the experts who testified on Fields's behalf, and his report reflected an inaccurate understanding of some facts.  Accordingly, the record foreclosed any demonstration of inadequate performance or prejudice.  A full hearing would not have altered what the record had shown, and the district court properly exercised its discretion to deny one.

## II.   TRIAL COUNSEL APPROPRIATELY SELECTED MITIGATING EVIDENCE FOR PRESENTATION AT TRIAL

Fields claims that trial counsel ineffectively failed to present evidence of his family's dysfunction.  He contends counsel should have adduced evidence of abuse and neglect in his own childhood and those of his parents.  Fields alleges his parents were emotionally remote and that his mother manipulated his father into inflicting abuse on the children.  Fields further claims his upbringing explain his flat affect, which he attributes to a long-undiagnosed depression and contends created a false impression of remorselessness after the murders.  Moreover, he contends that social history evidence would have helped explain his mental state at the time of the incident.  Br. 52-54.  Counsel, however, made a valid tactical

choice to forgo the social history evidence, which she believed was of marginal value and would detract from the main theme of her case. In any event, Fields cannot demonstrate a reasonable likelihood that the omission of the evidence prejudiced the verdict.

## A.    Counsel Made a Valid Tactical Choice

The law presumes that counsel acted for tactical reasons when they focus on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). The presumption that counsel's decision was objectively reasonable becomes "virtually unchallengeable" when the choice stemmed from an adequately informed strategy. *Strickland*, 466 U.S. at 690. Even incorrect decisions do not offend the guarantee of competent counsel, so long as they are not "completely unreasonable." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011); *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). In assessing the reasonableness of counsel's conduct, reviewing courts should "make every effort to 'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Turrentine v. Mullin*, 390 F.3d 1181, 1204 (10th Cir. 2004) (citing *Strickland*, 466 U.S. at 689).

Counsel do not err in omitting evidence that would have undermined, rather than supplemented, a viable mitigation strategy. *See Wackerly v. Workman*, 580

47

F.3d 1171, 1177-79 (10th Cir. 2009); *see also Brinkley v. Houk*, 831 F.3d 356, 365 (6th Cir. 2016) (rejecting a claim that trial counsel ineffectively omitted to present evidence of the defendant's substance dependence). Evidence of a troubled upbringing and mental health issues constitutes a double-edged sword, a fact that can support a reasonable strategic choice to omit it. *See Williams,* 384 F.3d at 619-20; *see also Wackerly*, at 1177-78 (collecting authority regarding the permissibility of omitting double-edged evidence). Thus, the failure to present evidence of childhood abuse does not constitute ineffectiveness if counsel presented a reasonable case in mitigation. *See Turrentine v. Mullin*, 390 F.3d at 1209.

As discussed above, the defense strategy in this case centered on an explanation of Fields's crimes as a behavioral aberration driven by a wrongly-prescribed psychotropic drug, Effexor. *See, supra*, Arg. I, A, 1. Underscoring the aberrant nature of the crime, the defense characterized Fields in conventional terms—offering evidence and alleging mitigators premised on the affection his friends and relatives felt for him. *See* ROA 1:960 (alleging that "The Defendant is a loved father . . . . loved brother . . . . loved son . . . [and] valued friend" and that his death would impact members of his social circle). The defense also capitalized on Fields's presumed affection for his family, alleging he had recently suffered the loss of his father, the relocation of his mother, and the departure of his ex-wife and children. *Id*. at 961. Indeed, the defense went so far as to appeal to the perception

48

that Fields had formed normal emotional attachments, alleging his ex-wife "has

recently had cancer which may or may not be in remission." *Id.*

Notwithstanding the fact that counsel wove two harmonious strands in a

single defense, Fields complains about the absence of evidence that he was— as a

product of his upbringing—strange, moody, unhappy, disinterested, disloyal,

depressed,[6] anxious, and emotionally repressed. *See* Br. 54 (citing ROA 11:186-

89). Any such forgone evidence would have undermined the existing strategy by

suggesting Fields was an antisocial person whose homicidal conduct was a product

of character. Although the defense could have chosen to paint a more nuanced

evidentiary portrait of Fields, counsel bore no professional obligation to pursue

that course, given that it would have undercut the successful effort to present him

as loving, lovable, and generally benign. *See Wackerly*, 580 F.3d at 1177-79.

The defense's effort to present Fields as non-threatening reflected a

conscious, articulated choice. Indeed, counsel explained her reliance on mental

health evidence as an avenue for avoiding Fields's social history:

> I have a jury pool of 225 people, less than 2 dozen with college
> educations, and only a handful who don't exceedingly approve of the

---

[6] The record contradicts Fields's assertion that he suffered a lifetime of
undiagnosed depression. Br. 54. According to Grinage, Fields received his first
diagnosis for depression at age 16 and "had been tried on . . . many, many
medications that were antidepressant in nature." ROA 3:394-95. Similarly,
Woods also observed that Fields received a depression diagnosis at age 16 and
"has been treated for depression, attempted to be treated for depression for many,
many years and with many, many different medications." ROA 4:117-18.

> death penalty.  And, I recognize that experts can cancel each other out in juror's minds.  And, many of them won't care about mental health.  [¶]   All that being said, I want to keep the "crap" away from the jury if at all possible.  I think it's going to be hard enough to get them to feel sympathy for client.  If they get to hear all the other junk, it may tip the scales.

ROA 12:118.

In an e-mail sent a few days later, counsel made manifest her specific concerns—what she had earlier referred to as "crap."  The subsequent e-mail reviewed Fields's social history, including his average intellect, lack of achievement, out-of-wedlock child, and twice-failed marriage to a woman who reported "he developed an addiction to the internet and on-line pornographic activity.  He was quick to anger, and infrequently violent toward her and the children."  ROA 12:638-39.  Counsel noted perceptions of Fields as "a little strange" and "creepy."  *Id*. at 639.  She observed he had dated two women simultaneously and discussed marriage with both.  *Id*.  He had also bragged about masturbating on camera, before 1000 internet viewers.  *Id*.  Counsel stated that Fields had brought a rifle and an inert explosive device to work, leaving them in his truck, but showing them to friends.  *Id*. at 640.  Counsel also reviewed accusations that Fields kept a pet snake but had abused cats and cows.  *Id*.

Counsel explained her strategy for forestalling evidence that might paint Fields in a negative light:

> Judge says virtually all of this stays out, as long as I don't open the

50

door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge (sic) and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff. Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, *but largely the compelling stuff is the manic-flip nature of Effexor treatment*.

ROA 12:640 (emphasis added). Consistent with her stated strategy, counsel informed Dr. Woods of her desire to portray Fields as non-violent before trial: "I want to settle this case, and the only way to do it is to convince the committee in Washington that Ed was SICK and that medicine he now takes makes him better and not dangerous." *Id.* at 485.

In short, counsel expressly intended to disassociate the murders from Fields's character and attribute them to a chemical imbalance, believing she possessed the evidence to do so: "Throughout his life, he has received mental health treatment, always diagnosed with depression. He has been treated with serzone, paxil, lexapro, and others." ROA 12:639. The most recent of those treatments, counsel wrote, had caused Fields to kill the Chicks: a physician "changed him to Effexor in mid-June. Double the dose on July 7. Murders happened on July 10." *Id.* This chronology drove counsel's focus on Effexor and, with it, her strategy for avoiding social history evidence that would invite potentially disquieting anecdotes about Fields. *See id.* at 639-40.

Attempting to forestall evidence of Fields's less palatable traits, counsel

51

characterized the murders as the aberrant conduct of a "SICK" individual, cured of his dangerousness by proper medication.  ROA 12:647 (quoting ROA 12:642).  Counsel maintained this theme, eliciting a nonthreatening portrait of Fields through his sister, ex-wife, coworker, son, and daughter, "while preventing the government from asking these same witnesses to explain why [Fields's] mother was scared of him."  ROA 12:647 (citing ROA 3:271-386 and ROA 4:71-80).  The testimony of Fields's sister embodied counsel's tactics, permitting the defense to humanize Appellant, while avoiding troubling aspects of his prior behavior and portraying the murders as anomalous.  *See, e.g.* ROA 3:341-42 (describing Appellant "sick" and remorseful but not "vicious").

To the extent the prosecution adduced evidence of Fields's less pleasant traits—languor, irascibility, and hyper-sexuality—the defense relied on that behavior to corroborate the diagnoses of bipolar or schizoaffective disorder that undergirded its mitigation theory.  *See, e.g.*, ROA 3:329 (laziness), 364 (moodiness affecting marriage), 407-08 (hyper-sexuality), 408-10 (irritability affecting family relationships); ROA 4:115 (hyper-sexuality), 118 (hyper-sexuality and irritability), 121 (laziness).  Fields's bad behavior became a foil for the conduct the defense attributed to him when, in its experts' opinions, he received appropriate mood stabilizing drugs.  Repeatedly, Fields's loved ones discussed a night-and-day shift in attitude, attributing the change to the defendant's regimen of mood stabilizing

drugs in jail.  *See, e.g.*, ROA 3:310, 319, 384-85; ROA 4:79.

Had his attorneys introduced evidence that Fields's dysfunctional upbringing had left him fundamentally flawed in a way that informed his crime and objectionable behavior, it would have undermined testimony that mood stabilizers had revealed his true character as a loving, caring father, brother and son. Evidence that Fields remained irritable and uncaring because of his own dysfunctional upbringing would have diminished the weight of any mitigators associated with Fields's relationships.  *Cf.* ROA5:102 (arguing a sociopath would not enjoy the love that Fields did).  Absent the improvement in behavior, the defense experts could not have attempted to corroborate their own diagnoses by pointing to positive changes caused by Fields's new medication.  *See* ROA 3:513-15, ROA 4:136-39.  Fields cannot respond that he could have avoided damage to his own case by arguing his dysfunctional upbringing caused the mood disorder that the drugs neutralized: his expert, Dr. Woods, clearly attributed mood disorders to genetics.  ROA 4:112.  Dr. Grinage agreed, allowing only that social factors could influence symptoms of the disease.  ROA 3:470.

Fields fails to show that counsel employed an unreasonable strategy, even if it did not ultimately succeed.  Under the circumstances, counsel appropriately exercised professional judgment in shaping the defense case.  Counsel had no professional obligation to present evidence—even evidence designed to garner

53

sympathy—if it could potentially backfire.  *See Hooks v. Workman*, 689 F.3d at

1201; *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); *see also Miles v. Ryan*,

691 F.3d 1127, 1137-39 (9th Cir. 2012), *amended on denial of reh. en banc*, 713

F.3d 477 (9th Cir. 2013) (upholding counsel's decision to avoid additional

evidence and portray the defendant as a relatively normal individual who made

some mistakes).  Hindsight aside, Fields cannot establish the unreasonableness of

the defense strategy, a failing that precludes any showing that counsel's tactics

amounted to ineffective assistance.  *See Byrd*, 645 F.3d at 1168.

B.     Counsel Made a Non-Prejudicial Choice

Assuming, arguendo, Fields had demonstrated his trial counsel unreasonably

omitted the social history evidence, he would have the burden of demonstrating

prejudice in order to obtain relief.

Although, as Fields observes, social history evidence can potentially

enhance a mitigation case, no court has declared its omission is necessarily

prejudicial.  *See Tippins v. Walker*, 77 F.3d 682, 686-87 (2d Cir. 1996) (applying a

finding of per se prejudice to sleeping counsel, but noting the analysis would not

apply to even risky or ill-advised strategies); *see also McInerney v. Puckett*, 919

F.2d 350, 353 (5th Cir. 1990) (holding that "bad lawyering, regardless of how bad,

does not support the [per se] presumption").  To establish prejudice, as previously

noted, Fields must demonstrate a reasonable probability that he would have

54

received a more favorable verdict absent the alleged error. *Barrett*, 797 F.3d at 1229. In assessing that likelihood, this court weighs the omitted evidence against that adduced at trial. *Id*.

The omission of marginal mitigating evidence does not amount to prejudicial ineffectiveness. *See DeRosa v. Workman*, 679 F.3d 1196, 1218-21 (10th Cir. 2012). Here, the omitted social history evidence was attenuated from the crime, unlikely to evoke sympathy, and contrary to the defense presented.

Plainly, attribution of Fields's homicidal behavior to problems in his childhood would have undercut the theory that he killed the Chicks as a result of Effexor consumption and an undiagnosed bipolar disorder. *See* ROA 5:105-06. Competing evidence that suggested Fields had longstanding anti-social behaviors, attributable to his upbringing, would have only served to dilute the mainstay of the mitigation case. Fields now observes that evidence of his maladjustment would have provided a "complete picture" of him (Br. 65), but counsel designed the mitigation to provide a simple, palatable answer to a potentially complex question: why did a seemingly law-abiding citizen suddenly commit a horrifying double murder of two strangers? Had the defense suggested Fields's conduct reflected character rather than chemical balance, it would have undermined the testimony suggesting that the medication he received in custody had revealed him as a loving and lovable family member. *See, e.g*., ROA3:310, 319, 332-33, 341; ROA 4:75-

80. In short, complicating the portrait of Fields would not have added weight to the case in mitigation.[7]

Having committed the murders nearly twenty years after departing his parents' home (*see* ROA 3:297), Fields would have begged credulity by suggesting a causal link between the crime and his childhood. Indeed, over the course of his life, Fields revealed himself as someone at least capable of respect for law and authority, joining the U.S. Navy (ROA 3:297) and working as a prison guard (*id*. at 362). If his upbringing had caused the type of damage that might lead a person to commit multiple murder, a jury would intuit that the damage would have manifested itself before the age of 36.

To the extent the defense had presented the evidence solely to generate sympathy (*see* Br. 64 (citing authority for the proposition that any evidence may have mitigating value)), rather than to explain Fields's commission of the murders, he would have fared little better. Although Fields recounts a less than ideal childhood, he hardly describes an upbringing of privation and mistreatment. *See Miniel v. Cockrell*, 339 F.3d 331, 345 (5th Cir. 2003) (upholding the rejection of

---

[7] Fields asserts Grinage could have relied on social history in support of his diagnosis. Br. 65 (citing ROA 11:180). If Grinage failed to do so, it reflects his judgment. Counsel provided Grinage with a swath of records (ROA 3:479), a psychosocial history report (ROA 11:180), access to family members (ROA 3:480), and an in-person interview of Fields (*id*. at 481-82). At trial, counsel asked Grinage to cite evidence from Fields's history to support his diagnosis. *Id*. at 406. He provided a lengthy answer, unimpeded by objection. *Id*. at 406-08.

prejudice because counsel omitted to present "mild" evidence of abuse and neglect).  Counsel recognized that Fields's father worked hard and "provided well for the family."  ROA 12:104.  As a child, Fields clung to his mother, had normal socialization skills, and was not a discipline problem while attending a private Catholic school. ROA 3:323-24.  He played high school sports (but quit of his own accord).  *Id*. at 329.  His father demonstrably loved him (*id*. at 315), and he had had a close relationship with his grandparents (*id*. at 363).  Apropos of Fields's middle class upbringing and parental concern for his wellbeing, counsel noted that his parents "took him to mom's shrink" after he ran away from home.  *Id*.  Given this backdrop, counsel did not prejudice the outcome of the case by omitting evidence of the unpleasantness in her client's childhood.

To the extent Fields's parents and sister experienced childhood trauma (*see* Br. 52-53), he cannot adopt those second- and third-hand experiences as his own, nor could he have done so at trial.  *See Phillips v. Bradshaw*, 607 F.3d 199, 216-19 (6th Cir. 2010) (upholding rejection of asserted prejudice from failure to present evidence that the defendant's siblings and half-siblings suffered abuse).  Evidence of multi-generational dysfunction would have suggested Fields's inherent instability and dangerousness, but would have lacked much credibility given that he reportedly had an excellent relationship with his maternal grandparents, whom his sister described as "great."  ROA 3:300-01, 363.  Fields's claim highlights the

57

difficulty of relying on evidence of dysfunction and maladjustment, as he attributes

to "his family history of mental illness" his own "lifelong battle with . . .

depression that led others to *unjustly* perceive him as 'moody,' 'strange,' and

'lazy.'" Br. 55 (emphasis added).   Justifiably or otherwise, if Fields's friends and

relations observed negative personality traits, emphasizing as much could well

have lent credibility to assertions of his dangerousness.

As regards perceptions of himself, Fields cannot sustain his argument that he

could have neutralized proof of his remorselessness had his attorneys explained his

emotionless affect.  Br. 54.  As Fields observes, the prosecution commented on the

fact that he "was even emotionless as he confessed."  ROA 5:116-17.  An

explanation of Fields's indifference would have done nothing to overcome the

overwhelming proof of his remorselessness, which hinged on the fact that he used

his victims' money to finance a celebratory trip with his girlfriend.  ROA 3:165,

175, 177, 179, 184-95.  That conduct aside, Fields later reveled in the status he

enjoyed as a murder defendant awaiting trial, explaining in a phone call that it

intimidated other inmates.  ROA 3:212-13.

Fields counters that irrespective of defense counsel's limited presentation,

the prosecution adduced evidence that subverted any tactical efforts to confine the

government's evidence.  Br. 60-61.  As noted, the defense turned much of the

government's evidence to its advantage, contrasting Fields behavior before and

58

after he received mood stabilizing drugs. Although the government elicited testimony about Fields's prior bad acts, including instances of domestic violence (*see, e.g.,* ROA 3:373-78), the defense had the opportunity to minimize and explain that evidence (*see id.* at 297-99, 380-84; *see also* Br. 66 (noting introduction of the evidence)).

Had the defense, instead, argued that longstanding maladjustment contributed to Field's homicidal impulses, it would have reinforced the government's theory that Fields murdered the Chicks as a product of his inability to empathize or self-regulate. *See* ROA 5:116 (arguing rhetorically, "Were his crimes out of character? Not out of his."), 120-21 (arguing Fields lacked a conscience and "savored" the murders), 126 (arguing the "hardened" defendant lacked "empathy or feeling"). Counsel recognized in the starkest of terms the need to characterize the crime as a behavioral outlier: "The fact that he has no prior criminal history . . . is of great importance because . . . the death penalty is the kind of punishment that is meant for someone who needs to be put down. That's not the case here." ROA 5:106-07. No reasonable likelihood exists that counsel's failure to pursue a strategy that would have diminished the argument against dangerousness in favor of potential sympathy altered the outcome of this trial.

Finally, had the defense presented evidence that Fields was emotionally estranged from his family, it would have contradicted defense arguments that the

death of his father and the illness of his mother represented a severe emotional disturbance. *Cf.* ROA 5:107. It would have tended to diminish the reliability and weight of mitigators premised on Fields's relationships with his friends and family. *See* ROA 1:960 (jury finding of mitigating factors based on Appellant's social connections).

Thus, the omission of family-dysfunction evidence benefited the defense as a whole, avoiding an unlikely basis of mitigation that would have strengthened the government's already potent hand, while detracting from the defense's main theory. The government had shown that Fields substantially planned and premeditated the murders of two strangers, sniping both of them from a distance and then revealing himself in a ghillie suit to pursue the surviving victim into a defenseless position, where he fatally shot her at close range. *See Fields*, 516 F.3d at 927; ROA 2:371-74; *see also* ROA 2:429 (Fields warns Carol Lamb she does not want to know his plans for camouflaging his rifle), 467-71 (recounting Fields's admission that he had stalked a couple in his ghillie suit); ROA 3:175-95 (reflecting Fields's absence of remorse). Amplifying the horror of the crime, the government adduced evidence of the social and emotional loss occasioned by the murders to the victims' friends and associates. *See* 516 F.3d at 946-48; *e.g.*, ROA 3:54-71, 116-34, 227-44.

Given the magnitude of these crime, and the harm caused, Fields cannot

show a reasonable likelihood that the omission of some evidence of dysfunction in his upbringing resulted in an unfavorable verdict. For want of demonstrable prejudice, this Court should affirm the district court judgment denying relief.

C.     The District Court Appropriately Denied an Evidentiary Hearing

Fields asserts that the district court erroneously denied him an evidentiary hearing in the face of a declaration in which trial counsel averred that she did not have a strategic basis for the decision to omit social history evidence. Br. 58-67. As with Fields's first claim of ineffectiveness, the records developed during the course of the litigation refuted the declaration and any possible showing of prejudice, obviating the need for a hearing. *See, supra*, Arg. II, A & B.

As noted, courts may dispose of § 2255 motions without evidentiary proceedings if the record renders a testimonial hearing unnecessary. *See Rodriguez-Vega*, 797 F.3d at 792; *see also Machibroda*, 368 U.S. at 495-96 (permitting courts to exercise common sense in deciding whether to conduct a formal hearing); *see also Castro*, 138 F.3d at 832 (holding courts may deny a claim of ineffectiveness based solely on a defendant's failure to demonstrate prejudice).

In this case, the district court determined that, irrespective of counsel's tactics, the omission of the social history evidence did not prejudice the verdict:

> [T]he evidence which Fields now suggests should have been introduced . . . would not have changed the jury's verdict. Rather, it would have actually undermined the defense theory that the Effexor caused an anomaly . . . . [It] would have diluted the defense theory

61

> that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies. [It] would have directly contradicted the defense arguments that the death of defendant's father and his mother's illness caused the defendant to experience severe emotional disturbances. Similarly, [it] would have undermined the notions that the defendant was remorseful and that he was a loved relative and friend.

ROA 12:598. Given that the court reached this decision without contemplation of any disputed fact, it properly denied an unnecessary evidentiary hearing. *See Castro*, 138 F.3d at 832; *see also See Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (ignoring counsel's declaration and focusing on a prejudice analysis under *Strickland*).

Assuming, arguendo, the district court had borne an obligation to consider the reasonability of counsel's performance, it did not have to credit her declaration. Counsel's admissions of ineffectiveness are not decisive, because the reasonableness of performance is a question for the court. *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *Harris v. Dugger*, 874 F.2d 756, 761 n.4 (11th Cir. 1989); *see also Allen*, 368 F.3d at 1240 (counsel's "about-face on the competency issue strongly suggests a willingness to 'fall on the sword' in order to derail a death sentence. The motive is transparent, if not misguided"). Self-critical affidavits of counsel, filed years after trial, do not create credibility issues when documented contemporaneous statements show the contrary. *Jackson v. United States*, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009).

In this case, as detailed above, counsel corresponded extensively about her goals and strategies for the case in mitigation. *See, supra*, Arg. II, A. In view of that evidence, the district court had no obligation to credit counsel's subsequent assertions to the contrary. Even if counsel's correspondence did not speak to the rationale for omitting every aspect of Fields social history (*see* Br. 60), the fact remains that her broadly-articulated strategies explain her actions: "my claim . . . [is] the manic flip due to Effexor." ROA 12:169; *see also* ROA 12:640 (explaining strategy for avoiding negative history evidence).

Given the record before the district court, it properly exercised its discretion and common sense to deny a needless evidentiary hearing on the claim that counsel ineffectively failed to present social history evidence about Fields.

### III. FIELDS PROCEDURALLY DEFAULTED HIS CLAIM OF PROSECUTORIAL MISCONDUCT

Fields claims the prosecutor improperly paraphrased a story from the Old Testament's Book of Daniel. He contends that the argument violated his right to a reliable sentencing and therefore invites scrutiny under a particularly demanding standard. Additionally, he argues that his trial attorneys' failure to object to the argument constituted ineffective assistance of counsel. Br. 67-74. Fields defaulted his claim of misconduct and appears to have abandoned any effort to excuse the resulting bar. Moreover, he does not have permission from this Court to pursue his claim of ineffective assistance of trial counsel. Assuming, arguendo,

this Court reviews the misconduct allegation, the secularized argument made in this case does not merit relief, because it did not interfere with the fairness of the proceeding. Accordingly, trial counsel had no obligation to interpose an objection, much less was the absence of one prejudicial.

A.    Fields Fails to Identify Any Cause for His Procedural Default Beyond a Claim of Ineffective Assistance of Trial Counsel That is Barred by the Certificate of Appealability

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the petitioner omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. McGaughy*, 670 F.3d 1149, 1159 (10th Cir. 2012). This doctrine applies equally in death penalty cases. *See, e.g., United States v. Bernard*, 762 F.3d 467, 476, 480 (5th Cir. 2014).

Courts may consider otherwise procedurally defaulted claims in two instances. First, they may review defaulted claims when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, they may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Snyder*, 871 F.3d 1122, 1126 (10th Cir. 2017) (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003)). "Cause" exists when a factor external

64

to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Wiseman*, 297 F.3d at 979. To demonstrate prejudice, a petitioner must show that the claimed error "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Snyder*, 871 F.3d at 1127-28 (citing *Frady*, 456 U.S. at 170).

In this case, as the district court held (ROA 12:599-613), Fields defaulted his claim of prosecutorial misconduct, having failed to raise it on appeal. *See Fields*, 516 F.3d 923. Because Fields confessed to the double murder and pleaded guilty (*see* ROA 1:25-27; ROA 2:316-30), he cannot make any showing of actual innocence, nor does he attempt to. In the district court, he argued that a factor external to his defense—the ineffectiveness of his appellate counsel—excused his default. The district court rejected this argument, holding Fields had not shown "appellate counsel was 'objectively unreasonable' in failing to raise these issues on direct appeal . . . [or a] reasonable probability that, but for his counsel's unreasonable failure to raise these claims, he would have prevailed in his direct appeal." ROA 12:601 (citing *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001)).

In this Court, however, Fields makes no effort to excuse his default with a showing of cause and prejudice. Indeed, his opening brief fails even to mention his procedural default, and he appears to disclaim his earlier effort to lay the blame at the feet of appellate counsel. *See* Br. 74 n.27 ("this is first and foremost a claim of *trial* counsel ineffectiveness") (emphasis original). Thus, he has waived any further reliance on ineffective assistance of appellate counsel. *See United States v. Porter*, 405 F.3d 1136, 1143-44 (10th Cir. 2005); *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) (holding issues perfunctorily mentioned in an opening brief, unaccompanied by some development, are deemed waived); *cf. Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011) (holding appellant's failure to show how a new theory satisfied the plain error standard "surely marks the end of the road for an argument for reversal not first presented to the district court"); *United States v. De Vaughn*, 694 F.3d 1141, 1159 (10th Cir. 2012) (holding the court had no obligation to consider plain error where the appellant made no effort to satisfy the doctrine).

On the other hand, Fields did not receive a COA to assert his newly-raised claim that his trial counsel was ineffective for failing to object to the prosecutorial argument. The certificate speaks only to a claim of prosecutorial error, not ineffective assistance: "whether the Government's penalty phase closing arguments violated Mr. Fields's constitutional rights (limited to the prosecutor's

66

story drawn from the Book of Daniel).” COA at 2. The certificate defines the scope of litigable issues. *See Fields v. Gibson*, 277 F.3d 1203, 1216 n.8 (10th Cir. 2002) (citing 28 U.S.C. § 2255(c); *Ramsey v. Bowersox*, 149 F.3d 749, 759 (8th Cir. 1998)).

Fields has trapped himself in a procedural netherworld. He defaulted the claim of prosecutorial misconduct he has permission to raise, and he waived any effort to excuse the default. Moreover, he lacks permission to present the claim of ineffective assistance of trial counsel that he appears to have asserted in favor of any effort at excusing his default. Trial counsel's alleged failures would not explain, much less excuse, Fields's failure to raise the misconduct issue on direct appeal. Accordingly, this Court should disregard Fields's claims that the prosecutor presented an improper argument and trial counsel ineffectively failed to object.

B.     Had Fields Attempted to Excuse His Default, he Could Not Show Cause and Prejudice

Even if Fields had not waived his previous assertion of cause and prejudice for his default—which he premised on ineffective assistance of appellate counsel—he could not make the requisite showing at this juncture. Indeed, to demonstrate cause based on ineffectiveness, Fields would have to establish that appellate counsel unreasonably omitted a prosecutorial misconduct claim that would have enjoyed a reasonable likelihood of success on appeal. *See Neill*, 278

F.3d at 1057. To satisfy the prejudice standard to excuse his default, Fields must show the underlying misconduct "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Snyder*, 871 F.3d at 1127-28. The prejudice standard for defaulted claims sets a bar at least as high as that applied to reviewable claims of prosecutorial misconduct on collateral review, under which a petitioner must show the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). By extension, in regard to misconduct in a capital summation, a petitioner "must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty." *Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006) (citing *DeChristoforo*).

Ignoring his default and attempting to escape his burden under *Short* and *DeChristoforo*, Fields asserts that the prosecutor's argument violated a specific constitutional right—the Eighth Amendment guarantee of a death sentence free from prejudice or passion. Br. 67, 69 (citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)). Having alleged the violation of that supposed right, Fields reasons the law requires him to show only that the alleged error "had a substantial prejudicial effect" on his guarantee of

dispassionate sentencing.  Br. 69-70 (citing *Paxton v. Ward*, 199 F.3d 1197, 1217-18 (10th Cir. 1999) and *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003)).

Fields's novel theory fails for three reasons.  First, the default of his misconduct claim requires him to meet a higher standard irrespective of the source of his claim.  Second, the claimed violation of a specific right is illusory: Fields fails to identify any authority for the proposition that a constitutional provision specifically prohibits misconduct during penalty phase arguments.[8]  If any court had announced such a right, it would swallow the *DeChristoforo* standard in all capital sentencings.  Third, Fields's suggestion that this Court should recognize a doctrine of relaxed scrutiny in death penalty cases (a position he did not take below) amounts to a request for application of a new rule on collateral review.

Collateral relief is limited to claims based on established law.  *Teague v. Lane*, 489 U.S. 288, 310 (1989).  A petitioner cannot receive habeas relief "unless reasonable jurists hearing the claim at the time the conviction became final would have felt compelled by existing precedent to rule in his favor." *Graham v. Collins*,

---

[8] Fields premises his theory of relaxed scrutiny on four inapposite cases.  Two of them, *Gregg* and *Woodson* do not concern misconduct.  A third, *Cargle*, evaluated misconduct under the auspices of cumulative error, observing – in a nod to *DeChristoforo* – that the error likely rendered the trial fundamentally unfair.  317 F.3d at 1223.  The fourth case, *Paxton*, found the prosecutor's impropriety involved a deprivation of recognized "rights to present mitigating evidence, to rebut evidence and argument . . ., and to confront and cross-examine the state's witnesses."  199 F.3d at 1218.  The opinion makes no mention of an Eighth Amendment right to sentencing free of passion.

506 U.S. 461, 467 (1993) (internal quotation marks omitted); *see also Saffle v. Parks*, 494 U.S. 484, 487 (1990) (holding the Court generally would "neither announce nor apply" a new rule on collateral review).

In view of *Teague* and its progeny, lower courts may not grant collateral relief based on their own newly-announced rules. *See Caspari v. Bohlen*, 510 U.S. 383, 390-396 (1994); *see also Petrovich v. Leonardo*, 229 F.3d 384, 387 (2d Cir. 2000) (holding *Teague* bars this Court from "announc[ing] a new rule [that is] not dictated by precedent"); *Lackey v. Scott*, 28 F.3d 486, 490 (5th Cir. 1994) (holding "acceptance of [the petitioner's] claim would require this Court to announce a new rule of constitutional law . . . . foreclosed [under *Teague*]"). The *Teague* bar applies unless the new rule substantively limits criminal liability or falls within a small set of "watershed" doctrines that implicate the fundamental fairness of a criminal proceeding. *United States v. Cousins*, 455 F.3d 1116, 1126 n.6 (10th Cir. 2006) (citing *Schriro v. Summerlin*, 542 U.S. 348 (2004)).

Fields cannot point to any case that requires relief whenever a prosecutor's improper argument had a substantial prejudicial effect on the fairness of capital sentencing. Indeed, the Supreme Court has not held that the Eighth Amendment provides a safeguard against prosecutorial misconduct separate from the Due Process Clause. As such, Fields asks this Court to announce a new rule on collateral review, and one that does not fall into either exception to the *Teague*

70

doctrine: it does not purport to substantively limit criminal liability or implicate the

fundamental fairness of a criminal proceeding.  Thus, if it excuses Fields's default,

the Court should apply the *DeChristoforo/Short* standard in assessing the claim of

prosecutorial misconduct.

In this case, at the conclusion of the rebuttal, the prosecutor argued Fields

should be "weighed in the balance" of justice and the applicable law and

instructions and found wanting.  As a preamble to that assertion, the prosecutor

recounted an Old Testament story, but did so in a fashion devoid of reference to

the Bible, any spiritual being, or any religious law:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends.  They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation.  They drank wine and they worshiped pagan idols.  All of a sudden the fingers of a hand began to write on the palace wall.  The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose.  He became white.  He shook.  His knees banged together.  He cried out: Bring the astrologers, bring the wise men of the nation.  Whoever interprets this saying on the wall will become the third most powerful member of my government.  He will have great riches.  The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought.  But they couldn't read much less interpret the writing on the wall.  The king's face turned ashen.  The queen, though, remembered a forgotten man.  She called for him after talking to the king.  And the king made the man the same offer.  The man, though, he turned down all of the riches, all the honor and all of the prestige.  The man bravely interpreted the writing on the wall.  And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance

71

and found wanting.  Sure enough, that night the king was killed.  His kingdom was separated among his neighboring enemies.

The Defendant weighed his options on July 10, 2003.  Under the Court's instructions and the law given by the Court, the Defendant should be, as it were, weighed in the balance and found wanting.

ROA 5:133-34.

Fields analogizes, by reference, the prosecutor's remarks to those made in six cases – *Cauthern v. Colson*, 736 F.3d 465, 476-77 (6th Cir. 2013); *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001); *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998); *Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996); *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991); and *United States v. Giry*, 818 F.2d 120, 133 (1st Cir. 1987).  Unlike the arguments in the cited cases, the prosecutor in this case made no mention of, or allusion to, any forbidden subject matter.  Although the argument included a biblical story, the prosecutor did not identify it as such or attempt to rely on it as authority for imposition of the death penalty.  The arguments at issue in Fields's cited cases provide a useful counterpoint.

In *Cauthern*, the prosecutor began his erroneous remarks by rhetorically asking why the defendant should die and then answering with an interpretation of the Lord's Prayer, presumably assuming the jury would recognize it as a Christian rite.  736 F.3d at 474.  The prosecutor argued that the prayer beseeched God for delivery from the "evil one."  *Id*.  He developed his theme, comparing the

72

defendant to two infamous murderers and arguing he was the devil incarnate. The

prosecutor then pressed for the death penalty, reasoning

> You cannot negotiate with the evil one . . . . You cannot deal in good faith
> with the evil one. You have got to destroy and destroy, or he and his
> benefactors will destroy you. He'll destroy us. He'll destroy our children. . .
> . . There is no treatment for this individual posing in a mask and taking
> human form. . . . Don't try to save him. Engage him in combat and destroy
> him. Do your duty.

*Id*. at 474-75. The remarks in *Cauthern*, unlike those at issue here, unambiguously

referred to religious teachings and asserted the jury bore a duty, imparted by a

higher authority, to impose the death penalty as a bulwark between society and

metaphysical evil. The argument also implied that the jury had an obligation to

impose capital punishment to prevent the defendant from killing again.

> In *Sandoval*, the deputy district attorney argued in pertinent part as follows:

> [Defense counsel] says don't play God. Let every person be in
> subjection to the governing authorities for there is no authority except
> from God and those which are established by God. Therefore, he who
> resists authority has opposed the ordinance of God, and they who have
> opposed will receive condemnations upon themselves for rulers are
> not a cause of fear for good behavior, but for evil. Do you want to
> have no fear of authority? Do what is good and you will have praise
> for the same for it is a minister of God to you for good. But if you do
> what is evil, be afraid for it does not bear the sword for nothing for it
> is a minister of God an avenger who brings wrath upon one who
> practices evil.
>      You are not playing God. You are doing what God says. This
> might be the only opportunity to wake him up. God will destroy the
> body to save the soul. Make him get himself right. [¶] . . . Don't be
> fooled by what's to come [in defense's rebuttal]. Let him have the
> opportunity to get his soul right. That's the only way to get his
> attention. You are not playing God. God ordains authority.

73

241 F.3d at 775 n.1.  This argument exacerbated the worst features of the improper

advocacy in *Cauthern*.  It paraphrased a biblical passage (Romans 13), identified

God as the source of authority for the death penalty, and presumed that God

preferred the death penalty to save the defendant's soul.  Nothing remotely close to

the *Sandoval* remarks occurred in this case, in which the prosecutor made no

mention of God, much less a religious obligation to impose the death penalty.

In *Coe*, the court found improper, but not prejudicial, an argument that both

testaments of the Bible condoned the death penalty.  161 F.3d at 351.  Before

reiterating his point that the Bible provided "foundation for capital punishment,"

the prosecutor invoked a religious commandment to impose the death penalty—

"Whosever sheddeth man's blood, by man shall his blood be shed."  *Id*.  If those

comments did not, as the Sixth Circuit held, have a substantial or injurious effect

on the verdict, the far less overtly religious remarks at issue here did not infect the

trial with unfairness that rendered the death sentence a denial of due process.

In another improper, but non-prejudicial, argument cited by Fields, a

prosecutor advocated that God ordained capital punishment:

> Some will say that society shouldn't take a life because that's murder
> also.  That's not true.  Vengeance is mine saith the Lord, but later
> when he covered the Earth with water and left only Noah and his
> family and some animals to survive, when he saw the damage what
> [*sic*] had been done to the Earth, God said "I'll never do that again"
> and handed that sword of justice to Noah.  [¶]  Noah is now the
> Government.  Noah will make the decision who dies.  "Thou shall

74

> [*sic*] not kill" is a prescription [*sic*] against an individual; it is not against Government.  Because Government has a duty to protect its citizens.

*Bennett*, 92 F.3d at 1346.  The Fourth Circuit held that these comments did not render the trial fundamentally unfair, citing the strength of the evidence, the vileness of the crime, and an instruction regarding summation.  *Id*.  The remarks at issue here lacked all express reliance on religious concepts present in *Bennett*, while the countervailing circumstances were more likely to ensure fairness: the government established guilt of this heinous crime by plea and confession (ROA 1:25-27; ROA 2:316-30), and the trial court instructed the jury that "arguments of counsel are not evidence," and that "if any statement by counsel about the law guiding your deliberations appears to be different, you must be guided by the instructions."  ROA 1:929, 937.

The Eleventh Circuit, in dicta to its *Cunningham* opinion, characterized a series of prosecutorial comments as "outrageous."  *Cunningham*, 928 F.2d at 1019.  The comments expressed offense that the defendant had exercised his Sixth Amendment right to trial, implied the defendant had abused the legal system by exercising that right, and questioned whether the defendant was entitled to his Sixth Amendment rights.  *Id*.  Additionally, the prosecutor argued that the jury should impose the death penalty based on an appeal to "religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot."  *Id*. at 1019-20 &

n.24.  But as previously noted, nothing of the sort occurred in this case, in which the prosecutor made, at most, a reference to a religious text but no effort to premise the imposition of punishment on a religious teaching.  The comments were not "outrageous," as the *Cunningham* court used that term.  Even if they were, *Cunningham* provides no basis for determining prejudice, as it expressly declined to reach the question.  In short, the distinguishable facts in *Cunningham* do not permit Fields to demonstrate a denial of due process.

Finally, in *Giry*, the prosecutor responded to an assertion that the defendants lacked specific intent despite extrajudicial statements indicating otherwise.  The prosecutor commented, "Sounds like Peter who for the third time denied Christ." *Giry*, 818 F.2d at 132.  Though the comment did not prejudice the verdict, the court found it "constituted an irrelevant and inflammatory appeal to the jurors' private, religious beliefs."  The statement was a patent appeal to one religion's beliefs and an effort to specifically identify the defendant with an apostle who disowned Jesus.  *See* Luke 22:33-34, 54-62.  In this case, by contrast, the prosecutor made no overt reference to religious teaching or any effort to use such doctrine to influence the jury or vilify Fields.  Once again, Fields has failed to identify analogous authority.

By no means has Fields shown a denial of due process by establishing that "absent the remarks, the jury would not have imposed the death penalty."  *Short*,

472 F.3d at 1195.  Here, the prosecutor recounted a Bible story without express reference to the Bible.  He concluded by reminding the jury that Fields should be "weighed in the balance and found wanting."  To the extent that argument echoed biblical language, it more significantly echoed the court's instructions: "[Y]ou must engage in a weighing process to determine whether a sentence of death is justified . . . . You must determine whether the proven aggravating factors sufficiently outweigh any proven mitigating factors to justify a sentence of death." ROA 1:949.

Whether delivered alongside a secularized Bible story or not, the thrust of the government's argument remained the same—the aggravator sufficiently outweighed the mitigators to justify a sentence of death.  *See* 18 U.S.C. § 3593(e). This case involved the egregious and premeditated murders of two strangers, one of whom Fields terrorized in the final moments of her life.  *See generally, supra,* Arg. II, B (summarizing the crimes).  Given the heinousness of the crime, the neutrality of prosecutor's remarks, and the strength of the instructions limiting reliance on argument, Fields has not identified misconduct that "so infected the trial with unfairness as to" render the verdict "a denial of due process." *DeChristoforo*, 416 U.S. at 643.

By extension, Fields has not shown that trial counsel acted ineffectively in failing to object to the prosecutor's comments. Trial counsel have no obligation to

raise futile objections.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005);

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999); *see Scott v. Romero*,

No. 04-2262, 2005 WL 2865173, at **2 (10th Cir. Nov. 2, 2005) (holding

"[c]ounsel is not ineffective for failing to advance a futile argument").

Fields has failed to identify an error that would have supported a valid trial

objection.  Counsel had no obligation to interrupt summation in a vain effort to

analogize this argument to those in *Cauthen* and *Sandoval*.  Emphasizing

unobjectionable remarks would have only served to underscore the broader

message—that the circumstances of the murders demanded the return of a death

verdict.  For want of any error, Fields cannot show any likelihood that the trial

court would have sustained an objection, much less a reasonable probability that

the forgone objection might have altered the outcome of the trial.  Accordingly,

even if Fields were allowed to raise an unauthorized claim of ineffective assistance

of trial counsel, that claim would fail and would therefore provide no basis for

excusing his procedural default.

Finally, Fields has not shown that appellate counsel acted ineffectively in

failing to raise the issue on appeal.  *See Hawkins v. Hannigan*, 185 F.3d 1146,

1152 (10th Cir. 1999) (finding the failure to raise a futile issue does not constitute

ineffectiveness).  Because there was no misconduct, Fields's appellate attorney

could not have transmogrified the prosecutor's comments into an issue that

undermined the fairness of the trial. *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997) (holding the "question for resolution is not the culpability of the government, but the fairness of the trial"); *see also United States v. Caro*, 597 F.3d 608, 624-25 (4th Cir. 2010) (determining in a capital case whether the prosecutorial error "prejudicially affected [defendant's] substantial rights so as to deprive him of a fair trial"). Appellate counsel had no obligation to challenge the government's argument, particularly because the defense failed to preserve the claim by objecting, meaning the claim would have been reviewed on direct appeal only for plain error. Fed. R. Crim. P. 52(b).

Given that appellate counsel had no obligation to raise this issue, Fields cannot establish cause to excuse his default. And, as repeatedly discussed, he has not shown prejudice of any stripe. Accordingly, the Court should deny relief.

## IV.   THERE ARE NO ERRORS TO ACCUMULATE

The cumulative-error analysis addresses the possibility that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (*en banc*); *see Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) ("A cumulative-error analysis merely aggregates all the errors that individually have [been] found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the

79

outcome of the trial is such that collectively they can no longer be determined to be harmless." (quoting *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003))). Federal habeas courts aggregate errors to determine if, together, they so "fatally infected the trial that they violated the trial's fundamental fairness." *Littlejohn*, 704 F.3d at 868 (quoting *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009)). But "wherever the cumulative error line may fall, it is not crossed often." *Id*. The cumulative error doctrine does not apply to non-errors. *Smith v. Jones* 143 F.3d 1086, 1113 (10th Cir. 1998).

As discussed above, Fields has not demonstrated that any of his claims have merit, much less that they prejudiced the outcome of his case to any degree. What he has failed to show in detail he cannot demonstrate in aggregate: there is no prejudice to accumulate and no basis for relief under such a theory.

80

## STATEMENT REGARDING ORAL ARGUMENT

The Government asserts that oral argument is necessary given the number of issues, the size and complexity of the record, and the gravity of the punishment.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this Court to affirm the judgment of the court below.

Dated:  March 8, 2019:

Respectfully submitted,

BRIAN A. BENCZKOWSKI
Assistant Attorney General
United States Department of Justice


/s/Jeffrey B. Kahan
Jeffrey B. Kahan
Deputy Chief, Capital Case Section
U.S. Department of Justice
1331 F Street, N.W.; 6th Fl.
Washington, D.C. 20530
Tel: (202) 305-8910
Jeffrey.Kahan@usdoj.gov

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma


/s/Christopher J. Wilson
Christopher J. Wilson


/s/Linda Epperley
Linda Epperley
Assistant United States Attorneys
Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401
Tel: (918) 684-5100
Chris.Wilson@usdoj.gov
Linda.Epperley@usdoj.gov

## V.    Certificate of Word Count Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).   According to MS Word 2010, this brief contains 21,396 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*/s/Linda A. Epperley*

## VI.    Certificate of Digital Submission

I certify that:

- all required privacy redactions have been made;

- that with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk;

-that the ECF submission was scanned for viruses using Trend Micro OfficeScan, updated March 8, 2019, and according to the program is free of viruses.

*/s/Linda A. Epperley*

## VII.   Certificate of ECF Filing & Delivery

I hereby certify that on March 8, 2019, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's CM-ECF system to the following counsel of record:

Hunter Labovitz          Hunter_Labovitz@fd.org

Katherine Ensler         katherine_ensler@fd.org

*/s/Linda A. Epperley*