**CASE NO. 17-7031**

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Appellee/Respondent, | : | DEATH PENALTY CASE |
| | : | |
| v. | : | D.C. Nos. 6:10-CV-00115-RAW; |
| | : | 6:03-CR-00073-RAW-1 |
| EDWARD LEON FIELDS, JR., | : | |
| | : | |
| Appellant/Petitioner. | : | |
| | : | |

Appeal from the United States District Court for the Eastern District of Oklahoma
Honorable Ronald A. White

**APPELLANT'S REPLY BRIEF**

Oral Argument Requested

HUNTER LABOVITZ
Assistant Federal Defender
Pa. Bar. No. 204760
KATHERINE ENSLER
Assistant Federal Defender
Pa. Bar No. 319029
Capital Habeas Unit
Federal Community Defender Office
for the Eastern District of
Pennsylvania
601 Walnut St., Ste. 545W
Philadelphia, PA 19106
Telephone: (215) 928-0520

Attorneys for Appellant/Petitioner

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES .......................................................................ii

I.    THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN
      FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER
      TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT
      AVAILABLE EVIDENCE OF MR. FIELDS'S BRAIN DAMAGE.............1

      A.    The Government Mischaracterizes the Strength of Dr. Gelbort's
            Pre-Trial Neuropsychological Findings. ..............................................2

      B.    The Government Posits Tactical Reasons for Trial Counsel's
            Conduct That Are Belied by the Record. .............................................9

      C.    The Government's Prejudice Arguments, Based on the District
            Court's *Sua Sponte* Ruling, Contradict Well-Established Law
            and Science. ........................................................................................16

II.   THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B)
      IN FAILING TO CONDUCT A HEARING TO DETERMINE
      WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO
      PRESENT MR. FIELDS'S SOCIAL HISTORY AS A MITIGATING
      FACTOR..................................................................................................23

      A.    The Door to Aggravating Evidence Was Already Open.....................24

      B.    The Omitted Social History Evidence Would Have Supported
            the Mitigation Case. ..........................................................................27

III.  THE GOVERNMENT'S INVOCATION OF RELIGIOUS
      AUTHORITY DURING CLOSING ARGUMENT WAS
      UNCONSTITUTIONAL AND PREJUDICIAL; THE DISTRICT
      COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO
      CONDUCT A HEARING TO DETERMINE WHETHER TRIAL
      COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT. ...............33

      A.    The Record Refutes the Government's Procedural Arguments..........34

      B.    The Government's Invocation of Religion Violated Mr. Fields's
            Sixth and Eighth Amendment Rights.................................................36

CONCLUSION .........................................................................................43

i

## TABLE OF AUTHORITIES

**Federal Cases**

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) ........................................ 19

*Bennett v. Angelone*, 92 F.3d 1336 (4th Cir. 1996) ............................................... 36

*Brinkley v. Houk*, 831 F.3d 356 (6th Cir. 2016) ............................................... 25, 26

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ................................................... 39, 40

*Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013) ............................. 37, 38, 41, 42

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ............................................. 38, 39

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013) ............................................... 8

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................ 41

*Hinton v. Alabama*, 571 U.S. 263 (2014) ............................................................. 14

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) .................................... 6, 7, 20

*Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989) ............................................. 38

*Littlejohn v. Royal*, 875 F.3d. 548 (10th Cir. 2017) .............................................. 17

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ........................................... 8

*Machibroda v. United States*, 368 U.S. 487 (1962) ........................................ *passim*

*Martinez-Morales v. Victaulic Co.*, No. CIV. 11-1660 MEL, 2013
WL 2443873 (D.P.R. June 5, 2013) ....................................................................... 22

*Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814
(10th Cir. 2014) ................................................................................................ 20, 21

*Porter v. McCollum*, 558 U.S. 30 (2009) ......................................................... 27, 31

*Raines v. United States*, 423 F.2d 526 (4th Cir. 1970) .......................................... 18

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................... 25

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) ...................................... *passim*

*Sawyer v. Smith*, 497 U.S. 227 (1990) .............................................................. 39, 40

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................. 27, 31

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................... 16

*Teague v. Lane*, 489 U.S. 288 (1989) ................................................................... 39

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) .............................. *passim*

*United States v. Giry*, 818 F.2d 120 (1st Cir. 1987) ......................................... 38, 42

ii

*United States v. Tee*, 881 F.3d 1258 (10th Cir. 2018) ............................................ 20

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ................................................................ 42

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009) .................................. 25, 26

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................ 25

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ............................................ 26

**Federal Statutes**

28 U.S.C. § 2255 ...................................................................................... *passim*

Appellant Edward Leon Fields, Jr., through undersigned counsel, hereby replies to the Government's Brief filed on March 8, 2019.  Doc. 010110136304.  In support of his reply, Mr. Fields states as follows:

In District Court, Mr. Fields made a specific, detailed, and corroborated proffer showing that trial counsel ineffectively failed to present mitigating evidence of Mr. Fields's frontal lobe dysfunction, failed to present his dysfunctional social history as a mitigating factor, and failed to object to the Government's penalty phase closing argument in which it exhorted the jury to sentence Mr. Fields to death based on religious law and Biblical scripture. Although the Government's Brief selectively presents some evidence to dispute Mr. Fields's proffer, the record falls well short of "conclusively show[ing] that [Mr. Fields] is entitled to no relief."  28 U.S.C. § 2255(b).  Rather, the Government's response merely highlights the numerous factual disputes that mandate an evidentiary hearing to determine the reasons for trial counsel's failures, and whether those omissions – individually or collectively – prejudiced Mr. Fields.

I.    **THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT AVAILABLE EVIDENCE OF MR. FIELDS'S BRAIN DAMAGE.**

In Claim I, Mr. Fields alleges trial counsel failed to present available mitigation evidence about his brain dysfunction.  In arguing that counsel was not

ineffective, the Government mischaracterizes the available evidence; posits tactical reasons for counsel's omission that are belied by the record; and raises new arguments that are contrary to law and science in defending the District Court's ruling that a post-conviction MRI test precludes a finding of prejudice.

## A.    The Government Mischaracterizes the Strength of Dr. Gelbort's Pre-Trial Neuropsychological Findings.

Pre-trial, comprehensive neuropsychological testing by Dr. Michael Gelbort revealed that Mr. Fields suffers from frontal lobe brain dysfunction.  Counsel considered that a critical finding to present to the sentencing jury but she failed to do so.

The Government argues that purported shortcomings in Dr. Gelbort's report excused this failure.  But the Government ignores the trial and post-conviction record, which must be accepted as true.  *See, e.g.*, *United States v. Barrett*, 797 F.3d 1207, 1224 (10th Cir. 2015).

The Government repeatedly claims that Dr. Gelbort's testing results were "tentative," GB[1] 13, 20, 25, 27, 28, 39,[2] asserting that "Dr. Gelbort never

---

[1] Cites to "GB" refer to the Government's Brief filed on March 8, 2019.

[2] *See also* GB 13, 25, 28, 38, 43, 46 (referring to Dr. Gelbort's testing results as "possible," "inchoate," "putative," "tepid," "nebulous," "unverified," and "unconfirmed").

diagnosed Fields with brain damage," *id.* at 20.  But there is nothing inconclusive about the language concerning brain impairment in Dr. Gelbort's report in the record.[3]  ROA 11:215-18.[4]  Rather, that report states that Mr. Fields's test results "display a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation needed"[5] and that the "nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior."  ROA 11:218.

Additional evidence refuting the "tentativeness" claim includes that:

- Dr. Gelbort told trial counsel almost one year before trial that Mr. Fields's "neuropsychological test results indicate the presents [sic] of front lobe impairment in his brain functioning," and counsel relied on this finding to move the trial court for more time to file mental health-related pleadings under Rule 12.2 of the Federal Rules of Criminal Procedure.  ROA 6:45;

---

[3] As detailed below, at counsel's request, Dr. Gelbort prepared subsequent reports that are not part of the record on appeal.  *See infra* pp. 9-10.  These reports would undoubtedly become part of the record at an evidentiary hearing.

[4] Citations to the record will be to "ROA," followed by the appropriate volume number, followed by the appropriate page numbers that appear in the bottom right hand corner of the PDF volume.

[5] This recommendation for further evaluation had no effect on Dr. Gelbort's confidence in his finding of frontal lobe brain dysfunction.  *See* ROA 11:507 (Dr. Gelbort explaining that he "did not need any additional testing to reach [his] opinion of Mr. Fields's brain impairments to a reasonable degree of neuropsychological certainty").

- Trial counsel told the Government during a pre-trial case settlement meeting that Mr. Fields has "a pre-existing frontal lobe impairment[, which] experts found . . . through psychological testing." ROA 11:221;

- Dr. Gelbort's post-conviction declaration confirms that his pre-trial neuropsychological evaluation revealed that Mr. Fields has frontal lobe brain dysfunction and cognitive impairments. ROA 11:505;

- Trial neuropsychiatrist Dr. George Woods – who reviewed Dr. Gelbort's report at trial counsel's request – found that Dr. Gelbort's pre-trial testing revealed brain dysfunction in Mr. Fields's frontal lobes. But trial counsel did not ask Dr. Woods any questions about this finding during his testimony. ROA 11:172;

- Trial counsel's post-conviction declaration corroborates that "Dr. Gelbort's report of his testing showed that Mr. Fields was damaged in the frontal lobes of his brain." ROA 11:163[6]; and

- Government trial consulting psychologist Emily Fallis revealed that then-United States Attorney Sperling told her that Mr. Fields "has apparent frontal lobe damage." ROA 1:496.

---

[6] The Government argues that the Court should not necessarily credit counsel's declaration. *See* GB 43, 62. But in cases the Government relies on to assert that an evidentiary hearing is unnecessary, the courts credited and depended on trial counsel's declaration. *See id.* at 41 (citing *United States v. Rodriguez-Vega*, 797 F.3d 781, 791 (9th Cir. 2015) (finding ineffectiveness and vacating conviction based on trial counsel's declaration without a hearing); *Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) (crediting counsel's declaration to deny § 2255 petition without a hearing)).

Elsewhere in its brief, the Government acknowledges that Dr. Gelbort diagnosed Mr. Fields with "mild brain damage." GB 29.[7] This assertion not only contradicts the Government's claim that Dr. Gelbort failed to reach a firm conclusion, it also mischaracterizes the extent of that conclusion. In fact, Dr. Gelbort found significant brain impairment, as demonstrated by the following:

- Trial counsel advised a consulting lawyer that Dr. Gelbort's neuropsychological test results "reveal[ed] serious brain dysfunction that had not been previously identified." ROA 6:70;

- In settlement discussions, trial counsel explained to the Government that any suggestion that Mr. Fields's impairment was "minor" reflected a misunderstanding of brain science. Counsel told the Government that "'there is no such thing as a minor case of brain damage' just like there is no 'minor' case of cancer"; "the frontal lobe is 'required for the brain's operating system'"; and "the brain 'can't just patch itself.'" ROA 11:221;

- Trial counsel's post-conviction declaration states that Dr. Gelbort told her Mr. Fields's front lobe impairment "was a significant finding." ROA 11:163;

- Dr. Woods reviewed Dr. Gelbort's findings pre-trial and considered Mr. Fields's frontal lobe impairment to be "severe." ROA 11:172; and

- After trial, psychiatrist Dr. Bradley Grinage reviewed Dr. Gelbort's neuropsychological findings and concluded that "Mr. Fields was moderately impaired at the time of trial." ROA 11:181.

---

[7] The Government uses analogous language such as "mild impairment," "minor," "insignificant," "tepid," "mild brain damage," "mild deficit," "mild organic impairment," and "uninspiring." GB 20, 25, 28, 29, 32, 38, 39.

The Government also alleges that "Gelbort never claimed to have a theory that explained Fields's commission of the murders." GB 20. In fact, Dr. Gelbort's trial report states that Mr. Fields's deficits affected "his every-day life, thought processes, and behavior." ROA 11:218. Moreover, had Dr. Gelbort testified, he would have elaborated on this finding, explaining:

> [Mr. Fields's] frontal lobe impairment . . . adversely impact[s] executive function, which acts in part as the "brakes" for a person's actions. Impairments in frontal lobe executive functions are correlated with impulsivity, disinhibition, poor reasoning, acting in an eccentric manner, affected judgment, and impaired ability to gauge the consequences of one's actions, all of which are present in Mr. Fields's case. . . . These deficits appear to be long-standing and impact his ability to think in a logical, adaptive and goal-directed manner . . . [and] also affect his social functioning.

ROA 11:505-07.

Neuropsychiatrist Dr. Woods could have supported these findings, testifying, had he been asked, that:

> People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. They also experience impairments in social judgment. Such people act out without making the types of judgments that persons with intact frontal lobe functioning can make.

ROA 11:172. Given the "attendant effects" that Mr. Fields's brain impairment has on his behavior, counsel could have "connect[ed] the dots" between Mr. Fields's impairment and "his commission of the crime in question." *Hooks v. Workman*, 689 F.3d 1148, 1204-05 (10th Cir. 2012).

6

Further, the Government claims that Dr. Gelbort's opinion was "incomplete" because counsel refused personality testing "apparently" necessary to his opinion. GB 21 n.5; *id.* at 46.  This assertion, which is yet another Government assumption, ignores that Dr. Gelbort's report does not state that he needed to conduct any personality testing before reaching an opinion.  ROA 11:218.  Dr. Gelbort's post-conviction declaration confirms that he "did not need any additional testing to reach [his] opinion of Mr. Fields's brain impairments to a reasonable degree of neuropsychological certainty."  ROA 11:507.  Additionally, trial counsel never suggested to the Government or trial court that any defense experts needed to conduct personality testing before they could opine on Mr. Fields's brain dysfunction.  ROA 6:45-48; ROA 11:220-23.

Last, the Government argues that, according to a consultant who the Government categorizes as an "investigator" and "member" of the "extended defense team," Dr. Gelbort misstated certain facts in Mr. Fields's background.  GB 26-27.  But the Government does not explain how any such errors affected the results of Dr. Gelbort's neuropsychological testing.

In short, the Government mischaracterizes the strength of the pre-trial neuropsychological findings.  Because there were "credible, reasonably discernable clues that [Mr. Fields's] circumstances w[ould] support a mitigation theory based on organic brain damage, it [was] at the core of [] defense counsel's

constitutional responsibilities . . . to present such evidence to the jury." *Littlejohn v. Trammell*, 704 F.3d 817, 860 n.23 (10th Cir. 2013). This is particularly true given that trial counsel recognized the "overwhelming importance [of Mr. Fields's frontal lobe impairment] for the mitigation case," ROA 6:55 n.7, but instead presented a "less powerful," *Grant v. Trammell*, 727 F.3d 1006, 1021 (10th Cir. 2013), and "unhelpful" mental health defense, *Barrett*, 797 F.3d at 1231. Regardless of whether counsel is required "to present 'all mental illness mitigating circumstance evidence . . . to render effective assistance,'" GB 19, this Court has emphasized the importance of presenting brain dysfunction specifically. *See* AB 19-21 (discussing cases).[8]

At most, the Government's depiction of Dr. Gelbort's findings demonstrates that there is a material factual dispute about the nature and meaning of his findings. Thus, an evidentiary hearing is appropriate to resolve this dispute. *See, e.g.*, *Barrett*, 797 F.3d at 1228 (record must "necessarily establish" that movant not entitled to relief in order to bar evidentiary hearing); *Machibroda v. United States*, 368 U.S. 487, 495 (1962) (record containing controverted facts by definition cannot conclusively resolve a claim without a hearing).

---

[8] Cites to "AB" refer to Appellant's Opening Brief, filed September 10, 2018.

8

**B.     The Government Posits Tactical Reasons for Trial Counsel's Conduct That Are Belied by the Record.**

The Government posits that trial counsel had concerns about presenting brain dysfunction mitigation generally – and Dr. Gelbort specifically – and therefore "made an informed tactical decision . . . to jettison" brain dysfunction evidence in favor of Dr. Woods's and Dr. Grinage's "manic flip" theory. GB 27-28, 38-39, 46. The Government's efforts to divine trial counsel's thought process are speculative at best. The evidence relied upon by the Government in support of this argument is selective, quoted out of context, and misrepresentative of the entire record. The Government also ignores counsel's key pre-trial statements regarding the brain impairment findings and, ultimately, ignores counsel's actual decision, after careful deliberation, to present the findings.

For the reasons discussed below, the record refutes the Government's speculation about trial counsel's motivations. Indeed, its speculations are refuted by trial counsel's sworn affidavit. Nevertheless, the Government's arguments demonstrate that, at a minimum, there is a material factual dispute about counsel's motivation and strategy. If the record itself does not show the fallacy of the Government's arguments, an evidentiary hearing is required to resolve the dispute.

The Government cites to email correspondence between trial counsel and outside consultants as evidence that counsel had concerns about what the

Government refers to as Dr. Gelbort's "report." GB 26-27. But the Government culled these emails from early in the case while ignoring later developments. The cited emails reflect counsel's concerns about a "very preliminary draft report" prepared by Dr. Gelbort in November 2004, ROA 12:77, which "was done in a hurry" at trial counsel's request, ROA 12:78.[9] Dr. Gelbort provided counsel with a revised draft report in March 2005. ROA 11:507. After trial counsel reviewed that draft, she told co-counsel Isaiah Gant: "I'm actually happy with this in many ways." ROA 12:553. The Government ignores this part of the record, and cites to no evidence demonstrating that counsel or others had any concerns with the updated report. The Government also ignores that in mid-June 2005, close to trial, counsel requested that Dr. Gelbort send her a final report. ROA 12:435. It is nonsensical that trial counsel would request a final report from a witness who counsel had decided to "jettison" based on concerns with a preliminary report drafted the previous year.

The Government speculates that trial counsel believed "brain damage evidence . . . would not advance the case," GB 20, or play a central role, *id.* at 28. But the Government's assertion ignores counsel's declaration that "[p]resentation

---

[9] In district court proceedings, the Government correctly referred to this report as a "draft report." ROA 12:35.

of such brain impairments would have been an important part of our mitigation presentation" but that she "abandon[ed]" this evidence without reason.  ROA 11:164.  The Government also ignores that just days after Dr. Gelbort notified counsel that Mr. Fields suffers from frontal lobe brain dysfunction, counsel relayed this information to the court, ROA 6:45, and argued it had "overwhelming importance  . . . for [Mr. Fields's] mitigation case," ROA 6:55 & n.7.  The Government also omits that trial counsel shared the neuropsychological findings with the Government in a pre-trial attempt to settle the case with a life sentence. She informed the Government that Mr. Fields's "[i]njury to the frontal lobe, which regulates impulse control and judgement [sic], would have undoubtedly complicated any mania suffered by the defendant."  ROA 1:436; ROA 11:221. Counsel also told the Government that "pre-existing frontal lobe impairment" was a "mental health aspect of [the defense's] mitigation case."  ROA 1:435; ROA 11:220.  This record evidence shows that counsel considered Mr. Fields's brain impairment an important part of the mitigation case that she wanted the sentencing jury to hear.

Further, the Government claims that counsel omitted brain dysfunction evidence because it was "outside the thrust of the mitigation case."  GB 46.  But this ignores that, early on, trial counsel recognized a possible interplay between mitigation themes, telling the Government that the medication error leading to the

manic flip "was compounded by a pre-existing frontal lobe impairment." ROA 11:221. Counsel confirmed in her post-conviction declaration that the defense "never considered [the presentation of both manic-flip and organic brain damage] to be mutually exclusive." ROA 11:163. Additionally, Dr. Woods endorsed the synergism between the presented defense and Mr. Fields's brain dysfunction. *See* ROA 11:172 ("Regardless of whether one accepts my opinion about a manic switch, the presence of frontal lobe impairments is highly significant. . . . By itself, this type of impairment is a highly mitigating factor. If this impairment is added to my clinical opinion that Mr. Fields underwent a manic switch, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flight into mania that I believe occurred.").

The Government suggests that counsel adopted the views of Drs. Woods and Grinage, who the Government claims did not "appear concerned with [Dr.] Gelbort's findings," GB 24, and "apparently[10] concluded that [Dr.] Gelbort's suggestion that [Mr.] Fields was brain-damaged did not merit meaningful comment

---

[10] The Government's repeated use of "apparently" and similarly tentative terms to explain the trial defense team's actions reflects the speculative nature of its theories and underscores the absence of evidentiary proceedings and findings in the District Court. *See* GB 21 n.5, 25, 26, 43 ("apparently"); *see also id.* at 22 ("appears to reflect"); *id.* at 23 ("[c]ounsel appeared convinced").

12

or reliance," *id.* at 43.  The Government further argues that Dr. Woods's failure to discuss Mr. Fields's brain impairment during his trial testimony "appears to reflect his sincere belief and confidence . . . that Fields suffered from a chemical imbalance amenable to medication, not organic brain damage."  *Id.* at 22-23.  The Government engages in the same speculation for Dr. Grinage.  *Id.* at 23-24.  Yet the Government ignores that:

- Dr. Woods told trial counsel that Mr. Fields's brain impairment was important to the mitigation case because "the frontal lobe is 'required for the brain's operating system' and that the brain 'can't just patch itself.'"  ROA 11:221;

- Dr. Woods knew pre-trial that testing showed "the presence of frontal lobe impairments[, which] is highly significant."  ROA 11:172;

- Because of counsel's "last minute and rushed" trial preparation, counsel neglected to prepare Dr. Woods to testify about Mr. Fields's brain impairment.  ROA 11:172;

- Based on a misunderstanding of the rebuttal process, *see infra*, trial counsel told Dr. Grinage to omit brain dysfunction from his testimony.  ROA 13:86; and

- Because counsel did not provide him with Dr. Gelbort's full report, Dr. Grinage could not even reach an opinion on brain dysfunction at the time of trial.  But once given access to the full report, Dr. Grinage recognized the weight of Mr. Fields's brain impairment.  ROA 11:180-81.

Therefore only counsel's errors – and not Dr. Woods's or Dr. Grinage's opinions – explain why these experts did not address Mr. Fields's brain dysfunction during their trial testimony.

Another basis for counsel's supposed strategic decision to omit neuropsychological testimony, according to the Government, was to preclude harmful rebuttal from Government experts, including a neuropsychologist. *See* GB 24-26, 35. But if counsel truly thought that the defense needed to jettison Dr. Gelbort and/or his findings to prohibit damaging rebuttal, then counsel acted unreasonably in not understanding that presenting mental health evidence through Drs. Woods and Grinage opened the door for Government rebuttal with a mental health expert of its choosing. *E.g.*, *Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014) (trial counsel's performance deficient for not understanding relevant law). Because the defense opened the door, fear of rebuttal was not a reasonable basis to fail to present brain impairment evidence. Indeed, once counsel opened the door, the Government presented neuropsychologist Dr. J. Randall Price, who told the sentencing jury that Mr. Fields had *no* brain impairments but did have antisocial personality traits. ROA 4:299, 350-51, 391-92.

Ultimately, the Government's position is that, "[i]n the end," based on reasons counsel "articulated and vetted," counsel "made an informed tactical decision . . . to jettison" Dr. Gelbort and "forgo" testimony about Mr. Fields's brain impairment and instead rely on the manic flip theory. GB 13, 27-28, 38-39, 43. The Government does not cite a single email, document, or declaration, or any other evidence in the record indicating that counsel made such a decision. The

Government simply assumes that because counsel initially "articulated" concerns,

she later decided to "omit" powerful, well-developed mitigation.  GB 28.  In fact,

the record shows the opposite:

- Counsel's pre-trial emails to case consultants in March and June 2005 corroborate that the defense decided to present "frontal lobe impairment" evidence as part of the mitigation case. *See, e.g.*, ROA 12:122, 124;

- The defense's amended expert notice filed approximately two weeks before trial stated that the defense experts "shall include" a "neuropsychiatrist, neuropsychologist, and psychiatrist."  ROA 1:861. Counsel did call neuropsychiatrist Woods and psychiatrist Grinage but did not call neuropsychologist Gelbort;

- In late June 2005, Dr. Price, the Government's neuropsychologist, was provided Dr. Gelbort's final report.  ROA 4:347-48.

- Just four days before the trial began, counsel told Drs. Woods and Gelbort that the defense "need[s] you both" at trial, and sent Dr. Gelbort a contract to secure his trial testimony.  ROA 12:555-57;

- Dr. Gelbort indicates that he and trial counsel then exchanged multiple emails to finalize his exact testimony date.  Dr. Gelbort's communications with "trial counsel led him to believe that [he] would be testifying."   ROA 11:508; and

- Counsel's declaration corroborates that "the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage," ROA 11:163, because the "[p]resentation of such brain impairments would have been an important part of our mitigation presentation," ROA 11:164.

Despite her intent, counsel did not present Dr. Gelbort's findings to the

sentencing jury because she was overwhelmed from trying a federal capital case

essentially by herself.  ROA 11:156, 164, 169.  Dr. Woods confirms that counsel

15

"dropped [presentation of brain dysfunction] out of the picture in [the] last minute and rushed preparations during trial." ROA 11:172. Furthermore, the Government ignores that even if counsel had ultimately decided not to present Dr. Gelbort, counsel could have – and should have – presented the credible findings of frontal lobe brain dysfunction through Dr. Woods and/or Dr. Grinage. As the Government concedes, both Dr. Woods and Dr. Grinage were well-qualified to opine on Mr. Fields's brain dysfunction. GB 22-23.

Thus, the contemporaneous court filings, emails, and other writings, as well as the multiple post-conviction declarations described in this reply and the opening brief confirm that trial counsel knew that Mr. Fields suffers from frontal lobe brain dysfunction; knew how significantly that impairment impacted Mr. Fields's daily functioning; knew the importance of presenting this evidence to the jury; had three experts available who could have testified about the impairment; and intended to present this impairment at sentencing. A reasonable lawyer would have made sure that the jury heard this important evidence.

C.    **The Government's Prejudice Arguments, Based on the District Court's *Sua Sponte* Ruling, Contradict Well-Established Law and Science.**

The Government raises two prejudice arguments. First, the Government contends that the opinion of its own expert that Mr. Fields does not suffer from brain damage precludes a finding of prejudice under *Strickland v. Washington*, 466

16

U.S. 668 (1984).  Because Mr. Fields has proffered four experts who opine that he does suffer brain damage, however, the Government's argument cannot be credited without evidentiary proceedings to resolve the experts' factual disputes.  Second, the Government claims that post-conviction MRI test results "refute Fields's claim that he has brain damage," GB 42, and therefore preclude a showing of prejudice. The Government never raised this argument in the District Court, and it is contrary to law and science.  Although the District Court adopted this theory, it did so *sua sponte*, without briefing or testimony.  At a hearing, the Government and defense experts can both be expected to testify that normal MRI results are not, as a matter of well-established science, inconsistent with brain dysfunction.

The Government first claims that prejudice cannot be established because its post-conviction expert, Dr. James Seward, proffers that Mr. Fields does not suffer from brain dysfunction.  GB 17-18.  But the credibility of Dr. Seward's view has not been subjected "to the crucible of adversarial testing."  *Littlejohn v. Royal*, 875 F.3d. 548, 559 n.4 (10th Cir. 2017).  Furthermore, it is contradicted by declarations from four defense mental health experts who each state to a reasonable degree of certainty that Mr. Fields suffered from frontal lobe brain dysfunction at the time of the crime.  *See* ROA 11:505-07 (Dr. Gelbort's declaration); ROA 11:181 (Dr. Grinage's declaration); ROA 11:172 (Dr. Woods's declaration); ROA 11:282, 286

(report of defense post-conviction expert Dr. Daniel Martell).[11]  Hence, there is a critical factual dispute that cannot be resolved on the existing record.

Given this dispute, the proper question under § 2255(b) is not whether Dr. Seward's proffer is correct, but whether Mr. Fields's proffer – taken as true – merits a hearing.  In *Barrett*, the only other capital § 2255 case in this Circuit, the Court held that where a § 2255 petitioner has "presented considerable evidence supporting his claims" – even if "other evidence may counter it" – "an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether [he] has a valid claim."  797 F.3d at 1224.

A case the Government relies upon, *Raines v. United States*, 423 F.2d 526 (4th Cir. 1970), *see* GB 41, confirms that "[w]hen the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive."  *Raines*, 423 F.2d at 530.  And *Raines*, as the Government notes, relied on *Machibroda*, the seminal Supreme Court case on the right to an evidentiary hearing in § 2255 cases.  *Id.*  In *Machibroda*, the Court held that when a movant makes a "detailed and specific"

---

[11] The Government asserts that this claim is "premised" on Dr. Martell's proffer, GB 41, but it ignores the opinions of three other defense mental health experts.  *See* ROA 12:527 n.16.

proffer, even if the Government's counter-proffer denies those allegations, the district court must grant an evidentiary hearing to decide the case "[n]ot by the pleadings and the affidavits, but by the whole of the testimony." 368 U.S. at 495 (quoting *Walker v. Johnston*, 312 U.S. 275, 287 (1941) (internal quotation marks omitted)). Adherence to this standard is particularly important in a capital case. *E.g.*, *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) (court must apply close scrutiny to trial counsel's capital sentencing stage performance).

Mr. Fields has made a "detailed and specific" proffer that he has brain dysfunction. Dr. Seward's position does not conclusively disprove that proffer, but, at most, creates a factual dispute requiring evidentiary resolution. *See* AB 44 (citing cases).

The post-conviction MRI report does not resolve the factual dispute either. The Government makes a new, erroneous argument, claiming that the MRI report "refute[s] Fields's claim that he has brain damage." GB 42. Its position is based on the District Court's *sua sponte* assertion – made without citation to any authority in the record, law, medicine, or science – that the result of the MRI scan negates the neuropsychological evidence showing Mr. Fields suffers from frontal lobe brain dysfunction. ROA 12:580. That assertion is legally and scientifically erroneous. Although the MRI scan may not show "physically verifiable brain damage," GB 14, neither does it *disprove* the existence of brain dysfunction,

especially when the neuropsychological testing shows otherwise.  *See* AB 45-49

(citing *inter alia* scientific and medical authority as well as *Barrett*, 797 F.3d at

1231, and *Hooks*, 689 F.3d at 1212-13 (Gorsuch, J., dissenting)).

The Government, while relying on an argument it never raised below,

complains that Mr. Fields is relying on information outside the record to refute the

District Court.  GB 30-31.  But a district court normally only answers questions the

parties present.  *E.g.*, *United States v. Tee*, 881 F.3d 1258, 1268-69 (10th Cir.

2018).  When a district court *sua sponte* decides an unpresented issue, this Court

ensures that the party affected – in this case, Mr. Fields – has the opportunity to

brief the issue on appeal.  *E.g.*, *Planned Parenthood of Kan. & Mid-Mo. v. Moser*,

747 F.3d 814, 836-38 (10th Cir. 2014).

The Government piggybacks on the District Court's erroneous ruling to

argue that the MRI refutes "the basic underpinnings" of Mr. Fields's "central

factual claim" "that he has brain damage."  GB 42, 44.  But the Government – like

the District Court – cites nothing in the record or elsewhere to support its new

theory that the MRI scan is dispositive.  Because the Government did not argue its

MRI theory in District Court, Mr. Fields had no chance to respond to it; this Court

should therefore consider the law and science that contradict the theory, as set forth

20

in his Opening Brief, *see* AB 45-49.  *See, e.g.*, *Planned Parenthood of Kan. & Mid-Mo.*, *supra*.[12]

Even the Government's own expert has implicitly conceded that the MRI results are not dispositive.  *After* being presented with the MRI report, ROA 12:232, Dr. Seward still administered numerous psychological and neuropsychological tests over the course of three days "in order to provide a comprehensive assessment of [Mr. Fields's] neuropsychological status."  ROA 12:239-40.  Asserting that his testing did not show brain dysfunction, Dr. Seward then added:  "[n]ot surprisingly, an MRI of the brain conducted in 2011 was normal."  ROA 12:259.  Neither Dr. Seward nor any other source ever contended that the MRI results preclude Mr. Fields from having brain impairment.  Nor did Dr. Seward – or any other source – support the Government's assertion that the MRI results meant that Mr. Fields's experts "misinterpret[ed] the [neuropsychological] data" "or "us[ed] the wrong testing methods."  GB 42.

The Government asserts that "the observations of an independent radiologist" who reported on the MRI scan "corroborate[]" the claim that "Fields

---

[12] The same cases the Government relies on to claim Mr. Fields raised a new argument in responding to the District Court's *sua sponte* assertion apply with equal force to its new argument about the MRI's purported significance.  *See* GB 31-32.

never suffered from brain damage." GB 35. But this misrepresents the radiologist's limited role: there is no indication that she reviewed any neuropsychological testing results or believed that the MRI result ruled out brain dysfunction. Rather, she reports that one particular test for physical injury "did not reveal any intracranial abnormality." ROA 12:232. That observation does not disprove the pre-trial neuropsychological findings.[13]

Having no other authority for its position, the Government makes much of the fact that Mr. Fields initially requested the MRI to support his claim. But Mr. Fields never said that the resulting scan would be dispositive of his ineffectiveness claim. Mr. Fields's claim has always relied on the opinions of all four defense mental health experts that the *neuropsychological test findings* show that Mr. Fields suffered from brain dysfunction at the time of the crime, and that the impairment adversely impacted his judgment. The MRI was sought at the recommendation of one of these defense experts only "to aid in proper differential

---

[13] *See, e.g.*, *Martinez-Morales v. Victaulic Co.*, No. CIV. 11-1660 MEL, 2013 WL 2443873, at *1 (D.P.R. June 5, 2013) (unpublished) (noting that where plaintiff's scores on neuropsychological testing "have been associated to the frontal lobe traumatic brain injury," one "do[es] not necessarily have to have visual MRI signs of brain damage to have brain damage" because "[t]here's substantial literature that indicate[s] that you can have brain damage and some of these instruments may not be sensitive to that type of a finding" (first two alterations in original) (internal quotation marks omitted)).

neurodiagnosis and treatment." ROA 11:286; *see also* ROA 10:318 ("[B]rain

scans and imaging *may* help identify the origins and course of Mr. Fields's

cognitive impairments." (emphasis added)).

Mr. Fields has cited law, science, and medicine in opposition to the

Government's new theory. *See* AB 45-49. At a minimum, the import of the MRI

result requires a fact-intensive inquiry at a hearing, not dismissal on the pleadings.

That is consistent with the process this Court followed in *Barrett* and *Hooks*, where

the Court ordered evidentiary hearings based on neuropsychological testing

showing functional brain impairment despite medical records suggesting that

neither defendant had any structural brain damage.

## II. THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS'S SOCIAL HISTORY AS A MITIGATING FACTOR.

Mr. Fields alleges trial counsel failed to present his full social history. The

Government's argument in support of counsel's effectiveness is two-fold: the

presentation of Mr. Fields's omitted social history evidence would have opened the

door to aggravating evidence, and it would have detracted from or undermined the

defense theory. *See* GB 47-49. However, the record establishes that the door was

already open to aggravating evidence, and that the omitted social history evidence

was entirely consistent with the defense's mitigation case.

### A.     The Door to Aggravating Evidence Was Already Open.

The Government argues that the evidence of Mr. Fields's troubled upbringing and history of intergenerational mental illness, which counsel failed to introduce, is a "double-edged sword," justifying counsel's omission. GB 48. However, it neglects to acknowledge that the aggravating "edge" of the evidence in question was already before the jury. *See* GB 47-48; *see also* AB 60-61 (summarizing the bad acts evidence the jury heard).[14] Elsewhere in its brief, the Government concedes that the prosecution adduced evidence of Mr. Fields's so-called "less pleasant traits," including "languor, irascibility, and hyper-sexuality," but also claims that the defense elicited a "nonthreatening portrait of Fields" through the testimony of his sister, ex-wife, coworker, son, and daughter. GB 52. In fact, that "portrait" included testimony that Mr. Fields's own mother was scared of him, that he physically and verbally threatened his sister, and that he physically and verbally abused his ex-wife. *See* AB 61. Once the aggravating edge of the social history sword was brandished, counsel was unreasonable in failing to

---

[14] By the Government's own account, at trial, Mr. Fields's sister "admitted he had violent outbursts that frightened her and their mother," "believed her brother did not provide emotional support for others," testified that Mr. Fields "has little contact with his children," and "counseled him to take fatherhood more seriously." GB 7-8.

present its mitigating side. *See Rompilla v. Beard*, 545 U.S. 374, 386 n.5 (2005) ("Counsel's obligation to rebut aggravating evidence extend[s] beyond arguing it ought to be kept out."); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (noting mitigation investigations "should comprise efforts to discover *all reasonably available* . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor" (quoting *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C) (1989)).

The Government cites several cases to support its contention that evidence of a troubled upbringing and mental health issues are double-edged, GB 47-48, but none of these cases are apt comparisons to Mr. Fields's. In *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009), this Court addressed the "double-edged nature" of substance abuse evidence – *e.g.*, such evidence can negatively highlight a defendant's failure to address the problem or bolster the perception that the defendant represents a continuing threat to society. *Id.* at 1178. Importantly, in finding Mr. Wackerly was not prejudiced by the omission of evidence of his substance abuse, this Court relied on the fact that "[t]he jury in this case was *not* already made aware of the significant potential 'aggravating' aspects of Mr. Wackerly's drug abuse." *Id.* at 1179; *see also Brinkley v. Houk*, 831 F.3d 356, 365

(6th Cir. 2016) (quoting *Wackerly*, 580 F.3d at 1178).[15]  This Court went on to

stress:

> This isn't to say that the mitigating edge of unproduced substance abuse evidence can never be sharper than its aggravating edge.  But it is to say that Mr. Wackerly has not shown his is such a case.  By way of example, he does not argue that this is a case in which the aggravating aspect of his drug use *was already placed before the jury*, such that no further harm, and only good, could have come from introducing further details of his substance abuse habit.  *See Smith v. Mullin*, 379 F.3d 919, 943 n.11 (10th Cir. 2004) (mitigating evidence of mental health problems not double-edged because aggravating "edge" of mental impairments was already presented to the jury in the guilt phase of trial).

*Wackerly*, 580 F.3d at 1178-79 (emphasis added).  Likewise, in *Williams v.*

*Woodford*, 384 F.3d 567 (9th Cir. 2004), the Ninth Circuit found counsel was not

ineffective in omitting evidence that could have opened the door to the defendant's

gang activity and "violent tendencies" with his family, none of which came in at

trial.  *Id.* at 616-21.

The aggravating aspects of the omitted evidence in these cases was not

already in front of the jury.  Here, the Government points to pre-trial

communications from trial counsel hoping to keep the "crap," *i.e.*, Mr. Fields's bad

---

[15] In *Brinkley*, the Sixth Circuit found counsel was not ineffective because the defendant himself had interfered with the mitigation investigation. *See* 831 F.3d at 365.

acts, out based on her belief that they only came in if she "opened the door."  ROA

12:640.  But this concern plainly cannot serve as a strategic basis after the door is

opened.  AB 60-61; *see also supra* p. 13 (discussing similar fallacy as it relates to

counsel's failure to present evidence of Mr. Fields's brain impairment).  Counsel

was ineffective for not presenting the available mitigating evidence, which could

have softened the aggravating nature of the parts of Mr. Fields's social history that

were presented at trial; humanized Mr. Fields; corroborated his mental health

diagnoses; and given the jury "a basis for a sentence less than death."  *Skipper v.*

*South Carolina*, 476 U.S. 1, 4 (1986); *Porter v. McCollum*, 558 U.S. 30, 41

(2009).[16]

## B.    The Omitted Social History Evidence Would Have Supported the Mitigation Case.

The Government characterizes the defense's mitigation theory as follows:

Mr. Fields's crimes were "a behavioral aberration driven by a wrongly prescribed

psychotropic drug," but once placed on the correct medication, he was "loving,

---

[16] The Government acknowledges that counsel admits she had no reason for omitting the social history evidence at trial but posits "common sense dictates that a formal evidentiary hearing would not have disclosed evidence to rebut counsel's contemporaneous thinking."  GB 16.  Such speculation disregards the record from trial and trial counsel's affidavit, and violates the guarantees set forth in 28 U.S.C. § 2255.  *See* AB 5-6.

lovable, and generally benign."[17]  GB 48-49.  Likewise, the Government

concludes, without citation, that evidence regarding Mr. Fields's troubled

upbringing "would have undermined the existing strategy by suggesting Fields was

an antisocial person whose homicidal conduct was a product of character."  GB 49;

*see also id.* at 51 ("counsel expressly intended to disassociate the murder from

Fields's character and attribute them to a chemical imbalance").  The record does

not support these overly simplistic characterizations of (1) the defense's mitigation

theory at trial and (2) how the omitted social history evidence would have been

used.

First, counsel presented some evidence regarding Mr. Fields's familial

dysfunction and social history, and thus had already embraced such evidence as

consistent with the mental health evidence, *see* AB 66, rebutting the Government's

argument that counsel believed that social history evidence would undercut the

mitigation case.  *See* GB 49-50. The aggravating parts of Mr. Fields's social

history came in at trial, so the potential for the omitted evidence to "backfire" is

---

[17] The Government claims Mr. Fields's counsel's effort to present him as such was "successful."  GB 49.  It is unclear what this conclusion is based upon given the jury found Mr. Fields posed a future danger, that his mitigation case did not outweigh the case in aggravation, and that he deserved a death sentence.  ROA 5:146-52.

illusory. *See id.* at 53-54.  The Government argues that by presenting Mr. Fields's

full social history, counsel would have "begged credulity by suggesting a causal

link between the crime and his childhood," and the jury "would intuit that the

damage would have manifested itself before the age of 36." *Id.* at 56.  Yet, at trial,

the Government was already making such arguments. *See* ROA 5:92 ("If the

Defendant was going to have a manic flip, it would have happened a long time ago

when he was treated with these antidepressants beforehand."); *see also* ROA 5:95

("They talk about the Defendant's family history maybe being involved.  Mother

wasn't killer.  Sister seems to be doing pretty good.  She's got Wendy's franchises

and if she's part of the genetic problem, she's doing well.").  As counsel herself

acknowledged to the jury in closing, "This man has never quite been able to live

his life the right way. . . ." ROA 5:102; *see also* ROA 5:102 ("He has people who

love him because he did fine in parts of his life and then other times he crashed.

That's what the testimony showed you.  His sister was honest with you, his wife

was honest with you.  This is the way Eddie was.").

Mr. Fields's post-arrest transformation, which the Government argues

"revealed him as a loving and lovable family member,"[18] GB 55, is not

---

[18] At trial, the Government argued:  "[Mr. Fields's] actions were no surprise to [his girlfriend].  No Effexor flip.  No manic switch.  The person she knew before the increased Effexor dosage, before the asserted nonexistent mania had committed

inconsistent with (or mutually exclusive of) him having a dysfunctional upbringing and intergenerational dysfunction and mental illness. None of the omitted social history evidence would have "undermined the testimony suggesting that the medication he received in custody had revealed him as a loving and lovable family member." GB 53, 55.

In sum, the Government assumes that mitigation is a zero-sum game – that a jury can only consider one theme in assessing a defendant's mitigation case[19] and any other theme would only detract from it. GB 47, 55-56. But even if that were true, the jury was already aware of Mr. Fields's allegedly "anti-social behaviors," *see* AB 60-61, and thus such evidence would have already "dilute[d]" or detracted from the mitigation case, GB 55, or "lend[ed] credibility to assertions of his dangerousness," *id.* at 58.

---

these murders. . . . The Defendant used and discarded people. He's a sociopath." ROA 5:116; *see also* ROA 5:126 (prosecutor arguing in closing, "[H]ere in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice.").

[19] The Government praises counsel's provision of a "simple, palatable answer to a potentially complex question: why did a seemingly law-abiding citizen suddenly commit a horrifying double murder of two strangers?" GB 55. However, counsel's failure to provide a more nuanced answer to the complex question was itself deficient performance.

Second, the omitted mitigation evidence included Mr. Fields's parents' neglect, emotional abuse,[20] and isolation and his familial history with mental illness.  Such evidence would not have suggested Mr. Fields was antisocial – and, regardless, any such evidence had already been introduced at trial.  Moreover, the evidence would not have served as a competing explanation for Mr. Fields's homicidal conduct.  *See Skipper*, *supra*; *Porter*, *supra*.  The Government portrays the evidence of Mr. Fields's dysfunctional upbringing as evidence that would necessarily be interpreted as evidence that he was "fundamentally flawed in a way that informed his crime and objectionable behavior."  GB 53.  While this assumption is based on the incorrect theory that only evidence with a nexus to the crime is mitigating, *see* AB 63-64, even if true, such a presentation is not mutually exclusive of the mental health presentation.  *Id.* at 65-66.[21]  The Government

---

[20] The Government argues Mr. Fields is trying to adopt his parents' and sister's childhood trauma as his own, GB 57, but Mr. Fields does no such thing.  His parents' social history provides a compelling look into the individuals who raised him and his sister's account is of the trauma she *and* Mr. Fields experienced.  *See* AB 52-53; *id.* at 53 ("Mom would not allow Eddie and I to be in the same room with them."); *id.* at 53 (testifying her mother "took pleasure in making sure Eddie and I stayed at each other's throats."); *id*. at 54 ("I recall my father being provoked by our mother to have us whip each other with belts.").

[21] The Government tries to have its cake and eat it too.  It argues that the omitted mitigation presentation would have been viewed by the jury as a competing explanation for Mr. Fields's criminal behavior with regard to the deficient performance prong, but that such a presentation was "marginal," in part

31

ignores Mr. Fields's other contentions that the omitted evidence would have bolstered his mental health defense,[22] humanized Mr. Fields, neutralized the evidence of his violent tendencies, and served as a reason for jurors to vote for a life sentence. AB 63. In fact, as the Government points out, Dr. Woods's opinion that mood disorders are attributed to genetics, GB 53, would have been bolstered with a more robust presentation of Mr. Fields's family history of mental illness. *See* AB 55, 65.

Lastly, the Government characterizes the evidence of Mr. Fields's early life as "evidence of unpleasantness," arguing it is not the type whose omission is prejudicial. GB 56-57. But the omitted evidence was more than just evidence of unpleasantness. It was evidence of multiple generations of mental illness and an upbringing defined by isolation, emotional deprivation, and physical abuse. Had it

---

because it is so "attenuated from the crime," with regard to the prejudice prong. GB 55.

[22] The Government cites Dr. Grinage's failure to rely on Mr. Fields's social history as a reflection of his judgment that doing so was not helpful, GB 56 & n.7, but as discussed above, counsel's error – and not Dr. Grinage's judgment – explains why he did not rely on Mr. Fields's social history during his trial testimony. *See* ROA 11:180 (noting counsel did not "prepare [his] testimony to cover these facts [referring to family history] in any sort of comprehensive manner"); *supra* pp. 24-27. Moreover, counsel specifically limited her question about evidence in Mr. Fields's history to "Mr. Fields's mental health history." ROA 3:406.

been presented with the evidence counsel did present at trial, there is a reasonable

probability that one juror would have voted for a life sentence.

### III. THE GOVERNMENT'S INVOCATION OF RELIGIOUS AUTHORITY DURING CLOSING ARGUMENT WAS UNCONSTITUTIONAL AND PREJUDICIAL; THE DISTRICT COURT ERRED IN VIOLATION OF § 2255(B) IN FAILING TO CONDUCT A HEARING TO DETERMINE WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

The Government closed its case for death by retelling a well-known Biblical

story in which God weighs the life of the idolatrous King Belshazzar, finds him

wanting, and condemns him to die.[23]  The prosecutor then expressly urged the jury

to "weigh" Mr. Fields's life and find him "wanting," just as God had done with

King Belshazzar.  Such a blatant appeal to religion in support of a death sentence

was objectionable under any standard.  Yet trial counsel did not object.  Had she

done so, there is a reasonable probability that the verdict would have been

different.

The bulk of the Government's response to this claim consists of unfounded

arguments about procedural default, waiver, and non-retroactivity.  Nothing in

---

[23] The prosecutor's lengthy recitation, reproduced in its entirety in Appellant's Opening Brief, *see* AB 68-69, was a paraphrase of the "writing on the wall" sermon from the Book of Daniel, *see Daniel* 5:1-31.

these or any other of the Government's arguments defeats Mr. Fields's entitlement to relief on this claim.

### A. The Record Refutes the Government's Procedural Arguments.

The Government variously contends that this ineffectiveness claim is defaulted, waived, and not properly a part of this appeal. GB 63-67. These arguments all derive from the Government's misreading of the record.

In Claim Five of his § 2255 motion, Mr. Fields alleged that the Government's penalty closing included six distinct types of improper argument, one of which was the prosecutor's unconstitutional appeal to Biblical law. Claim Five expressly alleged that "[t]rial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal." ROA 11:115; *see also* ROA 11:130-32 (explaining that trial counsel's failure to object to the prosecutor's improper closing was both deficient and prejudicial under *Strickland*); ROA 9:614-16 (same); ROA 9:144-46 (same).

The Government subsequently moved for summary judgment, opening its response to Claim Five as follows: "Fields claims his trial counsel provided ineffective assistance when they failed to object to several instances of alleged prosecutorial misconduct." ROA 12:58; *see also* ROA 9:726 (same); ROA 9:749-

34

52 (arguing that trial counsel reasonably abstained from objecting to prosecution's religious remarks in closing).

After the District Court granted the Government's motion, Mr. Fields requested COA from this Court, arguing that reasonable jurists could debate the District Court's denial of Mr. Fields's claim that the "Government's penalty phase closing arguments violated his constitutional rights," including his Sixth Amendment right to the effective assistance of counsel.  COA Mot. 62. [24]  Again, Mr. Fields expressly alleged that "[t]rial counsel was ineffective for failing to object to most of the Government's improper arguments." *Id.*  This Court granted Mr. Fields's request to appeal the violation of his "constitutional rights," albeit limiting the appeal to the "prosecutor's story drawn from the Book of Daniel." Case Management Order at 2 (Mar. 9, 2018).  Because trial counsel "fail[ed] to object," to the prosecutor's Biblical argument, COA Mot. 62, Mr. Fields's ineffective assistance of counsel claim was within the scope of the Court's COA.

The Government now contends that the ineffectiveness aspect of this claim is "newly-raised" and that he therefore lacks "permission" to raise the claim on appeal.  GB 66-67.  But the plain language of the pleadings filed throughout Mr.

---

[24] Cites to "COA Mot." refer to Appellant's Motion for Certificate of Appealability, filed on October 2, 2017.

Fields's § 2255 proceedings, and of this Court's order granting COA, demonstrates

otherwise.[25]

## B.     The Government's Invocation of Religion Violated Mr. Fields's Sixth and Eighth Amendment Rights.

As to the merits of Mr. Fields's claim, the Government attempts to

distinguish the prosecutor's remarks from the cases condemning the use of

religious argument in a capital case.  First, the Government argues that this case is

anomalous because the prosecutor here did not expressly reference "God" or "the

Bible."  *See* GB 72-76.  But the relevant precedent does not turn on the use of any

particular word or phrase.  Rather, the appeal to religious authority in support of

death offends the Eighth Amendment, regardless of how that appeal is

communicated to jurors.  *See* AB 70-72 and cases cited.  Indeed, the nationwide

prohibition[26] on religiously-charged prosecutorial argument would be meaningless

---

[25] While the Government devotes much of its response to arguing that Appellant has "waived" a claim of *appellate* ineffectiveness, neither Mr. Fields's § 2255 motion nor his COA application alleged appellate ineffectiveness as to improper prosecutorial arguments, including the Government's Biblical references. Again, the Government made this precise point in its own motion for summary judgment.  *See* ROA 12:58 ("Fields complains that *in instances in which trial counsel objected* to supposed misconduct, appellate counsel ineffectively failed to raise the issue on appeal." (emphasis added)).

[26] *See, e.g.*, *Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996) ("Federal and state courts have universally condemned such religiously charged arguments as confusing, unnecessary, and inflammatory."); *Sandoval v. Calderon*,

if a prosecutor could avoid sanction by simply omitting certain words while still conveying a religious message. Here, as the Government acknowledges, the prosecutor "recounted an Old Testament story" in his penalty phase closing argument. GB 71. While he did not explicitly use the word "Bible," the speech was "unmistakably Biblical in style," meaning jurors would "readily understand the words as referring to Scripture." *See Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2000) (granting habeas relief based on prosecutor's use of a "paraphrased" passage from Bible in capital case closing argument); *see also id.* (noting that "[t]hose learned in the New Testament would recognize the argument as closely following" the Biblical passage from which it was drawn).

Given the obviously religious nature of the speech, the Government next argues that the prosecutor made "at most, a reference to a religious text[,] but no effort to premise the imposition of punishment on a religious teaching." GB 76. But religious arguments are "inappropriate" in capital sentencing proceedings *precisely because* such arguments "create the inference that the death penalty is mandatory through their appeal to a higher authority." *Cauthern v. Colson*, 736

---

241 F.3d 765, 777 (9th Cir. 2000) ("[R]eligious arguments have been condemned by virtually every federal and state court to consider their challenge." (listing cases)).

37

F.3d 465, 477 (6th Cir. 2013); *cf. Jones v. Kemp*, 706 F. Supp. 1534, 1559-60 (N.D. Ga. 1989) ("To the average juror . . . the Bible is an authoritative religious document" and "a specific, extra-judicial code of conduct" which "would likely carry great weight with laymen and influence their decision."). In *Cauthern*, the court granted relief where the prosecutor's penalty phase closing merely mentioned the Lord's Prayer and referred to the defendant as "the evil one." 736 F.3d at 476-77 (internal quotation marks omitted). Here, the prosecutor retold an otherwise irrelevant, lengthy story in which God ordains the death of a pagan king after "weighing" him and then asked the jurors to make the same judgment after "weighing" Mr. Fields. ROA 5:133-34. It is disingenuous to deny that this was anything other than an "invocation of divine authority to direct a jury's verdict." *Sandoval*, 241 F.3d at 779; *see also United States v. Giry*, 818 F.2d 120, 134 (1st Cir. 1987) ("The complete irrelevance of the [religious reference] suggests that its sole purpose was to inflame the jury's passions.").

Finally, the Government argues that, regardless of the propriety of the prosecutor's religious argument, trial counsel had no duty to object because the remarks did not "so infect[] the trial with unfairness as to make the resulting [sentence] a denial of due process." GB 68 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This argument fails for two reasons.

First, as Mr. Fields established in his Opening Brief, a habeas petitioner need not satisfy the "fundamentally unfair" standard where the prosecutor's misconduct "effectively deprived the defendant of a specific constitutional right." *See* AB 69-70 (quoting *Donnelly*, 416 U.S. at 645).[27]  Appellee disputes that any relaxed standard applies in this case because, according to the Government, the Supreme Court has never "held that the Eighth Amendment provides a safeguard against prosecutorial misconduct separate from the Due Process Clause."  GB 69-70.[28]  In fact, the Supreme Court did just that in *Caldwell v. Mississippi*, granting relief based on improper prosecutorial argument that was "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'"  472 U.S. 320, 340 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)); *see also Sawyer v. Smith*, 497 U.S. 227, 235 (1990) ("[W]hile noting the principle" that prosecutorial misconduct typically will not warrant relief absent a showing that the

---

[27] Once again, the Government erroneously asserts that Mr. Fields made this argument for the first time in his Opening Brief.  GB 69.  The record plainly demonstrates otherwise.  *See* ROA 9:599-600.

[28] Accordingly, the Government argues that application of a relaxed standard here would violate the rule of non-retroactivity announced in *Teague v. Lane*, 489 U.S. 288 (1989).

39

entire proceedings were rendered fundamentally unfair, "the Court in *Caldwell*

determined to rely not on the Due Process Clause *but on more particular*

*guarantees of sentencing reliability* based on the Eighth Amendment." (emphasis

added)).[29] *Caldwell* is directly applicable to Mr. Fields's claim, as both cases

involve prosecutorial argument that improperly led the jury "to believe that the

responsibility for determining the appropriateness of the defendant's death rests

elsewhere," thereby permitting the jury "to minimize the importance of its role" in

imposing death. *Caldwell*, 472 U.S. at 328-29; *see also Sandoval*, 241 F.3d at 777

("Argument involving religious authority . . . undercuts the jury's own sense of

responsibility for imposing the death penalty" and "undermines the jury's role in

the sentencing process."). Hence, the Government's argument that *Teague* bars the

application of a relaxed standard in evaluating the impact of the prosecutor's

improper remarks here is unconvincing.

Second, even if this Court adopts the view that relief is proper only if the

prosecutor's argument rendered Mr. Fields's entire sentencing proceedings

---

[29] While the *Sawyer* Court determined that the rule in *Caldwell* was itself a
new rule of constitutional law not retroactive under *Teague*, the Court based its
decision on the fact that "no case *prior to Caldwell* invalidated a prosecutorial
argument as impermissible under the Eighth Amendment." *Sawyer*, 497 U.S. at
236 (emphasis added). Clearly, the same rationale is inapplicable to cases decided
*after Caldwell*, such as that of Mr. Fields.

fundamentally unfair, Mr. Fields meets that standard.  The Government contends that the fairness of the proceedings was "ensure[d]" by two factors:  (1) the prosecution "established guilt" through Mr. Fields's plea and confession; and (2) "the trial court instructed the jury that 'arguments of counsel are not evidence.'" GB 75.  But identical arguments were expressly rejected in *Cauthern*, in which the Sixth Circuit overruled the district court's finding that religious remarks in the prosecutor's penalty closing did not "unduly influence the jury," explaining:

> The district court noted that there was a great deal of evidence about Petitioner's guilt, but the weight of the evidence of guilt is completely and totally irrelevant to this inquiry.  *See Gregg v. Georgia*, 428 U.S. 153, 190-92 (1976) (discussing the advantages of bifurcated sentencing procedures in capital cases).  One would hope that when a state court convenes to determine whether a defendant should be put to death that there would no longer be any lingering question of that defendant's guilt.  [¶]

> The district court also noted that the trial court gave the curative instruction that statements by lawyers are not evidence.  But that generic instruction would likely have been given regardless of what the prosecutor said; were we to accept the reasoning of the district court on this point, then there would never be a viable claim for prosecutorial misconduct, because the most basic of instructions would cure the potential for an inflamed jury.

736 F.3d at 477.

The same points apply here.  Furthermore, even taking into account Mr. Fields's guilty plea and the trial court's instructions, it is nevertheless impossible to "assume that the prosecutor's religious argument did not persuade at least one of

41

the jurors to change a vote for life to death." *Sandoval*, 241 F.3d at 779; *see also*

*Cauthern*, 736 F.3d at 478 (granting habeas relief based on prosecutor's improper

argument where it was "plausible that given the high burden for imposing a death

sentence, the remarks were what tipped the scale in favor of imposing such a

sentence"); *cf. Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("When constitutional

error calls into question the objectivity of those charged with bringing a defendant

to judgment, a reviewing court [cannot] indulge a presumption of regularity.").

The prosecutor's unmistakable appeal to the Bible in support of the

Government's case for death violated Mr. Fields's Eighth Amendment right to a

verdict free from passion or prejudice and based solely on the evidence and the

law, and thus rendered his sentencing fundamentally unfair. Trial counsel attests

that she had no reasonable basis for failing to object to this clearly unconstitutional

argument, ROA 11:168-69, and Appellee has offered no reason to question

counsel's admission. Because the improper remarks constituted an "irrelevant and

inflammatory appeal to the jurors' private, religious beliefs," *see Giry*, 818 F.2d at

133, there is a reasonable probability that, had counsel objected, at least one juror

would have voted for life instead of death. Mr. Fields is entitled to relief.

## CONCLUSION

For the reasons stated herein and in Mr. Fields's Opening Brief, this Court should reverse the District Court's Opinion and Order and remand this matter for a new sentencing trial or, at a minimum, an evidentiary hearing.

Respectfully submitted,

/s/ Hunter Labovitz
HUNTER LABOVITZ
PA Bar No. 204760
Federal Community Defender Office for
  the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Hunter_Labovitz@fd.org

Dated:   April 22, 2019

43

## CERTIFICATE OF COMPLIANCE

I, Hunter Labovitz, hereby certify on this 22nd day of April, 2019, that the foregoing brief is in compliance with this Court's March 9, 2018 order that it consists of no more than 10,000 words. The foregoing brief contains 9,876 words.

/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATION THAT HARD COPIES ARE EXACT COPIES OF ELECTRONIC VERSION

I, Hunter Labovitz, hereby certify on this 22nd day of April, 2019, that the hard copies of Appellant's brief submitted to the Court are exact copies of the version submitted electronically.

/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATION THAT MOTION IS FREE FROM VIRUSES

I, Hunter Labovitz, hereby certify on this 22nd day of April, 2019, that the foregoing brief has been scanned for viruses using Symantec Endpoint Protection and is free from viruses.

/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATION REGARDING REDACTIONS

I, Hunter Labovitz, hereby certify on this 22nd day of April, 2019, that all the required privacy redactions have been made to the foregoing brief per Tenth Circuit Rule 25.5.

/s/ Hunter Labovitz
HUNTER LABOVITZ

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I, Hunter Labovitz, hereby certify on this 22nd day of April, 2019, that I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christopher J. Wilson, Attorney for Respondent
Jeffrey B. Kahan, Attorney for Respondent


/s/ Hunter Labovitz
HUNTER LABOVITZ